11 CIV 5443

## JUDGE MARRERO

## IN THE UNTIED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,
ex rel. Peter Belli,

       PLAINTIFF,

v.

ALLIED HOME MORTGAGE CAPITAL CORPORATION,

       DEFENDANT,



---

    Joseph C Bird
    Attorney for Relator, Peter Belli
    Mahany & Ertl
    573 Nakomis Trail
    Lake Orion, MI 48362
    (248) 909-4235

---

    Plaintiff, Peter Belli, as Relator, pursuant to Title 31, Section 3729 and 3730, as a

private person acting for the people of the United States and the United States

Government, through his attorney's, Mahany and Ertl and Joseph C Bird, alleges the

following against the Defendant:

1. Plaintiff is the United States of America ("United States"). Peter Belli and is

    the relator acting on behalf of the United States by filing this complaint.

    Plaintiff Belli is a resident of the State of Massachusetts.

1

2. Defendant Allied Home Mortgage Capital Corporation ("Allied") is a corporate entity organized pursuant to the law of the State of Texas. It is headquartered in Houston, Texas.

3. At all times relevant to this complaint, Allied was and remains in the business of providing a range of mortgage loan products, including government US government insured loans [HUD and FHA backed and certified in compliance with HUD and FHA regulations].

4. The department of Housing and Urban Development [HUD] is a cabinet department of the executive branch of the United States Government created in 1965 to administer the government's involvement in the mortgage industry including FHA mortgage insurance. The Federal Housing Administration is a separate agency, created in 1937 by Congress, to provide insurance on mortgage loans in order to encourage lenders to make mortgage loans.

5. Commencing in 1998, Belli was employed by Allied as a branch manager at several Allied offices throughout the country including: Milford, Massachusetts, Foxboro Massachusetts, Cranston, Rhode Island, Weirton, West Virginia, Kansas City, Missouri and Scottsdale, Arizona.

**JURISDICTION AND VENUE**

6. This Court has subject matter jurisdiction over this action pursuant to 31 USC Sect. 3732, 3729, 3730 and 28 USC 1331 and 1345.

7. This court has personal jurisdiction over the defendant as defendant transacts and/or during the relevant period, has transacted business in this District.

2

8. Venue is proper in this District under 31 USC Sect 3732(a) and 28 USC Sect 1391 (b) and (c) since defendant transacts and/or during the relevant period, transacted business in this District.

## FACTUAL ALLEGATIONS

9. Pursuant to Title II of the National Housing Act, 12 USC Sect 1701 et seq., the United States Department of Housing and Urban Development ("HUD") insures mortgage lenders against losses on loans to certain qualified borrowers seeking to purchase homes and subsequent refinancing of the original mortgage loans.

10. Allied was, at all relevant times, a direct endorsement mortgagee under the federal regulations implementing HUD's single family mortgage insurance programs. Allied provided mortgage loans to borrowers and obtained insurance from HUD on those loans.

11. As a direct endorsement mortgagee, Allied agreed to conduct its business pursuant to all applicable regulations concerning the operation of is branch offices as a condition of being eligible to offer HUD insurance on any loan to any borrower.

12. Allied also agreed to supervise and control its branch origination and lending practices.

13. As a condition to its status as a direct endorsement mortgagee eligible to offer HUD insured mortgage loans, Allied obligated itself to remain directly responsible for all branch operating expenses and losses, including rent, and to refuse to require or demand its branches or branch managers to enter into

office lease agreements on its behalf or to indemnify it against any liability for operating expenses at its branches.

14. These conditions to the ability of Allied to act as a direct endorsement mortgagee and obtain HUD insurance are contained in various HUD regulations governing branch operations, including Reg. 4060.1 REV-2, Mortgage Letter (ML) 00:15 and was certified by Allied to HUD and to the branch managers in HUD certification form 92001 B in which Allied certifies that each loan originated by each branch is in compliance with HUD 4060.1 REV-2 and that no branch manager is responsible for branch operating expenses. See attached form 92001-B.

15. Despite the fact that Allied's eligibility to act as a direct endorsement mortgagee for HUD and able to avail itself of HUD's insurance, Allied required its branches and branch mangers to execute employment agreements that directly violated these regulations by explicitly requiring branch mangers to enter into lease agreements for branch offices, pay the rent out of branch manager designated income, indemnify Allied for all operating expenses of the branch and/or agree to reimburse Allied if Allied paid any of these expenses.  See Exhibit 1, Belli 1998 Employment Agreement.

16. In 2000, HUD issued a notice to all certified lenders and brokers, including Allied, that requiring branch managers to be directly or indirectly responsible for branch operating expenses including branch office rent was an illegal net branch operation and a violation of prohibited branch practice regulations and

4

issued a directive to all lenders and brokers to cease and desist any such

activity. See Exhibit 2, ML 00-15 Letter.

17. While Allied could have charged its branch managers and branches a fee that

would allow it to pay the rent and other operating expenses from branch

income, it chose to charge a .03% fee rather than the industry average of .07%

to attract branch managers and expand its net branch operations. Instead,

Allied required its branch managers to take on direct and indirect liability for

all branch operating expenses, illegally withheld or deducted the operating

expenses from branch manger compensation, and thus prevented Allied from

liability for continuing operating expenses in the event of a branch closure, all

in violation of its certification to HUD and FHA.

18. Allied continued to offer mortgage loans to borrowers and act as a direct

endorsement mortgagee despite the warning to discontinue its net branch

operations and refused to bring its nationwide branch operating practices into

compliance with HUD regulations while continuing to originate loans backed

by HID and FHA insurance.

19. In 2001, HUD brought a Notice of Violation ("NOV") against Allied asserting

commission of prohibited branch practices by requiring indemnification from

its branch managers and by requiring branch managers to either enter into

branch office lease agreements or indirectly pay for the branch operating

expenses by deducting prohibited expenses from branch manager accounts in

violation of Allied's certification to HUD that branch managers were not

required to indemnify Allied and branch managers were not obligated to pay

for rent or other operating expenses [i.e. HUD required ongoing certification Allied was not operating an illegal net branch operation].

20. As a result of the NOV, Allied issued a new standard contract to all branch managers, titled Revised Branch Manager Employment Agreement, circa 2002, that "contemplated" continuing its illegal branch practices in violation of HUD regulations but which explicitly adopted HUD branch operating expenses requirements and excluded indemnity of Allied by branch managers. See Exhibit 3, 2002 Employment Agreement.

21. In August of 2003, Allied entered into a consent decree with HUD and promised that none of its branch manger agreements required indemnity or the direct or indirect payment of operating expenses, including branch office rent, reaffirming its obligation under each branch certification to HUD in form 92001-B. See Exhibit 4.

22. Despite the consent decree and settlement, Allied continued to require its branch managers to indemnify it for all branch operating expenses including rent and/or to execute the office leases in the name of the branch managers prohibited by HUD regulations.

23. The branch managers relied on the language in the revised employment agreements issued in the wake of the consent decree that it was legal for Allied to continue to require them to pay operating expenses. The agreements stated that Allied "contemplated" continuing requiring branch managers to pay rent and other operating expenses but referenced, generally, HUD regulations, but specifically did not mention 4060.1 REV-2 or ML 00:15. The

effect was to assure branch managers that nothing had changed so they would not object to rent and other operating expenses being deducted from their compensation but to include language in the agreement that appeared to comply with the 2003 HUD consent decree.

24. Through the revised employment agreements, Allied attempted to make it appear that it was lawful to operate its net branch practice by requiring its branch managers to be liable for rent and other operating expenses so they would not question Allied's practices but also cause it to appear to HUD that it was in compliance with its certifications in order to continue its net branch practices, avoiding the risks associated with true HUD certification compliance [branch office liability], increasing profits and net branch growth.

25. Through its fraudulent contracts with its branch managers, Allied remained certified and was able to continue to operate its illegal net branch operation in violation of certification requirements.

26. When questioned, Allied then asserted, falsely, that it was in compliance with regulations regarding branch operating expenses despite requiring branch managers to pay the expenses in violation of its various certifications. See Exhibit 5, Affidavit of General Counsel Joe James and Allied Is Not A Net Branch Company publication; and Exhibit 6, Letter from counsel to Belli branch landlord confirming it as Belli direct liability.

27. Allied became a "Super Broker" within the industry through this manipulation of HUD prohibited branch practices, growing its net branch operation through illegal deductions from branch manager compensation.

28. Allied's avoidance of HUD regulations which were a condition of its stated earnings certifications to HUD in order to be eligible for mortgage insurance allowed it to originate large numbers of loans that were issued as FHA and HUD complaint and insured. The total number of insured loans originated by Allied in violation of its certification exceeds 200,000.

29. Allied also used the combination of placing financial pressure on individual branch managers to find branch operations, securing a wide variety of lenders and investors by using false and misleading financial statements and encouraging branch managers to "look the other way" to create an atmosphere of lax credit standards and ignorance of underwriting standards and controls in favor of writing every loan possible.

30. One such practice was to submit multiple applications for borrowers and to cut and paste bank statements from different borrower's applications hiding the fraud in the high volume of applications.

31. The atmosphere of non compliance was evidenced by failing to conduct required post loan quality assurance compliance audits, failing to conduct true credit reviews relying on the non standard credit report, failing to supervise and train employees as to HUD standards for loan origination and underwriting standards including the use of cut and paste techniques that could be hidden in the high volume.

32. In 2006, Belli signed his new employment agreement. The 2006 Employment Agreement contained the "contemplated" continuation of the net branch practices but incorporated the general reference the HUD regulations on

prohibited branch operations. Belli, however, began asked questions of Allied compliance about what the contract language meant. His employment was terminated in July, 2007.

33. In 2008, Belli acted as an originator and contacted HUD concerning Allied's illegal activities and continued violation of prohibited branch operating procedures, including ML 00:15 and HUD certification form 92001-B, both which prohibited Allied from requiring its branch mangers from executing leases or otherwise being directly or indirectly responsible for branch operating expenses.

34. As a result, HUD, through the offices of the Inspector General, conducted an audit of one of the branches previously operated by Belli. Each of the five (5) branch offices audited was found not to be in compliance with HUD regulations. See 2009 OIG report, Exhibit 7.

35. The OIG report was based on an audit conducted from 2006-2008 stemming from Belli's tip, but did not capture the use of the Allied branch manager accounts by Allied to withdraw all operating expenses and in effect continue requiring complete indemnity by the braches of all operating expenses.

36. In order to be eligible for HUD insurance, which increases the value of a loan in the secondary mortgage market, Allied was required to certify to HUD that it operated its branches in accordance with HUD branch regulations. In order to be eligible to apply for and seek HUD insurance on any loan, Allied was required to be HUD complaint as to its branch operations.

37. As to each loan submitted to HUD by Allied for certification for insurance, Allied certified that it complied with all HUD regulations including branch office operating expense rules and regulations including close supervision of its employees at each branch.

38. Based on Allied's representations to HUD that it was in compliance with all HUD regulations as a condition of operating as a direct endorsement mortgagee, HUD certified Allied sponsored loans originated from all offices, including but not limited to those operated by the relators, HUD endorsed mortgage insurance on mortgage loans originated by Allied based on Allied's certification of compliance.

39. In fact, Allied continued to require its employees [branch managers]to pay for operating expenses and failed to train and supervise its employees on HUD standards, inviting the violation of loan underwriting standards while placing the risk of any loan default upon the US government. See for example, *US v Stafford*, _____ F 3d _____(6th Cir 2011), where Allied loan officers accepted knowingly false tax returns to support applications for loans as part of a mortgage fraud scheme.

40. Specifically, the insurance contract resulting from the approval of a loan from a HUD approved and certified lender, such as Allied, binds HUD and Allied to the statutory and regulatory provisions of the single family mortgage insurance program. The HUD insurance resulting from Allied's certifications and endorsements protects the lender, Allied, against losses arising from the mortgage loan. Assuming default on a loan, Allied may seek reimbursement

of all losses including unpaid principal, interest, all costs and including legal fees. The foreclosed property is conveyed to HUD and any additional expenses for the management and marketing of the property until sold are the obligation of HUD.

41. Allied's actions and operating procedures were and are in violation of HUD regulations designed to reduce risk to HUD and FHA for insured loans and eliminated the close supervisory control required by Allied over its branch operations by creating financial separation between it and its branches.

42. All mortgage loans originated by Allied from all of its nationwide branches from 1998 through January 2011, when Allied lost its certification due to a high default rate, that were HUD or FHA insured were originated and issued by Allied in violation of HUD and FHA branch regulations as well as HUD form 92001 B branch certifications issued by Allied to HUD as to each branch and its compliance with HUD regulations, including ML 00:15 (Exhibit 2) and Reg. 4060.1 Rev-2 and Form 92001. See Exhibit 8.

43. Allied, as a matter of corporate policy and procedure as well as a pattern and practice, systematically, knowingly and fraudulently certified to HUD that each of its branches was in compliance with branch operating expense, branch supervisory and training and other pertinent regulations from the HUD Mortgage Handbook, including but not limited to Reg. 4155.1 and .2, and as to all FHA or HUD insured loans originated by Allied through January of 2011, each and every such loan violated these certifications.

11

44. Allied misrepresented the nature of its operations as compliant with HUD regulations when in fact Allied violated HUD regulation 4060.1 REV-2, ML 00:15 and each and every certification 92001-B as a matter of policy and practice at every branch.

45. As a result, Allied sold it HUD and FHA backed mortgages to FREDDIE MAC, GINNIE MAE, FANNIE MAE and other entities for a premium, when in fact each non compliant loan was not entitled to a market premium because it was uninsurable due to non compliance with HUD certification.

46. In summary, Allied illegally operated a nationwide "net branch" operation that encouraged lack of institutional control and the origination of risky or non FHA and HUD compliant loans and was therefore disqualified from and ineligible to participate in HUD and FHA sponsored loans and insurance program.

47. Allied breached or violated the necessary certifications to offer HUD and FHA mortgage insurance, including HUD Mortgage Handbook Reg. 4060.1, REV-2, ML 00:15 and its separate branch specific 92001 B certifications of compliance and verification that branch managers are not responsible for office rent or operating expenses, an essential certification for submission of any mortgage insurance claim, as well as other Mortgage Handbook Reg's including 4155 by adopting a "common sense" standard as an alternative to true objective underwriting and origination standards.

48. Allied's actions constituted a fraud upon the United States and all of its involved agencies by certifying that its branch operations were in compliance

with HUD and FHA regulations when in fact they were not and Allied was therefore not certified to submit loans to HUD and FHA and receive mortgage insurance or certify those loans as compliant with government requirements and sell those loans at premium rates to GINNIE MAE AND FREDDIE MAC and FANNIE MAE, who paid Allied a market premium for government insured loans.

49. Specifically, as a matter of proximate causation, as to every loan originated by Allied and certified as compliant with HUD and FHA, the loan was fraudulent as to the United States. Thus, as to each and every loan default for which Allied submitted a claim to HUD or FHA [or the VA or other agency] for insurance, the claim was fraudulent since Allied did not comply with HUD and FHA regulations and the specific certifications of compliance with HUD Mortgage Reg. 4060-1 REV-2 as to financial capacity and branch manager non involvement in operating expenses in order to obtain the loan. Thus, the United States is entitled to be reimbursed for every claim submitted by Allied for an insured defaulted loan.

## I. FALSE CLAIMS ACT 31 USC Sect. 3729 (a) (1) ALLIED

50. Allied knowingly presented, or caused to be presented, to an officer or employee of the United States a false of fraudulent claim for payment or approval [i.e. fraudulent claims for payment and fraudulent certification of compliance and eligibility to originate FHA and HUD loans].

13

51. Specifically, Allied certified to HUD and FHA that it was in compliance with all HUD regulations as a condition to every mortgage insurance claim and as to each and every loan originated and certified as HUD and FHA complaint and eligible for mortgage insurance.

52. Despite promising compliance with HUD Mortgage Reg. 4060.1 REV-2 in multiple certifications to HUD and the FHA, including in each specific branch office's form 92001-B, Allied omitted advising HUD and FHA that it required its branch managers to be financially responsible, directly and indirectly, for branch operating expenses including but not limited to branch office rent.

53. Allied's false certifications caused HUD and FHA accept Allied loans as eligible for FHA and HUD insurance, to charge a market premium on the sale of each loan and ultimately caused the United States to pay mortgage insurance claims that were not eligible for insurance. These consequences were both a necessary and foreseeable consequence of violation of certification and a substantial factor in bringing about the filing of false mortgage insurance claims.

54. By virtue of the false or fraudulent claim, the United States has suffered damages under the False Claims Act, to be determined at trial, plus a civil penalty for each such false or fraudulent claim.

## II. FALSE CLAIMS ACT 31 USC Sect. 3729 (a) (2) ALLIED

14

55. Allied knowingly made, used or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States.

56. Specifically, Allied certified to HUD and FHA that it was in compliance with all HUD regulations as a condition to every mortgage insurance claim.

57. Despite promising compliance with HUD Mortgage Reg. 4060.1 REV-2 in multiple certifications to HUD and the FHA, including in each specific branch office's form 92001-B, Allied omitted advising HUD and FHA that it required its branch managers to be financially responsible, directly and indirectly, for branch operating expenses including but not limited to branch office rent.

58. Allied's false certifications caused HUD and FHA accept Allied loans as eligible for FHA and HUD insurance, to charge a market premium on the sale of each loan and ultimately caused the United States to pay mortgage insurance claims that were not eligible for insurance. These consequences were both a necessary and foreseeable consequence of violation of certification and a substantial factor in bringing about the filing of false mortgage insurance claims.

59. By virtue of the false record or statement, the United States has suffered damages and is therefore entitled to multiple damages under the False Claims Act, to be determined at trial, plus civil penalty for each such false or fraudulent claim.

### III. BREACH OF CONTRACT

60. By virtue of its participation in the mortgage lending programs sponsored by

HUD and FHA as described above, Allied and the United States had a contractual relationship that incorporated all the requirements and regulations of HUD and FHA relating to mortgage branch operations and branch operating expenses, which were all a condition of HUD and FHA certification.

61. Allied breached the contractual relationship and violated the express conditions for eligibility to participate in HUD and FHA sponsored mortgage lending programs and insurance by violating branch operating regulations, adopting prohibited branch procedures including but not limited to requiring its branch managers to be directly or indirectly responsible for branch operating expenses including but not limited to rent for branch office space.

62. As a direct and proximate result of Allied's illegal net branch practices, an environment of non compliance was created at each net branch due to lack of close supervisory control, causing the origination of risky and non compliant mortgages.

63. As a direct and proximate result of Allied's false certifications, a necessary and foreseeable consequence was the filing of false and fraudulent mortgage insurance claims and non complaint loan applications which were falsely certified as compliant, the United States has suffered damages, the amount of which is to be determined at trial.

## IV. UNJUST ENRICHMENT

16

64. This is a claim for the recovery of monies by which Allied has been unjustly enriched which includes the profits earned by Allied from the sale of HUD and FHA approved loans, originated by Allied, in the secondary mortgage market and monies recovered by Allied on defaulted loans pursuant to HUD and FHA mortgage insurance on loans originated by Allied.

65. As a result of Allied's wrongful conduct, Allied has and continues to maintain control over monies to which it is not entitled.

66. By maintaining control over monies to which it is not entitled. Allied is unjustly enriched, and is liable to account for any pay such amounts or the proceeds therefrom, to be determined at trial, to the United States.

### V. FRAUD

67. Allied knowingly and intentionally made or caused to be made false statements of material facts to the United States with knowledge that the statements were false and with the intent to deceive the United States and upon which statements the United States reasonably relied to its detriment and injury.

68. In reliance on the false statements made by Allied, the United States has suffered damages, the amount of which is to be determined at trial.

Wherefore, Relator demands and prays on behalf of the United States that judgment be entered in their favor against Defendant, that damages be determined, assessed against Defendant and awarded to Plainitff's and that the court order such further relief as the court deems just and proper.

**THE RELATOR DEMANDS A TRIAL BY JURY ON ALL COUNTS AND ON ANY AND ALL DEFENSES.**

05/12/2011


Respectfully Submitted,

Joseph C Bird, Mahany & Ertl,

Counsel for Relator Peter Belli
Mahany & Ertl
573 Nakomis Trail
Lake Orion, MI 48362
(248) 909-4235

%JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
UNITED STATED OF AMERICA, EX. REL. PETER BELLI

## DEFENDANTS
ALLIED HOME MORTGAGE CAPITAL CORPORATION

**(b)** County of Residence of First Listed Plaintiff **WORCESTER**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant **HARRIS**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Joseph C. Bird, Esq. Mahaney & Ertl, 573 Nakomis Trail, Lake Orion WI
248-909-4235

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☒ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / Med. Malpractice | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & / ☐ 365 Personal Injury - Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander / ☐ 368 Asbestos Personal Injury Product | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine / **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability / ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle / ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability / ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury / ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☒ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting / ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment / **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations / ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare / ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights / ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
31 USC 3729
Brief description of cause:
VIOLATION OF VARIOUS STATUTES

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE **JUDGE NANCY GERTNER**
DOCKET NUMBER **CIVIL NO. 10-11766-NG**

DATE 05/13/2011

SIGNATURE OF ATTORNEY OF RECORD /S/ JOSEPH C. BIRD

FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

# Exhibit 1

OCT-05-98 MON 11:47 AM                          FAX NO.                          P. 01

## EMPLOYMENT AGREEMENT
### (Branch Manager)

THIS AGREEMENT is made __OCT. 6__, 199 8, between ALLIED MORTGAGE CAPITAL CORPORATION ("Employer"), and __PETER M. BELLI__
("Employee").

### ARTICLE I

### TERM OF EMPLOYMENT

1.1. Employer hereby employs Employee, and Employee hereby accepts employment with Employer. *Employer and Employee agree that this employment shall be at will and is subject to termination by either Employer or Employee at any time, for any reason, with or without cause or notice other than required by law.*

### ARTICLE II

### DUTIES OF EMPLOYEE

2.1. Employee is hereby employed as a Branch Manager for Employer, and as such, shall actively solicit, originate, negotiate, secure, process, and administer the closing of loans as specifically directed by Employer, and shall perform any other duties requested by Employer.

2.2. Employee shall devote Employee's entire productive time, ability, and attention to the business of the Employer during the term of this Agreement. Employee shall not directly or indirectly render any services of a business, commercial or professional nature to any other person or organization, whether for compensation or otherwise, without the prior written consent of Employer.

2.3. Employee shall have the sole responsibility for profitability of the branch office staffed by Employee. This responsibility shall include, but not be limited to, the profitability of the branch office. In this regard, Employee's compensation shall be solely based upon the profitability of that branch office. All expenses of the branch shall be charged against the compensation as set forth in Article III of this Agreement. Such periodic commissions shall be paid to Employee only to the extent they exceed the projected expenses of the branch office for the next ensuing thirty (30) days (required reserves) after payment of such commissions and payroll. Such projected expenses shall be prepared by Employer, furnished to Employee in writing, and approved in writing by Employee as the basis for computing payment of such commissions. In the event expenses exceed those projected, an amount equal to the excess of such expenses shall be deducted from the next commission check that would otherwise be payable to Employee in addition to the regularly scheduled deduction for the projected expenses for the next ensuing thirty (30) days.

Such expenses shall include, but not be limited to, office space, telephones, facsimile machines, equipment, supplies, advertising, payroll expenses, and insurance. All such expenses and financial obligations shall be regularly administered in the normal course of Employer's business, by Employer performing the bookkeeping and issuing checks on such obligations, all of which shall be accounted for to Employee in periodic written reconciliation of Employee's profit center and total compensation. Employee shall not have the authority to charge any expenses to Employer without written approval of Employer. In the event Employee uses Employee's automobile in connection with such employment, liability insurance shall be provided on such automobile with Employer shown as an additional insured. This liability insurance coverage shall be in sufficient amounts to satisfy and comply with the laws of the state in which the branch is located. Employee shall furnish Employer with evidence of such coverage. Employee shall have the sole responsibility for all other reasonable and customary business expenses desired to be incurred by Employee in the course of Employer's business in excess of those approved in writing by Employer, and may deduct such expenses as is provided by the Internal Revenue Code. Employee shall immediately provide Employer with copies of all documentation reflecting any agreements as well as maintain copies at the branch office for which Employee is responsible. All records and documentation of Employer's of any kind whatsoever are the property of Employer and shall not be removed from the office by Employee. Employer shall promptly pay all bills for items previously approved by Employee, enumerated above

OCT-05-98 MON 11:47 AM                    FAX NO.                    P. 02

up to the total cash available to the Branch less the agreed upon reserve amount, subject to the billings for such being promptly submitted to Employer.

2.4.   It is specifically understood and agreed that Employee shall have no authority to act on behalf of, or to bind Employer with respect to any contract or agreement unless Employee has first been otherwise so authorized in writing by one of the following officers of Allied Mortgage Capital Corporation

| | |
|---|---|
| Jamey Hodge | President |
| Jeanne Stell | Vice President |
| Don Strouse | Senior Vice President |

Employee agrees to defend, indemnify and hold Employer harmless in the event that a third party pursues any claims or causes of action against Employer based upon an agreement made by Employee which said third party claims to be binding upon Employer. This agreement to defend and indemnify Employer includes a duty to pay the reasonable attorneys' fees of an attorney selected by Employer to defend Employer concerning such a claim.

2.5.   Employer shall approve all advertising and advertising copy, prior to such advertising being placed or distributed

2.6.   Employer shall promulgate all forms and documents used by Employee.

2.7.   Employee shall have all appropriate licenses required by state law and shall be responsible for paying all license fees and license audit fees, if any are required, in a timely manner.

2.8.   All monies received by Employee for Employer or to be held for others shall be made payable to Employer and received in trust by Employee for Employer and delivered immediately to Employer. Employee shall open no bank accounts in Employer's name.

2.9.   Employee shall comply with all governmental laws and regulations and with Employer's rules, regulations, and policies as set forth in Employer's policy manuals and otherwise. Employee shall not charge any customer any fees in excess of that allowed by RESPA or any other applicable regulations. Employee is responsible to have a complete and thorough knowledge of all of such requirements of HUD, the Veterans Administration, and/or FNMA or FHLMC. Each branch shall have available, as required by these agencies, a complete set of guidelines either in hard copy or on AllRegs

2.10.  If Employee enters into an agreement as a principal involving the purchase or sale of real property, or involving the obtaining or making of a loan on real property, Employee shall make a written disclosure of the fact of such purchase or sale or loan to the Employer within five (5) days from the execution of the agreement or before the closing of the transaction, whichever occurs first. All loans for an employee shall be processed in the Corporate office, and under no circumstance will an employee loan be processed at branch level.

2.11.  Employee shall be responsible for the collection of fees to be used to pay appraisals, credit reports, and long distance phone calls. Should Employee order any appraisal, credit report, or make any other charges to Employer prior to actual collection of the fees, Employee understands and agrees that Employee is financially responsible for the payment of such fees to Employer. Employee hereby agrees that said fees, if not collected by Employee when due, will be reimbursed to Employer by deduction from Employee's compensation. Accounting detail of any such deduction shall be furnished Employee at time of deduction.

2.12.  Employee shall have the authority to lock loan rates with any investor and/or any borrower for a period of sixty (60) days, or for a longer period of time if written confirmation of such longer lock period is obtained by Employee, without collecting a fee from the borrower or paying a fee to the investor. Employee SHALL NOT approve any loan for closing, make or issue any loan commitment, other than lock in loans with investor and lock in loans with borrowers, enter into any agreement to bind Employer, or quote interest rates, terms, or loan discounts other than those published and in effect in accordance with daily rate sheets of Employer or any other approved investor to whom the loan is sold and delivered. All loan files, whether the loan rate is locked by Borrower and Employer or not, must have a signed loan lock/float sheet signed by the Borrower at the time of loan application in the form set forth on Exhibit "A".

2.13. Employee does not have the authority to issue forward loan commitments for a commitment fee of one percent (1%) of the loan amount on proposed construction to borrowers whose credit has been approved. The Corporate office upon receipt of the 1003, the underwriter approval sheet and the branch request for such commitment will issue all forward commitments. The commitment letter will be issued within 24 hours of receipt of such request. Such loan commitments shall also be subject to reverification of appraisal, income, and credit factors at time of closing of the loan. Employee shall earn and be paid by Employer 0.70% of the one percent (1%) loan commitment fee collected for such commitments after deduction by Employer of 0.30% of the loan amount up to the FNMA/FHLMC conforming loan limit of each commitment on such commitments issued by Employer. If Employee issues such a loan commitment on any loan committed by an investor other than Employer, Employee shall earn and be paid by Employer the portion of the loan commitment fee collected for such commitment after deduction by Employer of any amount of the commitment fee required by the investor plus 0.30% of the loan amount to be retained by Employer.

2.14. Employee shall have the authority to originate sub-prime loan product for sale to investors approved by Allied Mortgage Capital Corporation. Employee further agrees to indemnify Employer against any loss due to premium Rebate Recapture and/or Section 32 High Cost Mortgage penalties as follow:

(A)    Premium Rebate Recapture for Sub-prime Loans.

1.    The definition of a Sub-prime loan shall be as follows: Any loan not conforming to Standard Agency Guidelines i.e. FHA, VA, Fannie Mae and Freddie Mac or deemed to be such per Employer at time of Underwriting.

2.    Recapture Term and recitals: Any loan originated, processed by Employee and closed And funded using Employers Warehouse lines for such transaction, shall be subject to the following Premium Recapture Provision. If a Loan is prepaid within 12 months from the date of purchase and Employee has received a premium over par for the Loan, or the Employer has received a premium from one of the Employers Correspondent relationships (Correspondents) on behalf of Employee to account for Employers Profit Margin on said Loan, the Employee shall repay Employer that portion of such premium paid Employee or paid to Employer on behalf of Employee within ten days from written demand. The portion of the premium to be repaid shall be: (a) 90% if prepayment occurs within 3 months of the date the Loan was purchased : (b) 75% if prepayment occurs more than 3 months but not more than 6 months from the date the Loan was purchased; (c) 50% if prepayment occurs more than 6 months but not more than 9 months from the date the Loan was purchased; (d) 25% of prepayment occurs more than 9 months but not more than 12 months from the date the Loan was purchased. The portion of the premium to be repaid shall be further reduced by a prepayment penalty collected by Employer or its Correspondents.

(B)    Indemnification Section 32 High Cost Mortgages

1.    Employee agrees to protect, indemnify, and hold Employer, its officers and directors harmless against, and in respect of, any and all losses, liabilities, costs and expenses ( including reasonable attorney's fees), judgments, damages, claims, counterclaims, demands, actions or proceedings, by whomsoever asserted, including but not limited to, the Borrowers, against any person or persons who prosecute or defend any actions or proceedings as representatives of or on behalf of a class or interested group, or any governmental instrumentality, body, agency, department or commission, or any administrative body or agency having jurisdiction pursuant to any applicable statute, rule regulation, order or decree, or the settlement or compromise of any of the foregoing, providing, however, any of the foregoing arises out of, is connected with or results from any breach of representations, covenants or warranties made by Employee in relation to Loans originated as Section 32 High Cost Mortgages

2.    The waiver of any breach, term, provision or condition of this Agreement shall not be construed to be a waiver of any other or subsequent breach, term, provision or condition.

OCT-05-98 MON 11:49 AM                          FAX NO.                              P. 04

All remedies afforded by this Agreement for a breach hereof shall be cumulative; that is, in addition to all other remedies provided for herein or at law or in equity

2.15 Employee shall indemnify and hold Employer and its parent, subsidiaries, and affiliated corporations, and their respective officers, directors, agents, employees, and insurers (collectively referred to herein as "Allied") harmless from and against any and all claims, losses, damages, fines, penalties, causes of action, suits, and liability of every kind, including all expenses of litigation, court costs and attorneys' fees arising on account of (1) any misconduct or misrepresentation made by Employee, Employee's agents, employees, representatives, officers, directors, beneficiaries, successors, and assigns, (2) any violation of this Agreement, and (3) any personal injury, death, property damage, civil liability, or fines or penalties imposed by any state or federal regulatory agency caused, in whole or in part, by the actions or conduct of Employee, Employee's agents, employees, representatives, officers, directors, beneficiaries, successors, and assigns. Employer shall provide errors and omissions insurance coverage as required by law and provide all required HUD audits and escrow and for general ledger accounting.

2.16      During time of employment and/or upon termination, Employee agrees that he/she will refrain from using the name "Allied" in any business ventures for a period of ten (10) years.

## ARTICLE III

### COMPENSATION

3.1.  As total compensation for services rendered under this Agreement, Employee shall be entitled to receive from the Employer the following:

- (1)    Employee shall earn and receive on each loan closed, an amount equal to the "Wholesale Pricing" premium, if any, as quoted from time to time by Allied Mortgage Corporation in its daily pricing sheets or any other company that Employer is approved to sell loans to and to which a loan is closed and sold to, plus any fee income net of expenses paid out by Employer. The sums payable pursuant to this subparagraph shall be paid once each month on the fifteenth day of each month for loans funded through the last day of the preceding month. However, such payment shall only be made to Employee to the extent that it is payable in accordance with 2.3 above after deduction for amounts chargeable to Employee.

- (2)    Employee shall be entitled to earn and receive forward loan commitment fees on the terms and conditions set forth in 2.12 above

- (3)    Employee shall be eligible for enrollment in Employer's medical insurance plan, 401K plan, or other retirement plan as each may be in effect from time to time during Employee's employment. The cost of such to be deducted from Employee's gross commissions. If the employee does not have funds in the branch account to cover medical insurance premiums, employee is responsible for remitting funds to Employer to cover said premiums.

- (4)    Employer shall withhold Social Security FICA, income tax withholding, and any other withholding from Employee's commissions as required by law for such.

3.2.  Employer shall pay to Employee all the above fees on each loan closed except for 0.30% up to the FNMA/FHLMC conforming loan limit on each loan closed, whether by Employer or a third party lender, subject to the provisions of 2.3 above, Employee being specifically authorized to place any loan to be closed with an approved lender of Employee's choice. Said payment shall be paid once each month on the fifteenth day of each month for loans funded through the last day of the preceding month. Employer is specifically authorized to pay itself the amounts due each month from Employee by deducting the sum from amounts due Employee in this article. In addition, Employer may from time to time, in Employer's sole discretion, require that a portion of the

OCT-05-98 MON 11:50 AM                         FAX NO.                          P. 05

compensation, although earned by Employee, be held in a reserve account for future possible losses or expenses incurred by Employee.

3.3 Thirty One Hundredths percent (0.30%) of the loan amount up to the FNMA/FHLMC conforming loan limit in connection with any loan commitment fee or fee for locking a loan rate shall be retained by Employer with any amount in excess of thirty hundredths percent (0.30%) plus any cost charged by the end investor to secure the quoted rate, credited as additional compensation or commission to Employee.

3.4 Upon termination of employment, for any reason, Employee shall be paid, less any repayable advances and all other monies owed to Employer, for all loans actively solicited, originated, and processed by Employee which are approved prior to the Employee's termination date if and only if actually funded within thirty (30) days of termination. With regard to such loans at time of termination, Employee will be paid a commission of one-half (0.50%) percent of the loan amount only if the loan is actually funded within thirty (30) days. Said payment to Employee to be paid only after any funds that may be owed by Employee to Employer are paid by Employee to Employer or at Employer's option, after the deduction by Employer of any such amounts still due Employer by Employee. Employer may deduct such amounts from any payments due to Employee which payments shall be made as soon as Employer can reasonably reconcile the accounts of Employer and Employee.

3.5. The terms of any Employee draw or advance other than set forth in 3.1(1) above shall be in writing, signed by Employer and Employee and attached as an exhibit hereto and evidenced by an advance note in the form attached hereto as Exhibit "B". No draw or advance may be made until the advance note is executed and in the possession of Employer. The draws and advances, if any, shall be reimbursed to the Employer from future earnings of the Employee. If the Employee terminates prior to the reimbursement of Employee's draw from earnings, Employee shall reimburse the Employer for the balance of such draw within ninety (90) days of said termination.

## ARTICLE IV

## DOCUMENTS & PERSONNEL

4.1. Employee, during the term of employment under this Agreement will have access to and become familiar with various company terms, forms, procedures and records, which are owned by Employer and which are regularly used in the operation of the business of Employer. Employee shall not disclose, nor reproduce, any of the aforesaid company forms, procedures, or records, nor use them in any way during the term of this Agreement, except as required in the course of Employee's employment, and at no time thereafter. All files, records, documents, drawings, specifications, proprietary information, and similar items relating to the business of Employer, whether prepared by Employee or otherwise coming into Employee's possession, shall remain the exclusive property of Employer and shall not be copied or removed from the premises of Employer under any circumstances whatsoever without the prior written consent of Employer.

4.2. During the term of this Agreement, Employee shall not, directly or indirectly in any manner, either as an Employee, Employer, Consultant, Agent, Principal, Partner, Stockholder, Corporate Officer, Director, or in any other individual or representative capacity, engage or participate in any business competing in any manner whatsoever with the business of Employer.

4.3 During the term of Employee's employment and upon termination of employment by Employee or Employer, and for a period of one (1) year thereafter, Employee shall not;(1) either directly or indirectly, interfere with the business of Employer, nor shall Employee solicit, attempt to hire or hire any other personnel or employees of Employer or any of its subsidiaries or affiliates, except for Employees working in the branch office of Employee without written approval of Employer, and;(2) shall not transact any business nor sell any loans to any of Employer's Investors, and (3) following termination shall not solicit the transfer of files to another company by any customer or prospective customer of Employer. The identity and all information obtained is confidential information and is the sole property of the Employer. All client lists obtained or prepared during the term of employment are the sole property of the Employer.

OCT-05-98 MON 11:51 AM                          FAX NO.                          P. 07


## ACKNOWLEDGEMENT

STATE OF _Mass_ )
                     ) ss.
COUNTY OF _Worcester_ )

This instrument was acknowledged before me on this __6__ day of __October__, 199_8_.
by _Peter M. Bell_

Witness my hand and official seal.

My commission expires: _5/22/2000_

_____
Notary Public in and for the
State of ~~Texas~~ _Massachusetts_


STATE OF TEXAS            )
                          ) ss
COUNTY OF _Harris_ )

This instrument was acknowledged before me on this _12th_ day of _October_, 199_9_, by
_____, as _____ of Allied Mortgage Capital Corporation

Witness my hand and official seal

My commission expires:

_____
Notary Public in and for the
State of Texas

SANDRA E. CROGHAN
MY COMMISSION EXPIRES
May 12, 2001

f:\home\richard\empagront.doc
4/8/1998
BRANCH

OCT-05-98 MON 11:50 AM        FAX NO.        P. 08

### ARTICLE V

#### GENERAL PROVISIONS

5.1 Employer and Employee agree to submit to final and binding arbitration any and all disputes, claims (whether in tort, contract, statutory, or otherwise), and disagreements concerning the interpretation or application of this Agreement and Employee's employment by Employer and the termination of this Agreement and Employee's employment by Employer including the arbitrability of any such controversy or claim, provided, however, notwithstanding the foregoing and in no event shall any dispute, claim, or disagreement arising under Article IV of this Agreement be admitted to arbitration pursuant to this Section 5.1 or otherwise. Any such dispute, claim, and disagreement subject to arbitration pursuant to the terms of this Section 5.1 shall be resolved by arbitration in accordance with the Employment Dispute Resolution Rules ("Arbitration Rules") of the American Arbitration Association (the "AAA") in effect at the time of arbitration. Arbitration under this section must be initiated within sixty (60) days of the action, inaction, or occurrence about which the party initiating the arbitration is complaining. The AAA will select a neutral arbitrator pursuant to rules of the AAA Arbitration Rules, as those rules may be amended from time to time. Employee and Employer agree that the decision of the AAA regarding the arbitrators selected hereunder will be final and binding on both parties. The parties agree that a judgment of a state or federal court with jurisdiction over the parties hereto may be entered upon the award made pursuant to the arbitration.

5.2 This Agreement supersedes any and all other agreements, either oral or in writing between the parties hereto, with respect to the employment of Employee by Employer and contains all of the covenants and agreements between the parties with respect to such employment in any manner whatsoever. *This Agreement may not be modified except in writing signed by both Employer and Employee.*

I HAVE READ, FULLY UNDERSTAND, AND ACCEPT THIS AGREEMENT AND ALL EXHIBITS ATTACHED THERETO HAVE RECEIVED A COPY OF THIS AGREEMENT FOR FUTURE REFERENCE PURPOSES.

Date: _OCT 6, 1998_        _____
                                   Employee

ACCEPTED:

                         ALLIED MORTGAGE CAPITAL CORPORATION

Date: _10·12·99_     By _____
                                  Vice President

# Exhibit 2

**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, D.C. 20410-8000

May 1, 2000

OFFICE OF THE ASSISTANT SECRETARY
FOR HOUSING-FEDERAL HOUSING COMMISSIONER

Mortgagee Letter 00-15

To:     ALL APPROVED MORTGAGEES

Subject:     Prohibited Branch Arrangements

It has come to the Department's attention that some HUD/FHA approved mortgagees are engaging in prohibited types of "branch office" arrangements. There have been growing numbers of arrangements referred to as "net branches." Some of these are allowable and some are not. This reflects the fact that the industry does not have a universal definition for the term "net branch." Accordingly, this letter provides further guidance and clarification regarding the Department's requirements for branch offices of HUD/FHA approved mortgagees.

The Department has learned that some HUD/FHA approved mortgagees are engaged in the practice of taking on an existing, separate mortgage company or broker as a branch and allowing that separate entity to originate insured mortgages under the approved mortgagee's HUD Mortgagee Number. Some mortgagees refer to this arrangement as a "net branch." This, however, constitutes a prohibited net branch arrangement. The Department has also noted advertisements in trade publications touting such prohibited "net branching" arrangements as a way for independent brokers to originate FHA mortgages without meeting HUD's application and asset requirements.

Paragraph 1-2 of the Mortgagee Approval Handbook 4060.1 Rev-1 specifies that HUD/FHA insured mortgages may only be originated, serviced, purchased, held, or sold by mortgagees that have been approved by HUD/FHA. Approved mortgagees are permitted to conduct such activities from branch offices. However, separate entities may not operate as "branches" of a HUD/FHA approved mortgagee and if the separate entity lacks HUD/FHA approval, its mortgages constitute third party originations which violate Departmental requirements. If the separate entity was purchased and merged into the approved mortgagee in compliance with applicable state law(s), the approved mortgagee must provide a copy of the merger documents and state license(s) to HUD's Lender Approval and Recertification Division, 451 Seventh Street SW, Room B133-P3214, Washington, DC 20410.

In contrast to the arrangements described above, another common example of a net branch arrangement is one wherein the branch manager's compensation is based upon the "net" profit of the branch. The HUD/FHA approved mortgagee collects the revenue from the branch, pays the branch expenses, and then pays the branch manager the remaining revenues, if any, as a commission. Such an arrangement is, essentially, an alternative compensation program for the branch manager and is an acceptable branch arrangement if all other branch requirements are met.

2

Paragraph 2-17 of the Mortgagee Approval Handbook 4060.1 Rev-1 requires a HUD/FHA approved mortgagee to pay all of its operating expenses including the compensation of all employees of its main and branch offices. Other operating expenses that must be paid by the HUD/FHA approved mortgagee include, but are not limited to, equipment, furniture, office rent, and other similar expenses incurred in operating a mortgage lending business. Thus, the distinction between an acceptable and unacceptable alternative branch compensation plan is not whether the manager's or any other employee's compensation is related to the profits generated by the branch. Rather, it is whether the operating expenses are paid by the HUD/FHA approved mortgagee. If the expenses are paid by the HUD/FHA approved mortgagee, the arrangement is acceptable. If, however, the expenses are paid by the branch manager from a personal or non-mortgagee account (or by some third party), the arrangement is prohibited and a true branch does not exist.

As part of on-site mortgagee monitoring reviews, the Department has obtained "employment" agreements executed by HUD/FHA approved mortgagees and their "net branches." A number of the provisions in these agreements violate Departmental branch requirements. For example, there are provisions that:

o   require all contractual relationships with vendors such as leases, telephones, utilities, and advertising to be in the name of the "employee" (branch) and not in the name of the HUD/FHA approved mortgagee.

o   require the "employee" (branch) to indemnify the HUD/FHA approved mortgagee if it incurs damages from any apparent, express, or implied agency representation by or through the "employee's" (branch's) actions.

o   require the "employee" (branch) to issue a personal check to cover operating expenses if funds are not available from an operating account.

These provisions violate Paragraphs 1-2, 2-13, 2-17, and 3-2B of the Mortgagee Approval Handbook 4060.1 Rev-1. Taken as a whole, such provisions seem designed to maintain a clear separation between the HUD/FHA approved mortgagees and their so-called "branches," which is inconsistent with the close supervisory control over all employees mandated by the handbook.

The Department believes that the origination of insured mortgages by lenders that have not received HUD/FHA approval increases the risk to the FHA insurance funds and to the public. Accordingly, mortgagees found to be in violation may be subject to the full range of HUD sanctions.

Sincerely,

William C. Apgar
Assistant Secretary for Housing-
Federal Housing Commissioner

# Exhibit 3

**THIS EMPLOYMENT AGREEMENT IS SUBJECT TO ARBITRATION.
BY SIGNING THIS EMPLOYMENT AGREEMENT, YOU ARE WAIVING
YOUR RIGHT TO A JURY TRIAL FOR CERTAIN CLAIMS.
PLEASE READ CAREFULLY.**

## EMPLOYMENT AGREEMENT
### (Branch Manager)

THIS EMPLOYMENT AGREEMENT ("Agreement") signed this _____ day of
_____, 200___ ("Effective Date"), by and between ALLIED HOME MORTGAGE
CAPITAL CORPORATION, a Texas Corporation ("Employer"), and
_____ ("Employee").  Unless otherwise provided herein,
Employer, as defined above, shall mean both ALLIED HOME MORTGAGE CAPITAL
CORPORATION and any such successor(s) or assign(s) that assumes and agrees to
perform this Agreement, by operation of law or otherwise.

**Employment.**  On the terms and subject to the conditions of this Agreement, Employer
hereby employs and engages the services of Employee to serve as, and Employee
agrees to diligently and competently serve as, and perform the functions of Branch
Manager.

**Term.**  Employee and Employer agree that this employment shall be "at will" and that
this Agreement does not contain or constitute a guarantee of employment for any
specific period.  At any time and for any reason, Employer may terminate Employee's
employment with or without cause or notice other than as required by law.  Employee
may resign or terminate his/her employment, but acknowledges that, if he/she resigns,
the Employer will need a certain period of time to locate a replacement.  Accordingly,
Employee will give at least two week's notice prior to resignation, however, Employer,
at its absolute discretion, may instruct Employee to leave earlier, and if so instructed,
Employee shall do so and his/her employment shall end as of such earlier date
designated by Employer.

**Scope of Employment.**  Employee shall have the duties and responsibilities associated
with the position of Branch Manager.  Employee shall be responsible for operating a
branch office, including but not limited to, originating, negotiating, securing, processing
and administering the closing of loans as directed by Employer and shall perform any
other duties set forth herein or requested by Employer.  As a Branch Manager,
Employee shall be responsible for managing the day-to-day operations of the branch
office where Employee is employed.  Employee shall be responsible for ensuring that
such branch office complies with all applicable federal, state and local statutes and
regulations, and Employer's policies, procedures and programs.

Employee is not authorized, absent prior written approval by Employer, to engage in or
perform any act or action contrary to company policies or procedures, including without
limitation: (i) to make or issue any loan commitment (other than lock loans with investor
and lock loans with borrowers in accordance with company policies and procedures); (ii)
to enter into or make (a) employment agreements, (b) lease agreements, (c) banking or
financial arrangements or agreements, such as business loans or lines of credit, (d)
purchases in excess of $1,000.00 in the aggregate during any calendar month, (e)
agreements for the purchase or lease of office equipment; (iii) to issue forward loan
commitments, (Employer will issue, subject to its sole discretion, all forward loan

commitments in accordance with company policies and procedures) (iv)  to place any advertising  in any medium; (Employee agrees and acknowledges that he or she is prohibited from placing or running any advertising in the name or for the benefit of Employer or a branch office without prior written approval), (v) to use the name "Allied" except in connection with Employer's business and, under all circumstances  is not authorized to use the name after termination or (vi) to hire or fire any personnel employed in the branch office.

Employee further agrees and acknowledges that he or she will not open, attempt to open, operate or attempt to operate, any bank account in Employer's name, or any similar name  and that all monies received by Employee for Employer or on Employer's behalf are funds of Employer and will be made payable to Employer and all such monies are held in trust and shall be delivered immediately to Employer, all in accordance with company policies and procedures.

**Compensation:** As and for compensation as a Branch Manager, Employer shall pay Employee a Commission equal to the Net Profit of the branch managed by Employee, subject to all applicable laws, rules and regulations, including without limitation, RESPA, HUD regulations and mortgagee letters  and state law restrictions.  Net Profit, as contemplated herein  shall be calculated as follows  Gross Revenues from loan originations  minus all Branch Operating Expenses.  Gross Revenues shall mean all monies earned through originating  negotiating, securing, processing and administering the closing of mortgage loans directly attributable to the operations of the branch office during the applicable period, computed as follows  an amount  equal to one of the following (at the choice of Employer depending on the type of loan), (i) the "Wholesale Pricing Premium," (ii) the forward loan  commitment fee collected, or (iii) the fee for locking a loan rate  if any, up to the FNMA/FHLMC conforming loan limit on each loan closed, in each case less any investor charges or fees, and less thirty (30) basis points of the loan amount.  The "Wholesale Pricing Premium" is the rate above par value of the loan as quoted by Employer in its daily pricing sheets, or as determined by any other company with which Employer is approved to sell loans and through which such loan is closed.  Branch Operating Expenses shall mean all expenses and fees actually incurred by the branch office from operations during the preceding calendar month.  Branch Operating Expenses are contemplated to include, but may not be limited to, branch salaries and payroll expenses, the branch office lease payment telephone charges, long distance  facsimile costs, equipment purchases and fees, supplies, advertising insurance, association or license fees, government license fees, audit fees  accrued expenses and amounts specified in the Employer's policies and procedures  which items  in each case, are permitted under applicable HUD regulations and mortgagee letters.

Employee shall be paid the Commission less all applicable taxes  including FICA and Social Security, and appropriate withholdings.  Commissions will be paid when earned on the 15th and last day of each month.

**Benefits.**  Employee shall be eligible for enrollment in Employer's medical insurance plan  dental insurance plan  401K plan and/or other retirement plan as each may be in effect from time to time during Employee's employment, the Employer's cost of such to be included in the Branch Operating Expenses.

**Termination.** Upon termination of employment Employee shall be paid a Commission for all loans actively originated, negotiated, secured, administered and processed by the branch at which Employee is the manager that are approved prior to Employee's termination date if and only if actually closed and funded prior to the date of termination, provided, that Employee may be entitled to additional compensation in accordance with company policies and procedures. The Commission shall only be paid after all Branch Operating Expenses have been deducted.

**Termination Due to Employee's Malfeasance.** Where Employee is terminated due to the Employee's acts of fraud, theft, forgery or other wrongful or illegal acts, Employee forfeits any right to additional compensation which may be otherwise paid in accordance with this Agreement or company policies and procedures.

**Confidentiality.** Employee during the term of employment under this Agreement will have access to and become familiar with various company terms, forms, procedures and records, which are owned by Employer, and which are regularly used in the operation of the business of Employer. Employee shall not disclose any of the aforesaid company forms, procedures, or records, nor use them in any way during the term of this Agreement, except as required in the course of Employee's employment, and at no time thereafter. All files, records, documents, drawings, specifications, proprietary information, and similar items relating to the business of Employer, whether prepared by Employee or otherwise coming into Employee's possession (including, without limitation, customer lists and loans/applications in process), shall remain the exclusive property of Employer and shall not be copied or removed from the premises of Employer under any circumstances whatsoever without the prior written consent of Employer.

**Employee Works.** All copyrights, patents, trade secrets or other intellectual property rights associated with any ideas, concepts, techniques, inventions, processes or works of authorship developed or created by Employee during the course of performing work for Employer (collectively, the "Work Product") shall belong exclusively to Employer and shall, to the extent possible, be considered a work made by Employee for hire for Employer within the meaning of Title 17 of the United States Code. To the extent any Work Product may not be considered a work made by Employee for hire for Employer, Employee agrees to assign, and automatically assigns at the time of creation of the Work Product, without any requirement of further consideration, any right, title or interest Employee may have in such Work Product to Employer. Upon request of Employer, Employee shall take such further actions, including execution and delivery of instruments of conveyance, as may be appropriate to give full and proper effect to such assignment.

**Non-Compete.** During the term of this Agreement, Employee shall not, directly or indirectly in any manner, either as an employee, employer, consultant, agent, principal, partner, stockholder, corporate officer, director, or in any other individual or representative capacity, engage or participate in any business within the mortgage banking or real estate industries (including without limitation any business competing in any manner whatsoever with the business of Employer.

**Non-Solicitation.** During the term of Employee's employment and for a period of one (1) year thereafter, Employee shall not, (a) either directly or indirectly, interfere in any manner whatsoever with the business of Employer; (b) either directly or indirectly solicit, attempt to hire or hire any other personnel or employees of Employer or any of its subsidiaries or affiliates without written approval of Employer; or (c) either directly or

indirectly facilitate or assist, in any manner whatsoever, any other person, entity or company with the solicitation, attempt to hire or hiring of any personnel or employee of Employer or any of its subsidiaries or affiliates without written approval of Employer.

**Equal Housing.** It is Employer's policy to fully support equal opportunities in housing and lending and the laws and principles pertaining thereto, and Employee agrees to and shall conduct his or her endeavors in full compliance therewith in furtherance of Employer's policy to strictly abide by such fair housing and lending laws, thereby providing services to borrowers, buyers and sellers regardless of race, creed, color, national origin, sex, age, handicap or familial status.

## ARBITRATION AND DISPUTE RESOLUTION

**Disputes Subject to Arbitration.** With the exception of claims by Employer or Employee for injunctive relief, Employee agrees that any dispute, controversy, claim or difference between Employer and Employee which directly or indirectly relates to or arises out of this Agreement, or its breach, shall be subject to arbitration in the City of Houston, Texas in accordance with the then governing rules of the American Arbitration Association. It is the intention of the parties that this Agreement shall be enforceable under the Federal Arbitration Act and at common law. Each party shall bear its own costs, expenses and fees, including without limitation, attorneys' fees and experts' fees with respect to any such arbitration. Judgment upon any resulting arbitration award may be entered in any court of competent jurisdiction.

The types of disputes or controversies intended by the parties to be subject to arbitration shall include, but not be limited to, (i) any claim which directly or indirectly relates to or arises out of this Agreement, (ii) any and all torts including defamation, libel, slander, false light, intentional infliction of emotional distress, tortuous interference, negligence, assault, battery, invasion of privacy, and any other violation of a legal duty not based in contract which gives rise to damages of whatever nature, (iii) any and all causes of action arising out of or relating to 18 U.S.C. §1702, 18 U.S.C. §§ 2510-2513, 2515-2521, 2701-2710, 3117, 3121-3126; 29 U.S.C. § 621 et seq., 42 U.S.C. § 1981, 42 U.S.C. §1983 and (iv) any and all causes of action that involve or relate to Title VII or applicable state or local laws, for discrimination because of race, color, sex, sexual orientation or preference, religion, national origin, age, marital status, handicap or disability, veteran or citizenship status, or sexual harassment.

**Severability of Disputes.** Employee agrees that in the event a dispute, controversy, claim, or difference which is subject to arbitration is alleged or plead in connection with any dispute, controversy, claim, or difference described in this Agreement between Employer and Employee, the non-arbitrable dispute or claim shall be severable by either party and litigated in a judicial proceeding separate and apart from the dispute, controversy, claim, or difference subject to arbitration. If Employee contends that the dispute, controversy, claim, or difference alleged or plead is so intertwined with the dispute, controversy, claim, or difference subject to arbitration, Employee agrees to waive the arbitration requirements contained in this Agreement at Employer's request.

**Attorney Fees.** If Employee brings a claim in court that should have been brought in arbitration pursuant to this Agreement, Employee agrees to pay Employer's

attorney fees, costs and expenses associated with transferring the matter to arbitration including any filing fees charged by the arbitration tribunal.

**Notices.** All notices and other communications required or permitted under this Agreement shall be validly given, made, or served if in writing and delivered personally or sent by registered mail, to the Employee at the following address:

~~~
..............................................................................................
..............................................................................................
..............................................................................................
..............................................................................................
~~~

addressed to the Employer at:

> Allied Home Mortgage Capital Corporation
> Attn: Jim C. Hodge, President
> 6110 Pinemont, Ste. 215
> Houston, Texas 77092
>
> Copy Attention: Sandy Croghan, Sr. Vice President
> 6110 Pinemont Drive
> Houston, Texas 77092

or at any other address as any party may, from time to time, designate by notice given in compliance with this section.

**Applicable Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Texas without regard to choice of law principles or the choice of law principles of the state or states where such Employee is employed. Subject to the arbitration provisions in this Agreement, each party consents to the personal jurisdiction of any state or federal court in the City of Houston, Harris County, Texas.

**Titles and Captions.** All section titles or captions contained in this Agreement are for convenience only and shall not be deemed part of the context nor affect the interpretation of this Agreement.

**Entire Agreement.** This Agreement contains the entire understanding between and among the parties and supersedes any prior understandings and agreements among them respecting the subject matter of this Agreement.

**Further Action.** The parties hereto shall execute and deliver all documents, provide all information and take or forbear from all such action as may be necessary or appropriate to achieve the purposes of the Agreement.

**Counterparts.** This Agreement may be executed in several counterparts and all so executed shall constitute one Agreement, binding on all the parties hereto even though all the parties are not signatories to the original or the same counterpart.

**Parties in Interest.** Nothing herein shall be construed to be to the benefit of any third party, nor is it intended that any provision shall be for the benefit of any third party.

**Presumption.** This Agreement or any section thereof shall not be construed against any party due to the fact that said Agreement or any section thereof was drafted by said party

**Savings Clause.** If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those as to which it is held invalid, shall not be affected thereby

**Waiver.** Any waiver of any provision of this Agreement shall not be effective unless in writing and signed by the waiving party. A waiver of one portion of this Agreement shall not effect a waiver of any other provision of this Agreement

ALLIED HOME MORTGAGE CAPITAL
CORPORATION, a Texas corporation
Employer

By

Name
Title

I HAVE READ, FULLY UNDERSTAND, HAVE HAD AN OPPORTUNITY TO CONSULT WITH COUNSEL AND HAVE DONE SO OR HAVE WILLINGLY WAIVED SUCH OPPORTUNITY, AND ACCEPT THIS AGREEMENT AND ALL EXHIBITS, IF ANY, ATTACHED HERETO AND HAVE RECEIVED A COPY OF THIS AGREEMENT

[Employee's Printed Name]

# Exhibit 4



**U.S. Department of Housing and Urban Development**
Washington, D.C. 20407-0050

Departmental Enforcement Center

APR 23 2001

## VIA FEDERAL EXPRESS

Mr. Jim Hodge
President
Allied Mortgage Capital Corporation
6110 Pinemount Drive #215
Houston, TX 77092

Subject:   Notice of Violation
               Notice of Intent to Seek Civil Money Penalty
               Mortgagee No. 7507300007

Dear Mr. Hodge:

This is to advise you that the Mortgagee Review Board (Board) of the U.S.
Department of Housing and Urban Development is considering an administrative action against
Allied Mortgage Capital Corporation (AMCC) pursuant to 24 CFR Part 25 (copy enclosed)
and civil money penalties pursuant to 24 CFR Part 30 (copy enclosed). This letter also
constitutes a 30-day notice as required by 12 U. S. C. Section 1708 and 24 CFR Part 30.

You are notified pursuant to 24 CFR Section 25.6 that any action by the Board would
be based on violations of HUD/FHA requirements by AMCC that were discovered during
reviews of AMCC's HUD/FHA loan origination activities by HUD's Quality Assurance
Division August 1998 in Houston, Texas; August 1999 in San Antonio, Texas; February 2000
in Slidell, Louisiana; during a complaint investigation March 2000 in Houston, Texas; and
during a review of Overland Park, Kansas, branch agreements in May 2000.

The violations of HUD/FHA requirements by AMCC, as set forth in Attachment A,
include:

1.  engaging in improper branch operations;
2.  advertising for non-employee originations;
3.  allowing persons not employed exclusively by AMCC to originate loans; and
4.  originating and processing FHA loans in space shared with another entity and
    not clearly identified as belonging to AMCC.

The foregoing are violations of the Department's regulations set forth in 24 CFR Parts 202 and 203 and the requirements set forth in HUD Handbooks 4060.1 REV-1, 4165.1 REV-1, 4000.2 REV-2, and 4000.4 REV-1 CHG 2.

As mentioned previously, the Board is considering seeking a civil money penalty against AMCC pursuant to 24 CFR Part 30. This letter also constitutes the Pre-Penalty Notice as required by 24 CFR Section 30.70. The imposition of a civil money penalty would be in addition to any other administrative action the Board may take against AMCC.

The penalty amount would be based on the types of violations cited above, under 24 CFR Part 30, to each insured mortgage or other separate occurrence listed or described in detail in Attachment A to this letter. In accordance with 24 CFR Section 30.35(c), the amount of the civil money penalty shall not exceed $5,500 for each such listed or described violation. Under 24 CFR Section 30.35(b), a continuing violation may constitute a separate violation for each day that the violation continues.

AMCC has 30 days from receipt of this letter to provide the Board with a written response to this matter. If AMCC wishes to set forth a reasonable settlement proposal in its response, the proposal will be presented to the Board. If you have any questions regarding this matter, please contact me at (202) 708-3041 extension 3574.

AMCC's response may be mailed to me at the U. S. Department of HUD, 451 Seventh Street SW, Room B-133-Portals 200, Washington, DC 20410, or sent by courier to 1250 Maryland Avenue SW, Suite 200, Washington, DC 20024. Failure to respond within the 30-day period will result in a determination by the Board without the benefit of any response or comments that AMCC may wish to provide.

Sincerely,

D. Jackson Kinkaid
Secretary
Mortgagee Review Board

Enclosures

2

**ATTACHMENT A**

**ALLIED MORTGAGE CAPITAL CORPORATION**
**HOUSTON, TX**
**SAN ANTONIO, TX**
**SLIDELL, LOUISIANA**
**OVERLAND PARK, KANSAS**

**Summary of HUD's Quality Assurance Findings**

Allied Mortgage Capital Corporation (AMCC) violated HUD-FHA requirements and prudent lending practices in the origination of 540 HUD-FHA insured mortgages. Specifically, AMCC:

  1. engaged in improper branch operations;
  2. advertised for non-employee originations;
  3. allowed persons not employed exclusively by AMCC to originate loans; and
  4. originated and processed FHA loans in space shared with another entity and not clearly identified as belonging to AMCC.

The foregoing are violations of the Department's regulations set forth in 24 CFR Parts 202 and 203 and the requirements set forth in HUD Handbooks 4060.1 REV-1, 4165.1 REV-1, 4000.2 REV-2, and 4000.4 REV-1 CHG 2.

**FINDINGS**

1.  **AMCC engaged in improper branch operations**

AMCC operated "branches" under written branch management "Employment Agreements" that do not comply with HUD Handbook 4060.1 REV-1. Specifically, these agreements violate paragraph 2-17, which states that a mortgagee must pay all of its own operating expenses, including compensation of employees of its main and branch offices. Operating expenses include, but are not limited to, equipment, furniture, office rent, overhead, and other similar expenses incurred in operating a mortgage lending business.

San Antonio Office

HUD's records show that a total of 338 loans have been endorsed for AMCC's San Antonio Office between April 1997 and July 2000 (see Table 1). An initial branch management "Employment Agreement" (Agreement) provided by the corporate office was found to be unacceptable. Although AMCC revised the Agreement, it is still unacceptable. According to the Agreement, AMCC establishes a branch fund for each of its branches. All revenues generated by the branch office are to be accounted for separately by AMCC in the branch fund. An example of this is found in Section

3.1, (3) regarding adequate funds in the branch account to cover medical insurance premiums.

In an attempt to reach compliance, Agreement language in Exhibit C of that document was revised to read that expenses shall be paid by and shall be the responsibility of the "employer," yet they are still deducted from commissions as per Section 3.1 of Article III, "Compensation" and Exhibit C. This circumvents the requirement that the mortgagee pay all operating expenses. While the mortgagee is paying required expenses, these same expenses are deducted from the "employee's" commissions. In an attempt to clarify the situation, AMCC responded to the Denver Homeownership Center's Quality Assurance Division stating that the "employee" would not be personally liable for expense loss which exceeded the reserve account, but went on to say that the amount reserved is one month's rent or the cost to operate the branch for one month. The source of funds for this reserve account has never been disclosed by AMCC. Other lenders contacting the Denver Homeownership Center regarding becoming "net branches" of AMCC indicated these reserve accounts are comprised of funds belonging to the "employee" and are a requirement of "signing on" with AMCC.

According to AMCC's San Antonio Office Employee Agreement, dated August 2, 1999, Article III, item 3.1.(1):

*"Employee shall earn and receive on each loan closed, an amount equal to the 'wholesale pricing' premium, if any, as quoted from time to time by Allied Mortgage Corporation in its daily pricing sheets or any other company that Employer is approved to sell loans to and to which a loan is closed and sold to, plus any fee income net of expenses paid out by employer, less the amounts set forth on Exhibit C...*

Exhibit C contains the following:

*"The calculation of the commissions payable to Employee under this Agreement shall take into account the following items:*

*"An amount equal to the amount of the expenses of the branch office, including but not limited to rent, lease payments, employee salaries, phone and fax, commissions, benefits, payroll taxes, insurance, supplies, licensing and permit fees, agency filings and audits, legal and accounting expenses, marketing and promotional expenses, the costs associated with loan fraud perpetrated by the personnel at the branch office, the costs, damages and claims (including attorneys fees and costs of defense and investigation) resulting from Employee's breach of this Agreement or from any other acts or omissions of Employee or the individuals supervised directly or indirectly by Employee, the interest payable under any promissory note made by Employer to Employee, and amounts permitted under Employer's guidelines or prudent industry standards to be charged back to the Employee (including without limitation charge backs for loan*

2

*premiums related to loans that pay off within 12 months of purchase). The foregoing expenses shall be limited to the extent of any reimbursements (including, without limitations, insurance benefits) received by Employer. <u>It is expressly understood and agreed that all of the foregoing expenses shall be paid by, and shall be the responsibility of, Employer. The listing of these amounts in this paragraph is only for the purpose of calculating Employee's commissions."</u>*

Item 3.1 (3) says that the "employee" shall be eligible for enrollment in the medical insurance plan, and the cost of such will be deducted from the "Employee's gross commissions." If the "employee" does not have funds in the branch account to cover medical insurance premiums, "employee" is responsible for remitting funds to "employer" to cover said premiums. In a response to HUD's request for clarification, AMCC indicated insurance is the same for all employees. AMCC pays 75% and the employee pays 25% of the monthly premium. Family members are paid in full by employees. This response did not alter the information contained in the Agreement, which showed that the Agreement requires the branch management "employee" to pay their insurance out of their commissions to the "employer."

Paragraph 3.2 says the "employer" shall pay all fees to the branch manager "employee" on all loans closed except for .30%, whether by "employer or a third party lender," "employee" being specifically authorized to place any loan to be closed with an approved lender of "employee's" choice. It continues:

*"Said payment shall be paid once each month on the fifteenth day of each month for loans funded through the last day of the preceding month. Employer is specifically authorized to pay itself the amounts due each month from Employee by deducting the sum from amounts due Employee in this article. In addition, Employer may from time to time, in Employer's sole discretion, require that a portion of the compensation, although earned by Employee, be held in a reserve account for future possible losses or expenses incurred by Employee."*

Paragraph 2.14 of the Agreement indicates that during employment and/or upon termination, the "employee" will refrain from using the name "Allied" in any business ventures for a period of ten years. This was addressed again in a response clarifying that this language referred to any purposes other than marketing and originating residential mortgage loans, but the Agreement language was not amended.

Louisiana Offices

AMCC operated offices in Slidell and Mandeville, Louisiana, using IMF #7507300529. HUD's records show that a total of 44 loans were endorsed for AMCC's Slidell Office between July 1999 and July 2000 (see Table 2). In reviewing ten Louisiana agreements, HUD found language similar to those in the agreements used by the San Antonio office and other violations as well.

    A.  Article II, "Duties of Employee," paragraph 2.3 contains the following:

3

*"Employee shall be responsible for all of Employee's business expenses."*

Paragraph 2-9(A) 2, contains the following:

*"Employee shall indemnify and hold Employer and its parent, subsidiaries, and affiliated corporations, and their respective officer, directors, agents, employees, and insurers (collectively referred to herein as 'Allied') harmless "from and against any and all claims, losses, damages, fines, penalties, causes of action, suits, and liability of every kind, including all expenses of litigation, court costs and attorneys' fees arising on account of (1) any misconduct or misrepresentation made by Employee, and )(2) any personal injury, death, property damage, civil liability, or fines or penalties imposed by any state or federal regulatory agency caused, in whole or in part, by the actions or conduct of Employee.*

*"Recapture Term and recitals: Any loan originated, processed by Employee and closed and funded using Employers Warehouse lines for such transaction, shall be subject to the following Premium Recapture Provision.  If a Loan is prepaid within 12 months from the date of purchase and Employee has received a premium over par for the Loan, or the Employer has received a premium from one of the Employers Correspondent relationships (Correspondents) on behalf of Employee to account for employers Profit margin on said Loan, the Employee shall repay Employer that portion of such premium paid Employee or paid to Employer on behalf of Employee within ten days from written demand."*

B.   The Employee Agreement for Gail W. Harris, Processor, Article II, "Duties of Employee," paragraph 2.5 reads as follows :

*"Employee shall indemnify and hold Employer and its parent, subsidiaries, and affiliated corporations, and their respective officers, directors, agents, employees, and insurers (collectively referred to herein as 'Allied') harmless from and against any and all claims, losses, damages, fines, penalties, causes of action, suits, and liability of every kind, including all expenses of litigation, court costs, and attorney's fees arising on account of (1) any misconduct or misrepresentation made by Employee, and (2) any personal injury, death, damage, civil liability, or fines or penalties imposed by any state or federal regulatory agency caused by the actions of conduct of Employee."*

4

Overland Park, Kansas

Two agreements for AMCC employees in the Overland Park office were obtained. HUD's records show that a total of 183 loans have been endorsed for AMCC's Overland Park Offices between October 1998 and October 2000 (see Table 3). Language similar to those in the Texas and Louisiana office agreements was found in regard to indemnifying employer against losses and recapture of premiums. It also included the following:

Article II, 2.3:

*"All expenses of the branch shall be charged against the compensation as set forth in Article III of the Agreement."*

*"In the event expenses exceed those projected, an amount equal to the excess of such expenses shall be deducted from the next commission check that would otherwise be payable to Employee in addition to the regularly scheduled deduction for the projected expenses for the next ensuing thirty (30) days. Such expenses shall include, but not be limited to, office space, telephones, facsimile machines, equipment, supplies, advertising, payroll expenses, and insurance."*

Article II, 2.15:

*"Employee shall indemnify and hold Employer and its parent, subsidiaries, and affiliated corporations, and their respective officers, directors, agents, employees, and insurers (collectively referred to herein as 'Allied') harmless from and against any and all claims, losses, damages, fines, penalties, causes of action, suits, and liability of every kind."*

Article III, 3.2:

*"Employer is specifically authorized to pay itself the amounts due each month from Employee by deducting the sum from amounts due Employee in this article. In addition, Employer may from time to time, in Employer's sole discretion, require that a portion of the compensation, although earned by Employee, be held in a reserve account for future possible losses or expenses incurred by Employee."*

2. **AMCC advertised for non-employee originations**

An advertisement from AMCC offered loan officers a program providing the chance to originate loans by "acting" as the loan officer and to receive the origination fee at closing. Additionally, the information below, quoting from a separate magazine article, shows that the intent of this advertisement was to convince loan officers with other companies, HUD-approved or non-HUD-approved, to originate loans for AMCC.

5

In an article in the February 1999 Mid West Mortgage Report, Mr. John Jordan wrote, "Mr. [Don] Strouse, [Executive Vice President of AMCC in Houston, Texas] said that mortgage brokers who join Allied, or other firms engaged in net branching for that matter, can operate under the companies' mortgage banking licenses and can therefore meet the various requirements to originate FHA, Fannie Mae, and VA loans, as well as have access to lenders that do business with Allied." The article went on to say that AMCC is one of the largest net branching firms in the United States. Don Strouse was quoted as saying the company had 450 net branch offices in operation in 49 states. In 1998, the firm was said to have established 200 net branch offices.

The article began by talking about the practice of a company taking on an existing mortgage broker as an employee and allowing the broker to operate under the net branch company's mortgage banking license. This violates HUD Handbook 4060.1 REV-1, paragraph 2-1, 2-24, and 2-25. The handbook requires that: 1) all mortgagees originating FHA mortgages must be approved; 2) a mortgagee may not pay a fee, kickback or compensation or thing of value (including a fee representing all or part of the mortgagee's origination fee) to any person or entity in connection with a HUD-FHA insured mortgage transaction, except for services actually performed and permitted by the Department; and 3) mortgagees may not perform only a part of the loan origination process, such as taking the loan application, and routinely transferring the underwriting package to another mortgagee. AMCC's response to this advertisement indicated that the ad had never been officially approved by AMCC.

Another AMCC flyer was faxed to HUD's Utah Quality Assurance Office by a Utah lender May 4, 2000. According to this flyer, AMCC branches are allowed to close loans in their own name "with non-disclosure of ysp's," and members of its network branch operation become banker/broker and their "own CEO." This violates HUD Handbook 4060.1 REV-1 which requires mortgagees to supervise personnel engaging in loan origination.

HUD's records indicate that AMCC, as a loan correspondent, has at least 168 sponsors.

3.  **AMCC allowed persons not employed exclusively by AMCC to originate loans**.

HUD Handbook 4060.1 Rev-1, paragraph 2-14 states that "all employees of the mortgagee except receptionists, whether full time or part-time, must be employed exclusively by the mortgagee at all times, and conduct only the business affairs of the mortgagee during normal business hours. Branch managers must be located at the branch office they manage and cannot operate or be the manager of more than one branch office at the same time."

A.  Employees of AMCC originated and processed FHA loans in a Mandeville, Louisiana, office that operated under the name, "Alpha Mortgage". This office had no signs indicating it was an office of AMCC.

6

B. In FHA case number 221-2830100, Loan number 274125, **Wallace,** the Agreement to Purchase or Sell dated August 21, 1997, and the final application dated September 30, 1997, were both executed by Gayle Dupaty. Ms. Dupaty signed the sales contract as the selling agent and broker, and she signed the application as interviewer. Ms. Dupaty is listed on AMCC's employee list as a loan officer. Additionally, the file contained an attachment to the 92900 worksheet that listed Ms. Dupaty as the real estate agent for this loan.

4. <u>**AMCC originated and processed FHA loans in space shared with another entity and not clearly identified as belonging to AMCC.**</u>

HUD Handbook 4060.1 REV-1, paragraph 2-16, states that a mortgagee's main and branch office facilities must be located in a space that is separate and apart from any other entity; and be clearly identified to the public so that mortgagors will know, at all times, exactly which business entity they are doing business. The mortgagee must also post business signs and procure its own telephones. AMCC's Mandeville office was identified as "Alpha Mortgage." In addition, the telephones were answered using the Alpha Mortgage name.

7

Table 1 – San Antonio, Texas Loans

| Mortgagee | FHA Case No. | Mortgagor | Case Ordered | Endorsed |
|---|---|---|---|---|
| 7507300109 | 495-4790245 | ESCAMILLA, JOSE D | 03-Mar-97 | 24-Apr-97 |
| 7507300109 | 495-4792745 | KENDALL, JENNIFER J | 06-Mar-97 | 18-Apr-97 |
| 7507300109 | 495-4792768 | ROUNTREE, VERNON S. | 06-Mar-97 | 29-May-97 |
| 7507300109 | 495-4811867 | WHITE, CHRISTOPHER R | 10-Apr-97 | 14-Nov-97 |
| 7507300109 | 495-4818320 | READ, BRUCE H | 22-Apr-97 | 17-Nov-97 |
| 7507300109 | 495-4827187 | FARMER, ROBERT | 07-May-97 | 07-Jul-97 |
| 7507300109 | 495-4834477 | DE LA CRUZ, ROBERT JR. | 16-May-97 | 06-Oct-97 |
| 7507300109 | 495-4844564 | PATEL, PRITESH D | 04-Jun-97 | 16-Sep-97 |
| 7507300109 | 495-4848590 | SANDOVAL, JULIAN | 11-Jun-97 | 23-Sep-97 |
| 7507300109 | 495-4860298 | VOLKMAN, JOANN M | 30-Jun-97 | 11-Aug-97 |
| 7507300109 | 495-4884211 | RUPP, MARK F. | 08-Aug-97 | 09-Oct-97 |
| 7507300109 | 495-4894487 | SILVAS, EMILY | 26-Aug-97 | 20-Oct-97 |
| 7507300109 | 495-4896804 | MARAS, BARBARA M. | 02-Sep-97 | 21-Oct-97 |
| 7507300109 | 495-4900258 | LEAL, ELISA A. | 05-Sep-97 | 22-Jan-98 |
| 7507300109 | 495-4906901 | MCCORMICK, PEGGY | 17-Sep-97 | 13-Nov-97 |
| 7507300109 | 495-4907522 | BAYER, MELINDA | 18-Sep-97 | 20-Nov-97 |
| 7507300109 | 495-4910363 | NAGEL, ROBIN L | 23-Sep-97 | 14-Nov-97 |
| 7507300109 | 495-4912183 | BEAUMONT, LISA MARIE | 26-Sep-97 | 12-Dec-97 |
| 7507300109 | 495-4916980 | ALCORN, GARY ALLEN | 06-Oct-97 | 13-Jan-98 |
| 7507300109 | 495-4918260 | HERNANDEZ, EDUARDO | 09-Oct-97 | 05-Dec-97 |
| 7507300109 | 495-4921445 | SPRUIELL, LINDA S. | 14-Oct-97 | 10-Dec-97 |
| 7507300109 | 495-4933285 | FREUND, JOHN F. | 04-Nov-97 | 29-Jan-98 |
| 7507300109 | 495-4939554 | VOLIA, SUZANNE D. | 14-Nov-97 | 20-Jan-98 |
| 7507300109 | 495-4943910 | MEADE, ALBERT A. | 21-Nov-97 | 29-Jan-98 |
| 7507300109 | 495-4962780 | SERNA, CARLOS | 07-Jan-98 | 20-Feb-98 |
| 7507300109 | 495-4969142 | PHAN, GIAU | 15-Jan-98 | 15-Jun-98 |
| 7507300109 | 495-4971753 | LEWIS, JASON RICHARD | 21-Jan-98 | 03-Mar-98 |
| 7507300109 | 495-4973045 | VASQUEZ, JAVIER | 22-Jan-98 | 22-May-98 |
| 7507300109 | 495-4973068 | AMADOR, ESTEBAN | 22-Jan-98 | 15-Apr-98 |
| 7507300109 | 495-4976432 | BERNAL, VICTOR M | 28-Jan-98 | 29-Mar-99 |
| 7507300109 | 495-4978672 | GLASS, TERRY D | 02-Feb-98 | 23-Jul-98 |
| 7507300109 | 495-4980102 | VILLARREAL, JESUS R | 04-Feb-98 | 17-Nov-98 |
| 7507300109 | 495-4983246 | DAVILA, LEONARDO D. | 05-Feb-98 | 08-Oct-98 |
| 7507300109 | 495-4984229 | WOODARD, JERRY L | 09-Feb-98 | 13-Nov-98 |
| 7507300109 | 495-4987855 | SOLITAIRE, GILBERT | 12-Feb-98 | 08-Apr-99 |
| 7507300109 | 495-4989383 | CUELLAR, JESUS V | 13-Feb-98 | 14-Sep-98 |
| 7507300109 | 495-4994958 | PECINA, RENE N | 23-Feb-98 | 19-Apr-99 |
| 7507300109 | 495-4998024 | VALLEJO, JULIO DAVID | 25-Feb-98 | 07-Apr-99 |
| 7507300109 | 495-4998126 | CAREY, SYLVIA PATRICIA | 25-Feb-98 | 08-Jul-98 |
| 7507300109 | 495-5000522 | PADILLA, JUAN | 02-Mar-98 | 14-Sep-98 |
| 7507300109 | 495-5002409 | WHORTON, MARK E | 04-Mar-98 | 17-Nov-98 |
| 7507300109 | 495-5009810 | PAREDES, JAMIE | 12-Mar-98 | 21-May-98 |
| 7507300109 | 495-5012458 | ACOSTA, MARGARET ANNE | 17-Mar-98 | 16-Nov-98 |
| 7507300109 | 495-5012464 | HARGROVE, MICHAEL P. | 17-Mar-98 | 27-May-98 |
| 7507300109 | 495-5012928 | VERTIZ, OSCAR J | 17-Mar-98 | 28-Jan-99 |
| 7507300109 | 495-5014005 | HERNANDEZ, FRANK M. | 18-Mar-98 | 17-Aug-98 |
| 7507300109 | 495-5014218 | SANCHEZ, PHYLLIS M. | 18-Mar-98 | 04-Aug-98 |
| 7507300109 | 495-5020171 | DELGADO, ANTONIO G | 26-Mar-98 | 16-Nov-98 |
| 7507300109 | 495-5027498 | SCHOENRADT, SAMUEL | 06-Apr-98 | 17-Nov-98 |
| 7507300109 | 495-5027519 | JINES, PAXTON | 06-Apr-98 | 06-Nov-98 |

1

Table 1 – San Antonio, Texas Loans, continued

| Mortgagee | FHA Case No. | Mortgagor | Case Ordered | Endorsed |
|---|---|---|---|---|
| 7507300109 | 495-5027593 | GREIERT, STEPHANIE R | 06-Apr-98 | 08-Apr-99 |
| 7507300109 | 495-5030480 | BONAPARTE, STEPHANIE L | 06-Apr-98 | 18-Dec-98 |
| 7507300109 | 495-5033067 | BRAVO, GAVINO | 10-Apr-98 | 10-Nov-98 |
| 7507300109 | 495-5034503 | VALLEJO, ROBERT | 13-Apr-98 | 23-Jul-98 |
| 7507300109 | 495-5041708 | SEGAL, JACOB | 21-Apr-98 | 05-Aug-98 |
| 7507300109 | 495-5047106 | DIOTTE, DANIEL F | 29-Apr-98 | 17-Nov-98 |
| 7507300109 | 495-5047588 | STANLEY, SHANE A | 29-Apr-98 | 13-Nov-98 |
| 7507300109 | 495-5048879 | BULLOCK, BRADFORD E. | 30-Apr-98 | 10-Sep-98 |
| 7507300109 | 495-5048735 | SALAZAR, GABRIELA F. | 30-Apr-98 | 16-Jul-98 |
| 7507300109 | 495-5052746 | LUCAS, CAROLYN R | 06-May-98 | 30-Jun-98 |
| 7507300109 | 495-5052894 | HUNT, JUDITH A. | 06-May-98 | 17-Nov-98 |
| 7507300109 | 495-5054803 | TORRES, BOBBY J. | 07-May-98 | 14-Sep-98 |
| 7507300109 | 495-5054928 | MEDRANO, ROSIE | 07-May-98 | 11-Jan-99 |
| 7507300109 | 495-5057345 | VALDEZ, REY ANTHONY | 12-May-98 | 01-Jun-99 |
| 7507300109 | 495-5058653 | HARRIS, RONALD EMMETT | 13-May-98 | 22-Jul-98 |
| 7507300109 | 495-5060692 | RODRIGUEZ, MELINDA | 15-May-98 | 22-Oct-98 |
| 7507300109 | 495-5061425 | PESCADERO, CRISTETA G. | 15-May-98 | 25-Sep-98 |
| 7507300109 | 495-5063034 | DUKE, GREGORY D. | 18-May-98 | 12-Aug-98 |
| 7507300109 | 495-5066899 | ROSELLE, LISA ANN | 22-May-98 | 23-Jul-98 |
| 7507300109 | 495-5067649 | WHITE, SHAWN | 26-May-98 | 08-Jul-99 |
| 7507300109 | 495-5069916 | MUSTAFA, ADHTERUL | 27-May-98 | 17-Nov-98 |
| 7507300109 | 495-5069922 | VANN, YOLANDA Y. | 27-May-98 | 30-Jul-98 |
| 7507300109 | 495-5073116 | GARCIA, EVARISTO | 02-Jun-98 | 31-Jul-98 |
| 7507300109 | 495-5073122 | BROWN, STACIE L | 02-Jun-98 | 30-Jul-98 |
| 7507300109 | 495-5076243 | TAYLOR, SYLVIA GARCIA | 04-Jun-98 | 04-Nov-98 |
| 7507300109 | 495-5076254 | PERRY, JEANETTE L. | 04-Jun-98 | 17-Aug-98 |
| 7507300109 | 495-5076467 | OROSCO, PRISCILLA L | 04-Jun-98 | 13-Aug-98 |
| 7507300109 | 495-5078720 | KRAMER, JUANITA C. | 08-Jun-98 | 19-Aug-98 |
| 7507300109 | 495-5081141 | ROJAS, RICKY LEE | 10-Jun-98 | 14-Dec-98 |
| 7507300109 | 495-5081873 | ORNELAS, AMELIA M. | 11-Jun-98 | 31-Jul-98 |
| 7507300109 | 495-5084204 | FARNUM, RYAN CASE | 15-Jun-98 | 24-Aug-98 |
| 7507300109 | 495-5084285 | LOPEZ, MARIE CHRISTINE | 15-Jun-98 | 06-Nov-98 |
| 7507300109 | 495-5084364 | LARSON, TIMOTHY JOHN | 15-Jun-98 | 31-Jul-98 |
| 7507300109 | 495-5085172 | BAILEY, FELICIA M. | 15-Jun-98 | 10-Aug-98 |
| 7507300109 | 495-5085239 | HERRING, MARK L. | 16-Jun-98 | 20-Oct-98 |
| 7507300109 | 495-5085750 | CHALMERS, TERESA K | 16-Jun-98 | 04-Jan-99 |
| 7507300109 | 495-5087354 | LUNA, LUIS FERNANDO | 17-Jun-98 | 05-Nov-98 |
| 7507300109 | 495-5090216 | LIRA, MARIA A. | 22-Jun-98 | 14-Sep-98 |
| 7507300109 | 495-5093871 | NAVARRO, RICHARD D | 26-Jun-98 | 07-Jan-00 |
| 7507300109 | 495-5097886 | ROBERTS, CHRISTOPHER L | 02-Jul-98 | 10-Nov-98 |
| 7507300109 | 495-5098459 | WAY, MITCHELL L | 02-Jul-98 | 31-Aug-98 |
| 7507300109 | 495-5098494 | BEHRENS, JOHN W | 02-Jul-98 | 17-Sep-98 |
| 7507300109 | 495-5098538 | AMARO, JUAN CARLOS | 02-Jul-98 | 09-Feb-99 |
| 7507300109 | 495-5098754 | MENDEZ, LINA A. | 06-Jul-98 | 11-Sep-98 |
| 7507300109 | 495-5102842 | RAMIREZ, CANDELARIO | 09-Jul-98 | 29-Sep-98 |
| 7507300109 | 495-5104706 | GALLEGO, JOSE D. | 13-Jul-98 | 04-Sep-98 |
| 7507300109 | 495-5105362 | DELGADO, VENTURA | 13-Jul-98 | 13-Nov-98 |
| 7507300109 | 495-5108057 | THUM, FRANCES | 15-Jul-98 | 09-Oct-96 |
| 7507300109 | 495-5108431 | OPSAHL, ARTHUR W | 16-Jul-98 | 09-Oct-98 |
| 7507300109 | 495-5109131 | RODRIGUEZ, ESTHER | 16-Jul-98 | 22-Oct-98 |

2

Table 1 -- San Antonio, Texas Loans, continued

| Mortgagee | FHA Case No. | Mortgagor | Case Ordered | Endorsed |
|---|---|---|---|---|
| 7507300109 | 495-5113188 | HINES, BRIAN | 22-Jul-98 | 21-Sep-98 |
| 7507300109 | 495-5114341 | POSADA, BLANCA E. | 23-Jul-98 | 10-Sep-98 |
| 7507300109 | 495-5118497 | DOMINGUEZ, JUAN JOSE | 29-Jul-98 | 29-Dec-98 |
| 7507300109 | 495-5123705 | BLAINE, JOHN A. | 05-Aug-98 | 30-Sep-98 |
| 7507300109 | 495-5124848 | CONDE, VIDAL | 08-Aug-98 | 23-Dec-98 |
| 7507300109 | 495-5131015 | AGUILAR, MICHAEL | 13-Aug-98 | 14-Oct-98 |
| 7507300109 | 495-5137959 | GARRISON, BRIAN S | 24-Aug-98 | 13-Nov-98 |
| 7507300109 | 495-5139445 | JENKINS, RHONDA L | 25-Aug-98 | 07-Oct-98 |
| 7507300109 | 495-5139474 | SELF, DAVID CARL | 26-Aug-98 | 22-Dec-98 |
| 7507300109 | 495-5141239 | DELGADO, MIREY E | 28-Aug-98 | 14-Oct-98 |
| 7507300109 | 495-5141251 | GUTIERREZ, DAVID | 28-Aug-98 | 10-Nov-98 |
| 7507300109 | 495-5141318 | URESTI, SANDRA ANN | 28-Aug-98 | 25-Jan-99 |
| 7507300109 | 495-5142178 | LUNA, BABARA | 31-Aug-98 | 22-Dec-98 |
| 7507300109 | 495-5146498 | ZERTUCKE, GILBERT JR | 04-Sep-98 | 07-Jan-99 |
| 7507300109 | 495-5149731 | SEALS, JAMES F | 10-Sep-98 | 13-Oct-98 |
| 7507300109 | 495-5151980 | HERNANDEZ, GERARDO R | 14-Sep-98 | 18-Mar-99 |
| 7507300109 | 495-5153004 | GOMEZ, ELVA P | 15-Sep-98 | 26-Oct-98 |
| 7507300109 | 495-5153112 | VILLARREAL, SIMON | 15-Sep-98 | 20-Oct-98 |
| 7507300109 | 495-5153129 | SANCHEZ, LEOBARDO | 15-Sep-98 | 12-Feb-99 |
| 7507300109 | 495-5153765 | HENRY, BURT | 15-Sep-98 | 10-Nov-98 |
| 7507300109 | 495-5156148 | GARZA, RENEE L | 17-Sep-98 | 08-Feb-99 |
| 7507300109 | 495-5159853 | MOHLER, PAUL B | 22-Sep-98 | 10-Dec-98 |
| 7507300109 | 495-5160335 | NORRIS, PAMELA | 23-Sep-98 | 22-Oct-98 |
| 7507300109 | 495-5163854 | GUEVARA, SAMUEL | 28-Sep-98 | 21-Jan-99 |
| 7507300109 | 495-5188508 | RYAN,KATHLEEN FRANCES | 02-Oct-98 | 22-Jan-99 |
| 7507300109 | 495-5169867 | BLANCO, JOSE J | 05-Oct-98 | 23-Apr-99 |
| 7507300109 | 495-5170287 | KNIGHT, KEVIN L. | 06-Oct-98 | 05-Mar-99 |
| 7507300109 | 495-5171188 | MCCOOL, KELLEY M. | 07-Oct-98 | 07-Dec-98 |
| 7507300109 | 495-5171898 | HERNANDEZ, TAMI V | 07-Oct-98 | 29-Jan-99 |
| 7507300109 | 495-5174482 | CHAIREZ, SANTIAGO B | 09-Oct-98 | 08-Apr-99 |
| 7507300109 | 495-5174828 | PARRA, ROSALINDA T | 09-Oct-98 | 23-Dec-98 |
| 7507300109 | 495-5174952 | BOTZONG, GLEN R | 09-Oct-98 | 02-Feb-99 |
| 7507300109 | 495-5174981 | VASQUEZ, ALBERT JR | 09-Oct-98 | 09-Feb-99 |
| 7507300109 | 495-5179001 | GUTIERREZ, HENRY | 14-Oct-98 | 17-Feb-99 |
| 7507300109 | 495-5179030 | BERLANGA, JOHN | 14-Oct-98 | 03-Jun-99 |
| 7507300109 | 495-5179053 | ANDERS, RONALD L JR | 14-Oct-98 | 30-Jun-99 |
| 7507300109 | 495-5181504 | O'FLAHERTY,ANTHONY JR | 16-Oct-98 | 15-Dec-98 |
| 7507300109 | 495-5182928 | GONZALEZ, ARNULFO | 19-Oct-98 | 23-Dec-98 |
| 7507300109 | 495-5186359 | RODRIGUEZ, MICHAEL A | 21-Oct-98 | 02-Mar-99 |
| 7507300109 | 495-5188084 | GUZMAN, JAMES | 23-Oct-98 | 01-Feb-99 |
| 7507300109 | 495-5191582 | TARRANTS, BRENNA C | 28-Oct-98 | 25-Mar-99 |
| 7507300109 | 495-5192355 | RAMIREZ, SYLVIA M | 28-Oct-98 | 08-Apr-99 |
| 7507300109 | 495-5193583 | HOOD, SHANNON L | 29-Oct-98 | 13-Jan-99 |
| 7507300109 | 495-5196862 | ALSUP, JOE F | 03-Nov-98 | 04-May-99 |
| 7507300109 | 495-5197057 | MIKLUSICAK, DANIEL J | 03-Nov-98 | 11-Jan-99 |
| 7507300109 | 495-5204447 | SANCHEZ, ROBERTO | 10-Nov-98 | 08-Feb-99 |
| 7507300109 | 495-5204499 | MCKNIGHT, FRANKIE J | 10-Nov-98 | 29-Jan-99 |
| 7507300109 | 495-5212393 | OTT, STEPHANIE L | 18-Nov-98 | 26-Jan-99 |
| 7507300109 | 495-5213218 | MELLOR, DANIEL J | 19-Nov-98 | 13-Jan-99 |
| 7507300109 | 495-5213274 | MORSE, KRISTA LEE | 19-Nov-98 | 13-Jan-99 |

3

Table 1 -- San Antonio, Texas Loans, continued

| Mortgages | FHA Case No. | Mortgagor | Case Ordered | Endorsed |
|-----------|--------------|-----------|--------------|----------|
| 7507300109 | 495-5213301 | MELBER, SHAWN R. | 19-Nov-98 | 23-Dec-98 |
| 7507300109 | 495-5219851 | BARRIENTOS, ROLANDO | 30-Nov-98 | 06-Jul-99 |
| 7507300109 | 495-5227982 | TAYS, ANABELLY | 08-Dec-98 | 29-Jan-99 |
| 7507300109 | 495-5230170 | NELSON, TIMOTHY P | 10-Dec-98 | 12-Mar-99 |
| 7507300109 | 495-5234084 | WALDROOP, PATRICIA R. | 16-Dec-98 | 26-May-99 |
| 7507300109 | 495-5236404 | SALAZAR, HECTOR | 18-Dec-98 | 24-Mar-99 |
| 7507300109 | 495-5236485 | FINNEY, THOMAS S. | 18-Dec-98 | 26-Feb-99 |
| 7507300109 | 495-5243700 | BOLTON, KERRY A | 04-Jan-99 | 17-Mar-99 |
| 7507300109 | 495-5244003 | LUSTER, CLARENCE D | 05-Jan-99 | 11-Mar-99 |
| 7507300109 | 495-5244872 | MARTIN, WILLIAM D | 05-Jan-99 | 16-Mar-99 |
| 7507300109 | 495-5246129 | LE-DOUX, CORA | 07-Jan-99 | 21-Apr-99 |
| 7507300109 | 495-5248815 | VILLANUEVA, REFUGIO JR | 11-Jan-99 | 06-Jul-99 |
| 7507300109 | 495-5252810 | SILVA, ISRAEL | 14-Jan-99 | 19-Aug-99 |
| 7507300109 | 495-5262672 | ROBERTSON, MICHAEL | 28-Jan-99 | 29-Mar-99 |
| 7507300109 | 495-5280551 | ULRICH,LARRY J | 16-Feb-99 | 14-Apr-99 |
| 7507300109 | 495-5290621 | SCHMIDT, SHELTON J. | 02-Mar-99 | 13-Sep-99 |
| 7507300109 | 495-5302692 | FLORES, JOHNNY | 12-Mar-99 | 02-Jun-99 |
| 7507300109 | 495-5325999 | JONES, MONICA J | 06-Apr-99 | 20-May-99 |
| 7507300109 | 495-5331495 | BISHOP, KIMBERLY | 14-Apr-99 | 07-Jul-99 |
| 7507300109 | 495-5332251 | GALVON, PEDRO E. | 14-Apr-99 | 13-Aug-99 |
| 7507300109 | 495-5332318 | HEAD, ROY | 14-Apr-99 | 30-Jun-99 |
| 7507300109 | 495-5332353 | PACHECO, JULIA T | 14-Apr-99 | 02-Mar-00 |
| 7507300109 | 495-5341390 | GRATTEN, RICHARD | 26-Apr-99 | 30-Jul-99 |
| 7507300109 | 495-5345080 | MORRISON, TIMOTHY S | 29-Apr-99 | 30-Jul-99 |
| 7507300109 | 495-5345392 | THOMAS, HELEN LANELL | 29-Apr-99 | 24-Aug-99 |
| 7507300109 | 495-5345652 | MORRISON, MICHAEL G | 29-Apr-99 | 24-Aug-99 |
| 7507300109 | 495-5345702 | VILLESCAS, SYLVIA | 29-Apr-99 | 09-Jul-99 |
| 7507300109 | 495-5347834 | PIZANA, MANUEL JR. | 03-May-99 | 21-Jul-99 |
| 7507300109 | 495-5347959 | SCHAEFER, WALETER L | 03-May-99 | 30-Jul-99 |
| 7507300109 | 495-5349835 | PEARCE, STEVEN L | 04-May-99 | 13-Jul-99 |
| 7507300109 | 495-5352148 | BRAVO, JORGE M | 06-May-99 | 15-Oct-99 |
| 7507300109 | 495-5358003 | OLIVAREZ, GUSTAVO | 12-May-99 | 02-Sep-99 |
| 7507300109 | 495-5364146 | GONZALEZ, ERNESTO | 19-May-99 | 19-Aug-99 |
| 7507300109 | 495-5372687 | FLORES, DAVID | 28-May-99 | 30-Jul-99 |
| 7507300109 | 495-5374852 | GONZALES, JOSE D JR | 02-Jun-99 | 02-Sep-99 |
| 7507300109 | 495-5377308 | SALAS, JANIE | 04-Jun-99 | 03-Aug-99 |
| 7507300109 | 495-5377343 | DELAURIER, BRIEN P | 04-Jun-99 | 20-Aug-99 |
| 7507300109 | 495-5381875 | BLANKENSHIP, STEPHEN A | 09-Jun-99 | 12-Jan-00 |
| 7507300109 | 495-5385015 | BARRERA, DAMARIS A | 14-Jun-99 | 02-Sep-99 |
| 7507300109 | 495-5385911 | GARCIA, JACOB H | 14-Jun-99 | 26-Aug-99 |
| 7507300109 | 495-5386736 | IZQUIERDO,JOSE ANTONIO | 15-Jun-99 | 02-Sep-99 |
| 7507300109 | 495-5386742 | GARCIA, JULIA T. | 15-Jun-99 | 15-Mar-00 |
| 7507300109 | 495-5392702 | GUTHRIE, JENNIFER LYNN | 22-Jun-99 | 03-Sep-99 |
| 7507300109 | 495-5393585 | FOSTER, DAVID R | 22-Jun-99 | 10-Sep-99 |
| 7507300109 | 495-5395280 | VITOPIL, ANTHONY L. | 24-Jun-99 | 26-Aug-99 |
| 7507300109 | 495-5396211 | SKROSS, JEFFERSON C. | 25-Jun-99 | 06-Nov-99 |
| 7507300109 | 495-5403811 | TRUJILLO, VINCENT G | 06-Jul-99 | 26-Aug-99 |
| 7507300109 | 495-5406223 | RIDINGS, VIRGINIA | 08-Jul-99 | 07-Sep-99 |
| 7507300109 | 495-5407661 | CASTRO, DARDO H | 09-Jul-99 | 15-Oct-99 |
| 7507300109 | 495-5408434 | TOWER, KEVIN A | 12-Jul-99 | 17-Aug-99 |

4

Table 1 – San Antonio, Texas Loans, continued

| Mortgages | FHA Case No. | Mortgagor | Case Ordered | Endorsed |
|-----------|--------------|-----------|--------------|----------|
| 7507300109 | 495-5409712 | SMITH, CHRISTOPHER B | 13-Jul-99 | 24-Aug-99 |
| 7507300109 | 495-5411587 | BESHEER, JAMES D. | 14-Jul-99 | 19-Aug-99 |
| 7507300109 | 495-5412807 | RICE, LAWRENCE D | 15-Jul-99 | 26-Aug-99 |
| 7507300109 | 495-5420934 | DOWDY, BEVERLY A | 26-Jul-99 | 01-Oct-99 |
| 7507300109 | 495-5424443 | OWENS, DRENDA A | 29-Jul-99 | 01-Oct-99 |
| 7507300109 | 495-5428711 | FISCHER, MARK | 04-Aug-99 | 25-Jan-00 |
| 7507300109 | 495-5431660 | CALLEJAS, GUILLERMO | 09-Aug-99 | 14-Oct-99 |
| 7507300109 | 495-5431893 | MARTINEZ, JESSE A | 09-Aug-99 | 19-Oct-99 |
| 7507300109 | 495-5432882 | RODRIGUEZ, ANTONIO B | 10-Aug-99 | 18-Jan-00 |
| 7507300109 | 495-5436508 | SALAZAR, MICHAEL A. | 13-Aug-99 | 13-Oct-99 |
| 7507300109 | 495-5438810 | RIVERA, RAMIRO | 17-Aug-99 | 26-Oct-99 |
| 7507300109 | 495-5440423 | MONTERROSO, IRMA | 19-Aug-99 | 22-Oct-99 |
| 7507300109 | 495-5440554 | BAUTISTA, RAMIRO | 19-Aug-99 | 14-Oct-99 |
| 7507300109 | 495-5447126 | KEIGER, RICHARD L. | 30-Aug-99 | 20-Oct-99 |
| 7507300109 | 495-5448281 | KARDOSZ, TIMOTHY | 01-Sep-99 | 14-Oct-99 |
| 7507300109 | 495-5452966 | STOVER, MARVIN C | 08-Sep-99 | 04-Jan-00 |
| 7507300109 | 495-5454258 | NELSON, ARTHUR AUGUST | 09-Sep-99 | 07-Dec-99 |
| 7507300109 | 495-5457537 | HERRIN, GEORGE | 14-Sep-99 | 18-Nov-99 |
| 7507300109 | 495-5457622 | MARTINEZ, ROSITA | 15-Sep-99 | 14-Mar-00 |
| 7507300109 | 495-5461945 | ORTEGON, SYLVIA G | 21-Sep-99 | 18-Nov-99 |
| 7507300109 | 495-5465066 | ROCHA, MARTINZ Z | 27-Sep-99 | 08-Nov-99 |
| 7507300109 | 495-5465851 | ESPRESION, JULIO | 28-Sep-99 | 03-May-00 |
| 7507300109 | 495-5469672 | HALL, DALE R | 04-Oct-99 | 20-Jan-00 |
| 7507300109 | 495-5469716 | MONTAG, JAMES | 04-Oct-99 | 14-Dec-99 |
| 7507300109 | 495-5470693 | GARZA, FAUSTINO JR | 05-Oct-99 | 29-Nov-99 |
| 7507300109 | 495-5475287 | SAUCEDO, GILBERT | 12-Oct-99 | 05-Jul-00 |
| 7507300109 | 495-5475445 | BARAJAS, JOSE T. | 12-Oct-99 | 18-Jan-00 |
| 7507300109 | 495-5475613 | DEL BOSQUE, MANUEL | 12-Oct-99 | 09-Dec-99 |
| 7507300109 | 495-5476247 | CAAMAL, ENRIQUE | 13-Oct-99 | 27-Mar-00 |
| 7507300109 | 495-5476883 | VILLARREAL, HECTOR M | 14-Oct-99 | 19-Jan-00 |
| 7507300109 | 495-5479056 | GREENING, ROBERT | 18-Oct-99 | 03-Dec-99 |
| 7507300109 | 495-5481673 | MONTALVO, MANUEL JR | 22-Oct-99 | 30-Nov-99 |
| 7507300109 | 495-5482583 | MORALES, VICTOR JR | 25-Oct-99 | 29-Dec-99 |
| 7507300109 | 495-5485488 | APONTE, EMILY | 29-Oct-99 | 02-Feb-00 |
| 7507300109 | 495-5485600 | SILGERO, JOSE MANUEL | 29-Oct-99 | 24-Nov-99 |
| 7507300109 | 495-5485617 | MCCAIN, TIMOTHY | 29-Oct-99 | 11-May-00 |
| 7507300109 | 495-5488659 | YBARRA, RICARDO | 04-Nov-99 | 03-Dec-99 |
| 7507300109 | 495-5490958 | PEREZ, DANIEL | 08-Nov-99 | 12-Jun-00 |
| 7507300109 | 495-5491300 | ESTRADA, SANJUANITA G | 09-Nov-99 | 11-Feb-00 |
| 7507300109 | 495-5491880 | HUDDLESTON, CLARENCE W | 09-Nov-99 | 09-Feb-00 |
| 7507300109 | 495-5492574 | CARDONA, ANACLETO | 10-Nov-99 | 07-Apr-00 |
| 7507300109 | 495-5495281 | STEIN, TROY A | 15-Nov-99 | 07-Jun-00 |
| 7507300109 | 495-5495643 | WALTERS, ROBERT M | 16-Nov-99 | 28-Dec-99 |
| 7507300109 | 495-5500296 | HOUSE, CHERYL M | 23-Nov-99 | 27-Jan-00 |
| 7507300109 | 495-5509634 | RODRIGUEZ, CARLOS | 09-Dec-99 | 13-Jan-00 |
| 7507300109 | 495-5509857 | GONZALEZ, JOSE D | 09-Dec-99 | 03-Feb-00 |
| 7507300109 | 495-5510002 | FREELAND, PERRY L | 10-Dec-99 | 15-Feb-00 |
| 7507300109 | 495-5510133 | GONZALEZ, SELINA | 10-Dec-99 | 26-Jan-00 |
| 7507300109 | 495-5511883 | LUNA, MARGARITO SR. | 14-Dec-99 | 16-Mar-00 |
| 7507300109 | 495-5511896 | YZAGUIRRE, QUIRINO | 14-Dec-99 | 13-Jan-00 |

Table 1 -- San Antonio, Texas Loans, continued

| Mortgagee | FHA Case No. | Mortgagor | Case Ordered | Endorsed |
|---|---|---|---|---|
| 7507300109 | 495-5512186 | MILLER, HANK A | 15-Dec-99 | 13-Jan-00 |
| 7507300109 | 495-5514027 | BARRERA, MARIO A | 20-Dec-99 | 28-Feb-00 |
| 7507300109 | 495-5514033 | TRENT, JOSHUA A | 20-Dec-99 | 02-Feb-00 |
| 7507300109 | 495-5514112 | HEMPEN, TERRY ALLEN | 20-Dec-99 | 18-Mar-00 |
| 7507300108 | 495-5514374 | LEMOS, MAURICIO III | 20-Dec-99 | 26-Jan-00 |
| 7507300109 | 495-5514453 | WINTER, BETTY L RODMAN | 20-Dec-99 | 13-Jan-00 |
| 7507300109 | 495-5514736 | GUTIERREZ, JULIO | 21-Dec-99 | 13-Mar-00 |
| 7507300109 | 495-5515097 | CHAVEZ, JOE | 22-Dec-99 | 17-May-00 |
| 7507300109 | 495-5515334 | MCGILL, ARTHUR | 22-Dec-99 | 02-Feb-00 |
| 7507300109 | 495-5518694 | PARKER, TINA L | 04-Jan-00 | 13-Mar-00 |
| 7507300109 | 495-5519067 | GALVAN, JEFFREY | 04-Jan-00 | 29-Feb-00 |
| 7507300109 | 495-5519415 | HAGGERTY, VANCE R | 04-Jan-00 | 14-Mar-00 |
| 7507300109 | 495-5525007 | PHILLIPS, CHERYL E | 13-Jan-00 | 24-Mar-00 |
| 7507300109 | 495-5525138 | DIAZ, EDWARD ISAAC | 13-Jan-00 | 31-Mar-00 |
| 7507300109 | 495-5525398 | OCHOA, GABRIEL T | 14-Jan-00 | 11-Feb-00 |
| 7507300109 | 495-5525903 | NORANJO, NORA L | 17-Jan-00 | 17-Feb-00 |
| 7507300109 | 495-5525910 | DICKINSON, MAX E | 17-Jan-00 | 20-Mar-00 |
| 7507300109 | 495-5525990 | VILLANUEVA, RUDY | 17-Jan-00 | 16-Mar-00 |
| 7507300109 | 495-5526185 | ELLIOTT, LYSANDER | 17-Jan-00 | 20-Mar-00 |
| 7507300109 | 495-5526372 | WATKINS, DAWN | 18-Jan-00 | 18-Feb-00 |
| 7507300109 | 495-5526553 | LERMA, LOUIS III | 18-Jan-00 | 06-Apr-00 |
| 7507300109 | 495-5527180 | DAVID, PAUL | 19-Jan-00 | 16-Mar-00 |
| 7507300109 | 495-5527819 | VERA, RICARDO F. | 19-Jan-00 | 17-Feb-00 |
| 7507300109 | 495-5529044 | RAMIREZ, RICHARD | 21-Jan-00 | 27-Mar-00 |
| 7507300109 | 495-5630672 | VERA, ALFREDO | 25-Jan-00 | 08-Mar-00 |
| 7507300109 | 495-5532020 | ESPINO, ALFREDO | 27-Jan-00 | 28-Mar-00 |
| 7507300109 | 495-5532122 | LARSON, BROCK A | 27-Jan-00 | 07-Mar-00 |
| 7507300109 | 495-5532326 | DURAN, JESUS A | 27-Jan-00 | 02-Mar-00 |
| 7507300109 | 495-5532962 | GIFFORD, CHARLES D JR | 28-Jan-00 | 18-Apr-00 |
| 7507300109 | 495-5532985 | RIVERA, LUKE SEGURA | 28-Jan-00 | 16-Mar-00 |
| 7507300109 | 495-5534391 | DICKSON, MICHAEL G | 01-Feb-00 | 10-Mar-00 |
| 7507300109 | 495-5535065 | DAWSON, BRIDGET | 01-Feb-00 | 24-Mar-00 |
| 7507300109 | 495-5535158 | SILVA, ARMANDO | 02-Feb-00 | 05-Apr-00 |
| 7507300109 | 495-5535946 | GONZALEZ, ANDREW V. JR | 02-Feb-00 | 11-Apr-00 |
| 7507300109 | 495-5536906 | GUTIERREZ, ALDOLFO | 03-Feb-00 | 16-Mar-00 |
| 7507300109 | 495-5538358 | SCHWING, MARK RICH | 07-Feb-00 | 17-Jul-00 |
| 7507300109 | 495-5539773 | CRUMP, KAREN J | 09-Feb-00 | 22-Mar-00 |
| 7507300109 | 495-5640193 | MCCOY, KEVIN | 09-Feb-00 | 21-Mar-00 |
| 7507300109 | 495-5540306 | GARCIA, GUILLERMO | 09-Feb-00 | 16-May-00 |
| 7507300109 | 495-5542120 | LITE, LAURIE L | 11-Feb-00 | 21-Mar-00 |
| 7507300109 | 495-5542136 | FENDLEY, JASON N | 11-Feb-00 | 29-Mar-00 |
| 7507300109 | 495-5544784 | ESCALANTE, DANIEL | 16-Feb-00 | 19-Apr-00 |
| 7507300109 | 495-5545234 | FLORES, RICHARD C. | 17-Feb-00 | 17-May-00 |
| 7507300109 | 495-5551036 | CURRY, WILLIE E | 28-Feb-00 | 07-Apr-00 |
| 7507300109 | 495-5551433 | EDDLETON, MARK S | 28-Feb-00 | 02-May-00 |
| 7507300109 | 495-5553910 | DE LA ROSA, AGUSTIN | 02-Mar-00 | 05-Jun-00 |
| 7507300109 | 495-5556401 | SERNA, ESTABAN S SR | 06-Mar-00 | 10-Apr-00 |
| 7507300109 | 495-5559580 | HIGGINBOTHAM,TERRY LEE | 09-Mar-00 | 19-May-00 |
| 7507300109 | 495-5560668 | ANDREWS, SETH | 11-Mar-00 | 15-May-00 |
| 7507300109 | 495-5560680 | GARCIA, LEONARD | 11-Mar-00 | 28-Jun-00 |

Table 1 -- San Antonio, Texas Loans, continued

| Mortgagee | FHA Case No. | Mortgagor | Case Ordered | Endorsed |
|---|---|---|---|---|
| 7507300109 | 495-5560701 | VARGAS, DIANE C. | 11-Mar-00 | 19-May-00 |
| 7507300109 | 495-5560718 | CUMPLIDO, LISA MARIE | 11-Mar-00 | 12-Jun-00 |
| 7507300109 | 495-5560760 | CAMPBELL, MICHAEL A | 13-Mar-00 | 09-Jun-00 |
| 7507300109 | 495-5561611 | HARRIS, MAURICE | 13-Mar-00 | 19-May-00 |
| 7507300109 | 495-5562176 | FOSTER, JOE D. | 14-Mar-00 | 05-Jul-00 |
| 7507300109 | 495-5582652 | RUIZ, MONICA | 14-Mar-00 | 17-Jul-00 |
| 7507300109 | 495-5566155 | MADRIGAL, GILBERT | 21-Mar-00 | 25-May-00 |
| 7507300109 | 495-5566473 | BENAVIDES, FELIPE M. | 21-Mar-00 | 12-Jul-00 |
| 7507300109 | 495-5567246 | SLOAN, KEVIN D | 22-Mar-00 | 10-Jul-00 |
| 7507300109 | 495-5569536 | SPROTT, MELVIN A | 24-Mar-00 | 19-May-00 |
| 7507300109 | 495-5570070 | DIETERT, JODY | 27-Mar-00 | 22-May-00 |
| 7507300109 | 495-5570382 | QUINONES, BELJA | 27-Mar-00 | 04-May-00 |
| 7507300109 | 495-5577578 | PARSLEY, PAUL W | 06-Apr-00 | 19-Jun-00 |
| 7507300109 | 495-5579454 | PENNICK, ALVIN LAMONT | 10-Apr-00 | 26-Jun-00 |
| 7507300109 | 495-5579924 | CORTINES, BLAZE | 10-Apr-00 | 20-Jun-00 |
| 7507300109 | 495-5581668 | GONZALEZ, MIGUEL A. | 12-Apr-00 | 11-Jul-00 |
| 7507300109 | 495-5582010 | PATULEA, GREGORY J | 12-Apr-00 | 20-Jun-00 |
| 7507300109 | 495-5584737 | MAYBIN, WARRIN | 14-Apr-00 | 16-Jun-00 |
| 7507300109 | 495-5585154 | FIELDER, WAYNE | 17-Apr-00 | 14-Jun-00 |
| 7507300109 | 495-5585443 | BANKS, DARNELL | 17-Apr-00 | 14-Jun-00 |
| 7507300109 | 495-5588269 | JOHNSON, JOEL C | 20-Apr-00 | 30-May-00 |
| 7507300109 | 495-5588275 | BUCKINGHAM, GARY L | 20-Apr-00 | 16-Jun-00 |
| 7507300109 | 495-5590125 | LIMAS-TREJO, JENNIFER | 25-Apr-00 | 05-Jul-00 |
| 7507300109 | 495-5590611 | MCGLAUGHLIN, SEAN M | 25-Apr-00 | 16-Jul-00 |
| 7507300109 | 495-5590828 | KITE, KENNETH W | 25-Apr-00 | 19-Jun-00 |
| 7507300109 | 495-5594705 | LOPEZ, MARTHA L | 02-May-00 | 29-Jun-00 |
| 7507300109 | 495-5596111 | BARKER, JERRY | 03-May-00 | 27-Jul-00 |
| 7507300109 | 495-5596192 | CLARIDGE, JEFFREY T | 03-May-00 | 21-Jun-00 |
| 7507300109 | 495-5597493 | JESTER, DAVID | 04-May-00 | 27-Jul-00 |
| 7507300109 | 495-5599311 | PORTER, HEATHER K | 08-May-00 | 27-Jul-00 |
| 7507300109 | 495-5599334 | UCAB, JOHN VOLTAIRE B | 08-May-00 | 21-Jun-00 |
| 7507300109 | 495-5599509 | SWISCHUK, ROBERTA | 08-May-00 | 17-Jul-00 |
| 7507300109 | 495-5602042 | STYLES, FARLEY | 11-May-00 | 07-Jul-00 |
| 7507300109 | 495-5603468 | MALDONADO, CYNTHIA | 12-May-00 | 11-Jul-00 |
| 7507300109 | 495-5608305 | HELTON, WILLARD J | 18-May-00 | 26-Jul-00 |
| 7507300109 | 495-5608958 | RODRIGUEZ, STEVEN | 19-May-00 | 10-Jul-00 |
| 7507300109 | 495-5610350 | GONZALES, HILARIO JR. | 22-May-00 | 10-Jul-00 |
| 7507300109 | 495-5631951 | CONKLIN, PAUL R. | 23-Jun-00 | 21-Jul-00 |

Table 2--Slidell, Louisiana Loans

| Mortgagee | FHA Case No. | Mortgagor | Case Ordered | Endorsed |
|---|---|---|---|---|
| 7507300529 | 498-0129667 | KENDALL, MICHAEL J | 12-May-99 | 09-Jul-99 |
| 7507300529 | 221-3075814 | WEATHERSBY, MARIE | 20-Jul-99 | 30-Sep-99 |
| 7507300529 | 221-3092001 | DIXON, JAMES KIRK | 03-Sep-99 | 28-Oct-99 |
| 7507300529 | 221-3052097 | POOLE, JOHN H JR | 14-Jun-99 | 29-Oct-99 |
| 7507300529 | 221-3096503 | SANTIAGO, RANDY | 27-Sep-99 | 01-Nov-99 |
| 7507300529 | 221-3096097 | DEGENHAROT, AMANDA N | 29-Sep-99 | 06-Nov-99 |
| 7507300529 | 221-3105583 | PERCY, RICHARD P | 20-Oct-99 | 16-Nov-99 |
| 7507300529 | 221-3089133 | HENDERSON, TERRY | 26-Aug-99 | 16-Dec-99 |
| 7507300529 | 221-3104962 | SMITH, GRADY LYNN | 19-Oct-99 | 03-Jan-00 |
| 7507300529 | 221-3117001 | DESHOTEL, BRIAN | 02-Dec-99 | 10-Jan-00 |
| 7507300529 | 281-2704441 | DAVIS, TYRONE | 26-Oct-99 | 13-Jan-00 |
| 7507300529 | 221-3113163 | HITHE, GAYNELL | 16-Nov-99 | 21-Jan-00 |
| 7507300529 | 221-3120262 | STEPHENS, CHARLES R. | 14-Dec-99 | 21-Jan-00 |
| 7507300529 | 221-3121652 | GOLDWASSER, ROBERT D | 21-Dec-99 | 21-Jan-00 |
| 7507300529 | 222-1508649 | COTTON, DAVID BRIAN | 13-Dec-99 | 27-Jan-00 |
| 7507300529 | 221-3118404 | ALFRED, DEBORAH JANE | 07-Dec-99 | 31-Jan-00 |
| 7507300529 | 221-3121744 | BARROIS, DAVID M | 21-Dec-99 | 07-Feb-00 |
| 7507300529 | 222-1509214 | WILLIAMS, CHARLES L | 22-Dec-99 | 09-Feb-00 |
| 7507300529 | 281-2713892 | SHUGART, JAY C | 28-Dec-99 | 11-Feb-00 |
| 7507300529 | 221-3124842 | RYE, DOUGLAS KEITH | 10-Jan-00 | 14-Feb-00 |
| 7507300529 | 221-3124734 | TASSIN, STEVEN J. | 10-Jan-00 | 14-Feb-00 |
| 7507300529 | 281-2711725 | HUNT JR, WILSON | 09-Dec-99 | 15-Feb-00 |
| 7507300529 | 221-3117365 | WATSON, JIM C III | 03-Dec-99 | 17-Feb-00 |
| 7507300529 | 221-3124497 | PIAZZA,ANTHONY FRANCIS | 07-Jan-00 | 18-Feb-00 |
| 7507300529 | 221-3124944 | PARKS, WILLIAM M JR | 10-Jan-00 | 23-Feb-00 |
| 7507300529 | 221-3129856 | DELAUGHTER, CHARLES R. | 28-Jan-00 | 29-Feb-00 |
| 7507300529 | 171-0015257 | CASTRO, JOSE S | 14-Sep-99 | 20-Mar-00 |
| 7507300529 | 222-1510705 | ROBERSON,ALBERT LESLIE | 25-Jan-00 | 22-Mar-00 |
| 7507300529 | 222-1511798 | DEMOSS, RICKY | 10-Feb-00 | 23-Mar-00 |
| 7507300529 | 221-3141387 | DELAUGHTER, CHARLES R | 08-Mar-00 | 31-Mar-00 |
| 7507300529 | 221-3107663 | ADAMS, WALTER G JR | 27-Dec-99 | 06-Apr-00 |
| 7507300529 | 221-3131242 | MERCADAL, DAREN P | 02-Feb-00 | 06-Apr-00 |
| 7507300529 | 221-3131997 | REED, LISA M | 04-Feb-00 | 12-Apr-00 |
| 7507300529 | 222-1514707 | PROHASKA,LORI LYNN G F | 15-Mar-00 | 02-May-00 |
| 7507300529 | 221-3146838 | DORMAN, CHRISTOPHER H | 23-Mar-00 | 09-May-00 |
| 7507300529 | 222-1516267 | MOORE, GLORIA JEAN | 03-Apr-00 | 09-May-00 |
| 7507300529 | 221-3147417 | RANDALL, RHONDA | 27-Mar-00 | 11-May-00 |
| 7507300529 | 221-3133736 | RINKER, ZACK L | 10-Feb-00 | 12-May-00 |
| 7507300529 | 222-1517971 | CORBELL, JUSTIN M | 24-Apr-00 | 18-May-00 |
| 7507300529 | 281-2710447 | POWE, SHELDON E. | 02-Dec-99 | 13-Jun-00 |
| 7507300529 | 222-1518156 | WARD, SAMMIE | 26-Apr-00 | 13-Jun-00 |
| 7507300529 | 221-3169753 | BIRKOFF, JOHANNES JR | 05-Jun-00 | 28-Jun-00 |
| 7507300529 | 221-3177300 | JERAL, GARY JOHN | 23-Jun-00 | 25-Jul-00 |
| 7507300529 | 281-2721620 | THIGPEN, MICHAEL | 18-Feb-00 | 27-Jul-00 |

1

Table 3—Overland Park, Kansas Loans

| Mortgagee | FHA Case No. | Mortgagor | Case Ordered | Endorsed |
|---|---|---|---|---|
| 7507300512 | 181-1712473 | OSTERLOH, CLIFFORD L | 03-Aug-98 | 05-Nov-98 |
| 7507300512 | 181-1714865 | RIDGWAY, RAYMOND J JR | 19-Aug-98 | 13-Nov-98 |
| 7507300512 | 181-1715326 | TAYLOR, JOHN W | 21-Aug-98 | 29-Oct-98 |
| 7507300512 | 181-1717890 | NEW, BRENDA L | 03-Sep-98 | 01-Dec-98 |
| 7507300512 | 181-1718969 | FARBER, RICK M. | 10-Sep-98 | 02-Mar-99 |
| 7507300512 | 181-1719255 | BARTEL, RICHARD O | 11-Sep-98 | 13-Nov-98 |
| 7507300512 | 181-1719817 | WILLIAMS, JANICE | 14-Sep-98 | 25-Jan-99 |
| 7507300512 | 181-1722724 | BECKER, JERRY L. | 02-Oct-98 | 07-Dec-98 |
| 7507300512 | 181-1723561 | LANKARD, GREG A | 06-Oct-98 | 31-Dec-98 |
| 7507300512 | 181-1723590 | SETCHELL, WILLIAM H. | 06-Oct-98 | 31-Dec-98 |
| 7507300512 | 182-0580283 | SNYDER, RICHARD L. | 07-Oct-98 | 22-Feb-99 |
| 7507300512 | 182-0590595 | MARTIN, DENNIS A | 08-Oct-98 | 02-Feb-99 |
| 7507300512 | 181-1725332 | ROSS, JEAN E. | 15-Oct-98 | 31-Dec-98 |
| 7507300512 | 181-1725346 | FOSTER, ARTHUR | 15-Oct-98 | 02-Mar-99 |
| 7507300512 | 182-0592581 | BALDWIN, KIRK | 26-Oct-98 | 05-Jan-99 |
| 7507300512 | 182-0594358 | ESCOBAR, JAVIER R | 06-Nov-98 | 02-Feb-99 |
| 7507300512 | 181-1733914 | HATHAWAY, DIANA R L | 30-Nov-98 | 04-Feb-99 |
| 7507300512 | 181-1737259 | ADAMS, MICHELLE A. | 18-Dec-98 | 06-Apr-99 |
| 7507300512 | 182-0598711 | TOWNS, JOHN M | 18-Dec-98 | 23-Apr-99 |
| 7507300512 | 182-0598950 | RIDER, DENNIS B | 21-Dec-98 | 23-Aug-99 |
| 7507300512 | 291-2556247 | HERRELL, TERRY | 28-Dec-98 | 21-Apr-99 |
| 7507300512 | 181-1738175 | HEPFORD, CHARLES A JR. | 29-Dec-98 | 08-Apr-99 |
| 7507300512 | 181-1738429 | CLARK, MICHAEL LEE | 30-Dec-98 | 05-May-99 |
| 7507300512 | 181-1738934 | LANKFORD, RICHARD L. | 06-Jan-99 | 02-Jun-99 |
| 7507300512 | 291-2558487 | KRONK, ANITA FAYE | 06-Jan-99 | 29-Jun-99 |
| 7507300512 | 181-1739463 | YOUNG, RONALD L JR | 06-Jan-99 | 17-Feb-99 |
| 7507300512 | 182-0600374 | LASKY, TERRY J | 11-Jan-99 | 14-May-99 |
| 7507300512 | 182-0600828 | HUGHES, DOUGLAS R | 13-Jan-99 | 16-Jun-99 |
| 7507300512 | 181-1741105 | LAIR, GIDEON L | 22-Jan-99 | 05-May-99 |
| 7507300512 | 291-2563803 | DUDLEY, DARLENE | 25-Jan-99 | 21-Apr-99 |
| 7507300512 | 291-2563832 | DURAND, ANTHONY M | 25-Jan-99 | 20-May-99 |
| 7507300512 | 291-2567089 | SHORT, DAVID R | 02-Feb-99 | 05-Apr-99 |
| 7507300512 | 291-2568216 | ALLEN, STEVEN E | 04-Feb-99 | 08-Apr-99 |
| 7507300512 | 182-0603148 | BOYLE, JASON LEROY | 04-Feb-99 | 16-Apr-99 |
| 7507300512 | 181-1743884 | LEWIS, GEORGE L. | 09-Feb-99 | 13-May-99 |
| 7507300512 | 291-2570929 | STEVENS, CRAIG | 11-Feb-99 | 25-May-99 |
| 7507300512 | 291-2570912 | VAN BIBER, TERRY D | 11-Feb-99 | 17-Sep-99 |
| 7507300512 | 291-2577473 | JONES, MILTON S | 02-Mar-99 | 07-May-99 |
| 7507300512 | 291-2577492 | JACKSON, LINDA | 02-Mar-99 | 11-May-99 |
| 7507300512 | 291-2577486 | ABBOTT, SAMUEL A | 02-Mar-99 | 20-May-99 |
| 7507300512 | 181-1748070 | GRAHAM, ERIN J. | 04-Mar-99 | 22-Jun-99 |
| 7507300512 | 291-2580878 | PADGETT, JEFFERSON | 09-Mar-99 | 01-Jun-99 |
| 7507300512 | 291-2581915 | MCCLAIN, MELISSA | 11-Mar-99 | 06-May-99 |
| 7507300512 | 182-0606801 | OVERMAN, JEFFREY | 11-Mar-99 | 14-May-99 |
| 7507300512 | 291-2582769 | HALL, VALERIE | 12-Mar-99 | 06-May-99 |
| 7507300512 | 291-2583554 | STEPHAN, MIKE | 16-Mar-99 | 13-May-99 |
| 7507300512 | 291-2585850 | ROLFE, BENJAMIN F | 22-Mar-99 | 06-May-99 |
| 7507300512 | 182-0606020 | PIGG, RANDY G | 22-Mar-99 | 18-Oct-99 |
| 7507300512 | 181-1751215 | CLARK, ROGER JAMES | 23-Mar-99 | 26-May-99 |
| 7507300512 | 181-1753353 | PARRISH, FRANCIS M | 05-Apr-99 | 16-Jun-99 |
| 7507300512 | 181-1753709 | CARDWELL, BRUCE | 08-Apr-99 | 05-Jan-00 |

Table 3—Overland Park, Kansas Loans, continued

| Mortgagee | FHA Case No. | Mortgagor | Case Ordered | Endorsed |
|---|---|---|---|---|
| 7507300512 | 181-1754733 | MOLINA, SHAELA F | 12-Apr-99 | 22-Jun-99 |
| 7507300512 | 181-1755196 | WARD, STEVEN L | 14-Apr-99 | 18-Aug-99 |
| 7507300512 | 181-1755541 | SMITH, CLIFTON J. | 15-Apr-99 | 19-Jul-99 |
| 7507300512 | 181-1755913 | ENCISO, MANUEL | 16-Apr-99 | 14-Feb-00 |
| 7507300512 | 181-1756626 | GARCIA, EMMA | 20-Apr-99 | 06-Jul-99 |
| 7507300512 | 181-1756582 | MENDOZA, ABEL | 20-Apr-99 | 18-Aug-99 |
| 7507300512 | 291-2598831 | WROBLEWSKI, TIMOTHY | 22-Apr-99 | 28-Jul-99 |
| 7507300512 | 292-3752185 | SIMPSON, MICHAEL G | 28-Apr-99 | 22-Jul-99 |
| 7507300512 | 181-1758685 | MCDONOUGH, DAVID JEWEL | 30-Apr-99 | 20-Aug-99 |
| 7507300512 | 181-1759189 | CRAWFORD, EDDIE M | 03-May-99 | 06-Jul-99 |
| 7507300512 | 181-1759520 | EDWARDS, GLENN | 05-May-99 | 24-Jun-99 |
| 7507300512 | 181-1759514 | REED, GREGORY R | 05-May-99 | 29-Jul-99 |
| 7507300512 | 182-0613513 | LOMBARDO, DAVID M | 10-May-99 | 26-Aug-99 |
| 7507300512 | 181-1761002 | DILL, CORRIE L | 12-May-99 | 12-Jul-99 |
| 7507300512 | 291-2607492 | RIVERA, ISRAEL | 12-May-99 | 12-Jul-99 |
| 7507300512 | 181-1761241 | EVANS, SUE ANN | 13-May-99 | 06-Jul-99 |
| 7507300512 | 291-2607991 | HERNANDEZ, EDUARDO R | 13-May-99 | 10-Sep-99 |
| 7507300512 | 181-1761973 | MACKAMUL, SHEILA K | 18-May-99 | 25-Aug-99 |
| 7507300512 | 181-1762180 | GILBERT, JOHN J | 19-May-99 | 29-Jul-99 |
| 7507300512 | 181-1762197 | PETERS, JAMES J | 19-May-99 | 19-Aug-99 |
| 7507300512 | 291-2611019 | HAYES, RACI | 21-May-99 | 23-Jul-99 |
| 7507300512 | 182-0614895 | HUTTIE, STAN LEE | 24-May-99 | 03-Sep-99 |
| 7507300512 | 181-1765873 | QUINONES, JORGE J. | 11-Jun-99 | 06-Aug-99 |
| 7507300512 | 181-1765888 | GARZA, GLORIA | 11-Jun-99 | 03-Nov-99 |
| 7507300512 | 181-1766862 | JOHNSTON,MARJORIE JUNE | 17-Jun-99 | 22-Oct-99 |
| 7507300512 | 291-2621792 | RUTTER-CHU, CRISTY | 23-Jun-99 | 07-Aug-99 |
| 7507300512 | 291-2621748 | POINDEXTER, DEBBIE R | 23-Jun-99 | 25-Aug-99 |
| 7507300512 | 181-1767976 | FRENCH, DEBORAH S | 24-Jun-99 | 27-Aug-99 |
| 7507300512 | 181-1767953 | SANDERS, MIKE | 24-Jun-99 | 25-Oct-99 |
| 7507300512 | 182-0616092 | HUDSON, LAURA | 25-Jun-99 | 17-Aug-99 |
| 7507300512 | 181-1768443 | KAUFMAN, STEVE | 28-Jun-99 | 06-Aug-99 |
| 7507300512 | 181-1768437 | PEREYDA, ARMANDO | 28-Jun-99 | 20-Aug-99 |
| 7507300512 | 181-1768601 | FERGUSON, DAVID L | 29-Jun-99 | 18-Aug-99 |
| 7507300512 | 182-0618714 | PERRECA, MASSIMO | 01-Jul-99 | 10-Sep-99 |
| 7507300512 | 182-0619393 | SMITH, HAROLD B | 13-Jul-99 | 08-Sep-99 |
| 7507300512 | 181-1770634 | SCHMIDT, WILLIAM C. | 14-Jul-99 | 25-Aug-99 |
| 7507300512 | 181-1770667 | JOHNSON, ANDREA C | 14-Jul-99 | 05-Oct-99 |
| 7507300512 | 291-2630386 | WEDDINGTON, JAMES M | 20-Jul-99 | 27-Sep-99 |
| 7507300512 | 291-2631013 | MANLEY, KAREN J | 21-Jul-99 | 15-Sep-99 |
| 7507300512 | 181-1772591 | DUNLAP, ROBERT B | 23-Jul-99 | 18-Aug-99 |
| 7507300512 | 182-0620470 | BRYANT, NATALIE A | 23-Jul-99 | 03-Sep-99 |
| 7507300512 | 181-1773160 | MANSOOR, SYED S | 27-Jul-99 | 27-Aug-99 |
| 7507300512 | 291-2633197 | NICHOLS, DAVID R | 28-Jul-99 | 13-Aug-99 |
| 7507300512 | 181-1774456 | NYE, TAMMY M | 02-Aug-99 | 14-Oct-99 |
| 7507300512 | 181-1777501 | RAYO, JORGE | 17-Aug-99 | 23-Sep-99 |
| 7507300512 | 181-1777480 | COHOON, CHAD L | 17-Aug-99 | 24-Nov-99 |
| 7507300512 | 181-1781797 | DAVIS, DARRYL D | 14-Sep-99 | 08-Nov-99 |
| 7507300512 | 181-1782098 | DOZE, MEL DUSTIN | 16-Sep-99 | 15-Nov-99 |
| 7507300512 | 181-1782104 | TAYLOR, ERIC J | 16-Sep-99 | 02-Feb-00 |
| 7507300512 | 181-1782314 | HICKS, KARLENE E | 17-Sep-99 | 04-Nov-99 |
| 7507300512 | 291-2650977 | FINLAY, ANTHONY T | 27-Sep-99 | 16-Dec-99 |

3

**Table 3—Overland Park, Kansas Loans, continued**

| Mortgagee | FHA Case No. | Mortgagor | Case Ordered | Endorsed |
|---|---|---|---|---|
| 7507300512 | 181-1784288 | PENA, CARLOS G | 04-Oct-99 | 09-Dec-99 |
| 7507300512 | 181-1787051 | FOUGERE, PAUL J. | 26-Oct-99 | 15-Nov-99 |
| 7507300512 | 181-1787261 | LOZANO, MARIA ALBA | 27-Oct-99 | 17-Dec-99 |
| 7507300512 | 291-2658328 | ABRAHAM-JONES, CERISE | 29-Oct-99 | 28-Dec-99 |
| 7507300512 | 181-1787833 | BOYKIN, MICHAEL T. | 03-Nov-99 | 03-Dec-99 |
| 7507300512 | 151-5911599 | GREGORY, CARLA R | 10-Nov-99 | 14-Jan-00 |
| 7507300512 | 182-0627847 | ERIVES, MANUELA | 12-Nov-99 | 24-Jan-00 |
| 7507300512 | 181-1789545 | CLARK, LINDA S. | 19-Nov-99 | 14-Jan-00 |
| 7507300512 | 181-1789959 | REAL, HERIBERTO | 23-Nov-99 | 16-Dec-99 |
| 7507300512 | 291-2663970 | DOUGLAS, NIKAYLIA | 24-Nov-99 | 21-Apr-00 |
| 7507300512 | 181-1791033 | FOLEY, KAREN D | 06-Dec-99 | 14-Jan-00 |
| 7507300512 | 291-2665360 | BONACORSO, JOSEPH J | 08-Dec-99 | 26-Jan-00 |
| 7507300512 | 181-1792617 | CLARK, ROGER Z | 23-Dec-99 | 14-Jan-00 |
| 7507300512 | 291-2670081 | TUCKER, KEITH | 04-Jan-00 | 08-Mar-00 |
| 7507300512 | 181-1793839 | MURPHY, DIANE | 12-Jan-00 | 24-Feb-00 |
| 7507300512 | 181-1793822 | LANSAW, MARTIN | 12-Jan-00 | 05-Apr-00 |
| 7507300512 | 182-0631205 | SINGLETON, BRIAN | 20-Jan-00 | 27-Apr-00 |
| 7507300512 | 182-0631589 | WALTHER, LARS | 27-Jan-00 | 04-Apr-00 |
| 7507300512 | 291-2675390 | KERFORD, KENNETH C | 01-Feb-00 | 06-Apr-00 |
| 7507300512 | 291-2675472 | ELLIOT, JIMI | 01-Feb-00 | 11-Apr-00 |
| 7507300512 | 181-1795721 | BEAL, T CHRISTINE | 01-Feb-00 | 26-Apr-00 |
| 7507300512 | 181-1795823 | DAVIS, JERRY L | 02-Feb-00 | 07-Apr-00 |
| 7507300512 | 291-2676417 | GOLDEN, BRIAN | 04-Feb-00 | 21-Aug-00 |
| 7507300512 | 182-0632331 | KAY, ELAINE | 08-Feb-00 | 28-Apr-00 |
| 7507300512 | 182-0632984 | MCCALLSON, JIM I | 17-Feb-00 | 20-Apr-00 |
| 7507300512 | 291-2680910 | MITCHELL, TRENT | 24-Feb-00 | 08-May-00 |
| 7507300512 | 181-1798909 | CIPPEAUX, DEBRA D | 29-Feb-00 | 09-May-00 |
| 7507300512 | 181-1799299 | SMITH, SHAWN D. | 03-Mar-00 | 02-May-00 |
| 7507300512 | 291-2682678 | SERRANT, MIKKA | 03-Mar-00 | 15-May-00 |
| 7507300512 | 181-1799609 | NEAVE, MARIANO | 06-Mar-00 | 26-Apr-00 |
| 7507300512 | 181-1799781 | MONTGOMERY, KARLA J | 07-Mar-00 | 11-May-00 |
| 7507300512 | 182-0634378 | MORRELL, JEREMY | 08-Mar-00 | 08-Jun-00 |
| 7507300512 | 181-1799991 | CLEM, KYLE | 08-Mar-00 | 09-Jun-00 |
| 7507300512 | 182-0634650 | BRACK, VIRLINDA | 13-Mar-00 | 17-May-00 |
| 7507300512 | 182-0634644 | SEGUNA, TONY | 13-Mar-00 | 25-May-00 |
| 7507300512 | 181-1800765 | WEST, NORA GRACE | 14-Mar-00 | 26-Apr-00 |
| 7507300512 | 181-1801388 | HAYES, RALPH A | 17-Mar-00 | 12-Jul-00 |
| 7507300512 | 291-2688937 | COBBETT, RAYMOND H | 22-Mar-00 | 01-Jun-00 |
| 7507300512 | 182-0635554 | TERWELP, PENNY M | 24-Mar-00 | 06-Jun-00 |
| 7507300512 | 182-0635633 | BROX, DAVID J. | 27-Mar-00 | 02-Sep-00 |
| 7507300512 | 181-1803256 | HURLA, BRIAN | 31-Mar-00 | 11-May-00 |
| 7507300512 | 181-1804093 | JONES, DEBORAH | 06-Apr-00 | 25-Jul-00 |
| 7507300512 | 181-1804540 | GRIGGS, BRENDA A | 10-Apr-00 | 03-Jul-00 |
| 7507300512 | 182-0636849 | GUANCE, ROBERT D | 11-Apr-00 | 19-Jun-00 |
| 7507300512 | 291-2695678 | EBERT, CHRISTINA M | 12-Apr-00 | 10-Aug-00 |
| 7507300512 | 182-0637295 | BEHRENS, BRIAN | 14-Apr-00 | 11-May-00 |
| 7507300512 | 181-1805648 | PROVO, DEL R | 17-Apr-00 | 21-Jun-00 |
| 7507300512 | 291-2700000 | BARCUS, DEBRA | 26-Apr-00 | 22-Jun-00 |
| 7507300512 | 182-0638074 | BORNSTEIN, BARRY | 26-Apr-00 | 24-Jul-00 |
| 7507300512 | 291-2701035 | PULLIAM, JEFFERY A. | 28-Apr-00 | 07-Jul-00 |
| 7507300512 | 291-2702359 | GRAHAM, EARL L. | 03-May-00 | 13-Jul-00 |

4

Table 3--Overland Park, Kansas Loans, continued

| Mortgagee | FHA Case No. | Mortgagor | Case Ordered | Endorsed |
|---|---|---|---|---|
| 7507300512 | 181-1807792 | PORTELA, ANTONIO | 03-May-00 | 15-Aug-00 |
| 7507300512 | 181-1807626 | MOUNCE, DELAND S | 03-May-00 | 02-Sep-00 |
| 7507300512 | 291-2703275 | MCDANIEL, BRIDGETT L | 04-May-00 | 03-Oct-00 |
| 7507300512 | 181-1808218 | BIERLE, WAYNE A | 05-May-00 | 27-Jun-00 |
| 7507300512 | 291-2703508 | STARKS, KENT A | 05-May-00 | 03-Aug-00 |
| 7507300512 | 291-2703820 | NGUYEN, DAVID | 05-May-00 | 28-Sep-00 |
| 7507300512 | 181-1808644 | RIEGLE, RANDY L | 09-May-00 | 26-Jun-00 |
| 7507300512 | 181-1808650 | ROGERS, JOSHUA K | 09-May-00 | 05-Jul-00 |
| 7507300512 | 182-0638159 | YANG, LEVISSDAN | 09-May-00 | 27-Jul-00 |
| 7507300512 | 181-1808752 | WHITESELL, SHAUN E | 10-May-00 | 10-Jul-00 |
| 7507300512 | 181-1808789 | OWEN, JAMES A. | 10-May-00 | 19-Jul-00 |
| 7507300512 | 182-0639480 | HAUSER, BRIAN | 12-May-00 | 04-Aug-00 |
| 7507300512 | 182-0639477 | DIOSOLADO, JUAN A. | 12-May-00 | 17-Aug-00 |
| 7507300512 | 291-2707484 | DANNER, RANDY | 17-May-00 | 17-Aug-00 |
| 7507300512 | 291-2707992 | FISHER, EDWIN LEROY | 18-May-00 | 25-Jul-00 |
| 7507300512 | 291-2708004 | MCGREGOR, DUNCAN JR. | 18-May-00 | 18-Aug-00 |
| 7507300512 | 181-1810438 | MOORE, JOHN A. | 19-May-00 | 18-Aug-00 |
| 7507300512 | 291-2708091 | PAYNE, DONALD | 19-May-00 | 08-Sep-00 |
| 7507300512 | 181-1812407 | BISHOP, JACOB | 01-Jun-00 | 04-Aug-00 |
| 7507300512 | 181-1812576 | BLAYLOCK, KRISTIE | 01-Jun-00 | 09-Aug-00 |
| 7507300512 | 182-0640837 | XAYAKHOM, CHANTHAPHONG | 01-Jun-00 | 10-Aug-00 |
| 7507300512 | 182-0641117 | ZINN, CHRISTOPHER | 06-Jun-00 | 12-Sep-00 |
| 7507300512 | 181-1814808 | RUBERO, ALFREDO | 13-Jun-00 | 17-Jul-00 |
| 7507300512 | 291-2715591 | NELSON, JANICE LEA | 19-Jun-00 | 19-Sep-00 |
| 7507300512 | 291-2717540 | BULT, RYAN E | 23-Jun-00 | 18-Sep-00 |
| 7507300512 | 291-2717239 | FERGUSON, JEFFREY P | 23-Jun-00 | 26-Sep-00 |
| 7507300512 | 291-2718646 | BELL-DANCY, KAREN Y | 28-Jun-00 | 25-Sep-00 |
| 7507300512 | 291-2718619 | THOMAS, CONNIE | 28-Jun-00 | 04-Oct-00 |
| 7507300512 | 291-2722403 | GUTH, BRIDGET | 11-Jul-00 | 05-Oct-00 |
| 7507300512 | 182-0643898 | YANG, SHOUA V. | 12-Jul-00 | 27-Sep-00 |

5

UNITED STATES OF AMERICA
DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
Washington, D.C.

| | |
|---|---|
| In the Matter of: | ) |
| | ) |
| ALLIED HOME MORTGAGE CAPITAL | ) |
| CORPORATION | ) Docket No. 01-1465-MR |
| | ) |
| Respondent. | ) |
| | ) |

## SETTLEMENT AGREEMENT

This Settlement Agreement is made and entered into between the United States Department of Housing and Urban Development ("Department" or "HUD") and Allied Home Mortgage Capital Corporation (formerly known as Allied Mortgage Capital Corporation), its owners, successors, subsidiaries, affiliates and assigns ("AHMCC" or "Mortgagee").

WHEREAS, HUD's Quality Assurance Division of the Office of Lender Activities and Program Compliance ("Quality Assurance Division") conducted a review of AHMCC's employment agreements and branch operations occurring at AHMCC's Houston, Texas; San Antonio, Texas; Slidell, Louisiana; and Overland Park, Kansas branch offices between August 1996 and May 2000;

WHEREAS, AHMCC was sent a Notice of Violation dated April 23, 2001, ("Notice") advising it that the HUD Mortgagee Review Board ("Board") was considering taking an administrative action and imposing a civil money penalty against

AHMCC based on its alleged violations of HUD/FHA requirements as stated in the Notice;

WHEREAS, AHMCC was provided an opportunity to respond to the Notice and subsequently submitted a written response;

WHEREAS, both HUD and AHMCC mutually desire to avoid further expense and administrative proceedings and to reach a satisfactory resolution of this matter; and

WHEREAS, this Settlement Agreement shall not constitute an admission of liability or fault on the part of any party.

NOW, THEREFORE, HUD and AHMCC agree as follows:

1. This Settlement Agreement shall become effective upon its execution by the Chairman of the Mortgagee Review Board or his duly authorized designee ("Effective Date").

2. AHMCC shall fully comply with all rules, regulations, and other requirements of HUD pertaining to the origination of HUD/FHA-insured mortgages. AHMCC represents that its employment agreements now comply with HUD requirements. In particular, AHMCC represents that its employment agreements do not require that the employee: 1) indemnify AHMCC; 2) pay the operating expenses of the AHMCC branch offices; and 3) fund reserve accounts.

3. AHMCC shall pay HUD an administrative payment in the amount of Fifty Thousand Dollars ($50,000). This payment shall be made payable, by certified check, to the U.S. Department of Housing and Urban Development. Payment shall be made by AHMCC upon execution of this Agreement.

2

4. Any breach of the terms and provisions of this Settlement Agreement by AHMCC shall constitute independent grounds for imposition of administrative sanctions by the Mortgagee Review Board against AHMCC pursuant to 24 C.F.R. Part 25.

5. This Settlement Agreement is for the purpose of settling this administrative action only and shall be used for no other purpose. This Settlement Agreement shall not affect any individual or entity other than AHMCC.

6. This Settlement Agreement is voluntary and entered into by AHMCC after due consideration of the terms contained herein. AHMCC will not seek the termination or reconsideration of this Settlement Agreement, directly or indirectly, after the Effective Date identified in Paragraph 1 supra.

7. AHMCC hereby agrees to waive, release, and remit any and all claims, directly or indirectly, against HUD or HUD employees with respect to this administrative action or the issuance by the Board to AHMCC of the Notice.

8. Each side to bear its own costs and legal fees.

REMAINDER OF PAGE INTENTIONALLY BLANK

# Exhibit 5

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTHONY E. DIETZ,

       Plaintiff,

—vs—

ALLIED HOME MORTGAGE CAPITAL
CORPORATION, a foreign corporation,

       Defendant.

Civil Action No. 2:10-cv-12610
Hon. George C. Steeh
Magistrate R. Steven Whalen

/

Jeffrey J. Fleury P53884
Ahern Fleury PC
430 North Old Woodward Ave, 2d Floor
Birmingham, MI 48009
(248) 723-6101
jfleury@ahernfleury.com
Co-counsel for Plaintiff
      —And—
Jane Groves Enright P37344
George & Enright, PC
330 E Maple Rd, Suite 286
Birmingham, MI 48009
Phone: (248) 792-9514
jenright@derrickgeorge.com
Co-counsel for Plaintiff Dietz

Marc E. Thomas P25628
Bendure & Thomas
30700 Telegraph Road, Suite 3475
Bingham Farms, MI 48025-4571
(248) 646-5255
marc@bendurethomaslaw.com
Attorneys for Defendant Allied Home
Mortgage Capital Corporation, a Texas
corporation

/

## AFFIDAVIT OF JOSEPH JAMES

NOW COMES Joseph James who, after being first duly sworn, deposes, and says:

1.     I am the general counsel for the defendant in this civil action, Allied Home

Mortgage Capital Corporation, a Texas corporation, hereafter "Allied Home Mortgage."

2.     I have been employed in this capacity with Allied Home Mortgage for

6 years.

3.               I am of suitable age and discretion to make this affidavit and, if called

upon, could testify competently about the matters herein set forth.

4.      I have read and am familiar with Plaintiff's Complaint For Money

Damages/Action For An Accounting and Jury Demand, as well as the exhibits attached thereto.

5.      Furthermore, I have read and am familiar with Plaintiff's Response and

Brief Opposing Defendant's Motion To Dismiss Plaintiff's Complaint, hereafter the "Response."

6.      Exhibit 2 to the Response is the Affidavit of Anthony E. Dietz, dated July

21, 2010.

7.      In his Affidavit, Plaintiff Dietz refers to an alleged telephone conversation

we had "on or about March 16, 2009," then referencing his email to me of that date.

8.      The statements attributed to me by Plaintiff Dietz regarding James Hodge

are false to the extent that those comments suggest Mr. Hodge "ignores the rules when he does

not agree" or otherwise is someone that refuses to follow applicable laws.   To the contrary, Mr.

Hodge is law abiding citizen who respects the rights of everyone, particularly Allied Home

Mortgage customers and employees.

            FURTHER AFFIANT SAITH NOT.

                                                        Joseph James

Subscribed and sworn to before me this
12th day of August, 2010.

Notary Public, Harris County, TX                SEAL
My commission expires: June 27, 2013

CYNTHIA A. COOGLER
MY COMMISSION EXPIRES
June 27, 2013



ALLIED
MORTGAGE
CAPITAL CORPORATION

## WHY ALLIED MORTGAGE CAPITAL CORPORATION IS NOT A "NET BRANCH" COMPANY

On May 1, 2000 HUD issued Mortgagee Letter 00-15 (see Quality Control Chapter for copy) addressing the issue of "net branches". Allied Mortgage Capital Corporation was certainly not surprised by this pronouncement because we have addressed this issue with several state regulatory authorities, including Illinois, Virginia, Ohio, South Carolina, Florida and New Hampshire. Additionally, this issue was addressed with HUD in conjunction with numerous HUD audits throughout the United States. In every state listed above, state regulators overwhelmingly endorsed us as being in compliance. While HUD was convinced that our operations were precisely in conformance with HUD Handbook 4060.1, Rev-1, they made several recommendations to us, and each of those recommendations was acted upon.

One of the problems with Allied Mortgage Capital Corporation being identified as a "net branch" was inadvertently created by us. We traditionally referred to ourselves as a "net branch" company. While the term "net branch" may have been a convenient term to use in the past, it does not accurately define Allied Mortgage Capital Corporation. We have gone to extraordinary lengths to remove the term "net branch" from all of our web site presentations, promotional materials and manuals.

We continue our quest to educate state regulators and HUD auditors so that they understand our operation. It is important that everyone understand that our Branch Managers, Loan Originators and any other employees execute an employment agreement that makes each one a W-2 employee and that we do not pay anyone, under any circumstances, as a 1099 or contract employee. Additionally, Allied Mortgage Capital Corporation pays all of the operating expenses for each branch including credit reports, rent, equipment leases, phone bills, payroll and any other expenses incurred by the branch. Allied Mortgage is also the lessee of the space occupied by the Allied Mortgage Capital Corporation branches.

No employee of Allied Mortgage Capital Corporation is authorized or allowed to co-broker or give anything of value to an unlicensed or non-approved person or entity. This means that if a Realtor, builder, individual, or another mortgage company wants to co-broker or refer a loan to an Allied Mortgage Capital Corporation employee or branch, this cannot and will not be done unless and until we are satisfied that the referring person or company is properly credentialed or exempt from specific requirements.

Allied Mortgage Capital Corporation is approved by the U.S. Department of Housing and Urban Development (HUD) and is an approved Fannie Mae Seller/Servicer. We are subject to stringent audits and monitoring from both of these agencies as well as from the investors with which we have agreements. Additionally, we maintain an extraordinary Quality Control program internally that meets or exceeds HUD, VA, Fannie Mae and Freddie Mac requirements. We audit, not only for compliance with federal and agency requirements, but also state compliance.





# Exhibit 6

11/06/2007 11:35 FAX 5087981863          SEDER&CHANDLER                    ☑002

## MORGAN, BROWN & JOY, LLP
### ATTORNEYS AT LAW
### 200 STATE STREET
### BOSTON, MASSACHUSETTS 02109-2605
### TELEPHONE (617) 523-6666
### FACSIMILE (617) 367-3125

DIANE M. SAUNDERS                                                                    DIRECT DIAL (617) 788-5017
*also admitted in NY                                                                 dsaunders@morganbrown.com

November 5, 2007

**BY FACSIMILE (508-478-0664) & REGULAR MAIL**

Domingos Afonso, President
Afonso-Gillon Court, Inc.
189 Main Street, Second Floor
Milford, MA 01757

Re:  Peter Belli/189 Main Street

Dear Mr. Afonso:

As you know, I represent Allied Home Mortgage Capital Corporation ("Allied"). I write this letter to request that you permit Allied to retrieve the files, property and equipment that remains in the offices formerly occupied by Peter Belli in the building located at 189 Main Street in Milford. In addition to confidential personnel and financial data of Allied, the files contained in that space may contain confidential data about Allied's customers. That consumer data is protected under federal law (specifically, the Gramm-Leach-Bliley Act, 15 U.S.C. s. 6801, *et seq.*), and Allied has a duty under federal law to protect such data from disclosure to third parties. In the event that you refuse to allow Allied to retrieve these files and thwart Allied's efforts to discharge its legal duty to protect this information, Allied will hold you and your company accountable for any unlawful disclosure of the confidential data contained in any of those files.

In previous telephone conversations in which I requested that you allow Allied to retrieve the files, property and equipment that remains in the 189 Main Street building in the space formerly occupied by Peter Belli, you indicated that you would not allow Allied to retrieve anything from the space unless and until Allied brought current the rent that you claim is due and owing on the space. Allied is not, however, willing to make such rent payments. As you know, Allied never had either a direct lease with you for the space in question, or a sublease with Mr. Belli for the space. While Allied made rent payments to you directly for several years, those payments were made on behalf of Mr. Belli in order to allow him to meet *his* obligations to you under his lease(s) with you. In doing so, Allied did not create any tenancy relationship with you.

11/06/2007 11:35 FAX 5087961563          SEDER&CHANDLER                              ☑003

MORGAN, BROWN & JOY LLP

In light of the above, I respectfully request that you contact me to make arrangements for Allied to retrieve its files, property and equipment from the 189 Main Street property, and I respectfully suggest that you pursue any rent arrears that may exist with Mr. Belli himself. Thank you for your consideration of this matter.

Very truly yours,

Diane Saunders

cc:     Kurt Binder, Esq. (counsel for Peter Belli)

2

# Exhibit 7



| Issue Date | |
|---|---|
| February 10, 2009 | |
| Audit Report Number | |
| 2009-FW-1005 | |

TO:        Brian D. Montgomery
           Assistant Secretary for Housing–Federal Housing Commissioner, H

           Henry S. Czauski, Acting Director, Departmental Enforcement Center, CV

           *Gerald R. Kirkland*

FROM:      Gerald R. Kirkland
           Regional Inspector General for Audit, Fort Worth Region, 6AGA

SUBJECT:   Allied Home Mortgage Capital Corporation, Houston, Texas, Did Not Fully
           Follow HUD's Branch Office Requirements  .

# HIGHLIGHTS



We reviewed Allied Home Mortgage Capital Corporation (Allied), a nonsupervised
loan correspondent. The objective of the review was to determine the validity of a
hotline complaint that Allied operated its branches in violation of U. S. Department
of Housing and Urban Development (HUD) requirements. Specifically, the
complaint alleged that Allied required its branch managers to enter into certain
contractual relationships, pay branch operating expenses, and provide
indemnification for losses and damages, all of which were prohibited branch
arrangements.



The complaint was partially valid as Allied did not fully follow HUD's branch office
requirements. Allied required branch mangers to personally enter into certain
contractual agreements, such as office space leases, equipment contracts, and utility
arrangements, at all five branches reviewed. Also, Allied did not consistently pay

rental, utility, and telephone expenses at all five branches. Further in one instance, Allied requested that a former employee use personal funds to cover branch operating losses. The allegation that Allied required its employees to indemnify it for loan losses was not valid. In addition, although not alleged in the complaint, testing disclosed that Allied hired an ineligible employee to originate Federal Housing Administration insured single family mortgages.



We recommend HUD's Assistant Secretary for Single Family Housing

- Require Allied to immediately discontinue its current practices related to leases/agreements for all branch offices; adopt new practices and controls that require it to directly enter into leases and/or agreements; and implement the necessary policies, systems, and controls to ensure that it pays all required branch operating costs.
- Require the Quality Assurance Division to confirm that all Allied branch offices have appropriate agreements and take appropriate actions if compliance does not occur.
- Request the Mortgagee Review Board pursue civil money penalties and/or administrative sanctions as appropriate against Allied Home Mortgage Capital Corporation for the violations cited in this report.

Further, we recommend that the Acting Director of the Departmental Enforcement Center pursue civil money penalties or take administrative action, as appropriate, against the responsible parties for the violations cited in this report.

For each recommendation without a management decision, please respond and provide status reports in accordance with HUD Handbook 2000.06, REV-3. Please furnish us copies of any correspondence or directives issued because of the audit.



We provided a draft to Allied and requested a response by January 15, 2009. Allied provided written comments on January 15, 2009. Allied generally agreed with our report but provided additional comments to explain why the conditions occurred. The complete text of Allied's response, along with our evaluation of that response, can be found in appendix A of this report.

At HUD's request, we made minor changes to the report terminology. We also further clarified the recommendations to better ensure that appropriate corrective actions are taken.

2

# TABLE OF CONTENTS

Background and Objective      4

Results of Audit
    Finding 1: Allied Did Not Fully Follow HUD's Branch Office Requirements      5

Scope and Methodology      11

Internal Controls      13

Appendixes

    A.  Auditee Comments and OIG's Evaluation      14

# BACKGROUND AND OBJECTIVE

Allied Home Mortgage Capital Corporation (Allied) was approved on September 26, 1991, as a nonsupervised loan correspondent for single family loans insured by the Federal Housing Administration (FHA). Allied's corporate headquarters is located at 6110 Pinemont in Houston, Texas. According to its website, Allied is the largest U. S. privately held mortgage banker/mortgage broker with hundreds of branch offices throughout the U. S. and the Virgin Islands. According to HUD's Neighborhood Watch system, as of June 9, 2008, Allied had 467 active branches.

The U. S. Department of Housing and Urban Development's (HUD) Office of Inspector General (OIG) received a hotline complaint, alleging that Allied did not follow HUD rules and requirements when operating its branch offices. Specifically, the complaint alleged that Allied required its branch managers to enter into certain contractual relationships, pay branch operating expenses, and provide indemnification for losses and damages, all of which violated HUD requirements.

The objective of the review was to determine the validity of a hotline complaint that Allied operated its branches in violation of HUD requirements.

# RESULTS OF AUDIT

## Finding 1  Allied Did Not Fully Follow HUD's Branch Office Requirements

Allied did not completely follow HUD's rules, regulations, procedures, and instructions when operating and managing its branch offices. Specifically, for all five branches reviewed, Allied did not ensure that contractual agreements were in its name. It also did not consistently pay rental, utility, and telephone expenses at all five branches. These conditions occurred because Allied did not have a system in place to ensure that it paid all operating expenses and it apparently attempted to maintain a separation between itself and its branches. Further, Allied requested that a former employee use personal funds to cover branch operating losses when the branch's operating account had a negative balance. In addition, it hired an ineligible employee because its president overrode its internal controls. As a result, Allied did not maintain the close supervisory control and oversight of its branches required by HUD and exposed HUD to possible unnecessary insurance risk.



None of the office space lease agreements for the five branches reviewed were in Allied's name. Instead, the branch managers personally entered into and signed the lease agreements. Four of the five branch managers had signed month-to-month subleases with Allied to show that Allied was paying the operating expenses. However, ultimate responsibility for the lease payments continued to rest with the branch manager if Allied canceled the sublease. The lease for the fifth branch was in the branch manager's name with the designation "d.b.a. Allied Home Mortgage." When Allied closed two of the five branches, one manager became liable for approximately one month on the lease, and the other manager became responsible for the remaining 33 months on that branch's lease.

In two cases, the branch managers submitted equipment leases in Allied's name: one for 36 months and one for 66 months. However, Allied instructed the vendors to remove its name from the equipment leases and required that the leases be put in the branch managers' names. One branch also had a utility bill in the branch manager's name.

According to HUD's requirements, Allied was prohibited from requiring that contractual relationships with vendors be in the name of the employee.[1]  According to Allied's audited financial statements, it entered into month-to-month operating leases to minimize its future lease commitments. By not directly entering into

---

[1]  HUD Mortgagee Approval Handbook 4060.1, REV-2, paragraph 2-14, and Mortgagee Letter ML 00-15.

leases, Allied apparently attempted to maintain a separation between itself and its branch offices which was inconsistent with the close supervisory control and oversight of its branches required by HUD.[2]



Allied did not consistently pay the monthly rental amounts at all five branches reviewed during the 27 months tested. The following table shows the number of months Allied did not pay rent and the outstanding rent due or credit balance as of March 31, 2008.

|  |  |  |
|---|---|---|
| 2315 | 15 | $148,090 |
| 1785 | 7 | 2,626 |
| 0835 | 2* | (2,587) |
| 0173 | 3 | 2,081 |
| 1886 | 1** | 1,500 |
| Total |  | $151,710 |

*For an additional 5 out of 27 months reviewed, Allied did not pay rent, but the branch had a credit balance due. Also, in addition to the monthly rental payment, the lease agreement required $6,270 for the lease year, but it was silent as to how or when it was to be paid.

** Although Allied closed the branch on January 17, 2008, it did not pay rent that was due on January 1, 2008.

Allied had a system in place named Auto-Pay that would automatically pay the branches' monthly rental expenses. Allied staff members said that this system allowed them to verify that all monthly rental payments were made. However, Allied did not consistently use the system for all branches during the period reviewed. As shown in the table, Allied's system did not work. Allied could not explain why this condition occurred. HUD's policies required Allied to pay all of the operating expenses of its branches.[3] In addition, Allied's written policies stated that Allied should have always paid all branch core expenses including rent.

---

[2]   HUD Mortgagee Approval Handbook 4060.1, REV-2, paragraphs 2-9 A and D.
[3]   HUD Mortgagee Approval Handbook 4060.1, REV-2, Paragraph 2-8.



In addition to rental expenses, Allied did not pay the required operating costs of utility and telephone expenses for all five branches for the 27 months reviewed.[4]

### Utilities

Allied's records showed that it did not pay any utility expenses at three of the five branches during the 27 months reviewed. At another branch, Allied occasionally paid utility expenses. Allied consistently paid utility expenses at the fifth branch until the month it closed the branch. The following table shows the number of months Allied did not make utility payments.

| | |
|------|----|
| 1785 | 27 |
| 0835 | 19 |
| 2315 | 27 |
| 0173 | 27 |
| 1886 | 1  |

### Telephone Expenses

Allied's records showed that it also did not consistently pay telephone expenses at all five branches. The following table shows the number of months in which Allied did not pay telephone expenses, according to its records, and the range of the payment amounts for the months in which Allied paid telephone expenses as the payment amounts fluctuated.

| | | | |
|------|-----|--------|---------|
| 1785 | 27  |        |         |
| 0835 | 10  | $  .72 | $1,027  |
| 2315 | 9   | 275    | 7,941   |
| 0173 | 6   | 173    | 2,188   |
| 1886 | 2*  | 309    | 554     |

\* One of the two nonpayment months was the month Allied closed the branch.

---

[4]   HUD Mortgagee Approval Handbook 4060.1, REV-2, Paragraph 2-8.

Allied's written policies required it to pay all core operating expenses each month, which included both telephone and utility expenses  Allied did not consistently pay these expenses because it did not have a system for determining whether core expenses such as utility and telephone expenses were paid each month.  In addition, it did not maintain records showing the amounts due each month or whether the branch managers submitted utility or telephone bills for payment.  Instead, Allied allowed its branch managers to decide which operating expenses to submit for payment or reimbursement, rather than requiring that they be turned in monthly for payment.

By not ensuring that it paid all core expenses such as office space rent, telephone and utility expenses, Allied did not maintain the close supervisory control and oversight over its branches as required by HUD and exposed HUD to possible unnecessary insurance risk.



Allied requested a former branch manager use his personal funds to cover operational expenses when one branch had an extremely high operating account deficit.  In emails between the former branch manager and the president of Allied, the president told the branch manager that he needed to "bring money to the table."  In another email, the former branch manager told the president of Allied that he was in the process of getting funding from an additional source to cover losses at another branch.  The branch manager did not provide proof that he ever made a payment to Allied to cover the operating losses.  However, HUD's rules prohibit requiring an employee to use personal funds to cover operating expenses if funds are not available from an operating account.[5]



The complaint allegation that Allied required its branch managers to indemnify it for losses and damages was invalid.  According to HUD's policies, HUD may require FHA approved lenders to enter into indemnification agreements on FHA insured loans when HUD determines that the loans expose HUD to an unacceptable level of risk.  An indemnification agreement states that the lender will repay HUD for any losses it incurs on loans covered by the agreement.  Allied did not require branches to repay it for losses incurred for loans under an indemnification agreement.  Allied did require branches to repay it for premiums earned on defaulted loans, which is an allowed operating expense according to HUD's requirements.

---

[5]   HUD Mortgagee Approval Handbook 4060.1, REV-2, paragraph 2-14, and Mortgagee Letter ML 00-15.



Allied hired an employee who lived in a different state, more than 300 miles from the HUD approved branch, to initiate loans declined by the employee's husband, who worked at another mortgage company. HUD's policies prohibit taking on an existing, separate mortgage company or broker and allowing it to originate insured mortgages under the approved lender's HUD mortgagee number. In addition, this practice is a violation of HUD's rules prohibiting third-party originations of FHA-insured loans.[6] The employee also indicated that she would be working for another real estate or mortgage company while working for Allied. However, HUD's rules prohibit staff from having outside employment in mortgage lending, real estate, or a related field.[7]

Allied's staff determined that the employee was ineligible and attempted to stop her from being hired. However, Allied's president overrode internal controls, and she was hired. The employee is no longer employed at Allied and did not originate any FHA loans. However, top management's willingness to override controls and the advice of staff exposed HUD to increased risk that another ineligible employee could also be hired. In addition, this incident supports the contention that Allied did not exercise adequate control and supervision over its branches as required.[8]



Allied did not have effective systems and controls in place to ensure that it fully complied with HUD's rules, regulations, procedures, and instructions when it operated its branches. Allied took steps indicating that it attempted to maintain a separation between itself and its branch offices. This action was inconsistent with the close supervisory control and oversight of its branch employees required by HUD and exposed HUD to increased risk to the FHA insurance fund.

---

[6]   Mortgagee Letter 00-15 and HUD Mortgagee Approval Handbook 4060.1, REV-2, paragraph 2-19.
[7]   HUD Mortgagee Approval Handbook 4060.1, REV-2, paragraph 2-9G.
[8]   HUD Mortgagee Approval Handbook 4060.1, REV-2, paragraphs 2-9 A and D.



We recommend that HUD's Assistant Secretary for Single Family Housing

1A.   Require Allied to immediately discontinue its current practices related to office space, utility, and equipment leases/agreements for all branch offices, and adopt new practices and controls that require Allied to directly enter into those leases and/or agreements.

1B.   Require Allied to implement the necessary policies, systems, and controls to ensure that it pays all branch operating costs, including rental, utility, and telephone expenses.

1C.   Require HUD's Quality Assurance Division to confirm that all Allied branch offices have appropriate agreements.  For those branches that do not comply, take appropriate action to ensure compliance including but not limited to prohibiting the branch office from originating FHA insured loans, and/or referring Allied to the Mortgagee Review Board.

1D.   Request the Mortgagee Review Board pursue civil money penalties and/or administrative sanctions as appropriate against Allied Home Mortgage Capital Corporation for the violations cited in this report.

We also recommend that the Acting Director of HUD's Departmental Enforcement Center

1E.   Pursue civil money penalties and administrative sanctions, as appropriate, against the responsible parties for the violations cited in this report.

10

# SCOPE AND METHODOLOGY

Our objective was to determine the validity of a hotline complaint that Allied operated its branches in violation of HUD requirements.  To accomplish our objectives, we

- Reviewed background information and HUD criteria that control branching arrangements.
- Reviewed the hotline complaint and documentation supplied.
- Reviewed various reports, databases, and documents to determine existing conditions at Allied.  The documents included Allied's Branch Training Manual and HUD's Quality Assurance Division's most recent review of Allied.
- Reviewed Allied's fiscal year 2006 and 2007 audited financial statements for information related to Allied's branching operations and for indications of questionable activities.
- Selected a nonrepresentative sample[9] of 5 of 548 (467 active and 81 terminated) Allied branch offices for review including branch 0173 in Kingwood, Texas; branch 0835 in Fairview Park, Ohio; branch 1785 in Houston, Texas; branch 1873 in Grove, Oklahoma; and branch 2315 in Kansas City, Missouri.  We selected a nonrepresentative sample instead of a representative sample to review specific items of interest (branches) which were alleged to have specific violations of HUD's branching requirements.  We selected three branches which were listed in the documentation supporting the hotline complaint.  We also selected two branches at random which were not listed in the complaint and which were located in the Houston area.
- For each branch selected, obtained and reviewed data in Allied's files, including office space leases and other contractual agreements; performed limited testing of expenses; and reviewed employee files to test employment agreements and pay status.
- Made site visits to two Allied branches.
- Interviewed former branch managers, Allied officials, and staff from HUD's Quality Assurance Division and Program Enforcement Division.
- Performed certain tests on the computer-processed financial data obtained from Allied.  We determined the data to be sufficiently reliable to meet our objectives.

We also used data maintained by HUD in the Neighborhood Watch system for background information and in selecting our sample of loans.  We did not rely on the data to base our conclusions.  Therefore, we did not assess the reliability of the data.

Our review covered the period January 1, 2006, through March 31, 2008.  We performed our audit from June through November 2008.  We conducted the review at the corporate headquarters of Allied located in Houston, Texas; two of Allied's area branch offices located in Houston and Kingwood, Texas; and the HUD office located in Houston, Texas.  The scope of our review was generally limited to issues raised in the complaint regarding prohibited branch arrangements.

---

[9]   A nonrepresentative sample selection is appropriate when enough is known about the population to identify a relatively small number of items of interest.

We performed our review in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the review to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our objective. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based upon our objective.

# INTERNAL CONTROLS

Internal control is an integral component of an organization's management that provides reasonable assurance that the following objectives are achieved:

- Effectiveness and efficiency of operations,
- Reliability of financial reporting, and
- Compliance with applicable laws and regulations.

Internal controls relate to management's plans, methods, and procedures used to meet its mission, goals, and objectives. They include the processes and procedures for planning, organizing, directing, and controlling program operations as well as the systems for measuring, reporting, and monitoring program performance.



We determined that the following internal controls were relevant to our audit objectives:

- Policies and procedures that management has implemented to reasonably ensure that its operations meet HUD's requirements in an effective and efficient manner.

We assessed the relevant controls identified above.

A significant weakness exists if management controls do not provide reasonable assurance that the process for planning, organizing, directing, and controlling program operations will meet the organization's objectives.



Based on our review, we believe that the following items are significant weaknesses:

- Allied did not ensure that branch contractual agreements were in its name.
- Allied did not consistently pay the required core operating costs of rental, utility, and telephone expenses for the five branch offices reviewed.
- Allied's president overrode its internal controls to hire an ineligible employee.

## Appendix A

## AUDITEE COMMENTS AND OIG'S EVALUATION

**Ref to OIG Evaluation**          **Auditee Comments**



ALLIED HOME MORTGAGE CAPITAL CORPORATION
**Legal Department**
6110 Pinemont Drive • Houston, TX 77092
Phone: 713-353-6464 • Fax: 713-353-6588
www.ahmcnetwork.com

January 15, 2009

Angela Wilson, Senior Auditor
Theresa Carroll, Assistant Regional Inspector General
Gerald R. Kirkland, Regional Inspector General for Audit
U.S. Department of Housing and Urban Development
Office of Inspector General, Region IV
819 Taylor Street, Suite 13A09
Fort Worth, Texas 76102

Re:     Audit Report Number 2009-FW-100X
        Allied Home Mortgage Capital Corporation

Dear Ms. Wilson, Ms. Carroll and Mr. Kirkland:

Allied Home Mortgage Capital Corporation ("Allied" or the "Company")
appreciates the opportunity to respond to the HUD Office of Inspector General Report on
Net-Branching Requirements, as referenced ("Report"). The Company understands and
appreciates its responsibilities as a HUD mortgagee, and considers all such matters
seriously. In responding to the Report we will attempt to be brief.

It is Allied's belief that the origin of the hotline complaint received by the HUD
Inspector General is a former branch manager currently involved in litigation with the
Company. During the last year of this individual's tenure with Allied there was
significant conflict, which eventually resulted in a severance of the relationship by the
corporate office. A lawsuit between the parties is currently pending in Federal Court in
Massachusetts regarding various claims of impropriety on the part of the former branch
manager. The Inspector General has been provided with a copy of relevant pleadings in
the case.

The foregoing is offered to demonstrate that the complaint was made to aid the
former manager in his litigation as opposed to a good faith effort to protect the interests
of the government.

Additionally, while the factual basis for the Report is correct in all material
respects, the stated facts alone do not give a complete picture of the operation of
Company branch operations during the audit period. Allied operated an average of
approximately 800 branches during the audit period. The audit reviewed records
associated with 5 branch offices, which represents 1% of operations. Also during the
audit period there was significant staff turnover in key positions within the company that
had responsibility to oversee the functions that were the subject of the audit report.

**Comment 1**

14

Specifically, two Chief Financial Officers served during this time and the director of compliance was absent during most of the audit period due to serious family medical issues that eventually caused her to resign her employment with the company.

**Comment 2**

At various times prior to and during the audit period, Allied received on site examinations by program officials and administrators with the U S Department of HUD office of single family who reviewed Allied's retail operation including its sublease arrangement with landlords. None of the reviews found a concern with Allied's sublease arrangement.

**Comment 1**

There are suggestions in the Report that some of the former practices of Allied exposed the government to undue risk. The facts are that neither the government nor any private party incurred any loss for such practices. All lease, utility and other branch expenses were timely paid or resolved to the satisfaction of the landlord and Allied.

Finding 1: <u>Allied Did Not Fully Follow HUD's Net-Branching Requirements</u>

<u>*Allied Did Not Ensure Branch Contractual Agreements Were In Its Name*</u>

Response - Allied must rely upon the disclosures made to its corporate office by individuals that it hires as branch managers concerning the extent of their operation prior to and at the time of their employment. In some instances individuals have pre-existing relationships with vendors that are not fully disclosed to Allied after a branch manager is hired. All known lease agreements are confirmed and a sublease is then executed and a monthly debit account is established to pay rent. In the past there were occasions when Allied relied upon the manager to submit monthly invoices to pay the rent but that process was discontinued several months ago.

**Comment 2**

Company policy requires that equipment lease agreements be approved at the corporate office only. A branch manager does not have the authority to bind the Company to any such agreement. On occasion the Company becomes aware that a manager has exceeded his or her authority and entered into an agreement that the Company would not otherwise have approved. In those instances Allied notifies the vendor that the transaction was unauthorized, having determined that the Company will not further ratify manager actions outside the scope of permissible authority.

<u>*Allied Did Not Consistently Pay Rental Expenses*</u>

Response – Allied incorporates its response contained in the foregoing paragraphs. In addition, during the period of the audit, Allied experienced turnover in the positions of Chief Financial Officer and Director of Compliance which had responsibility to establish, implement and supervise the accounting function to ensure that procedures were consistent with all applicable governmental policies and regulations. During the audit period, Allied was experiencing a conversion of the process that relied upon the manual submission of invoices by branch managers to an automated system. This took a

**Comment 3**

2

significant period for software installation and the staff, including branch managers, to be trained so that the system would work effectively

Additionally, the rental expense chart in the Report references five (5) branch offices. The first listed branch, 2315, is subject matter in the litigation previously referenced. The other four branch offices are cited as missing 13 rental payments from a combined total of 108 (27 months x 4 offices), with a combined stated underpayment of rent in the sum of $3,620, a de minimus amount.

**Comment 3**

*Allied Did Not Consistently Pay Utility and Telephone Expenses*

Allied incorporates its responses contained in the foregoing paragraphs. In addition, some utility payments were included in the monthly lease rental payment and were not billed as separate items. After conversions to the automatic pay system, all utility payments have been timely.

**Comment 4**

*Allied Requested That One Former Branch Manager Pay for Branch Operating Losses*

This is a situation where there was an apparent deviation from HUD procedures as opposed to an actual deviation. The mere discussion of a potential variation should not be the basis for an actual finding or the establishment of an actual deviation. The mere discussion in this one instance that never was consummated does not establish that the event, even if it had occurred, was universal or company wide. The circumstances discussed in the email were unique.

**Comment 5**

*Complaint Concerning Indemnification Was Invalid*

Allied accepts this finding without further comment.

*Allied Hired an Ineligible Employee to Initiate FHA Loans*

Even though the emails seem to indicate otherwise, the President of the company was under the impression that the individual employed would relocate within a reasonable time to her new place of employment, obtain proper certification in the new location and would cease operation with her former employer. The emails do not fully disclose the complete oral discussions and circumstances surrounding the decision to extend employment to the subject employee. This was a one-time event and has not and will not reoccur again.

**Comment 6**

*Conclusion*

Allied has carefully considered the findings and recommendations set forth in the Report and is committed to taking appropriate action to address any deficiencies. The Company is further committed to serving the needs of consumers and complying with all HUD regulations. The Company appreciates the opportunity to respond and looks forward to a continued dialogue with HUD. If you have any questions, comments, or

3

. . . .

require any additional information, please do not hesitate to contact the undersigned at
713.684.0732.

Very truly yours

Joseph James
Senior Counsel

4

17

## OIG Evaluation of Auditee Comments

Comment 1   Allied agreed with the facts disclosed in the report but offered additional comments to explain the conditions reported.  Allied also said that neither the government nor any private party incurred any loss as a result of its practices.  We disagree that no private parties incurred a loss resulting from Allied's practices.  When Allied terminated three of the five branches reviewed, the branch manager became personally responsible for expenses.

Comment 2   Allied's response did not address the fact that the branches' rental leases were not in its name.  HUD's policies require branch contractual agreements to be in the name of the HUD/FHA approved mortgagee, not in the name of the branch manager.

Allied further stated that its policy required equipment lease agreements to be approved at the corporate office only.  We disagree.  Allied's written policies that we obtained, dated from 2005 through March 2008, do not state this.  Instead they required signed equipment subleases in Allied's name.

Comment 3   Allied said staff turnover and new computer software were the reasons for rental expenses not being paid.  HUD policy required it to pay all operating expenses of its branches, including rent.  Since Allied did not have effective systems and controls in place, these expenses were not paid.

Allied also considered the missing rental payments from four of the branches reviewed to be a de minimus amount.  We disagree.  The 13 missed payments actually totaled $17,307, not $3,620 as stated by Allied.  Further, all five branches reviewed had at least one month where Allied did not make a rental payment.

Comment 4   In addition to its previous comments, Allied said that some utility payments were included in lease payments.  Our review did disclose that three of the five branches had leases that contained references to utility costs.  However, one lease included only partial utilities and Allied did make a few utility payments for this branch, but did not pay those utilities every month.  For another, the lease included statements that indicated utility costs were covered but also stated that the landlord could adjust for excess utilities and bill the lessee for costs in excess of calculated annual costs which indicated utility payments may have occurred and not been paid.  For the third lease, our testing included only one month where utility costs were included in the lease which indicated that utility costs should have been paid by Allied for the other months.  In addition, telephone expenses are not normally included in lease payments and we did not observe that telephone expenses were included in any of the lease agreements reviewed.

Comment 5   Allied stated that the deviation from HUD policies is apparent, rather than actual.  We disagree.  Allied's emails provided enough discussion to determine that the branch manager was asked to provide personal funding to cover branch operating losses which is prohibited by HUD's rules.

Comment 6    Allied stated that the emails do not fully disclose the complete discussions and
             circumstances surrounding the hiring of the ineligible employee.  We agree that the
             emails do not reflect oral discussions, but they do show warnings by staff to Allied's
             president that this employee should not have been hired which were disregarded.

# Exhibit 8

# Branch Office Notification
## Title I / Title II

**U.S. Department of Housing and Urban Development**
Office of Housing
Federal Housing Commissioner

OMB Approval No.
2502-0005 (exp. 03/31/2009)

See Public Reporting Burden and Privacy Act Statements on back before completing this form.

| | |
|---|---|
| 1a. Corporate Name | 6a. Title I Home Office Lender ID, if applicable (10 digits) |
| 1b. Branch DBA (if any) | 6b. Title II Home Office Mortgagee ID, if applicable (10 digits) |
| 2. Geographic Address of Branch Office (must be physical location) | 7. Branch phone (include area code and extension)  Ext. |
| Attention (Do not use an individual's name) | 8. Branch FAX (include area code) |
| Street Address | 9. Branch e-mail |

| 3. Title I Mailing Address or Title II (CHUMS) Address. Check if same as: ☐ Geographic | 10. County |
|---|---|
| Attention (Do not use an individual's name) | 11a. Branch Manager Name |
| Street Address/P.O. Box | 11b. Branch Manager Social Security Number |

| City | State | Zip Code | 12. Title II branch only | Number of employees |
|---|---|---|---|---|

☐ Traditional  ☐ Nontraditional

| 4. Endorsement Address (Title II only)  Check if same as: ☐ Geographic ☐ CHUMS | 13. Contact Name |
|---|---|
| Attention (Do not use an individual's name) | |
| Street Address/P.O. Box | 14. Contact phone (include area code and extension)  Ext. |
| City  State  Zip Code | 15. Contact FAX (include area code) |

| 5a. | Originate/Service | 5b. | | Originate/Service | 16. Contact e-mail |
|---|---|---|---|---|---|
| ☐ Title I  Property Improvement | ☐ ☐ | ☐ Title II | 1-4 Family Mortgages | ☐ ☐ | |
| Manufactured Housing | ☐ ☐ | | Multifamily Mortgages | ☐ ☐ | 17. Applicant Taxpayer Identifying Number (9 digits) |

**Certifications.** The Undersigned certifies that:

a. This branch office meets all HUD/FHA requirements.

b. The staff of this branch office are employees of this corporation which will pay all operating costs of this office, including compensation of all employees.

c. If this branch office has a DBA, it has a DBA Certificate from the State where it is physically located.

d. The branch office fee has been paid.

**HUD Authorization.** Your branch office is authorized to originate HUD insured loans in the following HUD Field Office jurisdictions:

Reserved (do not write in this space)

| Signature | Title (must be a senior executive) | **U.S. Department of Housing and Urban Development** Office of Lender Activities and Program Compliance | |
|---|---|---|---|
| Name (printed or typed) | Date | By | Date |

| **Title I** | **Title II** |
|---|---|
| Reserved (do not write in this space) | Reserved (do not write in this space) |

Previous editions are obsolete. Replaces HUD-92001-LB which is obsolete.     ref Handbooks 4060.1 & 4700.02     form **HUD-92001-B** (04/2007)

**Privacy Act Statement:** HUD is authorized to collect this information by Executive Order 9397. The Housing & Community Development Act of 1987, 42 U.S.C. 3543 authorizes the mandatory collection of the Social Security Number (SSN). HUD will use the information collected to determine the eligibility of program participants to participate or continue to participate in the HUD's programs. The names and SSN's are used to obtain positive identification of the officers and directors who have the authority to obligate the Lender. You must provide all of the information requested, including the SSN's of appropriate officers and directors. HUD may disclose this information to Federal, State and local agencies when relevant to civil, criminal, or regulatory investigations and prosecutions. It will not be other wise disclosed or released outside of HUD, except as required and permitted by law. Failure to provide any of the required information may result in a delay or disapproval of participation in HUD's programs.

Public Reporting Burden for this collection of information is estimated to average 30 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This agency may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB control number.

The information requested on this form is required by 24 CFR Part 202 and Sec. 306(g) of the National Housing Act or by HUD Handbooks 4060.1, 5500.1, and 5500.2. The information collected assists FHA and Ginnie Mae in determining which lenders should be approved to participate in the FHA single and multifamily insurance programs and/or the Ginnie Mae Mortgaged-Backed Securities Program. It is used to help FHA minimize its risk in insuring single-family and multifamily mortgages and Ginnie Mae to minimize its risk. Applicants are not required to respond to this collection of information unless a currently valid approved OMB control number is displayed on the form.

## Requirements

### For Branch Offices of Supervised, Non-Supervised and Loan Correspondent Mortgagees.

1. Submit this Notification for only those offices that will submit applications to HUD for insurance or service HUD-insured mortgages.

2. All employees of the branch must be employees of the mortgagee and, with the exception of receptionists will conduct only the business affairs of the mortgagee during normal business hours.

3. The branch office must be a true branch; that is, a separately located unit of the mortgagee, in an office in which no business other than that of the mortgagee is conducted. A branch may be located in a mortgagee's home office.

4. A branch manager must be located in the office and may not be the manager of more than one branch office. The manager must conduct only the business of the approved branch during normal business hours.

5. The mortgagee's facilities must be in a location conducive to transacting mortgage lending business and be separated by partitions from any other entity, be identified to the public, and provide privacy for conducting interviews. However, entrances and receptionists may be shared.

6. It shall have a staff of at least two employees and will be open during normal business hours.

The National Housing Act (12 U.S.C.); the HUD Regulations (24CFR) and HUD handbooks contain the complete Requirements.

### Instructions

**Item 1b**   Doing Business As. For optional use to identify a company which is doing business under a different name. Please attach copy of doing business as statement or assumed name certificate filed with the State.

The President or the Vice President of the mortgage corporation must sign the form.

**Item 2**   Geographic Address of Branch Office. Identifies the physical location of the branch office.

**Item 3**   Conditional and Firm Commitment Address. Enter an address which HUD should use to mail correspondence relative to applications for conditional and firm commitments to insure mortgages.

**Item 4**   Endorsement Address: Address to which the HUD-59100 Mortgage Insurance Certificate (MIC) is sent. Also, the address which the receipt for the onetime Mortgage Insurance Premiums (MIP) will be returned.

**Item6a/b**   The sixth through the ninth digits of a Title I lender or a Title II mortgage identification number identifies the branch or home office of the mortgagee. A mortgagee wishing a specific number for a branch office should complete this box.

**Fee.** A nonrefundable Branch Office Fee of $300 for either a Title I or a Title II branch must be submitted. If a Branch Office is already approved in one program and the application is for approval in the other program at the same address, there is no additional fee. Governmental institutions and not-for-profit entities are exempt from the fee. Checks should be made payable to the Department of Housing and Urban Development.

## Certification

### The undersigned certifies that:

1. No employee of this branch office is presently suspended, debarred or otherwise restricted under 24 CFR Part 24 or Part 25 or similar procedures of any other Federal Agency;

2. No employee of this branch office is presently under indictment or has been convicted of a felony for which the sentence has not been completed;

3. This branch office and its employees are not presently subject to outstanding findings as a result of HUD or other governmental audits or investigations; and

4. No employee of this branch office is engaged in business practices that do not conform to generally accepted practices of prudent lenders or that demonstrate irresponsibility.

**Material to Be Submitted.** Complete in triplicate. If there is inadequate space on the form, you may submit the information on a separate sheet of paper. The original and one copy should be submitted together with the $300.00 fee.

### Rights and Requirements:

1. Title I lenders and Title II mortgagees may have branch offices.

2. All employees of the branch office must be employees of the Lender.

3. The Branch Office must be a true branch; that is, a separately located unit of this corporation, in an office in which no other business than that of the Lender is conducted.

4. A branch manager must be located in the branch office and may not be the manager of more than one branch office. The manager must conduct only the business of the approved branch during normal business hours.

5. The Lender's facilities must be conducive to transacting lending business and be separated by permanent partitions from any other entity and must be clearly identified to the public, provide privacy for conducting interviews and have its own telephones. However, entrances and receptionists may be shared.

6. The Branch Office shall have a staff of at least two employees and be open during normal business hours.

### The Undersigned Agrees That:

1. This office will be a true branch; that is, a separately located unit of the Lender, in an office in which no business other than that of the Lender will be conducted;

2. This office will be maintained, staffed and identified to the public separately from any other business and no business other than that of the Lender will be conducted by employees of the branch, including the manager during normal business hours;

3. The office will be open to the public during normal business hours (unless approved otherwise in writing by HUD);

4. HUD will be notified within 10 days of the closing of the Branch Office or of any change in this notification;

5. The Lender will at all times provide for the servicing of all Loans in accordance with HUD Regulations; and

6. The staff of this Branch Office are employees of this corporation, which will pay all operating costs of this office, including compensation of all employees.

**Instructions:** If there is inadequate space, submit the required information on a separate sheet. The original should be submitted to HUD and a copy retained for the applicant's records. For information on fees, mailing addresses, and checklists to use when completing the application package, refer to HUD Handbook 4700.02, Title I Lender Approval Handbook, and HUD Handbook 4060.1, Mortgage Approval and Recertification.

**4060.1 REV-2**



### *FHA Title II Mortgagee Approval Handbook*

Directive Number: 4060.1, REV-2          August 14, 2006

## Table of Contents

CHAPTER 1.  OVERVIEW

| | | |
|---|---|---|
| **1-1** | Approval | 1-1 |
| **1-2** | Types of Approved Mortgagees | 1-2 |
| **1-3** | Renewal of FHA Approval | 1-3 |
| **1-4** | HUD's Lender Web Page | 1-3 |
| **1-5** | FHA Connection | 1-3 |
| **1-6** | HUDCLIPS | 1-3 |
| **1-7** | HUD Handbooks | 1-4 |
| **1-8** | Frequently Asked Questions | 1-4 |
| **1-9** | FHA Lender List on HUD's Web Site | 1-4 |
| **1-10** | Performance Requirements | 1-4 |
| **1-11** | Reports and Examinations | 1-4 |
| **1-12** | Home Mortgage Disclosure Act of 1974 (HMDA) | 1-4 |
| **1-13** | Administrative Actions, Administrative Sanctions, and Civil Money Penalties | 1-4 |
| **1-14** | Reporting Fraud, Illegal Acts, and Unethical Practices to HUD | 1-5 |
| **1-15** | Mortgagee's Address for Communication | 1-5 |
| **1-16** | Contacting the Department | 1-5 |
| **1-17** | OMB Approval of Information Collections | 1-5 |

CHAPTER 2.  MORTGAGEE REQUIREMENTS FOR INITIAL AND CONTINUING APPROVAL

## Part A. Requirements for all Mortgagees

| | | |
|---|---|---|
| **2-1** | Introduction | 2-1 |
| **2-2** | Business Form | 2-1 |
| **2-3** | State Licensing Requirements | 2-2 |
| **2-4** | Mortgagee Name | 2-3 |
| **2-5** | Net Worth Requirements | 2-3 |
| **2-6** | Liquid Assets | 2-5 |
| **2-7** | Application Fees. | 2-5 |
| **2-8** | Operating Expenses | 2-6 |
| **2-9** | Employees and Officers | 2-6 |
| **2-10** | Ineligible Participants. | |
| **2-11** | Office Facilities | 2-8 |
| **2-12** | Staffing Requirements | 2-10 |
| **2-13** | Outsourcing | 2-10 |
| **2-14** | Prohibited Branch Arrangement | 2-11 |
| **2-15** | Communications Capability and Responsibility | 2-12 |
| **2-16** | Fair Housing and Other Federal Laws | 2-13 |
| **2-17** | Misrepresentative Advertising | 2-13 |
| **2-18** | Loan Origination Requirement | 2-14 |

**4060.1 REV-2**

**2-19** Geographic Restrictions for Loan Origination and Underwriting ............... 2-14
**2-20** Loan Servicing Responsibility ............................................................. 2-15
**2-21** Escrow Funds.
**2-22** Prohibited and Permissible Payments .................................................. 2-16
**2-23** Quality Control ................................................................................ 2-17
**2-24** Requirement to Notify HUD of Changes Subsequent to Approval ............ 2-17

**Part B. Additional Requirements for Specific Mortgagee Types**
**2-25** Introduction.................................................................................... 2-18
**2-26** Supervised Mortgagees .................................................................... 2-18
**2-27** Non-supervised Mortgagees .............................................................. 2-18
**2-28** Supervised Loan Correspondents ....................................................... 2-19
**2-29** Non-supervised Loan Correspondents ................................................. 2-20
**2-30** Investing Mortgagees
**2-31** Governmental Institutions................................................................. 2-22

CHAPTER 3.  MORTGAGEE APPROVAL PACKAGE AND PROCEDURES

# Part A. Submission of Application

**3-1**    Introduction.................................................................................... 3-1
**3-2**    Required Documentation .................................................................... 3-1
**3-3**    Documentation for Specific Business Forms ........................................... 3-7

**Part B. Processing of Application**
**3-4**    Introduction.................................................................................... 3-8
**3-5**    Requests for Additional Information ..................................................... 3-8
**3-6**    Mortgagee Approval Processing .......................................................... 3-8
**3-7**    Approval Notifications ...................................................................... 3-10
**3-8**    Disapproval ................................................................................... 3-10

Part C. Appeals of Disapproval

*3-9*    ***INITIAL APPEAL***
**3-10** Final Appeal   ............................................................................... 3-11

Part D. Newly Approved Mortgagees

**3-11** Introduction................................................................................... 3-12
3-12   **Immediately Upon Approval.......................................................... 3-12**
3-13   FHA Mortgage Insurance Premiums and Claims..................................... 3-12
**3-14** Direct Endorsement (DE) ................................................................. 3-12

CHAPTER 4.  ANNUAL RENEWAL OF FHA APPROVAL

**4-1**    Requirement for Annual Renewal ........................................................ 4-1
**4-2**    Yearly Verification Report.................................................................. 4-1
**4-3**    Annual Renewal Fees
**4-4**    Annual Submission of Audited Financial Statements ............................... 4-2
          A.    Required Reports by Type of Mortgagee For Electronic Submission .. 4-3
          B.    Types of Mortgagee for Which Submission are Not Required........... 4-6

---

| 4060.1 REV-2 |
|---|

---

|  | C. | Extensions ................................................................ | 4-6 |
| **4-5** | LASS Review Procedures .............................................................. | | 4-6 |
|  | A. | Auditor's Report ........................................................ | 4-7 |
|  | B. | Annual Submission ..................................................... | 4-7 |
| **4-6** | Acceptance of LASS Submission ................................................... | | 4-11 |
| **4-7** | Deficient LASS Submission ........................................................... | | 4-11 |
| **4-8** | Rejected LASS Submission ........................................................... | | 4-12 |
| **4-9** | Termination of FHA Mortgagee Approval ..................................... | | 4-12 |
| **4-10** | Requests for Information .............................................................. | | 4-13 |

CHAPTER 5. BRANCH OFFICES, PRINCIPAL-AUTHORIZED AGENT RELATIONSHIPS AND ADDITIONAL
SPONSORS

Part A. Branch Offices
**5-1** Introduction
**5-2** Originating at Branch Offices .......................................................... 5-1
**5-3** Underwriting at Branch Offices ....................................................... 5-1
**5-4** Servicing at Branch Offices ............................................................ 5-1
**5-5** Centralized Centers ........................................................................ 5-1
**5-6** Mortgagees Permitted to Maintain Branch Offices ........................ 5-1
**5-7** Registration of a New Branch ......................................................... 5-1
**5-8** Direct Lending Branch Office .......................................................... 5-2

**Part B. Principal-Authorized Agent Relationship**
**5-9** Introduction ................................................................................... 5-4
**5-10** Principal ......................................................................................... 5-4
**5-11** Authorized Agent ........................................................................... 5-4
**5-12** Origination and Underwriting ......................................................... 5-4
**5-13** Mortgagee Name in Loan Closing .................................................. 5-5
**5-14** Establishing the Relationship ........................................................ 5-5
**5-15** Origination Fee .............................................................................. 5-5

## Part C. Additional Sponsors
**5-16** Adding Sponsors for a Loan Correspondent ................................. 5-5
**5-17** Registration Procedure .................................................................. 5-5

CHAPTER 6. CHANGES SUBSEQUENT TO APPROVAL

**6-1** Reporting Business Changes ......................................................... 6-1
**6-2** Change of Home Office Location or Telephone ............................. 6-2
|  | A. | Address Changes ...................................................... | 6-2 |
|  | B. | Telephone and Fax Numbers and Email Address .......... | 6-2 |
**6-3** Change of Branch Office Location or Telephone Number ............... 6-3
|  | A. | Within the Same State .............................................. | 6-3 |
|  | B. | To Another State ...................................................... | 6-3 |
**6-4** Termination of Principal-Authorized Agent Relationship ............... 6-3
**6-5** Termination of Loan Correspondent-Sponsor Agreement .............. 6-3
**6-6** Permission for Supervised Loan Correspondent to Service ........... 6-3
**6-7** Change of Fiscal Year
**6-8** Change of Legal Name ................................................................... 6-4
**6-9** Changes to "Doing Business As" (dba) Name ................................ 6-4

---

| 4060.1 REV-2 |

**6-10**  Loss of Direct Endorsement Underwriter ................................................. 6-4
**6-11**  Change of Senior Officer .............................................................................. 6-4
**6-12**  Change in a Partnership ................................................................................. 6-4
**6-13**  Change of Shareholder, Ownership, or Control.......................................... 6-5
**6-14**  Change in Charter or Federal Taxpayer Identifying Number. .................... 6-5
**6-15**  Change in Character of Business (Principal Activity) .................................. 6-6
**6-16**  Conversion of Mortgagee Type .................................................................... 6-6
**6-17**  Merger or Consolidation................................................................................. 6-9
**6-18**  Sale or Acquisition ...................................................................................... 6-11
**6-19**  Termination of Supervision ......................................................................... 6-13
**6-20**  Termination of Fidelity Bond or Errors and Omissions ............................ 6-13
**6-21**  Net Worth Deficiency
**6-22**  Liquid Assets Deficiency.............................................................................. 6-14
**6-23**  Operating Loss .............................................................................................. 6-14
**6-24**  Bankruptcy or Liquidation ........................................................................... 6-14
**6-25**  Voluntary Withdrawal of FHA Approval...................................................... 6-14
**6-26**  All Other Business Changes......................................................................... 6-14

CHAPTER 7 QUALITY CONTROL PLAN

**7-1**   General

Part A. Overall Requirements

**7-2**   GOALS OF QUALITY CONTROL
**7-3**   Basic Elements of Quality Control.......................................................... 7-1
**7-4**   Quality Control as a Risk Assessment Tool ........................................... 7-6

# Part B. Quality Control for Single Family Origination

**7-5**   Quality Control from Beginning to End ................................................... 7-6
**7-6**   Basic Requirements for Quality Control of Single Family Production ........... 7-7
**7-7**   Specific Elements for the Production Portion of
         the Quality Control Program............................................................. 7-11
**7-8**   Review of Procedural Compliance in Production..................................... 7-13
         A.   Fair Lending.... ................................................................. 7-13
         B.   Home Mortgage Disclosure Act ........................................ 7-14
         C.   Ineligible Participants........................................................ 7-14
         D.   Real Estate Settlement Procedures Act ........................... 7-14
         E.   Escrow Funds ..................................................................... 7-15
         F.   Mortgage Insurance Premiums ......................................... 7-15
         G.   Timely and Accurate Insurance ........................................ 7-15
         H.   Underwriting....................................................................... 7-15
         I.    Advertising....
**7-9**   Other Quality Control Issues Regarding Single Family Production. .......... 7-15
         A.   Automated Underwriting .................................................... 7-15
         B.   Streamline Refinances ...................................................... 7-16
         C.   Specific Programs.............................................................. 7-16

Part C. Quality Control for Single Family Servicing

| 4060.1 REV-2 |
| --- |

**7-10** Basic Requirements for Quality Control over Single Family Servicing ........ 7-17
     A.      Areas to be reviewed .............................................................. 7-17
     B.      Timeliness and Frequency ....................................................... 7-18
     C.      Sample Size ......................................................................... 7-18
**7-11** Review of Procedural Compliance in Servicing ...................................... 7-18
     A.      Real Estate Settlement Procedures Act ...................................... 7-18
     B.      Ineligible Participants............................................................. 7-18
     C.      Fair Lending ........................................................................ 7-19
     D.      Transfer of Servicing.............................................................. 7-19
**7-12** Required Elements for the Servicing Portion
     of the Quality Control Program ........................................................... 7-19

Chapter 8 MORTGAGEE MONITORING, ADMINISTRATIVE SANCTIONS,
                 CONTRACT TERMINATION, AND CREDIT WATCH STATUS

Part A. Monitoring Single Family Activities

**8-1**    Introduction.................................................................................. 8-1
**8-2**    On-site Reviews ............................................................................ 8-1
**8-3**    Results and Referrals

Part B. Administrative Sanctions and MRB Actions

**8-4**    Basics .......................................................................................... 8-2
     A.      Limited Denial of Participation (LDP) .......................................... 8-2
     B.      Debarment or Suspension ....................................................... 8-2
     C.      Mortgagee Review Board (MRB) Action........................................ 8-2
           1.      Administrative Actions .................................................... 8-3
           2.      Civil Money Penalties ...................................................... 8-3

Part C. Credit Watch Termination Initiative

**8-5**    Overview....................................................................................... 8-3
     A.      Review of Early Defaults and Claims ........................................... 8-3
     B.      Outcome.............................................................................. 8-3
     C.      Process............................................................................... 8-3

Part D. Neighborhood Watch

**8-6**    Overview....................................................................................... 8-3

**4060.1 REV-2**

U. S. Department of Housing and Urban Development
**Office of Housing**

Special Attention of:
Directors of Housing
Directors, Single Family
Homeownership Centers
Directors, Multifamily Housing HUBs &
Divisions
Field Office Managers, Chiefs
Area Coordinators, State Coordinators

**Transmittal**
Handbook No. 4060.1 REV-2
Issued: August 14, 2006

1.  **This transmits:** Handbook 4060.1 REV-2, FHA Title II Mortgagee Approval Handbook.

2.  **Explanation of changes:** This handbook incorporates the Department's FHA Title II mortgage approval and renewal requirements specified in 24 CFR Parts 202, 203, 206, 241, and 266 in addition to all Mortgagee Letters issued since September 30, 1993 pertaining to the FHA mortgage approval requirements. Other significant changes to this handbook include:

    a.  "Principal activity" for non-supervised mortgagees and non-supervised loan correspondents has been clarified to state that a non-supervised entity must have at least 50 percent of its gross revenues derived from mortgage lending activities [See paragraphs 2-27(D) and 2-29(C)].

    b.  All employees must be issued W-2s [see paragraph 2-9(A)].

    c.  Each traditional and nontraditional branch will no longer be required to have a separate branch manager [see paragraph 2-12(B)].

    d.  The use of satellite offices for taking single-family loan applications has been eliminated due to the expansion of the originating lending area of registered branch offices (see paragraph 2-19).

3.  **Cancellations:**
    a.  Handbook 4060.1 REV-1, dated September 30, 1993;
    b.  Mortgagee Letter 94-39, dated August 9, 1994;
    c.  Mortgagee Letter 94-46, dated October 5, 1994;
    d.  Mortgagee Letter 94-47, dated October 6, 1994;
    e.  Mortgagee Letter 95-6, dated January 25, 1995;
    f.  Mortgagee Letter 95-36, dated August 2, 1995, except for Item #5;
    g.  Mortgagee Letter 95-37, dated August 9, 1995;
    h.  Mortgagee Letter 96-12, dated February 29, 1996, except for Item #2;
    i.  Mortgagee Letter 96-64, dated November 21, 1996;
    j.  Mortgagee Letter 99-17, dated May 14, 1999;
    k.  Mortgagee Letter 00-15, dated May 1, 2000;
    l.  Mortgagee Letter 00-40, dated November 3, 2000;
    m.  Mortgagee Letter 01-01, dated January 5, 2001, paragraph 6 only;
    n.  Mortgagee Letter 03-03, dated February 25, 2003;

---

**4060.1 REV-2**

---

o.    Mortgagee Letter 04-06, Dated June 30, 2004;
p.    Mortgagee Letter 04-19, dated April 30, 2004;
q.    Mortgagee Letter 05-24, dated May 17, 2005;
r.    Mortgagee Letter 05-37, dated September 28, 2005;
s.    Mortgagee Letter 05-40, dated October 29, 2005;

## 4.  Filing Requirements:

Remove:                               Insert:

Handbook 4060.1 REV-1,                Handbook 4060.1 REV-2,
dated September 30, 1993              dated:  August 14, 2006


_____
Brian D. Montgomery
Assistant Secretary for Housing --
Federal Housing Commissioner

# Program Participants and Departmental Staff

**Distribution:** W-3-1                          **HULL:**

---

08/06                          vii

**4060.1 REV-2**

# FOREWORD

**Scope.** This Handbook covers the Department's requirements and policies for FHA approval and annual renewal of mortgagees for participation in the FHA Title II mortgage insurance programs. It provides information to HUD staff and participating mortgagees on procedures for obtaining and retaining FHA approval as a mortgagee. The Handbook also provides basic information on the Department's program for monitoring the loan origination and servicing performance of mortgagees, the Mortgagee Review Board, and civil money penalties.

**Enabling Legislation.** The U.S. Department of Housing and Urban Development is authorized by legislation to approve mortgage lenders to participate in FHA mortgage insurance programs, and to regulate those lenders. This authority is contained in the *National Housing Act* (12 U.S.C. 1701 et seq.) and the *Department of Housing and Urban Development Act* (42 U.S.C. 3531 et seq.).

**Regulations.** This Handbook incorporates the provisions of the Department's mortgagee approval regulations as set forth in 24 CFR Parts 202, 203, 206, 241, and 266.

### Handbook Organization:

- **Chapter 1:**  Overview
- **Chapter 2:**  Requirements for initial and continued FHA approval
- **Chapter 3:**  Applying for approval, appealing denials and being approved
- **Chapter 4:**  Annual renewal of FHA approval
- **Chapter 5:**  Branches, lending areas for single family originations, principal-authorized agents, and loan correspondent-sponsors
- **Chapter 6:**  Changes subsequent to FHA approval
- **Chapter 7**:  Quality Control Plan
- **Chapter 8:**  Monitoring, Administrative Sanctions, Credit Watch and Neighborhood Watch

**4060.1 REV-2**

# REFERENCES

1. 5 U.S.C. App. 3 *Inspector General Act of 1978*
2. 12 U.S.C. §1701 et seq. *National Housing Act*
3. 12 U.S.C. §2601 et seq. *Real Estate Settlement Procedures Act of 1974*
4. 12 U.S.C. §2801 et seq. *Home Mortgage Disclosure Act of 1975*
5. 15 U.S.C. §1601 et seq. *Federal Truth in Lending Act*
6. 15 U.S.C. §1691 et seq. *Equal Credit Opportunity Act*
7. 18 U.S.C. §709 *False advertising or misuse of names to indicate Federal agency*
8. 31 U.S.C. §7501 et seq. *The Single Audit Act of 1984, as amended*
9. 42 U.S.C. §3601 et seq. *Fair Housing Act*
10. 42 U.S.C. §3531 et seq. *Department of Housing and Urban Development Act*
11. 24 CFR Part 24 *Government Suspension and Debarment*
12. 24 CFR Part 25 *Mortgagee Review Board*
13. 24 CFR Part 30 *Civil Money Penalties*
14. 24 CFR Part 202 *Approval of Lending Institutions and Mortgagees*
15. 24 CFR Part 203 *Single Family Mortgage Insurance*
16. 24 CFR Part 206 *Home Equity Conversion Mortgage Insurance*
17. 24 CFR Part 241 *Supplementary Financing for Insured Project Mortgages*
18. 24 CFR Part 266 *Housing Finance Agency Risk-Sharing Programs for insured Affordable Multifamily Project Loans*
19. 24 CFR Part 3500 *Real Estate Settlement Procedures Act Regulations*
20. GAO "Yellow Book," *Government Auditing Standards*
21. HUD IG Handbook 2000.04, *Consolidated Audit Guide for Audits of HUD Program*
22. HUD Handbook 4000.2, *Mortgagees' Handbook, Application Through Insurance (Single Family)*
23. HUD Handbook 4000.4, *Single Family Direct Endorsement Program*
24. HUD Handbook 4060.2, *Mortgagee Review Board*
25. HUD Handbook 4155.1, *Mortgage Credit Analysis for Mortgage Insurance on One- to Four-Family Properties*
26. HUD Handbook 4330.1, *Administration of Insured Home Mortgages*
27. HUD Handbook 4350.4, *Insured Multifamily Mortgagee and Field Office Remote Monitoring*
28. HUD Handbook 4430.1, *Initial Closing Requirements for Project Mortgage Insurance*

Download Locations for Most Recent Version of References
Statutes: **http://www.gpoaccess.gov/index.html**.
HUD Regulations and handbooks: **http://www.hudclips.org/cgi/index.cgi**.
GAO "Yellow Book": **http://www.gao.gov/govaud/ybk01.htm**

---

| **4060.1 REV-2** |
|---|

# ACRONYMS

| | |
|---|---|
| AAFB | Area Approved for Business |
| CAIVRS | Credit Alert Interactive Voice Response System |
| CPA | Certified Public Accountant |
| DAS | Deputy Assistant Secretary |
| DBA (or dba) | Doing Business As |
| DCF | Data Collection Form |
| DE | Direct Endorsement |
| Fannie Mae | Federal National Mortgage Association |
| FDIC | Federal Deposit Insurance Corporation |
| FDT | Financial Data Templates |
| FHA | Federal Housing Administration |
| Freddie Mac | Federal Home Loan Mortgage Corporation |
| GAAP | Generally Accepted Accounting Principles |
| GAAS | Generally Accepted Auditing Standards |
| GAGAS | Generally Accepted Government Auditing Standards |
| GAO | General Accountability Office |
| Ginnie Mae | Government National Mortgage Association |
| HECM | Home Equity Conversion Mortgage (Reverse Mortgage) |
| HMDA | Home Mortgage Disclosure Act |
| HOC | FHA Single Family Homeownership Center |
| HUD | Department of Housing and Urban Development |
| IG | Inspector General for HUD |
| LASS | Lender Assessment Sub-system |
| LDP | Limited Denial of Participation |
| LLC | Limited Liability Company |
| MRB | Mortgagee Review Board |
| NCUA | National Credit Union Administration |
| P&U Division | Processing and Underwriting Division in a HOC |
| QAD | Quality Assurance Division |
| QC Plan | Quality Control Plan |
| RESPA | Real Estate Settlement Procedures Act |
| RMCR | Residential Mortgage Credit Reports |
| SAS | Statement of Auditing Standards |
| SSN | Social Security Number |
| V-form | Annual Verification Report |
| Yellow Book | Government Auditing Standards issued by GAO |

<u>Index</u>

---

**4060.1 REV-2**

**4060.1 REV-2**

## Chapter 1 Overview (TOP)

1-1 Approval:
The term "mortgagee" means both mortgagees and loan correspondents in this handbook unless specified otherwise. The requirements for approval vary depending on: (1) the mortgage function(s) that the mortgagee intends to perform, (2) which FHA loan programs it wants to participate in, i.e. single family and/or multifamily, and (3) the mortgagee's organizational type. Requirements for approval under the Title I home improvement loan and manufactured home loan programs are contained in HUD Handbook 4700.2.

**A.** **Application for Mortgagee Approval.** A mortgagee may become an FHA-approved mortgagee upon meeting the Department's approval requirements, and submitting an acceptable **HUD form 11701**, *Application for Approval*, the appropriate non-refundable application fee, and other materials as described in Chapters 2 and 3 of this Handbook. (TOP)

**B.** **Additional Approvals**

1. **Single Family Direct Endorsement Authority** allows mortgagees (but not loan correspondents) to underwrite single-family mortgages without FHA's prior review and submit them directly for endorsement (i.e. FHA mortgage insurance). This authority may be granted by a FHA Single Family Homeownership Center (HOC). The term "DE mortgagee" used in this handbook means a mortgagee who has received unconditional DE approval from one of the HOCs and is also commonly known as an underwriting mortgagee. They underwrite loans for a loan correspondent as their sponsor. See **HUD Handbook 4000.4** for details.

2. **Multifamily Accelerated Processing** allows mortgagees to underwrite and close multifamily mortgages for FHA insurance without FHA's review prior to closing. The Office of Multifamily Housing may grant this authority. Refer to the Multifamily Accelerated Processing Guide.

C. **Branch Offices, and Principal-Authorized Agent Relationships.** Most mortgagees may register branches for conducting their FHA mortgage functions. The most common function is the origination of single-family insured mortgages, which can be done within the lending area of each registered branch. A mortgagee, other than a loan correspondent or an investing mortgagee, may use the principal-authorized agent relationship to originate and underwrite single-family insured mortgages. See Chapter 5 for details.

**1-2 Types of Approved Mortgagees.** (TOP)
FHA classifies approved mortgagees based on the functions they will perform and type of organization. FHA may approve the following types of mortgagees.

**4060.1 REV-2**

A.  **Supervised Mortgagee.** This designation is limited to financial institutions that are members of the Federal Reserve System, and financial institutions whose accounts are insured by the Federal Deposit Insurance Corporation (FDIC), or the National Credit Union Administration (NCUA). Examples of supervised mortgagees are banks, savings associations, and credit unions. Supervised institutions may choose instead to apply as supervised loan correspondents or investing mortgagees. For details regarding approval as a supervised mortgagee, see paragraph 2-26.

A subsidiary or an affiliate of a supervised mortgagee must apply separately for FHA approval as either a non-supervised mortgagee or non-supervised loan correspondent. FHA approval only applies to the legal entity that is the actual applicant and does not cover any of its subsidiaries or affiliates.

B.  **Non-supervised Mortgagee (i.e., mortgage lenders).** This designation applies to non-depository financial entities that have as their principal activity the lending or investment of funds in real estate mortgages. For details regarding approval, see paragraph 2-27.

C.  **Non-supervised Loan Correspondent (i.e., mortgage brokers).** This designation applies to non-depository financial entities that have as their principal activity the origination of FHA-insured mortgages for sale or transfer to one or more Sponsors who underwrite the mortgages. Sponsors must be DE mortgagees. For details regarding approval, see paragraph 2-29.

D.  **Supervised Loan Correspondent.** A mortgagee that qualifies for approval as a supervised mortgagee may be approved as a supervised loan correspondent and must have one or more sponsors who underwrite the mortgages. Sponsors must be DE mortgagees. For details regarding approval, see paragraph 2-28.

E.  **Investing Mortgagee.** This designation applies to an organization, including a charitable or not-for-profit institution or pension fund, which is not approved as another type of institution and that invests funds under its own control. It may purchase, hold, and sell FHA insured mortgages but may not originate them. Investing mortgagees may only service FHA insured mortgages with the prior permission of FHA. For details regarding approval, paragraph 2-30.

F.  Governmental Institution, Government-sponsored enterprises, public housing agencies and State housing agencies:  A governmental institution may be approved as a mortgagee. For details regarding approval, see paragraph 2-31.

Examples are:
Federal government agency;
State government agency (including a State Housing Agency);

**4060.1 REV-2**

Municipal government agency (including a Public Housing Agency);
Federal Reserve Bank;
Federal Home Loan Bank;
Federal Home Loan Mortgage Corporation (Freddie Mac); and
Federal National Mortgage Association (Fannie Mae).

**1-3    Renewal of FHA Approval.** (TOP)
Each FHA approved mortgagee must renew its approval annually. The Department reviews information on each mortgagee to determine if continued approval is appropriate. All mortgagees submit an annual verification report. Most pay an annual renewal fee and non-supervised mortgagees and non-supervised loan correspondents must also submit audited financial statements and supplementary reports. See Chapter 4 for details on the renewal process.

**1-4    HUD's Lender Web Page.** (TOP)
All relevant material needed by mortgagees is available through HUD's lender web page at **http://www.fha.gov/sf/lend.cfm**. There are links on this page on how to become a FHA approved lender, information needed by approved mortgagees and links to the various systems used by FHA approved mortgagees who participate in the various FHA insured loan programs. In addition, there is a link to what is commonly known as the starter kit comprising the material a newly approved mortgagee normally needs.

**1-5    FHA Connection.** (TOP)
Mortgagees participating in FHA mortgage insurance programs must register for the FHA Connection that is the main portal that mortgagees use for online business transactions supporting the entire loan processing life cycle. The FHA Connection home page is at: **https://entp.hud.gov/clas**. It has various links on how to get started using the FHA Connection including how to **register**, **FAQs** and the **FHA Connection Guide**.

**1-6    HUDCLIPS.** (TOP)
The most recent versions of HUD's laws, regulations, Federal Register publications, handbooks, mortgagee letters and HUD forms are available on line at HUD's web site called HUDCLIPS at: **http://www.hudclips.org/cgi/index.cgi**.

**1-7    HUD Handbooks.** (TOP)
When handbooks are revised or changed, a suffix is added to the Handbook number such as REV-2 or CHG-5. In order to avoid citing an obsolete version of any handbook, all Handbooks will only be cited by the Handbook number only, such as 4060.1. The most recent versions of all handbooks are available in **HUDCLIPS**. Active links are provided in this handbook to any handbook that can be downloaded as a single file.

**1-8    Frequently Asked Questions.** (TOP)
The best FAQs related to this handbook are available on the **Frequently Asked Questions** page of the FHA Connection web site under the **Lender Approval** link.

4060.1 REV-2

**1-9    FHA Lender List on HUD's Web Site.** (TOP)
All approved mortgagees and their registered branch offices included on a HUD's web site at: **http://www.hud.gov/ll/code/llslcrit.html**.

**1-10   Performance Requirements.** (TOP)
Mortgagees must comply with the *Fair Housing Act;* Executive Order 11063 on Equal Opportunity in Housing; the *Equal Credit Opportunity Act* (ECOA); the *Real Estate Settlement Procedures Act;* the *Home Mortgage Disclosure Act;* and program statutory, regulatory and handbook requirements.

**1-11   Reports and Examinations.** (TOP)
FHA may, at any time, require a Title II mortgagee to report on any matter related to its FHA operations. This may include the inspection of a mortgagee's mortgage loan files, reports, records, books, or accounts. Representatives of the Office of Inspector General and/or Quality Assurance Division may periodically visit a mortgagee's office to review its origination and servicing procedures. See Chapter 8 for additional information.

**1-12   Home Mortgage Disclosure Act of 1974 (HMDA).** (TOP)
All FHA approved mortgagees are subject to HMDA.  Reporting criteria and requirements are specified in the "A Guide To HMDA Reporting - Getting It Right!" and on the Federal Financial Institutions Examination Council (FFIEC) HMDA web site is at **http://www.ffiec.gov/hmda**.

**1-13   Administrative Actions, Administrative Sanctions, and Civil Money Penalties.** (TOP)
The Department's Mortgagee Review Board (MRB) is authorized to take administrative action against an approved mortgagee that does not comply with FHA requirements, the Real Estate Settlement Procedures Act (RESPA), or the non-discrimination requirements of the *Equal Credit Opportunity Act,* the *Fair Housing Act,* or Executive Order 11063 on Equal Opportunity in Housing.  HUD, separately from the Mortgagee Review Board may take various types of administrative action against an approved mortgagee. See Chapter 8 for details.

**1-14   Reporting Fraud, Illegal Acts, and Unethical Practices to HUD.** (TOP)
Fraud, illegal acts, irregularities, and unethical practices, by any participant (including mortgagees, mortgagors, or any other party that has an interest in the mortgage transaction) must follow the procedures on page 7-5, paragraph J.

**1-15   Mortgagee's Address for Communication.** (TOP)
A mortgagee's home office must be its designated facility to which the Department directs all communications about the management affairs of the mortgagee, and from which the public obtains information on the activities of the mortgagee with one exception.  If a mortgagee has an administrative office separate from its home office and wants the Department to direct all communications about the management affairs of the mortgagee to that office, it may request that the Department direct communication to that office.  Mortgagees must keep all of their addresses current in FHA's automated systems using the FHA Connection.

**4060.1 REV-2**

**1-16  Contacting the Department.** (TOP)
Go to the home page of the **FHA Connection** and click on the "Contact Us"
link for a list of contact points by topic

**1-17  OMB Approval of Information Collections.** (TOP)
All information collections in this handbook are covered under the Office of
Management and Budget's (OMB) Control Number 2502-0005.  HUD may not
collect this information, and you are not required to provide this information,
unless it displays a currently valid OMB control number.

4060.1 REV-2

# Chapter 2  Requirements for Initial and Continuing FHA Approval

## Part A.  Requirements for all Mortgagees

**2-1    Introduction.** (TOP)

A mortgagee must meet the following general requirements to be approved for participation in the FHA mortgage insurance programs.  A mortgagee also must meet the specific requirements that apply to the type of mortgagee for which it seeks approval.  The additional requirements are specified in Part B of this chapter.

**2-2    Business Form.** (TOP)

A mortgagee seeking approval must be a corporation, partnership, or other chartered institution, and must be a permanent organization having succession.  A sole proprietorship or trust is not an acceptable business form for approval as a FHA mortgagee.

A.    **Corporation.**  To be approved as a FHA mortgagee a corporation must be an entity, chartered in the United States; and meet all applicable laws regarding corporations.

The corporation must be able to survive the death or incapacity of an officer or shareholder.  In determining official capacity or ownership, the Department, while accepting familial relationships, requires that there be a bona fide intent to share responsibilities and duties.  If a related individual has no substantive role in the management or operation of the mortgagee, ownership interest by that related party is aggregated with that of the individual having the operational or management role.  However, in determining ownership, all classes of stock for each owner must be aggregated to determine someone's ownership interest.

B.    **Partnership.**  A partnership may be approved as a FHA mortgagee.  However, each general partner that is a corporation or other chartered institution that consists of two or more persons.  An individual person or a personal corporation is not eligible as a general partner in an approved mortgagee.

1.    ***Managing General Partner.***  One general partner must be designated as the managing general partner.  The managing general partner must have as its principal activity the management of one or more partnerships, all of which are mortgage lenders, property improvement or manufactured home lenders; and must have exclusive authority to deal with FHA on behalf of each partnership.  The managing general partner, if itself a FHA approved mortgagee, may only be an investing mortgagee.  The managing general partner must meet the requirements with respect to officers.

**4060.1 REV-2**

2. ***Partnership Agreement.*** The partnership agreement must specify that the partnership will exist for a minimum term of 10 years. In the event that a partner withdraws, the partnership must be specifically authorized to continue its existence.

C. **Limited Liability Company (LLC).** A limited liability company is an unincorporated legal entity created under applicable State law combining legal and tax attributes of corporations and partnerships. The owners are referred to as members and generally have their liability limited to their investment. A LLC is neither a partnership nor a corporation but rather a different kind of legal entity formed and operated under the State's LLC laws. Some States do not allow LLCs to be used in certain businesses. For FHA, the key factors as to whether an LLC may be approved are permanence and succession of the LLC. The LLC's Articles of Organization and/or Operating Agreement must:

- Specify that the LLC consist of two or more members. A single member LLC is acceptable only if the member is a corporation consisting of two or more persons;
- Specify a minimum term of existence of at least ten years;
- Provide for succession;
- Authorize continuance in the event of the withdrawal or death of a member; and
- Specify that the LLC will not terminate until all FHA-insured mortgages have been transferred to another approved mortgagee.

The LLC must submit its Operating Agreement. Some States' LLC laws may conflict with FHA requirements, thus precluding approval of an LLC as a FHA lender in those States. Also, there is the possibility that an LLC formed in one State may not have the same legal standing in another State. State laws must be considered in both the application and approval processes. A managing member must be designated as the FHA contact. A single-member LLC is an acceptable form of business for approval as a FHA mortgagee only if the single member is a corporation consisting of two or more persons.

## 2-3 **State Licensing Requirements.** (TOP)

A mortgagee must obtain all required business licenses prior to, or in conjunction with, approval as a FHA mortgagee. Except for a supervised mortgagee, copies of all required licenses must be submitted with the application. A state-licensed mortgagee must also submit a letter certifying to the Department that it has not been refused a license or sanctioned. If the mortgagee has been subject to an action against its license, it must submit documentation concerning the action.

## 2-4 **Mortgagee Name.** (TOP)

All applicants must submit documentation that they have State approval for both their legal name and any "doing business as" name they use. All applications for approval as a non-supervised mortgagee, non-supervised loan correspondent, or investing mortgagee whose legal or dba name includes

**4060.1 REV-2**

"national," "Federal," or another restricted word, must as part of their application provide documentation that they have a legal right to its use (see **18 U.S.C. §709**. False advertising or misuse of names to indicate Federal agency). Generally, this right is only available to applicants that are a wholly owned subsidiary of a federally regulated financial institution.

**2-5  Net Worth Requirements.** (TOP)
Except for investing mortgagees and government institutions, mortgagees must meet specified net worth requirements for initial approval and to maintain approval. Adjusted net worth is owners' equity in the mortgagee less unacceptable assets. Adjusted net worth must equal or exceed the minimum requirement for the mortgagee. The net worth requirement for a supervised mortgagee or a non-supervised mortgagee increases after approval according to its FHA-insured single-family mortgage volume.

A.  *Requirements.*

1.  *Supervised and Non-supervised Mortgagees.*

a.  *Initial Approval.* For initial approval, any supervised mortgagee or non-supervised mortgagee must have an adjusted net worth of not less than $250,000. Supervised applicants are not required to verify adjusted net worth in their application, but may be asked to verify compliance during application processing.

b.  *Continued Approval.* For continued approval, any supervised mortgagee or non-supervised mortgagee must maintain an adjusted net worth of one percent of the volume of FHA single family insured mortgages the mortgagee originated, purchased, or serviced during the prior fiscal year, but not less than $250,000, up to a maximum requirement of $1 million. Supervised mortgagees are not required to verify adjusted net worth to renew their approval, but may be asked to verify compliance during the renewal process.

c.  *Mortgage Volume.* In calculating mortgage volume, only single-family FHA-insured mortgages are counted. The mortgage volume for a sponsor of a loan correspondent includes the aggregate original principal amount of mortgages purchased from its loan correspondents during the mortgagee's fiscal year. HECMs are included at their maximum claim amount irrespective of outstanding principal.

To determine mortgage volume at the end of the fiscal year under audit:
- Start with the aggregate unpaid principal balance in the servicing portfolio as of the end of the mortgagee's fiscal year;

**4060.1 REV-2**

- Add the aggregate original principal amount of insured mortgages endorsed during the fiscal year;
- Add the aggregate original principal amount of insured mortgages purchased from sponsored loan correspondents during the fiscal year; and
- Subtract from this total the aggregate outstanding principal balance of insured mortgages originated by the mortgagee or purchased from its loan correspondent(s) during the mortgagee's fiscal year that were retained for servicing.

Examples of calculations to determine net worth requirements are included in chapter 7 of the most recent version of HUD IG **Handbook 2000.04**, *Consolidated Audit Guide for Audits of HUD Programs.*

2. ***Mortgagee Approved Only for Multifamily Programs.*** Any mortgagee approved for participation only in the multifamily mortgage insurance programs must have an adjusted net worth of not less than $250,000, but is not subject to net worth requirements based on mortgage volume.

3. ***Supervised and Non-supervised Loan Correspondents.*** For initial approval and for continued approval, a loan correspondent must have and maintain an adjusted net worth of at least $63,000, plus $25,000 for each registered branch office up to a maximum required adjusted net worth of $250,000. Loan correspondents are not subject to net worth requirements based on mortgage volume. Supervised entities are not required to verify adjusted net worth, but may be asked to verify compliance during the approval or renewal process.

4. ***Investing Mortgagee.*** There is no specific net worth requirement for this type of mortgagee. However, it must have funds or funding arrangements for investment. See paragraph 2-30 for details.

5. ***Governmental Institution.*** There is no specific net worth requirement for this type of mortgagee.

B. ***Calculation of Adjusted Net Worth.*** All calculations must be prepared by a CPA pursuant to chapter 7 of the most recent version of HUD IG **Handbook 2000.04**, *Consolidated Audit Guide for Audits of HUD Programs.* Applicants seeking approval as a non-supervised mortgagee or non-supervised loan correspondent must also submit to the FHA a CPA certified audit report; see paragraph 3-2(A)(6) for details.

**2-6     Liquid Assets.** (TOP)

**4060.1 REV-2**

A.   **Requirement.**  A supervised or non-supervised mortgagee or loan correspondent must maintain liquid assets of 20 percent of its adjusted net worth or $100,000 whichever is lesser.  Supervised applicants are not required to verify liquid assets in their application, but may be asked to verify compliance during application processing.

B.   **Acceptable.**  Cash and cash equivalents constitute liquid assets.  Cash includes cash on hand, checking accounts, savings accounts, and certificates of deposit.  Cash equivalents are readily marketable investments, e.g. securities readily convertible into cash.  To be considered a liquid asset, the cash or cash equivalent must not be restricted or otherwise reserved for any purpose other than the payment of a current liability.

C.   **Unacceptable.**  FHA does not consider a line of credit or loans or mortgages held for resale by the mortgagee to be liquid assets.

**2.7   Application Fees.  All fees are nonrefundable** (TOP)
   A.   **Fee Amount.**

   1.   **Mortgagee Approval.**  The fee is $1,000 except for those entities already approved as a Title I lender, governmental institutions or non-depository not-for profit entities.

   2.   **Branch Office Registration.**  The fee is $300, except for governmental institutions or non-depository not-for profit entities.

   B.   **Fee Payment.**  The application fee must be mailed to HUD's lockbox together with the HUD form, *Application Fee for Title II Mortgagee Approval* to the following address:

   U.S.  Department of HUD
   P.O.  Box 198619
   Atlanta, GA 30384

   Copies of the check and application fee form must accompany the FHA lender application form.  If not, a copy of the front and back of the cancelled check will be requested.

**2-8   Operating Expenses.** (TOP)
A mortgagee must pay all its own operating expenses.  This includes expenses of its main and branch offices involved in originating or servicing any FHA insured mortgages.  Operating expenses include, but are not limited to, equipment, furniture, office rent, overhead, employee compensation, and similar expenses.

**2-9   Employees and Officers.** (TOP)
An approved mortgagee must employ trained personnel that are competent to perform their assigned responsibilities.

**4060.1 REV-2**

A.  **Employees.**  Employees are those individuals who are under the direct supervision and control of an FHA approved mortgagee and where the individuals are exclusively employed by the FHA approved mortgagee in the mortgage lending and real estate fields.  The mortgagee must demonstrate the essential characteristics of the employer-employee relationship upon inquiry by the Department. [See also paragraphs 2-9(D) and 2-9(G)]

Compensation of employees may be on a salary, salary plus commission, or commission only basis and includes bonuses.  All compensation must be reported on Form W-2.  Employees who perform underwriting and loan servicing activities may *not* receive commissions.

B.  **Officers.**  Individuals are officers for the purposes of FHA requirements if they bear the corporate title of Vice President or higher and also include Branch Managers.  A mortgagee must have one or more officers with authority over the mortgagee's loan origination and servicing operations.  An officer is either a corporate officer, or a principal of a non-corporate entity, who has authority to legally bind the corporation or entity.  In the case of a government institution, this role would be filled by a designated staff person(s).  At least one officer must spend full time managing and directing the mortgagee's operations.  That officer must have a minimum of three years acceptable experience in the mortgage activities for which the mortgagee is seeking approval.  Relevant training may be substituted for some of the required experience.  An applicant must submit, with its application, current resumes documenting this experience.  In determining the acceptability of an officer's experience, the Department will consider:

- Experience in originating single family and multifamily mortgages;
- Experience in servicing single family and multifamily mortgages;
- Experience in investing funds in real estate mortgages;
- Experience in managing other individuals performing these services; and

- Experience in real estate sales or brokerage does *not* qualify.

A Branch Manager's compensation may be based upon the "net" profit of the branch.  For example, the FHA approved mortgagee may collect the revenue from the branch, pay the branch expenses, and then pay the branch manager the remaining revenues, if any, as a commission. Such an arrangement is, essentially, an alternative compensation program for the branch manager and is an acceptable arrangement if all other branch requirements are met.

C.  **Companies with Joint Officers.**  If a mortgagee has any of the same officers, stockholders, partners, or members as another entity, the officers may represent more than one entity if:

**4060.1 REV-2**

1.     There is a clear and effective separation of the two entities, and mortgagors know at all times exactly with which entity they are doing business.

2.     There is a duly appointed or elected senior officer, with the required minimum three years of acceptable experience, designated to conduct exclusively the affairs of the mortgagee during normal business hours.

D.     ***Control and Supervision of Staff.*** (TOP) A mortgagee must exercise control and responsible management supervision over its home office and branch employees. Control and supervision must include, at a minimum, regular and ongoing reviews of employee performance and of work performed.

E.     ***Signatory Authority.*** (TOP) Any employee who signs applications for mortgage insurance on behalf of the mortgagee must be a Vice President, or be authorized to bind the mortgagee in matters involving the origination and servicing of insured mortgages.

F.     ***Conducting Mortgagee Business.*** (TOP) During his/her normal duty hours, employees, who are involved with FHA transactions, may conduct only the business of the mortgagee.

G.     ***Full Time, Part Time and Outside Employment.*** (TOP) A mortgagee may employ staff full time or part-time (less than the normal 40 hour work week). They may have other employment including self-employment. However, such outside employment may not be in mortgage lending, real estate, or a related field. Direct endorsement underwriters are included in this provision. An underwriter may not work on a part-time basis for any other mortgagee, even underwriting conventional mortgage loans. An underwriter may not underwrite loans for a parent or subsidiary of the underwriter's approved employer. A direct endorsement underwriter's authority is through the employer and does not extend under any corporate "umbrella."

**2-10 Ineligible Participants.** (TOP)
An applicant is ineligible for approval if the mortgagee or any officer, partner, director, principal, or employee of the applicant mortgage is:

A.     ***Suspended, debarred, under a limited denial of participation (LDP), or otherwise restricted under 24 CFR Part 24 or 25 or under similar provisions of any other Federal agency;***

B.     ***Under indictment for, or has been convicted of, an offense that reflects adversely upon the applicant's integrity, competence or fitness to meet the responsibilities of an approved mortgagee;***

C.     Subject to unresolved findings contained in a HUD or other governmental audit, investigation, or review;

4060.1 REV-2

D. Engaged in business practices that do not conform to generally accepted practices of prudent mortgagees or that demonstrate irresponsibility; and

E. Under investigation for any HUD-related violation.

**2-11 Office Facilities.** (TOP)
The mortgagee may conduct its loan origination and/or servicing activities from any approved and adequately staffed office. A mortgagee is fully responsible for the actions of its offices. Mortgagees that lease space from a real estate agent must assure compliance with RESPA requirements.

A. **Home office.** Each applicant must identify which location they consider their main or home office for FHA mortgage activities. It doesn't have to be the entity's corporate office. A mortgagee's home office facilities must:

1. Have adequate office space and equipment;

2. Be in a location conducive to mortgage lending;

3. Be located in a commercial space that is separate and apart from any other entity. A mortgagee may share general reception-type entrances or lobbies with another business;

4. Be clearly identified to the public so that loan applicants and mortgagors will know, at all times, exactly with whom they are doing business. This includes a permanently affixed business sign and other common means of identification used by a business entity;

5. Display a fair housing poster;

B. **Traditional branch office.** (TOP) A traditional branch office is a separately located unit of the mortgagee in commercial space. A traditional branch office must:

1. Have adequate office space and equipment;

2. Be in a location conducive to mortgage lending;

3. Be separated from any other entity by walls or partitions. (Entrances and reception areas may be shared.);

4. Be identified to the public;

5. *Display a fair housing poster;*

6. *Provide privacy for conducting interviews; and*

**4060.1 REV-2**

---

C.  ***Nontraditional branch office.***  A nontraditional branch office is required to meet branch office staffing requirements and the following requirements concerning office facilities:

    **1.**  ***It may be located in non-commercial space, but it must have adequate office space and equipment and must conform to the local government use requirements.***

    **2.**  ***It must display a fair housing poster if the public is ever received.***

**D.**  Direct lending branch office. ***A direct lending branch is an office whose origination operation only uses a call center and/or the Internet for contacting consumers. It must meet the office facilities and staff requirements of a traditional branch office except that it must have a separate manager and can be collocated with a lender's home office or one of its traditional branches. See paragraph 5-8 for the approval criteria of a direct lending branch.***

**2-12  Staffing Requirements.** (TOP)
An approved mortgagee must have sufficient staff or permitted contractor support for loan origination, processing, underwriting, servicing, and collection activities, to the extent that the mortgagee engages in these activities.

A.  ***Home office.***  The mortgagee must have a home office staff of at least two full time employees. A shared receptionist, while permitted, may not be used to meet this requirement.

B.  ***Branch office.***  A mortgagee must have at least one full time employee at each branch office. A manager must be assigned to each traditional and nontraditional branch office. A separate manager must be located at each direct lending branch.

C.  ***Branch Managers, Loan Officers and Underwriters.***  Loan officers (also known as loan originators) of FHA-insured mortgages must be employees of the mortgagee. Underwriters of FHA-insured mortgages must be employees of the mortgagee; its authorized agent; or, if the mortgagee is a loan correspondent, its sponsors. Managers, loan originators and underwriters may not be independent contractors or contract employees.

D.  ***Centralized Centers.***  Processing and/or underwriting functions may be centralized in any office(s) of the mortgagee or performed at each office of the mortgagee.

**2-13  Outsourcing.** (TOP)
A mortgagee may contract out certain administrative and clerical functions that do not materially affect underwriting decisions or increase the risk to FHA. However, the mortgagee is still responsible for the quality of the

---

4060.1 REV-2

mortgages and must ensure compliance with program requirements and RESPA requirements. The management, underwriting, and loan originator functions may not be contracted out.

A.   **Types of functions that may be contracted out are:** (TOP)

- Clerical Assistance;
- Loan processing:  typing of loan documents, mailing out and collecting verification forms, ordering credit reports, and/or preparing for endorsement and shipping loans to investors;
- Loan servicing:  ministerial processing of a foreclosure action, preservation and protection, and/or tax services;
- Legal functions;
- Quality control reviews; and
- Such other functions as may be approved in advance by the Department.

B.   **Provider Requirements.** The functions listed above in paragraph 2-13(A) may not be contracted out to third party loan originators, real estate brokers, or similar entities.  An approved mortgagee may own or have an ownership interest in a separate business entity that offers such contract services.  An affiliated business arrangement, in which affiliated or related companies make referrals to each other, is regulated under RESPA.  (See RESPA [**12 U.S.C.  §2602**]: (7) the term "affiliated business arrangement" means an arrangement in which (A) a person who is in a position to refer business incident to or a part of a real estate settlement service involving a federally related mortgage loan, or an associate of such person, has either an affiliate relationship with or a direct or beneficial ownership interest of more than 1 percent in a provider of settlement services; and (B) either of such persons directly or indirectly refers such business to that provider or affirmatively influences the selection of that provider.)

Mortgagees may not contract with entities or persons that are suspended, debarred, or under a relevant LDP or have agreed to a voluntary exclusion under 24 CFR part 24.

C.   **Costs of Outsourced Services.**  The costs of such services may not be imposed on a FHA borrower or mortgagor as allowed in the various FHA loan programs.

**2-14  Prohibited Branch Arrangement.**  (TOP)
An approved mortgagee may not originate or service FHA insured mortgages from branches that do not meet FHA requirements.

A.   **Separate Entities Acting as a Branch Office.**  An approved mortgagee is prohibited from engaging an existing, separate mortgage company or broker to function as a branch of the approved mortgagee and allowing that separate entity to originate insured mortgages under the approved mortgagee's FHA mortgagee number.  This constitutes a prohibited branch arrangement.  Separate entities may not operate as "branches" or "DBAs" of a FHA approved mortgagee. If the separate

| 4060.1 REV-2 |
|---|

entity was purchased and legally merged into the approved mortgagee in compliance with applicable state law(s), the approved mortgagee must provide a copy of the merger documents and state license(s) to FHA's Lender Approval and Recertification Division, as described in paragraph 6-17.

**B. *Certain Employment Agreements*.** A FHA approved mortgagee must pay all of its operating expenses including the compensation of all employees of its main and branch offices. Other operating expenses that must be paid by the FHA approved mortgagee include, but are not limited to, equipment, furniture, office rent, utilities and other similar expenses incurred in operating a mortgage lending business. A branch compensation plan that includes the payment of operating expenses by the branch manager, any other employee or by a third party is a prohibited arrangement. The following includes some, but not all, examples of unacceptable provisions in employment agreements:

- Require all contractual relationships with vendors such as leases, telephones, utilities, and advertising to be in the name of the "employee" (branch) and not in the name of the FHA approved mortgagee;
- Require the "employee" (branch) to indemnify the FHA approved mortgagee if it incurs damages from any apparent, express, or implied agency representation by or through the "employee's" (branch's) actions; and
- Require the "employee" (branch) to issue a personal check to cover operating expenses if funds are not available from an operating account.

**2-15   Communications Capability and Responsibility.** (TOP)
Except for a mortgagee that only services multifamily mortgages, a mortgagee's home office and each branch office must be able to provide prompt responses to applicant or mortgagor inquiries by one of the following methods:
- The office staff need not maintain complete records on each mortgage in it area, but it must be able to secure such information for the applicant or mortgagor;
- Have toll-free telephone service at an office that can provide needed information; and
- Accept collect telephone calls from mortgagors at an office that can provide the same sort of information as that described above.

To ensure equal opportunity for persons with hearing or speech impairments, it may be necessary for offices to purchase a TTY (telecommunications device for hearing and speech impaired persons) or provide equally effective communication systems. If an office offers a toll-free telephone number for non-disabled persons, it must also offer a toll-free opportunity for hearing and speech impaired persons, e.g., a relay system.

**2-16   Fair Housing and Other Federal Laws.** (TOP)

**4060.1 REV-2**

A. A mortgagee must comply with the *Fair Housing Act*, Executive Order 11063 on Equal Opportunity in Housing, the *Equal Credit Opportunity Act* (ECOA), the *Real Estate Settlement Procedures Act* (RESPA), the *Home Mortgage Disclosure Act* (HMDA), and all other Federal laws relating to the lending or investing of funds in real estate mortgages.

B. ***A mortgagee must fully cooperate with any investigations brought by HUD pursuant to the any authority. A mortgagee must make all officers and employees available for interviews and must promptly provide (within not more than 30 days) information and documents requested by HUD, in the format HUD requests. Failure to fully cooperate may result in administrative action by the Mortgagee Review Board and possible referral to the U.S. Department of Justice for further action.***

C. ***Fair housing posters.*** A mortgagee must post and maintain a fair housing poster at each place of business that participates in activities covered by Section 805 of the *Fair Housing Act* (i.e. making or purchasing of loans or providing other financial assistance: a) for purchasing, constructing, improving, repairing, or maintaining a dwelling; or b) secured by residential real estate). Fair housing posters must be prominently displayed so as to be readily apparent to all persons seeking residential real estate related transactions or brokerage services.

**2-17 Misrepresentative Advertising.** (TQP)
An approved mortgagee may not use misrepresentative advertising. If a mortgagee determines its branches or employees have engaged in such activity, then mortgagees must take action necessary to ensure that such practices do not occur again. All advertisements must emphasize the name of the company and not the government. See 18 U.S.C. §709 *False advertising or misuse of names to indicate Federal agency* and 18 U.S.C. §1017 *Government seals wrongfully used.*

A. ***Examples.*** This list is illustrative and should not be considered all-inclusive.

• Improperly using the name or seal of FHA or HUD to imply that the advertisement is from or is endorsed by FHA or HUD;
• Improperly advertising on a government type form designed to simulate an official Federal government document; and
• Stating that the advertisement "will serve as your official MIP account notice".

B. ***Actions.*** When HUD finds advertising abuses by mortgagees, it will take prompt action, as appropriate:

• The Mortgagee Review Board may sanction the mortgagee and/or impose civil money penalties; or
• A referral may be made to the Department's Inspector General for its review; or further referral to the Department of Justice which

**4060.1 REV-2**

---

has jurisdiction over criminal prosecution; or a referral may be made to the Federal Trade Commission which has jurisdiction over deceptive trade practices.

**2-18   Loan Origination Requirement.** (TOP)

All mortgagees must follow all applicable statutes, regulations and HUD written instructions, including program handbooks and mortgagee letters on loan originations.   Non-FHA approved mortgage brokers meeting the requirements in **Mortgagee Letter 00-10** may participate in the origination of a FHA Insured Reverse Mortgages (HECMs).

With few exceptions, a mortgagee must originate, close, fund, and submit mortgages for FHA insurance endorsement in its own name.   A mortgagee may not perform only a part of the loan origination process, such as taking the loan application, and routinely transfer the underwriting package (appraisal report and/or mortgage credit package) to another mortgagee except between a loan correspondent and its sponsor, and a principal and its authorized agent.   A loan correspondent may process an application and submit it to one of its sponsors for underwriting.   The loan correspondent must close the loan in its own name, or in the name of the sponsor that underwrote the loan.   An Authorized Agent may perform any part of the loan origination process, including underwriting, on behalf of its Principal; however the loan must be closed in the name of the Principal.   For further information on the Principal-Authorized Agents, see chapter 5, Part B.

**2-19   Geographic Restrictions for Loan Origination and Underwriting.** (TOP)

Each office of a mortgagee (main office or branch office) is authorized to operate only in those states, the District of Columbia, and/or Puerto Rico as designated by the Department.   Geographic restrictions apply to the loan origination component of taking a loan application and underwriting.   The processing of loan applications can be done at any office of a mortgagee. Approved mortgagees may purchase, hold, service, and sell insured FHA mortgages without regard to geographic restrictions.   Offices must not be located so as to avoid receiving applications from, or providing assistance to, minority loan applicants.

A.   ***Origination Lending Area for Home Offices, Traditional Branches and Nontraditional Branches:***   The single family origination lending area of each office is based on its geographic location and is composed of one or more States. This lending area is also known as the Area Approved for Business (AAFB) and can be verified via the FHA Connection.   A complete table of all lending areas is included in the Lender Approval FAQs in the FHA Connection FAQ section.

B.   ***Origination Lending Area for Direct Lending Branches:***   The single family origination lending area of these branches are determined on a case-by-case basis, but normally contain all of the HUD Field Office jurisdictions in all States where the lender is State approved, registered or exempt to conduct direct lending. See paragraph 5-8 for the approval criteria of a direct lending branch.

---

**4060.1 REV-2**

---

C.  **Underwriting Area of a DE Mortgagee.**  A DE mortgagee's initial approval to underwrite is granted by its respective HOC and covers all HUD Field Office jurisdictions within its AAFB plus those of any loan correspondents it sponsors and the AAFB for mortgagee that it established an Authorized Agent-Principal relationship.

D.  **Streamline Refinance.**  There are no geographic restrictions on the origination of streamline refinanced single-family loans.  See HUD Handbook 4155.1 for details on streamline refinancing.

E.  **Sponsoring Loan Correspondents**.  DE Mortgagees may sponsor loan correspondents operating in any HUD Field Office jurisdiction, whether or not they have origination approval for the same office.  The DE mortgagee uses their FHA Connection account to add a loan correspondent they want to sponsor.

F.  **Multifamily Mortgagees.**  A mortgagee participating in the Department's multifamily mortgage insurance programs may originate project mortgages in the jurisdiction of any Field Office.  The mortgagee must request and receive written permission from each Field Office in whose jurisdiction it seeks to do business.

**2-20   Loan Servicing Responsibility.** (TOP)
Each mortgagee that services or sub services FHA insured single-family mortgages must be an approved mortgagee and must follow the requirements of HUD Handbook 4330.1, *Administration of Insured Home Mortgages*.  Multifamily servicing mortgagees must meet the requirements of HUD Handbook 4350.4, *Insured Multifamily Mortgagee and Field Office Remote Monitoring.*

A Title II mortgagee may assign or otherwise transfer an insured Title II mortgage only to another approved Title II mortgagee.  The transferee or assignee may be any lender type except a non-supervised loan correspondent.

**2-21   Escrow Funds.** (TOP)

A.  **Use of Escrow Funds.**  Mortgagees may not use mortgagor escrow funds for any purpose other than for which they were received.  Escrow commitment deposits, work completion deposits, and all periodic payments received by the mortgagee, including ground rents, taxes, assessments, and insurance premiums, must be deposited with one or more financial institutions in a special account or accounts fully insured by the FDIC or the NCUA.  This requirement may be modified only with the written permission of the Department.  See HUD Handbook 4330.1 for details on escrow accounts.

B.  **Reporting of Escrow Funds.**  If escrow funds are reported on the balance sheet, they must be fully offset by a corresponding liability and must be segregated on the balance sheet.  A mortgagee may not report escrows as its own assets.  The annual audit of non-supervised

---

**4060.1 REV-2**

5. ***Newly Approved Mortgagee.*** If the mortgagee's initial approval date is less than six months prior to the end of its fiscal year and the audited financial statements submitted for approval are for the period ended not more than six months prior to the end of its fiscal year, then the mortgagee is not required to submit new audited financial statements for recertification, nor is an annual recertification fee due. However, the audited financial statements submitted with its next renewal must cover the period from the date of its initial audited financial statements to the end of its fiscal year. The period covered by the renewal audit cannot exceed 18 months.

C. ***Extensions.*** Extensions are granted only in cases of catastrophic events beyond the control of lender or auditor. Extension requests must be submitted through LASS. The request must be received no earlier than 45 days prior to the submission due date and no later than 15 days prior to the submission due date.

## 4-5 **LASS Review Procedures.** (TOP)

Each annual LASS submission by a non-supervised mortgagee or non-supervised loan correspondent is reviewed to determine compliance with the Department's net worth, liquidity, audit reporting and other financial requirements for continued approval. The review consists of, but is not limited to, the following procedures.

A. ***Auditor's Report.*** HUD reviews the information provided in the LASS submission to verify:

1. The audit was done by a qualified auditor, the audit firm contact is identified, and contact information and identifying information on the audit firm is provided.

2. The attestation was done by a qualified auditor, the attester is identified, and contact information and identifying information on the audit firm is provided.

3. The period covered by the financial statements corresponds to the date recorded in FHA records as stated in the mortgagee history profile screen.

4. The audit was done in accordance with:

- Generally Accepted Auditing Standards (GAAS);
- Generally Accepted Government Auditing Standards *(GAGAS)* as contained in the most recent General Accountability Office (GAO) Audit Guide -- **Government Auditing Standards** (commonly known as the "Yellow Book"); and
- The most recent version of **HUD IG Handbook 2000.04**
  *Consolidated Audit Guide for Audits of HUD Programs*

**4060.1 REV-2**

mortgagees and loan correspondents must cover such fiduciary accounts.

**2-22 Prohibited and Permissible Payments.** (TOP)
A mortgagee may not pay any fee, kickback, compensation or thing of value (including a fee representing all or part of the mortgagee's origination fee) to any person or entity in connection with a FHA insured mortgage transaction, except for services actually performed and permitted by the Department.

A.  **Prohibited Payments.** A mortgagee is not permitted to:

1. Advance funds to a real estate agent, real estate broker, mortgage broker, or packager as an advance of anticipated commissions on sales to be financed with a FHA-insured mortgage loan to be provided by the mortgagee.

2. Make low interest or no interest loans to a real estate broker, real estate agent, mortgage broker, packager, builder or any other party from whom the mortgagee accepts proposals involving FHA-insured mortgages.

3. Pay a gratuity or make a gift valued above items that are customarily distributed in the normal course of advertising, public relations, or as a general promotion device, to any person or entity involved in FHA-insured mortgage transactions of the mortgagee.

4. Pay any compensation or fee that is prohibited by RESPA.

B.  **Permissible Payments for Services Performed.** In connection with FHA insured mortgages and mortgage insurance applications, a mortgagee may pay fees permitted by program policy as identified in HUD Handbooks, Mortgagee Letters or Circular Letters. Generally, the policy for:

1. Single Family Origination is in **HUD Handbook 4000.2** , *Mortgagees' Handbook, Application Through Insurance (Single Family)*, HUD **HUD Handbook 4000.4**, *Single Family Direct Endorsement Program*, or **HUD Handbook 4155.1**, *Mortgage Credit Analysis for Mortgage Insurance on One to Four-Family Properties.*

2. Single Family Servicing is in HUD Handbook 4330.1, *Administration of Insured Home Mortgages.*

3. Multifamily Development is in HUD Handbook 4430.1, *Initial Closing Requirements for Project Mortgage Insurance..*

4. Multifamily Servicing is in HUD Handbook 4350.4, *Insured Multifamily Mortgagee and Field Office Remote Monitoring.*

**4060.1 REV-2**

**2-23   Quality Control.**  (TOP)
A mortgagee must maintain a written Quality Control Plan for the origination and servicing of FHA insured mortgages.  The Quality Control Plan and its implementation must meet the requirements set forth in chapter 7. Mortgagees are required to report to HUD any fraud, illegal acts, irregularities or unethical practices.

**2-24   Requirement to Notify HUD of Changes Subsequent to Approval.**  (TOP)
A mortgagee must notify the Department in writing within a specific number of days of any business change that affects its standing as an approved institution, or which changes the information on which it was originally approved, including: corporation conversion, merger, consolidation, succession, liquidation, termination; or a change in its charter provisions, name, bylaws, location, ownership, character of business, or senior officers; or a significant reduction in its revenues, assets or net worth.  See chapter 6 for details.

**Part B.  Additional Requirements for Specific Mortgagee Types** (TOP)

**2-25   Introduction.**  (TOP)
A mortgagee may be approved to participate in the Department's mortgage insurance programs as one of the following designated types of mortgagee. In addition to the general approval requirements of Part A of this chapter, it must meet specific requirements for its particular mortgagee type.

**2-26   Supervised Mortgagees.**  (TOP)
A supervised mortgagee is a financial institution that is a member of the Federal Reserve System or an institution whose accounts are insured by the FDIC or the NCUA.  Such a mortgagee is not required to have mortgage lending as a principal activity as described in paragraph 2-29(C). A subsidiary or an affiliate of a supervised financial institution is **not** considered to be supervised for approval as an FHA mortgagee.  Examples of supervised mortgagees are banks, savings associations, and credit unions.

A.     ***Permissible Mortgage Lending Activities.***  A supervised mortgagee may originate, underwrite, purchase, hold, service, and sell FHA insured mortgages and submit applications for mortgage insurance.

B.     ***Branch Offices.***   A supervised mortgagee may maintain FHA registered branch offices that originate insured mortgages.  Specific approval requirements are in chapter 5.  The mortgagee is fully responsible to HUD for the actions of its offices.

C.     ***Fiduciary Relationships.***   Approval of a financial institution as a supervised mortgagee constitutes approval for it to act in a fiduciary capacity in investing fiduciary funds, which are under its individual or joint control.  When such a fiduciary relationship is ended, any insured mortgages held in the fiduciary estate must be transferred to an approved supervised mortgagee; the fiduciary relationship must permit the transfer.

4060.1 REV-2

### 2-27 Non-supervised Mortgagees. (TOP)
A non-supervised mortgagee is a financial entity that has as its principal activity the lending or investing of funds in real estate mortgages.

A. **Permissible Mortgage Lending Activities.** A non-supervised mortgagee may originate, underwrite, purchase, hold, service, and sell FHA insured mortgages and submit applications for mortgage insurance.

B. **Branch Offices.** A non-supervised mortgagee may maintain FHA approved branch offices for the origination of FHA insured mortgages as described in chapter 5.

C. **Warehouse Line of Credit Requirement.** A non-supervised mortgagee, except a mortgagee approved for participation only in the multifamily mortgage insurance programs, must maintain a warehouse line of credit or other mortgage-funding program acceptable to the Department. Acceptable programs include table funding and concurrent funding arrangements. The program must be adequate to fund the mortgagee's average 60-day origination production pipeline, but not less than a $1 million warehouse line of credit or funding program. The line of credit must be issued directly to the mortgagee. In lieu of a warehouse line of credit, a mortgagee may have a letter from a financial institution stating that it will fund all mortgages originated by the mortgagee.

D. **Principal Activity.** A non-supervised mortgagee must spend a majority of its time and assets in the production of real estate mortgages and in the lending or investment of funds in real estate mortgages, or a directly related field. For FHA purposes, the principal activity of a non-supervised mortgagee, other than one organized as a not-for-profit entity, must contribute at least one-half of the entity's gross revenues, unless otherwise approved by FHA.

E. **Annual Certified Audit Report.** For continued approval, a non-supervised mortgagee must submit to the Department an acceptable audit report within 90 days after the close of the mortgagee's fiscal year. The audit report must be prepared in accordance with the requirements of the most recent off HUD IG **Handbook 2000.04**, *Consolidated Audit Guide for Audits of HUD Programs.*

### 2-28 Supervised Loan Correspondents. (TOP)
A mortgagee that meets the Department's definition of a supervised mortgagee may apply for and receive approval as a loan correspondent. The approval must be requested by at least one Sponsor. An approved loan correspondent is required to have at least one qualified sponsor at all times.

A. **Sponsor.** A sponsor of a loan correspondent must be a DE mortgagee.

   1. **Responsibility for Loan Correspondents.** The Sponsor is responsible to the Department for the actions of each of its loan

**4060.1 REV-2**

correspondents in originating FHA-insured mortgages. A Sponsor must supervise and perform quality control reviews of each of its loan correspondents. See chapter 7 for details.

2. ***Underwriting.*** The Sponsor performs loan underwriting on behalf of a loan correspondent. All mortgages originated by the loan correspondent must be closed in the name of the loan correspondent or the sponsor underwriting the loan.

B. ***Permissible Mortgage Lending Activities.*** (TOP) A supervised loan correspondent may originate FHA insured mortgages and submit applications for mortgage insurance.

1. ***Sale only to Sponsor(s).*** It may not sell or otherwise transfer any FHA mortgage to any mortgagee other than its registered Sponsor that underwrote the loan, without prior written approval from the Department.

2. ***Servicing.*** A supervised loan correspondent may service FHA-insured mortgages in its own portfolio with the prior permission of the Department. Such requests should be submitted to the Lender Approval and Recertification Division.

C. ***Funding agreement.*** (TOP) A supervised loan correspondent must have a letter or written agreement from each of its Sponsors that the Sponsor will purchase all FHA mortgages that the loan correspondent originates and that the Sponsor underwrites.

D. ***Branch Offices.*** A supervised loan correspondent may maintain FHA registered branch offices for the origination of insured mortgages as described in chapter 5, Part A.

**2-29  Non-supervised Loan Correspondents.** (TOP)
A non-supervised loan correspondent is a financial entity that has as its principal activity the origination of mortgages for sale or transfer to one or more registered Sponsors. An approved loan correspondent is required to have at least one qualified sponsor at all times.

A. ***Selection of a Sponsor.*** A Sponsor of a loan correspondent must be a DE mortgagee. (TOP)

1. ***Responsibility for Loan Correspondents.*** The Sponsor is responsible to the Department for the actions of each of its loan correspondents in originating FHA-insured mortgages. A Sponsor must supervise and perform quality control reviews of each of its loan correspondents. See chapter 7 for details.

2. ***Underwriting.*** The Sponsor performs the loan underwriting function on behalf of the loan correspondent. All mortgages originated by the loan correspondent must be closed in the name of the loan correspondent or the Sponsor underwriting the loan.

**4060.1 REV-2**

---

B. **Permissible Mortgage Lending Activities.** A non-supervised loan correspondent may originate FHA insured mortgages and submit applications for mortgage insurance.

  1. **Sale only to Sponsor(s).** It may not sell or otherwise transfer any FHA mortgage to any mortgagee other than its registered Sponsor that underwrote the loan, without prior written approval from the Department.

  2. **May not hold, purchase, or service.** It may not hold, purchase, or service FHA-insured mortgages. (TOP)

C. **Principal Activity.** A non-supervised loan correspondent must spend a majority of its time and assets in the production of real estate mortgages and in the lending or investment of funds in real estate mortgages, or a directly related field. For FHA purposes, the principal activity of a non-supervised loan correspondent, other than one organized as a not-for-profit entity, must contribute at least one-half of the entity's gross revenues, unless otherwise approved by FHA.

D. **Funding agreement.** It must have a written agreement with each of its Sponsors to fund all mortgages that it originates and that the Sponsor underwrites

E. **Branch Offices.** A loan correspondent may maintain FHA registered branch offices for the origination of insured mortgages as described in chapter 5, Part A. (TOP)

## 2-30 Investing Mortgagees.

An investing mortgagee is an organization, including a charitable or not-for-profit institution or pension fund, that invests funds under its own control.

A. **Permissible Mortgage Lending Activities.** An investing mortgagee may purchase, hold, and sell FHA-insured mortgages. It may not submit applications for mortgage insurance. It may not service insured mortgages without the prior approval of the Department, and must arrange for an approved mortgagee to service all insured mortgages the investing mortgagee acquires and monitor the performance of any service they hire.

B. **Special Requirements.** (TOP) An investing mortgagee must meet the following requirements:

  1. It must have lawful authority to purchase insured mortgages in its own name.

  2. It must have available, or have arranged for, funds sufficient to support a projected investment in real estate mortgages of at least $1 million. For example, a $1 million line of credit is acceptable.

---

**4060.1 REV-2**

---

**2-31 Governmental Institutions.** (TOP)
Any of the following may be approved as a mortgagee:

- A Federal, State or municipal government agency;
- A Public Housing Authority or State Housing Agency;
- A Federal Reserve Bank;
- A Federal Home Loan Bank;
- Freddie Mac; and
- Fannie Mae.

A. ***Permissible Mortgage Lending Activities.*** (TOP) A governmental institution may originate, underwrite, purchase, hold, service, and sell FHA insured mortgages and submit applications for mortgage insurance to the extent authorized by Federal, State, or local law.

B. ***Branch Offices.*** These mortgagees may maintain branch offices that originate and service insured mortgages as described in chapter 5, Part A.

C. ***Audit Requirements.*** (TOP) Except upon request, a governmental institution is not required to submit an audit to obtain or retain approval to participate in the Department's mortgage insurance programs. The *Single Audit Act Amendments of 1996* placed State and local governments, colleges and universities, and other not-for-profit grantees under the same audit process. As a result of this modification of the *Single Audit Act*, the Office of Management and Budget (OMB) issued uniform standards for the audit of such entities receiving Federal financial assistance, in Circular A-133, *Audits of States, Local Governments, and Non-Profit Organizations.* For additional information see HUD IG **Handbook 2000.04**, *Consolidated Audit Guide for Audits of HUD Programs* and AICPA Statement of Position 98-3, *Audits of States, Local Governments, and Not-for-Profit Organizations Receiving Federal Awards*.

---

4060.1 REV-2

# Chapter 3   Mortgagee Approval Package and Procedures

## Part A.   Submission of Application

**3-1   Introduction.** (TOP)
This part explains the documentation that the mortgagee must submit when applying for FHA approval.

**3-2   Required Documentation.** (TOP)
The documentation that must be submitted by the mortgagee as part of the application package varies according to the type of mortgagee status for which the applicant seeks approval. The following documentation (indicated by an "X") must be submitted. HUD may request additional documentation.

|   |   | Supervised Mortgagee | Nonsupervised Mortgagee | Supervised Loan Correspondent | Nonsupervised Loan Correspondent | Investing Mortgagee | Government Institution |
|---|---|---|---|---|---|---|---|
| 1 | Sponsor cover letter |   |   | X | X |   |   |
| 2 | Fee* | X | X | X | X | X |   |
| 3 | Application Form | X | X | X | X | X | X |
| 4 | Credit Reports |   | X |   | X | X |   |
| 5 | Resumes |   | X |   | X | X | X |
| 6 | Financial statements |   | X |   | X |   |   |
| 7 | Licenses |   | X |   | X | X |   |
| 8 | State DBA approval** | X | X | X | X | X | X |
| 9 | Facilities evidence |   | X |   | X |   |   |
| 10 | Fidelity bond | X | X |   |   | X | X |
| 11 | E&O insurance | X | X |   |   | X | X |
| 12 | Quality Control Plan | X | X | X | X | X*** | X |
| 13 | Funding program |   | X | X | X | X |   |
| 14 | Sanctions letter |   | X |   | X | X |   |

*Not required for non-profits if Servicing        **Where a DBA is used        ***Only

A.   **Explanation of Required Documentation.** (TOP)

**4060.1 REV-2**

1. ***Sponsor Cover Letter.*** An application from a mortgagee applying for approval as a loan correspondent must be accompanied by a letter from an approved direct endorsement mortgagee that will be its Sponsor, signed by an executive officer of the Sponsor, requesting approval of the loan correspondent. The letter must contain the Sponsor's mortgagee Identification Number. The letter may also state the mortgagee will fund all loans where it is the sponsor.

2. ***Application Fee.*** Evidence that the application fee has been transmitted: copies of the check and the HUD form, *Application Fee for Title II Mortgagee Approval*, as transmitted to the lock box (see paragraph 2-7C). If a copy of the check is not included, a copy of the front and back of the canceled check will be requested.

3. ***Application Form.*** **HUD form 11701**, *Application for Approval--FHA Lender and/or Ginnie Mae Mortgage Backed Securities Issuer*.

4. ***Credit Reports.*** An applicant, other than a supervised institution or a governmental institution, must order and pay for credit reports and submit the complete originals, with the application, directly to the Lender Approval and Recertification Division, HUD Headquarters.

   a. Required are:

      (1) Personal credit reports for the principals of the applicant, including the chairman of the board, president, vice presidents and any person or entity owning 25 percent or more of the mortgagee's voting stock or a controlling interest. Personal credit reports must be either Residential Mortgage Credit Reports (RMCR) or three-merged reports. Other types, e.g. in-file credit reports, are not acceptable.

      (2) A commercial credit report, or a Dun & Bradstreet report, if a principal owner is a business entity.

      (3) A commercial credit report or a Dun & Bradstreet report on the applicant. This is required even if the applicant is a start-up company.

   b. A written explanation must be submitted by the applicant for all negative items disclosed by any credit report. Credit Reports are evaluated pursuant to the FHA underwriting guidelines as set forth at **HUD Handbook 4155.1**, including any updates and/or revisions.

**4060.1 REV-2**

_____

5. ***Resumes.*** The applicant must submit current resumes on senior officers with qualifying mortgage origination or servicing experience covering at least the previous seven years of employment. A Government Institution must provide resumes on the senior staff person or persons designated to meet staffing and experience requirements. For details regarding experience requirements, refer to paragraph 2-9(B).

Instead of resumes or other documentation of experience, institutions applying to become supervised mortgagees or supervised loan correspondents may submit a list of officers involved with mortgage lending, together with each officer's Social Security Number.

6. ***Financial Statements.*** (TOP) The applicant must submit its most current CPA prepared audited financial statements for the period ended not more than 12 months prior to submission of the application. The financial statements must be supplemented by a computation of adjusted net worth pursuant to chapter 7 of the most recent version of **HUD IG Handbook 2000.04**, *Consolidated Audit Guide for Audits of HUD Programs* that also must be audited by the CPA.

For an ongoing business concern, a full set of financial statements is required:

- Balance sheet;
- Income statement;
- Cash flow statement;
- Retained earnings statement;
- Footnotes; and
- Auditor's report containing an unqualified (clean) opinion.

All financial statements must be prepared in accordance with Generally Accepted Accounting Principles (GAAP). The audit must be performed in accordance with Generally Accepted Auditing Standards (GAAS) by a Certified Public Accountant (or a Public Accountant licensed on or before Dec. 31, 1970) licensed to perform audits in the state in which the applicant's home office is located and who has not been suspended, debarred, or otherwise excluded from performing audits of mortgagees. The audit report must be complete, original and contain the auditor's report on the audit firm's letterhead stationery.

a. ***New Company.*** (TOP)If the applicant is a new company and has had no revenues or cash flow, the income statement and cash flow statement are not required.

b. ***Audited financial statements over six months old.*** If the audited financial statements are for a period

_____

**4060.1 REV-2**

ended more than six months but less than 12 months prior to submission of the application, additional financial statements must be submitted. This shall be in the form of a full set of financial statements (unaudited) and a computation of adjusted net worth.   The unaudited financial statements must be certified by management and be for the most recent interim accounting period, but not older than three months.

c.   ***Corrected Deficiency in Adjusted Net Worth.***  If the computation of adjusted net worth shows inadequate adjusted net worth at the date of the financial statements and the applicant has corrected this deficiency prior to issuance of the auditor's report, then the auditor will report this as a subsequent event.  A new computation of adjusted net worth must be provided and the audit reports shall be dual dated, when subsequent events relate to adjusted net worth.  If the auditor's report has already been issued, the auditor must verify that the applicant subsequently met the net worth requirement and issue an opinion on it, including a new computation of adjusted net worth.

7.   ***Licenses.***  (TOP) An applicant applying for approval as a non-supervised mortgagee or a non-supervised loan correspondent must obtain all required licenses prior to, or in conjunction with, approval as a FHA mortgagee.  Copies must be submitted with the application.  If the State does not require that mortgage lenders be licensed, the applicant must certify to that in writing.  If a State conditions the issuance of a State license upon the lender having a FHA approval, the Department can evidence its approval by signing the applicant's HUD Form 11701 which can then be provided to the State.  However, the FHA ID number will not be issued until FHA receives a copy of the State license.

8.   ***State Approval of "dba".***  If a mortgagee or any of its branch offices is using a "Doing Business As" (dba) name, it must submit with the application a copy of the DBA statement or assumed name certificate filed with the State.   See also paragraph 2-14, regarding prohibited branch arrangements.

9.   ***Evidence of Acceptable Facilities.***  (TOP) An applicant applying for approval as a non-supervised mortgagee or a non-supervised loan correspondent must provide sufficient evidence that its facilities meet FHA requirements.  See paragraph 2-13.  The applicant must submit photographs of its facilities, including its entrance, with evidence of permanent identification to the public.  The applicant must submit a floor plan, which may be hand-drawn.   The applicant must also submit a certification, signed by a senior officer, that the facilities comply with FHA requirements.  These submissions are in lieu of an on-site visit by FHA to the mortgagee's office facilities; however,

> 4060.1 REV-2

FHA may still conduct an on-site visit. Evidence of acceptable facilities is not required for branch offices.

10. **Fidelity Bond.** (TOP) All mortgagees, except loan correspondents, are required to maintain base coverage of $300,000 in fidelity bonds covering the mortgagee's employees and agents. The Department does not require that it be the beneficiary of such coverage. A fidelity bond that is generally acceptable to the secondary market agencies, such as Ginnie Mae, Fannie Mae, and Freddie Mac, will meet FHA's requirement. An applicant must provide evidence of such coverage. A governmental institution may be exempt from this requirement if it maintains alternative insurance coverage approved by the Secretary, that assures the faithful performance of the responsibilities of the mortgagee.

11. **Errors and Omissions Insurance.** (TOP) All mortgagees, except loan correspondents, are required to maintain base coverage of $300,000 in errors and omissions insurance coverage. The Department does not require that it be the beneficiary of such coverage. Errors and omissions insurance that is generally acceptable to the secondary market agencies, such as Ginnie Mae, Fannie Mae or Freddie Mac, will meet FHA's requirement. An applicant must provide evidence of such coverage. A governmental institution may be exempt from this requirement if it maintains alternative insurance coverage approved by the Secretary, that assures the faithful performance of the responsibilities of the mortgagee.

12. **Quality Control Plan.** The applicant must submit a copy of its Quality Control Plan. See chapter 7 for details.

13. **Funding Program.** The applicant must provide a letter or letters establishing or confirming acceptable funding arrangements totaling not less than $1 million, unless applying as a supervised mortgagee or Government Institution.

    a. **A Non-supervised Mortgagee,** (TOP) except a mortgagee approved for participation only in the multifamily mortgage insurance programs, must maintain a warehouse line of credit or other mortgage funding program acceptable to the Department. Acceptable programs include table funding and concurrent funding arrangements. The program must be adequate to fund the mortgagee's average 60-day origination production pipeline, but not less than a $1 million warehouse line of credit or funding program. The line of credit must be issued directly to the mortgagee. In lieu of a warehouse line of credit, a mortgagee may have a letter from a financial institution stating that it will fund all mortgages originated by the mortgagee.

4060.1 REV-2

---

b. **A Non-supervised Loan Correspondent** must comply
with the same funding requirements as a non-
supervised mortgagee or have a written agreement or
letter from each of its Sponsors to fund all mortgages
that the sponsor underwrites. The application package
must include, for each Sponsor, either:

- A separate agreement between the Sponsor and
  the non-supervised loan correspondent, which
  includes the funding provisions, or warehouse
  line of credit, or
- A Sponsor letter containing the written
  agreement that the Sponsor will fund all
  mortgages it underwrites that were originated by
  the non-supervised loan correspondent.

c. **A Supervised Loan Correspondent** must have a
letter or written agreement from each of its Sponsors
that the Sponsor will purchase all FHA mortgages that
the loan correspondent originates and that the Sponsor
underwrites.

d. **An Investing Mortgagee** must have, or have arranged
for, funds sufficient to support a projected investment in
real estate mortgages of at least $1 million.

14. **Sanctions Letter.** The applicant must certify that neither it
nor any of its officers, directors, or principals, has been denied
an operating license or otherwise sanctioned by any licensing or
regulatory body. A state-licensed mortgagee must submit with
its application for approval, a letter certifying to the
Department that the mortgagee sought and has not been
refused a license, and has not been sanctioned by any State or
States in which it will originate insured mortgages. If the
mortgagee or any of its officers, directors, or principals has
been sanctioned or subject to an action by the State against its
license, the applicant must submit a copy of the documents
concerning the action together with a written explanation.

## 3-3   Documentation for Specific Business Forms. (TOP)

A. **Partnership--Additional Documentation Required.** A partnership
seeking approval as a mortgagee must include the following additional
documentation with its application package:

1. **Names and Employer Identification Numbers of all
general partners.** (TOP)

2. **Identity of the designated managing general partner.**
The officers and directors of the managing general partner

---

08/06                                    3-6

**4060.1 REV-2**

must be listed, together with their Social Security Numbers, on the application, HUD form 11701.

3. ***Principal business activity of managing general partner.*** Evidence that the principal business activity of the managing general partner is the management of one or more partnerships, all of which are mortgage lenders, property improvement or manufactured home lenders; and that it has exclusive authority to deal with FHA on behalf of each partnership.

4. ***Partnership term of existence.*** Evidence that the partnership will exist for a minimum term of ten years and that in the event that a partner withdraws, the partnership is specifically authorized to continue its existence.

If the mortgagee certifies that it meets the requirements for partnerships as described in paragraph 2-2(B), a copy of the Partnership Agreement does not have to be submitted, unless requested by FHA.

B. ***Limited Liability Company--Additional Documentation Required.*** *(TOP)*

1. Names and Taxpayer Identifying Numbers of all members.

2. Names of managing member and FHA contact.

3. Copy of Operating Agreement.

4. Copy of Articles of Organization.

C. ***Not-for-profit Entity.*** A non-depository not-for-profit entity must provide evidence of its not-for-profit status. It may do this by providing a copy of its IRS Exemption Letter.

# Part B. Processing of Application (TOP)

**3-4 Introduction.** *(TOP)*
This Part explains the Department's procedures and processing requirements for an application for FHA mortgagee approval. The Lender Approval and Recertification Division in the Office of Lender Activities and Program Compliance, HUD Headquarters, is responsible for analyzing mortgagee application packages received, approving or disapproving applicants, and maintaining a record of approved mortgagees.

**3-5 Requests for Additional Information.** *(TOP)*
If additional documentation or information is needed to complete the processing of the application and to determine approval or disapproval, FHA may request it directly from the applicant. If the required documentation or information is not submitted within a reasonable time, as prescribed by FHA,

---

> **4060.1 REV-2**

---

the application review will be terminated.  Application fees are not refundable.  If the application is resubmitted, the applicant must pay a new fee.

**3-6    Mortgage Approval Processing** (TOP)
Applications for mortgagee approval are reviewed by the Lender Approval and Recertification Division.  This includes, but is not limited to, reviewing:

A.    ***The mortgagee's application package***.  The HUD Form 11701 and the required documentation, are reviewed for completeness, consistency, and accuracy.

B.    ***Application fees.***  Fees are examined for accuracy and correctness of the amounts remitted.

C.    ***Credit Reports.***  Credit reports are reviewed in accordance with FHA underwriting guidelines to ascertain financial responsibility.

D.    ***Financial Statements***.  When a mortgagee is required to submit financial statements, the financial statements are reviewed to ascertain the financial soundness of the applicant and the potential risk to FHA.

    1.    ***Form*** (TOP)

- The financial statements were audited by a Certified Public Accountant (or a Public Accountant licensed on or before Dec. 31, 1970), licensed to practice in the state in which the applicant has its home office, and who has not been suspended, debarred, or otherwise excluded from performing audits of mortgagees;
- The financial statements are current or supplemented by un-audited financial statements certified by management as described in paragraph 3-2(A)(6)(b);
- The audit was performed in accordance with Generally Accepted Auditing Standards (GAAS);
- The financial statements are in accordance with Generally Accepted Accounting Principles (GAAP);
- The Certified Public Accountant has issued an unqualified opinion on the financial statements;
- The financial statements are complete as appropriate to the applicant.  A Computation of Adjusted Net Worth must always be included; and
- The audit report is complete, original, and contain the auditor's report on the audit firm's letterhead stationery.

    **2.    Content** (TOP)

- Revenues must be more than one-half from mortgage lending (for an existing business applying as a non-supervised mortgagee or loan correspondent);
- Adjusted net worth must meet FHA requirements;
- Liquid assets must meet FHA requirements; and

---

**4060.1 REV-2**

---

- The financial statements are accurate and consistent.

E. **_Evidence of Acceptable Home Office Facilities._** Evidence submitted regarding facilities is reviewed to ascertain that FHA's requirements have been met, including that appropriate permanent signage is in place.

F. **_Principals._** The reviewer checks the principals of the mortgagee in the Department's automated credit alert system (CAIVRS) which lists defaulted Federal debts; the Department's LDP lists; the Government-wide list of debarred and suspended parties; and other databases containing information on criminal, civil, Federal debts, enforcement, or disciplinary actions taken by Federal or State regulators in the mortgage and financial services industry, and reports of serious misconduct. If any derogatory information is disclosed, the application may be disapproved.

**3-7   Approval Notifications.** (TOP)
Upon approval, a mortgagee will be assigned an identification number, notified, and provided with various materials. For details, see Part D of this chapter.

**3-8   Disapproval.** (TOP)
If a mortgagee fails to meet the Department's approval requirements, its application will be disapproved. The mortgagee will be sent a written notice that sets forth the reasons for the disapproval. The basis for disapproving an application may include, but is not limited to the following examples:

- Failure to meet the standards for approval as described in this Handbook or the Department's regulations at 24 CFR Part 202;

- Lack of financial responsibility by the applicant, directors, major stockholders, or principals, particularly in areas related to real estate lending and especially if such irresponsibility has resulted in monetary loss to the Federal government (e.g. foreclosure of a FHA insured or VA guaranteed mortgage, tax liens (State and county included), defaulted government loans, or any other Federal debt.) This includes bankruptcy discharged within the prior year and adverse credit report findings;

- Any reason that FHA determines could adversely affect the mortgagee's ability to participate in FHA's mortgage insurance programs. For example, a director's or principal's previous participation or termination of employment by a mortgage lender for cause relating to job performance if the applicant cannot provide a satisfactory explanation;

- Misrepresentation of a corporation's status regarding its FHA approval or misrepresentation of the meaning of such status;

- Using in its name certain words that are proscribed by law, which could mislead a person to believe that the mortgagee is a Federal

---

**4060.1 REV-2**

agency or has a relationship with or is endorsed by the Federal government. For details, see paragraph 2-4;

• Suspension, debarment, or other restrictions under 24 CFR Part 24 or 25 or under similar procedures of any other Federal agency;

• Indictment for, or conviction of, a felony; and

• Unresolved material findings of HUD or other Government audits or investigations.

Part C.  Appeals of Disapproval (TOP)

**3-9  Initial Appeal.** (TOP)
Upon written notice that the application has been disapproved (for reasons other than an incomplete submission), the applicant has 30 days to submit a written appeal of the disapproval to the Director, Office of Lender Activities and Program Compliance.

A.  ***Documentation Required.***  The mortgagee's appeal must be in writing and include any documentation requested in the disapproval letter.

B.  ***Review of Appeal.***  The Director, Office of Lender Activities and Program Compliance, after review of the appeal, either rescinds or affirms the disapproval.

• ***Application Approved.***  If the Director reverses the disapproval, the applicant will be assigned a mortgagee identification number and notified; or

• ***Disapproval Affirmed.***  If the Director affirms the disapproval, the applicant will be notified in writing.

**3-10  Final Appeal.** (TOP)
Upon receipt of a letter from the Director affirming the disapproval, the applicant has 30 days to submit an appeal of that decision to the Deputy Assistant Secretary (DAS) for Single Family Housing.

A.  ***Documentation Required.***  The appeal must be in writing and accompanied by all previous correspondence concerning the case.

B.  ***Review of Appeal.***  The Deputy Assistant Secretary (DAS) for Single Family Housing, after review of the appeal, either rescinds of affirms the disapproval.

• ***Application Approved.***  If the DAS reverses the disapproval, the applicant will be assigned a mortgagee identification number and notified; or.

**4060.1 REV-2**

---

- • **Disapproval Affirmed.** If the DAS affirms the disapproval, the applicant will be notified in writing. The DAS's decision is the final agency action. The applicant may re-apply in one year from the date of the disapproval letter.

Part D. Newly Approved Mortgagees (TOP)

**3-11 Introduction.** (TOP)
This Part describes what happens and what is required once a mortgagee receives its initial approval.

3-12 Immediately Upon Approval.

- A. **Mortgagee Identification Number.** FHA assigns a 10-digit mortgagee identification number. This number must be used in all correspondence regarding FHA mortgages and in dealing with FHA.

- B. **Notification of Approval.** The Lender Approval and Recertification Division will notify the mortgagee of its approval and provide the mortgagee with its FHA mortgagee ID number. It will then send the formal approval package consisting of an approval letter, copy of the signed approved application, a FHA lender seal, Equal Housing Opportunity decals, Equal Housing Opportunity posters and additional information on participating in the FHA loan programs.

- C. **FHA Connection Registration.** All mortgagees are required to sign up for a FHA Connection account which can be done as soon as they are notified of their approval at: **https://entp.hud.gov/clas**.

- D. **FHA Lender List.** All mortgagees and their registered branches will be added to HUD's web site at: **http://www.hud.gov/ll/code/llslcrit.html**.

- E. **Notification to Sponsor.** If the mortgagee is a loan correspondent, a copy of the signed approved application is sent to the initial Sponsor and to all other sponsors processed with the application.

- F. **Starter Kit.** FHA maintains a Starter Kit page on its website at **www.fha.gov/sf/lend/** which provides links to all relevant HUD Handbooks and Mortgagee Letters.

- G. **Forms.** Specific forms are required for FHA mortgage insurance transactions. Forms are not included in the Starter Kit; however, forms can be downloaded from the forms section of **HUDCLIPS**.

**3-13 FHA Mortgage Insurance Premiums and Claims.** (TOP)
All financial transactions by mortgagees with regard to FHA mortgage insurance (premiums and claims) are done electronically via of the FHA Connection.

---

**4060.1 REV-2**

**3-14 Direct Endorsement (DE).** (TOP)
After a mortgagee has been approved as a supervised mortgagee or as a
non-supervised mortgagee, it may apply to the appropriate Homeownership
Center for DE authority. See **HUD Handbook 4000.4**, *Single Family Direct
Endorsement Program* for details.

**4060.1 REV-2**

---

# Chapter 4 Annual Renewal of FHA Approval

**4-1**    **Requirement for Annual Renewal.** (TOP)
A mortgagee must renew its approval each year. In addition to continuing to meet all the requirements it met for initial approval, it must also execute the *Title II Yearly Verification Report*. A mortgagee, except a governmental entity, must pay an annual recertification fee. A non-supervised mortgagee or non-supervised loan correspondent must submit an acceptable audited financial statements and supplementary reports.

**4-2**    **Yearly Verification Report.** (TOP)
Annually, each mortgagee must complete and return to the Department a *Title II Yearly Verification Report* (V-Form) which can be downloaded from their Institution Profile page in the Lender Approval part of the **FHA Connection**. See instructions at: **https://entp.hud.gov/pdf/mp_lndapp.pdf**. The report must be completed by the mortgagee, signed by a senior officer (vice president or above) and returned to FHA within 30 days after the close of the mortgagee's fiscal year. A copy should be given to a non-supervised mortgagee's auditor for review and as proof of FHA approval.

   A.    ***Update By Mortgagee.*** The mortgagee must make the necessary changes to its institution profile in the FHA Connection to ensure the V-Form information is correct before downloading, signing and submitting the form.

   B.    ***Branch Office Information.*** The report displays the total number of registered branch offices of the mortgagee. If the number is incorrect or, within the past year, branches have moved, changed or added a "dba" or changed managers, the mortgagee should record the corrections through the Lender Approval functions on FHA Connection before downloading, signing and submitting the form.

**4-3**    **Annual Renewal Fees.** (TOP)
All mortgagees except governmental institutions must pay an annual renewal fee within 30 days after the close of the mortgagee's fiscal year.

   A.    ***Amount.*** A mortgagee must remit a $500 annual renewal fee for its approved main office and $200 for any registered branch office that was registered at least six months prior to the end of the mortgagee's fiscal year. No renewal fee is due for branches registered in the last six months of a mortgagee's fiscal year. In addition, no fee is required for a non-registered office or any office that the mortgagee deletes through the Lender Approval functions on FHA Connection before they pay their renewal fee.

   B.    **Payment.** This payment must be made by accessing pay.gov via the FHA Connection by using the "Pay Now" button that has been added to the Institution Profile page of each mortgagee. Delete any branches that are not being renewed before clicking on the "Pay Now" button, In

---

**4060.1 REV-2**

order to be charged the correct amount. See instructions at:
**https://entp.hud.gov/pdf/mp_lndapp.pdf**.

**4-4 LASS Submission of Annual Audited Financial Statements.** (TOP)
Within 90 days after the close of its fiscal year, non-supervised mortgagees and non-supervised loan correspondents must submit their audited financial and compliance data electronically through LASS. The LASS homepage at **http://www.hud.gov/offices/hsg/sfh/lass/prodlass.cfm** contains links on how to register to use LASS, FAQs, latest updates and additional links to many items including the LASS User Manual. LASS consists of: (1) specifically designed financial data templates (FDT) which collects financial data; (2) a data collection form (DCF) which will collect information about the mortgagee and the auditor reporting on the financial statements, internal controls, compliance data, and the attachment of the mortgagee's signed audit reports, including the compliance and internal control reports to their financial statements and (3) a Note and Finding template which allows for the attachment of the mortgagee's audited footnotes, auditor's finding, and mortgagee's corrective action plans.

The hard copy basic financial statements and auditor reports must be issued prior to the mortgagee initiating their electronic submission of their financial and compliance data and are the basis for the mortgagee's electronic submission. The basic financial statements must be prepared and audited in accordance with HUD IG most recent **Handbook 2000.04**, *Consolidated Audit Guide for Audits of HUD Programs*; and *GAO's* most recent ***Government Auditing Standards*** (the "Yellow Book"). The audit must be done by a Certified Public Accountant (or a Public Accountant licensed on or before Dec. 31, 1970) qualified to perform the audit and licensed to practice in the State in which the mortgagee has its home office, and who has not been suspended, debarred, or otherwise excluded from performing audits of mortgagees. When requested by the Department, a mortgagee must submit any other materials that may be needed to make a determination regarding continuation of approval.

If the auditor becomes aware of illegal acts or fraud that have occurred or are likely to have occurred, the auditor must report instances of fraud and illegal acts. The auditor must report directly to the HUD District Inspector General for Audit. For details, see Chapter 1 of the most recent version of **HUD IG Handbook 2000.04**, *Consolidated Audit Guide for Audits of HUD Programs*. The Office of the Inspector will notify the appropriate offices within the Department, including the Office of Lender Activities and Program Compliance.

A. ***Required Reports by Type of Mortgagee For LASS Submission.***
(TOP)

    1. ***Non-supervised Mortgagee.*** A non-supervised mortgagee, unless exempt per paragraph 4-4(B)(5), must maintain the following documents to support their electronic submission:

        a. ***Audited financial statements***

**4060.1 REV-2**

- Balance sheet;
- Income statement;
- Cash flow statement;
- Statement of Equity; and
- Footnotes.

b.  **Computation of adjusted net worth including a Statement of Auditing Standards (SAS) 29 opinion.** The SAS 29 opinion can be issued in a separate report or included within the Independent Auditor's Report on the Financial Statements.

c.  **Independent Auditor's Report on the Financial Statements.** (TOP)

d.  **Independent Auditor's Report on Internal Control.**

e.  **Independent Auditor's Report on Compliance with Specific Requirements Applicable to Major/Non-Major HUD Programs.** Major program mortgagees are subject to an audit of their compliance with HUD major programs. Non-major program mortgagees are subject to a review of their compliance with HUD non-major programs.   Major program means an individual assistance program or a group of programs in a category of Federal financial assistance, which exceeds $300,000 during the applicable year. A project, which has an outstanding HUD-insured or guaranteed loan balance exceeding $300,000 as of the reporting date, shall be considered a major program. A mortgagee or loan correspondent, which originates and/or services an aggregate of FHA-insured loans exceeding $300,000 during the period under audit, is considered a major program.

f.  **Schedule of Audit Finding.** When reporting deficiencies in internal control or instances noncompliance the auditor should generate a schedule of finding.  The auditor should place their findings in proper perspective by providing a description of the work performed that resulted in the finding.   To the extent possible the auditor should develop the elements of criteria, condition, cause, effect, and recommendations to assist management in understanding the need for taking corrective action.

g.  **Corrective Action Plan.** If the auditor has noted any findings then the mortgagee must submit a corrective action plan, which addresses each finding.

**4060.1 REV-2**

2.   ***Non-supervised Loan Correspondent.*** (TOP)   A non-supervised loan correspondent, unless exempt per paragraph 4-4(B)(5), must maintain the following documents to support their electronic submission:

    a.   ***Audited financial statements.*** (TOP)

        • Balance sheet;
        • Income statement;
        • Cash flow statement;
        • Statement of Equity; and
        • Footnotes.

    b.   ***Computation of adjusted net worth including a Statement of Auditing Standards (SAS) 29 opinion.*** The SAS 29 opinion can be issued in a separate report or included within the Independent Auditor's Report on the Financial Statements.

    c.   ***Independent Auditor's Report on the Financial Statements.*** (TOP)

***d.***   **Independent Auditor's Report on Internal Control.**

    ***e.***   ***Independent Auditor's Report on Compliance with Specific Requirements Applicable to Major/Non-major HUD Programs.*** Major program mortgagees are subject to an audit of their compliance with HUD major programs. Non-major program mortgagees are subject to a review of their compliance with HUD non-major programs. Major program means an individual assistance program or a group of programs in a category of Federal financial assistance, which exceeds $300,000 during the applicable year. A project, which has an outstanding HUD-insured or guaranteed loan balance exceeding $300,000 as of the reporting date, shall be considered a major program. A mortgagee or loan correspondent, which originates and/or services an aggregate of FHA-insured loans exceeding $300,000 during the period under audit, is considered a major program.

    For Title II loan correspondents, the requirement for the auditor to review and report on the mortgagee's compliance has been modified under the condition that the Sponsor agrees to assume the responsibility of assuring compliance for each loan correspondent under their sponsorship. In those instances where the Sponsor agrees to assume the responsibility of assuring compliance of loan correspondents under their sponsorship the Sponsor must communicate annually in writing to the individual loan correspondents their intent

**4060.1 REV-2**

to assume responsibility for their compliance. The Sponsor must indicate the areas of compliance that they will be assuming. The Sponsor must issue annually a written report summarizing the results of their compliance testing. In addition, the Sponsor must accumulate and retain the supporting information that served as the basis for the written annual compliance report issued to the loan correspondent. Nevertheless, in accordance with Government Auditing Standards (the "Yellow Book") it is incumbent upon the auditor to test and report on those areas of compliance not assumed by the Sponsor. In addition, the auditor must determine where applicable that the Sponsors are testing and reporting the results of their compliance reviews. Accordingly, when meeting the requirements of *Government Auditing Standards*, the auditor should issue a *Report on Compliance and on Internal Control Over Financial Reporting Based on an Audit of Financial Statements Performed in Accordance with GOVERNMENT AUDITING STANDARDS*. The report may vary depending on whether there are reportable instances of noncompliance or material weaknesses. However, if the non-supervised loan correspondent is also approved under the Title I program, then separate reports on internal control and compliance will have to be issued for that program.

f. **Schedule of Audit Finding.** When reporting deficiencies in internal control or instances noncompliance the auditor should generate a schedule of finding. The auditor should place their findings in proper perspective by providing a description of the work performed that resulted in the finding. To the extent possible the auditor should develop the elements of criteria, condition, cause, effect, and recommendations to assist management in understanding the need for taking corrective action.

g. **Corrective Action Plan.** If the auditor has noted any findings then the mortgagee must submit a corrective action plan, which addresses each finding.

B. **Types of Mortgagee for Which LASS Submission are Not Required.** (TOP)

1. **Supervised Mortgagee.**

2. **Supervised Loan Correspondent.**

3. **Investing Mortgagee.** (TOP)

4. **Governmental Institution.** (TOP)

**4060.1 REV-2**

---

5.  The financial statements comply with Generally Accepted Accounting Principles (GAAP).

6.  The auditor's opinion on the financial statements, including all notes.  In addition, the auditor must express a SAS 29 opinion on the mortgagee's computation of its adjusted net worth.

B.  ***Annual Submission.***  HUD reviews the mortgagee's LASS submission for completeness and consistency and to verify that it includes:

1.  ***Audited Financial Statements.*** (TOP)

    •   ***Balance Sheet.***  All accounts are properly classified and reported within the FDT.  All unacceptable assets must be clearly identifiable.  Escrows must be excluded from assets of the mortgagee;
    •   ***Income Statement.***  Revenues from mortgage and non-mortgage related activities must be clearly identifiable and properly classified;
    •   ***Statement of Equity;***
    •   ***Statement of Cash Flows;***
    •   ***Notes to the financial statements.***  Footnotes must be attached and must comply with GAAP;
    •   ***Computation of Adjusted Net Worth for FHA Requirements.***  Mortgagee has maintained their Net Worth required for their program type; and
    •   ***Liquidity.***  Mortgagee has maintained their required Liquidity for their program type.

2.  ***Independent Auditor's Report on Internal Control.***  Through review of the LASS submission, HUD verifies that the audit contains the required and properly prepared report on internal control structure.

3.  ***Independent Auditor's Report on Compliance with Specific Requirements Applicable to Major/Non-major HUD Programs.***  Through review of the LASS submission, HUD verifies that the audit contains required and properly prepared compliance report:  the CPA's *Report on the Internal Control Structure* and *Report on Compliance with Specific Requirements Applicable to Major HUD Programs* (if aggregate balances originated or serviced were $300,000 or more) or *Report on Compliance with Specific Requirements Applicable to Non-major HUD Program Transactions.*  HUD checks that the reports are in accordance with:

    •   HUD IG most recent **Handbook 2000.04**, *Consolidated Audit Guide for Audits of HUD Programs;*
    •   GAO's most recent **Government Auditing Standards** (the "Yellow Book"), and
    •   Statement of Auditing Standards (SAS) Number 74, *Compliance Auditing Considerations in Audits of*

---

**4060.1 REV-2**

*Governmental Entities and Recipients of Governmental Financial Assistance*, Feb. 1995.

If a loan correspondent submits the alternative Report on Compliance and on Internal Control Over Financial Reporting Based on an Audit of Financial Statements Performed in Accordance with Government Auditing Standards, the report must adhere to Government Auditing Standards reporting requirements.

4.   ***Audit Findings & Corrective Action Plans.***   HUD verifies that there is an acceptable audit finding and corrective action plan for every reportable condition and/or material weakness and material noncompliance indicator.

5.   ***Adjusted Net Worth.***   HUD reviews the mortgagee's financial statements and notes to the LASS submission to determine if there are unacceptable assets. Unacceptable assets are listed in chapter 7 of the most recent version of **HUD IG Handbook 2000.04**, *Consolidated Audit Guide for Audits of HUD Programs*. Unacceptable assets must be deducted from owner's equity as shown in the Balance Sheet. The computation must be shown in the *Computation of Adjusted Net Worth*.

a.   ***Correction of Deficiency Before Audit Report is Issued.***   If the mortgagee's adjusted net worth falls below FHA requirements, HUD reviews the notes to the financial statements to determine if there has been a subsequent event that brings the mortgagee's net worth to ***FHA*** requirements.

b.   ***Correction of Deficiency After Audit Report is Issued.***   When the mortgagee has corrected a deficiency in its Adjusted Net Worth after the date of the auditor's report, then the mortgagee must submit documentation to support that sufficient amount of capital has been contributed to the company to correct the deficiency. This documentation must include the audit finding, written by the financial statement auditor, on the lack of compliance with the net worth requirement and the corrective action plan, written by the mortgagee, detailing how the deficiency was corrected and how the compliance will be monitored. The mortgagee's corrective action plan must describe the form of the capital contribution, the exact date of the contribution, and the amount or value of the contribution. Also, the auditor must provide a signed statement that they verified the subsequent capital contribution to the mortgagee's books and records.

c.   ***Failure to Meet Net Worth Requirement.***   Analysis of the LASS submission and notes that reveals that the

4060.1 REV-2

mortgagee's adjusted net worth does not meet FHA requirements is grounds for administrative action by HUD's Mortgagee Review Board.

d.   **Failure to Maintain Required Net Worth.**   If the review of a LASS submission discloses that the mortgagee does not consistently maintain the required net worth throughout the year, the Department may request that the mortgagee submit interim audited or compiled financial statements and consider further actions.   The failure to consistently maintain the required net worth is grounds for an administrative action by the Mortgagee Review Board.

6.   **Liquid Assets.**  HUD reviews the Balance Sheet, Statement of Cash Flows, and notes to the mortgagee's LASS submission to verify that the mortgagee has, and has consistently maintained, adequate liquid assets.

a.   **Correction of Deficiency Before Audit Report is Issued.**  If the mortgagee's total liquid assets fall below FHA requirements, HUD reviews the notes to the financial statements to determine if there has been a subsequent event that brings the mortgagee's liquid assets to FHA requirements.

b.   **Correction of Deficiency After Audit Report is Issued.**   When the mortgagee has corrected a deficiency in its liquid assets after the date of the auditor's report, then the mortgagee must submit documentation to support that sufficient amount of cash and/or acceptable cash equivalents has been infused into the company to correct the deficiency.   This documentation must include the audit finding, written by the financial statement auditor, on the lack of compliance with the requirement and the corrective action plan, written by the mortgagee, detailing how the deficiency was corrected and how the compliance will be monitored.   Also, the auditor must provide a signed statement that they verified the subsequent liquid asset infusion   to the mortgagee's books and records. Depending on the situation, HUD may require a higher level of assurance or additional documentation.

c.   **Failure to Meet Liquid Assets Requirement.** Analysis of the LASS submission and notes that reveals that the mortgagee's total liquid assets do not meet FHA requirements is grounds for administrative action by the Mortgagee Review Board.

d.   **Failure to Maintain Required Liquid Assets.**   If HUD's review of LASS submission discloses that the

4060.1 REV-2

mortgagee does not consistently maintain the required liquid assets throughout the year, the Department may request that the mortgagee submit interim audited or compiled financial statements and consider further actions. The failure to consistently maintain the minimum liquid assets is grounds for an administrative action by the Mortgagee Review Board.

7. **Revenues.** The principal source of revenues of a non-supervised mortgagee or non-supervised loan correspondent must be from its mortgage lending operations, property improvement or manufactured home lending activities. The mortgagee may include in its revenues activity from loans secured by real property or unsecured Title I insured loans.

8. **Indications of Noncompliance.** HUD reviews the financial statement submission, including the notes to the financial statements and the other documentation, for any indication of fraud, illegality, or practices not in compliance with FHA requirements. The review also provides a means to determine whether the mortgagee meets the FHA principal activity requirement.

If violations of FHA requirements, fraud, or illegality are identified, the mortgagee is referred to the Quality Assurance Division, the Office of Inspector General, and/or the Mortgagee Review Board for further action or, where appropriate, a letter is sent to the mortgagee requesting an explanation.

9. **Reports on Compliance and Internal Control.** Where the auditor has reported noncompliance or material weaknesses in the compliance report or internal control report, the mortgagee's management must provide a *Corrective Action Plan*, which details the actions to be taken to correct the noncompliance or weaknesses. Depending on the nature of the findings, the mortgagee may be referred to the Quality Assurance Division, the Office of Inspector General, or the Mortgagee Review Board for further appropriate action.

**4-6 Acceptance of LASS Submission.** (TOP)
After HUD has reviewed all the information contained in the LASS submission and has determined it is acceptable, the mortgagee is recertified from a financial standpoint. Mortgagees can check the status of their LASS submission within the LASS system, which will show its status as "Audit Accepted".

**4-7 Deficient LASS Submission.** (TOP)
In some instances, FHA will determine the submission is deficient. When this occurs, the mortgagee must adhere to the review comments attached to the submission and follow the instructions in the LASS user manual on how to cure a deficient submission. Failure to submit an acceptable cure within the

| 4060.1 REV-2 |
| --- |

prescribed timelines outlined in the LASS user manual may result in the loss of a mortgagee's FHA approval.

**4-8   Rejected LASS Submission.** (TOP)
In some instances HUD will reject a submission. A rejected submission allows the mortgagee to modify the submission to correct a deficiency that in HUD's opinion may have been attributed to an oversight by the mortgagee and the auditor.   Once the submission has been changed the mortgagee must transmit the submission to the auditor for review. If the auditor agrees with the content of the template then they will transmit the submission back to the mortgagee for submission to HUD. If the auditor disagrees with the content of the template then they indicate their disagreement and the submission is returned to the mortgagee for modification. The process continues until the auditor has deemed the submission acceptable. The mortgagee transmits the revised submission to HUD through the LASS system. Failure to submit an acceptable submission within the prescribed timelines outlined in the LASS user manual may result in the loss of a mortgagee's FHA approval.

**4-9   Termination of FHA Mortgagee Approval.** (TOP)

A.   ***Notice of Violation.***   If a mortgagee, when required, fails to pay its annual renewal fee, return its annual verification report, or in the case of non-supervised mortgagees and non-supervised loan correspondents, submit an acceptable LASS submission, the Mortgagee Review Board may send the mortgagee a Notice of Violation that gives the mortgagee 30 days from receipt of the notice to comply.

B.   ***Notice of Withdrawal – Termination of Approval.***   If the mortgagee fails to comply with the Notice of Violation, the Mortgagee Review Board may send the mortgagee a Notice of Withdrawal terminating its approval upon receipt of the notice.

C.   **Appeal of Notice of Withdrawal.** (TOP) All mortgagees have a 30-day period to appeal their termination and request reinstatement.

1.   **Annual Fee.** Reinstatement requests due to nonpayment of the annual fee must be sent directly to the Lender Approval and Recertification Division. The terminated mortgagee will be sent a Settlement Agreement, which must be executed and returned with payment of the required annual fee and a $1,000 reinstatement fee.   Once the settlement agreement and required monies are received and reviewed, the mortgagee will be reinstated.

2.   **LASS Submission of Audited Financial Statements.** Reinstatement requests due to either an unacceptable or no LASS submission must be made through the LASS system. The terminated mortgage must submit an audit submission that meets all of our reporting and threshold requirements.   In addition, where applicable the mortgagee must submit a corrective action plan that adequately resolves all reported internal control weaknesses and noncompliance.   Once the

**4060.1 REV-2**

submission has been accepted the mortgagee must execute a Settlement Agreement online in LASS and then submit a $1,000 reinstatement fee directly to the Lender Approval and Recertification Division.  Once the reinstatement fee is received the mortgagee will be reinstated and then must complete the LASS submission of their annual audit.

If the termination was based on both nonpayment of the annual fee and no acceptable LASS submission, two settlement agreements will be required, but only one reinstatement fee must be paid.

Terminated mortgagees who don't appeal or seek reinstatement within the 30 day period may not reapply for FHA approval until 12 months after the effective date of their termination.

**4-10   Requests for Information.** (TOP)
Under the Department's regulations at 24 CFR 202.5(g), mortgagees must provide, upon request, not only a copy of their latest financial statements, but any additional information that the Department requests to be submitted to an examination of that portion of the mortgagee's records that relates to its FHA insured mortgage activities.

4060.1 REV-2

# Chapter 5 Branch Offices, Principal-Authorized Agent Relationships, and Additional Sponsors

## Part A.   Branch Offices

**5-1   Introduction.** (TOP)
All mortgagees or loan correspondents, except for investing mortgagees may register any of its offices that meet the staffing and office facilities for a branch office as detailed in paragraphs 2-11 and 2-12.  This registration must remain active for a branch to conduct FHA related mortgage operations.  The mortgagee is fully responsible to HUD for the actions of its branch offices.

**5-2   Originating at Branch Offices.** (TOP)
If a mortgagee is approved to originate single- family FHA mortgages, it may take loan applications for properties located in the branch's single-family origination ending area.  A complete listing of lending area is Table of *Lending Areas for Single Family Origination.*  All other origination functions can be performed in any registered branch without regard to where the property is located.

**5-3   Underwriting at Branch Offices.** (TOP)
If a mortgagee is approved as a DE mortgagee, it may perform underwriting functions in any of its registered branch locations for any loan application where the mortgagee is identified as the originator, sponsor, authorized agent or principal for the subject loan in the FHA Connection.

**5-4   Servicing at Branch Offices.** (TOP)
If a mortgagee is approved to service FHA mortgages, it may perform the servicing functions in any registered branch without regard to where the mortgaged properties are located.

**5-5   Centralized Centers.** (TOP)
Processing and/or underwriting functions may be centralized in any office(s) of the mortgagee or performed at each office of the mortgagee.    All centralized locations must be registered branches of the mortgagee.

**5-6   Mortgagees Permitted to Maintain Branch Offices.** (TOP)
Any mortgagee, except an investing mortgagee, may register branch offices.

**5-7   Registration of a New Branch.** (TOP)
All mortgagees register their new branches on-line through the FHA Connection as explained in the FHA Connection User Guide located at: **https://entp.hud.gov/pdf/mp_lndapp.pdf**.  All loan correspondents must register their new branches by submitting **HUD form 92001-B**, *Branch Office Notification.*  The registration information, in both cases, includes the name and Social Security Number (SSN) of the manager assigned to oversee the operation of the branch.  The branch manager's SSN is matched against the Credit Alert Interactive Voice Response System (CAIVRS).  If a match is found, an error message will display.  The Federal debt must be paid, under a

**4060.1 REV-2**

repayment plan or cleared by the relevant agency before this individual may be approved as the branch manager

A.   **Registration Fee.**  A non-refundable $300 registration fee is required for each branch office and must be mailed to HUD's lock box address shown in paragraph 2-7, together with its transmittal form.  The mortgagee's 10 digit FHA identification number for its home office must be inserted in the memo section of the check and the transmittal form.

B.   **Mortgagees.**  Mortgagees, other than a loan correspondents, register new branches electronically through the FHA Connection - Lender Approval - Title II Branch Functions - Add a Branch.  All required fields are shown on the screen.  If the registration is successful, the branch is electronically assigned an identification number and the number is transmitted back to the mortgagee immediately.

Title I Branch Registration.  Title II mortgagees that are also approved a Title I lender, may also register Title I branches using FHA Connection.  If the Title I branch is physically located at the same address as the Title II branch, no additional fee is required.  If the Title I branch is not located at an address of an already approved Title II branch, then a non-refundable registration fee is required.  See HUD Handbook 4700.2, *Title I Lender Approval Handbook*, regarding the fee amount and lock box address.

C.   **Loan Correspondents.**  Loan correspondents must register their branch offices by submitting **HUD form 92001-B**, *Branch Office Notification* to the Lender Approval and Recertification Division.  In addition, non-supervised loan correspondents must have an adjusted net worth of not less than $63,000 with an additional net worth of $25,000 for each registered branch office, up to a combined maximum of $250,000 already on file with FHA or they will be required to submit such documentation of compliance.  If the financial statements submitted show insufficient adjusted net worth, an updated balance sheet, prepared and signed by the CPA, may be submitted to show evidence of compliance.

**5-8   Direct Lending Branch Office.** (TOP)      A mortgagee may request a separate FHA branch ID number for a traditional type branch that will be used for the sole purpose of direct lending. Each mortgagee will be limited to only one branch ID number for its direct lending operation. This operation must have a separate manager and may be co-located in an existing office or established at a new location. The following is process for registering a direct lending branch:

All requests for approval of a direct lending branch must be submitted to Lender Approval and Recertification Division in FHA and cannot be registered via the FHA Connection. The request must include:

A.      A fully executed **HUD form 92001-B**, *Branch Office Notification form*;

4060.1 REV-2

B.  A statement that it agrees to originate only direct mortgages through the branch ID number and not use the ID number to order case numbers for loans that are not originated through any means other than their internet and/or call center operation. This is required so the Department will be able to track and evaluate this type of origination.

C.  A list of the States where the mortgagee plans to originate FHA single family mortgages by direct lending. Mortgagees will be granted approval to only originate in the States requested.

D.  A certification as of the date of the request that:

1.  The mortgagee has updated its quality control plan to include specific elements covering direct market lending.

2.  The mortgagee has already obtained the appropriate State license or registration and meets all other State requirements to originate loans in the specific States included in the request. State exemptions that allow FHA approved mortgagees to originate a small number of loans is not acceptable.

3.  The mortgagee agrees to notify HUD in writing if it no longer meets the requirements of any of these States. This will result in the State being removed from the lending area of the direct lending branch.

4.  Neither the mortgagee nor any of its officers, directors, or principals or employees have been denied a license or otherwise sanctioned by any Federal, State, or Local agency or have been suspended, debarred, or otherwise denied participation in HUD programs.

Mortgagees are reminded that false certifications may subject the mortgagee and/or its agents to sanctions, including but not limited to, debarment, reprimand, withdrawal, and civil money penalties.

E.  Each request must include a $300 check payable to HUD as a non-refundable processing fee.

F.  The Department will review all information and certifications provided and will also determine whether the mortgagee is in good standing with the Department, including that it:

1.  Has no unresolved issues regarding renewal of its FHA approval.

2.  Has no actions pending or unresolved issues with the Mortgagee Review Board; and

3.  Has no unresolved audit findings with HUD's Quality Assurance Division or HUD's Office of the Inspector General.

4060.1 REV-2

G.   A mortgagee may request additional States be added to the lending area of its direct lending branch at any time after its initial registration for no additional fee.

**Part B.  Principal- Authorized Agent Relationship** (TOP)

**5-9   Introduction.** (TOP)
The principal-authorized agent relationship provides mortgagees flexibility in the origination of FHA insured single-family loans in situations where a mortgagee wishes to collaborate with another mortgagee.   This process provides mortgagees flexibility to offer diversified loan products or programs because of the ability to team with firms that may have more expertise in specialized areas.  This includes products such as HECM or 203(k).  It also can be utilized to handle unique situations such as when a mortgagee no longer has a DE underwriter on its staff or for some reason does not have a particular expertise or capacity.  In almost all cases, mortgagees use this procedure when they need assistance in the underwriting of a loan.

**5-10   Principal.** (TOP)
The principal in the relationship can only be an FHA approved non-supervised mortgagee, supervised mortgagee or government mortgagee.  FHA approved loan correspondents cannot serve as a principal.

**5-11   Authorized Agent.** (TOP)
The authorized agent can only be an FHA approved non-supervised mortgagee or supervised mortgagee.   FHA approved loan correspondents cannot serve as an authorized agent.

**5-12   Origination and Underwriting.** (TOP)
Either party can originate or underwrite the loan as long as they have the appropriate approval.   However, since the authorized agent typically underwrites the loan, its FHA lender ID number is shown in the sponsor field of an FHA case file.  Also, since the principal typically takes the application, its ID is in the originator field of the case file.  Both mortgagees are responsible for the part of the origination and underwriting processing they perform.

**5-13   Mortgagee Name in Loan Closing.** (TOP)
Per regulation Section 202.3(a)(3), the loan must close in the name of the principal.  Either party can submit the closed loan for insurance for the benefit of the principal.

**5-14   Establishing the Relationship.** (TOP)
The relationship must be set up by the authorized agent via the FHA Connection as explained in the Lender Approval Section of the FHA Connection     User     Guide     located     at: **https://entp.hud.gov/pdf/mp_lndapp.pdf**.

**5-15   Origination Fee.** (TOP)
As in all originations, the amount of the origination fee each lender receives is a contractual matter to be determined by the two parties, which in these cases are the principal and authorized agent.  The total fees charged to a

**4060.1 REV-2**

mortgagor may not exceed the amount allowed for the type of FHA single-family loan as contained in the appropriate handbooks and mortgagee letters.

## Part C.  Additional Sponsors (TOP)

**5-16  Adding Sponsors for a Loan Correspondent.** (TOP)
A loan correspondent may have more than one sponsor.  Only supervised mortgagees, non-supervised mortgagees, and Governmental Institutions may sponsor loan correspondents.

**5-17  Registration Procedure.** (TOP)
The additional sponsor relationship is requested by the sponsor.  It is done electronically through FHA Connection - Lender Approval - Sponsor Relations - Add a loan correspondent.  An acknowledgment message is returned to the sponsor immediately.

4060.1 REV-2

# Chapter 6 Changes Subsequent to Approval

**6-1    Reporting Business Changes.** (TOP)
A mortgagee is required to notify the Department within a specified number of business days of any business change that affects its standing as an approved institution, or which changes the information on which it was originally approved. Generally, notification consists of a letter to FHA, signed by an executive officer of the mortgagee. Certain changes may require additional documentation. The notice must be sent or faxed to the Director, Lender Approval and Recertification Division. Failure to notify HUD may lead to processing delays or sanctions by the Mortgagee Review Board.

| Type of Change | Days | Paragraph |
|---|---|---|
| Change of home office location or telephone number | 10 | 6-2 |
| Change of branch office location or telephone number | 10 | 6-3 |
| Termination of Principal-Authorized Agent Relationship | 10 | 6-4 |
| Termination of Loan Correspondent-Sponsor Agreement | 10 | 6-5 |
| Permission for Supervised Loan Correspondent to service | When Approval Required | 6-6 |
| Change of Fiscal Year | 10 | 6-7 |
| Change of name | 10 | 6-8 |
| Changes to "Doing Business As" ("dba") name | 10 | 6-9 |
| Loss of DE underwriter | Immediate | 6-10 |
| Change of senior officer | 10 | 6-11 |
| Changes in a partnership | Immediate | 6-12 |
| Change of shareholder, ownership, or control | 10 | 6-13 |
| Changes in charter or Federal Taxpayer ID Number | 10 | 6-14 |
| Change in character of business (principal activity) | 10 | 6-15 |
| Conversion of mortgagee type | When Approval Required | 6-16 |
| Type of Change | Days | Paragraph |
| Merger or consolidation | 10 | 6-17 |
| Sale or acquisition | 10 | 6-18 |

**4060.1 REV-2**

| Termination of Supervision | 10 | 6-19 |
|---|---|---|
| Termination of fidelity bond or E&O insurance | 10 | 6-20 |
| Net Worth Deficiency | 30 | 6-21 |
| Liquid Assets Deficiency | 30 | 6-22 |
| Operating loss | 30 | 6-23 |
| Bankruptcy or liquidation | 30 | 6-24 |
| Voluntary withdrawal | n/a | 6-25 |
| All other business changes | 10 | 6-26 |

**6-2   Change of Home Office Location or Telephone Number.** (TOP)
The Department maintains the following addresses for the home office of a mortgagee:

- *Geographic Address*, Address where the office is physically located;
- *Mailing Address*, Address to which HUD correspondence is sent;
- *Premium Address*, Address of the office to which premiums are to be billed;
- *Payee Address*, Address is used to mail Advice of Payment letters;
- *Conditional and Firm Commitment (CHUMS) Address*, Address HUD will use to conduct business relating to applications for insurance; and
- *Endorsement Address*, Address to which the confirmation will be sent of payment of the "one-time" mortgage insurance premium.

A.   **Address Changes.** Mortgagees update all of their addresses via their FHA Connection account. However, they may not change the "State" part of the Geographic Address of the home office. If an office has relocated to a different State, the mortgagee must submit a request to the Lender Approval and Recertification Division to update the address. A mortgagee whose address in incorrect for delivery of its FHA Connection Coordinator's registration information, should submit a request for correction to the Lender Approval and Recertification Division.

B.   **Telephone and Fax Numbers and Email Address.** Because FHA often has a need to contact mortgagees by telephone or fax or by email, a mortgagee must update this information through the Lender Approval functions of the FHA Connection. The numbers are also displayed on searchable lists of FHA approved mortgagees on HUD's web site.

**4060.1 REV-2**

---

**6-3     Change of Branch Office Location or Telephone Number.** (TOP)

    A.     ***Within the Same State.***   The mortgagee must update the addresses for each branch through the Lender Approval functions under the FHA Connection.

    B.     ***To Another State.***   A mortgagee cannot change the "State" part of the Geographic Address of a branch office. If an office has relocated to a different State, the mortgagee must submit a request to the Lender Approval and Recertification Division to update the address.

**6-4     Termination of Principal-Authorized Agent Relationship.** (TOP)
If a Principal/Authorized Agent relationship is terminated by either party, then either party must also terminate the relationship in FHA's systems via the Lender Approval functions under the FHA Connection.

**6-5     Termination of Loan Correspondent-Sponsor Relationship.** (TOP)
If a loan correspondent/sponsor relationship is terminated by either party, then either party must also terminate the relationship in FHA's systems via the Lender Approval functions under the FHA Connection. Because a loan correspondent must have at least one sponsor, loss of all sponsors is grounds for FHA to withdraw the loan correspondent's approval. In such cases, the loan correspondent has 30 days to establish a relationship with at least one new sponsor. If the loan correspondent fails to establish a new Sponsor relationship, then its FHA approval will be withdrawn.

**6-6     Permission for Supervised Loan Correspondent to Service.** (TOP)
Upon application to the Department, a supervised loan correspondent may be granted permission to service its own FHA-insured mortgages. The "application" consists of a letter to the Lender Approval and Recertification Division. Generally, permission is granted only when the mortgagee has converted from a supervised mortgagee and has an outstanding portfolio of FHA-insured mortgages.

**6-7     Change of Fiscal Year.** (TOP)
A mortgagee is allowed to change its fiscal year. The mortgagee must submit a written request to the Lender Approval and Recertification Division. HUD may, at its discretion, require the mortgagee to submit financial statements and a computation of adjusted net worth certified by its management. This requirement depends on the length of time since the mortgagee last submitted audited financial statements to the Department. Every period must eventually be audited. In no case may more than 18 months elapse between the dates of ***audited*** financial statements.

**6-8     Change of Legal Name.** (TOP)
For a change of name, a mortgagee must submit the following to the Lender Approval and Recertification Division

A.     Acceptable documentation showing the name change, such as:

The amendment to its articles of incorporation;
Resolution by the mortgagee's Board of Directors; and

---

**4060.1 REV-2**

Charter amendment for a supervised institution.

B.    When required by the State, evidence that the name change has been accepted by the State in which the home office is located.

**6-9    Changes to "Doing Business As" (dba) Name.** (TOP)
A mortgagees makes changes to its "doing business as" through the FHA Connection and certify it has the appropriate approval to use the dba name. Although a mortgagee may have more than one "dba," each home or branch office is limited to one "dba" name in the FHA Connection. See paragraph 2-4, regarding names including restricted words such as "national" or "Federal."

**6-10    Loss of Direct Endorsement Underwriter.** (TOP)
If a mortgagee with Direct Endorsement (DE) authority loses its only DE underwriter, it must immediately obtain and register a qualified replacement. Without a registered DE underwriter, the mortgagee will be unable to underwrite FHA mortgages. If it is unable to obtain and register a replacement, then the mortgagee must either enter into a Principal-Authorized Agent relationship or convert to loan correspondent status. For Principal-Authorized Agents, see chapter 5 Part B. For conversion, see paragraph 6-16.

**6-11    Change of Senior Officer.** (TOP)
If a mortgagee has an addition or substitution of a principal, including but not limited to chairman of the board, president, vice president, director, or LLC member, the mortgagee must notify HUD of the change. A Residential Mortgage Credit Report must be submitted on the new individual. A supervised mortgagee or supervised loan correspondent does not have to comply with the credit report requirement.

**6-12    Change in a Partnership.** (TOP)
If a managing general partner withdraws or is removed from the partnership, a new managing general partner must be substituted and the Department must be immediately notified of the change. The mortgagee must immediately notify the Department of any amendments to the partnership agreement that would affect the partnership's actions under any of the mortgage insurance programs. Newly admitted partners must agree to the management of the partnership by the designated managing general partner. Before a partnership is terminated, all FHA insured mortgages held by the partnership must be transferred to an approved mortgagee.

**6-13    Change of Shareholder, Ownership, or Control.** (TOP)
Whenever an individual or entity, that previously owned less than 25 percent of voting stock of a mortgagee, acquires voting stock resulting in ownership of 25 percent or more, the mortgagee must notify HUD. A resume and Residential Mortgage Credit Report must be submitted on any such individual; for a business entity, a commercial credit report, or a Dun & Bradstreet report, must be submitted. If a mortgagee's controlling ownership changes, a new application and fee may be necessary. The mortgagee should contact the Lender Approval and Recertification Division in advance to determine what will be required. A change of ownership or control resulting from a merger or

**4060.1 REV-2**

consolidation is covered in paragraph 6-17; a change of ownership or control resulting from acquisition of the mortgagee is covered in paragraph 6-18.

**6-14  Change in Charter or Federal Taxpayer Identifying Number.** (TOP)

  A.   ***Change Resulting in New Federal Taxpayer Identifying Number.***
       If a mortgagee reincorporates the approved institution, changes the institution's charter, changes the State where the company is incorporated or otherwise chartered, or completes any other change that results in the company receiving a different Federal Taxpayer Identifying Number, the mortgagee is required to submit a new application for mortgagee approval and pay the fee for a new mortgagee approval as specified in paragraph 2-7. If a new mortgagee identification number is issued, HUD will leave the old mortgagee identification number active for approximately 45 days to allow completion of processing of loans in process under that identification number. When a new mortgagee identification number is issued, the mortgagee must cease originating cases under the old number.

  B.   ***Change Not Resulting in Change of Federal Taxpayer Identifying Number.*** If the change does not result in a new Federal Taxpayer Identifying Number, then the mortgagee must submit the following to the Lender Approval and Recertification Division:

       1.   Certification as to the nature of the conversion and that there has been no change in the Federal Taxpayer Identifying Number or depositor insurance (in the case of a supervised mortgagee).

       2.   Certification that the institution will continue to comply with the approval requirements of this Handbook.

       3.   Certification that the newly chartered entity will continue to be responsible for the assets and liabilities of the former institution. This would include any problems found subsequently by the Department in the origination or servicing of any Title II mortgages originated or serviced by the institution prior to the adoption of the new charter.

       4.   Copy of the new charter and a complete description of the changes. In lieu of the above, the mortgagee must submit a new application for mortgagee approval and pay the fee for a new mortgagee approval as specified in paragraph 2-7.

  C.   ***Special Cases.*** There may be instances where the Federal Taxpayer Identifying Number may not change, but the change in the business entity is such that HUD may require a new application.

**6-15  Change in Character of Business (Principal Activity).** (TOP)
       If there is a change in the character of an approved non-supervised mortgagee's business such that it may no longer qualify under the "principal

**4060.1 REV-2**

activity" rule (see paragraph 2-27(D) or 2-29(C), as applicable and 24 CFR 202.7(a) or 202.8(a)(2), as applicable.), and this change in character is permanent, it must withdraw from the program.   If the change is temporary, it must notify the Department and provide to the Department a Corrective Action Plan detailing how it will reestablish mortgage lending as its principal activity.

**6-16   Conversion of Mortgagee Type.** (TOP)

A mortgagee that converts its status from one type to another during its fiscal year must continue to comply with all annual recertification requirements.  To convert its mortgagee type, a mortgagee must complete a new **HUD form 11701**, *Application for Approval, FHA Lender and/or Ginnie Mae Mortgage Backed Securities Issuer*, and pay a non-refundable $300 conversion fee.  A mortgagee or loan correspondent must demonstrate that it has adequate net worth to meet the requirements of the type of mortgagee to which it is converting.   The conversion application and its supporting documentation must be sent the Director, Lender Approval and Recertification Division.   The non-refundable $300 conversion fee must be mailed to HUD's lock box address shown in paragraph 2-7, together with its transmittal form.   The mortgagee's 10 digit FHA identification number for its home office must be inserted in the memo section of the check and the transmittal form.

A.   ***Supervised Mortgagee to Supervised Loan Correspondent.***  In this type of conversion, the mortgagee must submit:

- Transmittal letter, showing the mortgagee's ID number, name, address and nature of request;
- Copy of the check for the conversion fee and the transmittal form;
- Sponsor Letter, in which the sponsor agrees to sponsor the supervised loan correspondent and purchase all FHA mortgages originated by the supervised loan correspondent and underwritten by the Sponsor; and
- Certification that all FHA-insured mortgages held or serviced has been transferred to another FHA mortgagee that is approved to service FHA-insured mortgages; or a request for permission to hold or service FHA-insured mortgages.

B.   ***Supervised Loan Correspondent to Supervised Mortgagee.***  In this type of conversion, the mortgagee must submit:

- Transmittal letter, showing the mortgagee's ID number, name, address and nature of request;
- Copy of the check for the conversion fee and the transmittal form;
- Evidence of errors and omissions insurance for a minimum of $300,000; and
- Evidence of a fidelity bond for a minimum of $300,000.

C.   ***Supervised Entity to Non-supervised Entity.***  In this type of conversion, the mortgagee must submit:

**4060.1 REV-2**

- Transmittal letter, showing the mortgagee's ID number, name, address and nature of request;
- Copy of the check for the conversion fee and the transmittal form;
- A new **HUD form 11701**, *Application for Approval, FHA Lender and/or Ginnie Mae Mortgage-Backed Securities Issuer*; and
- The same documentation as for a new application for approval with all the required documentation for that type of mortgagee.

D. **Non-supervised Mortgagee to Non-supervised Loan Correspondent.** (TOP) In this type of conversion the mortgagee must submit:

- Transmittal letter, showing the mortgagee's ID number, name, address and nature of request;
- Copy of the check for the conversion fee and the transmittal form;
- Sponsor letter showing evidence of an acceptable funding agreement; and
- Certification that all FHA-insured mortgages held or serviced has been transferred to another FHA mortgagee that is approved to hold and service FHA-insured mortgages.

E. **Non-supervised Loan Correspondent to Non-supervised Mortgagee.** (TOP) In this type of conversion, the mortgagee must submit:

- Transmittal letter, showing the mortgagee's ID number, name, address and nature of request;
- Copy of the check for the conversion fee and the transmittal form;
- Copy of its most recent audited financial statements and, if these are more than six months old, management certified financial statements and computation of adjusted net worth. (see paragraph 3-2(A)(6);
- Evidence of an acceptable funding program. (see paragraph 2-27.C);
- Evidence of errors and omissions insurance for a minimum of $300,000; and
- Evidence of a fidelity bond for a minimum of $300,000.

(TOP)
Once this conversion is approved, the mortgagee will no longer have any sponsors and needs to contact the appropriate Homeownership Center for obtaining approval as a DE mortgagee if they wish to underwrite single family loans.

F. **Conversion to Investing Mortgagee.** In this type of conversion, the mortgagee must submit:

- Transmittal letter, showing the mortgagee's ID number, name, address and nature of request;

**4060.1 REV-2**

---

- Copy of the check for the conversion fee and the transmittal form;
- A new **HUD form 11701**, *Application for Approval, FHA Lender and/or Ginnie Mae Mortgage-Backed Securities Issuer*;
- Evidence that it meets the requirements specified in paragraph 2-30(B), regarding legal authority to purchase insured mortgages and availability of funding; and
- Certification that all servicing of FHA-insured mortgages has been transferred to another approved FHA mortgagee that is approved to service FHA-insured mortgages. (TOP)

G. ***Conversion from Investing Mortgagee.*** In this type of conversion, the mortgagee must submit:

- Transmittal letter, showing the mortgagee's ID number, name, address and nature of request;
- Copy of the check for the conversion fee and the transmittal form;
- Submit the same documentation as for a new application for approval with all the required documentation for that type of mortgagee; and
- If conversion is to a loan correspondent, certify that all FHA-insured mortgages held or serviced have been transferred to another FHA mortgage that is approved to hold and service FHA-insured mortgages.

**6-17  Merger or Consolidation.**
Mergers can take a variety of forms. (TOP)

A. ***Two or More HUD/FHA-Approved Mortgagees Merge.***

1. ***Non-surviving Entity.*** The non-surviving entity must:

a. Submit a letter signed by an executive officer informing the Department that it is merging with another entity. The letter must:

- Indicate which mortgagee will survive;
- Provide the mortgagee identification numbers for each mortgagee involved;
- Provide the date the merger occurred or will occur; and
- Request termination of its approval.

b. If the non-surviving mortgagee was a Sponsor of FHA-approved loan correspondents, it must notify its loan correspondents of its request for termination.

c. Once the non-surviving entity ceases to exist or its approval is terminated, whichever comes first:

---

**4060.1 REV-2**

- It may not accept any new applications for Title II mortgages;
- It may no longer purchase Title II mortgages;
- It may no longer service Title II mortgages; and
- It may no longer submit claims to the Department.

d.   When the non-surviving mortgagee holds a portfolio of Title II mortgages, it must arrange to transfer the loans to the surviving mortgagee or some other approved FHA mortgagee approved to service FHA mortgages.   See paragraphs 6-17(A)(2)(e) and (f). There is a continued obligation to pay insurance premiums due and to meet all other obligations associated with the insured mortgages.

(TOP)
2.   ***Surviving Entity.*** The surviving entity must:

a.   Submit a letter describing the merger and certifying that 1) any loan correspondents not continuing with sponsorship have been notified, 2) all loan correspondents of the non-surviving mortgagee will be sponsored by the surviving mortgagee or 3) the non-surviving mortgagee was not the sponsor of any loan correspondents.

b.   Submit a copy of the document which evidences the merger.   A supervised mortgagee, must submit a copy of the letter from the supervisory authority which approved the merger.

c.   Submit a list identifying each of the non-surviving entity's branch offices which will remain open under the auspices of the surviving entity, and pay the branch office registration fee specified in paragraph 2-7.

d.   Register each of the non-surviving entity's loan correspondents, if any, that the surviving entity will continue to sponsor in the FHA Connection. Sponsorship is not automatically transferred.   Each of the non-surviving entity's loan correspondents, for which the surviving entity will not continue sponsorship, must be given 30 days written notice by the Sponsor.

e.   If the surviving mortgagee acquires only a portion of the non-surviving mortgagee's Title II mortgages, one of the parties must submit a *Mortgage Record Change* transaction for each mortgage that will not be acquired by the surviving mortgagee.

f.   If the surviving mortgagee acquires all of the non-surviving mortgagee's outstanding Title II mortgages, it

**4060.1 REV-2**

is not necessary to submit *Mortgage Record Changes*. All loans will be transferred to the surviving entity by HUD when the merger is processed.

B. ***An Approved Mortgagee Merges with a Non-approved Mortgagee.*** (TOP)

    1. ***Non-approved Mortgagee Survives.***

        a. The non-surviving mortgagee must comply with the provisions of paragraph 6-17(A)(1).

        b. If the surviving mortgagee wishes to originate or hold Title II mortgages or submit claims for mortgages previously held by the non-surviving mortgagee, it must become FHA-approved. To become approved, it must follow the approval procedures of this Handbook. The mortgagee should include with its application a letter describing the merger, and, if applicable, its intentions regarding the non-surviving mortgagee's outstanding Title II mortgages and sponsored loan correspondents. Immediately after becoming approved, the mortgagee should register each of the non-surviving entity's branch offices which will remain open under the auspices of the surviving entity, and pay the branch registration fee specified in paragraph 2-7. The mortgagee must register each of the loan correspondents it is sponsoring in the FHA Connection. (TOP)

    2. ***Approved Mortgagee Survives.*** The surviving mortgagee must:

        a. submit a letter describing the merger.

        b. Submit a copy of the document which evidences the merger. A supervised mortgagee, must submit a copy of the letter from the supervisory authority which approved the merger.

**6-18 Sale or Acquisition.**
The sale or acquisition of a FHA-approved mortgagee may take the form of stock, assets or operations being acquired or some combination of these. The mortgagee may cease to exist, becoming part of the acquiring company, it may continue as a subsidiary or affiliate of the acquiring company, or may become an independent company. Each of these is handled differently. (TOP)

A. ***An Approved Mortgagee Acquired by Another Approved Mortgagee.*** The necessary action depends upon whether the acquired mortgagee will cease to exist or will continue as a subsidiary or affiliate of the acquiring mortgagee. (TOP)

**4060.1 REV-2**

1. **Continuation as Subsidiary or Affiliate.** If the mortgagee being acquired will continue to operate as a subsidiary or affiliate of the acquiring mortgagee, the acquiring mortgagee must submit a letter describing the transaction including the names of all parties, their FHA mortgagee identification numbers, and the date of the acquisition. The letter must also explain that the acquired entity will continue as a subsidiary or affiliate of the acquiring entity. The acquired mortgagee must notify the Department by letter that it has been acquired and will continue to operate as a subsidiary or affiliate of the acquiring mortgagee. The acquired mortgagee may continue to operate under its existing Title II mortgagee Identification Number. (TOP)

2. **Dissolution of Mortgagee.** If the mortgagee being acquired will be dissolved,

   a. The non-surviving entity must submit a letter signed by an executive officer informing the Department of details regarding its acquisition and requesting termination of its approval. The mortgagee must comply with the provisions of paragraphs 6-17(A)(1).

   b. The surviving entity must submit to HUD a copy of the articles of dissolution and a letter describing the acquisition and, if applicable, its intended disposition or sale of FHA insured loans held or serviced by the non-surviving mortgagee. The letter must also certify that 1) any loan correspondents not continuing with sponsorship have been notified, 2) all loan correspondents of the non-surviving mortgagee will be sponsored by the surviving mortgagee or 3) the non-surviving mortgagee was not the sponsor of any loan correspondents. The surviving mortgagee must comply with paragraphs 6-17(A)(2)(c) through (f). (TOP)

B. **An Approved Mortgagee Acquired by an Entity that is Not Approved.**

   1. **Acquiring Entity Requires Approval to Participate in Program.** If the acquiring entity wishes to be able to originate, hold, or service Title II mortgages, it must apply for approval under the applicable provisions of this Handbook. (TOP)

**4060.1 REV-2**

If the acquired mortgagee will not be continuing as a subsidiary or affiliate, the acquiring entity should include with its application a letter describing the acquisition and, if applicable, its intentions regarding the non-surviving mortgagee's outstanding Title II mortgages and sponsored loan correspondents. Immediately after becoming approved, the mortgagee should register each of the non-surviving entity's branch offices which will remain open under the auspices of the surviving entity, and pay the branch registration fee specified in paragraph 2-7(A). The mortgagee may electronically register each of the loan correspondents it is sponsoring or follow the alternate procedures described in paragraph 5-12. (TOP)

2.   ***Acquired Mortgagee to Continue as Subsidiary or Affiliate.*** If the acquired entity will continue to operate as a subsidiary or affiliate of the acquiring mortgagee, it may continue to operate as a Title II mortgagee under its own name, whether or not the acquiring entity becomes FHA-approved. The mortgagee must submit a letter describing the acquisition and its future operating status. (TOP)

3.   ***Acquired Mortgagee Ceases to Exist.*** If the acquired entity will cease to exist, it must comply with the provisions of paragraph 6-18(A)(2)(a). (TOP)

C.   ***The Approved Mortgagee Becomes Independent.*** When an approved mortgagee, which has been a subsidiary or part of a larger entity, becomes independent, it must notify HUD and provide details of the change. Based on this, HUD may require additional information. For changes in senior officers, directors, or ownership, the mortgagee must submit documentation as specified in paragraphs 6-11 and 6-13.

D.   ***The Approved Mortgagee Acquires an Entity that is Not Approved.*** If the acquired entity will operate as a subsidiary or affiliate of the acquiring mortgagee and wishes to be able to originate, hold or service Title II mortgage, it must apply for approval under the applicable provisions of this Handbook. (TOP)

**6-19   Termination of Supervision.**
A supervised mortgagee is required to notify the Department in writing within 10 business days after the termination of supervision by its supervising agency. If the mortgagee qualifies for approval as another type of mortgagee, it must submit a new application, with the appropriate non-refundable fee, for approval to participate in the Department's mortgage insurance programs. (TOP)

**6-20   Termination of Fidelity Bond or Errors and Omissions Insurance.**
If a mortgagee's fidelity bond or errors and omissions insurance is terminated and the mortgagee is unable to obtain a new policy within ten business days, to continue as a FHA approved mortgagee, it must convert to a loan correspondent (see paragraph 6-16). (TOP)

**4060.1 REV-2**

### 6-21 Net Worth Deficiency. (TOP)

An approved mortgagee must maintain at least the minimum required adjusted net worth at all times. If at any time it falls below the required minimum, the mortgagee must notify the Lender Approval and Recertification Division and submit a Corrective Action Plan. Failure to comply is grounds for an administrative action by the Mortgagee Review Board.

### 6-22 Liquid Assets Deficiency. (TOP)

An approved mortgagee must maintain at least the minimum required liquid assets at all times. If at any time it falls below the required minimum, the mortgagee must notify the Lender Approval and Recertification Division and submit a Corrective Action Plan. Failure to comply is grounds for an administrative action by the Mortgagee Review Board.

### 6-23 Operating Loss. (TOP)

A mortgagee must submit financial statements within 30 days of the end of each fiscal quarter in which the mortgagee experiences an operating loss of 20 percent or greater of its net worth. The interim financial statements may be either audited or un-audited, and the mortgagee must continue to submit them until it shows an operating profit for two consecutive quarters, or until its next annual recertification by FHA, whichever is later.

### 6-24 Bankruptcy or Liquidation. (TOP)

A.   **Business.** A mortgagee must submit a statement of Adjusted Net Worth within 30 days of commencement of voluntary or involuntary bankruptcy, conservator ship, receivership or any transfer of control to a Federal or State supervisory agency. A current original Dun and Bradstreet or business credit report must be submitted. HUD must be notified of each change of status in the bankruptcy proceedings. HUD reserves the right to require the mortgagee to submit court documents.

B.   **Personal.** If an officer or principal of the mortgagee commences voluntary or involuntary bankruptcy, within 30 days the mortgagee must notify HUD. A current original credit report for that officer or principal must be submitted. HUD must be notified of each change of status in the bankruptcy proceedings.

### 6-25 Voluntary Withdrawal of HUD/FHA Approval. (TOP)

A mortgagee may request a voluntary withdrawal of its FHA approval by submitting written notification, signed by a senior officer, to the Lender Approval and Recertification Division. The request will not be honored while there is an administrative action or Mortgagee Review Board action pending against the mortgagee. Any mortgagee whose approval is voluntarily withdrawn may reapply for FHA approval at any time after its withdrawal.

### 6-26 All Other Business Changes. (TOP)

Any other business change that affects a mortgagee's approval status or its conduct of business with the Department must be reported in writing to the Lender Approval and Recertification Division within 10 days.

**4060.1 REV-2**

# Chapter 7 Quality Control Plan

**7-1 General.** (TOP)

All FHA approved mortgagees, including loan correspondents, must implement and continuously have in place a Quality Control Plan for the origination and/or servicing of insured mortgages as a condition of receiving and maintaining FHA approval. This applies to both the Single Family and the Multifamily Housing programs. A copy of the plan must be submitted when applying for mortgagee approval.

Quality Control must be a prescribed and routine function of each mortgagee's operations whether performed by a mortgagee's staff or an outside source. Mortgagees applying for approval to originate only or service only may submit a plan that pertains only to the function they will perform. A mortgagee that will perform both origination and servicing must submit a plan that covers both functions.

This Chapter sets forth basic requirements that all mortgagees must meet, along with a degree of flexibility, so that each mortgagee may develop a program that fits its circumstances while conforming to FHA's requirements. Mortgagees should consider that some of the requirements might not be applicable to their operation. It is necessary to perform Quality Control only on those activities in which a mortgagee is engaged.

Part A. Overall Requirements

**7-2 Goals of Quality Control.** (TOP)

The following are the overriding goals of Quality Control. Mortgagees must design programs that meet these basic goals:

- Assure compliance with FHA's and the mortgagee's own origination or servicing requirements throughout its operations;
- Protect the mortgagee and FHA from unacceptable risk;
- Guard against errors, omissions and fraud; and
- Assure swift and appropriate corrective action.

Failure to comply with specific Quality Control requirements may result in sanctions and the imposition of Civil Money Penalties by the Mortgagee Review Board (MRB).

**7-3 Basic Elements of Quality Control.** (TOP)

There are several basic elements that are required in all Quality Control Programs that apply to both origination and servicing.

A.  **Plan Form and Execution.** All Quality Control Programs must be in writing. Mortgagees must have fully functioning Quality Control Programs from the date of their initial FHA approval until final surrender or termination of their approval.

B.  **Independence.** The Quality Control function must be independent of the origination and servicing functions. This independence may be accomplished in a variety of ways. Depending on a mortgagee's

**4060.1 REV-2**

operations, loan volume, staff size or other factors, a mortgagee may prefer one method over another. Quality Control functions may be performed using:

1. ***In-House Staff.*** Mortgagees may establish a unit that is dedicated solely to Quality Control. Staff performing Quality Control reviews must not be involved in the day-to-day processes that they are reviewing. (TOP)

2. ***Outside Firms.*** Mortgagees may engage outside sources to perform the Quality Control function. The FHA approved sponsors of loan correspondents are acceptable as such outside sources. A mortgagee contracting out any part of its Quality Control function is responsible for ensuring that the outside source is meeting HUD's requirements. Any agreement with the outside source must be in writing, state the roles and responsibilities of each party, and be available for review by HUD staff. (TOP)

C. ***Qualified Staff.*** Mortgagees must properly train staff involved in Quality Control and provide them access to current guidelines relating to the operations that they review. It is not necessary for mortgagees to maintain these guidelines in hard copy format if they are accessible in an electronic format. Many of the statutes, regulations, HUD Handbooks and Mortgagee Letters which establish the requirements for FHA programs are available on the web page for HUDCLIPS at: **http://www.hudclips.org/cgi/index.cgi**.

D. ***Timeliness.*** Mortgagees must ensure that quality control reviews are performed on a regular and timely basis. Depending on a mortgagee's production volume, origination reviews may be performed weekly, monthly, or quarterly. The review of a specific mortgage should be completed within 90 days of closing. Reviews of different aspects of servicing will vary in frequency; however, delinquent servicing and loss mitigation activities should be reviewed monthly. Timeliness is discussed further in the Origination and Servicing sections of this Chapter.

E. ***System of Loan File Review.*** The Quality Control Program must provide for the review of a representative sample of a mortgagee's loans. This review must evaluate the accuracy and adequacy of the information and documentation used in reaching decisions in either the origination or servicing processes. Specific elements for items to review are discussed in the Origination and Servicing sections of this Chapter. (TOP)

F. ***Adequate Scope and Sampling.*** The Quality Control reviews must thoroughly evaluate the mortgagee's origination and/or servicing functions to determine the root cause of deficiencies. The mortgagee must expand the scope of the Quality Control review when fraud or patterns of deficiencies are uncovered; scope means both an increased number of files as well as more in-depth review. All aspects of the

**4060.1 REV-2**

mortgagee's operation, including but not limited to all branch offices or sites, FHA approved loan correspondents, authorized agents, loan officers or originators, processors, underwriters, appraisers, closing personnel, all FHA loan programs, servicing personnel, loss mitigation procedures, escrow analysis, and assumptions, must be subject to the mortgagee's Quality Control reviews.  Sample Size is discussed in the Origination and Servicing sections of this Chapter. (TOP)

G.    ***Site   Review.***   A   mortgagee's   offices,   including   traditional, nontraditional branch and direct lending offices engaged in origination or servicing of FHA-insured loans, must be reviewed to determine that they are in compliance with the Department's requirements.

1.    ***Review Items.*** The review must include, but not necessarily be limited to, confirmation of the following items:

- The office is properly registered with FHA and the address is current;
- Operations are conducted in a professional, business-like environment;
- If located in commercial space, the office is properly and clearly identified for any walk-in customers; has adequate office space and equipment; is in a location conducive to mortgage lending; and is separated from any other entity by walls or partitions (entrances and reception areas may be shared);
- If located in non-commercial space, the office has adequate office space and equipment; displays a fair housing poster if the public is received; if it is open to receive the public, it must be accessible to persons with disabilities, including those with mobility impairments; if it is not open to the public, but used occasionally to meet with members of the public, alternate means of accommodation may be used to serve persons with disabilities;
- The servicing office provides toll-free lines or accepts collect calls from mortgagors;
- The office is sufficiently staffed with trained personnel;
- Office personnel have access to relevant statutes, regulations, HUD issuances and Handbooks, either in hard copy or electronically;
- Procedures are revised to reflect changes in HUD requirements and personnel are informed of the changes;
- Personnel at the office are all employees of the mortgagee or contract employees performing functions that FHA allows to be outsourced; and
- The office does not employ or have a contract with anyone currently under debarment or suspension, or a Limited Denial of Participation. (TOP)

4060.1 REV-2

2.  **Frequency.** Technology enables mortgagees to conduct effective Quality Control remotely. Annual visits are mandatory for offices meeting certain higher risk criteria such as high early default rates, new branches or new key personnel, sudden increases in volume, and past problems. Other sites must be reviewed to assure compliance with FHA's requirements at a frequency and in a manner determined appropriate by the mortgagee. The criteria used by the mortgagee to determine the frequency of on-site reviews must be in writing and available for review by HUD at the corporate office and any branch office that is not being reviewed annually.

3.  **Staffing.** When it is not feasible for Quality Control staff to visit each branch, qualified personnel from another office of the mortgagee, not involved in the day-to-day processes they are reviewing, or an outside firm may perform the review. (TOP)

H.  **Affiliate Review.** The Department requires mortgagees to ensure that their contractors, agents, and loan correspondents are acceptable to FHA and operate in compliance with FHA requirements. (TOP)

1.  **Sponsors.** A sponsor's Quality Control Program must provide for a review of loans originated and sold to it by each of its loan correspondents. sponsors should determine the appropriate percentage to review based on volume, past experience and other factors. Sponsors must document the methodologies and results.

2.  **Loan Correspondents.** Loan correspondents may arrange with their sponsor(s) to perform Quality Control provided:

    •   The arrangement with the sponsor(s) is detailed in writing;
    •   The aggregate number and scope of reviews meet FHA requirements;
    •   Loans are reviewed within 90 days of closing;
    •   Findings are clear as to source and cause; and
    •   Results are available in a timely manner to both mortgagees and HUD.

3.  **Whole Loan and Servicing Purchasers.** Mortgagees acquiring loans must confirm that mortgage insurance premiums have been paid, insurance is in force, security instruments have been recorded, and that the files and records are complete and as expected. (TOP)

I.  **Reporting and Corrective Action.** Review findings must be reported to the mortgagee's senior management within one month of completion of the initial report. Management must take prompt action to deal appropriately with any material findings. The final report or an addendum must identify actions being taken, the timetable for their completion, and any planned follow-up activities. (TOP)

4060.1 REV-2

---

J.   **Notification to HUD.** Findings of fraud or other serious violations must be immediately referred, in writing (along with any available supporting documentation) to the Director of the Quality Assurance Division in the HUD Homeownership Center (HOC) having jurisdiction (determined by the State where the property is located). In lieu of submitting a paper report, mortgagees must use the Lender Reporting feature in the Neighborhood Watch Early Warning System. If HUD staff is suspected of involvement, refer to the Office of Inspector General at 451 7th Street, SW, Room 8256, Washington, DC 20410.

A mortgagee's Quality Control Program must ensure that findings discovered by employees during the normal course of business and by quality control staff during reviews/audits of FHA loans are reported to HUD within 60 days of the initial discovery. (TOP)

K.   **File Retention.** The Quality Control review report and follow-up, including review findings and actions taken, plus procedural information (such as the percentage of loans reviewed, basis for selecting loans, and who performed the review) must be retained by the mortgagee for a period of two years. These records must be made available to HUD on request. (TOP)

L.   **Restricted Participation.** Determine that no one is employed for HUD origination, processing, underwriting or servicing who is debarred, suspended, subject to a Limited Denial of Participation (LDP) or otherwise restricted from participation in HUD/FHA programs. Mortgagees must periodically check employee list, at least semi-annually. (TOP)

**7-4   Quality Control as a Risk Assessment Tool.**
The Department recommends that Quality Control reports to mortgagee management include an assessment of risks. Mortgagees may develop a system of evaluating each Quality Control sample on the basis of the severity of the violations found during the review. The system should enable a mortgagee to compare one month's sample to previous samples so the mortgagee may conduct trend analysis.

Management can also use this tool to respond quickly to a sudden decline in the quality of its loans and help identify and correct the problem. Mortgagees may consider a ratings system such as the following for each loan reviewed, then aggregate these into an overall rating for the sample.

A.   **Low Risk.** No, or a minor, problem was identified with the origination or servicing of the loan. (TOP)

B.   **Acceptable Risk.** A variety of issues were identified pertaining to processing, documentation or decisions made but none were material to creditworthiness, collateral security or insurability of the loan. (TOP)

---

**4060.1 REV-2**

---

C. **Moderate Risk.** The records contained significant unresolved questions or missing documentation. Failure to resolve these issues has created a moderate risk to the mortgagee and FHA. (TOP)

D. **Material Risk.** The issues identified during the review were material violations of FHA or mortgagee requirements and represent an unacceptable level of risk. For example, a significant miscalculation of the insurable mortgage amount or the applicant's capacity to repay, failure to underwrite an assumption or protect abandoned property from damage, or fraud. Mortgagees must report these loans, in writing, to the Quality Assurance Division in the FHA Homeownership Center having jurisdiction.

## Part B. Quality Control for Single Family Origination

7-5 **Quality Control from Beginning to End.** (TOP)
Quality Control for origination has historically been performed only at the end of the process, that is, after a loan has closed. In order to make it more useful, mortgagees are encouraged to implement Quality Control throughout the loan origination process. The following recommendations will help mortgagees accomplish these ends:

A. **Monitor Application Process.** Mortgagees should monitor the intake of mortgagor information to ensure sufficient questions are asked to elicit a complete picture of the mortgagor's financial situation, the source of funds for the transaction, the intended use of the property, and that employees working with the mortgage applicant are knowledgeable of the origination process to fully describe the mortgagor's responsibilities in obtaining a FHA-insured mortgage. This may involve periodically monitoring calls and following up with applicants regarding their treatment and understanding of the process and their obligations (e.g., to avoid misrepresentation and falsification). Mortgagees must also verify the identity of the loan applicant.

B. **Conduct Pre-funding Reviews.** Mortgagees may want to sample cases prior to closing to evaluate the quality of processing and underwriting. Using such reviews, mortgagees may detect problems prior to closing while problems can still be corrected. This would be especially beneficial in cases involving loans with higher risk characteristics. An important part of pre-funding reviews is reverification (by telephone or in writing) of the applicant's employment, source of funds and residency history. If a written reverification received during a pre-funding Quality Control review is satisfactory, another written reverification is not required if the loan is selected for post-closing review. (TOP)

C. **Identify Patterns.** Mortgagees must identify patterns of early defaults by location, program, loan characteristic, loan correspondent or sponsor. Mortgagees may use HUD's *Neighborhood Watch - Early Warning System* to identify patterns. Mortgagees must identify

---

4060.1 REV-2

commonalities among participants in the mortgage origination process to learn the extent of their involvement in problem cases. Loans involving appraisers, loan officers, processors, underwriters, etc. who have been associated with problems must be included in the review sample.

**7-6    Basic Requirements for Quality Control of Single Family Production.** In order for a Quality Control Program to be useful and acceptable to FHA, there are several requirements that must be met. Mortgagees must adhere to each of the requirements below when conducting reviews. (TOP)

A.    *Timeliness.* Loans must be reviewed within 90 days from the end of the month in which the loan closed. This requirement is intended to ensure that problems left undetected prior to closing are identified as early after closing as possible. (TOP)

B.    *Frequency.* For mortgagees closing more than 15 loans monthly, quality control reviews must be conducted at least monthly and must address one month's activity. Mortgagees closing 15 or fewer loans monthly may perform quality control reviews on a quarterly basis.

C.    *Sample Size and Loan Selection.* Because it is not feasible to review all loans originated during a period, the Program must require that an appropriately sized sample is selected and evaluated during each review. A mortgagee who originates and/or underwrites 3,500 or fewer FHA loans per year must review 10 % of the FHA loans it originates. A mortgagee who originates and/or underwrites more than 3,500 FHA loans per year may review 10 % of its loans or a statistical random sampling that provides a 95 % confidence level with 2 % precision. Each review must document how the sample size and selections were determined. (TOP)

Regardless of the percentage of loans being reviewed, the mortgagee must comply with the following:

1.    *Targeting Loans for Review.* The Quality Control Program must contain provisions to select loans meeting the conditions stated below. It may not be feasible to select loans from each category every month, but an effort must be made to select loans from each category as often as possible. An emphasis should be placed on any participants that have large volumes of loans, show sudden increases in loan volumes or loan default rates, have recently begun a relationship with the mortgagee, or concentrate in soft market areas.

a.    Loans must be reviewed from all branch offices and all sources including authorized agents and loan correspondents; (TOP)

b.    Mortgagees must review the work of each of the loan processors, loan officers, and underwriters based on the sample selected. In addition, mortgagees must review

4060.1 REV-2

the work of roster appraisers, real estate companies, and builders with whom they do a significant amount of business; and (TOP)

c.   The sample must include all FHA programs in which the mortgagee participates including, but not limited to, 203(b), 203(k), 234(c), and Home Equity Conversion Mortgages.

2.   **Recommendations for Selecting Individual Loans.** The Department's experience in reviewing loans that went into early default has shown that many have one or more of the characteristics listed below.   It is recommended that mortgagees consider these characteristics, or any additional ones they find useful, in identifying loans to be reviewed. (TOP)

- 2-4 unit properties;
- New construction or rehab loans;
- Properties transferred within the past year;
- Substantial seller concessions;
- Non-occupying co-mortgagors or multiple mortgagors;
- Housing expenses increasing by 1.5 times or more;
- Large or multiple earnest money deposits (money orders);
- Large increase in bank account balance;
- Sale of personal property for funds to close;
- Gifts or loans of funds to close;
- Self-employed; and
- Loans risk assessed as "refers" by automated underwriting systems.

D.   **Early Payment Defaults.** In addition to the loans selected for routine quality control reviews, mortgagees must review all loans going into default within the first six payments.  As defined here, early payment defaults are loans that become 60 days past due. (TOP)

E.   **Documentation Review and Verification.** The Quality Control Program must provide for the review and confirmation of information on all loans selected for review. (TOP)

1.   **Credit Report.** A new credit report must be obtained for each borrower whose loan is included in a Quality Control review, unless the loan was a streamline refinance or was processed using a FHA approved automated underwriting system exempted from this requirement.  A credit report obtained for a Quality Control review may be a Residential Mortgage Credit Report, a three repository merged in-file report or, when appropriate, a business credit report.  The report must comply with the credit report standards described in **HUD Handbook 4155.1** (as revised).  A full Residential Mortgage Credit Report must be obtained from a different credit source on cases in

**4060.1 REV-2**

which the in-file report reveals discrepancies with the original credit report. (TOP)

2. ***Credit Document Re-verification.*** Documents contained in the loan file should be checked for sufficiency and subjected to written re-verification. Examples of items that must be re-verified include, but are not limited to, the mortgagor's employment or other income, deposits, gift letters, alternate credit sources, and other sources of funds. Sources of funds must be acceptable as well as verified. Other items that may be re-verified include mortgage or rent payments. If the written re-verification is not returned to the mortgagee, a documented attempt must be made to conduct a telephone verification. If the original information was obtained electronically or involved alternative documents, a written re-verification must still be attempted. Any discrepancies must be explored to ensure that the original documents (except blanket verification releases) were completed before being signed, were as represented, were not handled by interested third parties and that all corrections were proper and initialed. All conflicting information in the original documentation should have been resolved before the complete file was submitted to the underwriter.

3. ***Appraisals.*** A desk review of the property appraisal must be performed on all loans chosen for a Quality Control review except streamline refinances and HUD Real Estate Owned (REO) sales. The desk review must include a review of the appraisal data, the validity of the comparables, the value conclusion ("as repaired" to meet safety and soundness requirements in HUD Handbook 4905.1 (as revised)), any changes made by the underwriter and the overall quality of the appraisal. (TOP)

Mortgagees are expected to perform field reviews on 10 % of the loans selected during the sampling process outlined previously in paragraph 7-6 C and D. Field reviews must be performed by licensed appraisers listed on FHA's Roster of Appraisers. Mortgagees should select loans for field reviews based on factors such as those listed previously in paragraph 7-6(C)(2) and the following:

- Property complaints received from mortgagors;
- Discrepancies found during desk reviews;
- Large adjustments to value;
- Comparable sales more than six months old;
- Excessive distances from comparables to the subject property;
- Repetitive sales activity for the subject property;
- Investor-sold properties;
- Identity of interest between buyer and seller;
- Seller identity differs from owner of record; and

**4060.1 REV-2**

- Vacant properties.

In addition, a field review should be completed on loans selected in accordance with paragraphs 7-6(C) and (D) where the desk review revealed significant problems/deficiencies with the appraisal report. If serious deficiencies or patterns are uncovered, mortgagees must report these items, in writing, to the Quality Assurance Division in the HUD Homeownership Center having jurisdiction. (TOP)

4.  *Occupancy Reverification.* In cases where the occupancy of the subject property is suspect, mortgagees must attempt to determine whether the mortgagor is occupying the property. The failure of the mortgagor to occupy the property may be an indication that the loan contains other problems. If it is found that the mortgagor is not occupying a property mortgaged as owner-occupied, mortgagees must report this, in writing, to the Quality Assurance Division in the HUD Homeownership Center having jurisdiction. It also would be advisable to review other similar loans for occupancy. (TOP)

F.  *Underwriting Decisions.* Each Direct Endorsement loan selected for a quality control review must be reviewed for compliance with HUD underwriting requirements, sufficiency of documentation and the soundness of underwriting judgments. (TOP)

G.  *Condition Clearance and Closing.* Each loan selected for a quality control review must be reviewed to determine whether:

- Conditions which were required to be satisfied prior to closing were in fact met prior to closing;
- The seller was the owner of record, or was exempt from the owner of record requirement in accordance with HUD regulations;
- The loan was closed and funds disbursed in accordance with the mortgagee's underwriting and subsequent closing instructions; and
- The closing and legal documents are accurate and complete.

**7-7   Specific Elements for the Production Portion of the Quality Control Program.** (TOP)

A mortgagee's Quality Control Program must provide for a review of mortgage loan files to evaluate the loan origination and underwriting functions. The Department has found that the items listed below are typically found in a good Quality Control Program. Minimally, the Quality Control Program must address these elements as well as any others that might be useful in the evaluation.

A.  Determine whether the information in the preliminary loan application, final application and all credit documents is consistent or reconciled.

4060.1 REV-2

B.   Determine whether the appraised value was established using reasonable comparables, reasonable adjustments, and in expectation of repairs required to meet minimum safety and soundness requirements.

C.   Determine whether loan documents requiring signature (other than blanket verification releases) were signed by the mortgagor or employee(s) of the mortgagee only after completion; and that all corrections were initialed by the mortgagor or employee(s) of the mortgagee. (TOP)

D.   Determine whether verifications of employment, verifications of deposit or credit reports are suspect due to handling by any interested third party or the mortgagor.

E.   Determine whether the loan file contains a financial statement, tax returns and the appropriate type of credit report if the mortgagor is self-employed. (TOP)

F.   Determine whether more than one credit report was ordered and whether all credit reports were submitted with the loan package to HUD/FHA or the Direct Endorsement Underwriter.

G.   Determine whether outstanding judgments shown on the credit report were shown on the **HUD form 92900**, Mortgage Credit Analysis Worksheet (MCAW) and acceptably explained in accompanying documentation.

H.   Determine whether the loan file contains pertinent documentation of the mortgagor's source of funds for the required investment, the acceptability of that source, and that any obligation to repay the funds is included on HUD form 92900. This is especially important in cases where the source was other than the applicant's accounts at a financial institution. (TOP)

I.   Determine whether all conflicting information or discrepancies in the application file were resolved and properly documented in writing prior to submission of the loan for underwriting.

J.   Determine whether there are sufficient and documented compensating factors if the debt ratios exceed FHA limits.

K.   Determine the accuracy and completeness of underwriting conclusions and mortgagee documentation. (TOP)

L.   Determine whether all conditions were cleared prior to closing.

M.   Determine whether the **HUD-1** Settlement Statement was accurately prepared and properly certified.  Assure that only FHA allowable fees and charges were paid by the mortgagor.  The HUD-1 should be compared with other relevant loan documents to determine whether

4060.1 REV-2

the mortgagor made the required minimum investment and whether any credits resulted in an over-insured mortgage.

N.   Determine whether the loan file contains all required loan processing, underwriting and legal documents. (TOP)

O.   Determine whether the loan was submitted for insurance within 60 days of closing or included a payment history showing the loan was current when it was submitted for mortgage insurance.

P.   Determine whether the seller acquired the property at the time of or soon before closing, indicating a possible property "flip." (TOP)

Q.   If possible, determine whether the mortgagor transferred the property at the time of closing or soon after closing, indicating the possible use of a "straw buyer" in the transaction.

R.   Determine whether all items requiring documentation have been properly evidenced and retained in the file. (TOP)

**7-8   Review of Procedural Compliance in Production.**
In addition to a review of a mortgagee's case files, there are certain other areas of a mortgagee's operation that must be reviewed and corrected if deficient.

A.   ***Fair Lending.*** The Quality Control Program must verify that the mortgagee's operations are in compliance with the various fair lending laws including the following:

  •   Fair Housing Act;
  •   Equal Credit Opportunity Act (15 U.S.C. §1691 et seq.); and
  •   Federal Truth in Lending Act (15 U.S.C. §1601 et seq.). (TOP)

Additional fair lending matters are discussed below. Possible violations or incidences of discrimination must be reported to the Office of Fair Housing and Equal Opportunity in HUD's Headquarters in a timely manner.

  1.   ***Rejected Applications.*** Of the total loans rejected, a minimum of 10 % or a statistical random sampling that provides a 95 % confidence level with 2 % precision must be reviewed, concentrating on the following areas:

    •   Ensuring that the reasons given for rejection were valid;
    •   Ensuring that each rejection has the concurrence of an officer or senior staff person of the company, or a committee chaired by a senior staff person or officer;
    •   Ensuring that the requirements of the Equal Credit Opportunity Act are met and documented in each file;
    •   Ensuring that no Civil Rights violations are committed in rejection of applications; and

| 4060.1 REV-2 |
|---|

Where possible discrimination is noted, the mortgagee is expected to take immediate corrective action. (TOP)

2. ***Mortgagee Practices.*** Ensure that the mortgagee is in compliance with the Department's requirements concerning Tiered Pricing, Overages and Premium Pricing. (TOP)

3. ***Minimum Loan Amounts.*** Mortgagees are prohibited from setting minimum loan amounts.

4. ***Fair Housing Logo.*** Verify that fair housing and equal opportunity signs and logos are displayed in offices and on stationery and documents. (TOP)

B. ***Home Mortgage Disclosure Act.*** The Quality Control Program must verify that the mortgagee is in compliance with the Home Mortgage Disclosure Act reporting requirements and the Department's requirements for reporting FHA-insured mortgages. The check should include confirmation that the report is made timely, information being reported is accurate, and information is being reported correctly. Refer to current HUD requirements.

C. ***Ineligible Participants.*** The Quality Control Program must verify that the mortgagee is ensuring that none of the participants in a mortgage transaction (excluding the seller of a principal residence) is debarred or suspended, or is under an LDP for the program and jurisdiction. Periodically check employee list, at least semi-annually.  There also must be procedures to determine if the mortgage applicant is ineligible due to a delinquent federal debt (eligibility is influenced by repayment arrangements, extenuating circumstances and the age of the debt). (TOP)

D. ***Real Estate Settlement Procedures Act.*** The Quality Control Program must verify that the mortgagee is in compliance with the provisions of RESPA, including, but not limited to:

- Distributing the *Special Information Booklet* to mortgage applicants;
- Providing applicants with Good Faith Estimates of the settlement costs relating to obtaining a mortgage not later than 3 business days after the application is received or prepared;
- Providing applicants with their HUD-1;
- Disclosing transfer of servicing; and
- Disclosing business relationships with affiliated entities.

E. ***Escrow Funds.*** The Quality Control Program must verify that escrow funds received from mortgagors are not used for any purpose other than that for which they were received.  Mortgagees must also ensure that the funds are maintained in an account separate from the mortgagee's general operating account. (TOP)

4060.1 REV-2

F.    **Mortgage Insurance Premiums.** The Quality Control Program must verify that HUD/FHA Mortgage Insurance Premiums (MIPs) that are due upfront (prior to insurance) are remitted within the time period established by FHA, or if not, that the remittance includes late charges and interest penalties.  Mortgagees must address any pattern of late submissions and promptly take corrective measures.  (TOP)

G.    **Timely and Accurate Insurance.** The Quality Control Program must determine whether mortgages are being submitted to HUD for insurance within 60 calendar days of closing.  If mortgages have been submitted beyond the 60 days, the Quality Control Program should verify that the mortgage was current when submitted and met the payment requirements of HUD Handbook 4165.1 (as revised).  Mortgagees must address any pattern of late submissions and promptly take corrective measures.  The Quality Control Program also should include a review of the Mortgage Insurance Certificate for accuracy.

H.    **Underwriting Reports.** The Quality Control Program should include a review of reports available to mortgagees, including underwriting reports and notices of return (regarding cases rejected for insurance due to errors or omissions). (TOP)

I.    **Advertising.** Ensure that branch offices or employees are not engaging in false or misleading advertising practices.   Refer to paragraph 2-17.

**7-9    Other Quality Control Issues Regarding Single Family Production.**

A.    **Automated   Underwriting.**   Mortgagees   using   an   automated underwriting system should consider how best to design their Quality Control Programs to evaluate loans underwritten by these systems.  The following are only basic requirements:

1.    **Sample.** The Quality Control sample must include loans that fairly represent the percentage of loans underwritten in this manner. (TOP)

2.    **Requirements.** The Quality Control Program must verify that correct information has been entered into the automated underwriting system, including data identifying the borrower(s), property, mortgage, income, assets, and source of funds.  Copies of the assessment by the automated underwriting system must be included in the loan file in addition to the normal documentation required for an FHA mortgage transaction.   Whenever the automated underwriting system cannot "accept" the application, the basis of the automated underwriter system's decision on the loan must be documented and retained. (TOP)

4060.1 REV-2

3. **Referred Applications.** The Quality Control Program must verify that applications receiving a "refer" are manually underwritten by an underwriter before a final decision is made on the application.

4. **Exemptions to Individual Quality Control Program Requirements.** A new credit report is not required.

5. **Overrides.** The Quality Control Program must verify that if manual downgrades or overrides are applied, that no patterns of illegal discrimination against loan applicants are revealed and that the downgrade or override was proper. (TOP)

B. **Streamline Refinances.** Mortgages made under FHA's streamline refinancing requirements typically will contain very few documents. Streamline refinances should be included in the Quality Control sample; however, they should comprise a very small proportion of the sample unless streamline refinances are a significant proportion of the mortgagee's production.  The reviews may be limited to the functions performed when originating such loans and confirmation that the loan was eligible for streamline processing. (TOP)

C. **Specific Programs.** Mortgages originated under specific FHA programs warrant special attention.

1. **Section 203(k) Loans.** The Quality Control Program of mortgagees originating or purchasing 203(k) loans must provide for reviews of the handling of rehabilitation escrows and disbursements, the rehabilitation loan agreements, the scope of the repairs, the timeliness of their completion, and borrower complaints about quality.  Also, mortgagees should conduct physical inspections on a sampling of 203(k) loans.

In addition, the Quality Control Program of mortgagees originating 203(k) loans must clearly define standards for the 203(k) consultant's performance in its Quality Control Program. These standards must be provided to each consultant that the mortgagee relies on in the 203(k) program.  Mortgagees must evaluate and document the performance of these consultants on at least an annual basis, to include a review of the consultant's actual work product.  Mortgagees must not use the services of consultants who have demonstrated previous poor performance.  Fraud or malfeasance should be documented and reported to the Department for possible administrative action.

2. **Home Equity Conversion Mortgages (HECMs).** The Quality Control Program of mortgagees originating HECMs should provide for reviews to ensure that the homeowners received the appropriate counseling and that any referral fees paid are reasonable for the service provided and disclosed in the loan file. (TOP)

| 4060.1 REV-2 |
|---|

Part C. Quality Control for Single Family Servicing

**7-10   Basic Requirements for Quality Control over Single Family Servicing.**
In general, servicing activities vary on individual loans and over the course of the year.  As a result, sampling for servicing reviews will be focused on specific aspects of servicing rather than against the entire portfolio. (TOP)

A.   ***Areas to be reviewed.*** Servicers must review all aspects of their servicing operations as they relate to FHA-insured mortgages. The areas listed below must be reviewed to ensure that all FHA, RESPA, and other pertinent requirements are being met.

- Servicing delinquent accounts;
  - Loss Mitigation efforts;
  - Reporting under the Single Family Default Monitoring System (SFDMS);
- Foreclosure processing;
- MIP billings;
- Deficiency judgments;
- Claims, and claims without conveyance of title;
- New loans, servicing transfers, acquisitions;
- Customer service;
- Fees and charges;
- Escrow administration;
- ARM adjustments and disclosures;
- HECM disbursement reporting;
- Section 235 recertifications;
- Assumption processing;
- Handling of prepayments;
- Paid-in-full mortgages; and
- Maintenance of records.

B.   ***Timeliness and Frequency.*** Quality Control of servicing must be an ongoing function. Due to the importance of these aspects of servicing, mortgagees must perform monthly reviews of delinquent loan servicing, claims, and foreclosures.  The other items listed in the previous paragraph must be reviewed at least quarterly and should address activity that occurred within the prior three months. (TOP)

C.   ***Sample Size.*** Mortgagees servicing fewer than 3,500 loans, in their total FHA portfolio, must review 10% of the FHA loans for each area of servicing outlined in Paragraph 7-10(A), in accordance with the review period described in 7-10(B).  Mortgagees servicing more than 3,500 loans may use an appropriately sized statistical sampling that provides a 95 % confidence level with 2 % precision for the review of each area of servicing --- provided the total population of the area of servicing outlined in Paragraph 7-10(A), for the review period described in 7-10(B), is sufficient to apply a statistical random sampling methodology.  All mortgagees, regardless of their portfolio size, must document the total population and how the sample size and selections were determined for each area of servicing outlined in Paragraph 7-10(A). (TOP)

| 4060.1 REV-2 |
| --- |

**7-11   Review of Procedural Compliance in Servicing.**

    A.    ***Real Estate Settlement Procedures Act.*** The Quality Control Program must determine whether the mortgagee is in compliance with the provisions of RESPA in its escrow account administration. (TOP)

    B.    ***Ineligible Participants.*** The Quality Control Program must determine whether the mortgagee is ensuring that none of the participants in an assumption (excluding the seller of a principal residence) has been debarred or suspended, or is under an LDP for the program and jurisdiction.   There also must be procedures to determine if the mortgage assumptor is ineligible due to a delinquent federal debt (eligibility is influenced by repayment arrangements, extenuating circumstances and the age of the debt).

    C.    ***Fair Lending.*** The Quality Control Program must include a review of the mortgagee's operations, including assumption processing, to assure compliance with the various fair lending laws including the Fair Housing Act and the Equal Credit Opportunity Act. Possible violations or incidences of discrimination must be reported, in writing with supporting documentation, to the Office of Fair Housing and Equal Opportunity in HUD Headquarters.   Patterns of disproportionate aggressiveness or forbearance in foreclosures on the basis of race, color, religion, sex, handicap, familial status or national origin under the Fair Housing Act or the same prohibited areas in addition to age or martial status under the Equal Credit Opportunity Act. (TOP)

    D.    ***Transfer of Servicing.*** The Quality Control Program must include a review of the transfer of servicing provisions as provided under Section 6 of RESPA. (TOP)

**7-12   Required Elements for the Servicing Portion of the Quality Control Program.** (TOP)

    Mortgagees must service mortgages in compliance with HUD regulations, Handbook 4330.1 (as revised), Mortgagee Letters and instructions for the submission of claims.   A mortgagee's Quality Control Program for servicing must provide for a review of all aspects of loan servicing.   Mortgagees must include the following elements in the evaluation.

    A.    Determine whether loan-servicing records are promptly established after loan closing and if the servicing records contain all necessary documentation.

    B.    Determine whether mortgagors are promptly notified when the mortgagee acquires servicing from another mortgagee and whether loan servicing records are established immediately upon transfer of a loan to the mortgagee's loan servicing portfolio.

    C.    Determine whether loans purchased contain all necessary documents.

4060.1 REV-2

D.  Determine whether all Mortgage Insurance Premiums (MIP) are paid timely and in the correct amounts. The Quality Control review must include an analysis to determine whether a monthly or risk-based premium is due. This review must include a sampling of recently purchased loans. (TOP)

E.  Determine whether the *Mortgage Record Change* was reported to HUD on loans sold to another servicer. Also, determine whether the selling servicer reported the transfer of recently purchased loans. This may be done by examining the portfolio using the FHA Connection. (TOP)

F.  Determine whether requests from mortgagors concerning their individual mortgage accounts are responded to promptly. Determine whether complaints are promptly and effectively handled. (TOP)

G.  Determine whether escrow account functions are being performed properly. This includes ensuring that:

    •   Funds are maintained in an account separate from the mortgagee's general operating account;
    •   Mortgagors are billed the proper amounts;
    •   Disbursements are made promptly as the items for which the escrow was established become due and payable;
    •   Bills are requested and obtained when not automatically received;
    •   Excessive balances are promptly refunded to the mortgagor or applied to the unpaid principal balance if the mortgagor so requests; and
    •   Escrow shortages are promptly reported to the mortgagor and the mortgagor is informed of all options to remedy the shortage. (TOP)

H.  Determine whether fees and charges imposed on the mortgagor are permitted and do not exceed the amount allowed by HUD/FHA and the provisions of the mortgage and mortgage note. For example:

    •   Allowed fees:  such as late charges, inspection fees, assumption fees, and attorney's fee (only for the initiation of foreclosure proceedings); and
    •   Prohibited fees:  such as prepayment fees or reinstatement fees.

I.  Determine whether ARM adjustments are calculated correctly and implemented timely, after mortgagors are properly notified. (TOP)

J.  Determine whether Section 235 recertification's are performed annually, that assistance payments are accurately computed and billed using the proper formula, that the income used for computing the assistance payments is compared to the income included in the mortgagor's income verification, and that mortgagors are properly notified of any changes to their payment. Determine if the prior year's

**4060.1 REV-2**

income increased and/or a job change occurred necessitating computation and collection of any overpaid assistance. (TOP)

K.   Determine whether qualifying assumptions were properly underwritten.   Determine whether a *Mortgage Record Change* (identifying assumptor's name and Social Security Number) is promptly reported to HUD when the mortgage is assumed.

L.   Determine whether effective collection activities are pursued in a timely fashion.   Determine whether contact is attempted with all co-mortgagors, co-signors and former mortgagors, as appropriate.

M.   Determine whether accurate documentation of collection efforts is maintained, including:

   •   referral of the mortgagor to a HUD-approved counseling agency; and
   •   mailing of HUD pamphlet HUD-426 to mortgagors no later than the second month of delinquency. (TOP)

N.   Determine whether a personalized interview (face-to-face or telephone) with the mortgagor is attempted before three full mortgage installments become delinquent.   If the interview was not conducted, documentation must be provided of an exception allowed by HUD. (TOP)

O.   Determine whether accurate and timely submission of required reports is being made to the Single Family Default Monitoring System.

P.   Determine whether mortgagor information is reported to credit reporting bureaus when appropriate. (TOP)

Q.   Determine whether property inspections to protect and preserve the property are performed in accordance with HUD requirements. (TOP)

R.   Determine whether all appropriate Loss Mitigation tools (i.e. special forbearance, loan modification, partial claim, pre-foreclosure sale, and deed-in-lieu) have been considered and documented, and that mortgagors are provided every reasonable opportunity to remedy a delinquency or default prior to the decision to foreclose.

S.   Determine whether additional assistance to remedy the delinquency (e.g. oral and written forbearance agreements and refinances) is reasonable given the financial data submitted by the mortgagor. Determine whether reasonable partial payments are accepted in accordance with requirements. (TOP)

T.   Determine whether foreclosure proceedings are initiated and completed in a timely manner, and in compliance with HUD requirements (e.g., decision to foreclose had concurrence of management).

U.   Determine whether disaster moratorium requirements are met. (TOP)

**4060.1 REV-2**

---

V.   Determine whether deficiency judgments are taken where required.

W.   Determine whether there are sufficient controls to ensure that claims for insurance benefits are accurately prepared, properly calculated, fully supported, and submitted in a timely manner to HUD. The review must include, but should not be limited to, the following items:

- Preservation and protection;
- Appraisal costs;
- Foreclosure costs of acquiring the property;
- Costs associated with pursuing a deficiency judgment;
- Taxes;
- Special assessments;
- Association fees;
- Hazard insurance premiums;
- Periodic MIP;
- Uncollected mortgage interest; and
- Debenture interest.

All fees included must comply with the reasonable and customary fees specified by the FHA Single Family Homeownership Center having jurisdiction over REO in the location or with Fannie Mae guidelines. (TOP)

X.   Determine whether interest charges in prepayments are accurate. Determine whether the note and security instrument are promptly satisfied, the termination of FHA mortgage insurance is properly reported to FHA on paid-in-full mortgages, and escrow balances are promptly refunded. Determine whether security instruments are promptly released. (TOP)

Y.   Determine whether the documents required to be retained as originals and the remaining paper documents or acceptable imaged or microfilmed versions are retained for a minimum of the life of the loan plus three years, and any additional time required due to payment of a claim or Section 235 subsidies. (TOP)

Z.   Determine whether the servicing of 203(k) loans has been completed in accordance with FHA guidelines (i.e., reviews of the handling of rehabilitation escrows and disbursements, the rehabilitation loan agreements, the scope of the repairs, the timeliness of their completion, and borrower complaints about quality). In addition, mortgagees should conduct physical inspections on a sampling of 203(k) loans.

(TOP)


Page Intentionally Left Blank

---

**4060.1 REV-2**

# Chapter 8 Mortgagee Monitoring, Administrative Sanctions and MRB Actions, Credit Watch and Neighborhood Watch

Part A. Monitoring Activities

**8-1  Introduction.**
Various offices within HUD monitor the performance of mortgagees originating or servicing single family insured mortgages.  The objectives of the mortgagee monitoring program are:

A.   To ensure that mortgagee practices are in compliance with statutory, regulatory and administrative loan origination and servicing requirements;

B.   To identify mortgagees representing a high risk to the Department's insurance funds and take appropriate actions to mitigate losses; and

C.   To provide consistency in the resolution of problems relating to non-compliance with FHA's loan origination and servicing requirements by approved mortgagees.

**8-2  On-site Reviews.** (TOP)
These reviews, conducted at mortgagees' offices, consist of an opening conference; interviews with mortgagee officials and their employees; reviews of individual case files, logs and computer records; reviews of the mortgagee's policies, procedures, and Quality Control Program; and an exit conference; followed, as appropriate, by selected re-verifications, such as interviews with mortgagors. Mortgagees are given a few days notice prior to an origination review and approximately one month's notice prior to a servicing review.  Mortgagees are expected to have files requested by FHA monitors available for their review.

On-site comprehensive reviews of national and large national lenders evaluate, not only mortgagee files, records, and practices, but also the lender's overall operations and policies with respect to lender relationships, quality control and risk management, wholesale loans and riskier FHA product lines.  These reviews are conducted using staff and resources from one or more of the QADs in the Homeownership Centers and Headquarters.

**8-3  Results and Referrals.** (TOP)
Upon completion of the on-site review, an exit conference is held to discuss problems and deficiencies in loan files and in the mortgagee's operations. Minor findings, which have been resolved by the mortgagee, may be closed out at the exit conference.  Following the completion of the post on-site review activities, the QAD will send a letter to the mortgagee's home office identifying any problems found and actions needed, or refer the matter for further handling.  Mortgagees are expected to respond to findings letters promptly, and include a detailed description and appropriate documentation on any refuted findings.

**4060.1 REV-2**

Referrals may be made to:

- Office of Fair Housing and Equal Opportunity (fair lending issues);
- Office of Consumer and Regulatory Affairs (RESPA issues);
- HUD's Enforcement Center (suspension or debarment actions);
- Mortgagee Review Board;
- Office of Inspector General (fraud or illegal activities are suspected); and
- State licensing agencies – eg. Secretary of State, Real Estate Commissioner, Appraisal Review Board, Department of Banking, Bar Association.

Part B. Administrative Sanctions and MRB Actions

**8-4    Basics.** (TOP)
HUD may take an administrative action against individuals, companies and lenders for actions or omissions in connection with FHA mortgage insurance programs.

   A.   ***Limited Denial of Participation (LDP).*** Serious, isolated, violations of FHA requirements may lead to an LDP of an individual or company (other than an approved mortgagee) by the Homeownership Center, Multifamily Hub or Center, or a Deputy Assistant Secretary. The LDP precludes the party from participating in the HUD programs specified, within the jurisdiction of the HUD official taking the action, for up to one year (see 24 Code of Federal Regulations (CFR) Part 24).

   B.   ***Debarment or Suspension.*** Violations of statutes or serious or repeated violations of FHA requirements may lead to a debarment or suspension of an individual, a company, or with approval of the MRB, a lender, by the Department's Enforcement Center or an Assistant Secretary. These actions preclude the party from participating in most Federal domestic programs (see 24 CFR Part 24). (TOP)

   C.   ***Mortgagee Review Board (MRB) Action.*** The Department's Mortgagee Review Board (MRB) is authorized to impose civil money penalties on a mortgagee or other party, and to take administrative action against any approved mortgagee that does not comply with FHA requirements or the non-discrimination requirements of the *Equal Credit Opportunity Act*, the *Fair Housing Act*, or Executive Order 11063. The Department's regulations on the Mortgagee Review Board and civil money penalties are in 24 CFR Parts 25 and 30.

      1.   ***Administrative Actions.*** The Board may issue a letter of reprimand, place a mortgagee on probation, suspend or withdraw a mortgagee's approval, or enter into a Settlement Agreement. The Board may also issue a cease and desist order where there is reasonable cause to believe that a mortgagee is violating, or has violated the Department's requirements. The nature and extent of the violations determines the type of administrative action that the Board may take. (TOP)

**4060.1 REV-2**

---

>   2.   ***Civil Money Penalties.*** The Board is authorized to impose a civil money penalty of up to $6,500 per violation, per day of its continuance, against a party that knowingly and materially violates FHA program regulations or requirements. A civil money penalty may be imposed against a mortgagee in addition to any other administrative action taken by the Board.

Part C. Credit Watch Termination Initiative

**8-5    Overview.**

Credit Watch Termination Initiative holds single family mortgagees accountable for poorly performing loans that they originated or underwrote. This process is administered by the Quality Assurance Division (QAD) in FHA Headquarters (see 24 CFR 202.2 and 202.3(c)(2)). (TOP)

>   A.   ***Review of Early Defaults and Claims.*** QAD compares the proportion of a mortgagee's loans that became 90 days delinquent early in their term to the proportion of early defaults and claims on all insured loans.
>
>   B.   ***Outcome.*** A mortgagee (or branch) with default and claim rates that are two or more times the average for a HUD Field Office jurisdiction may become ineligible to originate or underwrite further single family insured mortgages in that area. (TOP)
>
>   C.   ***Process.*** Before any restriction takes effect, a mortgagee will have an opportunity to present its analysis of the early defaults and claims, and conclusions about its accountability to FHA officials in Washington, DC.

Part D. Neighborhood Watch

**8-6    Overview:**

The Neighborhood Watch Early Warning System is a web-based software application that displays loan performance data for single family mortgagees and appraisers, by loan types and geographic areas using FHA-insured single family loan information.

Origination loan information is displayed for a two-year period and is updated on a monthly basis. The default data includes current defaults, and defaults within the first and first two years from endorsement. Results can be displayed for distinct categories of FHA lenders (e.g. sponsors, loan correspondents) and can be viewed for numerous reporting periods (e.g. current month, 24 months of quarterly data). Servicing data is updated monthly and can be viewed by single servicer or all servicers. (TOP)

To support its users, the Neighborhood Watch system has an extensive Help menu as well as a Feedback feature. Lenders can access Neighborhood Watch via the FHA Connection. Details on its use are contained in the Single Family Housing portion of the FHA Connection Guide. (TOP)

---

**4060.1 REV-2**

## Index (TOP)

Acquisition,
  Between Approved
Mortgagees
  By Non-approved
Mortgagee
Acronyms, List of ...........................................See page
Additional Sponsors for a Loan
Correspondent.
Address
  Mortgagee Address in FHA
Records ..............................................
  Office of Lender Activities
and Its Divisions. ............... See FAQs in FHA Connection
Administrative Actions &
Sanctions, and Civil Money
Penalties.
  Administrative Actions ..........................
  Civil Money Penalities .........................
  Debarment or Suspension ....................
  Limited Denial of
Participation (LDP)
  Mortgagee Review Board
(MRB) Actions ..............................
Areas Approved for Business ...................
Civil Money Penalties ...........................
Advertising, Misrepresentative ...............
Annual Audit Requirements .....................
  Extensions
  Newly Approved Mortgagee
  Nonsupervised Loan
Correspondent.
  Nonsupervised Mortgagee .....................
  When Not Required ..............................
Annual Audit, Review of LASS
Submissions ......................................
Annual Renewal of FHA Approval
  Annual Renewal Fees ...........................
  Annual Submission of
Audited Financial Statements .................
  Failure to Comply ...............................
  Summary of Requirements .....................
  Yearly Verification Report .....................
Appeal
  Disapproval of Initial
Application     3-9
  Notice of Withdrawal ...........................
Application Form ...............................

Application, Initial
  Application Processing........................
  Approval of Application ......................
  Disapproval of Application .................
  Formal Notice of Initial
Approval................6-18(A).............
  Required Documents........................
  Application Fee(B)..............
Application Form
  Credit Reports 1-16.............
  Errors and
Omissions Insurance ............
  Evidence of, 6-2,
Acceptable Facilities .........................
  Fidelity Bond ...................
  Financial Statements .............
  Funding Program....................
  Licensing.....................
  Quality Control Plan ..............
  Resumes ................
  Sanctions Letter ..............
  Sponsor Cover
Letter  3-2(A)(1)
  State Approval of
"dba" 3-2(A)(8)
Approval Requirements............
  Business Form ...........
  Corporation ................
  Limited Liability Company...........
  Liquid Assets...............
  Mortgagee Name ..............
  Net Worth Requirements ...........
  Partnership .............
  State Licensing
Requirements .............
  Approvals

**Direct Endorsement**
1-1(A)
  Multifamily Accelerated
Processing.........................
  Newly Approved
Mortgagees.......................
  Renewal of Mortgagee
Approval.........................
  Types of Mortgagee
Approvals........................
  Voluntary Withdrawal of
FHA Approval.........................
Authorized Agent Principal
Relationship

**4060.1 REV-2**

Bankruptcy ..............................................................
Branch Office
   Centralized Centers ......................................
   Change of Address or
Telephone Number
   Direct Lending Branch ...............................
   Manager ......................................................
   Mortgagees Permitted to
Maintain Branch Offices
   Originating at Branch
Offices 5-2
   Servicing by Branch Offices ......................
   Staffing .......................................................
   Summary of Branch Office
Requirements ...........................................................
   Underwriting at Branch
Offices 5-3
Business Form
   Approval Requirements ..............................
   Character of Business
(Principal Activity), Change to .............................
   Charter, Change to ....................................
   Reporting Changes .....................................
Changes
   Address and/or Telephone
Number ....................................................................
   Bankruptcy or Liquidation .........................
   Character of Business
(Principal Activity), Change to .............................
   Charter, Change to ....................................
   Control, Change in
   Conversion of Mortgagee
Type 6-16
   dba ............................................................
   Errors and Omissions
Insurance ..................................................................
   Federal Taxpayer
Identifying Number ...................................................
   Fidelity Bond, Termination ........................
   Fiscal Year ..................................................
   Legal Name ................................................
   Liquid Assets Deficiency ...........................
   Loss of Underwriter ...................................
   Merger or Consolidation ............................
   Net Worth Deficiency .................................
   Operating Loss ...........................................
   Partnership, Change in ...............................
   Reporting Changes .....................................
   Requirement to Notify HUD
of Changes Subsequent to
Approval ...................................................................
   Sale or Acquisition .....................................

Senior Officer ........ 6-24 ..............................
Shareholder, Ownership or
Control ............................ 5-5 ..........................
Termination of Supervision ................
Voluntary Withdrawal of
FHA Approval ............... 5-8 ........................
Civil Money Penalties ........ 2-8 ..................
Compensation, Employees ............................
Conducting Mortgage Business ...............
Contacting the Department ........................
Control, Change in ...................................
Conversion of Mortgagee Type .... 5-4 ........
Corporation, Approval 2-12(B)
Requirements ..............................................
Credit Watch Termination ... 5-1
Initiative      8-5
Deficiency
Liquid Asset Requirement ..................
Net Worth Requirement ... 2-2 ...............
Direct Endorsement (DE)
Mortgagee ........................ 6-15 ...............
Loss of Underwriter 6-14 ....................
Underwriting Area ... 6-1 ....................
Documentation for Specific
Business Forms ............................................
Doing Business As (dba) Name ... 6-8,
Change of ..................... 6-24 .......................
Employee
Compensation ........ 6-15 ..........................
Control and Supervision of
Staff ........................ 6-13 ..........................
Employees and Officers ....................
Employees ...........................................
Full Time, Part Time and
Outside Employment ...............................
Enabling Legislation ......... 6-20 ..............
Errors and Omissions Insurance ..............
Escrow Funds ................... 6-14 ...............
Evidence of Acceptable Facilities ...............
Extension Requests of LASS 6-7
Submissions ..................... 6-8 ...................
Fair Housing and Other Federal
Laws ... 2-16,         6-10
Federal Taxpayer Identifying
Number, Change to ........... 6-21 .................
Fees                6-23
Annual Renewal Fee 6-12 ...................
Branch Registration 6-1 ...................
Conversion of Mortgagee
Type 6-16
Initial Application ... 2-24 ....................
FHA Connection .............. 6-18 .................

**4060.1 REV-2**

FHA Monitoring Activities ....... 8-1  
   On-site Reviews .......................................... 8-2  
   Results and Referrals ................................. 8-3  
Fidelity Bond  
   Requirement ...............................................  
   Termination ...................................................  
Financial Statements  
   Annual Renewal ...........................................  
   Initial Approval ............................................  
Fiscal Year, Change of ...................................  
Frequently Asked Questions..........................  
Funding Program ...........................................  
Geographic Restrictions for Loan  
Origination and Underwriting ......................  
Governmental Institutions,  
Additional Approval Requirements ..............  
Handbooks.......................................................  
Home Mortgage Disclosure Act of  
1974 (HMDA) ..................................................  
Home Office  
   Change of Address or  
Telephone ........................................................  
   Staffing ...........................................................  
HUD's Lender Web Page.................................  
HUDCLIPS.........................................................  
Ineligible Participants. ..................................  
Information Requests, By FHA ......................  
Investing Mortgage  
   Additional Approval  
Requirements ..................................................  
   Conversion from ...........................................  
   Conversion to .................................................  
LASS Submissions...........................................  
   Acceptance of LASS  
Submission ......................................................  
   Deficient LASS Submission .........................  
   Extension Requests ......................................  
   Rejected LASS Submission ..........................  
Legal Name, Change of ...................................  
Lender Approvals, Types of ...........................  
Lender Lists on HUD's Web Site ...................  
Lender Operations  
   Examination by HUD.....................................  
Mortgagee's Address for  
Communication...............................................  
   Operating Expenses .....................................  
   Reports Submitted to FHA ...........................  
Lending Area ....................................................  
Licenses ...........................................................  
Limited Liability Company  

Additional Documentation  
Required ..........................................................  
   Approval Requirement..................................  
   Liquid Asset Requirement .. 8-3  
Approval Requirements. ...................  
   Deficiency...3-2(A)(10).....................  
   Renewal Requirement .....................  
Liquidation ......................................  
   Loan Officer.....................4-4..........  
   Loan Servicing Responsibility..........  
Mergers ............................6-7..........  
   Approved Mortgagee......................  
   Non-approved Mortgagee(A)(13)....  
Two Approved Mortgagees................  
   Misrepresentative Advertising.........  
Mortgage Lender...............................  
   Mortgage Broker..............2-31.......  
   Mortgagee Identification Number....  
Mortgagee Name  
   Approval Requirement.....................  
Change .............................................  
Mortgagee  
   Mergers.............................6-2..........  
   Ownership Change 2(A).....................  
   Sale or Acquisition...1-4....................  
   Types..................................1-7...........  
   Mortgagee Review Board (MRB)  
   Actions...............................4-10.........  
Multifamily Accelerated  
Processing........................................  
   Nationwide Branch (Direct Lending  
Branch)...........6-16(G)......................  
   Neighborhood Watch...6-16(F)..........  
   Net Branching ...................4-4...........  
Net Worth Requirement  
   Approval Requirement....6..................  
   Deficiency...........4-7........................  
   Renewal Requirement(8)..................  
   Nonsupervised Loan........... 4-8  
   Correspondent ................6-8  
   Additional Approval. 1-2  
   Requirements.....................1-9.........  
Conversion to  
   Nonsupervised Mortgagee 1-12........  
Nonsupervised Mortgagees  
   Additional Approval1-16..................  
   Requirements.....................2-8..........  
   Conversion to........ 1-12  
   Nonsupervised Loan........ 2-19  
   Correspondent .....3-2(A)(7)..............  
Not-for-profit Entity ........................  
Notice of Violation ..........................

**4060.1 REV-2**

Notice of Withdrawal – Termination of Approval ................................................
Office Facilities
 *Direct Lending Branch Office* ..................................................... 2-13(D)
 *Home office* ................................................................................
 *Nontraditional branch office* .................................................
 *Traditional branch office* ...................................................... 2-13(A)
Officers ..............................................................................................
 Companies with Joint Officers ..............................................
OMB Approval of Information Collections ..............................................
Operating Loss ..............................................................................
Origination Lending Areas ............................................................
Outsourcing Mortgage Operations .................................................... 2-13
Ownership, Change in ...................................................................
Partnership
 Additional Documentation Required ...................................................
 Approval Requirements ..................................................................
 Change in ...................................................................................
Performance Requirements of Lenders ..............................................
Principal-Authorized Agent Relationship ............................................
 Establishing the Relationship ........................................................
 Mortgagee Name in Loan Closing ...................................................
 Origination and Underwriting .........................................................
 Origination Fee ............................................................................
 Principal ....................................................................................
 Termination .................................................................................
Prohibited
 Branch Arrangements (including Net Branching) ...............................
 Prohibited and Permissible Payments .............................................
 Words in Mortgagee Name ............................................................
Quality Control Plan
 Adequate Scope and Sampling ......................................................
 Affiliate Review ............................................................................
 as a Risk Assessment Tool ...........................................................
 Basic Elements ............................................................................
 File Retention ..............................................................................
 General ......................................................................................
 Goal of Quality Control .................................................................
 Independence .............................................................................

Notification to FHA ..........................................
Plan Form and Execution ..................................
Qualified Staff ..................................................
Reporting and Corrective Action .. 7-3(L) .......... 2-13(D)
Requirements for Approval .................
Restricted Participation ......................
Site Review ..... 2-13(C) ......................
System of Loan File Review ................
Timeliness .......2-9(B) ........................
**Quality Control for Multifamily Servicing** .2-9(E)
14
**Quality Control for Single Family Origination** .. 2-13
 Conduct ............. Prefunding Reviews ..............
 Identify Patterns ...............................
 Monitor Application Process ................ 2(B) from
 Quality Control .......... 6-12
 Beginning to End ...............................
Quality Control for Single Family Production ...................... 1-10
 Advertising .......................................
 Automated Underwriting ....................
 Basic Requirements ..........................
 Condition Clearance 2-4 and Closing ........................................
 Documentation Review and Verification ......................................
 Early Payment Defaults .....................
 Escrow Funds ........... 5-15
 Fair Lending .......... 5-10
 Frequency ............. 6-4
 HECM Loans .....................................
 HMDA ..............................................
 Ineligible Participants 2-4 ....................
 Mortgage Insurance Premiums .......... 2-22
 RESPA ............. 2-4 ........................
 Sample Size and Loan Selection ........................................
 Section 203(k) Loans 3(F) ....................
 Specific Elements 7-3(H) ....................
 Streamline Refinances 4 .....................
 Timeliness ............. 7-3
 Timely and Accurate Underwriting Decisions 2
 Insurance ...............7-1
 .......... 7-3(B)

**4060.1 REV-2**

Underwriting ............................................ Streamline Refinance, Lender(s)
Quality Control for Single                         Area ...........................................
Family Servicing                                   Supervised Entity, Conversion to
  Areas to be reviewed ................................ Nonsupervised Entity...7-10(A).
  Basic Requirements  7-                           Supervised Loan Correspondent
10                                                   Additional Approval
  Fair Lending ......................................... Requirements...7-11(C)....................
  Ineligible Participants ........................... Conversion to... 7-11(B)
  Required Elements ................................. Nonsupervised Entity.......7-12..........
  RESPA ............................................... Conversion to Supervised
  Sample Size ........................................ Mortgagee................7-10(C)...................
  Timeliness and Frequency ..................... Supervised Mortgagee. 7-10(B)
  Transfer of Servicing ............................. Additional Approval11(D)
References, List of ....................................... Requirements, of Forward....................
References, Online locations ........................... Conversion to Forward
Registration, Branches                              Nonsupervised Entity ........................
  Direct Lending Branch                           Conversion to Supervised
Offices 5-8                                          Loan Correspondent .........................
  Loan Correspondent                              Termination of Supervision ...............
Branches ............................................. Termination.................5-7(C)
  Mortgagee Branches ........................... Errors and Omissions(B)
  New Branch ........................................ Coverage.......................5-7.
  Registration Fee.................................. FHA Approval.....5-7(A)..........
Regulations ......................................... see page i of mortgaged
Renewal of Approval, Summary ................. Approval.........1-3, 4-1.....................
Reporting Fraud, Illegal Acts, and              Fidelity Bond ................................
Unethical Practices to HUD ..................... Loan Correspondent-14
Reports, Submitted by Lenders .................. Sponsor Agreement.........1-11.............
Requirement to Notify HUD of                    Principal-Authorized Agent
  Changes Subsequent to                          Relationship ..................................
  Approval ............................................ Supervision of a Supervised
Resumes.............................................. Mortgagee............3-2(A)(5)..............
Sale or Acquisition of Mortgagee ............... Voluntary Termination 8....................
Sanctions Letter.................................... Voluntary Withdrawa8(A)(4)
Senior Officer, Change of ......................... Approval......................6-11..............
Servicing, Permission for                        W-2 Compensation, Employees .............
Supervised Loan Correspondent to
Service ............................................................. 6-6
Shareholders Change in ........................................ 6-13
Signatory Authority ...........................................2-9(E)
Single   Family   Homeownership
Centers ............................................................ 7-13
Sponsor
  Cover Letter ............................................. 3-2(A)(1)
  Registration............................................... 5-17
  Termination of Sponsorship ............................ 6-5
Staff
  Control and Supervision ............................... 2-9(D)
  Staffing Requirements .................................. 2-12
Starter Kit..........................................................3-12(G)
State Approval of "dba" .................................. 3-2(A)(8)
State Licensing Requirements...............................2-3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only). Peter Belli, ex rel. United States of America v
   Allied Home Mortgage Capital Corporation

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.   (See local rule 40.1(a)(1)).

   ☐   I.   410, 441, 470, 535, 830*, 891, 893, 894, 895, R.23, REGARDLESS OF NATURE OF SUIT.

   ☐   II.   110, 130, 140, 190, 196, 230, 240, 290,320,362, 370, 371, 380, 433, 440, 442-445, 710, 720, 730, 740, 790, 820*, 840*, 850, 870, 871.

   ☑   III.   120, 190, 151, 152, 153, 195, 210, 220, 240, 310, 315, 330, 340, 345, 350, 355, 360, 365, 368, 383, 400, 422, 423, 450, 460, 462, 463, 465, 480, 490, 510, 530, 540, 550, 555, 610, 620, 625, 630, 640, 650, 660, 690, 791, 810, 861-865, 875, 890, 892, 900, 950.

   *Also complete AO 120 or AO 121, for patent, trademark or copyright cases.

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.
   Peter Belli v Allied Home Mortgage Capital Corporation, 10-cv-11766-NG

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

   YES ☐   NO ☑

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)

   YES ☐   NO ☑

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

   YES ☐   NO ☑

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

   YES ☐   NO ☑

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

   YES ☐   NO ☑

   A.   If yes, in which division do all of the non-governmental parties reside?

   Eastern Division ☐        Central Division ☐        Western Division ☐

   B.   If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

   Eastern Division ☑        Central Division ☐        Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

   YES ☐   NO ☑

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME   Joseph C Biro-Mahany & Erl PC
ADDRESS   N28 W23000 Roundy Drive, Suite 200, Pewaukee, WI 53072
TELEPHONE NO.   (248) 909-4235 or (262) 970-8500

(CategoryForm4-4-11.wpd - 4/4/11)