IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff-Intervenor, | ) |
| | ) |
| v. | )  CIVIL ACTION 4:12-CV-2676 |
| | ) |
| AMERICUS MORTGAGE | ) |
| CORPORATION, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## DEFENDANTS ALLQUEST HOME MORTGAGE CORPORATION AND AMERICUS MORTGAGE CORPORATION'S APPENDIX

**Munsch Hardt Kopf & Harr, P.C.**

Fred Wahrlich
Texas Bar No. 20666500
SD No. 248
700 Louisiana Street, Suite 4600
Houston, Texas 77002-2732
Tel:  (713) 222-1469
Fax: (713) 222-5869
fwahrlich@munsch.com
**ATTORNEYS-IN-CHARGE FOR DEFENDANT Allquest Home Mortgage Corporation**

**Of Counsel**

Mitchel H. Kider (*Pro hac vice*)
David M. Souders (*Pro hac vice*)
Bruce E. Alexander (*Pro hac vice*)
WEINER BRODSKY SIDMAN KIDER PC
1300 19th Street, N.W. 5th Floor
Washington, DC 20036
Tel: (202) 628-2000
Fax: (202) 628-2011
kider@wbsk.com
souders@wbsk.com
alexander@wbsk.com

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................ i

24 C.F.R. § 25.6 .................................................................. DA 1

24 C.F.R. § 202.1 ............................................................... DA 5

24 C.F.R. § 202.3 ............................................................... DA 6

24 C.F.R. § 202.3(c)(2)(iii)(A) ............................................ DA 7

24 C.F.R. § 202.3(d) .......................................................... DA 9

24 C.F.R. § 202.5 ............................................................. DA 11

24 C.F.R. § 202.5(a)(3) ..................................................... DA 11

24 C.F.R. §202.5(h) ......................................................... DA 12

24 C.F.R. § 202.5(j) ......................................................... DA 13

24 C.F.R. § 202.5(k) ......................................................... DA 13

24 C.F.R. § 202.5(m) ........................................................ DA 13

24 C.F.R. § 202.12 ........................................................... DA 17

HUD Handbook 4060.1, Rev. 2 § 1-13 .......................... DA 19

HUD Handbook 4060.1, Rev. 2 § 8-1 ............................ DA 20

HUD Handbook 4060.1, Rev. 2 § 8-4 ............................ DA 21

*Apex Maritime Co. v. OHM Enters., Inc.*,
   No. 10-CV-8119, 2011 U.S. Dist. LEXIS 35707
   (S.D.N.Y. Mar. 31, 2011) ......................................... DA 23

*Escalon v. World Grp. Secs. Inc.*,
   No. 5:07-CV-214, 2008 U.S. Dist. LEXIS 107196
   (N.D. Tex. Nov. 14, 2008) ........................................ DA 30

*Gonzalez v. Bank of Am.*,
   No. 09-2946, 2011 U.S. Dist. LEXIS 16963 (S.D. Tex. Feb. 20, 2011) ... DA 48

*In re Crude Oil Commodity Litig.*,
　No. 06-CV-6677, 2007 U.S. Dist. LEXIS 47902
　(S.D.N.Y. June 28, 2007)........................................................................ DA 59

*Maine State Ret. Sys. v. Countrywide Fin. Corp.*,
　No. 10-CV-302, 2011 U.S. Dist. LEXIS 53359
　(C.D. Cal. Apr. 20, 2011)........................................................................ DA 68

*United States ex rel. Hebert v. Dizney*
　295 F. App'x 717 (5th Cir. 2008) ........................................................... DA 82

*United States ex rel. Jamison v. McKesson Corp.*,
　No. 2:08-CV-214, 2012 U.S. Dist. LEXIS 142078
　(N.D. Miss. Sep. 28, 2012) ..................................................................... DA 93

*United States ex rel. Patton v. Shaw Services, LLC*,
　418 F. App'x 366 (5th Cir. 2011) ........................................................... DA 111

*United States ex rel. Pilecki-Simko v. The Chubb Inst.*,
　No. 06-CV-3562, 2010 U.S. Dist. LEXIS 27187
　(D.N.J. March 22, 2010) ......................................................................... DA 120

*United States ex rel. Werner Stebner v. Stewart & Stephenson Svcs., Inc.*,
　144 F. App'x 389 (5th Cir. 2005) ........................................................... DA 138

*United States ex rel. Willoughby v. Collegiate Funding Servs., Inc.*,
　469 F. App'x 244 (4th Cir. 2012) ........................................................... DA 145

*United States v. Cypress Health Sys.*
　No. 1-09-CV-137, 2011 U.S. Dist. LEXIS 74768
　(N.D. Fla. Jul 21, 2011) ......................................................................... DA 162



# 24 CFR 25.6

This section is current through the November 15, 2012 issue of the Federal Register

**Code of Federal Regulations**   **> TITLE 24--**   **> SUBTITLE A--**   **> PART 25--**

---

**§ 25.6 Violations creating grounds for administrative action.**

---

Any administrative action imposed under *12 U.S.C. 1708*(c) shall be based upon one or more of the following violations:

   (a) The transfer of an insured mortgage to non-approved mortgagee, except pursuant to 24 CFR 203.433 or 203.435;

   (b) The failure of a mortgagee to segregate all escrow funds received from mortgagors on account of ground rents, taxes, assessments and insurance premiums, or failure to deposit these funds with one or more financial institutions in a special account or accounts that are fully insured by the Federal Deposit Insurance Corporation or by the National Credit Union Administration except as otherwise provided in writing by the Assistant Secretary for Housing -- Federal Housing Commissioner;

   (c) The use of escrow funds for any purpose other than that for which they are received;

   (d) The termination of a mortgagee's supervision by a governmental agency;

   (e) The failure of a nonsupervised mortgagee to submit the required annual audit report of its financial condition prepared in accordance with instructions issued by the Secretary within 90 days of the close of its fiscal year, or such longer period as the Assistant Secretary of Housing -- Federal Housing Commissioner may authorize in writing prior to the expiration of 90 days;

   (f) The payment by a mortgagee of a referral fee to any person or organization; or payment of any thing of value, directly or indirectly, in connection with any insured mortgage transaction or transactions to any person, including but not limited to an attorney, escrow agent, title company, consultant, mortgage broker, seller, builder or real estate agent, if that person has received any other compensation from the mortgagor, the seller, the builder or any other person for services related to such transactions or from or related to the purchase or sale of the mortgaged property, except compensation paid for the actual performance of such services as may be approved by the Assistant Secretary for Housing -- Federal Housing Commissioner;

   (g) Failure to comply with any agreement, certification, undertaking, or condition of approval listed on, or applicable to, either a mortgagee's application for approval or an approved mortgagee's branch office notification;

   (h) Failure of an approved mortgagee to meet or maintain the applicable net worth, liquidity or warehouse line of credit requirements of 24 CFR part 202 pertaining to net worth, liquid assets, and warehouse line of credit or other acceptable funding plan;

   (i) Failure or refusal of an approved mortgagee to comply with an order of the Board, the Secretary, the hearing official, hearing officer or other independent official to whom matters are referred under § 25.8(d)(2).

(j) Violation of the requirements of any contract or agreement with the Department, or violation of the requirements set forth in any statute, regulation, handbook, mortgagee letter, or other written rule or instruction;

(k) Submission of false information to HUD in connection with any HUD/FHA insured mortgage transaction;

(l) Failure of a mortgagee to respond to inquiries from the Board;

(m) Indictment or conviction of a mortgagee or any of its officers, directors, principals or employees for an offense which reflects upon the responsibility, integrity, or ability of the mortgagee to participate in HUD/FHA programs as an approved mortgagee;

(n) Employing or retaining:

  (1) An officer, partner, director, or principal at such time when such person was suspended, debarred, ineligible, or subject to a limited denial of participation under 2 CFR part 2424 or otherwise prohibited from participation in HUD programs, where the mortgagee knew or should have known of the prohibition;

  (2) An employee who is not an officer, partner, director, or principal and who is or will be working on HUD/FHA program matters at a time when such person was suspended, debarred, ineligible, or subject to a limited denial of participation under 2 CFR part 2424 or otherwise prohibited from participation in HUD programs, where the mortgagee knew or should have known of the prohibition;

(o) Violation by an approved mortgagee of the nondiscrimination requirements of the Equal Credit Opportunity Act *(15 U.S.C. 1691*-1691f), Fair Housing Act *(42 U.S.C. 3601*-3619), Executive Order 11063 *(27 FR 11527),* and all regulations issued pursuant thereto;

(p) Business practices which do not conform to generally accepted practices of prudent mortgagees or which demonstrate irresponsibility;

(q) Failure to cooperate with an audit or investigation by the Department's Office of Inspector General or an inquiry by HUD/FHA into the conduct of the mortgagee's HUD/FHA insured business or any other failure to provide information to the Secretary or a representative related to the conduct of the mortgagee's HUD/FHA business;

(r) Violation by an approved mortgagee of the requirements or prohibitions of the Real Estate Settlement Procedures Act *(12 U.S.C. 2601*-2617);

(s) Without regard to the date of the insurance of the mortgage, failure to service an insured mortgage in accordance with the regulations and any other requirements of the Secretary which are in effect at the time the act or omission occurs;

(t) Failure to administer properly an assistance payment contract under section 235 of the National Housing Act *(12 U.S.C. 1715z);*

(u) Failure to pay the application and annual fees required by 24 CFR part 202;

(v) The failure of a coinsuring mortgagee:

  (1) To properly perform underwriting, servicing or property disposition functions in accordance with instructions and standards issued by the Commissioner;

  (2) To make full payment to an investing mortgagee as required by 24 CFR part 204;

  (3) To discharge responsibilities under a contract for coinsurance;

(4) To comply with restrictions concerning the transfer of a coinsured mortgage to an agency not approved under 24 CFR part 250;

(5) To maintain additional net worth requirements, as applicable;

(w) Failure to remit, or timely remit, mortgage insurance premiums, loan insurance charges, late charges, or interest penalties to the Department;

(x) Failure to submit a report required under 24 CFR 202.12(c) within the time determined by the Commissioner, or to commence or complete a plan for corrective action under that section within the time agreed upon with the Commissioner.

(y) Failure to properly perform underwriting functions in accordance with instructions and standards issued by the Department;

(z) Failure to fund mortgage loans or any other misuse of mortgage loan proceeds;

(aa) Permitting the use of strawbuyer mortgagors in an insured mortgage transaction where the mortgagee knew or should have known of such use of strawbuyers;

(bb) Breach by the mortgagee of a fiduciary duty owed by it to any person as defined in § 25.3, including GNMA and the holder of any mortgage-backed security guaranteed by GNMA, with respect to an insured loan or mortgage transaction.

(cc) Violation by a Title I lender of any of the applicable provisions of this section or 24 CFR 202.11(a)(2).

(dd) Failure to pay any civil money penalty, but only after all administrative appeals requested by the mortgagee have been exhausted.

(ee) Submitting, or causing to be submitted, with an application for FHA mortgage insurance an appraisal, valuation condition sheet, or any other documentation relating to an appraisal that does not satisfy FHA requirements.

(ff) Any other violation of Federal Housing Administration requirements that the Board or the Secretary determines to be so serious as to justify an administrative sanction.

(Approved by the Office of Management and Budget under Control Number 2502-0450)

**Statutory Authority**

**AUTHORITY NOTE APPLICABLE TO ENTIRE PART:**
*12 U.S.C. 1708(c), 1708(d), 1709(s), 1715b and 1735(f)-14; 42 U.S.C. 3535(d).*

**History**

[57 FR 31051, July 13, 1992; *57 FR 37085, Aug. 18, 1992, as amended at 57 FR 58339, Dec. 9, 1992; 58 FR 47379, Sept. 9, 1993; 60 FR 13836, March 14, 1995; 60 FR 39236, 39238, Aug. 1, 1995; 61 FR 684, 685, Jan. 9, 1996; 62 FR 20080, 20081, April 24, 1997; 69 FR 45304, 43509, July 20, 2004; 72 FR 73484, 73492, Dec. 27, 2007; redesignated and amended at 73 FR 60538, 60541, Oct. 10, 2008; 77 FR 51465, 51467, Aug. 24, 2012]*

24 CFR 25.6

*LEXISNEXIS' CODE OF FEDERAL REGULATIONS*
*Copyright © 2012, by Matthew Bender & Company, a member of the LexisNexis Group. All rights reserved.*



# 24 CFR 202.1

This section is current through the November 15, 2012 issue of the Federal Register

**Code of Federal Regulations** > **TITLE 24--** > **SUBTITLE B--** > **CHAPTER II--** > **SUB-CHAPTER B--** > **PART 202--** > **SUBPART A--**

---

§ 202.1 Purpose.

---

This part establishes minimum standards and requirements for approval by the Secretary of lenders and mortgagees to participate in the Title I and Title II programs.

---

Statutory Authority

---

**AUTHORITY NOTE APPLICABLE TO ENTIRE PART:**
*12 U.S.C. 1703, 1709 and 1715b; 42 U.S.C. 3535(d).*

---

History

---

[56 FR 52436, Oct. 18, 1991; 57 FR 6480, Feb. 25, 1992; *62 FR 20080, 20082, April 24, 1997*]

*LEXISNEXIS' CODE OF FEDERAL REGULATIONS*
*Copyright © 2012, by Matthew Bender & Company, a member of the LexisNexis Group. All rights reserved.*



# 24 CFR 202.3

This section is current through the November 15, 2012 issue of the Federal Register

**Code of Federal Regulations** **> TITLE 24--** **> SUBTITLE B--** **> CHAPTER II--** **> SUB-CHAPTER B--** **> PART 202--** **> SUBPART A--**

---

**§ 202.3 Approval status for lenders and mortgagees.**

---

(a)   Initial approval. A lender or mortgagee may be approved for participation in the Title I or Title II programs upon filing a request for approval on a form prescribed by the Secretary and signed by the applicant. The approval form shall be accompanied by such documentation as may be prescribed by the Secretary.

(1)  Approval is signified by:

(i)   The Secretary's agreement that the lender or mortgagee is considered approved under the Title Ior Title II programs, except as otherwise ordered by the Mortgagee Review Board or an officer or subdivision of the Department to which the Mortgagee Review Board has delegated its power, unless the lender or mortgagee voluntarily relinquishes its approval;

(ii)  Consent by the lender or mortgagee to comply at all times with the general approval requirements of § 202.5, and with additional requirements governing the particular class of lender or mortgagee for which it was approved as described under subpart B at §§ 202.6 through 202.10; and

(iii)  Under the Title I program, the issuance of a Contract of Insurance constitutes an agreement between the Secretary and the lender and which governs participation in the Title I program.

(2)  Limitations on approval:

(i)   Separate approval as lender or mortgagee is required for participation in the Title I or Title II programs, respectively. Application must be made, and approval will be granted, on the basis of one or both categories of programs, as is appropriate.

(ii)  Separate approval as mortgagee is required for the Single Family Mortgage Insurance Programs and for the Multifamily Mortgage Insurance Programs. Application must be made, and approval will be granted, on the basis of either or both categories, as is appropriate.

(iii)  In addition to the requirements for approval as a Title II mortgagee, the Secretary may from time to time issue eligibility requirements for participation in specific programs, such as the Direct Endorsement program.

(iv)  A Title II mortgagee may be approved to operate either on a nationwide basis or on a geographically restricted basis in only those areas designated by the Secretary.

(v)  A Title I lender may originate loans or purchase advances of credit only within a geographic lending area approved by the Secretary. Expansion of this lending area

shall be subject to a determination by the Secretary that the lender is able to originate loans in compliance with part 201 of this chapter within such expanded area.

(3) Authorized agents. A mortgagee approved under §§ 202.6, 202.7, or 202.10 as a non-supervised mortgagee, supervised mortgagee, or governmental or similar institution approved as a Direct Endorsement mortgagee under *24 CFR 203.3* may, with the approval of the Secretary, designate a nonsupervised or supervised mortgagee with Direct Endorsement approval under *24 CFR 203.3* as authorized agent for the purpose of underwriting loans. The application for mortgage insurance may be submitted in the name of the FHA-approved mortgagee or its designated authorized agent under this paragraph.

(b)   Recertification. On each anniversary of the approval of a lender or mortgagee, the Secretary will determine whether recertification, i.e., continued approval, is appropriate. The Secretary will review the yearly verification report required by § 202.5(n)(2) and other pertinent documents, ascertain that all application and annual fees have been paid, and request any further information needed to decide upon recertification.

(c)   Termination. (1) Termination of the Title I Contract of Insurance.

(i)   Notice. A Contract of Insurance may be terminated in accordance with its terms by the Secretary or by the Secretary's designee upon giving the lender at least 5 days prior written notice.

(ii)   Informal meeting. If requested, and before expiration of the 5-day notice period, a lender shall be entitled to an informal meeting with the Department official taking action to terminate the Contract of Insurance.

(iii)   Effect of termination. Termination of a Contract of Insurance shall not affect:

(A)   The Department's obligation to provide insurance coverage with respect to eligible loans originated before the termination, unless there was fraud or misrepresentation;

(B)   A lender's obligation to continue to pay insurance charges or premiums and meet all other obligations, including servicing, associated with eligible loans originated before termination; or

(C)   A lender's right to apply for and be granted a new Title I Contract of Insurance, provided that the requirements for approval under this part are met.

(2)   Credit Watch Termination.

(i)   Scope and frequency of review. The Secretary will review, on an ongoing basis, the number of defaults and claims on mortgages originated, underwritten, or both, by each mortgagee in the geographic area served by a HUD field office. HUD will make this rate information available to mortgagees and the public through electronic means and will issue instructions for accessing this information through a Mortgagee Letter. For this purpose, and for all purposes under paragraph (c) of this section, a mortgage is considered to be originated in the same federal fiscal year in which its amortization commences. The Secretary may also review the insured mortgage performance of a mortgagee's branch offices individually and may terminate the authority of the branch or the authority of the mortgagee's overall operation.

(ii) Credit Watch Status. Mortgagees are responsible for monitoring their default and claim rate performance. A mortgagee is considered to be on Credit Watch Status if, at any time, the mortgagee has a rate of defaults and claims on insured mortgages originated, underwritten, or both, in an area which exceeds 150 percent of the normal rate and its origination approval agreement has not been terminated.

(iii)  Notice of termination. (A) Notice of termination of origination approval agreement. The Secretary may notify a mortgagee that its origination approval agreement will terminate 60 days after notice is given, if the mortgagee had a rate of defaults and claims on insured mortgages originated in an area which exceeded 200 percent of the normal rate and exceeded the national default and claim rate for insured mortgages.

(B)  Notice of termination of direct endorsement approval. The Secretary may notify a mortgagee that its direct endorsement approval under 24 CFR part 203 will terminate 60 days after notice is given, if the mortgagee had a rate of defaults and claims on insured mortgages underwritten in an area which exceeded 200 percent of the normal rate and exceeded the national default and claim rate for insured mortgages. The termination of a mortgagee's direct endorsement approval pursuant to this section is separate and apart from the termination of a mortgagee's direct endorsement approval under 24 CFR part 203.

(C)  No need for prior action by Mortgagee Review Board. The termination notices described in paragraphs (c)(2)(ii)(A) and (B) of this section may be given without prior action by the Mortgagee Review Board.

(D)  Underserved areas. Before the Secretary sends the termination notice, the Secretary shall review the Census tract concentrations of the defaults and claims. If the Secretary determines that the excessive rate is the result of mortgage lending in underserved areas, as defined in *24 CFR 81.2*, the Secretary may determine not to terminate the mortgagee's origination approval agreement and/or direct endorsement approval.

(iv)  Request for informal conference. Prior to termination the mortgagee may submit a written request for an informal conference with the Deputy Assistant Secretary for Single Family Housing or that official's designee. HUD must receive the written request no later than 30 calendar days after the date of the proposed termination notice. Unless HUD grants an extension, the informal conference must be held no later than 60 calendar days after the date of the proposed termination notice. After considering relevant reasons and factors beyond the mortgagee's control that contributed to the excessive default and claim rates, the Deputy Assistant Secretary for Single Family Housing or designee may withdraw the termination notice.

(v)  Limitation on the establishment of new branches. Upon receipt of a proposed termination notice of its origination approval agreement, the mortgagee shall not establish a new branch or new branches for the origination of FHA-insured mortgages in the area or areas that are covered by the proposed termination notice. As of January 18, 2005, a mortgagee that is in re-

ceipt of a notice of proposed termination may not establish any new branch in the location or locations cited in the proposed termination notice until either:

(A)  The proposed termination notice is withdrawn or

(B)  The Secretary reinstates the mortgagee's origination approval agreement, in accordance with paragraph (e) of this section.

(vi)  Effects of termination. (A) Termination of origination approval agreement. If a mortgagee's origination approval agreement is terminated, it may not originate single family insured mortgages unless the origination approval agreement is reinstated by the Secretary in accordance with paragraph (e) of this section, notwithstanding any other provision of this part except § 202.3(c)(2)(vii)(A).

(B)  Termination of direct endorsement approval. If a mortgagee's direct endorsement approval is terminated, it may not underwrite single family insured mortgages for the area(s) identified in the termination notice, unless the direct endorsement approval is reinstated by the Secretary in accordance with paragraph (e) of this section, notwithstanding any other provision of this part except § 202.3(c)(2)(vii)(A).

(vii)  Rights and obligations in the event of termination. Termination of the origination approval agreement and/or direct endorsement approval shall not affect:

(A)  The eligibility of the mortgage for insurance, absent fraud or misrepresentation, if the mortgagor and all terms and conditions of the mortgage had been approved before the termination by the Direct Endorsement or Lender Insurance mortgagee or were covered by a firm commitment issued by the Secretary; however, no other mortgages originated or underwritten after the date of termination by the mortgagee shall be insured unless the mortgagee's origination approval agreement and/or direct endorsement approval is reinstated by the Secretary;

(B)  The right of a mortgagee whose direct endorsement approval has been terminated to transfer cases to another mortgagee with direct endorsement approval for the area covered by the termination.

(C)  A mortgagee's obligation to continue to pay insurance premiums and meet all other obligations, including servicing, associated with insured mortgages;

(D)  A mortgagee's right to apply for reinstatement of the origination approval agreement and/or direct endorsement approval in accordance with paragraph (e) of this section; or

(E)  A mortgagee's right to purchase insured mortgages or to service its own portfolio or the portfolios of other mortgagees with which it has a servicing contract.

(d)  Withdrawal and suspension of approval. Lender or mortgagee approval may be suspended or withdrawn by the Mortgagee Review Board as provided in part 25 of this title.

(e)  Reinstatement. (1) General. A mortgagee whose origination approval agreement and/or di-

rect endorsement approval has been terminated under paragraph (c) of this section may apply for reinstatement if:

(i) The origination approval agreement and/or direct endorsement approval for the affected branch or branches has been terminated for at least six months; and

(ii) The mortgagee continues to be an approved mortgagee meeting the general standards of § 202.5 and the specific requirements of §§ 202.6, 202.7, 202.8 or 202.10, and 202.12.

(2) Application for reinstatement. The mortgagee's application for reinstatement must:

(i) Be in a format prescribed by the Secretary and signed by the mortgagee;

(ii) Be accompanied by an independent analysis of the terminated office's operations and identifying the underlying cause of the mortgagee's unacceptable default and claim rate. The independent analysis must be prepared by an independent Certified Public Accountant (CPA) qualified to perform audits under the government auditing standards issued by the General Accounting Office; and

(iii) Be accompanied by a corrective action plan addressing each of the issues identified in the independent analysis described in paragraph (e)(2)(ii) of this section, along with evidence demonstrating that the mortgagee has implemented the corrective action plan.

(3) HUD action on reinstatement application. The Secretary will grant the mortgagee's application for reinstatement if the mortgagee's application is complete and the Secretary determines that the underlying causes for the termination have been satisfactorily remedied.

---

**Statutory Authority**

## AUTHORITY NOTE APPLICABLE TO ENTIRE PART:
12 U.S.C. 1703, 1709 and 1715b; 42 U.S.C. 3535(d).

---

**History**

[56 FR 52436, Oct. 18, 1991; 57 FR 6480, Feb. 25, 1992, as amended at 57 FR 58340, Dec. 9, 1992; 58 FR 13536, March 12, 1993; 60 FR 13836, March 14, 1995; 61 FR 8458, March 4, 1996; 61 FR 36260, 36263, July 9, 1996; 62 FR 20080, 20082, April 24, 1997; 62 FR 30222, 30225, June 2, 1997; 62 FR 65180, 65181, Dec. 10, 1997, as confirmed at 63 FR 44360, 44361, Aug. 18, 1998; 69 FR 75802, 75807, Dec, 17, 2004, as confirmed at 71 FR 4970, 4973, Jan. 30, 2006; 75 FR 20718, 20731, Apr. 20, 2010]

*LEXISNEXIS' CODE OF FEDERAL REGULATIONS*
*Copyright © 2012, by Matthew Bender & Company, a member of the LexisNexis Group. All rights reserved.*



# 24 CFR 202.5

This section is current through the November 15, 2012 issue of the Federal Register

**Code of Federal Regulations** > **TITLE 24--** > **SUBTITLE B--** > **CHAPTER II--** > **SUB-CHAPTER B--** > **PART 202--** > **SUBPART A--**

---

### § 202.5 General approval standards.

---

To be approved for participation in the Title I or Title II programs, and to maintain approval, a lender or mortgagee shall meet and continue to meet the general requirements of paragraphs (a) through (n) of this section (except as provided in § 202.10(b)) and the requirements for one of the eligible classes of lenders or mortgagees in §§ 202.6 through 202.10.

(a) Business form. (1) The lender or mortgagee shall be a corporation or other chartered institution, a permanent organization having succession, or a partnership. A partnership must meet the requirements of paragraphs (a)(1)(i) through (iv) of this section.

(i) Each general partner must be a corporation or other chartered institution consisting of two or more persons.

(ii) One general partner must be designated as the managing general partner. The managing general partner shall comply with the requirements of paragraphs (b), (c), and (f) of this section. The managing general partner must have as its principal activity the management of one or more partnerships, all of which are mortgage lenders or property improvement or manufactured home lenders, and must have exclusive authority to deal directly with the Secretary on behalf of each partnership. Newly admitted partners must agree to the management of the partnership by the designated managing general partner. If the managing general partner withdraws or is removed from the partnership for any reason, a new managing general partner shall be substituted, and the Secretary shall be immediately notified of the substitution.

(iii) The partnership agreement shall specify that the partnership shall exist for the minimum term of years required by the Secretary. All insured mortgages and Title I loans held by the partnership shall be transferred to a lender or mortgagee approved under this part prior to the termination of the partnership. The partnership shall be specifically authorized to continue its existence if a partner withdraws.

(iv) The Secretary must be notified immediately of any amendments to the partnership agreement that would affect the partnership's actions under the Title I or Title II programs.

(2) Use of business name. The lender or mortgagee must use its HUD-registered business name in all advertisements and promotional materials related to FHA programs. HUD-registered business names include any alias or "doing business as" (DBA) on file with FHA. The lender or mortgagee must keep copies of all print and electronic advertisements and promotional materials for a period of 2 years from the date that the materials are circulated or used to advertise.

    (3) Non-FHA-approved entities. A lender or mortgagee that accepts a loan application from a non-FHA-approved entity must confirm that the entity's legal name and Tax ID number are included in the FHA loan origination system record for the subject loan. The loan to be insured by FHA must be underwritten by the FHA-approved lender or mortgagee.

(b) Employees. The lender or mortgagee shall employ competent personnel trained to perform their assigned responsibilities in consumer or mortgage lending, including origination, servicing, and collection activities, and shall maintain adequate staff and facilities to originate and service mortgages or Title I loans, in accordance with applicable regulations, to the extent the mortgagee or lender engages in such activities.

(c) Officers. All employees who will sign applications for mortgage insurance on behalf of the mortgagee or report loans for insurance shall be corporate officers or shall otherwise be authorized to bind the lender or mortgagee in the origination transaction. The lender or mortgagee shall ensure that an authorized person reports all originations, purchases, and sales of Title I loans or Title II mortgages to the Secretary for the purpose of obtaining or transferring insurance coverage.

(d) Escrows. The lender or mortgagee shall not use escrow funds for any purpose other than that for which they were received. It shall segregate escrow commitment deposits, work completion deposits, and all periodic payments received under loans or insured mortgages on account of ground rents, taxes, assessments, and insurance charges or premiums, and shall deposit such funds with one or more financial institutions in a special account or accounts that are fully insured by the Federal Deposit Insurance Corporation or the National Credit Union Administration, except as otherwise provided in writing by the Secretary.

(e) Servicing. A lender shall service or arrange for servicing of the loan in accordance with the requirements of 24 CFR part 201. A mortgagee shall service or arrange for servicing of the mortgage in accordance with the servicing responsibilities contained in subpart C of 24 CFR part 203 and in 24 CFR part 207, with all other applicable regulations contained in this title, and with such additional conditions and requirements as the Secretary may impose.

(f) Business changes. The lender or mortgagee shall provide prompt notification to the Secretary, in such form as prescribed by the Secretary, of:

    (1) All changes in its legal structure, including, but not limited to, mergers, terminations, name, location, control of ownership, and character of business; and

    (2) Any officer, partner, director, principal, manager, supervisor, loan processor, loan underwriter, loan originator, of the lender or mortgagee, or the lender or mortgagee itself, that is subject to one or more of the sanctions in paragraph (j) of this section.

(g) Financial statements. The lender or mortgagee shall furnish to the Secretary a copy of its annual audited financial statement within 90 days of its fiscal year end, furnish such other information as the Secretary may request, and submit to an examination of that portion of its records that relates to its Title I and/or Title II program activities.

(h) Quality control plan. The lender or mortgagee shall implement a written quality control plan, acceptable to the Secretary, that assures compliance with the regulations and other issuances of the Secretary regarding loan or mortgage origination and servicing.

24 CFR 202.5

(i) Fees. The lender or mortgagee, unless approved under § 202.10, shall pay an application fee and annual fees, including additional fees for each branch office authorized to originate Title I loans or submit applications for mortgage insurance, at such times and in such amounts as the Secretary may require. The Secretary may identify additional classes or groups of lenders or mortgagees that may be exempt from one or more of these fees.

(j) Ineligibility. For a lender or mortgagee to be eligible for FHA approval, neither the lender or mortgagee, nor any officer, partner, director, principal, manager, supervisor, loan processor, loan underwriter, or loan originator of the lender or mortgagee shall:

(1) Be suspended, debarred, under a limited denial of participation (LDP), or otherwise restricted under 2 CFR part 2424 or 24 CFR part 25, or under similar procedures of any other federal agency;

(2) Be indicted for, or have been convicted of, an offense that reflects adversely upon the integrity, competency, or fitness to meet the responsibilities of the lender or mortgagee to participate in the Title I or Title II programs;

(3) Be subject to unresolved findings as a result of HUD or other governmental audit, investigation, or review;

(4) Be engaged in business practices that do not conform to generally accepted practices of prudent mortgagees or that demonstrate irresponsibility;

(5) Be convicted of, or have pled guilty or nolo contendere to, a felony related to participation in the real estate or mortgage loan industry:

(i) During the 7-year period preceding the date of the application for licensing and registration; or

(ii) At any time preceding such date of application, if such felony involved an act of fraud, dishonesty, or a breach of trust or money laundering;

(6) Be in violation of provisions of the Secure and Fair Enforcement (SAFE) Mortgage Licensing Act of 2008 *(12 U.S.C. 5101* et seq.) or any applicable provision of state law; or

(7) Be in violation of any other requirement established by the Secretary.

(k) Branch offices. A lender may, upon approval by the Secretary, maintain branch offices for the origination of Title I or Title II loans. A branch office of a mortgagee must be registered with the Department in order to originate mortgages or submit applications for mortgage insurance. The lender or mortgagee shall remain fully responsible to the Secretary for the actions of its branch offices.

(l) Conflict of interest and responsibility. A mortgagee may not pay anything of value, directly or indirectly, in connection with any insured mortgage transaction or transactions to any person or entity if such person or entity has received any other consideration from the mortgagor, seller, builder, or any other person for services related to such transactions or related to the purchase or sale of the mortgaged property, except that consideration, approved by the Secretary, may be paid for services actually performed. The mortgagee shall not pay a referral fee to any person or organization.

(m) Reports. Each lender and mortgagee must submit an annual certification on a form prescribed by the Secretary. Upon application for approval and with each annual recertification, each lender and mortgagee must submit a certification that it has not been re-

fused a license and has not been sanctioned by any state or states in which it will originate insured mortgages or Title I loans. In addition, each mortgagee shall file the following:

(1) An audited or unaudited financial statement, within 30 days of the end of each fiscal quarter in which the mortgagee experiences an operating loss of 20 percent of its net worth, and until the mortgagee demonstrates an operating profit for 2 consecutive quarters or until the next recertification, whichever is the longer period; and

(2) A statement of net worth within 30 days of the commencement of voluntary or involuntary bankruptcy, conservatorship, receivership, or any transfer of control to a federal or state supervisory agency.

(n) Net worth --(1) Applicability. The requirements of this section apply to approved supervised and nonsupervised lenders and mortgagees under § 202.6 and § 202.7, and approved investing lenders and mortgagees under § 202.9. For ease of reference, these institutions are referred to as "approved lenders and mortgagees" for purposes of this section. The requirements of this section also apply to applicants for FHA approval under §§ 202.6, 202.7, and 202.9. For ease of reference, these entities are referred to as "applicants" for purposes of this section.

(2) Phased-in net worth requirements for 2010 and 2011 --(i) Applicants. Effective on May 20, 2010, applicants shall comply with the net worth requirements set forth in paragraph (n)(2)(iii) of this section.

(ii) Approved mortgagees. Effective on May 20, 2011, each approved lender or mortgagee with FHA approval as of May 20, 2010 shall comply with the net worth requirements set forth in paragraphs (n)(2)(iii) or (n)(2)(iv) of this section, as applicable.

(iii) Net worth requirements for non-small businesses. Each approved lender or mortgagee that exceeds the size standard for its industry classification established by the Small Business Administration at 13 CFR 121.201 Sector 52 (Finance and Insurance), Subsector 522 (Credit Intermediation and Related Activities) shall have a required minimum net worth of not less than $ 1,000,000. No less than 20 percent of the approved lender or mortgagee's required minimum net worth must be liquid assets consisting of cash or its equivalent acceptable to the Secretary.

(iv) Net worth requirements for small businesses. Each approved lender or mortgagee that meets the size standard for its industry classification established by the Small Business Administration at 13 CFR 121.201 Sector 52 (Finance and Insurance), Subsector 522 (Credit Intermediation and Related Activities) shall have a required minimum net worth of not less than $ 500,000. No less than 20 percent of the approved lender or mortgagee's required minimum net worth must be liquid assets consisting of cash or its equivalent acceptable to the Secretary. If, based on the audited financial statement or other financial report that is required to be prepared at the end of its fiscal year and provided to HUD at the commencement of the new fiscal year, an approved lender or mortgagee no longer meets the Small Business Administration size standard for its industry classification, the approved lender or mortgagee shall meet the net worth requirements set forth in paragraph (n)(2)(iii) of this section for a non-small business approved lender or mortgagee by the last day of the fiscal year in which the audited financial statement or other financial report, as applicable,

24 CFR 202.5

was submitted.

(3) Net worth requirements for 2013 and subsequent years. Effective May 20, 2013:

(i) Irrespective of size, each applicant and each approved lender or mortgagee, for participation solely under the FHA single family programs, shall have a net worth of not less than $ 1 million, plus an additional net worth of one percent of the total volume in excess of $ 25 million of FHA single family insured mortgages originated, underwritten, purchased, or serviced during the prior fiscal year, up to a maximum required net worth of $ 2.5 million. No less than 20 percent of the applicant's or approved lender or mortgagee's required net worth must be liquid assets consisting of cash or its equivalent acceptable to the Secretary.

(ii) Multifamily net worth requirements. Irrespective of size, each applicant for approval and each approved lender or mortgagee for participation solely under the FHA multifamily programs shall have a minimum net worth of not less than $ 1 million. For those multifamily approved lenders or mortgagees that also engage in mortgage servicing, an additional net worth of one percent of the total volume in excess of $ 25 million of FHA multifamily mortgages originated, purchased, or serviced during the prior fiscal year, up to a maximum required net worth of $ 2.5 million, is required. For multifamily approved lenders or mortgagees that do not perform mortgage servicing, an additional net worth of one half of one percent of the total volume in excess of $ 25 million of FHA multifamily mortgages originated during the prior fiscal year, up to a maximum required net worth of $ 2.5 million, is required. No less than 20 percent of the applicant's or approved lender's or mortgagee's required net worth must be liquid assets consisting of cash or its equivalent acceptable to the Secretary.

(iii) Dual participation net worth requirements. Irrespective of size, each applicant for approval and each approved lender or mortgagee that is a participant in both FHA single-family and multifamily programs must meet the net worth requirements as set forth in paragraph (n)(3)(i) of this section.

---

**Statutory Authority**

---

**AUTHORITY NOTE APPLICABLE TO ENTIRE PART:**
12 U.S.C. 1703, 1709 and 1715b; 42 U.S.C. 3535(d).

---

**History**

---

[56 FR 52437, Oct. 18, 1991; 57 FR 6481, Feb. 25, 1992; 61 FR 8458, March 4, 1996; 62 FR 20080, 20084, April 24, 1997, as corrected at 63 FR 9742, Feb. 26, 1998; 62 FR 65180, 65181, Dec. 10, 1997, as confirmed at 63 FR 44360, 44361, Aug. 18, 1998; 67 FR 53450, 53451, Aug. 15, 2002; 72 FR 73484, 73495, Dec. 27, 2007; 75 FR 20718, 20732, Apr. 20, 2010, as corrected at 75 FR 23582, May 4, 2010; 77 FR 51465, 51468, Aug. 24, 2012]

24 CFR 202.5

*LEXISNEXIS' CODE OF FEDERAL REGULATIONS*
*Copyright © 2012, by Matthew Bender & Company, a member of the LexisNexis Group. All rights reserved.*



# 24 CFR 202.12

This section is current through the November 15, 2012 issue of the Federal Register

**Code of Federal Regulations** > **TITLE 24--** > **SUBTITLE B--** > **CHAPTER II--** > **SUB-CHAPTER B--** > **PART 202--** > **SUBPART C--**

---

§ 202.12 Title II.

---

(a)  Tiered pricing --(1) General requirements --(i) Prohibition against excess variation. The customary lending practices of a mortgagee for its single family insured mortgages shall not provide for a variation in mortgage charge rates that exceed 2 percentage points. A variation is determined as provided in paragraph (a)(6) of this section.

  (ii) Customary lending practices. The customary lending practices of a mortgagee include all single family insured mortgages originated by the mortgagee, including mortgages that were originated by the mortgagee's sponsored third-party originator(s).

  (iii) Basis for permissible variations. Any variations in the mortgage charge rate up to two percentage points under the mortgagee's customary lending practices must be based on actual variations in fees or cost to the mortgagee to make the mortgage loan, which shall be determined after accounting for the value of servicing rights generated by making the loan and other income to the mortgagee related to the loan. Fees or costs must be fully documented for each specific loan.

  (2) Area. For purposes of this section, an area is:

    (i) An area used by HUD for purposes of § 203.18(a) of this chapter to determine the median 1-family house price for an area; or

    (ii) The area served by a HUD field office but excluding any area included in paragraph (a)(2)(i) of this section.

  (3) Mortgage charges. Mortgage charges include any charges under the mortgagee's control and not collected for the benefit of third parties. Examples are interest, discount points and origination fees.

  (4) Interest rate. Whenever a mortgagee offers a particular interest rate for a mortgage type in an area, it may not restrict the availability of the rate in the area on the basis of the principal amount of the mortgage. A mortgagee may not direct mortgage applicants to any specific interest rate category on the basis of mortgage size.

  (5) Mortgage charge rate. The mortgage charge rate is defined as the amount of mortgage charges for a mortgage expressed as a percentage of the initial principal amount of the mortgage.

  (6) Determining excess variations. Variation in mortgage charge rates for a mortgage type is determined by comparing all mortgage charge rates offered by the mortgagee within an area for the mortgage type for a designated day or other time period, including mortgage charge rates for all actual mortgage applications.

  (7) Mortgage type. A mortgage type for purposes of paragraph (a)(6) of this section

will include those mortgages that are closely parallel in important characteristics affecting pricing and charges, such as level of risk or processing expenses. The Secretary may develop standards and definitions regarding mortgage types.

(8) Recordkeeping. Mortgagees are required to maintain records on pricing information, satisfactory to the Secretary, that would allow for reasonable inspection by HUD for a period of at least 2 years. Additionally, many mortgagees are required to maintain racial, ethnic, and gender data under the regulations implementing the Home Mortgage Disclosure Act *(12 U.S.C. 2801*-2810).

(b)  Servicing. Any mortgagee that services mortgages must be approved by the Secretary under § 202.6, § 202.7 or § 202.10, or be specifically approved for servicing under § 202.9(a).

(c)  Report and corrective plan requirements. If a mortgagee approved for participation in Title II programs is notified by the Secretary that it had a rate of defaults and claims on HUD-insured mortgages during the preceding year, or during recent years, which was higher than the normal rate, it shall submit a report, within 60 days, containing an explanation for the above-normal rate of defaults and claims, and, if required by the Secretary, a plan for corrective action with regard to mortgages in default and its mortgage processing system in general.

---

**Statutory Authority**

---

**AUTHORITY NOTE APPLICABLE TO ENTIRE PART:**
*12 U.S.C. 1703,* 1709 and 1715b; *42 U.S.C. 3535*(d).

---

**History**

---

[57 FR 58340, Dec. 9, 1992; *61 FR 2650, 2651,* Jan. 26, 1996; *61 FR 8458, 8459,* March 4, 1996; *61 FR 36260, 36263,* July 9, 1996; *62 FR 20080, 20087,* April 24, 1997; *75 FR 20718, 20734,* Apr. 20, 2010; *77 FR 51465, 51469,* Aug. 24, 2012]

*LEXISNEXIS' CODE OF FEDERAL REGULATIONS*
*Copyright © 2012, by Matthew Bender & Company, a member of the LexisNexis Group. All rights reserved.*

4060.1 REV-2

on line at HUD's web site called HUDCLIPS at: http://www.hudclips.org/cgi/index.cgi.

**1-7    HUD Handbooks.** When handbooks are revised or changed, a suffix is added to the Handbook number such as REV-2 or CHG-5. In order to avoid citing an obsolete version of any handbook, all Handbooks will only be cited by the Handbook number only, such as 4060.1. The most recent versions of all handbooks are available in HUDCLIPS. Active links are provided in this handbook to any handbook that can be downloaded as a single file.

**1-8    Frequently Asked Questions.** The best FAQs related to this handbook are available on the Frequently Asked Questions page of the FHA Connection web site under the Lender Approval link.

**1-9    FHA Lender List on HUD's Web Site.** All approved mortgagees and their registered branch offices included on a HUD's web site at: http://www.hud.gov/ll/code/llslcrit.html.

**1-10   Performance Requirements.** Mortgagees must comply with the *Fair Housing Act;* Executive Order 11063 on Equal Opportunity in Housing; the *Equal Credit Opportunity Act* (ECOA); the *Real Estate Settlement Procedures Act;* the *Home Mortgage Disclosure Act;* and program statutory, regulatory and handbook requirements.

**1-11   Reports and Examinations.** FHA may, at any time, require a Title II mortgagee to report on any matter related to its FHA operations. This may include the inspection of a mortgagee's mortgage loan files, reports, records, books, or accounts. Representatives of the Office of Inspector General and/or Quality Assurance Division may periodically visit a mortgagee's office to review its origination and servicing procedures. See Chapter 8 for additional information.

**1-12   Home Mortgage Disclosure Act of 1974 (HMDA).** All FHA approved mortgagees are subject to HMDA. Reporting criteria and requirements are specified in the "A Guide To HMDA Reporting - Getting It Right!" and on the Federal Financial Institutions Examination Council (FFIEC) HMDA web site is at http://www.ffiec.gov/hmda.

**1-13   Administrative Actions, Administrative Sanctions, and Civil Money Penalties.** The Department's Mortgagee Review Board (MRB) is authorized to take administrative action against an approved mortgagee that does not comply with FHA requirements, the Real Estate Settlement Procedures Act (RESPA), or the non-discrimination requirements of the *Equal Credit Opportunity Act,* the *Fair Housing Act,* or Executive Order 11063 on Equal Opportunity in Housing. HUD, separately from the Mortgagee Review Board may take various types of administrative action against an approved mortgagee. See Chapter 8 for details.

4060.1 REV-2

# CHAPTER 8
## MORTGAGEE MONITORING, ADMINISTRATIVE SANCTIONS AND MRB ACTIONS, CREDIT WATCH AND NEIGHBORHOOD WATCH

### Part A. Monitoring Activities

8-1    **Introduction.**    Various offices within HUD monitor the performance of mortgagees originating or servicing single family insured mortgages.    The objectives of the mortgagee monitoring program are:

A.    To ensure that mortgagee practices are in compliance with statutory, regulatory and administrative loan origination and servicing requirements;

B.    To identify mortgagees representing a high risk to the Department's insurance funds and take appropriate actions to mitigate losses; and

C.    To provide consistency in the resolution of problems relating to non-compliance with FHA's loan origination and servicing requirements by approved mortgagees.

8-2    **On-site Reviews.** These reviews, conducted at mortgagees' offices, consist of an opening conference; interviews with mortgagee officials and their employees; reviews of individual case files, logs and computer records; reviews of the mortgagee's policies, procedures, and Quality Control Program; and an exit conference; followed, as appropriate, by selected reverifications, such as interviews with mortgagors. Mortgagees are given a few days notice prior to an origination review and approximately one month's notice prior to a servicing review.    Mortgagees are expected to have files requested by FHA monitors available for their review.

On-site comprehensive reviews of national and large national lenders evaluate, not only mortgagee files, records, and practices, but also the lender's overall operations and policies with respect to lender relationships, quality control and risk management, wholesale loans and riskier FHA product lines.  These reviews are conducted using staff and resources from one or more of the QADs in the Homeownership Centers and Headquarters.

8-3    **Results and Referrals.**    Upon completion of the on-site review, an exit conference is held to discuss problems and deficiencies in loan files and in the mortgagee's operations. Minor findings, which have been resolved by the mortgagee, may be closed out at the exit conference. Following the completion of the post on-site review activities, the QAD will send a letter to the mortgagee's home office identifying any problems found and actions needed, or refer the

DA 20

matter for further handling.  Mortgagees are expected to respond to findings letters promptly, and include a detailed description and appropriate documentation on any refuted findings.

Referrals may be made to:

- Office of Fair Housing and Equal Opportunity (fair lending issues);
- Office of Consumer and Regulatory Affairs (RESPA issues);
- HUD's Enforcement Center (suspension or debarment actions);
- Mortgagee Review Board;
- Office of Inspector General  (fraud or illegal activities are suspected); and
- State licensing agencies – eg. Secretary of State, Real Estate Commissioner, Appraisal Review Board, Department of Banking, Bar Association.

## Part B. Administrative Sanctions and MRB Actions

8-4     **Basics.** HUD may take an administrative action against individuals, companies and lenders for actions or omissions in connection with FHA mortgage insurance programs.

A.     ***Limited Denial of Participation (LDP).***  Serious, isolated, violations of FHA requirements may lead to an LDP of an individual or company (other than an approved mortgagee) by the Homeownership Center, Multifamily Hub or Center, or a Deputy Assistant Secretary.  The LDP precludes the party from participating in the HUD programs specified, within the jurisdiction of the HUD official taking the action, for up to one year (see 24 Code of Federal Regulations (CFR) Part 24).

B.     ***Debarment or Suspension.*** Violations of statutes or serious or repeated violations of FHA requirements may lead to a debarment or suspension of an individual, a company, or with approval of the MRB, a lender, by the Department's Enforcement Center or an Assistant Secretary.  These actions preclude the party from participating in most Federal domestic programs (see 24 CFR Part 24).

C.     ***Mortgagee Review Board (MRB) Action.*** The Department's Mortgagee Review Board (MRB) is authorized to impose civil money penalties on a mortgagee or other party, and to take administrative action against any approved mortgagee that does not comply with FHA requirements or the non-discrimination requirements of the *Equal Credit Opportunity Act*, the *Fair Housing Act*, or Executive Order 11063. The Department's regulations on the Mortgagee Review Board and civil money penalties are in 24 CFR Parts 25 and 30.

**4060.1 REV-2**

1.  ***Administrative Actions.*** The Board may issue a letter of reprimand, place a mortgagee on probation, suspend or withdraw a mortgagee's approval, or enter into a Settlement Agreement. The Board may also issue a cease and desist order where there is reasonable cause to believe that a mortgagee is violating, or has violated the Department's requirements. The nature and extent of the violations determines the type of administrative action that the Board may take.

2.  ***Civil Money Penalties.*** The Board is authorized to impose a civil money penalty of up to $6,500 per violation, per day of its continuance, against a party that knowingly and materially violates FHA program regulations or requirements. A civil money penalty may be imposed against a mortgagee in addition to any other administrative action taken by the Board.

## Part C. Credit Watch Termination Initiative

8-5     **Overview.** Credit Watch Termination Initiative holds single family mortgagees accountable for poorly performing loans that they originated or underwrote. This process is administered by the Quality Assurance Division (QAD) in FHA Headquarters (see 24 CFR 202.2 and 202.3(c)(2)).

A.  ***Review of Early Defaults and Claims.*** QAD compares the proportion of a mortgagee's loans that became 90 days delinquent early in their term to the proportion of early defaults and claims on all insured loans.

B.  ***Outcome.*** A mortgagee (or branch) with default and claim rates that are two or more times the average for a HUD Field Office jurisdiction may become ineligible to originate or underwrite further single family insured mortgages in that area.

C.  ***Process.*** Before any restriction takes effect, a mortgagee will have an opportunity to present its analysis of the early defaults and claims, and conclusions about its accountability to FHA officials in Washington, DC.

## Part D. Neighborhood Watch

8-6     **Overview:** The Neighborhood Watch Early Warning System is a web-based software application that displays loan performance data for single family mortgagees and appraisers, by loan types and geographic areas using FHA-insured single family loan information.

Origination loan information is displayed for a two-year period and is updated on a monthly basis. The default data includes current defaults, and defaults within

DA 22




Cited
As of: November 14, 2012 3:25 PM EST

## Apex Mar. Co. v. OHM Enters.

United States District Court for the Southern District of New York

March 30, 2011, Decided; March 31, 2011, Filed

10 Civ. 8119 (SAS)

**Reporter:** 2011 U.S. Dist. LEXIS 35707; 2011 WL 1226377

APEX MARITIME CO., INC. d/b/a Apex Shipping Co. and APEX SHIPPING CO. (NYC), INC., Plaintiffs, - against - OHM ENTERPRISES, INC. d/b/a STARCO, STARCO INTERNATIONAL, STARCO FURNITURE, STARCO, VIMAL KUMAR AMIN, AND RAJEEV BEDI, Defendants.

**Notice:**

---

| Core Terms |
|---|

corporate veil, veil-piercing, fraudulent inducement, shipping

**Counsel:** [*1] For Plaintiffs: Nicholas E. Pantelopoulos, Esq., Jennifer Huang, Esq., KAPLAN, MASSAMILLO & ANDREWS, LLC, New York, New York.

For Defendants: Sanjay Chaubey, Esq., New York, New York.

**Judges:** Shira A. Scheindlin, U.S.D.J.

**Opinion by:** Shira A. Scheindlin

---

| Opinion |
|---|

## OPINION AND ORDER

### SHIRA A. SCHEINDLIN, U.S.D.J.:

### I. INTRODUCTION

APEX MARITIME CO. INC. d/b/a Apex Shipping Co. and APEX SHIPPING CO. (NYC), INC. (collectively, "Apex") bring this action to recover monies allegedly owed by defendants OHM ENTERPRISES, INC. d/b/a STARCO, STARCO INTERNATIONAL, STARCO FURNITURE, STARCO, Vimal Kumar Amin and Rajeev Bedi (collectively, "defendants") pursuant to an agreement under which defendants agreed to pay shipping charges relating to certain shipments of goods from ports in China and Vietnam to the United States.

2011 U.S. Dist. LEXIS 35707, *3

Apex brings an action for intentional misrepresentation/fraudulent inducement and a claim to pierce the corporate veil against Vimal Kumar Amin and Rajeev Bedi in their individual capacities. Amin and Bedi now move for judgment on the pleadings pursuant to *Rule 12(c) of the Federal Rules of Civil Procedure*, [1] For the reasons discussed below, Amin's and Bedi's motion is granted.

## II. BACKGROUND

During the course of 2010, Apex shipped various goods for defendants from ports in China and Vietnam to the United States. [2] Pursuant to their agreement, Apex allegedly advanced the shipping costs on behalf of the defendants. [3] After receiving checks issued by Amin and Bedi for the amounts allegedly owed, Apex released the goods into defendants' custody. [4] Defendants then issued a ″Stop Payment″ on the checks, which were returned to Apex unpaid. [5] Apex alleges that it is owed the shipping costs that it advanced on behalf of defendants as well as the costs of its shipping services. [6]

## III. APPLICABLE LAW

### A. Judgment on the Pleadings; Motion to Dismiss

Under *Rule 12(c) of the Federal Rules of Civil Procedure*, after the pleadings close but before the trial begins, a party may move for judgment on the pleadings provided that the motion is made early enough so as not to delay the trial.  **[*3]** [7] A party is entitled to judgment on the pleadings only if it is clear that no material issues of fact remain to be resolved and that it is entitled to judgment as a matter of law. [8]

″'The standard for addressing a *Rule 12(c)* motion for judgment on the pleadings is the same as that for a *Rule 12(b)(6)* motion to dismiss for failure to state a claim.'″ [9] In either instance, the court must accept as true the non-movant's allegations, along with the allegations in the movant's pleading that the non-movant has admitted, and must draw all reasonable inferences in the non-movant's favor. [10] The court need not accord ″[l]egal conclusions, deductions or opinions couched as factual allegations . . . a presumption of truthfulness.″ [11]

---

[1]   Amin and Bedi also mention Rule 21 as a ground  **[*2]** for dismissal. However, they have cited no authority for why such action would be appropriate. *See* Memorandum of Law of Defendants Vimal Kumar Amin, and Rajeev Bedi, in Support of Motion to Dismiss (″Def. Mem.″).

[2]   *See* Complaint (″Compl.″) ¶ 12.

[3]   *See id.* ¶¶ 13-14.

[4]   *See id.* ¶ 29.

[5]   *See id.*

[6]   *See id.* ¶¶ 13-14.

[7]   *See* Fed. R. Civ. P. 12(c).

[8]   *See Burns Int'l Sec. Servs. v. International Union, United Plant Guard Workers of Am.*, 47 F.3d 14, 16 (2d Cir. 1994); *Carballo ex rel. Cortes v. Apfel*, 34 F. Supp. 2d 208, 214 (S.D.N.Y. 1999).

[9]   *Wachovia Corp. v. Citigroup, Inc.*, 634 F. Supp. 2d 445, 450 (S.D.N.Y. 2009) (quoting *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 520 (2d Cir. 2006)).

[10]   *See id.*

[11]   *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) **[*4]** (quotation marks omitted).

2011 U.S. Dist. LEXIS 35707, *4

The allegations in a complaint must meet a standard of "plausibility." [12] A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that [plaintiff is entitled to relief]." [13] Plausibility "is not akin to a probability requirement;" rather plausibility requires "more than a sheer possibility . . . ." [14] Pleading a fact that is "merely consistent with a defendant's liability" does not satisfy the plausibility standard. [15]

The court "must limit itself to the facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." [16] A document is considered incorporated by reference if it is "in a pleading . . . adopted by reference elsewhere in the same pleading or in any other pleading . . . ." [17] A court may also consider a document not specifically incorporated by reference but on which the complaint heavily relies [*5] and which is integral to the complaint. [18]

## B. Intentional Misrepresentation/Fraudulent Inducement under *Rule 9(b)*

To state a claim for fraud in New York, plaintiff must allege "that the defendant knowingly made a false statement of material fact with the intent to induce the plaintiff's reliance, and also that the plaintiff did in fact rely on that false statement to its detriment." [19] Allegations of fraud are subject to the heightened pleading standards of *Rule 9(b)*, which state that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." [20] Although *Rule 9(b)* does not require plaintiffs to set forth their evidence in the complaint, the complaint must give particulars regarding "the fraudulent content of the speech, the time and place at which the statements were made, and the identity of individuals making the fraudulent statements." [21] Furthermore, "[w]here multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant [*6] of the nature of his alleged participation in the fraud." [22]

## C. Piercing the Corporate Veil[23]

Courts in this district have described determining the proper pleading standard for piercing the cor-

---

[12] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 564, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).

[13] *Ashcroft v. Iqbal*, 556 U.S. ___, __, 129 S.Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quotation marks omitted).

[14] *Id.* (quotation marks omitted).

[15] *Id.* (quotation marks omitted).

[16] *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).

[17] Fed. R. Civ. P. 10(c).

[18] *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

[19] *Lomaglio Assocs. Inc. v. LBK Marketing Corp.*, 876 F. Supp. 41, 44 (S.D.N.Y. 1995).

[20] Fed. R. Civ. P. 9(b).

[21] *Lomaglio*, 876 F. Supp. at 44.

[22] *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987).

[23] Generally, under New York's choice of law rules, the law of the state of the defendants' incorporation will be applied to piercing the corporate veil claims. *See Soviet Pan Am Travel Effort v. Travel Comm., Inc.*, 756 F. Supp. 126, 131 (S.D.N.Y. 1991). However, in the absence of countervailing public policy, the parties may choose which state's law to apply. *See William Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 137 (2d Cir. 1991); *see also Walter E. Heller & Co. v. Video Innovations, Inc.*, 730 F.2d 50, 52 (2d Cir. 1984). Here, because both parties have cited and relied exclusively on New York law, I will apply New York law to the claims for piercing the corporate veil.

porate veil as a "knotty question." [24] Piercing the corporate veil is a "narrow [*7] exception to the doctrine of limited liability for corporate entities, and . . . courts should permit veil-piercing only under 'extraordinary circumstances.'" [25] New York courts will pierce the corporate veil only "when the [corporate] form has been used to achieve fraud, or when the corporation has been so dominated by an individual or another corporation . . . that it primarily transacted the dominator's business rather than its own and can be called the other's alter ego." [26]

In New York, [*8] a party seeking to pierce the corporate veil must generally establish "that '(1) the owners [27] exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury.'" [28] "To avoid dismissal, a party... must come forward with factual allegations as to both elements of the veil-piercing claim." [29]

To the extent that a plaintiff's veil-piercing claim rests on allegations of fraud, the claim must adhere to the heightened pleading standard of _Rule 9(b)_. [30] However, because a veil-piercing claim can be established without proving fraud if [*9] the claimant can identify some non-fraudulent "wrong," "the heightened pleading standard does not apply to every veil-piercing allegation." [31] Instead, "[w]here the veil-piercing claims are not based on allegations of fraud, the liberal 'notice pleading' standard of _Rule 8(a)_ applies." [32] "[T]he liberal standards of _Rule 8(a)_ apply to those allegations premised on harm other than fraud and those components of fraud-based allegations that do not relate to fraud, such as dominance and control." [33]

"Nevertheless, [*10] '[p]urely conclusory allegations cannot suffice to state a claim based on veil-piercing or alter-ego liability, even under the liberal notice pleading standard.'" [34] A complaint that consists of purely conclusory allegations unsupported by factual assertions will not survive a

[24] _In re Currency Conversion Fee Antitrust Litig._, 265 F. Supp. 2d 385, 425 (S.D.N.Y. 2003); _Sofi Classic S.A. de C.V. v. Hurowitz_, 444 F. Supp. 2d 231, 240 (S.D.N.Y. 2006); _United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc._, 216 F. Supp. 2d 198, 222-23 (S.D.N.Y. 2002).

[25] _EED Holdings v. Palmer Johnson Acquisition Corp._, 228 F.R.D. 508, 512 (S.D.N.Y. 2005) (quoting _Murray v. Miner_, 74 F.3d 402, 404 (2d Cir. 1996)).

[26] _Gartner v. Snyder_, 607 F.2d 582, 586 (2d Cir. 1979). Accord _Passalacqua Builders_, 933 F.2d at 138 ("Liability therefore may be predicated either upon a showing of fraud or upon complete control by the dominating corporation that leads to a wrong against third parties.").

[27] A nonshareholder can be deemed an "equitable owner" for purposes of piercing the corporate veil if the individual exercises sufficient control over the corporation. _See, e.g._, _Freeman v. Complex Computing Co._, 119 F.3d 1044, 1051 (2d Cir. 1997) ("Equitable ownership has been recognized for veil-piercing purposes.").

[28] _Trust v. Kummerfeld_, 153 Fed. Appx. 761, 763 (2d Cir. 2005) (quoting _Matter of Joseph Morris v. New York State Dept. of Taxation & Fin._, 82 N.Y.2d 135, 141, 623 N.E.2d 1157, 603 N.Y.S.2d 807 (1993)).

[29] _EED Holdings_, 228 F.R.D. at 512.

[30] _See In re Currency Conversion_, 265 F. Supp. 2d at 425.

[31] _Id._

[32] _Id._

[33] _Sofi Classic_, 444 F. Supp. 2d at 241. Accord _EED Holdings_, 228 F.R.D. at 512 ("In this district, veil-piercing claims are generally subject to the pleading requirement imposed by Rule 8(a) . . . . However, where a veil-piercing claim is based on allegations of fraud, the heightened pleading standard of Rule 9(b) is the lens through which those allegation[s] must be examined.") (quoting _In re Currency Conversion_, 265 F. Supp. 2d at 425) (quotation marks omitted).

[34] _Aspace Commc'ns, Ltd. v. Burke_, 522 F. Supp. 2d 509, 521 (W.D.N.Y. 2007) (quoting _In re Currency Conversion_, 265 F. Supp. 2d at 426) (alteration in original).

2011 U.S. Dist. LEXIS 35707, *10

motion for judgment on the pleadings. [35]

## D. Amendments to Pleadings

"Rule 15(a) provides that, other than amendments as a matter of course, a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." [36] "[W]hether to permit a plaintiff to amend its pleadings is a matter committed to the Court's sound discretion." [37] However, the Supreme Court has explained that

> [i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the **[*11]** merits. In the absence of any apparent or declared reason — such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. — the leave sought should, as the rules require, be "freely given." [38]

Accordingly, '"[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead.'" [39]

## IV. DISCUSSION

## A. Intentional  [*12] Misrepresentation/Fraudulent Inducement Claim

Amin and Bedi seek dismissal of Apex's claim for intentional misrepresentation/fraudulent inducement partly on the ground that "it was plaintiff who has indulged in fraudulent inducement and presented the checks without consent of defendants." [40] A court must accept the non-movant's allegations as true; therefore, Amin's and Bedi's argument that any fraud committed was actually committed by plaintiff is irrelevant at this stage of the proceedings. [41]

Amin and Bedi also seek dismissal on the ground that an individual cannot be held personally liable for a contract that he executed in his capacity as an officer of a corporation. [42] However, this assertion is inaccurate since '"[o]fficers and directors of a corporation may be held liable for

---

[35]  See De Jesus v. Sears, Roebuck & Co., 87 F.3d 65, 70 (2d Cir. 1996) ("A complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6).") (quoting Palda v. General Dynamics Corp., 47 F.3d 872, 875 (7th Cir. 1995)).

[36]  Slayton v. American Express Co., 460 F.3d 215, 226 n.10 (2d Cir. 2006) (quotation marks and citation omitted).

[37]  McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007) (quotation marks and citation omitted).

[38]  Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962). Accord Jin v. Metropolitan Life Ins. Co., 310 F.3d 84, 101 (2d Cir. 2002).

[39]  Vacold LLC v. Cerami, No. 00 Civ. 4024, 2002 U.S. Dist. LEXIS 1895, 2002 WL 193157, at *6 (S.D.N.Y. Feb. 6, 2002) (quoting Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991)). Accord Hayden v. County of Nassau, 180 F.3d 42, 53 (2d Cir. 1999) ("When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint.").

[40]  Def. Mem. at 6.

[41]  See Wachovia, 634 F. Supp. 2d at 450.

[42]  See Def. Mem. at 7.

fraud if they participate in it or have actual knowledge of it.'" [43]

Nevertheless, under *Rule 9(b)*, a party alleging fraud against multiple defendants must "'plead with particularity  [*13] by setting forth separately the acts complained of by each defendant.'" [44] Apex's Complaint lumps all defendants -both corporate and individuals — together and alleges that "Defendants issued a 'Stop Payment'" and that "Defendants intended all along to issue the foregoing 'Stop Payment' orders to their bank so [Plaintiff] [45] would not be paid." [46] These allegations fail to specify what role each defendant played in the alleged fraud and which defendants in particular issued the "Stop Payments." Because Apex does not separately set forth the fraudulent acts perpetrated by Amin and Bedi, the Complaint fails to state a claim for fraud against them with the particularity required by *Rule 9(b)*. [47]

## B. Piercing the Corporate Veil

Amin and Bedi also seek dismissal of Apex's claim to pierce the corporate veil on the ground that Apex "merely alleged that defendant Amin and Bedi personally benefited . . . without any other allegations or theory as to how defendants Amin and Bedi benefited by any alleged breach of agreement by and between the parties." [48] Amin and Bedi appear to reference Apex's allegation that "Amin and Bedi have . . . exercise[d] complete dominion and control over OHM and/or STARCO, in disregard of the corporate form, and for Amin and/or Bedi's personal benefit." [49]

Plaintiffs have failed to adequately allege a claim for piercing the corporate veil. The only allegations in the Complaint that support plaintiff's alter ego theory are that Amin and Bedi have "engaged in a course of conduct so as to exercise complete dominion and control over OHM and/or STARCO... so as to commit a fraud or wrong against the Plaintiffs" and that Amin and  [*15] Bedi "ratified, accepted or otherwise approved OHM's and/or STARCO's breaches of contract and tortious conduct against Plaintiffs as set forth above." [50] Under the alter ego theory, claimants must plead domination and control of the corporate entity as well as a resulting fraud or wrong. [51] Although the domination and control prong of the alter ego theory need only comply with *Rule 8(a)*'s liberal pleading standard, conclusory statements are insufficient. [52] "The mere claim that the corporation was dominated by the defendants... without more, will not suffice to

---

[43]   *Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir. 1994) (quoting *People v. Apple Health & Sports Clubs, Ltd.*, 80 N.Y.2d 803, 807, 599 N.E.2d 683, 587 N.Y.S.2d 279 (1992)) (alteration in original).

[44]   *Sofi Classic*, 444 F. Supp. 2d at 248 (quoting *Ellison v. American Image Motor Co.*, 36 F. Supp. 2d 628, 641-42 (S.D.N.Y. 1999)).

[45]   Although Apex wrote "Defendant" it obviously meant to write "Plaintiff would not be paid." Compl. ¶ 29.

[46]   *Id.*

[47]   *See, e.g.*, *Amusement Indus., Inc. v. Stern*, ___ F. Supp. 2d ___, 2011 U.S. Dist. LEXIS 25154, No. 07 Civ. 11586, 2011 WL 867274 (S.D.N.Y. Mar. 11, 2011); *Natowitz v. Mehlman*, 542 F. Supp. 674, 676 (S.D.N.Y. 1982) ("When a plaintiff sues sixteen defendants, he or she has an obligation to  [*14] allege specifically the fraud perpetrated by each defendant. . . .The complaint is replete with vague accusations against 'the defendants' without reference to the specific parties or the specific acts.").

[48]   Def. Mem. at 6.

[49]   Compl. ¶ 35.

[50]   Compl. ¶¶ 35, 36.

[51]   *See* *Matter of Morris*, 82 N.Y.2d at 141.

[52]   *See, e.g.*, *De Jesus*, 87 F.3d at 70 (finding that plaintiffs failed to state a claim under *Rule 12(b)(6)* when the complaint asserted that the fraudulent actions taken by the subsidiary's employees  [*16] were "caused by, known to and ratified by" the parent corporation but the pleadings were devoid of any specific facts or circumstances supporting this allegation).

2011 U.S. Dist. LEXIS 35707, *16

support the equitable relief of piercing the corporate veil." [53] Here, the Complaint lacks any factual allegations supporting the conclusion that Amin and Bedi exercised domination and control over OHM or STARCO. "The unadorned invocation of dominion and control is simply not enough." [54] Apex's purely conclusory allegations fail even the liberal pleading standard of *Rule 8(a)*.

## C. Leave to Replead

Leave to replead is typically granted unless amendment would be futile. Here, Apex may be able to separately set forth the fraudulent acts perpetrated by Amin and Bedi. Apex may also be able to *specifically* allege that Amin and Bedi exercised complete domination and control over the defendant corporations and that such domination was used to commit a fraud or wrong against Apex. Because amendments to Apex's claims may not be futile, Apex may file an amended complaint within thirty (30) days of the date of this Order. If Apex fails to do so, the claims against Amin and Bedi will be dismissed with prejudice.

## V. CONCLUSION

For the reasons stated above, Amin's and Bedi's motion **[*17]** for judgment on the pleadings is granted pursuant to *Rule 12(c)*. The Clerk of the Court is directed to close this motion (docket # 14). A conference is scheduled for May 16, 2011, at 4:30 pm.

SO ORDERED:

/s/ Shira A. Scheindlin

Shira A. Scheindlin

U.S.D.J.

New York, New York

Dated: March 30, 2011

---

[53] *Damianos Realty Group, LLC v. Fracchia*, 35 A.D.3d 344, 344, 825 N.Y.S.2d 274 (2d Dep't 2006).

[54] *In re Currency Conversion*, 265 F. Supp. 2d at 426 (finding that a complaint fails the Rule 8(a) standard when plaintiffs failed to allege any facts to support their conclusion that the bank holding companies exercised dominance and control over its subsidiaries).





Cited
As of: November 14, 2012 3:10 PM EST

# Escalon v. World Group Secs, Inc.

United States District Court for the Northern District of Texas, Lubbock Division
November 14, 2008, Decided; November 14, 2008, Filed
Civil Action No. 5:07-CV-214-C

**Reporter:** 2008 U.S. Dist. LEXIS 107196; 2008 WL 5572823

BEN ESCALON and wife, MARIA ESCALON, Plaintiffs, v. WORLD GROUP SECURITIES, INC. and LANCE C. CANSINO, Defendants.

**Notice:**

---

| Core Terms |
| --- |

churning, summary judgment, investor, issue of fact, summary judgment motion, discovery, fraud claim, non-movant, repose, fiduciary duty, no evidence, predecessor, omissions, broker, mere continuation, accrues, breach of fiduciary duty, motion to exclude, inquiry notice, sophistication, diligence, successor, respondeat superior, limitations period, genuine issue, doctrine, scienter, misrepresentation, reckless, unsophisticated

---

| Case Summary |
| --- |

**Procedural Posture**

Plaintiff investors sued defendants, an investment broker and an investment management firm, in state court, asserting violations of *Tex. Rev. Civ. Stat. Ann. art. 581-33* and S.E.C. *Rule 10b-5*, *17 C.F.R. § 240.10b-5*, and the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j(b)*. Defendants removed the case and moved for summary judgment on grounds of limitations and no evidence. The parties each moved to strike certain evidence.

**Overview**

The investors placed their retirement funds with the investment management firm's predecessor-in-interest in the broker's control. The investments lost two thirds of their original value. Plaintiffs alleged that defendants engaged in excessive trading of their investments, which amounted to "churning" of their account. Inter alia, the court held that the churning claim could not stand on transactions occurring more than five years before their claim was filed. Defendants' evidence failed to show that plaintiffs were on inquiry notice of churning or consented to the trading as a matter of law and failed to address plaintiffs' degree of investor sophistication, so there was a fact issue as to whether plaintiffs had the capacity to consent to the broker's trading. Moreover, a fact issue existed as to when the applicable period of limitations began to run on the churning claim. Fact issues also existed as to whether the broker acted with intent to defraud or a reckless or willful disregard for plaintiffs' interests. As the fiduciary breach theory was premised on a finding of churning, unresolved fact issues necessarily existed as to the accrual of the breach as well.

## Outcome

The court granted the summary judgment motions as to the churning claims occurring before August 28, 2002 and the misrepresentation claims as to all defendants, as well the common law fraud as to the successor-in-interest. The court denied all remaining motions.

---

### LexisNexis® Headnotes

Civil Procedure > ... > Summary Judgments > Entitlement as Matter of Law > Appropriateness
Civil Procedure > ... > Summary Judgments > Entitlement as Matter of Law > Genuine Disputes
Civil Procedure > ... > Summary Judgments > Entitlement as Matter of Law > Legal Entitlement
Civil Procedure > ... > Summary Judgments > Entitlement as Matter of Law > Materiality of Facts

*HN1* Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, when viewed in the light most favorable to the non-moving party, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Civil Procedure > ... > Summary Judgments > Entitlement as Matter of Law > Genuine Disputes

*HN2* On a motion for summary judgment, a dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. In making its determination, the court must draw all justifiable inferences in favor of the non-moving party.

Civil Procedure > ... > Summary Judgments > Burdens of Proof > General Overview
Civil Procedure > ... > Summary Judgments > Burdens of Proof > Movant Persuasion & Proof
Civil Procedure > ... > Summary Judgments > Burdens of Proof > Nonmovant Persuasion & Proof
Civil Procedure > ... > Summary Judgments > Entitlement as Matter of Law > General Overview

*HN3* On a motion for summary judgment, once the moving party has initially shown that there is an absence of evidence to support the nonmoving party's case, the non-movant must come forward, after adequate time for discovery, with significant probative evidence showing a triable issue of fact. *Fed. R. Civ. P. 56(e)*.

Civil Procedure > ... > Summary Judgments > Burdens of Proof > General Overview
Civil Procedure > ... > Summary Judgments > Entitlement as Matter of Law > Genuine Disputes

*HN4* On a motion for summary judgment, conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation are not adequate substitutes for specific facts showing that there is a genuine issue for trial.

Civil Procedure > ... > Summary Judgments > Burdens of Proof > Nonmovant Persuasion & Proof
Civil Procedure > ... > Summary Judgments > Evidentiary Considerations > Scintilla Rule

*HN5* To defeat a properly supported motion for summary judgment, the non-movant must present more than a mere scintilla of evidence. Rather, the non-movant must present sufficient evidence upon which a jury could reasonably find in the non-movant's favor.

Civil Procedure > Judgments > Summary Judgments > Evidentiary Considerations
Civil Procedure > ... > Summary Judgments > Supporting Materials > General Overview
Civil Procedure > ... > Summary Judgments > Supporting Materials > Affidavits

*HN6* The pleadings are not summary judgment evidence. A nonmoving party must go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.

Civil Procedure > ... > Summary Judgments > Entitlement as Matter of Law > Need for Trial

*HN7* Absent a showing that there is a genuine issue for trial, a properly supported motion for summary judgment should be granted.

Securities Law > Blue Sky Laws > Blue Sky Fraud > Statute of Limitations
Securities Law > ... > Statute of Limitations > Initial Offerings > False Statements
Securities Law > ... > Exchanges & Market Actors > Broker-Dealer Practices > Churning

*HN8* *Tex. Rev. Civ. Stat. art. 581-33* and S.E.C. *Rule 10b-5*, *17 C.F.R. § 240.10b-5*, have similar rules governing their respective limitations and repose periods. Under art. 581-33, a claim for misrepresentation or omission must be made within three years after the discovery of the untruth or omission or the date after the discovery should have been made in the exercise of reasonable diligence. *Tex. Rev. Civ. Stat. art. 581-33(H)(2)*. Under *Rule 10b-5*, a claim must be filed within two years after the discovery of the violation. *28 U.S.C.S. § 1658(b)*. In any case, a claim must be filed no later than five years after the date of the violation in *Rule 10b-5*, or sale in article 581-33. Unlike the limitations periods, which do not run until after the discovery of the facts constituting a violation, the repose periods begin to run the moment the violation (or sale) occurs, regardless of the claimant's discovery. *28 U.S.C.S. § 1658*; *Tex. Rev. Civ. Stat. art. 581-33(H)(2)*.

Securities Law > Blue Sky Laws > Blue Sky Fraud > Statute of Limitations
Securities Law > ... > Statute of Limitations > Initial Offerings > False Statements
Securities Law > ... > Exchanges & Market Actors > Broker-Dealer Practices > Churning

*HN9* To determine if a churning claim is barred by repose periods, the court must first determine when the churning, if any, occurred. The United States Court of Appeals for the Fifth Circuit describes churning as "a unified offense" because there is no single transaction, or limited, identifiable group of trades, which can be said to constitute churning.

Securities Law > Blue Sky Laws > Blue Sky Fraud > Statute of Limitations
Securities Law > ... > Statute of Limitations > Initial Offerings > False Statements
Securities Law > ... > Exchanges & Market Actors > Broker-Dealer Practices > Churning

*HN11* There is authority interpreting "sale" under *Tex. Rev. Civ. Stat. art. 581-33H(2)(b)*'s 5-year repose period as "initial purchase," which would apparently bar a churning claim five years after Plaintiffs initially purchased the investment. Strictly applying this interpretation of sale to a churning claim not only reaches the inequitable result of giving potential violators a free pass to churn the accounts of unsuspecting investors five years after the investors placed their initial purchase, but also looks past the difficulty of defining when a churning claim accrues. To avoid this, the United States District Court for the Northern District of Texas, Lubbock Division finds that the Texas Legislature implied a different interpretation of sale under *Tex. Rev. Civ. Stat. art. 581-33(H)(2)(b)* for churning claims, and construes the repose periods applicable to a churning claim under article 581-33 and S.E.C. *Rule 10b-5*, *17 C.F.R. § 240.10b-5*, to be the same.

Securities Law > Blue Sky Laws > Blue Sky Fraud > Statute of Limitations
Securities Law > ... > Statute of Limitations > Initial Offerings > False Statements
Securities Law > ... > Exchanges & Market Actors > Broker-Dealer Practices > Churning

*HN10* The United States Court of Appeals for the Fifth Circuit has not allowed churning claims to stand on transactions occurring prior to the applicable limitations or repose cut-off date.

Governments > Legislation > Statute of Limitations > Time Limitations

2008 U.S. Dist. LEXIS 107196, *107196

Securities Law > Blue Sky Laws > Blue Sky Fraud > Statute of Limitations
Securities Law > ... > Statute of Limitations > Initial Offerings > False Statements

**HN14** Congress amended the limitations period for S.E.C. *Rule 10b-5*, *17 C.F.R. § 240.10b-5*, on July 30, 2002. Any claim commencing on or after this date not already barred by the former limitations period carries a 2-year statute of limitations period. *28 U.S.C.S. § 1658*.

Governments > Legislation > Statute of Limitations > Time Limitations
Governments > Legislation > Statute of Limitations > Tolling
Securities Law > Blue Sky Laws > Blue Sky Fraud > Statute of Limitations
Securities Law > ... > Statute of Limitations > Initial Offerings > False Statements

**HN15** The tolling provisions in *Tex. Rev. Civ. Stat. art. 581-33H* are similar, if not identical, to the tolling provisions applicable to S.E.C. *Rule 10b-5*, *17 C.F.R. § 240.10b-5*, and the United States District Court for the Northern District of Texas, Lubbock Division, will construe them to be the same.

Governments > Legislation > Statute of Limitations > Time Limitations
Securities Law > ... > Statute of Limitations > Initial Offerings > False Statements

**HN12** The controlling date for purposes of the running of statutes of limitations in a securities fraud case is when a purchaser of securities knew--or in the exercise of reasonable diligence, should have known--of the alleged wrongdoing. This standard is generally referred to as "inquiry notice," and it applies when a reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning.

Governments > Legislation > Statute of Limitations > Time Limitations
Securities Law > Blue Sky Laws > Blue Sky Fraud > Statute of Limitations
Securities Law > ... > Statute of Limitations > Initial Offerings > False Statements
Securities Law > ... > Exchanges & Market Actors > Broker-Dealer Practices > Churning

**HN13** To determine whether a plaintiff had inquiry notice of churning, courts consider the entirety of the transactions in question and the degree of investor sophistication. The issue of actual or constructive knowledge of churning is usually a fact-intensive inquiry typically appropriate for consideration by a jury.

Securities Law > Blue Sky Laws > Blue Sky Fraud > Elements of Proof
Securities Law > ... > Exchanges & Market Actors > Broker-Dealer Practices > Churning

**HN16** Courts emphasize the importance of investor sophistication in churning claims because, for the unsophisticated investor, churning is a claim which may be particularly difficult to detect. Courts explain that churning is conduct which is not common to the experience of the ordinary individual. Hence, facts that may constitute inquiry notice or consent for the sophisticated investor may not constitute inquiry notice or consent for the unsophisticated investor. Degree of sophistication of the investor is usually a fact issue.

Securities Law > Blue Sky Laws > Blue Sky Fraud > Elements of Proof
Securities Law > ... > Exchanges & Market Actors > Broker-Dealer Practices > Churning

**HN17** Churning occurs when securities brokers enter into transactions and manage a client's account in furtherance of their own interests and in disregard of their clients's interest. Churning is a manipulative or deceptive device that can result in a violation of securities law and common law fiduciary duties. A plaintiff establishes a churning claim by showing (1) the trading in the investor's account was excessive in light of the investment objectives; (2) the broker in question ex-

2008 U.S. Dist. LEXIS 107196, *107196

ercised control over the trading in the account; and (3) the broker acted with the intent to de-fraud or with willful and reckless disregard for the investor's interest.

Securities Law > Blue Sky Laws > Blue Sky Fraud > Elements of Proof

**HN18** Churning is a misrepresentation or omission under *Tex. Rev. Civ. Stat. art. 581-33A* be-cause it is trading inconsistent with the investor's stated objectives without the investors' knowl-edge or consent. A court will look to federal law for the claim's elements and construe them to be the same.

Securities Law > Blue Sky Laws > Blue Sky Fraud > Elements of Proof
Securities Law > ... > Exchanges & Market Actors > Broker-Dealer Practices > Churning

**HN19** To establish a churning claim, a plaintiff must show the defendant acted with scienter. How-ever, proof of churning does not require proof of a specific or invidious intent to defraud. The bur-den of proof is measured by the preponderance of the evidence standard. Instead, churning, in and of itself, may be a deceptive and manipulative device under § 10(b)1, the scienter required by § 10(b) being implicit in the nature of the conduct.

Securities Law > Blue Sky Laws > Blue Sky Fraud > Elements of Proof

**HN20** Although some Texas cases appear to hold, contrary to federal law, that the element of sci-enter is not required to find a violation of *Tex. Rev. Civ. Stat. art. 581-33*, this rule appears to be limited to a certain class of claims.

Securities Law > ... > Exchanges & Market Actors > Broker-Dealer Practices > Churning

**HN22** Damages for a churning claim under S.E.C. *Rule 10b-5*, *17 C.F.R. § 240.10b-5*, may be es-tablished by estimating the loss of the account caused by the excessive trading.

Securities Law > Blue Sky Laws > Blue Sky Fraud > Elements of Proof
Securities Law > ... > Exchanges & Market Actors > Broker-Dealer Practices > Churning

**HN21** Proof of commissions is unnecessary for establishing churning liability. Instead, the ele-ment of scienter may be implied from the excessiveness of the trades.

Business & Corporate Law > Agency Relationships > Fiduciaries > Fiduciary Duties
Securities Law > Investment Advisers > Advisers, Brokers & Dealers > General Overview
Torts > Intentional Torts > Breach of Fiduciary Duty > Elements

**HN23** To recover for breach of fiduciary duty under Texas law, a party must show the existence of a fiduciary duty, breach, causation and damages.

Business & Corporate Law > Agency Relationships > Fiduciaries > Fiduciary Duties
Securities Law > Blue Sky Laws > Blue Sky Fraud > Elements of Proof

**HN24** Under Texas law, whether a fiduciary duty exists between an investor and his securities bro-ker is a question of fact.

Business & Corporate Law > Agency Relationships > Fiduciaries > Fiduciary Duties
Securities Law > Blue Sky Laws > Blue Sky Fraud > Elements of Proof
Securities Law > ... > Exchanges & Market Actors > Broker-Dealer Practices > Churning

**HN25** Establishing a churning claim is generally sufficient to state a breach of fiduciary duty un-

der state law.

Business & Corporate Law > Agency Relationships > Fiduciaries > General Overview
Torts > Intentional Torts > Breach of Fiduciary Duty > General Overview

*HN26* Claims for breach of fiduciary duty must be filed within four years from the date the claim accrues. *Tex. Civ. Prac. Rem. Code § 16.004(a) (5)*.

Business & Corporate Law > ... > Duties & Liabilities > Negligent Acts of Agents > Liability of Principals
Securities Law > Criminal Offenses & RICO Actions > RICO Actions > Respondeat Superior
Securities Law > Civil Liability Considerations > Secondary Liability > Respondeat Superior
Torts > ... > Employers > Activities & Conditions > General Overview

*HN27* The United States Court of Appeals for the Fifth Circuit has determined that the common law liability doctrine of respondeat superior supplements the derivative liability provisions provided by the Securities Exchange Act of 1934. *Tex. Rev. Civ. Stat. art. 581-33F* contains a similar derivative liability provision, which the Texas courts interpret as comparable to the federal provision. Because most circuits have found that respondeat superior is viable under S.E.C. *Rule 10b-5*, *17 C.F.R. § 240.10b-5*, it is likely that Texas courts would interpret *Tex. Rev. Civ. Stat. art. 581-33* the same.

Business & Corporate Law > ... > Duties & Liabilities > Negligent Acts of Agents > Liability of Principals
Securities Law > Civil Liability Considerations > Secondary Liability > Respondeat Superior

*HN28* Generally, the doctrine of respondeat superior creates liability in a principal for the acts and omissions committed by the principal's agent if those acts and omissions were committed in furtherance of the principal's business and within the course and scope of the agent's employment.

Governments > Legislation > Statute of Limitations > Time Limitations
Securities Law > ... > Statute of Limitations > Initial Offerings > False Statements

*HN29* A private action under S.E.C. *Rule 10b-5*, *17 C.F.R. § 240.10b-5*, or *Tex. Rev. Civ. Stat. art. 581-33* may be brought no later than five years after such violation or sale has occurred. *28 U.S.C.S. § 1658*; *Tex. Rev. Civ. Stat. Ann. art. 581-33*.

Governments > Legislation > Statute of Limitations > Time Limitations
Torts > Business Torts > Fraud & Misrepresentation > General Overview

*HN30* Fraud claims under Texas law must be filed no later than four years after the day the cause of action accrues. *Tex. Civ. Prac. Rem. Code § 16.004 (a)(4)*. The discovery rule applies to fraud claims. Under this rule, the fraud claim does not accrue until the fraud is discovered or, in the exercise of reasonable diligence, should have been discovered.

Business & Corporate Law > Agency Relationships > Fiduciaries > General Overview
Securities Law > Investment Advisers > Advisers, Brokers & Dealers > General Overview
Torts > Intentional Torts > Breach of Fiduciary Duty > General Overview

*HN31* If a securities broker and his clients were in a fiduciary relationship, the law will hold the clients to a lesser standard of diligence in discovering any securities fraud.

Torts > Business Torts > Fraud & Misrepresentation > General Overview
Torts > ... > Fraud & Misrepresentation > Actual Fraud > Elements
Torts > ... > Fraud & Misrepresentation > Constructive Fraud > Elements

2008 U.S. Dist. LEXIS 107196, *107196

*HN32* Under Texas law, the elements for fraud are (1) that a material representation was made; (2) that it was false; (3) that when the speaker made it he knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by the party; (5) that the party acted in reliance upon it; (6) that he thereby suffered injury.

Mergers & Acquisitions Law > Liabilities & Rights of Successors > General Overview
Torts > Vicarious Liability > Corporations > Predecessor & Successor Corporations

*HN33* Under Texas law, the buying and selling corporations' purchase agreement's choice of law provision controls the applicability of successor liability doctrines.

Mergers & Acquisitions Law > Liabilities & Rights of Successors > Successor Liability Doctrine
Torts > Vicarious Liability > Corporations > Predecessor & Successor Corporations

*HN34* Under Florida law, a corporation that acquires the assets of another business entity does not assume the liabilities of the prior business as a matter of law. However, a successor corporation may be held liable for the liabilities of the predecessor corporation if the successor is a 'mere continuation' of the predecessor. Whether a succeeding corporation is a mere continuation of the predecessor corporation is usually a fact issue. A successor corporation is a mere continuation of the predecessor corporation if it is a reincarnation of the predecessor under a different name. The key is that there is a change in form, but not in substance. Florida courts find continuation when one corporation is absorbed by another, as evidenced by an identity of assets, location, management, personnel, and stockholders.

**Counsel:**  **[*1]** For Ben Escalon, Maria Escalon, Plaintiffs: James L Gorsuch, LEAD ATTORNEY, Law Office of James L Gorsuch, Lubbock, TX.

For World Group Securities Inc, Defendant: W Bruce Williams, LEAD ATTORNEY, David Wayne Lauritzen, Cotton Bledsoe Tighe & Dawson PC, Midland, TX.

For Lance C Cansino, Defendant: Amy C Welborn, LEAD ATTORNEY, Kelly Hart & Hallman LLP, Austin, TX.

**Judges:** SAM R. CUMMINGS, UNITED STATES DISTRICT JUDGE.

**Opinion by:** SAM R. CUMMINGS

---

| Opinion |
| --- |

**ORDER**

On this day the Court considered the following motions filed by Plaintiffs, Ben Escalon and wife, Maria Escalon ("Plaintiffs"), Defendant World Group Securities, Inc. ("World Group"), and Defendant Lance C. Cansino ("Cansino"):

**1. Defendant World Group's Motion to Exclude the Testimony and Opinions of Plaintiffs' Expert James Pinnell [# 40], filed September 15, 2008.**

The Court, after considering Defendant World Group's Motion, together with Plaintiffs' Response [# 51], filed October 3, 2008, is of the opinion that the Motion to Exclude Expert Testi-

2008 U.S. Dist. LEXIS 107196, *1

mony of James Pinnell should be **DENIED.**

**2. <u>Defendant Cansino's Motion to Exclude the Testimony and Opinions of Plaintiffs' Expert James Pinnell [# 43], filed September 15, 2008.</u>**

The Court, after considering Defendant Cansino's **[*2]** Motion, together with Plaintiffs' Response [# 51], filed October 3, 2008, is of the opinion that the Motion to Exclude Expert Testimony of James Pinnell should be **DENIED.**

**3. <u>Defendant Cansino's Motion for Summary Judgment [# 44], filed September 15, 2008.</u>**

The Court, after considering Defendant Cansino's Motion, together with Plaintiffs' Response [# 52], filed October 3, 2008, is of the opinion that Cansino's Motion for Summary Judgment should be **GRANTED** in part and **DENIED** in part.

**4. <u>Defendant World Group's Motion for Summary Judgment [# 41], filed September 15, 2008.</u>**

The Court, after considering Defendant World Group's Motion, together with Plaintiffs' Response [# 52], filed October 3, 2008, is of the opinion that World Group's Motion for Summary Judgment should be **GRANTED** in part and **DENIED** in part. [1]

**5. <u>Plaintiffs' Motion to Strike Affidavit of Jerome C. Vahl [# 50], filed October 3, 2008.</u>**

The Court, after considering Plaintiffs' Motion, together with Defendant World Group's Response [# 58], filed October 17, 2008, is of the opinion that the Motion to Strike should be **DENIED** as moot.

**I.**

**<u>BACKGROUND</u>**

Plaintiffs, Ben and Maria Escalon, live in Lubbock, Texas. During the summer of 2000, Plaintiffs were preparing for retirement and looking to invest in "safe" investments that could earn enough interest for Plaintiffs to withdraw a certain monthly sum without depreciating the principal. Plaintiffs met with Defendant Lance C. Cansino, an investment broker who at the time was a manager for nonparty World Marketing Alliance, to discuss various investment options **[*4]** that could meet their goals. After meeting with Cansino, Plaintiffs invested their retirement funds with World Marketing Alliance.

Unfortunately, Plaintiffs' investment strategy proved to be anything but safe. By the end of 2001, Plaintiffs' investment had lost about 50 percent of its original value. Plaintiffs contacted Cansino and Cansino encouraged Plaintiffs to hold on to their investments. In April of 2002, Defendant World Group Securities, Inc. purchased Plaintiffs' investments from World Marketing Alliance and Cansino moved over to World Group and continued managing Plaintiffs' account. The change in ownership did little to change the course of Plaintiffs' investments. Several years

---

[1]  The following replies made by the parties were not considered because they were filed without leave of Court: (1) Defendant World Group Securities, Inc.'s Reply to Plaintiffs' Response to Defendants' Motions for Summary Judgment [# 55], filed October 16, 2008; (2) Defendant World Group Securities, Inc.'s Reply in Support of its Motion to Exclude the Testimony and Opinions of Plaintiffs' **[*3]** Expert James Pinnell [# 57], filed October 16, 2008; and (3) Plaintiffs' Reply to Defendant's Response to Plaintiffs' Motion to Strike Expert Affidavit of Jerome C. Vahl [# 60], filed October 31, 2008. The undersigned judge does not permit the filing of reply briefs without leave of court. *See* Judge Specific Requirements for District Judge Sam R. Cummings, P II.B., available at <u>http://www.txnd.uscourts.gov/judges/</u> scummings_req.html.

later, Plaintiffs' investment had yet to recover and was continuing to lose value. Eventually, Plaintiffs felt forced to alter their original plans; Plaintiffs stopped withdrawing monthly sums and came out of retirement. By the end of 2007, Plaintiffs' investment had lost nearly two thirds of its original value and was about half the amount it would have been had Plaintiffs invested in and withdrawn their monthly amounts from a non interest-bearing checking account.

On August 28, 2007, Plaintiffs filed [*5] their Original Petition in the 72nd District Court of Lubbock County, Texas, asserting claims of securities fraud in violation of both Texas and federal law against Cansino and World Group (collectively "Defendants"). World Group filed its original answer on September 25, 2007, and removed the case to this Court on October 1, 2007, with Cansino's consent.

Plaintiffs' multiple claims for securities fraud arise from two basic acts or omissions allegedly committed by Defendants. First, Plaintiffs allege that Defendants engaged in excessive trading of Plaintiffs' investments. Plaintiffs allege that this excessive trading amounted to churning of their account in violation of state and federal securities law under the *Texas Revised Civil Statutes article 581-33* and *Rule 10b-5* of the Securities Exchange Act of 1934, *15 U.S.C. § 78j(b)*. Plaintiffs also allege that the churning breached common law fiduciary duties owed by Defendants. Second, Plaintiffs allege that Defendants misrepresented their intentions in managing Plaintiffs' retirement funds and the growth potential of Plaintiffs' investments during the parties' initial meetings in the summer of 2001. Plaintiffs allege that these misrepresentations [*6] amounted to common law fraud and violations of state and federal securities law under article *581-33* and *Rule 10b-5*.

Defendants move for summary judgment as to each of Plaintiffs' claims on grounds of limitations and no evidence. World Group moves for summary judgment asserting that there is no evidence or insufficient evidence to find World Group derivatively liable for the acts or omissions, if any, of Cansino. Defendants also move to exclude certain evidence that Plaintiffs relied upon in their Response to Defendants' motions for summary judgment. Likewise, Plaintiffs move to strike certain evidence supporting Defendants' motions for summary judgment. Because these motions potentially have bearing on how the Court will rule on Defendants' motions for summary judgment, Plaintiffs' Motion to Strike Affidavit of Jerome C. Vahl and Defendants' motions to exclude the testimony and opinions of Plaintiffs' expert James Pinnell will be considered along with Defendants' motions for summary judgment.

## II.

### STANDARD

*HN1* Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the light [*7] most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)* (internal quotations omitted). *HN2* A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id. at 248*. In making its determination, the court must draw all justifiable inferences in favor of the non-moving party. *Id. at 255*. *HN3* Once the moving party has initially shown "that there is an absence of evidence to support the nonmoving party's case," the non-movant must come forward, after adequate time for discovery, with significant probative evidence showing a triable issue of fact. *Fed. R. Civ. P. 56(e)*; *Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*;

2008 U.S. Dist. LEXIS 107196, *7

*State Farm Life Ins. Co. v. Gutterman,* 896 F.2d 116, 118 (5th Cir. 1990). *HN4* Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation are not adequate substitutes for specific facts showing that there is a genuine issue for trial. *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1428 (5th Cir. 1996) **[*8]** (en banc); *SEC v. Recile,* 10 F.3d 1093, 1097 (5th Cir. 1993).

*HN5* To defeat a properly supported motion for summary judgment, the non-movant must present more than a mere scintilla of evidence. *See Anderson,* 477 U.S. at 251. Rather, the non-movant must present sufficient evidence upon which a jury could reasonably find in the non-movant's favor. *Id.HN6* The pleadings are not summary judgment evidence. *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994). The nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Giles v. General Elec. Co.,* 245 F.3d 474, 493 (5th Cir. 2001) (quoting *Celotex,* 477 U.S. at 324). *HN7* Absent a showing that there is a genuine issue for trial, a properly supported motion for summary judgment should be granted. *See Eversley v. MBank Dallas,* 843 F.2d 172, 173-74 (5th Cir. 1988); *Resolution Trust Corp. v. Starkey,* 41 F.3d 1018, 1022-23 (5th Cir. 1995).

**III.**

## DISCUSSION

### A. Defendants' Motion for Summary Judgment: Excessive Trading

### 1. Limitations: Churning

Defendants move for summary judgment on Plaintiffs' **[*9]** churning claim under article *581-33* and *Rule 10b-5* asserting that the claim is barred by the statutes' applicable limitations or repose periods. *HN8* Article *581-33* and *10b-5* have similar rules governing their respective limitations and repose periods. Under article *581-33*, a claim for misrepresentation or omission must be made within three years after the discovery of the untruth or omission or the date after the discovery should have been made in the exercise of reasonable diligence. *Tex. Rev. Civ. Stat. art. 581 -33(H)(2).* Under *10b-5*, a claim must be filed within two years after the discovery of the violation. *28 U.S.C. § 1658(b).* In any case, a claim must be filed no later than five years after the date of the violation in *10b-5* or sale in article *581-33*. Unlike the limitations periods, which do not run until after the discovery of the facts constituting a violation, the repose periods begin to run the moment the violation (or sale) occurs, regardless of the claimant's discovery. *28 U.S.C. § 1658*; *Tex. Rev. Civ. Stat. art. 581-33(H)(2); see Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 363, 111 S. Ct. 2773, 115 L. Ed. 2d 321 (1991); *Topalian v. Ehrman,* 954 F.2d 1125, 1135 (5th Cir. 1992).

Plaintiffs **[*10]** present evidence that Cansino may have begun engaging in excessive trading as early as 2001. (Pls.' App. 5.) *HN9* To determine if Plaintiffs' churning claim is barred by the applicable repose periods, the Court must first determine when the churning, if any, occurred. [2] The Fifth Circuit describes churning as "a unified offense" because "there is no single transaction,

---

[2]   *HN11* There is authority interpreting "sale" under article 581-33H(2)(b)'s 5-year repose period as "initial purchase," which would apparently bar Plaintiffs' churning claim five years after Plaintiffs initially purchased the investment with World Marketing Alliance in the summer of 2000. *See, e.g, Hanley v. First Investors Corp.,* 793 F. Supp. 719, 721 (E.D. Tex. 1992). Strictly applying this interpretation of sale to a churning claim not only reaches the inequitable result of giving potential violators a free pass to churn the accounts of unsuspecting investors five years after the investors placed their initial purchase, but also looks past the difficulty of defining when a churning claim accrues. To avoid this, the Court finds that the **[*12]** Texas Legislature im-

or limited, identifiable group of trades, which can be said to constitute churning." *Romano v. Merrill Lynch, Pierce, Fenner & Smith,* 834 F.2d 523, 526 n.1, 528 (5th Cir. 1987) (citing *Miley,* 637 F.2d at 327). Plaintiffs argue that because churning is a unified offense, their churning claim could not accrue until the last trade took place in 2007. *See Nesbit v. McNeil,* 896 F.2d 380, 384 (9th Cir. 1990). Hence, any transaction that took place in 2001 forms part of Plaintiffs' churning claim that accrued sometime in 2007 and is not barred by the periods of limitations or repose. The Court disagrees. **HN10** The Fifth Circuit has not allowed churning claims to stand on transactions occurring prior to the applicable limitations or repose cut-off date. *See, e.g., Romano v. Merrill Lynch, Pierce, Fenner & Smith,* 834 F.2d 523, 526, 528-29 (5th Cir. 1985) [*11] (affirming the district court in dismissing a churning claim to the extent it was based upon transactions occurring prior to the limitations cut-off date). Thus, Plaintiffs' churning claim cannot stand on transactions occurring more than five years prior to the filing of their claim, or August 28, 2002. To the extent Plaintiffs' churning claim relies on transactions occurring prior to this date, Plaintiffs' claim is barred by the applicable statute of repose.

This does not complete the Court's inquiry because Plaintiffs present evidence of trading that occurred after August 28, 2002. (Pls.' App. 5-6.) Defendants argue that Plaintiffs' churning claim is barred by the 2-year limitations period under *10b-5* and the 3-year limitations period under article *581-33* to the extent the churning claim stands upon transactions occurring two or three years prior to Plaintiffs' date of filing. *28 U.S.C. § 1658(a);* [3]*Tex. Rev. Civ. Stat. Ann. art. 581-33H.* [4]**HN12** "The controlling date for purposes of the running of the respective statutes of limitations is when a purchaser of securities knew--or in the exercise of reasonable diligence, should have known--of the alleged wrongdoing." *Sudo Props., Inc. v. Terrebonne Parish Consol. Gov't,* 503 F.3d 371, 376 (5th Cir. 2007) (quoting *Topalian v. Ehrman,* 954 F.2d 1125, 1133 (5th Cir.1992)); *see also Tex. Rev. Civ. Stat. Ann. art. 581-33H(2)(a).* "This standard is generally referred to as 'inquiry notice,' [*13] and it applies 'when a reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning.'" *Sudo Props., Inc.,* 503 F.3d at 376 (quoting *DeBenedictis v. Merrill Lynch & Co., Inc.,* 492 F.3d 209, 216 (3d Cir. 2007)). **HN13** To determine whether a plaintiff had inquiry notice of churning, courts consider the entirety of the transactions in question and the degree of investor sophistication. *Romano v. Merrill Lynch, Pierce, Fenner & Smith,* 834 F.2d 523, 528-529 (5th Cir. 1985). The issue of actual or constructive knowledge of churning is usually a "'fact-intensive inquiry' . . . 'typically appropriate for consideration by a jury.'" *Sudo Props., Inc.,* 503 F.3d at 376 (quoting *Margolies v. Deason,* 464 F.3d 547, 553 (5th Cir.2006)). Defendants argue that Plaintiffs effectively consented to the trades, showing that Plaintiffs knew of and were concerned about their investment's poor performance (Defs.' App. Ex. A, 15, 18-19, 160:7-11, 190), that all trades occurred within Plaintiffs' knowledge (Defs.' App. A 62-65), and that Plaintiffs were uninterested in the specifics of the transactions, but expected Cansino to use his best judgment to maintain

---

plied a different interpretation of sale under article 581-33(H)(2)(b) for churning claims, and construes the repose periods applicable to a churning claim under article 581-33 and 10b-5 to be the same.

[3]   Defendants suggest that the former limitations period of one year may apply to Plaintiffs' churning claim under 10b-5. **HN14** Congress amended the limitations period for 10b-5 on July 30, 2002. Any claim commencing on or after this date not already barred by the former limitations period carries a 2-year statute of limitations period. Because Plaintiffs' churning claim can only be based on transactions occurring on or after August 28, 2002, this claim is under the 2-year limitations period. *See* 28 U.S.C. § 1658.

[4]   The Court found little if any authority applying a churning claim to the tolling provisions under Texas Securities Law article 581-33H. Although the parties do not dispute otherwise, the Court finds that **HN15** the tolling provisions in article 581-33H are similar, if not identical, to the tolling provisions applicable to Rule 10b-5 and will construe them to be the same.

[*14] or grow the principal (Defs.' App. Ex. A 65). [5]

The Court finds [*15] that Defendants' evidence is insufficient to show that Plaintiffs' were on inquiry notice of churning or consented to the trading as a matter of law. Defendants' evidence fails to address Plaintiffs' degree of investor sophistication. *HN16* Courts emphasize the importance of investor sophistication because, for the unsophisticated investor, churning is a claim which "may be particularly difficult to detect." *Romano, 834 F.2d at 528.* Courts explain that "churning is conduct which is not common to the experience of the ordinary individual." *Id.* (quoting *Dzenits v. Merrill Lynch, Pierce, Fenner, & Smith, Inc., 494 F.2d 168, 172 (10th Cir. 1974)).* Hence, facts that may constitute inquiry notice or consent for the sophisticated investor may not constitute inquiry notice or consent for the unsophisticated investor. *See id. at 528-29.* Degree of sophistication of the investor is usually a fact issue. *Dzenits, 494 F.2d at 172.* Summary judgment evidence shows that Plaintiffs may have been unsophisticated investors relying upon Cansino's expertise to manage their investment. (Pls.' App. 69 [237:1-23], 132 [134:5-17].) This raises a fact issue on whether Plaintiffs had the capacity to consent to Cansino's [*16] trading. Hence, the Court is not convinced that Defendants' evidence meets their "heavy burden" of showing that Plaintiffs were on inquiry notice of churning as a matter of law because they had knowledge of the trades. *See* *Luke v. Lincoln Nat'l Life Ins. Co., No. Civ.A. 5:03-CV-256, 2006 U.S. Dist. LEXIS 35445, 2006 WL 297761, at * 4 (E.D. Tex. Feb. 8, 2006)* (unpublished) (citing *Phillips v. Kidder, Peabody & Co., 782 F. Supp. 854, 859 (S.D.N.Y. 1991)).* The Court finds that a fact issue exists as to when the applicable period of limitations began to run on Plaintiffs' churning claim.

### 2. No Evidence: Churning

In the alternative, Defendants argue that summary judgment is appropriate because Plaintiffs can show no evidence to support any of the elements of their churning claim under article *581-33* or *10b-5*. *HN17* Churning occurs when securities brokers enter into transactions and manage a client's account in furtherance of their own interests and in disregard of their clients's interest. *See, e.g., Miley v. Oppenheimer & Co., 637 F.2d 318, 324 (5th Cir. 1981)* (en banc), *abrogated on other grounds by Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 105 S. Ct. 1238, 84 L. Ed. 2d 158 (1985).* [6] Churning is a manipulative or deceptive device that can result in [*17] a violation of securities law and common law fiduciary duties. *Id.* A plaintiff establishes a churning claim by showing (1) the trading in the investor's account was excessive in light of the investment objectives; (2) the broker in question exercised control over the trading in the account; and (3) the broker acted with the intent to defraud or with willful and reckless disregard for the investor's interest. *Romano v. Merrill Lynch, Pierce, Fenner & Smith, 834 F.2d 523, 529 (5th Cir. 1985)* (citing *Miley, 637 F.2d at 324)).*

---

[5]   Although Defendants did not directly address the issue of inquiry notice with respect to the churning claim, the Court construed Defendants' evidence addressing inquiry notice of Cansino's misrepresentations as equally applicable to Plaintiffs' churning claim.

[6]   The Court found little if any authority applying the elements of a churning claim to article *581-33*. Although the parties do not dispute otherwise, the Court finds that *HN18* churning is a misrepresentation or omission under *581-33A* because it is trading inconsistent with the investor's stated objectives without the investors' knowledge or consent. The Court will look to federal law for the claim's elements and construe them to be the same. *See, e.g., Prudential Securities Inc. v. Shoemaker, 981 S.W.2d 791, 792 & n.1, 793-94 n.6 (Tex. App.--Houston [1st Dist.] 1998, no pet.)* (affirming an arbitration panel's award of punitive damages for a securities fraud claim under [*18] article *581-33* and *10b-5* on other grounds, but implicitly approving the arbitration panel's citation to *Miley* in interpreting whether punitive damages were appropriate under article *581-33* and *10b-5); Hall Dadeland Towers Assocs. v. Hardeman, 736 F. Supp. 1422, 1432-33 (N.D. Tex. 1990)* (applying the federal Securities Exchange Act *Rule 10b-5* language of "device, scheme or artifice to defraud" and "operate as a fraud or deceit" to "misrepresentation or omission" under Texas Securities Law article *581-33)*.

2008 U.S. Dist. LEXIS 107196, *18

As for the first two elements, Plaintiffs show they had a conservative investment strategy aimed at capital preservation and long-term growth. (Pls.' App. 4.) Instead of investing in low-risk accounts, Defendants invested in high-risk index funds and engaged in multiple trades, which may have been excessive in light of the Plaintiff's goals. (Pls.' App. 4-5.) Although Defendants argue that Plaintiffs exercised control over the funds, the evidence also supports the contrary, that Plaintiffs gave Cansino control over the details of handling their account. (Defs.' App. Ex. C 122 [102:23-103:21].) The Court finds that facts issues exist as to the first two elements.

Defendants also challenge  [*19] the third element of scienter. *HN19* To establish a churning claim, a plaintiff must show the defendant acted with scienter. [7] *See Dupuy v. Dupuy,* 551 F.2d 1005, 1014 (5th Cir. 1977). However, "proof of churning does not require proof of a specific or invidious intent to defraud." *See Dzenits v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 494 F.2d 168, 171 n.4 (10th Cir. 1974) (finding that the burden of proof is "measured by the 'preponderance of the evidence' standard"). Instead, "[c]hurning, in and of itself, may be a deceptive and manipulative device under section 10(b), the scienter required by section 10(b) being implicit in the nature of the conduct." *Armstrong v. McAlpin,* 699 F.2d 79, 91 (2d Cir. 1983).

Defendants argue that there is no evidence of scienter because Cansino received no commissions for the trades. [8] (Defs.' Ex. C 54:5-58:9.) Despite not receiving commissions, Cansino may still be liable for churning because *HN21* "proof of commissions is unnecessary for establishing churning liability." *Ruiz v. Charles Schwab & Co., Inc.,* 736 F. Supp. 461, 463 (S.D. N.Y. 1990); *see Miley v. Oppenheimer & Co.,* 637 F.2d 318, 326 (5th Cir. 1981) (en banc). Instead, the element of scienter may be implied from the excessiveness of the trades. *See Arceneaux v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 767 F.2d 1498, 1502 (11th Cir. 1985) ("With regard to the third element of churning . . . plaintiffs' expert also testified that the velocity of trading in plaintiffs' account made no sense, other than to generate commissions. . . . which was sufficient evidence . . . ."). Defendants also show that Cansino informed Plaintiffs of the trades (Defs.' Ex. A 17 [62:23-25]), and "did the best he [the broker] could" to maintain the retirement account in light of Plaintiffs' goals. (Defs.' Ex. F  [*21] 157 [60:4-9]). Plaintiffs present evidence that tends to establish that Cansino's trading was excessive or reckless in light of Plaintiffs' goals. (Pls.' App. 5-6.) The accounts' poor performance over the 7-year period compared to the average market's performance suggests that Cansino did not act with Plaintiffs' interests in mind. (Pls.' App. 5-6.) Viewing the evidence in a light most favorable to Plaintiffs, Plaintiffs' evidence is sufficient to raise a fact issue on whether Cansino acted with intent to defraud or a reckless or willful disregard for Plaintiffs' interests.

### 3. Breach of Fiduciary Duty

Defendants also move for summary judgment on Plaintiffs' breach of fiduciary duty claim. Plain-

---

[7]  *HN20* Although some Texas cases appear to hold, contrary to federal law, that the element of scienter is not required to find a violation of article 581-33, this rule appears to be limited to a certain class of claims. *Compare Busse v. Pac. Cattle Feeding Fund No. 1, Ltd.,* 896 S.W.2d 807 (Tex. App.--Texarkana 1995, writ denied) (holding no scienter required to prove broker sold unregistered security in violation of article 581-33) *with Hendricks v. Thornton,* 973 S.W.2d 348, 357, 359 (Tex. App.--Beaumont 1998, pet. denied) [*20] (holding evidence of scienter required to prove fraudulent misrepresentation in violation of article 581-33).

[8]  Defendants also argue that because Cansino generated no commissions in making the trades, Plaintiffs can present no evidence on damages on their churning claim, citing *TIG Specialty Insurance Co. v. Pink Monkey.com, Inc.,* 375 F.3d 365, 370 (5th Cir. 2004) and *Nash v. J. Arthur Warner & Co.,* 137 F. Supp. 615 (D.C. Mass 1955). This argument is not persuasive. *Pink Monkey.com* interprets a separate cause of action under the Texas Business and Commerce Code, not a churning claim under 10b-5. *See id. HN22* Damages for a churning claim under 10b-5 may be established by estimating the loss of the account caused by the excessive [*22] trading. *Miley v. Oppenheimer & Co.,* 637 F.2d 318, 326, 328 (5th Cir. 1981) (en banc); *see also Police Retirement Sys. of St. Louis v. Midwest Inv. Advisory Servs., Inc.,* 706 F. Supp. 708, 716-17 (E.D. Mo. 1989). Plaintiffs present evidence of damages. (*See* Pls.' App. 6.) Defendants' citation to *Nash* is also misplaced. Unlike here, the court in *Nash* determined that the plaintiffs were sophisticated investors and had capacity to understand and approve the trades. 137 F. Supp. at 617-18.

2008 U.S. Dist. LEXIS 107196, *21

tiffs claim that Defendants breached fiduciary duties by churning Plaintiffs' investment. *HN23* To recover for breach of fiduciary duty under Texas law, a party must show the existence of a fiduciary duty, breach, causation and damages. *Abetter Trucking Co. v. Arizpe,* 113 S.W.3d 503, 508 (Tex. App.--Houston [1st Dist.] 2003, no pet.). Defendants first argue that Cansino did not owe a fiduciary duty to the Plaintiffs as a matter of law. Summary judgment cannot be granted on this ground because *HN24* under Texas law, whether a fiduciary duty exists between an investor and his broker is a question **[*23]** of fact. *See id.; W. Reserve Life Assur. Co. of Ohio v. Graben,* 233 S.W.3d 360, 373-74 (Tex. App.--Fort Worth 2007, no pet. h.) (citing *Romano v. Merrill Lynch, Pierce, Fenner & Smith,* 834 F.2d 523 (5th Cir. 1987)). Defendants also argue that there is no evidence to support Plaintiffs' claim. Again, the Court disagrees. On the issue of duty, both parties cite conflicting evidence sufficient to raise issues of fact on whether a fiduciary relationship existed between the parties. (*Compare* Pls.' App. 8 *with* Defs.' App. Ex. C 136 [157:10 -16]). As for the remaining elements, Plaintiffs' claim for breach is premised upon a finding that Cansino churned Plaintiffs' investments. *HN25* Establishing a churning claim is generally sufficient to state a breach of fiduciary duty under state law. *See Miley v. Oppenheimer & Co.,* 637 F.2d 318, 324 (5th Cir. 1981) (en banc), *abrogated on other grounds by Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 105 S. Ct. 1238, 84 L. Ed. 2d 158 (1985). However, whether Defendants' actions constitute churning or caused damages are yet unresolved fact issues.

Defendants also raise a limitations issue. *HN26* Claims for breach of fiduciary duty must be filed within four years from the date the claim accrues. *Tex. Civ. Prac. Rem. Code § 16.004(a) (5).* **[*24]** Again, Plaintiffs' theory for breach is premised upon a finding of churning. Hence, the breach of the fiduciary duty, if any, accrued simultaneously with the accrual of the churning claim. Because unresolved fact issues exist as to the accrual of the churning claim, unresolved fact issues necessarily exist as to the accrual of Plaintiffs' breach of fiduciary claim. Summary judgment is not proper to this claim.

### 4. No Evidence: World Group's Derivative Liability

World Group moves for summary judgment claiming it is not liable for any churning that may have been committed by Cansino. Plaintiffs respond by asserting that World Group may be held liable under article *581-33, 10b-5,* and state law under the common law doctrine of respondeat superior. [9] Defendants challenge that there is no evidence to support such a finding.

*HN27* The Fifth Circuit has determined that the common law liability doctrine of respondeat superior supplements the derivative liability provisions provided by the Securities Exchange Act of 1934. *Paul F. Newton & Co. v. Tex. Commerce Bank,* 630 F.2d 1111, 1118 (5th Cir. 1980); **[*25]** *but compare Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 200 n.12, 114 S. Ct. 1439, 128 L. Ed. 2d 119 (1994) (Stevens, J., dissenting) (noting the majority opinion potentially undermines incorporation of common law liability doctrines, such as respondeat superior, into private causes of action under *10b-5*), *with Southland Sec. Corp. v. IN-Spire Ins. Solutions, Inc.,* 365 F.3d 353, 366 n.9 (5th Cir. 2004) (implicitly recognizing the continuing viability of the holding in *Paul F. Newton*). Article *581-33F* contains a similar derivative liability provision, which the Texas courts interpret as comparable to the federal provision. *Busse v. Pac. Cattle Feeding Fund No. 1, Ltd.,* 896 S.W.2d 807, 815 (Tex. App.--Texarkana 1995, writ den.) (holding the term "control person" under *581-33* is "used in the same broad sense as in the federal statutes" in *15 U.S.C. § 78t*); *see, e.g., Lane Hartman Ltd. v. P.R.O. Missions, Inc.,* No. Civ.A.3:95-CV-0869-P, 1997 U.S. Dist. LEXIS 23068, 1997 WL 457512, at *4-5 (N.D.

---

[9]   Neither Plaintiffs nor Defendants address whether World Group may be held liable as a "control person" under article *581-33F* or *15 U.S.C. § 78t*.

*Tex. Aug. 5, 1997*) (unpublished) (applying federal law to whether a person was vicariously liable under *581-33F*); *Frank v. Bear, Stearns & Co.,* 11 S.W.3d 380, 384 (Tex. App.--Houston [14th Dist.] 2000, no pet.) (applying **[\*26]** the same test under federal law to determine whether a defendant should be held vicariously liable under article *581-33*). Because most circuits have found that respondeat superior is viable under *10b-5*, [10] it is likely that Texas courts would interpret article *581-33* the same.

*HN28* Generally, the doctrine of respondeat superior creates liability in a principal for the acts and omissions committed by the principal's agent if those acts and omissions were committed in furtherance of the principal's business and within the course and scope of the agent's employment. Plaintiffs present evidence that World Group exercised some degree of oversight and control over Cansino's trading. (*See* Pls.' App. 110-11, 118, 224). Plaintiffs raise sufficient evidence to create a fact issue **[\*27]** on whether World Group is vicariously liable for the acts or omissions of Cansino and summary judgment is not appropriate on these grounds. [11]

### B. Defendants' Motions for Summary Judgment: Fraud

#### 1. Limitations: Article *581-33* & *Rule 10b-5*

Defendants also move for summary judgment on Plaintiffs' fraud claims under article *581-33* and *10b-5* asserting that the claim is barred by the statutes' applicable repose periods. As previously discussed, *HN29* a private action under *10b-5* or article *581-33* may be brought no later than five years after such violation or sale has occurred. *28 U.S.C. § 1658*; *Tex. Rev. Civ. Stat. Ann. art. 581-33*. Plaintiffs admit that the only statements complained of were made during the Summer of 2000 [12] (Pl's. App. 61 [207:1-23]); (Defs.' App. Ex. A 12 [42:11-43:5]), **[\*28]** but Plaintiffs did not file their claim until August 28, 2007, more than five years after the time the alleged violation occurred. Therefore, any cause of action based on these statements is barred by both the Texas and federal repose periods. Summary judgement is proper as to these statutory claims.

#### 2. Limitations: Common Law Fraud

Defendants also argue that Plaintiffs' common law fraud claim is barred by the applicable limitations period. *HN30* Fraud claims under Texas law must be filed no later than four years after the day the cause of action accrues. *Tex. Civ. Prac. Rem. Code § 16.004 (a)(4)*. The discovery rule applies to fraud claims. Under this rule, the fraud claim does not accrue until the fraud is discovered or, in the exercise of reasonable diligence, should have been discovered. *Ruebeck v. Hunt,* 142 Tex. 167, 176 S.W.2d 738, 739 (1943).

As previously discussed, Plaintiffs' fraud **[\*29]** claim arises from statements made by Cansino during the summer of 2000. Although the cause of action was not filed until seven years later, fact is-

---

[10]   *See In re Villa,* 261 F.3d 1148, 1152 (11th Cir. 2001); *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564 (9th Cir. 1990); *Commerford v. Olson,* 794 F.2d 1319, 1322 (8th Cir. 1986); *In re Atlantic Fin. Mgmt., Inc.,* 784 F.2d 29, 32 (1st Cir. 1986); *Henricksen v. Henricksen,* 640 F.2d 880, 887 (7th Cir . 1981); *Marbury Mgmt., Inc. v. Kohn,* 629 F.2d 705, 712-13 (2d Cir. 1980); *Holloway v. Howerdd,* 536 F.2d 690, 695 (6th Cir. 1976).

[11]   World Group asserts that as a successor corporation World Group cannot be held liable for the acts or omissions committed by its predecessor corporation, World Marketing Alliance. With respect to Plaintiffs' churning claim, this argument is moot. The Court has determined that Plaintiffs' churning claim is limited to transactions that occurred after World Group purchased Plaintiffs' investment account in April of 2002.

[12]   Although Plaintiffs assert that Defendants continued to make misrepresentations after the summer of 2000 (Pls.' App. 61 [207:3 -8]), Plaintiffs indicate that these misrepresentations do not refer to new false or misleading statements but the alleged churning by Defendants. (Pls.' App. 61[207:11-12, 21-23].)

sues exist as to when the cause of action accrued because a fact issue exists as to when, in the exercise of reasonable diligence, Plaintiffs should have discovered the fraud. The Court has already determined that a fact issue exists as to whether Cansino owed a fiduciary duty to Plaintiffs. *HN31* If Cansino and Plaintiffs were in a fiduciary relationship, the law will hold Plaintiffs to a lesser standard of diligence in discovering the fraud. *See, e.g., Pace v. McEwen,* 574 S.W.2d 792, 797 (Civ. App.--El Paso 1978, writ ref. n.r.e.). After Plaintiffs' investments began to decline, Plaintiffs show evidence that they relied upon Cansino's assurances to keep their money with Cansino. (Pls.' App. 8.) Viewing the evidence in a light most favorable to Plaintiffs, Cansino's assurances may have delayed Plaintiffs' discovery of Defendants' misrepresentations. The Court finds that fact issues exist as to the running of the limitations period.

### 3. No Evidence: Common Law Fraud

Defendants also assert that Plaintiffs have no evidence to support their fraud claim. **[*30]** *HN32* Under Texas law, the elements for fraud are "(1) that a material representation was made; (2) that it was false; (3) that when the speaker made it he knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by the party; (5) that the party acted in reliance upon it; (6) that he thereby suffered injury." *Stone v. Lawyers Title Ins. Corp.,* 554 S.W.2d 183, 185 (Tex. 1977).

Plaintiffs allege that Cansino misrepresented his intentions in how he would manage their investment. Plaintiffs present issues of fact on each of the prima facie elements. Plaintiffs allege that Cansino made statements indicating that Plaintiffs' money would be invested in "safe" stock and held for a long time. (Pls.' App. 8, 114 [64:1-8], 115 [68:13-16].) Cansino did not indicate how often he planned to trade Plaintiffs' investments. (Defs.' App. 122 [101:1-3].) Plaintiffs present evidence that they relied upon Cansino's representations (Pls.' App. 7-8, 21 [46:1-6]); that Cansino engaged in excessive trading, which is some evidence that Cansino falsely represented his true intentions (Defs.' App. 122 [101:1-3], **[*31]** Pls.' App. 4-5); that this representation was intended to and did in fact induce Plaintiffs into making the investment (Pls.' App. 7-8); and Plaintiffs suffered injury therefrom (Pls.' App. 6). Plaintiffs raise fact issues as to their fraud claim based upon Cansino's statement.

### 4. No Evidence: World Group's Successor Liability

Nevertheless, World Group maintains that summary judgment is appropriate because it was not affiliated with Cansino when the representations were made. World Group alleges that Plaintiffs originally purchased their investment account through Cansino, who at the time was working for another entity, World Marketing Alliance. It was not until April of 2002 that World Group's parent company purchased Plaintiffs' investment account and Cansino began working for World Group. In the purchase agreement, World Group, through its parent corporation, expressly excluded assumptions of the preceding corporation's liabilities. (*See* Defs.' App. Ex. E 5). Hence, World Group argues, it is not liable for the representations made by Cansino during the summer of 2000. Plaintiffs respond by arguing that World Group is a mere continuation of World Marketing Alliance, the predecessor **[*32]** corporation, under Florida law and should be held liable for World Marketing Alliance's liabilities.

In analyzing Plaintiffs' Texas common law fraud claim, the Court applies Texas choice of law rules. *See Harris v. Parker College of Chiropractic,* 286 F.3d 790, 793 (5th Cir. 2002). *HN33* Under Texas law, the buying and selling corporations' purchase agreement's choice of law provision controls the applicability of successor liability doctrines. *See Lockheed Martin Corp. v. Gordon,* 16 S.W.3d 127, 133-34 (Tex. App.--Houston [1st Dist.] 2000, pet. denied). It is undisputed

that the purchase agreement between World Group's parent company and World Marketing Alliance was governed by Florida Law. (*See* Defs.' App. Ex. E 31.) *HN34* Under Florida law, a corporation that acquires the assets of another business entity does not assume the liabilities of the prior business as a matter of law. *Corp. Exp. Office Products, Inc. v. Phillips,* 847 So.2d 406, 412 (Fla. 2003). However, a successor corporation may be held liable for the liabilities of the predecessor corporation if the successor is a 'mere continuation' of the predecessor. *See Patin v. Thoroughbred Power Boats Inc.,* 294 F.3d 640, 649 (5th Cir. 2002). [*33] Whether a succeeding corporation is a mere continuation of the predecessor corporation is usually a fact issue. *Id.* at 650. A successor corporation is a mere continuation of the predecessor corporation if it is a reincarnation of the predecessor under a different name. *Id.* The key is that there is a change in form, but not in substance. *Chicago Title Ins. Co. v. Alday-Donalson Title Co. of Fla., Inc.,* 832 So.2d 810, 814-15 (Fla. App. 2 Dist. 2002). Florida courts find continuation when one corporation is absorbed by another, as evidenced by an identity of assets, location, management, personnel, and stockholders. *Patin,* 294 F.3d at 650.

To show mere continuation, Plaintiffs present evidence indicating that Cansino's contracts with World Group and the World Marketing Alliance were similar. (Pls.' App. 118.) This is not probative of mere continuation because this evidence does not show an identity of assets, location, management, or stockholders between the two corporations. Moreover, the evidence tends to negate several continuation factors, such as identity of managers, directors, and personnel. (*See* Pls.' App. 118 [78:12-16].) Plaintiffs' evidence is insufficient to raise a fact issue [*34] on mere continuation and no other theory is presented by Plaintiffs to hold World Group vicariously liable for these representations. Summary judgment is proper as to World Group on Plaintiffs' common law fraud claim.

### C. Plaintiffs' Motion to Exclude Expert Testimony of Jerome C. Vahl

Plaintiffs move for the Court to strike the affidavit of Jerome C. Vahl as evidence supporting Defendants' Motion for Summary Judgment. (*See* Defs.' App. Ex. D.) This affidavit sought to establish the relationship between World Group's parent corporation and World Marketing Alliance, the predecessor corporation bought out by World Group's parent corporation. Defendants used this evidence to support their argument that World Group, as a successor corporation, was not a mere continuation of World Marketing Alliance. The Court found that Plaintiffs presented no evidence to support their mere continuation theory, and as such the Defendants' submitted evidence was not relied upon by the Court and had no effect on the Court's decision. Plaintiffs' motion will be denied as moot.

### D. Defendants' Motions to Exclude Expert Testimony of James Pinnell

Defendants argue that the testimony and opinions of James Pinnell, Plaintiffs' [*35] expert, upon which Plaintiffs rely upon in support of their Response to Defendants' Motions for Summary Judgment, should be excluded. Defendants argue that Mr. Pinnell's qualifications and methodology fail to satisfy the requirements of *Daubert, Kumho,* and *Federal Rule of Evidence 702.* The Court disagrees. While Defendants show that Mr. Pinnell does not have extensive experience in working with variable annuities, the type of investments Plaintiffs' funds were placed in, Defendants admit that Mr. Pinnell has extensive experience working with investments. Defendants fail to explain or cite any authority demonstrating why this distinction carries a legal significance affecting admissibility. Defendants also challenge Mr. Pinnell's methodology, claiming that Mr. Pinnell's opinions are inadmissible because Mr. Pinnell failed to research various sources in preparing his opinions, is biased, and makes unfounded assumptions. The Court finds that Defendants' arguments go to the weight of Mr. Pinnell's testimony, not its admissibility, and are matters Defendants may explore during cross examination. However, this does not affect

the admissibility of Mr. Pinnell's testimony. The Motion will  **[\*36]** be denied.

## IV.

## <u>CONCLUSION</u>

Therefore, for the reasons stated herein, the Court rules as follows:

1. Defendant Cansino's Motion for Summary Judgment is GRANTED as to

a. Plaintiffs' churning claim based on article *581-33* and *10b-5* to the extent the claim relies upon transactions occurring before August 28, 2002; and

b. Plaintiffs' misrepresentation claims based on article *581-33* and *10b-5*.

2. Defendant World Group Securities, Inc.'s Motion for Summary Judgment is GRANTED as to

a. Plaintiffs' churning claim based on article *581-33* and *10b-5* to the extent the claim relies upon transactions occurring before August 28, 2002;

b. Plaintiffs' misrepresentation claims based on article *581-33* and *10b-5*; and

c. Plaintiffs' common law fraud claim.

3. Defendant Cansino's Motion for Summary Judgment is DENIED as to

a. Plaintiffs' churning claim under article *581-33* and *10b-5* to the extent the claim relies upon transactions occurring on or after August 28, 2002;

b. Plaintiffs' breach of fiduciary duty claim; and

c. Plaintiffs' common law fraud claim.

4. Defendant World Group Securities, Inc.'s Motion for Summary Judgment is DENIED as to

a. Plaintiffs' churning claim under article *581-33* and *10b-5* to the extent the  **[\*37]** claim relies upon transactions occurring on or after August 28, 2002; and

b. Plaintiffs' breach of fiduciary duty claim.

5. Plaintiffs' Motion to Strike Affidavit of Jerome C. Vahl is DENIED as moot.

6. Defendant World Group Securities, Inc.'s Motion to Exclude the Testimony and Opinions of Plaintiffs' Expert James Pinnell is DENIED.

7. Defendant Lance C. Cansino's Motion to Exclude the Testimony and Opinions of Plaintiffs' Expert James Pinnell is DENIED.

All other relief requested is denied and this case remains set for trial on February 2, 2009.

SO ORDERED.

Dated November 14, 2008.

/s/ Sam R. Cummings

SAM R. CUMMINGS

UNITED STATES DISTRICT JUDGE




Caution
As of: November 14, 2012 3:25 PM EST

## Gonzalez v. Bank of Am.

United States District Court for the Southern District of Texas
February 20, 2011, Decided; February 20, 2011, Filed
Civil Action H-09-2946

**Reporter:** 2011 U.S. Dist. LEXIS 16963

Jorge Gonzalez, Plaintiff, versus Bank of America, et al., Defendants.

**Notice:**

**Subsequent History:** As Amended March 2, 2011.
Affirmed in part and modified in part by, Dismissed without prejudice by *Gonzalez v. Bank of Am. Ins. Servs., 2011 U.S. App. LEXIS 25237 (5th Cir. Tex., Dec. 12, 2011)*

---

| Core Terms |
| --- |

customer, telemarketer, coverage, account number, fraudulent, premiums, buy, unjust enrichment, predicate act, misrepresentation, subsidiary, mail, wire fraud, racketeering activity, amended complaint, depositor, privacy, native

**Counsel:** **[\*1]** For Jorge Gonzalez, Individually and on Behalf of All Other Similarly Situated, Plaintiff: Kenneth R Wynne, LEAD ATTORNEY, The Wynne Law Firm, Houston, TX; John Francis Sullivan , III, Watt Beckworth Thompson & Henneman, L.L.P., Houston, TX.

For Bank of America Insurance Services, Inc., BA Insurance Services, Inc., Bank Of America, N.A., Defendants: Eric Scott Lipper, LEAD ATTORNEY, Hirsch Westheimer PC, Houston, TX; Joanna Elizabeth Baden-Mayer, Stephen Ray Freeland, Thomas Erik Gilbertsen, LEAD ATTORNEYS, Kelley Drye et al, Washington, DC; Joseph T Krause, Locke Lord et al, Dallas, TX.

For Intersections, Inc., Intersections Insurance Services, Inc., Defendants: Ileana M Blanco, DLA Piper USA LLP, Houston, TX.

For LOEB Holding, Corp, Defendant: Daniel A. Rozansky, Julia B. Strickland, LEAD ATTORNEYS, PRO HAC VICE, Stroock Stroock Lavan LLP, Los Angeles, CA; Glen M Boudreaux, Jackson Walker LLP, Houston, TX.

For Global Contact Services, L.L.C., Defendant: Mark K Glasser, LEAD ATTORNEY, Baker Botts, Houston, TX; Tracy N LeRoy, Baker Botts LLP, Houston, TX; Tyler M Simpson, Baker Botts LLP, Dallas, TX.

For American International Group, Inc., National Union Fire Insurance Company of Pittsburgh, **[\*2]** PA, Defendants: Mark W Bayer, LEAD ATTORNEY, Gardere Wynne et al, Dallas, TX; Randy D Gordon, Gardere Wynne Sewell LLP, Dallas, TX.

**Judges:** Lynn N. Hughes, United States District Judge.

**Opinion by:** Lynn N. Hughes

---

## Opinion

---

Opinion on Dismissal

I. *Introduction.*

A man accuses Bank of America and eight other companies of having done something wrong when they offered customers like him insurance, some of whom agreed to buy it. He has described nothing more than a business arrangement that people willingly and knowingly agreed to enter. His case will be dismissed.

2. *Gonzalez's Allegations.*

Jorge Gonzalez has sued Bank of America, NA, and eight other companies for selling accidental death and disability insurance. He does not say he bought the insurance much less when, from whom, or for how long.

Gonzalez is twenty-two years old. He was born in Mexico and has lived in the United States since 2000. He has not graduated from high school, speaks limited English, and worked as a painter before being hurt in a car accident in 2008.

Gonzalez would like to be the named plaintiff  **[*3]** in a class action. The class, he says, consists of ethnically Hispanic people whose native language is Spanish, who have not earned a college degree, and whose average monthly checking-account balance is under $5,000.

Having already amended his complaint, Gonzalez describes the defendants' actions that he says violate the law. He says that the defendants "misused" information about him and others like him to "foist" on them "useless" accidental death and disability insurance.

The Bank's deposit agreement incorporates its privacy policy. In it, the Bank agrees not to share customer information with outsiders, but it says it might share customer information "among our companies" or with "companies that work for us."

Gonzalez says that the Bank gave the demographic profiles of customers like him to Intersections, Inc., a telemarketer. Intersections, he says, sometimes conveyed it to Global Contact Services, LLC, another telemarketer. A Spanish'speaking salesman would call to sell the insurance. When a person chose to buy it, the salesman would record that part of the conversation.

According to Gonzalez, Intersections withdrew monthly premiums from the buyers' accounts. The bank statements,  **[*4]** however, show that payments go to a company called Smart Step. Smart Step, he says, is the Bank's partner that sells the insurance. The complaint does not reconcile its contradictory accusations about who withdrew the premiums even though Gonzales got statements every month.

The insurance companies say that National Union Fire Insurance Company of Pittsburgh, PA, is a wholly owned subsidiary of American International Group, Inc. They say that the Bank is the

named insured on a blanket policy; the Bank then uses third-party marketing agreements to sell the insurance to its customers. After a customer buys the insurance, National Union sends a "description of coverage" and administers claims.

In his complaint, Gonzalez does not say that (a) people were charged for insurance they did not agree to buy, or (b) people were charged more than the filed and approved rates.

Gonzalez insists that this arrangement is actionable on five legal theories: (a) the Racketeer Influenced and Corrupt Organizations Act, (b) breach of contract, (c) breach of fiduciary duty, (d) common law fraud, and (e) unjust enrichment.

The defendants have asked the court to dismiss Gonzalez's complaint for failure to state **[*5]** a claim. Loeb says it should also be dismissed for lack of personal jurisdiction.

3. *No Injury.*

To have standing, the plaintiff must show that he has suffered an injury in fact. *Rivera v. Wyeth-Ayerst Labs*, 283 F.3d 315, 318 (5th Cir. 2002). Also, the named plaintiff who represents a class must "allege and show [that he] personally ha[s] been injured, not that injury has been suffered by other, unidentified members of the class . . ." *Lewis v. Casey*, 518 U.S. 343, 357, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996).

Gonzalez does not claim that he, directly and individually, was injured; the complaint speaks in generalities about insurance sales, but it fails to link a particular injury to Gonzalez. By not saying that funds were withdrawn from his account beyond his permission or that an insurance claim of his was not honored, Gonzalez has not specified how or whether he was hurt. Without allegations of — at a minimum — an actual, personal financial loss, Gonzalez has not shown an injury necessary for his standing.

Assuming funds were withdrawn from his account, Gonzalez does not claim that he did not receive the coverage he agreed to buy or that he was charged rate he did not agree to pay. He also does not say that the rates **[*6]** were more than those approved by the Texas Department of Insurance.

4. *Abstract and Vague.*

Not only does Gonzalez not show that he has been injured, his complaint does not indicate wrongdoing by the defendants. Rather, it is nothing more than conclusory allegations that mimic statutory language. He has submitted an abstract complaint, devoid of facts detailing each defendant's conduct.

A. *Loeb Holding.*

Loeb Holding is incorporated in Maryland with headquarters in New York. Loeb is an investor in Intersections but not its parent.

Gonzalez's sole accusation against Loeb is that it is a "controlling parent" of Intersections, Inc., another defendant. He never specifies what Loeb did to him, whether and how it may have directed Intersections to injure him or a specific wrongful act it committed. He lumps Loeb's name into broad conclusory accusations giving Loeb no indication of what actions it committed that require a defense. Controlling parent is not useful to establish liability; being a parent and being liable for a subsidiary's acts are distinct.

More important, Gonzalez does not show that Loeb has a connection with Texas. In Texas, Loeb does not own property, employee anyone, advertise, **[\*7]** occupy an office, meet, or collect mail.

Intersection's Form 10-K says that "insiders have substantial control over us . . . Loeb Holding Corp., which is controlled by one of our directors, owns approximately 42% of our outstanding stock." The form does not say Loeb directed it, nor does Gonzalez does allege that the ultimate owners did anything to justify the court's collapsing the corporate entities into one or making the parent amenable to jurisdiction in Texas. Gonzalez concedes in his response to the motions to dismiss that he lacks sufficient information to know whether it amounts to enough for jurisdiction. The law requires Gonzales to investigate the facts and law of his complaint before filing it; it sanctions those who sue first and ask questions later. Because Gonzalez does not describe Loeb's acts of direct liability or how Intersections could be its alter ego, Gonzalez has not made a *prima facie* showing of personal jurisdiction.

Without more, accusing Loeb of being a "controlling parent" does not state a claim against Loeb, nor does it establish jurisdiction over it. He implicitly **[\*8]** admits that he cannot explain why Loeb was included.

B. *Global.*

Global is a telemarketer. Gonzalez does not say that he spoke to a telemarketer, much less that he spoke specifically to one hired by Global. The complaint generically says "when someone meetingJorge Gonzalez's description opens a checking account at the Bank, the bank conveys" his information to Intersections. Intersections "then usually engages a telemarketing company, often [Global], to have a trained telemarketer, a native Spanish speaker . . . call the . . . depositor . . . and convince the depositor to authorize, over the phone, the purchase of some form of insurance."

First, Gonzalez has not established a connection between himself and Global. Without describing a real conversation that he had with Global, he has not stated a claim against Global.

Second, assuming Gonzalez did purchase the insurance after a conversation with Global, the complaint fails to show how this is actionable. The complaint includes facts that describe noting. It says: "a native *Spanish* speaker . . . call[s] the *unsuspecting* depositor . . . and *convince[s]* the depositor to authorize, *over the phone*, the purchase **[\*9]** of *some form* of insurance. . . . The telemarketers are trained to trumpet the high value and low cost of the insurance protection being offered. They make the offer justoo *good* to pass up." Rather than showing illegality, Gonzalez describes the role of a salesmen. The emotive imprecision betrays the emptiness of the claim.

Of course the value of the deal will be emphasized. Of course the salesperson will try to convince the customer that he is making a great decision. Convincing people to buy a produce is what salespeople do. Further, while not required, the salesman spoke in the customers' native language, something that should be encouraged, not discouraged. Lawsuits have been filed when the salesman did not speak in the customer's native tongue.

Later in the complaint, Gonzalez says Global and other telemarketers "use false, misleading and high-pressure sales scripts to induce victims . . . to purchase." Yet, nowhere does Gonzalez recite a misrepresentation that Global supposedly made — a minimum requirement to state a claim for fraud.

C. *Intersections and Intersections Insurance* **[\*10]** *Services, Inc.*

As best the court can gather from the complaint and other papers, Intersections is a company hired by the Bank to offer insurance to its customers and that it subcontracted some of its responsibilities. Gonzalez complains that the Bank allows Intersections to withdraw funds from some customers' accounts, yet acknowledges that these people all agreed to buy the insurance through the deductions. Because the customers bought the insurance and gave authority for their accounts to be debited for premium installments, Intersections is permitted to do so. This is not illegal; it is efficient.

Other than being a subsidiary of Intersections, the complaint gives no indication of Services's role. It has only conclusory allegations that track statutory language. For example, Gonzalez says "Intersections Insurance Services, Inc.[,] and BA Insurance Services, Inc., deceptively and fraudulently obtains the personal information of vulnerable Bank of America checking account owners . . . ." Left unanswered is the content of the information, how Services acquired it, how Services shared it, and Services distinction from Intersections. He omits an identification of any of the elements of **[*11]** fraud from an intentional misstatement of a present fact through the others to aan injury consequent on the reasonable reliance.

Because the complaint contains no hint, no clue about Services actual participation, if it did, Gonzalez has pleaded no claim against it. No one on the downside of the versus has information about the customers except that that they divulged by the customers to the Bank or to the marketer. It was obtained in a consensual, mutually beneficial business transaction.

D. *American International Group and National Union Fire Insurance Company.*

American and National Union are insurance companies. Gonzalez says American and National Union issued coverage with limits of $100,000 for accidental death and disability insurance to people who consented. The insurance companies clarify that American is a holding company for National Union, the underwriter.

Because American is a holding company and does not underwrite or market the insurance, it is improvidently joined.

Gonzalez does not say in his amended complaint that National Union insured him. Rather, he says broadly that when some customer agrees to purchase the insurance and that either America **[*12]** or National Union sends a description of coverage. According to Gonzalez, the description varied from the master policy; he, however, does not say how it varied and whether the variation was material or detrimental. More important, Gonzalez does not say the policies vary from filed rates, that he received less coverage than he bought, or what the insurance companies told him that could have been lies.

Boiled down, his accusations are that American and National sold insurance through a typical marketing arrangement with the Bank. He does not say he did not receive the coverage he might have agreed to and paid for. On his own facts, assuming that he bought something from somebody, the court cannot see how Gonzalez could have been hurt by correct insurance defendant, National.

E. *Bank of America, NA., Bank of America Insurance Services, Inc., and BA Insurance Services, Inc.*

Bank of America, NA, is, according to Gonzalez, a bank headquartered in Charlotte, North Carolina. Gonzalez says Bank of America Insurance Services, Inc., is the Bank's subsidiary and an in-

surance plan administrator for it. He says BA Insurance Services, Inc., is a subsidiary of the Bank that "provides insurance related  [*13] services."

In his complaint, Gonzalez never describes what exactly Bank of America Insurance Services or BA Insurance Services does or how each specifically contributed to his imagined scheme. His most specific fact is that the Bank disclosed to him in its privacy policy that they are "companies that have consumer-customer relationships with Bank of America."

Overall, Gonzalez accuses the Bank and its subsidiaries of masterminding the whole arrangement and participating in nearly every aspect of it. At best he describes a business relationship on the offerors' side and that some people willingly consented to accept the insurance that they were offered because of it.

4. *Racketeer Influenced and Corrupt Organizations Act.*

Gonzalez says the nine defendants violated *section 1962(c)* of the Racketeer Influenced and Corrupt Organizations Act — that they conducted "affairs" through a pattern of racketeering activity. Essential components include (a) conduct, (b) of an enterprise, (c) through a pattern, (d) of racketeering activity. He also accuses some or all of the defendants of a conspiracy to commit RICO.

A. *Pattern of Racketeering Activity.*

A pattern of racketeering activity requires that each  [*14] defendant commit at least two predicate acts within ten years. *18 U.S.C. § 1961(5)*; *In re Burzynski, 989 F.2d 733, 742 (5th Cir. 1993)*. Gonzalez says that the defendants' predicate acts consist of mail fraud, wire fraud, violations of the Access Device Fraud Act, the Telemarketers and Consumer Fraud and Abuse Prevention Act, and its implementing regulations, the Telemarketing Sales Rule.

(1) *Fraud.*

The Wire Fraud Act bans people from calling across state lines to plan or conduct fraudulent schemes. *18 U.S.C. § 1343*. The Mail Fraud Act bans people from using the mail to do the same. *18 U.S.C. § 1341*. To prove a scheme to defraud, the complainer must show fraudulent activity. *United States v. Stephens, 571 F.3d 401, 404 (5th Cir. 2009)*. In the statute, fraud retains its common-law meaning, and at common law, fraud requires, at minimum, a material misrepresentation or omission to someone who relied on it reasonably and was deprived of property. *See Neder v. United States, 527 U.S. 1, 21-22, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999)*. *See also Joe N. Pratt Ins. v. Doane, 2008 U.S. Dist. LEXIS 22448, 2008 WL 819011, at *4 (S.D. Tex. March 20, 2008)*.

Additionally, mail and wire fraud must be pleaded with particularity. *Fed. R. Civ. P. 9 (b)*. Gonzalez must  [*15] specify the content of the statements or omissions considered to be fraudulent and the identity of the speaker, the time, and place. *Tel-Phonic Serv., Inc. v. TBS Int'l, Inc., 975 F.2d 1134, 1138-39 (5th Cir. 1992)*.

(a) *Wire.*

Gonzalez says the Bank committed wire fraud by posting misrepresentations on its website about its privacy policy, security protections, products, and services.

Gonzalez says telemarketers like Global — directed by the Intersections entities or Loeb — called Gonzalez "through fraudulent practices" and used false and misleading scripts to con-

vinced him to purchase the insurance. The complaint says the telemarketers offered the customer a free trial and, when he consented, he was sent a description of coverage and insurance coverage before the first premium was withdrawn.

Nowhere does the complaint identify a single lie told to the customer. He does not identify the person or company with whom he may have spoken, or that he personally spoke with anyone at all. Gonzalez broadly accuses Intersections, Loeb, Global, and their related companies but never specifies how each participated or whether anyone communicated to him directly.

The amended complaint  [*16] then accuses the defendants of committing wire fraud by violating the Telemarketers and Consumer Fraud and Abuse Prevention Act and the Telemarketing Sales Rule. _15 U.S.C. § 6101 et seq._; _16 C.F.R. §310_.

First, the this is a civil statute and regulation. Violating the Telemarketers and Consumer Fraud and Abuse Prevention Act and rule is not a crime; a violation does not become wire fraud, and it may not be the basis of a RICO claim. Second, Gonzalez has not identified a misrepresentation made. Third, private individuals may only bring a claim under this act in specific circumstances. Normally, these actions are brought by the state attorneys general or the Federal Trade Commission. A person like Gonzalez may only sue under the act when he has suffered $50,000 in actual damages and has given prior written notice to the Federal Trade Commission. Gonzalez's complaint does not show that he has done either. Because he has not described a misrepresentation and because he has not met his prerequisites under the act, Gonzalez has not alleged a claim under the Telemarketers and Consumer Fraud and Abuse Prevention Act even if it were a RICO predicate act.

(b) _Mail._

Gonzalez says all defendants  [*17] have used the mail in executing their "scheme." The six examples, however, are abysmally insufficient. The first three do no more than describe the Bank's privacy policy; conspicuously absent is any link to the mail. Amended Complaint ¶ 65 (a), (b), and (c). In the other three examples, Gonzalez notes that statements, invoices, letters, and documents have been mailed. Amended Complaint ¶ 65 (d), (e), and (f). He does not, however, identify the speaker, time, place, or content of the alleged misrepresentation. Nor does he show that or how these documents furthered a scheme, much less a fraudulent one. His main contention seems to be that the description of coverage does not match the master policy, but he does not point out a "material" difference or describe how this was fraudulent.

(c) _Fraud Conclusion._

Under _Rule 9 (b)_, the heightened pleading standard, fraud must be described thoroughly. The defendants are not required to guess what statements were made in connection with the sale and how and why they are fraudulent. Gonzalez has not supplied particulars to meet the higher pleading standard for fraud.

Gonzalez's complaint does not specify each defendant's conduct. It gives no clue  [*18] as to what each defendant's role was and how it participated. "General allegations, which lump all defendants together and fail to segregate the alleged wrongdoing of one from those of another, cannot meet the requirements of _Rule 9(b)_." _Patel v. Holiday Hospitality Franchising, Inc._, 172 F.Supp. 2d 821, 824 (N.D. Tex. 2001). _See also Mills v. Polar Molecular Corp._, 12 F.3d 1170, 1175 (2d Cir. 1993).

(2) _Access Devices._

Gonzalez says the Bank, its subsidiaries, American, and National Union violated the act by furnishing account numbers to Intersections and Global. He says Intersections, Global, and other unnamed telemarketers violated the Access Devices Act by obtaining account numbers with the intent to defraud. His allegations track the statutory language.

The complaint does not specify which account numbers are the devices — the customer's checking account numbers or insurance account numbers. The court assumes the "account numbers" at issue are checking account numbers, because the complaint refers to "payment via the unauthorized access devices."

To violate the Access Devices Act, the device — here, the account numbers — must be unauthorized. Unauthorized access **[*19]** devices are those that are lost, stolen, canceled, or obtained with the intent to defraud. *18 U.S.C.S §1029*.

The complaint acknowledges that the customers agreed to purchase the insurance; they consented to automatic withdrawals from their accounts with the sharing of their account information. Accordingly, the account numbers were authorized. The complaint never says Gonzales — or anyone else — was not given the insurance he purchased or was charged more than he authorized. *See U.S. v. Luttrell, 889 F.2d 806, 810 (9th Cir. 1989)*. Moreover, the Bank cannot unlawfully "obtain" account numbers it issues.

Gonzalez's own complaint contradicts his accusation that the account numbers were used without authorization. He has not pleaded a violation of the Access Devices Act by any defendant.

(3) *No Predicate Act.*

Not only do each of predicate acts Gonzalez claims underlie his RICO theory have no merit, his complaint contains no facts showing that *each* of the nine defendants committed at least two of the predicate acts. Consequently, he has not pleaded a violation of RICO.

B. *Enterprise.*

Gonzalez says the nine defendants are an "association-in-fact" enterprise consisting of the nine defendants or **[*20]** fewer than nine. To support his claim of an association-in-fact, Gonzalez must plead plead facts showing that it (a) has an existence separate and apart from the pattern of racketeering, (b) is an ongoing organization, and (c) functions as a continuing unit as shown by a hierarchical or consensual decision making structure. *Crowe v. Henry, 43 F.3d 198, 205 (5th Cir. 1995)*.

(1) *No Separate Existence.*

Gonzalez has not pleaded specific facts which establish that the association exists for purposes other than simply to commit the imaginary predicate acts. *Elliott v. Foufas, 867 F.2d 877, 881 (5th Cir. 1989)*. At most, he has accused the defendants of engaging in their normal course of business.

(2) *No Structure.*

Gonzalez does not have a single fact showing that the defendants operate in as a continuing unit with a hierarchical or consensual decision-making structure. At best, some of the defendants had separate roles in the selling of insurance, but each party's conducting of its own affairs is not hierarchical or consensual decision making or an ongoing organization. *In re MasterCard In-*

*tern.*, 132 F. Supp. 2d 468, 487 (E.D. Louisiana 2001). Nothing suggests the defendants partici-pated in a hierarchy  [*21] beyond their contractual relationships — if the defendant had a role at all. Gonzalez's allegations are conclusory and empty.

C. *Conduct.*

*Section 1962(c)* requires that each defendant must participate in the operation or management of the enterprise itself. *Reves v. Ernst & Young*, 507 U.S. 170, 113 S. Ct. 1163, 122 L. Ed. 2d 525 (1993). Participation means direction, in some part, an enterprise's affairs.

Gonzalez says the defendants contributed to the enterprise ″with the knowledge of or willful dis-regard″ for the other defendants' supposed criminal activity. Simple contributions —if any — are not enough. Gonzalez has not pleaded — much less proved — the operation or management of the supposed enterprise by a single defendant, much less all.

D. *Conspiracy.*

In addition to claiming all the defendants violated RICO, Gonzalez also says they conspired to do so. His complaint, however, does not specifically say what the agreement was, who entered into it, or the actions taken in furtherance of it. He had described only a general business arrange-ment — no nefarious plot.

5. *Breach of Contract.*

Gonzalez says the Bank breached its contract. He does not specify the contract or the promises The Bank may have made. He says ″Bank of America [*22] became obligated both explicitly and implicitly to comply with certain constraints, not the least of which were to permit withdrawals from those accounts only upon the depositors' authorizations and to comply with its own an-nounced 'Privacy Policy for Consumers . . .'″ That accusation does not contain the elements needed to describe a breach of contract. He specifies no act by the bank that contravenes a term of which contract and how it harmed him.

6. *Good Faith and Fair Dealing.*

Gonzalez says the Bank is guilty of breaching a duty of good faith and fair dealing that it owed to him, but he has not described a relationship between the Bank and himself that would make it his fiduciary. He has stated no claim against the Bank for breach of good faith and fair dealing.

7. *Common Law Fraud.*

Gonzalez says all defendants committed common law fraud, but as discussed in the RICO sec-tion he has not pled fraud with particularity. He does not identify the speaker, time, place, or con-tent of a fraudulent misrepresentation made to him — much less reasonable reliance to his detri-ment.

8. *Unjust Enrichment.*

Gonzalez says all of the defendants have been unjustly enriched by ″misappropriating, disclos-ing,  [*23] selling and wrongfully capitalizing on {his} private and confidential information.″

Unjust enrichment arises in equity and results from one's failure to pay for benefits wrongfully ob-tained. *See Heldenfels Bros. Inc. v. Corpus Christi*, 832 S.W.2d 39, 42 (Tex. 1992). It is used to per-

mit recovery in equity where neither a contract or tort exists; it is a legal theory that implies a promise. More important for Gonzales, the doctrine of unjust enrichment does not rescue a party from the consequences of a bad bargain. *Burlington Northern R.R. Co. v. Southwestern Elec. Power Co., 925 S.W.2d 92, 96-97 (Tex. App. — Texarkana 1996).*

Assuming Gonzalez did agree to purchase the insurance, he may not under the label unjust enrichment escape the consequences of that decision — having paid the premiums —because he now thinks he paid too much for it. He never says he was charged more than he authorized or more than the scheduled or advertised rate. He does not say he did not receive the coverage. If he was unhappy, he could and should have canceled his policy.

Gonzalez says the money withdrawn from customer accounts was for items other than premiums. He is wrong. In insurance, as in all transactions, [*24] every cost of the seller is borne by the consumer. To illustrate, people often say that illegal immigrants do not pay taxes. When an illegal immigrant from, say, Luxemburg buys a beer at a local convenience store, he obviously pays the sales and alcohol taxes. The money he hands to the clerk is the source for the clerk's income and payroll taxes as well as the owner's franchise, property, income, and payroll taxes. It pays the clerk's landlord's property taxes. It pays the efficient and the wasteful steps that go into the result. Since it pays, the owner's personal income, the price of the beer pays for his vacation, 42'inch television, and BMW. It pays for the clerk's remittances to his family in New Zealand.

A premium pays for all of the costs that a company arranges to be able to offer the insurance for sale. Gonzales says that authorizing a deduction for insurance premiums only extends to the net amount required by the actuarial calculation on expected loss. An insurance premium is the retail price of a financial service, and it includes everything especially sales costs. Whether it is a financial "product" or a used car, if it is not sold no one eats in its creation eats. When the portions [*25] are paid to the participants does not affect their legitimacy.

At any rate, Gonzalez has not explained how this practice is results in an improper benefit.

Additionally, the enrichment of one party is not unjust where it is permitted under an express agreement. *Id.* Here, the debiting of accounts was not wrongful because nothing was taken without the customer's permission. Nor was the sharing of customer information — names and telephone numbers — wrongful because (a) the Bank disclosed that it might do it and (b) Gonzalez has not identified the benefit the Bank or the other eight defendants from information they may have shared.

Gonzalez has not described a viable request for restitution under the theory of unjust enrichment.

9. *Conclusion.*

Although amended already, Gonzalez's complaint is a 32-page mask of conclusion to cover its emptiness. It is unorganized, imprecise, and contradictory — amounting to nothing more than a populist press release to reap rewards from an ordinary, proper consumer relationship that he and others may have made. Because his has not and cannot state a claim, his case will be dismissed.

Gonzalez did not create this waste of the public's and defendant's resources. [*26] His complaint was mediated by a lawyer, a lawyer who did not or cannot do the rigorous researching and thinking — the work of mastering facts and analyzing law.

Gonzalez will take nothing by his claims because, in his amended complaint, he has been unable to state a claim. This conclusion disposes of all of the parties; however, Loeb is also not ame-

2011 U.S. Dist. LEXIS 16963, *26

nable to jurisdiction on this claim in Texas, and that objection by it to these proceedings is pre-
served as a contingency.

Signed on February 20, 2011, at Houston, Texas.

/s/ Lynn N. Hughes

Lynn N. Hughes

United States District Judge




Positive
As of: November 14, 2012 3:25 PM EST

# In re Crude Oil Commodity Litig.

United States District Court for the Southern District of New York
June 28, 2007, Decided; June 28, 2007, Filed
Master File 06 Civ. 6677 (NRB)

**Reporter:** 2007 U.S. Dist. LEXIS 47902; 2007 WL 1946553

In re CRUDE OIL COMMODITY LITIGATION

**Notice:**

**Subsequent History:** Reconsideration denied by, Motion denied by *In re Crude Oil Commodity Litig., 2007 U.S. Dist. LEXIS 66208 (S.D.N.Y., Sept. 7, 2007)*

---

| Core Terms |
| --- |

crude oil, manipulation, storage, natural gas, artificial, futures contract, commodity, deliverable, delivery, conceal, pipeline, sweet, oil, class period, prompt-month, conclusory, misleading, proxies

**Counsel:** **[\*1]** For Plaintiffs: Geoffrey M. Horn, Esq., Vincent Briganti, Esq., Lowey Dannenberg Bemporad Selinger & Cohen, P.C., White Plains, NY.

For Defendants: Leslie Smith, Esq., Bredale Rucker, Esq., Kirkland & Ellis, Chicago, IL; Peter D. Doyle, Esq., Kirkland & Ellis LLP, New York, NY.

**Judges:** NAOMI REICE BUCHWALD, UNITED STATES DISTRICT JUDGE.

**Opinion by:** NAOMI REICE BUCHWALD

---

| Opinion |
| --- |

## MEMORANDUM AND ORDER

## NAOMI REICE BUCHWALD

## UNITED STATES DISTRICT JUDGE

Plaintiffs Richard Hershey, Michael Anastasio, Peter C. Fede, Fred Dray, Max Wulff, and Roberto Calle Gracey (collectively, "plaintiffs") brought this case on behalf of themselves and all others who purchased and/or sold light, sweet crude oil futures and options contracts on the New York Mercantile Exchange ("NYMEX"). The class of plaintiffs consists of various individuals who

purchased and sold light, sweet crude oil futures contracts on the NYMEX during the putative class period, starting on January 1, 2001 and continuing until a date unknown by the plaintiffs but believed to extend at least until December 31, 2004 (the "class period"). The consolidated amended complaint alleges that BP America, Inc., BP Products North America, Inc., BP Corporation North America, Inc., and  [*2] defendants John Does 1-10 (collectively "BP" or "defendants") acted to unlawfully manipulate the prices of light, sweet crude oil futures and options contracts traded on the NYMEX, in contravention of the Commodity Exchange Act ("CEA"), as amended, *7 U.S.C. § 1 et seq.* Plaintiffs claim that they suffered losses while buying and selling NYMEX light, sweet crude oil futures during the class period, which they attribute to defendants' manipulation of these contracts to artificial levels. Defendants moved to dismiss the complaint, on the basis that plaintiffs' pleading failed to meet the requirements of *Rules 9(b)* and *12(b)(6) of the Federal Rules of Civil Procedure*. [1] For the reasons set forth below, defendants' motion is granted.

## BACKGROUND

2

## I. Commodities Futures Markets

We begin with some brief background concerning commodities futures markets.  [*3] A futures contract is an agreement to buy or sell a commodity and to deliver that item at a certain date in the future. Every aspect of a futures contract traded on the NYMEX, including those for crude oil, is standardized except for the price. The party selling the commodity, and thus who is obligated to deliver the commodity on the specified delivery date, is known as being on the "short" side, and to hold the short position on the futures contract. By contrast, the party on the other side of the deal is the buyer of the commodity, who is said to be on the "long" side. The buyer, who holds the long position on the futures contract, is obligated to accept delivery of the commodity on the specified delivery date. Options contracts are contracts which give the buyer the right, but not the obligation, to buy or sell a specified quantity of futures contracts at a predetermined price on or before a given date, regardless of the market price of the futures contract at the time the option is exercised. Only a small percentage of all futures contracts actually result in the delivery of the underlying commodities. Instead, traders generally offset their futures positions before their contracts  [*4] mature.

The crude oil market as a whole includes the exchange of physical barrels of oil, trading on registered futures exchanges such as NYMEX, and unregulated, over-the-counter ("OTC") markets. Many OTC crude oil contracts are based on NYMEX prices, including the final price for an expired NYMEX crude oil futures contracts. These contracts are called "NYMEX look-alikes." The crude oil marketing hub in Cushing, Oklahoma ("Cushing") is a significant marketing and trading hub for crude oil, and serves as the delivery (or price settlement) point for light, sweet crude oil futures and options contracts traded on NYMEX. West Texas Intermediate ("WTI") crude oil, one of the most actively traded domestic crudes, is the U.S. benchmark grade and is the primary deliverable grade under the NYMEX light, sweet crude oil futures and options contracts.

---

[1]   In addition, defendants argue that plaintiffs lack standing to bring their claims, and also that their claims are time barred. In light of our conclusion with regard to plaintiffs' failure to comply with Rule 9(b), we do not find it necessary to reach these issues.

[2]   Except where indicated, there are no genuine issues regarding the following facts.

Crude oil coming out of and going into Cushing is transported by a network of pipelines between oil producing areas and refineries throughout North America. As common carriers, oil pipelines are not allowed to refuse space to any shipper that meets their published conditions of service. If shippers nominate more volumes than the line can carry, the **[*5]** pipeline operator is supposed to allocate space in a non-discriminatory manner, usually on a pro rata basis. There are no alternative means to transport crude oil to Cushing, and no substitutes for the storage facilities in Cushing to store crude oil pending delivery against NYMEX crude oil futures contracts. Accordingly, supply and demand factors at the Cushing hub have a potential impact not only upon the price levels of crude oil at Cushing and its surrounding areas, but also throughout the entirety of the crude oil market.

## II. Allegations in the Complaint

Plaintiffs allege that during most of the class period, the defendants were in control of substantial pipeline, storage, production, and gathering facilities related to the Cushing crude oil market. [3] As such, plaintiffs allege that defendants had the capacity to take advantage of price signals [4] by adjusting supply and demand factors at the Cushing hub to their advantage. CAC P 38. According to plaintiffs, typically, futures markets have a "carrying charge" relationship, whereby the current futures contract price is less than the following months' futures contract prices. The amount of the difference is an amount sufficient to **[*6]** cover the carrying charge of the futures contract, which consists of interest on the capital invested in the commodity, storage costs, and insurance. *Id.* P 40. Instead, plaintiffs note, throughout the class period, North American crude oil markets, and NYMEX crude oil futures in particular, were predominantly in "backwardation," where near prompt-month prices of WTI crude oil are higher than the prices prevailing in future months. *Id.* P 39. As such, plaintiffs assert that defendants had an economic incentive to release, rather than restrict, supply to the marketplace, since the market no longer offers the market participant the incentive to hold stocks, as oil will be cheaper in the future and storing oil would result in a loss to the market participant. Yet, according to plaintiff, defendants held storage crude oil and deliverable position rather than delivering. *Id.* P 43.

Since defendants engaged in such "particularly uneconomic" behavior, plaintiffs believe that the backwardation was "a sign or result of manipulative conduct." *See id.* PP 42-43. Plaintiffs allege that, by virtue of BP's market position, defendants had access to proprietary information on oil and gas deliveries, storage capacity, and other critical market data. *Id.* P 44. "Armed with such proprietary data, the market participant has a substantial motive and opportunity to abuse this data in its commodities trading." *Id.* Plaintiffs assert that defendants engaged in at least seven methods of market **[*8]** manipulation, by: (1) exploiting their substantial energy assets located in Cushing, and other locations within and outside of Oklahoma, by acting in an uncommercial manner to deprive market participants of pipeline transmission, storage space, or crude oil, which were needed by these participants to fulfill their obligations for crude oil delivery at Cushing; (2) unlawfully conspiring with other market participants, including defendants John Does 1-10, to conceal the availability, release, and/or sale of defendants' supplies of crude oil at Cushing; (3) using proxies to sell its Cushing crude inventories as to not appear to the market as a seller of crude

---

[3]   Specifically, plaintiffs allege that during most of the class period, defendants: (1) owned approximately 10 million barrels, or about 37% of available storage at Cushing; (2) through lease agreements and other arrangements and/or agreements, increased their control to between 48% to 52% of the storage capacity **[*7]** at Cushing; (3) owned and/or controlled a substantial portion (in excess of 60%) of the WTI crude oil supply at Cushing through their production and gathering assets; (4) controlled over 5 million barrels of storage in Midland, Texas, the principal market center for domestic Cushing-bound WTI crude oil; and (5) owned substantial pipelines leading into and out of Cushing. CAC P 37.

[4]   A price signal is message sent to consumers and producers in the form of a price charged for a commodity. Such signals can be seen as an indication for producers to increase supplies and/or consumers to reduce demand.

oil, and at prices determined by BP, by guaranteeing that the proxies would not receive less than the amount the proxy paid for the inventory or BP would make up the difference; (4) holding large, uncommercially sound positions in the soon-to-expire prompt-month NYMEX futures contract in excess of defendants' commercial needs; (5) engaging in the practice of "talking up" their non-existent commercial needs to drive up the price of NYMEX crude oil futures contracts; (6) representing to market participants and regulators that defendants'  [*9] physical commitments supported both the maintenance of high storage levels in their Cushing storage facilities and their large prompt-month NYMEX crude oil futures positions; and (7) "bidding up" and/or "trashing" spot market prices for crude oil deliverable at Cushing in order to benefit defendants' crude oil physical and financial positions. *Id.* P 56. Plaintiffs allege that these actions were taken by defendants to support their market manipulation and to conceal the acts from the marketplace. *Id.* P 57. The cumulative effect of these actions, according to plaintiffs, was to create the false impression that the accessible deliverable supply of crude oil was limited at Cushing, thus driving up prices for NYMEX crude oil futures contracts which were deliverable only at Cushing. *Id.* P 58. Plaintiffs also allege that defendants "squeezed" the crude oil market. Each month, as the prompt-month NYMEX crude oil futures contract moved closer to expiration, "[d]efendants' percentage of the NYMEX crude oil futures open interest frequently increased, its commercially unreasonable use of its storage, pipeline, and other Cushing assets frequently continued, and [d]efendants frequently squeezed,  [*10] or manipulated to higher prices[,] the expiring NYMEX crude oil futures contracts." *Id.* P 60.

According to plaintiffs, BP profited from its manipulative acts because BP traded not only in the crude oil physical market and NYMEX crude oil futures and options market, but also conducted business involving the purchase and sale of OTC contracts in crude oil and other energy derivatives. *Id.* P 68. Accordingly, assert plaintiffs, BP was able to price crude oil to ensure trading profits on their NYMEX crude oil futures and option contract positions, OTC crude oil financial contracts which were priced off of the exchange traded futures and options contracts, including NYMEX look-alikes, and the sale of physical crude oil. *Id.* PP 59, 68. These positions included BP's "large and commercially unreasonable" long NYMEX crude oil futures positions, which according to plaintiffs increased in value due to the artificially high NYMEX crude oil futures prices. *Id.* P 59. Plaintiffs point to defendants' large trading operation, which registered profits in excess of $ 2 billion during 2004-05, as further evidence of defendants' market position and capacity to manipulate the market. *Id.* P 69.

## *DISCUSSION*

## I.  [*11] The Commodity Exchange Act

Plaintiff's complaint asserts that defendants' alleged activities "constitute manipulation of the price of NYMEX light, sweet crude oil futures contracts, and/or the price of the crude oil underlying those contracts . . . in violation of Sections 9(a) and 22(a) of the CEA, *7 U.S.C. §§ 13(a)*, *25(a)*." CAC P 83. The elements of a market manipulation claim under *section 9(a) of the CEA* are as follows: (1) the defendant possessed an ability to influence market prices; (2) an artificial price existed; (3) the defendant caused the artificial price; and (4) the defendant specifically intended to cause the artificial price. *In re Natural Gas Commodity Litigation*, 337 *F.Supp.2d 498, 507 (S.D.N.Y. 2004)* ("*In re Natural Gas I*"). *Section 22(a) of the CEA* provides plaintiffs with a private cause of action to pursue claims of market manipulation. *See 7 U.S.C. § 25(a)*.

## II. Standard of Review

2007 U.S. Dist. LEXIS 47902, *11

**A.** *Rule 12(b) (6)*

When considering a motion to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, we are to accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in favor of the non-moving party. *Securities Investor Protection Corp. v. BDO Seidman, LLP, 222 F.3d 63, 68 (2d Cir. 2000)*. **[*12]** Although a complaint attacked by a 12(b)(6) motion to dismiss ″does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.″ *Bell Atlantic Corp. v. Twombly, 550 U.S.    , 127 S. Ct. 1955, 167 L. Ed. 2d 929, 2007 WL 1461066, at *8 (2007)*. Plaintiffs' factual allegations must be sufficient to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true, even if doubtful in fact. *Id.*

**B. Applicability of** *Rule 9(b)* **as opposed to** *Rule 8(a)*

The parties disagree as to whether the complaint is subject to the dictates of *Rule 8(a)*, or the heightened pleading standards of *Rule 9(b)*. *Rule 8(a)* requires only ″a short and plain statement of the claim showing that the pleader is entitled to relief,″ in order to ″give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.″ *Id.* (citing *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*). By contrast, *Rule 9(b)* requires that ″[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake **[*13]** shall be stated with particularity.″ *Fed.R.Civ.P. 9(b)*. *Rule 9(b)* is designed ″to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit.″ *O'Brien v. National Property Analysts Partners, 936 F.2d 674, 676 (2d Cir. 1991)*. Accordingly, the Second Circuit has read *Rule 9(b)* to require that a complaint ″(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.″ *Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004)*.

District courts have split on the question of whether heightened pleading is required in a market manipulation claim under section 9(a)(2) of the CEA, *7 U.S.C. § 13(a)(2)*. Some courts have declined to hold claims of manipulation under the CEA to the factual specificity required under *Rule 9(b)*. *See, e.g., Commodity Futures Trading Comm'n v. Enron Corp., No. H-03-909, 2004 U.S. Dist. LEXIS 28794, 2004 WL 594752, at *3 (S.D. Tex. Mar. 10, 2004)* (in case involving CFTC as plaintiff, as opposed to a private party, ″[t]he **[*14]** CFTC's claims in Count I, under *sections 6(c)*, *6(d)*, and *9(a)(2)* of the CEA . . . need not be pled with the factual specificity required by *Fed.R.Civ.P. 9(b)*.″). Others have examined the facts as alleged in the complaint to see whether *Rule 9(b)* should apply. *See, e.g., Premium Plus Partners, L.P. v. Davis, No. 04 Civ. 1851, 2005 U.S. Dist. LEXIS 6158, 2005 WL 71191, at *15 (N.D. Ill. Mar. 28, 2005)* (″The instant manipulation claim is not premised on allegations of fraud: Defendants are not alleged to have made any statements (false or otherwise) in connection with the alleged market manipulation. Although the Court does not purport to endorse a rule that *Rule 9(b)* pleading requirements *never* could apply to a CEA manipulation claim, the facts of this particular case do not appear consistent with the imposition of such requirements.″) In what appears to be the only instance in which a court from this circuit has dealt with this precise issue, the court took the latter approach and held that although the amended complaint did not allege fraud under the CEA, the alleged manipulative scheme described in the amended complaint sounded in fraud and thus the complaint was required to comport with *Rule 9(b)*. *In re Natural Gas Commodity Litigation, 358 F.Supp.2d 336, 343 (S.D.N.Y. 2005)* **[*15]** (″*In re Natural Gas II*″). Relying on the Second Circuit's opinion in *Rombach,* the court concluded that the complaint alleged a scheme that was ″clas-

sically associated with fraud: the dissemination of '*inaccurate, misleading,* and *false* trading information,' and participation in 'a variety of *fraudulent* trade reporting strategies whose purpose was to create the precention [sic] of increased liquidity and demand for natural gas, and thus to manipulate the spot prices of natural gas.'" *In re Natural Gas II,* 358 F.Supp.2d at 343 (quoting Amended Complaint in that case) (emphasis in original).

We agree with the case-specific approach taken by the court in *In re Natural Gas II.* Although plaintiffs have apparently carefully avoided the word "fraud" in their complaint, this is not dispositive in a determination of the essence of the factual premises of their claim, nor whether *Rule 9(b)* applies. The wording of *Rule 9(b)* "is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action." *Rombach,* 355 F.3d at 171. As such, we turn to the allegations as pled in the complaint to  **[*16]** determine if they sound in fraud.

Plaintiffs allege that defendants unlawfully conspired with other market participants "to *conceal* the availability, release and/or sale" of defendants' supplies of crude oil and Cushing, and also used proxies to sell their crude oil inventories "so as to *not appear* to the market as a seller of crude oil" and "to support their manipulative acts and conceal such from the marketplace." CAC P 2(b), (c) (emphasis added). Further, plaintiffs do assert that defendants made false or misleading statements in support of their claims of manipulation. Plaintiffs claim that defendants "engag[ed] in the practice of *'talking up'* their non-existent commercial needs in order to manipulate or drive up the price of NYMEX crude oil futures contracts," *id.* PP 2(e), 56(e) (emphasis added), "represent[ed] to market participants and regulators that [d]efendants' physical commitments supported both the maintenance of high storage levels in their Cushing storage facilities and their large prompt-month NYMEX crude oil futures positions," and engaged in "'*bidding up*' and/or *'trashing'* spot market prices for crude oil deliverable at Cushing" to benefit their crude oil physical  **[*17]** and financial positions. *Id.* P 56(g) (emphasis added). The gravaman of the complaint is essentially that "BP created the *false impression* that the accessible deliverable supply of crude oil was limited at Cushing. This *false impression* drove up prices for NYMEX crude oil futures contracts." *Id.* P 58 (emphasis added). It is beyond question that the crux of plaintiffs' allegations is that defendants misled the market with regard to supply and demand at Cushing by concealing its capacity and its actions, resulting in artificial prices. Accordingly, we conclude that plaintiff's market manipulation claim should be subject to the heightened pleading standard for *Rule 9(b)*.

## C. Compliance with *Rule 9(b)*

As noted *supra,* there are four elements to a market manipulation claim under *section 9(a) of the CEA*: (1) that the defendant possessed an ability to influence market prices; (2) that an artificial price existed; (3) that the defendant caused the artificial price; and (4) that the defendant specifically intended to cause the artificial price. *In re Natural Gas I,* 337 F.Supp.2d at 507. We believe that defendants have adequately pled the first two elements of a market manipulation claim: namely,  **[*18]** that defendants had the capacity to influence crude oil prices, and that an artificial price existed. Thus, we turn to whether plaintiff has adequately pled the third and fourth elements of the claim: whether defendants caused the artificial price, and whether defendants intended to cause the artificial price.

## 1. Defendants' Actions that Caused the Artificial Price

To satisfy the particularity requirements of *Rule 9(b)*, a complaint sounding in fraud must specify the time, place, speaker, and content of the alleged statements and explain why those state-

ments were misleading. *See Simon v. Castello,* 172 F.R.D. 103, 105 (S.D.N.Y. 1997). To meet the requirements of *Rule 9(b)* in the context of a market manipulation claim, the plaintiff must specify "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *In re Natural Gas II,* 358 F.Supp. at 344.

The actions allegedly taken by defendants that caused the artificial prices in the crude oil market are described in a wholly speculative and conclusory manner in the complaint. None of plaintiffs' allegations specify  [*19] which of the defendants perpetrated the acts in question. In situations where multiple defendants are alleged to have committed fraud, the complaint must specifically allege the fraud perpetrated by each defendant, and "lumping" all defendants together fails to satisfy the particularity requirement. *Simon,* 172 F.R.D. at 105 (citing *Doehla v. Wathne Ltd., Inc.,* No. 98 Civ. 6087 (CSH), 1999 U.S. Dist. LEXIS 11787, 1999 WL 56631, at *17-18 (S.D.N.Y. Aug. 3, 1999)). Also, plaintiffs do not identify the market players and proxies with whom defendants allegedly unlawfully conspired to conceal their participation in the marketplace with regard to the availability, release, and/or sale of defendants' crude oil supplies, other than the reference to John Does 1-10. They cannot point to one specific instance in which defendants or their agents made misleading statements "talking up" their "non-existent commercial needs," or "bidding up" or "trashing" spot market prices for crude oil deliverable at Cushing. Plaintiffs cannot point to which market participants and regulators were the recipients of representations by any defendant regarding the reasons behind the maintenance of high storage levels at their Cushing storage facilities,  [*20] nor how the representations were misleading, nor which defendants or agents made the statements. It is clear that the pleading of fraud through completely unattributed statements and representations is insufficient to meet the dictates of *Rule 9(b),* even when a plaintiff alleges on information and belief that the statements were made by agents of the defendants. *See, e.g., In re Time Warner Inc. Securities Litigation,* 9 F.3d 259, 265 (2d Cir. 1993). Further, absent the delineation of the class period, there is no date specified of when any of the purportedly manipulative acts were performed by defendants or their coconspirators. Courts have consistently held that such a lengthy time-frame fails to satisfy the particularity requirement of *Rule 9(b). Concorde Funds, Inc. v. Value Line, Inc.,* No. 04 Civ. 9932 (NRB), 2006 U.S. Dist. LEXIS 18759, 2006 WL 522466, at *5 (S.D.N.Y. Mar. 2, 2006) (collecting cases).

An exception to the strict dictates of *Rule 9(b)* exists where allegations are based on "information and belief when facts are peculiarly within the opposing party's knowledge." *Three Crown Ltd. Partnership v. Caxton Corp.,* 817 F.Supp. 1033, 1040 (S.D.N.Y. 1993) (citing *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir. 1990).  [*21] This exception has been found to apply to market manipulation cases, where the exact mechanism of the scheme is likely to be unknown to the plaintiffs. *See, e.g., In re Blech Securities Litigation,* 961 F.Supp. 569, 580 (S.D.N.Y. 1997). However, the ability to plead on information and belief should not be read as "free license to base claims of fraud on speculation and conclusory allegations"; rather, the complaint must "adduce specific facts supporting a *strong inference* of fraud." *Three Crown Ltd. Partnership,* 817 F.Supp. at 1040 (citing *Wexner*) (emphasis in original). Plaintiffs attempt to relieve themselves of the heightened standards of 9(b) by pleading their complaint on information and belief. CAC Introduction. However, the foundation for plaintiffs' theory of market manipulation is insufficient in specificity and detail to establish a strong inference of fraudulent behavior that caused the market manipulation. [5] The pleading of fraud through completely unattributed statements, representations, and concealments, even when plaintiff alleges on information and belief that they were made by agents of the defendants, is simply insufficiently detailed as to meet the dictates of

---

[5]   We note that the recent Supreme Court decision in *Tellabs, Inc. v. Makor Issues & Rights Ltd.,* 551 U.S. ___, 127 S. Ct. 2499,

*Rule 9(b)*.  **[\*22]** *In re Time Warner Inc. Securities Litigation,* 9 F.3d at 265.

At bottom, there is an important distinction between the complaint here and that in *In re Natural Gas II,* where the court found the plaintiffs' allegations of market manipulation in the natural gas market had met the requisite level of specificity under *Rule 9(b)*. In alleging market manipulation, the complaint in *In re Natural Gas II* relied upon the findings of a CFTC order, which found that two traders employed by defendant Western knowingly reported false pricing and volume information to a trade publication at the direction of a supervisor from June 1999 to February 2001, and that four Western traders knowingly delivered false reports of transactions to trade publications between March 2001 and December 2002. *358 F.Supp.2d at 344-45*. Here, plaintiffs cannot point to a specific instance in which defendants engaged in a manipulative manner, and instead rely on conclusory statements about actions defendants allegedly took to further their scheme. In sum, the complaint is replete with innuendo and devoid of detail. Allowing plaintiffs' case to go forward on the basis of these conclusory allegations as to defendants' conduct would contravene  **[\*25]** an important purpose of *Rule 9(b)*, which is "to discourage the filing of complaints as a pretext for discovery of unknown wrongs." *Madonna v. United States,* 878 F.2d 62, 66 (2d Cir. 1989). We are loathe to allow plaintiffs to proceed to discovery in the hope that they will unearth information tending to establish that defendants misled or market manipulation, for this is precisely what *Rule 9(b)* attempts to prohibit. *Id.*

## 2. Defendants' Intent

With regard to whether defendants intended to manipulate the market, *Rule 9(b)* provides that "[m]alice, intent, knowledge[,] and other condition of mind of a person may be averred generally," since plaintiffs are not expected to plead defendants' state of mind with particularity. *Fed.R.Civ.P. 9(b)*. However, as noted earlier, this relaxation of *Rule 9(b)* is not a "license to base claims of fraud on speculation and conclusory allegations." *Simon,* 172 F.R.D. at 106. "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 290-91 (2d Cir. 2006).

Plaintiffs  **[\*26]** fail to satisfy either of these methods of adequately pleading intent. The complaint concisely sums up plaintiff's theory of motive and opportunity by essentially stating that de-

---

168 L. Ed. 2d 179, 2007 WL 1773208 (2007) may have some bearing on the present issues before us. *Tellabs* dealt specifically with the meaning of "strong inference" in the context of pleading scienter pursuant to § 21D(b)(2) of the Private Securities Litigation Reform Act of 1995 ("PLSRA"), 15 U.S.C. § 78u-4(b)(2). The Court explained that the PSLRA had codified the Second Circuit's stringent "strong inference" standard under *Rule 9(b)* as applied in the securities fraud context, albeit without concurrently codifying the Second Circuit's interpretation of "strong inference." 168 L. Ed. 2d 179, 2007 WL 1773208 at *7-9. The Court went on to describe the task before it as one of deciding on a "workable construction of the 'strong inference' standard" in light of "the PSLRA's twin goals: to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims." 168 L. Ed. 2d 179, 2007 WL 1773208 at *9. As articulated by the Court, in considering whether a "strong inference" has been established, the following question should be posed: "[w]hen the allegations  **[\*23]** are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least a strong as any opposing inference" of nonfraudulent intent? 168 L. Ed. 2d 179, 2007 WL 1773208 at *11. Obviously, we are cognizant that *Tellabs,* a decision interpreting the PSLRA, is not directly applicable to the case at hand, which involves applying Second Circuit interpretations of *Rule 9(b)* to the CEA. However, in light of the sentiment expressed by the Court in *Tellabs* that private securities fraud actions "if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law," 168 L. Ed. 2d 179, 2007 WL 1773208 at *9, and similar concerns raised by the Court in the context of private antitrust suits, *see Twombly,* 550 U.S. ___, 127 S. Ct. 1955, 167 L. Ed. 2d 929, 2007 WL 1461066, at *9 (noting that in light of the expense of antitrust discovery, "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed") (quoting *Associated Gen. Contractors of Cal., Inc. v. Carpenters,* 459 U.S. 519, 528 n.17, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)), we believe that our adoption of a heightened pleading standard in the context of the claims presented herein is  **[\*24]** in conformity with the direction of the Court.

fendants had a large presence in the crude oil market, the NYMEX crude oil futures and options market, and also engaged in the purchase and sale of OTC contracts in crude oil, and thus defendants "stood to gain large profits from their dealings in crude oil by manipulating prices of crude oil to obtain trading profits." CAC P 68. Such a generalized motive, one which could be imputed to any corporation with a large market presence in any commodity market, is insufficient to show intent. *See Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001) (allegations that defendants were motivated to conceal certain communications to protect compensation provisions, to avoid personal liability, and to ensure that company would be able to obtain a more favorable business agreement are too generalized to be sufficient under *Rule 9(b)*); *Chill v. General Electric Co.*, 101 F.3d 263, 267 (2d Cir. 1996) (allegation that company's interest in justifying to shareholders $ 1 billion investment in subsidiary insufficient motive to [*27] show intent to defraud shareholders). Further, plaintiffs fail to allege facts which would constitute strong circumstantial evidence of intent.

Rather, plaintiffs preface their complaint with a recitation of: (1) complaints filed against BP and its subsidiaries and settlements arising therefrom and governmental investigations of BP; (2) a *Wall Street Journal* article dated August 29, 2006 which reported that the Commodity Futures Trading Commission ("CFTC") was investigating whether BP used information about its own pipelines and storage tanks at Cushing to influence crude-oil price benchmarks; and (3) BP p.l.c.'s having recently retained KPMG to investigate BP's trading culture. *See* CAC P 4. The hearsay nature of these recitals underscores why they are an insufficient substitute for factual allegations, for "[p]laintiffs cannot be permitted to free ride off the press or the complaints of other parties filing similar lawsuits," but instead "must prove to the court that their complaint is backed by specific facts supporting a strong inference of fraud." *Three Crown Ltd.*, 817 F.Supp. at 1040 n.11. Moreover, the other complaints and governmental investigations relied upon by plaintiffs [*28] are unrelated to defendants' position in the crude oil market, and thus cannot be seen as sufficient facts upon which one could strongly infer manipulative intent or conduct in the crude oil market as alleged by plaintiffs in their complaint. [6]

### CONCLUSION

For the reasons stated above, [*29] defendants' motion to dismiss is granted in its entirety, and plaintiffs' complaint is dismissed.

**IT IS SO ORDERED.**

Dated: New York, New York

June 28, 2007

NAOMI REICE BUCHWALD

UNITED STATES DISTRICT JUDGE

---

[6]   In fact, we note that the *Wall Street Journal* article itself states that the CFTC's civil investigation into BP's participation in the natural gas market "isn't related to" the other cases and investigations in the propane, gasoline, and natural gas markets referred to by plaintiffs. John R. Wilke, "BP Woes Deepen With New Probe," *Wall St. J.*, Aug. 29, 2006, at C1.

We do acknowledge that the complaint also points to a settlement reached between defendant BP Corporation North America, Inc. and NYMEX, related to NYMEX crude oil trading. Although plaintiffs note that "[t]he settlement papers cited 10 violations in 2001 and 2002, which included wash trades, or simultaneous swaps of the same amount of a commodity for the same price," the plaintiffs do not assert that this behavior is a factual predicate for the manipulative conduct alleged in this case, which relates to defendants' crude oil holdings in Cushing.





Caution
As of: November 20, 2012 11:23 AM EST

## Me. State Ret. Sys. v. Countrywide Fin. Corp.

United States District Court for the Central District of California
April 20, 2011, Decided; April 20, 2011, Filed
Case No. 2:10-CV-0302 MRP (MANx)

**Reporter:** 2011 U.S. Dist. LEXIS 53359

MAINE STATE RETIREMENT SYSTEM, individually and on behalf of all others similarly situated, Plaintiff, v. COUNTRYWIDE FINANCIAL CORPORATION, et al., Defendants.

**Notice:**

**Subsequent History:** Motion granted by, Complaint dismissed at, in part, Motion to strike granted by *Me. State Ret. Sys. v. Countrywide Fin. Corp., 2011 U.S. Dist. LEXIS 125203 (C.D. Cal., May 5, 2011)*
*Related proceeding at Putnam Bank v. Countrywide Fin. Corp., 2011 U.S. Dist. LEXIS 99460 (D. Conn., May 16, 2011)*
*Transferred by, Motion denied by, Remanded by, in part, Motion granted by, Motion denied by, in part In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig., 2011 U.S. Dist. LEXIS 92702 (J.P.M.L., Aug. 15, 2011)*
*Related proceeding at Allstate Ins. Co. v. Countrywide Fin. Corp., 2011 U.S. Dist. LEXIS 123844 (C.D. Cal., Oct. 21, 2011)*

**Prior History:** *Me. State Ret. Sys. v. Countrywide Fin. Corp., 722 F. Supp. 2d 1157, 2010 U.S. Dist. LEXIS 118431 (C.D. Cal., 2010)*

---

| Core Terms |
| --- |

merger, de facto, asset sale, seller, de facto merger, transferor, successor liability, shareholders, doctrine, entities, purchasing corporation, choice of law, subsidiary, successor, motion to dismiss, absence of fraud, federal court, true conflict, disadvantage, doctrine of merger, federal question, local law, de jure, fraudulent, guidelines, sell a corporation

---

| Case Summary |
| --- |

**Overview**

In a putative class action where purchasers of mortgage backed securities asserted control person liability claims under *15 U.S.C.S. § 77o* against a parent corporation for the acts of its subsidiary, dismissal of the claims against the parent corporation was proper because the complaint failed to adequately allege de facto merger under Delaware law.

**Outcome**

2011 U.S. Dist. LEXIS 53359, *53359

Motion to dismiss granted.

| LexisNexis® Headnotes |
| --- |

Evidence > Judicial Notice > Adjudicative Facts > Judicial Records

*HN1* A court may take judicial notice of the existence of another court's opinion, which is not subject to reasonable dispute over its authenticity. *Fed. R. Evid. 201(b)*.

Business & Corporate Law > Corporations > General Overview
Torts > Vicarious Liability > Corporations > Subsidiary Corporations

*HN2* A parent corporation ordinarily is not liable for the acts of its subsidiary.

Civil Procedure > ... > Federal & State Interrelationships > Choice of Law > General Overview
Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > Erie Doctrine
Mergers & Acquisitions Law > Liabilities & Rights of Successors > Successor Liability Doctrine

*HN3* Successor liability is governed by state law under the Erie doctrine. As to matters governed by state law, a federal court must follow the choice of law rules of the state in which it is sitting to determine which state's law to apply. This rule applies even if the court's jurisdiction is based on a federal question.

Civil Procedure > ... > Subject Matter Jurisdiction > Supplemental Jurisdiction > Pendent Claims
Civil Procedure > ... > Federal & State Interrelationships > Choice of Law > General Overview
Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > Erie Doctrine

*HN4* In a federal question action where the federal court is exercising supplemental jurisdiction over state claims, the federal court applies the choice-of-law rules of the forum state.

Civil Procedure > ... > Federal & State Interrelationships > Choice of Law > Governmental Interests
Evidence > Burdens of Proof > Allocation

*HN5* California generally applies the governmental interest approach to choice of law analysis. Under this approach (1) the court examines the substantive laws of each jurisdiction to determine whether the laws differ as applied to the relevant transaction, (2) if the laws do differ, the court must determine whether a true conflict exists in that each of the relevant jurisdictions has an interest in having its law applied, and (3) if more than one jurisdiction has a legitimate interest, the court must identify and apply the law of the jurisdiction whose interest would be more impaired if its law were not applied. Only if both jurisdictions have a legitimate but conflicting interest in applying its own law will the court be confronted with a true conflict case. As a default, the law of the forum state will be invoked, and the burden is with the proponent of foreign law to show that the foreign rule of decision will further the interests of that state.

Mergers & Acquisitions Law > Liabilities & Rights of Successors > De Facto Mergers

*HN6* Although California and Delaware both recognize de facto merger, Delaware courts use the doctrine of de facto merger sparingly, only in very limited contexts. Because Delaware respects a corporation's ability to structure transactions to its advantage, so long as the statutes governing such transactions are fully complied with, Delaware is reluctant to find an asset sale is a de facto merger in the absence of fraud. Delaware thus requires intent to defraud, for example, an allegation that the sale was designed to disadvantage shareholders or creditors. California , on the other hand, is more willing to find de facto merger if the court concludes--notwithstanding the struc-

2011 U.S. Dist. LEXIS 53359, *53359

ture of the transaction--that an asset sale produces the same result as a merger. In Marks, the trial court set forth a checklist for determining whether an asset sale constituted a de facto merger and created successor liability. The factors are: (1) was the consideration paid for the assets solely stock of the purchaser or its parent; (2) did the purchaser continue the same enterprise after the sale; (3) did the shareholders of the seller become shareholders of the purchaser; (4) did the seller liquidate; and (5) did the buyer assume the liabilities necessary to carry on the business of the seller? An allegation of fraud or intent to harm is not required if all the indicia of a merger are present.

Business & Corporate Law > ... > Corporate Formation > Place of Incorporation > General Overview
Civil Procedure > ... > Federal & State Interrelationships > Choice of Law > Significant Relationships

*HN7* According to *Restatement (Second) of Conflict of Laws § 302* (2010): (1) Issues involving the rights and liabilities of a corporation, other than those dealt with in *Restatement (Second) of Conflict of Laws § 301*, are determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties under the principles stated in *Restatement (Second) of Conflict of Laws § 6*; (2) The local law of the state of incorporation will be applied to determine such issues, except in the unusual case where, with respect to the particular issue, some other state has a more significant relationship to the occurrence and the parties, in which event the local law of the other state will be applied. Comment a to the Restatement explains that *§ 302* is concerned with issues involving matters that are peculiar to corporations and other associations, whereas the rule of *§ 301* is concerned with issues arising from corporate acts of a sort that can also be done by individuals.

Mergers & Acquisitions Law > Liabilities & Rights of Successors > De Facto Mergers
Mergers & Acquisitions Law > Liabilities & Rights of Successors > Successor Liability Doctrine

*HN8* It is a well-settled rule of corporate law that where one company sells or transfers all of its assets to another, the second entity does not become liable for the debts and liabilities, including torts, of the transferor. This is the general rule of successor liability, recognized in all jurisdictions: when a corporation purchases all or most of the assets of another corporation, the purchasing corporation does not assume the debts and liabilities of the selling corporation. There are four widely recognized exceptions to this rule of successor non-liability: (1) there is an express or implied agreement of assumption; (2) the transaction amounts to a consolidation or merger of the two corporations; (3) the purchasing corporation is a mere continuation of the seller; or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts. A de facto merger may be found where an asset sale took place that amounted to a merger. Under the de facto merger doctrine, the purchaser is liable for all the seller's debts by operation of law, the same as in a merger.

Mergers & Acquisitions Law > Liabilities & Rights of Successors > De Facto Mergers

*HN9* One factor Delaware courts consider when determining whether to find de facto merger is whether consideration was received and held in exchange for the assets that were transferred. In general, no liability has been found under a de facto merger theory so long as the transfer was in the ordinary course of business and the seller received and held consideration. Only in a few cases, where the consideration passed directly to the transferor' stockholders without coming into possession of the transferor corporation, has a de facto merger been found. The consideration must also be adequate. A second factor Delaware courts consider is whether the asset transfer complied with the statute governing such an asset sale. Delaware cases have held form more sacred than substance, by reasoning that intent is manifested in following statutory forms and guidelines and that where the parties follow the mechanical guidelines of the statute, then the method chosen must

be honored even though the form selected may be comparable to a merger. Delaware recognizes the doctrine of independent legal significance. A third factor Delaware courts consider is whether creditors or stockholders have suffered an injury from such failure to comply. A fourth factor is fraud or bad faith.

Mergers & Acquisitions Law > Liabilities & Rights of Successors > De Facto Mergers

*HN10* Under Delaware law, the separate legal existence of corporate entities should be respected --even when those separate corporate entities are under common ownership and control. Thus, in the absence of fraud, it is a long-standing principle of Delaware law that an asset sale is not a merger. To state a successor-liability claim under the de facto merger doctrine, therefore, the complaint must allege that the sale was designed to disadvantage shareholders or creditors.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim
Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

*HN11* A *Fed. R. Civ. P. 12(b)(6)* motion to dismiss should be granted when, assuming the truth of the plaintiff's allegations, the complaint fails to state a claim for which relief can be granted. Under Conley, a complaint could not be dismissed for failure to state a claim unless it appeared beyond doubt that the plaintiff could prove no set of facts in support of his claim which would entitle him to relief. In Twombly, the U.S. Supreme Court expressly retired Conley's "no set of facts" language and required judges to engage in a context-specific review of the complaint. Pleading labels or conclusions is no longer sufficient. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.

Mergers & Acquisitions Law > Mergers > General Overview
Mergers & Acquisitions Law > Sales of Assets > General Overview

*HN12* The Delaware Supreme Court allows parties to choose whatever reorganization plan they wish, asset sale or merger, so long as they follow the mechanical guidelines of the statute.

**Counsel:** **[*1]** For Maine State Retirement System, Individually and On Behalf of All Ohters Similarly Situated, Plaintiff: Andrew L Zivitz, Jennifer L Joost, Lauren Wagner Pederson, Sharan Nirmul, LEAD ATTORNEYS, PRO HAC VICE, Barroway Topaz Kessler Meltzer & Check LLP, Radnor, PA; Christina A Royce, Daniel S. Drosman, Lauren G Kerkhoff, Scott H Saham, Spencer Alan Burkholz, Thomas E Egler, LEAD ATTORNEYS, Robbins Geller Rudman & Dowd LLP, San Diego, CA; Sean M Handler, PRO HAC VICE, Barroway Topaz Kessler & Check LLP, Radnor, PA.

For Putnam Bank, Movant: Arthur L Shingler, III, Scott and Scott LLP, Los Angeles, CA.

For United Methodist Churches Benefit Board, Inc., Movant: Avi N Wagner, The Wagner Firm, Los Angeles, CA; Ira M Press, Randall K Berger, PRO HAC VICE, Kirby McInemey LLP, New York, NY.

For Iowa Public Employees' Retirement System, Movant: Christopher Lometti, Daniel B Rehns, Joel P Laitman, LEAD ATTORNEYS, PRO HAC VICE, Richard A Speirs, LEAD ATTORNEY, Cohen Milstein Seller & Toll PLC, New York, NY; Julie G Reiser, Matthew B Kaplan, S Douglas Bunch, Steven J Toll, LEAD ATTORNEYS, PRO HAC VICE, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Michael Marc Goldberg, Glancy Binkow & Goldberg **[*2]** LLP, Los Angeles, CA; Joshua S Devore, PRO HAC VICE, Cohen Milstein Hausfeld & Toll PLLC, Washington, DC.

For Maine Public Employees Retirement System, Operating Engineers Annuity Plan, Pension Trust Fund for Operating Engineers, Vermont Pension Investment Committee, Washington State Plumbing & Pipefitting Pension Trust, Movants: Spencer Alan Burkholz, Robbins Geller Rudman & Dowd LLP, San Diego, CA.

For Mashreqbank, P.S.C., Movant: Azra Z Mehdi, Milberg LLP, Los Angeles, CA; Spencer Alan Burkholz, Robbins Geller Rudman & Dowd LLP, San Diego, CA.

For Countrywide Financial Corporation, a Delaware corporation, Countrywide Home Loans, Inc., CWALT, Inc., CWMBS, Inc., CWHEQ, Inc., Countrywide Capital Markets, Countrywide Securities Corporation, N. Joshua Adler, CWABS, Inc., Defendants: Lloyd Winawer, LEAD ATTORNEY, Goodwin Procter LLP, Los Angeles, CA; Brian Charles Devine, Brian E Pastuszenski, Inez H Friedman-Boyce, Jennifer B Luz, PRO HAC VICE, Goodwin Procter LLP, Boston, MA.

For J.P. Morgan Securities Inc., formerly known as Bear, Stearns & Co. Inc., Deutsche Bank Securities Inc., Bear, Stearns & Co. Inc., also known as J.P. Morgan Securities Inc., Banc of America Securities LLC, UBS Securities, [*3] LLC, Edward D. Jones & Co., L.P., Citigroup Global Markets Inc., Goldman, Sachs & Co., Credit Suisse Securities (USA) LLC, formerly known as Credit Suisse First Boston LLC, Greenwich Capital Markets, Inc., formerly known as RBS Greenwich Capital, Barclays Capital Inc., HSBC Securities (USA) Inc., also known as HSBC Securities (USA), Morgan Stanley & Co. Inc., also known as Morgan Stanley & Co. Incorporated, Merrill Lynch, Pierce, Fenner & Smith, Inc., also known as Merrill Lynch, Pierce, Fenner & Smith, Incorporated, Defendants: Alexander K Mircheff, Dean J Kitchens, Gibson Dunn and Crutcher LLP, Los Angeles, CA.

For BNP Paribas Securities Corp., Defendant: Alexander K Mircheff, Dean J Kitchens, Gibson Dunn and Crutcher LLP, Los Angeles, CA; Inez H Friedman-Boyce, PRO HAC VICE, Goodwin Procter LLP, Boston, MA.

For Stanford L. Kurland, Defendant: Christopher G Caldwell, Caldwell Leslie and Proctor, Los Angeles, CA; David C Codell, Jeffrey M Hammer, Caldwell Leslie & Proctor PC, Los Angeles, CA.

For David A. Spector, Defendant: Jennifer M Sepic, LEAD ATTORNEY, Bingham McCutchen LLP, Los Angeles, CA; Leiv H Blad, Jr, LEAD ATTORNEY, PRO HAC VICE, Boyd Cloern, PRO HAC VICE, Bingham McCutchen [*4] LLP, Washington, DC.

For Eric P. Sieracki, Defendant: David A Priebe, DLA Piper LLP, East Palo Alto, CA; Jeffrey B Coopersmith, DLA Piper US LLP, East Palo Alto, CA; Matthew D Caplan, DLA Piper LLP US, Los Angeles, CA; Nicolas Morgan, DLA Piper US LLP, Los Angeles, CA; Shirli Fabbri Weiss, DLA Piper Rudnick Gray Cary US, San Diego, CA.

For Ranjit Kripalani, Jennifer S. Sandefur, Defendant: Joshua G Hamilton, Peter Young Hoon Cho, William F Sullivan, LEAD ATTORNEYS, Paul Hastings Janofsky and Walker LLP, Los Angeles, CA.

For David A. Sambol, Defendant: Michael D Torpey, LEAD ATTORNEY, Orrick Herrington and Sutcliffe, San Francisco, CA; Michael C Tu, LEAD ATTORNEY, Orrick Herrington and Sutcliffe LLP, Los Angeles, CA; Penelope A Graboys Blair, LEAD ATTORNEY, Orrick Herrington and

2011 U.S. Dist. LEXIS 53359, *4

Sutcliffe LLP, San Francisco, CA.

For Bank of America Corp., NB Holdings Corporation, Defendants: Jonathan Rosenberg, PRO HAC VICE, O'Melveny & Myers LLP, New York, NY; Matthew W Close, O'Melveny and Myers, Los Angeles, CA; Seth A Aronson, O'Melveny and Myers LLP, Los Angeles, CA.

For JP Morgan Chase, Erroneously Sued As JPMorgan Chase & Co, RBS Securities Inc., formerly known as Greenwich Capital Markets, Inc., [*5] Defendants: Alexander K Mircheff, Gibson Dunn and Crutcher LLP, Los Angeles, CA.

**Judges:** Hon. Mariana R. Pfaelzer, United States District Judge.

**Opinion by:** Mariana R. Pfaelzer

---

| Opinion |
| --- |

## ORDER DISMISSING BANK OF AMERICA CORPORATION AND NB HOLDINGS CORPORATION

## I. INTRODUCTION

Plaintiffs filed this putative class action individually and "on behalf of a class of all persons or entities who purchased or otherwise acquired beneficial interests in" certain mortgage backed securities ("MBS") in the form of certificates issued in 427 separate offerings (the "Offerings") between January 25, 2005 and November 29, 2007 "pursuant and/or traceable to the Offering Documents" and were damaged thereby. Consolidated Amended Complaint ("AC") ¶¶ 1, 186. The claims are brought against the Countrywide Defendants pursuant to *Sections 11*, *12* and 15 of the Securities Act of 1933. The operative complaint refers to Countrywide Financial Corporation ("CFC"), Countrywide Securities Corporation ("CSC"), Countrywide Home Loans ("CHL"), and Countrywide Capital Markets ("CCM") as the "Countrywide Defendants." Plaintiffs also purport to include Bank of America and NB Holdings Corporation ("NB Holdings") in this category. Plaintiffs contend the Countrywide [*6] Defendants made materially untrue or misleading statements or omissions regarding Countrywide's loan origination practices in public offering documents associated with 427 separate offerings. Also named as defendants are Countrywide special-purpose issuing trusts, several current or former Countrywide officers and directors, and a number of banks that served as underwriters on one or more of the offerings at issue.

All of the defendants filed motions to dismiss the AC. After the motions were fully briefed, the Court heard extensive oral argument on October 18, 2010. The Court dismissed the action without prejudice on the basis of standing and the statute of limitations on November 4, 2010. The Court reserved judgment on the remaining issues until after Plaintiffs had cured the chief pleading deficiencies the Court identified in that Order. *See Maine State Ret. Sys. v. Countrywide Fin. Corp.*, 722 F. Supp. 2d 1157 (C.D. Cal. 2010).

On December 6, 2010, Plaintiffs filed a Second Amended Complaint ("SAC") which reduced the offerings in the case to 14 separate public offerings between October 2005 and December 2006 and set forth the alleged bases for tolling. Docket No. 227. The Court held [*7] an additional hearing on March 23, 2011, at which the motion to dismiss filed by Bank of America and NB Holdings, Docket No. 175, was discussed. Bank of America and NB Holdings argued the Securi-

ties Act *Section 15* control person liability claims, *15 U.S.C. §77o*, should be dismissed against them. The Court adjudicates that motion in this Order. The motion to dismiss is **GRANTED** for the reasons that follow.

## II. BACKGROUND

In July 2008, Defendant CFC merged into a wholly-owned Bank of America subsidiary named Red Oak Merger Corporation, pursuant to the terms of an Agreement and Plan of Merger, dated as of January 11, 2008. SAC ¶ 38. The transaction was a stock-for-stock *de jure* merger and was approved as fair by the Delaware Supreme Court sitting *en banc*. *Id.*; *Arkansas Teacher Ret. Sys., et al. v. Caiafa*, 996 A.2d 321 (Del. 2010). [1] Red Oak Merger Corporation was subsequently renamed Countrywide Financial Corporation ("CFC"), which remained a subsidiary of Bank of America. Docket No. 176-3 (Close Decl. Ex. 2 [CFC Form 10-Q dated August 11, 2008] at 27). Four months later, on November 7, 2008, "substantially all of Countrywide's assets were transferred to Bank of America . . . along with  [*8] certain of Countrywide's debt securities and related guarantees." SAC ¶ 38. The SAC further alleges that CFC ceased filing its own financial statements at that time and its assets and liabilities are now included in Bank of America's financial statements. SAC ¶ 38.

According to the SAC, the Countrywide brand was retired shortly after the merger and currently CFC's former website redirects the user to the Bank of America website. SAC ¶ 38. In addition, Bank of America has assumed CFC's liabilities, having paid to resolve other litigation arising from misconduct such as predatory lending allegedly committed by CFC. SAC ¶ 38. Finally, Plaintiffs allege "many of the same locations, employees, assets and business operations that were formerly CFC continue under the Bank of America Home Loans brand." SAC ¶ 38.

Defendant NB Holdings, a wholly-owned subsidiary of Bank of America, is alleged to be one of the shell entities used to effectuate the Bank of America-CFC merger,  [*9] and a successor in interest to Defendant CHL. SAC ¶ 39. Plaintiffs claim that on July 3, 2008, CHL completed the sale of substantially all of its assets to NB Holdings. SAC ¶ 39.

Plaintiffs bring suit against Bank of America for violation of *Section 15* of the Securities Act, *15 U.S.C. § 77o*, for the acts of its subsidiary CFC. SAC ¶ 240. *HN2* A parent corporation ordinarily is not liable for the acts of its subsidiary. *U.S. v. Bestfoods*, 524 U.S. 51, 61, 118 S. Ct. 1876, 141 L. Ed. 2d 43 (1998). Plaintiffs argue, however, that Bank of America is a successor in interest to CFC, CSC, CCM and CHL. SAC ¶ 241. Plaintiffs contend the asset transfer that occurred between Bank of America and its subsidiary CFC in November 2008, when viewed in conjunction with the July 2008 *de jure* merger, actually constituted a *de facto* merger. SAC ¶ 38.

Plaintiffs bring suit against NB Holdings for violation of Section 15 of the Securities Act, as a successor in interest to Defendant CHL. SAC ¶¶ 39, 241. The allegations against NB Holdings are not clear. Indeed, the Court can only guess at the factual or legal basis for the conclusory allegation that "by virtue of their control, ownership, offices, directorship, and specifics acts," CFC, CSC, CCM  [*10] and CHL—and Bank of America and NB Holdings as their successors in interest —"had the power and influence and exercised the same to cause the Issuer Defendants to engage in the acts described herein." SAC ¶ 241.

## III. APPLICABLE LAW

---

[1]   *HN1* A court may take judicial notice of the existence of another court's opinion, which is not subject to reasonable dispute over its authenticity. *Fed. R. Evid. 201(b)*; *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001).

A. Choice of Law

*HN3* Successor liability is governed by state law under the Erie doctrine. As to matters governed by state law, a federal court must follow the choice of law rules of the state in which it is sitting to determine which state's law to apply. Wright, Miller, and Cooper, Federal Practice & Procedure § 4506 (2010); *Paracor Fin. Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996). This rule applies even if the court's jurisdiction is based on a federal question. *SEC v. Elmas Trading Corp.*, 683 F. Supp. 743, 748 (D. Nev. 1987) (citing numerous examples where a federal court applied state choice of law rules to state law issues pendent to federal question claims).

Defendants cite *In re Lindsay* for the proposition that the Court should apply federal choice of law rules in federal question cases. *59 F.3d 942, 948 (9th Cir. 1993)*. However, three years after *In re Lindsay*, the Ninth Circuit articulated specifically:

> *HN4* In a federal question action  **[*11]** where the federal court is exercising supplemental jurisdiction over state claims, the federal court applies the choice-of-law rules of the forum state—in this case, California.

*Paracor Fin., Inc.*, 96 F.3d at 1164 (citing *Elmas*, 683 F. Supp. at 747-49; *In re Nucorp Energy Sec. Litig.*, 772 F.2d 1486, 1491-92 (9th Cir. 1985)). Thus, California choice of law rules govern here with respect to the state law issue of successor liability.

*HN5* California generally applies the "governmental interest" approach to choice of law analysis. *Love v. Assoc. Newspapers, Ltd.*, 611 F.3d 601, 610 (9th Cir. 2010); *Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 107-08, 45 Cal. Rptr. 3d 730, 137 P.3d 914 (Cal. 2006). Under this approach,

> (1) the court examines the substantive laws of each jurisdiction to determine whether the laws differ as applied to the relevant transaction, (2) if the laws do differ, the court must determine whether a true conflict exists in that each of the relevant jurisdictions has an interest in having its law applied, and (3) if more than one jurisdiction has a legitimate interest, the court [must] identify and apply the law of the [jurisdiction] whose interest would be more impaired if its law were not applied. Only  **[*12]** if both [jurisdictions] have a legitimate but conflicting interest in applying its own law will the court be confronted with a "true conflict" case.

*Love*, 611 F.3d at 610 (quoting *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1005 (9th Cir. 2001)) (alteration in *Love*). "As a default, the law of the forum state will be invoked, and the burden is with the proponent of foreign law to show that the foreign rule of decision will further the interests of that state." *CRS Recovery, Inc. v. Laxton*, 600 F.3d 1138, 1142 (9th Cir. 2010). Plaintiffs argue the Court should apply the governmental interest approach in this case and conclude that California law applies. Plaintiffs reason that Defendants have failed to meet their burden of establishing first that there is true conflict between Delaware and California law and next that Delaware has a greater interest in having its law applied. The Court disagrees on both counts.

First, the Court concludes there is a true conflict between Delaware and California law. *HN6* Although both states recognize *de facto* merger, Delaware courts use the doctrine of *de facto* merger sparingly, "only in very limited contexts." *Binder v. Bristol-Myers Squibb, Co.*, 184 F.

2011 U.S. Dist. LEXIS 53359, *12

Supp. 2d 762, 769 (N.D. Ill. 2001); [*13] Balotti and Finkelstein, Del. L. of Corp. and Bus. Org. § 9.3 (2010). Some treatises have gone so far as to conclude that "Delaware has rejected the *de facto* merger doctrine." Aaron Rachelson, Corporate Acquisitions, Mergers and Divestitures § 4:6 (2011). *But see Heilbrunn v. Sun Chemical Corp.*, 38 Del. Ch. 321, 150 A.2d 755, 757 (Del. 1959) ("The doctrine of *de facto* merger has been recognized in Delaware."). Because Delaware respects a corporation's ability to structure transactions to its advantage, so long as the statutes governing such transactions are fully complied with, Delaware is reluctant to find an asset sale is a *de facto* merger in the absence of fraud. *See, e.g., Heilbrunn v. Sun Chemical Corp.*, 37 Del. Ch. 552, 146 A.2d 757, 760 (Del. Ch. 1958) (dismissing *de facto* merger allegations because, *inter alia*, the purchase was made in conformity with Delaware statutory authority, and the complaint did not clearly allege that the transaction was fraudulent or the consideration insufficient), aff'd *38 Del. Ch. 321, 150 A.2d 755 (Del. 1959)*; *Bryant, Griffith & Brunson, Inc. v. General Newspapers*, 36 Del. 468, 6 W.W. Harr. 468, 178 A. 645, 648 (Del. Super. 1935) (concluding that the transfer of assets, in the absence of fraud or other equitable considerations, [*14] does not constitute *de facto* merger). Delaware thus requires intent to defraud, for example, an allegation that the sale was designed to disadvantage shareholders or creditors. *See In re McKesson HBOC, Inc. Secs. Litig.*, 126 F. Supp. 2d 1248, 1277 (N.D. Cal. 2000) (applying Delaware law); *Stauffer v. Standard Brands, Inc.*, 40 Del. Ch. 202, 178 A.2d 311, 316 (Del. Ch. 1962) ("In the absence of fraud, the separate entity of a corporation is to be recognized.").

California, on the other hand, is more willing to find *de facto* merger if the court concludes—notwithstanding the structure of the transaction—that an asset sale produces the same result as a merger. *See Marks v. Minn. Mining & Mfg. Co.*, 187 Cal. App. 3d 1429, 1436-38, 232 Cal. Rptr. 594 (1986). In *Marks*, the trial court set forth a checklist for determining whether an asset sale constituted a *de facto* merger and created successor liability. *Id.* at 1436. The factors are:

> (1) was the consideration paid for the assets solely stock of the purchaser or its parent; (2) did the purchaser continue the same enterprise after the sale; (3) did the shareholders of the seller become shareholders of the purchaser; (4) did the seller liquidate; and (5) did the buyer assume the liabilities [*15] necessary to carry on the business of the seller?

*Id.* An allegation of fraud or intent to harm is not required if all the indicia of a merger are present. The Court thus finds a material difference between California and Delaware law.

Next, the Court concludes both states have a legitimate interest in having their law applied. Delaware is the state of incorporation of CFC. SAC ¶ 34. California is the forum state of this lawsuit and the headquarters of CFC, at least before the *de jure* merger in July 2008. *Id.*

Finally, having concluded there is a true conflict of law, the Court determines which state has a greater interest in having its law applied. **HN7** According to *Section 302 of the Restatement,*

> (1) Issues involving the rights and liabilities of a corporation, other than those dealt with in § 301, are determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

> (2) The local law of the state of incorporation will be applied to determine such issues, except in the unusual case where, with respect to the particular issue, some other state has a more significant [*16] relationship to the occurrence and the parties, in which event the local law of the other state will be applied.

2011 U.S. Dist. LEXIS 53359, *16

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 302 (2010). Comment *a* to the Restatement explains that *Section 302* is concerned with issues involving matters that are peculiar to corporations and other associations, whereas the rule of *Section 301* is concerned with issues arising from corporate acts of a sort that can also be done by individuals. *Id.*, cmt. *a*, *e*; *see Chrysler Corp. v. Ford Motor Co.*, 972 F. Supp. 1097, 1102 (E.D. Mich. 1997). The particular issue in this case is successor liability by virtue of *de facto* merger. Mergers, reorganizations, and matters that may affect the interests of the corporation's creditors all fall within the scope of *Section 302*, which prescribes the law of the state of incorporation. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 302, cmt. *a*, *e*. Thus, because the issue of whether an asset transfer constitutes a *de facto* merger is peculiar to corporations, Delaware law applies.

## B. DE FACTO MERGER DOCTRINE

*HN8* It is a "well-settled rule of corporate law, [that] where one company sells or transfers all of its assets to another, the second entity does not **[*17]** become liable for the debts and liabilities, including torts, of the transferor." *Polius v. Clark Equip. Co.*, 802 F.2d 75, 77 (3d Cir. 1986). This is the general rule of successor liability, recognized in all jurisdictions: "when a corporation purchases all or most of the assets of another corporation, the purchasing corporation does not assume the debts and liabilities of the selling corporation." *Raytech Corp. v. White*, 54 F.3d 187, 192 n.6 (3rd Cir. 1995) (citing 15 W. FLETCHER, CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 7122 at 232). There are four widely recognized exceptions to this rule of successor nonliability:

> (1) there is an express or implied agreement of assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts.

*Id.* Plaintiffs argue the second exception applies here, that the transaction amounts to a *de facto* merger of the two corporations and has left the selling corporation, CFC, unable to satisfy its creditors. "A *de facto* merger may be found **[*18]** where an asset sale took place that amounted to a merger." *Binder*, 184 F. Supp. 2d at 770. Under the *de facto* merger doctrine, the purchaser is liable for all the seller's debts by operation of law, the same as in a merger.

Delaware courts use the doctrine of *de facto* merger sparingly, "only in very limited contexts." *Id.* at 769. It is therefore difficult to find much authority elucidating the circumstances under which Delaware would recognize *de facto* merger. The parties have not set forth the applicable test Delaware would apply. And, although Bank of America and NB Holdings advocate for Delaware law, they argue only that Delaware requires an allegation that the asset sale was engineered to disadvantage shareholders and creditors. Neither party analyzes the transactions at issue using Delaware law. From the meager authority the Court has found dealing with the *de facto* merger doctrine under Delaware law, the Court can glean only a few factors considered by Delaware courts when considering the issue.

*HN9* One factor Delaware courts consider when determining whether to find *de facto* merger is whether consideration was received and held in exchange for the assets that were transferred. In *Fehl* **[*19]** *v. S.W.C. Corp.*, the District of Delaware explained:

> In general, no liability has been found under a de facto merger theory so long as the transfer was in the ordinary course of business and the seller received and held consider-

DA 77

ation. *McKee v. Standard Minerals Corp.*, 18 Del. Ch. 97, 156 A. 193 (1931). Only in a few cases, where the consideration passed directly to the transferor' stockholders without coming into possession of the transferor corporation, has a de facto merger been found. *McKee v. Standard Minerals Corp., supra; Drug v. Hunt*, 35 Del. 339, 5 W.W. Harr. 339, 168 A. 87 (1933); *Bryant, Griffith & Brunson v. General Newspaper*, 36 Del. 468, 6 W.W. Harr. 468, 476, 178 A. 645 (1935). See generally, FOLK, THE DELAWARE GENERAL CORPORATION LAW, 421-423.

*433 F. Supp. 939, 947 (D. Del. 1977)* (finding no *de facto* merger where the assets were sold for good consideration). *Drug v. Hunt*, 35 Del. 339, 5 W.W. Harr. 339, 168 A. 87 (Del. 1933), is a Delaware case in which the Supreme Court of Delaware agreed with a creditor of the transferor corporation, *i.e.*, seller, that an asset sale constituted a *de facto* merger and imposed successor liability on the transferee corporation, *i.e.*, the buyer. The court found consideration was not received and **[*20]** held by the transferor corporation because the consideration—which was stock in the purchasing corporation?was paid directly to the stockholders of the transferor corporation, not to the transferor corporation itself. *Id.* at 96. Therefore, there was no consideration received and held by the transferor corporation. The court in *Drug v. Hunt* distinguished another case, *Butler v. New Keystone Copper Co.*, 10 Del. Ch. 371, 93 A. 380 (Del. Ch. 1915), because in *Butler* the stock issued by the purchasing corporation, in return for the asset transferred, was given to the selling corporation and not to its shareholders. In that case, then, the transaction was found to be an asset sale. *Drug*, 168 A. at 96. The consideration must also be adequate. *See Heilbrunn v. Sun Chemical Co.*, 146 A.2d at 760 (″Plaintiffs . . . may not complain of a corporate purchase made in conformity with Delaware statutory authority unless such transaction is fraudulent as having been carried out for a grossly inadequate consideration or otherwise made in bad faith.″).

A second factor Delaware courts consider is whether the asset transfer complied with the statute governing such an asset sale. *See id.; Orzeck v. Englehart*, 41 Del. Ch. 361, 195 A.2d 375, 378 (Del. 1963) **[*21]** (observing that *de facto* merger ″has been recognized in cases of sales of assets for the protection of creditors or stockholders who have suffered an injury by reason of failure to comply with the statute governing such sales.″); *Heilbrunn*, 150 A.2d at 757-58; *Binder*, 184 F. Supp. 2d at 769-70. These cases have held form more sacred than substance, by reasoning that intent is manifested in following statutory forms and guidelines and that where the parties follow the mechanical guidelines of the statute, then the method chosen must be honored even though the form selected may be comparable to a merger. *See, e.g., Hariton v. Arco Elecs., Inc.*, 41 Del. Ch. 74, 188 A.2d 123, 125 (Del. 1963). In *Hariton*, the Delaware Supreme Court held that a sale of assets, combined with the assumption of liabilities by the purchasing corporation and the dissolution of the selling corporation did not constitute a *de facto* merger even though the same object was achieved as would have been accomplished by acting under the merger statute. The Court reasoned that the merger statute and the sale-of-assets statute are independent of each other, ″of equal dignity, and the framers of a reorganization plan may resort to either **[*22]** type of corporate mechanics to achieve the desired end.″ *Id.* at 125. Delaware recognizes this principle as the doctrine of independent legal significance. BALOTTI AND FINKELSTEIN, DEL. L. OF CORP. AND BUS. ORG. § 9.4 (2010).

A third factor Delaware courts consider is whether creditors or stockholders have suffered an injury from such failure to comply. *See, e.g., Heilbrunn*, 146 A.2d at 759; *Heilbrunn*, 150 A.2d at 758-59. In *Heilbrunn*, the Supreme Court of Delaware rejected the application of *de facto* merger doctrine because it failed to see how any injury had been inflicted upon the plaintiffs, who were stockholders of the purchasing corporation. *150 A.2d at 758-59.*

2011 U.S. Dist. LEXIS 53359, *22

A fourth factor is fraud or bad faith. *HN10* Under Delaware law, the separate legal existence of corporate entities should be respected—even when those separate corporate entities are under common ownership and control. *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1038 (Del. Ch. 2006); *Stauffer*, 178 A.2d at 316 ("In the absence of fraud, the separate entity of a corporation is to be recognized."). Thus, in the absence of fraud, it is a long-standing principle of Delaware law that an asset sale is not a merger. [2] **[*23]** *Bryant, Griffith & Brunson, Inc.*, 178 A. at 648; *Heilbrunn*, 146 A.2d at 760 (dismissing *de facto* merger allegations because, *inter alia*, the complaint did not clearly allege that the transaction was fraudulent or the consideration insufficient). To state a successor-liability claim under the *de facto* merger doctrine, therefore, the complaint must allege that the sale was designed to disadvantage shareholders or creditors. *In re McKesson*, 126 F. Supp. 2d at 1277.

Accordingly, the Court applies the following factors to its analysis of whether Plaintiffs have adequately pleaded successor liability due to *de facto* merger: (1) was adequate consideration received and held by the transferor corporation in exchange for the assets that were transferred; (2) did the asset transfer comply with the statute governing such an asset sale; (3) were creditors or stockholders injured by a failure to comply with the statute governing an asset sale; and (4) was the sale designed to disadvantage shareholders or creditors?

C. Motion to Dismiss Standard

*HN11* A Rule 12(b)(6) **[*24]** motion to dismiss should be granted when, assuming the truth of the plaintiff's allegations, the complaint fails to state a claim for which relief can be granted. *See Simon v. Hartford Life, Inc.*, 546 F.3d 661, 663-64 (9th Cir. 2008). In the past, a complaint could not be dismissed for failure to state a claim "unless it appear[ed] beyond doubt that the plaintiff [could] prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957). In *Twombly v. Bell Atlantic Corp.*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), the Supreme Court expressly retired *Conley*'s "no set of facts" language and required judges to engage in a "context-specific" review of the complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009). Pleading labels or conclusions is no longer sufficient. *Twombly*, 550 U.S. at 555. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570).

# IV. DISCUSSION

The Court dismisses Bank of America and NB Holdings from this lawsuit because the SAC fails to adequately allege *de facto* **[*25]** merger under Delaware law. With respect to NB Holdings there are no allegations to support the claim that NB Holdings is a successor in interest to CHL. The SAC alleges NB Holdings is a shell entity used to effectuate the *de jure* merger between Bank of America and CFC, and that NB Holdings is a successor to CHL, but does not explain on what basis Plaintiffs make these allegations. SAC ¶ 39. The SAC states only that CHL sold "substantially all of its assets to NB Holdings" on July 3, 2008. SAC ¶ 241. These allegations are insufficient to plead successor liability under the doctrine of *de facto* merger. Moreover, while the SAC alleges that NB Holdings "had the power and influence and exercised the same to cause the Issuer Defendants to engage in the acts described herein," there is not a single factual allega-

---

[2]   The Court notes that the SAC specifically disclaims fraud. SAC ¶ 3 ("The Complaint asserts no allegations of fraud on the part of any Defendant.")

2011 U.S. Dist. LEXIS 53359, *25

tion to support this conclusion. Count III is hereby **DISMISSED WITH PREJUDICE** against NB Holdings for failure to state a claim.

With respect to Bank of America, the SAC fails to adequately plead *de facto* merger with CFC. Plaintiffs seek to combine two separate transactions, the July 2008 *de jure* merger between Red Oak Merger Corporation and CFC with the November 2008 asset sale between **[\*26]** CFC and Bank of America, as constituting one transaction that amounts to a *de facto* merger between Bank of America and its new subsidiary CFC. The first transaction, the *de jure merger*, has already been reviewed by the Delaware courts and found to be fair. *Arkansas Teacher Ret. Sys., et al. v. Caiafa*, 996 A.2d 321 (Del. 2010). The second transaction, the asset sale, is not properly alleged to constitute *de facto* merger under Delaware law as the Court explains below. Plaintiffs' attempt to characterize two separate, legal transactions as one combined fraudulent transaction must fail under Delaware law. Delaware respects the independent legal significance of transactions, even when under common ownership and control, as long as they comply with statutory authority. *See Hariton*, 188 A.2d at 125; BALOTTI AND FINKELSTEIN, DEL. L. OF CORP. AND BUS. ORG. § 9.4 (2010).

Viewing the November 2008 asset sale in the context of the *de facto* merger doctrine, the Court concludes the SAC does not adequately state a claim against Bank of America. First, the SAC fails to plead that adequate consideration was not received and held by CFC in exchange for the assets that were transferred to Bank of America. **[\*27]** In fact, as contemporaneous public SEC filings make clear, Bank of America acquired CFC's assets in exchange for valuable consideration totaling billions of dollars that included the assumption of "debt securities and related guarantees of Countrywide in an aggregated amount of approximately $16.6 billion." Docket No. 176-11 (Close Decl., Ex. 6 [Bank of America Form 8-K dated Nov. 10, 2008] at 399). [3] CFC has retained that consideration and its creditors can look to Bank of America to satisfy those of CFC's obligations that Bank of America has assumed. Because Plaintiffs have not alleged that CFC did not receive and hold adequate consideration for its assets, Plaintiffs have not properly alleged *de facto* merger.

Second, the SAC does not allege that the asset sale **[\*28]** failed to comply with the relevant Delaware statutes governing such a sale. *HN12* The Delaware Supreme Court allows parties to choose whatever reorganization plan they wish, asset sale or merger, so long as they follow the mechanical guidelines of the statute. *Hariton*, 188 A.2d at 125. Third, the SAC does not allege that creditors or stockholders have suffered an injury as a result of Bank of America's failure to comply with the statutory requirements of an asset sale. *Heilbrunn*, 150 A.2d at 758-59. Fourth, as Bank of America has repeatedly emphasized, the SAC does not allege that the November 2008 asset sale was designed to disadvantage stockholders or creditors. *In re McKesson*, 126 F. Supp. 2d at 1276-77. Accordingly, the Court **DISMISSES WITH PREJUDICE** Count III against Bank of America for failure to state a claim.

## V. CONCLUSION

The Court **DISMISSES** Count III against Bank of America and NB Holdings. The dismissal is **WITH PREJUDICE.** As no further claims are alleged against them, Bank of America and NB Holdings are **DISMISSED** from the lawsuit entirely.

---

[3]   The Court takes judicial notice of Bank of America's Current Report on Form 8-K filed with the SEC on or about November 10, 2008 as facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Fed. R. Evid. 201(b)(2)*. The Court may consider this document for this motion to dismiss as it is a matter of public record. *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994).

2011 U.S. Dist. LEXIS 53359, *28

**IT IS SO ORDERED.**

DATED: April 20, 2011

/s/ Mariana R. Pfaelzer

Hon. Mariana R. Pfaelzer

United States District Judge





Cited
As of: November 12, 2012 2:25 PM EST

# United States ex rel. Hebert v. Dizney

United States Court of Appeals for the Fifth Circuit

October 10, 2008, Filed

No. 07-31053

**Reporter:** 295 Fed. Appx. 717; 2008 U.S. App. LEXIS 21413; 71 Fed. R. Serv. 3d (Callaghan) 1322

UNITED STATES OF AMERICA ex rel. BERNIE A. HEBERT, JR. and GWENDOLYN M. McINNIS, Plaintiffs-Appellants v. DONALD R. DIZNEY; DAVID A. DIZNEY; JAMES E. ENGLISH; KEVIN BARKMAN; PATRICK HAMMER; GREGG CUNNIFF; UNITED MEDICAL CORPORATION; ST. CLAUDE MEDICAL CENTER, LLC; UNITED MEDICAL CORPORATION OF ORLANDO; TEN BROECK-DUPONT HOSPITAL; TEN BROECK-KMI HOSPITAL; TEN BROECK JACKSONVILLE, LLC; TEN BROECK NORTH CAROLINA, LLC; TEN BROECK HOSPITALS, INC; UNITED MEDICAL CORPORATION OF TAMPA; UNITED MEDICAL CORPORATION OF PUERTO RICO, INC.; UNITED MEDICAL CORPORATION TEN BROECK, INC.; UNITED MEDICAL CORPORATION OF KENTUCKY; UNITED MEDICAL CENTER OF NEW ORLEANS; HOSPITAL PAVIA-SANTURCE; HOSPITAL PAVIA-HATO REY; SAN JORGE CHILDREN'S HOSPITAL; HOSPITAL GUBERN; HOSPITAL PEREA; LAS MARIA REFERENCE AND O/P LABS; KENTUCKY UNITED MEDICAL CORPORATION; and UNITED MEDICAL CORPORATION OF LOUISIANA, Defendants-Appellees

**Notice:**

**Prior History:** [**1] Appeal from the United States District Court for the Eastern District of Louisiana. USDC No. 2:03-CV-437.

---

**Core Terms**

---

false claim, district court, leave to amend, relaxed, license, pled, denial of leave, opposing party, claim for payment, constitute fraud, qui tam, fraudulent, beds, cure

---

**Case Summary**

---

### Procedural Posture

In a qui tam case, appellant relators sought judicial review of the United States District Court for the Eastern District of Louisiana's dismissal of their claims under the False Claims Act, *31 U.S.C.S. § 3729 et seq.*, against appellees, a medical corporation, affiliated health care companies, and executives, for failure to plead fraud with particularity under *Fed. R. Civ. P. 9(b)* and denial of their motion to amend the complaint.

### Overview

The relators asserted a multifaceted scheme to obtain illegal Medicare and Medicaid payments. They had made broad claims against numerous appellees without identifying specific actions of spe- cific individuals at specific times that would constitute fraud against the government. On ap- peal, the relators presented arguments with respect to only four of the fourteen counts in their sec- ond amended complaint. Their allegations did not point with specificity to the what, when, or where of any individual false claim, and therefore did not satisfy *Rule 9(b)*'s particularity require- ments. Additionally, they failed in all of the counts in the second amended complaint to specify the identity of the person making the misrepresentation beyond appellees. The relators' argu- ments that *Rule 9(b)*'s should have been relaxed failed. The denial of the relators' *Fed. R. Civ. P. 59(e)* motion was reviewed for abuse of discretion, in light of the limited discretion of *Fed. R. Civ. P. 15(a)*. The district court did not abuse its discretion in denying leave to amend. The rela- tors had filed an original complaint and two amended complaints; they had been given ample op- portunity to plead their statutory claims.

**Outcome**
The judgment of the district court was affirmed.

---

**LexisNexis® Headnotes**

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint
Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Fraud Claims
Governments > Federal Government > Claims By & Against

*HN1* While complaints generally need contain only a short and plain statement of the cause of ac- tion, claims brought under the False Claims Act, *31 U.S.C.S. § 3729 et seq.*, must comply with *Fed. R. Civ. P. 9(b)*.

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Fraud Claims

*HN2* *Fed. R. Civ. P. 9(b)* states that in alleging fraud or mistake, a party must state with particu- larity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other con- dition of a person's mind may be alleged generally. Under *Rule 9(b)*, a plaintiff must include the time, place and contents of the false representations, as well as the identity of the person mak- ing the misrepresentation and what that person obtained thereby. That is known as the who, what, when, where, and how of the alleged fraud.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim
Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Fraud Claims
Civil Procedure > Appeals > Standards of Review > De Novo Review

*HN3* A dismissal for failure to plead fraud with particularity under *Fed. R. Civ. P. 9(b)* is treated as a dismissal for failure to state a claim under *Fed. R. Civ. P. 12(b)(6)* and is reviewed de novo. A plaintiff must plead enough facts to state a claim to relief that is plausible on its face. Fac- tual allegations must be enough to raise a right to relief above the speculative level, on the as- sumption that all the allegations in the complaint are true, even if doubtful in fact.

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Leave of Court
Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

*HN4* An appellate court reviews a district court's denial of leave to amend under *Fed. R. Civ. P. 15(a)* for an abuse of discretion. However, *Rule 15(a)* severely restricts the judge's freedom, di- recting that leave to amend shall be freely given when justice so requires and, therefore, leave to

295 Fed. Appx. 717, *717; 2008 U.S. App. LEXIS 21413, **1

amend should not be denied without a substantial reason such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of amendment.

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Fraud Claims
Governments > Federal Government > Employees & Officials

*HN5* The conduct to which liability attaches in a suit under the False Claims Act (FCA), *31 U.S.C.S. § 3729 et seq.*, consists in part of false statements or claims for payment presented to the government. Because such statements or claims are among the circumstances constituting fraud in an FCA suit, those must be pled with particularity under *Fed. R. Civ. P. 9(b)*. Particularized allegations of an actual false claim is an indispensable element of an FCA violation. FCA attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the claim for payment. It seems to be a fairly obvious notion that an FCA suit ought to require a false claim. The submission of a claim is the sine qua non of an FCA violation.

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Fraud Claims
Governments > Federal Government > Claims By & Against

*HN6* In a case brought under the False Claims Act, *31 U.S.C.S. § 3729 et seq.*, allegations that do not point with specificity to the what, when, or where of any individual false claim, do not satisfy *Fed. R. Civ. P. Rule 9(b)*'s particularity requirements.

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Fraud Claims

*HN7* Generalized allegations do not come close to satisfying *Fed. R. Civ. P. 9(b)*.

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Fraud Claims

*HN8* When information is peculiarly within the perpetrator's knowledge, the *Fed. R. Civ. P. 9(b)* standard is relaxed, and fraud may be pled on information and belief.

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Fraud Claims
Governments > Federal Government > Claims By & Against

*HN9* Pleading on information and belief does not otherwise relieve a qui tam plaintiff from the requirements of *Fed. R. Civ. P. 9(b)*. Information and belief' allegations remain subject to the particularity requirements of *Rule 9(b)*. If the facts pled in a complaint are peculiarly within the opposing party's knowledge, fraud pleadings may be based on information and belief. However, that luxury must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Fraud Claims
Governments > Federal Government > Claims By & Against

*HN10* While *Fed. R. Civ. P. 9(b)* does not require a qui tam plaintiff alleging a long-running scheme involving many false claims to list every false claim, its dates, and the individuals responsible, the allegedly great extent and complexity of a fraudulent scheme does not excuse a failure to plead at least one false claim with the requisite specificity.

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Fraud Claims
Governments > Federal Government > Claims By & Against

295 Fed. Appx. 717, *717; 2008 U.S. App. LEXIS 21413, **1

Governments > Legislation > Interpretation

*HN11* The United States Court of Appeals for the Fifth Circuit refuses to relax *Fed. R. Civ. P. 9(b)* in the context of qui tam suits. The text of the rule provides no justification for doing so. Courts are to be practical and strive for simple, direct and clear meanings. They have no license to craft judicial exceptions.

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Fraud Claims
Governments > Federal Government > Claims By & Against

*HN12* The False Claims Act, *31 U.S.C.S. § 3729 et seq.*, grants a right of action to private citizens only if they have independently obtained knowledge of fraud. *31 U.S.C.S. § 3730(e)(4)*. With that requirement, the government seeks to purchase information it might not otherwise acquire. It must decide on review of the sealed complaint whether to take the case over. A special relaxing of *Fed. R. Civ. P. 9(b)* is a qui tam plaintiff's ticket to the discovery process that the statute itself does not contemplate.

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Leave of Court
Civil Procedure > Dismissal > General Overview
Civil Procedure > Judgments > Relief From Judgments > General Overview

*HN13* In the United States Fifth Circuit, when a district court dismisses the complaint, but does not terminate the action altogether, the plaintiff may amend under *Fed. R. Civ. P. 15(a)* with permission of the district court. When a district court dismisses an action and enters a final judgment, however, a plaintiff may request leave to amend only by either appealing the judgment, or seeking to alter or reopen the judgment under *Fed. R. Civ. P. 59* or *60*.

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

*HN14* Arguments raised for the first time in a reply brief are waived.

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Leave of Court
Civil Procedure > Judgments > Entry of Judgments > General Overview
Civil Procedure > Judgments > Relief From Judgments > Vacation of Judgments
Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

*HN15* Where judgment has been entered on the pleadings, a holding that the trial court should have permitted amendment necessarily implies that judgment on the pleadings was inappropriate and that therefore a motion to vacate should be granted. Thus, the disposition of a plaintiff's motion to vacate under *Fed. R. Civ. P. 59(e)* should be governed by the same considerations controlling the exercise of discretion under *Fed. R. Civ. P. 15(a)*. An appellate court reviews a district court's denial of a plaintiff's *Rule 59(e)* motion for abuse of discretion, in light of the limited discretion of *Rule 15(a)*.

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Leave of Court
Civil Procedure > Judicial Officers > Judges > Discretionary Powers

*HN16* A district court judge's discretion is not wide enough to permit denial of leave to amend under *Fed. R. Civ. P. 15(a)* without a substantial reason such as undue delay, repeated failures to cure deficiencies in previous amendments, undue prejudice to the opposing party, or futility.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim
Civil Procedure > ... > Pleadings > Amendment of Pleadings > Leave of Court
Governments > Courts > Judicial Precedent

295 Fed. Appx. 717, *717; 2008 U.S. App. LEXIS 21413, **1

*HN17* While there is a strong pull to decide cases on the merits rather than on the sufficiency of the pleadings and case law supports the premise that granting leave to amend is especially appropriate when the trial court has dismissed the complaint for failure to state a claim, the United States Court of Appeals for the Fifth Circuit has upheld the denial of leave to amend under similar circumstances.

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Leave of Court
Civil Procedure > Dismissal > Involuntary Dismissals > Failure to State Claims

*HN18* At some point a court must decide that a plaintiff has had fair opportunity to make his case; if, after that time, a cause of action has not been established, the court should finally dismiss the suit. When a plaintiff has already filed an original complaint and two amended complaints, each alleging the same types of claims, the plaintiff has been given ample opportunity to plead his or statutory claims.

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Leave of Court

*HN20* A bare request in an opposition to a motion to dismiss, without any indication of the particular grounds on which the amendment is sought, does not constitute a motion within the contemplation of *Fed. R. Civ. P. 15(a)*.

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Leave of Court

*HN19* While leave to amend must be freely given, that generous standard is tempered by the necessary power of a district court to manage a case, and a busy district court need not allow itself to be imposed upon by the presentation of theories seriatim.

**Counsel:** For BERNIE A HEBERT, JR, GWENDOLYN M MCINNIS, Plaintiffs - Appellants: James F Willeford, New Orleans, LA.; Don M Richard, Chehardy, Sherman, Ellis, Murray, Recile, Griffith & StakelumMetairie, LA; Reagan L Toledano, Willeford Law Firm, New Orleans, LA.

For DONALD R DIZNEY, DAVID A DIZNEY, JAMES E ENGLISH, KEVIN BARKMAN, PATRICK HAMMER, GREGG CUNNIFF, UNITED MEDICAL CORP, ST CLAUDE MEDICAL CENTER LLC, (in bankruptcy), TEN BROECK-DUPONT HOSPITAL, TEN BROECK-KMI HOSPITAL, TEN BROECK JACKSONVILLE LLC, TEN BROECK HOSPITALS INC, UNITED MEDICAL CORPORATION OF TAMPA, UNITED MEDICAL CORPORATION TEN BROECK INC, UNITED MEDICAL CORPORATION OF KENTUCKY, UNITED MEDICAL CENTER OF NEW ORLEANS, KENTUCKY UNITED MEDICAL CORP, Defendants - Appellees: John Francis Emmett, Waits, Emmett & Popp, New Orleans, LA.

**Judges:** Before BARKSDALE, BENAVIDES, and DENNIS, Circuit Judges.

**Opinion by:** FORTUNATO P. BENAVIDES

---

| **Opinion** |
| --- |

[*719] FORTUNATO P. BENAVIDES, Circuit Judge: [*]

---

[*]   Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except

DA 86

Bernie  [**2]  A. Hebert, Jr., and Gwendolyn M. McInnis (collectively, "Relators") brought this qui tam action against United Medical Corporation ("UMC"), various affiliated health care companies including St. Claude Medical Center, LLC ('St.  [*720]  Claude"), and certain UMC executives (collectively, "Defendants"), alleging violations of the False Claims Act ("FCA"), *31 U.S.C. § 3729, et seq.* The district court granted the Appellees' motion to dismiss for failure to plead fraud with particularity under *Federal Rule of Civil Procedure 9(b)* and denied Relators' motion to amend the complaint. We affirm.

I.

St. Claude operates a hospital, St. Claude Medical Center (the "Hospital"), in New Orleans, Louisiana. While serving as executives of St. Claude, Relators allegedly became aware of a multifaceted scheme by UMC, St. Claude, and the individual defendants to obtain illegal Medicare and Medicaid payments from the Government over a period of more than seven years. On February 12, 2003, Relators filed suit in the United States District Court for the Eastern District of Louisiana. The complaint, and an Amended Complaint alleging an additional cause of action filed almost a year later, remained sealed while the Government  [**3]  considered whether to intervene. After nearly four years it decided not to do so, and on January 10, 2007, the district court ordered the complaints to be served on the Defendants. On March 15, 2007, Relators filed their Second Amended Complaint, adding another claim, striking an original relator, and dismissing claims against some original defendants. [1] On May 21, 2007, Defendants  [*721]  moved to dismiss under *Rule 12(b)(6)* for failure to plead with the particularity required by *Rule 9(b) of the Federal Rules of Civil Procedure*, which the district court granted on August 3, 2007. Relators then timely filed a combined *Rule 59(e)* motion to alter or amend judgment and a motion seeking leave to amend their complaint under *Rule 15(a)*, accompanied by a proposed amendment. The district court denied this motion on October 18, 2007, and entered final judgment on November 19. Relators timely filed notice of appeal.

(1) Falsely stating the Hospital had at least 100 available beds in order to qualify for a higher rate of reimbursement  [**4]  for Medicare claims as a hospital serving a disproportionate share of low-income patients. *See42 C.F.R. § 412.106*.

(2) Falsely stating the Hospital had at least 100 available beds in order to receive higher per diem payments under Louisiana's Medicaid program.

(3) Falsely stating the Hospital had at least 100 available beds in order to receive higher reimbursements under the Psychiatric Partial Hospital Program at the Hospital, as well as falsely certifying that this program met Medicare regulations and submitting non-qualified expenses to Medicare.

(4) Submitting claims to Medicare and Medicaid for Psychiatric Inpatient Hospital admissions for patients who did not meet inpatient criteria and were detained against their will.

(5) Providing financial inducements to referring doctors.

(6) Submitting false Medicare claims by including inappropriate or non-existent costs in the Psychiatric Partial Hospital Program and submitting Medicare and Medicaid cost reports that improperly included travel, food, alcohol, and entertainment expenses not related to appropriate business activities.

---

under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1]   The Second Amended Complaint includes fourteen counts, alleging, in summary, that from January 1, 1995, to February 12, 2003, Defendants violated the FCA in the following ways:

(7) Routinely failing to attempt to collect co-insurance payments from Medicare payments and billing Medicare **[\*\*5]** for those payments.

(8) Providing financial inducements to referring doctors and threatening to punish doctors who admitted poor patients, resulting in questionable admissions.

(9) Not paying vendors while reporting the vendors' unpaid bills to the Government as operating costs.

(10) Informing Hospital employees that they had medical coverage and deducting money from their salaries without providing medical coverage.

(11) Filing questionable tax returns by declaring losses based on loans to the Hospital that were withdrawn shortly after the end of the tax year.

(12) Engaging in numerous unlawful business practices, including, in addition to some of the practices alleged in other claims, the failure to purchase basic medical equipment and adequately maintain the Hospital.

(13) Falsely certifying that they were meeting all health standards when the Government would not have paid Defendants under Medicare and Medicaid if it had known of the violations.

(14) Violating all conditions of participation in Medicare and Medicaid.


## II.

**HN1** While complaints generally need contain only a short and plain statement of the cause of action, "[c]laims brought under the FCA must comply with *Federal Rule of Civil Procedure 9(b)*." **[\*\*6]** *United States ex rel. Doe v. Dow Chem. Co.,* 343 F.3d 325, 328 (5th Cir. 2003) (internal citation omitted). **HN2** *Rule 9(b)* states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other condition of a person's mind may be alleged generally." *Fed. R. Civ. P. 9(b)*. Under *Rule 9(b)*, a plaintiff must include the "time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby." *United States ex rel. Russell v. Epic Healthcare Mgmt. Group,* 193 F.3d 304, 308 (5th Cir. 1999) (internal citation omitted) (alteration in original). This is known as the "who, what, when, where, and how of the alleged fraud." *United States ex rel. Thompson v. Columbia/ HCA Healthcare Corp.,* 125 F.3d 899, 903 (5th Cir. 1997) (citation omitted).

**HN3** A dismissal for failure to plead fraud with particularity under *Rule 9(b)* is treated as a dismissal for failure to state a claim under *Rule 12(b)(6)* and is reviewed *de novo. Id.* at 901. A plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." **[\*\*7]** *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 1965 (internal citations and footnote omitted).

**HN4** We review a district court's denial of leave to amend under *Rule 15(a)* for an abuse of discretion. *Stripling v. Jordan Prod. Co.,* 234 F.3d 863, 872 (5th Cir. 2000). However, "*rule 15(a)* severely restricts the judge's freedom, directing that leave to amend 'shall be freely given when justice so requires,'" *Dussouy v. Gulf Coast Inv. Corp.,* 660 F.2d 594, 597 (5th Cir. 1981), and, therefore, leave to amend should not be denied without a substantial reason such as "undue de-

295 Fed. Appx. 717, *721; 2008 U.S. App. LEXIS 21413, **7

lay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment.'" *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962); *see also Stripling*, 234 F.3d at 872.

III.

A. Dismissal of Relators' Claims

Relators first appeal the district court's dismissal of their action **[**8]** for failure to plead with particularity as required by *Rule 9(b)*. *HN5* "The conduct to which liability attaches in [an FCA] suit consists in part of false statements or claims for payment presented to the government. Because such statements or claims are among the circumstances constituting fraud in [an FCA] suit, these must be pled with particularity under *Rule 9(b)*." *Russell*, 193 F.3d at 308 (citation omitted); *see also United States ex rel. Bledsoe v. Cmty. Health Sys.*, 501 F.3d 493, 505 (6th Cir. **[*722]** 2007) ("Particularized allegations of an actual false claim is an indispensable element of a FCA violation[.]"); *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 225 (1st Cir. 2004) ("The [FCA] attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the claim for payment.") (citation omitted); *United States ex rel. Aflatooni v. Kitsap Physicians Serv.*, 314 F.3d 995, 997 (9th Cir. 2002) ("It seems to be a fairly obvious notion that a False Claims Act suit ought to require a false claim."); *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002) ("The submission of a claim is . . . the **[**9]** *sine qua non* of a False Claims Act violation."). The district court concluded that Relators have made "broad claims against numerous defendants without identifying specific actions of specific individuals at specific times that would constitute fraud against the government." We agree with this characterization.

On appeal, Relators present arguments with respect to only four of the fourteen counts in their Second Amended Complaint. Relators first argue that their first and second counts, involving allegations that Defendants falsely reported the number of beds at the Hospital in order to qualify for a higher rate of reimbursement under Medicare and Medicaid, *see 42 C.F.R. § 412.106*, as well as their thirteenth count, involving allegations of a failure to "meet the medical community standards of care" at the Hospital, were pled with sufficient particularity. These counts, Relators maintain, allege that Defendants made false claims in their annual cost reports and provide the "who, what, when, where, and how" of these reports. The words "annual cost report" do not appear in these counts, however, nor do the counts contain allegations of specific false claims having been submitted in these **[**10]** cost reports or otherwise. Rather, these counts contain general statements such as "Defendants made knowingly false representations . . . at least once each year (1995-2001) in connection with the annual licensing application," "[D]efendants routinely submitted bills -- on a daily basis -- to Medicare for reimbursement and payment," "[D]efendants knowingly made false reports in connection with a claim for payment . . . for the time period January 1, 1996 to present," "the 'licensed beds' for [1996-2002] . . . should not have been reported at the 136-bed levels and should not have been reported for licensing," and "[D]efendants provided false information . . . regarding the quality of care . . . in the course of negotiating for Medicare and Medicaid contracts and thus all claims submitted by [D]efendants are considered false." These *HN6* allegations do not point with specificity to the "what, when, or where" of any individual false claim, and therefore do not satisfy *Rule 9(b)*'s particularity requirements. *See Clausen*, 290 F.3d at 1312 (holding that the "failure to allege with any specificity if -- or when -- any actual improper claims were submitted to the Government is indeed fatal").

Further, **[**11]** as the district court noted, Relators fail -- in all of the counts in the Second Amended Complaint -- to specify "the identity of the person making the misrepresentation" beyond "defendants." *Russell*, 193 F.3d at 308. While Relators argue that it is the identity of the corporate actor rather than the natural person that is relevant here, *see Bledsoe*, 501 F.3d at 506, Relators have not pled the identity of the corporate actor with particularity: there are twentyone corporate and six individual defendants named in the Second Amended Complaint.

Relators also argue that count seven, in which Relators allege that Defendants failed to attempt to collect required co-payments from Medicare and Medicaid patients, **[*723]** meets the requirements of *Rule 9(b)*. Nowhere in this count, though, do Relators allege with specificity that any false claim was submitted. Instead, this count alleges that Defendants "routinely failed to collect . . . coinsurance payments," and that "Medicaid was routinely billed for the portion not paid by other payers" in five different states and Puerto Rico over approximately seven years. These **HN7** generalized allegations do not come close to satisfying *Rule 9(b)*. Relators, however, **[**12]** suggest that *Rule 9(b)*'s requirements should be relaxed because information about individual false claims is "peculiarly within the perpetrator's knowledge." *Willard*, 336 F.3d at 385. We have held that **HN8** under those circumstances the "*Rule 9(b)* standard is relaxed, and fraud may be pled on information and belief." *Russell,* 193 F.3d at 308. Even assuming that this relaxed standard should apply here, the allegations in the Second Amended Complaint fail to meet it: Relators do not make, even on information and belief, particularized allegations of any false claim having been submitted. **HN9** Pleading on information and belief does not otherwise relieve a qui tam plaintiff from the requirements of *Rule 9(b)*. *See Karvelas,* 360 F.3d at 226 ("'[I]nformation and belief' allegations remain subject to the particularity requirements of *Rule 9(b)*."); *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1068 (5th Cir. 1994) ("If the facts pleaded in a complaint are peculiarly within the opposing party's knowledge, fraud pleadings may be based on information and belief. However, this luxury must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.") **[**13]** (citation omitted).

Relators also assert that we should relax *Rule 9(b)*'s requirements with respect to their failure-to-collect-co-insurance allegations because this scheme would have affected thousands of claims. *See United States ex rel. Johnson v. Shell Oil Co.,* 183 F.R.D. 204, 206 (E.D. Tex. 1998) ("where the fraud allegedly was complex and occurred over a period of time, the requirements of *Rule 9(b)* are less stringently applied"); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 20 F. Supp. 2d 1017, 1049 (S.D. Tex. 1998) ("*Thompson II*") (holding that *Rule 9(b)* is satisfied where "[t]he basic framework, procedures, the nature of the fraudulent scheme, and the financial arrangements and inducements among the parties and physicians that give rise to Relator's belief that fraud has occurred have been alleged with specificity"). **HN10** While we agree that *Rule 9(b)* does not require a qui tam plaintiff alleging a long-running scheme involving many false claims "to list every false claim, its dates, [and] the individuals responsible," *Thompson II,* 20 F. Supp. 2d at 1049, the allegedly great extent and complexity of a fraudulent scheme does not excuse a failure to plead at least **[**14]** one false claim with the requisite specificity. As we said in *Russell:*

> **HN11** We decline to further relax *Rule 9(b)* in the context of *qui tam* suits. The text of the rule provides no justification for doing so. As we observed in reading *Rule 4 of the Federal Rules of Appellate Procedure*, we are to be practical and strive for simple, direct and clear meanings. We have no license to craft judicial exceptions, and we see no reason to do so here. Furthermore, **HN12** the False Claims Act grants a right of action to private citizens only if they have independently obtained knowledge of fraud. *See 31 U.S.C. § 3730(e)(4)*. With this requirement the government seeks to purchase information it might not otherwise acquire. It must decide on review of the sealed com-

295 Fed. Appx. 717, *723; 2008 U.S. App. LEXIS 21413, **14

plaint whether to take the case over. A special relaxing of *Rule 9(b)* is a *qui tam* plaintiff's ticket to **[*724]** the discovery process that the statute itself does not contemplate.

*193 F.3d at 308--09*. The district court did not err in dismissing the Second Amended Complaint.

B. Denial of Leave to Amend

Relators also challenge the district court's denial of their combined *Rule 59(e)* motion to alter or amend judgment and *Rule 15* motion for leave to amend. *HN13* "In this **[**15]** Circuit, when a district court dismisses the complaint, but does not terminate the action altogether, the plaintiff may amend under *Rule 15(a)* with permission of the district court." *Rosenzweig v. Azurix Corp., 332 F.3d 854, 865 (5th Cir. 2003)* (citing *Whitaker v. City of Houston, 963 F.2d 831, 835 (5th Cir. 1992))*. "When a district court dismisses an action and enters a final judgment, however, a plaintiff may request leave to amend only by either appealing the judgment, or seeking to alter or reopen the judgment under *Rule 59* or *60*." *Rosenzweig, 332 F.3d at 865* (citations omitted). Here, the district court concluded that it had dismissed the action, and Relators do not challenge this conclusion in their opening brief. *See United States v. Jackson, 426 F.3d 301, 304 n.2 (5th Cir. 2005)* (*HN14* "Arguments raised for the first time in a reply brief . . . are waived."). Regardless, Relators timely filed a *Rule 59(e)* motion, and, under these circumstances, the considerations for a motion under *Rule 59(e)* are the same as those governing a motion under *Rule 15(a)*:

> *HN15* Where judgment has been entered on the pleadings, a holding that the trial court should have permitted amendment necessarily implies **[**16]** that judgment on the pleadings was inappropriate and that therefore the motion to vacate should have been granted. Thus the disposition of the plaintiff's motion to vacate under *rule 59(e)* should be governed by the same considerations controlling the exercise of discretion under *rule 15(a)*.

*Rosenzweig, 332 F.3d at 865* (quoting *Dussouy v. Gulf Coast Inv. Corp., 660 F.2d 594, 597 n.1 (5th Cir. 1981))*. Therefore, "we review the district court's denial of plaintiffs' *59(e)* motion for abuse of discretion, in light of the limited discretion of *Rule 15(a)*." [2]*Rosenzweig, 332 F.3d at 865*. As noted above, *HN16* a district court judge's discretion is not wide enough to permit denial of leave to amend under *Rule 15(a)* without a substantial reason such as undue delay, repeated failures to cure deficiencies in previous amendments, undue prejudice to the opposing party, or futility. *Foman, 371 U.S. at 183*; *Stripling, 234 F.3d at 872*.

*HN17* While there is a strong pull to decide cases on the merits rather than on the sufficiency of the pleadings and "our cases support the premise that granting leave to amend is especially appropriate . . . when the trial court has dismissed the complaint for failure to state a claim," *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 329 (5th Cir. 2002)* (citation omitted), we have upheld the denial of leave to amend under similar circumstances. Here, the district court noted that the Relators "have previously amended their complaint twice." In *Herrmann* **[*725]** *Holdings Ltd. v. Lucent Techs., Inc.,* we found no abuse of discretion in the dis-

---

[2] The district court included both the correct, Rule 15(a) standard and an erroneous, post-merits-judgment amendment standard, *see Vielma v. Eureka Co., 218 F.3d 458, 468 (5th Cir. 2000)* (In cases "where a party seeks to amend her complaint after entry of judgment, we have consistently **[**17]** upheld the denial of leave to amend where the party seeking to amend has not clearly established that he could not reasonably have raised the new matter prior to the trial court's merits ruling.") (citation omitted), in its Order and Reasons denying Relators' motion and supplied reasoning applicable to both. Relators do not argue that the district court's stated reasons were not intended to apply to Rule 15(a).

295 Fed. Appx. 717, *725; 2008 U.S. App. LEXIS 21413, **17

trict court's reasoning that "although plaintiffs should ordinarily be offered an opportunity to amend if it appears that a more **[**18]** carefully drafted complaint might state claims upon which relief could be granted, that course need not be followed here since plaintiffs have already twice amended their complaint." *302 F.3d 552, 566 (5th Cir. 2002)* (citing *Jacquez v. Procunier, 801 F.2d 789, 793 (5th Cir. 1986)* (*HN18* "At some point a court must decide that a plaintiff has had fair opportunity to make his case; if, after that time, a cause of action has not been established, the court should finally dismiss the suit.")). Because the plaintiffs had "already filed an original complaint and two amended complaints, each alleging [the same types of claims]," they had been "given ample opportunity to plead their statutory claims." *Herrmann,* 302 F.3d at 567. In this case, all of Relators' complaints involved FCA claims, and although Relators argue that their previous amendments, which were not intended to cure deficiencies, should not be grounds for denial of leave to amend, there is no indication that the amendments at issue in *Hermann* were so intended.

Further, as was the case in *Rosenzweig,* Relators here failed to seek leave to amend prior to dismissal [3] and do not argue that their proposed amendment "raised any facts which were **[**19]** not available previous to the district court's opinion." *332 F.3d at 865*. *HN19* "While leave to amend must be freely given, that generous standard is tempered by the necessary power of a district court to manage a case," *Shivangi v. Dean Witter Reynolds, Inc., 825 F.2d 885, 891 (5th Cir. 1987),* and "a busy district court need not allow itself to be imposed upon by the presentation of theories seriatim," *Rosenzweig,* 332 F.3d at 865 (quoting *Freeman v. Continental Gin Co., 381 F.2d 459, 469 (5th Cir. 1967))*. Under these circumstances, we cannot say that the district court abused its discretion in denying leave to amend. [4]

IV.

For the reasons above, we AFFIRM.

---

[3]   Relators briefly argue that they moved for leave to amend in their memorandum and sur-reply memorandum to the district court in opposition to the motion to dismiss. However, the sum total of their request consisted of the following: "If this Court finds these allegations insufficient, relators request leave to amend their complaint" and "Nonetheless, if this Court finds the allegations insufficient, plaintiff requests leave to amend." These bare statements, however, unaccompanied by a proposed amendment, do not constitute a motion. *Willard,* 336 F.3d at 387 (*HN20* "[A] bare request in **[**20]** an opposition to a motion to dismiss -- without any indication of the particular grounds on which the amendment is sought, *cf.*Fed. R. Civ. P. 7(b) -- does not constitute a motion within the contemplation of Rule 15(a).") (citations and quotations omitted).

[4]   The district court also concluded that allowing the proposed amendment would be futile. Because we affirm the denial of leave to amend on other grounds, we do not reach this issue.





Neutral
As of: November 12, 2012 3:08 PM EST

# United States ex rel. Jamison v. McKesson Corp.

United States District Court for the Northern District of Mississippi, Delta Division
September 28, 2012, Decided; September 28, 2012, Filed
CIVIL ACTION NO. 2:08cv214-SA-JMV

**Reporter:** 2012 U.S. Dist. LEXIS 142078; 2012 WL 4499136

UNITED STATES OF AMERICA, ex rel., THOMAS F. JAMISON, PLAINTIFFS v. MCKESSON CORPORATION, et al., DEFENDANTS

**Notice:**

**Prior History:** *United States ex rel. Jamison v. McKesson Corp., 2012 U.S. Dist. LEXIS 17856 (N.D. Miss., Feb. 14, 2012)*

---

**Core Terms**

billing, bid, supplier, patient, medical supply, fair market value, actual cost, false claim, discount, entity, induce, fee schedule, certification, reimbursement, remuneration, fail to prove, field service, nursing home, customer, tracking, billing services, incremental, nutrition, bidders, carved, final bid, negotiations, referrals, analyses, kickback

**Counsel:** **[\*1]** For United States of America, Ex Rel., Thomas F. Jamison, Plaintiff: Albert Thomas Morris, LEAD ATTORNEY, Charles John Biro, U.S. DEPARTMENT OF JUSTICE, Washington, DC; Felecia L. Wilson, LEAD ATTORNEY, U.S. ATTORNEY'S OFFICE, Oxford, MS; James C. Johnson, II, LEAD ATTORNEY, J. Brad Pigott, PIGOTT REEVES JOHNSON & MINOR, PA, Jackson, MS.

For McKesson Corporation, McKesson Medical-Surgical MediNet, Inc., Defendants: Benjamin W. Berkowitz, David J. Silbert, Jeffrey R. Chanin, John W. Keker, LEAD ATTORNEYS, PRO HAC VICE, KEKER & VAN NEST, San Fransisco, CA; Caitlin E. Bales, Thomas E. Gorman, LEAD ATTORNEYS, PRO HAC VICE, KEKER & VAN NEST LLP, San Francisco, CA; Kenneth H. Coghlan, LEAD ATTORNEY, Merrill King Nordstrom, Stuart Sheffield Davis, RAYBURN COGHLAN LAW FIRM, PLLC, Oxford, MS; Patric Hooper, LEAD ATTORNEY, PRO HAC VICE, HOOPER LUNDAY & BOOKMAN, INC., Los Angeles, CA.

For GGNSC Holdings, LLC, Golden Gate Ancillary, LLC, Beverly Enterprises, Inc., Ceres Strategies, Inc., Ceres Strategies Medical Services, Inc., Defendants: Heather J. Pellegrino, LEAD ATTORNEY, PRO HAC VICE, AKIN GUMP STRAUSS HAUER & FELD LLP, Washington, DC; Kelly M. Cleary, Robert S. Salcido, LEAD ATTORNEYS, PRO **[\*2]** HAC VICE, AKIN GUMP STRAUSS HAUER & FELD LLP - DC, Washington, DC; Benjamin W. Berkowitz, David J. Silbert, KEKER & VAN NEST, San Fransisco, CA; Bradley S. Clanton, Jeffrey Scott Newton, BAKER, DONELSON, BEARMAN & CALDWELL - Jackson, Jackson, MS.

For Chris Roussos, Material Witness: Oliver Benton Curtis, III, LEAD ATTORNEY, PRO HAC VICE, EPSTEIN, BECKER & GREEN, P.C., Washington, DC.

For Bobby Stephens, Les Henderson, Material Witnesses: Kirkman T. Dougherty, LEAD ATTORNEY, PRO HAC VICE, HARDIN, JESSON & TERRY, PLC, Fort Smith, AR.

**Judges:** Sharion Aycock, U.S. DISTRICT JUDGE.

**Opinion by:** Sharion Aycock

---

| Opinion |
| --- |

FINAL JUDGMENT

A bench trial of this matter commenced February 21, 2012. After fourteen days of trial, twenty-four witnesses, hundreds of exhibits, and post-trial briefing, the Court is ready to finally adjudicate this case. Because the Government has failed to carry its burden of proof that Defendants violated the Anti-Kickback Statute or False Claims Act, judgment is entered in favor of Defendants.

*Procedural History*

In December 2004, Thomas Jamison filed a sealed *qui tam* complaint under the False Claims Act (FCA) against approximately 450 defendants, ranging from individual nursing homes, nursing home chains, **[*3]** nursing home management companies, durable medical equipment (DME) [1] suppliers and billers, as well as the owners and employees thereof. He alleged those persons and entities presented false claims to Medicare and Medicaid in three ways: (1) forming improper joint ventures to defraud the Government; (2) violating the supplier standards required by DME suppliers; and (3) submitting fraudulent Medicaid Cost Reports. See United States ex rel. Jamison v. Beverly of Tupelo, et al., No. 2:04cv355-SA-DAS [19] (N.D. Miss. June 22, 2006). The Relator's amended complaint specifically alleged that medical supply companies that sold DME-POS formed and organized DME suppliers within nursing homes. These newly formed suppliers then contracted the DME supplies and supplier functions from the organizing entity, allowing the nursing home owners to seek reimbursement under their own DME supplier number. This enabled the nursing homes to capture the substantial profits available under the Medicare reimbursement plan, especially from the provision of enteral nutrition supplies. The Relator contended that the profits realized by the nursing home owners were kickbacks, therefore, all claims submitted under **[*4]** the DME numbers were false, in violation of the False Claims Act. The Relator also argued that because the newly-organized in-house DME suppliers did not comply with the supplier standards outlined by Department of Health and Human Services regulations, all claims submitted were false in violation of federal statute. In addition, the Relator asserted that because expenses related to the DME entities based out of the nursing homes were not "backed out" of the Medicaid cost reports, claims by those facilities were false under the FCA. After numerous ex-

---

[1]   The acronym "DMEPOS" stands for durable medical equipment, prosthetics, orthotics, and supplies, and is commonly abbreviated "DME." Items considered as DMEPOS are "equipment furnished by a supplier or a home health agency that—(1) can withstand repeated use; (2) is primarily and customarily used to serve a medical purpose; (3) generally is not useful to an individual in the absence of an illness or injury; and (4) is appropriate for use in **[*5]** the home." 42 C.F.R. § 414.202 (2003).

2012 U.S. Dist. LEXIS 142078, *4

tensions of the sixty-day period allowed under *31 U.S.C. Section 3730(b)(3)*, the Government intervened against the Defendants here, a new unsealed case was opened, and an amended complaint was filed.

The Defendants filed motions to dismiss based on *Federal Rules of Civil Procedure 9(b)* and *12(b)(6)*. The Court analyzed the claims with regard to the Amended Complaint filed in civil action 2:08cv214-SA-JMV, as all complaints filed in civil action 2:04cv355-SA-DAS were still being investigated and were under seal. Therefore, Defendants had no knowledge of the allegations contained therein, and Plaintiffs had narrowed the claims alleged to those against these particular Defendants in the more recent case. The Court found that the Government asserted with sufficient particularity the allegations of the Amended Complaint thus complying with *Federal Rule of Civil Procedure 9(b)*, and sustained its burden under *Rule 12(b)(6)* in civil action 2:08cv214-SA-JMV. *United States ex rel. Jamison v. McKesson Corp.*, 2009 U.S. Dist. LEXIS 89807, 2009 WL 3176168 (N.D. Miss. Sept. 29, 2009).

Thereafter, the Defendants filed motions for partial summary judgment challenging the Court's subject matter jurisdiction over the Relator and his claims. The Court granted those motions finding that the Relator's claims were based on publicly disclosed information of which Thomas [*6] Jamison was not the original source. *United States ex rel. Jamison v. McKesson Corp.*, 2010 U.S. Dist. LEXIS 28562, 2010 WL 1276712 (N.D. Miss. Mar. 25, 2010). Accordingly, the Court dismissed the Relator. Jamison appealed to the Fifth Circuit which affirmed the outcome that the district court lacked jurisdiction under *31 U.S.C. Section 3730(e)(4)* . *United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322 (5th Cir. 2011).

The Defendants next filed motions for partial summary judgment seeking dismissal of the Government's allegations of false claims submitted due to supplier standard violations. The Court granted those motions finding that Defendants' good faith reliance on National Supplier Clearinghouse (NSC) and Centers for Medicare and Medicaid Services' (CMS) determinations of compliance with the supplier standards precluded those claims as being deemed "false." *United States ex rel. Jamison v. McKesson Corp.*, 784 F. Supp. 2d 664 (N.D. Miss. 2011). The Court denied Defendants' contention that the determinations of compliance also estopped adjudication of the alleged Anti-Kickback Statute (AKS) violations here.

Finally, the Defendants filed motions for summary judgment seeking [*7] dismissal of the remaining claims in this case. The Court denied those motions finding that there were genuine disputes of material fact as to the Defendants' liability under the False Claims Act for alleged AKS violations. *United States ex rel. Jamison v. McKesson Corp.*, 2012 U.S. Dist. LEXIS 17856, 2012 WL 487998 (N.D. Miss. Feb. 14, 2012).

*Allegations at Issue*

The Government brings this action on behalf of the Department of Health and Human Services and the CMS against McKesson Corporation; McKesson Medical-Surgical MediNet, Inc.; McKesson Medical-Surgical MediMart, Inc.; GGNSC Holdings, LLC; Golden Gate Ancillary, LLC; Beverly Enterprises, Inc.; Ceres Strategies, Inc.; and Ceres Strategies Medical Services, LLC. [2]

---

[2]  For ease of reference, throughout this opinion, the Court will refer to McKesson Corporation, McKesson Medical-Surgical MediNet, Inc., and McKesson Medical-Surgical MediMart, Inc., as the "MediNet Defendants" or simply "MediNet" unless further differentiation is required. Likewise, the Court will refer to the remaining defendants as the "CSMS Defendants" or "CSMS."

McKesson Corporation is a global healthcare company primarily based out of San Francisco, California. McKesson's  [*8] subsidiary, McKesson Medical-Surgical Minnesota, and in particular, its Extended Care branch (Extended Care), was the entity directly over the companies allegedly involved in this action - MediNet, MediMart, and Minnesota Supply (MMS). [3] MediNet and MediMart both supplied DMEPOS on a full assignment and a contract billing basis. [4] Under a full assignment, the nursing homes contracted with a third party DME supplier, i.e., MediNet, to order, deliver, and bill for DME supplies and services. When MediNet was the full assignment provider for a nursing facility, MediNet used MMS to distribute the supplies. MMS, as a subsidiary of the same parent company as MediNet, was able to access the same software for patients' information and orders. In a full assignment situation, the nursing home would receive no direct reimbursement from Medicare. As a contract billing company, MediNet also offered to its customers the option of using a third party supplier to supply the DMEPOS while contracting with MediNet to bill Medicare for those products under the DME supplier number of the customer. In this way, the customers were able to receive direct reimbursement from Medicare. MediNet performed both  [*9] full assignment and contract billing work; however, prior to 2003, MediNet never performed contract billing work where the third party supplier was not MMS.

Ceres Strategies Medical Services (CSMS) is the in-house DME supplier organized within the Beverly nursing home conglomerate. GGNSC Holdings, LLC, and Golden Gate Ancillary, LLC, have since acquired the Beverly Enterprises, Inc., properties and assumed the liability for that entity. CSMS and MediNet entered Services Agreements in 2003 and again in 2006 for the provision of non-enteral DMEPOS on a full assignment basis, and contract billing for CSMS's enteral DME needs.

The Government's remaining claims have evolved over the course of this litigation to now include:

Count 2: Presenting or causing to be presented, false claims in violation of the FCA based on Anti-Kickback Statute violations relating to illegal remuneration for business referrals in the form of below market value pricing or discounts;

Count 4:  [*10] Conspiring to submit false claims in violation of the FCA between the CSMS Defendants and the MediNet Defendants based on those AKS violations;

Count 5: Using false records or statements, or causing false records or statements to be made, to get false claims paid in violation of the FCA based on the same AKS violations; and

Count 6: Unjust enrichment based on the prior misconduct.

In relation to the 2003 Services Agreement and negotiations for that contract between CSMS and MediNet, the Government contends that CSMS "dangled" the prospect of McKesson receiving the Beverly nursing homes' general medical supply contract in order to get the contract billing services below fair market value, below actual costs, or at a discounted price. Likewise, the Government asserts that because of the possibility of receiving the general medical supply contract, MediNet lowered its price on contract billing to below fair market value or actual costs, or offered a discount on those services.

As for the 2006 transaction, the Government argues that CSMS "carved out" enteral supply distribution from its general medical supply contract in order to induce MediNet to provide below

---

[3]   MMS is not a defendant in this case.

[4]   MediNet and MediMart have since been consolidated.

fair market value, below actual **[*11]** cost, or discounted prices on its contract billing services beginning in 2006. Conversely, the Government alleges that MediNet offered below fair market value, below actual cost, or discount pricing in order to induce CSMS to award McKesson the general medical supply or enteral supply business.

*Findings of Fact*

Medicare Part A covers hospital, nursing home, hospice and home healthcare for the first one hundred days in a skilled nursing facility. Part A pays a per diem amount based on average costs in the region. Part B, which is a supplemental medical insurance benefit plan, covers medically-necessary supplies, including durable medical equipment, prosthetics, orthotics and services. Under Part B, benefits are paid according to a predetermined fee schedule. DMEPOS, which is covered by Part B, can be further broken down into enteral and non-enteral products. Enteral products encompass supplies offering nutritional support, while non-enteral supplies are products that offer no nutritional support. While non-enteral supplies are reimbursed based solely on the predetermined cost of the product, enteral products are reimbursed based on the cost of the product plus the costs associated with **[*12]** the use of those products, including the cost of checking pumps, inserting feeding tubes, as well as the high cost of shipping.

Around 2002, Medicare restructured its reimbursement strategy to be implemented at a later date for qualified Part B services and supplies. Jeff Freimark, Chief Financial Officer of Beverly Enterprises, Inc., during 2002, testified that prior to the "Medicare Cliff," as this shift was internally referred, Beverly was struggling financially, and the implementation of the new reimbursement rates was projected to cause a $14 million shortfall to Beverly's 2003 operating budget. Chris Roussos was hired as a Beverly executive during this time to change the corporate culture of that entity. Due to the extremely tight margins in the nursing facility field, Roussos was tasked with maintaining profitability and staying out of bankruptcy, as other national chains were increasingly forced to do during this time. Prior to and during the pertinent time periods at issue in this case, Beverly Enterprises, Inc., owned and operated a significant number of skilled nursing facilities (SNF) nationwide. Along with revamping the procurement process, Roussos also encouraged the selling **[*13]** off and consolidation of under-performing SNFs. As a result of his initiative, Beverly's numbers fluctuated during the time period at issue between five hundred and three hundred homes. Roussos set out to review and re-examine the internal structure, as well as all external contracts in order to reduce costs.

Since the early 1990s, Beverly contracted with Gulf South to furnish the general medical supplies of Beverly's hundreds of nursing facilities. This contract was rumored to be worth $50 million. In fact, throughout MediNet and McKesson internal communications regarding Beverly's general medical supply contract, it is often referred to as the "$50 million contract."

McKesson Corporation, as a national healthcare supply and service provider, was interested in supplying the general medical needs of the Beverly SNFs and aggressively pursued the opportunity to do business with Beverly. Several entities under the McKesson umbrella were involved in enticing Beverly. Pertinent here is McKesson subsidiary, McKesson Medical-Surgical Minnesota - Extended Care's two branches, MediNet and Minnesota Supply (MMS). MediNet, an Oregon-based company, was originally part of RedLine, which was acquired **[*14]** by McKesson in 1998. MediNet functioned as a DME supplier using MMS, another McKesson entity, as a distributor. MediNet additionally offered its expertise in billing Medicare to customers intent on using third party suppliers for their DMEPOS needs. These services are commonly referred to as contract billing services.

During the period of time leading up to the 2003 Services Agreement, Carol Muratore was the President of Extended Care; Gail Beske was the Vice President of Reimbursement Services of Extended Care, of which MediNet was a subsidiary; and Curt McLeod was the founder of MediNet prior to its acquisition by McKesson.

*2003 Transaction*

Ceres Strategies, Inc., the procurement arm of Beverly Enterprises, Inc., formed CSMS in response to the "Medicare Cliffs." Janet Houston, CSMS Director of Operations, was tasked with investigating and determining the steps necessary for CSMS to acquire its own DMEPOS supplier number. As a DMEPOS supplier with its own supplier number, CSMS could capture reimbursement from Medicare directly, instead of having to engage a third party supplier.

For the fifteen years prior to CSMS's formation, Pharmerica supplied DMEPOS to Beverly's patient base on a [*15] full assignment basis. Full assignment means that the nursing homes contracted with a DME supplier to order, deliver, and bill Medicare for those supplies and services. Using a full assignment vendor, Beverly and CSMS would not receive direct reimbursement from Medicare. The Pharmerica full assignment contract was set to expire in December 2002. Also set to expire around that same time was the $50 million general medical supply contract for all Beverly SNFs. On the basis of presentations from service providers in the summer of 2002, CSMS decided to contract out a significant number of the functions of a DME supplier. Thus, as opposed to a full assignment, CSMS sought to pursue a contract biller. Under this system, CSMS would seek reimbursement directly from Medicare using its own DME supplier number and pay another entity, the contract biller, to service those products and fill out the Medicare paperwork on CSMS's behalf. Because CSMS was in its infancy when the Pharmerica contract expired, a Request for Proposals (RFP) was drafted in order to determine the price CSMS would have to pay to outsource those functions and convert Beverly SNF's enteral nutrition needs from full assignment [*16] to contract billing. Specifically, CSMS sought a DME supplier to take over the non-enteral supplies full assignment, and perform contract billing functions using an outside supplier for enterals. CSMS also required the winning bidder to provide tracking services for patients qualified under Part A who might later qualify for Part B.

The RFP informed bidders that the Beverly SNFs serviced 1700 residents with enteral nutrition needs, averaging 4.1 residents per facility. The following bids were received by CSMS: (1) ProClaim - $74.00 per resident per month, $15.00 per resident per month tracking fee, and a $250.00 per month minimum fee for facilities with less than four enteral patients; (2) MediNet - $75.00 per resident per month, $20.00 per resident per month tracking fee; however, if MMS distributed the product, MediNet would charge $50.00 per resident per month for its billing services; (3) NCS - $50.00 per resident per month; and (4) Pharmerica - $210.00 per resident per month.

As acknowledged by several McKesson-associated witnesses, prior to the CSMS contract, MediNet's contract billing services were almost always paired with McKesson subsidiary MMS supplying the product. Gail Beske, [*17] Vice President of Reimbursement Services of Extended Care and charged with authority over MediNet, testified that it was her mission to steer MediNet toward a contract billing-only structure, as opposed to contract billing plus supply based on the former's profitability. MediNet's two-tiered bid to CSMS was based on efficiencies realized by MediNet being able to use its own supplier. Such efficiencies include the ability to streamline patient information into the McKesson software system once, as opposed to inputting the patient information into the system separately for tracking, billing, and ordering; maintaining the proof of delivery within the McKesson structure; and managing product shipments and patient needs. In-

deed, the record is replete with trial testimony regarding the problems inherent in dealing with out-side suppliers, such as MediNet's inability to reconcile product ordered with product needed, and MediNet not receiving the information necessary to maintain the supplier standards, especially the paperwork necessary to maintain proof of delivery. Further, the MediNet representatives testified as to the lack of efficiency in another entity ordering product for which MediNet  [*18] was held accountable to Medicare.

An incremental cost model prepared by Curt McLeod, of MediNet Oregon, and e-mailed out on October 4, 2002, introduced the $75.00 claim fee for contract billing, or $50.00 claim fee for contract billing coupled with DMEPOS supply. As the most knowledgeable about contract billing at MediNet, McLeod's evaluation of the service costs and projections was trusted completely in that organization. While McLeod's analysis did not include field service representative cost and failed to analyze the full assignment business apart from the contract billing aspect, he projected that both endeavors - contract billing and the full assignment business - would be profitable in excess of $1.6 million over the three year term of the contract. Field service representatives (FSR) cost were not included in MediNet's costs to provide services to CSMS because the FSRs were not MediNet employees, but were paid by McKesson Medical-Surgical Minnesota.

MediNet submitted its bid on October 11, 2002, using the figures and numbers referenced in Curt McLeod's analysis. After the bid was submitted, Gail Beske and Carol Muratore, both of whom were in a position over MediNet, continued  [*19] to work from McLeod's $75.00/$50.00 analysis to measure the incremental profitability of the contract after direct costs were deducted. MediNet resubmitted its initial bid to CSMS on December 5, 2002. Thus, MediNet rebid the $75.00 per patient per month for contract billing and $50.00 per patient per month if MMS supplied the products. However, on October 8, 2002, Ceres renewed Gulf South's general medical supply contract for Beverly's SNFs, which included the provision of enteral supplies to those SNFs. Upon resubmitting its bid for contract billing as well as the bid for contract billing plus product distribution, MediNet was told "not to expect the product side." At the latest, MediNet knew on January 14, 2003, that any agreement with CSMS would not include the distribution of enteral nutrition products. The factual development on the record established that CSMS could not have "dangled" the general medical supply contract in order to induce MediNet to lower its bid, as MediNet knew prior to its final bid that the general medical supply contract had already been awarded.

The Government introduced internal MediNet pricing projections in an effort to prove that MediNet's actual costs  [*20] to provide services under the CSMS contract were above the price bid, or that MediNet's bid was not fair market value or was discounted. If proven, those calculations could show that MediNet offered kickbacks to CSMS.

MediNet put together other profitability projections prior to entering into the 2003 Sales Agreement with CSMS. In particular, MediNet formulated a financial analysis based on three claims fees - $75.00, $70.00, and $65.00. The costs included on that analysis included operating expenses, sales coverage, pick, pack and ship of non-enterals, as well as start up costs. On that projection alone, MediNet believed claims fees of $65.00 per resident per month would be profitable. According to the testimony at trial, Beske and Muratore, two McKesson executives responsible for MediNet's bottom line, used this analysis to formulate MediNet's best and final offer to CSMS. Based on the chart and the handwritten notes accompanying it, MediNet believed ProClaim's bid to be at $65.00. They believed that maintaining their bid at $75.00 would "kill the deal" and acknowledged that MediNet should be able to do contract billing cheaper than any other company. Muratore and Beske both believed  [*21] $70.00 per patient per month to be competitive in the contract billing market. Indeed, further financial projections of a $70.00 claim fee over a three

year period showed a 10.3% return on sales. MediNet submitted its best and final offer for contract billing of enteral products for $70.00 per patient per month, $10.00 tracking fee, and full assignment of non-enteral products. ProClaim submitted a final bid for the same services for $69.00 per patient per month and $15.00 tracking fees per month.

Using a matrix of factors, CSMS determined that MediNet offered the best value for the price, even though it was not the lowest bid. Janet Houston, CSMS Director of Operations, testified that NCS and Pharmerica were eliminated from consideration in January of 2003, before CSMS requested best and final offers from MediNet and ProClaim. CSMS was worried that the infrastructure of NCS would be too small to handle the volume of CSMS business, and CSMS lacked confidence in Pharmerica's abilities from its prior dealings with that entity. Janet Houston, Chris Roussos, and Eric Berlin, Beverly's in-house counsel, chose MediNet as their contract billing agent because of MediNet's experience as a contract [*22] biller, the number of patients serviced, the days sales outstanding, and low rejection rate of submitted claims to Medicare. Houston cited that MediNet was the contract billing agent chosen as MediNet had been in business since 1975, submitted 9000 claims per month, served 1500 facilities nationwide, and had a claim rejection rate of one percent. The 2003 Services Agreement between CSMS and MediNet was signed and became effective on March 1, 2003, for a three-year term in which CSMS agreed to pay $70.00 per enteral patient per month and a $10.00 per month tracking fee for all qualified residents. MediNet planned a nine-month rollout during 2003, with full capabilities in place in 2004.

During the terms of the Services Agreement, there was no indication from MediNet to CSMS that the contract was not profitable, and CSMS never reviewed or received any profitability analyses of the MediNet/CSMS contract.

*Interim Years*

In late November 2003, MediNet developed a new Billing Fee Schedule and disbursed it to all Regional Managers. This Billing Fee Schedule set prices for contract billing depending on the size of the customer and level of services provided. The new pricing scale was "very [*23] competitive" with the marketplace for comparable services. Under the new Billing Fee Service price list, a Large Chain Account (defined as "100+ facilities" on one fee schedule and "101-300" on another) for which MediNet was a "billing vendor only" would be charged $70.00 per patient per month for basic services, which included a customer service hotline, and $90.00 per patient per month for the customer service hotline plus periodic field visits for document collection and inventory tracking. The Government alleged that CSMS received a discount on MediNet's contract billing services based on the figures outlined in the Billing Fee Schedule and the level of services MediNet promised in the Services Agreement. This, the Government contends, was a kickback to CSMS.

Les Henderson, Director of the procurement arm of Beverly Enterprises, identified the "Billing Plus" services anticipated to be performed by the contract billing agent for CSMS in 2003. CSMS expected its contract billing agent to perform a scope of services encompassing customer service, billing, document management and compliance, as well as field service support. In particular, CSMS wanted its contract biller to "[s]chedule [*24] routine facility visits by appropriately skilled field service reps, at minimum once per month." During those field visits, those representatives would procure documents to substantiate claims, verify and document proof of deliveries, and monitor product inventory. MediNet agreed to provide this level of services in the Services Agreement signed on March 1, 2003. The Billing Fee Schedule disbursed in November of 2003 indicated that a base level of service for contract billing included claims processing and cus-

tomer service. The more substantial services, warranting the higher price, included claims processing, customer service, and "periodic field visits for document collection & inventory tracking." Thus, if the Billing Fee Schedule was applicable to CSMS, the services provided by MediNet would require CSMS to pay the higher $90.00 fee, as MediNet field service representatives were performing functions as listed on the higher purchase level of the schedule. MediNet contends that the Billing Fee Schedule did not apply to CSMS, as that account was a national account, and not subject to the regional pricing.

Evidence admitted at trial proved that MediNet continually put together projections, [*25] substituting actual data when available throughout the duration of the 2003 Services Agreement. John Griffiths, Director of Planning and Analysis at Extended Care, compared the original financial projection with the February 2004 numbers generated under the 2003 Services Agreement. A summary of the differences in projected and actual costs produced in February of 2004 showed a decreased realization of profit. Griffiths acknowledged that the shortfalls resulted from a drop in the number of Beverly facilities, which decreased the number of patients serviced, leading to lower numbers. Griffiths later commented that the "[v]olume is below the planned level due to Beverly selling off a significant number of homes . . . ." He noted that the current operations were "only slightly below the planned profitability levels as a percent of sales." Griffiths numbers' showed, using ten months of actual data and two months of forecasted numbers, a healthy margin of profitability. Not only were profitability models run, but Beske received quarterly updates on the profitability of each of Extended Care's going concerns, of which the CSMS contract was one.

In late summer and early fall of 2005, Gary Keeler, [*26] another overseer of MediNet under the Medical-Surgical Minnesota umbrella, questioned the actual profits realized from the MediNet/CSMS agreement. Sandipan Panigrahi, a new financial analyst with McKesson Medical-Surgical Minnesota Extended Care, compiled profit and loss statements using CSMS-specific data. Panigrahi concluded that the contract was, at best, a breakeven proposition. Several executives questioned Panigrahi's extrapolation of the field service representative costs, but in the interest of analyzing the contract conservatively, continued to use those numbers throughout 2005. Beske, reviewing actual fiscal year data in March 2005, acknowledged that the "first year was a bust because of the rollout costs and delay in recognizing revenue from claim fees until the claims were billed." However, Beske noted that MediNet was "now making a good return and overall showed an 8% [return on sales] over the 3 years of the contract."

In order to realize Beske's goal of a contract billing-only model for MediNet, Panigrahi analyzed contract billing by itself to determine profitability and costs per claim in June of 2005. The results were not specific to Beverly. According to Panigrahi's [*27] analysis, enteral contract billing cost MediNet $21.20 per patient. In a later analysis, Panigrahi seemed to indicate that the cost of CSMS enteral billing per patient was $51.64 without field service added into that equation. Panigrahi later analyzed the sales coverage expense to be between $7.80 and $5.15 per patient.

Panigrahi's final Beverly analysis was produced on August 4, 2005. Jeff Bowman, the Field Vice President of Reimbursement Services at Extended Care, answered Panigrahi's analysis with figures of his own and calculated the expense per patient to be $51.40. Based on Panigrahi's analysis, Beske considered the Beverly business "about break even, although the selling exp[ense] is subjective and overall profitability probably ranges from zero to $150K."

*2006 Transaction*

On September 13, 2005, Gulf South informed Beverly that it would no longer service the general medical supply contract signed in 2002. As a result, Ceres issued an RFP for the "$50 mil-

lion contract." McKesson Medical-Surgical Minnesota, MedLine, and four other bidders responded. The contract was awarded to MedLine. MedLine was announced as the general medical supplier for Beverly Enterprises, Inc., on February **[*28]** 15, 2006.

Up until this point, enteral nutrition products were included in the Beverly SNFs general medical supply contract. It was decided that based on Gulf South's abrupt termination, enteral supply should be separated or "carved out" of the general medical supply contract. Because enteral products provided the nutrition and sustenance of an entire class of Beverly residents, and Gulf South's unexpected determination to cease providing supplies as of a certain date, CSMS desired to remove that essential portion of product from the general medical supply contract. As a result, enteral supply distribution was added to the CSMS RFP issued February 27, 2006. All other particulars from the 2003 Services Agreement remained the same.

The 2006 bid process was initiated using Procuri software. Procuri allowed CSMS to distribute specifications and answer questions while providing the same information to all bidders. The software collected the bids from each supplier and helped create a level playing field for each company to competitively bid.

MediNet submitted the price it was charging from the 2003 agreement - $70.00 per resident per month, and $10.00 per resident per month tracking. MedLine, **[*29]** the only other bidder, submitted a price of $60.00 per resident per month for enteral contract billing, plus $15.00 per resident per month tracking. CSMS then changed its RFP and requested new submissions on the basis of three separate scenarios: Part B qualified contract billing and enteral supply plus (a) monthly visits to all facilities; (b) monthly visits to all facilities identified as high users; and (c) quarterly visits to all facilities. Janet Houston, CSMS Director of Operations, noted that because the Beverly nursing facilities had a good handle on the enteral nutrition program, it was not necessary to have representatives in the SNFs as frequently as before. CSMS eventually decided to go with the second option, defining "high users" as facilities with five or more enteral patients.

Based on the limitations of the scope of field services required, MediNet submitted a bid for $60.00 per resident per month, while MedLine submitted a $55.00 per resident per month bid. When asked for best and final offers, MediNet submitted a bid for $55.00 per patient per month with $10.00 per qualified patient per month tracking fee, which CSMS accepted. Beske noted that when MediNet submitted **[*30]** the $55.00 final bid, it believed its closest competitor to have submitted a bid for $45.00.

Prior to bidding and entering into the 2006 Services Agreement with CSMS, MediNet had substantially more profit projections and actual data to consider. John Griffiths, Extended Care's Director of Planning and Analysis, testified that prior to the 2006 bid, the financial analysis showed that it would cost MediNet under $54.00 to bill and distribute enteral products according to the prior actual data analysis compiled in August of 2005. He indicated that MediNet would realize savings up to $165,000 per year by visiting only facilities with five or more enteral patients.

The contract was signed on June 1, 2006, and terminated by CSMS on January 15, 2008, for reasons unrelated to this lawsuit.

Between 2002 and 2008, forty-eight profitability analyses of the CSMS/MediNet contract were performed by MediNet or McKesson associates. No analysis presented to the Court outright evidenced MediNet lost money on those contracts. MediNet's use of an incremental cost model to project profitability was reasonable and was commonly used by MediNet in its dealings with other customers. MediNet projected that incremental **[*31]** revenues from contract billing fees at $70 in 2003, and $55 in 2006, would exceed the incremental expenses of providing such services once

the agreements were fully implemented. No ledgers or actual accountings from MediNet were presented showing a loss. The actual data used in analyses and for forecasting showed MediNet was not losing money on the CSMS contracts. Further, the witnesses testifying on MediNet's behalf appeared credible when asserting that they believed the CSMS contract would be profitable. Moreover, these same witnesses were believable when they indicated that the prices submitted to CSMS were not below fair market value, below actual costs, or discounted. Carol Muratore, President of Extended Care, averred that there was no secret as to where the pricing in the market was during the time period at issue. The parties to this contract engaged in business negotiations that were fair, reasonable, and warranted under the facts of this case.

*Conclusions of Law*

The False Claims Act imposes civil liability on any who "knowingly presents, or causes to be presented, to an office or employee of the United States Government . . . a false or fraudulent claim for payment or approval," [**32**] *31 U.S.C. § 3729(a)(1) (2008)*, or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *31 U.S.C. § 3729(a)(1)(B) (2009)*. [5]

In order to establish a violation of the False Claims Act, a plaintiff must show that: (1) there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the Government to pay out money or to forfeit moneys due (i.e. that involved a claim). *United States ex rel. Longhi v. Lithium Power Techs. Inc.*, 575 F.3d 458, 467 (5th Cir. 2009) (citing *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008) (citations omitted)). *Section 3731(c)* of the False Claims Act provides that the United States must "prove all essential elements of the cause of action, including damages, by a preponderance of the evidence." *31 U.S.C. § 3731(c)*.

*False Certifications*

The Government claims that because the Defendants violated the Anti-Kickback Statute, all claims submitted by those entities for payment through Medicare [**35**] are "false claims" under the False Claims Act. Thus, those claims are alleged to be legally false, as opposed to factually false. To be "legally false," the Government must prove that the claimant knowingly falsely certified that it complied with a statute or regulation of which compliance is a condition for Gov-

---

[5]   The Fraud Enforcement Recovery Act of 2009 (FERA), Pub. L. No. 111-21, § 386, 123 Stat. 1617 (2009), enacts several amendments to the False Claims Act, including changes to the language of subsections implicated in this action, namely 31 U.S.C. § 3729(a)(1), (2), and (3). Section 4(f) of FERA, the "retroactivity provision," states that the amendments shall take effect on the date of enactment of the Act (May 20, 2009), except that "subparagraph (B) of section 3729(a)(1) [formerly 3729(a)(2)] . . . , shall take effect as if enacted on June 7, 2008, and apply to all claims under the False Claims Act (31 U.S.C. 3729, et seq.) that are pending on or after that date." During the pendency of this action, the Fifth Circuit in United States ex rel. Steury v. Cardinal Health, Inc. indicated that where a **complaint** was pending on June 7, 2008, the FERA amendment to (a)(2) would apply. 625 F.3d 262, 267 n.1 (5th Cir. 2010) ("Although the 2009 amendments to the FCA generally apply only to conduct on or after [**33**] May 20, 2009, § 3729(a)(1)(B) applies retroactively to all claims pending on or after June 7, 2008 . . ."). The Fifth Circuit has recently affirmed a district court's determination that FERA's retroactivity provision did not apply, however, because "claim" was a term of art under the FCA, and the claims submitted to the Government were not pending on June 7, 2008, although the complaint was pending on that date. See Gonzalez v. Fresenius Med. Care N. Am., No. 10-50413 consol. with No. 10-51171, 689 F.3d 470, 2012 U.S. App. LEXIS 15704, 2012 WL 3065314 (5th Cir. 2012) (citing United States ex rel. Gonzalez v. Fresenius Med. Care N. Am., 748 F. Supp. 2d 95, 106-08 (W.D. Tex. 2010)). Thus, under Steury, the Court should consider the amended FERA language, but pursuant to Gonzalez, the Court should not. Here, the Court cites the amended language of the (a)(2) claim because the parties cited the law as such. The Court has been unable to discern any difference in analysis for either language under the FCA or FERA. See Steury, 625 F.3d at 267 (stating elements for claim pursuant to FERA language as: (1) a false statement or fraudulent course of conduct; (2) made or carried out with the requisite [**34**] scienter; (3) that was material; and (4) that is presented to the Government); Gonzalez, 689 F.3d 470, 2012 U.S. App. Lexis 15704, *9 (listing elements of FCA action as same). Regardless of whether the Court considers the Government's claims under the FCA or FERA, those claims still fail.

ernment payment. *United States v. Southland Mgmt. Corp.*, 288 F.3d 665, 678 (5th Cir. 2002); cf. *United States ex rel. Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001) (proof of falsehood under a "factually false" theory of liability involves showing that the government payee has submitted "an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided"). Courts have further delineated legally false claims into two separate categories: expressly false and impliedly false claims. Under the "express false certification" theory, an entity is liable under the FCA for falsely certifying that it is in compliance with regulations which are prerequisites to Government payment in connection with the claim for payment of federal funds. *Rodriguez v. Our Lady of Lourdes Med. Ctr.*, 552 F.3d 297, 303 (3d Cir. 2008). Thus, "where  [*36] the government has conditioned payment of a claim upon a claimant's certification of compliance with, for example, a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or regulation." *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997) (false certification on annual cost reports that entity is compliant with anti-kickback statute can establish FCA liability).

The implied certification theory of liability under the FCA is "based on the notion that the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment." *Steury*, 625 F.3d at 268 (citations omitted). The Fifth Circuit has not recognized this theory, [6] and this Court has on at least two occasions refused to acknowledge this as a viable cause of action in this Circuit as well. Defendants assert that the Government's contentions - that the claims submitted were false because the DME supplier enrollment application required compliance with the Anti-Kickback Statute, but CSMS and MediNet violated that statute by offering or causing to  [*37] be offered remuneration for referrals - fit squarely within the implied false certification theory. The Court disagrees and clarifies its reasons for believing so here.

In order to directly bill Medicare as a DME supplier, Kevin Roberts, on behalf of CSMS, signed a statement acknowledging that "payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law) . . . ." CSMS applied for re-enrollment in June of 2006 and again signed the same declaration that payment was conditioned on compliance with the Anti-Kickback Statute. Barry Bromberg, project  [*38] officer for National Supplier Clearinghouse, a contractor for Medicare, testified that an entity must be enrolled to get a DME supplier billing number, enabling that entity to bill Medicare for products and services.

Without a signed certification statement, no DME supplier number will be issued. Therefore, to enroll as a DME supplier, CSMS had to sign the certification assuring compliance with the AKS. This completed enrollment application is the first step in securing a DME supplier number. Without a DME supplier number, Medicare would not reimburse a supplier for those products and services. Thus, an entity could not bill and receive payment from Medicare without a DME supplier billing number. See *Gonzalez*, 689 F.3d 470, 476, 2012 U.S. App. LEXIS 15704, *12 n.6, 2012 WL 3065314 (the question of whether or not certifications are a condition of payment is a question of fact). This certification on the enrollment application is a condition of payment under Medicare. Accordingly, Roberts' signature on the enrollment certification assuring that CSMS

---

[6]  Indeed, the Fifth Circuit has avoided recognizing the implied certification theory of liability on several occasions. See *Gonzalez*, 689 F.3d 470, 476, 2012 U.S. App. LEXIS 15704, *12 n.6, 2012 WL 3065314; *United States ex rel. Marcy v. Rowan Co., Inc.*, 520 F.3d 384, 389 (5th Cir. 2008); *United States ex rel. Willard v. Humana Health Plan of Tex.*, 336 F.3d 375, 381-82 (5th Cir. 2003); *United States ex rel. Stebner v. Stewart & Stephenson Servs., Inc.*, 144 F. App'x 389, 394 (5th Cir. 2005).

would comply with the AKS was a condition of payment under Medicare.

The allegations in the Government's complaint sufficiently fit under the express certification [*39] theory of recovery. In particular, CSMS executed a statement that all claims and the transactions underlying CSMS's claim for payment complied with the AKS. Without that signed certification, a DME billing number would not have been issued. Without a DME billing number, claims submitted to Medicare would not be paid, and no reimbursements from Medicare would issue. Thus, CSMS's allegedly false certification of compliance with the AKS may render the claim submitted under that number false. However, because there was no violation of the Anti-Kickback Statute, regardless of whether the Government's claims are classified under the express certification theory or implied certification theory, the Government's contentions fail.

*Anti-Kickback Statute*

The Government claims Defendants' violations of the AKS satisfies the first prong of an FCA claim, i.e., that CSMS and the MediNet Defendants engaged in a false or fraudulent course of conduct. The Anti-Kickback Statute imposes criminal penalties on anyone who

> knowingly and willfully offers or pays any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such [*40] person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

*42 U.S.C. § 1320a-7b(b) (2008).* When analyzing alleged violations of the AKS, a key distinction is that the law "does not criminalize referrals for services paid for by Medicare or Medicaid — it criminalizes knowing and willful acceptance of remuneration in return for such referrals." *United States v. Ctr. for Diagnostic Imaging, Inc.*, 787 F. Supp. 2d 1213, 1218 (W.D. Wash. 2011) (quoting *Klaczak v. Consol. Med. Transp.*, 458 F. Supp. 2d 622, 678 (N.D. Ill. 2006)).

At trial, the Government did not put on sufficient proof of an AKS violation, specifically that there was any remuneration either offered or paid. Indeed, the Government failed to prove MediNet offered its contract billing services below fair market value, below actual costs, or at a discount, or that the CSMS Defendants intended to induce MediNet to offer a lower price by dangling the general medical supply contract or carving out enteral supply from the general medical supply contract. Further, the Government failed to prove [*41] that the Defendants had knowledge of any alleged kickback offered or paid.

*(a) Inducement and Remuneration*

Inducement serves a central role in assessing claims of Medicare fraud. See *Polk County, Tex. v. Peters*, 800 F. Supp. 1451, 1455 (E.D. Tex. 1992) ("The gravamen of Medicare fraud is inducement."). The Government failed to prove by a preponderance of the evidence that Defendants induced referrals by offering or paying remuneration. [7] Indeed, the evidence showed that the Government's allegations that CSMS "dangled" the general medical supply contract or "carved

---

[7]   The Court analyzed the Government's AKS claims under the "preponderance of the evidence" standard common in civil actions as opposed to the criminal "beyond a reasonable doubt" standard. Because the Government has failed to meet the lower civil standard, it is inconsequential which is the proper standard to consider for civil liability to attach under the AKS. However, [*42] the Court acknowledges that if this case were a closer call, the proper course would likely be to use criminal intent to prove a civil AKS violations. See *Gonzalez*, 689 F.3d 470, 2012 U.S. App. LEXIS 15704, 2012 WL 3065314 (affirming district court's grant of judgment as a matter of law on the AKS violation for failure to show "criminal intent to induce referrals").

out" enteral supply for MediNet or McKesson to be without merit, and failed to prove that Medi-
Net offered its services below fair market value, below actual costs, or at a discount. Therefore,
there was no inducement or remuneration necessary for an AKS violation.

*(i) CSMS Defendants*

The Government asserts that the CSMS Defendants dangled the prospect of the general medical sup-
ply contract in order to induce MediNet to lower its billing fee. Evidence revealed at the trial
showed that Gulf South renewed its general medical supply contract with the Beverly conglomer-
ate prior to the bids on the 2003 CSMS contract being received. Indeed, the renewal contract
for the general medical supply was signed on October 8, 2002. Bids for the contract billing ven-
dors were due on Ocotber 11, 2002. At the latest, MediNet had documented knowledge that
the supply side was "off the table" in January of 2003, prior to the final bid for the 2003 Ser-
vices Agreement in February. Therefore, the Beverly general medical supply contract could not be
an inducement for any alleged kickback. Likewise, in 2006, the general medical **[*43]** supply con-
tract was signed with MedLine prior to the RFP for the enteral supply and billing contract be-
ing disbursed to potential bidders. Not only was the general medical supply contract already signed
with another medical supplier prior to the bids on both transactions, proof at trial showed that
MediNet and McKesson were aware that the contracts had been awarded before bidding on the
DME contracts with CSMS. Indeed, McKesson had bid on the general medical supply contract and
been found not to be the lowest bidder or most competitive for that business. If CSMS and Bev-
erly were intending to induce MediNet to lower its billing fees by dangling the opportunity to re-
ceive the general medical supply contract, it seems illogical that Beverly would award the $50 mil-
lion contract prior to the bids on contract billing. Thus, the general medical supply contracts
could not have been an incentive or an inducement for referrals under the AKS.

The Government alluded to the possibility of working with Beverly as the overarching goal of
McKesson, but presented no proof that either party did anything illegal or in bad faith. Indeed, in
order to violate the AKS, it is not enough to covet the business **[*44]** of another, there must ac-
tually be some bad intent to violate the law. *United States v. Davis*, 132 F.3d 1092, 1094 (5th
Cir. 1998).

The Government contends that CSMS "carved out" the enteral supply distribution from the gen-
eral medical supply contract on a promise by MediNet to lower prices on its enteral billing ser-
vices in exchange for the enteral product distribution. The credible proof at trial showed that Gulf
South's abrupt exit from the general medical supply contract made Beverly's SNFs nervous
about such an important piece of product being subject to the whims of one company. Indeed,
the Court understands why enteral products, as nutrition for eligible patients, would be deemed criti-
cal by those charged with patient care.

Moreover, MediNet's initial bid for the 2006 transaction including enteral supply was the same
bid as the 2003 transaction without enteral supply. Accordingly, the "carving out" of enteral sup-
ply from the general medical contract did not result in lower contract billing prices. It was
only after negotiations and a winnowing of services that MediNet lowered its bid. The Govern-
ment does not meet its burden with conjecture regarding ultimatums issued by MediNet **[*45]** to
CSMS to carve out the enteral distribution. Again, the Court finds it illogical that MediNet
could force CSMS to alter its national contracts to secure a lower price when others were bid-
ding similarly, or sometimes lower, to perform the same services for CSMS.

Thus, as the Defendants contended at trial, the Government has failed to show any *quid pro quo*
in the dealings between the MediNet and CSMS Defendants. See *Gonzalez*, 689 F.3d 470,
2012 U.S. App. LEXIS 15704, 2012 WL 3065314 (no "quid pro quo" or AKS violation where vol-

2012 U.S. Dist. LEXIS 142078, *45

ume of referrals remained constant regardless of alleged wrongdoing).

*(ii) MediNet Defendants*

The Government asserted that the MediNet Defendants violated the AKS by offering as remuneration contract billing services priced below fair market value, below the actual cost to provide those services, or at a discount. Because the Government did not define fair market value or show that MediNet's bid was below fair market value, prove the actual costs were above MediNet's bid, or establish that the bids were discounted, the Government has "failed **[*46]** to identify a reliable benchmark against which the Court [can] determine whether the contracts satisfy the statutory definition of remuneration." See *Klaczak,* 458 F. Supp. 2d at 626.

In the context of the AKS, courts use "fair market value" as the gauge of value when assessing the remuneration element of the offense. See *Klaczak,* 458 F. Supp. 2d at 679; *United States ex rel. Obert-Hong v. Advocate Health Care,* 211 F. Supp. 2d 1045, 1049 & n.2 (N.D. Ill. 2002). Fair market value as a concept was never defined by the parties at trial or in earlier pleadings or motions. Black's Law Dictionary defines "fair market value" as "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arms'-length transaction." BLACK'S LAW DICT. 1691 (9th ed. 2009). A similar definition has been used under the AKS. See *Klaczak,* 458 F. Supp. 2d at 678 (defining fair market value under the AKS as "the price a willing buyer would pay a willing seller . . . when neither is under compulsion to buy or sell") (citing *United States v. Draves,* 103 F.3d 1328, 1332 (7th Cir. 1997). Barry Bromberg, a project officer for the National Supplier Clearinghouse, testified that **[*47]** in his opinion, a fair market value could be determined through competitive bidding.

As evidenced by the prices listed above, MediNet's bid was not the lowest and not unreasonable when viewed alongside the other bids. Further, as the Government failed to prove that the general medical supply contract was improperly "dangled" over MediNet in order to receive a lower contract billing fee, the 2003 negotiations were not tainted. Likewise, because the enteral supply was not "carved out" as an inducement for a lower price in 2006, those negotiations were arms-length transactions as well. The Government's allegations of wrongdoing by CSMS and MediNet were not proved convincingly enough to warrant a finding that the two bidding transactions were tainted by collusive bad acts.

MediNet's initial and final bids were not the lowest received by CSMS. In fact, CSMS chose MediNet as a contract biller despite MediNet's offer being higher than other competitors. The Government attempts to infer that because Pharmerica's 2003 bid of $210.00 was three times MediNet's final offer, that MediNet's bid was not fair market value. Based on the definition of fair market value identified above, the Government's **[*48]** contention fails The Government has failed to prove that the bidding process for the 2003 transaction was not competitive or was tainted in any way, such that it would not be an arms-length transaction which would reveal the fair market value of the services at issue here.

The Government failed to prove that MediNet offered remuneration by pricing its services below the actual costs to provide them. MediNet constructed over forty analyses related to the CSMS business, including proposed pricing reviews, anticipated profitability constructions, and calculations using actual data. None of the analysis reviewed by the Court showed MediNet to be unprofitable over the term of the agreements. The numbers and reviews by MediNet introduced at trial employed an incremental cost analysis to calculate anticipated profits. Using this method of accounting, the MediNet Defendants projected the amount of costs associated with the CSMS contracts by analyzing costs expected to increase solely because of that business. According to the incremental cost model, fixed costs and overhead, including executive salaries and property costs,

were not associated or accounted as a cost inherent in the CSMS business  [*49] because such expenses would be incurred regardless of whether MediNet won the contract or not. The Government sought to highlight the fact that an incremental cost analysis was not the proper way to analyze profitability of a contract; however, Plaintiff failed to present evidence that such analysis was either illegal under the AKS or improper under standard accounting principles. John Griffiths, a financial analyst and analyst supervisor for MediNet, noted that the incremental cost analysis is a well-accepted method of analyzing opportunities and profitability.

The Government highlighted as evidence of MediNet's deliberate indifference or knowledge that the price submitted was below actual costs the fact that in some analyses field service costs were not included. Field service representatives were employees of McKesson Medical-Surgical, not MediNet, therefore, it was reasonable in determining the incremental profit projections for MediNet, that FSR costs would not be included in the analysis. At trial, the parties spent a good deal of time cobbling together calculations using numbers garnered from different documents and analyses in order to show either that MediNet priced its bids  [*50] below the actual costs to provide the services or that its actual costs were lower than the number originally projected. Indeed, where the Government manipulated the numbers to show a definitive loss, the MediNet Defendants could calculate other numbers to show a profit. Overall, the Court was left with the impression that the Government failed to prove that the MediNet bids were priced below actual costs by a preponderance of the evidence. The Government's arguments of remuneration offered based on the actual costs to provide those services is unfounded in the record.

The Court further finds that any negotiations to get a final bid for services was not a "discount" as alleged by the Government for two distinct reasons: first, the bids in 2003 and 2006 were fair market value; and second, prior to the 2003 bid, MediNet had no set pricing list from which to discount, and the 2006 bid complied with the Billing Fee Schedule developed by MediNet.

As noted above, the final bids submitted by MediNet in both 2003 and 2006 were fair market value to the extent that the bidding process was an arms-length transaction and other bidders were willing to provide the services for similar, if not lower,  [*51] prices. Indeed, most other bidders submitted prices that were, if not lower, within a few dollars of MediNet's opening bid. Because such price reflects fair market value, even if MediNet could have charged a higher price, CSMS did not get the benefit of a discount as there were other bidders willing to sell the services at MediNet's final bid price.

MediNet's Billing Fee Schedule was not formulated or implemented prior to the commencement of the 2003 Services Agreement, or even bid negotiations. According to the testimony at trial, the Billing Fee Schedule, emailed and promoted to Regional Account Managers, was intended to govern regional accounts only. As CSMS was a national account, not a regional account, and at all times had over three hundred facilities, the Billing Fee Schedule did not apply to that entity. Even if the fee schedule applied, however, because the schedule was developed and implemented after commencement of the 2003 Services Agreement, it is not indicative of any malfeasance on the part of MediNet as to the earlier contract between CSMS and MediNet. If the Billing Fee Schedule covered the CSMS business, by 2006, CSMS would qualify as a "prime vendor," placing its  [*52] fee range at either $45.00 for customer service and billing only, or $65.00 for customer service, billing, and field service once a month. Since the 2006 RFP indicated a reduced scope of services from full service, the Court finds MediNet's $55.00 fee to be reasonable.

The Government failed to prove that Defendants violated the AKS by offering or paying any remuneration to induce referrals. CSMS did not dangle its general medical supply contract over MediNet, or carve out enteral distribution in the 2006 contract billing agreement in order to induce MediNet to offer its services for below fair market value, actual costs, or at a discount. Like-

2012 U.S. Dist. LEXIS 142078, *52

wise, MediNet did not offer its services for below fair market value, actual costs, or at a discount in order to induce CSMS to carve out the enteral distribution in 2006 or as an inducement for the general medical supply contract. The Court finds this failure of proof enough to find in favor of Defendants. However, because Plaintiff further failed to prove knowledge or intent under either the AKS or FCA, the Court analyzes the proof under that element as well.

*(b) Knowledge*

"Knowledge" has been proven in AKS criminal cases where proof that "the **[\*53]** act was done voluntarily and intentionally, not because of mistake or accident." *Davis*, 132 F.3d at 1094 (citing *United States v. Garcia*, 762 F.2d 1222, 1224 (5th Cir. 1985) (knowledge of the particular law allegedly violated not required)). The Government asserts that the Defendants had knowledge of or were deliberately indifferent as to whether an AKS violation occurred. The Fifth Circuit has affirmed the giving of a deliberate indifference jury instruction in criminal AKS cases. *United States v. Ogba*, 526 F.3d 214, 230 (5th Cir. 2008); *United States v. Brown*, 354 F. App'x 216, 223 (5th Cir. 2009). A deliberate indifference instruction is warranted if the evidence at trial raises two inferences: "(1) the defendant was subjectively aware of a high probability of the existence of the illegal conduct; and (2) the defendant purposefully contrived to avoid learning of the illegal conduct." *Brown*, 354 F. App'x at 223 (citing *United States v. Lara-Velasquez*, 919 F.2d 946, 951 (5th Cir. 1990)).

The AKS also requires that Defendants act "willfully." Under the AKS, "willfully" is defined as any act "committed voluntarily and purposely with the specific intent to do something the law forbids; **[\*54]** that is to say, with bad purpose either to disobey or disregard the law." *Davis*, 132 F.3d at 1094. Because the Government failed to prove that the Defendants acted "knowingly and willfully" in either of the transactions, no AKS violation has been proven.

The evidence presented at trial shows that Defendants lacked the intent to commit an AKS violation. On several occasions, MediNet employees admitted to substituting arbitrary figures into analyses where numbers or costs were unknown. They assumed those figures were conservative estimates, even though oftentimes, they were not. On some analyses, the cost per patient was generated on the basis of all patients, not solely enteral patients. Beske admitted to "misplacing" numbers used from one analysis to another; in particular, the cost difference calculated between MediNet or McKesson supplying enteral products with contract billing versus another company supplying those products. Further, the number of facilities used to approximate the cost per patient was never concrete or based on the actual number of SNFs. Because of the number and differing backgrounds of persons at MediNet putting together cost projections, it is understandable **[\*55]** why those figures and analyses are not consistent. The Government did not prove that Defendants were intentionally or deliberately mishandling the numbers, but were more likely negligent or careless. Such carelessness does not evidence a willful wrong intentionally committed against the Government.

The 2006 transaction is substantively different from the 2003 transaction because of the variance in the scope of services provided to CSMS. Testimony at trial indicated that the number of Beverly SNFs with five or more enteral patients would be roughly one third of the facilities previously required to be visited monthly under the 2003 Services Agreement. Griffiths testified that such a limit on the scope of services would reduce the cost of field services by $165,000.

Like the 2003 transaction, MediNet engaged in a significant number of financial projections using actual and forecasted data. MediNet believed that with the reduction in the scope of services, it would be profitable charging $55.00 per patient per month for its contract billing services. MediNet's $55.00 bid was not the lowest received by CSMS in the arms-length negotiations. Further, the

Government failed to prove $55.00 was **[*56]** below its actual costs to provide these services. Medi-Net's price charged under the 2006 Agreement was consistent with the Billing Fee Schedule for largest nursing facility chain with reduced field service. In 2006, CSMS qualified as a "prime vendor" which made CSMS eligible for pricing of $45.00 per patient per month for basic services, and $65.00 per patient per month for enhanced services, including monthly visits to all facilities. MediNet's final bid of $55.00 for reduced scope of services splits the Billing Fee Schedule between those two outlier figures. Accordingly, MediNet Defendants did not knowingly or willfully violate the AKS because MediNet thought the prices quoted in negotiations for the 2006 contract were reasonable, fair, and profitable for MediNet.

The CSMS Defendants, likewise, did not knowingly or willfully solicit bids below fair market value, actual costs, or at a discount in either the 2003 or 2006 transactions. As proved at trial, the CSMS Defendants were not apprised of any profitability projections as to the CSMS contract, nor did they know the actual cost of contract billing per patient per month. Therefore, the Government has not proved the liability of the **[*57]** CSMS Defendants, as they had no knowledge of any alleged kickback. Also, there was no proof presented that the CSMS Defendants were deliberately indifferent to any alleged kickback, as the bid process showed others bidding the similar, sometimes lower, amounts.

Accordingly, the Government has failed to show Defendants had knowledge or acted willfully such that liability under the AKS would attach. Likewise, because the burden of proof as to the scienter element under the AKS was not carried, the Government has also failed to carry that burden as to the False Claims Act. Accordingly, no false claims exist under the facts alleged to support FCA violations.

### _Unjust Enrichment_

The Government likewise failed to prove that Defendants were unjustly enriched by a preponderance of the evidence for the foregoing reasons.

### _Conclusion_

The Government failed to carry its burden that Defendants violated the AKS by offering or paying remuneration to induce referrals or having knowledge of such violation. For the reasons previously stated, the Court finds for the Defendants. Judgment is hereby ordered in favor of the Defendants.

SO ORDERED, this the 28th day of September, 2012.

**/s/ Sharion Aycock**

**U.S. DISTRICT  [*58] JUDGE**





Caution
As of: November 12, 2012 2:37 PM EST

# United States ex rel. Patton v. Shaw Servs., L.L.C.

United States Court of Appeals for the Fifth Circuit
March 17, 2011, Filed
No. 10-30376

**Reporter:** 418 Fed. Appx. 366; 2011 U.S. App. LEXIS 5415

UNITED STATES OF AMERICA, ex rel, JOHN PATTON, Plaintiff–Appellant v. SHAW SER-VICES, L.L.C., Defendant–Appellee

**Notice:** PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Prior History:** [**1] Appeal from the United States District Court for the Eastern District of Loui-siana. No. 2:08-CV-4325.
*United States ex rel. Patton v. Shaw Servs., LLC, 2010 U.S. Dist. LEXIS 27433 (E.D. La., Mar. 23, 2010)*

---

### Core Terms

false claim, district court, summary judgment, fraudulent, protected activity, fraudulent claim, internal quotation marks, genuine dispute, qui tam, termination, set forth, contractor's, genuine, contract provision, retaliation claim, specific facts, retaliation

---

### Case Summary

#### Procedural Posture

Plaintiff employee brought a qui tam action against defendant construction company, alleging that defendant submitted false or fraudulent claims to the Government for payment in violation of the False Claims Act (FCA), *31 U.S.C.S. §§ 3729-3733*, and terminated his employment in re-taliation for his complaints. The U.S. District Court for the Eastern District of Louisiana granted summary judgment in defendant's favor. Plaintiff appealed.

#### Overview

Plaintiff identified "fraudulent" construction mistakes concerning the rebar and concrete work on a project that was partly funded with federal money, which allegedly rendered defendant's claims for payment false or fraudulent within the meaning of the FCA. However, plaintiff pro-duced no evidence regarding the presentment of any claim to the government that was false or fraudulent within the meaning of the FCA. There was no indication, for instance, that defendant falsely certified compliance with the contract provisions or construction methods that plaintiff al-leged were violated; nor had he shown that compliance with those provisions or methods was a con-dition to payment under the contract. Plaintiff also failed to present evidence creating a genuine dispute as to whether defendant acted with the requisite scienter. His retaliation claim likewise

418 Fed. Appx. 366, *366; 2011 U.S. App. LEXIS 5415, **1

failed. There was no evidence to support the allegation that his fraud complaints to the governmental entities were known to defendant. Without knowledge that plaintiff was investigating fraud, defendant could not possess the retaliatory intent necessary to establish a violation of *31 U.S.C.S. § 3730(h)*.

**Outcome**
The court affirmed the judgment of the district court.

---

| LexisNexis® Headnotes |
| --- |

Civil Procedure > Appeals > Summary Judgment Review > Standards of Review

*HN1* An appellate court reviews summary judgment orders de novo, applying the same standards as the district court.

Civil Procedure > ... > Summary Judgments > Entitlement as Matter of Law > Appropriateness
Civil Procedure > ... > Summary Judgments > Entitlement as Matter of Law > Genuine Disputes
Civil Procedure > ... > Summary Judgments > Entitlement as Matter of Law > Legal Entitlement

*HN2* Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*.

Civil Procedure > ... > Summary Judgments > Evidentiary Considerations > Absence of Essential Element
Civil Procedure > ... > Summary Judgments > Burdens of Proof > Movant Persuasion & Proof
Civil Procedure > ... > Summary Judgments > Burdens of Proof > Nonmovant Persuasion & Proof

*HN3* Once a party moving for summary judgment has initially shown that there is an absence of evidence to support the non-moving party's cause, the non-movant must come forward with specific facts showing a genuine factual issue for trial.

Civil Procedure > Judgments > Summary Judgments > Evidentiary Considerations

*HN4* On summary judgment review, a court resolves any doubts and draws all reasonable inferences in favor of the nonmoving party.

Labor & Employment Law > ... > False Claims Act > Scope & Definitions > Qui Tam Actions

*HN5* The False Claims Act (FCA), *31 U.S.C.S. §§ 3729-3733*, is the Government's primary litigation tool for recovering losses resulting from fraud.

Labor & Employment Law > ... > False Claims Act > Scope & Definitions > Qui Tam Actions

*HN6* An individual violates the False Claims Act (FCA), *31 U.S.C.S. §§ 3729-3733*, under former *31 U.S.C.S. § 3729(a)(1)* and *(2)* when he knowingly presents a false or fraudulent claim for payment, *§ 3729(a)(1)*, or knowingly makes a false record or statement to get a false or fraudulent claim paid or approved by the Government, *§ 3729(a)(2)*.

Labor & Employment Law > ... > False Claims Act > Scope & Definitions > Qui Tam Actions

*HN7* The False Claims Act (FCA), *31 U.S.C.S. §§ 3729-3733*, is a fraud prevention statute, and not a general enforcement device for federal statutes, regulations and contracts. The FCA does not create liability for a contractor's breach of a contractual provision or regulation unless, as a result of such acts, the contractor knowingly asks the Government to pay amounts it does not

418 Fed. Appx. 366, *366; 2011 U.S. App. LEXIS 5415, **1

owe.

Labor & Employment Law > Employer Liability > False Claims Act > Burdens of Proof

*HN8* To prove a violation of the False Claims Act (FCA), *31 U.S.C.S. §§ 3729-3733*, a plaintiff must establish (1) a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim).

Labor & Employment Law > ... > False Claims Act > Scope & Definitions > Qui Tam Actions

*HN9* The False Claims Act (FCA), *31 U.S.C.S. §§ 3729-3733*, attaches liability, not to the underlying fraudulent activity but to the claim for payment.

Civil Procedure > ... > Summary Judgments > Entitlement as Matter of Law > Genuine Disputes

*HN10* Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial.

Labor & Employment Law > ... > False Claims Act > Scope & Definitions > Qui Tam Actions

*HN11* For liability to attach under the False Claims Act (FCA), *31 U.S.C.S. §§ 3729-3733*, not only must a defendant submit false claims, but the defendant must have knowingly or recklessly cheated the government. *31 U.S.C.S. §§ 3729(b)(1)(A)(i)-(iii)*.

Civil Procedure > ... > Summary Judgments > Evidentiary Considerations > Absence of Essential Element
Civil Procedure > ... > Summary Judgments > Entitlement as Matter of Law > Appropriateness

*HN12* A complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial and mandates the entry of summary judgment for the moving party.

Labor & Employment Law > ... > False Claims Act > Scope & Definitions > Protected Activities

*HN13 31 U.S.C.S. § 3730(h)*, the whistleblower provision of the False Claims Act (FCA), *31 U.S.C.S. §§ 3729-3733*, encourages employees with knowledge of fraud to come forward by prohibiting retaliation against employees who assist in or bring qui tam actions against their employers.

Labor & Employment Law > ... > False Claims Act > Scope & Definitions > Protected Activities

*HN14 31 U.S.C.S. § 3730(h)* protects lawful acts done by an employee in furtherance of an action under the section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section.

Labor & Employment Law > ... > False Claims Act > Scope & Definitions > Protected Activities

*HN15* To bring a retaliation claim pursuant to the False Claims Act (FCA), *31 U.S.C.S. §§ 3729-3733*, for termination of employment, a plaintiff must show that he engaged in activity protected under the statute, that his employer knew he engaged in protected activity, and that he was discharged because of it.

418 Fed. Appx. 366, *366; 2011 U.S. App. LEXIS 5415, **1

Civil Procedure > ... > Summary Judgments > Burdens of Proof > Nonmovant Persuasion & Proof
Civil Procedure > ... > Summary Judgments > Opposing Materials > Accompanying Documentation

*HN16* Unsupported allegations or affidavit or deposition testimony setting forth ultimate or con-clusory facts and conclusions of law are insufficient to defeat a motion for summary judg-ment.

Labor & Employment Law > ... > False Claims Act > Scope & Definitions > Qui Tam Actions

*HN17* For internal complaints to constitute protected activity ″in furtherance of″ a qui tam ac-tion, the complaints must concern false or fraudulent claims for payment submitted to the govern-ment.

Labor & Employment Law > ... > False Claims Act > Scope & Definitions > Protected Activities
Labor & Employment Law > ... > False Claims Act > Scope & Definitions > Qui Tam Actions

*HN18* An employer is entitled to treat a suggestion for improvement as what it purports to be rather than as a precursor to qui tam litigation.

**Counsel:** For JOHN PATTON, Plaintiff - Appellant: John Courtney Wilson, Metairie, LA.

For SHAW SERVICES, L.L.C., Defendant - Appellee: Michael F. Weiner, Sandra S. Varnado, Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C., Mandeville, LA; Erin E. Pelleteri, Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C., New Orleans, LA.

**Judges:** Before KING, DAVIS, and SOUTHWICK, Circuit Judges.

---

| **Opinion** |
|---|

[*367]  PER CURIAM:[*]

John Patton brought a *qui tam* action against Shaw Services, L.L.C., alleging that the company sub-mitted false or fraudulent claims to the federal government for payment in violation of the False Claims Act, and terminated his employment in retaliation for his complaints about the com-pany's allegedly fraudulent practices. The district court granted summary judgment in favor of the employer on all of Patton's claims. We affirm the judgment of the district court.

## I. FACTS AND PROCEDURAL BACKGROUND

From May 27, 2008 through July  [**2] 23, 2008, Shaw Services, L.L.C. (″Shaw″) employed [*368]  John Patton as a carpenter on a project at the Louisiana State Transportation Center. This project was funded in part by the federal government. Patton brought suit against Shaw under the False Claims Act (″FCA″), *31 U.S.C. §§ 3729-3733 (2006)*.[1] Patton alleged in Count 1 of his Complaint that Shaw received payment for allegedly substandard construction work by present-ing false or fraudulent claims to the government or by making false records or statements (the ″§ 3729(a) claims″). In Count 2 of his Complaint, Patton alleged that Shaw violated the FCA's

---

[*]  Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1]  The Government declined to intervene in the action.

whistleblower provision by creating a hostile work environment that culminated in his discharge because of his complaints to Shaw and to state and federal agencies about Shaw's construction methods and false claims (the "retaliation claim").

In lieu of an answer, Shaw filed two dispositive motions. First, Shaw moved to dismiss, or in the alternative, for partial summary judgment on Patton's retaliation claim on the basis that Patton failed to establish that his supervisors were aware of, and terminated his employment because of, his complaints **[\*\*3]** about Shaw's allegedly fraudulent practices. Shaw also moved to dismiss the *§ 3729(a)* claims for failure to plead fraud with particularity under *Federal Rule of Civil Procedure 9(b)*.

Because the parties presented materials outside the pleadings in connection with both motions, the district court treated the motions as motions for summary judgment under *Federal Rule of Civil Procedure 56*, in accordance with *Rule 12(d)*. *See* FED. R. CIV. P. 12(d) ("If, on a motion under *Rule 12(b)(6)* . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under *Rule 56*."). Because Shaw's motion on the *§ 3729(a)* claims had been presented solely as a motion to dismiss under *Rule 12(b)(6)*, the district court granted the parties fourteen days to submit supplemental material pertinent to that motion. After both parties submitted additional materials, the district court considered Shaw's motions together and granted summary judgment for Shaw on all of Patton's claims. Patton appeals.

## II. DISCUSSION

*HN1* We review summary judgment orders *de novo,* applying the same standards as the district court. *United States ex rel. Longhi v. United States,* 575 F.3d 458, 465 (5th Cir. 2009). **[\*\*4]** *HN2* Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). *HN3* "Once the moving party has initially shown that there is an absence of evidence to support the non-moving party's cause, the non-movant must come forward with specific facts showing a genuine factual issue for trial." *United States ex rel. Farmer v. City of Houston,* 523 F.3d 333, 337 (5th Cir. 2008) (citation and internal quotation marks omitted). *HN4* "This Court resolves any doubts and draws all reasonable inferences in favor of the nonmoving party." *Longhi,* 575 F.3d at 465.

## A. Claims under *31 U.S.C. § 3729(a)*

*HN5* "The FCA is the Government's primary litigation tool for recovering losses resulting from fraud." *United States ex rel. Steury v. Cardinal Health, Inc.,* 625 F.3d 262, 267 (5th Cir. 2010) (citation and internal quotation marks omitted). The language of Patton's Complaint tracks the language of *31 U.S.C. §§ 3729(a)(1)* and *(2),* as in effect when Patton filed his claim **[\*369]** on September 8, 2008. *HN6* An individual violates the FCA under these sections when he "knowingly presents . . . a false or fraudulent claim **[\*\*5]** for payment," *§ 3729(a)(1),* or "knowingly makes . . . a false record or statement to get a false or fraudulent claim paid or approved by the Government," *§ 3729(a)(2).*[2]

---

[2]   The 2009 amendments to the FCA replaced former sections *§ 3729(a)(1)* and *(2)* with new sections *§ 3729(a)(1)(A)* and *(B).* Although the 2009 amendments generally apply only to conduct occurring on or after May 20, 2009, new provision *§ 3729(a)(1)(B),* which replaced and amended *§ 3729(a)(2),* applies retroactively to "all claims under the False Claims Act . . . that are pending on or after" June 7, 2008. *See* Fraud Enforcement & Recovery Act of 2009, Pub.L. 111-21, § 4(f)(1), 123 Stat. 1617, 1625 (2009). Because Patton filed suit on September 8, 2008, his complaint was "pending" after the effective date of new provision *§*

418 Fed. Appx. 366, *369; 2011 U.S. App. LEXIS 5415, **5

*HN7* The FCA is a fraud prevention statute, and "not a general enforcement device for federal statutes, regulations and contracts." *Steury,* 625 F.3d at 268 (internal quotation marks omitted). The FCA does not create liability for a contractor's breach of a contractual provision or regulation "unless, as a result of such acts, the [contractor] knowingly asks the Government to pay amounts it does not owe." *United States ex rel. Willard v. Humana Health Plan of Texas Inc.,* 336 F.3d 375, 381 (5th Cir. 2003). Accordingly, *HN8* to prove a violation of the FCA, a plaintiff must establish "(1) . . . a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)." *Longhi,* 575 F.3d at 467 (internal quotation marks omitted) (adopting the test stated in *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.,* 525 F.3d 370, 376 (4th Cir. 2008)). *HN9* "[T]he statute attaches **[**7]** liability, not to the underlying fraudulent activity . . . but to the 'claim for payment.'" *Id.* (internal quotation marks omitted) (quoting *Harrison v. Westinghouse Savannah River* Co., 176 F.3d 776, 785 (4th Cir. 1999)).

Patton alleged in his Complaint that Shaw committed fraud "at or in connection with construction to less than contract specifications and/or applicable building codes at the Louisiana State Transportation Center." Patton identified "fraudulent" construction mistakes concerning the rebar and concrete work on the project,[3] which allegedly rendered Shaw's claims for payment false or fraudulent within the meaning of the FCA. To create a genuine issue of fact for trial, Patton submitted excerpts from various industry treatises, textbooks, and manufacturers' catalogs, averring that Shaw's construction methods deviated from the standards set forth in these materials. Patton supported his contentions with an affidavit from Ladd Ehlinger, a practicing **[*370]** architect and expert witness, who testified generally about the harms resulting from the construction defects that Patton alleged in his Complaint. He also produced a declaration in which he alleges that his Shaw supervisors admitted **[**8]** on various unspecified occasions to the construction mistakes alleged in his Complaint.

The district court found that Patton failed to show how Shaw violated any provision of its contract or any applicable building code by employing the construction methods outlined in Patton's Complaint and described in his briefing. The district court rejected Patton's argument that Shaw's construction work was "defective" and improper because it was not performed in accordance with the standards set forth in the authorities Patton produced to the court. The district court found that none of the materials Patton submitted were referenced in or incorporated into Shaw's contract, and therefore, any failure to conform to the standards set forth in those materials was irrelevant to determining whether **[**9]** Shaw violated its obligations under the contract. Furthermore, the district court noted that Shaw produced evidence that a third-party architectural firm retained by the state inspected Shaw's work weekly and drafted field reports, none of which indicated that Shaw's work was not in compliance with the contract or otherwise improper in the ways Patton contends. Because Patton failed to demonstrate that the allegedly defec-

---

3729(a)(1)(B). *See Steury,* 625 F.3d at 267 n.1 (applying § 3729(a)(1)(B) to a complaint pending as of the effective date of the amendment).

The amended provision imposes liability on any person who "knowingly makes . . . a false record or statement material to a false or fraudulent claim." § 3729(a)(1)(B). Any substantive difference between the prior and amended provision is irrelevant here because, as discussed **[**6]** below, Patton has not adduced *any* evidence of a false record or statement so as to create a genuine dispute about Shaw's liability under either version of the statute.

[3] The alleged construction mistakes in Patton's Complaint include Shaw's failure to use rebar "chairs," improper removal of rebar, inadequate doweling for intersecting walls, improper application of a "form release agent" to the rebar, and improper splicing of horizontal rebar, all of which allegedly affected the integrity or load-bearing strength of the structure and created potentially serious safety risks.

418 Fed. Appx. 366, *370; 2011 U.S. App. LEXIS 5415, **9

tive work violated the contract, the district court found Patton's *§ 3729(a)* claims to be without merit.

Patton concedes on appeal that he cannot show that the standards set forth in the materials he submitted to the district court are incorporated into the contract. He urges, however, that he should be accorded the "reasonable inference" that they are incorporated because the construction methods set forth in those materials represent standard industry practice, and that we should likewise infer that any violation of standard industry practice, as set forth in these materials, represents a violation of the contract.[4] Patton also contends that his summary judgment evidence sufficed to raise a triable issue of fact as to whether Shaw complied with particular provisions **[**10]** of the contract. We need not delve into the disputed provisions of the contract, however, because even if Patton created a genuine dispute as to whether Shaw complied with the contract specifications in all particulars, Patton has nonetheless failed to put forth any evidence to support the other elements of his claims so as to establish that Shaw's conduct constituted a violation of the FCA.

Patton has produced no evidence regarding the presentment of any claim to the government that was false or fraudulent within the meaning of the FCA. There is no indication, for instance, that Shaw falsely certified compliance with the contract provisions or construction methods that Patton alleges Shaw violated; nor has he shown that compliance with those provisions or methods was a condition to payment under the contract. *See Steury*, 625 F.3d at 268 **[**11]** (upholding dismissal of FCA claims premised on a contractor's billing for work that did not comply with federal statutes, regulations, or contract provisions when a contractor's compliance "was not a 'condition' or 'prerequisite' to payment under a contract"); *cf. United* **[*371]** *States v. Southland Mgmt. Corp.,* 326 F.3d 669, 674-75 (5th Cir. 2003) (en banc) ("It is only those claims for money or property to which a defendant is not entitled that are 'false' for purposes of the False Claims Act."). Moreover, Patton admitted to the district court that he could not point to a any false record or certification that the construction work was done correctly, but speculated that Shaw must have falsified records because he never saw an inspector at the job site. However, *HN10* "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *Farmer*, 523 F.3d at 337 (citation and internal quotation marks omitted).

Furthermore, Patton has not put forth evidence creating a genuine dispute as to whether Shaw acted with the requisite scienter. *HN11* For FCA liability **[**12]** to attach, not only must the defendant submit false claims, but the defendant must have "*knowingly* or *recklessly* cheated the government." *United States ex rel. Taylor–Vick v. Smith,* 513 F.3d 228, 232 (5th Cir. 2008) (emphasis added); *see also* 31 U.S.C. §§ 3729(b)(1)(A)(i)—(iii); *Southland Mgmt. Corp.,* 326 F.3d at 682 (Jones, J., specially concurring) (mere violations of regulations and contractual provisions "are not fraud unless the violator knowingly lies to the government about them" (quoting *United States ex rel. Lamers v. City of Green Bay,* 168 F.3d 1013, 1019 (7th Cir. 1999)). At best, Patton has put forth unsubstantiated allegations that his supervisors admitted to employing substandard or improper construction practices, but these allegations are insufficient to create a genuine dispute as to whether Shaw knowingly or recklessly submitted false claims to the government. *See Farmer,* 523 F.3d at 337.

Because Patton has not adduced evidence to create a genuine dispute as to the essential elements

---

[4]   We do not address Patton's argument, raised for the first time on appeal, that the construction standards that he alleged Shaw violated fall within the "good faith" requirement that Louisiana law imposes on all contracts. *See Yohey v. Collins,* 985 F.2d 222, 225 (5th Cir. 1993) ("As a general rule, this Court does not review issues raised for the first time on appeal.").

of his claims, the district court did not err in granting summary judgment in favor of Shaw. *See Farmer,* 523 F.3d at 337 (*HN12* "'[A] complete failure of proof concerning an essential element [**13] of the nonmoving party's case necessarily renders all other facts immaterial' and 'mandates the entry of summary judgment' for the moving party.") (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

**B. Retaliation under** *31 U.S.C. § 3730(h)*

*HN13* The whistleblower provision of the False Claims Act, *31 U.S.C. § 3730(h),* encourages employees with knowledge of fraud to come forward by prohibiting retaliation against employees who assist in or bring *qui tam* actions against their employers. *Robertson v. Bell Helicopter Textron, Inc.,* 32 F.3d 948, 951 (5th Cir. 1994). *HN14* *Section 3730(h),* as applicable to Patton's suit, protects "lawful acts done by [an] employee . . . in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section."[5] *§ 3730(h).* *HN15* To bring an FCA retaliation claim for his termination, Patton was required to show that he engaged in activity protected under the statute, that his employer knew he engaged in protected activity, and that he was discharged because [*372] of it. *Id.; Robertson,* 32 F.3d at 951.

Patton declared that he "complained repeatedly" to on-site Shaw supervisors and to off-site management about "fraudulent construction mistakes," the same allegedly improper construction methods that Patton alleges gave rise to his *§ 3729(a)* claims. Patton contends that his complaints constituted protected activity within the meaning of the anti-retaliation provision of the FCA. Patton also alleged that he complained to state and federal authorities about Shaw's work prior to his termination.

We agree with the district court that Patton failed to put forth sufficient evidence to overcome summary judgment on his retaliation claim. Patton's allegations that Shaw supervisors retaliated against him for internally reporting "fraudulent" construction practices or "false claims construction mistakes" are conclusory and unsupported by specific facts creating a genuine [**15] issue for trial. *Clark v. America's Favorite Chicken Co.,* 110 F.3d 295, 297 (5th Cir. 1997) (citations omitted) (*HN16* "Unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment."); *see also United States v. Lawrence,* 276 F.3d 193, 197 (5th Cir. 2001) ("[S]elf-serving allegations are not the type of significant probative evidence required to defeat summary judgment.") (citation and internal quotation marks omitted). Additionally, assuming that he contacted state and federal authorities prior to his termination, Patton has put forth no evidence to support the allegation in his Complaint that "his complaints to the governmental entities were known to defendant."

Moreover, although Patton alleges that he internally reported "fraud," it is clear that the substance of his complaints concerned Shaw's allegedly unsafe or improper construction methods, and not that Patton was concerned that Shaw was defrauding the government. *HN17* For internal complaints to constitute protected activity "in furtherance of" a *qui tam* action, the complaints must concern false or fraudulent claims [**16] for payment submitted to the government. *See Robertson,* 32 F.3d at 952 (finding no protected activity where employee "never characterized his concerns as involving illegal, unlawful, or false-claims investigations"). Mere criticism of Shaw's

---

[5]   Congress amended this section in 2009 to provide relief to any employee [**14] discharged for acting "in furtherance of other efforts to stop 1 or more violations of this subchapter." Pub.L. No. 111-21, § 4(d), 123 Stat. 1617, 1624-25 (2009). The amendment only applies to conduct on or after May 20, 2009. *See id.* § 4(f), 123 Stat. at 1625. Shaw fired Patton in July 2008, so these changes do not apply here.

construction methods, without any suggestion that Patton was attempting to expose illegality or fraud within the meaning of the FCA, does not rise to the level of protected activity. *See United States ex rel. Owens v. First Kuwaiti General Trading & Contracting Co.,* 612 F.3d 724, 736 (4th Cir. 2010) (employee on a government-funded construction project was not engaged in protected activity where he merely complained of "construction mistakes" and improper construction methods, and where there was no evidence that the employee was concerned about fraud). Furthermore, **HN18** "[a]n employer is entitled to treat a suggestion for improvement as what it purports to be rather than as a precursor to litigation," *Luckey v. Baxter Healthcare Corp.,* 183 F.3d 730, 733 (7th Cir. 1999), and allegations regarding construction methods do not demonstrate that Patton put Shaw on notice that he was investigating fraud against the government.

Without knowledge that Patton **[**17]** was investigating fraud, Shaw "could not possess the retaliatory intent necessary to establish a violation" of *§ 3730(h). Robertson,* 32 F.3d at 952. To the contrary, Shaw produced an affidavit from the supervisor who fired Patton, as well as documentation from Patton's HR file, corroborating Shaw's contention that Shaw management **[*373]** did not have knowledge of any complaints about fraud, and that Patton was terminated after an altercation with his supervisors about a construction matter unrelated to his FCA allegations, rather than because anyone believed Patton was engaged in any activity in furtherance of FCA litigation. Patton's conclusory statement that he was wrongfully discharged after confronting his supervisor about Shaw's "false claims construction mistakes" is insufficient to raise a genuine dispute as to whether Shaw management retaliated against him "because of activities which the employer had reason to believe were taken in contemplation of a *qui tam* action against the employer." *McKenzie v. BellSouth Telecomms., Inc.,* 219 F.3d 508, 518 (6th Cir. 2000). Accordingly, summary judgment in favor of Shaw was proper.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment **[**18]** of the district court.




Caution
As of: November 14, 2012 3:10 PM EST

## United States ex rel. Pilecki-Simko v. Chubb Inst.

United States District Court for the District of New Jersey
March 22, 2010, Decided; March 22, 2010, Filed
Civil Action No. 06-3562

**Reporter:** 2010 U.S. Dist. LEXIS 27187; 2010 WL 1076228

UNITED STATES OF AMERICA, ex rel. MARY BETH PILECKI-SIMKO and TOM GIUNTA, Relators, v. THE CHUBB INSTITUTE, THE CHUBB CORPORATION, CHUBB AMERICA SERVICE CORPORATION, and HIGH-TECH INSTITUTE, INC., Defendants.

**Notice:** NOT FOR PUBLICATION

**Subsequent History:** Complaint dismissed at United States ex rel. Pilecki-Simko v. Chubb Inst., 2010 U.S. Dist. LEXIS 48345 (D.N.J., May 17, 2010)

---

| Core Terms |
| --- |

false claim, false certificate, accreditation, veil-piercing, ban, parent corporation, financial aid, false statement, placement, enrollment, subsidiary, successor liability, entity, ego, eligibility, phase, corporate veil, fraudulent, scienter, purported, motion to dismiss, fraudulent claim, leave to amend, court finds, conspiracy, graduates, misrepresentations, circumstantial, shareholders, misconduct

**Counsel:** **[*1]** Michael S. Green, Esq., GREEN & PAGANO, LLP, East Brunswick, New Jersey, Gary S. Graifman, Esq., KANTROWITZ, GOLDHAMER & GRAIFMAN, Montvale, New Jersey, Attorneys for Plaintiffs/Relators.

Eric A. Savage, Esq., LITTLER MENDELSON, PC, Newark, New Jersey, Attorneys for Defendants The Chubb Institute & High-Tech Institute, Inc.

Michael R. McDonald, Esq., GIBBONS, PC, Newark, New Jersey, Attorneys for Defendant The Chubb Corporation.

**Judges:** Hon. GARRETT E. BROWN, JR., United States District Judge.

**Opinion by:** GARRETT E. BROWN, JR.

---

| Opinion |
| --- |

## MEMORANDUM OPINION

Case 4:12-cv-02676   Document 57-1   Filed in TXSD on 11/20/12   Page 124 of 171

Page 2 of 18
2010 U.S. Dist. LEXIS 27187, *3

**BROWN, Chief Judge:**

This matter is a *qui tam* action [1] brought pursuant to the False Claims Act, *31 U.S.C. § 3729 et seq.,* by Relators Mary Beth Pilecki-Simko and Tom Giunta against their former employer, The Chubb Institute (TCI). Relators allege that TCI knowingly caused false claims to be filed by making a number of misrepresentations to the Department of Education, its accrediting agencies, and students that wrongfully enabled them to secure student financial aid in the form of loans and grants from the federal government. Relators also seek to impose liability for this conduct on TCI's former corporate parents, High-Tech Institute (HTI) and The Chubb Corporation, **[*2]** on the basis of their alleged control of TCI's actions.

Presently before the Court are two motions (Doc. Nos. 38, 39) to dismiss Relators' Second Amended Complaint filed by Defendants The Chubb Corporation, TCI, and HTI. [2] Both motions seek dismissal pursuant to *Federal Rules of Civil Procedure 9(b)* and *12(b)(6)* on the grounds that Relators have failed to plead fraud with **[*3]** the requisite particularity and failed to state a claim upon which relief can be granted. HTI and The Chubb Corporation also challenge the sufficiency of the allegations supporting Relators' veil-piercing and successor liability claims against them. For the following reasons, the Court will grant The Chubb Corporation's motion, and the Court will grant the motion filed by TCI and HTI.

## I. PROCEDURAL HISTORY

The present motions challenge the sufficiency of Relators' Second Amended Complaint (SAC). Defendants had previously filed motions challenging the sufficiency of Relators' First Amended Complaint, [3] but this Court denied those motions without prejudice on August 24, 2009, because Relators sought leave to amend their pleadings a second time. Defendants and the Court consented to Relators' request, [4] and Relators filed a six-count SAC on September 21, 2009.

Defendants renewed their motions to dismiss on October 16, 2009, and the Government reinstated the Statement of Interest it filed with regard to Defendants' earlier motions to dismiss. (Doc. No. 43.) [5] These motions are now ripe for the Court's consideration.

## II. THE SECOND AMENDED COMPLAINT

For purposes of these motions, this Court must accept as true the factual allegations contained in the SAC and draw all reasonable inferences in favor of Relators. *See, e.g., Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).* According to the SAC, as of the time of the Com-

---

[1]   "Qui tam actions have a long history and were used in England before the foundation of this country." *United States ex rel. Atkinson v. Pa. Shipbuilding Co., 473 F.3d 506, 509 (3d Cir. 2007).* The term "qui tam" derives from "the Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur,* which means 'who pursues this action on our Lord the King's behalf as well as his own.'" *Vt. Agency of Natural Res. v. United States ex rel. Stevens, 529 U.S. 765, 769 n.1, 120 S. Ct. 1858, 146 L. Ed. 2d 836 (2000)* (citation omitted). "Under modern practice, *qui tam* actions are brought by private plaintiffs on behalf of the Government in exchange for some portion of any resulting damages award." *United States ex rel. Rodriguez v. Our Lady of Lourdes Med. Ctr., 552 F.3d 297, 299 n.1 (3d Cir. 2009)* (citing *Vt. Agency of Natural Res., 529 U.S. at 773-74*).

[2]   This matter was reassigned to the undersigned by Order of August 10, 2009.

[3]   The Court notes that the docket in this case reflects that Relators' did not properly file the First Amended Complaint on the Court's CM/ECF system. In lieu of this filing, The Chubb Corporation has provided a copy of the First Amended Complaint (McDonald Decl., **[*4]** Ex. B), which Relators do not dispute.

[4]   Defendants' stipulation of consent is reflected by Magistrate Judge Esther Salas' Consent Order of September 22, 2009.

[5]   The Government had previously declined to intervene in this case on August 19, 2008. (Doc. No. 5.)

plaint, TCI [6] was a technical career training institute that had been a part of the HTI family of technical career training schools since HTI purchased the Institute in 2004. Prior to that time, TCI had been a subsidiary of insurance company The Chubb Corporation. Relators worked as career services and admissions counselors, respectively, for the North Brunswick Campus of TCI for [*5] different periods between 1995 and 2005. (SAC PP 5-7.)

According to Relators, TCI participates in the federal student financial aid program authorized by Title IV of the Higher Education Act, which provides financial assistance in the form of direct loans and federally insured private loans to eligible students that attend qualifying higher education institutions. [*6] In order to qualify for federal subsidies, the institution must enter into a Program Participation Agreement (PPA) with the Department of Education, which requires continuing adherence to a number of statutory and regulatory conditions. (*See id.* PP 9-23.) This process has been referred to by courts as the "phase I application." Students at qualifying higher education institutions then submit individual applications for financial aid, which courts have referred to as "phase II applications."

The Court understands Relators to contend that TCI violated the False Claims Act by knowingly violating Title IV requirements it had agreed to in the phase I application (the PPA) and knowingly providing false statements to maintain Title IV eligibility, but nevertheless continuing to submit students' phase II applications for financial aid as if it had complied with the regulations. (*See id.* PP 24, 51-86.) Courts have referred to this theory of False Claims Act liability--wherein a party "submit[s] claims for payment to the federal Government while at the same time violating, without disclosing, applicable rules" governing eligibility for the government program--as the implied false certification [*7] [7] theory of liability. *See, e.g., United States ex rel. Rodriguez v. Our Lady of Lourdes Med. Ctr., 552 F.3d 297, 303 (3d Cir. 2009).* In other words, by submitting or causing to be submitted the claim for funds, the entity implicitly falsely certifies that it has complied with governing regulations.

With regard to specific violations of Title IV regulations, Relators allege that TCI knowingly made the following misrepresentations to the Department of Education, its accreditation agencies, and students between 2001 and 2006 in order to satisfy various phase I obligations: (1) false reports of the employment placement rates of TCI graduates (SAC PP 24(i)(a)-(g) and (ii), 52-59); (2) false assurances that TCI students were making satisfactory academic progress in their program of study (*id.* PP 24(iii), 68-72); (3) permitting [*8] English-deficient applicants and applicants who failed admissions tests to enroll despite their failure to meet TCI admissions standards (*id.* PP 24(iv), 60-67); (4) allowing students ineligible for financial assistance under Title IV to apply for Title IV funds (SAC PP 24(v), 80-85); and (5) false assurances of compliance with Title IV's ban (hereinafter "incentive compensation ban") on the payment of bonuses to recruiters on the basis of the number of students they admit (*id.* PP 24(vi), 73-79). Further, Relators allege that TCI employees used "pixie dust" to increase applicants' admission test scores and thereby increase enrollment, that TCI rated admissions personnel with scorecards to award bonuses based on

---

[6]   The Court notes that the SAC purports to use "Chubb Institute" and/or "Chubb" to refer to TCI, The Chubb Corporation, and Chubb America Service Corporation (SAC P 6); yet, the SAC consistently differentiates between TCI and its alleged parent corporations bearing the "Chubb" name. Furthermore, in their opposition papers, Relators do not contend that The Chubb Corporation or Chubb America Service Corporation directly violated the False Claims Act. Thus, rather than reading every allegation about "Chubb" as a group allegation against all three Chubb Defendants, which would be inconsistent with Relators' representations to the Court, the Court construes the SAC's "Chubb" and "Chubb Institute" allegations to refer to TCI unless the SAC specifies that allegation concerns The Chubb Corporation or Chubb America Service Corporation.

[7]   Implied false certification, which refers to a submission for payment without disclosing the knowing failure to comply with applicable regulations, thus differs from an express false certification, which occurs when a participating institution falsely certifies, usually on the claim for payment itself, that it is currently in compliance with the applicable regulations.

Case 4:12-cv-02676   Document 57-1   Filed in TXSD on 11/20/12   Page 126 of 171

Page 4 of 18
2010 U.S. Dist. LEXIS 27187, *8

enrollment numbers, and that TCI administrators made "professional judgment[s]" that admissions personnel should submit to the Government the financial aid forms for ineligible students. (*Id.* at PP 61, 74-75, 82.)

In support of these allegations, Relators submit numerous exhibits that they contend demonstrate the willfully false statements TCI submitted to its accreditation agencies concerning the job-placement rates of its students. (SAC Exs. A-E.) Relator Pilecki-Simko also **[*9]** submitted a sworn affidavit identifying 13 students from TCI's North Brunswick campus that she claims "are examples of the allegations made in the complaint and disclosure statement." (SAC Ex. F, Pt. 23 P 3.) These purported "examples" included one graduate discovered to be an illegal alien, two graduates who were not proficient in the English language, two students who gave poor interviews and could not be placed, two students that received assurances from admissions representatives regarding employment and salary opportunities, and six students whose employment TCI ostensibly misrepresented. (*See id.*) [8]

With regard to TCI's parent corporations, Relators assert that HTI directly participated in TCI's misrepresentations to **[*10]** its accrediting agency about the employment placement rates of TCI graduates. (*See id.* P 24(i)(a), (b).) Relators further allege that HTI and The Chubb Corporation both (i) knew of TCI's misconduct, and (ii) controlled TCI to the point that TCI was their alter ego. (*See id.* PP 99-119.)

As presently constituted, the SAC presents three counts of False Claims Act violations arising under the following subsections [9] of *31 U.S.C. § 3729*: *(a)(1)* (knowingly causing a false claim for payment to be presented to an employee of the United States Government), *(a)(2)* (knowingly using a false statement to get a false claim paid by the Government), and *(a)(3)* (conspiracy to defraud the Government by getting a false claim paid). With regard to TCI's former parent corporations, the SAC alleges one count of piercing the corporate veil against both HTI and The Chubb Corporation, as well as one count of successor liability against HTI.

## III. DISCUSSION

A motion to dismiss under *Federal Rule of Civil Procedure 12(b)(6)* may be granted only if, accepting all well-pleaded allegations in the complaint as true **[*11]** and viewing them in the light most favorable to the plaintiff, a court finds that plaintiff has failed to set forth fair notice of what the claim is and the grounds upon which it rests. *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)* (citations omitted). A complaint will survive a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)* (quoting *Twombly, 550 U.S. at 570*).

The plausibility standard requires that "the plaintiff plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" and demands "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal, 129 S. Ct. at 1949* (citing *Twombly, 550 U.S. at 556*). Although a court must accept as true all factual allegations in a complaint, that tenet is "inapplicable to legal conclusions," and "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not

---

[8]   Relator Giunta also submitted a two-paragraph affidavit, consisting solely of vague assertions that he was "fully familiar with this proceeding," and that "[t]he allegations in the complaint and disclosure statement . . . as to the Admission Process and misrepresentations as regards admissions and financial aid are to my knowledge accurate." (SAC Ex. F, Pt. 24.) Relator Pilecki-Simko's affidavit contained similar generic assertions. (*See* SAC Ex. F, Pt. 23 PP 1-2.)

[9]   Unless otherwise noted, the Court refers to portions of *31 U.S.C. § 3729* when it refers to "subsections."

do.'" *Iqbal,* 129 S. Ct. at 1949 (quoting *Twombly,* 550 U.S. at 555); *see also Phillips v. County of Allegheny,* 515 F.3d 224, 231 (3d Cir. 2008). **[\*12]** In evaluating a motion to dismiss, a court may consider only the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the complainant's claims are based upon those documents. *Pension Benefit Guar. Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1196 (3d Cir. 1993).

Here, Relators allege that TCI violated the False Claims Act by knowingly violating Title IV requirements it had agreed to in its phase I application (the PPA) and knowingly providing false statements to maintain Title IV eligibility, but nevertheless continuing to submit students' phase II applications for financial aid as if it had complied with the applicable regulations. Alternatively, Relators allege that TCI conspired with its corporate parents to defraud the Government by performing these alleged acts. Relators further allege that TCI's parent corporations controlled TCI's operations to the point that liability should attach to them for TCI's transgressions. Presently, Defendants challenge both the legal basis and the sufficiency of the fraud allegations for Relators' False Claims Act claims, as well as the pleadings for Relators' veil-piercing and successor **[\*13]** liability claims. Although the weight of authority appears to support Relators' implied false certification theory of a False Claims Act violation in the context of a university's phase I application for Title IV funds, the Court finds that the allegations contained in the SAC fall well short of *Rule 9(b)*'s heightened pleading requirement for allegations of fraud. The Court further finds Relators' conclusory allegations about TCI's parent corporations insufficient to support veil-piercing and successor liability claims.

## A. False Claims Act

At the time that Relators commenced this lawsuit, the False Claims Act provisions relied on by Relators made it unlawful for any entity to do the following acts:

> (1) knowingly present[ing], or caus[ing] to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
>
> (2) knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;
>
> (3) conspir[ing] to defraud the Government by getting a false or fraudulent claim allowed or paid . . . .

*31 U.S.C.A. § 3729(a)(1)-(3)* **[\*14]** (West 2003 & Supp. 2008). [10] For purposes of these subsections, the Act defined the scienter requirement "knowingly" to refer to a person who

---

[10] Last year, Congress substantively revised and reorganized the above portion of § 3729(a) into a new § 3729(a)(1), which prohibited the following acts:

> (A) knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (C) conspir[ing] to commit a violation of subparagraph (A), (B), …

Fraud Enforcement Recovery Act (FERA), Pub. L. No. 111-21, § 4(a)(1), 123 Stat. 1617, 1621 (2009) (codified at 31 U.S.C. § 3729(a)(1)). Congress provided that, with the exception of new § 3729(a)(1)(B), these revisions to § 3729(a)(1) would only "apply to conduct on or after **[\*15]** the date of enactment [May 20, 2009]." FERA § 4(f)(1). Thus, it is clear that FERA's revisions to the False Claims Act would not supplant the preexisting subsections (a)(1) and (a)(3) of § 3729 in

"(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information," but notes that "no proof of specific intent to defraud is required." *31 U.S.C.A. § 3729(b)(1)-(3)* (West 2003 & Supp. 2008).

*Subsections (a)(1)* and *(a)(2)* share many common elements. As the Third Circuit explained in *United States ex rel. Schmidt v. Zimmer, Inc.,* a prima facie case of a violation under *subsection (a)(1)* requires a showing that "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent," but "[i]n order to prove a claim under *[subsection] (a)(2),* a plaintiff must also show that the defendant made or used (or caused someone else to make or use) a false record in order to cause the false claim to be actually paid or approved." *386 F.3d 235, 242 (3d Cir. 2004)* (citations omitted). The Supreme Court clarified in *Allison Engine Co. v. United States ex rel. Sanders* that while a subsection (a)(2) violation does not require subsection (a)(1)'s presentment requirement, an (a)(2) violation requires a showing "that **[*17]** the defendant made a false record or statement for the purpose of getting 'a false or fraudulent claim paid or approved by the Government.'" *553 U.S. 662, 128 S. Ct. 2123, 2130, 170 L. Ed. 2d 1030 (2008).* Meanwhile, a conspiracy in violation of *subsection (a)(3)* does not require a showing "that the conspirators intended the false record or statement to be presented directly to the Government, but it must be established that they agreed that the false record or statement would have a material effect on the Government's decision to pay the false or fraudulent claim." *Id.* at 2130.

Before the Court addresses Relators' pleadings, the Court will examine the viability of Relators' false certification theory of False Claims Act liability and the applicability of *Federal Rule of Civil Procedure 9(b).*

*1. Implied False Certification Theory of Liability*

With regard to Relators' false certification theory of False Claims Act liability, it bears mentioning that the Third Circuit has twice declined to adopt this doctrine, but in each instance, it left the door open for this theory of liability in future cases. *See Rodriguez,* 552 F.3d at 303-04 & n.6 (explaining, on review of a 12(b)(6) dismissal, that the Circuit has not adopted the **[*18]** false certification theory and declining to address the issue, but nevertheless holding that the relators "failed to assert the elements necessary to succeed under that theory"), *abrogated on other grounds by United States ex rel. Eisenstein v. City of N.Y.,* 129 S. Ct. 2230, 173 L. Ed. 2d 1255 (2009); *United States ex rel. Quinn v. Omnicare Inc.,* 382 F.3d 432, 441-43 (3d Cir. 2004) (finding, on appeal of an order of summary judgment, that relators' evidence failed to establish a false certification claim under the standards articulated by other courts).

The "archetypal *qui tam* False Claims action" involves "a private company overcharg[ing] under a government contract, [where] the claim for payment is itself literally false or fraudulent."

---

this case. Yet Congress made new § 3729(a)(1)(B) retroactive to "all claims under the False Claims Act . . . that are pending on or after [June 7, 2008]." FERA § 4(f)(1).

Defendants submit that the statutory provision applicable at the time of the filing of the lawsuit should apply, and Relators do not suggest otherwise. This Court is persuaded by Judge Rose's statutory interpretation in *United States ex rel. Sanders v. Allison Engine Co.,* 667 F. Supp. 2d 747, 2009 WL 3626773 at *3-4 (S.D. Ohio 2009) (citing § 3729's definition of "claim," 31 U.S.C. § 3729(b)(2)(A), another FERA retroactivity provision premised on "cases pending on the date of enactment," FERA § 4(f)(2), and the legislative history of FERA), that the "claims pending" trigger to FERA's retroactivity clause refers to *claims* for payment and not *cases* presenting False Claims Act claims. *See also United States v. Aguillon,* 628 F. Supp. 2d 542, 550-51 (D. Del. 2009) (declining to give FERA's revisions retroactive effect). Relators **[*16]** have not alleged that Defendants directly or indirectly made false claims for payment that were pending on or after June 7, 2008. Thus, the Court will not apply FERA's § 3729 provisions retroactively to the legal claims involved in this case.

*United States ex rel. Hendow v. Univ. of Phoenix,* 461 F.3d 1166, 1170 (9th Cir. 2006). Yet the Supreme Court has recognized that Congress "intended [the False Claims Act] to reach all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co.,* 390 U.S. 228, 232, 88 S. Ct. 959, 19 L. Ed. 2d 1061 (1968) (citation omitted). Congress reinforced this broad mandate when it passed the 1986 amendments to the False Claims Act, instructing courts **[*19]** that "each and every claim submitted under a contract, loan guarantee, or other agreement which was originally obtained by means of false statements or other corrupt or fraudulent conduct, or in violation of any statute or applicable regulation, constitutes a false claim." S. Rep. No. 99-345, at 9, *reprinted in* 1986 U.S.C.C.A.N. at 5274. Consequently, the overwhelming majority of courts have extended False Claims Act liability to a party's knowingly false certification of compliance with applicable regulations when such regulations are a condition of payment. *See, e.g., United States ex rel. Mikes v. Straus,* 274 F.3d 687, 697 (2d Cir. 2001); *United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.,* 214 F.3d 1372, 1376, 341 U.S. App. D.C. 459 (D.C. Cir. 2000); *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 786-87, 793 (4th Cir. 1999); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 125 F.3d 899, 902 (5th Cir. 1997); *United States ex rel. Hopper v. Anton,* 91 F.3d 1261, 1266-67 (9th Cir. 1996).

While the extent of the broader implied false certification theory (i.e., where the claim for payment does not include an express certification of compliance) is less clear, both the Seventh **[*20]** and Ninth Circuits have endorsed False Claims Act liability under false certification and/or promissory fraud theory in the context of educational institutions' phase I applications for Title IV eligibility and subsequent receipt of financial aid. *Hendow,* 461 F.3d at 1171-77; *United States ex rel. Main v. Oakland City Univ.,* 426 F.3d 914, 916-17 (7th Cir. 2005). [11] Although these decisions are not binding on this Court, the Court finds their analyses helpful in gauging the extent of false certification liability under the False Claims Act. The purported false certification in both cases, which also appears in the matter *sub judice,* consisted of the educational institution's false certification on its PPA that it would comply with Title IV's incentive compensation ban. *Hendow,* 461 F.3d at 1175; *Main,* 426 F.3d at 916. Placing the purported fraud in terms of the statutory language, the *Main* court explained:

> [t]he University "uses" its phase-one application (and the resulting certification of eligibility) when it makes (or "causes" a student to make) a phase-two application for payment. . . . The phase-two application is itself false because it represents that the student is enrolled in **[*21]** an eligible institution, which isn't true. . . . If a false statement is integral to a causal chain leading to payment, it is irrelevant how the federal bureaucracy has apportioned the statements among layers of paperwork.

*Main,* 426 F.3d at 916.

Defendants ask this Court to employ the Second Circuit's narrow application of the doctrine, which requires that the applicable regulations be an express condition of payment. *See Mikes,* 274 F.3d at 699-700. Ostensibly, **[*22]** Defendants worry that broad application of the false certification theory would turn the False Claims Act "into 'a blunt instrument to enforce compliance with all . . . regulations.'" *See Rodriguez,* 552 F.3d at 304 (quoting *Mikes,* 274 F.3d at 699). With re-

---

[11]  Although the *Main* court's decision relies on principles of promissory fraud, this Court agrees with the *Hendow* court's observation that promissory fraud and false certification are two sides of the same coin. *See Hendow,* 461 F.3d at 1174 (explaining that promissory fraud "in substance, is not so different from the false certification theory, and even requires the same elements"). The difference between the two, so far as the Court can discern, is when the institution manifested the scienter to defraud the Government: when it signed the PPA (promissory fraud), or when it purposely caused claims to be filed, knowing that it was violating the PPA (false certification). *Compare* Main, 426 F.3d at 917 *with* Hendow, 461 F.3d at 1171-72.

gard to the Second Circuit's express-condition requirement, the Court notes that the Third Circuit, while stopping short of adopting the false certification theory, has suggested a lower threshold would apply, one requiring only "that the alleged violations would be relevant to 'the [G]overnment's disbursement decisions.'" *Id.* (addressing *dicta* in the Circuit's prior opinion in *Quinn* that the false certification theory should not be limited to regulations that are express conditions of payment). However, even if the express-condition-of-payment rule applied, the Court does not see how the narrower rule would benefit TCI in this case; federal statutory and regulatory law, as well as the PPA itself, expressly condition Title IV participation, and necessarily the receipt of federal funds, on compliance with a number of regulations, including the incentive compensation ban. *E.g.,20 U.S.C. § 1094(a)(20)*; *34 C.F.R. § 668.14(a)(1)*, *(b)(22)(i)*; [*23] *Hendow, 461 F.3d at 1176* (rejecting the university's argument that PPA-incorporated regulations were "merely . . . condition[s] of *participation*, [but] not [] condition[s] of *payment*"). The PPA requirements are "'prerequisites,' and 'the *sine qua non*' of federal funding, for one basic reason: if the [institution] had not agreed to comply with them, it would not have gotten paid." *Hendow, 461 F.3d at 1176.* As for Defendants' larger concern about a broad application of the false certification theory, this Court finds solace in the Seventh Circuit's differentiation between breach of contract and promissory fraud in *Main*:

> The University protests that this approach would treat any violation of federal regulations in a funding program as actionable fraud, but that's wrong. A university that accepts federal funds that are contingent on following a regulation, which it then violates, has broken a contract. But fraud requires more than breach of promise: fraud entails making a false representation, such as a statement that the speaker will do something it plans not to do. Tripping up on a regulatory complexity does not entail a knowingly false representation.

*426 F.3d at 917* [*24] (citation omitted).

*2. Federal Rule of Civil Procedure 9(b)*

At the motion to dismiss stage, Relators need not satisfy the above burdens with specific proofs. Yet, because the False Claims Act is a fraud statute, Relators' pleadings must satisfy the heightened pleading requirements of Federal *Rule 9(b)*. See *United States ex rel. LaCorte v. SmithKline Beecham Clinical Lab., Inc., 149 F.3d 227, 234 (3d Cir. 1998)* (noting that *Rule 9(b)* "provides sufficient deterrence against overly broad allegations" under the False Claims Act); *see also United States ex rel. Clausen v. Lab. Corp. of Am., Inc., 290 F.3d 1301, 1309-10 (11th Cir. 2002)* (concluding that it was "well settled" and "self-evident" that the False Claims Act was "a fraud statute" triggering application of *Rule 9(b)*'s heightened pleading requirements). Accordingly, Relators must plead "with particularity the circumstances constituting fraud," but "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Fed. R. Civ. P. 9(b).*

The Third Circuit has held that "*Rule 9(b)* requires, at a minimum, that plaintiffs support their allegations of . . . fraud with all of the essential factual background  [*25] that would accompany 'the first paragraph of any newspaper story'--that is, the 'who, what, when, where and how' of the events at issue." *In re Rockefeller Ctr. Props., Inc. Secs. Litig., 311 F.3d 198, 217 (3d Cir. 2002)* (citations omitted). "*Fed. R. Civ. P. 9(b)* requires plaintiffs to plead the circumstances of the alleged fraud with particularity to ensure that defendants are placed on notice of the 'precise misconduct with which they are charged, and to safeguard defendants against spurious charges' of fraud." *Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 645 (3d Cir. 1989)* (quoting *Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984)*).

Although *Rule 9(b)* permits a plaintiff to generally allege a defendant's mental state, the Third Circuit has read the Rule to still require plaintiffs to "allege facts that show the court their basis for inferring that the defendants acted with 'scienter.'" *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1418 (3d Cir. 1997).* Although *Burlington Coat Factory* dealt with securities fraud, the Court sees no reason to limit its ruling to that context, especially in light of the Circuit's concern that the False [*26] Claims Act not become a "blunt instrument" of regulatory enforcement. *See Rodriguez, 552 F.3d at 304*; *cf. Quinn, 382 F.3d at 440* (explaining that False Claims Act relators "cannot 'merely . . . describe a private scheme in detail but then . . . allege simply and without any stated reason for his belief that claims requesting illegal payments must have submitted, were likely submitted or should have been submitted to the Government.") (quoting *United States ex rel. Clausen v. Lab. Corp. of Am., 290 F.3d 1301, 1311 (11th Cir. 2002)).* [12]

*3. Application*

While the Court agrees that the weight of authority supports Relators' implied false certification theory of liability in the Title IV context under the False Claims Act, the Court finds that Relators' allegations lack sufficient particularity to satisfy *Rule 9(b).*

Although [*27] Relators present five species of misrepresentation that they contend demonstrate TCI's knowing false certification of compliance with PPA requirements, Relators do not allege any facts identifying either a particular false claim submitted to a Government agent, per *§ 3729(a)(1)*, or a false statement used to get a false claim paid in violation of *§ 3729(a)(2).* To recap, Relators allege that TCI made the following misrepresentations to its accreditation agency, the Department of Education, and/or its students, in violation of PPA regulations: (a) false reports of TCI graduates' employment placement rates; (b) false assurances that TCI students were making satisfactory academic progress in their program of study; (c) permitting English-deficient applicants and applicants who failed admissions tests to enroll despite their failure to meet TCI admissions standards; (d) allowing students ineligible for financial assistance under Title IV to apply for Title IV funds; and (e) false assurances of compliance with Title IV's incentive compensation ban. Relators also allege (f) that TCI and its parent corporations conspired to commit the above violations. The Court considers each subset of allegations [*28] in turn.

*a. Misrepresentations Regarding Employment Placement*

With regard to the alleged false reports of employment placement rates, Relators attached numerous documents to the SAC that they contend TCI submitted to its accreditation agency between 2003 and 2005. (*See* SAC P 24(i) Exs. A ("Completion and Placement Charts"), B ("Letter of Assurance" and "[TCI] Jersey City Campus Interim Report, July 2004"), C ("2003 ACCSCT Annual Report for [TCI] North Brunswick Campus"), D ("2005 Annual Institutional Report for the Year [2004-2005]"), and E ("Probation Officer Response").) Relators claim that these documents contained willfully false statements "with the purpose of falsely obtaining accreditation" and Title IV eligibility. *See generally* SAC P 24(i). Yet Relators' pleadings do not provide a plausible basis for making this conclusion, and the purported false statements are not apparent on the face of the documents. Among the voluminous statistics presented by these documents, Relators' pleadings do not identify which statements regarding the placement rates were false (or conversely what the actual placement rates were), to what degree they were inflated or diminished, and upon whose instructions [*29] they were falsified. In other words, Relators only provide the *what,*

---

[12]   The Court notes that the Seventh Circuit has endorsed a similar pleading requirement--that the plaintiff "must be able to point to specific, objective manifestations of fraudulent intent"--in the analogous context of promissory fraud claims. *Bower v. Jones, 978 F.2d 1004, 1012 (7th Cir. 1992)* (quoting *Hollymatic Corp. v. Holly Sys., Inc., 620 F. Supp. 1366, 1369 (N.D. Ill. 1985)).*

but omit the *who, when,* and *how.*[13]

Also missing from Relators' conclusory allegations is the *why;* Relators do not allege circumstantial facts indicating that TCI knowingly committed acts in violation of *§ 3729.* See *31 U.S.C. § 3729(b)* (defining "knowing" to require, at a minimum, "reckless disregard of the truth or falsity of the information"); *Allison Engine,* 128 S. Ct. at 2128 (explaining that "a person must have the purpose of getting a false or fraudulent **[*30]** claim 'paid or approved by the Government' in order to be liable under *§ 3729(a)(2)*"). Conspicuously absent from the SAC is any indication, other than Relators' *ipse dixit,* that TCI had notice that its submissions contained erroneous data, let alone that they intended to use erroneous data for the purpose of defrauding the Government. *Cf. Hendow,* 461 F.3d at 1175 (noting that relators had alleged specific instances of improper bonuses, in addition to allegations that the university adopted policies of violating the incentive compensation ban, that it repeatedly changed these policies to avoid detection, and that its staff "openly bragged about perpetrating fraud"). The SAC does not provide a plausible basis for inferring that TCI acted with scienter with regard to providing false employment placement reports. *See Burlington Coat Factory,* 114 F.3d at 1418.

### b. False Certifications of Satisfactory Progress

Turning next to Relators' allegations that TCI gave false assurances of students' satisfactory progress in their program of study, the SAC again provides the *what,* but omits the *who, where, when, why,* and *how.* Relators aver that failing students received passing grades so that they would **[*31]** be eligible for Title IV financial aid, that teachers gave open-book exams with the answers included in the exam, and that "teachers were pressured by management to change the grade curving of classes such that more students would pass . . . [and consequently Chubb] would be allowed under federal and state guidelines to receive more of the tuition monies paid by students." (SAC PP 69-71.) [14] Relators provide no examples of this alleged misconduct (i.e., specific student grades changed, specific teacher pressured to change grading practices), and again they fail to aver circumstantial facts enabling the inference that TCI acted with scienter with regard to providing false progress reports. *See Burlington Coat Factory,* 114 F.3d at 1418.

### c. Admitting Sub-Standard Students Contrary to TCI Guidelines

Relators' allegations that TCI knowingly admitted unqualified students who failed TCI's Entrance Assessment Test or lacked English proficiency also lack particularity. Relators provide no examples of admissions counselors being instructed to apply "pixie **[*32]** dust" to the admissions exams, nor do they provide examples of students benefitting from this practice. (*See generally* SAC PP 60-63.) Although Relator's Affidavit identifies two students whom she claims were not proficient in the English language, the SAC does not explain how their admission violated TCI's PPA requirements. Further, the SAC again fails to aver circumstantial facts enabling the inference that TCI acted with scienter with regard to admitting allegedly unqualified students. *See Burlington Coat Factory,* 114 F.3d at 1418.

### d. Permitting Ineligible Students to Apply for Title IV Financial Aid

---

[13]   The "examples" contained in Relator Pilecki-Simko's Affidavit do not fill in these gaps. Although Relator indicates that as many as six graduates' employment placements were incorrectly entered into TCI's student-placement database, it is unclear who made these entries (i.e., did the Relators make these entries?), why these entries were made, and how they were used. The SAC does not allege that this data was in any way improperly used by TCI to procure federal funds, and the SAC fails to allege circumstantial facts permitting the inference that these entries were knowingly entered into the database with the purpose of obtaining federal funds not otherwise due.

[14]   It is unclear from the SAC whether this alleged misconduct violated Title IV requirements, accreditation requirements, or TCI's own guidelines.

2010 U.S. Dist. LEXIS 27187, *32

With regard to Relators' allegations that TCI permitted ineligble students (including illegal aliens) to apply for Title IV financial aid, Relators plead no specific facts to support this allegation. Although Relator's Affidavit identifies one TCI graduate who was discovered to be an illegal alien by her employer, neither the SAC nor the Affidavit allege that TCI knew of this fact at the time it admitted this student, or that the mere admission of this student violated TCI's PPA requirements. Moreover, the SAC fails to allege circumstantial facts enabling the inference that TCI acted with **[\*33]** scienter in assisting ineligible students apply for Title IV financial aid. *See Burlington Coat Factory,* 114 F.3d at 1418.

*e. False Certification of Compliance with Incentive Compensation Plan*

With regard to Relators' claim that TCI adopted compensation policies that rewarded higher enrollments in violation of Title IV's incentive compensation ban, Relators attached examples of TCI's compensation plan to the SAC. Defendants argue that the compensation plans are protected by regulatory safeharbor because the compensation plan was not based solely on enrollment practices covered by the ban. As a matter of law, the Court agrees with Defendants.

While the incentive compensation ban prohibits Title IV-participating institutions from "provid-[ing] any commission, bonus, or other incentive payment based directly or indirectly upon success in securing enrollments or financial aid to any person or entity engaged in any student recruiting or admission activities," *20 U.S.C. § 1094(a)(20), 34 C.F.R. § 668.14(b)(22)(i)*, federal regulation permits:

> The payment of fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as that compensation is not adjusted up or down more than **[\*34]** twice during any twelve month period, and any adjustment is not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid.

*34 C.F.R. § 668.14(b)(22)(ii)(A).* Although the language of the safeharbor provision appears at odds with the incentive compensation ban, it stands to reason that an institution adhering to a federal regulation defining the contours of permissible compensation under the incentive compensation ban cannot have the requisite scienter to violate the ban. *See, e.g., United States ex rel. Bott v. Silicon Valley Colleges,* 262 F. App'x 810, 812 (9th Cir. 2008); *United States ex rel. Lee v. Corinthian Colleges,* No. 07-1984, 2009 U.S. Dist. LEXIS 120462, 2009 WL 4730890, at \*4 (C.D. Cal. Dec. 4, 2009). Relators do not allege that TCI based its compensation practices solely on means prohibited by the Title IV ban, and the examples provided with the SAC demonstrate that TCI's compensation scale complied with the regulatory safeharbor. (*See* SAC, Ex. F, Pts. 25 (basing performance evaluation not only on enrollment starts, but student retention, success at recruiting activities, and administrative tasks), 26-27 (basing compensation not only on enrollment starts, but student **[\*35]** retention, success at recruiting activities, administrative records-keeping, and professionalism).)

The SAC does not allege with particularity examples of other prohibited compensation practices not covered by the safeharbor, and the SAC further fails to allege circumstantial facts enabling the inference that TCI acted with scienter by falsely certifying compliance with Title IV's incentive compensation ban. *See Burlington Coat Factory,* 114 F.3d at 1418.

*f. Conspiracy to Commit the Above Violations*

Lastly, the Court considers Relators' claim that TCI conspired with its corporate parents to commit the above violations. Defendants argue, and the Court agrees, that the law deems a parent corporation and its subsidiaries "legally incapable of forming a conspiracy with one another." *Fogie*

*v. THORN Ams., Inc.,* 190 F.3d 889 (8th Cir. 1999) (applying parent-subsidiary conspiracy rule, pronounced by the Supreme Court in the context of the Sherman Act, *see Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 777, 104 S. Ct. 2731, 81 L. Ed. 2d 628 (1984), to claims arising under RICO). However, even if the law permitted a conspiracy claim to lie solely between a parent corporation and its subsidiary, Relators have not plead [*36] a plausible conspiracy claim against TCI and its parent corporations. Other than conclusory assertions that HTI provided false statements for TCI's placement records and participated in the submission of false placement records to TCI's accreditation agency, the SAC does not provide particularized allegations that TCI had an agreement with any of its corporate parents that it would use a false record or statement that "would have a material effect on the Government's decision to pay the false or fraudulent claim." *See Allison Engine,* 128 S.Ct. at 2130. Further, as explained *supra,* Relators have not identified with particularity any intentional falsehoods in the attached placement statements.

* * *

To summarize, Relators' primary allegations of fraudulent misconduct against TCI lack sufficient particularity to satisfy *Federal Rule of Civil Procedure 9(b).* Perhaps in recognition of these deficiencies, Relators ask this Court to ease *Rule 9(b)*'s pleading requirements, arguing that Defendants retain control over key information supporting their claims. Relators correctly note that courts will "relax" the particularity requirements of *Rule 9(b)* "when factual information is peculiarly within [*37] the defendant's knowledge or control," *Craftmatic Sec. Litig.,* 890 F.2d at 645 (collecting cases), but "even under a non-restrictive application of the rule, claimants must allege that the necessary information lies within defendants' control, and their allegations must be accompanied by a statement of the facts upon which the allegations are based," *id.* (collecting cases). However, Relators' argument is undermined by the fact that they have had access for the past two years to voluminous records concerning TCI's employment placement statistics (including the records submitted as Exhibits to the SAC) courtesy of the Government's 2007 subpoena. Relators do not explain how the additional discovery they seek will enable them to cure the above pleading deficiencies. Because Defendants have not stated plausible False Claims Act claim against TCI, the Court will dismiss all such claims (SAC, Counts I-III) pursuant to *Federal Rules of Civil Procedure 9(b)* and *12(b)(6).*

### B. Piercing the Corporate Veil & Successor Liability

Because Relators have not sufficiently alleged that TCI violated the False Claims Act, and because Relators do not aver that The Chubb Corporation, Chubb America Service Corporation, [*38] and/or HTI themselves violated the False Claims Act, no claims remain for the imposition of liability upon TCI's corporate parents. [15] However, *assuming arguendo* that Relators sufficiently alleged False Claims Act violations committed by TCI, the allegations contained in Relators' SAC fail to state veil-piercing and successor liability claims against The Chubb Corpration and HTI.

### 1. Veil-Piercing

Because veil-piercing is a state-law claim, the Court must apply the alter ego framework of the state(s) in which The Chubb Corporation and HTI are incorporated. *See, e.g., In re Cambridge Bio-*

---

[15]   Although Defendant Chubb America Service Corporation does not join the current motions, the SAC only seeks to impose liability against this Defendant on the basis of its veil-piercing claim, a derivative claim. (*See* SAC Count IV, P 100-04.) In the absence of a properly pled claim against TCI, Relators may not impose liability on a purported corporate parent such as Chubb America Service Corporation. Accordingly, this Count will be dismissed as against both The Chubb Corporation and Chubb America Service Corporation.

2010 U.S. Dist. LEXIS 27187, *38

*tech Corp.*, 186 F.3d 1356, 1376 n.11 (Fed. Cir. 1999); *Stromberg Metal Works, Inc. v. Press Mech., Inc.*, 77 F.3d 928, 933 (7th Cir. 1996). **[*39]** The SAC alleges that The Chubb Corporation was incorporated in New Jersey, and the parties appear to agree that New Jersey law governs Relators' veil-piercing claim against it. With regard to HTI, however, the SAC only avers that HTI has a principal place of business in Arizona, leading this Court to believe that Arizona law may govern this veil-piercing claim. However, the Court need not definitively decide which jurisdiction controls this claim, because the Court agrees with Defendants that Arizona law does not materially differ from New Jersey law as it applies to Relators' pleadings.

As in other jurisdictions, it is well-established in New Jersey "that a corporation is a separate entity from its shareholders, and that a primary reason for incorporation is the insulation of shareholders from the liabilities of the corporate enterprise." *State, Dep't of Envtl. Prot. v. Ventron Corp.*, 94 N.J. 473, 500, 468 A.2d 150 (1983) (citations omitted). This limited-liability principle-- known as the corporate veil--applies to corporate shareholders as well. *Id.* In the parent- subsidiary context, New Jersey law permits courts to "pierce the corporate veil" where the subsidiary is shown to be the alter ego, or **[*40]** "mere instrumentality," of the parent corporation. *Id.* at 500-01. Alter ego liability attaches where "the parent [corporation] so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent." *Id.* at 501 (citation omitted); *accord Gatecliff v. Great Republic Life Ins. Co.*, 170 Ariz. 34, 821 P.2d 725, 729 (Ariz. 1991) (applying Arizona law). Yet, "[e]ven in the presence of corporate dominance, liability generally is imposed only when the parent has abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or otherwise to circumvent the law." *Ventron*, 94 N.J. at 501 (citations omitted); *see also Craig v. Lake Asbestos of Quebec, Ltd.*, 843 F.2d 145, 150 (3d Cir. 1988) ("It is patently clear since *Ventron* that in New Jersey even the exercise of significant control by the parent over the subsidiary will not suffice to pierce the corporate veil.").

"In order to state a claim for piercing the corporate veil under New Jersey law, a plaintiff must show that: (1) one corporation is organized and operated as to make it a mere instrumentality of another corporation, and (2) the dominant corporation is using the subservient corporation **[*41]** to perpetrate fraud, to accomplish injustice, or to circumvent the law." *Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 171 (3d Cir. 2002) (citation omitted); *cf. Gatecliff*, 821 P.2d at 728 (recognizing that veil-piercing in Arizona requires a showing of "(1) unity of control and (2) that observance of the corporate form would sanction a fraud or promote injustice.") (citations omitted). Relevant considerations to the veil-piercing analysis include

> gross undercapitalization . . . failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant stockholder, non-functioning of other officers or directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders.

*Foodtown*, 296 F.3d at 172 (citations and internal quotation marks omitted) (applying New Jersey law); *cf. Deutsche Credit Corp. v. Case Power & Equip. Co.*, 179 Ariz. 155, 876 P.2d 1190, 1195-96 (Ariz. Ct. App. 1994) (identifying similar relevant factors under Arizona law). Without more, neither stock ownership (majority **[*42]** or complete) nor overlapping boards of directors suffice to establish an alter ego relationship. *E.g., Ramirez v. STi Pre- paid LLC*, 644 F. Supp. 2d 496, 507 (D.N.J. 2009) (applying New Jersey law); *Horizon Res. Bethany Ltd. v. Cutco Indus.*, 180 Ariz. 72, 881 P.2d 1177, 1180 (Ariz. Ct. App. 1994) (applying Arizona law); *see also United States v. Bestfoods*, 524 U.S. 51, 69, 118 S. Ct. 1876, 141 L. Ed. 2d 43 (1998); *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484-85 (3d Cir. 2001).

*a. The Chubb Corporation*

With regard to The Chubb Corporation, Relators allege that The Chubb Corporation founded TCI in 1970 to train employees for its computer center, [16] and that TCI was a subsidiary of The Chubb Corporation until The Chubb Corporation sold TCI to co-Defendant HTI in 2004. (SAC PP 6-7, 26.) Under its veil-piercing claim in Count IV, Relators further aver that The Chubb Corporation and Chubb Services Corporation both (i) "exclusively controlled" and "managed" TCI; (ii) that they received reports from TCI; (iii) that they "directly benefitted" from the federal funds obtained by TCI; (iv) that they used TCI as an alter ego; (v) that they "were aware of and had complete control of the fraud committed by [TCI];" and (vi) that they "created **[*43]** this corporate structure to avoid [their] duties to consumers and to shelter [their] wrongdoings from judicial or administrative oversight." (*Id.* PP 100-105.) These boilerplate allegations, which presume the legal conclusion that TCI was The Chubb Corporation's alter ego, do not speak to the factors identified by the Third Circuit for determining whether a subsidiary is the mere instrumentality of the parent. Relators do not allege that TCI was grossly undercapitalized, failed to observe corporate formalities, had non-functioning directors, or that it commingled funds with either of its parent corporations. Instead, Relators contend that The Chubb Corporation should be liable because it was the "sole owner and beneficiary" of TCI's alleged false claims. (Relators' J. Opp'n Br. at 23.) Yet courts in New Jersey have consistently rejected imposing alter ego liability solely on this basis. *E.g., Ramirez,* 644 F. Supp. 2d at 508 (finding allegations that a parent corporation owned a controlling interest in its subsidiary and shared upper management with its subsidiary insufficient to state a valid veil-piercing claim); *Premier Pork L.L.C. v. Westin, Inc.,* No. 07-1661, 2008 U.S. Dist. LEXIS 20532, 2008 WL 724352, at *7 (D.N.J. Mar. 17, 2008)* **[*44]** (same).

Relators attempt to minimize these deficiencies in their opposition brief and in the declaration of counsel, which present the following new allegations not contained in the SAC: (i) that another corporation, Chubb Computer Services, Inc., owned all of TCI's stock in 2004; (ii) that *this* entity sold the shares to HTI in the 2004 sale of TCI; and (iii) that this entity had a common treasurer and secretary with The Chubb Corporation. (Relators' J. Opp'n Br. at 7 (citing Green Decl., Exs. E, F).) Relators' attempt to bolster their pleadings midstream is improper. *See Burlington Coat Factory.,* 114 F.3d at 1426 ("As a general matter, **[*45]** a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings."). However, accepting these allegations for the sake of argument, the Court does not understand how they advance Relators' position. Not only do these allegations add nothing to the claim that The Chubb Corporation dominated TCI, but they contradict the SAC's claim that The Chubb Corporation sold TCI to HTI in 2004. If anything, the new allegations suggest that The Chubb Corporation had a close working relationship with Chubb Computer Services, Inc., but the SAC does not allege that The Chubb Corporation had an alter ego relationship with this company. [17]

The SAC also falls short under the second prong of the Third Circuit's veil-piercing analysis, because Relators fail to plead The Chubb Corporation's role in TCI's alleged fraud with sufficient particularity. "When a cause of action seeks to pierce the corporate veil on the basis of fraud, it is subject to *Fed. R. Civ. P. 9(b)*." **[*46]** *Foodtown,* 296 F.3d at 172 n.10 (citing *Coyer v. Hem-*

---

[16]   Relators base this allegation on a statement that purportedly appeared on TCI's website on or about the time this case was filed. (*See* SAC P 26 (averring that TCI's website contained the following statement: "In 1970, one of the largest insurance organizations in the world needed qualified people to run its multimillion dollar computer center. Not able to find skilled employees, it created its own training center. This proved so successful that [other companies] soon asked [TCI] to provide them with computer professionals. And so [TCI] was born".)

[17]   In fact, it does not appear that the SAC even identifies this entity, lest this Court is to presume that Chubb Computer Services, Inc., is the same corporation as co-Defendant Chubb America Service Corporation.

*mer, 901 F. Supp. 872, 883-84 (D.N.J. 1995))*. As noted above, the SAC fails to allege with suffi-cient particularity that TCI used false statements to fraudulently procure federal monies. The SAC provides no additional perspective on The Chubb Corporation's purported role in this scheme. Construing the SAC in the light most favorable to Relators and accepting the additional facts as-serted in Relators' brief, the SAC is bereft of allegations permitting an inference that The Chubb Corporation used TCI as a mere instrumentality to perpetrate fraud.

*b. HTI*

Turning to HTI, Relators advance *verbatim* the same veil-piercing allegations that they made about The Chubb Corporation that the Court considered above. (SAC PP 107-12.) Relators also al-lege that Defendants submitted documents, letters, and reports to its accreditation agency at vari-ous dates between 2003 and 2005 that "contain[ed] willfully false statements made by [TCI] and The High Tech Institute" (*id.* P 24(i)(a)), and that TCI and HTI "submitted these documents with the purpose of falsely obtaining accreditation and falsely entitling them to Title IV/HEA fund-ing from the Department  **[*47]** of Education" (*id.* P 24(i)(b)). Although the SAC does not ap-pear to speak to the matter, Relators contend in their brief that HTI's chief executive officer also acted as an officer of TCI and submitted documents on their behalf to unspecified recipients. (Re-lators' J. Opp'n Br. at 30; *see also id.* at 7 (suggesting additional overlapping officers).) Finally, Re-lators allege that statements appeared on TCI's and/or HTI's website [18] proclaiming that HTI "added The Chubb Institute's eight locations to its list of 17 HTI campuses throughout the United States," and referring to TCI and/or TCI affiliates as "branch[] schools" and "part of the HTI fam-ily of schools." (SAC P 27; Relators' J. Opp'n Br. at 24.)

By themselves, the duplicated boilerplate allegations and the shared-corporate-officers allegations fail to state a claim with respect to HTI for the same reason that these allegations failed to state a claim against The Chubb Corporation. *See Horizon, 881 P.2d at 1180* (recognizing that, un-der Arizona law, "[A] mere showing that one corporation is owned by another or that the two share interlocking officers or directors is insufficient to support a finding of alter ego."); *accord Ramirez, 644 F. Supp. 2d at 507* (applying New Jersey law). The question remains whether Rela-tors' additional allegations that HTI welcomed TCI into its "family of schools" and participated in the submission of false statements to TCI's accreditation agency sufficiently plead the unity of control and/or mere instrumentality status to state a claim for veil-piercing. The Court finds that they do not.

With regard to the alleged website statements that TCI joined the HTI family of schools, these state-ments do not permit the inference that TCI ceased operating as a distinct corporate entity. The al-leged  **[*49]** statements do not suggest that TCI was grossly undercapitalized, failed to ob-serve corporate formalities, had non-functioning directors, or that it commingled funds with either of its parent corporations. Meanwhile, Relators' contention that HTI participated in the submis-sion of false documents fails to state a plausible veil-piercing claim against HTI because the docu-ments provided with the SAC do not support this contention.

As noted above, Relators included Exhibits A (2003 Placement Charts) and B (2004 Letter of As-surance and Interim Report) with the SAC to demonstrate Defendants' submission of false state-ments to their accreditation agencies. The SAC avers that HTI either provided false statements

---

[18]   The Court notes that not all of these statements appear in the SAC, and the SAC indicates that one of the statements ap-peared on The Chubb Institute's website rather than HTI's website. (*See* SAC P 27.) Further, although Relators attached printouts of portions of Defendants' respective websites, the Court has been unable to locate where each of these statements were made, and the websites referenced in the SAC appear to have changed since the time this lawsuit was filed. For purposes of  **[*48]** ad-dressing Relators' argument, the Court will accept the alleged website statements as described in Relators' brief.

and/or participated in the submission of these documents to the accreditation agency, but these documents do not bear any indicia of HTI approval or participation, and Relators do not explain which, if any, of the statements contained therein were attributable to HTI. Moreover, because these allegations purport to speak for HTI's role in the fraudulent activity, they must comport with the heightened pleading requirements of *Rule 9(b)*. *See, e.g., Foodtown,* 296 F.3d at 172 n.10. As the **[*50]** Court explained with regard to Relators' claims against TCI, *see supra* Part III.A, Relators do not identify a single knowingly false statement among the voluminous statistics contained in these exhibits. Thus, presuming that HTI submitted some of these documents to accreditation agencies and/or that HTI made some of the statements contained therein, Relators have not plead with particularity that HTI participated in the commission of fraud.

## 2. *Successor Liability*

Relators rely on the same veil-piercing allegations above (including the boilerplate allegations made against The Chubb Corporation and HTI) to present a claim for successor liability against HTI. (*See* SAC PP 114-19.) However, the same allegations fair no better under New Jersey's law for successor liability.

The general rule in New Jersey is that "where one company sells or otherwise transfers all its assets to another company the latter is not liable for the debts and liabilities of the transferor." *Ramirez v. Amsted Indus., Inc.,* 86 N.J. 332, 340, 431 A.2d 811 (1981) (citations omitted). Nevertheless, New Jersey law recognizes the following exceptions warranting the imposition of successor liability: "where (1) the purchasing corporation **[*51]** expressly or impliedly agreed to assume such debts and liabilities; (2) the transaction amounts to a consolidation or merger of the seller and purchaser; (3) the purchasing corporation is merely a continuation of the selling corporation, or (4) the transaction is entered into fraudulently in order to escape responsibility for such debts and liabilities." *Id.* at 340-41 (collecting cases); *see also Colman v. Fisher-Price, Inc.,* 954 F. Supp. 835, 838 (D.N.J. 1996). Relators contend that their allegations state a plausible claim under the merger and mere continuation theories.

The following considerations guide a court's determination of whether the sale of a corporation constitutes a *de facto* merger or mere continuation: "(a) continuity of management, personnel, physical location, assets, and general business operations; (b) a cessation of ordinary business and dissolution of the predecessor as soon as practically and legally possible; (c) assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor; and (d) continuity of ownership/shareholders." *Portfolio Fin. Servicing Co. ex rel. Jacom Computer Servs., Inc.,* 334 F. Supp. 2d 620, 625-26 (D.N.J. 2004); **[*52]** *see also Luxliner P.L. Export, Co. v. RDI/Luxliner, Inc.,* 13 F.3d 69, 73 (3d Cir. 1993). All of the factors need not be present to demonstrate a *de facto* merger or mere continuation, and "[t]he crucial inquiry is whether there was an 'intent on the part of the contracting parties to effectuate a merger or consolidation rather than a sale of assets.'" *Luxliner,* 13 F.3d at 73 (quoting *McKee v. Harris-Seybold Co.,* 109 N.J. Super. 555, 567, 264 A.2d 98 (App. Div. 1970)).

Here, Relators contend that HTI absorbed TCI by incorporating TCI's campuses into the "HTI family of schools." (Relators' J. Opp'n Br. at 27.) Relators further argue that HTI's assumption of TCI's liabilities "is clear on its face--the obligations for accreditation and revenue requirements, obligations to vendors, teachers and administrators have all undeniably passed to the new entity go-

Case 4:12-cv-02676   Document 57-1   Filed in TXSD on 11/20/12   Page 139 of 171

Page 17 of 18
2010 U.S. Dist. LEXIS 27187, *52

ing forward." (*Id.*) [19] Unfortunately, these conclusory assertions are not supported by the pleadings.

The SAC avers that HTI is the successor corporation to TCI (SAC P 119), but Relators concede that HTI purchased TCI from Chubb Computer Services, Inc. (Relators' J. Opp'n Br. at 27). [20] Relators also appear to concede that HTI did not purchase TCI's assets. (Relators' J. Opp'n Br. at 27 (explaining that the 2004 sale of TCI "was a stock purchase, not an asset purchase").) With regard to the purportedly merged entity, the SAC does not allege that TCI has ever ceased operations as a distinct corporate entity, and Relators concede that TCI continued to operate at the "same campus locations" under the same "Chubb brand" after the stock sale, "albeit within the HTI 'family' of schools." (Relators' J. Opp'n Br. at 26, 27.) Furthermore, the SAC neither alleges that HTI's purchase of TCI maintained continuity in shareholders (i.e., that HTI exchanged shares for TCI's assets), nor that HTI expressly or implicitly agreed to assume TCI's debts and obligations. In the absence of such **[*54]** allegations, Relators cannot plausibly claim that HTI and Chubb Computer Services, Inc. intended to merge TCI into HTI when the latter sold its shares of TCI stock.

## III. LEAVE TO AMEND

The Court notes that Relators have already amended the original Complaint twice. It also appears that, courtesy of a Government subpoena served in 2007, they have had access to a considerable amount of records providing TCI's employment placement statistics for the years 2003-2005, which included student and employer contact information, as well as all TCI submissions to accreditation agencies. (*See* SAC Exs. A-E; TCI & HTI Reply Br. at 1.) Despite having had access to this information for more than two years, Relators still have not pled plausible causes of action for a False Claims Act violation, piercing the corporate veil, or successor liability. Further, Relators do not seek leave to amend the SAC to cure their pleading deficiencies.

*Federal Rule of Civil Procedure 15(a)* provides that "leave [to amend] shall be freely given when justice so requires," and the Third **[*55]** Circuit has recommended granting leave to amend unless amendment would be futile, prejudicial to a party, or dilatory, *see In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997)*. It may well be that further amendment would be futile; however, the Court will give Relators an opportunity to explain otherwise. For the time being, the Court will dismiss the claims presented in the Second Amended Complaint without prejudice, and the Court will give Relators 30 days from the receipt of the accompanying Order to show cause as to why they should be granted leave to amend the Complaint for a third time. Pursuant to the Government's continuing authority under *31 U.S.C. § 3730*, the Court will require Relators to provide the Government a copy of any such reasons within the time allotted to show cause.

## IV. CONCLUSION

For the aforementioned reasons, the Court will grant The Chubb Corporation's motion (Doc. No. 38) to dismiss, as well as the motion (Doc. No. 39) to dismiss filed by TCI and HTI. Relators' Second Amended Complaint will be dismissed in its entirety without prejudice. An appropriate form of

---

19   The Court understands Relators to argue that the purchase of stock necessarily entails an assumption of the corporation's debts and obligations. This argument flies in the face of the corporate veil doctrine, which presumes, with limited exceptions, **[*53]** "that a corporation is a separate entity from its shareholders, and that a primary reason for incorporation is the insulation of shareholders from the liabilities of the corporate enterprise." *Ventron*, 94 N.J. at 500.

20   As previously noted, the SAC does not identify Chubb Computer Services, Inc., and Relators do not suggest that this entity merged with HTI.

2010 U.S. Dist. LEXIS 27187, *55

order accompanies this Memorandum Opinion. Relators will have thirty (30) **[*56]** days from the filing of the accompanying Order to show cause for why they should be granted leave to amend the Second Amended Complaint.

Dated: March 22, 2010

/s/ Garrett E. Brown, Jr.

GARRETT E. BROWN, JR., U.S.D.J.





Neutral
As of: November 20, 2012 11:26 AM EST

## United States ex rel. Stebner v. Stewart & Stephenson Servs.

United States Court of Appeals for the Fifth Circuit

August 8, 2005, Filed

No. 04-20209

**Reporter:** 144 Fed. Appx. 389; 2005 U.S. App. LEXIS 16582

United States of America, ex rel., WERNER STEBNER, Plaintiff-Appellant, versus STEWART & STEPHENSON SERVICES, INC.; MCLAUGHLIN BODY CO., Defendants-Appellees.

**Notice:   [\*\*1]**  RULES OF THE FIFTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**Subsequent History:** US Supreme Court certiorari denied by *Stebner v. Stewart & Stevenson Servs., 2006 U.S. LEXIS 96 (U.S., Jan. 9, 2006)*

**Prior History:** Appeal from the United States District Court for the Southern District of Texas. (4:96-CV-3363).
*United States ex rel. Stebner v. Stewart & Stevenson Servs., 305 F. Supp. 2d 694, 2004 U.S. Dist. LEXIS 2881 (S.D. Tex., 2004)*

**Disposition:** AFFIRMED IN PART; DISMISSED IN PART.

---

| Core Terms |
| --- |

corrosion, false claim, summary judgment, modifications, certification, notice, cabs, district court, manufactured, contractual, invoices, progress

| Case Summary |
| --- |

### Procedural Posture

Plaintiff relator filed a qui tam action against defendants, contractor and subcontractor, and alleged that they committed fraud against the United States Government in violation of the False Claims Act, *31 U.S.C.S. § 3729 et seq. (FCA)*. Following a remand, the United States District Court for the Southern District of Texas granted summary judgment in favor of defendants and awarded costs. The relator appealed.

### Overview

Defendants contracted to build a Family of Medium Tactical Vehicles (FMTV). The relator alleged that the goods did not conform to contractual specifications because of a problem with corrosion, yet the contractor submitted invoices to the Government. The claims that were submitted to the Government were the progress payment requests and the Government-signed form

144 Fed. Appx. 389, *389; 2005 U.S. App. LEXIS 16582, **1

DD250. Neither expressly certified compliance with every provision of the overall contract. The Fifth Circuit had not adopted an implied theory of certification, but even if it had, FCA liability would not have attached. The Government was involved in the design, production, testing, and modification of the FMTVs; the contractor and the Government negotiated contract modifications in response to the well-documented corrosion problem. The Government exercised its discretion to conditionally accept or refuse to accept FMTVs that did not meet contractual standards; and the form DD250 was not signed by the Government until it was ready to accept a vehicle. Finally, because the relator failed to file a supplemental notice of appeal specifying the costs award, the appellate court lacked jurisdiction to review the issue.

**Outcome**
The appellate court affirmed the decision of the district court and dismissed the appeal from the costs award.

---

### LexisNexis® Headnotes

Civil Procedure > Appeals > Summary Judgment Review > Standards of Review
Civil Procedure > ... > Summary Judgments > Evidentiary Considerations > Scintilla Rule
Civil Procedure > ... > Summary Judgments > Entitlement as Matter of Law > General Overview
Civil Procedure > Appeals > Standards of Review > De Novo Review

*HN1* A summary judgment is reviewed de novo. Such judgment is proper when there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. All inferences must be drawn in favor of the nonmovant; but, there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

Labor & Employment Law > Wrongful Termination > Whistleblower Protection Act > General Overview
Public Contracts Law > Voiding Contracts > Misrepresentation

*HN2* See *31 U.S.C.S. §§ 3729(a)(1)* and *(a)(2)*.

Labor & Employment Law > ... > False Claims Act > Scope & Definitions > General Overview
Labor & Employment Law > Wrongful Termination > Whistleblower Protection Act > General Overview
Public Contracts Law > Voiding Contracts > Misrepresentation

*HN3* The False Claims Act defines ″claim″ as any request or demand, whether under a contract or otherwise, for money or property. *31 U.S.C.S. § 3729(c)*. It is only those claims for money or property to which a defendant is not entitled that are ″false″ for purposes of the False Claims Act.

Civil Procedure > ... > Summary Judgments > Hearings > General Overview
Civil Procedure > ... > Summary Judgments > Hearings > Oral Arguments
Public Contracts Law > Contract Performance > Accepting & Inspecting Goods & Services

*HN4* The United States Court of Appeals for the Fifth Circuit has not adopted an implied theory of certification of compliance with a government contract by a contractor's submission of invoices to the Government.

Civil Procedure > Appeals > Appellate Jurisdiction > General Overview
Civil Procedure > Appeals > Notice of Appeal

144 Fed. Appx. 389, *389; 2005 U.S. App. LEXIS 16582, **1

**HN5** Where an appellant notices the appeal of a specified judgment only, an appellate court has no jurisdiction to review other judgments or issues which are not expressly referred to and which are not impliedly intended for appeal. Pursuant to *Fed. R. App. P. 3(c)(1)(B)*, a notice of appeal must designate the judgment, order, or part thereof being appealed.

**Counsel:** For WERNER STEBNER, Plaintiff - Appellant: Carol L Nelkin, Stuart M Nelkin, Jay P Nelkin, Nelkin & Nelkin, Houston, TX.

For STEWART & STEPHENSON SERVICES, INC., Defendant - Appellee: Daniel M McClure, William Joseph Boyce, Darryl Wade Anderson, Fulbright & Jaworski, Houston, TX.

For MCLAUGHLIN BODY CO., Defendant - Appellee: John H Bennett, Jr, Glen M Boudreaux, Boudreaux, Leonard & Hammond, Houston, TX.

**Judges:** Before KING, Chief Judge, BARKSDALE, and STEWART, Circuit Judges.

---

| **Opinion** |
|---|

**[*390]** PER CURIAM: [*]

For this **[**2]** action under the *qui tam* provisions of the False Claims Act, *31 U.S.C. § 3729 et seq.*, Relator Werner Stebner challenges: (1) the summary judgment awarded Stewart & Stevenson Services, Inc. (S&S), and McLaughlin Body Co. (MBC); and (2) the costs awarded S&S. Concerning the summary judgment, Stebner contends the defendants submitted false and fraudulent claims to the United States during the course of a military contract. The judgment is **AFFIRMED**; the appeal from the costs-award, **DISMISSED**.

I.

In 1991, the Government contracted with S&S to build a Family of Medium Tactical Vehicles (FMTV); they were a variety of models of two-and-a-half ton to five-ton military trucks (cargo, dump, tractor, and wrecker) with enclosed cabs. S&S contracted with MBC to produce the cabs. From 1993 until 1998, S&S produced FMTVs under the relevant contracts. (The Government has since awarded **[*391]** S&S two more FMTV contracts.) One specification requires that FMTVs be free of corrosion during the first ten years of use.

To monitor the FMTVs' production, the Government established a Defense Plant Representative Office (DPRO) adjacent to S&S's Sealy, Texas, manufacturing **[**3]** plant. Approximately 30 Government personnel were assigned to that DPRO: contract specialists helped administer the contract and oversaw any modifications or revisions; property specialists maintained FMTVs delivered and stored in Sealy; and quality assurance specialists audited and monitored manufacturing processes and assembly of the vehicles and conducted 100% vehicle inspection and testing.

Contract payment was conducted as follows. S&S submitted monthly progress payments for up to 85% of its costs for producing FMTVs that month. Upon conditional acceptance of a vehicle, S&S invoiced the Government for 90% of its total contract price, from which the Government deducted the 85% attributable to the progress payment. Upon final acceptance, the Government paid

---

[*]   Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

S&S the balance. Progress-payment invoices were submitted on Government Standard Form 1443, which contained a certification that the costs reflected on the form were actually incurred by S&S or would be incurred. The vehicle-acceptance documents included Government form DD250 ("Material Inspection and Receiving Report"), the Vehicle Inspection Record, and the Final Inspection Record. The on-site Government officials reviewed **[**4]** and completed these forms and inspected the FMTVs. Upon the Government's being satisfied with a vehicle, its representative signed the DD250, indicating conditional or final acceptance. All documents were then returned to S&S, which converted the DD250 into an invoice and submitted it for payment. The DD250 contained no express certifications of contractual compliance. (Only Government officials' signatures appeared on the DD250.)

The Government accepted the FMTVs in stages; acceptance of produced vehicles was conditional prior to the Government's granting First Article Approval (FAA) for full-scale production. Vehicles presented to the Government for conditional acceptance were stored in a Government-controlled area at the Sealy plant until FAA was granted. It was not granted until the vehicle design passed a series of tests; the test results informed design modifications. During the life of the contract, the Government and S&S agreed to numerous amendments which specified needed vehicle modifications suggested by the various test results. Conditionally-accepted vehicles not in accordance with the final design were retrofitted to conform, then re-submitted for approval.

After a **[**5]** final design was agreed upon in 1995, S&S began retrofitting the conditionally-accepted vehicles. During the retrofit, S&S found corrosion problems on the cabs and cargo beds of many of the vehicles. S&S informed the Government immediately. In response, on 19 January 1996, S&S and the Government negotiated modifications, which, *inter alia*, required S&S to: produce a Cab Corrosion Report disclosing the corrosion's "root cause"; repair vehicles that had certain corrosion levels; and refrain from submitting for acceptance vehicles with severe corrosion. The modifications allowed S&S to submit certain vehicles for acceptance but allowed the Government to withhold up to $ 2,000 per conditionally-accepted vehicle.

At around the same time, the FMTV was being subjected to the contractually-mandated Accelerated Corrosion Test (ACT), which simulated the required ten-years **[*392]** of corrosion-free use. The tested vehicle failed the ACT. Because the vehicles' cabs, manufactured by MBC, exhibited most of the corrosion, S&S and Government inspectors began investigating MBC's production facility and processes. Stebner, as the S&S employee in charge of the Cab Corrosion Report, also inspected the FMTVs **[**6]** and MBC's facility. He found internal and external cab corrosion on the vehicles; blamed inadequacies at MBC's production facility and its use of faulty products and sealing procedures; and concluded MBC's corrosionprevention coating product and processes did not conform to contractual requirements and produced "junk".

S&S instructed Stebner not to include the totality of his assessment in the Cab Corrosion Report, but to say the systems were only bad "some of the time". Stebner refused, and was removed from the project. In any event, the Government was aware of the conditions at MBC's facilities; officials from both DPRO and other Government offices inspected the facilities and determined MBC's processes were inadequate. The Government also knew of other possible sources of corrosion, such as faulty windshield seals. The Cab Corrosion Report was presented to the Government on 2 April 1996.

Approximately six months later, after two retrofitted vehicles failed testing for the negotiated corrosion-repair, the Government suspended conditional acceptance of any vehicles evidencing corrosion or which had undergone corrosion repair. After further negotiations, the Government and S&S agreed **[**7]** on two contract modifications. The Government would resume acceptance if S&S: (1) provided a ten-year corrosion warranty, capped at $ 10 million, on vehicles al-

144 Fed. Appx. 389, *392; 2005 U.S. App. LEXIS 16582, **7

ready manufactured or being manufactured (entered November 1996); and (2) modified the contract to provide fully galvanized cabs (entered March 1997). The Government agreed to increase the price for the galvanized-cab vehicles because it believed galvanization would extend the vehicles' corrosion-free life-span past the contracted-for ten years. The Government considered these two modifications the "final resolution of the corrosion problems".

Pursuant to the False Claims Act (FCA), Stebner filed this action under seal on 8 October 1996, after the Government suspended all acceptance but before the corrosion settlement was reached. In his 19 March 1997 second amended complaint, Stebner claimed S&S and MBC made false representations and certifications to the Government with intent to defraud and made "misleading minimization in reports to the Government of known systemic problems in the coating and cleaning process of the FMTV". This action was stayed pending appellate review of *United States ex rel. Riley v. St. Luke s Episcopal Church, 982 F. Supp. 1261 (S.D. Tex. 1997)* **[**8]** (individuals lack standing to file FCA claims on behalf of the United States); was administratively closed in November 1997; but was re-opened on Stebner's 1 June 2000 motion, following the Supreme Court's decision in *Vermont Agency of Natural Res. v. United States ex rel. Stevens, 529 U.S. 765, 146 L. Ed. 2d 836, 120 S. Ct. 1858 (2000)* (individuals have standing to file FCA claims on behalf of the United States). On 29 August 2000, the Government elected *not* to intervene in this action.

In 2001, the district court granted S&S's motion to dismiss for failure to state a claim, following our precedent in *Riley, 196 F.3d 514 (5th Cir. 1999)* (*qui tam* provisions of FCA unconstitutional). *United States ex rel. Stebner v. Stewart & Stevenson, 2001 U.S. Dist. LEXIS 25676, No. H-96-3363 (S.D. Tex. 13 March 2001)*(unpublished). After a different result **[*393]** was reached for *Riley* in *en banc* proceedings, *see Riley, 252 F.3d 749 (5th Cir. 2001)*(en banc), our court summarily vacated the district court decision in this action and remanded. *See United States ex rel. Stebner v. Stewart & Stevenson*, No. 01-20272 (5th Cir. 2 July 2001)(unpublished).

**[**9]** On remand, the parties filed cross-motions for summary judgment. S&S contended: (1) it submitted no false claims within the meaning of the FCA; (2) the Government's knowledge of the manufacturing processes and corrosion issues precludes any claim of falsity; and (3) Stebner's claims are barred by the contractual resolution of the corrosion problem. S&S and MBC jointly contended the certifications provided by MBC applied only to its contract with S&S, not to compliance with S&S's contract with the Government.

In moving for summary judgment, Stebner contended: S&S filed DD250 and progress payment claims for vehicles it knew did not meet the contract's corrosion standards; MBC violated the FCA by falsely certifying to S&S that the cabs and production processes complied with the contract; and S&S violated the FCA by accepting MBC's false claims.

The district court awarded summary judgment to S&S and MBC, concluding: S&S did not submit false claims, either express or implied, to the Government; and there were no false claims because there was no material misrepresentation to the Government and it received the benefit of the bargain. *United States ex rel. Stebner v. Stewart & Stevenson, 305 F. Supp. 2d 694 (S.D. Tex. 2004).* **[**10]**

II.

Stebner challenges the summary judgment and the costs awarded S&S. We address the summary judgment first.

A.

*HN1* A summary judgment is reviewed *de novo. E.g., GDF Realty **Investments, Ltd. v. Norton***, 326 F.3d 622, 627 (5th Cir. 2003), *cert. denied*, 162 L. Ed. 2d 294, 125 S. Ct. 2898 (2005). Such judgment is proper when ″there is no genuine issue as to any material fact and … the [movant] is entitled to a judgment as a matter of law″. *FED. R. CIV. P. 56(c)*; *e.g.*, **Celotex Corp. v. Catrett**, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). All inferences must be drawn in favor of the nonmovant, **Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.**, 475 U.S. 574, 587-88, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986); but, ″there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted″. **Anderson v. Liberty Lobby, Inc.**, 477 U.S. 242, 249-50, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986) (internal **[**11]** citations omitted).

Stebner asserts violations under the following FCA provisions:

>    *HN2* (a) Liability for certain acts. - Any person who - (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; [or] (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;… is liable to the United States Government for a civil penalty….

*31 U.S.C. § 3729(a)(1)*, *(a)(2)*. *HN3* The FCA defines ″claim″ as ″any request or demand, **[*394]** whether under a contract or otherwise, for money or property″. *31 U.S.C. § 3729(c)*. ″It is only those claims for money or property to which a defendant is not entitled that are 'false' for purposes of the False Claims Act.″ **United States v. Southland Mgmt. Corp.**, 326 F.3d 669, 674-75 (5th Cir. 2003) (en banc) (citation omitted).

Stebner asserts: the district court interpreted too narrowly the meaning of ″claim″; an FCA violation has **[**12]** occurred when, as here, goods do not conform to contractual specifications but invoices are submitted to the Government. Stebner contends the district court failed to analyze sufficiently the summary judgment evidence as to MBC and erred when it concluded: there was no implied certification in the DD250 or progress reports; MBC's certifications to S&S were not false claims under the FCA; and there can be no false claim where the Government has received the benefit of its bargain.

S&S and MBC respond: Stebner fails to identify any false claims; the Government's contractual resolution with S&S negates any alleged false claims; there was no knowing submission of false claims because the Government was informed of all corrosion problems; and Stebner cannot establish that the claims, if false, were material to the Government's decision to pay.

Based upon our review of the record and the parties' briefs and oral arguments, summary judgment in favor of S&S and MBC was appropriate. The claims S&S submitted to the Government were the progress payment requests and the Government-signed DD250. Neither expressly certified compliance with every provision of the overall contract. *HN4* Our court has **[**13]** not adopted an implied theory of certification. *See U.S. ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 381-82 (5th Cir. 2003). Even if we were to do so, FCA liability would not attach in this action. The Government was involved in the design, production, testing, and modification of the FMTVs; and S&S and the Government negotiated contract modifications in response to the well-documented corrosion problem. The Government retained, and exercised, its discretion to conditionally accept or refuse to accept FMTVs that did not meet contractual standards; and the DD250 was not signed by the Government until it was ready to accept a ve-

hicle. *See Southland*, 326 F.3d at 675. As a result, S&S's subcontractor, MBC, did not cause[] a prime contractor to submit a false claim to the Government". *United States v. Bornstein*, 423 U.S. 303, 309, 46 L. Ed. 2d 514, 96 S. Ct. 523 (1976).

**B.**

Concerning his challenge to the approximately $ 42,000 in costs awarded S&S, Stebner filed a notice of appeal from the 2 February 2004 judgment on 1 March 2004, after S&S had filed its bill of costs on 17 February and Stebner had filed a motion **[**14]** on 27 February for review of costs. On 7 April, the district court granted S&S's original bill of costs.

That 7 April decision was an independently appealable order. *See Pope v. MCI Telecomm. Corp.*, 937 F.2d 258, 266-67 (5th Cir. 1991). *HN5* "Where the appellant notices the appeal of a specified judgment only … this court has no jurisdiction to review other judgments or issues which are not expressly referred to and which are not impliedly intended for appeal." *Id.* at 266 (internal quotation and citations omitted); *FED. R. APP. P. 3(c)(1)(B)* (notice of appeal must "designate the judgment, order, or part thereof being appealed"). Stebner's 1 March notice of appeal specifies appeal only from the 2 February judgment. Because he failed to file a supplemental **[*395]** notice of appeal, specifying the 7 April costs award, we lack jurisdiction to review this issue. *See Pope*, 937 F.2d at 266-67.

**III.**

For the foregoing reasons, the judgment is **AFFIRMED**; the appeal from the costs-award, **DISMISSED**.

*AFFIRMED IN PART; DISMISSED IN PART*





Neutral
As of: November 20, 2012 11:26 AM EST

# United States v. Collegiate Funding Servs.

United States Court of Appeals for the Fourth Circuit

December 7, 2011, Argued; March 14, 2012, Decided

No. 11-1103

**Reporter:** 469 Fed. Appx. 244; 2012 U.S. App. LEXIS 5574

UNITED STATES OF AMERICA ex rel. LENORA JONES and PATRICIA J. WILLOUGHBY, Plaintiff - Appellant, v. COLLEGIATE FUNDING SERVICES, INC.; COLLEGIATE FUNDING SERVICES, LLC; CFS-SUNTECH SERVICING, LLC; JP MORGAN CHASE & COMPANY, Defendants - Appellees.

**Notice:**  PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Prior History:**  [**1] Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. (3:07-cv-00290-HEH). Henry E. Hudson, District Judge.
*United States ex rel. Willoughby v. Collegiate Funding Servs., 2011 U.S. Dist. LEXIS 3055 (E.D. Va., Jan. 12, 2011)*

**Disposition:**  AFFIRMED.

---

### Core Terms

public disclosure, district court, false claim, amended complaint, lender, counseling, certifications, exit, subject matter jurisdiction, false certificate, guaranty, default, consolidation, inducements, failure to state a claim, federal government, original source, student loan, eligible, independent knowledge, disclosure, misleading, borrowers, mail, solicitation, deceptive, customer, software, blank, tam

---

### Case Summary

#### Procedural Posture

Plaintiff relators filed a complaint that alleged 21 separate counts of False Claims Act, *31 U.S.C.S. §§ 3729-3732*, violations arising out of defendant former employer's unlawful conduct. The employer moved to dismiss the complaint. The United States District Court for the Eastern District of Virginia, at Richmond, granted the motion to dismiss, pursuant to *Fed. R. Civ. P. 12(b)(1)*, *(b)(6)*, and *9(b)*. The relators appealed.

#### Overview

The relators argued that the district court erred in determining that they actually based the allegations in some of the counts on public disclosures. The court found that the district court did not clearly err in concluding that the relators failed to establish that the counts of the complaint were

not actually based, in whole or in part, on public disclosures, under former *31 U.S.C.S. § 3730(e)(4)*, because there was evidence of public disclosures and there were no reasonably inferable sources other than these documents. Securities and Exchange Commission (SEC) filings were administrative reports for the purposes of the public disclosure bar because, while the documents were not authored by the SEC or created under their supervision, they were produced at the request of and were made public by the SEC in the course of carrying out its activities as a federal agency. Finally, there was no error in the district court's dismissal of the remaining counts for failure to state a claim under *Fed. R. Civ. P. 9(b)* and *12(b)(6)* because false certification was critical to all the counts and the relators' allegations of false certification were not adequately particular.

**Outcome**
The judgment of the district court was affirmed.

---

**LexisNexis® Headnotes**

---

Labor & Employment Law > ... > False Claims Act > Scope & Definitions > Jurisdictional Bar

*HN1* See former *31 U.S.C.S. § 3730(e)(4)*.

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review
Labor & Employment Law > Employer Liability > False Claims Act > General Overview

*HN2* The determination of an actual basis for a False Claims Act, *31 U.S.C.S. §§ 3729-3732*, allegation is a finding of fact, reviewed for clear error.

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss
Evidence > Burdens of Proof > Preponderance of Evidence
Labor & Employment Law > Employer Liability > False Claims Act > Burdens of Proof
Labor & Employment Law > ... > False Claims Act > Scope & Definitions > Jurisdictional Bar

*HN3* In the context of the False Claims Act, *31 U.S.C.S. §§ 3729-3732*, a relator's action is based upon a public disclosure of allegations only where the relator has actually derived from that disclosure the allegations upon which his or her qui tam action is based. The public disclosure bar encompasses actions even partly based upon prior public disclosures. Once a motion to dismiss on jurisdictional grounds is filed, the relator bears the burden of proving by a preponderance of the evidence that the allegations are not based upon public disclosures.

Civil Procedure > Preliminary Considerations > Jurisdiction > General Overview
Civil Procedure > ... > Pleadings > Amendment of Pleadings > General Overview

*HN4* When a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction.

Labor & Employment Law > ... > False Claims Act > Scope & Definitions > Jurisdictional Bar

*HN5* See former *31 U.S.C.S. § 3730(e)(4)*.

Labor & Employment Law > Employer Liability > False Claims Act > Burdens of Proof
Labor & Employment Law > ... > False Claims Act > Scope & Definitions > Jurisdictional Bar

*HN6* While relators are not required to affirmatively prove the source of their information for False Claims Act, *31 U.S.C.S. §§ 3729-3732*, allegations, mere denial of knowledge of public dis-

closures does not satisfy the burden established by Vuyyuru.

Labor & Employment Law > ... > False Claims Act > Scope & Definitions > Jurisdictional Bar

*HN7* In the context of the False Claims Act, *31 U.S.C.S. §§ 3729-3732*, under Vuyyuru, even partial reliance on public disclosure bars a qui tam action.

Labor & Employment Law > ... > False Claims Act > Scope & Definitions > Jurisdictional Bar

*HN8* In the context of the False Claims Act, *31 U.S.C.S. §§ 3729-3732*, it is the fact of public disclosure--not Federal Government creation or receipt--that is the touchstone of the public disclosure bar.

Administrative Law > Agency Adjudication > Hearings > General Overview

*HN9* Hearings are, by general definition, forums in which parties present and submit privately prepared documents in support of their positions on a particular question; reports, on the other hand, are generally distinguishable as products of official activity of some kind. The context for an administrative hearing and report are sufficiently unique that a rule for the former would not necessarily apply to the latter.

Labor & Employment Law > ... > False Claims Act > Scope & Definitions > Jurisdictional Bar

*HN10* In the context of ruling that state and local agencies are "administrative" for the purposes of the public disclosure bar, the United States Supreme Court has noted that statutory construction of the False Claims Act, *31 U.S.C.S. §§ 3729-3732*, should be guided by the likelihood that a disclosure will put the Government on notice of a potential fraud. Congress passed the public disclosure bar to bar a subset of those suits that it deemed unmeritorious or downright harmful. The statutory touchstone is whether the allegations of fraud have been publicly disclosed.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim
Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > General Overview

*HN11* Dismissal under *Fed. R. Civ. P. 9(b)* is treated as a failure to state a claim under *Fed. R. Civ. P. 12(b)(6)*.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim
Civil Procedure > Appeals > Standards of Review > De Novo Review

*HN12* An appellate court reviews de novo a district court's dismissal for failure to state a claim. In determining whether the order was proper, the appellate court accepts as true all of the well-pleaded allegations and views the complaint in the light most favorable to the non-moving party. It then determines whether a plausible claim for relief has been made.

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Fraud Claims

*HN13* *Fed. R. Civ. P. 9(b)* sets out a heightened pleading standard for fraud: In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally. The "circumstances" required to be pled with particularity under *Rule 9(b)* are the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby. Liability for a false certification will lie only if compliance with the statutes or regulations was a prerequisite to gaining a benefit, and the defendant af-

469 Fed. Appx. 244, *244; 2012 U.S. App. LEXIS 5574, **1

firmatively certified such compliance.

**Counsel:** ARGUED: Joe Bradley Pigott, PIGOTT & JOHNSON, PA, Jackson, Mississippi, for Appellant.

John Donley Adams, MCGUIREWOODS, LLP, Richmond, Virginia, for Appellees.

ON BRIEF: M. Bryan Slaughter, MICHIEHAMLETT PLLC, Charlottesville, Virginia, for Appellant.

J. William Boland, Jeremy S. Byrum, MCGUIREWOODS, LLP, Richmond, Virginia; Jonathan A. Vogel, MCGUIREWOODS, LLP, Charlotte, North Carolina, for Appellees.

**Judges:** Before KING, GREGORY, and DAVIS, Circuit Judges. Judge Davis wrote the opinion, in which Judge King and Judge Gregory joined.

**Opinion by:** DAVIS

---

| Opinion |
| --- |

**[*245]**  DAVIS, Circuit Judge:

In this appeal, we are urged to hold that the district court erred in its dismissal with prejudice, pursuant to *Fed. R. Civ. P. 12(b)(1)*, *(b)(6)* and *9(b)*, of Appellants' myriad claims under the False Claims Act, *31 U.S.C.A. §§ 3729-3732* (West 2003 & Supp. 2011) (FCA). [1] Finding no error, we affirm.

**[*246]**  I.

Appellants-Relators Lenora Jones and Patricia J. Willoughby (the  **[**2]** Relators) are former employees of Collegiate Funding Services, Inc. (CFS). [2] They allege that CFS violated various provisions of the FCA in the course of its routine business practices. CFS is a major student loan lender and servicing company that provides a variety of federal student loan products, loan services, and school services as a participant in the Federal Family Education Loan Program (FFELP). The FFELP was established by the Higher Education Act (HEA), *20 U.S.C. §§ 1071 et seq.*, and is administered by the federal Department of Education (DoEd). The Eighth Circuit explained the operation of the FFELP in *U.S. ex rel. Vigil v. Nelnet, Inc.*, 639 F.3d 791, 795 (8th Cir. 2011) (footnotes omitted):

> Under the FFELP, DoEd pays claims submitted by eligible private lenders for interest-rate subsidies and special allowances granted on behalf of student borrowers. See *20*

---

[1]   We indicate throughout, where relevant, the provisions of the FCA that were in effect at the time this case was initiated.

[2]   The named defendants were Collegiate Funding Services, Inc. (the parent company); Collegiate Funding Services, LLC (a CFS subsidiary) (CFS, LLC); CFS-Suntech Servicing, LLC (a CFS, LLC subsidiary); and JPMorgan Chase & Co. (purchaser of CFS in late 2005 or early 2006). As noted by the district court, the Complaint "often refers to CFS generally, without distinguishing between the several Defendants." United States ex rel. Jones v. Collegiate Funding Services, No. 3:07-cv-00290-HEH, 2011 U.S. Dist. LEXIS 3055, 2011 WL 129842, at *3 (E.D. Va. Jan. 12, 2011). The record indicates that in 2009, CFS, Inc., and CFS-Suntech Servicing,  **[**4]** LLC, were sold to ACS Education Services, Inc., and now go by the new respective names of "Education Services Company" and "ACS Education Loan Services, LLC." Because none of the issues before us turn on the particular identities of the defendants, we refer to them collectively as CFS.

469 Fed. Appx. 244, *246; 2012 U.S. App. LEXIS 5574, **4

*U.S.C. §§ 1078(a)(1)*, *1087-1*; *34 C.F.R. § 682.300*, *.302*. DoEd also reduces private lenders' risk of loan defaults by entering into guaranty agreements with Guaranty Agencies who, in turn, insure Lenders against their potential default losses on student loans. See *20 U.S.C. §§ 1078(b)-(c)*, *1080*; *34 C.F.R. § 682.100(b)(1)* **[**3**]** . . . .

The practices of private Lenders and Servicers are heavily regulated, and their participation in the FFELP is conditioned on compliance with detailed DoEd regulations.

The applicable regulations provide for withdrawal of eligible lender status if, inter alia, a lender (1) offers direct or indirect inducements to secure loan applications, *20 U.S.C. § 1085(d)(5)(A)*; (2) engages in fraudulent or misleading advertising, *20 U.S.C. § 1085(d)(5)(I)*; [3] or (3) fails to afford exit counseling by schools to borrowers that includes repayment and indebtedness information, *20 U.S.C. § 1092(b)*.

The Relators worked as telemarketing solicitors for CFS, making and receiving calls from existing and potential student loan borrowers about consolidation loan products. After leaving CFS, Willoughby worked for various other lenders, as well.

The Relators' Original Complaint, filed in the United States District Court for the Northern District of Illinois, alleged that CFS submitted false claims to the federal government in connection with three distinct courses of conduct that violated federal loan regulations. First, CFS "offered and paid, to financial aid units within post-secondary education institutions . . . payments **[*247]** and other inducements in order to secure **[**5**]** applications for [federal] loans." J.A. 27. Second, CFS "engaged in misleading advertising in the form of direct mail solicitations," which were designed to create the perception that the mailings were "official communications from the Federal Government." J.A. 28. Third, CFS solicited consolidation loans in violation of the "single holder rule," which provides that loans may not be consolidated by a lender who does not already hold at least one of the student's loans that will be part of the consolidation.

The Relators asserted that in the course of engaging in the unlawful loan processing conduct described above, CFS regularly submitted claims, or caused claims to be submitted, to the DoEd in order to obtain interest payment subsidies, special allowances, and guaranty payments occasioned by loan payment defaults. The DoEd requires that all such submissions for payment be accompanied by a certification that the loan at issue conforms to all federal regulations. [4] The Relators alleged that CFS therefore violated the FCA when it submitted claims to the government for interest, allowances, and guaranty payments with certification of compliance with FFELP regulations, when it had in fact **[**6**]** engaged in unlawful practices to obtain the underlying loans. Specifically, the Relators alleged four distinct counts under the FCA: (1) presenting false claims; (2) causing false certifications and other statements to be used to get false claims paid and approved; (3) conspiring to get false claims allowed and paid; and (4) causing false certifications and other statements used to avoid obligations to pay the government.

---

[3]   While the current provision concerning disqualification of eligible lender status was revised in 2008 to provide further detail of prohibited conduct, it is substantively the same as the provision in effect at the time the instant case was filed.

[4]   The blank certification form submitted by the Relators with their Original Complaint states as follows, in part, in small type at the bottom:

> By submitting this claim to the guarantor for reimbursement, the lender/holder certifies, to the best of its knowledge, that the information in this claim is true and accurate and that the loan(s) included in the claim was (were) made, disbursed (including remittance of origination fees) and serviced in compliance with all federal regulations and appropriate guarantor rules.

J.A. 113.

Almost four months later, after the case had been transferred from the Northern District of Illinois to the Eastern District of Virginia, the Relators filed an Amended Complaint. The Amended Complaint alleged four "patterns of CFS violations" of federal [**7] loan regulations. J.A. 45. These alleged "patterns" included the following practices, some of which differed significantly from the allegations in the Original Complaint: (1) that CFS provided inducements to secure and maintain preferred lender status, rather than to increase mere loan volume; (2) that CFS provided on-line, rather than in-person exit counseling to students, which was misleading and inadequate under the statutory requirements for counseling; (3) that CFS engaged in misleading advertising; and (4) that CFS's own recruiters had been induced to increase application volume through per-application bonuses. The Amended Complaint alleged that for each pattern, if the government had been aware of the regulatory violations, no interest, guaranty, or special allowance payments would have been made, and CFS would have been obliged to repay any federal funds received because they would not have qualified as an "eligible lender" under the FFELP. See, e.g., J.A. 50 ("If Guaranty Agency or DoEd representatives had known the truth of such violations, no such claims or funds would have been paid to CFS. If DOEd representatives had known of the truth of such violations, CFS would have [**8] been obligated to re-pay funds [*248] of the United States received since the time that CFS would have been found not to have been an eligible lender pursuant to 20 U.S.C. § 1085(d)(5).").

The Amended Complaint specifically alleged 21 separate counts of FCA violations arising out of CFS's unlawful conduct, rather than the original four counts. The first 15 counts alleged that CFS and its loan servicing company had, in violation of 31 U.S.C. § 3729(a)(2) (2006), caused false statements to be used to get insurance guaranty payments and claims paid for loans made as a result of the following deviations from prescribed conduct: (1) unlawful inducements (Counts 1-3); (2) deceptive exit counseling (Counts 4-6); (3) deceptive direct mail solicitation (Counts 7-9); (4) bonus-compensated recruiters (Counts 10-12); and (5) violations of the single holder rule (Counts 13-15). The Amended Complaint also alleged that CFS directly presented false claims related to unlawfully made loans, namely, for insurance guaranty payments (Count 16) and loan interest and special allowance payments (Count 17), in violation of 31 U.S.C. § 3729(a)(1) (2006). In addition, the Amended Complaint alleged in separate counts [**9] that CFS had conspired to get false claims paid for (1) insurance guaranty payments (Count 18) and (2) loan interest and special allowance payments (Count 19), in violation of 31 U.S.C. § 3729(a)(3) (2006). Finally, the Amended Complaint alleged that CFS had caused false certifications and other statements to be used to avoid obligatory repayment of government insurance payments (Count 20) and government interest and special allowance payments (Count 21), in violation of 31 U.S.C. § 3729(a)(7) (2006) (making, using, or causing a false claim to be used "to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government"). [5]

CFS filed a motion to dismiss the Amended Complaint in its entirety. First, CFS argued that the court lacked subject matter jurisdiction over all counts except Counts 10-12 (concerning bonus-compensated recruiters) under the "public disclosure bar" of the FCA. Second, CFS argued that all of the counts suffered from inadequate particularity under Fed. R. Civ. P. 9(b), and therefore failed to state a claim upon which relief could be granted under [**10] Fed. R. Civ. P. 12(b)(6).

The FCA public disclosure bar, 31 U.S.C. § 3730(e)(4) (2006), [6] provided at the time that:

---

[5]   In 2009, the FCA was amended and these provisions are now found at 31 U.S.C.A. § 3729(a)(1).

[6]   As part of the Patient Protection and Affordable Care Act of 2010, the public disclosure provision was also revised and now provides that courts "shall dismiss" an action "if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed . . . unless the person bringing the action is [**11] an original source of the information." 31 U.S.C.A. § 3730(e)(4)(A).

469 Fed. Appx. 244, *248; 2012 U.S. App. LEXIS 5574, **11

*HN1* (A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government **[*249]** before filing an action under this section which is based on the information.

To support this ground for dismissal, CFS submitted 38 exhibits. The exhibits included newspaper and internet articles concerning investigations into student lender business practices, CFS's publicly available filings with the Securities and Exchange Commission (SEC), and the complaint filed in United States ex rel. Vigil (another FCA case brought by the Relators' attorneys, which asserted similar claims against another lender on behalf of other Relators). [7] CFS also submitted a chart comparing language from these publicly-available documents with the specific language of the Amended Complaint to show that the Relators' claims alleged conduct that had in fact been made public prior to the allegations made in this case.

In opposing the Motion to Dismiss, the Relators filed affidavits attesting that they had not read any of the publicly-available documents submitted by CFS before filing their lawsuit, and they had not resided in any of the cities where news media producing the coverage were based. In addition, the Relators submitted a copy of the government's amicus curiae brief in *Ortho Biotech Products v. U.S. ex rel. Chinyelu Duxbury*, 130 S. Ct. 3454, 177 L. Ed. 2d 1054 (2010) (denying cert.), in which the government urged a liberal construction **[**13]** of pleading requirements for FCA complaints. Finally, the Relators submitted a number of other documents intended to show that they and their then counsel had no knowledge of the news coverage or of the publicly-available documents in question, [8] and a 2006 letter from prior counsel to an Assistant United States Attorney in which he set out a theory of FCA liability for CFS regarding their eligible lender status.

The Motion to Dismiss was considered initially by a magistrate judge, who conducted an evidentiary hearing and thereafter prepared a Report and Recommendation (R & R) for the district judge. The R & R recommended that Counts 1-6 and **[*250]** 16-19 be dismissed for lack of sub-

---

[7]  Two of the exhibits submitted by CFS clearly were not in the public domain: (1) a declaration by a CFS employee regarding the company's training of customer service representatives such as the Relators, and (2) a table listing five similar *qui tam* actions against other student lenders that had all been filed by the Relators' original counsel, Tim Matusheski, Esq., and dismissed on various grounds. These **[**12]** cases include United States ex rel. Lopez v. Strayer Educ. Inc., 698 F. Supp. 2d 633 (E.D. Va. 2010) (dismissed under the public disclosure bar); Schultz v. DeVry, Inc., No. 07-c-5425, 2009 U.S. Dist. LEXIS 17015, 2009 WL 562286 (N.D. Ill. Mar. 4, 2009) (dismissed under the public disclosure bar); United States ex rel. Fuhr v. Corinthian Colleges, Inc., No. cv-07-1157-ag-cw (C.D.Cal. Aug. 24, 2009) (dismissed under the FCA's first-to-file bar; appeal voluntarily withdrawn); United States ex rel. Batiste v. SLM Corp., 659 F.3d 1204, 398 U.S. App. D.C. 110 (D.C. 2011) (affirming dismissal under first -to-file bar); United States ex rel. Vigil v. Nelnet, Inc., 639 F.3d 791 (8th Cir. 2011) (affirming dismissal for failure to state a claim).

[8]  These documents included: (1) a "Dear Colleague" letter from the DoEd warning colleges that lender inducements to schools violate the HEA and that the consequences for such conduct might include rescission of eligible lender status and loss of benefits on particular loans; (2) an affidavit from the Relators' counsel of record, Brad Pigott, Esq., averring that co-counsel, Timothy Matusheski, Esq., engaged his services because of his FCA expertise and that Pigott did not read, use, rely on, or possess any of the public disclosures offered by CFS; (3) a fax dated May 12, 2008, of the Wall Street Journal article "J.P. Morgan to Stop Alumni Deals," sent to Pigott from Matusheski; and (4) a letter from Mr. Pigott to the assigned magistrate judge explaining that Pigott did not know **[**14]** the CFS document comprising SEC filing Form 8-K (2005) had been filed with the agency and understood it to be a "confidential investor" presentation at the time it was cited in the Amended Complaint.

ject matter jurisdiction under the public disclosure bar, and that Counts 7-12 and 20-21 be dismissed for failure to state a claim. (Counts 13-15 were dismissed voluntarily by the Relators.) The public disclosure bar applied to the former counts, the R & R explained, because the Relators failed to show any actual direct knowledge (acquired in the course of their employment as customer service representatives) of the preferred lender program, exit counseling programs, or alleged kickback arrangements between CFS and various schools. This "lack of detail in the Relators' affidavits" and "insufficient revelations of counsel" concerning when counsel learned of certain news reports from the original attorney for the Relators constituted [**15] a failure to overcome the public disclosure bar. J.A. 736. In determining that the public disclosure bar applied, the R & R concluded that forms filed with the SEC by CFS were administrative reports for the purposes of the FCA. As to the "original source" exception to the public disclosure bar, the R & R found that the Relators' "lack of convincing evidence of 'direct and independent knowledge' . . . weighs against their credibility." J.A. 739.

The R & R found that the court had subject matter jurisdiction over Counts 7-9, relating to direct mail solicitation to consolidate federal loans, because the Relators had provided "unrefuted and credible" assertions that while they were employed at CFS they handled calls from prospective borrowers who had received the mailings, and they had been trained to tell callers that CFS was "licensed and backed by the federal government." J.A. 738. Nevertheless, the R & R recommended dismissal of these counts for failure to state a claim.

Addressing the adequacy of the pleadings for Counts 7-12, all of which alleged that CFS caused false statements or certifications to be used (in violation of *31 U.S.C. § 3729(a)(2) (2006)*), the R & R noted that "[t]he [**16] only details [pled] relate to asserted violations of the HEA and DOED regulations - not to the submissions of false claims subject to those regulations." J.A. 744. Because the Relators had no personal knowledge of any particular claims submitted for defaulted loans, and had failed to provide "[any] details of the claims process" such as "specific defaults, payments, dates, or other indicia from which a specific claim can be inferred to have been submitted," they had failed to state a claim with sufficient particularity. J.A. 745-46; 743. The R & R also noted that a false claim concerning a government-insured loan is material only when the loan has gone into default and a claim is in fact submitted (i.e., the insurance payout has been triggered). Here, no specific allegation regarding a particular loan had been made. [9]

Finally, the R & R recommended denying leave to amend the Amended Complaint because the "Relators candidly admit that they do not possess the information that is necessary" [**17] for a particularized allegation about false claims submitted to the federal government by CFS. J.A. 746.

The Relators filed timely exceptions to the R & R, and submitted supplemental affidavits attesting to additional facts concerning their direct knowledge of CFS's practices. Relator Willoughby asserted that as a CFS customer service representative she had received calls from students [*251] who were using the exit counseling software alleged to be misleading; that she learned through her work with other lenders after leaving CFS that the company designed its software to be misleading; that CFS had an agreement with Norfolk State University to be an exclusive endorsed provider of consolidation loans through the alumni association, which in return received pay-

---

[9]  The R & R concluded that it was unnecessary to determine whether the allegedly false certifications were material to federal payments to CFS because the fraud allegations themselves lacked particularity.

ments per loan application; [10] and that she had contacted CFS about the application kickbacks through alumni groups and was referred to an unnamed representative who would be able to provide her more information about these arrangements.

Relator Jones also submitted a supplemental affidavit. She asserted that as an employee of CFS she had access to the National Student Loan Data System, which indicates the status of each federal loan (i.e., whether the loan was in default and therefore presumptively eligible for federal guaranty payments). In addition, Jones attested that she, Willoughby, and their legal counsel had met with representatives of the Department of Justice and DoEd on July 13, 2007 (in the interim between the filing the Original and Amended Complaints) to discuss their claims.

The district court overruled the Relators' exceptions to the R & R and granted the motion to dismiss. *United States ex rel. Jones v. Collegiate Funding Servs., Inc.*, No. 3:07-cv-290, 2011 U.S. Dist. LEXIS 3055, 2011 WL 129842 (E.D. Va. Jan. 12, 2011). First, the court addressed the Relators' assertion that the R & R unfairly "proceeded from a false dichotomy . . . that if [their] knowledge was not [**19] derived from their employment, then it must have been derived from prior public disclosures." *2011 U.S. Dist. LEXIS 3055, [WL] at *5*. The district court found this assertion lacked merit in light of the fact that the magistrate judge "appropriately considered" Relator Willoughby's work in the student loan industry generally. *2011 U.S. Dist. LEXIS 3055, [WL] at *7*. The court also declined to consider the supplemental affidavits, as they were untimely filed.

Second, the court turned to the Relators' contention that SEC filings by CFS were not "administrative reports" for purposes of the public disclosure bar and thus should be disregarded in assessing the dismissal motion. The court reasoned that administrative reports are defined not by government authorship, but government receipt, public availability, and the use of a particular document for the government's own investigative or analytical purposes. Finding that the SEC filings met each of these requirements, the district court concluded it was proper to consider the documents as administrative reports under the public disclosure bar.

Third, the court addressed the Relators' broad contention that their allegations concerning preferred lender inducements and deceptive exit counseling were not [**20] actually derived from public disclosures. Acknowledging that not "every relator in a qui tam action must affirmatively establish the source of his or her knowledge," the court listed the publicly disclosed information for both patterns of conduct alleged in Counts 1-6 and found that the Relators failed to provide adequate evidence of their "logical access" to the information within their employment as an alternative explanation for the source of their allegations. *2011 U.S. Dist. LEXIS 3055, [WL] at *11*.

 [*252]  The evidence cited included SEC filings by CFS in which the company touted being on more than 500 preferred lender lists, documentation of then-New York Attorney General Andrew Cuomo's investigation into possibly illegal activity by student lenders to secure preferred lender status, and a New York Times article published days before the filing of the Relators' Original Complaint in which JP Morgan was named as a target of that investigation.

The district court also cited articles published on May 8, 2007, in USA Today and the Wall Street Journal that "disclosed that JP Morgan Chase had entered into preferred-lender deals with

---

[10]   The evidence for this prior, independent knowledge of the kickback scheme is a 2006 email in which Willoughby shared the information with a financial aid director. Willoughby, working as a private consultant, [**18] had contacted the financial aid director to offer payments on behalf of her own clients and when she was rebuffed on the ground that such payments violated the HEA, she retorted that, "If it is [illegal to donate payments per loan], CFS is in BIG trouble." J.A. 778.

alumni associations." *2011 U.S. Dist. LEXIS 3055, [WL] at *12*. While these disclosures were made after the filing of **[**21]** the Original Complaint, the court found that they were relevant because they preceded the filing of the Amended Complaint, in which the Relators first made allegations regarding alumni associations (instead of or in addition to, financial aid offices).

Regarding public disclosures related to the second pattern of conduct, deceptive exit counseling, the district court cited CFS's SEC filings about their exit counseling software products, and a New York Times article specifically mentioning that the CFS software directed student borrowers to their consolidation loan products. In addition, the court noted that during the period between the filing of the Original and Amended Complaints, two publicly disclosed reports referred to CFS's exit counseling software; one of these reports indicated that prohibited marketing was included in the counseling.

The court observed that the Relators' Original Complaint made no mention of online exit counseling at all, yet the Amended Complaint included 17 paragraphs concerning online exit counseling, which had in the interim been disclosed or referred to in various publications. The court concluded that the public disclosures concerning inducements and **[**22]** online exit counseling were therefore "far more than coincidental." *2011 U.S. Dist. LEXIS 3055, [WL] at *10*.

The district court then turned to the "original source" exception to the public disclosure bar, pursuant to which a Relator may proceed despite publicly available knowledge if he or she is an "original source" of the information on which an FCA claim is based. *31 U.S.C. § 3730(e)(4)(A) (2006)*. Under the terms of the statute in effect at the time, an original source was defined by two elements: "direct and independent knowledge" of the information, and voluntary provision of the information to the government before filing an action under the FCA that is based on that information. *31 U.S.C. § 3730(e)(4)(B) (2006)*. The district court adopted the finding in the R & R that the "Relators' affidavits do not evidence independent knowledge of the allegations in the Amended Complaint." *Jones*, 2011 U.S. Dist. LEXIS 3055, 2011 WL 129842 at *12. Subject matter jurisdiction for Count 1-6 was therefore lacking and a determination of the second element, whether the Relators had provided the government with their information, was unnecessary.

The district court then considered whether it had subject matter jurisdiction over the direct mail solicitation **[**23]** allegations (Counts 7-9). The court adopted the R & R finding that the Relators' personal experience as customer service representatives supported their independent knowledge of CFS's conduct. As to CFS's challenge to subject matter jurisdiction for Counts 20-21, conspiracy to cause false statements and certifications to be used to avoid repayment obligations, the district court again adopted the findings in the R & R that these counts were independent of the other counts and jurisdiction was therefore **[*253]** proper. Finally, the court rejected the R & R finding that subject matter jurisdiction was lacking for Counts 16-19, finding instead that, as with Counts 20 and 21, the bases for these allegations was independent of the invalidated counts.

To summarize, the district court dismissed Counts 1-6 for lack of subject matter jurisdiction under the public disclosure bar, finding inadequate evidence of Relators' independent knowledge of CFS's conduct. On the other hand, the court found the existence of subject matter jurisdiction over the remaining counts, Counts 7-12 (alleging violations of § (a)(2)), and Counts 16-21 (alleging violations of § § (a)(1),(3),(7)), as to which the Relators had **[**24]** satisfied their burden to show their access to independent, first-hand bases for the allegations. [11]

Having found jurisdiction over Counts 7-12 and 16-21, the district court then turned to the issue

---

[11]   As noted above, Relators voluntarily dismissed Counts 13-15.

469 Fed. Appx. 244, *253; 2012 U.S. App. LEXIS 5574, **24

of whether these counts met the heightened pleading requirements of *Fed. R. Civ. P. 9(b)*. In the court's view, the Relators "maintain[ed] that they satisfied *Rule 9(b)* by attaching a blank FFELP claim form and describing Defendants' alleged HEA violations." *2011 U.S. Dist. LEXIS 3055, [WL] at *15*. The court ruled this submission inadequate for two reasons: (1) the Relators did not allege the involvement of any third party claimants (analogous to subcontractors) and thus there was no basis for an allegation that CFS "used or caused to be used a false certification . . . to get a false or fraudulent claim paid by the government," *31 U.S.C. § 3729(a)(2)*; and (2) any certifications by CFS would be false only upon submission to the government and a blank form was not evidence of submission of any actual claim for federal payment by the company.

As for the Relators' argument that they were not required to "particularize dates and amounts of individual claims" because  [**25]  they were alleging a fraudulent scheme rather than specific events, *Jones*, 2011 U.S. Dist. LEXIS 3055, 2011 WL 129842 at *17, and accepting that *Rule 9(b)* can be satisfied by allegations of a scheme, the court ruled that the Relators had not alleged facts showing that false claims had in fact been submitted by CFS and had "not allege[d] any instances of payment by the government, instances of default, or any other facts from which the Court could infer that Defendants actually submitted any false statements." *2011 U.S. Dist. LEXIS 3055, [WL] at *18*. Certification forms were relevant only to a specific loan, the court noted, and thus did not assert compliance with federal loan regulations generally, as to other or all loans by the lender. In addition, a blank form was merely evidence that CFS <u>could</u> submit a false claim, not evidence that it did do so. The allegations regarding submitted claims were therefore "naked assertion," the court concluded, and as such were merely speculative. [12] *2011 U.S. Dist. LEXIS 3055, [WL] at *19*.

 [*254]  The court's final order thus dismissed Counts 1-6 for lack of subject matter jurisdiction and Counts 7-12 and 16-21 for failure to state claim. The Relators have timely appealed.

II.

This case comes to us under somewhat ironic circumstances, in that the district court found that some of the allegations of fraud brought by the Relators, if meritorious, were too widely known to support their claims, and some of the allegations were too opaque and lacking specificity. We first consider the propriety  [**27]  of the dismissal of some claims based on the public disclosure bar. Next, we consider whether the district court erred in dismissing any one or more claims for failure to state a claim. For the reasons set forth herein, we discern no error in the court's analysis.

A.

The Relators argue first that the district court erred in determining that they actually based the allegations in Counts 1-6 of the Amended Complaint, concerning loans made as a result of unlawful inducements and deceptive exit counseling, on public disclosures. **HN2** The determination of an actual basis for an FCA allegation is a finding of fact, reviewed for clear error. *United States*

---

[12]   The district court also briefly addressed the government's submission of a Statement of Interest, which articulated its understanding of the particularity standard for FCA claims. The Statement asserted that "where liability does not depend on  [**26]  anything specific in the defendants' claims themselves as the basis for alleging that they were false, and instead relies on the general principle that a defendant's false representations prior to submission of claims and/or failure to comply with contractual promises can render the defendant's subsequent claims payment false," no specific allegations of a particular claim are required. United States' Statement of Interest at 3, United States ex rel. Jones v. Collegiate Funding Services, 2011 U.S. Dist. LEXIS 3055, 2011 WL 129842 (E.D.Va. Jan. 12, 2011)(No. 3:07-cv-00290-HEH). The court noted that it agreed with the government as to the applicable pleading standard, and was ruling only that the Relators had failed to meet it.

*ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 348 (4th Cir. 2009). *HN3* "[A] relator's action is 'based upon' a public disclosure of allegations only where the relator has actually derived from that disclosure the allegations upon which his [or her] qui tam action is based." *United States ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d 1339, 1348 (4th Cir. 1994). [13] The public disclosure bar "encompasses actions even partly based upon prior public disclosures." *Vuyyuru*, 555 F.3d at 351. Once a motion to dismiss on jurisdictional grounds is filed, the relator **[\*\*28]** "[bears] the burden of proving by a preponderance of the evidence" that the allegations are not based upon public disclosures. *Id.* at 348 (citing *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 468, 127 S. Ct. 1397, 167 L. Ed. 2d 190 (2007)). Moreover, *HN4* "when a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction." *Rockwell*, 549 U.S. at 473-74.

At the time of the Relators' Complaints, the FCA's public disclosure bar provided:

> *HN5* (A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, **[\*\*29]** or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
>
> (B) For purposes of this paragraph, 'original source' means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

**[\*255]** *31 U.S.C. 3730(e)(4) (2006)*. [14] The Relators argue that under the plain language of the statute and precedent in this circuit, the public disclosure bar applies only where an FCA

---

[13]   For much of the time that the FCA language of 2007 was in effect, this circuit's subjective "actual reliance" rule differed from that of the majority of circuits, which held that an objective standard (in which a factual overlap of relator allegations and public disclosures, regardless of actual reliance, triggers the bar) is proper. See *Jones*, 2011 U.S. Dist. LEXIS 3055, 2011 WL 129842, at \*5 (noting that the Second, Third, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits all applied an objective rule of public disclosure for the provision in effect in 2007).

[14]   In 2010, these provisions were amended. Section 3730(e)(4) now provides:

> (A) The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—
>
> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
>
> (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
>
> (iii) from the news media,
>
> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
>
> (B) For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C. § 3730(e)(4).

469 Fed. Appx. 244, *255; 2012 U.S. App. LEXIS 5574, **29

claim is actually based upon publicly disclosed information, and those disclosures specifically set out conduct by the particular defendant. They assert that neither requirement obtains in this case because they have submitted sworn affidavits that they did not read any of the publically-available documents in question and, in any event, the publicly-available documents themselves fail to set out allegations against the **[**30]** defendants named in this case.

Appellees **[**31]** respond by emphasizing that CFS's parent, JPMorgan Chase, was in fact named in news coverage of New York Attorney General Cuomo's investigations, and that the various news reports and SEC filings available before the Original and Amended Complaints provided enough information for the Relators to build their claims. They urge us to consider the public disclosures together, rather than discretely as to a particular allegation, and assert that the Relators do not, and cannot, argue that under such a holistic approach their claims avoid the public disclosure bar.

In light of the evidence adduced in the hearing before the magistrate judge below and the justified findings adopted by the district court based thereon, we are unable to conclude that the district court committed clear error in finding that the Relators' claims were actually based upon public disclosures.

The Relators argue that public accounts of general industry behavior, without specific allegations concerning CFS, are insufficient to provide a basis for specific claims against a particular defendant. They rely primarily on an unpublished Seventh Circuit decision, *United States ex rel. Baltazar v. Warden & Advanced Healthcare Assoc.*, 635 F.3d 866, 2011 WL 559393 (7th Cir. 2001), **[**32]** for the proposition that reports of a high rate of fraud within an industry should not bar specific FCA actions against individual wrongdoers. The publically-available information underlying this case, however, does not establish merely an industry-wide set of allegations. The district court cited a published report that CFS was involved in the Cuomo probe, and CFS's own claim that its business model included special inducement arrangements with schools for access to student borrowers. *HN6* While relators are not required to affirmatively prove the source of their information for FCA allegations, as the district court noted, mere denial of knowledge of public disclosures does not satisfy the burden established by *Vuyyuru*.

**[*256]**  In their affidavits, the Relators aver that their employment with CFS and in the student loan industry provides the sole source of their allegations, yet the scope of their employment - by their own description - does not establish or plausibly suggest access to the kind of information upon which their allegations are based. In addition, as noted above, *HN7* under Vuyyuru, even partial reliance on public disclosure bars a qui tam action. Faced with evidence of public disclosures **[**33]** and no reasonably inferable sources other than these documents (and in light of the apparent pattern of litigation by the Relators' initial counsel in similar cases), the district court did not clearly err in concluding that the Relators failed to establish that Counts 1-6 of the Amended Complaint were not actually based, in whole or in part, on public disclosures. [15]

---

[15]   The district court found that the allegations in Counts 7-9, concerning deceptive mailings designed to mislead borrowers into believing that CFS was a government entity, were not made in actual reliance on public disclosures and were therefore within the subject matter jurisdiction of the court. While the counts were dismissed nonetheless under Rule 9(b), CFS urges us to reverse the district court's finding by "abandoning" the actual reliance rule of Siller and adopting the majority rule in which allegations "substantially similar" to public disclosures are barred. Apart from the fact that a panel of this court is not free to disregard binding circuit precedent, see United States v. Collins, 415 F.3d 304, 311 (4th Cir. 2005), such a step is unnecessary, as the 2010 amendment of the FCA explicitly incorporates the substantially **[**34]** similar standard: "The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions in the action were publicly disclosed." 31 U.S.C. § 3730(e)(4). When the instant case was initiated, however, the provision barred actions "based on" public disclosures and thus Siller's reasoning properly applies to the language in effect at the time, and the district court correctly applied circuit precedent.

B.

As a distinct component of their arguments concerning the public disclosure bar, the Relators challenge the district court's determination that SEC filings by CFS were "administrative reports" for purposes of the public disclosure bar. See *31 U.S.C. § 3730(e)(4)(A)*. They note that, "In the end . . . the District Court acknowledged that 'the applicability of the public disclosure bar in this case does not turn on whether CFS's SEC filings are 'administrative reports.'" Appellants' Br. 28. Because the district court did consider SEC reports in its analysis, however, we take this opportunity to address the issue.

The Relators point to *Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 130 S. Ct. 1396, 1402, 176 L. Ed. 2d 225 (2010),  [**35] for the rule that "administrative" in the FCA context relates to "the activities of governmental agencies," and they argue that, consequently, a document merely received by an agency cannot constitute an administrative report. But as the district court noted, under Graham County, *HN8* "It is the fact of 'public disclosure'- not Federal Government creation or receipt-that is the touchstone of [the public disclosure bar]." *Id.* at 1405. The court went on to reason that because documents created by private parties constituted materials of "administrative hearings" for the FCA, under *United States ex rel. Grayson v. Advanced Management Tech.*, 221 F.3d 580 (4th Cir. 2000), privately-created SEC filings can also constitute an administrative report.

We find this reasoning unpersuasive in the context of this case. *HN9* Hearings are, by general definition, forums in which parties present and submit privately prepared documents in support of their positions on a particular question; reports, on the other [*257]  hand, are generally distinguishable as products of official activity of some kind. The context for an administrative hearing and report are sufficiently unique that a rule for the former would not necessarily  [**36] apply to the latter.

We are satisfied, nonetheless, that the SEC filings by CFS were reasonably determined to be administrative reports because they were submitted under the SEC's administrative regulatory requirements of the company. Forms 8-K and S-1 are mandatory filings for all publicly traded companies. See, e.g., *17 C.F.R. §§ 240.13a-11, 229.101*. While these documents were not authored by the SEC or created under their supervision, they were produced at the request of and were made public by the SEC in the course of carrying out its activities as a federal agency.

*HN10* In the context of ruling that state and local agencies are "administrative" for the purposes of the public disclosure bar, the Supreme Court has noted that statutory construction of the FCA should be guided by the likelihood that a disclosure will "put the Government on notice of a potential fraud . . . . Congress passed the public disclosure bar to <u>bar</u> a subset of those suits that it deemed unmeritorious or downright harmful . . . . The statutory touchstone, once again, is whether the allegations of fraud have been [publicly disclosed]." *Graham County*, 130 S. Ct. at 1404, 1409, 1410. Here, the SEC forms in question were  [**37] requested, received, made public, and presumably included in any corporate profiles compiled by the agency. While such a report does not necessarily alert federal agencies to wrongdoing, it certainly provides easily accessible notice of the transactions between CFS and its customers from which an investigation could have begun or developed. Because the SEC filings in question comport with the FCA purposes set out in Graham County, we find that they are administrative reports for the purposes of the public disclosure bar, and were properly considered by the court below in the mix of publically available information on the basis of which, in whole or in part, the Relators' claims are based.

C.

The final issue on appeal is whether the district court erred in dismissing Counts 7-12 and 16-21 for lack of particularity under *Fed. R. Civ. P. 9(b)*. *HN11* Dismissal under *Rule 9(b)* "is treated as a failure to state a claim under *Rule 12(b)(6)*." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 n.5 (4th Cir. 1999). *HN12* "This Court reviews ade novo a district court's dismissal for failure to state a claim[.]" Id.

> In determining whether the order was proper, the appellate court accepts as true [**38] all of the well-pleaded allegations and views the complaint in the light most favorable to the non-moving party. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). It then determines whether a "plausible claim for relief" has been made. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).

*Lesueur-Richmond Slate Corp. v. Fehrer*, 666 F.3d 261, 264, 2012 WL 104914, *1 (4th Cir. 2012).

To briefly recap the theory of the Relators' FCA claims, they assert that CFS habitually violated the regulations of the FFELP, and thus all certifications of compliance with FFELP for loans obtained or serviced unlawfully were false. When these certifications were submitted to the federal government in support of claims for interest subsidy, insurance guaranty, or special allowance payments, the submissions were therefore false claims under the FCA.

[*258] As an initial matter, we observe that there seems to have been some confusion below as to which category of loans by CFS the Relators alleged were in fact related to false claims. The Relators apparently raised an objection before the district court that the magistrate judge misunderstood their claims to extend to all loans made or serviced by CFS. They [**39] sought to clarify that they claimed only the loans "subject to inducement promises and payments" resulted in false claims; the R & R itself, however, noted that Relators' claims were limited to certifications for loans that actually went into default (and were therefore eligible for guaranty payments).

The Amended Complaint alleges the making and presentation of, and conspiracy to make or present, false claims for payments related to disbursed consolidation loans (Counts 8, 9, 11, 12, 17, 19, 21) and defaulted consolidation loans (Counts 7, 10, 16, 18, 20). An adequately particular claim under *Rule 9(b)* related to these two categories could ostensibly be different— allegations of claims for special allowance and interest payments on a general class of disbursed loans that were accompanied by a false certificate of compliance do not suffice as particularized claims related to defaulted loans, for which insurance guaranty payments have been made by the government. Without detailing a separate analysis for each count, the district court concluded that merely providing blank certification forms together with allegations that all loans made or serviced as a result of unlawful conduct resulted [**40] in false claims was inadequate under *Rule 9(b)* for all the counts over which subject matter jurisdiction was proper.

Before us on appeal, the Relators now argue that they did not rely merely on blank certification forms to satisfy their pleading allegation of false claims. They explain that their claims set out allegations that, taken together, adequately support the inference that false claims were actually presented to the federal government. [16]

---

[16] Their argument on this point appears limited, however, to claims related to loan defaults, i.e., Counts 7, 10, 16, 18, and 20;

469 Fed. Appx. 244, *258; 2012 U.S. App. LEXIS 5574, **40

**HN13** *Federal Rule of Civil Procedure 9(b)* sets out a heightened pleading standard for fraud:

> In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

"[T]he 'circumstances' required to be pled with particularity under *Rule 9(b)* are 'the time, **[**41]** place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *Harrison*, 176 F.3d at 784 (citation omitted). In Harrison, we noted with approval that "[t]he Fifth Circuit has emphasized that liability for a false certification will lie only if compliance with the statutes or regulations was a prerequisite to gaining a benefit, and the defendant affirmatively certified such compliance." *Id.* at 787.

Because false certification is critical to all the relevant counts in question here, providing the basis for all the allegedly submitted claims being legally "false," the initial question for all counts is whether the Relators' allegations of false certification are adequately particular. [17] We **[*259]** agree with the district court that each remaining count fails on this ground. As the district court observed, the "Relators neither serviced nor processed any consolidated loans, provided any post-consolidation customer service, or had access to information regarding claims for government reimbursement submitted by CFS." *Jones*, 2011 U.S. Dist. LEXIS 3055, 2011 WL 129842 at *19. In Harrison, by contrast, the Relator alleged personal knowledge **[**42]** of the certification process, and of the misrepresentations made in the allegedly false certification (which resulted in a subcontractor in fact being retained for work that the Relator had personal knowledge of). *Harrison*, 176 F.3d at 781-82.

Similarly, in *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 191-92 (5th Cir. 2009), the Fifth Circuit found adequate particularity in the allegations of a claim where the Relator's allegations of false statements "made to get a claim paid" included dates and recollections of face-to-face meetings with alleged falsifiers and dates of billing falsification by a particular doctor. See also *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853-54 (7th Cir. 2009) **[**43]** (finding adequate particularity under *Rule 9(b)* where a Relator provided evidence of specific parts shipped on specific dates, and details of payment, even where the company's claim submitted to the government were not provided).

Here, the Relators allege only the broad inferential claim that but-for the certifications, the loans would not have been disbursed. They have made no allegation as to any particular transactions between CFS and the government in which the certifications were material, nor do they name or identify any employee who (knowingly or not) completed a false certification form. In light of the complete absence of any particularity as to their allegations, we agree with the district court that the Relators fail to meet the requirements of *Rule 9(b)* and their claims were properly dismissed.

III.

---

the Relators do not directly address the district court's dismissal of the counts relating to interest and special allowance payments on loans that were disbursed but never entered default, i.e., Counts 8, 9, 11, 12, 17, 19, and 21.

[17]  The district court focused on the alleged (a)(2) violations (false statements), finding that certification was not alleged with adequate particularity even under a "fraudulent scheme" claim, and that the Relators failed to offer facts supporting the inference that any claims were actually submitted. J.A. 900-9. The other alleged violations, under (a)(1), (a)(3), and (a)(7), were not addressed directly, presumably because the false claims alleged therein are also based on the assertion of false certification.

469 Fed. Appx. 244, *259; 2012 U.S. App. LEXIS 5574, **43

For the foregoing reasons, we discern no error in the district court's dismissal for lack of subject matter jurisdiction Counts 1-6 of the Amended Complaint under the public disclosure bar of the FCA. Furthermore, we discern no error in the district court's dismissal of Counts 7-12 and Counts 16-21 for failure to state a claim under *Fed. R. Civ. P. 9(b)*, *12(b)(6)*. Accordingly, **[**44]** the judgment of the district court is

<u>AFFIRMED</u>.




Caution
As of: November 14, 2012 3:14 PM EST

# United States v. Cypress Health Sys. Fla.

United States District Court for the Northern District of Florida, Gainesville Division

July 12, 2011, Decided; July 12, 2011, Filed

Case No. 1:09-CV-137-SPM-GRJ

**Reporter:** 2011 U.S. Dist. LEXIS 74768

UNITED STATES OF AMERICA, the STATE OF FLORIDA, and the STATE OF MONTANA, ex. rel., ROBERT WATINE, M.D., Plaintiffs, v. CYPRESS HEALTH SYSTEMS FLORIDA, INC., and CYPRESS HEALTH SYSTEMS, LLC, Defendants.

**Notice:**

**Subsequent History:** Motion granted by, in part, Motion denied by, in part *United States ex rel. Watine v. Cypress Health Sys. Fla., Inc., 2012 U.S. Dist. LEXIS 17875 (N.D. Fla., Feb. 14, 2012)*

---

| Core Terms |
| --- |

patient, fraudulent, reimbursement, heightened, false claim, churning, billing, fraudulent scheme, nursing home, fail to meet, healthcare program, attorney's fees, allege fraud, charts

**Counsel:** **[\*1]** For UNITED STATES OF AMERICA, Plaintiff: ATLEE W WAMPLER, LEAD ATTORNEY, WAMPLER BUCHANAN WALKER ETC - MIAMI FL, MIAMI, FL; BENJAMIN W BEARD, LEAD ATTORNEY, US ATTORNEY - PENSACOLA FL, NORTHERN DISTRICT OF FLORIDA, PENSACOLA, FL.

For STATE OF FLORIDA, STATE OF MONTANA, ROBERT WATINE, MD EX REL, Plaintiffs: ATLEE W WAMPLER, WAMPLER BUCHANAN WALKER ETC - MIAMI FL, MIAMI, FL; BENJAMIN W BEARD, US ATTORNEY - PENSACOLA FL, NORTHERN DISTRICT OF FLORIDA, PENSACOLA, FL.

For CYPRESS HEALTH SYSTEMS FLORIDA INC, Defendant: JACK E FERNANDEZ, MARCOS E HASBUN, ZUCKERMAN SPAEDER LLP - TAMPA FL, TAMPA, FL.

For CYPRESS HEALTH SYSTEMS LLC, Defendant: LEE JOHN HARANG, HOLSONBACK & HARANG PA, TAMPA, FL.

**Judges:** Stephan P. Mickle, Senior United States District Judge.

**Opinion by:** Stephan P. Mickle

| Opinion |
| --- |

## ORDER

THIS CAUSE comes before the Court on a Motion to Dismiss (doc. 26) filed by Defendant Cypress Health Systems LLC (Cypress Wyoming) and a Motion to Dismiss (doc. 31) filed by Defendant Cypress Health Systems Florida, Inc. (Cypress Florida) asking this Court to dismiss Plaintiff Robert Watine's (Plaintiff) *qui tam* Complaint (doc. 1). [1] Plaintiff responded to both, opposing Cypress Wyoming's Motion to Dismiss (doc. 34) and opposing Cypress **[*2]** Florida's Motion to Dismiss (doc. 37). Concurrent with filing his opposition to Cypress Florida's Motion to Dismiss, Plaintiff filed a Motion to Amend his Complaint if Necessary (doc. 38). Both Cypress Wyoming (doc. 40) and Cypress Florida (doc. 39) filed their respective opposition. [2] Based on the following reasons, both defendants' Motions to Dismiss are GRANTED.

## I. BACKGROUND

Plaintiff brings this cause of action, on behalf of the United States, the state of Florida and the state of Montana, pursuant to the provisions of the federal False Claims Act (FCA), *31 U.S.C. §§ 3729-32*, the Florida False Claims Act, *Fla. Stat. §§ 68.081-086*, and the Montana False Claims Act, *MT ST 17-8-406(1)* and *17-8-403(1)(a)* and *(b)*. Specifically, Plaintiff alleges that Defendant Cypress Wyoming and Defendant Cypress Florida engaged in acts, schemes and billing practices with **[*3]** the aim and result of defrauding various government healthcare programs, mainly the United States Medicare Trust Fund as well as Montana Medicaid and Florida Medicaid programs. Cypress Florida, where Plaintiff was employed from March 2008 until April 2008, owns and operates a 40-bed acute care for-profit hospital, known as Nature Coast Regional Hospital, in Williston, Florida. Cypress Wyoming manages, but does not own, a 19-bed rural hospital, known as Powell County Memorial Hospital, in Deer Lodge, Montana.

Medicare establishes a system through which hospitals obtain reimbursement for services they provide to Medicare beneficiaries. To obtain reimbursement, hospitals submit claims of payment to Medicare. These claims are based on discharge summaries prepared when the Medicare beneficiary and hospital patient is discharged from the hospital's service. Medicare pays the hospital a pre-determined amount based on the Diagnosis Related Group (DRG) Code assigned to each patient. Some DRG Codes pay a significantly higher amount than others. Further, where the patient was seen (i.e. the patient's "place of service") will also result in different reimbursement amounts. Plaintiff's allegations **[*4]** of fraud concern the submission of allegedly fraudulent bills to maximize Medicare reimbursements through fraudulent "upcoding" of a patient's DRG Code, fraudulently reporting patient's place of service, and fraudulently churning a patient's diagnosis, testing, treatment and medication.

Throughout his employment with Cypress Florida, Plaintiff alleges that the physicians who worked there were instructed to bill the highest paying DRG Codes for the purpose of receiving the highest amount of reimbursement. As an incentive, the physicians who reported these higher paying, but false, DRG Codes would receive higher bonuses. Plaintiff alleges that the administrative personnel of Cypress Florida, along with posting the highest paying DRG Codes,

---

[1]   As a *qui tam* plaintiff, Watine sues on behalf of the government in this case. The government has decided to not to intervene in this action at this time, but has reserved this right to intervene in the future.

[2]   Because of the overlap between all three motions and respective responses, the Court will respond in one collective order.

also verbally told employees to bill more of these Codes. Plaintiff alleges that he was even directly remonstrated by the hospital administrator, Alan Bird, for failing to follow the fraudulent scheme.

However, Plaintiff was not convinced that such fraudulent billing was actually occurring until the hospital administration asked him to review twenty-five Explanation of Benefits or Medicare Summary Notices (EOBs) and then write a letter to the Medicare [*5] Intermediary appealing the denial of claims. Throughout this process of review, Plaintiff alleges that he was unable to write a single letter appealing the denial of claims because all of the DRG Codes submitted were incorrect.

Plaintiff, on his own initiative, randomly pulled sixteen patient history charts, reflecting a seven year period. These charts, which Plaintiff alleged used DRG Codes that were false but higher paying than the Code that should have been used, had been apparently submitted to Medicare, or another government healthcare program, for reimbursement. Plaintiff asserts that this practice of "upcoding" with false DRG Codes is a violation of the FCA.

Further, Plaintiff alleges that he was encouraged to see patients at the Williston Rehabilitation & Nursing Center, LLC (Nursing Home) several days a week. Plaintiff made these visits weekly. However, Plaintiff alleges that because reimbursements for seeing patients at the hospital were higher than reimbursements for seeing patients at the Nursing Home, Cypress Florida billed these Nursing Home patient visits as if the patient was seen at the hospital. Plaintiff alleges that of the 125 patients that he and another physician [*6] saw at the Nursing Home, all 125 were billed as having been seen at the hospital. Moreover, when Plaintiff asked the administrator Alan Bird why his Nursing Home visits weren't reflected in his physician compensation sheet, Bird replied that the visits were incorporated into the hospital visits.

Finally, Plaintiff alleges that he was constantly berated and admonished for not adhering to the Cypress Florida business plan of fraudulently churning patient visits. Because Medicare would pay a higher reimbursement amount for each office visit a patient made, the business plan was to separate patient diagnosis, testing, surgery, treatment and medication into separate office visits to maximize out-patient clinic revenue. Plaintiff alleges that Bird explained to him the eight step plan for how to conduct this churning.

On April 7, 2009, the Plaintiff provided to the United States Government the information contained in his Complaint pursuant to *31 U.S.C. 3730(b)(2)*. On August 2, 2010, after the Government reviewed the Complaint and decided not to intervene, this Court ordered that the Complaint be served on all defendants.

## II. DISCUSSION

### A. Heightened Pleading

*Standard*

The Federal Rules of Civil [*7] Procedure require that when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." *Fed. R. Civ. P. 9(b)*. This heightened pleading standard applies to actions brought pursuant to the FCA. *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1308-09 (11th Cir. 2002). To meet the standard of pleading with particularity, the "plaintiff must plead facts as to time, place and substance of the defendant's alleged fraud . . . ." *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1357 (11th Cir. 2006) (internal citations omitted). Specifically, this means pleading the "details

of the defendant's allegedly fraudulent acts, when they occurred, and who engaged in them." Id. (internal citations omitted); _United States ex rel._ Cooper v. Blue Cross & Blue Shield of Fla., 19 F.3d 562, 567 (11th Cir. 1994).

Merely pleading false practices or fraudulent schemes alone is insufficient to state a claim pursuant to the FCA. _United States ex rel._ Hopper v. Solvay Pharm., Inc., 588 F.3d 1318, 1328 (11th Cir. 2009). Rather, a plaintiff must show that the government paid, or that the defendant submitted to the government to be paid,  [*8] a false claim. Id. The submission of a false claim is the "_sine qua non_ of a False Claims Act violation." Clausen, 290 F.3d at 1311.

_Cypress Florida_

Plaintiff's claims concerning fraudulent "upcoding" stem from allegations that he overheard conversations concerning the fraudulent billing practice, he was exhorted by a superior telling him to bill higher DRG codes, he was asked to review twenty five EOBs that contained false DRG codes and he performed his own random survey of sixteen patient charts which used false DRG codes. However, none of Plaintiff's allegations reach the requisite level of specificity as required by the _Rule 9(b)_ heightened pleading standard.

With regard to the twenty five EOBs that Plaintiff reviewed, Plaintiff makes general comments concerning their accuracy, and as to a select few, specifically cites reasons for the errors, but does not provide any specific details about their allegedly false submission to a government healthcare program. The EOBs were not attached to Plaintiff's complaint and Plaintiff has failed to allege the amount of the claims, who submitted the claims, and when the claims were submitted. Although in Plaintiff's review of the EOBs he allegedly  [*9] could find no support for the use of the higher paying DRG codes, by failing to allege the details concerning how these EOB claims were actually submitted, Plaintiff has failed to meet the heightened pleading standard. Plaintiff has failed to include the "details of the defendant's allegedly fraudulent acts, when they occurred, and who engaged in them." Atkins, 470 F.3d at 1357 (internal citations omitted).

Similarly, Plaintiff's allegations concerning the sixteen patient charts he reviewed are insufficient. Plaintiff alleges that the improper DRG code was used when diagnosing the patient. However, Plaintiff fails to allege the particulars surrounding the submission of claims to a government healthcare program as a result of the improper use of these DRG codes. Without these details, Plaintiff cannot meet _Rule 9(b)_'s heightened pleading standard.

Plaintiff's second main allegation of fraud concerns false place of service claims. Plaintiff bases these allegations of fraudulent false place of service on two attached records reflecting two patient visits made by Plaintiff. However, these records are internally-generated records and Plaintiff provides no details as to how these claims were  [*10] submitted, when the claims were submitted, and to whom these claims were submitted. Plaintiff provides no indication as to how these records were billed. The only detail that Plaintiff includes is a reference to a general header that says "Clinic Outpatient Record." The attached exhibits themselves make no account for how these claims were submitted and even if the claims were submitted.

Plaintiff also attached a compensation sheet to support his allegations of false place of service claims. Regarding this sheet, Plaintiff alleges that Bird explained that no nursing home visits were recorded on the compensation sheet because they were incorporated into out-patient clinic visits. However, this explanation only attests to a general scheme of fraud. Plaintiff does not provide any details concerning actually submitted claims in connection with the alleged fraudulent place of service nursing home visits. Allegations of a fraudulent scheme, alone, are not enough to meet the heightened pleading standard, see Hopper, 588 F.3d at 1328, and without the requi-

site details as to the claims' submission, these allegations fail to plead with particularity as required by *Rule 9(b)*.

Plaintiff's final  **[*11]** allegation of fraudulent churning is supported only by the allegation that he was berated by Bird for not fraudulently churning patients. Plaintiff alleges that Bird then explained the "business plan" for why and how churning should occur. However, although Plaintiff alleges he was told the particulars of the fraudulent scheme, Plaintiff again fails to include the details of any falsely submitted claims for payment based on this scheme. Standing alone, allegations of an improper billing scheme, which may result in the submission of false claims, is not enough to satisfy *Rule 9(b)*. See *United States ex rel. Hopper v. Solvay Pharm., Inc.*, 590 F. Supp. 2d 1352, 1359 (M.D. Fla. 2008) (finding that it is not the law of the Eleventh Circuit that allegations of false or fraudulent claims "from which it can be inferred that a false claim was submitted to government" satisfy *Rule 9(b)*'s pleading with particularity requirement), aff'd *588 F.3d 1318 (2009)*, cert. denied *130 S. Ct. 3465, 177 L. Ed. 2d 1055 (2010)*. Since Plaintiff has failed to allege the particulars of any claim falsely submitted under this scheme of fraudulently churning patients, Plaintiff has failed to adequately plead fraudulent churning as required  **[*12]** by *Rule 9(b)*.

Similar to the pleading the court found insufficient in <u>Atkins</u>, Plaintiff "portrays the scheme and then summarily concludes that the defendants submitted false claims to the government for reimbursement." *Atkins*, 470 F.3d at 1359. By failing to show that Cypress Florida "*actually submitted* reimbursement claims for the services he describes," Plaintiff has failed to meet the standard to plead fraud with particularity. <u>Id.</u> (emphasis in original). Thus, Plaintiff has failed to state a cause of action against Cypress Florida upon which relief could be granted.

*Cypress Wyoming*

Necessarily, because Plaintiff has failed to plead with particularity against Cypress Florida, Plaintiff's allegations also fail to meet the heightened pleading standard of *Rule 9(b)* as to Cypress Wyoming. All of Plaintiff's allegations against Cypress Wyoming are based off of allegations against Cypress Florida. Since those allegations are deficient, there are no claims against Cypress Wyoming upon which Plaintiff can state a cause of action.

Moreover, even if all of Plaintiff's allegations against Cypress Florida were sufficient, Plaintiff would still fail to meet the heightened pleading standard as to  **[*13]** Cypress Wyoming. Plaintiff has no independent or specific allegations linking Cypress Wyoming to the actions of Cypress Florida. In fact, Plaintiff has no real allegations against Cypress Wyoming at all. All of the patient files, the review of the Medicare appeals, and the generalized fraudulent scheme occur at the hospital owned by Cypress Florida.

These allegations fail to specifically allege fraud against Cypress Wyoming and fail to allege the details of any fraudulently submitted claims. Indeed, Plaintiff's only real reference to Cypress Wyoming is a statement made by Bird who allegedly stated that Cypress Wyoming doctors, who were a part of the Cypress "system," received the highest bonuses by following the same fraudulent scheme in place at Cypress Florida. Yet, as stated by the Eleventh Circuit, "[i]mproper practices standing alone are insufficient to state a claim" under the FCA. *Hopper*, 588 F.3d at 1328. Accordingly, because Plaintiff has failed to meet the heightened pleading standard set in place by *Rule 9(b)*, Plaintiff has failed to state a cause of action against Cypress Wyoming upon which relief could be granted.

**B. Subject Matter Jurisdiction**

2011 U.S. Dist. LEXIS 74768, *13

Cypress Wyoming argues that **[*14]** to bring suit under the FCA, the Plaintiff must allege fraud from an original source of the information. *31 U.S.C. 3730(e)(4)(A)*. However Cypress Wyoming is incorrect in this assertion. The original source requirement only applies if Plaintiff's allegations were similar to or substantially the same as allegations which were publicly disclosed. Id. The Eleventh Circuit has held that the ″′original source′ inquiry only becomes necessary once a court makes a factual determination that the particular *qui tam* suit before it was based upon information that was publicly disclosed.″ *United States ex rel. Williams v. NEC Corp., 931 F.2d 1493, 1500 (11th Cir. 1991)*. Since there are no assertions that Plaintiff relied upon publicly disclosed information, this Court does not reach the question of whether Plaintiff was an original source of that information.

Cypress Wyoming's attempt to make an argument for lack of subject matter jurisdiction is better suited for discussion concerning the pleading standard of *Rule 9(b)*. What Cypress Wyoming is really challenging is the sufficiency of Plaintiff's allegations, rather than this Court's power to hear Plaintiff's case. In asserting that Plaintiff has **[*15]** ″never worked at, and was never affiliated with, the hospital operated by Cypress Wyoming″ and that due to this Plaintiff's allegations are ″predictive and speculative,″ Cypress Wyoming is merely restating its argument that Plaintiff has failed to plead with particularity as required by *Rule 9(b)*. This Court has dealt with those arguments above and cannot now say that it lacks subject matter jurisdiction as to Cypress Wyoming in the instant case.

## C. Lack of Connection to Cypress Wyoming

Plaintiff's Complaint also fails to show that Cypress Wyoming is in fact the same entity as Cypress Florida. Plaintiff's allegations on this point are tenuous at best. The only reference of fraud made by Plaintiff to Cypress Wyoming is a comment made by the administrator of the Cypress Florida hospital, Bird. Bird allegedly stated that doctors in the Cypress ″system,″ and who were employed at the hospital managed by Cypress Wyoming, get the highest bonuses by following the same fraudulent scheme in place at Cypress Florida. As stated above, that allegation fails to meet the heightened pleading standard of *Rule 9(b)*. And, although Plaintiff does allege that the current administrator and a few key personnel **[*16]** of Cypress Florida also happen to be members or executive officers of Cypress Wyoming, Plaintiff does not allege any facts which would establish that the two entities are indeed the same entity. Without such a showing, and without any independent allegations against Cypress Wyoming, Plaintiff has failed to show that Cypress Wyoming should be joined as a party in this action. [3]

Moreover, Plaintiff's Motion to Amend fails to adequately add any allegations which would satisfy a showing that Cypress Wyoming should be joined to this litigation. Because of these deficiencies, it is improper for this Court to continue to **[*17]** include Cypress Wyoming as a party to this lawsuit. Therefore, the dismissal of Plaintiff's Complaint as against Cypress Wyoming is with prejudice.

## D. Attorneys' Fees

Pursuant to the FCA, this Court may award attorneys' fees to a defendant if the defendant prevails and the plaintiff's action was ″clearly frivolous, clearly vexatious, or brought primarily for pur-

---

[3]   Because Plaintiff has failed to show that Cypress Wyoming is a proper party to this action, Plaintiff cannot use the jurisdictional grant of *31 U.S.C. § 3732* to establish jurisdiction. Consequently, and because Plaintiff has failed to show Cypress Wyoming has any minimum contacts with this forum, this Court also cannot say it has personal jurisdiction over Cypress Wyoming. This Court does not reach the question of venue as that is a question of convenience for the litigants decided only after this Court's power to hear the case has been affirmatively established.

poses of harassment." *31 U.S.C. 3730(d)(4)*. Although both Cypress Wyoming and Cypress Florida have shown that Plaintiff's pleading is inadequate, neither deserves an award of attorneys' fees. Plaintiff's complaint was not clearly frivolous or vexatious. As against Cypress Florida, this is revealed through Plaintiffs inadequate yet strong allegations. Plaintiff does need to cure his allegations, specifying the particulars of his allegations against Cypress Florida, to bring his Complaint within the requisite pleading standard; however such cure is not beyond mere amendments to his Complaint. Cypress Florida is not entitled to an award of attorneys' fees.

Against Cypress Wyoming, Plaintiff's allegations are severely lacking in showing that Cypress Wyoming and Cypress Florida are the same entity. Indeed, Plaintiff has failed to show **[*18]** why Cypress Wyoming should even be a joined as a party to this litigation. However, this Court finds that this error is more ascribed to Plaintiff's mistake than it is to clear frivolousness or intentional harassment. Therefore, an award for Cypress Wyoming's attorneys' fees would not be proper.

### E. Leave to Amend

Because the dismissal of Plaintiff's Complaint against Cypress Wyoming is with prejudice, this Court will not grant the Plaintiff leave to amend as to Cypress Wyoming. However, Plaintiff's allegations as against Cypress Florida are not outside the realm of cure. Plaintiff adequately addresses the deficiencies of his allegations as to the sixteen patient charts by including the specific billing details that Plaintiff failed to include in his original complaint. However, for Plaintiff's allegations concerning false place of service and churning, Plaintiff must produce the details of the claims submitted to a government healthcare program. In Plaintiff's Motion to Amend, Plaintiff includes the additional nursing home and outpatient records he will produce. However, these records must reveal the "facts as to time, place and substance of the defendant's alleged fraud," *Atkins*, 470 F.3d at 1357 **[*19]** (citation omitted), if they are to survive *Rule 9(b)*'s heightened pleading standard. Accordingly, this Court grants Plaintiff leave to amend his Complaint as against Cypress Florida, and thus the dismissal of Plaintiff's Complaint as against Cypress Florida is without prejudice.

### IV. ORDER

Based on the foregoing it is hereby ORDERED and ADJUDGED that

   1. Defendant Cypress Florida's Motion to Dismiss (doc. 31) is GRANTED, and Plaintiff's Complaint as to Cypress Florida is dismissed without prejudice.

   2. Defendant Cypress Wyoming's Motion to Dismiss (doc. 26) is GRANTED, and Plaintiff's Complaint as to Cypress Wyoming is dismissed with prejudice.

   3. Plaintiff's Motion to Amend Complaint (doc. 38) is GRANTED as to Cypress Florida and DENIED as to Cypress Wyoming.

DONE and ORDERED on this 12th day of July, 2011.

/s/ *Stephan P. Mickle*

Stephan P. Mickle

Senior United States District Judge