IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff-Intervenor, ) | |
| ) | |
| v. ) | CIVIL ACTION 4:12-CV-2676 |
| ) | |
| AMERICUS MORTGAGE ) | |
| CORPORATION, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## APPENDIX TO DEFENDANTS' MOTION TO STRIKE

**Munsch Hardt Kopf & Harr, P.C.**          **Of Counsel**

Fred Wahrlich                                          WEINER BRODSKY SIDMAN KIDER PC
Texas Bar No. 20666500                          Mitchel H. Kider (*Pro hac vice*)
SD No. 248                                              David M. Souders (*Pro hac vice*)
700 Louisiana Street, Suite 4600             Bruce E. Alexander (*Pro hac vice*)
Houston, Texas 77002-2732                    1300 19th Street, N.W. 5th Floor
Tel:  (713) 222-1469                                Washington, DC 20036
Fax: (713) 222-5869                                Tel:  (202) 628-2000
fwahrlich@munsch.com                           Fax:  (202) 628-2011
**ATTORNEYS-IN-CHARGE FOR**          kider@wbsk.com
**DEFENDANT Jim C. Hodge**                 souders@wbsk.com
                                                              alexander@wbsk.com

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................ i

*Bayou Fleet P'ship, LLC v. St. Charles Parish,*
    No. 10-1557, 2011 U.S. Dist. LEXIS 73867
    (E.D. La. Jul. 8, 2011)................................................................DA1

*Doe I v. Roman Catholic Diocese*,
    No. H-05-1047, 2006 U.S. Dist. LEXIS 58347
    (S.D. Tex. Aug. 18, 2006)......................................................... DA7

*In re Beef Indus. Antitrust Litig.*,
    600 F.2d 1148 (5th Cir. 1979) ................................................. DA15

*Marceaux v. Lafayette Consol. Gov't*,
    No. 6:12-CV-01532, 2012 U.S. Dist. LEXIS 150922
    W.D. La. Oct. 18, 2012)........................................................... DA37

28 TAC § 15.2 ........................................................................... DA42



**User Name:** 40NH4QT
**Date and Time:** Nov 20, 2012 19:21 EST
**Job Number:** 1466218

## Document(1)

1. Bayou Fleet P'ship, LLC v. St. Charles Parish, 2011 U.S. Dist. LEXIS 73867
   **Client/matter:** 94088.022

LexisNexis® | About LexisNexis | Privacy Policy | Terms & Conditions | Copyright © 2012 LexisNexis.




Positive
As of: November 20, 2012 7:21 PM EST

# Bayou Fleet P'ship, LLC v. St. Charles Parish

United States District Court for the Eastern District of Louisiana
July 8, 2011, Decided; July 8, 2011, Filed
CIVIL ACTION NO. 10-1557 SECTION ″B″(3)

**Reporter:** 2011 U.S. Dist. LEXIS 73867; 2011 WL 2680686

BAYOU FLEET PARTNERSHIP, LLC versus ST. CHARLES PARISH

**Notice:**

**Subsequent History:** Partial summary judgment granted by Bayou Fleet P'ship, L.L.P. v. St. Charles Parish, 2011 U.S. Dist. LEXIS 99740 (E.D. La., Aug. 30, 2011)

**Prior History:** Bayou Fleet P'ship, L.L.P. v. St. Charles Parish, 2011 U.S. Dist. LEXIS 4512 (E.D. La., Jan. 12, 2011)
Bayou Fleet, Inc. v. Alexander, 234 F.3d 852, 2000 U.S. App. LEXIS 29718 (5th Cir. La., 2000)

---

| Core Terms |
| --- |

zoning, state law, batture, rezoned, motion to strike, ripe, substantive due process, neighboring, stricken, substantive due process claim, protected property interest, equal protection claim, motion to dismiss, property interest, tracts, discretionary immunity, exhaust

**Counsel:** **[\*1]** For Bayou Fleet Partnership LLP, Plaintiff, Counter Claimant: J. Mac Morgan, LEAD ATTORNEY, Law Office of J. Mac Morgan, New Orleans, LA.

For St. Charles Parish, Defendant, Counter Claimant: Alan A. Zaunbrecher, LEAD ATTORNEY, Zaunbrecher Treadaway, LLC (Metairie), Lakeway II, Metairie, LA; Christine E. Bergeron, Michelle Marie O'Daniels, Zaunbrecher Treadaway, LLC (Covington), Covington, LA.

**Judges:** Ivan R. Lemelle, United States District Judge.

**Opinion by:** Ivan R. Lemelle

---

| Opinion |
| --- |

## ORDER AND REASONS

Before the Court is Defendant's Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (Rec. Doc. No. 28), and Plaintiff's Motion to Strike Defendant's State Law Defenses pursuant to Federal Rule of Civil Procedure 12(f) (Rec. Doc. No. 22), both of which are opposed (Rec. Doc. Nos. 27, 34). For the following reasons,

**IT IS ORDERED** that Defendant's Motion to Dismiss (Rec. Doc. No. 28) is **DENIED**;

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Strike Defendant's State Law Defenses (Rec. Doc. No. 22) is **GRANTED IN PART** and **DISMISSED IN PART.**

Plaintiff owns four tracts of Mississippi River batture property located along the Lower Mississippi River in St. Charles Parish. Rec. Doc. No. 28-1, at 1; **[\*2]** Rec. Doc. No. 34, at 1. Before St. Charles Parish (″the Parish″) ad-

2011 U.S. Dist. LEXIS 73867, *4

opted its Comprehensive Zoning Ordinance, Plaintiff's batture property had been used for various industrial activities, including aggregate storage and distribution facilities, sand pit extraction, and shipyard facilities. Rec. Doc. No. 28-1, at 1-2; Rec. Doc. No. 1, at 3. With the adoption of the Parish's Comprehensive Zoning Ordinance, all of Plaintiff's tracts were zoned B-1 (a non-industrial batture district), and the previous industrial uses of Plaintiff's property became classified as non-conforming uses. Rec. Doc. No. 28-1, at 2; Rec. Doc. No. 1, at 3.

The Comprehensive Zoning Ordinance also established a B-2 zoning classification for batture property, which created an industrial batture district and only prohibited batture property from being used for medical waste storage, treatment, or disposal facilities. Rec. Doc. No. 1, at 3-4. Plaintiff asserts that its neighboring batture property, which had historically been utilized for the same types of economic activity, applied for and was granted a rezoning from B-1 to B-2 in 1996 and 1999. Rec. Doc. No. 28-1, at 2; Rec. Doc. No. 34, at 1; Rec. Doc. No. 1, at 4-5.  [*3] However, in 2003, and again in 2009, Plaintiff applied to have its property rezoned from B-1 to B-2, which the Parish denied. Rec. Doc. No. 1, at 5-6. Plaintiff filed its Complaint against the Parish on May 25, 2010, alleging violations of substantive due process and equal protection pursuant to 42 U.S.C. § 1983, claiming that the Parish "arbitrarily or capriciously engaged in reverse spot zoning, by singling out the plaintiff's four tracts of batture property for different, less favorable, treatment, than the neighboring batture property." Rec. Doc. No. 1, at 6-7.

The Parish previously filed a motion to dismiss Plaintiff's Complaint based on prescription, and this Court granted the motion as it related to the 2003 denial, but denied the motion regarding the 2009 request. See Rec. Doc. Nos. 6, 13. The Parish then filed its Answer to Plaintiff's Complaint on January 31, 2011. See Rec. Doc. No. 15. In early February 2011, Plaintiff filed a Supplemental and Amending Complaint, which added the Parish's denial of Plaintiff's third application for rezoning of its property in 2010 as a new claim, additionally sought a "permanent mandatory injunction," and increased the monetary damage demand.  [*4] See Rec. Doc. No. 19.

## I. Motion to Dismiss

The Parish filed the instant motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), alleging that both of Plaintiff's Complaints fail to state the essential elements of either substantive due process or equal protection and should therefore be dismissed. Rec. Doc. No. 28, at 1; Rec. Doc. No. 28-1, at 4. The Parish asserts that Plaintiff has not articulated a constitutionally protected property interest, legitimate claim of entitlement, or any justifiable expectation that its property would be rezoned, which is necessary to sustain a substantive due process claim in this context. Rec. Doc. No. 28-1, at 4-5. Further, the Parish argues that without this prerequisite property interest, Plaintiff's substantive due process allegations completely overlap its equal protection claim, and therefore, the Court should dismiss Plaintiff's substantive due process claim and analyze the facts and allegations only with regard to the alleged equal protection violation. Id. at 6-7. Finally, the Parish contends that Plaintiff has failed to adequately allege that the neighboring batture property allowed to be rezoned was substantially similar to  [*5] Plaintiff's property in order to maintain an equal protection claim based on a "class of one" theory. Id. at 7-9.

Plaintiff first urges that the Parish's motion is untimely to the extent it seeks a dismissal of the claims set forth in Plaintiff's original Complaint, as the motion was filed after the Parish filed its Answer to the original Complaint, and pursuant to Rule 12(b), a 12(b)(6) motion must be made prior to the filing of the Answer. Rec. Doc. No. 34, at 4. Plaintiff additionally contends that it has sufficiently alleged a protected property interest, as ownership in and use and enjoyment of real property has been held to be a protected property interest worthy of due process protection and moreover, in limited circumstances, such a property interest includes not only what is owned but also what is sought. Id. at 5-6. Plaintiff further maintains that it has a protected property interest in and legitimate entitlement to a rational zoning decision, since under Louisiana law, a local governmental body has no authority or discretion to engage in irrational, arbitrary, or capricious reverse spot zoning, which is alleged here. Id. at 7. Accordingly, Plaintiff asserts that it has adequately  [*6] pled the prerequisite protected property interest for its substantive due process claim, and therefore, the claim cannot be subsumed by its additional equal protection claim and should not be dismissed. Id. at 8. Plaintiff further argues that it has sufficiently stated a claim for equal protection based on a "class of one" theory, as it clearly alleges in both its original and Supplemental and Amending Complaint that its property and its neighbors' property were similarly situated with the same historical uses, yet the Parish rezoned the neighboring property but refused to rezone Plaintiff's. Id. at 11.

*A. Motion to Dismiss Standard*[1]

---

[1]   While Plaintiff correctly contends that a Rule 12(b) motion must be filed before responsive pleadings, a motion to dismiss for failure to state a claim filed after the answer may be treated as a 12(c) motion for judgment on the pleadings based on a failure to state a claim on which relief may be granted, which may be filed after the pleadings are closed. *Jones v. Greninger*, 188 F.3d 322,

2011 U.S. Dist. LEXIS 73867, *6

When reviewing a motion to dismiss, courts must accept all well-pleaded facts as true and view them in the light most favorable to the non-moving party. *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). However, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). " 'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.' " *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)) (internal quotation marks omitted). The Supreme Court in *Iqbal* explained that *Twombly* promulgated a "two -pronged approach" to determine whether a complaint states a plausible claim for relief. *Iqbal*, 129 S.Ct. at 1950. First, [*8] courts must identify those pleadings that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* Legal conclusions "must be supported by factual allegations." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 1949.

Upon identifying the well-pleaded factual allegations, courts then "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 1950. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949. This is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* The plaintiffs must "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

*B. Plaintiff's Substantive Due Process Claim*

In order to establish a substantive due process violation, a plaintiff must first show the existence of a constitutionally protected property right to which the Fourteenth Amendment's due process protection [*9] applies. *Simi Inv. Co., Inc. v. Harris County, Tex.*, 236 F.3d 240, 249-50 (5th Cir. 2000); *McCachren v. U.S. Dept. Of Agriculture, Farmers Home Administration*, 599 F.2d 655 (5th Cir. 1979). The United States Supreme Court has explained that property interests, for the purposes of the due process clause, are created and defined by existing rules or understandings that stem from an independent source such as state law. *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972). The Court further stated that a protected property interest requires more than a person's abstract need, desire, or unilateral expectation of it; one must instead have a legitimate claim of entitlement to it. *Id.* In addition, although the existence of a property interest must be decided initially by reference to state law, federal constitutional law determines whether that interest rises to the level of entitlement protected by the due process clause. *Shawgo v. Spradlin*, 701 F.2d 470, 475 (5th Cir. 1983) (citing *Winkler v. County of DeKalb*, 648 F.2d 411, 414 (5th Cir. 1981)).

Plaintiff claims it has a protected property interest in a legitimate zoning decision, as Louisiana law prohibits irrational reverse [*10] spot zoning. Rec. Doc. No. 34, at 7. Indeed, in *Shelton v. City of College Station*, 754 F.2d 1251 (5th Cir. 1985), the United States Fifth Circuit Court of Appeals, in considering a substantive due process claim under § 1983 in connection with the denial of a zoning variation, found that because Texas law recognizes the right of an owner not to have his use of his property arbitrarily restricted, and further allows this right to be judicially enforced, such right "is, in our view, sufficiently a property right - a 'legitimate claim of entitlement' - that the arbitrary deprivation thereof implicates an invasion of Fourteenth Amendment due process rights." *Shelton*, 754 F.2d at 1256-57 (citing *Roth, supra*, 408 U.S. at 577; *Perry v. Sindermann*, 408 U.S. 593, 599-603, 92 S. Ct. 2694, 33 L. Ed. 2d 570 (1972)). The court specifically focused on the fact that Texas law provided a judicial remedy for property owners aggrieved by an arbitrary and unreasonable zoning action by a municipal agency, including where, through arbitrary and discriminatory exercise of the power to deny zoning applications, the municipal actor deprives the owner of a property interest of a business use of his property that is permitted to others similar [*11] situated. *Shelton*, 754 F.2d at 1256 (internal citations omitted). [2]

Louisiana similarly recognizes and allows judicial redress for arbitrary and capricious zoning decisions made by municipalities, including where the denial of a rezoning request results in a plaintiff being treated differently than those whose rezoning requests have been granted, thereby resulting in "reverse spot zoning." *See, e.g., Four States Re-*

---

324 (5th Cir. 1999). We therefore construe the Parish's motion to dismiss, to the extent it challenges the claims raised in Plaintiff's original Complaint, as one for judgment [*7] on the pleadings under 12(c). The Fifth Circuit applies the same standard for a motion to dismiss under Rule 12(c) as it does for a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Jones*, 188 F.3d at 324; *see also Oakville Community Action Group v. Industrial Pipe, Inc.*, 2003 U.S. Dist. LEXIS 22808, 2003 WL 22990719, *1-*2 (E.D.La. 2003).

[2]   Although rehearing en banc was held in this matter, the court did not address the issue of defining the property right in question, as it found that there was a rational basis for the zoning decision made, thereby precluding a substantive due process claim. *See Shelton v. City of College Station*, 780 F.2d 475, 477, 479 (5th Cir. 1986).

2011 U.S. Dist. LEXIS 73867, *11

*alty Co. v. City of Baton Rouge*, 309 So. 2d 659 (La. 1975); *Jenniskens v. Parish of Jefferson*, 940 So.2d 209 (La. App. 5 Cir. 2006); *Cook v. Metropolitan Shreveport Bd. of Appeals*, 339 So.2d 1225 (La. App. 2 Cir. 1976); *Sears, Roebuck & Company v. City of Alexandria*, 155 So.2d 776 (La. App. 3 Cir. 1963). Accordingly, at this stage in the proceedings, Plaintiff has set forth a plausible constitutionally protected property interest sufficient to **[*12]** prevent dismissal of its substantive due process claim.

*C. Plaintiff's Equal Protection Claim*

To establish an equal protection claim based on a "class of one" theory, the plaintiff must show that he or she was treated differently from others similarly situated and there was no rational basis for the difference in treatment. *Stotter v. Univ. of Tex. at San Antonio*, 508 F.3d 812, 824 (5th Cir. 2007) (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000)). The Parish asserts that Plaintiff has failed to provide sufficient facts in its Complaint to support its claim that the tracts of land at issue are substantially similar. Rec. Doc. No. 28-1, at 9. However, Plaintiff specifically alleges in its Complaint that before the Parish adopted its Comprehensive Zoning Ordinance, which created the classifications of non-industrial and industrial batture districts, its neighboring tracts of batture property - the Home Place Tract and the Giambelluca Tract - had been used for the same industrial uses as Plaintiff's property, which among other uses included aggregate storage and distribution facilities, sand pit extraction, storage and distribution facilities, and shipyard facilities. Rec. **[*13]** Doc. No. 1, at 2-3. Additionally, Plaintiff's Complaint provides that when the Parish adopted its Comprehensive Zoning Ordinance, Plaintiff's property, the Home Place Tract, and the Giambelluca Tract were all zoned B-1; however, when the latter tracts applied to be rezoned from B-1 to B-2, such requests were granted, while Plaintiff's were repeatedly denied. *Id.* at 3-6. Accepting these facts as true and viewing them most favorably to Plaintiff, the Complaint sufficiently alleges that Plaintiff's property was treated differently than its neighboring property, which in light of the pertinent characteristics at issue here can be considered similarly situated. Accordingly, the Parish's Motion to Dismiss Plaintiff's equal protection claim is also denied.

## II. Motion to Strike

Plaintiff urges this Court to strike the Parish's three state law defenses raised in its answer. Rec. Doc. No. 22. Specifically, Plaintiff asserts that the Parish's state law discretionary immunity defense should be stricken because the defenses to a § 1983 claim are defined and controlled by federal, not state, law. Rec. Doc. No. 22-1, at 2-3. Similarly, Plaintiff argues that the Parish's state law jury trial limitation **[*14]** defense should be stricken because the right to a jury trial in federal court presents a question of federal law, even when a state statute would preclude a jury trial in state court. *Id.* at 3. Plaintiff further maintains that this Court should strike the Parish's allegation that Plaintiff's lawsuit is premature for failure to exhaust all administrative remedies provided in the Parish Code of Ordinances, as exhaustion of state administrative remedies is not a prerequisite to a § 1983 action. *Id.* at 4. Plaintiff claims that to the extent the Parish argues that the suit is not ripe because Plaintiff is essentially pursuing a takings claim, such contention should be stricken, because Plaintiff does not allege a takings claim, but only substantive due process and equal protections claims, which are clearly ripe. Rec. Doc. No. 33, at 3-6. Finally, Plaintiff contends that to the extent the Parish seeks to challenge Plaintiff's Supplemental and Amending Complaint on the basis of failure to exhaust administrative remedies, such issue is not properly before the Court at this time since the Parish has not yet filed its answer to the Supplemental and Amending Complaint. *Id.* at 7.

The Parish contends **[*15]** that because Plaintiff's Complaint invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367, thereby implying that its allegations include potential state law claims, the Parish's state law discretionary immunity defense should not be stricken at this time. Rec. Doc. No. 27, at 1-4. The Parish, however, concedes that Plaintiff is entitled to a trial by jury on its § 1983 claims to the extent those claims seek legal damages. *Id.* at 4. Additionally, the Parish argues that its ripeness defense based on Plaintiff's failure to exhaust all administrative remedies provided in the Parish's Code of Ordinances should be allowed because Plaintiff's Supplemental and Amended Complaint contains factual allegations and claims that have not first been submitted to the St. Charles Parish Council. *Id.* at 5. The Parish further asserts that Plaintiff's damage demand is "for all intents and purposes a Fifth Amendment takings claim," which requires a litigant to pursue available state law remedies prior to seeking relief in federal court, and therefore Plaintiff's claims are not ripe and the Parish's defense based on such should not be stricken. *Id.* at 5-7.

*A.* **[*16]** *Motion to Strike Standard*

Rule 12(f) allows the Court to strike "from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." The purpose of this rule is to streamline the pleadings and the litigation and to avoid unnecessary inquiry into immaterial matters. *McInerney v. Moyer Lumber & Hardware, Inc.*, 244 F. Supp. 2d 393,

2011 U.S. Dist. LEXIS 73867, *16

402 (E.D. Pa. 2002). Immateriality is established by showing the challenged allegations "can have no possible bearing upon the subject matter of the litigation." *Sadler v. Benson Motors Corp.*, 1997 U.S. Dist. LEXIS 7118, 1997 WL 266735, at *1 (E.D. La. 1997) (quoting *Succession of Wardlaw v. Whitney Nat'l Bank*, 1994 U.S. Dist. LEXIS 12349, 1994 WL 479183, at *1 (E.D. La. 1994)). Although motions to strike are disfavored and infrequently granted, striking certain allegations can be appropriate when they "have no possible relation to the controversy and may cause prejudice to one of the parties." *McInerney*, 244 F. Supp. 2d at 402; *see also Berry v. Lee*, 428 F. Supp. 2d 546, 563 (N.D. Tex. 2006); *Boreri v. Fiat S.p.A.*, 763 F.2d 17, 23 (1st Cir. 1985).

*B. Discretionary Immunity Defense (La. R.S. 9:2798.1)*

The Parish maintains that its state law discretionary immunity defense should  **[*17]** not be stricken because Plaintiff's Complaint has invoked the supplemental jurisdiction of this Court thereby suggesting that some of Plaintiff's claims may arise from state law. Rec. Doc. No. 27, 1-4. Plaintiff, however, has not asserted any state law claims; instead, its original and Supplemental and Amending Complaint only allege causes of action under § 1983, based on the Parish's purported violation of Plaintiff's federal Fourteenth Amendment substantive due process and equal protection rights. *See* Rec. Doc. Nos. 1, 19. As "conduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 [] cannot be immunized by state law," [3] the Parish's state law discretionary immunity defense has no bearing upon the subject matter of the litigation, and therefore Plaintiff's motion to strike this defense is granted.

*C. Jury Trial Limitation (La. R.S. 13:5105)*

As set forth above, the Parish concedes that Plaintiff is entitled to a trial by jury on its § 1983 claims to the extent those claims seek legal damages. Rec. Doc. No. 27, at 4. Accordingly, Plaintiff's  **[*18]** motion to strike the Parish's state law jury trial limitation defense is granted.

*D. Ripeness of Plaintiff's Claims Based on Failure to Exhaust Administrative Remedies*

The Parish argues that it should be allowed to assert its ripeness defense based on Plaintiff's failure to exhaust all administrative remedies provided in the Parish's Code of Ordinances because Plaintiff is in reality asserting a Fifth Amendment takings claim, which requires a Plaintiff to seek compensation through available state court procedures before pursuing a federal court action. Rec. Doc. No. 27, at 5-7. The Parish also asserts that Plaintiff's Supplemental and Amending Complaint contains hypothetical allegations of applications and denials that have not even been before the St. Charles Parish Council for decision. *Id.* at 4-5.

With respect to the Parish's contention that Plaintiff is in actuality asserting a takings claim under the Fifth Amendment, Plaintiff's motion to strike the Parish's defense of ripeness is granted. Plaintiff has not, in either its original Complaint or Supplemental and Amending Complaint, stated or implied a takings claim under the Fifth Amendment. *See* Rec. Doc. Nos. 1, 19. Indeed, Plaintiff  **[*19]** has consistently only asserted claims pursuant to § 1983 for the Parish's alleged violation of Plaintiff's Fourteenth Amendment substantive due process and equal protection rights. *Id.* Because Plaintiff has not alleged a takings claim, explicitly or otherwise, the Parish's ripeness defense premised on Plaintiff's "mischaracterization" of its causes of action is immaterial and is hereby stricken.

However, considering the Parish's alternative assertion that certain allegations contained in Plaintiff's Supplemental and Amending Complaint are not ripe for review, the Court finds that this issue is not properly before it at this time, as the Parish has yet to file its Answer to the Supplemental and Amending Complaint asserting such defense. Accordingly, to the extent that this issue has been raised, Plaintiff's motion to strike is dismissed without prejudice to re-urge on a timely basis.

New Orleans, Louisiana, this 8th day of July, 2011.

/s/ Ivan R. Lemelle

United States District Judge

---

[3] *Martinez v. California*, 444 U.S. 277, 284 n.8, 100 S. Ct. 553, 62 L. Ed. 2d 481 (1980) (citing *Hampton v. Chicago*, 484 F.2d 602, 607 (7th Cir. 1973)).



**User Name:** 40NH4QT
**Date and Time:** Nov 20, 2012 18:08 EST
**Job Number:** 1465625

## Document(1)

1.  Doe I v. Roman Catholic Diocese, 2006 U.S. Dist. LEXIS 58347
    **Client/matter:** 94088.022







Neutral
As of: November 20, 2012 6:08 PM EST

# Doe I v. Roman Catholic Diocese

United States District Court for the Southern District of Texas, Houston Division
August 18, 2006, Decided ; August 18, 2006, Filed
CIVIL ACTION NO. H-05-1047

**Reporter:** 2006 U.S. Dist. LEXIS 58347; 2006 WL 2413721

JOHN DOE I, JOHN DOE II, and JOHN DOE III, Plaintiffs, vs. ROMAN CATHOLIC DIOCESE OF GALVES-
TON-HOUSTON, et al., Defendants.

**Notice:**

**Subsequent History:** Summary judgment granted, in part, summary judgment denied, in part by, Motions ruled
upon by Doe v. Roman Catholic Diocese of Galveston-Houston, 2007 U.S. Dist. LEXIS 71330 (S.D. Tex., Sept. 26,
2007)

**Prior History:** Doe v. Roman Catholic Diocese of Galveston-Houston, 408 F. Supp. 2d 272, 2005 U.S. Dist. LEXIS
39492 (S.D. Tex., 2005)

---

| Core Terms |
| --- |

motion to strike, misrepresentation, second amended complaint, affirmative defense, priests, sexual, motion to
dismiss, seminarians, fraudulent, child abuse, amended complaint, fraudulent concealment, prior ruling, fiduciary,
misrepresentation claim, vicarious liability, gross negligence, move to strike, religious

**Counsel:** **[*1]** For John Doe I, John Doe II, John Doe III, John Doe IV, Plaintiffs: Tahira Khan Merritt, Attorney
at Law, Dallas, TX.

For The Archdiocese of Galveston-Houston, Defendant: Phillip B Dye, Jr., Robert M Schick, Joel E Mafrige, Vinson
& Elkins, Houston, TX.

For Joseph A Fiorenza, Individually and as Archbishop (now former) of the Roman Catholic Diocese of Galveston-
Houston, William Pickard, The Archdiocese of Galveston-Houston, Defendants: Phillip B Dye, Jr., Robert M Schick,
Joel E Mafrige, Vinson & Elkins, Houston, TX; Jennifer Heather Davidow, Vinson and Elkins LLP, Houston, TX.

For Roman Catholic Diocese of Galveston-Houston, Defendant: Robert M Schick, Vinson & Elkins, Houston, TX.

For United States of America, Interested Party: Vincent M Garvey, DOJ, Washington, DC.

**Judges:** Lee H. Rosenthal, United States District Judge.

**Opinion by:** Lee H. Rosenthal

---

| Opinion |
| --- |

## MEMORANDUM AND ORDER

Plaintiffs John Doe I, John Doe II, John Doe III, and John Doe IV sued the Archdiocese of Galveston-Houston;
Juan Carlos Patino-Arango, who at the relevant time was a seminarian training to be a priest; Joseph A. Fiorenza,
then Bishop of the Diocese; William Pickard, then Monsignor of the parish; **[*2]** and Cardinal Joseph Ratzinger, then
the prefect of the Congregation for the Doctrine of Faith and now Pope Benedict XVI. The plaintiffs are young

2006 U.S. Dist. LEXIS 58347, *4

men who allege that in 1996, when they were children, Patino used his position as a clergy member assigned to their church to sexually assault them. (Docket Entry Nos. 1, 29). The plaintiffs asserted state-law causes of action for intentional torts, including breach of confidential relationships, assault by offensive physical contact, intentional infliction of emotional distress, fraud and fraudulent misrepresentation, sexual exploitation by a mental health services provider, fraudulent concealment, and conspiracy to commit each of these torts. The plaintiffs also asserted causes of action for negligence, including negligence *per se*, negligent misrepresentation involving risk of physical harm, defective premises, and gross negligence. (*Id.*).

In previous rulings, this court granted Pope Benedict's motion to dismiss on the basis of head-of-state immunity, (Docket Entry No. 62). This court also dismissed the following causes of action against the Archdiocese Defendants for failure to state a claim under Rule 12(b)(6): vicarious liability **[*3]** for Patino's intentional torts, including assault by offensive physical contact and intentional infliction of emotional distress; breach of confidential or fiduciary relationships; gross negligence and negligence *per se* based on failure to report child sexual abuse; and for intentional and negligent misrepresentation. This court denied the plaintiffs' motions to amend and supplement with respect to the dismissed claims. This court denied the Archdiocese Defendants' motion to dismiss the plaintiffs' negligence and gross negligence claims alleging that the Archdiocese Defendants allowed Patino's abuse to occur and continue, and the plaintiffs' claims for recovery based on the allegation that a purported mental-health services provider perpetrated the abuse, and granted plaintiffs' motions for leave to amend and supplement as to these claims. (Docket Entry No. 63). [1]

The plaintiffs moved for leave to file a second amended complaint, **[*4]** which this court granted. (Docket Entry No. 91). Before that complaint was filed, the Archdiocese Defendants moved to strike certain parts of the previously filed first amended complaint under Rule 12(f) of the Federal Rules of Civil Procedure, (Docket Entry No. 74). The Archdiocese Defendants filed an amended answer to the second amended complaint, in which they reassert their motion to strike. (Docket Entry No. 93). The plaintiffs responded to the motion to strike. (Docket Entry No. 77). In the response, the plaintiffs agreed that certain of the allegations should be struck based on the court's prior rulings on the motion to dismiss. The plaintiffs disputed that other allegations were covered by the prior rulings and seek either clarification that they are not dismissed or reconsideration of the court's dismissal rulings. The Archdiocese Defendants replied. (Docket Entry No. 87). The plaintiffs also moved under Rule 12(f) to strike certain affirmative defenses. (Docket Entry No. 78). The Archdiocese Defendants responded, (Docket Entry No. 88), and the plaintiffs replied, (Docket Entry No. 89).

After reviewing the motions and responses, the record, and the applicable law, this court **[*5]** grants in part and denies in part both motions to strike. The reasons are explained below.

## I. The Legal Standards

A motion to strike material from a pleading is made under Rule 12(f). It allows a court to strike from a pleading any "insufficient defense" or any material that is "redundant, immaterial, impertinent or scandalous." A Rule 12(f) motion is not a motion to dismiss for failure to state a claim upon which relief may be granted. If it does not involve a purportedly insufficient defense, it simply tests whether a pleading contains inappropriate material. When a Rule 12(f) motion to strike challenges the sufficiency of an affirmative defense, the standards for a Rule 12(f) motion to strike and a Rule 12(b)(6) motion to dismiss are "mirror image[s.]" *Canadian St. Regis Band of Mohawk Indians v. New York, 278 F. Supp. 2d 313, 332 (N.D.N.Y.2003)* (internal quotation marks and citations omitted); *see also Brumley Estate v. Iowa Beef Processors, Inc., 704 F.2d 1351, 1358 (5th Cir. 1983); Siemens Med. Solutions USA Inc. v. Sunrise Med. Tech. Inc., No. Civ. 3:04-CV-2711-H, 2005 U.S. Dist. LEXIS 43560, 2005 WL 615747, * 5 (N.D. Tex. Mar. 16, 2005).*

**[*6]** The essential function of a Rule 12(f) motion is to "avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Fantasy, Inc. v. Fogerty, 984 F.2d 1524, 1527 (9th Cir. 1993), rev'd on other grounds, 510 U.S. 517, 114 S. Ct. 1023, 127 L. Ed. 2d 455 (1994).* Because of "the limited importance of pleadings in federal practice," motions to strike pursuant to Rule 12(f) are disfavored. *Bureerong v. Uvawas, 922 F. Supp. 1450, 1478 (C.D. Cal. 1996).*

## II. The Archdiocese Defendants' Motion to Strike

The Archdiocese Defendants have filed a motion to strike the following paragraphs from the plaintiffs' second amended complaint: 3.08, 3.18, 3.19, 3.34 (alleging that the Archdiocese Defendants failed to report child abuse);

---

[1]   The plaintiffs named Patino as a defendant but have not served him with process.

2006 U.S. Dist. LEXIS 58347, *6

3.20, 5.08, 8.02-8.06, 14.04-14.07, 14.12 (alleging fraudulent concealment); 5.07, 5.11, 8.06-8.07 (alleging vicarious liability for Patino's conduct); 3.36, 8.05, and 8.07 (alleging "confidential," "quasi-fiduciary," and/or "special" relationship between the Archdiocese Defendants and Patino); 5.06 (alleging negligence); 5.09, 9.02-9.04 (alleging negligent misrepresentation); **[*7]** 5.10 (alleging misrepresentation); 6.01-6.06, 6.08-6.09 (alleging a corporate policy or practice showing the Archdiocese Defendants' knowledge of Patino's dangerous propensities); 8.02-8.06, 14.04-14.07, 14.12 (alleging fraud). In support of the motion, the Archdiocese Defendants rely on this court's March 27, 2006 Memorandum and Order, which granted the Archdiocese Defendants' motion to dismiss certain claims. The Archdiocese Defendants are using Rule 12(f) to challenge the reassertion of claims this court previously dismissed and denied plaintiffs leave to reallege through amending or supplementing their complaint. To some extent, plaintiffs agree that they are precluded by this court's prior rulings from realleging certain claims that this court has already dismissed. To the extent plaintiffs dispute the motion to strike, they seek either reconsideration or clarification of this court's prior rulings under Rule 12(b)(6).

### A. The breach of fiduciary duty claims

This court's March 27, 2006 Memorandum and Order dismissed the breach of fiduciary duty claims against the Archdiocese Defendants because Texas does not recognize a fiduciary relationship between a clergy member and **[*8]** a parishioner. (Docket Entry No. 63 at 9 (citing *Hawkins v. Trinity Baptist Church*, 30 S.W.3d 446, 452-53 (Tex. Ct. App. -- Tyler 2000, no writ.)). The Archdiocese Defendants argue that paragraph 3.36 of the Second Amended Complaint, which alleges that "[a]ll Defendants herein were in a confidential or quasi-fiduciary or special relationship with the Plaintiffs grounded upon the duty of good faith and fair dealing and the obligation to act with the highest degree of trust, confidence, and loyalty," (Docket Entry No. 91, P 3.36), is an attempted end-around this court's ruling. The plaintiffs agreed that Paragraph 3.36 should not be included in their complaint because it alleges breach of fiduciary duty, a claim the court dismissed. The motion to strike paragraph 3.36 of the first amended complaint (and the second amended complaint) is unopposed and is granted. The motion to strike paragraph 8.05 and 8.07 is also granted to the extent it alleges breach of fiduciary duty.

### B. The claims of negligent failure to report child sexual abuse to law enforcement

The Archdiocese Defendants move to strike paragraphs 3.08, 3.18, 3.19, and subparagraph 7 of paragraph 5.06, **[*9]** which include allegations that the Archdiocese Defendants did not report Patino's conduct to law enforcement authorities. (Docket Entry No. 87 at 3). The Archdiocese Defendants contend that this court has dismissed these claims. Plaintiffs respond that this court dismissed plaintiffs' claims of gross negligence and negligence *per se* based on the failure to comply with the Texas child abuse reporting statute. The plaintiffs agree that to the extent paragraph 3.18 and paragraph 5.06 rely on the Texas child abuse reporting statute, they should be removed from the complaint. The second amended complaint omits the negligence *per se* claims. The plaintiffs dispute whether the court's prior rulings preclude them from proceeding on the claims alleged in paragraph 3.08, 3.19, and 5.13 that allege negligence in failing to report Patino's behavior but are not based on noncompliance with the Texas child abuse reporting statute.

This court's previous Memorandum and Order relied on *Perry v. S.N.*, 973 S.W.2d 301, 41 Tex. Sup. Ct. J. 1162 (Tex. 1998), in dismissing the claims for negligence in failing to report child abuse. (Docket Entry No. 63 at 32). *Perry* decided whether a claim for gross negligence **[*10]** or negligence *per se* could be asserted for failing to comply with the Texas child abuse reporting statute. The trial court in that case had granted summary judgment on the plaintiffs' common law negligence claims on the basis of prior Texas cases refusing to recognize a common law duty to report abuse. *See Golden Spread Council, Inc. v. Akins*, 926 S.W.2d 287, 39 Tex. Sup. Ct. J. 1005 (Tex. 1996); *Butcher v. Scott*, 906 S.W.2d 14, 38 Tex. Sup. Ct. J. 1164 (Tex. 1995). *Perry* declined to decide whether Texas should impose a new common-law duty to report child abuse because the plaintiffs did not preserve their common law negligence claims on appeal. *Perry*, 973 SW.2d at 303.

Although Texas courts have not embraced this negligence theory, they have not explicitly rejected it. Dismissal of negligence claims based on a negligent failure to report child sexual abuse to law enforcement on a Rule 12(b)(6) motion is premature. The Archdiocese Defendants' arguments on this issue are more appropriately considered in a summary judgment motion. The Archdiocese Defendants' motion to strike paragraphs 3.08, 3.18, 3.19, and 5.06 subparagraph 7, is denied.

### C. The "general" negligence claims

**[*11]** The Archdiocese Defendants move to strike paragraph 5.06 in the second amended complaint. It reads:

The negligent acts arising out of the Defendants' policies and practices include, but are not limited to:

1. recruiting, hiring, supervising, reassigning, and retaining priests, deacons and seminarians, including Patino-Arango who were either predictable risks as sexual deviants or known to have abused minors;

2. failing to inform the vulnerable parents that such seminarians, deacons and priests assigned to their parishes were sexual threats;

3. ignoring warnings from medical professionals even within the Catholic Church or employed by individual dioceses that certain seminarians, deacons and priests were potentially sexually dangerous to children;

4. misrepresenting facts to victims who requested information about such seminarians, deacons and priests in order to fraudulently conceal the Archdiocese's own negligence;

5. failing to alert parishioners, previous parishes and the surrounding communities where abusive seminarians, deacons and priests had served that they were exposed to known or suspected child molesters;

6. ignoring warnings from [*12] others within the Archdioceses and bishops conferences who believed that such seminarians, deacons and priests were threats to children;

7. failing to report the crimes committed by such seminarians, deacons and priests to law enforcement and obstructing or interfering with law enforcement investigations concerning abusive priests;

8. making decisions which reveal that the interests of abusive seminarians, deacons and priests and the desire to avoid scandal to the Church were vastly superior to the interests of persons who had been abused by seminarians, deacons and priests and of their families;

9. using Church influence to alter the outcome of the criminal legal process relating to priests who had been engaging in illegal sexual acts and to conspire to spirit them out of the state or out of the United States, as with Patino-Arango, in order to avoid liability and accountability to civil authorities and their victims and to recycle them back into active ministry elsewhere; and

10. fostering an environment and culture where abuse of children could flourish and in which it was clearly understood that there was no corporate accountability for criminal acts toward [*13] children.

(Docket Entry No. 91, P 5.06). The Archdiocese Defendants specifically object to subparagraphs 1, 2, 4, 5, 7, 8, 9, and 10, arguing that they are virtually identical to paragraph 9.02, subparagraphs a, b, d, e, g, i, j, k, l, and m of the proposed amended complaint that the plaintiffs submitted in May 2005. In the March 27, 2006 Memorandum and Order, this court found that these allegations could not "in themselves, serve as a basis on which relief can be granted." (Docket Entry No. 63 at 26). This court did not dismiss all these allegations or forbid leave to amend or supplement, allowing the plaintiffs to allege facts related to this case. At the same time, this court noted that plaintiffs could not use this case to challenge general Catholic Church practices or policies unrelated to this case. (Docket Entry No. 63 at 24-25).

Based on the prior rulings on the motion to dismiss, this court clarifies that subparagraph 4, which states a fraudulent concealment and misrepresentation claim, was and remains dismissed. Although subparagraphs 8, 9, and 10 are very general, they are not so "redundant, impertinent, or scandalous" as to require striking, given that the complaint [*14] will not be shown to the jury that will hear this case. This reading of the claims does not limit the plaintiffs' ability to allege, for example, a pattern or practice of behavior by the Archdiocese Defendants that negligently led to the damages suffered by the plaintiffs, but does limit the plaintiffs' ability to bring in facts and allegations wholly unrelated to this case.

**D. Claims seeking to "put the Catholic Church on trial"**

Relatedly, the Archdiocese Defendants move to strike paragraphs 6.01-6.06 and 6.08-6.09 in the second amended complaint on the ground that they run afoul of this court's ruling that the plaintiffs could not try religious tenets and practices of the Catholic Church. In the March 27, 2006 Memorandum and Order, this court stated that, "The plaintiffs are not, however, precluded from alleging facts that, if proven, could support their claims by showing that the Archdiocese Defendants' actions or omissions with respect to Patino followed a general policy or practice relating to

supervision, hiring, and retention of sexually-abusive clerics or to providing information about them." (Docket Entry No. 63 at 26). These paragraphs fall within these parameters.  [*15]  The motion to strike these paragraphs is denied. The Archdiocese Defendants' challenges to these paragraphs are less challenges to the pleadings than to the admissibility of the evidence summarized or referred to in those paragraphs; such challenges are not appropriate to a motion to strike under Rule 12(f).

### E. The misrepresentation claims

The Archdiocese Defendants move to strike paragraphs 3.18, 5.09-5.10, 5.11, 8.02-8.04, 9.02-9.05, 14.04-14.07, and 14.12 in the second amended complaint on the ground that this court previously dismissed these fraudulent and negligent misrepresentation claims. In the March 27, 2006 Memorandum and Order, this court granted the Archdiocese Defendants' motion to dismiss the fraudulent, intentional, and negligent misrepresentation claims. (Docket Entry No. 63 at 30-31). The recently filed second amended complaint, like the earlier filed complaints, does not state a valid fraudulent concealment or fraudulent, intentional, or negligent misrepresentation claim under Texas law.

In responding to the motion to strike, the plaintiffs ask this court to reconsider this ruling. (Docket Entry No. 77 at 6). In making this request, the plaintiffs list the [*16]  elements of a fraud claim, including the requirement that the defendant make a representation to the plaintiff, but fail to allege any misrepresentation in the second amended complaint. The pleading standard applicable to fraud claims requires such an allegation. *See Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006) ("That Rule [FED. R. CIV. P. 9(b)] requires a plaintiff to specify the alleged fraudulent statements, the speaker, when and where the statements were made, and why they are fraudulent.") (citing *ABC Arbitrage v. Tchuruk*, 291 F.3d 336, 349-50 (5th Cir. 2002); FED. R. CIV. P. 9(b)); *see also Bevan v. Gen. Elec. Credit Equities*, 1999 Tex. App. LEXIS 8662, No. 14-98-00233-CV, 1999 WL 1041185, * 2 (Tex. App. -- Houston [14th Dist.] 1999, pet. denied) ("[A] plaintiff's statement of what he thought was implied by defendant's representation is not sufficient to support an actionable misrepresentation."). The most specific allegation that the plaintiffs make is that in May 1996, the Archdiocese Defendants allegedly informed the plaintiffs that Patino would be removed from the ministry and that his conduct would be reported [*17]  to the police. (Docket Entry No. 91, P 8.02). This alleged misrepresentation does not support a fraud claim on which relief may be granted because the plaintiffs do not allege how they relied on these representations or how any reliance caused them harm. No plaintiff alleges that he was again put into contact with Patino; instead, the plaintiffs allege that Patino "may well have abused more minors before he was spirited out of the United States by" the Archdiocese Defendants. (*Id.*). This speculation is unrelated to any plaintiff's injury. The remainder of the fraud claims rely on general misrepresentations that do not meet the Rule 9 standard. (*See, e.g., id.* at P 8.04 ("All Defendants . . . fraudulently misrepresented to the public, including Plaintiffs and their parents, that Patino-Arango was a sexually safe, moral cleric who would not be sexually dangerous to minors.")).

Similarly, the first and second amended complaints fail to allege misrepresentations that could form the basis for recovery under a negligent misrepresentation theory. Because the plaintiffs have again failed to include allegations of specific misrepresentations on which they relied for which relief may [*18]  be granted, this court adheres to its previous decision dismissing the fraud-and misrepresentation-based claims. The intentional and negligent misrepresentation claims and related conspiracy claims were, and remain, dismissed.

Plaintiffs alternatively contend that because this court denied the Archdiocese Defendants' motion to dismiss under the statute of limitations, the motion to strike the fraudulent concealment allegations should be denied. (Docket Entry No. 77 at 6). This argument is based on a misreading of this court's opinion. The court ruled that the plaintiffs have filed certain claims that overcome limitations bars to recovery; this ruling did not turn on allegations of fraudulent concealment as a means to toll limitations or delay the accrual of a claim. The Archdiocese Defendants' motion to dismiss (and strike) paragraphs 3.20, 5.08, 8.02-8.06, 14.04-14.07, and 14.12 is granted.

### F. The vicarious liability claims

The Archdiocese Defendants move to strike paragraphs 5.07, 5.11, 8.06, and 8.07 of the second amended complaint on the ground that these paragraphs assert vicarious liability claims that this court has dismissed. (Docket Entry No. 87 at 1-2). As noted [*19]  above, paragraphs 8.06 and 8.07 allege fraudulent misrepresentation and were dismissed on that basis. The motion to strike is granted as to those paragraphs.

The plaintiffs argue that paragraph 5.07 alleges direct rather than vicarious liability. Plaintiffs invoke Section 302B of the RESTATEMENT (SECOND) OF TORTS, which provides liability under the doctrine of negligent assumption of the risk of intentional or criminal conduct. (Docket Entry No. 77 at 2). Plaintiffs contend that in *Golden Spread Council, Inc. No. 562 of Golden Spread Council, Inc. # 562 of the BSA v. Akins*, 926 S.W.2d 287, 39 Tex. Sup. Ct. J.

1005 (Tex. 1996), the Supreme Court of Texas recognized such liability. In *Akins*, the court quoted comment e to Section 302B, which recognizes that there may be liability "[w]here the actor has brought into contact or association with the other a person whom the actor knows or should know to be peculiarly likely to commit intentional misconduct, under circumstances which afford a peculiar opportunity or temptation for such misconduct." RESTATEMENT (SECOND) OF TORTS § 302B, cmt e, P D (quoted in *Akins, 926 S.W.2d at 291*). *Akins* held that if a person or organization knew or should [*20] have known that someone was "peculiarly likely to molest boys, it had a duty not to recommend him" for a position that would put him into close and unsupervised contact with boys. The Archdiocese Defendants argue that *Akins* imposed this duty only on a defendant who has recommended the sexual predator for a position that involves close and unsupervised contact with potential victims and argue that the plaintiffs do not allege that the Archdiocese Defendants recommended Patino for the clerical position he held when he committed the alleged acts.

This court agrees that the duty imposed by *Akins* is narrow, but disagrees that the plaintiffs have not or could not allege facts that, if proven, could state a negligence claim against the Archdiocese Defendants under this theory. The challenge to the claim can be raised in a summary judgment motion. The motion to strike paragraph 5.07 and the related damages allegation in paragraph 5.11 is denied.

### III. The Plaintiffs' Motion to Strike the Archdiocese Defendants' Affirmative Defenses

The plaintiffs have filed a motion to strike the following affirmative defenses: (1) statute of limitations; (2) laches and estoppel; (3) federal [*21] constitution, state constitution, and the Religious Freedom Restoration Act; (4) damages proximately caused by others; and (5) responsible third parties. "Before such a motion can be granted, the court must be convinced that there are no questions of fact and that any questions of law are clear and not in dispute, and that under no set of circumstances can that defense succeed." *Puckett v. United States, 82 F. Supp. 2d 660, 662-63 (S.D. Tex. 1999)* (quoting *Soanes v. Baltimore & O.R. Co., 89 F.R.D. 430, 431 n.1 (E.D.N.Y. 1981)*). Because most of the affirmative defenses that the plaintiffs wish to strike are fact-bound, a motion to strike is unlikely to prevail at this stage of the case.

In the March 29, 2006 Memorandum and Opinion, this court largely rejected the Archdiocese Defendants' statute of limitations defense. Striking the defense entirely, however, is inappropriate, because although the current record does not permit such a defense, the Archdiocese Defendants could later find and introduce facts sufficient to show that the statute of limitations has run on certain claims. The motion to strike the statute of limitations defense is denied.

 [*22]  The motion to strike the affirmative defenses asserting laches and estoppel, proximate cause, and responsible third-party liability is denied on the same basis. The Archdiocese Defendants have pleaded each of these affirmative defenses in a way that, if proven, would reduce or eliminate their liability for the alleged harm. The motion to strike these defenses is denied.

In the March 27, 2006 Memorandum and Opinion, this court rejected the Archdiocese Defendants' constitution-based affirmative defenses as a matter of law. (Docket Entry No. 63 at 26). The Archdiocese Defendants argue that "[s]o long as the plaintiffs make allegations or seek discovery concerning the Catholic Church generally, the religious internal policies and practices of this Archdiocese, or the religious tenets of the Church, the Archdiocese Defendants are titled to defend those allegations with the religious protections of the U.S. Constitution, the Texas Constitution, and the Religious Freedom and Restoration Act." (Docket Entry No. 88 at 3-4). This court has dismissed, and will not permit discovery into, the religious tenets or policies of the Church. The plaintiffs' claims are limited to the facts and parties [*23] involved in this case; the claims against the Archdiocese Defendants "involve an examination of the defendants' possible role in allowing one of its employees to engage in conduct which they, as employers, as well as society in general expressly prohibit." *Nutt v. Norwich Roman Catholic Diocese, 921 F. Supp. 66, 74 (D. Conn. 1995)*. A First Amendment-based affirmative defense cannot shield the Archdiocese Defendants from liability from such claims. The motion to strike the federal and state constitutional and statutory affirmative defenses is granted.

### IV. Conclusion

The Archdiocese Defendants' motion to strike is granted in part and denied in part. The following paragraphs from the Second Amended Complaint must be stricken: 3.20, 3.36, 5.08, 5.06(4), 8.02-8.07, 14.04-14.07, 14.12.

The plaintiffs' motion to strike is granted only as to the federal constitutional and statutory affirmative defenses and as to the state constitutional affirmative defense, and is otherwise denied.

2006 U.S. Dist. LEXIS 58347, *23

The plaintiffs must submit a Third Amended Complaint in conformity with this decision by **September 1, 2006.** The Archdiocese Defendants should file an Amended Answer in conformity **[*24]** with this decision by **September 8, 2006.**

SIGNED on August 18, 2006, at Houston, Texas.

Lee H. Rosenthal

United States District Judge



**User Name:** 40NH4QT
**Date and Time:** Nov 20, 2012 18:07 EST
**Job Number:** 1465602

## Document(1)

1.   In re Beef Industry Antitrust Litigation, 600 F.2d 1148
     **Client/matter:** 94088.022



⚠️ Caution
As of: November 20, 2012 6:07 PM EST

# In re Beef Industry Antitrust Litigation

United States Court of Appeals for the Fifth Circuit
August 17, 1979
Nos. 78-1817 78-1829

**Reporter:** 600 F.2d 1148; 1979 U.S. App. LEXIS 12397; 1979-2 Trade Cas. (CCH) P62,802; 28 Fed. R. Serv. 2d (Callaghan) 39

In re BEEF INDUSTRY ANTITRUST LITIGATION; PONY CREEK CATTLE CO., INC., et al., Plaintiffs-Appellants, Musselman Ranch Co., etc., et al., Plaintiffs-Intervenors-Appellants, v. The GREAT ATLANTIC & PA-CIFIC TEA CO. et al., Defendants-Appellees; R. Dirk AGEE et al., Plaintiffs-Appellants, v. SAFEWAY STORES, INC., et al., Defendants-Appellees; MEAT PRICE INVESTIGATORS ASSOCIATION, etc., et al., Plaintiffs-Appellants, v. SAFEWAY STORES, INC., et al., Defendants-Appellees; Richard S. LOWE et al., Plaintiffs-Appellants, v. SAFE-WAY STORES, INC., et al., Defendants-Appellees; A.L. BLACK et al., Plaintiffs-Appellants, v. ALBERTSON'S, INC., et al., Defendants-Appellees (two cases); CHAPARRAL CATTLE CORP., et al., Plaintiffs-Appellants, v. SAFE-WAY STORES, INC., et al., Defendants-Appellees; Burke PETERSEN et al., Plaintiffs-Appellants, v. SAFEWAY STORES, INC., et al., Defendants-Appellees; Ronald BECKER et al., on behalf of themselves and all other persons similarly situated, Plaintiffs-Appellants, v. SAFEWAY STORES, INC., et al., Defendants-Appellees; John O. VAR-IAN et al., Plaintiffs-Appellants, v. SAFEWAY STORES, INC., et al., Defendants-Appellees; MEAT PRICE INVES-TIGATORS ASSOCIATION et al., Plaintiffs-Appellants, v. SAFEWAY STORES, INC., etc., et al., Defendants-Appellees; LITTLE RANCH CO., INC., et al., Plaintiffs-Appellants, v. The NATIONAL ASSOCIATION OF FOOD CHAINS, etc., et al., Defendants-Appellees; Ronald BECKER et al., on behalf of themselves and all other persons similarly situated, Plaintiffs-Appellants, v. SAFEWAY STORES, INC., etc., et al., Defendants-Appellees

**Notice:**

**Prior History:** [**1] Appeals from the United States District Court for the Northern District of Texas.

---

| Core Terms |
| --- |

price-fixing, packers, retail, chains, passing-on, beef, conspiracy, cattle, antitrust, district court, overcharge, wholesale, summary judgment, slaughterers, cost-plus, indirect, injunctive relief, sellers, statute of limitations, formula, alleged conspiracy, concealment, oligopsony, monopsony, diligence, customer, cattlemen, tolled, claim for damages, lawsuit

---

| Case Summary |
| --- |

**Procedural Posture**
In consolidated appeals, plaintiffs challenged the dismissal of their antitrust complaints by the United States District Court for the Northern District of Texas. The complaints alleged the sales by the primary producers to the middle-men at prices allegedly depressed by price-fixing at the retail distribution level.

**Overview**
Plaintiffs, cattlemen, ranchers, and feeders, contended that the district court erred in dismissing their actions against de-fendants, retail food chains, a wholesale grocer, a national trade association, and a beef industry price reporting pub-lication. Plaintiffs in the various suits charged that the retail chains combined, primarily by using the trade associa-tion and the price reporting publication, to fix at artificially low levels the prices at which beef was purchased from the slaughterhouses and the meat packers, and ultimately from the producers, the cattle ranchers and the feeders. Plain-tiffs based their claims on federal antitrust laws. On appeal, the court held that plaintiffs had successfully pleaded the narrow cost-plus exception to the Illinois Brick rule. The court held that it was error to strike plaintiffs' allegations of retail price-fixing from their complaints. The court found that the complaints all stated claims for injunctive relief un-der § 16 of the Clayton Act, 15 U.S.C.S. § 26.

600 F.2d 1148, *1148; 1979 U.S. App. LEXIS 12397, **1

### Outcome

The judgment dismissing the complaints was reversed because plaintiffs alleged the functional equivalent of cost-plus contracts, which was an exception to the Illinois Brick rule.

---

**LexisNexis® Headnotes**

---

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

*HN1* Where actions are dismissed on the pleadings, the allegations of the complaints must be taken as true for purposes of appeal.

Antitrust & Trade Law > Clayton Act > General Overview
Governments > Legislation > Statute of Limitations > General Overview

*HN2* See § 4B Clayton Act, 15 U.S.C.S. § 15b.

Antitrust & Trade Law > Clayton Act > General Overview
Antitrust & Trade Law > Clayton Act > Remedies > General Overview
Antitrust & Trade Law > Clayton Act > Remedies > Damages
Antitrust & Trade Law > ... > Private Actions > Purchasers > General Overview
Antitrust & Trade Law > ... > Private Actions > Purchasers > Indirect Purchasers

*HN3* The Illinois Brick rule bars damage actions against alleged price-fixers by indirect purchasers.

Antitrust & Trade Law > ... > Private Actions > Purchasers > General Overview

*HN4* The use of passing-on as a defense is barred in an antitrust action.

Antitrust & Trade Law > ... > Private Actions > Purchasers > General Overview

*HN5* With few exceptions, indirect purchasers of an alleged price-fixer's product cannot maintain a treble damages action predicated on the offensive use of the theory that the price-fixer's overcharge to his customer was passed on to the plaintiffs.

Antitrust & Trade Law > ... > Private Actions > Purchasers > General Overview

*HN6* The passing-on theory of damages must be barred in those situations in which the defendant could not assert a passing-on defense against his direct purchasers.

Antitrust & Trade Law > ... > Private Actions > Purchasers > General Overview

*HN7* There is nothing special about monopsony or oligopsony price-fixing cases that justifies treating them differently from monopoly price-fixing cases for passing-on purposes.

Civil Procedure > ... > Pleadings > Amendment of Pleadings > General Overview
Civil Procedure > ... > Pleadings > Amendment of Pleadings > Leave of Court

*HN8* Leave to amend pleadings should be granted liberally when previously unimportant factual issues gain significance as the result of rulings on a point of law handed down during the pendency of the litigation.

Civil Procedure > ... > Pleadings > Amendment of Pleadings > General Overview
Civil Procedure > ... > Pleadings > Amendment of Pleadings > Leave of Court
Civil Procedure > Judgments > Relief From Judgments > Altering & Amending Judgments

*HN9* Fed. R. Civ. P. 15(a) requires that leave to amend be freely granted "when justice so requires."

Civil Procedure > ... > Pleadings > Amendment of Pleadings > General Overview
Civil Procedure > ... > Pleadings > Amendment of Pleadings > Leave of Court

*HN10* The United States Supreme Court has said that motions to amend may properly be denied when there has been undue delay in moving for leave to amend.

Civil Procedure > ... > Pleadings > Amendment of Pleadings > General Overview
Civil Procedure > Judgments > Relief From Judgments > Altering & Amending Judgments

*HN11* Denial of leave to amend is proper when the proposed amendment would be futile.

Antitrust & Trade Law > ... > Private Actions > Purchasers > General Overview

*HN12* There is a general "cost-plus" exception to the bar against assertion of a passing-on defense, an exception defined by the policies underlying the bar.

Antitrust & Trade Law > ... > Private Actions > Purchasers > General Overview
Antitrust & Trade Law > ... > Private Actions > Purchasers > Indirect Purchasers

*HN13* Permitted is the assertion of passing-on in situations that are the functional equivalent of the cost-plus contract case. Although the exception was intended to have a "narrow scope", any situation in which the impact of the overcharge is essentially determined in advance without reference to the interactions of supply and demand would function in the same way.

Antitrust & Trade Law > ... > Private Actions > Purchasers > General Overview
Antitrust & Trade Law > ... > US Department of Justice Actions > Civil Actions > General Overview

*HN14* The Illinois Brick rule has no application to claims for injunctive relief.

Antitrust & Trade Law > ... > Private Actions > Purchasers > General Overview

*HN15* The Illinois Brick rule does not bar suits for injunctive relief by indirect purchasers in price-fixing actions because the policy considerations underlying the pass-on rule are not implicated in claims for injunctive relief.

Antitrust & Trade Law > Clayton Act > General Overview
Antitrust & Trade Law > Clayton Act > Claims
Antitrust & Trade Law > Clayton Act > Remedies > General Overview
Antitrust & Trade Law > Clayton Act > Remedies > Damages
Antitrust & Trade Law > Clayton Act > Remedies > Injunctions
Antitrust & Trade Law > ... > US Department of Justice Actions > Civil Actions > General Overview
Civil Procedure > ... > Injunctions > Grounds for Injunctions > General Overview

*HN16* To secure injunctive relief under § 16 of the Clayton Act, 15 U.S.C.S. § 26 plaintiffs need show only threatened loss or damage by a violation of the antitrust law. To show a threat of such injury, plaintiffs would not have to show the extent of their harm. It would suffice to show by a preponderance of the evidence that the alleged price-fixing had or will have some adverse impact on the prices they receive, or that the conspiracy reduced the demand.

Antitrust & Trade Law > Clayton Act > General Overview
Antitrust & Trade Law > Clayton Act > Claims

*HN17* Where a complaint alleges that some of the plaintiffs have purchased a product as consumers at prices affected by the alleged conspiracy, such an allegation is an adequate allegation of the injury to one's "property" within the meaning of § 4 of the Clayton Act, 15 U.S.C.S. § 15.

Civil Procedure > Pleading & Practice > Joinder of Claims & Remedies > General Overview

*HN18* Fed. R. Civ. P. 18(a) grants plaintiffs complete freedom to join in a single action all claims that they may have against any defendants.

Antitrust & Trade Law > ... > Private Actions > Standing > General Overview
Civil Procedure > ... > Justiciability > Standing > General Overview

*HN19* Only those within the "target area" of an alleged antitrust conspiracy have standing to sue.

Civil Procedure > ... > Justiciability > Standing > General Overview
Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Denial of Allegations

*HN20* The question of standing is a preliminary one, to be answered from examination of the allegations of the complaint.

600 F.2d 1148, *1148; 1979 U.S. App. LEXIS 12397, **1

Antitrust & Trade Law > ... > Private Actions > Purchasers > General Overview

*HN21* The ″target″ of a retail price-fixing conspiracy is the retail purchaser.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Strike > General Overview
Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Strike > Immaterial Matters
Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Strike > Irrelevant Matters
Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Strike > Redundant Matters
Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

*HN22* The district court has ample discretion, under Fed. R. Civ. P. 12(f), to order stricken from the complaint any redundant or immaterial matter. Although unnecessary evidentiary details are usually not stricken from the complaint unless prejudicial or of no consequence to the controversy, evidence pleading, as distinguished from the pleading of ultimate facts, is not favored under the Federal Rules. See Fed. R. Civ. P. 8(a). Many courts have properly stricken unnecessary evidentiary detail from pleadings.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Strike > General Overview
Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

*HN23* The district court's action in striking pleadings will not be disturbed unless it was an abuse of discretion.

Antitrust & Trade Law > Clayton Act > General Overview
Civil Procedure > ... > Statute of Limitations > Tolling of Statute of Limitations > Fraud
Civil Procedure > ... > Statute of Limitations > Tolling of Statute of Limitations > Fraudulent Concealment
Governments > Legislation > Statute of Limitations > General Overview
Governments > Legislation > Statute of Limitations > Tolling

*HN24* Fraudulent concealment tolls the Clayton Act's statute of limitations. To avail himself of this tolling doctrine, an antitrust plaintiff must show that the defendants concealed the conduct complained of, and that he failed, despite the exercise of due diligence on his part, to discover the facts that form the basis of his claim.

Antitrust & Trade Law > Clayton Act > General Overview
Governments > Legislation > Statute of Limitations > General Overview
Governments > Legislation > Statute of Limitations > Time Limitations

*HN25* The question of when the statute of limitations began to run on a plaintiff's cause under § 4 of the Clayton Act, 15 U.S.C.S. § 15, is a factual one, and is therefore not determinable on a motion for summary judgment.

Antitrust & Trade Law > Clayton Act > General Overview
Civil Procedure > ... > Summary Judgments > Burdens of Proof > General Overview
Civil Procedure > ... > Summary Judgments > Opposing Materials > General Overview
Civil Procedure > ... > Summary Judgments > Entitlement as Matter of Law > General Overview
Civil Procedure > ... > Summary Judgments > Entitlement as Matter of Law > Genuine Disputes
Civil Procedure > ... > Summary Judgments > Supporting Materials > General Overview
Governments > Legislation > Statute of Limitations > General Overview
Governments > Legislation > Statute of Limitations > Pleadings & Proof

*HN26* The party moving for summary judgment on the issue of statute of limitations has the burden of demonstrating the absence of any genuine material issue of fact, and the plaintiff has no obligation to present evidence opposing the motion unless the defendants' affidavit and exhibits initially established the absence of a genuine issue.

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview
Evidence > ... > Exceptions > Public Records > General Overview

*HN27* Numerous federal courts have suggested that plaintiffs are chargeable with knowledge of the contents of public records.

Governments > Legislation > Statute of Limitations > General Overview

*HN28* In a case involving a claim that the statute of limitations has been tolled, the means of knowledge are the same thing as knowledge itself.

Governments > Legislation > Statute of Limitations > General Overview
Governments > Legislation > Statute of Limitations > Tolling

600 F.2d 1148, *1148; 1979 U.S. App. LEXIS 12397, **1

*HN29* Although the statute of limitations is not tolled simply because the plaintiffs lack much of the evidence supporting their potential claim, they cannot have notice of a potential claim unless they are aware of some evidence tending to support it.

Civil Procedure > Attorneys > General Overview
Criminal Law & Procedure > ... > Counsel > Right to Counsel > General Overview
Governments > Legislation > Statute of Limitations > General Overview
Legal Ethics > Professional Conduct > Frivolous Claims & Conduct

*HN30* The filing by others of a similar lawsuit against the same defendants may in some circumstances suffice to give notice but to rule that it does so as a matter of law is to compel a person to file suit, on the pain of forfeiting his rights, regardless of whether his attorney believes that there is "good ground to support it". Fed. R. Civ. P. 11. The mere filing of a similar lawsuit, without more, does not necessarily give "good ground" because that suit might well be frivolous or baseless.

Evidence > Burdens of Proof > General Overview
Evidence > Burdens of Proof > Ultimate Burden of Persuasion
Torts > ... > Fraud & Misrepresentation > Nondisclosure > General Overview
Torts > ... > Fraud & Misrepresentation > Nondisclosure > Elements

*HN31* Plaintiffs bear the ultimate burden of persuasion on a fraudulent concealment issue. The burden is a heavy one. Those who have learned of facts "calculated to excite inquiry" must inquire.

**Counsel:** Ben L. Krage, Kasmir, Willingham & Krage, Dallas, Tex., for Pony creek, et al.

Lowell V. Summerhays, Robinson, Guyon, Summerhays & Barnes, Salt Lake City, Utah, for Varian, et al., Chaparral Cattle Corp., et al. and Petersen, et al.

Robert R. Eidsmoe, Gleysteen, Harper, Kunze, Eidsmoe & Heidman, Sioux City, Iowa, Burt A. Braverman, Frances Chetwynd, Washington, D. C., for Lowe, et al.

Lex Hawkins, Glenn L. Norris, Hawkins & Norris, Des Moines, Iowa, John A. Cochrane, Cochrane & Bresnahan, St. Paul, Minn., for Meat Price Investigators Ass'n, et al. and Becker, et al.

James W. Witherspoon, Donald L. Davis, Witherspoon, Aikin & Langley, Hereford, Tex., for Black, et al.

Joseph M. Alioto, Steven J. Cannata, Law Offices of Joseph L. Alioto, San Francisco, Cal., for Little Ranch Co.

W. Randolph Elliott, Baker, Glast, Riddle, Tuttle & Elliott, Dallas, Tex., for intervenors Powell Cattle Co., et al.

Jess B. Hawley, Jr., Hawley, Troxell, Ennis & Hawley, Boise, Idaho, for Albertson's, Inc., Skaggs-Albertson's.

Sheldon S. Toll, Honigman, Miller, Schwartz & Cohn, Detroit, Mich., for Allied **[**2]** Supermarkets, Inc.

Benjamin M. Quigg, Jr., Stephen W. Armstrong, James J. Rodgers, Morgan, Lewis & Bockius, Philadelphia, Pa., H. Dudley Chambers, Jackson, Walker, Winstead, Cantwell & Miller, Dallas, Tex., for American Stores Co. f/k/a Acme Markets, Inc.

Roy Lewis Shults, Mitchell, Silberberg & Knupp, Los Angeles, Cal., for Arden-Mayfair, Inc.

Sylvan Rapaport, c/o Borman's, Inc., Detroit, Mich., for Borman's, Inc.

George B. Haley, Jr., Kilpatrick, Cody, Rogers, McClatchey & Regenstein, Atlanta, Ga., Robert W. Coleman, Stalcup, Johnson, Meyers & Miller, Dallas, Tex., for Colonial Stores, Inc.

John D. Leech, Calfee, Halter & Griswold, Cleveland, Ohio, for First Nat. Stores, Inc.

David A. Rosen, Stein, Rosen & Ohrenstein, New York City, for Food Fair Stores, Inc.

H. Kenneth Kudon, Danzansky, Dickey, Tydings, Quint & Gordon, Washington, D. C., for Giant Food, Inc.

600 F.2d 1148, *1148; 1979 U.S. App. LEXIS 12397, **2

Kenneth A. Plevan, Skadden, Arps, Slate, Meagher & Flom, New York City, for The Grand Union Co.

Wilson W. Herndon, Strasburger & Price, Dallas, Tex., for Liaison Counsel.

Denis McInerney, Thomas F. Curnin, Cahill, Gordon & Reindel, New York City, for The Great Atlantic & Pac. Tea Co., Inc.

Theodore A. Groenke, **[**3]** Walter M. Jones, McDermott, Will & Emery, Chicago, Ill., for Jewel Companies, Inc.

Alexander E. Bennett, Norman Diamond, Washington, D. C., Wilson W. Herndon, Strasburger & Price, Dallas, Tex., for The Kroger Co.

Arnold M. Lerman, C. Loring Jetton, Jr., Wilmer, Cutler & Pickering, Washington, D. C., Jerry L. Buchmeyer, Thompson, Knight, Simmons & Bullion, Dallas, Tex., for Lucky Stores, Inc.

James F. Rill, Martin A. Rosen, Collier, Shannon, Rill, Edwards & Scott, Washington, D. C., John L. Hauer, Richard C. Levin, Akin, Gump, Hauer & Feld, Dallas, Tex., for The Nat. Ass'n of Food Chains.

Jeffrey S. Davidson, Fred H. Bartlett, Jr., Daniel Edelman, Kirkland & Ellis, Chicago, Ill., for Nat. Provisioner, Inc.

Franklin P. Auwarter, Kenneth J. Jurek, Mayer, Brown & Platt, Chicago, Ill., for National Tea Co.

Peter D. Standish, Weil, Gotshal & Manges, New York City, for Pueblo Intern., Inc.

Les J. Weinstein, Aaron M. Peck, McKenna & Fitting, Los Angeles, Cal., for Ralph's Grocery Co.

Richard W. Odgers, John B. Bates, Pillsbury, Madison & Sutro, San Francisco, Cal., W. B. West, III, William F. Carroll, Clark, West, Keller, Sanders & Butler, Dallas, Tex., for Safeway Stores, **[**4]** Inc.

Michael R. Murphy, Donald B. Holbrook, Jones, Waldo, Holbrook & McDonough, Salt Lake City, Utah, for Skaggs Companies, Inc., Skaggs-Albertson's.

Robert D. Paul, Goodwin, Proctor & Hoar, Boston, Mass., Stanley E. Neely, Locke, Purnell, Boren, Laney & Neely, Dallas, Tex., for The Stop & Shop Companies, Inc.

Geoffrey M. Kalmus, Nickerson, Kramer, Lowenstein, Nessen, Kamin & Soll, New York City, T. L. Caudle, III, Coke & Coke, Dallas, Tex., for Supermarkets General Corp.

Michael E. Bress, Dorsey, Windhorst, Hannaford, Whitney, Halladay, Minneapolis, Minn., for Super Valu Stores, Inc.

Timothy J. Sargent, Bodkin, McCarthy, Sargent & Smith, Los Angeles, Cal., for Thriftmart, Inc.

Ronald L. Olson, Munger, Tolles & Ricker-Hauser, Los Angeles, Cal., for Vons Grocery Co.

Chester Bedell, John A. DeVault, III, Charles P. Pillans, Bedell, Bedell, Dittmar & Zehmer, Jacksonville, Fla., Charles P. Storey, John K. DeLay Jr., Storey, Armstrong, Steger & Martin, Dallas, Tex., for Winn-Dixie Stores, Inc.

**Judges:** Before WISDOM, HILL, and FAY, Circuit Judges.

**Opinion by:** WISDOM

600 F.2d 1148, *1148; 1979 U.S. App. LEXIS 12397, **4

| Opinion |
| --- |

[*1152]  These consolidated appeals involve the applicability of Illinois Brick Co. v. Illinois, 1977, [**5] 431 U.S. 720, 97 S. Ct. 2061, 52 L. Ed. 2d 707, to sales by primary producers to middlemen at prices allegedly depressed by price-fixing at the retail level of distribution. The appeals also present other difficult questions concerning federal antitrust laws.

These appeals arise from thirteen private antitrust actions alleging that the concerted activities of the defendants violate the provisions of §§ 1 and 2 of the Sherman Antitrust [*1153] Act, 15 U.S.C. §§ 1 and 2. The complaints ask for treble damages and for injunctive relief under §§ 4 and 16 of the Clayton Act, 15 U.S.C. 15 and 26. The plaintiffs are cattlemen, ranchers, and feeders. The defendants are twenty-five retail food chains, a wholesale grocer, the retail chains' national trade association, and a beef industry price reporting publication. [1] The plaintiffs in the various suits charge that the retail chains combined, primarily by using the trade association and the price reporting publication, to fix at artificially low levels the prices at which beef is purchased from slaughterhouses and meat packers, and ultimately from the producers cattle ranchers and feeders. The resulting depression in wholesale prices [**6] to retailers, passed up the chain of distribution, reduced the prices which the plaintiffs received in selling their cattle to the packers and slaughterhouses.

The Judicial Panel on Multidistrict Litigation assigned the cases to the District Court for the Northern District of Texas, for coordinated or consolidated pretrial proceedings. In re Beef [**7] Industry Antitrust Litigation, 419 F. Supp. 720 (Jud.Pan.Mult.Lit., 1976). In June 1977 the Supreme Court handed down its decision in Illinois Brick, holding that a purchaser could not maintain an antitrust damage action against a seller remote from him in the chain of distribution; rejecting, with narrow exceptions, the offensive use of "passing-on". [2] Shortly thereafter the defendants moved for dismissal of the complaints on the ground that the plaintiffs' theory of damages (sellers suing remote purchasers) was a "pass-on" theory indistinguishable in all important respects from the theory of damages (purchasers suing remote sellers) at issue in Illinois Brick. The district court agreed with the defendants and dismissed the complaints with prejudice for failure to state claims upon which relief could be granted. The court did not file an opinion, but stated from the bench that the dismissal was based on Illinois Brick.

[**8]  The main issue is whether the complaints should have been dismissed on the strength of Illinois Brick. The plaintiffs/appellants also urge that the district court erred in striking from the complaints allegations of retail price-fixing. The plaintiffs in Pony Creek Cattle Co., Inc., et al. v. The Great Atlantic & Pacific Tea Co., et al. appeal partial summary judgments granted against them on their allegation that the statute of limitations was tolled because the defendants fraudulently concealed the alleged conspiracy. We agree with the defendants-appellees that the claims for damages, as pleaded, are within the ambit of the rule of Illinois Brick. Nevertheless we reverse and remand in all thirteen cases because the complaints state claims for damages within the "cost-plus" exception to the Illinois Brick bar. We reverse the partial summary judgments entered on the issue of fraudulent concealment in Pony Creek. In the Agee and Varian cases, we reverse the district court's order striking the allegations of retail price-fixing. In addition, we hold that the complaints in all the cases state claims for injunctive relief under section 16 of the Clayton Act.

[*1154]  I.

[**9]  *HN1* These actions were dismissed on the pleadings. The allegations of the complaints therefore are taken as true for purposes of these appeals.

---

[1]    The lawsuits involved in this appeal are: Petersen et al. v. Safeway Stores, Inc., et al.; Pony Creek Cattle Co., et al. v. The Great Atlantic & Pacific Tea Co., et al.; Lowe, et al. v. Safeway Stores, Inc., et al.; Meat Price Investigators Ass'n et al. v. Safeway Stores, Inc., et al.; Shoshone Tribe of Duckwater, et al. (formerly styled Agee, et al.) v. Safeway Stores, Inc., et al.; Black, et al. v. Acme Markets, et al.; Chapparal Cattle Corp., et al. v. Safeway Stores, Inc., et al.; Becker, et al. v. Safeway Stores, Inc., et al.; Varian, et al. v. Safeway Stores, Inc., et al.; and Little Ranch Co., et al. v. The National Association of Food Chains, et al.

[2]    "Passing-on" usually means the process whereby a middleman in the chain of distribution who has been overcharged by a manufacturer or by a producer adjusts his prices upward in sales to a lower level in the chain to reflect the overcharge. This case presents the converse of that situation. Here the passing-on was the result of alleged depressed prices fixed by retailers and imposed upon the middlemen (slaughterhouses and packers). In turn, the middlemen passed-on the undercharge, the depression in prices, to the primary producers (cattle ranchers and feeders).

600 F.2d 1148, *1154; 1979 U.S. App. LEXIS 12397, **9

The plaintiffs are all cattle ranchers or feeders or both. Cattle are bred and raised on farms, ranches, and commercial feedlots. The animals are fattened for slaughter by feeding them a concentrated ration for fast growth. Ranchers either fatten the cattle themselves or sell to or place the livestock with feeders for fattening. Most fat cattle, say the plaintiffs-appellants, are purchased by slaughterhouses and packers directly from the ranchers and feedlots, although some are purchased by the slaughterers through auction markets. The cattle are then slaughtered and most of the beef is sold as either boxed or carcass beef to retail and wholesale grocers. The large retail food chains buy most of their beef directly from slaughterers and packers. The complaints do not allege a conspiracy between the slaughterers and packers and the defendants.

The plaintiffs allege that the wholesale or carcass price of beef, the price paid by the retail chains to packers and slaughterers, is established by the large retail chains acting in concert. For [**10] any given week, it is alleged, the wholesale price in a given area of the United States is set by the pricing decision of the A & P or Safeway Stores, Inc. or the Kroger Co. or one of the other defendants. In antitrust jargon, each wields monopsony power in its region or, with others, oligopsony power. [3.] One designated retail chain in a given area will buy its beef in the regional wholesale market early in the week. The pricing decisions of the leading purchasers in the various regions of the nation are reported in the National Provisioner Daily Market and News Service, ("National Provisioner") or "Yellow Sheet", and thus become known to the entire wholesale beef trade. The other retail chains, it is alleged, then follow the price established by the regional leader in purchasing their requirements of beef for the period. The chains, according to the complaints, can dictate the wholesale price to the packers because they wield monopsony or oligopsony power and because the packers have no long-term storage facilities and therefore cannot withhold their product. [4.] The chains' power is augmented by their considerable cold-storage capacity: they can blunt price rallies by abstaining [**11] from the wholesale market and working from their stockpiles.

The price depressions thus engineered are directly "passed on" to the ranchers and feeders, according to the complaints. The plaintiffs allege that the cattlemen, like the slaughterers and packers Vis-a-vis the chains, are in no position to negotiate prices because they cannot, at least in the short term, withhold their product. A fattened steer or heifer, the complaints allege, must be sold within three weeks of the time it reaches choice grade. [**12] If the animal is not sold in that time it becomes over-fattened and hence less valuable. The supply of fat cattle is therefore inelastic in the short term. The cattlemen contend that they must take the price the packers quote. The packers, according to the complaints, bid prices derived directly from the Yellow Sheet (or, west of the Rockies, the Safeway) carcass price. Working from estimates of the percentage of an animal that will be carcass beef salable to the retain chains, the packers pay cattle prices based on the Yellow Sheet prices. [5.] Thus, the allegedly artificially [*1155] low wholesale prices established by the retail chains' combination translate directly into artificially low prices for fat cattle.

 [**13] The plaintiffs do not know when this alleged conspiracy began, but contend that it has been in operation since 1963 at the latest. The food chain defendants, according to the complaints, coordinate their efforts through meetings conducted by the National Association of Food Chains. The conspirators allegedly effect their price-fixing schemes by allocating to dominant chains geographical areas in which to exercise price leadership, and by controlling or manipulating the "Yellow Sheet". The elimination of price competition is further assured by agreements concerning the conspirators' respective specifications for beef. The plaintiffs charge that the chains in any given region coordinate their specifications so that the chains do not compete with each other in purchasing beef of their respective specifications.

The complaints were filed in 1975. The cattlemen charge that the scheme violates section 1 of the Sherman Act, because it is a scheme "in restraint of trade and commerce". They also contend that the scheme was "an attempt to monopolize" and had the effect of monopolizing the wholesale beef market in violation of section 2 of the Act. The complaints also allege that [**14] the retail chains fix the retail price of beef to consumers. They request injunctive relief, under section 16 of the Clayton Act, and treble damages going back to the beginning of the alleged conspiracy. The Clayton Act's four-year statute of limitations would ordinarily operate to limit recovery to damages ac-

---

3.    We use the term "monopoly" to refer to price-fixing by sellers; "monopsony" and "oligopsony" to refer respectively, to price-fixing by a single purchaser or by a group of purchasers, that is, the retailers/defendants in this case.

4.    Chainwide pricing decisions for a given region are made possible, according to the allegations of the complaints, by the chain's centralized buying practices. Purchases are made for an entire chain or for a large part of a chain, it is alleged, from a central location.

5.    As explained in Paragraph 28 of the Amended and Substituted Complaint in the Meat Price Investigators Association ("MPIA") suit:

Cattle buyers for beef slaughterers figure the percentage of dressed meat on the live animal and give the cattle feeder a price for the live animal based on the Yellow Sheet or its west coast counterpart, the "Safeway price."

cruing within four years of the filing of the complaints. [6.] The plaintiffs, however, urged that the defendants and their co-conspirators fraudulently concealed the conspiracy from the beginning, and that the statute of limitations therefore did not begin to run until the plaintiffs discovered, in July 1974, that the alleged conspirators had indeed met to discuss the pricing of beef. [7.]

[**15] In late 1975, before the instant actions were consolidated in the Northern District of Texas, that court entered partial summary judgments in the Pony Creek case, a suit originally filed in the Northern District of Texas, dismissing with prejudice the Pony Creek plaintiffs' claims for damages that accrued prior to June 5, 1971. In December of 1976, following the consolidation of the various actions in the Northern District of Texas, the defendants filed motions for partial summary judgment on the statute of limitations issue in the remaining suits. The district court denied those motions. The Pony Creek plaintiffs filed a motion to vacate the earlier partial summary judgments entered against them, but the district court has not acted on that motion.

In June 1977 the defendants in all the cases filed a joint motion for judgment on the pleadings based on the Supreme Court's opinion in Illinois Brick. They pointed out the absence of any allegations that the plaintiffs had sold cattle directly to the defendant retail chains. The suits, they contended, were therefore barred by the general rule of Illinois Brick that only those parties who have dealt directly with members of a price-fixing [**16] conspiracy can maintain an antitrust action for damages against the price-fixers. The plaintiffs asked the district court to stay its ruling on the defendants' motion pending further discovery. Six months later, in December, 1977, the district court entered its order dismissing twelve of the suits for failure to state claims and striking the allegations of retail price-fixing. The court dismissed the [*1156] remaining case the Little Ranch case in February 1977. All the cases were dismissed with prejudice.

II.

We address first the most important issue in these appeals: Did the district court err in dismissing the appellants' claims for damages?

A.

We meet at the outset questions about the applicability of Illinois Brick to these actions. The appellants' first line of attack on the district court's decision is the bold argument that Illinois Brick simply has no application to these actions. They also urge that, assuming Illinois Brick is relevant, the decision cannot bar damage claims against the National Provisioner and the grocery chain trade association because neither is a buyer or seller of beef. In the interests of clarity, our assessment of these contentions will [**17] begin with a discussion of the background and rationale of the Illinois Brick decision.

HN3 The Illinois Brick rule barring damages actions against alleged price-fixers by indirect purchasers has its genesis in Hanover Shoe, Inc. v. United Shoe Machinery Corp., 1968, 392 U.S. 481, 88 S. Ct. 2224, 20 L. Ed. 2d 1231. Hanover Shoe involved an antitrust treble-damages suit under § 4 of the Clayton Act against a manufacturer of shoe machinery by one of its customers, a lessee of the machinery. The plaintiff claimed damages arising from the defendant's practice of leasing, rather than selling, the machinery, a practice that the plaintiff contended was a violation of section 2 of the Sherman Act. The Supreme Court affirmed the trial court's refusal to permit the defendant to prove up the defense that any illegal overcharges imposed on the lessee shoe manufacturer had been passed on to that manufacturer's customers. The Court referred to a "general tendency in the law" not to trace damages "beyond the first step". 392 U.S. at 488 n.6, 88 S. Ct. 2224, n.6 (quoting Southern Pacific Co. v. Darnell-Taenzer Lumber Co., 1918, 245 U.S. 531, 38 S. Ct. 186, 62 L. Ed. 451). [8.] The Court rejected the [**18] defendant's argument that the general rule should admit of an exception when economic circumstances are such that the overcharge to the buyer both caused and enabled the buyer to pass on the full overcharge to his customers. The impact of the overcharge on

---

[6.] HN2 Section 4B of the Act, 15 U.S.C. § 15b, states, in relevant part:

Any action to enforce any cause of action under sections 15 or 15a of this title shall be forever barred unless commenced within four years after the cause of action accrued.

[7.] That information was allegedly disclosed during discovery in Bray, et al. v. Safeway Stores, et al., N.D.Cal., 392 F. Supp. 851 (1975), a suit virtually identical to the instant actions brought by California cattlemen against many of the defendants in these cases.

[8.] Before Illinois Brick, a strong case could have been made that the Hanover Shoe decision rested primarily on the Court's perception that the middleman, and not the remote purchaser, is the likeliest enforcer of the antitrust laws. Although it is probable that Hanover, like most middlemen, passed on much of the overcharge, recognition of a passing-on defense would have reduced

the buyer's pricing decisions, said the Court, cannot be demonstrated with any precision in the ordinary case. 392 U.S. at 492-93, [9.] 88 S. Ct. 2224. Recognition of a general passing-on defense would, **[*1157]** in the Court's opinion, simply encourage defendants to attempt to establish its applicability, thus complicating and protracting many antitrust proceedings. Id. at 493, 88 S. Ct. 2224. The Court rejected the passing-on defense as a general matter and expressed its view that the defense should be permitted only in certain narrow circumstances when the concerns underlying its rejection in Hanover Shoe were not present. Id. at 494, 88 S. Ct. 2224.

Hanover Shoe barred defensive passing-on, **[**20]** *HN4* the use of passing-on as a defense in an antitrust action. In Illinois Brick, the Court resolved a split of authority in the courts of appeals by ruling that, *HN5* with few exceptions, indirect purchasers of an alleged price-fixer's product cannot maintain a treble damages action predicated on the offensive use of the theory that the price-fixer's overcharge to his customer was passed on to the plaintiffs. The plaintiffs were separated from the price-fixing offenders by two intervening transactions: the bricks moved from the manufacturers through subcontractors and general contractors to the consumers, carrying a four-cent-per-brick overcharge each time the brick changed hands. The court decided that if Hanover Shoe were to be followed, offensive as well as defensive use of passing-on must be barred. The Court noted that recognition of a "one-sided" limitation on a passing-on theory of damages would lead to a "serious risk of multiple liability". If offensive use of passing-on were permitted, a price-fixer could be held liable to an indirect purchaser for the amount of the overcharge passed-on to that purchaser by the price-fixer's direct customer yet, lacking a passing-on defense **[**21]** (under Hanover Shoe ), would be liable to the direct purchaser, his customer, for the full amount of the overcharge. [10.] Further, the Court concluded that the rationale of Hanover Shoe had not depended on the defensive context in which passing-on was asserted in that case. The "uncertainties and difficulties in analyzing price and out-put decisions" in the real world, 431 U.S. at 731-32, 97 S. Ct. at 2068, the "principal basis" for the Hanover Shoe holding, Id. at 731, 97 S. Ct. 2061, counseled rejection of offensive passing-on as well. Those same "evidentiary complexities and uncertainties" and undesirable delays would attend the effort of indirect purchasers to establish that illegal overcharges were passed on to them. Id. at 732, 97 S. Ct. 2061. The Court decided, therefore, that *HN6* the passing-on theory of damages must be barred in those situations in which the defendant could not assert a passing-on defense against his direct purchasers. Id. at 735-36, 97 S. Ct. 2061.

**[**22]** Because Illinois Brick adopted a unified "mutuality" approach to passing-on problems we must reject the appellants' argument that Illinois Brick has no application to these suits insofar as they seek relief for violations of Section 2 of the Sherman Act. Under Illinois Brick, the plaintiffs would be entitled to urge a pass-on theory of damages only if the defendant retail chains could use a passing-on defense to claims brought by the packers and slaughterers. Whether the plaintiffs can proceed on a passing-on theory of damages is, applying the mutuality principle, a question unaffected by their denomination of the claim. Absent exceptional circumstances, Illinois Brick and Hanover Shoe limit the use of passing-on theory in antitrust actions without regard to the parties' characterization of the offense.

---

the incentives for middlemen to sue. Professor Posner has observed: "The choice was thus between overcompensating Hanover and underdeterring United. The Court's preference for the former is consistent with the view that the primary purpose of antitrust damage actions is to deter violations of law." R. Posner, Antitrust Cases, Economic Notes and Other Materials 149 (1974). See Illinois Brick, 431 U.S. at 752-53, 97 S. Ct. 2061, 52 L. Ed. 2d 707 (Brennan, J., dissenting).

In Illinois Brick, however, the Court observed that the Hanover Shoe decision rested primarily on the difficulty-of-proof problem, and not on the deterrence rationale. Illinois Brick, 431 U.S. at 720 n.12, 97 S. Ct. 2061, 52 L. Ed. 2d 707 n.12.

9.    Normally the impact of a single change in the relevant conditions cannot be measured after the fact; indeed a businessman may be unable to state whether, had one fact been different (a single supply less expensive, general economic conditions more buoyant, or the labor market tighter, for example), he would have chosen a different price. Equally difficult to determine, in the real economic world rather than an economist's hypothetical model, is what effect a change in the company's price will have on its total sales. Finally, costs per unit for a different volume of total sales are hard to estimate. Even if it could be shown that the buyer raised his price in response to, and in the amount of, the overcharge and that his margin of profit and total sales had not thereafter declined, there would remain the nearly insuperable difficulty of demonstrating that the particular plaintiff could not or would not have raised his prices absent the overcharge or maintained the higher price had the overcharge been discontinued.

392 U.S. at 492-93, 88 S. Ct. at 2231.

10.    A serious risk of overlapping liability would remain even under a rule permitting the offensive use of passing-on only in situations in which the defendant could use a passing-on defense, unless the scope of passing-on were narrowly restricted to cases in which the incidence of overcharges could be established with certainty. That risk would arise from the risk of inconsistent factfindings in separate lawsuits by direct and indirect purchasers. Note, Scaling the Illinois Brick Wall: The Future of Indirect Purchasers in Antitrust Litigation, 63 Cornell L.Rev. 309, 319 n.43 (1978). The magnitude of that risk would vary directly with the speculativeness of the proof of the incidence of the overcharge. By narrowly limiting the use of passing-on to cases in which the overcharge can be traced with ease and certainty, see part II, B of this opinion below, the Supreme Court has all but eliminated this risk of duplicative liability.

[*1158]  The appellants' most ambitious contention is that Illinois Brick is entirely inapposite to price-fixing suits brought by sellers against indirect purchasers. They point out that Illinois Brick involved purchasers who charged price-fixing by a remote seller and contend that Illinois Brick should be limited to that type of case because the harm suffered by sellers [**23]  in cases such as this one is much greater than the harm suffered by indirect purchasers in the paradigmatic Illinois Brick -type case. Especially is this so, they urge, when, as here, the alleged price-fixing conspiracy stands like a tollgate athwart the powerful "middle position" in the beef marketing system. The cattlemen's argument, we take it, is that the serious harm flowing from monopsony or oligopsony price-fixing at a middle tier in an industry's structure outweighs the considerations, avoidance of overlapping liability and concern about complexities and uncertainties of proof, that underlay Illinois Brick concerns that the Court may have overemphasized. See The Supreme Court, 1976 Term, 91 Harv.L.Rev. 70, 221-31 (1977).

The first step in assessing this argument is to examine the claim that the harm engendered by monopsony or oligopsony pricing of the kind alleged is, as a categorical matter, greater than that engendered by monopoly pricing. We focus first on monopsony or oligopsony pricing in general, without regard to the position occupied by the price-fixing combination in the productive chain. On this point, the appellants' contentions center on the harm suffered by  [**24]  the competitors themselves the sellers. In the case of monopoly price-fixing, they say, the damaged buyer has a choice: he can refuse to buy the affected product and buy, instead, a substitute. In the monopsony or oligopsony price-fixing case, however, the seller faces a Hobson's choice: he can sell into the rigged market and take the depressed price, or he can refuse to sell at all. In their case, say the cattlemen, this means destroying fat cattle or, in the long run, cutting back production or going out of business.

We might acknowledge the difference as a general matter, but we have no reason to believe that the damage caused by the typical monopsony or oligopsony price-fixing scheme is significantly greater than that caused by the usual seller price-fixing scheme. Both types of price-fixing are attended by restrictions in industry output and the consequent reallocation of resources to less valuable uses. [11.] The appellants argue that the reallocation process in the monopsony price-fixing case is inherently more likely than in the monopoly price-fixing case to cause business failures. [12.] Assuming this to be true, Arguendo, we do not think that this distinction is sufficient [**25]  to  [*1159]  warrant disparate treatment of monopoly and oligopsony for purposes of pass-on problems. If the Illinois Brick decision is grounded on a balancing of the deterrence and compensation policies of the treble-damages action against considerations of judicial economy and fairness to defendants a view of Illinois Brick that is crucial to the appellants' argument [13.] it seems to us that the Supreme Court chose to permit entire price-fixing schemes, in some circumstances, to go unremedied by private damage actions. If the Court felt that competing considerations outweigh the costs of leaving unremedied the totality of harm flowing from some monopoly price-fixing schemes, we find it difficult to believe that the incremental harm, in the form of possible business failures, that might flow from un-

---

[11.]   See generally J. Hibdon, Price and Welfare Theory 244-53 (Monopoly pricing); 264-67 (Monopsony) (1969); K. George & J. Shorey, The Allocation of Resources 150-52 (1978).

[12.]   In the case of monopoly price-fixing, the price-fixing generally raises the price of all goods that incorporate the product subject to the price-fixing. If the conspirators sell directly to the consuming public, the only businesses adversely affected are those in industries that supply complementary goods. If the conspirators do not sell directly to the consuming public, then the product is but an input in the production of other goods or services. By raising the cost of that input, the price-fixing conspiracy might conceivably have the effect of driving marginal firms that use the input out of the market. The likelihood of this occurring depends upon the magnitude of the cost of the input relative to the purchasing firm's total costs of production and on the elasticity of demand for the firm's product. A fixed percent rise in the cost of beef, for example, threatens the profitability of a steakhouse far more than that of a grocery store. The impact will be greatest in the rare case of a firm that simply buys and resells only the good affected by the price-fixing conspiracy.

Most firms that sell directly to the typical monopsony or oligopsony price-fixing conspiracy, however, are in a position analogous to that of the single-product distributor who purchases his product from price-fixing conspirators. The good affected by the price-fixing conspiracy is likely to be the seller's only product or to represent a significant percentage of the seller's output. In general, the impact on a firm's revenues of a purchaser price-fixing scheme aimed at the product it sells is greater than the impact on a firm's costs of a monopoly price-fixing scheme affecting an input into the firm's product.

[13.]   If Illinois Brick did not involve such a balancing, even implicitly, then the appellants' argument that the greater harm flowing from purchaser, as compared with seller, price-fixing, justifies special treatment of passing-on problems in monopsony cases loses its premise. Formally, at least, Illinois Brick involved no such balancing as suggested in the text. The Illinois Brick holding is essentially the rule of mutuality. That rule was justified almost entirely by reference to the problem of overlapping liability, and the Court's focus on the risk of overlapping liability was a result of its assumption that direct purchasers, as well as indirect, would likely sue the price-fixers. On the surface of it, then, Illinois Brick does not acknowledge that its pass-on rule involves any significant sacrifice of antitrust enforcement: in those cases in which the rule bars indirect purchasers from suing, the direct purchasers, it is assumed, will likely come to the fore.

remedied monopsony or oligopsony price-fixing schemes would tip the Court's balance in favor of enforcement in the purchaser price-fixing case. The increment is too insignificant in comparison with the total damage caused by price -fixing.

The appellants urge that the Supreme Court has recognized that conspiracies aimed at sellers are especially abhorrent. None [**28] of the cases they cite, however, establish anything more than the unsurprising proposition that producers damaged by anti-competitive schemes have a remedy under the antitrust laws. [14.] As support for their contention that conspiracies at the strategic middle position or "bottleneck" in an industry's structure are especially disfavored, they cite the Supreme Court's decisions in American Tobacco Co. v. United States, 1946, 328 U.S. 781, 66 S. Ct. 1125, 90 L. Ed. 1575, and Standard Oil Co. of New Jersey v. United States, 1911, 221 U.S. 1, 31 S. Ct. 502, 55 L. Ed. 619. Those decisions, it is true, recognize the seriousness of monopsony or oligopsony at the dominant middle of an important industry's productive chain, but they do not single out that situation for special treatment under antitrust laws. We cannot carve from an important antitrust rule intended to be of general application exceptions based on the sheer magnitude or impact of the particular conspiracy alleged.

[**29] We conclude that *HN7* there is nothing special about monopsony or oligopsony price-fixing cases that justifies treating them differently from monopoly price-fixing cases for passing-on purposes. Illinois Brick therefore speaks to the instant cases.

A final issue as to the applicability of the Illinois Brick rule concerns the appellants' cases against the National Provisioner and the National Association of Food Chains. The appellants argue that the Hanover Shoe-Illinois Brick limitations on the use of passing-on theory apply only to suits brought against firms that are in the chain of production. They theorize that the "central rationale" of the Hanover Shoe And Illinois Brick decisions is that firms dealing directly with the alleged price-fixer are likelier than firms remote in the productive chain to sue and that severe limitations on the use of passing-on theory are necessary [*1160] lest direct-dealing firms be discouraged from bringing suit. Because the trade publication and the trade association do not buy or sell beef at all, the argument continues, there are no firms in the beef marketing system that deal directly with these defendants. The cattlemen, the appellants [**30] conclude, are as likely as anyone to bring suit against those defendants.

The argument rests on a faulty premise. The Illinois Brick decision rested on avoidance of overlapping liability and on concern about the complexities and uncertainties of proof that would attend general recognition of passing-on theories of damage. What is critical is not whether a defendant competes in the relevant industry but whether the plaintiff's action (or the defendant's defense) asserts a form of passing-on theory. The complaints in these cases do so. The National Provisioner and the National Association of Retail Chains do not buy or sell beef but the appellants' complaints charge that they conspired with firms that do buy beef to fix the purchase price of boxed and carcass beef. That the trade publication and trade association defendants do not market beef does not diminish the problems of overlapping liability and uncertainty of proof posed by the use of a passing-on theory of damages. The doctrine of Illinois Brick therefore applies to the complaints against these two defendants.

B.

Having determined that the Hanover Shoe-Illinois Brick Doctrine applies to the damages claims in their entirety [**31] we turn to the appellants' contentions that these actions fit recognized exceptions to the bar against use of passing-on theory.

1. The Co-Conspirator Exception.

Certain of the appellants contend that the complaints in these actions, liberally construed, allege a conspiracy between the retail chains, on the one hand, and the packers and slaughterers on the other. [15.] They argue for an exception from the Illinois Brick rule for cases involving a conspiracy between the remote price-fixers and the direct-dealing intermediary.

---

[14.] E. g., Zenith Radio Corp. v. Hazeltine Research, Inc., 1969, 395 U.S. 100, 89 S. Ct. 1562, 23 L. Ed. 2d 129; Continental Ore v. Union Carbide & Carbon Co., 1962, 370 U.S. 690, 82 S. Ct. 1404, 8 L. Ed. 2d 777; Klor's, Inc. v. Broadway Hale Stores, Inc., 1959, 359 U.S. 207, 79 S. Ct. 705, 3 L. Ed. 2d 741; Mandeville Island Farms v. American Crystal Co., 1948, 334 U.S. 219, 68 S. Ct. 996, 92 L. Ed. 1328. The cases cited by the appellants, with the exception of Mandeville Island Farms, were cases involving monopolization or exclusionary practices, not price-fixing. None involved passing-on theories of damage.

[15.] Indeed, many of the allegations strongly suggest that all the non-defendant co-conspirators adverted to in the complaints are food retailers. Paragraph 34 of the MPIA Amended and Substituted Complaint, for example, states in part:

600 F.2d 1148, *1160; 1979 U.S. App. LEXIS 12397, **32

[**32]  They argue, first, that cases involving conspiracy spanning two levels in the chain of distribution fit the exception recognized in Illinois Brick for cases in which the defendant owned or controlled its customer (the middleman). Illinois Brick, 431 U.S. at 720 n.16, 97 S. Ct. 2061, 52 L. Ed. 2d 707 n.16. [16.] If the retail chains conspired with the packers and slaughterers, they urge, the retailer can be said to have "controlled" the middleman within the meaning of footnote 16 of Illinois Brick. Market forces would have been  [*1161]  superseded in such circumstances. There would then be no indirect dealing problem, it is argued, since those selling to the packers and slaughterers would have dealt directly with the price-fixing conspiracy.

[**33]  Even if proof of a multilevel conspiracy would not bring the case within the "control" exception recognized in Illinois Brick, it is urged, we should recognize a distinct exception for vertical conspiracies. The appellants argue that the defendants remote from the plaintiffs in the chain of distribution do not run the risk of double liability if it is proved that the intermediary was an equal participant in the price-fixing conspiracy, for the co-conspirator intermediary could not recover in a suit against the remote seller or purchaser. This is so, they say, because "when parties of substantially equal economic strength mutually participate in the formation and execution of the scheme and bear equal responsibility for the consequent restraint of trade, each is barred from seeking treble damages from the other". Columbia Nitrogen Corp. v. Royster Co., 4 Cir. 1971, 451 F.2d 3, 15. See also Premier Electrical Constr. Co. v. Miller-Davis Co., 7 Cir. 1970, 422 F.2d 1132, Cert. denied, 1970, 400 U.S. 828, 91 S. Ct. 56, 27 L. Ed. 2d 58.

As the appellees point out, however, the co-conspiracy theory now urged by the plaintiffs-appellants was not set forth in the complaints. The theory [**34] of the complaints, both before and after the Illinois Brick decision, was that the defendants conspired to fix the prices paid to packers and that the packers simply "passed on" the price depression to cattlemen. Certain allegations in the complaints refer to unnamed co-conspirators, and the appellants now contend that the packers and slaughterers are included among those unnamed co-conspirators. Various paragraphs in the complaints refer to the unnamed co-conspirators as nondefendant food retailers. Nothing in the complaints, however, suggests that packers or other intermediaries conspired with the defendants. In their joint reply brief the appellants cite paragraph 34 of the MPIA and Becker Amended Complaints as an example of a packer conspiracy allegation. [17.] That paragraph, however, states merely that most slaughterers and packers have standing agreements with the defendant chain stores to supply fixed quantities of beef each week, and that the Yellow Sheet or "Safeway" price paid the packers sets the price that the packers pay the plaintiffs for their cattle. This is merely an allegation of passing-on, not of conspiracy. No agreement to fix prices is alleged. If the act [**35] of passing-on sufficed to brand the intermediary as a co-conspirator the asserted exception would wholly swallow the Hanover Shoe-Illinois Brick, rule.

---

b. Specifications have been established by the defendant retail food chains and other co-conspirators for the beef they buy. In most instances, the specifications for beef carcasses or parts thereof have varied . . . thus eliminating competition between and among the defendants and other co-conspirators.

c. The defendant food chains and other co-conspirators have allocated retail marketing areas . . . .

d. The defendant food chains and other co-conspirators have agreed not to compete with one another on a price basis in purchasing beef at wholesale . . . .

e. . . . Through uniform entry into the wholesale beef market or uniform withdrawal from the wholesale beef market, the defendant food chains and other co-conspirators have combined to monopolize to affect the demand for beef products and artificially depress the wholesale price of beef products to an unreasonably low level, which level is directly reflected by the Yellow Sheet price and the "Safeway price,' and which prices are directly passed on to the beef producer.

16.    "Another situation in which market losses have been superseded and the pass-on defense might be permitted is where the direct purchaser is owned or controlled by its customer. Cf. Perkins v. Standard Oil Co., 395 U.S. 642, 648, 89 S. Ct. 1871, 1874, 23 L. Ed. 2d 599 (1969); In re Western Liquid Asphalt Cases, 487 F.2d 191, (at) 197, 199." But "reliance upon direct purchasers to bring suit is wholly unjustified when they are controlled by the prospective defendants". The Supreme Court, 1976, 91 Harv.L-.Rev. 70, 230 (1977).

17.    That paragraph states:

Most slaughterers and packers have standing agreements with various receivers, including the defendant chain stores and other co-conspirators, for certain quantities of beef each week. With knowledge of their weekly requirements and of the prices quoted in the Yellow Sheet or the "Safeway Price," the packers and slaughterers directly pass down the price established by the defendant retail food chains. The packers and slaughterers in aggregate do not suffer any diminution of sales, purchases, margins or profits as a result of this artificially low price.

600 F.2d 1148, *1161; 1979 U.S. App. LEXIS 12397, **35

The appellants urge that the district court abused its discretion by failing to give them adequate opportunity to amend their complaints, after the Illinois Brick decision, to allege a vertical conspiracy, and by denying post-judgment requests for leave to amend. We do not agree.

[**36] *HN8* Leave to amend pleadings should be granted liberally when previously unimportant factual issues gain significance as the result of rulings on a point of law handed down during the pendency of the litigation. E. g., Commissioner of Internal Revenue v. Estate of Donnell, 5 Cir. 1969, 417 F.2d 106. In none of these cases, however did the district court before the entry of its dismissal order deny the plaintiffs leave to amend their complaints in light of Illinois Brick. And all plaintiffs had a reasonable opportunity to amend before the district court ruled on the defendants' dismissal motions. Those motions, based on Illinois Brick, were filed on July 17, 1977, eight days after the [*1162] Supreme Court's decision. The district court did not rule on the motions until October, 1977. In three of the suits, the MPIA, Becker, And Petersen suits, the complaints were amended, with leave of court, after the filing of the defendants' motions to dismiss. None of those complaints, however, adequately alleged "conspiracy." The plaintiffs in the remaining suits stood on the allegations of their complaints, asserting that the "unnamed" co-conspirators mentioned therein were indeed packers [**37] and slaughterers. Following the court's communication of its decision to the parties, an attorney for one of the plaintiffs requested that the dismissal be "without prejudice," but none of the plaintiffs attempted to amend the complaints until the Black And Pony Creek plaintiffs, After the court's December 9 entry of its order dismissing the suits with prejudice, filed motions for leave to amend.

The district court did not abuse its discretion in denying the post-judgment motions for leave to amend. *HN9* Rule 15(a) of the Federal Rules of Civil Procedure requires that leave to amend be freely granted "when justice so requires." The Supreme Court has said that *HN10* motions to amend may properly be denied when there has been undue delay in moving for leave to amend. Foman v. Davis, 1962, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222. The plaintiffs have offered no credible explanation for their failure to move for leave to amend until nearly five months after the defendants moved for dismissal on the basis of Illinois Brick. [18.] Absent any apparent justification for this delay, we cannot hold that the district court abused its discretion. We emphasize, moreover, that these motions were [**38] made after the court's entry of the dismissal orders and after the movants had, in their legal memoranda in support of their opposition to the motion to dismiss, asserted that they stood, in regard to the co-conspiracy issue, on the allegations of their existing complaints. The plaintiffs tested the theory that their embellished allegations of passing-on were equivalent to allegations of packer complicity in the price-fixing conspiracy and lost. We have said before that

> (m)uch of the value of summary judgment procedure . . . would be dissipated if a party were free to rely on one theory in an attempt to defeat a motion for summary judgment and then, should the theory prove unsound, come back long thereafter and fight on the basis of some other theory.

Freeman v. Continental Gin Co., 5 Cir. 1967, 381 F.2d 459, 469-70.

The Supreme [**39] Court in Foman also declared that *HN11* denial of leave to amend is proper when the proposed amendment would be futile. Foman v. Davis, supra, 371 U.S. at 182, 83 S. Ct. 227. The district court's denial of the post-judgment motions was supportable on this ground as well. Amendment of the complaints to allege a vertical conspiracy would not have brought these actions within the "control" exception in Illinois Brick. In footnote 16 of Illinois Brick the Court suggested the intended scope of the "control" exception by citing the Ninth Circuit's decision in In re Western Liquid Asphalt Cases, 1973, 487 F.2d 191, Cert. denied, 415 U.S. 919, 94 S. Ct. 1419, 39 L. Ed. 2d 474. In that case there was evidence tending to show that the defendants controlled their direct customers "either through acquisition of stock, or indirectly through various financial arrangements, including credit". Id. at 195. It has been suggested that "courts should invoke the exception only to ensure that sellers do not insulate themselves from suit . . . by strong-arming direct purchasers into choosing not to sue". Note, Scaling the Illinois Brick Wall: The Future of Indirect Purchasers in Antitrust Litigation, 63 [**40] Cornell L.Rev. 309, 328-29 (1978). The plaintiffs in these suits have never suggested that the grocery chains "controlled" the packers or slaughterhouses, either through stock ownership or credit arrangements. Indeed, the plaintiffs proposed to amend their complaints to allege a vertical conspiracy, [*1163] not to allege arrangements by which the defendants controlled the packers and slaughterhouses.

Nor do we think that allegations of conspiracy would bring these cases within an exception for suits alleging vertical conspiracy. It is true that some courts have acknowledged such an exception. E. g., Florida Power Corp. v. Gran-

---

18.    The only explanation given is the Chapparal plaintiffs' lame assertion that it took a long time to divine the meaning and implications of the Illinois Brick Decision.

600 F.2d 1148, *1163; 1979 U.S. App. LEXIS 12397, **40

lund, M.D.Fla., 1978, 78 F.R.D. 441; Donson Stores, Inc. v. American Bakeries Co., S.D.N.Y., 1973, 58 F.R.D. 481. Whatever the merits of the arguments for such an exception in general, we do not think that the reasoning of Illinois Brick permits recognizing the exception when, as here, the alleged co-conspirator middlemen are not named as parties defendant. Absent joinder of the packers and slaughterhouses, the rule forbidding one antitrust conspirator from maintaining an action against another for damages arising from the joint activity would not protect [**41] these defendants from the risk of overlapping liability. The retail chains could not, in a suit brought by the packers, use a judgment or finding of vertical conspiracy in the instant case to prevent the packers from successfully asserting in their own lawsuit that they did not in fact conspire with the chains and are therefore not barred by the co-conspirator doctrine from recovering damages from the retail chains. E. g., Mosher Steel Corp. v. N. L. R. B., 5 Cir. 1978, 568 F.2d 436. Because the packers are not parties to this suit, the possibility of inconsistent adjudications on the issue of the existence of a vertical conspiracy leaves the defendants subject to the risk of multiple liability that the Illinois Brick Court found unacceptable.

For these reasons we uphold the district court's refusal to permit post-judgment amendments to the complaints.

2. The "Cost-Plus" Exception.

The appellants urge that outright dismissal of their damage claims was error because the complaints stated good claims within the "cost-plus contract" exception in Illinois Brick.

The Supreme Court acknowledged in Hanover Shoe "that there might be situations for instance, when an over-charged buyer [**42] has a pre-existing "cost-plus" contract, thus making it easy to prove that he has not been damaged when the considerations requiring that the passing-on defense not be permitted in this case would not be present". 392 U.S. at 494, 88 S. Ct. at 2232. The Court in Hanover Shoe seemed to suggest **HN12** a general exception to the bar against assertion of a passing-on defense, an exception defined by the policies underlying the bar. Cases in which the middleman's customer is obligated under a pre-existing cost-plus contract to purchase a fixed quantity of goods are paradigmatic of this exception. The proof the contract itself and evidence of its performance is simple and unequivocal. [19.] Uncertainties of proof are thus avoided. The risk of overlapping liability is eliminated or reduced to the barest minimum inasmuch as the evidence is not susceptible of differing interpretations and is unlikely to be accepted in one lawsuit and rejected in another.

[**43] As we understand these cases, the Court meant the scope of the exception to be narrow, but it did not imply that only cases involving cost-plus contracts qualify. Commentators have observed that Hanover Shoe and Illinois Brick **HN13** permit the assertion of passing-on situations that are the functional equivalent of the cost-plus contract case. E. g., Note, Recovery by Indirect Purchasers and the Functions of Antitrust Treble Damages, 55 Texas L.Rev. 1445, 1454-57 (1978). "Although the Court [*1164] intended the exception to have a "narrow scope', any situation in which (the impact of the overcharge is essentially determined in advance "without reference to the interactions of supply and demand' would function in the same way." Note, Scaling the Illinois Brick Wall: The Future of Indirect Purchasers in Antitrust Litigation, 63 Cornell L.Rev. 309, 331 n.93 (1978) (citations omitted). When the impact of an overcharge on a middleman's pricing decisions can be so determined, the uncertainties involved in resorting to general economic theorems are avoided and the clarity of the evidence virtually eliminates the possibility of overlapping liabilities as the result of inconsistent verdicts [**44] in separate lawsuits. Functional equivalence is not lost simply because the proponent of passing-on theory cannot demonstrate that the middleman suffered no loss in volume as the result of raising the price to his customers. [20.] In the cost-plus contract case itself, the middleman is likely to have suffered a loss of volume and hence profits as a result of the overcharge. His higher selling

---

19.    In Hanover Shoe the Court emphasized the inadequacy of economic theory to the task of tracing the incidence of an overcharge. See note 7 Supra. In Illinois Brick the Court elaborated on the point. The Court noted that economic theory provides a formula for determining the incidence of an overcharge, but that the analysis rests on "an array of simplifying assumptions" and assumes knowledge of the elasticities of supply and demand in the relevant market. 431 U.S. at 741-42, 97 S. Ct. 2061. The unacceptability of the assumptions and the near-impossibility of measuring the relevant elasticities renders such incidence analysis little more than a guessing game in practice, the Court seemed to suggest. The Court was concerned not so much with the complexity of such proof as with its speculative character.

20.    In Yoder Bros., Inc. v. California-Florida Plant Corp., 5 Cir. 1976, 537 F.2d 1347, Cert. denied, 429 U.S. 1094, 97 S. Ct. 1108, 51 L. Ed. 2d 540, a panel of this Court reversed a treble damages judgment that was erroneously reduced by recognition at trial of a passing-on defense. The Court ruled that the defense was not available because the evidence of the party asserting the defense did not demonstrate the applicability of the cost-plus exception suggested in Hanover Shoe. The Court found that the evidence did not show the effect of a price change on the direct purchaser's total sales or unit costs for a different sales volume. Under the rule of Yoder Bros., the passing-on defense is unavailable absent evidence that the direct purchaser did not suffer harm in the form of lost sales volume, even if it is proved that the direct purchaser passed on the entirety of the overcharge.

600 F.2d 1148, *1164; 1979 U.S. App. LEXIS 12397, **44

price will likely have caused potential customers to forego his product. See Note, 63 Cornell L.Rev. 309, 329 n.87. The middleman's loss of volume and the indirect purchaser's absorption of the overcharge are wholly separable items of damage.

[**45]  Applying these principles, we conclude that the district court erred in dismissing these actions. The dismissal, we emphasize, was on the pleadings. The question at the pleading stage is simply whether [*1165] the allegations of the complaints state a case within the ″cost-plus″ exception. The complaints sufficiently allege that the impact of the retail chains' price changes upon the pricing decisions of the packers is determined in advance without regard to the interactions of supply and demand. The plaintiffs allege that the packers set the price of live cattle by strictly applying certain formulae to the Yellow Sheet or Safeway wholesale beef price. Under these allegations a plaintiff would be entitled, once he proved what the competitive wholesale price would have been for a given grade of beef in a given region at a given time, and once he established that the packer to whom he sold strictly applied a formula to the Yellow Sheet price for the particular sale, to damages in the amount of the difference between the price he actually received on that sale of fat cattle and the price he would have received absent price-fixing (computed by applying the packer's formula to [**46] the constructed competitive wholesale price). The packer's habitual use of predetermined formulae [21.] would enable measurement of the effect on prices for fat cattle of changes in wholesale prices. [22.] The plaintiffs have alleged the functional equivalent of cost-plus contracts.

[**47]  We do not agree with the appellees that the packer pricing mechanism alleged is exactly analogous to the ″fixed percentage markup″ or cost-based pricing systems rejected by the Illinois Brick Court as exceptions to the passing-on rule. In Illinois Brick the Court refused to recognize an exception where middlemen ″purport″ to charge a

---

Application of the Illinois Brick mutuality principle would suggest that, because under Yoder Bros. these defendants could not assert a passing-on defense at all in a treble damages suit brought by the packers and slaughterers absent proof that the packers and slaughterers suffered no loss of volume as a result of the alleged price-fixing, the cattlemen should be barred from using passing-on theory offensively against the defendants unless they demonstrate that the packers and slaughterers suffered no loss of volume. If this is so, then the bar against use of passing-on is absolute, for it would be impossible, not simply ″virtually″ impossible to make such a showing. Indeed, Yoder Bros. has the effect of eliminating the passing-on defense altogether, except perhaps in the very narrow case of a pre-existing, fixed quantity cost-plus contract.

We do not believe, however, that the Yoder Bros. Court's treatment of the pass-on issue is viable after Illinois Brick. The Yoder Bros. Court's very literal reading of Hanover Shoe to require parties asserting a pass-on defense to prove that the intermediary suffered no harm whatsoever rested, we think, on its view that the private treble damage action is of ″overriding importance . . . in the antitrust enforcement scheme.″ Id. at 1375. Indeed, Hanover Shoe was plausibly read, before Illinois Brick, as resting on the view that the strong policy in favor of antitrust enforcement justifies buying enforcement at the expense of overcompensating plaintiffs. See note 6 Supra. In Illinois Brick, however, the Court denigrated the importance of the antitrust enforcement rationale in the decision of Hanover Shoe and characterized the difficulty-of-proof problem as the key to Hanover Shoe. 431 U.S. at 732 n.12, 97 S. Ct. 2061 n.12. Indeed, Illinois Brick itself demonstrated that the policy in favor of vigorous antitrust enforcement must sometimes give way in face of the risk of overpunishing antitrust violators. The Yoder Bros. panel would not have taken so niggardly a view of the passing-on defense had it had the benefit of the Illinois Brick Court's interpretation of the Hanover Shoe opinion, or had it known the implications that its decision might have for antitrust plaintiffs after Illinois Brick.

Post-Illinois Brick commentary, moreover, has generally assumed that the issue of the impact on the direct purchaser's sales volume of an overcharge should not be dispositive in a case involving the offensive use of passing-on theory. E. g., Note, Recovery by Indirect Purchasers and the Functions of Antitrust Treble Damages, 55 Texas L.Rev. 1445, 1455 n.69 (1977). See also, Note, Scaling the Illinois Brick Wall: The Future of Indirect Purchasers in Antitrust Litigation, 63 Cornell L.Rev. 309, 329 n.87 (1978).

[21.]  Because these cases come up on appeal from dismissals on the pleadings, we are not concerned with the question whether packers and slaughterers in fact applied pricing formulae without deviation, or with the question whether the formulae employed were such that a change in wholesale prices in a given region had a predetermined effect on the price offered feeders in the region by the packers and the slaughterers. We must assume, for purposes of these appeals, that the plaintiffs could demonstrate that both questions are to be answered in the affirmative.

[22.]  In Hanover Shoe the Court pointed out that in attempting to prove a pass-on a litigant would have to demonstrate that the intermediary would not have raised his price absent the overcharge. 392 U.S. at 493 and n.9, 88 S. Ct. 2224 and n.9. This is a causation issue. The Court's general rejection of the use of passing-on theory rested in part on its view that this issue of causation could not, except in rare cases, be resolved with adequate certainty. See note 17 Supra. If, however, an intermediary over a long period of time consistently determines his purchase price by applying a fixed formula to the price he will receive when he in turn sells, the objection based on the speculativeness of the causation evidence disappears. Our legal system routinely permits triers of fact, as indeed it must, to infer causation, or the lack of causation, from the observation of deviation Vel non from long-indulged habit or practice.

fixed percentage markup. 431 U.S. at 743, 97 S. Ct. 2061. Here it is alleged that the packers In fact engaged in formula pricing. The Court in Illinois Brick was skeptical of the plaintiffs' claims because there is evidence that firms purporting to apply fixed markups above costs in fact fit the markup to the elasticity of demand for the product or juggle cost allocations to achieve the same result. F. Scherer, Industrial Market Structure and Economic Performance 176 (1970). An intermediary, such as a contractor in Illinois Brick, who employs numerous inputs in assembling his final product might bear the larger brunt of an increase in the price of one of his inputs without leaving any evidence that he did so. It is alleged that the intermediaries in these cases determine their purchase price for fat cattle by rigid application of formulae to the [**48] wholesale price for carcass beef. Assuming the allegations of the complaints to be true, a packer's absorption of a loss resulting directly from a decrease in the wholesale price would be detectable from a change in his purchasing formulae or from his paying a price for fat cattle that is above the price he would have paid had he adhered to his customary formulae. It is alleged, moreover, that the packers have no reason to depart from their purchasing formulae in the short run because short term supply is, by the very nature of cattle production, highly inelastic.

[*1166]  We recognize that it might be said that we are engaging in "the process of classifying various market situations according to the amount of pass-on likely to be involved and its susceptibility of proof in a judicial forum". See Illinois Brick, 431 U.S. at 744–45, 97 S. Ct. at 2074. But the Supreme Court itself engaged in such a process in suggesting exceptions to its bar against the use of passing-on theories. If allegations of structural inelasticity of short term supply and of rigid formula pricing by intermediaries do not bring a case within the cost-plus exception for purposes of a motion to dismiss [**49]  on the pleadings, then the cost-plus exception is a narrow one indeed, and must include only cases involving literal cost-plus contracts. [23.] In light of the purposes behind the passing-on bar preventing duplicative recoveries and avoiding the uncertainties involved in the use of incidence theory the situation alleged in these complaints is the functional equivalent of the cost-plus contract case.

The appellees are correct in asserting that the proposed proof of damages is far from simple. It will require detailed proof as to individual transactions. Attention must focus on the type and grade of cattle sold, and on whether (and which) pricing formulae were used by packers in making particular purchases. The proof must be detailed and particular. But this is a complexity born of quantity. The Kinds of proof that will be involved, [**50]  however, are not new to courts, and certainly not to antitrust courts. The cases as pleaded escape Illinois Brick only insofar as they avoid the use of general economic theory in tracing the effect of the defendants' price decisions, and only insofar as they can be proved, in the damages phase, with certainty. If, as to a particular transaction, it cannot be clearly shown that the purchasing packer applied a specific price formula, or if other details of a transaction, such as the quantity or grade of cattle, are not available, then the plaintiff cannot recover damages as to that sale. [24.]

[**51]  We reverse the district court's dismissal orders. Because the pleadings state a case within the cost-plus exception. We emphasize that we are not ruling that these plaintiffs are entitled to go to trial. The Supreme Court intended that it be determined early in the litigation whether (or to what extent) a party should be entitled to present a pass-on theory at trial. The defendants will have the opportunity to raise that issue again by summary judgment motion. Given the strictures of Hanover Shoe and Illinois Brick, the district court may and  [*1167]  should demand from the plaintiffs in each case a pretrial demonstration that they have definite and particularized proof that they will

---

[23.]    That view was recently taken by the Third Circuit Court of Appeals in Mid-West Paper Products Co. v. Continental Group, Inc., 596 F.2d 573 (1979), As amended April 5, 1979.

[24.]    The appellees have suggested that the plaintiffs will have to trace their cattle through the chain of production to establish that the cattle they sold to packers and slaughterhouses were in turn sold, in carcass form, to members of the alleged retail chain conspiracy. If the prices allegedly established by the defendants were uniformly followed by the beef retailing industry, as the plaintiffs allege, however, tracing would be unnecessary. The plaintiffs' theory of damages is not in all respects a pass-on type of theory. Their theory, stated most broadly, is that the activities of the alleged price-fixing conspiracy depressed wholesale prices generally, and not simply the prices paid by members of the conspiracy, and that packers and slaughterers based their purchases of live cattle on the depressed wholesale price. It is immaterial whether or not a steer purchased from a plaintiff found its way into the hands of a conspirator retailer. It is enough if, as alleged, the conspirators' activities caused a general depression in wholesale prices and the intermediary purchasing from a plaintiff based his pricing decision on the depressed wholesale beef price.

We disagree with the recent ruling of a divided panel of the Third Circuit Court of Appeals that one who deals with a nonconspiring competitor of price-fixing firms lacks standing to sue those firms for treble damages. See Mid-West Paper Products Co. v. Continental Group, Inc., supra note 23, 596 F.2d 587. That decision supports the appellants' contention, for if a person who deals directly with a nonconspiring competitor lacks standing, then an indirect purchaser from, or an indirect seller to, a nonconspiring competitor of the defendants A fortiori lacks standing. We agree with the dissent in Mid-West Paper Products that such a plaintiff satisfies the "target area" test for standing, See Part IV below, and that the injury suffered by such a plaintiff satisfies the tests for proximate causation. See 596 F.2d at 597.

need to establish damages. Nor does our ruling imply that the plaintiffs may attempt to trace damages beyond the tier comprised of those who sell directly to the packers or slaughterers. Under the allegations of the complaint only those plaintiffs who sold directly to the packers or slaughterers that engaged in strict formula buying are entitled to maintain damage claims. The complaints do not allege that feeders or brokers "passed on" price depressions to ranchers or that they engaged in [**52] strict formula buying based solely on Yellow Sheet prices.

III.

The appellants also appeal the dismissal of their claims for injunctive relief on the basis of Illinois Brick. It follows from our ruling that it was error to dismiss the damage claims on the pleadings that it was also error to dismiss the claims for injunctive relief on the pleadings. Our disposition of the injunctive relief issue, however, rests on the broader ground that *HN14* the Illinois Brick rule has no application to claims for injunctive relief.

We agree with the reasoning of Mid-West Paper Prods. Co. v. Continental Group, Inc., 3 Cir. 1979, 596 F.2d 573, As amended April 5, 1979. The court in that case ruled that *HN15* Illinois Brick does not bar suits for injunctive relief by indirect purchasers in price-fixing actions because the policy considerations underlying the pass-on rule are not implicated in claims for injunctive relief. An injunctive suit does not expose a defendant to monetary liability at all, much less to the risk of duplicative liability, and does not require the trier of fact to determine the incidence of the overcharge. *HN16* To secure injunctive relief under section 16 of the Clayton Act, the plaintiffs [**53] need show only "threatened loss or damage by a violation of the antitrust laws". 15 U.S.C. § 26. To show a threat of such injury, plaintiffs in a case such as this would not have to show the extent of their harm. It would suffice to show by a preponderance of the evidence that the alleged price-fixing had or will have some adverse impact on the prices they receive for their cattle, or that the conspiracy reduced the packers' demand for fat cattle.

The appellees argue that injunctive relief is barred to indirect sellers or purchasers whose damage claims are barred by Illinois Brick because Illinois Brick holds that such persons are not injured within the meaning of section 4 of the Clayton Act. Section 4 and section 16, they point out, are coextensive except that section 16, unlike section 4, does not require an injury to the plaintiff's "business or property". It therefore follows, it is urged, that indirect sellers or purchasers barred from section 4 treble damages by the Illinois Brick rule are not threatened with legally cognizable injury within the meaning of section 16.

We disagree with the appellees' characterization of the Illinois Brick decision. Formally, it is true, [**54] both Hanover Shoe and Illinois Brick held that, with the exceptions previously discussed, the overcharged direct purchaser, and not the indirect purchaser who may ultimately bear part of the overcharge, suffers the full injury for purposes of section 4. Had those decisions even purported to rest on a divination of the original meaning of section 4 of the Act we would agree with the appellees that Illinois Brick has clear implications for injunctive actions under section 16 as well. But neither Hanover Shoe nor Illinois Brick involved statutory construction in the ordinary sense. They are judicial glosses on an old statute, predicated on contemporary policy considerations. The implications of those decisions therefore reach only as far as the policy considerations informing them.

IV.

In its December 1977 order dismissing the actions, the district court granted the defendants' motion to strike allegations of retail price-fixing from the complaints. Those allegations charged the retail chains with conspiring to set artificially high prices for beef sold to retail consumers. The plaintiffs in all the suits appeal that action.

[*1168] It was error to strike the allegations [**55] of retail price-fixing in the Agee and Varian complaints. 25. These *HN17* complaints allege that some of the plaintiffs have purchased beef as consumers at prices affected by the alleged conspiracy. Such an allegation is an adequate allegation of the injury to one's "property" within the meaning of section 4 of the Clayton Act. Reiter v. Sonotone Corp., 442 U.S. 330, 99 S. Ct. 2326, 60 L. Ed. 2d 931 (1979). That the allegations might have been added to the complaint in the effort to inject highly prejudicial matter into a lawsuit that is primarily based on wholesale price-fixing, as the appellees charge, is of no consequence, for *HN18* Rule 18(a) of the Federal Rules of Civil Procedure grants the plaintiffs complete freedom to join in a single action all claims that they may have against any of the defendants. 6 C. Wright & A. Miller, Federal Practice and Procedure § 1582 (1971).

---

25. The Agee suit has been restyled Shoshone Tribe of Duckwater, et al. v. Safeway Stores, Inc., et al. We follow the parties' practice of referring to the case as "Agee".

[**56]  It was not error, however, to strike the retail price-fixing allegations from the remaining complaints. With the exception of the Agee and Varian complaints, none of the complaints alleged injury to the plaintiffs' business or property within the meaning of the Clayton Act. The appellants contend that they have adequately alleged injury to their businesses. They say that intend to prove, under their allegations, that the alleged retail price-fixing conspiracy reduced consumer demand for beef, thereby derivatively reducing the retailers' and the packers' demand for the plaintiffs' fat cattle.

The appellants, however, lack standing to sue for such remote injury. *HN19* Only those within the "target area" of an alleged antitrust conspiracy have standing to sue. E. g., Jeffrey v. Southwestern Bell, 5 Cir. 1975, 518 F.2d 1129, 1131. *HN20* The question of standing is a preliminary one, to be answered from examination of the allegations of the complaint. Yoder Bros., Inc. v. California-Florida Plant Corp., 5 Cir. 1976, 537 F.2d 1347, Cert. denied, 429 U.S. 1094, 97 S. Ct. 1108, 51 L. Ed. 2d 540. Looking to the complaints, we find allegation of retail purchases in only the Agee and Varian [**57] complaints. In the other complaints we find, at best, allegations under which the plaintiffs could show harm flowing derivatively from a reduction in consumer demand. *HN21* The "target" of a retail price -fixing conspiracy, however, is the retail purchaser. E. g., Kemp Pontiac-Cadillac, Inc. v. Hartford Automobile Dealers' Ass'n, 1974, D.Conn., 380 F. Supp. 1382, 1386. To recognize the non-purchasing plaintiffs as "targets" of the alleged retail price-fixing conspiracy would be to grant antitrust standing to firms and persons at every level in the chain of beef production and distribution. "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." Hawaii v. Standard Oil Co., 1972, 405 U.S. 251, 263 n.14, 92 S. Ct. 885, 891-892, 31 L. Ed. 2d 184. Only the Varian and Agee allegations satisfy the "target area" test for standing to sue.

Shifting ground, the appellants argue that evidence of the alleged retail price-fixing conspiracy is highly relevant to their claims of monopolization and monopsony or oligopsony price-fixing at the wholesale level. The defendants' retail -level activities, they urge, [**58] are evidence of the defendants' monopoly power and proclivity to collude. Evidence of those activities is also essential, they contend, to painting for the jury a complete picture of the alleged conspiracy and of the industry in which it operates. They contend, in short, that they simply pleaded evidence.

This is not the place or time to debate the relevance of the retail price-fixing evidence. *HN22* The district court had ample discretion, under Rule 12(f) of the Federal Rules of Civil Procedure, to order stricken from the complaint any redundant or immaterial matter. 5 C. Wright & A. Miller, Federal Practice and Procedure § 1382 at 807 (1969). Although unnecessary evidentiary details are usually not stricken from the complaint unless prejudicial or of no [*1169] consequence to the controversy, Id.; see also Augustus v. Board of Public Instruction, 5 Cir. 1962, 306 F.2d 862, evidence pleading, as distinguished from the pleading of ultimate facts, is not favored under the Federal Rules. See Rule 8(a) Fed.R.Civ.P.; 5 C. Wright & A. Miller, Supra, at 832-33. Many courts have properly stricken unnecessary evidentiary detail from pleadings. E. g., Control Data Corp. v. International [**59] Business Machines Corp., 8 Cir. 1970, 421 F.2d 323; Commissioner of Internal Revenue v. Licavoli, 6 Cir. 1958, 252 F.2d 268; Mitchell v. Hart, 1966, S.D.N.Y., 41 F.R.D. 138, 143. *HN23* The district court's action will not be disturbed unless it was an abuse of discretion. E. g., Commissioner of Internal Revenue v. Licavoli, supra, at 272. We find here no abuse of discretion. Nor do we perceive how the plaintiffs have been harmed. The district court's order striking the pleadings does not control the issues of materiality and relevancy that govern admissibility of the evidence. E. g., Control Data Corp. v. International Business Machines Corp., supra, at 326-27. The plaintiffs need not plead these matters. Schlick v. Penn-Dixie Cement Corp., 2 Cir. 1974, 507 F.2d 374, Cert. denied, 421 U.S. 976, 95 S. Ct. 1976, 44 L. Ed. 2d 467. "If the trial court considers these matters proper proof upon the trial, he may admit them even though not pleaded." Alden-Rochelle, Inc. v. American Society of Composers, Authors and Publishers, 1942, S.D.N.Y., 3 F.R.D. 157, 159.

V.

The plaintiffs in the Pony Creek action appeal the partial summary judgment entered against them on their claim that the defendants' [**60] fraudulent concealment of the alleged conspiracy tolled the four-year statute of limitations of section 4B of the Clayton Act. 15 U.S.C. § 15b.

The Pony Creek action was filed on June 5, 1975. Unless the statute of limitations was somehow tolled, the Pony Creek plaintiffs cannot recover for damages sustained prior to June 5, 1971. They allege in their complaint that they had failed to discover their cause of action before the June 1971 commencement of the limitations period because the defendants had fraudulently concealed it from them. *HN24* Fraudulent concealment tolls the Clayton Act's statute of limitations. General Electric Co. v. City of San Antonio, 5 Cir. 1964, 334 F.2d 480; Rinzler v. Westinghouse Electric Corp., 5 Cir. 1964, 333 F.2d 719. To avail himself of this tolling doctrine, an antitrust plaintiff must show that the defendants concealed the conduct complained of, and that he failed, despite the exercise of due diligence on his part,

600 F.2d 1148, *1169; 1979 U.S. App. LEXIS 12397, **60

to discover the facts that form the basis of his claim. Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp., 4 Cir. 1976, 546 F.2d 570; Dayco Corp. v. Firestone Tire & Rubber Co., 6 Cir. 1975, 523 F.2d 389.

The defendant Kroger Co. ("Kroger") [**61] moved for partial summary judgment on the fraudulent concealment claim. Kroger submitted with its motion evidentiary matter that, it contended, conclusively established that the plaintiffs had known, or would have known through the exercise of due diligence, of the existence of their claims before June 5, 1971. The evidence consisted of copies of numerous articles and reports published in the late 1960's in newspapers and cattle industry trade journals, together with an affidavit attesting to the authenticity of the copies. The articles and reports publicized the dissatisfaction of livestock producers with cattle prices, as well as the charges of many cattlemen that the retail chains were colluding to depress prices. Many of the articles reported the filing, in 1968, of Bray, et al. v. Safeway Stores, et al., N.D.Cal., 392 F. Supp. 851 (1975) a lawsuit brought by several California cattlemen against major retail chains and which involved allegations essentially identical to those of the Pony Creek complaint. The defendants' exhibits showed that the allegations of the Bray Complaint had received much publicity nationwide. The plaintiffs filed no counter-affidavits. They argued [**62] that the Bray revealed no operative facts relating to their claim and that none were revealed until discovery in the Bray suit during 1973 disclosed that [*1170] some of the defendants had indeed discussed prices at trade association meetings.

Finding no genuine issue of material fact, and mindful of the suggestion in part 1.80 of the Manual for Complex Litigation that issues such as fraudulent concealment be determined as early as possible in complex litigation so as to define the scope of discovery, [26.] the district court granted the motion.

[**63] The Manual's salutary principle notwithstanding, HN25 the question of when the statute of limitations began to run on the plaintiffs' cause of action is a factual one, E. g., Ciccarone v. United States, 3 Cir. 1973, 486 F.2d 253, 256, and is therefore not determinable on a motion for summary judgment. The district court's task was simply to determine whether a genuine question was presented justifying trial, F.R.Civ.P. 56(c), as the court fully recognized. The defendants, as HN26 the moving parties, had the burden of demonstrating the absence of any genuine material issue of fact, and the plaintiffs had no obligation to present evidence opposing the motion unless the defendants' affidavit and exhibits initially established the absence of a genuine issue. Advisory Committee Notes to the 1963 Amendments to Rule 56, 31 F.R.D. 647, 648; Adickes v. Kress, 1970, 398 U.S. 144, 90 S. Ct. 1598, 26 L. Ed. 2d 142. Kroger's evidentiary showing went entirely to the issues of the plaintiffs' actual or constructive knowledge of their cause of action. The question presented, then, is whether Kroger's showing established the absence of a genuine issue as to the plaintiffs' knowledge, actual or constructive, [**64] of their claim. [27.]

From the affidavit and exhibits it is abundantly clear that the plaintiffs knew or should have known in 1968 and 1969 of the allegations of the Bray complaint. The Bray case was widely publicized in numerous issues of numerous trade publications, including, as the district court noted, an issue of The American National Cattlemen's Association's weekly publication Beef Business Bulletin, which, according to the supporting affidavit, had at the relevant time a circulation of nearly 300,000. The Bray complaint itself was, of course, a matter of public record. It is of no [**65] moment that Kroger presented no direct evidence demonstrating that the plaintiffs were actually aware of the Bray case. Even assuming that the inferences of actual knowledge to be drawn from Kroger's presentation were insufficient for summary judgment purposes, the evidence was more than adequate to establish beyond doubt that reasonably diligent cattlemen in the plaintiffs' situation would have been aware, in the late 1960's, of the Bray allegations. HN27 Numerous federal courts have suggested that parties are chargeable with knowledge of the contents of public records. E. g., Dayco Corp. v. Goodyear Tire & Rubber Co., 6 Cir. 1975, 523 F.2d 389, 394; Morgan v. Koch, 7 Cir. 1969, 419 F.2d 993, 998; Overfield v. Pennroad Corp., 8 Cir. 1944, 146 F.2d 889, 898; Pettibone v.

---

26. Part 1.80 states in relevant part:

In some complex cases it becomes apparent at the preliminary pretrial conference or shortly thereafter that the determination of a legal question will expedite the disposition of the cause. This is particularly the case where the nature and scope of discovery and further pretrial proceedings would be substantially affected by the determination of the preliminary legal question. For example, in the electrical equipment civil antitrust cases the question whether fraudulent concealment would toll the running of the statute of limitations was one of the most important questions. It was very desirable to secure a determination of this question as early as possible, for if the statute was not tolled by fraudulent concealment, the discovery would be comparatively narrow in scope of time and a summary judgment on some or all issues could be rendered in many cases.

Manual for Complex Litigation 80 (1977).

27. Kroger, of course, did not have to demonstrate the absence of triable fact issues as to the allegation that the defendants actively concealed the alleged conspiracy. If the defendants established that the plaintiffs knew or should have known of their cause of action before June 5, 1971, the running of statute of limitations would not have been tolled even had the defendants affirmatively concealed the alleged scheme.

600 F.2d 1148, *1170; 1979 U.S. App. LEXIS 12397, **65

Cook County, 8 Cir. 1941, 120 F.2d 850, 855. *HN28* In a case involving a claim that the statute of limitations has [*1171] been tolled, "the means of knowledge are the same thing as knowledge itself." Wood v. Carpenter, 1979, 101 U.S. (11 Otto) 135, 143, 25 L. Ed. 807.

The plaintiffs' knowledge of the Bray complaint, however, is not As a matter of law tantamount to actual or constructive knowledge of their claim. *HN29* Although [**66] the statute of limitations is not tolled simply because the plaintiffs lack much of the evidence supporting their potential claim, Prather v. Neva Paperbacks, Inc., 5 Cir. 1971, 446 F.2d 338, they cannot have notice of a potential claim unless they are aware of some evidence tending to support it. *HN30* The filing by others of a similar lawsuit against the same defendants may in some circumstances suffice to give notice, but to rule that it does so As a matter of law is to compel a person situated like these plaintiffs to file suit, on the pain of forfeiting his rights, regardless of whether his attorney believes that there is "good ground to support it". Rule 11, F.R.Civ.P. The mere filing of a similar lawsuit, without more, does not necessarily give "good ground" because that suit might well be frivolous or baseless. [28]

[**67] The leap from the plaintiffs' knowledge of the Bray complaint to actual or constructive knowledge of their cause of action therefore involves factual issues. The defendants had the burden, as the moving parties, to demonstrate conclusively that the plaintiffs, through the exercise of reasonable diligence, would have discovered adequate ground for filing suit. The summary judgment evidence consisted only of a demonstration that the plaintiffs should have been aware of the Bray complaint. There is no evidence in the record suggesting that the Bray litigation turned up any verification for the allegations before June 5, 1971, or that the plaintiffs had independent access before that time to any information, beyond the Bray complaint itself, that tended to verify their suspicions. At best, the materials on file might support an inference that the plaintiffs would have discovered adequate support before June 1971 had they been reasonably diligent. The inference, however, is not so compelling as to entitle the defendants to summary judgment. Because the defendants failed to demonstrate the absence of genuine issues of fact the partial summary judgment must be reversed.

We should [**68] emphasize that this ruling is dictated by the posture of the question and the nature of the defendants' summary judgment showing. *HN31* The plaintiffs bear the ultimate burden of persuasion on the fraudulent concealment issue. The burden is a heavy one. Those who have learned of facts "calculated to excite inquiry" must inquire. Clement A. Evans & Co. v. McAlpine, 5 Cir. 1970, 434 F.2d 100, 102, Cert. denied, 402 U.S. 988, 91 S. Ct. 1660, 29 L. Ed. 2d 153. The widely publicized Bray complaint certainly put these plaintiffs to a duty to investigate. They must demonstrate to the trier of fact that they investigated with reasonable diligence and discovered nothing that would have justified them in filing suit before June 5, 1971. Id.; see also Dayco Corp. v. Goodyear Tire & Rubber Co., supra. In opposing the motion for summary judgment, however, the plaintiffs were not required to make any showing unless the defendants demonstrated that no genuine issues of fact underlay the due diligence question. This the defendants failed to do.

The judgments below [**69] are REVERSED and the cases REMANDED for further proceedings consistent with this opinion.

---

28.    That the Bray plaintiffs eventually succeeded (in 1975) in their lawsuit is of no consequence, for the Bray action might have disclosed nothing about the alleged conspiracy before June 5, 1971.



**User Name:** 40NH4QT
**Date and Time:** Nov 20, 2012 18:25 EST
**Job Number:** 1465793

## Document(1)

1.  Marceaux v. Lafayette Consol. Gov't, 2012 U.S. Dist. LEXIS 150922
    **Client/matter:** 94088.022

| About LexisNexis | Privacy Policy | Terms & Conditions | Copyright © 2012 LexisNexis.




Neutral
As of: November 20, 2012 6:25 PM EST

# Marceaux v. Lafayette Consol. Gov't

United States District Court for the Western District of Louisiana, Lafayette Division
October 18, 2012, Decided; October 18, 2012, Filed
CIVIL ACTION NO. 6:12-cv-01532

**Reporter:** 2012 U.S. Dist. LEXIS 150922

KANE MARCEAUX, ET AL. VERSUS LAFAYETTE CONSOLIDATED GOVERNMENT, ET AL.

**Notice:**

**Prior History:** Marceaux v. Lafayette City-Parish Consol. Gov't, 2012 U.S. Dist. LEXIS 134146 (W.D. La., Sept. 18, 2012)

---

| Core Terms |
|---|

original complaint, immaterial, scandalous, amended complaint, motion to strike, undersigned, impertinent, municipal, claim for punitive damages, official capacity, set forth, redundant, punitive, stricken

**Counsel:** **[*1]** For Kane Marceaux, Rachel Roberts, Paul Taylor, Jr, Donald Ceaser, Kencil D Joseph, Robert Polanco, Gus Sanchez, Aleeta M Harding, Regina Briscoe, Uletom P Hewitt, Novey Stelly, Norbert Myers, Gabriel Thompson, Scott Poiencot, Greg Cormier, Plaintiffs: Richard Royal Alexander, Shreveport, LA; Stanley Stephen Spring, II, Spring & Spring, Baton Rouge, LA; John Christopher Alexander, Sr, Alexander Law Firm, Baton Rouge, LA.

For Lafayette City-Parish Consolidated Government, George Jackie Alfred, individually and in his capacity as Patrol Division Commander of the Lafayette Police Department, James P Craft, individually and in his capacity as Chief of the Lafayette Police Department, Dee Edward Stanley, individually and in his capacity as Chief Administrative Officer of the Lafayette City-Parish Consolidated Government, Lester Joseph Durel, Jr, in his capacity as President of the Lafayette City-Parish Consolidated Government, City Police of Lafayette, Defendants: Michael P Corry, LEAD ATTORNEY, Hallie Pilcher Coreil, Patrick J Briney, Richard R Montgomery, Briney Foret Corry, Lafayette, LA.

**Judges:** PATRICK J. HANNA, UNITED STATES MAGISTRATE JUDGE. JUDGE HAIK.

**Opinion by:** PATRICK J. HANNA

---

| Opinion |
|---|

## MEMORANDUM RULING

Currently **[*2]** pending before the Court is the defendants' motion to strike redundant, immaterial, impertinent, and scandalous material from the plaintiffs' complaint (Rec. Doc. 4, re-urged in Rec. Doc. 65). The motion is opposed. Oral argument was heard on October 16, 2012. For the following reasons, the motion will be granted in part and denied in part.

### FACTUAL BACKGROUND

This lawsuit was brought by fifteen current or former police officers with the Lafayette, Louisiana police department, under 42 U.S.C. §§ 1983 and 1988, seeking to recover monetary damages and other relief for alleged acts by their employer and/or fellow officers that they claim constitutes retaliatory discharge, wrongful discharge, and deprivation of procedural due process (Rec. Doc. 74 at p. 50, ¶ 344) in violation of rights protected by the United States Constitution. The plaintiffs also seek to recover under Louisiana state law. (Rec. Doc. 74 at p. 52, ¶ 353).

2012 U.S. Dist. LEXIS 150922, *2

In this motion, the defendants seek to strike certain allegations set forth in the plaintiff's original complaint. Before the motion to strike was ruled upon, the undersigned permitted the plaintiffs to amend their complaint, and the defendants re-urged the motion to strike.  [*3] (Rec. Doc. 65).

ANALYSIS

The defendants' motion to strike has two distinct parts. The defendants seek to strike the allegations set forth in Paragraphs 23-178, 242-250, and 267-270 of the original complaint, arguing that these allegations are either redundant, immaterial, impertinent, or scandalous. The defendants also seek to strike the plaintiffs' claim for punitive damages to the extent that punitive damages are sought to be recovered from a municipality and from municipal officials acting in their official capacities.

A. THE APPROPRIATE STANDARD UNDER FED. R. CIV. P. 12(f)

Federal Rule of Civil Procedure 12(f) states: "The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." The court may do so in response to a party's motion or on its own motion.[1] Deciding whether to strike all or a portion of a pleading lies within the court's discretion.[2] A motion to strike under Rule 12(f) "is a drastic remedy to be resorted to only when required for the purposes of justice."[3] Accordingly, motions to strike made under Rule 12(f) are viewed with disfavor by the federal courts, and are infrequently granted.[4]

Redundant matter consists of allegations that constitute a needless repetition of other averments in the pleading.[5] Immaterial matter is that which has no essential or important relationship to the claim for relief or the defenses being pleaded.[6] Immateriality is established by showing that the challenged allegations "can have no possible bearing upon the subject matter of the litigation."[7] Impertinent matter consists of statements that do not pertain, and are not necessary, to the issues in question; while scandalous matter is that which improperly casts a derogatory light on someone, most typically on a party to the action.[8] "The granting of a motion to strike scandalous matter is aimed, in part, at avoiding prejudice to a party by preventing a jury  [*5] from seeing the offensive matter or giving the allegations any other unnecessary notoriety inasmuch as, once filed, pleadings generally are public documents and become generally available."[9]

Therefore, a motion to strike should be granted only when "the allegations are prejudicial to the defendant or immaterial to the lawsuit."[10]

B. THE REDUNDANT, IMMATERIAL, IMPERTINENT, AND SCANDALOUS PORTIONS OF THE PLAINTIFFS' COMPLAINT

In this case, the defendants filed a motion seeking to strike certain paragraphs from the plaintiffs' original complaint (Rec. Doc. 1) on the basis that they were redundant, immaterial, impertinent, or scandalous under Rule 12(f). The plaintiffs were permitted an opportunity to amend their complaint, and they filed their first amended and supplemental complaint (Rec. Doc. 74). The amended complaint does not fully and completely replace the original complaint.  [*6] In-

---

[1]   Fed. R. Civ. P. 12(f).

[2]   In re Beef Industry Antitrust Litigation, MDL Docket No. 248, 600 F.2d 1148, 1168-69 (5th Cir. 1979).  [*4] citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1382 at 807 (1969). See, also, Cambridge Toxicology Group, Inc. V. Exnicios, 495 F.3d 169, 178 (5th Cir. 2007).

[3]   Augustus v. Bd. of Pub. Instruction of Escambia Cnty., Fla., 306 F.2d 862, 868 (5th Cir. 1962); see also Kaiser Aluminum & Chem. Sales, Inc. V. Avondale Shipyards, Inc., 677 F.2d 1045, 1057 (5th Cir. 1982).

[4]   C. Wright & A. Miller, 5C Fed. Prac. & Proc.3d § 1380.

[5]   C. Wright & A. Miller, 5C Fed. Prac. & Proc.3d § 1382.

[6]   Id.

[7]   Bayou Fleet Partnership, LLC v. St. Charles Parish, No. 10-1557, 2011 U.S. Dist. LEXIS 73867, 2011 WL 2680686, at *5 (E.D. La. Jul. 8, 2011).

[8]   C. Wright & A. Miller, 5C Fed. Prac. & Proc.3d § 1382.

[9]   Id.

[10]   Eubanks v. Jordan, No. Civ. A. 05-1532, 2006 U.S. Dist. LEXIS 33945, 2006 WL 1476111, at *1 (W.D. La. May 26, 2006).

2012 U.S. Dist. LEXIS 150922, *6

stead, the plaintiffs "amend, revise, restate, and generally supplement" their original complaint (Rec. Doc. 74 at p. 2) while re-alleging and re-averring "those relevant portions of" the original complaint (Rec. Doc. 74 at ¶¶ 59, 74, 86, 93, 101, 118, 166, 183, 209, 255, 262, 272, 298, 317). Although the plaintiffs "aver that *all* of the objectionable allegations identified by Defendants have been removed by way of Plaintiffs' more recent First Amended and Supplemental Complaint" (Rec. Doc. 71 at 5, emphasis in original), each plaintiff expressly re-alleged and re-averred "relevant portions" of the original complaint without identifying the parts of the original complaint that survive and those that do not. Declining to decide what the plaintiffs believe to be relevant, the undersigned assumes that all of the original complaint has been adopted and incorporated by reference in the amended complaint.

Having carefully reviewed the allegations of the original complaint and the amended complaint, the undersigned finds that the following paragraphs contain allegations that are either redundant, immaterial, impertinent, or scandalous, as those terms are used in Rule 12(f): ¶¶ 25, 26, 27, **[*7]** 30, 55-78, 82-106, 107-121, 147-162, and 242-250 of the original complaint, and ¶¶ 114-116 and 345-350 of the amended complaint.

The undersigned finds that the allegations set forth in ¶¶ 25, 26, 27, and 30 of the original complaint are scandalous, as that term is used for purposes of Rule 12(f), because they serve no purpose other than to cast the Lafayette Police Department in a poor light.[11]

The undersigned finds that the allegations set forth in ¶¶ 55-78, 82-106, 107-121, 147-162, and 242-250 of the original complaint have no possible bearing upon the subject matter of the litigation because they are unrelated to the events giving rise to any of the plaintiffs' claims. As such, these allegations are immaterial.

Similarly, the undersigned finds that the allegations set forth in Paragraphs 114-116 of the amended complaint, which are set forth in the section of the complaint pertaining to plaintiff Novey Stelly, have no possible bearing upon the subject matter of the litigation because they are unrelated to the events that led to Mr. Stelly's claim against his employer and coworkers. Therefore, these allegations are immaterial.

The undersigned finds that Paragraphs 345-350 of the amended complaint are comprised of legal argument interpreting a legal decision that is not **[*9]** controlling precedent in this case rather than relevant factual allegations. Accordingly, these paragraphs do not pertain, and are not necessary, to the factual issues in question and are impertinent.

The undersigned finds that the remaining allegations of the plaintiffs' complaint to which the defendants objected are insufficiently redundant, immaterial, impertinent, or scandalous to justify being stricken.

For these reasons, (1) these paragraphs are stricken from the original complaint: ¶¶ 25, 26, 27, 30, 55-78, 82-106, 107-121, 147-162, 242-250; and (2) these paragraphs are stricken from the amended complaint: ¶¶ 114-116 and 345-350.

**B.** THE PLAINTIFFS' PUNITIVE DAMAGES CLAIM

In their original and amended complaints, the plaintiffs assert claims for punitive damages. (Rec. Doc. 1 at p. 36, ¶ 270(L); Rec. Doc. 1 at p. 36, prayer ¶ I; Rec. Doc. 74 at p. 54, ¶354(L); Rec. Doc. 74 at p. 55, prayer ¶ I). The defendants contend that this claim should be stricken with regard to the claims asserted against the City and the individual defendants who are city officials and were sued in their official capacities, arguing that the plaintiffs in a §1983 action cannot recover punitive damages from **[*10]** a municipality or its officials acting in their official capacities.

The defendants' reasoning is sound. "It is well settled that municipalities are not subject to the imposition of puni-

---

11   This Court notes that in the original complaint (Rec. Doc. 1) and again in the amended complaint (Rec. Doc. 74), the plaintiffs listed "Lafayette Police Department through the Lafayette City-Parish Consolidated Government" as a separate defendant in the lawsuit. The Lafayette Police Department is an agency or department of the Lafayette City-Parish Consolidated Government that does not function independently of the City. Therefore, the Lafayette Police Department does not have the legal capacity to be sued. *Cormier v. Lafayette City Parish Consol. Government,* No. 6:09-cv-0703, 2011 U.S. Dist. LEXIS 125283, 2011 WL 5156862, at *3 (W.D. La. Oct. 28, 2011); *Batiste v. Bonin,* No. 06-1352, 2007 U.S. Dist. LEXIS 44355, 2007 WL 1791219, at *4 (W.D. La. June 13, 2007). See, also, *Angers v. Lafayette Consolidated Gov't,* No. 07-0949, 2007 U.S. Dist. LEXIS 74435, 2007 WL 2908805, *3 (W.D. La. Oct. 3, 2007)  **[*8]** (holding that Lafayette's Roicy Duhon Animal Shelter is not a juridical entity susceptible of being sued). This Court therefore construes any claims alleged against the Lafayette Police Department to be brought against the Lafayette Consolidated Government which renders these allegations impertinent as well..

2012 U.S. Dist. LEXIS 150922, *10

tive damages under Section 1983."[12] Furthermore, "[i]t is equally well settled that a suit against a municipal official in his or her official capacity is simply another way of alleging municipal liability."[13] Accordingly, the court finds that the plaintiffs do not have a valid claim for punitive damages against Lafayette City-Parish Consolidated Government. The court further finds that the plaintiffs do not have a valid punitive damages claim against the individual defendants who were sued in their official capacities because those claims are duplicative of the punitive damages claim asserted against the city.[14] Accordingly, the plaintiffs' punitive damages claims against the City and against the city officials who were sued in their official capacities are stricken.

However, punitive damages are recoverable against municipal employees who are sued in their individual capacities pursuant to a § 1983 claim.[15] Therefore, to the extent that the plaintiffs have asserted punitive claims against individual defendants who are city officials that were sued in their individual capacities, those claims are not stricken.

CONCLUSION

For the foregoing reasons, the defendants' motion to strike (Rec. Doc. 4, re-urged in Rec. Doc. 65) is GRANTED IN PART and DENIED IN PART. Signed this 18th day of October, 2012 at Lafayette, Louisiana.

/s/ Patrick J. Hanna

PATRICK J. HANNA

UNITED STATES MAGISTRATE JUDGE

---

[12] *Howell v. Town of Ball,* No. 12-951, 2012 U.S. Dist. LEXIS 128433, 2012 WL 3962387, at *4 (W.D. La. Sept. 4, 2012), citing *Cook County, Ill. V. U.S. ex rel. Chandler,* 538 U.S. 119, 123 S. Ct. 1239, 155 L. Ed. 2d 247 (2003), *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S. Ct. 2748, 69 L. Ed. 2d 616 (1981), and *Webster v. City of Houston,* 735 F.2d 838 (5th Cir. 1984).

[13] *Howell,* 2012 U.S. Dist. LEXIS 128433, 2012 WL 3962387, at *4,  [**11**] citing *Monell v. New York City Department of Social Services,* 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).

[14] *Castro Romero v. Becken,* 256 F.3d 349, 355 (5th Cir. 2001).

[15] *Givs v. City of Eunice,* No. 6:05-CV-0788, 2006 U.S. Dist. LEXIS 46643, 2006 WL 1831528, at *1 (W.D. La. June 29, 2006), citing *Smith v. Wade,* 461 U.S. 30, 35, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983), and *Williams v. Kaufman County,* 352 F.3d 994, 1015 (5th Cir. 2003).



**User Name:**  40NH4QT
**Date and Time:**  Nov 20, 2012 18:30 EST
**Job Number:**  1465831

**Document(1)**

1.   28 TAC § 15.2

  **Client/matter:**  94088.022

| About LexisNexis | Privacy Policy | Terms & Conditions | Copyright © 2012 LexisNexis.



# 28 TAC § 15.2

This document reflects all regulations in effect as of October 31, 2012

**Texas Administrative Code**   **>** **TITLE 28.**   **>** **PART 1.**   **>** **CHAPTER 15.**   **>** **SUBCHAPTER A.**

---

**§ 15.2. Definitions**

---

The following words and terms, when used in this subchapter, shall have the following meanings, unless the context clearly indicates otherwise.

   (1)  Admitted or authorized insurer--An insurer that is doing the business of insurance in this state as defined in the Texas Insurance Code, and is licensed under the provisions of the Texas Insurance Code.

   (2)  Eligible surplus lines insurer--An unlicensed insurer allowed by the commissioner to do business in Texas as a surplus lines insurer.

   (3)  Licensee--A person holding a surplus lines agent's license.

   (4)  Person--An individual or entity as defined by the Texas Insurance Code Article 21.21, § 2(a).

   (5)  Properly allocated and apportioned--The division or distribution of premium based upon the location of the various exposures afforded coverage under the insurance contract. This distribution of premium must be in accordance with the methods prescribed by the Comptroller of Public Accounts of Texas (the comptroller).

   (6)  Stamping Office--The Surplus Lines Stamping Office of Texas created under the Texas Insurance Code, and operating under the plan of operation specified by § 15.101 of this title (relating to the Plan of Operation of the Surplus Lines Stamping Office of Texas).

   (7)  Surplus lines agent or agency--An agent or agency holding a surplus lines license issued by this department pursuant to the Texas Insurance Code Article 1.14-2.

   (8)  Surplus lines agent of record--The Texas licensed surplus lines agent placing a policy with an eligible surplus lines insurer or the Texas licensed surplus lines agent transacting business directly with an unlicensed out-of-state agent to obtain coverage with an eligible surplus lines insurer. The agent or agents in these situations are the agent of record for their portion of the premium for the policy placement.

   (9)  Taxable surplus lines premium--For surplus lines taxation purposes, except for exempt or federally preempted premiums, surplus lines premium is taxable as provided in Texas Insurance Code Article 1.14-2, § 12.

  (10)  Unauthorized insurer--An insurer that is conducting the business of insurance as defined in the Texas Insurance Code and is not licensed or an eligible surplus lines insurer under the Texas Insurance Code.

  (11)  Client--Any person to whom a surplus lines agent sells or attempts to sell a surplus lines insurance policy or from whom an application for surplus lines insurance is accepted or to whom advice and counsel on a surplus lines insurance policy is given for the purpose of selling a surplus lines insurance policy.

---

**History**

---

**SOURCE:**
The provisions of this § 15.2 adopted to be effective December 12, 2000, 25 TexReg 12179; amended to be effective October 21, 2002, 27 TexReg 9773

TEXAS ADMINISTRATIVE CODE