UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
------------------------------------------------------- x

UNITED STATES OF AMERICA,

               Plaintiff-Intervenor,

      v.

ALLQUEST HOME MORTGAGE
CORPORATION, f/k/a ALLIED HOME
MORTGAGE CORPORATION, AMERICUS
MORTGAGE CORPORATION, f/k/a ALLIED
HOME MORTGAGE CAPITAL
CORPORTATION, JIM C. HODGE, and
JEANNEE L. STELL

               Defendants.

------------------------------------------------------- x

               12 Civ. 02676 (GCH)

               **ECF**

## PLAINTIFF'S APPENDIX

KENNETH MAGIDSON
United States Attorney for the
Southern District of Texas
86 Chambers Street
New York, New York 10007
Telephone: 212.637.2678
Fax: 212.637.2686
E-mail: jeannette.vargas@usdoj.gov

JEANNETTE A. VARGAS
JAMES NICHOLAS BOEVING
Special Assistant United States Attorneys

    – Of Counsel –

# TABLE OF CONTENTS

**Cases**                                                                          **Page**

*Barnes v. District of Columbia*,
    --- F.R.D. -- 2012 WL 4466669 (D.D.C. 2012).......................................................PA1

*Dupell v. K. Hovnanian Companies, LLC*,
    No. 3:12-CV-6, 2012 WL 1831484 (N.D.W.Va. May 18, 2012)..........................PA33

*Odom v. Southeast Supply Header, LLC*,
    No. 09-0147-WS-N, 2009 WL 1658961 (S.D. Ala. June 11, 2009)......................PA41

*SEC v. Savino*,
    No. 01 Civ. 2438 (GBD), 2006 WL 375074 (S.D.N.Y. Feb. 16, 2006)................PA45

*TM, LLC v. Anderson*,
    No. 2:11-CV-00071, 2012 WL 4483180 (E.D.N.C. Sept. 27, 2012) ....................PA63

Westlaw.

--- F.R.D. ----, 2012 WL 4466669 (D.D.C.)
**(Cite as: 2012 WL 4466669 (D.D.C.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
District of Columbia.
Carl A. BARNES, et al., Plaintiffs,
v.
The DISTRICT OF COLUMBIA, Defendant.

No. 06–cv–315 (RCL).
Sept. 28, 2012.

**Background:** In jail detainees' putative class action, under § 1983, against District of Columbia, alleging overdetentions in violation of Fourth, Fifth, and Eighth Amendments, plaintiffs moved to compel production of documents and defendant moved to compel discovery responses and to strike expert reports.

**Holdings:** The District Court, Royce C. Lamberth, Chief Judge, held that:

(1) plaintiffs fully answered interrogatories through supplements to their expert reports;

(2) summary of likely testimony of each witness was sufficient response to interrogatory;

(3) plaintiffs' supplemental expert reports would not be stricken on basis of prejudice to defendant;

(4) good cause did not exist to amend scheduling order to allow defendant time to designate rebuttal experts;

(5) eleven day delay in filing was not sufficient on its own to disqualify motion to compel;

(6) query used to search electronic database was a "writing" subject to production; but

(7) request for contents of entire database was overbroad.

Ordered accordingly.

West Headnotes

**[1] Federal Civil Procedure 170A €170A1278**

170A Federal Civil Procedure

170AX Depositions and Discovery
170AX(A) In General
170Ak1278 k. Failure to Respond; Sanctions. Most Cited Cases

**Federal Civil Procedure 170A €1538**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(D) Written Interrogatories to Parties
170AX(D)3 Answers; Failure to Answer
170Ak1537 Failure to Answer; Sanctions
170Ak1538 k. Order Compelling Answer. Most Cited Cases

When deciding whether to grant a motion to compel response to discovery request or interrogatory, court considers the prior efforts of the parties to resolve the dispute, the relevance of the information sought, and the burden or expense of production. Fed.Rules Civ.Proc.Rules 37(a)(1), 26(b)(2)(C), 28 U.S.C.A.

**[2] Federal Courts 170B €820**

170B Federal Courts
170BVIII Courts of Appeals
170BVIII(K) Scope, Standards, and Extent
170BVIII(K)4 Discretion of Lower Court
170Bk820 k. Depositions and Discovery. Most Cited Cases

An appellate court reviews a district court's decision whether to compel discovery for an abuse of discretion. Fed.Rules Civ.Proc.Rule 37(a)(1), 28 U.S.C.A.

**[3] Federal Civil Procedure 170A €1278**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(A) In General
170Ak1278 k. Failure to Respond; Sanctions. Most Cited Cases

Courts may, if appropriate, consider motions to compel discovery filed after discovery has closed.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2012 WL 4466669 (D.D.C.)
**(Cite as: 2012 WL 4466669 (D.D.C.))**

Fed.Rules Civ.Proc.Rule 37(a)(1), 28 U.S.C.A.

**[4] Federal Civil Procedure 170A** ⌘1532.1

170A Federal Civil Procedure
  170AX Depositions and Discovery
    170AX(D) Written Interrogatories to Parties
     170AX(D)3 Answers; Failure to Answer
      170Ak1532 Duty to Answer
       170Ak1532.1 k. In General. Most Cited Cases

Parties must answer interrogatories fully with true, explicit, responsive, complete, and candid answers. Fed.Rules Civ.Proc.Rule 33, 28 U.S.C.A.

**[5] Federal Civil Procedure 170A** ⌘1271

170A Federal Civil Procedure
  170AX Depositions and Discovery
    170AX(A) In General
     170Ak1271 k. Proceedings to Obtain. Most Cited Cases

Party objecting to discovery bears the burden of showing why discovery should not be permitted, while party seeking to compel discovery has the burden of proving that a discovery response is inadequate. Fed.Rules Civ.Proc.Rule 37(a)(4), 28 U.S.C.A.

**[6] Federal Civil Procedure 170A** ⌘1101

170A Federal Civil Procedure
  170AVII Pleadings and Motions
    170AVII(N) Striking Pleading or Matter Therein
     170Ak1101 k. In General. Most Cited Cases

An expert report is a "pleading" under federal rule authorizing court to strike all or part of a pleading for insufficiency, redundancy, immateriality, impertinence, or scandalousness. Fed.Rules Civ.Proc.Rule 12(f), 28 U.S.C.A.

**[7] Federal Civil Procedure 170A** ⌘1103

170A Federal Civil Procedure
  170AVII Pleadings and Motions

    170AVII(N) Striking Pleading or Matter Therein
     170Ak1103 k. Discretion of Court. Most Cited Cases

**Federal Civil Procedure 170A** ⌘1104

170A Federal Civil Procedure
  170AVII Pleadings and Motions
    170AVII(N) Striking Pleading or Matter Therein
     170Ak1104 k. Motion Not Favored. Most Cited Cases

Motions to strike pleadings are strongly disfavored, and the decision of whether to strike all or part of a pleading rests within the sound discretion of the court. Fed.Rules Civ.Proc.Rule 12(f), 28 U.S.C.A.

**[8] Federal Civil Procedure 170A** ⌘1261

170A Federal Civil Procedure
  170AX Depositions and Discovery
    170AX(A) In General
     170Ak1261 k. In General. Most Cited Cases

Courts do not allow supplemental or amended expert reports simply at the whim of a party; they are permitted: (1) upon court order; (2) when the party learns that the earlier information is inaccurate or incomplete; or (3) when answers to discovery requests are inaccurate or incomplete. Fed.Rules Civ.Proc.Rule 26(a), 28 U.S.C.A.

**[9] Federal Civil Procedure 170A** ⌘1261

170A Federal Civil Procedure
  170AX Depositions and Discovery
    170AX(A) In General
     170Ak1261 k. In General. Most Cited Cases

**Federal Civil Procedure 170A** ⌘1935.1

170A Federal Civil Procedure
  170AXIV Pre-Trial Conference
    170Ak1935 Order

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2012 WL 4466669 (D.D.C.)
**(Cite as: 2012 WL 4466669 (D.D.C.))**

170Ak1935.1 k. In General. Most Cited Cases

Court may modify discovery deadlines in a scheduling order upon a showing of good cause. Fed.Rules Civ.Proc.Rule 6(b), 28 U.S.C.A.; District of Columbia Local Rule 16.4.

**[10]** Federal Civil Procedure 170A ☞1261

170A Federal Civil Procedure
   170AX Depositions and Discovery
      170AX(A) In General
         170Ak1261 k. In General. Most Cited Cases

**Federal Civil Procedure 170A ☞1935.1**

170A Federal Civil Procedure
   170AXIV Pre-Trial Conference
      170Ak1935 Order
         170Ak1935.1 k. In General. Most Cited Cases

Deciding whether to extend discovery deadlines set forth in scheduling order is within the sound discretion of the trial court. Fed.Rules Civ.Proc.Rule 6(b), 28 U.S.C.A.

**[11]** Federal Civil Procedure 170A ☞1261

170A Federal Civil Procedure
   170AX Depositions and Discovery
     170AX(A) In General
        170Ak1261 k. In General. Most Cited Cases

**Federal Civil Procedure 170A ☞1935.1**

170A Federal Civil Procedure
   170AXIV Pre-Trial Conference
     170Ak1935 Order
        170Ak1935.1 k. In General. Most Cited Cases

In deciding whether good cause exists to amend a scheduling order to extend discovery deadline, court primarily considers the diligence of the party in seeking discovery before the deadline. Fed.Rules Civ.Proc.Rule 6(b), 28 U.S.C.A.; District

of Columbia Local Rule 16.4.

**[12]** Federal Civil Procedure 170A ☞1261

170A Federal Civil Procedure
   170AX Depositions and Discovery
     170AX(A) In General
        170Ak1261 k. In General. Most Cited Cases

Granting leave to supplement or amend report of rebuttal expert is within the discretion of trial court. Fed.Rules Civ.Proc.Rules 26(A)(2)(d)(ii), 26(a)(2)(C), 28 U.S.C.A.

**[13]** Federal Civil Procedure 170A ☞1534

170A Federal Civil Procedure
   170AX Depositions and Discovery
     170AX(D) Written Interrogatories to Parties
       170AX(D)3 Answers; Failure to Answer
         170Ak1534 k. Sufficiency. Most Cited Cases

Answers to interrogatories may properly come via expert reports or by supplements thereto. Fed.Rules Civ.Proc.Rule 33, 28 U.S.C.A.

**[14]** Federal Civil Procedure 170A ☞1534

170A Federal Civil Procedure
   170AX Depositions and Discovery
     170AX(D) Written Interrogatories to Parties
       170AX(D)3 Answers; Failure to Answer
         170Ak1534 k. Sufficiency. Most Cited Cases

In § 1983 putative class action against District of Columbia for overdetentions at jail, detainees clearly and fully answered interrogatories concerning the number of disputed overdetentions which had occurred, precluding District's motion to compel responses, when they timely filed supplements to their expert reports, since the reports fully answered the interrogatory questions. 42 USCA § 1983; Fed.Rules Civ.Proc.Rule 33, 28 U.S.C.A.; Fed.Rules Civ.Proc.Rule 37(a)(4), 28 U.S.C.A.

**[15]** Federal Civil Procedure 170A ☞1534

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2012 WL 4466669 (D.D.C.)
**(Cite as: 2012 WL 4466669 (D.D.C.))**

170A Federal Civil Procedure
  170AX Depositions and Discovery
    170AX(D) Written Interrogatories to Parties
      170AX(D)3 Answers; Failure to Answer
        170Ak1534 k. Sufficiency. Most Cited Cases

  A party is not justified in providing insufficient answers to interrogatories just because its opponent did. Fed.Rules Civ.Proc.Rule 33, 28 U.S.C.A.

**[16] Federal Civil Procedure 170A ⟐1534**

170A Federal Civil Procedure
  170AX Depositions and Discovery
    170AX(D) Written Interrogatories to Parties
      170AX(D)3 Answers; Failure to Answer
        170Ak1534 k. Sufficiency. Most Cited Cases

  In § 1983 putative class action against District of Columbia for overdetentions at jail, detainees' response to interrogatories seeking names of witnesses to be used at trial and topics to which they would testify, was not required to include each fact to which each witness would testify, but could properly include only a summary of the likely testimony of each witness, including expert witnesses. 42 USCA § 1983; Fed.Rules Civ.Proc.Rule 33, 28 U.S.C.A.

**[17] Federal Civil Procedure 170A ⟐1531**

170A Federal Civil Procedure
  170AX Depositions and Discovery
    170AX(D) Written Interrogatories to Parties
      170AX(D)3 Answers; Failure to Answer
        170Ak1531 k. In General. Most Cited Cases

  A party is not entitled to dictate the form of opponent's responses to interrogatories. Fed.Rules Civ.Proc.Rule 33, 28 U.S.C.A.

**[18] Federal Civil Procedure 170A ⟐921**

170A Federal Civil Procedure
  170AVII Pleadings and Motions
    170AVII(I) Motions in General

170Ak921 k. In General. Most Cited Cases

  Although no Federal Rule of Civil Procedure specifically governs motions for clarification, these motions are generally recognized and allowed by federal courts.

**[19] Federal Civil Procedure 170A ⟐1278**

170A Federal Civil Procedure
  170AX Depositions and Discovery
    170AX(A) In General
      170Ak1278 k. Failure to Respond; Sanctions. Most Cited Cases

  Although plaintiffs' supplemental expert reports were different from prior reports, the changes were not so dramatic and prejudicial as would warrant striking the reports in their entirety, since any prejudice to defendant in not receiving fair opportunity to respond could be minimized by allowing narrower motion to strike or motion in limine directed at removing only irrelevant passages, and by allowing defendant opportunity to depose plaintiffs' experts. Fed.Rules Civ.Proc.Rules 26(e)(1)(B), 37(c)(1), 28 U.S.C.A.

**[20] Federal Civil Procedure 170A ⟐1275**

170A Federal Civil Procedure
  170AX Depositions and Discovery
    170AX(A) In General
      170Ak1272 Scope
        170Ak1275 k. Identity and Location of Witnesses and Others. Most Cited Cases

  While federal rule allows a party to designate a rebuttal expert within 30 days of receiving an opposing party's expert disclosure, there is no separate rule conferring a right to designate a rebuttal expert upon receiving a supplemental or amended report from a previously-disclosed expert. Fed.Rules Civ.Proc.Rule 26(A)(2)(d)(ii), 28 U.S.C.A.

**[21] Federal Civil Procedure 170A ⟐1267.1**

170A Federal Civil Procedure
  170AX Depositions and Discovery

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2012 WL 4466669 (D.D.C.)

**(Cite as: 2012 WL 4466669 (D.D.C.))**

170AX(A) In General

170Ak1267 Discretion of Court

170Ak1267.1 k. In General. Most Cited Cases

District court has considerable discretion in handling discovery and expert witnesses. Fed.Rules Civ.Proc.Rule 26(a)(2)(C), 28 U.S.C.A.

**[22] Federal Civil Procedure 170A ⟶1261**

170A Federal Civil Procedure

170AX Depositions and Discovery

170AX(A) In General

170Ak1261 k. In General. Most Cited Cases

**Federal Civil Procedure 170A ⟶1935.1**

170A Federal Civil Procedure

170AXIV Pre-Trial Conference

170Ak1935 Order

170Ak1935.1 k. In General. Most Cited Cases

Good cause did not exist to amend scheduling order to allow defendant time to designate rebuttal experts following filing of plaintiffs' supplemental expert reports; deadline for discovery had passed, supplemental expert reports were not dramatically different than originals, defendant had failed on prior occasions, during three month period it had been in possession of the supplemental reports, to take opportunity to designate rebuttal experts, and should plaintiff file further amended expert reports, court could consider whether leave was warranted at that point. Fed.Rules Civ.Proc.Rule 16(b), 28 U.S.C.A.

**[23] Federal Civil Procedure 170A ⟶1636.1**

170A Federal Civil Procedure

170AX Depositions and Discovery

170AX(E) Discovery and Production of Documents and Other Tangible Things

170AX(E)5 Compliance; Failure to Comply

170Ak1636 Failure to Comply; Sanc-

tions

170Ak1636.1 k. In General. Most Cited Cases

Even though plaintiffs' motion to compel production of documents was filed after close of discovery, the eleven day delay in filing was not sufficient on its own to disqualify the motion where it did not seek an amendment to scheduling order to reopen discovery, but instead demanded production of documents pursuant to requests served during the discovery period, and motion to compel same documents had been filed prior to close of discovery but had been rejected on technicality for plaintiffs' failure to comply with federal rule's meet and confer requirement. Fed.Rules Civ.Proc.Rule 37(a)(1), 28 U.S.C.A.

**[24] Federal Civil Procedure 170A ⟶1581**

170A Federal Civil Procedure

170AX Depositions and Discovery

170AX(E) Discovery and Production of Documents and Other Tangible Things

170AX(E)3 Particular Subject Matters

170Ak1581 k. In General. Most Cited Cases

Query used to retrieve electronically stored data and generate reports is a "writing" subject to production under federal discovery rule. Fed.Rules Civ.Proc.Rule 34(a)(1)(A), 28 U.S.C.A.

**[25] Federal Civil Procedure 170A ⟶1593**

170A Federal Civil Procedure

170AX Depositions and Discovery

170AX(E) Discovery and Production of Documents and Other Tangible Things

170AX(E)3 Particular Subject Matters

170Ak1593 k. Government Records, Papers and Property. Most Cited Cases

Query used by District of Columbia to search electronic database listing jail detainees, for purposes of preparing reports in response to request for production of documents in inmates' § 1983 putative class action alleging overdetentions, was subject to production; query, as a search algorithm,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2012 WL 4466669 (D.D.C.)
**(Cite as: 2012 WL 4466669 (D.D.C.))**

was electronically stored information and as such considered a "writing" under federal discovery rule, query was clearly relevant to inmates' understanding of whether District's reports accurately reflected the total number of overdetentions, and production of query would not be unduly burdensome to District. 42 USCA § 1983; Fed.Rules Civ.Proc.Rule 26(b)(1), 28 U.S.C.A.

**[26] Federal Civil Procedure 170A ⊆⇒1593**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(E) Discovery and Production of Documents and Other Tangible Things
            170AX(E)3 Particular Subject Matters
                170Ak1593 k. Government Records, Papers and Property. Most Cited Cases

    Inmates' motion to compel production of District of Columbia's entire electronic database containing jail detention records would be denied in § 1983 putative class action alleging overdetention, absent evidence that there were records missing from database, since request was overbroad. 42 USAC § 1983; Fed.Rules Civ.Proc.Rules 26(b)(2)(C), 37(a)(1), 28 U.S.C.A.

William CharlesCole Claiborne, III, Law Office of William Claiborne, III, Ralph Douglas Robinson, Ralph D. Robinson, PC, Falls Church, VA, Barrett S. Litt, Paul J. Estuar, Litt, Estuar,Harrison & Kitson, LLP, Los Angeles, CA, for Plaintiffs.

Ellen A. Efros, Grace Graham, Andrew J. Saindon, Keith David Parsons, Office of the Attorney General, Washington, DC, for Defendant.

**MEMORANDUM OPINION[FN*]**
ROYCE C. LAMBERTH, Chief Judge.

  **\*1** Before the Court are three discovery motions: defendant's Motion to Compel Discovery Responses or Preclude Plaintiffs from Using Certain Evidence, May 22, 2012, ECF No. 351; defendant's Motion to Strike, Or, In the Alternative, For Extension of Time and Leave to Designate Rebuttal Ex-

pert(s), June 29, 2012, ECF No. 365; and plaintiffs' Non–Consent Amended and Re–Stated Motion to Compel Production of the Release Discrepancy Database, June 25, 2012, ECF No. 362. Upon consideration of the motions, the oppositions and replies thereto, and the record herein, the Court will deny in part and grant in part defendant's Motion to Compel [351] and deny defendant's Motion to Strike [365]. The Court will also deny defendant's Motion in the Alternative for Extension of Time and Leave to Designate Rebuttal Expert(s) [365]. The Court will reopen discovery for 28 days to allow the depositions of plaintiffs' expert witnesses, instead of the 74 days requested by the defendant. Furthermore, the Court will grant in part and deny in part plaintiffs' Motion to Compel [362].

## I. BACKGROUND

  This case concerns the District of Columbia Department of Corrections' ("DOC") practice of overdetaining and strip searching its inmates. The plaintiffs, former inmates subject to overdetentions and strip searches, filed a class action against the District of Columbia ("District") over six years ago. Compl., Feb. 23, 2006, ECF No. 1. This long-running case is virtually identical to a prior case before this Court, *Bynum v. District of Columbia*, Civil Action No. 02–956(RCL) (filed in 2002). Given this extensive history, the Court assumes familiarity with its prior opinions, which set forth the background of this class-action litigation in greater detail. *See, e.g., Barnes v. District of Columbia*, 793 F.Supp.2d 260, 265 (D.D.C.2011) (ECF No. 307) (discussing background of case up to summary judgment stage).[FN1]

  In June 2011, the Court granted plaintiffs' Motion for Summary Judgment as to the District of Columbia's liability for any overdetentions at its jails, throughout the class period, caused by the DOC's application of the so-called "10 p.m. cutoff" rule, and all overdetentions occurring from September 1, 2005 to December 31, 2006. *Id.* at 286. The Court granted the District's Motion for Summary Judgment as to overdetentions occurring

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2012 WL 4466669 (D.D.C.)
**(Cite as: 2012 WL 4466669 (D.D.C.))**

from February 26, 2008 forward that were not caused by the DOC's enforcement of the 10 p.m. cut-off rule. *Id.* The Court denied both parties' motions as to the District's liability for overdetentions that occurred from January 1, 2007 to February 25, 2008 (the "disputed" or "Trial Period") that were not caused by the DOC's enforcement of the 10 p.m. cut-off rule. *Id.* at 286 & n. 18. The District's liability for that subset of overdetentions remains undetermined pending trial.

Following these rulings, the Court ordered limited, additional discovery in December 2011. *See Barnes v. District of Columbia,* 278 F.R.D. 14, 18 (D.D.C.2011) (ECF No. 328). The parties' competing trial proposals each assumed the need for additional fact and expert discovery prior to trying the remaining liability issues, and the Court—responding to and agreeing with the District's concerns—restricted that discovery "to such ... as will assist the parties in determining how many overdetentions occurred during the disputed period." *Id.* The Court made clear that it would not permit further discovery on "process" and related issues. *Id.* at 23. The Court ordered the parties to update their expert reports by February 10, 2012, and ordered that this additional discovery period would close on April 6, 2012. *Id.*

**\*2** Between January 13, 2012 and March 6, 2012, the District served four sets of interrogatories and requests for production on plaintiffs, seeking information about plaintiffs' contentions regarding the number of overdetentions during the Trial Period. Plaintiffs' responses to two of those sets of interrogatories, as well as the scope of an upcoming deposition of plaintiffs' statistical expert, were in dispute. These disputes were rooted in a disagreement as to the proper scope of discovery. The District contended that the only overdetentions that are relevant to the upcoming liability trial are those not caused by the 10 p.m. cut-off rule. Consequently, the District believed that plaintiffs needed to determine the number of 10 p.m. cut-off rule overdetentions during the Trial Period so that those over-

detentions could be excluded. Plaintiffs argued that the plain language of the Court's December 2011 Order limited additional discovery to the number of overall overdetentions during the Trial Period, without specifying that this number had to exclude overdetentions caused by the 10 p.m. cut-off rule. *See Barnes v. District of Columbia,* 281 F.R.D. 53, 55 (D.D.C.2012) (ECF No. 336) (summarizing parties' discovery disputes).

On April 3, 2012, the Court resolved these discovery disputes in a Memorandum Opinion.[FN2] *Barnes,* 281 F.R.D. 53. The Court considered both parties' positions "substantially justified," *id.* at 56 n. 2, but ultimately agreed "with the District that the purpose of the Court's December 2011 discovery Order was to permit the parties to ascertain the number of disputed overdetentions during the Trial Period." *Id.* at 55. To this end, the Court ordered the plaintiffs to answer the District's Interrogatory 1 (seeking overall number of overdetentions during Trial Period) and Interrogatory 2 (seeking number of overdetentions during Trial Period caused by 10 p.m. cut-off rule). *Id.* The Court "recognize[d] that ordering a party to create a document that doesn't exist or to perform analyses it hasn't yet performed is somewhat unusual," but decided:

> In the circumstances of this case, where plaintiffs' failure to perform the required analysis would almost certainly result in the exclusion of that key evidence prior to trial, and where that analysis can be performed comparatively easily using computerized data plaintiffs have in their possession, ordering plaintiffs to create the requested information is reasonable.

*Id.* at 55–56.[FN3] To allow for the completion of this additional analysis, the Court extended discovery first until April 25, 2012 (Minute Order, Apr. 24, 2012), then until June 11, 2012 (Order, Apr. 27, 2012, ECF No. 345), and ultimately until June 14, 2012 (Minute Order, June 12, 2012). The plaintiffs filed two supplemental expert reports and one set of errata on June 14, 2012. *See* Sealed Documents, June 14, 2012, ECF No. 360.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2012 WL 4466669 (D.D.C.)
**(Cite as: 2012 WL 4466669 (D.D.C.))**

On May 22, 2012, before the amended discovery deadlines had passed, the District filed a Motion to Compel interrogatory responses and preclude plaintiffs from introducing certain evidence. ECF No. 351. Upon receipt of the plaintiffs' supplemental expert reports and errata, the District filed a Motion to Strike the expert reports. ECF No. 365. In the alternative, the District requested additional time to complete discovery and leave to designate rebuttal experts. *Id.* These motions are related to one another, and the Court considers them in turn.

**\*3** While creating the supplemental expert reports, the plaintiffs claim that their experts discovered that the District's production was incomplete. The plaintiffs filed, on June 22, 2012, their Non–Consent Amended and Re-Stated Motion to Compel Production of the Release Discrepancy Database. ECF No. 362. This opinion also resolves this motion.

## II. LEGAL STANDARD

### A. Motion to Compel

Under Federal Rule of Civil Procedure 26(b)(1) , "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party." This right is subject to Rule 26(b)(2)(C), which limits discovery that is, *inter alia,* unreasonably duplicative, burdensome, or expensive. A party may submit to another party interrogatories that "relate to any matter that may be inquired into under Rule 26(b)." F.R.C.P. 33(a).

[1][2][3] When a party fails to respond to a proper discovery request or interrogatory, the other party may—after first attempting to resolve the issue by conferring with the other party—file a motion to compel. F.R.C.P. 37(a)(1). Courts consider the prior efforts of the parties to resolve the dispute, the relevance of the information sought, and the limits imposed by Rule 26(b)(2)(C) when deciding whether to grant a motion to compel. *See, e.g., Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 350–52, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978);

*Harris v. Koenig,* 271 F.R.D. 356, 363 (D.D.C.2010); *U.S. ex rel. Pogue v. Diabetes Treatment Centers of America, Inc.,* 235 F.R.D. 521, 529–30 (D.D.C.2006) (Lamberth, J.). An appellate court will review a district court's decision whether to compel discovery for an abuse of discretion. *See Libscomb v. Winter,* 2009 WL 1153442, \* 1 (D.C.Cir. Apr.3, 2009) (affirming district court because "appellant has not shown the district court abused its discretion in denying his motion to compel discovery."). Courts may, if appropriate, consider motions to compel filed after discovery has closed. *See Lurie v. MidAtlantic Permanente Medical Group, P.C.,* 262 F.R.D. 29, 31 (D.D.C.2009) (Lamberth, C.J.) ("[C]ourts routinely consider motions related to discovery, even though they are filed outside the discovery period.").

[4][5] Interrogatories, as a part of the discovery process, help litigants prepare for trial by narrowing the issues and determining what evidence they will need at trial. 8b CHARLES ALAN WRIGHT, ET AL., FED. PRAC. & PROC. § 2162 (3d ed.2012). Parties must answer interrogatories "fully" with "true, explicit, responsive, complete and candid" answers. *Equal Rights Ctr. v. Post Properties, Inc.,* 246 F.R.D. 29, 32 (D.D.C.2007). "The party objecting to ... discovery bears the burden of 'show[ing] why discovery should not be permitted,' " *Alexander v. F.B.I.,* 193 F.R.D. 1, 3 (D.D.C.2000) (internal citations omitted), while the party seeking to compel discovery has the burden of proving that a discovery response is inadequate. *Equal Rights Ctr.,* 246 F.R.D. at 32. Courts treat evasive or incomplete answers to interrogatories as a failure to respond. F.R.C.P. 37(a)(4).

### B. Motion to Strike

**\*4** [6][7] Under Federal Rule of Civil Procedure 12(f), a court may strike all or part of a pleading for insufficiency, redundancy, immateriality, impertinence, or scandalousness. *See* F.R.C.P 12(f); *Judicial Watch, Inc. v. Dep't of Commerce,* 224 F.R.D. 261, 263 (D.D.C.2004). Under this Rule, "pleading" encompasses expert reports. *See U.S. ex*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2012 WL 4466669 (D.D.C.)
**(Cite as: 2012 WL 4466669 (D.D.C.))**

*rel. Pogue v. Diabetes Treatment Centers of America, Inc.,* 474 F.Supp.2d 75, 79 (D.D.C.2007) (Lamberth, J.) (providing standard of review for motion to strike expert report, applying 12(f)). These motions are strongly disfavored, and the decision of whether to strike all or part of a pleading rests within the sound discretion of the Court. *See Judicial Watch,* 224 F.R.D. at 263 (collecting authorities); 2–12 MOORE'S FEDERAL PRACTICE–CIVIL § 12.37 (2006). A "motion to strike is considered an exceptional remedy and is generally disfavored," *Larouche v. Dep't of the Treasury,* 2000 WL 805214 at *13, (D.D.C. Mar.31, 2000) (citing MOORE'S at § 12.37), and the proponent of such a motion must carry a "formidable burden." *Judicial Watch,* 224 F.R.D. at 264.

[8] Defendant seeks to strike supplemental and amended expert reports, so the legal standards for filing and amending expert reports are relevant. Rule 26(A)(2)(d) states:

A party must [disclose expert testimony] at the time and in the sequence that the court orders. Absent a stipulation or court order, the disclosures must be made: at least 90 days before the date set for trial or for the case to be ready for trial; or if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party ..., within 30 days after the other party's disclosure.

F.R.C.P. 26(A)(2)(d) (original formatting omitted). The Rules further state:
A party who has made a disclosure under Rule 26(a) ... must supplement or correct its disclosure or response: in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information had not otherwise been made known to the parties during the discovery process or in writing; or as ordered by the court.

F.R.C.P. 26(e) (original formatting omitted). Courts do not allow supplemental or amended re-

ports simply at the whim of a party; they are permitted: "(1) upon court order; (2) when the party learns that the earlier information is inaccurate or incomplete; or (3) when answers to discovery requests are inaccurate or incomplete." *Mineba Co., Ltd. v. Papst,* 231 F.R.D. 3, 6 (D.D.C.2005) (citing *Keener v. United States,* 181 F.R.D. 639, 640 (D.Mont.1998)).

**C. Extension of Time**

[9][10][11] The Rules provide that "[w]hen an act may or must be done within a specified time, the court may, for good cause, extend the time: with or without motion or notice if the court acts, or if a request is made, before the original time or its extension expires; or on motion made after the time has expired if the party failed to act because of excusable neglect." F.R.C.P. 6(b). Specifically pertaining to scheduling orders, Federal Rule 16(b) and Local Rule 16.4 allow the Court to modify the discovery deadlines of a scheduling order "upon a showing of good cause." *Myrdal v. District of Columbia,* 2007 WL 1655875, *2 (D.D.C. June 7, 2012) (Lamberth, J.). Deciding whether to extend discovery is within the sound discretion of the trial court. *See, e.g., U.S. v. Microsoft Corp.,* 253 F.3d 34, 100 (D.C.Cir.2001) ("[T]he trial court [has] wide latitude to receive evidence as it sees fit."); *Food Lion, Inc. v. United Food and Commercial Workers Int'l Union,* 103 F.3d 1007, 1012 (D.C.Cir.1997) ("Trial courts exercise considerable discretion in handling discovery matters[.]"). In deciding whether good cause exists under Rules 16(b) and 16.4 to amend a scheduling order, the Court primarily considers the diligence of the party in seeking discovery before the deadline. *See Johnson v. Mammoth Recreations, Inc.,* 975 F.2d 604, 609 (9th Cir.1992) ( "Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party seeking the amendment....If the party was not diligent, the inquiry should end."); *St. Paul Mercury Ins. Co. v. Capitol Sprinkler Inspection, Inc.,* 2007 WL 1589496, *6 (D.D.C. June 1, 2007) (collecting cases, quoting *Johnson* ).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2012 WL 4466669 (D.D.C.)
**(Cite as: 2012 WL 4466669 (D.D.C.))**

**D. Leave to Designate Rebuttal Experts**

   **\*5** Rule 26(A)(2)(d)(ii) allows a party to designate a rebuttal expert "within 30 days after the other party's disclosure." Rebuttal experts are used "solely to contradict or rebut evidence on the same subject matter identified by another party." F.R.C.P. 26(A)(2)(d)(ii). There is no freestanding Rule that specifically addresses the designation and disclosure of rebuttal experts vis-à-vis supplemental or amended expert reports. Some Courts have held that, when a party had previously failed to designate a rebuttal expert, that party does not necessarily get another chance after a report is amended. *See* Hubbard v. Potter, 247 F.R.D. 27, 31 (D.D.C.2008) (denying motion to strike supplemental expert report and denying leave to designate rebuttal experts). Other Courts, when faced with a report containing significant changes filed during or near trial, have gone as far as striking the entire supplemental report. *See* Minebea, 231 F.R.D. at 6 (striking supplemental expert reports submitted during trial).

   **[12]** Ultimately, granting leave is within the discretion of the Court. Rule 26(a)(2)(C) states that "[expert witness] disclosures shall be made at the times and in the sequence directed by the court." From "the language of Rule 26(a)(2)(C), the Court has the authority to control the timing and sequence in which expert designations are made" including whether a party can make a designation of an expert for the purposes of rebuttal. Estate of Vaughn v. KIA Motors America, Inc., 2006 WL 1806454, \*2 (S.D.Miss. June 29, 2006).

**III. DISCUSSION**

**A. Defendant's Motion to Compel Answers to Interrogatories No. 1 and 2**

   The District's current Motion to Compel relates to a previous Order of the Court resolving several discovery motions. On April 3, 2012, the Court ruled on two motions by the defendant to compel discovery responses and a motion by the plaintiffs for a protective order. Barnes, 281 F.R.D. 53. The

District challenged plaintiffs' responses to Interrogatories 1, 2, 5, and 6. Id. at 55. As previously summarized by the Court:

   Interrogatory No. 1 seeks, in short, the overall number of overdetentions during the Trial Period. Interrogatory No. 2 seeks the number of the overdetentions during the Trial Period that plaintiffs contend were caused by the 10 p.m. cut-off rule. Interrogatory No. 5 seeks the number of overdetentions (the time period is not specified) in which an inmate was sent to the Medical Holding Unit before being overdetained. Interrogatory No. 6 seeks a breakdown ("for all periods at issue") of the number of inmates who were overdetained for certain lengths of time—"less than 2 hours," "2 or more hours but less than 4 hours," and so forth.

   Id. (citations omitted). This Court denied defendant's motion to compel as to Interrogatories 5 and 6, id. at 56, but granted the motion [FN4] as to Interrogatories 1 and 2. Id. at 55. To this end:

   [T]he Court will order plaintiffs to revise their responses to Interrogatories Nos. 1 and 2 by stating how many overdetentions they contend occurred during the Trial Period (excluding from that number the number of overdetentions that they contend were caused by the DOC's enforcement of the 10 p.m. cut-off rule) and also by stating how many 10 p.m. cut-off rule overdetentions they contend occurred during the Trial Period. As requested by the District, plaintiffs must also explain in full in their responses how they arrived at these figures. The Court recognizes that ordering a party to create a document that doesn't exist or to perform analyses it hasn't yet performed is somewhat unusual....In the circumstances of this case, where plaintiffs' failure to perform the required analysis would almost certainly result in the exclusion of that key evidence prior to trial, and where that analysis can be performed comparatively easily using computerized data plaintiffs have in their possession, ordering plaintiffs to create the requested information is

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2012 WL 4466669 (D.D.C.)
**(Cite as: 2012 WL 4466669 (D.D.C.))**

**\*6** *Id.* at 55–56. In their present motion, the District claims—despite the Court's April 3rd Order—that it still has not received satisfactory responses to Interrogatories 1 and 2. Def.'s Mem. ISO its Mot. to Compel 2–3, May 22, 2012, ECF No. 351.

The Court's December 2011 Trial Plan opened a period of limited discovery to close on April 6, 2012. *Barnes,* 278 F.R.D. at 18. After this Court issued its April 3rd Discovery Opinion, the parties each moved to extend the discovery deadline to accommodate the discovery compelled by the Order. *See* ECF docket entries 337, 338, 339, 343. On April 27, 2012 this Court resolved those motions and set the deadline for extended discovery for June 11, 2012, adding: "[T]he Court shall permit the District to depose both [plaintiffs' experts] Dr. Kriegler and Mr. Day, at its option. No further extensions of discovery will be permitted." ECF No. 345. On June 12, 2012, the Court issued a Minute Order granting an additional extension of time, ordering the plaintiffs to "produce the [expert] reports and all related discoverable material no later than 12:00 AM on Thursday June 14, 2012." On June 14, 2012, the plaintiffs submitted their supplemental expert reports per the Court's Order. *See* ECF No. 360.

[13] When granting defendant's earlier motion to compel as to Interrogatories 1 and 2, this Court expected that the answers may come via supplemental expert reports. This Court carefully considered the appropriateness of ordering plaintiffs to create new documents or perform new analyses, and ultimately decided that so ordering was "reasonable." 281 F.R.D. at 55–56. The Court extended discovery so plaintiffs could respond to Interrogatories 1 and 2 with supplemental reports identifying the requested information and explaining their methodologies. The District may have misunderstood the Court's April 3rd Discovery Opinion, because on May 22, 2012 it filed a renewed motion to compel. At that time, the plaintiffs

had until June 11, 2012 to file reports answering the interrogatories. Therefore, the District's May 22nd motion to compel was premature; the plaintiffs still had time to file their responses.

[14] In any event, the plaintiffs timely filed expert reports aimed at clearly and fully answering Interrogatories 1 and 2. Supplemental Report of Sean R. Day, June 14, 2012, ECF No. 360–2; Third Supplemental Expert Report of Brian Kriegler, Ph.D., June 14, 2012, ECF No. 360–3. When these reports came in, the defendant filed a Motion to Strike; the Court declines to strike these reports, for the reasons discussed in Part III.C. *infra.* The defendant may dispute the accuracy and methodologies of the reports, and they are free to do via deposition. However, plaintiffs answered Interrogatories 1 and 2 in the manner and time allowed by the Court. Therefore, the defendant's Motion to Compel as to Interrogatories 1 and 2 is denied.

**B. Defendant's Motion to Compel Answer to Interrogatory No. 13**

**\*7** The District also seeks to compel plaintiffs to answer Interrogatory 13, which reads:

> Please identify each fact witness (by name, address at which the person can be served a deposition notice such as a home address, phone number, and social security number) you intend to call during the liability phase of the trial and also please state each fact you expect the witness to testify to.

Def.'s Fourth Set of Interrogs. & Req. for Produc. of Docs. 5, Mar. 6, 2012, ECF No. 351–1. The plaintiffs responded:

> Plaintiffs have not yet had an opportunity to revise their trial strategy in response to the Discovery Revision Order [docket # 336] and so plaintiffs reserve the right to supplement its responses but at this point plaintiffs reserve the right to call all fact witnesses on the defendant's responses to plaintiffs [*sic* ] interrogatories. Plaintiffs will state (subjection [*sic* ] to objections provided by the rules and other law) "each fact

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2012 WL 4466669 (D.D.C.)
**(Cite as: 2012 WL 4466669 (D.D.C.))**

you expect the witness to testify to" when the District responds to plaintiffs' interrogatory and tells plaintiffs what those facts are.

Pls.' Resp. to Def.'s Fourth Set of Doc. Prodc. Req. 1, Apr. 25, 2012, ECF No. 351–2. The plaintiffs then listed two witnesses, Razina Jones and Judith Jamison, and indicated that these witnesses "may be contacted through plaintiffs' counsel." *Id.* at 2.

As with the dispute over Interrogatories 1 and 2, the dispute over Interrogatory 13 relates to another discovery ruling of the Court. When the District filed its Motion to Compel, the plaintiffs had a similar motion pending. On April 16, 2012, the plaintiffs filed a Motion to Compel Responses to Plaintiffs' 2–10–12 Liability Interrogatories and Document Production Requests to Defendant. ECF No. 341. In this motion, plaintiffs sought an answer to an interrogatory virtually identical to the District's Interrogatory No. 13. The plaintiffs submitted:

Please identify (by name, address at which the person can be served a deposition subpoena such as a home address, phone number, and social security number) each fact witness whom you intend to call at trial and also please state each fact you expect the witness to testify to.

*See* Pls.' Mot. to Compel Resp. to its 2–10–12 Interrogs. 3. To the plaintiffs' interrogatory, the District replied generally:
The District objects to the extent that this Interrogatory seeks to replace, expand, or preempt the deadlines set by the Federal Rules of Civil Procedure and the Orders of this Court. The District objects to the extent the information sought is unduly invasive of the privacy of witnesses who will willingly appear as current employees of the District, and affirmatively states that, where applicable, such witnesses may be deposed through arrangement with District counsel. The District objects that the requested recitation of "each fact" to be attested to in evidence at trial in this class

action involving thousands of detainees would be unduly burdensome and vexatious.

**\*8** *See id.* Subject to objections, the District provided responses for ten witness; some examples: Jeanette Myrick: Ms. Myrick can be reached through counsel for the District for the purposes of a deposition. Ms. Myrick will testify regarding DOC Records Office procedures, including staffing and training; the inmate-release process; and discrepancy reports....

Sean Day: Mr. Day is an expert retained by Plaintiffs and whose contact information is already in Plaintiffs' possession. Mr. Day will testify regarding the methods he used to evaluate inmate jackets and prepare the data that was used by Dr. Kriegler in his expert reports.

*Id.* at 3–4. Plaintiffs argued that these responses were deficient because the District "stated the names of witnesses and the topics they would testify to but not 'each fact you expect the witness to testify to.' " *Id.* at 5.

On June 12, 2012—after the District filed its present Motion to Compel-this Court ruled on the plaintiffs' motion. This Court stated:

[T]he plaintiffs' interrogatory asks for "each fact that each witness would testify to." The Court agrees with Defendant to an extent: this is a step too far. Providing a complete answer to this interrogatory would be impossible. However, defendant's other objection—that they could not answer such a question because they have not prepared their witnesses—is nonsensical. Defendant provided the names of their witnesses to plaintiffs presumably because the defense intends to call these witnesses at trial. Defendant must have some understanding of their own witnesses' testimony. Otherwise, naming them as witnesses would be both foolish and illogical.... [D]efendant is ordered to provide a summary of the likely testimony of each of the ten witnesses it named in its response to plaintiffs' interrogat-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2012 WL 4466669 (D.D.C.)
**(Cite as: 2012 WL 4466669 (D.D.C.))**

ory[.]

*Barnes v. District of Columbia,* 2012 WL 3105218, *4 (D.D.C. June 12, 2012) (ECF No. 358).

[15] If the plaintiffs thought the District's responses were deficient, surely they thought their responses were no better. The plaintiffs did not even attempt a brief summary of the facts to which each witness would attest. They did not include their two experts, who they concede will testify at trial. *See* Pls.' Opp'n to Def.'s Mot. to Compel 9, June 8, 2012, ECF No. 354. Instead, they simply referred to the witnesses' previous affidavits and interrogatory responses in their opposition papers. *Id.* at Exs. 1, 2. Basically, the plaintiffs played a game of discovery chicken, refusing to detail their witnesses until the District did the same. However, a party "is not justified in providing insufficient answers just because [the other party] did." *Covad Communications Co. v. Revonet, Inc.,* 258 F.R.D. 17, 24 (D.D.C.2009).

[16] The Court understands that the parties may try to gain a competitive advantage through gaming the discovery process. Such strategic maneuvers can cause headaches for courts, as they trudge through multiple discovery motions with no real issues in dispute. The parties drag their feet until prodded, hoping to gain an upper hand through delay. Plaintiffs had previously filed a motion to compel on a nearly identical question. Plaintiffs provided even less detailed than the defendant's, and even admit that they are waiting until "the District responds to plaintiffs' pending interrogatory." Pls.' Resp. to Def.'s Fourth Set of Doc. Prodc. Req. 1. The Court reminds plaintiffs that Federal Rule 37 gives the Court "broad discretion to impose sanctions for discovery violations." *Bonds v. District of Columbia,* 93 F.3d 801, 807 (D.C.Cir.1996) (citing *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 638, 642–43 (1976) (per curiam)); *see also D.L. v. District of Columbia,* 274 F.R.D. 320, 324–26 (D.D.C.2011) (Lamberth, C.J.) (explaining wide

discretion of trial courts to impose wide variety of sanctions). This case has been going on for over six years. The plaintiffs refused to do something they wanted the Court to demand the District to do. Discovery, at least for the liability phase, is nearing the finish line. If the plaintiffs persist in needlessly gumming up the process, sanctions—not a further warning—may be appropriate.

**\*9** The plaintiffs are ordered to provide a narrative response to Interrogatory 13. The Court requires plaintiffs to answer the question in the same manner, and with the same level of detail, as the Court ordered the District. If the plaintiffs have any questions about what the Court requires, they may look at the Court's June 12, 2012 Memorandum and Order, in particular the language block-quoted above. *See Barnes,* 2012 WL 3105218, *4.

**C. Defendant's Motion to Preclude Plaintiffs from Using Certain Evidence**

The District also requests, within the motion to compel discussed above, that the Court preclude the plaintiffs from "using their experts' reports or testimony at trial." Def.'s Mem. ISO its Mot. to Compel 5. The District claims that the plaintiffs' failure "fully to answer Defendant's Interrogatory No. 13 and timely supplement their expert reports deprives the District of the chance to adequately test plaintiffs' experts' conclusions and prejudices the District's defense of this case." *Id. See also Williams v. Johnson,* 278 F.R.D. 10, 14 (D.D.C.2011) ("[T]he sanction is automatic; '[i]f a party fails to provide information ... as required by Rule 26(a) or (e), the party is not allowed to use that information ... to supply evidence ... at trial, unless the failure was substantially justified or harmless.") (quoting F.R.C.P. 37(c)(1)). However, for the reasons discussed regarding the District's Motion to Strike *infra,* the Court does not agree with the District's assertion that plaintiffs' experts were "lying in wait to express new opinions at the last minute." Def.'s Mem. ISO its Mot. to Compel 5 n. 3 (quoting *Iacangelo v. Georgetown Univ.,* 272 F.R.D. 233, 234 (D.D.C.2011)). The plaintiffs' experts filed

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2012 WL 4466669 (D.D.C.)
**(Cite as: 2012 WL 4466669 (D.D.C.))**

their reports within the time allotted by this Court. Therefore, there is no need to preclude the plaintiffs from introducing this evidence. *Cf. Dormu v. District of Columbia,* 795 F.Supp.2d 7, 28 n. 16 (D.D.C.2011) (denying motion to strike supplemental expert report when report filed "several months prior to trial, leaving defendants with sufficient time to adjust their trial preparation.... Any harm they do experience, however, can be minimized by allowing defendants to depose the expert if they so choose.") (citing *Albert v. Warner–Lambert Co.,* 2002 WL 745822, *1 (D.Mass. Apr.24, 2002) ("[I]n lieu of preclusion, the court will allow [the expert] to supplement his report contingent upon his being made available for up to four hours of additional direct deposition testimony at [plaintiff's] expense.")).

**D. Defendant's Motion to Strike Plaintiffs' Supplemental Expert Reports**

As discussed in Part III.A. *supra,* the Court had directed the plaintiffs to respond to the District's Interrogatories 1 and 2 (requesting information about number of overdetentions during the trial period and overdetentions attributable to the 10 p.m. cut-off rule). The Court took the somewhat unusual move of ordering the plaintiffs to produce new documents in response to the interrogatories. *Barnes,* 281 F.R.D. at 55–56. At that time, the Court expected the answers to come in the form of supplemental expert reports estimating the number of overdetentions and explaining the reasoning behind those numbers. To permit the production of these reports, the Court reopened discovery until June 11, 2012, ECF No. 345, and ultimately extended the deadline via Minute Order to June 14. By the amended deadline, the plaintiffs filed their amended expert reports answering Interrogatories 1 and 2. *See* ECF No. 360.

**\*10** When the District received these reports, instead of withdrawing their now-moot Motion to Compel answers to Interrogatories 1 and 2, it responded with a Motion to Strike, Or, In the Alternative, For Extension of Time and Leave to Designate Rebuttal Expert(s), June 29, 2012, ECF No. 365. The District claims that the "latest expert reports radically alter their analysis and vastly increase their estimates of overdetentions in the Trial Period," and characterize the reports as eleventh hour filings. Def.'s Mem. ISO its Mot. to Strike 1, 5. The District asks the Court to strike the amended expert reports. In the alternative, the District asks the Court to extend discovery for at least 74 days to allow the District to analyze the new reports and depose Dr. Kriegler and Mr. Day, the plaintiffs' experts. The District also requests leave to designate potential rebuttal experts. *Id.* at 12.

[17] This is another example of the District apparently misunderstanding this Court's April 3rd Discovery Opinion. In support of its Motion to Strike, the District dismissively states that "plaintiffs had already asserted on multiple occasions that answering [Interrogatories 1 and 2] would require not just a supplemental discovery response, but for them to 'create documents that did not exist' and consult with their experts." *Id.* at 3. The language the District quotes, however, originates from the Court—not the plaintiffs. In its April 3rd Discovery Opinion, the Court stated, "The Court recognizes that ordering a party to *create a document that doesn't exist* or to perform analyses it hasn't yet performed is somewhat unusual ... [yet] ordering plaintiffs to create the requested information is reasonable." *Barnes,* 281 F.R.D. at 55–56 (emphasis added). There can be no undue surprise that this information was coming because it was what the Court had ordered.[FN5] Between this Motion to Strike and the premature May 22 Motion to Compel responses to Interrogatories 1 and 2, it seems that the District failed to examine or understand the Court's April 3rd Discovery Opinion. The Court urges the District to study this Court's previous orders before filing additional motions.

It also seems that the District failed to examine or understand other orders of this Court. The District complains that the expert reports came "literally on the last day of discovery," and there-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2012 WL 4466669 (D.D.C.)
**(Cite as: 2012 WL 4466669 (D.D.C.))**

fore caused undue surprise. Def.'s Mem. ISO its Mot. to Strike 5. The plaintiffs filed their expert reports on June 14, 2012—the deadline established by the Court. The defendant seems to think that the June 14th deadline applied to *all* aspects of the additional discovery, including the depositions of the experts based on the supplemental expert reports. Def.'s Mem. ISO its Mot. to Strike 4–6, 10–12. The District characterizes the plaintiffs as "lying in wait" and "sandbagging [the District] with three new expert reports." *Id.* at 11.

If the District had just read the Court's orders extending time, it could have refrained from such dramatic language and taken a more measured approach. In their April 23, 2012 Motion for a Nunc Pro Tunc Extension of All Discovery Deadlines, ECF No. 343, the plaintiffs stated: "Plaintiffs now estimate that it will take until Monday, June 11, 2012 for Mr. Day to complete his investigation and analysis and to pass them on to Dr. Kriegler, and then for Dr. Kriegler to complete his investigation and analysis, and for both to complete and finalize their reports." *Id.* at 6. On April 27, 2012, the Court granted plaintiffs' motion, ordering: "Specifically, the discovery deadlines in this case are hereby extended until Monday, June 11, 2012. Furthermore, the Court shall permit the District to depose both Dr. Kriegler and Mr. Day, at its option." ECF No. 345. On June 12, 2012, the Court entered a Minute Order "granting [plaintiffs'] Motion for Extension of Time to produce Plaintiffs' experts' reports." The Order continued: "Plaintiffs are ordered to produce the reports and all related discoverable material no later than 12:00 AM on Thursday June 14, 2012." From these filings, it should have been apparent to the District that it would receive the expert reports on the day of the deadline.

**\*11** [18] The Court understands that there might have been some ambiguity in its April 27th Order. The Court extended the discovery deadlines in this case ... until Monday, June 11, 2012," allowed "the District to depose both Dr. Kriegler and Mr. Day, at its option," but stated that "[n]o further

extensions of discovery will be permitted." ECF No. 345. By this, the Court meant that the District could depose the experts, at its option, after it received the reports. These depositions need not occur before June 11, as the Court considered the leave to take depositions an *additional* extension of discovery, beyond *which* "[n]o further extensions .... [would] be permitted." *Id.* When the District received the reports on June 14, rather than asking the Court to clarify its April 27th Order to determine when and whether it could depose plaintiffs' experts,[FN6] it cranked the dial up to eleven and filed a Motion to Strike.

The District claims that the supplemental reports depart so dramatically from the previous reports that the Court cannot consider them mere updates and must strike them. Def.'s Mem. ISO its Mot. to Strike 6. The District relies on *Mineba v. Papst,* 231 F.R.D. 3 at 6, wherein the Court struck an amended expert report where "[t]he nature of the second disclosure [was] so substantially different from the first that it [fell] far outside any reasonable notion of correcting an incomplete or inaccurate report." *Mineba* concerned an attempt by a party to amend their expert report during *trial. Id.* The *Mineba* opinion states that "[t]he purpose of Rule 26(a)(2) [governing timing of expert disclosures] is to prevent unfair surprise at trial." *Id.* at 5–6. Although this Court wants to finish discovery and proceed to trial as soon as possible, it has not yet set a trial date. Another case relied on by the District, *Coles v. Perry,* 217 F.R.D. 1, 4 (D.D.C.2003), concerns an attempt by an expert to supplement his report after the close of discovery.[FN7] In the present case, plaintiffs filed their reports during the window of additional discovery set aside for this purpose. The supplemental reports were filed "as ordered by the court," F.R.C.P. 26(e)(1)(B), by its April 3rd Discovery Opinion directing plaintiffs to create documents responsive to Interrogatories 1 and 2. *Barnes,* 281 F.R.D. at 55–56. The plaintiffs filed Errata to the Second Supplemental Expert Report, ECF No. 360–3, to correct an incomplete or incorrect prior report, per Rule 26(e)(1)(A).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2012 WL 4466669 (D.D.C.)
**(Cite as: 2012 WL 4466669 (D.D.C.))**

[19] Motions to strike are strongly disfavored, and the decision of whether to strike all or part of a pleading or attachment thereto rests within the sound discretion of the Court. *See supra* Part.II.B. (collecting cases). As detailed in Part III.D *infra,* while the Court concedes that the supplemental reports are different from the prior reports, the Court does not see the changes as so dramatic and prejudicial to the District as to warrant striking the reports. When considering strong sanctions a Court must consider less strict options. *Bonds,* 93 F.3d at 808. To the extent the supplemental reports introduce new issues, the Court can minimize any prejudice to the District through less severe means. If parts of the plaintiffs' new reports contain irrelevant information, the Court may consider narrower motions to strike or *in limine* directed at removing only the irrelevant passages. Moreover, allowing the District to depose the plaintiffs' experts ensures the District a fair opportunity to respond to the plaintiffs' reports.

**\*12** The Rules require that parties disclose their expert reports "at the times and in the sequence that the Court orders." F.R.C.P. 26(a)(2)(D)[FN8]. That is what the plaintiffs did. Pursuant to the Court's April 3rd Discovery Opinion and subsequent extensions for time, the plaintiffs filed supplemental expert reports answering defendant's Interrogatories 1 and 2. The Court reopened discovery for this purpose and the plaintiffs filed those reports within that window. Since the plaintiffs followed the Court's order and timely filed their supplemental expert reports, the Court will not strike them.

**E. Defendant's Motion to Extend and Grant Leave to Designate Rebuttal Experts**

This Court has noted that it would give the District an opportunity to depose plaintiffs' experts Dr. Krieger and Mr. Day after the District received the supplemental expert reports. *See* Order, Apr. 17, 2012, ECF No. 345 ("[T]he Court shall permit the District to depose both Dr. Kriegler and Mr. Day, at its option."). Now that the plaintiffs have submitted

their expert reports, the Court will reopen discovery for the limited purpose of allowing the District to depose plaintiffs' experts. The Court does not believe it needs to reopen discovery for the full 74 days requested by the District.[FN9] *See* Def.'s Mem. ISO its Mot. to Strike 12. The District has had the expert reports for almost three months and has reviewed them when drafting its Motion to Strike and Reply in support thereto. Therefore, the Court will reopen discovery for 28 days for the sole purpose of allowing the District to depose Dr. Kriegler and Mr. Day on issues relating to the expert reports they filed on June 14, 2012, and other matters as allowed by the prior orders of this Court.[FN10]

[20][21] The Court will not reopen discovery to allow the District to designate rebuttal experts. While the Rules allow a party to designate a rebuttal expert within 30 days of receiving an opposing party's expert disclosure, F.R.C.P. 26(A)(2)(d)(ii), there is no separate rule conferring a right to designate a rebuttal expert upon receiving a supplemental or amended report from a previously-disclosed expert. The Court *could* reopen discovery and grant leave upon a showing of good cause, as permitted by Federal Rule 16(b) and Local Rule 16.4. A district court has considerable discretion in handling discovery and expert witnesses. *See Food Lion,* 104 F.3d at 1012; F.R.C.P. 26(a)(2)(C).

The deadline for discovery—save for the allowance to depose plaintiffs' experts—has passed. The Court agrees with the plaintiffs that this request falls under Rule 16(b)—not Rule 6(b)—because it asks to modify the discovery deadlines contained in a scheduling order. *See Barnes,* 278 F.R.D. at 18 (establishing trial plan); *Myrdal,* 2007 WL 1655875, *2 (applying 16(b) to request to change discovery deadlines); *Mercury Ins.,* 2007 WL 1589495, *6 ("Filing an expert disclosure or a supplement thereto after the close of discovery requires leave of the Court pursuant to [F.R.C.P.] 16(b)."). Therefore, the District's request requires a showing that good cause exists to reopen and extend discovery, and the Rules give the Court considerable dis-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2012 WL 4466669 (D.D.C.)
**(Cite as: 2012 WL 4466669 (D.D.C.))**

cretion in deciding whether to grant that request. *See Myrdal,* 2007 WL 1655875, *2.

**\*13** There is no good cause where the District passed on several opportunities to timely designate a rebuttal expert. *See Johnson.,* 975 F.2d at 609 (" Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party seeking the amendment[.]"). On March 6, 2010, the District received Mr. Day's first report on his review of inmate jackets. [FN11] Def.'s Reply ISO its Mot. to Strike 2, Aug. 15, 2012, ECF No. 381. The District did not then designate a rebuttal expert. On November 15, 2010, Dr. Kriegler released his first expert report, estimating overdetentions based on a stratified random sample of inmate jackets provided by Mr. Day. *Id.* at 2–3. The District did not then designate a rebuttal expert. On December 2, 2010, Dr. Kriegler revised the numbers in his first expert report. *Id.* at 3. The District did not then designate a rebuttal expert. On December 13, 2010, Mr. Day filed a supplemental report based on additional reviews of jackets. *Id.* at 4. The District did not then designate a rebuttal expert. A day later, Dr. Kriegler again revised his first report based on Mr. Day's new report. *Id.* The District did not then designate a rebuttal expert. On December 7, 2011, the Court reopened limited discovery until April 6, 2012; on February 14, 2012 Dr. Kriegler filed his Second Supplemental Report. *Id.* at 4–5. The District did not then designate a rebuttal expert. From April 3, 2012 onwards, the Court extended discovery, eventually setting the deadline for plaintiffs' supplemental expert reports for June 14, 2012. *Id.* at 5. The District did not then designate a rebuttal expert. At no time, in the almost two years since receiving the first report, did the District feel the need to designate a rebuttal expert. It is only now, after all the extended deadlines have passed and the Court has stated that "[n]o further extensions of discovery will be permitted," Order, Apr. 27, 2012, ECF No. 345, that the District decides it might need an expert witness to rebut Mr. Day and Dr. Kriegler's reports.

If the plaintiffs submitted reports vastly differ-

ent from their original reports, then the District might need another opportunity to designate a rebuttal expert. Therefore, the Court must examine the supplemental reports and determine how they differ from the original reports. First, bear in mind that the plaintiffs created the supplemental reports at the direction of the Court. After summary judgment, only a subset of the facts remained in dispute. The Court—so the plaintiffs could respond to interrogatories *posed by the District* —asked the plaintiffs to revise their data to focus only on the overdetentions in dispute. Barnes, 281 F.R.D. at 55–56. The Court understood that this might require additional analysis on the behalf of the plaintiffs' experts, and communicated as much in its April 3rd Discovery Opinion. *Id.* The District should have known such analysis was forthcoming, so it cannot claim shock when plaintiffs produced what they were asked to produce.

**\*14** The District claims that the supplemental reports represent "an entirely new analysis—independent of both methodologies used in Dr. Kriegler's 2nd Report" and estimate a number of overdetentions during the Trial Period "almost one third greater than Dr. Kriegler's previous estimate." Def.'s Mem. ISO its Mot. to Strike 3–4 (original formatting omitted). In particular, the District claims that Dr. Kriegler's Third Supplemental Report uses different data sources (the District's Discrepancy Reports instead of statistically sampled jacket data), employs different statistical methods (simple random sampling instead of stratified random sampling), and comes to different results (estimating 1,543 overdetentions instead of 1,180). *Id.* at 6–7. The District claims that Mr. Day's June 11th report differs from his previous report because it "involves the review of entries from a 'Review Spreadsheet' created by Dr. Kriegler from the District's Release Discrepancy Database" instead of "reviewing [a] random, statistically-selected assortment of inmate jackets." *Id.* at 8. The District claims that Dr. Kriegler's Errata to his Second Report simply revises the numbers upwards without any "justification for this correction." *Id.* at 9.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 18

--- F.R.D. ----, 2012 WL 4466669 (D.D.C.)

**(Cite as: 2012 WL 4466669 (D.D.C.))**

The plaintiffs respond that these changes were justified and, in any event, do not require the District to designate a rebuttal expert. The plaintiffs state that their reports were not prepared on a whim, but pursuant to Court order. Pls.' Opp'n to Def.'s Mot. to Strike 16–17, Aug. 8, 2012, ECF No. 378. They mention that after the plaintiffs told the Court and the District that they anticipated the need to do additional analysis, "the District's only response was to ask for leave to depose Mr. Day ... [and] Dr. Kriegler upon receipt of their supplemental reports." *Id.* at 19. The plaintiffs contend that Mr. Day had previously analyzed the District Audit Analysis, which is "virtually identical in design and content to the Release Discrepancy Database" analyzed in Mr. Day's June 2012 report. *Id.* at 20. The District did not produce its Discrepancy Reports to the Court until June 2011. *Barnes,* 793 F.Supp.2d at 270. The change in data sources, plaintiffs allege, reflects newly produced data that allows plaintiffs to separate out overdetentions attributable to the 10 pm cut-off rule more accurately; but Mr. Day did not change *how* he reviewed the data. Pls.' Opp'n to Def.'s Mot. to Strike 26–32. The plaintiffs explain in detail the reasons why Dr. Kriegler shifted from a stratified random sample in his Second Report to a simple random sample in his Third Report. *See id.* at 43–45. Regardless of the particulars of why they made the change, plaintiffs state:

> The District does not state why adding a simple random sample of a stratified random sample instead of a stratified random sample ... makes the analysis so novel that it requires an expert to understand it where before the District did not designate an expert. Arguably, if the type of statistical analysis used in the Third Supplemental Report were more complicated than the type of analysis used in the Original Report and Second Supplemental Report, then this might support the District's claim to need an expert now where it did not before. But the opposite is true-a statistical analysis using a stratified random sampling design is much more complex than one using a simple random sample[.]

**\*15** *Id.* at 42–43. This is perhaps the plaintiffs' most compelling argument.

In essence, the District's argument is that the supplemental expert reports and errata are different. Stratified random sampling is different from simple random sampling; the Discrepancy Reports are different from jackets; 1,180 is different from 1,543. What the District fails to explain, however, is how these differences relate *to its request* to potentially designate rebuttal experts. From its previous inaction, the Court assumes that the District was perfectly fine going into trial without a rebuttal expert when Dr. Kriegler's report used stratified random sampling. The District does not explain *how* the differences change the game—how the methods and data sources used are different *such that* the District did not need a rebuttal expert before, but may need one now. It does not explain why the District felt it could adequately rebut, without an expert, Dr. Kriegler's Second Supplemental Report, but *now* would be unduly prejudiced if the Court does not allow it to designate an expert. The District passed on multiple opportunities to designate a rebuttal expert. Rule 16(b) requires a showing of good cause before the Court will alter the scheduling order. The Court finds no such good cause exists, and the District has not convinced it otherwise.

If the District sees a problem with methods and data sources used in the supplemental reports, it can address them during its depositions of Mr. Day and Dr. Kriegler. If the supplemental reports contain new, irrelevant information such as "producing expert opinions on a range of *other* topics, extending even to the idiosyncrasies of various employee-review techniques in the DOC Records Office," Def.'s Mem. ISO its Mot. to Strike 12, then the solution would be targeted motions *in limine* or motions to strike. The solution is not to strike the whole report or allow the District to appoint an unnecessary expert to rebut irrelevant information.

Judge Facciola, when faced with a similar set of facts, came to a reasonable solution. In *Hubbard v. Potter,* 247 F.R.D. 27, 31 (D.D.C.2008), the de-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2012 WL 4466669 (D.D.C.)
**(Cite as: 2012 WL 4466669 (D.D.C.))**

fendant received a supplemental report from plaintiffs' expert. In response, the defendant sought leave to designate rebuttal witnesses, claiming that he "would be prejudiced if not permitted to respond to [plaintiffs' expert's] conclusions in his second report." *Id.* Judge Facciola decided:

> Unfortunately for defendant, this argument comes too late. As noted by plaintiffs, pursuant to the scheduling order ... all expert designations were due on or before March 3, 2006, with rebuttal designations due on or before March 31, 2006. At that point in time, defendant chose not to designate an expert witness. It also chose not to designate a rebuttal expert witness. On September 8, 2006, however, when plaintiffs' expert filed his supplemental report, defendant moved to strike, limit, or exclude the report on the grounds that it exceeded the subject matter of the first report. In denying defendant's motion, the Court fashioned a practical solution to address defendant's concerns by allowing defendant to take a supplemental deposition of plaintiffs' expert. Defendant has thus had ample opportunity to address the issues raised by plaintiffs' expert's supplemental report. Defendant has identified no reason why the court should allow defendant to change its mind at this late date, when defendant was clearly given ample opportunity to 1) designate an expert witness, 2) designate a rebuttal expert, and 3) depose plaintiffs' expert on not one but two occasions, following the submission of both of plaintiffs' experts' reports.

**\*16** *Id.* The facts in this case are similar. The District, after receiving the plaintiffs' previous expert reports, did not designate their own expert. When this Court reopened discovery so plaintiffs could create reports to answer Interrogatories 1 and 2, the District did not seek leave to designate experts. And in this case, instead of granting the District's motion to strike or leave to designate rebuttal experts, the Court will "fashion[ ] a practical solution to address defendant's concerns by allowing defendant to take a ... deposition" of plaintiffs' ex-

perts.[FN12] *Id.* Recognizing Judge Facciola's wisdom and expertise resolving discovery disputes, this Court is confident following his lead. *See also Dormu,* 795 F.Supp.2d at 28 n. 16 (denying motion to strike supplemental expert report and allowing deposition of expert to minimize any harm or prejudice); *Warner,* 2002 WL 745822, *1 (allowing additional deposition of expert in lieu of precluding supplemental expert report).

[22] At this stage, the Court will allow the District the opportunity to depose plaintiffs' experts, but nothing more. The Court does not feel that the changes reflected in the plaintiffs' supplemental reports provide good cause to amend the scheduling order to allow the designation of rebuttal experts, where the District had previously passed on several opportunities to so designate. Nevertheless, this does not foreclose the District's ability to designate rebuttal experts in the future if the plaintiffs continue to supplement and amend their expert reports. For example, if in response to the discovery compelled in the following section, plaintiffs file new amended expert reports, the Court might then consider whether leave to designate rebuttal experts is warranted.

## F. Plaintiff's Motion to Compel Production of the Release Discrepancy Database

Finally, the Court considers the plaintiffs' June 26, 2012 Motion to Compel the Production of the Release Discrepancy Database. ECF No. 362. Plaintiffs' had originally filed a similar Motion to Compel before the end of discovery. Non–Consent Mot. to Compel Prodc. of the Release Discrepancy Database, June 11, 2012, ECF No. 356. However, this motion failed to include the required certification that the plaintiffs met and conferred with the District prior to filing. *See* F.R.C.P. 37(a)(1). After so conferring, the plaintiffs filed the present motion to supersede the previous defective motion. *See* Pls.' Mot. to Compel 1; Def.'s Opp'n to Pls.' Mot. to Compel 3, July, 12, 2012, ECF No. 369.

In their Re–Stated Motion to Compel, the plaintiffs argue that they have not received all the

--- F.R.D. ----, 2012 WL 4466669 (D.D.C.)

**(Cite as: 2012 WL 4466669 (D.D.C.))**

data and documents they requested from the District. *See* Pls.' Mot. to Compel 3–4. A short history of how the District and plaintiffs have tracked overdetentions will be helpful. Early in the original class period—from approximately 2005 to 2007—the District had no organized way to track inmate overdetentions. The data for this period primarily came from analyses of inmates' physical files (commonly referred to as "jackets") and the DOC's data management system, called the Jail and Community Corrections System ("JACCS"). *See Barnes,* 793 F.Supp.2d at 265–70. To estimate overdetentions occurring during this early period, the plaintiffs' experts used a combination of the JACCS data and a stratified random sample of physical jackets. *Id . at 270–71.* Since the District had no competing data the Court could credit, the Court deemed plaintiffs' facts for this early period uncontested, and granted plaintiffs summary judgment as to the District's liability for overdetentions that occurred from September 1, 2005 to December 31, 2006. *Id.* at 280.

*\*17* Beginning in January 2007, the District finally began tracking overdetentions in a systematic way. The DOC began producing "Discrepancy Reports" listing individual overdetentions by month and noting the reasons for the overdetentions. The District provided these reports to the plaintiffs following a June 2011 hearing before this Court. *Id.* at 270. For the purposes of these reports, the DOC defined an "overdetention" as "anyone retained after 11:59 p.m. on the day they are ordered released, or alternatively, situations where the end of sentence calculation was computed incorrectly." Souverain Decl. 2, June 7, 2011, ECF No. 301–2. The DOC prepares these reports by running a query in the JACCS database to generate a " 'Crystal Report,' " which identifies the inmates who have been *potentially* over-detained. The institutional file of each inmate on this list is then reviewed by hand and a notation is entered into Lotus Notes as to whether the inmate was over-detained or not." *Id.* at 1–2 (emphasis in original). This Court credited these Discrepancy Reports and found that they cre-

ated a contested issue of material fact, precluding an award of summary judgment to either side. *Barnes,* 793 F.Supp.2d at 292–93.

After the Court resolved the cross-motions for summary judgment, the District's liability for overdetentions—not attributable to the 10 p.m. cut-off rule—that occurred between January 1, 2007 and February 25, 2008 remained in dispute. *See Barnes,* 278 F.R.D. at 17. The Court refers to this period, from January 2007 to February 2008, as the "disputed" or "Trial Period." *See id.* Following this narrowing of the issues, the Court opened a window of "limited fact and expert discovery as to liability" permitting "[o]nly such discovery as will assist the parties in determining how many overdetentions occurred from January 1, 2007 to February 25, 2008." *Id.* at 23. The Court stated that "[n]o discovery on 'process' and related issues shall be permitted." *Id.* The Court reaffirmed and clarified the limited scope of additional discovery in its subsequent April 3rd Discovery Opinion. *See Barnes,* 281 F.R.D. at 55–57.

Plaintiffs claim that the District has wrongfully withheld some of the underlying data the DOC used to create its Release Discrepancy Reports. As noted above, the Reports are the result of District employees analyzing and compiling inmate data. Plaintiffs refer to this underlying data as the "Release Discrepancy Database," and they claim they only received one version of it—what the plaintiffs call "Beta." Plaintiffs seek, among other documents, the entire Release Discrepancy Database—what the plaintiffs call "Alpha." *See* Pls.' Mot. to Compel 1–3. They also seek the query the DOC used to analyze inmate data and generate the Crystal Reports and Release Discrepancy Database. *See* Pls.' Reply ISO its Mot. to Compel 1–3, July 25, 2012, ECF No. 373. The District counters that "plaintiffs have all the data they demanded, including all the underlying JACCS data used to generate the Release Discrepancy Database," and that plaintiffs' motion is untimely. Def.'s Opp'n to Pls.' Mot. to Compel 8, 9–11, July 12, 2012, ECF No. 369.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2012 WL 4466669 (D.D.C.)
**(Cite as: 2012 WL 4466669 (D.D.C.))**

**1. Timeliness of Plaintiffs' Motion to Compel**

**\*18** The lateness of plaintiffs' motion concerns the Court. The plaintiffs filed this motion on June 25, 2012—eleven days after the close of discovery, a deadline that had been extended multiple times to accommodate the plaintiffs. *See* ECF docket entries 328, 339, 343, 345, 355; Minute Order, Apr. 23, 2012 (granting plaintiffs' Motion for Extension of Time, ECF No. 339); Minute Order, June 12, 2012 (granting plaintiff's Motion for Extension of Time, ECF No. 355). Based on this untimeliness, the Court might be justified in denying plaintiffs' motion to compel. *See Dag Enterprises, Inc. v. Exxon Mobil Corp.,* 226 F.R.D. 95, 104 (D.D.C.2005) (ordering protective order against untimely discovery filing). The District cites a long list of cases to support its position that this Court could deny plaintiffs' motion simply because it was filed after the close of discovery. *See* Def.'s Opp'n to Pls.' Mot. to Compel 10–11 (citing, *e.g., Klugel v. Clough,* 252 F.R.D. 53, 55–56 (D.D.C.2008) (motion to compel coming two months after close of discovery denied as untimely); *Long v. Howard Univ.,* 561 F.Supp.2d 85, 91 (D.D.C.2008) (denying motion where plaintiff obtained allegedly incomplete document production "over three years prior to the filing of his motion.")). However, if courts should deny *all* motions to compel filed after the close of discovery, that would be the rule; it is not so. *Cf. Jinks–Umstead v. England,* 227 F.R.D. 143, 153 (D.D.C.2005) (allowing untimely discovery notices to stand).

At the end of its paragraph arguing that this Court should deny plaintiffs' motion as untimely, the District included one citation to contrary authority. Def.'s Opp'n to Pls.' Mot. to Compel 10–11. This Court recognizes the case— *Lurie v. MAPMG,* 262 F.R.D. 29 (D.D.C.2009) (Lamberth, C.J.)-as its own. In that opinion, this Court stated:

Although [defendant] contends that [plaintiff]'s motion to compel is untimely, it cites no authority for its position that a motion to compel filed outside the discovery period is untimely per se.

Indeed, to the contrary, courts routinely consider motions related to discovery, even though they are filed outside the discovery period, especially where the time of filing of such a motion is attributable, as it is here, to the parties' attempted settlement of the discovery dispute. *See, e.g., McFadden v. Ballard, Spahr, Andrews, & Ingersoll, LLP,* 243 F.R.D. 1, 11 (D.D.C.2007) (noting that the federal rules contain no provision regarding the time of filing for a motion to compel and suggesting that a per se rule would create perverse incentives in discovery).

262 F.R.D. at 31. This Court believes its discretion to manage its docket and oversee discovery cuts both ways. While the Court is perfectly justified in denying an untimely motion if it comes too late (*see Dag,* 226 F.R.D. at 104), it may also exercise its discretion to permit motions to compel coming after the close of discovery. *Jinks–Umstead,* 227 F.R.D. at 153; *Lurie,* 262 F.R.D. at 31. The time of the filing does not end the inquiry.

**\*19** Certainly Courts might be less willing to grant a discovery motion filed after a scheduling order's discovery deadline has passed, when the discovery deadlines have been extended several times over. *Cf., Lurie v. MAPMG,* 589 F.Supp.2d (D.D.C.2008) (Lamberth, J.) ("Given their heavy case loads, district courts require the effective case management tools provided by Rule 16. Therefore, after the deadlines provided by a scheduling order have passed, the good cause standard must be satisfied to justify leave to amend the pleadings.") (quoting *Nourison Rug Corp. v. Parvizian,* 535 F.3d 295, 298 (4th Cir.2008)); *Johnson,* 975 F.2d at 610 ("A scheduling order 'is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded without peril.'... [D]isregard of the order would undermine the court's ability to control its docket, disrupt the agreed-upon course of litigation, and reward the indolent and the cavalier.") (quoting *Gestener Corp v. Case Equip. Co.,* 108 F.R.D. 138, 141 (D.Me.1985)).

On the other hand, since there is no rule "that a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2012 WL 4466669 (D.D.C.)
**(Cite as: 2012 WL 4466669 (D.D.C.))**

motion to compel filed outside the discovery period is untimely per se," *Lurie,* 262 F.R.D. at 31, plaintiffs do not have to meet the requirements of Federal Rule 16(b) and Local Rule 16.4 to file a motion to compel. After all, they are not seeking an amendment to the scheduling order to reopen discovery; they are demanding the production of documents pursuant to requests served during the discovery period. Plaintiffs' are not asking for "new" discovery—they are asking for discovery they should have already received. Therefore, while the "good cause" and "diligence" requirements of 16(b) may be helpful in determining whether plaintiffs' Motion to Compel comes too late, they do not control. That said, the parties do not have free reign to file discovery motions long after discovery has closed, without any justification for the delay.

This Court feels that it has been very generous in extending discovery, while warning the parties that—at some point—discovery must end. *See, e.g.,* Order, Apr. 27, 2012, ECF No. 345 (extending discovery but stating, "No further extensions of discovery will be permitted."). However, unless there would be some undue prejudice to the parties, it is for the Court to decide when this generosity runs out. In *Beale v. District of Columbia,* 545 F.Supp.2d 8, 15–16 (D.D.C.2008), the plaintiffs contended that the Judge Kay "bound himself to the deadlines for the defendant's expert reports and the close of discovery ... because he wrote [in an earlier Order].' 'There will be no further extensions of discovery.' " Judge Urbina eloquently responded:

The plaintiffs forget a fundamental rule of litigation: the court's discretionary pronouncements are for it—not the parties—to enforce. A judge does not bind his own broad discretion when he runs a tight ship. And if, in furtherance of case management, a judge occasionally betrays the fact that his bark is scarier than his bite, that is not a grievance on which a losing party is entitled to rest a reversal.

**\*20** 545 F.Supp.2d at 16 (citations omitted). This Court truly wishes, in the spirit of its April 27,

2012 Order, ECF No. 345, that discovery for the liability phase would be finished by now. However, the Court finds reason to partially grant plaintiffs' Motion to Compel, despite the fact that it is filed after the close of fact discovery.

[23] The plaintiffs filed their motion less than two weeks after the close of additional discovery. The cases cited by the District, Def .'s Opp'n to Pls.' Mot. to Compel 10, deal with significantly longer delays. *See Klugel,* 252 F.R.D. at 55–56 (motion to compel filed two months after close of discovery); *Long,* 561 F.Supp.2d at 91 (motion filed over three years after plaintiff received allegedly incomplete document production); *Suntrust Bank v. Blue Water Fiber, LP,* 210 F.R.D. 196, 201–202 (E.D.Mich.2002) (motion filed 18 months after discovery closed); *Tim W. Koerner & Assocs., Inc.,* 492 F.Supp. 294, 298 (S.D.Tex.1980) (motion filed nine months after plaintiff received allegedly defective production). Since "courts routinely consider motions related to discovery[ ] even though they are filed outside the discovery period," *Lurie,* 262 F.R.D. at 31, this Court finds that an eleven day delay does not necessarily disqualify plaintiffs' motion.

## 2. Substantive Merits of Plaintiffs' Motion to Compel

The timeliness of plaintiffs' motion will play a factor, but not control, the Court's disposition of plaintiffs' Motion to Compel. Therefore, the Court will consider the substantive merits of plaintiffs' requests in greater detail.

Plaintiffs claim the information they seek relates to three previous document requests. Plaintiffs' Eighth Document Requests sought "[a] Release Processing System Data Production to include data from all fields and all tables for inmates released on or after September 1, 2005" and "all writings or documents related to any Lotus Notes system used in the commitment detention or release of inmates from any DOC facility including data inputted into the system since 2005 and all writings or documents related to show how the system was

--- F.R.D. ----, 2012 WL 4466669 (D.D.C.)
**(Cite as: 2012 WL 4466669 (D.D.C.))**

created or is maintained or operated." *See* Def.'s Resp. to Pls.' Eighth Doc. Req. 4, 8, Mar. 29, 2010, ECF No. 366–4 (original formatting omitted). In the Document Requests Served in the Deposition Notice of Shirley Simmons, plaintiffs requested "[a]ny other reports or writings generated by or for the District of Columbia regarding late releases and erroneous releases." *See* Def.'s Resp. to Pls.' Doc. Req. Served in Dep. Notice of Shirley Simmons 8, March 23, 2010, ECF No. 366–6. The District argues that it produced everything responsive to these requests, subject to its objections limiting production to the class period; and, in any event, plaintiffs' requests come years after they should have realized the production was incomplete. *See* Def.'s Opp'n to Pls.' Mot. to Compel 4–11.

After ruling on summary judgment, the Court ordered the parties to focus their remaining discovery efforts on the "disputed" or "Trial Period." *Barnes,* 278 F.R.D. at 17. Despite this, plaintiffs seek discovery beyond the Trial Period, including "the entire Release Discrepancy Database for the class period to date." Pls.' Mot. to Compel 1. The document requests plaintiffs claim cover this all predate this Court's summary judgment ruling. *Compare Id.* at 10–13 (listing three document requests), *with Barnes,* 793 F.Supp.2d at 292–93 (June 24, 2011). Plaintiffs' Eighth Document Requests, quoted *supra,* came before March 29, 2010. FN13 *See* Def.'s Resp. to Pls.' Eighth Doc. Req. 10. Plaintiffs' Document Request Served in Deposition Notice of Shirley Simmons, quoted *supra,* came before March 23, 2010. *See* Def.'s Resp. to Pls.' Doc. Req. Served in Dep. Notice of Shirley Simmons 10. When the Court restricted all additional discovery to the "Trial Period," it stated that "[d]iscovery beyond this narrow issue would needlessly prolong this litigation, since plaintiffs had ample opportunity to probe such issues prior to the close of liability-phase discovery." 278 F.R.D. at 18–19. The Court finds no reason to reopen discovery beyond the disputed period. To the extent the Court grants any part of plaintiffs' Motion to Compel, such production shall be limited to documents relating to al-

leged overdetentions occurring from January 1, 2007 to February 25, 2008, and any documents or writings that would aid plaintiffs in interpreting data from that period (even if such writings were created outside of the Trial Period).

**i. Plaintiffs' Request for the Entire Release Discrepancy Database for the Class Period and All Documents Needed to Interpret the Data**
   **\*21** First, the plaintiffs ask the Court to compel the District to produce:

> the entire Release Discrepancy Database for the class period to date in native format or in an excel spreadsheet, as well as all documents needed to interpret the data in the database, such as the names of the fields, both the programmer names and the data entry field names, and to produce all writings on how the database was created and how it has been used by the District.

Pls.' Mot. to Compel 1–2. As noted above, the Court will not permit any production beyond the Trial Period. Therefore, plaintiffs are not entitled to production of "the *entire* Release Discrepancy Database" regardless of whether this information is responsive to an earlier document request. The time for that discovery has long since passed, and the Court and parties have shifted their focus to the Trial Period. In the next section, the Court considers whether the plaintiffs are entitled to the complete Release Discrepancy Database as it relates to the overdetentions that occurred during the Trial Period. FN14

[24][25] The party filing a motion to compel has the burden of showing that the production they received is incomplete or inadequate. *Equal Rights Ctr.,* 246 F.R.D. at 32. There is a showing that the District withheld the query DOC used to analyze inmate data and generate the Crystal Reports and Release Discrepancy Database. FN15 *See* Pls.' Mot. to Compel 5–8; Pls.' Reply ISO its Mot. to Compel 1–4. The "query" refers to the search algorithm the DOC ran against inmate data to identify potential overdetentions. In essence, it is a set of software

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2012 WL 4466669 (D.D.C.)
**(Cite as: 2012 WL 4466669 (D.D.C.))**

commands created by the District to help create the Discrepancy Reports. As such, it is "electronically stored information" that counts as a "writing" under Federal Rule 34(a)(1)(A). The Court also agrees with plaintiffs that the query is a "writing generated by or for the government of the District ... regarding late releases or erroneous releases" relating to "documents needed to interpret the data in the database." *See* Pls.' Reply ISO its Mot. to Compel 3. The query is clearly relevant to the case. In order for the plaintiffs to understand fully the District's Discrepancy Reports, they need to have all the underlying data and information on how the DOC prepared the Reports. The query the DOC used is a critical piece of this—it selected which records would be subject to further review. *See* Souverain Decl. 1–2 ("In order to identify an over-detention, the DOC runs a "Crystal Report," which identified the inmates who have been *potentially* over-detained."); Decl. of Steve Fezuk ¶ 5, July 12, 2012, ECF No. 370–3 ("Every month, a query is run in JACCS to identify potential late releases, and the data obtained from the query is exported (in spreadsheet form) into the Release Discrepancy Database."); Decl. of Reena Chakraborty *passim,* June 29, 2012, ECF No. 370–4 (discussing use of query in preparing Discrepancy Reports). The plaintiffs have the right to check the District's work and determine whether the Discrepancy Reports accurately reflect the total number of overdetentions.

**\*22** Having established that the query is a writing, falls under one of the plaintiffs' previous document requests, and is relevant, the Court must determine if there is any reason not to compel its production. If the plaintiffs already received the query the District used, then there is nothing to compel. *Cf. Hubbard,* 247 F.R.D. at 29 ("[P]laintiffs fail to account for the possibility that they may in fact have already received all responsive documents."). The District seems to concede, in its Opposition and exhibits thereto, that the plaintiffs have *not* received the query the DOC used to prepare its Discrepancy Reports. The District repeatedly argues that "the query identified [by plaintiffs] is *not* the

one used to generate the Release Discrepancy Database." *See, e.g.,* Def.'s Opp'n to Pls.' Mot. to Compel 6. What is missing—tellingly—is *any claim* by the District that it has already produced the query the DOC did use. Even in their proposed Surreply—which the District claimed was necessary to counter the plaintiffs' "new" allegation in Reply that the District did not produce the query (Def.'s Mot. for Leave to File Surreply 2)—the best the District could argue was that since the plaintiffs had "re-created" the disputed query "based on the information provided by the District" they already have it and their motion is moot. Def.'s Proposed Surreply 2, Aug. 2, 2012, ECF No. 376–2. This does not explain why the District never produced the query in the first place, and therefore the plaintiffs meet their burden of showing that the District's production was incomplete.[FN16]

After incompleteness has been established, the burden shifts to the party opposing production to show that the movant's requests are burdensome, overly broad, vague, outside the scope of discovery, or otherwise fall within the limitations on discovery in Rule 26(b)(2)(C). *Chubb Integrated Sys. Ltd. v. Nat'l Bank of Washington,* 103 F.R.D. 52, 59–60 (D.D.C.1984). The plaintiffs should not have to reverse engineer the District's query.[FN17] It would be much simpler for the District just to produce it. Therefore, the query's production would not be "unreasonably cumulative or duplicative" and it could not be "obtained from some other source" than the District "that is more convenient, less burdensome, or less expensive." F.R.C.P. 26(b)(2)(C)(i). Moreover, the District makes no claim that "the burden or expense of the proposed discovery outweighs its likely benefit." F.R.C.P. 26(b)(2)(C)(iii). The District does not contend that the query would be particularly expensive to find or produce. Presumably, the query is simply a set of instructions that the Lotus Notes database program runs against the inmate data. The query itself must dwarf in "size" when compared to the data to which it is being applied. Furthermore, as a query repeatedly used by the DOC to help generate its Dis-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2012 WL 4466669 (D.D.C.)
**(Cite as: 2012 WL 4466669 (D.D.C.))**

crepancy Reports, it should be easily identifiable. Based on the District's multiple assertions that the plaintiffs are confused as to which query the DOC ran (*see, e.g.,* Def.'s Opp'n to Pls.' Mot. to Compel 6–8), surely the District knows which query the DOC *did run.*

**\*23** The District rests part of its argument on Federal Rule 26(b)(2)(C)(ii), which provides that "the court must limit the frequency or extent of discovery otherwise allowed by these rules ... if it determines that ... the party seeking discovery has had ample opportunity to obtain the information by discovery in the action[.]" *See also* Def.'s Opp'n to Pls.' Mot. to Compel 11 ("[P]laintiffs' motion should be denied pursuant to Fed.R.Civ.P. 26(b)(2)(C)(ii)[.]"). This is where the timeliness of plaintiffs' motion—discussed in detail in Part III.F.1. *supra*—comes in. When a party's motion comes late, some courts have denied motions to compel on 26(b)(2)(C)(ii) grounds because the party "had ample opportunity to obtain the information during the fact discovery period, and failed to raise the issue with the Court at the appropriate time." *Gucci America, Inc. v. Guess?, Inc.,* 790 F.Supp.2d 136, 140–42 (S.D.N.Y.2011).

The District's own Opposition helps explain why the plaintiffs might not have objected to this incomplete production earlier—the plaintiffs could have been under the false impression, for some time, that they already had the query the District used. As the District explains:

> Plaintiffs ... cite the query developed by Lee Gazlay (a former consultant for DOC) to identify potential late releases as the source of the "Crystal Reports" which are exported on a monthly basis from JACCS into the Release Discrepancy Database. But the query identified is *not* the one used to generate the Release Discrepancy Database.... [T]he query identified by Lee Gazlay and discussed in his deposition has never been identified (by DOC) as the one used by DOC to generate the Release Discrepancy Database.

Def.'s Opp'n to Pls.' Mot. to Compel 6. What the District does *not* say is that it has produced the query that DOC *did* use, and if the plaintiffs searched the production they could have corrected their mistake. Generally, adversaries do not have a duty to actively help the other side—but the District did have a duty to produce the query. The District's Opposition also does not provide a real explanation of why the query was not produced in the first place. The District cannot withhold discoverable information, allow plaintiffs falsely to think they already *have* the information, and then claim the request comes too late once plaintiffs realize they do not have the correct information. Permitting such an approach could incentivize discovery abuses.

The "query" is a writing, the production of which is reasonably calculated to lead to the production of relevant evidence. *See* F.R.C.P. 34(a)(1)(A); F.R.C.P. 26(b)(1). It should have been produced pursuant to plaintiffs previous request for "all writings or documents related to show how the system was created," *See* Def.'s Resp. to Pls.' Eighth Doc. Req. 8. Its production has been again requested by the plaintiffs' motion to compel "all documents needed to interpret the data in the database" and "all writings on how the database was created and how it has been used by the District." Pls.' Mot. to Compel 1–2. With the burden of showing that the District's production was incomplete met (*see* Guantanamera Cigar Co. v. Corporation Habanos, S.A., 263 F.R.D. 1, 7 (D.D.C.2009) (Lamberth, C.J.)), the District has not met its burden to show that the plaintiffs' request is overbroad, vague, or falls under one of the limitations of Rule 26(b)(2)(C). *See Chubb,* 103 F.R.D. at 59–60. While the plaintiffs' request for the query comes late, that does not overcome the plaintiffs' right to the information. Therefore, the Court will grant, in part, plaintiffs motion to compel as to their first request. The Court will order the immediate production of any database query or search algorithm used by the District during the Trial Period to help prepare its Discrepancy Reports.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2012 WL 4466669 (D.D.C.)
**(Cite as: 2012 WL 4466669 (D.D.C.))**

**\*24** However, the plaintiffs' request for the entire Release Discrepancy Database is overbroad, especially considering the Court's narrowing of the remaining discovery to the "Trial Period." Furthermore, except as to the "query," the plaintiffs have not shown that the District's production was otherwise incomplete. In the following section, the Court will discuss in greater detail the plaintiffs' claim that there are records and data missing from the produced version of the Release Discrepancy Database.

**ii. Plaintiffs' Request for the All the Data the District Used to Complete its Discrepancy Reports**

Second, the plaintiffs ask the Court to compel the District to produce:

the entire database or electronic compilation of records from which the discrepancy reports filed by the District under Notice of Filing [Document # 301] and referenced by Ms. Souverain in her Declaration [Document # 301–2] ["Delta"] were taken from, if that database is different from the complete Release Discrepancy Database ["Alpha"].FN18

Pls.' Mot. to Compel 2. As with the plaintiffs' first request, any production would need to be limited to the Trial Period, and the Court will not order the production of "the entire database" extending beyond the period of overdetentions in dispute.

Plaintiffs' basic argument is that while "complying with the Court's order to calculate total over-detentions for the Trial Period and total 'disputed over-detentions' for the Trial Period," plaintiffs' expert examined "the information available," and discovered that "the version of Release Discrepancy Database the District produced" was missing information. Pls.' Mot. to Compel 3–4. As such, the plaintiffs request "production of the missing records, the missing comments, and the missing entries from the Discrepancy Type field." Id. at 4.

[26] The District argues that there is "no data is

missing here." Def.'s Opp'n to Pls.' Mot. to Compel 4 (formatting omitted). First, the District spends over three pages of its Opposition arguing that the plaintiffs used the wrong "query" to examine the District's raw data and "find" missing records. Id. at 4–8. Since the plaintiffs used the wrong "query," their claims about missing information are erroneous. See id. Furthermore, as to the plaintiffs' "complain[t] that empty comments in the District's Release Discrepancy Database is 'missing' information that should be compelled," the District responds: "However, when District employees are entering data in the Release Discrepancy Database, comments are optional." Id. at 7 (emphasis in original). Overall, the District's argument is: "The records plaintiffs claim are 'missing' were never part of the Release Discrepancy Database in the first place; plaintiffs have all the data they demanded, including all the underlying JACCS data used to generate the Release Discrepancy Database.... The information plaintiffs claim is 'missing' or 'withheld' is neither. The District produced the complete Release Discrepancy Database, and all the data from which it was developed." Id. at 8–9.

**\*25** This request comes down to whether the plaintiffs have met their burden of showing that the District's production is incomplete. If there is any "missing" information, the plaintiffs are entitled to it. The complete database and all the information the District used to prepare its Discrepancy Reports are clearly relevant under Rule 26(b)(1) and responsive to plaintiffs' prior document requests. FN19 See Pls.' Mot. to Compel 10–13 (listing three document requests quoted in this Opinion supra ). If there is missing data, the District has not made any showing that producing it would be unduly expensive or burdensome under Rule 26(b)(2)(C)(iii). It has made no showing that the information could come from a more convenient or less expensive source under Rule 26(b)(2)(C)(i). To the extent there are additional unproduced records, producing them would not be "unreasonably cumulative or duplicative." F.R.C.P. 26(b)(2)(C)(i). The District may not produce some, but not all, of the data and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2012 WL 4466669 (D.D.C.)
**(Cite as: 2012 WL 4466669 (D.D.C.))**

claim that plaintiffs have everything they need. The plaintiffs are entitled to all the tools needed to critically analyze the District's Discrepancy Reports and come to their own estimates of overdetentions. *See Novelty, Inc. v. Mountain View Marketing, Inc.,* 265 F.R.D. 370, 378 (S.D.Ind.2009) ("Producing only those documents that are deemed helpful to the producing party's litigation position—parsing out the bad from the good—is, of course, impermissible."); *see also United States v. Procter & Gamble Co.,* 356 U.S. 677, 682, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958) (explaining that liberal discovery provisions of Federal Rules are designed to make "trial less a game of blind man's bluff and more a fair context with the basic issues and facts disclosed to the fullest practical extent."). The plaintiffs also explain why their motion to compel comes relatively late, and why they have not previously "had ample opportunity to obtain the information by discovery in the action." F.R.C.P. 26(b)(2)(C)(ii). The plaintiffs did not notice that records might be missing until they calculated, per Court order, the number of alleged overdetentions for the Trial Period. *See* Pls.' Mot. to Compel 2–3. After making this "discovery," the plaintiffs promptly told the District and this Court that they believed records were missing.

To find that a production is incomplete, the Court requires more than a mere "theoretical possibility that more documents exist ... to justify additional discovery." *Hubbard,* 247 F.R.D. at 29. Instead, the Court must be able to make a "reasonable deduction" from the documents that exist that "other documents may exist or did exist and have been destroyed." *Id. See also Harris,* 271 F.R.D. at 370 ("If plaintiffs are speculating that documents responsive to these requests do exist, there must be a reasonable deduction that that is true, and not a mere hunch."). The Court believes the District when it says the plaintiffs were using the incorrect query to determine that there were records missing. Def.'s Opp'n to Pls.' Mot. to Compel 4–8. As such, the plaintiffs have not—for now—met their burden of proving that there are any missing records to be

produced. However, the Court will deny the plaintiffs' Motion to Compel on this issue without prejudice. The plaintiffs were unable to correctly scrutinize the District's data because the query—key to understanding how the District analyzed its data—has not been produced. As explained *supra,* the Court will compel the immediate production of the query used during the Trial Period to analyze inmate data and generate the Release Discrepancy Database and Discrepancy Reports. If, after using the correct query to analyze the information available, the plaintiffs can show that information is missing, then the plaintiffs may then file a motion to compel. The Court urges the plaintiffs to work diligently and quickly, after receiving the correct query, to determine if any files are missing, so discovery for the liability phase may finally come to an end.

## IV. CONCLUSION

**\*26** Both of the District's motions, [351] and [365], would have been unnecessary had the parties carefully reviewed this Court's orders and engaged in discovery in good faith. Both the District and the plaintiffs are to blame. The District asked for answers to interrogatories it should have known were forthcoming. When the District received those answers, it moved to strike them—based, in part, on undue surprise. The District failed on several opportunities to designate a rebuttal expert, but now demands leave almost two years after receiving the initial report from plaintiffs' experts. The plaintiffs, while asking the Court to compel a narrative response to one of their interrogatories, felt they did not need to do the same when answering a nearly identical interrogatory from the District.

This case presents serious issues. This Court has already found that the District wrongfully overdetained hundreds of inmates. *Barnes,* 793 F.Supp.2d at 286. Hundreds more alleged overdetentions are now in dispute. If true, this represents a considerable civil rights violation. The Court understands that the attorneys owe a duty to be zealous advocates for their clients, but this does not ex-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2012 WL 4466669 (D.D.C.)
**(Cite as: 2012 WL 4466669 (D.D.C.))**

cuse gaming discovery simply to gain a tactical advantage. It does not excuse sloppy, late, or repetitive filings. It does not excuse failing to examine this Court's prior orders, and not asking for clarification if key points are ambiguous. Each party has reason to be annoyed and frustrated at the other, and this comes out in their filings. But the Court urges the parties to remember the importance of this case. The plaintiffs' counsel does not simply represent the named parties, but hundreds who may have had their civil rights violated. The defendant's counsel represents the District of Columbia, and by extension its over 600,000 citizens [FN20]. Both parties owe a duty to litigate this case fairly, honestly, and carefully. The Court knows that each party is capable of such, and asks them to focus on the real issues, instead of how many misspellings are in the other party's filing.[FN21]

For the reasons stated above, the Court denies in part and grants in part the District's Motion to Compel [ECF No. 351]. The District has already received a satisfactory response to Interrogatories 1 and 2 and thus the Court denies the motion as to those interrogatories. The plaintiffs refused to answer Interrogatory 13 because the District had not answered a virtually identical question the way plaintiffs wanted. The Court grants the District's motion as to Interrogatory 13 and orders the plaintiffs to answer the question in the same manner the Court had earlier directed the District. *See Barnes,* 2012 WL 3105218, *4 (granting plaintiffs' motion to compel against District on virtually identical interrogatory).

The Court denies the District's Motion to Strike [ECF No. 365]. The Court finds no reason to strike supplemental expert reports that the Court itself ordered. Motions to Strike are strongly disfavored and require the Court to consider alternatives. The Court also denies the District's motion, in the alternative, for an extension of time and leave to designate rebuttal experts [ECF No. 365]. The Court has not found that good cause exists to grant leave to designate experts after the close of discovery.

The District's request to reopen discovery for 72 days to allow for the depositions of Dr. Kriegler and Mr. Day is excessive. Instead, the Court reopens discovery for 28 days from this date for the sole purpose of allowing the District to depose Dr. Kriegler and Mr. Day.

**\*27** The plaintiffs' Non–Consent and Re–Stated Motion to Compel the Production of the Release Discrepancy Database [ECF No. 362] presents more complicated issues. The Court's April 3rd Discovery Opinion required the plaintiffs to revise their expert reports to focus on overdetentions occurring during the "disputed" or "Trial Period." In doing so, the plaintiffs claim they discovered that the District's production was incomplete. The plaintiffs seek complete discovery, including the entire Release Discrepancy Database—what the plaintiffs dub "Alpha." In responding to the plaintiffs' motion, the District argued that the plaintiffs used faulty methods to determine that there are "missing" records. Therefore, as long as the plaintiffs' argument rests on their application of the wrong "query," they cannot meet their burden of showing that "Alpha" exists and has not been produced. In so replying, however, the District betrayed the fact that the District never revealed or produced which "query" the DOC did use to identify potential overdetentions. By discussing the unproduced and undisclosed query in greater detail, the District's Opposition helped the plaintiffs demonstrate that the District's production was incomplete and that the District wrongfully withheld production of the query.

Therefore, the Court grants in part and denies in part plaintiffs' Motion to Compel [362]. The Court compels the District to immediately produce and identify any Lotus Notes query or other search algorithm used by the defendant or defendant's agent(s) during the Trial Period to analyze JACCS or other inmate data to identify potential overdetentions, or any query otherwise used in connection with generating the Discrepancy Reports and Release Discrepancy Database during the Trial Period.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2012 WL 4466669 (D.D.C.)
**(Cite as: 2012 WL 4466669 (D.D.C.))**

The Court will not compel the production of the *entire* Release Discrepancy Database. The Court furthermore denies, without prejudice, plaintiffs' motion to compel the production of data underlying the District's Discrepancy reports to the extent such data is different from the version of the Release Discrepancy Database the District has already produced. The plaintiffs cannot, at this time, meet their burden of showing that any records or data is missing; however, after the plaintiffs have had a chance to analyze the District's data using the correct query, they might be able to make such a showing.

A separate Order consistent with this Memorandum Opinion shall issue this date.

Originally Signed, Royce C. Lamberth, Chief Judge, September 19, 2012.

Amended Pursuant to Rule 60(a). Mem. Op. & Order, Sept. 28, 2012, ECF No. 396.

Amended Opinion Signed, Royce C. Lamberth, Chief Judge, September 28, 2012.

FN* Following defendant District of Columbia's Motion to Clarify the Record, Sept. 27, 2012, ECF No. 394, the Court decided to make two non-material changes to clarify the factual record. *See* ECF No. 396. Those changes are reflected in footnote 11 (page 22 of the ECF version) and Part.III.E. (pp. 24–25).

FN1. Considering some of the parties' current motions—which frequently raise issues that could have been resolved by carefully reading the prior Orders of this Court—assuming familiarity might be a stretch. The following three paragraphs of this background section are taken, largely, from the Court's description in *Barnes v. District of Columbia,* 281 F.R.D. 53, 53–54 (D.D.C.2012).

FN2. The Court will refer to this opinion and order as "April 3rd Discovery Opin-

ion" herein.

FN3. This Opinion also denied parties' motions to compel as to several other interrogatories and outlined the proper scope of the interrogatory of plaintiffs' expert Dr. Krieger. *Id.* at 55–57.

FN4. With limitations. This Court did not grant "the District's request in Interrogatory No. 1 for the overdetention figures to be broken down into "CRER" and "non-CRER" overdetentions." 281 F.R.D. at 56. "CRER" stands for "Court Return Entitled to Release" and "indicates an inmate who left the DOC's correctional facilities to attend a court hearing and who was entitled to be released upon his or her return to jail." *Id.* at 56 n. 1.

FN5. The District objects to the form of the plaintiffs' answer. Def .'s Mem. ISO its Mot. to Strike 2 n. 3. However, the plaintiffs answered this way because they were directed to do so by the Court's April 3rd Discovery Opinion. 281 F.R.D. at 55–56. The District is not entitled to dictate the form of the plaintiffs' response. *Huthnance v. District of Columbia,* 255 F.R.D. 297, 300 (D.D.C.2008).

FN6. Although no Federal Rule of Civil Procedure specifically governs "motions for clarification," these motions are generally recognized and allowed by federal courts. *See U.S. v. Phillip Morris USA Inc.,* 793 F.Supp.2d 164, 168–69 (D.D.C.2011) (explaining motions for clarification). "The general purpose of" a classic "motion for clarification is to explain or clarify something ambiguous or vague[.]" *Resolution Trust Corp. v. KPMG Peat Marwick, et al.,* 1993 WL 211555, *2 (E.D.Pa. June 8, 1993).

FN7. A third case relied on by the District,

Page 30

--- F.R.D. ----, 2012 WL 4466669 (D.D.C.)
**(Cite as: 2012 WL 4466669 (D.D.C.))**

*U.S. ex rel. Purcell v. MWI Corp.,* 824 F.Supp.2d 12, 19 (D.D.C.2011) did not concern the filing of supplemental expert reports. Rather, "the defendant failed to disclose two of its witnesses" *at all* during discovery, and for that reason the Court granted "the government's motion to strike those witnesses' declarations." *Id.* at 12. While this opinion contains strong passages that sound good for the District, the facts are dissimilar. Here, the plaintiffs submitted supplemental reports—written by experts whom have already been disclosed—pursuant to a Court order. This is very different from springing two entirely new witnesses on a party.

FN8. The plaintiffs supplemented their expert reports under Rule 26(e)(1)(B), pursuant to this Court's April 3rd Discovery Opinion and subsequent extension orders. Therefore, the Court does not need to consider the requirements of Rule 26(e)(1)(A), which some Courts have read more narrowly. *See Keener,* 181 F.R.D. at 640 (limiting supplementation under 26(e)(1)(A) to "correcting inaccuracies, or filling the interstices of an incomplete report based upon information that was not available at the time of the initial disclosure."). In the course of preparing these supplemental reports, the plaintiffs revisited and revised an earlier report and filed errata thereto. The plaintiffs did not revisit the earlier report *sua sponte* but discovered the inaccuracies as they prepared the reports ordered by this Court. Therefore, this Court finds that this errata filing was proper under Rule 26(e)(1)(A), as the plaintiffs "learn[ed] that in some material respect the [earlier] disclosure or response [was] incomplete or incorrect" and the Court believes that the plaintiffs provided corrections in a timely manner after learning of the need for them.

FN9. In a bold move, the District states it needs "at the very least, 60 days to analyze" the supplemental reports. Def.'s Mem. ISO its Mot. to Strike 12. To put this in context, this is *twice* the length that Rule 26(A)(2)(d)(ii) would allow the District to designate a rebuttal expert after receiving an initial expert disclosure.

FN10. For example, in its April 3rd Discovery Opinion, the Court clarified the permissible scope of the District's deposition of Dr. Kriegler. *Barnes,* 281 F.R.D. at 57. The parties are urged to review the prior orders of this Court before filing any additional motions to compel or motions for protective orders.

FN11. An "inmate jacket" is a term referring to the inmate's physical file, which includes information about the inmate's term of sentence and time of release. The District also maintained an electronic database of inmate information, known as "JACCS," that was supposed to compile the information contained in the jackets. Starting in January 2007, the District began systematically tracking overdetentions through the production of Discrepancy Reports. The District did not produce these Discrepancy Reports to the Court until June 2011. For a more thorough discussion of how the District and plaintiffs determined and tracked overdetentions, see *Barnes,* 793 F.Supp.2d at 265–72.

FN12. This Court feels that it has already fashioned this solution, and that it had already given the District leave to "depose both Dr. Kriegler and Mr. Day, at its option" after receipt of their supplemental reports. Order, Apr. 27, 2012, ECF No. 345. Nevertheless, the Court will "refashion" the solution and formally reopen discovery to allow for the depositions of Dr. Kriegler and Mr. Day.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2012 WL 4466669 (D.D.C.)
**(Cite as: 2012 WL 4466669 (D.D.C.))**

FN13. The plaintiffs attached, as the ex-
hibits to their Motion to Compel, the Dis-
trict's responses to their document requests
instead of the original requests. *See* Pls.'
Sealed Exs., July 2, 2012, ECF Nos.
366–1–10. The District's responses are
dated, and logic dictates that the plaintiffs
could not serve requests before the date the
District responded.

FN14. Although the Court separates the
plaintiffs' motion into two "requests," there
is some overlap between the two.

FN15. The District moved for leave to file
a surreply, claiming that "plaintiffs in their
Reply raise for the first time the issue of
whether the District produced the disputed
query[.]" Def.'s Mot. for Leave to File Sur-
reply, Aug. 2, 2012, ECF No. 376. This
Court, noting that "surreplies are generally
disfavored," denied the District's motion.
Memorandum and Order, Sept. 5, 2012,
ECF No. 386 (quoting *Glass v. LaHood,*
*786 F.Supp.2d 189, 231 (D.D.C.2011)*).
The Court concedes that plaintiffs went in-
to far greater detail about the query in thier
Reply. *See* Pls.' Reply ISO its Mot. to
Compel 1–4. However, this was in direct
response to the District's lengthy discus-
sion of the query in its Opposition. *See*
Def.'s Opp'n to Pls.' Mot. to Compel 5–8.
Therefore, if anyone raised it for the first
time, it was the District. And most import-
antly, this Court thoroughly reviewed the
District's proposed surreply before denying
leave. The Court did not see anything that
would convince it to rule on plaintiffs' mo-
tion differently.

FN16. It is not material to the outcome of
this motion that, in a sense, the District's
Opposition made the clearest case that the
plaintiffs do not have the query. After
reading the briefings, the Court is con-
vinced that the District failed to identify or

produce something it should have.

FN17. The District also does not get to
say, in one place, that the plaintiffs already
have the correct query because they re-
created it, Def.'s Proposed Surreply 2, but
claim elsewhere that the plaintiffs' query
was not the one used by the District. *See*
Def .'s Opp'n to Pls.' Mot. to Compel 7
("Plaintiffs simply *assumed* that the over-
broad query developed by Lee Gazlay to
identify potential overdetentions is the
same one used by the DOC to generate the
Release Discrepancy Database. Not so.").

FN18. The Court also considers, in this
section, the plaintiffs' request for
"Alpha"—the entire Release Discrepancy
Database which, plaintiffs claim, contains
records missing from what has been pro-
duced.

FN19. Again, subject to the limitation that
any information produced must be relevant
to alleged overdetentions occurring during
the Trial Period.

FN20. The Census Bureau estimates the
population of the District of Columbia, as
of July 2011, as 617,996. U.S. Census Bur-
eau, *Annual Estimates of the Resident Pop-
ulation for the United States, Regions,
States, and Puerto Rico: April 1, 2010 to
July, 1, 2011,* 2011 POPULATION ES-
TIMATES (Dec.2011), *available at* ht-
tp://www.census                      .            gov/
popest/
data/
state/
totals/2011/tables/NST–EST2011–01.csv.

FN21. The Court also asks the parties not
to include such careless typos in the first
place.

D.D.C.,2012.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2012 WL 4466669 (D.D.C.)
**(Cite as: 2012 WL 4466669 (D.D.C.))**

Barnes v. District of Columbia
--- F.R.D. ----, 2012 WL 4466669 (D.D.C.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy, 2012 WL 1831484 (N.D.W.Va.)
**(Cite as: 2012 WL 1831484 (N.D.W.Va.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. West Virginia,
Martinsburg.
Maureen DUPELL, Plaintiff,
v.
K. HOVNANIAN COMPANIES, LLC and Aetna
Insurance Company, Defendants.

Civil Action No. 3:12–CV–6.
May 18, 2012.

Peter G. Zurbuch, Busch, Zurbuch & Thompson,
PLLC, Elkins, WV, for Plaintiff.

Grant P.H. Shuman, Spilman, Thomas & Battle,
PLLC, Charleston, WV, for Defendants.

*ORDER GRANTING DEFENDANTS' MOTION
TO STRIKE AND GRANTING DEFENDANTS'
PARTIAL MOTION TO DISMISS*

GINA M. GROH, District Judge.

### 1. Introduction

**\*1** On this day, the above-styled matter came
before the Court for consideration of the Defend-
ants' Motion to Strike and Partial Motion to Dis-
miss [Doc. 7] with regard to the Plaintiff's Com-
plaint [Doc. 5]. In their Motion, the Defendants
pray that the Court strike a Functional Capacity
Evaluation attached as an exhibit to the Plaintiff's
Complaint, and the Defendants furthermore pray
that the Court dismiss K. Hovnanian Companies,
LLC, as a party defendant to this case.

### 2. Factual Background

The Plaintiff alleges in her Complaint that she
was an employee of K. Hovnanian Companies,
LLC ("K–Hov") in Martinsburg, West Virginia,
and as a result qualified for long-term disability
("LTD") benefits. The Plaintiff alleges that Aetna
Insurance Company ("Aetna") "acted as the under-
writer and claims administrator for the K. Hovnani-
an Companies, LLC's long-term disability plan in-
cluding making the decision to deny Plaintiff's
long-term disability claim."

The Plaintiff alleges that she developed degen-
erative disk disease and a ruptured disk in 1991, for
which she underwent surgery in 1992 consisting of
a laminectomy and discectomy. According to the
Plaintiff, although her leg pain initially improved
after surgery, she has progressively suffered from
lower back pain and left leg pain from her hip and
her foot which has significantly worsened since her
surgery in 1992, and because of the progression of
the compression, she has also developed arthritic
pain in her right hip.

The Plaintiff alleges that on October 30, 2004,
an MRI examination of the Plaintiff's lumbar spine
was conducted, which revealed, among other
things, further degenerative disk disease. On
December 22, 2005, the Plaintiff was found to be
totally disabled by the Social Security Administra-
tion, finding that she had been under a disability
since March 2, 2004.

In September 2005, the Plaintiff went to work
part-time as a sales assistant for Dan Ryan Build-
ers. Her Social Security Disability payments contin-
ued during her nine month trial work months while
Plaintiff allegedly "tested her ability to work." Her
trial work period ended in June 2006. On March 20,
2006, the Plaintiff was hired by Defendant K–Hov
as a sales consultant with a $14,000 annual base
salary, plus commissions. The physical require-
ments of Plaintiff's job with K–Hov allegedly in-
cluded being able to sit, stand, and drive without
limitations, being able to work a minimum of eight
to ten hours per day, being able to drive to Chan-
tilly, Virginia every Monday to turn in contracts
and attend meetings, being able to attend periodic
training or meetings in Chantilly, Virginia, or
Landover, Maryland, being able to unload large
boxes of brochures and promotional items, and be-
ing able to interact with customers.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1831484 (N.D.W.Va.)
**(Cite as: 2012 WL 1831484 (N.D.W.Va.))**

The Plaintiff alleges that while working for K–Hov, her medical conditions were exacerbated and worsened. She was allegedly diagnosed with "chronic pain versus fatigue and adrenal fatigue." The Plaintiff also allegedly suffers from fibromyalgia, hypothyroidism, sleep apnea, and depression.

**\*2** The Plaintiff alleges that on or about September 27, 2007, she became totally disabled from her occupation as a real estate sales consultant for K–Hov. She applied for and was placed on short-term disability until April 30, 2008, under K–Hov's group plan. The Plaintiff was not entitled to Social Security Disability payments from October 2006 through September 2007 because of substantial work. The Plaintiff's Social Security Disability payments were reinstated by letter dated November 2, 2007, because she was no longer able to work.

On March 11, 2008, the Plaintiff applied for long-term disability. Pursuant to the application for long-term disability, the Plaintiff alleges that a Physician Statement was prepared by Dr. J.A. Burgess which directed that the Plaintiff could not lift, that the Plaintiff could not sit, stand, walk, or drive for more than thirty minutes at a time, and that a low-stress environment was preferred for the Plaintiff.

On March 26, 2008, the Plaintiff was approved for long-term disability and began receiving benefits pursuant to the plan. On February 17, 2009, an MRI of the Plaintiff's spine revealed further degeneration. On November 5, 2009, the Plaintiff underwent a "fluoroscopically guided left L5 dorsal ramus blockade," and an "S1, S2, and S3 lateral branch blockade" by Dr. Mayo Friedlis, who diagnosed the Plaintiff with: (1) left sacroilitis; (2) post laminectomy, lumbar; (3) left L5 radiculopathy; (4) multilevel lumbar disk disease with disk protrusion/disk osteophyte complexes/annular tearing; (5) congenital and acquired lumbar spine stenosis; (6) lumbar facet arthropathy; (7) lumbar spondylosis; and (8) lumbar/gluteal myofascial dysfunction.

On January 20, 2010, as part of the Plaintiff's renewed application for long-term disability benefits, the Aetna Attending Physician Statement form was completed by Dr. Sylvia Cruz, D.O., Pain Management Specialist. Dr. Cruz listed the Plaintiff's diagnoses as lumbar spondylosis, lumbar radiculopathy, and chronic pain. Dr. Cruz opined that the Plaintiff had no ability to work.

On March 9, 2010, Dr. Lawrence Blumberg, M.D., was assigned to perform a Physician Review by Defendant Aetna. In his report, Dr. Blumberg included notes from a peer-to-peer consultation with Dr. Cruz on March 10, 2010. The Plaintiff asserts that Dr. Blumberg "mischaracterized his conversation with Dr. Cruz indicating Plaintiff could perform any occupational activities as long as she was allowed to change positions."

On March 30, 2010, the Plaintiff's application for long-term disability benefits was denied by the Defendants effective April 1, 2010. The Plaintiff appealed this denial.

According to the Plaintiff, upon reviewing the March 30, 2010 determination letter, Dr. Cruz sent a letter to Aetna Disability–Workability Appeals dated May 10, 2010, in which Dr. Cruz sought to clarify her March 10, 2010 peer-to-peer conversation with Dr. Blumberg. In her letter, Dr. Cruz noted that "as time has progressed [the Plaintiff's] functionality has significantly decreased since her disability determination, and she is not able to perform these functions as well as she did when she was determined to be disabled."

**\*3** It was discovered in March 2010 that the Defendants failed to reduce Plaintiff's disability payments to take into consideration the Plaintiff's Social Security Disability payments. The Defendants allegedly demanded repayment of $43,905.24 in overpayment within fifteen days. On April 28, 2010, the Plaintiff claims to have tendered to the Defendants a check in the amount $35,030.10, and to have reimbursed the Defendants for the remainder of the overpayment by donating her disab-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1831484 (N.D.W.Va.)
**(Cite as: 2012 WL 1831484 (N.D.W.Va.))**

ility payments for the remainder of the balance.

According to the Plaintiff, she underwent a comprehensive and detailed independent medical evaluation on June 18, 2010 by Dr. Alex Ambroz. As part of her appeal, the Plaintiff submitted Dr. Ambroz's report of the evaluation. Dr. Ambroz concluded that "[a]s a result of her medical problems she is permanently and totally disabled ... [s]he fully meets the terms of Aetna's permanent disability."

The Plaintiff alleges that on September 20, 2010, as part of another physician review performed by Defendant Aetna, Dr. Richard S. Kaplan spoke to Dr. Friedlis, a Pain Management Specialist. Dr. Kaplan's report indicated that "Dr. Friedlis reports that ... [the Plaintiff] ... would not have been able to work at all during the period under review." In a supplemental physician review dated October 6, 2010, Dr. Kaplan found that "a more quantitative validation of this claimant's functional abilities would certainly be appropriate ... [t]here might reasonably be some difference in professional judgment regarding the exact level of restrictions/limitations at which this claimant is able to work...."

The Plaintiff alleges that "[d]espite the findings of Plaintiff's treating physicians concerning Plaintiff's disabilities, and the recommendations of Aetna's physician reviewers, Aetna did not choose to obtain a functional capacity evaluation nor did it choose to have any of its physicians actually examine the Plaintiff."

On or about December 16, 2010, Defendant Aetna issued a final denial of the Plaintiff's claim for long-term disability benefits.

On August 15, 2011, a functional capacity evaluation of the Plaintiff was performed by Tobi M. Smith, OTR/L. This functional capacity evaluation found that the Plaintiff "was not capable of performing work activities within the Sedentary physical demand level." The Plaintiff has attached this functional capacity evaluation to her Complaint

as Exhibit 1 and seeks to have it considered by the Court.

### 3. Procedural History

The Plaintiff filed her Complaint [Doc. 5] on January 23, 2012. On February 14, 2012, the Defendants filed a Motion to Strike and Partial Motion to Dismiss [Doc. 7]. On February 29, 2012, the Plaintiff filed a Response in Opposition to the Defendants' Motion [Doc. 12], and on March 8, 2012, the Defendants filed a Reply to the Plaintiff's Response [Doc. 14]. The matter is now ripe for adjudication.

### 4. Standards of Review

A. *Motion to Strike*

**\*4** Federal Rule of Civil Procedure 12(f) provides that:

The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act:

(1) on its own; or

(2) on motion made by a party, either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading.

FED.R.CIV.P. 12(f). The standard upon which a motion to strike is measured places a substantial burden on the moving party. "A motion to strike is a drastic remedy which is disfavored by the courts and infrequently granted." *Clark v. Milam,* 152 F.R.D. 66, 70 (S.D.W.Va.1993) (*citing First Financial Sav. Bank v. Am. Bankers Ins. Co.,* 783 F.Supp. 963, 966 (E.D.N.C.1991); *United States v. Fairchild Indus., Inc.,* 766 F.Supp. 405, 408 (D.Md.1991)). Generally, such motions are denied "unless the allegations attacked have no possible relation to the controversy and may prejudice the other party." *Steuart Inv. Co. v. Bauer Dredging Const. Co.,* 323 F.Supp. 907, 909 (D.Md.1971).

B. *Motion to Dismiss*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1831484 (N.D.W.Va.)
**(Cite as: 2012 WL 1831484 (N.D.W.Va.))**

In assessing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept all well-pled facts contained in the complaint as true. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 255 (4th Cir.2009). However, "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement fail to constitute well-pled facts for Rule 12(b)(6) purposes." *Id.* (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 667, 129 S.Ct. 1937, 1949 (2009)). A court will decline to consider "unwarranted inferences, unreasonable conclusions, or arguments." *Id.* (citing *Wahi v. Charleston Area Med. Ctr., Inc.,* 562 F.3d 599, 615 n. 26 (4th Cir.2009)).

### 5. Analysis

A. *Motion to Strike*

The Defendants argue, first and foremost, that the administrator's denial of the Plaintiff's claim in the case *sub judice* is subject to an abuse of discretion standard of review. The Plaintiff, on the other hand, argues that review should be *de novo.* The Court must, as an initial step, determine the applicable standard of review, which will, in turn, be determinative of the issue of whether or not the Court may consider evidence which was not before the claims administrator at the time that the claims administrator rendered its decision.

The United States Court of Appeals for the Fourth Circuit has held that:

[A]lthough it may be appropriate for a court conducting a *de novo* review of a plan administrator's action to consider evidence that was not taken into account by the administrator, the contrary approach should be followed when conducting a review under ... the abuse of discretion standard.

*Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co.,* 32 F .3d 120, 125 (4th Cir.1994). Thus,

[A] court reviewing the denial of disability benefits under ERISA initially must decide whether a benefit plan's language grants the administrator

or fiduciary discretion to determine the claimant's eligibility for benefits, and if so, whether the administrator acted within the scope of that discretion.

**\*5** *Gallagher v. Reliance Standard Life Ins. Co.,* 305 F.3d 264, 268 (4th Cir.2002). "If a plan does not clearly grant discretion, the standard of review is *de novo.*" *Id.* at 269. "Any ambiguity in an ERISA plan 'is construed against the drafter of the plan, and it is construed in accordance with the reasonable expectations of the insured.' " *Id.* (quoting *Bynum v. Cigna Healthcare, Inc.,* 287 F.3d 305, 313–14 (4th Cir.2002)).

The Plaintiff argues that after the December 16, 2010 final denial of the Plaintiff's long-term disability application by the Defendants, the Plaintiff, by letter dated February 1, 2011, requested, *inter alia,* a complete and certified copy of the plan applicable to the Plaintiff's disability claim. The Plaintiff alleges that Aetna then sent her what was referred to as "a complete copy of the Long Term Disability contract ... for [the Plaintiff's] employer, K. Hovnanian." The Plaintiff argues that there is no grant of discretionary authority contained within the plan which Aetna sent to her ("the Group Plan"), nor in the Summary Plan Description ("SPD") produced by K–Hov, and thus review of the denial of her claim should be *de novo.* With regard to the "Group Accident and Health Insurance Policy" ("the Group Policy") between K–Hov and Aetna, which is attached as Exhibit B to the Defendants' Motion to Strike, the Plaintiff argues that this document was never provided to her during her employment, nor was it produced when the Plaintiff's counsel requested a copy of the plan. The Plaintiff argues that if the Group Policy is, in fact, part of the Long–Term Disability Contract, then Aetna violated 29 U.S.C. § 1024(b)(4) by failing, "upon written request of any participant or beneficiary, [to] furnish a copy of the latest updated summary plan description ... contract, or other instruments under which the plan is established or operated." The Plaintiff argues that she has been prejudiced by undergoing a Functional

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1831484 (N.D.W.Va.)
**(Cite as: 2012 WL 1831484 (N.D.W.Va.))**

Capacity Evaluation based on the belief that the standard of review in this case would be *de novo.*

The Defendants, on the other hand, argue that the Plaintiff cannot make any showing that the Summary Plan Description and other documents provided to her by K–Hov and Aetna conflict with the Group Policy which the Defendants cite in their Motion to Strike.

In *Martin v. Blue Cross & Blue Shield of Virginia, Inc.,* the United States Court of Appeals for the Fourth Circuit held that "we find no conflict between the absence of discretionary language in [an] SPD and its presence in [a] Plan ... [v]esting the plan administrator with discretion in making coverage decisions simply does not conflict with the SPD's silence on the matter." *Martin,* 115 F.3d 1201, 1205 (4th Cir.1997), *abrogated on other grounds by Hardt v. Reliance Standard Life Ins. Co.,* 130 S.Ct. 2149 (2010) (*see Williams v. Metropolitan Life Ins. Co.,* 609 F.3d 622, 634 (4th Cir.2010)).

**\*6** The United States District Court for the Western District of North Carolina reached an identical conclusion in a case involving an Aetna group policy in *Worsley v. Aetna Life Ins. Co.,* where the court held:

[Plaintiff] argues that the SPD is silent on Aetna's discretion, and that only the Group Policy and Administrative Information Booklet ("AIB") contain language granting such discretionary authority to Aetna. From here, [plaintiff] asserts that since Aetna maintains that the SPD's terms control in the case of a conflict, and the SPD is allegedly silent on discretion, the Plan does not grant Aetna the discretionary authority that would trigger abuse of discretion review.

This argument fails. The Group Policy and AIB contain express grants of discretion to Aetna, and the SPD does not conflict with these express grants. Rather, the SPD contains multiple references to Aetna's authority to make benefit de-

terminations, and these references are consistent with the grants of discretion in the Group Policy and AIB. For instance, the SPD states that eligibility for long term disability benefits are "determined by Aetna" and that benefits begin only when "Aetna certifies that you are disabled." The Court thus finds that no conflict exists between the SPD on the one hand, and the Group Policy and AIB on the other, regarding Aetna's discretion under the Plan. The Court reviews Aetna's denial of benefits for abuse of discretion.

*Worsley,* 780 F.Supp.2d 397, 404 (W.D.N.C.2011).

In the case *sub judice,* the Plaintiff, by her own admission, received from Aetna a copy of the Group Plan. Page 1 of this document states that "[t]his Plan is underwritten by the Aetna Life Insurance Company, of Hartford, Connecticut." Page 3 states that:

Your period of disability ends on the first to occur of:

(1) The date Aetna finds you are no longer disabled or the date you fail to furnish proof that you are disabled;

(2) The date Aetna finds you have withheld information which indicates you are performing, or capable of performing, the duties of a reasonable occupation; ...

Page 5 states that:
**How and When to Report Your Claim**

You are required to submit a claim to Aetna by following the procedures chosen by your Employer. If the procedure requires that claim forms be submitted, they may be obtained at your place of employment or from Aetna. Your claim must give proof of the nature and extent of the loss. Aetna may require copies of documents to support your claim, including data about any other income benefits. You must also provide Aetna with authorizations to allow it to investigate your

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1831484 (N.D.W.Va.)
**(Cite as: 2012 WL 1831484 (N.D.W.Va.))**

claim and your eligibility for and the amount of other income benefits.

The Plaintiff also, by her own admission, received from K–Hov a copy of the Summary Plan Description applicable to the Plaintiff's claim. Page 5 of that document provides that "[t]he insurance described in this Booklet–Certificate will be provided under Aetna Life Insurance Company policy form GR–29." A subsequent unnumbered page in that same document provides that "[t]he plan of benefits described in the Booklet–Certificate is underwritten by ... Aetna Life Insurance Company," while yet another subsequent unnumbered page in the same document provides that:

**\*7** The following information is provided to you in accordance with the Employee Retirement Income Security Act of 1974 (ERISA) ...

**Type of Administration:**

Group Insurance Policy with:

Aetna Life Insurance Company

...

**Plan Administrator:**

K. Hovnanian Companies, LLC....

The Group Policy, which the Plaintiff claims she did not receive, provides on page 9190 that:

**ERISA Matters**

Under Section 503 of Title I of the Employee Retirement Income Security Act of 1974, as amended (ERISA), Aetna is a fiduciary. It has complete authority to review all denied claims for benefits under this policy. In exercising such fiduciary responsibility, Aetna shall have discretionary authority to:

determine whether and to what extent employees and beneficiaries are entitled to benefits;

and

construe any disputed or doubtful terms of this policy.

Aetna shall be deemed to have properly exercised such authority. It must not abuse its discretion by acting arbitrarily and capriciously.

From the Court's review, these documents are all perfectly consistent with each other. Just as in *Worsley,* "the SPD contains multiple references to Aetna's authority to make benefit determinations, and these references are consistent with the grants of discretion in the Group Policy...." *Id.* at 404.

The Plaintiff distinguishes the instant case from *Martin* by arguing that Aetna did not produce a Summary Plan Description, but rather produced a document it referred to as the "Long–Term Disability Contract," which stated that "[t]he benefits and main points of the group contract for persons covered under this Plan are set forth in this Booklet." The Plaintiff also argues that the Summary Plan Description in this case was produced by K–Hov, not Aetna, and likewise does not contain any reference to discretionary review.

The Court rejects this argument. Both the Summary Plan Description and the Group Plan make multiple references to Aetna's authority to make benefit determinations, and in fact, the Summary Plan Description clearly states that "[t]he insurance described in this Booklet–Certificate will be provided under Aetna Life Insurance Company policy form GR–29." Aetna Life Insurance Company policy form GR–29, in turn, is the Group Policy which the Plaintiff claims not to have received a copy of.

Furthermore, the Court rejects the Plaintiff's argument that she has been prejudiced by undergoing a Functional Capacity Evaluation on the mistaken assumption that the applicable standard of review would be *de novo.* Even if *de novo* review were applicable, the decision of whether or not to allow additional evidence to be presented beyond that which

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1831484 (N.D.W.Va.)
**(Cite as: 2012 WL 1831484 (N.D.W.Va.))**

was before the plan administrator is always discretionary on the part of the Court. *See, e.g., Quesinberry v. Life Ins. Co. of North America,* 987 F.2d 1017, 1025 (4th Cir.1993) ("we adopt a scope of review that permits the district court in its discretion to allow evidence that was not before the plan administrator ... only when circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision."). The Plaintiff, therefore, could not have reasonably anticipated that the Court would admit additional evidence in this case, and hence there was no detrimental reliance or prejudice.

**\*8** Thus, the Court **FINDS** that Aetna did reserve discretionary authority to determine eligibility for benefits, and, such being the case, the applicable standard of review for this matter is an abuse of discretion standard. Because abuse of discretion is the applicable standard, the Court may not review evidence which was not before Aetna at the time it made its decision with regard to the Plaintiff's claim, and the Defendants' Motion to Strike is accordingly **GRANTED.**

B. *Motion to Dismiss*

K–Hov argues that inasmuch as the Plaintiff can make no showing of a colorable claim against K–Hov, K–Hov should be dismissed as a party defendant to this case. According to K–Hov, Defendant Aetna was the claims administrator, and as such had sole discretion to approve or deny the Plaintiff's claim. K–Hov asserts that the Plaintiff has made no showing that that K–Hov controlled or influenced the administration of the plan, and accordingly argues that Aetna is the only proper defendant to this action.

The Plaintiff, in response, first observes that K–Hov was disclosed as the plan administrator in the Summary Plan Description, and then, citing *U.S. Steel Mining Co., Inc. v. District 17, United Mine Workers of America,* 897 F.2d 149, 152 (4th Cir.1990), goes on to argue that "[a]s the plan administrator, [K–Hov] is clearly a fiduciary." As a fiduciary, the Plaintiff argues that K–Hov is a prop-

er party to this case.

K–Hov concedes that it is, in certain contexts, a fiduciary in its role as a Plan Sponsor and Plan Administrator. Nevertheless, K–Hov argues that it was not a fiduciary with regard to the Plaintiff's benefits claim.

Under ERISA,

[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).

"The same entity may function as an ERISA fiduciary in some contexts but not in others." *Darcangelo v. Verizon Communications, Inc.,* 292 F.3d 181, 192 (4th Cir.2002). "An entity involved with a benefit plan is a fiduciary 'only as to the activities which bring the [entity] within the definition' of fiduciary under ERISA." *Id.* (*citing Custer v. Sweeney,* 89 F.3d 1156, 1161–62 (4th Cir.1996)).

"An employer may not be named a defendant in an ERISA action unless the plaintiff shows the employer controlled or influenced the administration of the plan." *Marcum v. Zimmer,* 887 F.Supp. 891, 894 (S.D.W.Va.1995) (collecting cases). "The party that controls administration of an employee benefits plan is the only proper defendant in an action concerning benefits under ERISA." *Sawyer v. Potash Corporation of Saskatchewan,* 417 F.Supp.2d 730, 737 (E.D.N.C.2006). "In determining whether a defendant is properly named in an ERISA benefits action, a court must consider

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1831484 (N.D.W.Va.)
**(Cite as: 2012 WL 1831484 (N.D.W.Va.))**

whether the defendant has influenced the handling of the plaintiff's claim." *Id. See also Gluth v. Wal–Mart Stores, Inc.,* 1997 WL 368625 (4th Cir.1997) (holding that "the district court erred in granting [plaintiff's] motion, because the Trust, as the funding mechanism for the Plan with no control over its administration, is not a proper defendant in this action." (citation omitted)); *Chaffin v. Nisource, Inc.,* 703 F.Supp. 579, 582–83 (S.D.W.Va.2010) ("a claimant's employer is not a proper defendant if the employer exercised no control over the administration of the plan, even if the employer was listed as plan administrator in the summary of benefits" (quoting *Williams v. UNUM Life Ins. Co. of America,* 250 F.Supp.2d 641, 645 (E.D.Va.2003))).

**\*9** In the case *sub judice,* the Plaintiff has not presented any evidence that K–Hov in any way controlled or influenced Aetna's decision-making with regard to claims. To the contrary, it appears that Aetna exercised sole discretion with regard to the approval or denial of the Plaintiff's claim. The simple fact that K–Hov was the plan administrator is not enough to render it a fiduciary with regard to the Plaintiff's claim, and the Defendants' Motion to Dismiss K–Hov as a party defendant to this action is accordingly **GRANTED.**

### 6. Conclusion

For the reasons stated above, this Court hereby **GRANTS** the Defendants' Motion to Strike **[Doc. 7].** The Court further **GRANTS** the Defendants' Partial Motion to Dismiss **[Doc. 7],** and Defendant K. Hovnanian Companies, LLC, is hereby **DISMISSED** as a party defendant to this action.

As a final matter, the Court's foregoing determination that an abuse of discretion standard of review is the applicable standard of review in this case effectively **MOOTS** the Plaintiff's Motion to Consider Functional Capacity Evaluation as Part of *De Novo* Review **[Doc. 15],** as the Plaintiff's argument in that Motion presupposes that *de novo* review would be the applicable standard.

It is so **ORDERED.**

The Clerk is hereby directed to transmit copies of this Order to counsel of record herein.

N.D.W.Va.,2012.
Dupell v. K. Hovnanian Companies, LLC
Slip Copy, 2012 WL 1831484 (N.D.W.Va.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1658961 (S.D.Ala.)
**(Cite as: 2009 WL 1658961 (S.D.Ala.))**

**H**
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
S.D. Alabama,
Southern Division.
Larry A. ODOM, Sr., et al., Plaintiffs/
Counter–Defendants,
v.
SOUTHEAST SUPPLY HEADER, LLC, Defendant/Counter–Plaintiff.

Civil Action No. 09–0147–WS–N.
June 11, 2009.

John W. Parker, Mobile, AL, for Plaintiffs/
Counter–Defendants.

Benjamin Young Ford, Duane A. Graham, Scott G. Brown, Armbrecht Jackson LLP, Mobile, AL, for Defendant/Counter–Plaintiff.

**ORDER**
WILLIAM H. STEELE, District Judge.

**\*1** This matter comes before the Court on the Motion to Strike (doc. 14) filed by plaintiffs/counter-defendants, Larry A. Odom, Sr. and Judy Odom (the "Odoms"). Defendant / counter-plaintiff, Southeast Supply Header, LLC ("SESH"), has filed a Response (doc. 17), and the Odoms elected not to submit a reply within the time allotted. Briefing having closed, the Motion is now ripe for disposition.[FN1]

> FN1. The Odoms have requested oral argument on their Motion. Pursuant to Local Rule 7.3, the Court in its discretion may rule on any motion without oral argument. Given the straightforward matters presented and the fact that the Odoms squandered a full and fair opportunity to be heard in writing, the request for oral argument is **denied.**

This lawsuit arises from an easement agreement entered into between SESH and the Odoms, pursuant to which SESH was authorized to install a natural gas pipeline on the Odom's property in Mobile County, Alabama. The Odoms' Complaint alleges that SESH installed the pipeline in the wrong place on plaintiffs' property, then refused to relocate the pipeline after the error was brought to its attention. Plaintiffs maintain that the result of SESH's conduct (which plaintiffs characterize as being deliberate, intentional or reckless) is that a strip of "no-man's land" has been created on the Odoms' property, diminishing the value of such property and causing plaintiffs to suffer severe mental anguish. On that basis, the Odoms filed suit in federal court alleging state-law claims of misrepresentation, continuing trespass, nuisance, and violation of the Alabama Eminent Domain Code, Ala.Code §§ 18–1A–1 et seq. Plaintiffs demand compensatory damages for diminution of property value and mental anguish, plus punitive damages. Pursuant to Rule 13, Fed.R.Civ.P., SESH filed a Counterclaim (doc. 9) against the Odoms seeking a declaratory judgment that SESH's actions were in conformity with the easement agreement, alternatively requesting reformation of that agreement on grounds of mutual mistake, and claiming damages for abuse of process.

In a cursory, two-page Motion to Strike, devoid of any citations to authorities (either Federal Rules of Civil Procedure or case law), the Odoms ask that SESH's Counterclaim be stricken.[FN2] Insofar as plaintiffs' position can be gleaned from their skeletal Motion, they contend that the Counterclaim should be stricken for the following reasons: (1) the Odoms disagree with SESH's interpretation of the easement agreement, and believe that interpretation to be "contrary to the law of construction of documents"; (2) because SESH purportedly misreads the easement agreement, all counts of the Counterclaim

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1658961 (S.D.Ala.)
**(Cite as: 2009 WL 1658961 (S.D.Ala.))**

"fail to state a cause of action on which relief can be granted"; (3) the reformation cause of action fails to state a claim because SESH drafted the easement agreement in the first place; and (4) the allegations set forth in SESH's abuse of process claim are, according to the Odoms, "inflammatory, prejudicial, untrue, unfounded, ... without factual predicate, [and] fail on their face to state a claim." (Doc. 14, at 1–2.)

> FN2. Contemporaneously with their Motion, the Odoms filed an Answer (doc. 15) to the Counterclaim, wherein they reiterated many of the same assertions set forth in their Motion, albeit recast as affirmative defenses instead of grounds for striking the pleading.

To the extent that plaintiffs are asking for the Counterclaim to be stricken pursuant to Rule 12(f), Fed.R.Civ.P., that request is **denied.** Rule 12(f) provides, in pertinent part, that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." *Id.* Striking a pleading on Rule 12(f) grounds is a drastic, disfavored remedy. *See, e.g., Exhibit Icons, LLC v. XP Companies, LLC,* 609 F.Supp.2d 1282, 2009 WL 806794, * 12 (S.D.Fla. Mar. 26, 2009) ("Motions to strike ... are generally disfavored ... [because] courts consider striking a pleading to be a drastic remedy to be resorted to only when required for the purposes of justice.") (citations and internal quotation marks omitted); *Stephens v. Trust for Public Land,* 479 F.Supp.2d 1341, 1346 (N.D.Ga.2007) (noting that a motion to strike is a "drastic remedy" and that such motions "are rarely granted absent a showing of prejudice"); *BB In Technology Co. v. JAF, LLC,* 242 F.R.D. 632, 641 (S.D.Fla.2007) (opining that Rule 12(f) motions "will usually be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties"); *126th Ave. Landfill, Inc. v. Pinellas County, Fla.,* 2009 WL 1544030, *2 (M.D. Fla. June 3, 2009) (federal court "will not exercise its discretion under

the rule to strike a pleading unless the matter sought to be omitted has no possible relationship to the controversy, may confuse the issues, or otherwise prejudice a party"). Plaintiffs have made no showing that the Counterclaim is prejudicial to them, that SESH's allegations therein have no relationship to the controversy, or that the purposes of justice require that they be stricken. At most, the Odoms have argued that all three causes of action set forth in the Counterclaim lack merit and that they contest the factual underpinnings of Count Three. The mere presence of legal and factual disputes, without more, hardly justifies the extreme and disfavored remedy of striking SESH's pleading pursuant to Rule 12(f) .<sup>FN3</sup>

> FN3. To be sure, the Motion to Strike includes a conclusory assertion that the allegations of Count Three are "inflammatory, prejudicial, untrue, unfounded, and without factual predicate." (Doc. 14, at 2.) But review of Count Three reveals nothing improper in its supporting allegations. In particular, SESH alleges that Mr. Odom has engaged in a campaign of threatening, abusive, interfering, and harassing conduct toward SESH throughout the pipeline easement and installation project. Such allegations, if proven at trial, at least arguably support an abuse of process cause of action under Alabama law; therefore, they are directly germane to this dispute and are not gratuitously inflammatory or prejudicial. And plaintiffs' insistence that the factual allegations of Count Three are false is certainly not a basis for striking them at the outset of this litigation on counsel's mere say-so. *See, e.g., Taylor v. Holiday Isle, LLC,* 561 F.Supp.2d 1269, 1275 n.11 (S.D.Ala.2008) ("Unadorned representations of counsel in a ... brief are not a substitute for appropriate record evidence.").

**\*2** To the extent that the Odoms intend to argue

Not Reported in F.Supp.2d, 2009 WL 1658961 (S.D.Ala.)
**(Cite as: 2009 WL 1658961 (S.D.Ala.))**

that the Counterclaim should be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, that request is likewise **denied.** For starters, plaintiffs have not complied with the clear requirement in this District Court that "[a]ny motion filed pursuant to Rule 12(b) ... of the Federal Rules of Civil Procedure must be supported by a brief. Failure to file a brief may result in the denial of the motion." Local Rule 7.1(a). That omission, and the resulting vagueness of plaintiffs' motion, warrant denial of their purported Rule 12(b)(6) motion. Moreover, the Eleventh Circuit has explained that "the threshold of sufficiency to which a complaint is held at the motion-to-dismiss stage is exceedingly low." *United States v. Baxter Int'l, Inc.,* 345 F.3d 866, 881 (11th Cir.2003). It is well settled that "[a] motion to dismiss does not test the merits of a case, but only requires that the plaintiff's factual allegations, when assumed to be true, must be enough to raise a right to relief above the speculative level." *Young Apartments, Inc. v. Town of Jupiter, FL,* 529 F.3d 1027, 1037 (11th Cir.2008) (citations and internal quotation marks omitted).

Clearly, the Odoms disagree with both SESH's factual allegations and the legal theories on which the Counterclaim hinges. Nevertheless, the Court is satisfied that all three causes of action in the Counterclaim state claims that are sufficient to raise SESH's right to relief above a speculative level. In Count One, SESH's construction of the "limited margin of error" language in the easement agreement may or may not be correct, but it is sufficiently plausible to survive Rule 12(b)(6) scrutiny. In Count Two, SESH has alleged sufficient facts to state a colorable claim for reformation of the agreement on the ground of mutual mistake, based on what defendant characterizes as the parties' shared intent in entering into such agreement. And Count Three details a barrage of purportedly harassing, malicious and abusive conduct by Mr. Odom that, if accepted as true, would support a non-speculative (whether or not ultimately meritorious) claim for abuse of process under Alabama law. *See, e.g.,*

*Moon v. Pillion,* 2 So.3d 842, 846 (Ala.2008) ("[I]n order to prove the tort of abuse of process, a plaintiff must prove: (1) the existence of an ulterior purpose; 2) a wrongful use of process, and 3) malice.") (citations and internal quotation marks omitted). The Odoms have presented no argument to the contrary, and offer no legal analysis that the allegations of Count Three fail to establish a non-speculative right to relief. If there are legal defects in SESH's abuse of process theory, the Odoms have not identified them. This Court will not endeavor to articulate plaintiffs' legal arguments for them. In short, now is not the time to adjudicate these causes of action on the merits, in advance of discovery and with only meager briefing by the Odoms.

**\*3** For all of these reasons, the Motion to Strike (doc. 14) is **denied.**[FN4]

> [FN4]. In its brief, SESH questions whether the requisite amount in controversy for federal subject matter jurisdiction to attach under 28 U.S.C. § 1332 is satisfied here. SESH states that it "will be pleased to brief this issue further as and when the Court desires." (Doc. 17, at 6.) On its face, the Complaint alleges that "[t]he amount in controversy without interest and costs exceeds the sum or value specified by 28 U.S.C. § 1332." (Doc. 1, ¶ 1.) Where a plaintiff claims a sufficient sum to satisfy the amount in controversy requirement, "it must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal." *Federated Mut. Ins. Co. v. McKinnon Motors, LLC,* 329 F.3d 805, 807 (11th Cir.2003) (citation omitted); *see also Mitchell v. Brown & Williamson Tobacco Corp.,* 294 F.3d 1309, 1314 (11th Cir.2002) (explaining that deferential "legal certainty" standard "give[s] great weight to plaintiff's assessment of the value of plaintiff's case") (citation omitted). Here, plaintiffs have expressly pleaded that the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1658961 (S.D.Ala.)
**(Cite as: 2009 WL 1658961 (S.D.Ala.))**

$75,000 threshold is in controversy, thereby triggering the strict "legal certainty" standard. It is not obvious to the Court that, to a legal certainty, the amount in controversy here is actually less than $75,000, given plaintiffs' claims of diminution in property value, mental anguish and punitive damages. This assessment is heightened by SESH's admission that it paid the Odoms $120,000 for the easement that lies at the heart of this litigation. If, notwithstanding these allegations, SESH believes it to be apparent to a legal certainty that the Odoms cannot recover the requisite amount in controversy, then SESH should file an appropriate, properly supported Rule 12(b)(1) motion without delay, and without awaiting a specific judicial directive or invitation. On this record, however, the Court perceives no basis for initiating a *sua sponte* investigation of the jurisdictional amount in controversy issue at this time.

DONE and ORDERED.

S.D.Ala.,2009.
Odom v. Southeast Supply Header, LLC
Not Reported in F.Supp.2d, 2009 WL 1658961 (S.D.Ala.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2006 WL 375074 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,705
**(Cite as: 2006 WL 375074 (S.D.N.Y.))**

United States District Court,
S.D. New York.
UNITED STATES SECURITIES AND EX-
CHANGE COMMISSION, Plaintiff,
v.
Dominick SAVINO, et al., Defendants.

No. 01 CV 2438(GBD).
Feb. 16, 2006.

*MEMORANDUM DECISION*

DANIELS, J.

**\*1** The Securities and Exchange Commission
("SEC") commenced this action seeking to enjoin
Dominick J. Savino ("Savino") and other named
defendants from further violations of Section 17(a)
of the Securities Act of 1933 ("Securities Act"), 15
U.S.C. § 77q(a), Section 10(b) of the Securities Ex-
change Act of 1934 ("Exchange Act"), 15 U.S.C. §
78j(b) and Rule 10b-5 promulgated thereunder, 17
C.F.R. § 240.10b-5, and to disgorge the defendants
of an amount equal to the value of any personal be-
nefits resulting from their alleged violative conduct.
The SEC alleged that defendants violated the secur-
ities laws through fraudulent schemes to give kick-
backs of cash, improper gifts, and gratuities to co-
defendant Anthony Shen ("Shen"), a bond trader
employed by New York Life Insurance Company,
Inc. ("New York Life"). The SEC further alleged
that in return, the defendants obtained business and
favorable bond trades at New York Life's expense.

The SEC resolved its claims against four of the
five defendants by settlement. This Court entered
final orders enjoining those defendants from further
violations of the federal securities laws and provid-
ing other relief.[FN1] Defendant Savino, however,
contested the SEC's allegations.

> FN1. Each of the defendants that settled in
> this action was ordered, adjudged, and de-
> creed permanently enjoined from further

violations of the securities laws. In addi-
tion, the Court ordered disgorgement, plus
prejudgment interest on the disgorged sum.
Defendant Shen was adjudged liable for
disgorgement of $278,000, plus prejudg-
ment interest thereon; defendant Srinivas
Anumolu was adjudged liable for disgorge-
ment of $205,500; defendant Ronald W.
Pinto was adjudged liable for $1,800,000
and a civil penalty of $500,000; and de-
fendant Deborah J. Breckenridge was ad-
judged liable for disgorgement of
$236,562.

This Court held a bench trial on the SEC's
claims against defendant Savino. The SEC called
three fact witnesses, co-defendant Anthony Shen,
Anaaita N. Kotfal, managing director and associate
general counsel for Greenwich Capital Markets
("Greenwich Capital"), and defendant Savino.
Savino further testified on his own behalf during
the defense case, and called no other witnesses.

This Opinion constitutes the Court's findings of
fact and conclusions of law. FED. R. CIV. P. 52
(2005). Based upon the credible evidence adduced
at trial, the Court finds that the SEC has proven by
a preponderance of the evidence that defendant
Savino violated Section 17(a) of the Securities Act,
Section 10(b) of the Exchange Act and Rule 10b-5.
The Court also concludes that Savino violated Sec-
tion 20(e) of the Exchange Act by knowingly aiding
and abetting Shen's violations of Section 10(b) and
Rule 10b-5.

**I. FACTUAL DETERMINATION**

A. Shen's Employment with New York Life

New York Life is a mutual insurance company
owned by the policyholders of the insurance
policies it issues. From 1995 to 1999, New York
Life, located at 51 Madison Avenue in New York
City, employed Shen as a trader and analyst in its

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 375074 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,705
**(Cite as: 2006 WL 375074 (S.D.N.Y.))**

investment department. Shen worked on the Public Fixed Income Desk, which traded investment-grade bonds, including treasury securities, mortgage securities, and investment grade corporate bonds. The function of the Public Fixed Income Desk was to buy and hold securities to cover the risk of the insurance policies New York Life issued. Trial Transcript ("Tr.") 25:2-26:25, 26:20-27:24.

In 1998, New York Life promoted Shen to the position of Associate Vice President. Shen became responsible, on a day-to-day basis, for trading mortgage-backed securities on behalf of New York Life. These securities included existing "pass-through" mortgage securities backed by government agencies; mortgage-backed securities that were not yet funded with underlying mortgages, known as "TBAs"; treasury bonds; collateralized mortgage obligations ("CMO" bonds) which are specialized mortgage-backed securities; and investment grade corporate bonds rated AAA through BBB. Tr. 28:15-31:25, 80:16-81:1, 132:3-7, 385:5-386:11.

**\*2** In 1998 and 1999, Shen possessed authority to execute trades on behalf of New York Life without obtaining prior approval from his supervisors. In executing trades, New York Life required Shen to obtain two competitive quotes for a security before he executed a trade. During Shen's employment, a central exchange for bond quotes did not exist. To obtain quotes, Shen's practice was to telephone broker-dealers, or to obtain pricing information on a Bloomberg terminal.[FN2] Tr. 32:8-35:2, 50:22-51:23.

> FN2. Securities professionals often used Bloomberg terminals to communicate pricing and other information. The Bloomberg terminals possessed an "instant message" feature that allowed securities professionals to send emails to one another.

Between 1998 and January 1999, Shen's direct supervisor handled the CMO trades at New York Life. Shen knew that his supervisor obtained gifts and kickbacks from broker-dealers in connection with his supervisor's securities trades on behalf of New York Life. After his supervisor left New York Life in January 1999, another supervisor handled CMO trades at New York Life. Plaintiff's Exhibit ("Pl.Exh.") 1-18; Tr. 37:3-17, 231:15-17, 272:11-274:13, 385:16-386:11.

In July 1999, Shen took medical leave from New York Life. Around that time, New York Life commenced an internal investigation into Shen's trading activity. Shen returned to work in October 1999. New York Life terminated his employment one week later after the internal investigation found some of Shen's trades to be executed "off-market," that is, outside the bid/ask spread. Tr. 136:19-25, 147:7-148:21.

B. Savino's Employment with Greenwich Capital

At the time of trial, defendant Savino possessed extensive experience in mortgage-backed securities. He began work in the securities industry in July 1986. He became a mortgage-backed securities trader in September 1988 for Banque Indosuez. He subsequently worked as a mortgage-backed securities broker for Electronic Trading Systems, a mortgage-backed securities salesman and trader for Countrywide Securities Corporation, and as a mortgage-backed securities salesman for Credit Suisse First Boston. In August 1998, Savino was hired as a mortgage- and asset-backed securities representative for Greenwich Capital. When Greenwich Capital hired him, Savino was a securities professional licensed by the National Association of Securities Dealers ("NASD"). Savino worked in Greenwich Capital's Connecticut office. Pl. Exh. 2-1, 2-2; Tr. 410:18-22.

Greenwich Capital guaranteed Savino a total compensation of the greater of $750,000 or his "net commissions," which were a portion of the gross commissions Greenwich Capital received on securities trades Savino made during its fiscal year ending September 30. Greenwich Capital recorded Savino's net commissions on trades and Savino was given credit for those net commissions. Savino's

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 375074 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,705
**(Cite as: 2006 WL 375074 (S.D.N.Y.))**

commissions were to be paid on a quarterly basis. Savino also received a $100,000 annual advance against commissions. This amount was payable in bi-weekly sums. Pl. Exh. 2-1, 2-24; Tr. 412:1-114:4.

In 1998, Savino's net commission rate was twenty-five percent of Greenwich Capital's gross commissions on risk transactions and thirty percent of gross commissions on riskless transactions. In 1999, Savino's net commission rate was twenty percent of gross commissions on risk transactions and thirty percent of gross commissions on riskless transactions. As a Greenwich Capital salesman, Savino was aware of his commissions during the quarter as they were being earned. Pl. Exh. 2-1, 2-24; Tr. 412:1-114:4.

*3 Savino was required to follow certain regulations as a Greenwich Capital employee. Greenwich Capital was a member of the NASD. NASD Rule 3060 prohibits the making of payments or the giving of gifts valued in excess of $100 per year, by any person associated with a member firm, to an employee or agent of another person with whom the member firm is transacting business. NASD Rule 3060 also requires a record of gifts and payments to be maintained by the member firm. Greenwich Capital maintained records of gifts and payments by its employees to employees or agents of clients.

Greenwich Capital provided to its employees its internal rules through its Compliance Manual and its Ethical Standards Policy handouts. These rules substantially tracked the NASD rules. Greenwich Capital rules did not permit its employees to make payments or give gifts valued in excess of $100 per year to any person associated with another broker, dealer, or financial institution, or the splitting of commissions with anyone outside the firm. Savino received copies of Greenwich Capital's Compliance Manual and Ethical Standards Policy handout. Savino understood these rules when he worked for Greenwich Capital. Tr. 404:3-20.

At the time of the trial, Savino continued to be employed in the securities industry. Defendant Savino was a bond trader at Greenwich Financial Services. [FN3] Savino continues to hold NASD series 7, series 63, and series 3 licenses. Savino's compensation in 2003 was $1.5 million. Tr. 482:12-483:12.

FN3. Greenwich Financial Services is not affiliated with Greenwich Capital.

C. Shen's and Savino's Relationship

Shen's and Savino's relationship existed well before Savino began employment at Greenwich Capital. Shen engaged in trades with Savino when Savino worked for Credit Suisse First Boston and continued to do so after Greenwich Capital hired Savino in October 1997. At all times in 1998 and 1999, Shen was involved in New York Life's decisions to purchase CMOs and facilitated CMO trades at Savino' request. Tr. 183:23-190:13, 272:11-274:13, 385:16-386:11.

In addition to their business relationship, the interactions between Shen and Savino encompassed a personal friendship as well. Shen and Savino were "close friends" with a "pretty close relationship," having socialized at least "every couple of weeks or so." Their offices were in close proximity when Savino worked at Credit Suisse First Boston. Shen had met Savino's wife and socialized with the two on numerous occasions, having also visited Savino's family home and spent the Fourth of July weekend with them. Shen testified that he and Savino were "comfortable with each other" and traded "stupid locker room kind of" remarks and "coarse language." Tr. 190, 208.

When Greenwich Capital hired Savino, Shen was, like his direct supervisor, involved in "kickbacks" and "one-way bets" with two salesmen at other broker-dealers in connection with trades he executed on behalf of New York Life. Shen used one-way bets to receive payments from broker-dealers in connection with trades. Shen's one-way bets were bets that involved no risk to Shen. If Shen won, he would receive the benefit of the bet.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 375074 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,705
**(Cite as: 2006 WL 375074 (S.D.N.Y.))**

If Shen lost, however, he would pay nothing; instead, he would give the winner a favorable trade from New York Life. Tr. 57:16-58:21.

**\*4** While at work, Shen and Savino communicated over the telephone or used Bloomberg instant-messaging emails to conduct their securities trades. Greenwich Capital used tape-recorded lines for telephone calls to its sales representatives. Its sales representatives, including Savino, were aware of this practice. Shen was likewise aware that some of the phone lines at Greenwich Capital were taped. From time to time, Shen would call Savino's cellular phone to avoid being taped. Pl. Exh. 1-18; Tr. 41:4-42:17, 42:25-45:18.

Shen knew that Savino was not paid on a commission basis at Credit Suisse First Boston and that Savino would be paid on a commission basis at Greenwich Capital. Shen's understanding was that the standard commission rate a salesman at broker-dealers was approximately thirty (30) percent of the gross profit that the broker-dealer made on the salesman's trade. Tr. 69:2-70:6.

D. Evidence of the Scheme to Defraud New York Life

To prove that Savino and Shen entered into a scheme to defraud New York Life, the SEC introduced evidence of the following: (1) email exchanges between Savino and Shen containing negotiations of a commission splitting agreement; (2) cash payments Savino provided Shen during high-volume trading between the two; (3) gifts that Savino promised or provided Shen in connection with trades during high volume trading between the two; (4) Savino's and Shen's email conversations showing their collusion to hide their cash and gift exchanges; and (5) conversations and other actions of Savino and Shen indicating that they knew their actions were wrong.

1. Negotiations Concerning a Commission Splitting Agreement

Bloomberg email conversations between Savino and Shen on September 28, 1998 and November 12, 1998 demonstrated that Shen and Savino actively negotiated, yet failed to reach, a formula to share Savino's commissions on New York Life trades with Shen. On September 28, 1998, Savino and Shen informally discussed commission splitting. Shen sent Savino a Bloomberg message, suggesting a commission sharing arrangement: "Let's work on the formula!!! 1MM 1/32== $20." In this message, Shen proposed that Savino pay Shen $20 for each "tick" he received.[FN4] Shen had previously worked out similar formulas with other brokers. In his attempts to form a concrete agreement to share commissions, Shen told Savino that Shen would be able to ensure that Savino's trades with New York Life would be at "no risk" to Savino, which would have the effect of earning Savino higher commissions, because Shen would set trade prices at the outer limit of the securities' bid/ask range. Pl. Exh. 1-2; Tr. 59:8-86:3.

> **FN4.** Quotes on bonds were often given in terms of the percentage value of the bond's face value. In pricing a bond, a "tick" is equivalent to one thirty-second (1/32) of a percentage point, and a "plus" is half of that amount, or one sixty-fourth (1/64) of a percentage point. The dollar value of a tick is $312.50 per million of bond face value.

Savino made counter-offers to Shen during these negotiations. In the September 28, 1998 email exchange, Shen inquired of Savino "and what do I get?" in an attempt to reopen commission sharing negotiations. Savino, attempting to re-negotiate the commission sharing formula, replied "well what's your offer?" Later, in the same conversation, Savino told Shen that, with reference to working out a formula for their commission-sharing arrangement, they would "cross that bridge when they [got] there." Savino reminded Shen that he had never "said no to a real request." Pl. Exh. 1-2; Tr. 65:19-66:24, 74:4-13.

**\*5** During a November 12, 1998 email exchange, Savino and Shen engaged in further negotiations for a kickback arrangement. In response to

Not Reported in F.Supp.2d, 2006 WL 375074 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,705
(Cite as: 2006 WL 375074 (S.D.N.Y.))

Savino's message stating "I'm always a reasonable man when dealing with reasonable men," Shen stated, "Let's work on some formulas then." Savino replied by asking Shen to give him a kickback-free first trade because Shen had a "one trade floor." This was a reference to New York Life's policy that Shen's commissions only accrue following Shen's first trade of the day. Shen replied, "U C What's wrong with this pic? It's all about u u u u u u u!" When Shen indicated his resistance to the proposed arrangement as offering too little, Savino replied that he was attempting to work out a deal. He wanted to "remit payment to [his] underpaid under-appreciated buddy Anthony." Pl. Exh. 1-3; Tr. 82:9-83:21.

In the entire exchange, Savino does not tell Shen that he would not agree to any formula to share his commissions with Shen. Moreover, there is no credible evidence that Savino indicated to Shen that he was joking. Shen believed that Savino was genuinely attempting to work out a commission splitting agreement during the conversation. Tr. 62:10-20.

Several other email exchanges indicated that Savino and Shen were attempting to formulate some sort of commission sharing arrangement. First, during the course of the November 12, 1998 email negotiations over a commission sharing arrangement, Savino urged Shen to encourage Shen's direct supervisor at New York Life, to buy CMOs from Savino because Savino would receive larger commissions on CMO sales. When Shen responded that purchasing a CMO "does nothing for me," Savino told Shen that was not the case "as far as [Savino was] concerned" because having Shen on the other side of Savino's CMO deals "would be like having a sales partner," indicating that Savino would be willing to share his commissions with Shen on CMO trades Shen helped to get for Savino. Pl. Exh. 1-3; Tr. 80:1-82:8.

Shen did not inform New York Life that he was attempting to negotiate a formula to share Savino's commissions on his trades with Greenwich Capital,

or that Savino had offered to enter into a commission sharing arrangement with Shen after a "one-trade floor." Shen did not know of anyone at New York Life who was aware of his discussion with Savino about splitting Savino's commissions on the New York Life trades. Tr. 74:14-22; 85:16-86:4.

2. Evidence of Savino's Payments in Connection with Trades

On September 8, 1998, at Savino's urging, Shen purchased a $25 million dollar bond from Greenwich Capital that Shen did not want to purchase for New York Life. At Savino's request, Shen gave Savino an additional tick on the price on that trade, which made the price less favorable to New York Life by approximately $7,812.50. On the same day, Savino engaged in a bet with Shen, whereby if Savino lost he would pay Shen $200, and if Shen lost he would give Savino a "100mm trade the day the season ends." Savino lost the bet and subsequently paid $200 to Shen, which Shen did not report to New York Life. Both Savino and Shen testified that the bet was intended as a real bet, with reasonable chances of either man winning. Regarding the proviso that Savino would have won a $100 million New York Life trade, Shen testified that he would have done trades in that order of magnitude irrespective of the bet's outcome. Pl. Exh. 2-8, 1-1, 2-9; Tr. 46:17-59:6, 278-80, 282, 354:18-355:12, 572-73.

*6 In the three weeks following the November 12, 1998 email exchange, Shen and Savino completed four securities trades, resulting in net commissions credited to Savino of $78,867.63. One of these trades was a CMO sale to New York Life on November 20, 1998, on which Savino was credited with a net commission of $39,105. The other trades included a purchase by Greenwich Capital of a TBA bond on November 19, 1998, resulting in a net commission of $3,515.63 to Savino; a sale of a TBA bond to New York Life on November 30, 1998, resulting in a net commission of $25,000 to Savino; and a sale of a bond to New York Life on

Not Reported in F.Supp.2d, 2006 WL 375074 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,705
**(Cite as: 2006 WL 375074 (S.D.N.Y.))**

December 1, 1998, resulting in a net commission of $11,247 to Savino. Pl. Exh. 2-24; Tr. 382:15-24.

After these four securities trades, Shen applied an approximation of the commission sharing formula he suggested during the September and November email negotiations to his estimate of Savino's net commission on the December 1, 1998 trade. He asked Savino to pay him the result-$3,000. Shen testified that he communicated his request to Savino by telephone, over a line that was not taped. Savino agreed to pay Shen the $3,000 that Savino now owed him. Savino testified that no such conversation occurred. According to Savino, he did later provide the cash, but only for entertainment unrelated to trades. Tr. 86:5-89:7.

Savino gave Shen the $3,000 during a trip they took together to Atlantic City on December 3, 1998. Before leaving for Atlantic City, Savino cashed a $6,000 check to obtain cash. Through Greenwich Capital, Savino arranged for helicopter transportation from New York City to Atlantic City with Shen and another trader from Greenwich Capital. Shen, Savino, and the third trader dined at the Hard Rock Café in the Taj Mahal casino. While there, Savino and Shen were together alone when the third trader excused himself to the bathroom. Savino then handed Shen $3,000 in cash. The cash exchange took place at Savino's and Shen's first moment alone together. Shen took the money and purchased $3,000 in chips with which to gamble at the Taj Mahal. Shen did not report the trip to Atlantic City, nor did he report the $3,000 he received from Savino in Atlantic City, to anyone at New York Life. Pl. Exh. 2-11, 2-12; Tr. 89:18-93:23.

On January 25, 1999, Savino contacted Shen in an attempt to conduct more trades with Shen. Shen wrote back to Savino that he had "no incentive 2 trade." Savino replied reminding Shen of the Atlantic City trip, and said that Shen's "no incentive" excuse "does not fly anymore [ ... ] you ask you get." When Shen complained that he had not received anything from Savino since the Atlantic City trip in December 1998, Savino agreed but said, "my

point is thats what u asked for thats what u got [ ... ] u want something else ask away."

Around the January 25 email exchange, Savino gave Shen periodic gifts and gratuities to ensure a flow of trades. On January 29, 1999, Savino reimbursed Shen for his hotel cost of $371.08 during the Superbowl in Florida. Savino did report this payment to Greenwich Capital on one of its travel and expense reports. In June 1999, Savino gave Shen theatre tickets to a Broadway show worth approximately $650. This gift was also recorded on a Greenwich Capital entertainment request form. Savino did not accompany Shen on the Superbowl trip, or to the theatre. Pl. Exh. 1-4, 1-6, 2-13, 2-21; Tr. 95:25-98:7, 109:21-110:12.

### 3. Savino's Purchase of a Surround-Sound System for Shen

**\*7** A series of email exchanges in March 1999 reflect Savino's promise to Shen that he would provide Shen a surround-sound home stereo system in connection with a securities trade. On March 12, 1999, Shen asked Savino whether he was ready to "buy that piece yet," referring to a "NSCOR" bond. When Savino requested a quote on the bond, Shen indicated that the price on the bond depended on what sort of surround system Savino would offer Shen in connection with the trade. Savino replied that a price of "28 back" from the benchmark Treasury bond price, a price which was not good for New York Life, would "equal" a surround-sound system for Shen. Savino described to Shen a surround-sound system with a digital receiver, separate sub-woofer, a center channel and four speakers, and a five-disc CD player worth approximately $3,000-$4,000. Shen agreed to sell the NSCOR bond to Greenwich Capital for "28 ticks back from a treasury bond." Shen expected to get a surround-sound system in connection with the trade. Shen did not inform anyone at New York Life that Savino offered him a surround-sound system in connection with the NSCOR trade. That day, New York Life sold the NSCOR bond to Greenwich Capital. The trade earned Savino a net commission of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 375074 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,705
**(Cite as: 2006 WL 375074 (S.D.N.Y.))**

$12,229.57. Pl. Exh. 1-5, Pl. Exh. 2-24; Tr. 98:8-107:5, 109:5-14, 365:1-366:2.

In July 1999, after being reminded by Shen of his promise to purchase a surround-sound system, Savino and Shen went to Harvey Electronics in New York. Savino picked out the surround-sound system, paid for it with his personal credit card, and instructed the store to deliver the system to Shen's home. The system cost Savino $2,744.08. The system consisted of the same components described by Savino in his March 12, 1999 email exchange concerning the NSCOR trade. Neither Shen nor Savino informed anyone at New York Life or Greenwich Captial that Savino bought a surround-sound system for Shen. Pl. Exh. 1-7, 1-8, 1-9; Tr. 116:21-24; 510:21-23.

4. Car Service to Foxwoods Casino

On March 29, 1999, in response to Shen's request for car service for a personal trip, Savino indicated that he would obtain car service for Shen in exchange for two securities trades, replying that car service would be supplied "as long as we (u + I) do trades today and tomorrow." Shen engaged in two trades with Savino on that day, and gave Savino an additional "plus" on the price of the first trade as a bonus commission to Savino. Savino bought one TBA bond from New York Life, and sold another TBA bond to New York Life. Savino received commissions from Greenwich Capital of $7,734.37 for those two securities trades. The price on the first trade was not favorable to New York Life. New York Life overpaid as much as $12,000 because of the non-favorable pricing. Savino gave Shen car transportation to Foxwoods Resort Casino in Connecticut. Neither Shen nor Savino told New York Life or Greenwich Capital that Shen had received car transportation from Savino in connection with those trades. Pl. Exh. 1-10, 2-24; Tr. 116:25-123:14; 356:18-20, 368:16-369:24, 510:17-20.

5. Adult Entertainment

**\*8** On April 6, 1999, Savino sent an email message to Shen asking to purchase FNMA seven per-

cent coupon bonds. Shen offered to sell the bonds in a "dollar roll" transaction, essentially, a sale of certain securities coupled with an agreement to repurchase those securities at an agreed upon price on a date certain. Shen also jokingly requested a gift of approximately $50,000 worth of AOL shares. Savino responded by indicating that he would be willing to provide adult entertainment in connection with the trade.

In the first part of the trade, Greenwich Capital purchased $125 million worth of FNMA seven percent mortgage bonds for settlement on April 9, 1999. In the second part of the trade, Greenwich Capital sold $125 million worth of FNMA seven percent bonds to New York Life for settlement on May 17, 1999. Shen set the price on the sale to Greenwich Capital at a price more favorable to Greenwich Capital and less favorable to New York Life than the price Savino initially proposed. Savino received $13,183.59 in commissions from Greenwich Capital on the two trades. Subsequently in April, Savino took Shen to a strip club. Pl. Exh. 2-24; 1-11; Tr. 123:15-131:13; Savino Depo. 248:20-23.

6. Arizona Trip

In May 1999, Shen was planning a personal vacation to Arizona and discussed his vacation plans with Savino. During those discussions, Savino offered to pay for Shen's hotel room during the vacation. On May 10, 1999, Shen went to dinner with Savino. At the dinner, Savino and Shen discussed a potential sale of a CMO bond from Greenwich Capital to New York Life. On the following day, Savino sent Shen an email message asking if New York Life still wanted to buy the CMO bond. Savino told Shen that Shen should do two things: buy the CMO bond and "get me the hotel phone number before its too late." Savino subsequently sent Shen an email message stating that Shen's cap for the hotel room was $2,500 and that $1,000 of that cap was "dependent on this [CMO trade] getting done." Shen agreed to purchase the CMO from Greenwich Capital. On May 11, 1999, Savino sold

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 375074 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,705
**(Cite as: 2006 WL 375074 (S.D.N.Y.))**

New York Life a CMO bond on which he made $53,547.30 in net commissions. Pl. Exh. 1-12, 2-24; Tr. 137:1-142:23.

After Shen returned from his vacation in Arizona, he had a disagreement with Savino over Savino's promise to pay for Shen's hotel bill. Shen told Savino that the hotel bill was $5,500. On June 9, 1999, Savino said to Shen in an email message "evry single time we agree to something you back away I offd and agreed to 25 you said you would let me knoew when ... is now when?" Savino complained to Shen that he had already given Shen theatre tickets and car transportation to Foxwoods casino, and that he was not willing to pay more than the $2,500 he offered for Shen's hotel bill. In response, Shen told Savino that Savino was not giving Shen sufficient gifts and payments and that he would stop trading securities with Savino. Ultimately, Shen did not receive payment for this trip. Shen did not tell anyone at New York Life that Savino offered to reimburse Shen for his hotel room in connection with the May 11, 1999 purchase of the CMO. Pl. Exh. 1-13, 2-24; Tr. 142:24-147:6; 377:13-378:21.

7. Other Evidence of Conscious Wrongdoing
**\*9** In email exchanges, both Shen and Savino indicated their understanding that their securities trades were executed at prices less favorable to New York Life than otherwise obtainable. They thought that this variance would not be noticed because these prices were within the bid/ask spread. In a Bloomberg email exchange on April 9, 1999, Shen complained to Savino that someone in another branch of New York Life's Public Fixed Income Desk was examining his trades. In response, Savino asked Shen if it was because Shen executed trades "off market," that is, outside the bid/ask spread. When Shen told Savino he was doing the same as Savino, executing off-market by one-quarter of a tick, Savino replied "it's a bid offer spread, no problem," that is, no one would notice that the prices were less favorable to New York Life because the prices were not materially off-market. Pl. Exh.

2-18; Tr. 132:17-136:19.

Finally, during their negotiations over a commission sharing formula in September 1998, Savino and Shen confirmed that each was deleting and purging their email messages in order to conceal their exchanges. Shen believed that by doing so, the email messages could not be retrieved later. Savino first brought up the topic of deleting the email messages. During their September 28, 1998 email discussion, Savino told Shen, "[b]y the way, you best be deleting these messages as you get them." Shen responded to Savino's direction to delete the emails with the comment "[a]nd purge them please." Savino informed Shen that Savino used the "[a]uto-purge" function of the Bloomberg terminal, which automatically purges deleted emails from the computer system. Pl. Exh. 1-2; Tr. 70:17-72:17, 578:1-23.

E. Investigations into Savino's New York Life Trades
On or about April 26, 2000, New York Life approached Greenwich Capital and stated that it was damaged because of kickbacks that Savino gave Shen in connection with their trades. Greenwich Capital general counsel's office initiated an investigation into all of Greenwich Capital's securities trades with New York Life, focusing on trades executed by Savino. Tr. 416:7-418:23.

In or around March 2000, after his termination, Shen learned that a number of employees in the Investment Department and Public Fixed Income Desk at New York Life were also recently terminated. On March 21, 2000, Shen called Savino at Greenwich Capital to warn him against soliciting trades with New York Life by offering gifts and entertainment in connection with the trades, as Savino had done with Shen. Shen was aware that the line was being taped by Greenwich Capital because of the audible tone on the line. Shen was concerned that Savino could "unravel the whole deal we had," that is, uncover the fraudulent arrangement between the two, if Savino contacted the remaining New York Life employees to try to sell bonds. Shen

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 375074 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,705
**(Cite as: 2006 WL 375074 (S.D.N.Y.))**

warned Savino not to start "anything stupid" with New York Life and implored him to do him a favor "and don't get in trouble." Savino responded to Shen by asking if the other New York Life employees were terminated because of the gifts and entertainment Shen received in connection with his trades at New York Life. Pl. Exh. 1-14, 1-15; Tr. 149:7-159:3.

*10 Savino was questioned in the internal investigation. Savino lied to the investigators. He denied giving Shen any money in Atlantic City, and instead falsely claimed that he borrowed $500 from Shen during that trip. Savino also denied that he gave Shen a surround-sound system. Tr. 431:3-432:23, 438:10-439:9.

After the initial interview of Savino by Greenwich Capital's attorneys, Greenwich Capital asked Savino to cooperate in their investigation into his trades with New York Life by, among other things, contacting Shen and obtaining Shen's consent to be interviewed by Greenwich Capital. Savino instead called Shen and asked Shen to call back and leave a recorded message expressing Shen's desire not to be interviewed by Greenwich Capital's attorneys. Savino told Shen that Savino already supplied Greenwich Capital's attorneys a false story, that there was nothing in the way gifts exchange between Savino and Shen that was material to the investigation. He asked Shen to corroborate Savino's false story, which Shen did. Tr. 161:10-165:2, 434:12-436:13.

Also, after their initial interview of Savino, Greenwich Capital's attorneys asked for and received Savino's financial records, including Savino's personal credit card statements. On June 22, 2000, Shen called Savino at Greenwich Capital. During that call, Savino told Shen that because Savino paid for the surround-sound system on his credit card, the purchase was "traceable" and "not invisible," and "would find its way to the light of day." However, Savino urged Shen to stick to the story that he had never given Shen any money. Savino told Shen that other than the money,

"everything else I'm going to tell the truth about." When Shen attempted to discuss the cash Savino gave him in Atlantic City, Savino cut him off because Savino did not want Shen discussing the cash during a call that was possibly being recorded by Greenwich Capital. Savino knew that if Greenwich Capital learned about the cash, he would lose his job. Pl. Exh. 1-7, 1-16, 1-17; Tr. 168:19-169:20, 433:24-434:7, 515:16-516:1.

Because Shen knew that the stereo he gave Shen would be discovered from his credit card receipts, in or around July 2000, he disclosed its purchase to Greenwich Capital. When Greenwich Capital learned of the stereo, Savino was involuntarily terminated effective August 1, 2000. Savino never informed Greenwich Capital about the $3,000 Savino gave to Shen in Atlantic City. Pl. Exh. 3-7; Tr. 439:10-441:6, 484:11-12, 514:3-10, 515:12-14.

Greenwich Capital settled New York Life's claim arising out of the trades between Savino and Shen with a payment to New York Life of $800,000. On March 22, 2001, Shen entered a guilty plea to conspiracy to commit securities fraud, mail fraud, wire fraud, and commercial bribery. The criminal charge against Shen arose from his securities trading activities in 1998 and 1999, schemes to defraud involving "one way" bets between Shen and sales persons at brokerage firms, and Shen's receipt of other kickbacks for trades from those salespersons. Shen did not have a cooperation agreement with the government, but voluntarily cooperated with the government's investigation. Shen was sentenced to three years probation including 1000 hours of community service and restitution to New York Life. Pl. Exh. 1-18, 1-19; Tr. 37:23-40:20, 45:13-18, 441:7-441:11.

*11 Subsequent to Greenwich Capital's investigation, Savino was deposed in connection with his trades with New York Life. Savino stated in his deposition that he did not ask Shen to lie about the surround-sound system to the attorneys for Greenwich Capital. During his deposition, Savino stated that he gave Shen between $1,000 and $1,500 in

Not Reported in F.Supp.2d, 2006 WL 375074 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,705
**(Cite as: 2006 WL 375074 (S.D.N.Y.))**

Atlantic City because Shen was teaching Savino how to play blackjack. Savino claimed during his deposition that he purchased a stereo for Shen as a "housewarming gift" because he felt guilty that he had not done anything for Shen. Savino also claimed that his negotiations with Shen and his offers of gifts to Shen in connection with trades were just a "joke." Savino Depo. 25:9-11, 26:5-178, 186:2-187:5

**F. Savino's Defense**

In his post-trial memorandum, Savino contends that the SEC did not meet its burden of proof at trial. Savino argues that the testimony at trial and email exchanges introduced as evidence did not show a scheme to defraud New York Life. Rather, Savino argues that the emails evidenced a "disjointed pattern of joking mockery, posturing and good natured abuse." Savino differentiated his relationship with Shen from the "real kickback agreements" Shen entered into with other co-defendants. Those kickback agreements were delivered in cash, per an understood code or specific agreement. Savino argued that the absence of those circumstances in this instance demonstrates the lack of a scheme to defraud here. Def. Post-trial Memo. at 4, 9.

Savino also argues that the favorable pricing that Greenwich Capital received from New York Life was not the product of a scheme to defraud. Savino relied on Shen's testimony that a broker-dealer "could not have the best executable price and still win a bid[,]" if the firm "provide[d] research value" for instance. Savino further argues that Greenwich Capital provided New York Life with its proprietary research at Shen's request. This, Savino argued, was the true cause of the favorable pricing that Greenwich Capital received on its trades with New York Life. Finally, Savino argues that Shen's testimony did not demonstrate that, by design, Savino hid from New York Life the fact that he received gifts. Savino argues that Shen's testimony suggests that Shen may have told his supervisors about some of the gifts he received. Def.

Post-Trial Memo. at 11-12.

**G. Savino's Commissions**

Pl. Exh. 2-24 lists approximately sixty-seven securities trades between Shen and Savino in 1998 and 1999. It also shows, for each trade, the amount of the gross commission Greenwich Capital made and the amount of net commission credited to Savino.

In the fiscal year ending September 30, 1998, Savino's net commissions did not exceed the minimum annual compensation guaranteed by Greenwich Captial. [FN5] As a result, Savino received a pro rata share of his minimum guaranteed salary of $750,000 from Greenwich Capital. In the fiscal year ending September 30, 1999, Savino's net commissions exceeded the minimum guaranteed annual compensation, and he received approximately $1,000,000 in compensation. Pl. Exh. 2-1, 2-24; Tr. 410:23-414:3.

> FN5. In fiscal year 1998, in the months of August and September, Savino was credited with commissions totaling $105,885.41 from trades between New York Life and Greenwich Capital. In August, Savino was credited with $5,625 in commissions. In September, Savino was credited with $100,260.41 in commissions.

**\*12** In fiscal year 1999, Savino received $366,358.04 in net commissions from trades between New York Life and Greenwich Capital. In October, Savino was credited with $1,085.94. In November, Savino was credited with $86,787.30 in commissions. In December, Savino was credited with $11,872. In January, Savino was credited with $1,250 in commissions. In February, Savino was credited with $21,735.69 in commissions. In March, Savino was credited with $71,313.35 in commissions. In April, Savino was credited with $21,589.85 in commissions. In May, Savino was credited with $95,052.04 in commissions. In June, Savino was credited with $16,609.37 in commissions. In July, Savino did not receive commissions

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 375074 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,705
**(Cite as: 2006 WL 375074 (S.D.N.Y.))**

in connection with New York Life trades. In August, Savino was credited with $39,062.50 in commissions. After August 1999, Savino received no further commissions in connection with trades with New York Life.

II. Conclusions of Law

A. Counts 1 and 2-Direct Violation of the Federal Antifraud Statutes

The evidence in this case established by a preponderance of the evidence that Savino violated both Sections 10(b) of the Securities Exchange Act FN6 and Section 17(a) of the Securities Act. FN7

FN6. Section 10(b), which applies to both buyers and sellers, makes it

unlawful for any person ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

FN7. Section 17(a), which applies only to sellers or offerors, states:

It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportations or communication in interstate commerce or by the use of the mails directly or indirectly-(1) to employ any device, scheme, or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (3) to engage in any transaction, practice, or course of business which operates or would oper-

ate as a fraud or deceit upon the purchaser.

Pursuant to its rulemaking power under this section, the SEC promulgated Rule 10b-5, which provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made not misleading, or (c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5.

In order to meet its burden of proof, the government must establish by a preponderance of the evidence each of the following elements: (1) that the defendant employed a device, scheme, or artifice to defraud in connection with the sale of a security; (2) that the victim justifiably relied on the defendant's statements or conduct; (3) that the defendant acted with intent to defraud or with reckless disregard for the truth; (4), that the defendant's conduct was the proximate cause of the injury to the victim; and (5) that the defendant used, or caused to be used, means and instrumentalities of interstate commerce. *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 61 (2d Cir.1985).

The purpose of § 10(b) and Rule 10b-5 is to protect persons from being deceived in securities transactions-to make sure that buyers of securities get what they think they are getting and that sellers of securities are not tricked into parting with

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 375074 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,705
**(Cite as: 2006 WL 375074 (S.D.N.Y.))**

something for a price known to the buyer to be inadequate, or for a consideration known to the buyer not to be what it purports to be. *Chemical Bank v. Arthur Anderson & Co., 726 F.2d 930, 943 (2d Cir.1984).*

Savino's liability is primarily predicated on five factual circumstances: (1) Savino failed to disclose the fact that he was compensating Shen in connection with trades; (2) Savino did not disclose that as a result, Shen was trading securities at prices unfavorable to New York Life; (3) Savino's compensation to Shen in connection with the trades to cause Shen to trade prices unfavorable to New York Life was information material to New York Life; and (4) during the course of their arrangement, Savino and Shen took affirmative steps to conceal conduct that they knew was illegal; and (5) in carrying out this scheme, Savino used the means and instruments of interstate commerce.

### 1. Scheme to Defraud in Connection with the Purchase or Sale of a Securities

**\*13** The record demonstrates that beginning in September 1998, Shen and Savino reached agreements constituting an illegal scheme to defraud New York Life. Savino attempted to enter into a commission splitting formula to compensate Shen for increasing Savino's commissions by giving Savino New York Life trades at favorable prices. The evidence also demonstrates that Savino and Shen, at times, implemented a "you ask, you get" compensation arrangement. To wit, in December 1998, Savino gave Shen $3,000 in cash in Atlantic City to compensate Shen for giving Savino New York Life Trades; in spring of 1999, Savino promised and gave Shen a surround-sound system in connection with New York Life trades; in March 1999, Savino promised and gave Shen car transportation to Foxwoods Resort Casino in connection with New York Life Trades; in April 1999, Savino promised and gave Shen adult entertainment in connection with New York Life trades; and in May 1999, Savino promised to give Shen $2,500 toward his vacation hotel bill in connection with New York

Life Trades.

Savino and Shen did not reach a concrete commission sharing formula in their September and November exchanges. However, the credible evidence demonstrated that the $3,000 Atlantic City payment was made to facilitate certain trades. Savino made cash payments to Shen, which Shen credibly testified were in connection with several trades. Increased trading between Shen and Savino around the time of the negotiations corroborated this testimony. Shen and Savino's email exchanges during this time further support this conclusion.

The evidence demonstrates that Savino obtained a flow of trades, and therefore more commissions, by offering and making payments and giving gifts to Shen. As part of his arrangement with Savino, Shen gave Savino additional ticks and plusses on trades to allow Savino to increase his profits. Further to the arrangement, Shen did not obtain competitive bids on the trades from other broker-dealers. Savino obtained specific favorable trades with his promises and provision of payments and gifts to Shen in connection with those trades. Moreover, the evidence demonstrates that Savino's flow of trades with New York Life increased substantially during those periods when he was negotiating and making payments to Shen, and when he promised and provided gifts to Shen in connection with those trades. Indeed, Savino's most lucrative months were those when he was negotiating a potential commission splitting arrangement with Shen.[FN8]

> **FN8.** In September and November 1998, Savino's credited net commissions on his Shen trades totaled $100,260.41 and $86,787.30 respectively. In March and May of 1999, months in which Savino promised Shen large gifts and payments, Savino's net commissions on his Shen trades totaled $71,313.35 and $95,052.04 respectively.

### 2. Material Misrepresentations and Ommissions

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 375074 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,705
**(Cite as: 2006 WL 375074 (S.D.N.Y.))**

Savino made material misrepresentations and omissions in connection with its trades. Savino concealed the fact that he was compensating Shen in connection with his trades. Savino also concealed the fact that Shen was trading New York Life's securities at less than favorable prices because of Savino's promises and gifts. Savino affirmatively misrepresented the nature of the consideration he paid New York Life for his trades. *See Feminella,* 947 F.Supp. at 732 (allegations that defendant concealed from his client that the consideration paid on certain security trades included money that he intended to, and did, kickback to his purchaser sufficient to state a claim).

**\*14** These misrepresentations and omissions were material in that they involved information that a reasonable investor would consider important in the decision to buy or sell securities. *Schlick v. Penn-Dixie Cement Cor.,* 507 F.2d 374 (2d Cir.1974). Both New York Life and Greenwich Capital were entitled to know that Shen was being promised and given cash, gifts, and gratuities by Savino in connection with trades. *See In re Stephes, Inc.,* 1998 WL 807950, at \*7 (68 S.E.C. Docket 1801, Nov. 23, 1998) (secret kickback arrangements material because "they are always corrupting"); *In re First Fidelity Sec. Group,* 1996 WL 20840, at \*7 (61 S.E.C. Docket 40, Jan. 9, 1996) (secret payments to agent material 'because such arrangements and payments could compromise the independence and judgment of these agents").

3. Scienter

Savino acted with the requisite scienter. He intentionally did not disclose and intentionally concealed the material circumstances of his trading relationship with Shen. Shen understood that he owed a duty to treat his customers fairly and to disclose to his customers all information that was relevant to the trades he handled, including all forms of consideration given in connection with his trades. Despite acknowledging his duties to his customers, Savino admittedly never told his employers or New York Life that Shen was soliciting gifts and

payments, nor did he disclose that he gave Shen gifts and payments.

During the course of their arrangement, Savino and Shen knew that their conduct was wrong, and took affirmative steps to conceal it. Savino was aware of the NASD and Greenwich Capital rules prohibiting certain types of gifts, yet he disregarded these rules in his dealings with Shen. Savino waited until he and Shen were alone before he gave Shen the $3,000 payment in Atlantic City. Savino also used his personal credit card to purchase the surround-sound system for Shen in order to avoid detection. Savino did not report the payments, gifts, or gratuities he gave Shen in connection with their trades on the travel and expense forms he submitted to Greenwich Capital. Moreover, Savino's intent to defraud is further demonstrated by his instructions to Shen to continue to conceal their scheme after Greenwich Capital began to investigate his trades with New York Life.

Both Shen and Savino understood that their securities trades were executed at prices less favorable to New York Life than what was otherwise obtainable. They thought that this variance would not be noticed because these prices were within the bid/ask spread. Savino was aware that Shen was receiving gifts from other broker-dealers and that Shen sought payments and gifts in connection with certain trades. Savino was also aware that Shen's former supervisor at New York Life sought gifts in connection with trades until he left in January 1999.

Other than Shen's expectation of gifts or payments in connection with his trades with Savino, there was no credible reason for Shen to engage in securities trades in the manner they were conducted. Savino argues that "[a]s to those rare occasions where Mr. Shen even arguably made concessions within the spread in Greenwich Capital's favor ... Mr. Savino was perfectly justified in believing that such gestures were in recognition of the unique and valuable advice that his employer provided on an ongoing basis to New York Life. *See* Def. Post-Trial Memo at 3. There is no credible evidence,

Not Reported in F.Supp.2d, 2006 WL 375074 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,705
**(Cite as: 2006 WL 375074 (S.D.N.Y.))**

however, that these were "concessions" for any re-search or other legitimate service in connection with trades.

**\*15** Savino's explanation and testimony were not credible during the trial. He testified that his offers of gifts and payments to Shen were not connected with his trades with Shen. This testimony that is contradicted by logic and, among other evidence, the words of his own emails to Shen. He also testified that he did not ask Shen to lie to the attorneys from Greenwich Capital investigating his trades. That testimony is contradicted by Shen's testimony that Savino asked him to corroborate Savino's story that there had been no gifts or payments made by Savino, and by Savino's own statements during the taped conversations between Savino and Shen. Savino's claim at trial that his email discussions with Shen were just "jokes" is a characterization that flies in the face of all the evidence. Savino's incredible testimony that his misconduct was simply a "joke" is undercut by, among other evidence, his own statements in his emails to Shen emphasizing his willingness to give Shen the gifts Savino offered, and by Savino's own admissions that he gave Shen the gifts and payments he offered in connection with trades.

The Court accepts that much of the email relationship between Savino and Shen show a "disjointed pattern of joking, mockery, posturing, and good-natured abuse." Def. Post-Trial Memo at 4. Indeed, the joking nature of these email exchanges was consistent with their long-term friendship. Despite the light-hearted nature of many of the communications between Savino and Shen, the evidence demonstrated that, underlying the ostensibly jocular conversation, Savino and Shen reached agreements to exchange cash and gifts in connection with trades. Moreover, Savino was willing to further negotiate as opportunities arose.

**B. Count 3-Aiding and Abetting Shen's Violations of the Federal Antifraud Statutes**

The SEC's Third Claim charges that Savino violated Section 10(b) of the Exchange Act by know-ingly aiding and abetting Shen, in violating Section 19(b) and Rule 10b-5.[FN9] To prove its case under the Third Claim, the SEC must show that (1) Shen committed at least one violation of Section 10(b) and Rule 10b-5 (a "primary violation"); (2) Savino either knew of Shen's primary violations, or was reckless in not knowing of the violations; and (3) Savino substantially assisted Shen's primary violation. SEC v. Lybrand, 200 F.Supp.2d 384, 399-400 (S.D.N.Y.2002).

> FN9. 15 U.S.C. § 78t(f) authorizes the SEC to bring claims for aiding and abetting a violation of the securities laws. It states in pertinent part:
>
> > For the purposes of any action brought by the Commission under paragraph (1) or (3) of section 78u(d) of this title, any person that knowingly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

In proving these elements, the SEC must persuade the Court by a fair preponderance of the evidence. See e.g., Securities and Exchange Comm. v. Commonwealth Chemical Securities, Inc., 574 F.2d 90, 102 (2d Cir.1978). The SEC is not required to prove reliance or actual harm or damages resulting from conduct violating the securities laws in order to obtain relief. Graham v. SEC, 222 F.3d 994, 1001 n. 15 (D.C.Cir.2000); SEC v. McCaskey, 2001 WL 1029053, at \*5 (S.D.N.Y. Sept. 6, 201).

The record shows that (1) Shen committed at least one violation of Section 10(b) and Rule 10b-5; (2) Savino knew of Shen's primary violations; and (3) Savino substantially assisted Shen's primary violations. Shen committed primary violations of Section 10(b) and Rule 10b-5 when he failed to disclose to New York Life the payments and gifts

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 375074 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,705
**(Cite as: 2006 WL 375074 (S.D.N.Y.))**

offered and made in connection with his securities trades. *See United States v. Rudi,* 902 F.Supp. 452, 456-57 (S.D.N.Y.1995) (agent defrauded his principal by accepting secret payments from underwriter). Shen's actions resulted in his criminal conviction.

**\*16** The evidence demonstrated that Savino was aware that Shen was defrauding New York Life by soliciting and accepting payments, gifts, and gratuities in connection with securities transactions. Indeed, Savino was on the other side of transactions amounting to Shen's primary violation. Savino knew Shen was making materially false and misleading statements and omissions to New York Life in connection with the securities trades he conducted. Savino's efforts to conceal the scheme emphasized his awareness that he and Shen were defrauding New York Life. Early in their relationship, for example, Savino urged Shen to delete and purge incriminating Bloomberg email messages, and further suggested that Shen use the computer's "auto-purge" feature to ensure that the incriminating messages were purged.

Savino substantially assisted Shen's primary violation by offering and giving Shen secret payments, gifts, and gratuities in connection with their securities trades. For example, in December 1998, Savino gave Shen $3,000 in cash in Atlantic City to compensate Shen for giving Savino New York Life Trades. In spring of 1999, Savino promised and gave Shen a surround-sound system in connection with New York Life trades. In March 1999, Savino promised and gave Shen car transportation in connection with New York Life Trades. In April 1999, Savino promised and gave Shen adult entertainment in connection with New York Life trades. In May 1999, Savino promised to give Shen $2,500 toward his vacation hotel bill in connection with New York Life Trades.

III. Equitable Remedies

A. Permanent Injunction

The SEC seeks permanent injunctive relief against Savino pursuant to Section 20(b) of the Securities act and § 21(d) of the Exchange Act, both of which provide that "upon a proper showing a permanent or temporary injunction or restraining order shall be granted." A district court is given wide discretion to enjoin possible future violations of the federal securities laws in view of a showing of past violations, when "there is a reasonable likelihood that, unless enjoined, the violations will continue." *First Jersey Securities,* 101 F.3d at 1477; *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1100 (2d. Cir.1972). In determining whether a proper showing has been made, the Court must find a reasonable likelihood that past wrongdoing will recur. *See SEC v. Bausch & Lomb, Inc.,* 565 F.2d 8, 18 (2d Cir.1997). To make this showing the SEC is required to go beyond the mere facts of past violations. *See SEC v. Commonwealth Chemical Securities, Inc.,* 574 F.2d 90, 100 (2d Cir.1978). The SEC must prove that a violator has a propensity to engage in future violations. *See id.* at 99. The Court is mindful, however, that "fraudulent past conduct gives rise to an inference of a reasonable expectation of continued violations." *Manor Nursing Centers,* 458 F.2d at 1100.

Additional factors that weigh in the Court's determination include (1) the degree of the scienter involved; (2) the sincerity of the defendant's assurances against future violations; (3) the defendant's recognition of the wrongful nature of his conduct; and (4) the degree to which the defendant's professional occupation will affect the chance of recurring violations. *See SEC v. Universal Major Industries,* 546 F.2d 1044, 1048 (2d Cir.1976). Unlike a nonstatutory injunction, there is no requirement that the SEC demonstrate irreparable injury or lack of any adequate remedy at law. *See SEC v. Management Dynamics, Inc.,* 515 F.2d at 808. The Court, however, will engage in the traditional balancing of the equities before issuing an injunction. *SEC v. Geon Industries, Inc.,* 531 F.2d 39, 54-55 (2d Cir.1976).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 375074 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,705
**(Cite as: 2006 WL 375074 (S.D.N.Y.))**

**\*17** The level of scienter involved in Savino's violations is high. Savino knowingly and willingly defrauded New York Life, and knowingly and willingly aided and abetted Shen in Shen's own violations of the federal security laws. Savino's violations were repeated multiple times over the course of his relationship with Shen. Savino has been unwilling to admit that he engaged in wrongdoing with Shen, and continues to claim that the scheme was all a joke, despite overwhelming evidence to the contrary. Savino was untruthful during his deposition and in his testimony during trial.

Due to his current occupation as a licensed securities professional trading bonds for a broker-dealer, Savino is in a position to engage in further fraudulent conduct. *See Charles Hughes & Co. v. SEC,* 139 F.2d 434, 437 (2d Cir.1943) ("[t]he business of trading in securities is one in which opportunities for dishonesty are of constant recurrence and ever present"). An injunction shall issue to deter future illicit conduct by defendant Savino.

B. Disgorgement

The SEC further seeks disgorgement of Savino's ill-gotten gains in connection with his New York Life trades, and prejudgment interest in connection with this amount. Disgorgement of ill-gotten gains is also appropriate in actions to enforce the federal securities laws. *See SEC v. Fishbach Corp.,* 133 F.3d 170, 175 (2d Cir.1997); *First Jersey Securities,* 101 F.3d at 1474-75. Disgorgement is an equitable remedy. *SEC v. UNIOIL,* 951 f.2D 1034 (D.C.Cir.1991). The Court need only make a reasonable approximation of the profits causally connected to the fraud. *SEC v. Warde,* 1512 F.3d 45, 50 (2d Cir.1998). "The proper measure of disgorgement is the amount of the wrongdoer's unjust enrichment." *SEC v. Falbo,* 14 F.Supp.2d 508, 527 (S.D.N.Y.1998). The Court will order disgorgement of Savino's total fiscal year 1999 commissions from trades between New York Life and Greenwich Capital for Savino's fiscal year 1999 commissions. The Court will further order prejudgment interest on the disgorgement sum.

In fiscal year 1999, $366,358.04 of Savino's total commission compensation was attributable to his New York Life trades with Shen. The commissions that Savino earned from these trades were a result of the continuing scheme to defraud New York Life. Disgorgement of Savino's 1999 commissions is therefore appropriate.

In fiscal year 1998, Savino did not receive payment for the net commissions for which he was credited because his net commissions were less than his minimum guaranteed salary of $750,000. The SEC argues that Savino's 1998 compensation from, and retention by, Greenwich Capital was related to his production of commissions, including the commissions generated from Savino's New York Life trades. Because Savino's guaranteed salaried payment of $750,000 in 1998 was not in fact commissions generated by the fraud, however, this Court will not order disgorgement of his 1998 salary.

**\*18** The interest rate used to calculate the amount of pre-judgment interest is the rate set by the Internal Revenue Service for money owed to the United States Treasury, which is the rate that best approximates the use value of Savino's ill-gotten gains. *See* 26 U.S.C. § 6621(a)(2); *SEC v. First Jersey Securities, Inc.,* 101 F .3d 1450, 1476 (2d Cir.1996). The pre-judgment interest should be calculated by the SEC on Savino's total commissions on New York Life trades in Greenwich Capital's fiscal year of 1999, that is, trades occurring between October 1, 1998 and September 30, 1999. As requested by the SEC, interest on each trade is to be calculated from the first day of the month following the trades that earned the commissions through the date of this judgment.[FN10]

> FN10. In its papers, the SEC requests prejudgment interest on each New York Life trade, beginning to accrue on the first day of the month following the trade. Defendant Savino does not object to the date proposed by the SEC.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 375074 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,705
**(Cite as: 2006 WL 375074 (S.D.N.Y.))**

D. Civil Money Penalties

The SEC further requests that the Court order payment of a civil monetary penalty. Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 77t(d), 78u(d)(3), provide for the payment of civil monetary penalties in SEC enforcement actions. "The amount of the penalty shall be determined by the court in light of the facts and circumstances." *Id.* The statutory scheme provides three tiers of penalties of increasing severity.FN11 The SEC argues that the Court should order Tier Three penalties against defendant Savino in the amount equal to his disgorgement.

> FN11. Each tier provides a maximum penalty as the greater of "the gross amount of pecuniary gain to such defendant as a result of the violation" or a statutory penalty. The Tier One statutory penalty is $5,000 per natural person. Tier Two penalties are available if the violation involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." The Tier Two statutory penalty is $50,000 per natural person. 15 U.S.C. § 77t(d)(2) (2006)

Tier Three penalties are available if the violation involved "fraud, deceit, manipulation or reckless disregard of a regulatory requirement," and if the violation "resulted in substantial losses or created a significant risk of substantial losses or created a risk of substantial losses to other persons." The Tier Three statutory maximum penalty is the greater of $100,000 per natural person or "the gross amount of pecuniary gain to such defendant as a result of the violation." 15 U.S.C. § 77t(d)(2) (2006).

The Court considers the following factors in determining the amount of the penalty: (1) the egregiousness of the defendant's violations; (2) the level of scienter involved; (3) the repeated nature of the violations; (4) the defendant's willingness to admit his wrongdoing; (5) the losses or risk of loss the defendant's misconduct caused to others; (6) the defendant's cooperation and honesty with authorities; and (7) the defendant's current and future financial situation. *See Lybrand,* 281 F.Supp.2d at 730. This Court has also considered whether the defendant concealed his conduct and whether he is employed in the securities industry. *SEC v. Falbo,* 14 F.Supp.2d 508, 528-29 (S.D.N.Y.1998).

The Tier Three penalty is appropriate here. This Court orders defendant Savino to pay a civil monetary penalty of $100,000 in addition to the disgorgement and prejudgment interest. Savino's actions satisfy the statutory requirements for the imposition of Tier III penalties. Savino's violations involved "fraud, deceit, manipulation, or deliberate or reckless disregard of regulatory requirements" In addition, Savino's violations directly resulted in substantial losses its victims.

**\*19** Savino's violations are egregious. They were committed while Savino was a licensed security professional employed in the securities industry. As a registered representative of Greenwich Capital, Savino possessed a duty to fully inform his clients as to all consideration involved in each security trade. Savino violated his duties by engaging in an illegal fraudulent scheme with Shen. Savino has been unwilling to admit that he engaged in wrongdoing, contending that the fraudulent scheme was in jest. The evidence also reveals that Savino attempted to obstruct the investigation conducted by authorities. Savino lied to the attorneys at Greenwich Capital when they were conducting an internal investigation. Savino also urged Shen to lie to investigators to further conceal their scheme. Savino's lack of cooperation and candor continued with his untruthful statements concerning his conduct during his deposition, and at trial. Finally, Savino's current and future financial situation further supports the imposition of the statutory monetary penalty. The record shows that at the time of trial, Savino continued to be employed in the securities industry. Savino's tax returns for the year before the trial reflected that his income exceeded $1,500,000.

An appropriate judgment and order shall issue

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 375074 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,705
**(Cite as: 2006 WL 375074 (S.D.N.Y.))**

consistent with this memorandum decision.

   SO ORDERED:

S.D.N.Y.,2006.
U.S. S.E.C. v. Savino
Not Reported in F.Supp.2d, 2006 WL 375074
(S.D.N.Y.), Fed. Sec. L. Rep. P 93,705

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 4483180 (E.D.N.C.)
**(Cite as: 2012 WL 4483180 (E.D.N.C.))**

C
Only the Westlaw citation is currently available.

United States District Court,
E.D. North Carolina.
TM, LLC, Plaintiff,
v.
Gary Charles ANDERSON, Katherine Gail Anderson, CYA OBX, LLC, Anderson Homes of the Outer Banks, LLC, Linda Desibia, Elizabeth Desibia, Alexandra Desibia, Quinn Desibia, and Paris Faschette, Defendants.

No. 2:11–CV–00071–FL.
Sept. 27, 2012.

Paul A. Sheridan, Chad Cochran, Vann & Sheridan, LLP, Raleigh, NC, for Plaintiff.

Neil Wilton Scarborough, Dan L. Merrell & Associates, PC, Kitty Hawk, NC, Dennis C. Rose, Rose Harrison & Gilreath, P.C., Kill Devil Hills, NC, for Defendants.

ORDER
LOUISE W. FLANAGAN, District Judge.

**\*1** This matter is before the court on four motions: a motion to dismiss by defendants Linda Desibia, Elizabeth Desibia, Alexandra Desibia, and Quinn Desibia (collectively the "Desibia defendants") (DE # 48), to which plaintiff has responded in opposition (DE # 53); two motions for costs and to strike by defendants Gary Charles Anderson, Katherine Gail Anderson, CYA OBX, LLC, and Anderson Homes of the Outer Banks, LLC (collectively the "Anderson defendants") (DE # 50, 55), to which plaintiff has responded in opposition (DE # 59, 62); and a motion for extension of time for service and to conduct discovery by plaintiff (DE # 60), to which no response has been filed. In this posture, the issues raised are ripe for decision. For reasons given, the Desibia defendants' motion to dismiss (DE # 48) is granted in part and denied in part. Also for reasons given below, the Anderson

defendants' first motion for costs and to strike (DE # 50) is denied as moot, and their second motion for costs and to strike (DE # 55) is granted in part and denied in part as to the motion for costs and denied as to the motion to strike. Finally, plaintiff's unopposed motion for extension of time for service and to conduct discovery (DE # 60) is granted.

**BACKGROUND**

Plaintiff filed complaint on December 21, 2011, asserting a federal claim pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO") along with several state law claims, all arising out of an alleged scheme to shield assets from plaintiff, a judgment creditor of defendants Gary Charles Anderson ("Gary Anderson") and Katherine Gail Anderson ("Katherine Anderson"). Plaintiff's claims are contained in complaint spanning over forty (40) pages. The core of plaintiff's claims devolves around allegations the Anderson defendants, the Desibia defendants, and Paris Faschette conspired to commit fraudulent transfers of assets belonging to Gary Anderson and Katherine Anderson in order to secrete them from plaintiff and frustrate efforts of plaintiff to collect an award in arbitration confirmed as a Florida and North Carolina judgment against Gary Anderson and Katherine Anderson in the amount of $403,335.43 plus interest.

On February 28, 2012, the Desibia defendants filed motion to dismiss pursuant to Rules 9, 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure. On March 5, 2012, the Anderson defendants filed an incorporated answer and motion for costs and to strike. On March 27, 2012, the Anderson defendants filed an amended answer and separately refiled their motion for costs and to strike.[FN1] On April 20, 2012, plaintiff filed a motion for extension of time to serve defendant Paris Faschette and for leave to conduct third-party discovery.

FN1. As a result of Anderson defendants'

Slip Copy, 2012 WL 4483180 (E.D.N.C.)
**(Cite as: 2012 WL 4483180 (E.D.N.C.))**

refiling of the motion (DE # 55), the first motion for costs and to strike (DE # 50) is denied as moot.

## DISCUSSION

### A. Motion to Dismiss

The Desibia defendants seek to dismiss the RICO claims against them for failure to state a claim, pursuant to Rule 12(b)(6), and to dismiss the remaining state law claims for lack of personal jurisdiction, pursuant to Rule 12(b)(2). The court will address each in turn.

### 1. RICO Claims

#### a. Standard of Review

*2 The purpose of a Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted is to eliminate claims that are factually or legally insufficient. Fed.R.Civ.P. 12(b)(6); *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–50, 173 L.Ed.2d 868 (2009); *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly,* 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "A court need not accept a complaint's legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." *Alfaro v. United States,* No. 5:09–CT–3073–D, 2011 WL 561320, at *1 (E.D.N.C. Feb.8, 2011) (citing *Iqbal,* 129 S.Ct. at 1949–50; *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 255 (4th Cir.2009)).

The sufficiency of a civil RICO claim is judged in accordance with the notice pleading requirement of Rule 8(a), requiring a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). At the same time, however, "where RICO claims are based on predicate acts of fraud, the heightened pleading standard set forth in Rule 9(b) of the Federal Rules of Civil Procedure applies." *Field v. GMAC, LLC,* 660 F.Supp.2d 679, 686 (D.Md.2011) (citing *Menasco, Inc. v. Wasserman,* 886 F.2d 681, 684 (4th Cir.1989)). Rule 9(b) requires that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b).

#### b. Analysis

Plaintiff asserts claims under RICO subsections (b), (c), and (d). 18 U.S.C. § 1962(b), (c), (d). To state a RICO claim under subsection (b), plaintiff must plead facts that, if proven, would tend to establish (1) the acquisition or maintenance of an interest in or control; (2) of an enterprise; (3) through a pattern of racketeering activity. 18 U.S.C. § 1962(b); *see Beck v. Prupis,* 529 U.S. 494, 497, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000). The elements of a RICO claim under subsection (c) are: (1) the conduct; (2) of an enterprise; (3) through a pattern of racketeering activity. 18 U.S.C. § 1962(c); *see Salinas v. United States,* 522 U.S. 52, 63, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997). " 'Enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "Racketeering activity" includes, inter alia, "any act which is indictable" under specifically enumerated criminal provisions, including those relating to mail and wire fraud set forth in 18 U.S.C. §§ 1341 and 1343. 18 U.S.C. § 1961(1). Finally, a " 'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years ... after the commission of a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 4483180 (E.D.N.C.)
**(Cite as: 2012 WL 4483180 (E.D.N.C.))**

prior act of racketeering activity," 18 U.S.C. § 1961(5), and the predicate acts must be related and amount to or pose a threat of continued criminal activity, *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). Subsection (d) is aimed at conspiracies to violate subsections (a) through (c). To state a subsection (d) claim, plaintiff must allege that "each defendant agreed that another co-conspirator would commit two or more acts of racketeering." *United States v. Pryba,* 900 F.2d 748, 760 (4th Cir.1990).

*3 The Desibia defendants first contend, with respect to subsections (b) and (c), that plaintiff failed to properly allege a pattern of racketeering activity as to each of them and that, therefore, the RICO claims against them should be dismissed. Plaintiff alleged predicate acts of mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U .S.C. § 1343; specifically, that on or about October 8, 2009, Andersons transferred a total of $104,000.00 "to the Desibia family via personal checks" through the U.S. mail to Linda Desibia, Elizabeth Desibia, Quinn Desibia, and Alexandra Desibia in the amount of $26,000.00 each and that "[d]uring late 2010," Andersons transferred, by use of the U.S. mail and wires, $26,000.00 to each Desibia defendant. (Compl.97, 101–108, 242(k)-(n), 260(k)-(n)). It is not entirely clear to the court that two sets of transfers to each Desibia defendant actually took place.[FN2] However, even assuming, *arguendo,* that there were two predicate acts as to each Desibia defendant, the court finds that they are insufficient to satisfy the pattern requirement.

> FN2. It appears that "2010" may have been a typographical error and that plaintiff intended to refer to the October 2009 transfers, as occurring in "late 2009." In the "Background Facts" section of complaint entitled "Illicit Transfers Involving the Desibias," plaintiff makes its allegations with respect to the October 8, 2009 transfers of $26,000.00 to each Desibia defend-

ant, (Compl.¶¶ 101–108), but makes no mention of any "late 2010" transfers, which only appear in counts ten and eleven of complaint, (*id.,* ¶¶ 242(k)-(n), 260(k)-(n)). Conversely, counts ten and eleven of complaint make no mention of the October 8, 2009 transfers. Additionally, plaintiff only provided copies of the October 8, 2009 checks as an exhibit to complaint, (*id.,* Ex. I at 1–4), and failed to mention any "late 2010" transfers to Desibia defendants in its response in opposition to the motion to dismiss while citing to the October 8, 2009 transfers multiple times. Pl.'s Resp. in Opp'n at 3, 6, 12, 16. Accordingly, the reasonable inference is that plaintiff has alleged that only one set of transfers to Desibia defendants occurred in October 2009.

The Fourth Circuit has been "cautious about basing a RICO claim on predicate acts of mail and wire fraud because it will be the unusual fraud that does not enlist the mails and wires in its service at least twice." *GE Inv. Private Placement Partners II v. Parker,* 247 F.3d 543, 549 (4th Cir.2001) (quoting *Al– Abood v. El–Shamari,* 217 F.3d 225, 238 (4th Cir.2000)). "This caution is designed to preserve a distinction between ordinary or garden-variety fraud claims better prosecuted under state law and cases involving a more serious scope of activity." *Al– Abood,* 217 F.3d at 238. "RICO liability is reserved for ongoing unlawful activities whose scope and persistence pose a special threat to social wellbeing." *Id.* (quoting *Menasco, Inc. v. Wasserman,* 886 F.2d 681, 684 (4th Cir.1989)). The acts alleged with respect to the Desibia defendants, which can be distilled to the receipt of one or at the most two fraudulent transfers, lack the "scope and persistence" for which RICO liability was intended to apply and are more properly characterized as garden-variety state law fraudulent transfer claims.

In an attempt to broaden the scope of the fraud as to the Desibia defendants, plaintiff argues that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 4483180 (E.D.N.C.)
**(Cite as: 2012 WL 4483180 (E.D.N.C.))**

they played a role in planning and benefitting from more than forty transactions involving Andersons' assets. (Pl.'s Mem. in Opp'n at 8.) However, the court must consider the allegations with respect to each particular defendant, and the allegations with respect to Desibia defendants' involvement in the broader alleged scheme are conclusory and speculative at best. With the exception of the $26,000.00 transfers, the Desibia defendants are not mentioned in connection with any transfers. (Compl. ¶¶ 39–95; 111–124). Absent some factual enhancement, allegations such as "[d]efendants agreed, cooperated, and conspired with one another to commit the fraudulent transfers," (Compl.¶ 188), or that the Desibia defendants, Anderson Homes, and CYA "joined in a scheme such that they also acquired and maintained an interest in the enterprise through a pattern of racketeering activity," (*id.* at 238), are insufficient to satisfy *Twombly,* not to mention Rule 9(b)'s particularity requirement.

**\*4** Finally, plaintiff contends that a "long line of cases establish that RICO liability may be predicated upon a scheme to defraud creditors through a series of fraudulent transfers." (Pl.'s Mem. in Opp'n at 7–8.) The court neither endorses a *per se* rule that fraudulent transfers conducted by use of the mail or wires can never be the basis for a civil RICO claim, nor does it make any judgment as to the sufficiency of the allegations as to other defendants. As the Fourth Circuit has observed, "[t]here is no mechanical formula to assess whether the pattern requirement has been satisfied; it is a commonsensical, fact-specific inquiry." *ePlus Technology, Inc. v. Aboud,* 313 F.3d 166, 181–82, (4th Cir.2002) (citations omitted). Furthermore, the cases cited by plaintiff are distinguishable from the present case. *See, e.g., Fed. Deposit Ins. Corp. v. Kerr,* 637 F.Supp. 828 (W.D.N.C.1986) (predicate acts also included securities fraud); *Gutierrez v. Givens,* 989 F.Supp. 1033 (S.D.Cal.1997) (predicated acts also included racketeering in interstate travel or commerce and money laundering). Here, the facts as alleged with respect to the Desibia defendants are insufficient to establish a pattern of racketeering

activity. Accordingly, plaintiff has failed to state a claim as to the Desibia defendants under RICO subsections (b) and (c).

With respect to the subsection (d) conspiracy claim, plaintiff must show that each defendant agreed with another co-conspirator to commit two or more acts of racketeering, although "[t]here is no requirement that each conspirator personally commit illegal acts in furtherance of the conspiracy or to accomplish its objectives." *Pryba,* 900 F.2d at 760. As explained above, plaintiff's conclusory allegations with respect to the Desibia defendants' involvement in planning and executing the alleged fraudulent scheme are insufficient to allow the court to draw a plausible inference that the Desibia defendants were in agreement as to the alleged conspiracy. *See Walters v. McMahen,* 795 F.Supp.2d 350, 355–56 (D.Md.2011). Accordingly, the RICO conspiracy claim as to the Desibia defendants also fails as a matter of law.

In sum, the RICO claims as to Desibia defendants are dismissed for failure to state a claim upon which relief may be granted.

**2. Personal Jurisdiction**

**a. Standard of Review**

Where the court addresses a Rule 12(b)(2) motion without the benefit of evidentiary hearing, but rather relies only on the motions papers, supporting memoranda, affidavits, and pleadings, the plaintiff's burden is simply to make a prima facie showing of jurisdiction. *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.,* 334 F.3d 390, 396 (4th Cir.2003). Ultimately, the burden of proof on the plaintiff is one of preponderance of the evidence. *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.,* 416 F.3d 290, 294 (4th Cir.2005). In this context, the court construes the allegations in the light most favorable to the plaintiff, assumes credibility, and draws the most favorable inferences for the existence of jurisdiction. *Carefirst,* 334 F.3d at 396. All that is initially required of the plaintiff to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 4483180 (E.D.N.C.)
**(Cite as: 2012 WL 4483180 (E.D.N.C.))**

make out a prima facie showing of personal jurisdiction are allegations that such jurisdiction exists. *Clark v. Remark,* No. 92–1682, 1993 U.S.App. LEXIS 10043 *6, 1993 WL 134616 (4th Cir. Apr. 29, 1993).

**\*5** However, a plaintiff may not rest on mere jurisdictional allegations where defendants have countered those allegations with evidence that jurisdiction does not exist. *Id.* (citing *Barclays Leasing v. Nat'l. Bus. Sys.,* 750 F.Supp. 184, 186 (W.D.N.C.1990)). Rather, plaintiff must come forward with affidavits or other evidence to counter defendants' arguments, and once both parties have presented evidence, factual conflicts are resolved in favor of the party asserting jurisdiction. *Id.* In construing the pleadings, affidavits, and other supporting documents in the light most favorable to plaintiff, the court does not "credit conclusory allegations or draw farfetched inferences." *Masselli & Lane, PC v. Miller & Schuh, PA,* No. 99–2440, 2000 U.S.App. LEXIS 11932 * 5, 2000 WL 691100 (4th Cir. May 30, 2000) (citations omitted).

**b. Analysis**

The Desibia defendants contend that, absent RICO's provision for nationwide service and the exercise of personal jurisdiction over foreign defendants, they are not subject to personal jurisdiction in North Carolina. Plaintiff faces a two-part test in establishing personal jurisdiction over a nonresident defendant: (1) jurisdiction must be authorized by the state long-arm statute and (2) the exercise of jurisdiction in the particular case must be consistent with due process. *Christian Sci. Bd. of Dirs. v. Nolan,* 259 F.3d 209, 215 (4th Cir.2001). North Carolina's long-arm statute extends jurisdiction to the full extent permitted by the Due Process Clause. *Id.* Therefore, the court need only determine whether "the defendant has such 'minimal contacts' with the forum state that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *Id.* (quoting *Int'l. Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

To establish general jurisdiction, "the defendant's activities in the State must have been 'continuous and systematic,' a more demanding standard than is necessary for establishing specific jurisdiction." *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.,* 293 F.3d 707, 712 (4th Cir.2002). In determining whether the exercise of specific jurisdiction is appropriate, the court weighs three factors: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the ... claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Id.*

According to their declarations, the Desibia defendants have never resided in or owned property in North Carolina, nor have they conducted or solicited business in North Carolina, but they have traveled to North Carolina for "family visits." (Decl. of Alexandra Desibia ¶¶ 4–7; Decl. of Elizabeth Desibia ¶¶ 4–7; Decl. of Linda Desibia ¶¶ 4–7; Decl. of Quinn Desibia ¶¶ 4–7). It is not necessary for the court to determine at this juncture whether a prescribed number of "family visits" would or would not rise to the level of continuous and systematic contacts with the forum necessary to establish general jurisdiction, where the declarations at issue provide no indication as to the frequency or duration of these visits. *Id.* Furthermore, "[e]ven a single contact may be sufficient to create [specific] jurisdiction when the cause of action arises out of that single contact, provided that the principle of 'fair play and substantial justice' is not thereby offended." *Carefirst,* 334 F.3d at 397.

**\*6** Given the nature of the allegations, *i.e.,* fraudulent transfers between family members, and construing the allegations in the light most favorable to the plaintiff and drawing the most favorable inferences for the existence of jurisdiction, the motion to dismiss for lack of personal jurisdiction is denied.

**B. Motion for Costs and to Strike**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 4483180 (E.D.N.C.)
**(Cite as: 2012 WL 4483180 (E.D.N.C.))**

## 1. Rule 41(d) Motion for Costs

The Anderson defendants contend that this action is based on some of the same transactions and includes some of the same claims plaintiff asserted against them in a prior state court action and that, therefore, pursuant to Rule 41(d), this court should order plaintiff to pay these defendants' costs in defending the prior action and stay these proceedings pending plaintiff's compliance with such order. In response, plaintiff does not appear to contest that some of the claims in this action were previously asserted in the prior state court action, which was voluntarily dismissed on the second day of trial, but, rather, contends that the current action is much broader than the state court action. Furthermore, plaintiff argues that the state and not the federal rule of procedure governs the instant request for costs, and thus the court is strictly limited in the types of costs that may be awarded. Further, plaintiff argues that even if the federal rule applies, an award of costs is not justified.

The federal rule provides as follows:

If a plaintiff who previously dismissed an action in any court files an action based on or including the same claim against the same defendant, the court: (1) may order the plaintiff to pay all or part of the costs of that previous action; and (2) may stay the proceedings until the plaintiff has complied.

Fed.R.Civ.P. 41(d). The state rule is similar in that it provides for payment of costs and a stay of proceedings, yet differs in that the language in the state rule is mandatory and not permissive:

A plaintiff who dismisses an action or claim under section (a) of this rule shall be taxed with the costs of the action unless the action was brought in forma pauperis. If a plaintiff who has once dismissed an action in any court commences an action based upon or including the same claim against the same defendant before the payment of the costs of the action previously dismissed, unless such previous action was brought in forma

pauperis, the court, upon motion of the defendant, shall make an order for the payment of such costs by the plaintiff within 30 days and shall stay the proceedings in the action until the plaintiff has complied with the order. If the plaintiff does not comply with the order, the court shall dismiss the action.

N.C. Gen.Stat. § 1A–1, Rule 41(d).

Plaintiff first argues that the state and federal rules are consistent and that, therefore, this court should apply the state procedural rule and related state statutes limiting the categories of costs that may be awarded. (*See* Pl's. Opp. at 4–12). The Supreme Court in *Hanna* considered whether service of process in a civil action brought in federal court under diversity jurisdiction would be governed by the Federal Rules of Civil Procedure or a contrary Massachusetts law that required "in hand" service. 380 U .S. at 461–62. The Court ruled that where the state and federal rules were in direct conflict, the federal rule controlled. *Id.* at 473–74. In doing so, the Court noted that it had only "held applicable a state rule in the face of an argument that the situation was governed by one of the Federal Rules" where the "scope of the Federal Rule was not as broad as the losing party urged, and therefore, there being no Federal Rule which covered the point in dispute, *Erie* commanded the enforcement of the state law." *Id.* at 470.

**\*7** Such is not the case here where the federal rule sufficiently covers the "point in dispute." *See Kahn v. Sturgil,* 66 F.R.D. 487, 491 (M.D.N.C.1975). Furthermore, while the state and federal rule contemplate the same issue, they address it in contradictory ways, i.e., a state court is required to order payment of costs, to impose a stay, and ultimately to dismiss the case in the event of noncompliance, whereas the federal court is given broad discretion to impose such measures. The state and federal rules are in conflict; ergo, the federal rule is controlling. *Id.; Hanna,* 380 U.S. at 473.

Even assuming, arguendo, that plaintiff is cor-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 4483180 (E.D.N.C.)
**(Cite as: 2012 WL 4483180 (E.D.N.C.))**

rect that the state and federal rules are consistent, this court would still be bound to apply the federal rule. The Court unequivocally stated in *Hanna* that "were there no conflicting state procedure," the Federal procedural rule "would clearly control." 380 U.S. at 465 (citing *Nat'l. Equip. Rental, Ltd. v. Szukhent,* 375 U.S. 311, 316, 84 S.Ct. 411, 11 L.Ed.2d 354 (1963)). *See also Hottle v. Beech Aircraft Corp.,* 47 F.3d 106, 109 (4th Cir.1995) ("[A]s a general rule, a federal court sitting in diversity is to apply state substantive law and federal procedural law.") (citing *Stonehocker v. General Motors Corp.,* 587 F.2d 151, 154 (4th Cir.1978)). Thus, the court will apply the federal rule.

Plaintiff contends that even if the court applies the federal rule, an award of costs is not justified. Whether to award costs pursuant to Rule 41(d) is within the sound discretion of the trial court. *Hython v. City of Steubenville,* No. 95–3629, 1996 U.S.App. LEXIS 22264 *4, 1996 WL 456032 (6th Cir. Aug. 12, 1996)* (citing *Wright & Miller, Federal Practice and Procedure: Civil 2d § 2375 at 415 (1995)*). Plaintiff explains its basis for dismissal of the state court fraudulent conveyance action as follows:

The 2010 matter proceeded to trial before Dare County Superior Court Judge Jerry R. Tillett. Trial proceedings involved two witnesses (Gary Anderson and Tom Sims) who testified on a single day, October 5, 2011. Plaintiff's fraudulent conveyance complaint requested a series of remedies against CYA OBX, LLC, including execution sale and receivership over the fraudulently transferred real estate. On the evening of October 5, 2011, Judge Tillett informed Plaintiff's counsel that he would not grant Plaintiff any remedy other than a judgment against CYA OBX, LLC. **Plaintiff disagreed with Judge Tillett's election of remedies statement.... Plaintiff understood that, if it did not dismiss the proceedings, the parties would spend significantly higher costs proceeding with Plaintiff's case in chief, appealing Judge Tillett's eventual ruling, and**

**conducting remanded proceedings.** Accordingly, Plaintiff dismissed the 2010 case without prejudice when the courthouse opened the next morning.

(Pl.'s Opp. at 3) (emphasis added). Plaintiff dismissed the state court action on the second day of trial because plaintiff took issue with the Judge's ruling and determined implicitly to proceed again before another tribunal.

**\*8** Rule 41(d) serves the remedial purpose of preventing "vexatious litigation" and forum shopping, including "attempts to gain any tactical advantage by dismissing and refiling th[e] suit." *Rogers v. Wal–Mart Stores, Inc.,* 230 F.3d 868, 874 (6th Cir.2000) (citations omitted). Plaintiff's dismissal of one suit in search of a more favorable ruling in another court is precisely the type of forum shopping conduct that Rule 41(d) was enacted to redress. *See id.* These defendants are entitled to an award of costs, and the court must now determine the appropriate amount.

The Anderson defendants seek to recover $66,098.79, which sum is itemized as follows: $2,075.00 for an appraisal; $1,200.00 for the appraiser's appearance fee for trial; $1,265.00 in travel and accommodation expenses for two additional non-testifying trial witnesses; and $61,558.79 in attorney's fees and costs in defending two state court cases, $27,553.89 in No. 09–CVS–1134 and $34,024.90 in No. 10–CVS–322. (Defs.' Br. in Supp. at 3–4).

As an initial matter, the appraisal cost and appraiser's appearance fee were paid by Anderson Homes of the Outer Banks, which does not appear to have been a party to the prior litigation. (Defs .' 2d. Mot. for Costs and Mot. to Strike, Ex. 1, 3). Accordingly, the court finds that it would be inappropriate to award those costs. Additionally, although the court has not been provided with a copy of the complaint in the first state court case, No. 09–CVS–1134, it appears that it was initiated in order to domesticate plaintiff's Florida judgment and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 4483180 (E.D.N.C.)
**(Cite as: 2012 WL 4483180 (E.D.N.C.))**

to conduct post-judgment discovery, (Pl.'s Opp. at 2), and that the second state court case, No. 10–CVS–322, was the fraudulent conveyance action, which embodied some of the claims brought in this action. Importantly, plaintiff contends that it did not dismiss the first case, which is a prerequisite for an award of costs under Rule 41(d), and defendants have provided no evidence to the contrary. (Pl.'s Opp. at 11). Accordingly, the court finds that it would be inappropriate to award costs attributable to the first state court action, No. 09–CVS–1134.

With respect to the travel and accommodation costs of $1,265.00 paid to the two non-testifying trial witnesses, John Desibia and Adam Meyer, the court finds it appropriate to award the actual costs of travel, meals and accommodations expended by these witnesses, not to exceed the $1,265.00 expense incurred by Gary Anderson. (Defs.' 2d. Mot., Ex. 3, Aff. of Gary Anderson). Counsel are directed to confer in a good faith attempt to reach an agreement on the appropriate amount. In the event they fail to do so, Anderson defendants are directed to file a Bill of Costs within **fourteen (14) days** of the date of this order, to which plaintiff will have **fourteen (14) days** to object.

With respect to the request for attorney's fees and costs of $34,024.90 incurred in defending the state court fraudulent conveyance action, the court will award the claimed costs of $53.40, (Defs.' 2d. Mot. Ex. 3, Aff. of Dana W. Roepcke Ex. A), but declines to award attorney's fees, for the reasons stated below.

**\*9** The Fourth Circuit has not addressed the issue of whether, for the purpose of Rule 41(d), "costs" include attorney's fees, and other circuit courts have reached varying conclusions. *Compare Meredith v. Stovall,* No. 99–3350, 2000 U.S.App. LEXIS 14553 \*4, 2000 WL 807355 (10th Cir. June 23, 2000) (finding no abuse of discretion in district court's award of attorney's fees pursuant to Rule 41(d)), and *Evans v. Safeway Stores, Inc.,* 623 F.2d 121, 122 (8th Cir.1980) (affirming a Rule 41(d)

award of attorney's fees without substantive discussion), *with Esposito v. Piatrowski,* 223 F.3d 497, 501 (7th Cir.2000) (holding that a party may recover reasonable attorney's fees as part of its "costs" under Rule 41(d) only where the underlying statute defines costs to include attorney's fees), *and Rogers v. Wal–Mart Stores, Inc.,* 230 F.3d 868, 875 (6th Cir.2000) (vacating Rule 41(d) award of attorney's fees, because they are not expressly provided for by the rule).

Decisions in the lower court are likewise divergent, although some have noted that a majority allow for attorney's fees in an award of costs under Rule 41(d). *Compare Andrews v. Am.'s Living Ctrs., LLC,* No. 1:10cv257, 2011 WL 3359921, at \*2 (W.D.N.C. Aug.3, 2011) (concluding that "costs" as used in Rule 41(d) includes attorney's fees, but limiting award of fees to those associated with motion to dismiss), *and Katen v. Katen,* No. 5:97–CV–275–BR, 1998 U.S. Dist. LEXIS 11592 \*4, 1998 WL 721092 (E.D.N.C. Feb. 28, 1998) (concluding that "costs" as used in Rule 41(d) includes attorney's fees, but declining to award fees associated with work that would be useful in second action), *with Irons, LLC v. Brandes,* No. 06–0904, 2007 WL 495802, at \* 1 (D.D.C. Feb.15, 2007) (declining to award attorney's fees, because they are not explicitly provided for under Rule 41(d)), *and Lawson v. Toney,* 169 F.Supp.2d 456, 466 (M.D.N.C.2001) (same).

The plain language of Rule 41(d) provides only for an award of "costs," and "the law generally recognizes a difference between the terms 'costs' and 'attorney fees'...." *Rogers,* 230 F.3d at 874. Many of the Federal Rules expressly provide for an award of attorney's fees, *see, e.g.,* Fed.R.Civ.P. 16(f)(2), 26(g)(3), 30(g), 37(a)(5), 56(h), which indicates that the absence of such provision in Rule 41(d) is purposeful. *Id.* at 875. In *Marek v. Chesny,* 473 U.S. 1, 105 S.Ct. 3012, 87 L.Ed.2d 1 (1985), the court considered whether costs included attorney's fees for purposes of Rule 68, Offer of Judgment, which expressly provided for an award of "costs"

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 4483180 (E.D.N.C.)
**(Cite as: 2012 WL 4483180 (E.D.N.C.))**

but neither defined the term, nor was it discussed in the Rule's history. *Id.* at 7–8. The court first acknowledged the "American Rule," that each party bear its own attorney's fees and recognized certain exceptions, such as where Congress had provided for an award of attorney's fees by statute. *Id.* at 8. The court then reasoned that "given the importance of 'costs' to the Rule, it is very unlikely that this omission was mere oversight" and concluded that "the most reasonable inference is that the term "costs" in Rule 68 was intended to refer to all costs properly awardable under the relevant substantive statute or other authority." *Id.* at 9. This court finds that the reasoning of *Marek* naturally extends to Rule 41(d), where the award of costs is an important component of the Rule, and yet the term "costs" was left undefined in the Rule itself. *See Esposito,* 223 F.3d 500–01.

*\*10* While some courts have declined to extend *Marek* to Rule 41(d), based on, among other things, a subsequent amendment to Rule 54(d) that distinguished "costs other than attorney's fees" and "attorney's fees," *Cadle Co. v. Beury,* 242 F.R.D. 695, 697–98 (S.D.Ga.2007), this court is not persuaded by such reasoning where neither Rule 68, at issue in *Marek,* nor Rule 41(d) has been amended in the same manner as Rule 54(d) and there is no indication that the drafters intended a broader application of the amendment beyond Rule 54(d) itself. To award attorney's fees under Rule 41(d), only when a party would be entitled to recover them as costs in the cause of action underlying the first dismissed suit, serves the remedial purpose of the Rule without offense to the long standing principle that, absent Congressional intent, attorney's fees are not recoverable costs.

These defendants have not claimed that attorney's fees are recoverable under the North Carolina Uniform Fraudulent Transfer Act or that fees were awarded by the state court, and the court has found no provision for attorney's fees within the act itself. *See* N.C. Gen.Stat. §§ 39–23.1 to 39–23.12. Accordingly, because attorney's fees are not expressly

provided for under Rule 41(d) and are not provided for by the underlying statute that formed the basis of the state court action, these defendants are not entitled to recover their attorney's fees pursuant to Rule 41(d).

In sum, the court will award $53.40 in costs plus the actual costs expended and reimbursed to the non-testifying witnesses, not to exceed $1,265.00, as set forth in this order. Plaintiff is ordered to satisfy its obligation within **fourteen (14) days** of entry of this order. In the event the parties are unable to reach agreement with respect to the costs associated with the non-testifying witnesses, plaintiff may defer payment of the $53.40 until the court rules on the Bill of Costs. The court, in its discretion, declines to stay this proceeding pending payment of the awarded costs.

### 2. Rule 12(f) Motion to Strike

Anderson defendants contend that paragraphs 63, 66 through 76, 120 and 123 are "irrelevant, immaterial and inadmissible pursuant to Rules 402, 403, and 404" of the Federal Rules of Civil Procedure and should be stricken. (Mot. for Costs and to Strike at 3.) Rule 12(f) permits a district court, on motion of a party or on its own initiative, to strike from a pleading "redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). " Rule 12(f) motions are generally viewed with disfavor because striking a portion of a pleading is a drastic remedy and because it is often sought by the movant simply as a dilatory tactic." *Waste Mgmt. Holdings, Inc. v. Gilmore,* 252 F.3d 316, 347 (4th Cir.2001) (citations omitted). Therefore, motions to strike are rather strictly considered and a showing of prejudice is often required to obtain relief. *See Godfredson v. JBC Legal Group, P.C.,* 387 F.Supp.2d 543, 547–48 (E.D.N.C.2005). The court is required to "view the pleading under attack in a light most favorable to the pleader." *Racick v. Dominion Law Assocs.,* 270 F.R.D. 228, 232 (E.D.N.C.2010).

*\*11* The allegations at issue concern Andersons' alleged failure to report certain transactions

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 4483180 (E.D.N.C.)
**(Cite as: 2012 WL 4483180 (E.D.N.C.))**

on their tax returns and financial records, (Compl.¶¶ 63, 120, 123), and the alleged circumstances surrounding state court contempt proceedings against Andersons in the prior fraudulent conveyance action. (*Id.* 66–76). It is not clear to the court that the subject matter of these allegations is irrelevant to the claims in this case. These defendants will have the opportunity to challenge the admissibility of evidence related to these allegations in due course, which alleviates the alleged danger of prejudice. *See Milliken & Co. v. CNA Holdings, Inc.,* No. 3:08–CV–578, 2011 WL 3444013, at *15 (W.D.N.C. Aug.8, 2011). Accordingly, these defendants have failed to carry the heavy burden of Rule 12(f), and the motion to strike is denied.

**C. Motion for Extension of Time for Service and to Conduct Discovery**

Plaintiff seeks a 120–day extension of time to serve defendant Paris Faschette ("Faschette") and to conduct non-party discovery to ascertain his whereabouts for the purpose of effecting service. No response to the motion has been filed. Plaintiff contends that despite its diligence in attempting to locate Faschette, it has been unable to identify any such person and, thus, proposes to depose two alleged associates of Faschette in order to obtain information to aide in effecting service.

Rule 4(m) allows the court to extend the time for service, Fed.R.Civ.P. 4(m), and Rule 26(d) provides that a party may seek discovery prior to the Rule 26(f) conference when authorized by court order, Fed.R.Civ.P. 26(d)(1). The court finds good cause to grant both requests. Plaintiff shall have sixty (60) days from entry of this order to conduct limited third-party discovery with respect to Faschette and one hundred twenty (120) days from entry of this order to effect service on Faschette. Failure to achieve service within this time period will result in the dismissal of defendant Faschette.

**CONCLUSION**

The Desibia defendants' motion to dismiss (DE # 48) is **GRANTED IN PART** as to the RICO claims and **DENIED IN PART** as to lack of personal jurisdiction. Other defendants' first motion for costs and to strike (DE # 50) is **DENIED AS MOOT** and the second motion for costs and to strike (DE # 55) is **GRANTED IN PART AND DENIED IN PART** as to the request for costs, as set forth in this order, and **DENIED** as to the request to strike certain allegations from the complaint. Plaintiff's motion for extension of time for service and to conduct discovery (DE # 60) is **GRANTED.**

SO ORDERED.

E.D.N.C.,2012.
TM, LLC v. Anderson
Slip Copy, 2012 WL 4483180 (E.D.N.C.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.