UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff-Intervenor,<br><br>  v.<br><br>ALLQUEST HOME MORTGAGE<br>CORPORATION, f/k/a ALLIED HOME<br>MORTGAGE CORPORATION, AMERICUS<br>MORTGAGE CORPORATION, f/k/a ALLIED<br>HOME MORTGAGE CAPITAL<br>CORPORTATION, JIM C. HODGE, and<br>JEANNE L. STELL<br>     Defendants. | 12 Civ. 02676 (GCH)<br><br>**ECF** |

**Memorandum of Law in Opposition to Defendants'
Motions to Dismiss the Second Amended Complaint**

     KENNETH MAGIDSON
     United States Attorney for the
     Southern District of Texas
     *Attorney for the United States of America*
     86 Chambers Street – 3d Floor
     New York, NY  10007
     Telephone:  212. 637.2678
     Facsimile:  212. 637.2686
     E-mail:  jeannette.vargas@usdoj.gov

JEANNETTE A. VARGAS
JAMES NICHOLAS BOEVING
Special Assistant United States Attorneys

  – Of Counsel –

# TABLE OF CONTENTS

**Page**

NATURE AND STAGE OF THE PROCEEDING ............................................................ 1

STATEMENT OF THE ISSUES ...................................................................... 1

SUMMARY OF THE ARGUMENT ..................................................................... 2

BACKGROUND ................................................................................... 4

    A.    The FHA Insurance Program ...................................................... 4

    B.    Allegations in the Complaint...................................................... 6

        1.    Falsified HUD ID Numbers in Loan Application Packages ............. 7

        2.    False Statements in Branch Certification Forms............................... 8

        3.    Annual Certifications for 2006 and 2007 ....................................... 10

        4.    Falsified Quality Control Reports ................................................. 12

ARGUMENT..................................................................................... 12

STANDARD OF REVIEW........................................................................... 14

POINT I.    THE GOVERNMENT HAS ALLEGED FACTS SUFFICIENT TO SUPPORT ITS CLAIMS UNDER THE FCA ............................................. 13

    A.    The Complaint Sufficiently Alleges False Statements or A Fraudulent Course of Conduct.................................................... 14

    B.    The Complaint Sufficiently Alleges Scienter............................................. 18

        1.    The "Government Knowledge" Defense Does Not Apply ............. 20

        2.    *Allison Engine* Did Not Alter the FCA's Scienter Requirements................................................... 25

    C.    The Complaint Sufficiently Alleges Materiality ......................................... 27

i

D.      The Complaint Sufficiently Alleges Payment of Claims ............................ 31

POINT II.      THE GOVERNMENT'S FCA CLAIMS ARE NOT BARRED BY THE
STATUTE OF LIMITATIONS .................................................................. 36

POINT III.      THE COMPLAINT ALLEGES SUFFICIENT FACTS TO
DEMONSTRATE HODGE'S PERSONAL LIABILITY FOR FCA
VIOLATIONS ............................................................................................ 40

POINT IV.      THE COMPLAINT STATES A CLAIM UNDER FIRREA ..................... 42

A.      The Complaint Sufficiently Pleads that Defendants Made False
Statements to HUD/FHA in Violation of Sections 1006 and 1014 of
FIRREA ........................................................................................................ 45

B.      The Complaint Properly Pleads That Defendants Acted with the Requisite
Scienter in Making False Statements of HUD/FHA ................................... 49

C.      Defendants Fall within the Scope of Parties Covered by Section 1006 ...... 53

1.      Section 1006 Applies to Parties "Connected With" HUD/FHA ...... 53

2.      Section 1006 Applies to Corporations .............................................. 56

3.      Allied Capital and Allied Corporation are Liable for Their
Employees' Violations of Section 1006 Under Respondeat
Superior .............................................................................................. 56

POINT V.      THE COMPLAINT MEETS THE PARTICULARIZED PLEADING
STANDARD OF RULE 9(B) ..................................................................... 59

POINT VI.      ALLIED CORPORATION IS LIABLE FOR THE ACTIONS OF ALLIED
CAPITAL ................................................................................................... 68

A.      Federal Common Law Controls Whether Allied Corporation is the Legal
Successor to Allied Capital ........................................................................ 68

B.      Allied Corporation Is Liable for the Fraudulent Conduct of Allied
Capital ......................................................................................................... 70

C.      The Government Is Not Collaterally Estopped From Arguing Successor
Liability ....................................................................................................... 70

1. Governing Law .................................................................................. 72

2. The Preliminary Injunction Action ................................................... 74

3. Collateral Estoppel Does Not Apply ................................................ 75

POINT VII. IF THE COURT DETERMINES THE COMPLAINT IS
INADEQUATE, THE GOVERNMENT REQUESTS LEAVE TO
AMEND ................................................................................................ 79

CONCLUSION ............................................................................................. 80

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

*Algonquin Power Income Fund v. Christine Falls of New York, Inc.*,
    362 F. App'x 151 (2d. Cir. 2010) ...................................................................... 78

*Allied Home Mortg. Corp. v. Donovan*,
    830 F. Supp. 2d 223 (S.D. Tex. 2011) ........................................................ 74, 77

*Allied Home Mortg. Corp. v. Donovan*,
    No. 11 Civ. 3864, 2012 WL 3276978 (S.D. Tex. Aug. 8, 2012)................ 75, 76

*In re Allied Pilots Class Action Litigation*,
    No. CIV.A.3:99-CV-0480P, 2000 WL 1405235
    (N.D.Tex. Sept. 26, 2000)........................................................................... 76

*Allison Engine Co. v. United States*,
    553 U.S. 662 (2008)................................................................................. 25, 26

*In re Argo Finance, Inc.*,
    337 F.3d 516 (5th Cir. 2003) ...................................................................... 78

*Baros v. Texas Mexican Railway Co.*,
    400 F.3d 228 (5th Cir. 2005) ................................................................. 76, 78

*Beaudine v. United States*,
    368 F.2d 417 (5th Cir. 1966) ...................................................................... 54

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)..................................................................................... 13

*In re Cambridge Biotech Corp.*,
    186 F.3d 1356 (Fed. Cir. 1999) .................................................................. 70

*In re Cardiac Devices Qui Tam Litigation*,
    221 F.R.D. 318 (D. Conn. 2004) ................................................................ 63

*Carolene Products Co. v. United States*,
    140 F.2d 61 (4th Cir. 1944), *aff'd*, 323 U.S. 18 (1944) ................................... 45

*Cates v. Creamer*,
 7:00-CV-0121-0, 2008 WL 2620097 (N.D. Tex. June 27, 2008) ................... 31

*Central Fla. Sheet Metal Contractors Association, Inc. v. N.L.R.B.*,
 664 F.2d 489 (5th Cir. 1981) ......................................................... 75

*Chicago Truck Drivers, Helpers, and Warehouse Workers Union
 (Independent) Pension Fund v. Tasemkin, Inc.*,
 59 F.3d 48 (7th Cir. 1995) ............................................... 69, 70, 72

*Continental Baking Co. v. United States*,
 281 F.2d 137 (6th Cir. 1960) .......................................................... 59

*Copeland v. Merrill Lynch & Co.*,
 47 F.3d 1415 (5th Cir. 1995) .......................................................... 73

*Duffy & McGovern Accommodation Services v. QCI Marine Offshore, Inc.*,
 448 F.3d 825 (5th Cir. 2006) .......................................................... 73

*EEOC v. G-K-G, Inc.*,
 39 F.3d 740 (7th Cir. 1994) ...................................................... 69, 70

*FDIC v. Belli*,
 981 F.2d 838 (5th Cir. 1993) .......................................................... 38

*Fuller v. Board of Immigration Appeals*,
 -F.3d -, 2012 WL 4875696 (2d Cir. 2012) ........................................ 78

*Geschrey v. Generations Healthcare, LLC*,
 No. 10 C 2413, 2012 WL 3581060 (N.D. Ill. 2012) ......................... 70

*Gordon v. Colin*,
 267 F. App'x 843 (11th Cir. 2008) .................................................. 78

*Grand Union Co. v. United States*,
 696 F.2d 888 (11th Cir. 1983) ........................................................ 57

*Harrison v. Westinghouse Savannah River Co.*,
 176 F.3d 776 (4th Cir. 1999) ............................................. 17, 18, 34

*Hart v. Bayer Corp.*,
 199 F.3d 239 (5th Cir. 2000) .......................................................... 80

*Henderson v. Thaler*,
    626 F.3d 773 (5th Cir. 2010) ........................................................ 78

*Isik Jewelry v. Maritimes Media, Inc.*,
    418 F. Supp. 2d 112 (E.D.N.Y. 2005) ........................................... 58

*Jones v. Cain*,
    600 F.3d 527 (5th Cir. 2010) ................................................... 30, 49

*Jones v. Robinson Property Group, L.P.*,
    427 F.3d 987 (5th Cir. 2005) ....................................................... 79

*Kuzinich v. Santa Clara County*,
    689 F.2d 1345 (9th Cir. 1982) ...................................................... 75

*Laro, Inc. v. Chase Manhattan Bank*,
    866 F. Supp. 132 (S.D.N.Y. 1994) ................................................ 58

*Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*,
    594 F.3d 383 (5th Cir. 2010) ....................................................... 13

*Marbury Management, Inc. v. Kohn*,
    629 F.2d 705 (2d Cir. 1980) ........................................................ 58

*Mitchell v. Joseph*,
    117 F.2d 253 (7th Cir. 1941) ....................................................... 78

*N. Arapahoe Tribe v. Hodel*,
    808 F.2d 741 (10th Cir. 1987) ...................................................... 77

*Pace v. Bogalusa City Sch. Board*,
    403 F.3d 272 (5th Cir. 2005) ....................................................... 77

*Pacific Mutual Life Insurance Co. v. Haslip*,
    499 U.S. 1 (1991)........................................................................ 57

*Peterson v. Weinberger*,
    508 F.2d 45 (5th Cir. 1975) ......................................................... 42

*R.C.M. Executive Gallery Corp. v. Rols Capital Co.*,
    901 F. Supp. 630 (S.D.N.Y. 1995) ................................................ 69

*RecoverEdge L.P. v. Pentecost,*
44 F.3d 1284 (5th Cir. 1995) ......................................................... 73

*Riddle v. Dyncorp International, Inc.,*
666 F.3d 940 (5th Cir. 2012) ......................................................... 38

*Shevack v. Litton Applied Tech.,*
No. 95 Civ. 7740 (JSM), 1998 WL 512959 (S.D.N.Y. Aug 18, 1998) ........... 69

*State of New York v. National Serv. Industrial, Inc.,*
352 F.3d 682 (2d Cir. 2003) ......................................................... 69

*State of Tex. v. Wellington Resources Corp.,*
706 F.2d 533 (5th Cir. 1983) ......................................................... 76

*Steinbach v. Hubbard,*
51 F.3d 843 (9th Cir. 1995) ......................................................... 68

*Stromberg Metal Works, Inc. v. Press Mechanical, Inc.,*
77 F.3d 928 (7th Cir. 1996) ......................................................... 70

*Sunbeam Products, Inc. v. West Bend Co.,*
123 F.3d 246 (5th Cir. 1997) ......................................................... 77

*Tuchman v. DSC Communications Corp.,*
14 F.3d 1061 (5th Cir. 1994) ................................................... 18, 19

*United States ex rel. Anti-Discrimination Ctr. of Metropolitan New York v.
Westchester County,*
668 F. Supp. 2d 548 (S.D.N.Y. 2009) ............................................. 28

*United States ex rel. Becker v. Westinghouse Savannah River Co.,*
305 F.3d 284 (4th Cir. 2002) .............................................. 20, 21, 52

*United States ex rel. Bennett v. Boston Scientific Corp.,*
Civil Action No. H-07-2467, 2011 WL 1231577
(S.D. Tex. Mar. 31, 2011) .................................................... 26, 27

*United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.,*
393 F.3d 1321 (D.C. Cir. 2005) ..................................................... 34

*United States ex rel. Bibby v. Wells Fargo Bank, N.A.,*
-, F. Supp. 2d -, 2012 WL 5866137 (N.D. Ga. Nov. 19, 2012) ..................... 32

*United States ex rel. Bledsoe v. Community Health System, Inc.*,
    501 F.3d 493 (6th Cir. 2007) ........................................................................ 64

*United States ex rel Bryant v. Williams Building Corp.*,
    158 F. Supp. 2d 1001 (D.S.Da. 2001) ........................................................... 58

*United States ex rel. Burlbaw v. Orenduff*,
    548 F.3d 931 (10th Cir. 2009) ................................................................ 24, 53

*United States ex rel. Davis v. District of Columbia*,
    591 F. Supp. 2d 30 (D.D.C. 2008) ................................................................. 67

*United States ex rel. Dekort v. Integrated Coast Guard System*,
    705 F. Supp. 2d 519 (N.D. Tex. 2010) .......................................................... 24

*United States ex rel. Doe v. Dow Chemical Co.*,
    343 F.3d 325 (5th Cir. 2003) ......................................................................... 64

*United States ex rel. Durcholz v. FKW Inc.*,
    189 F.3d 542 (7th Cir. 1999) ........................................................... 21, 23, 52

*United States ex rel. Duxbury v. Ortho Biotech Products, L.P.*,
    579 F.3d 13 (1st Cir. 2009) ........................................................................... 67

*United States ex rel. Fago v. M & T Mortg. Corp.*,
    518 F. Supp. 2d 108 (D.D.C. 2007) ............................................................... 29

*United States ex rel. Fisher v. Network Software Associates, Inc.*,
    180 F. Supp. 2d 192 (D.D.C. 2002) .................................................... 68, 70, 72

*United States ex rel. Folliard v. CDW Technology Serv., Inc.*,
    722 F. Supp. 2d 20 (D.D.C. 2010) ........................................................... 65, 67

*United States ex rel. Franklin v. Parke-Davis, Division of Warner-Lambert*
    *Co.*, 147 F. Supp. 2d 39 (D. Mass. 2001) ...................................................... 63

*U.S. ex rel. Geschrey v. Generations Healthcare, LLC*,
    No. 10 C 2413, 2012 WL 3581060 (N.D. Ill. 2012) ....................................... 69

*United States ex rel. Grubbs v. Kanneganti*,
    565 F.3d 180 (5th Cir. 2009) ................................................................. passim

*United States ex rel. Hendow v. University of Phoenix*,
   461 F.3d 1166 (9th Cir. 2006) ........................................................ 17, 18, 34, 35

*United States ex rel. Jajdelski v. Kaplan, Inc.*,
   834 F. Supp. 2d 1182 (D. Nev. 2011) .............................................................. 70

*United States ex rel. King v. Solvay S.A.*,
   823 F. Supp. 2d 472 (S.D. Tex. 2011) ............................................................. 80

*United States ex rel. Kirk v. Schindler Elevator Corp.*,
   601 F.3d 94 (2d Cir. 2010) ............................................................................... 34

*United States ex rel. Kreindler & Kreindler v. United Technologies Corp.*,
   985 F.2d 1148 (2d Cir. 1993) ..................................................................... 24, 53

*United States ex rel. Lemmon v. Envirocare of Utah, Inc.*,
   614 F.3d 1163 (10th Cir. 2010) ....................................................................... 28

*United States ex rel. Longhi v. Lithium Power  Technology, Inc.*,
   513 F. Supp. 2d 866 (S.D. Tex. 2007) ....................................................... 21, 52

*United States ex rel. Longhi v. Lithium Power Technologies, Inc.*,
   575 F.3d 458 (5th Cir. 2009) .................................................................... passim

*United States ex rel. Loughren v. Unum Group*,
   613 F.3d 300 (1st Cir. 2010) ...................................................................... 26, 27

*United States ex rel. Main v. Oakland City University*,
   426 F.3d 914 (7th Cir. 2005) ........................................................................... 35

*United States ex rel. Mikes v. Straus*,
   274 F.3d 687 (2d Cir. 2001) ............................................................................ 16

*United States ex rel. Miller v. Bill Harbert International Construction, Inc.*,
   No. 95-1231, 2007 WL 915237 (D.D.C. Mar. 27, 2007) ................................ 34

*United States ex rel. Pilecki-Simko v. The Chubb Institute*,
   06 Civ. 3562, 2010 WL 1076228 (D.N.J. Mar. 22, 2010) ............................... 70

*United States ex rel. Pogue v. America Healthcorp., Inc.*,
   977 F. Supp. 1329 (M.D. Tenn. 1997) ............................................................ 65

*United States ex rel. Riley v. St. Luke's Episcopal Hospital,*
    355 F.3d 370 (5th Cir. 2004) ................................................................ 41

*United States ex rel. Shackelford v. America Management, Inc.,*
    484 F. Supp. 2d 669 (E.D. Mich. 2007) ................................................ 58

*United States ex rel Sikkenga v. Regence Bluecross Blueshield of Utah,*
    472 F.3d 702 (10th Cir. 2006) .............................................................. 41

*United States ex rel. Steury v. Cardinal Health, Inc.,*
    625 F.3d 262 (5th Cir. 2010) ........................................................ passim

*United States ex rel. Taylor-Vick v. Smith,*
    513 F.3d 228 (5th Cir. 2008) ................................................................ 21

*United States ex rel. Tyson v. Amerigroup Illinois, Inc.,*
    488 F. Supp. 2d 719 (N.D. Ill. 2007) .................................................... 23

*United States ex rel. Wall v. Circle C Contr., LLC,*
    697 F.3d 345 (6th Cir. 2012) ................................................................ 26

*United States ex rel. Westrick v. Second Chance Body Armor, Inc.,*
    685 F. Supp. 2d 129 (D.D.C. 2010) ...................................................... 65

*United States ex rel. Willard v. Humana Health Plan of Texas Inc.,*
    336 F.3d 375 (5th Cir. 2003) .......................................................... 18, 19

*United States ex rel. Wilson v. Kellogg Brown & Root, Inc.,*
    525 F.3d 370 (4th Cir. 2008) ................................................................ 34

*United States v. A&P Trucking Co.,*
    358 U.S. 121 (1958) ............................................................................. 56

*United States v. Anchor Mortg. Corp.,*
    No. 06 C 210, 2010 WL 3184210 (N.D. Ill. Aug. 11, 2010) .................... 29, 32

*United States v. Anghaie,*
    1:09-CR-37-SPM/AK, 2011 WL 720044 (N.D. Fla. Feb. 21, 2011) .............. 38

*United States v. Automated Medical Laboratories, Inc.,*
    770 F.2d 399 (4th Cir. 1995) ................................................................ 57

*United States Bancorp Mortg. Co. v. Bonner Mall Partnership*,
 513 U.S. 18 (1994) ................................................................ 77, 79

*United States v. BNP Paribas SA*,
 -, F. Supp. 2d -, 2012 WL 3234233 (S.D. Tex. Aug. 6, 2012) ........... 37, 39, 40

*United States v. Bolstad*,
 998 F.2d 597 (8th Cir. 1993) .................................................... 55

*United States v. Bourseau*,
 531 F.3d 1159 (9th Cir. 2008) ................................................ 27, 28

*United States v. Brophy*,
 22 F.3d 1093 (5th Cir. 1994) .................................................... 50

*United States v. Caremark, Inc.*,
 634 F.3d 808 (5th Cir. 2011) .................................................... 36

*United States v. Chandler*,
 66 F.3d 1460 (8th Cir. 1995) .................................................... 55

*United States v. Cincotta*,
 689 F.2d 238 (1st Cir. 1982) .................................................... 57

*United States v. Cleary*,
 565 F.2d 43 (2d Cir. 1977) ...................................................... 44

*United States v. Davis*,
 953 F.2d 1482 (10th Cir. 1992) ................................................ 44

*United States v. Dillman*,
 15 F.3d 384 (5th Cir. 1994) ..................................................... 50

*United States v. Dolphin Mortg. Corp.*,
 No. 06-CV-499, 2009 WL 153190 ......................................... 29, 33

*United States v. Eghbal*,
 548 F.3d 1281 (9th Cir. 2008) ............................................. 32, 33, 34

*United States v. First National Bank of Cicero*,
 957 F.2d 1362 (7th Cir. 1992) .................................................. 32

xi

*United States v. General Battery Corp.*,
   423 F.3d 294 (3d Cir. 2005) ........................................................................ 69

*United States v. Hangar One, Inc.*,
   563 F.2d 1155 (5th Cir. 1977) .................................................................... 57

*United States v. Harris*,
   729 F.2d 441 (7th Cir. 1984) ...................................................................... 55

*United States v. Harvard*,
   103 F.3d 412 (5th Cir. 1997) ...................................................................... 43

*United States v Hopkins*,
   916 F.2d 207 (5th Cir. 1990) ................................................................ 43, 44

*United States v. Huron Consulting Group, Inc.*
   No. 09 Civ. 1800, 2011 WL 253259 (S.D.N.Y. Jan. 24, 2011)................. 60, 65

*United States v. Johnson*,
   585 F.2d 119 (5th Cir. 1978) ............................................................ 43, 44, 52

*United States v. Jones*,
   372 F.3d 910 (7th Cir. 2004) ................................................................ 54, 56

*United States v. Kimbell Foods, Inc.*,
   440 U.S. 715 (1979).................................................................................... 68

*United States v. Kolsky*,
   137 F. Supp. 359 (E.D. Pa. 1955) .............................................................. 39

*United States v. Luce*,
   No. 11 C 5158, 2012 WL 2359357 (N.D. Ill. June 20, 2012) ...................... 66

*United States v. Mackby*,
   261 F.3d 821 (9th Cir. 2001) ...................................................................... 41

*United States v. Macomb Contracting Corp.*,
   763 F. Supp. 272 (M.D. Tenn. 1990)........................................................ 37

*United States v. McDow*,
   27 F.3d 132 (5th.Cir. 1994) ........................................................................ 44

*United States v. Meeks*,
   69 F.3d 742 (5th Cir. 1995) ............................................................. 54

*United States v. Miller*,
   645 F.2d 473 (5th Cir. 1981) ...................................................... 32, 34

*United States v. Munsingwear, Inc.*,
   340 U.S. 36 (1950).......................................................................... 78

*United States v. Neifert-White Co.*,
   390 U.S. 228 (1968)......................................................................... 13

*United States v. O'Connell*,
   890 F.2d 563 (1st Cir. 1989)............................................................ 57

*United States v. Parks*,
   68 F.3d 860 (5th Cir. 1995) ............................................................. 43

*United States v. Payne*,
   750 F.2d 844 (11th Cir. 1985) ......................................................... 55

*United States v. Pfluger*,
   685 F.3d 481 (5th Cir. 2012) ........................................................... 40

*United States v. Pierre Bouchet, Inc.*,
   No. 85 Civ. 8530 (PKL), 1987 WL 11565 (S.D.N.Y. May 21, 1987) ............ 58

*United States v. Potter*,
   463 F.3d 9 (1st Cir. 2006)................................................................ 57

*United States v. Prater*,
   805 F.2d 1441 (11th Cir. 1986) ....................................................... 55

*United States v. President and Fellows of Harvard College*,
   323 F. Supp. 2d 151 (D. Mass. 2004) .............................................. 42

*United States v. Prosperi*,
   573 F. Supp. 2d 436 (D. Mass. 2008) .............................................. 39

*United States v. Puente*,
   982 F.2d 156 (5th Cir. 1993) ........................................................... 28

*United States v. Rice*,
    645 F.2d 691 (9th Cir. 1981) ............................................................... 54, 55, 56

*United States v. Rogan*,
    517 F.3d 449 (7th Cir. 2008) ............................................................... 27

*United States v. Sandlin*,
    589 F.3d 749 (5th Cir. 2009) ............................................................... 43, 44

*United States v. Scott*,
    701 F.2d 1340 (11th Cir. 1983) ........................................................... 49

*United States v. Slaey*,
    Civ. No. 06-4930, 2007 WL 2142361 (E.D. Pa. July 24, 2007) .................... 38

*United States v. Southland Management Corp.*,
    288 F.3d 665 (5th Cir. 2002) ............................................................... passim

*United States v. Southland Management Corp.*,
    326 F.3d 669 (5th Cir. 2003) ............................................................... 20

*United States v. Technology Refrigeration*,
    143 F. Supp. 2d 1006 (N.D. Ill. 2001) .................................................. 37

*United States. v. Van Oosterhout*,
    96 F.3d 1491 (D.C. Cir. 1996) ............................................................ 32

*United States v. Van Oosterhout*,
    898 F. Supp. 25 (D.D.C. 1995) ........................................................... 49

*United States v. Wells*,
    519 U.S. 482 (1997) ........................................................................... 43

*Vine Street, LLC v. Keeling ex rel. Estate of Keeling*,
    460 F. Supp. 2d 728 (E.D.Tex. 2006) .................................................. 69

*Whelco Indust., Ltd. v. United States*,
    503 F. Supp. 2d 906 (N.D. Ohio 2007) ................................................ 69

*Winters v. Diamond Shamrock Chemical Co.*,
    149 F.3d 387 (5th Cir. 1998) ............................................................... 73

*Wynne v. Rochelle*,
  385 F.2d 789 (5th Cir. 1967) ........................................................................ 78

## **Statutes**

1 U.S.C. § 1 ........................................................................................................ 56

12 U.S.C. § 1708 .............................................................................................. 48

12 U.S.C. § 1833a............................................................................. 1, 42, 61

18 U.S.C. § 1005 .............................................................................................. 43

18 U.S.C. § 1006 ...................................................................................... passim

18 U.S.C. § 2 .................................................................................................... 44

18 U.S.C. § 656 ................................................................................................ 54

18 U.S.C. § 1014 ...................................................................................... passim

18 U.S.C. § 3287 ........................................................................................ 37, 39

31 U.S.C. § 3729(a)(1)(A) (2009) ................................................................ 41

31 U.S.C. § 3729(a)(1)(B) (2009) ................................................................ 13

31 U.S.C. § 3729(a)(2) (2006) ................................................................ 13, 41

31 U.S.C. § 3729(b) (2008) ............................................................................ 18

31 U.S.C. § 3729(b)(1)(B) (2009) ................................................................ 25

31 U.S.C. § 3729(b)(3) (2006) ...................................................................... 25

31 U.S.C. § 3729(b)(4) (2009) ...................................................................... 27

31 U.S.C. §§ 3729 *et seq* .............................................................................. 1

31 U.S.C. § 3731(b).......................................................................................... 37

42 U.S.C. § 3534(a) .......................................................................................... 48

National Housing Act,
  48 Stat. 1246 (1934) ......................................................................... 48

50 U.S.C. § 1544(b) ................................................................................ 39

## Rules & Regulations

24 C.F.R. § 25.6 ..................................................................................... 48

24 C.F.R. §§ 202.1-12 ............................................................................ 48

Fed. R. Civ. P. 9(b) .......................................................................... 49, 59

Fed. R. Civ. P. 15(c) .............................................................................. 36

## Miscellaneous

Restatement (Second) of Judgments § 28(1) ......................................... 73

The Authorized Use of Military Force, Pub. L. 107-40, 115 Stat. 224,
  Senate Joint Resolution 23, Section 2(a) (Sept. 18, 2001) ............... 39

Pub. L. 111-21, § 4(f)(1), 123 Stat. 1617, 1625 (2009) ......................... 13

The Authorized Use of Military Force Against Iraq Resolution of 2002,
  Pub. L. 107-243, 116 Stat. 1498 ....................................................... 39

S. Rep. No. 99-345 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5274 ....... 32, 37

## NATURE AND STAGE OF THE PROCEEDING

This is a civil fraud action brought by the United States of America

("Government" or "Plaintiff") under the False Claims Act ("FCA"), as amended, 31

U.S.C. §§ 3729 *et seq,* and the Financial Institutions Reform, Recovery, and Enforcement

Act of 1989 ("FIRREA"), 12 U.S.C. § 1833a, arising from fraud perpetrated on the

United States Department of Housing and Urban Development ("HUD" or "HUD/FHA")

in connection with Americus Mortgage Corporation's, formerly known as Allied Home

Mortgage Capital Corporation ("Allied Capital"), residential mortgage lending business.

Defendants Allied Capital, Allquest Home Mortgage Corporation, formerly known as

Allied Home Mortgage Corporation ("Allied Corporation," and collectively with Allied

Capital, "Allied"), Allied's owner, President, CEO and sole Director, Jim C. Hodge

("Hodge"), and Allied's Executive Vice President and Director of Compliance Jeanne

Stell ("Stell") have each separately moved to dismiss the Second Amended Complaint

(the "Complaint" or "Compl.") pursuant to Rules 9 and 12(b)(6) of the Federal Rules of

Civil Procedure.

## STATEMENT OF THE ISSUES

Defendants' motions to dismiss the Complaint should be denied because (1) the

Complaint states a claim under the FCA where it alleges that Defendants Allied Capital,

Allied Corporation and Hodge knowingly made false statements of fact in loan

applications submitted to HUD to obtain Federal Housing Administration ("FHA")

insurance for the loans; (2) the Complaint states a claim against Allied Capital and Hodge

for civil penalties under FIRREA for having violated of 18 U.S.C. §§ 1006 and 1014,

where it is alleged that Allied Capital and Hodge knowingly caused false statements to be submitted to the FHA; (3) the Complaint states a claim under FIRREA against the Defendants because they are "connected in any capacity" with HUD within the meaning of 18 U.S.C. § 1006; (4) Allied Capital and Allied Corporation are vicariously liable for the fraudulent conduct of their employees, including their violations of FIRREA; (5) the allegations of the Complaint satisfy Rule 9(b)'s requirement of pleading fraud with particularity; (6) the United States is not collaterally estopped from asserting that Allied Corporation is liable as the successor entity to Allied Capital by virtue of a ruling entered at the preliminary injunction stage of a separate proceeding that was later vacated as moot; and (7) Allied Corporation may be held liable under federal common law as the successor entity to Allied Capital.

## SUMMARY OF THE ARGUMENT

Allied Capital profited for years as one of the nation's largest FHA lenders by flouting the requirements of the FHA mortgage insurance program and engaging in reckless mortgage lending.  Allied Capital was nonetheless able to maintain its status in the FHA program by repeatedly and systematically lying to HUD about its operations so that its improper activities would not be detected.  The Complaint alleges that, in the past decade, Allied Capital, at the instigation and direction of Hodge, engaged in a fraudulent scheme to induce HUD to insure thousands of loans by falsely representing to HUD that the loans originated from legitimate, HUD-approved branch offices, when in actuality the loans originated from Allied Capital's network of unauthorized "shadow" branch offices. Allied Capital repeatedly lied to conceal its anemic quality control program from HUD.

Allied Capital, through certifications executed by Stell, lied to HUD about its accumulating sanctions from state authorities and the felony convictions of its employees in order to conceal from HUD its flagrant violations of governing HUD regulations. Allied Capital, and later its successor Allied Corporation, both knowingly submitted false statements of fact to HUD concerning Allied's branch operations. These pervasive and persistent lies and misrepresentations are the subject of the instant action.

Defendants primarily argue that the FCA claims should be dismissed because the Government has not established that Defendants falsely certified compliance with federal rules and regulations that constitute conditions of payment under the FHA program. The two FCA counts of the Complaint rest, however, not on any certifications of compliance with HUD rules or regulations, but on objectively false statements of fact contained in loan packages submitted to HUD. It is well-established that knowingly false and material statements in loan applications submitted to a government agency for the purpose of obtaining insurance or a loan guaranty give rise to liability under the FCA for the claims subsequently paid out on defaulted loans. *See infra* Pt.I.D. Accordingly, Defendants cannot escape their liability under the FCA for these knowingly made false statements that caused the Government to insure hundreds of millions of now-defaulted mortgage loans (and others that will default) it otherwise would not have insured.

The Government's FIRREA claims are also well plead. The Complaint alleges that Defendants knowingly and intentionally lied to, misled, and submitted false statements to HUD/FHA in order to induce HUD to, *inter alia*, (1) insure loans under the FHA insurance program, (2) grant approvals for participation in the FHA program, (3)

forbear from taking administrative action against Allied Capital, and (4) otherwise influence HUD during the life of the fraudulent scheme.  These false statements or reports give rise to liability for civil penalties under FIRREA for violations of 18 U.S.C. §§ 1006 and 1014.  *See infra* Pt.IV.A.

Moreover, Allied Corporation's attempt to shed liability for the actions of Allied Capital should not be countenanced.  The Complaint sufficiently pleads that Allied Corporation is nothing more than the continuation of Allied Capital, maintaining the same owners, the same management, the same business, the same offices, and the same staff.  Indeed, the Complaint alleges that the only change that occurred when Allied Capital was absorbed by Allied Corporation was to the signage.  As the successor to Allied Capital, Allied Corporation is liable for Allied Capital's violations of the FCA and FIRREA. *See infra* Pt.VI.B.

Accordingly, the motions to dismiss the Complaint for failure to state a claim should be denied.

## BACKGROUND

### A.  The FHA Insurance Program

Pursuant to the National Housing Act of 1934, HUD, through the FHA, offers various mortgage insurance programs.  Compl. ¶ 26.  Through these programs, FHA insures approved lenders against losses on mortgage loans made to buyers of single-family housing.  *Id.*

A fundamental rule of the HUD insurance program is that a lender must be approved by HUD to originate, purchase, hold, or sell HUD/FHA-insured mortgages.  *Id.*

¶ 28.  For a loan correspondent, such as Allied Capital, HUD requires not only that the lender be approved generally, but also that the lender obtain HUD approval for each branch office from which the lender intends to originate HUD-insured loans.  *Id.* To obtain HUD approval to originate FHA loans from a specific branch office, the loan correspondent must submit HUD Form 92001-B (the "Branch Certifications") to HUD containing basic information about the branch, a general certification that the branch "meets all HUD/FHA requirements," and a specific certification that the lender "will pay all operating costs of the branch office . . . ."  *Id.* ¶ 29.  Although lenders are permitted to pay branch managers the commission resulting from branch revenue minus branch expenses, they must remain the financially responsible party and be the ultimate guarantor on branch contractual obligations.  *Id.* ¶ 30.  If a lender is permitted to operate "no cost" branches by paying its branch managers purely on commission and assuming no ultimate financial responsibility for the branch, it will have an incentive to add far more branches than it can effectively supervise and control.  *Id.*

After submitting the Branch Certification, the loan correspondent receives a HUD ID that permits the branch to originate FHA loans.  *Id.* ¶ 31.  HUD requires lenders to enter the specific HUD ID for the originating branch in every loan file submitted to HUD. *Id.* ¶ 31.  To obtain HUD's endorsement for FHA insurance for a particular loan, the loan correspondent must submit the loan file to HUD, along with a loan-specific certification — HUD Form 92900-A — in which a lender certifies that the information contained in the application is "true to the best of the lender's knowledge and belief."  *Id.* ¶ 36.  The HUD Handbook provides that, if, at the time the loan "is submitted [to HUD] for

endorsement, HUD has evidence that there is fraud or misrepresentation on the part of the originating mortgagee, HUD will consider the certifications as fraudulent and will not endorse the mortgage for insurance." *Id.*

The continued availability of FHA mortgage insurance requires that HUD accurately assess the risk of default on the loans it insures. *Id.* ¶ 4.  To accomplish this task, HUD relies on assurances by lenders that the loans they submit for insurance comply with HUD standards and guidelines specifically designed to mitigate the risk to HUD, including, most fundamentally, that the loan originated from a HUD-approved lender and a HUD-approved branch office. *Id.*

In the event that a borrower defaults on an FHA-insured mortgage, the holder of the loan submits a claim to HUD for the costs associated with the defaulted mortgage and the sale of the property. *Id.* ¶ 37.  HUD then pays off the balance of the mortgage and other related costs, and may assume ownership of the property. *Id.*

**B.   Allegations in the Complaint**

Allied Capital was, until recently, an approved FHA loan correspondent, and as such, had the authority to originate HUD-insured mortgage loans for sale or transfer to other qualifying mortgagees. *Id.* ¶ 5.  Between January 1, 2001, and the end of 2010 — when HUD discontinued the loan correspondent program —Allied Capital originated 112,324 home loans. *Id.*  Of those loans, 35,801 (or nearly 32% percent) have defaulted, resulting in more than $834 million in insurance claims paid by HUD. *Id.*

The Complaint alleges that, while Allied Capital made substantial profits through its origination and sale of FHA-insured mortgages, it willfully violated the requirements

that provide protection to HUD's insurance fund and knowingly deceived HUD in order to perpetuate its fraudulent schemes.  *Id.* ¶ 6.  These misrepresentations were submitted to HUD/FHA in four separate types of documents:  (1) loan application packages to secure approval for FHA insurance; (2) Branch Certifications to obtain approval to originate FHA loans from a new branch office; (3) Annual Certifications to secure Allied Capital's continued participation in the FHA program; and (4) quality control reports by Allied Capital in late 2008.

### 1.   Falsified HUD ID Numbers in Loan Application Packages

For at least a decade, Allied Capital originated loans out of hundreds of "shadow" branches that were never approved by HUD, and thus were not permitted to originate FHA-insured loans.  *Id.* ¶¶ 37-39.  In some jurisdictions, the number of "shadow" branches vastly outstripped the number of HUD-approved branches.  *Id.* ¶¶ 48, 51.  For example, while Allied Capital had authorization to operate only eight branch offices in North Carolina, it was secretly operating more than seventy offices in that state without HUD's knowledge or approval.  *Id.* ¶ 48.  Allied Capital was even able to use its "shadow" branches to continue operating in regions where HUD had suspended Allied Capital's authorization to originate FHA loans because of high default rates.  *Id.* ¶¶ 44-45.  Because HUD was unaware of the existence of these "shadow" branches, Allied Capital was able to operate this profitable network of branches without oversight or scrutiny by HUD.   *Id.* ¶¶ 8, 38, 53.

Even though HUD prohibited the origination of loans from unapproved branch offices, Allied Capital was nonetheless able to secure FHA insurance for these loans by

falsifying the records submitted to HUD.  *Id.* ¶¶ 6, 38, 52.  Following the explicit

instructions of Allied Capital CEO Hodge, Allied Capital employees routinely entered the

HUD ID number of an approved branch into the loan documentation for "shadow"

branch loans that were submitted to HUD for approval, thereby falsely stating that such

loans had originated from an approved branch office when in fact they had not.  *Id.* ¶¶ 6,

38, 47, 52.  HUD then endorsed these loans for insurance based on the false statements in

the loan documentation that these loans originated from HUD-approved branches.  *Id.* ¶¶

6, 53.  Although several senior managers voiced concerns about this practice, it was

continued under the direction of Hodge.  *Id.* ¶¶ 6, 47, 52.

### 2.   False Statements in Branch Certification Forms

Even when Allied Capital sought HUD approval for its authorized branch offices,

it lied to obtain that approval.  *Id.* ¶¶ 7, 55.  Each time Allied Capital opened a new

branch and applied for HUD approval, it falsely certified in its HUD Form 92001-B that

the branch office met all HUD/FHA requirements and, specifically, that Allied Capital

would pay all operating costs of the branch office.  For the last ten years, however, Allied

Capital, and later its successor, Allied Corporation, maintained a corporate policy of

requiring branch managers to assume financial responsibility for their branches.  For

example, Allied demanded that branch offices enter directly into leasing agreements for

office space, required that branch managers indemnify Allied from "liability of every

kind" and made the branch managers responsible for payroll, insurance, legal judgments

and other office expenses.  *Id.* ¶¶ 7, 56, 63-76.

Well aware that Allied Capital was not paying the operating expenses of its branches, as it was required to do, Allied Capital issued an Examination/Audit Procedure guide that instructed branch managers how to mislead HUD auditors on this topic:

> Select ONE PERSON, and one person ONLY in your office to interface and converse with the examiner/auditor . . . No one else in the office should have any conversation with the examiner/auditor prior to, during or after the examination/audit. The only corporate personnel who should converse with the examiner/auditor prior to, during or after the exam/audit should be Jeanne Stell or Jim Hodge. . . .
>
> You, and any employee working in your branch, are W-2 employees of Allied. Frequently, examiners/auditors view us as a franchise. WE ARE NOT A FRANCHISE. Along those same lines, Allied pays all the bills incurred by the branch. **Both of these statements are true and that is the only way those questions are to be answered, *no deviations*!** (bold and italics in original.)

Compl. ¶ 59.

According to the Complaint, it was Stell who directed another Allied Capital employee to make the false Branch Certifications.  *Id.* ¶ 73.  Specifically, the Complaint alleges that in 2009, after a HUD audit report found that Allied Capital's leasing arrangements with its branches violated HUD regulations, Stell sent an email concerning the Branch Certifications, stating:

> I had [another senior manager] sign the 'add a branch' form for years for HUD as I knew this would eventually happen.  It required that you swear the branches meet and will continue to meet HUD's regulations.  Jim [Hodge] has to be the biggest target personally for his disregard for the regulations.  Serves him right never listening and thinking he didn't have to play by the rules.

*Id.*

### 3.    Annual Certifications for 2006 and 2007

To maintain HUD-approved status, loan correspondents and direct endorsement

lenders must also submit annual certifications to HUD (the "Annual Certifications").  *Id.*

¶ 33.  The Annual Certifications contain four distinct representations, set forth below:

> I certify that none of the principals, owners, officers, directors, and/or employees of the above-named lender is currently involved in a proceeding and/or investigation that could result, or has resulted in a criminal conviction, debarment, limited denial of participation, suspension, or civil money penalty by a federal, state, or local government.
>
> I certify that the above named lender has not been refused a license and has not been sanctioned by any state(s) in which it originates and/or services HUD-FHA insured loans.
>
> I know, or am in the position to know, whether the operations of the above named lender conform to HUD-FHA regulations, handbooks, and policies.
>
> I certify that to the best of my knowledge, the above named lender conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the above named lender is fully responsible for all actions of its employees including those of its HUD-FHA approved branch offices.

*Id.*

Among the requirements for loan correspondents to maintain HUD/FHA approval

is that they implement a quality control program, which, among other things, ensures

compliance with certain key HUD requirements.  *Id.* ¶ 34.  As part of its quality control

program, a mortgagee must (1) conduct an on-site audit of all branch offices within 90

days of opening and annually thereafter; (2) review 10% of all closed loan files to ensure

they were underwritten in accordance with HUD guidelines; and (3) review all early

payment defaults (*i.e.*, those that default within the first six months).  *Id.* ¶ 35.  Review of

early payment defaults is particularly important because such defaults are indicative of

mortgage fraud.  *Id.*

Jeanne Stell, in her role as chief compliance officer of Allied Capital, signed the Annual Certifications on behalf of Allied Capital for the years 2006 and 2007, in which she falsely certified to HUD that Allied Capital was not subject to any sanctions by state regulators, and that none of its employees had felony convictions. *Id.* ¶¶ 92-107.

According to the Complaint, the 2006 and 2007 Annual Certifications were false for another reason as well. The Annual Certifications certified that "the above named lender conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval," including the quality control requirements described above. *Id.* ¶¶ 33-35, 83. Allied Capital's quality control program was practically non-existent, however, and was incapable of meeting these regulatory requirements. *Id.* ¶¶ 83-84.

Allied Capital failed to implement an internal quality control plan. Although Allied Capital operated between 400 and 650 branches at any given time between 2003 and early 2009, it typically maintained only three branch auditors, and those three auditors had other responsibilities in addition to conducting branch audits. *Id.* ¶ 84. Allied Capital conducted on-site branch office audits only sporadically, at best, and by 2009 had discontinued branch audits entirely. *Id.*

Allied Capital's review of early payment defaults was equally deficient. *Id.* ¶ 85. When Allied Capital hired a new quality control manager in August of 2004, she discovered that the company was not reviewing early payment defaults. *Id.* Allied Capital did not even begin conducting reviews of early payment defaults until late 2005 or early 2006. *Id.* Between 2004 and 2008, Allied Capital was originating loans out of several hundred branches, yet had a quality control staff of just two in its corporate office

to conduct reviews of all early payment defaults.  *Id.*  Allied Capital maintained 2-5 additional members of its quality control department in St. Croix, in the U.S. Virgin Islands.  *Id.*  When the quality control manager visited her staff in St. Croix, however, she discovered that they did not know "what HUD was," or even "what a mortgage was."  *Id.*

Stell, as the senior compliance officer, was aware that Allied Capital's quality control program did not meet the regulatory requirements, yet signed the false Annual Certifications regardless.  *See id.* ¶ 107.

### 4.   Falsified Quality Control Reports

The Complaint also alleges that Hodge caused a member of Allied Capital's quality control department to prepare fraudulent quality control reports and submit them to HUD.  *Id.* ¶ 91.  Specifically, the Complaint asserts that, in October 2008 or shortly thereafter, Allied Capital was asked by HUD to provide up-to-date quality control reports.  *Id.* ¶ 89.  As Allied Capital did not have adequate or qualified quality control staff, it was unable to prepare the reports on time.  *Id.* ¶¶ 86-89.  Hodge therefore instructed a member of his quality control staff to make the reports appear complete by indicating that verifications of income, employment, and deposit in the loan files under review had been conducted.  *Id.* ¶ 91.  The employee followed Hodge's instructions and prepared and submitted the fraudulent quality control reports to HUD.  *Id.* ¶ 91.

## ARGUMENT

## STANDARD OF REVIEW

Dismissal for failure to state a claim should not be granted unless it appears beyond doubt that the Plaintiff can prove no set of facts that would entitle him or her to

relief.  The well pleaded facts must be assumed to be true and viewed in the light most favorable to the Plaintiff.  *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).  The test is whether the Complaint alleges "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## I. THE GOVERNMENT HAS ALLEGED FACTS SUFFICIENT TO SUPPORT ITS CLAIMS UNDER THE FCA

The Complaint asserts claims against Defendants Allied Capital, Allied Corporation and Hodge under former 31 U.S.C. § 3729(a)(2) (2006) of the FCA, which applies to any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."  The Complaint further alleges that Defendants Allied Capital, Allied Corporation and Hodge violated current 31 U.S.C. § 3729(a)(1)(B) (2009), which similarly renders any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" liable under the FCA.[1]

The FCA was enacted "to reach all types of fraud, without qualification, that might result in financial loss to the Government" and reaches "all fraudulent attempts to cause the Government to pay out sums of money."  *United States v. Neifert-White Co.*,

---

[11] The FCA was amended in May 2009 by the Fraud Enforcement and Recovery Act of 2009 ("FERA").  Although the May 2009 amendments are generally applicable only to conduct occurring on or after May 20, 2009, 31 U.S.C. § 3729(a)(1)(B), which replaced and amended former section 3729(a)(2), applies retroactively to all claims pending on or after June 7, 2008. Pub. L. 111-21, § 4(f)(1), 123 Stat. 1617, 1625 (2009); *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 267 n.1 (5th Cir. 2010).  For purposes of the present action, there is no substantive difference between the two provisions.  *See infra* at _
.

390 U.S. 228, 231-33 (1968).  According to the Complaint, Defendants engaged in a fraudulent scheme to induce HUD to insure loans by falsely representing in documents that were submitted to HUD that the loans originated from legitimate, HUD-approved branch offices, when in actuality the loans originated from unapproved "shadow" branches.  Such allegations plainly state a claim under the FCA.

To plead a claim under either former section 3729(a)(2) or the current section 3729(a)(1)(B), the Government must allege that Defendants either made, used, or caused to be made or used, (1) "a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or forfeit moneys due (*i.e.*, that involved a claim)." *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 468 (5th Cir. 2009) (applying test to claims arising under section 3729(a)(2)); *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 267 (5th Cir. 2010) (applying test to claims arising under section 3729(a)(1)(B)).  As explained in detail below, the allegations in the Complaint easily satisfy each of the above elements.

## A.   The Complaint Sufficiently Alleges False Statements or A Fraudulent Course of Conduct

The Complaint alleges both that Defendants made, or caused to be made, false statements of fact, and that they engaged in a fraudulent course of conduct.  With respect to the former, the Complaint alleges that Defendants created false records, statements and certifications in each of the loan application packages from the shadow branches.  Specifically, as detailed in the Complaint, Allied Capital was required to enter in every loan file submitted to HUD/FHA the specific HUD ID number for the branch office that

originated the loan.  Compl. ¶ 31.  The Complaint alleges that, because the shadow branches operated secretly, without HUD/FHA's knowledge or approval, they were not issued such HUD ID numbers, and indeed, did not even have the authorization to originate loans.  Accordingly, rather than expose their fraudulent scheme to HUD/FHA and reveal that these loans had been originated from shadow branches operating illicitly outside the scope of HUD/FHA's oversight, the Defendants falsely stated in the loan application packages that these loans had originated from other, HUD/FHA-approved branches.  By falsely stating, or causing others to falsely state, that a loan had originated from a particular approved branch office, when in fact it had not, Defendants caused false statements of fact to be submitted to HUD/FHA.

The Complaint also alleges that each of the loan packages submitted to HUD/FHA, including for loans originated by the shadow branches, contained a loan-specific certification, the HUD Form 92900-A, in which the lender certifies that the information contained in the loan application is "true to the best of the lender's knowledge and belief."  Compl. ¶ 36.  According to the Complaint, the information contained in the loan applications originated by the shadow branches was not true to the best of Allied Capital's knowledge and belief, because the loan application packages falsely represented that the loans were originated by legitimate branch offices.  *Id*. ¶¶ 38, 46, 53.

And finally, the Complaint alleges that Defendants engaged in a "fraudulent course of conduct" within the meaning of *Longhi*.  Defendants' shadow branch operations were not merely sporadic and isolated violations of HUD's rules and

regulations.  Rather, as the Complaint details, Defendants operated hundreds of shadow branches nationwide, which in some regions generated more loans than the legitimate, HUD/FHA-approved branch offices.  *Id*. ¶¶ 38-54.  Running an entire clandestine lending operation allowed Defendants to crank out thousands of additional loans while evading HUD/FHA's oversight or scrutiny.  *Id.*  In order to maintain the profits generated by these shadow branches, the Defendants crafted a method of keeping these branches beyond the detection of HUD/FHA — that is, entering false information regarding the originating branch office in the loan applications, knowing that those loan documents would be submitted to HUD/FHA for insurance endorsement.  *Id.*

In their motions to dismiss, Defendants essentially ignore the allegations in the Complaint concerning these factually false statements and Defendants' fraudulent course of conduct, arguing instead that, "in order to state a claim for FCA violations, the statement allegedly creating liability must certify compliance with a statute or regulation that is a condition of payment."  Defendant Americus Mortgage Corporation's Memorandum in Support of Its Motion to Dismiss ("Americus Br.") at 10 (citing *United States ex rel. Mikes v. Straus*, 274 F.3d 687, 696-98 (2d Cir. 2001)).  This is not a correct statement of law, and is plainly contrary to established FCA jurisprudence.  Although a certification falsely indicating compliance with a statute or regulation can form the basis of an FCA claim, it is not the sole method of establishing FCA liability.  *See Longhi*, 575 F.3d at 471 (holding defendant liable under the FCA for including factually false statements in grant applications submitted to Department of Defense).

Defendants attempt to obfuscate the Government's simple and straightforward theory of liability by casting the Government's FCA theory as something that it is not and attacking various strawmen in the process.  To be clear, the FCA counts of the Complaint are premised on the false statements and certifications in the individual loan files submitted to HUD/FHA.  They do not rest on the theory that Defendants either expressly or impliedly certified compliance with various regulatory requirements in either the Annual Certifications or the Branch Certifications.  Accordingly, all of Defendants' arguments regarding the validity of the implied certification theory in the Fifth Circuit, *see, e.g.*, Americus Br. at 8-10, whether false Annual Certifications could give rise to liability under the FCA, *see, e.g.*, *id.* at 20-21, whether various HUD rules and regulations establish rules of participation in the FHA insurance program or constitute prerequisites to payment, *see, e.g.*, *id.* at 12-16, and whether violations of regulatory eligibility requirements can give rise to FCA liability, *see, e.g.*, *id.* at 10-12, are inapposite and can be disregarded.[2]

---

[2] Although the Government has not asserted an FCA claim based on Defendants' submission of false statements in the Branch Certifications and the Annual Certifications, such false statements could very well give rise to FCA liability, both because they contain objectively false factual statements and because they expressly certify compliance with federal rules and regulations.  The distinction that Defendants attempt to draw between conditions of participation and conditions of payment is an untenable one. *See, e.g.*, *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1176 (9th Cir. 2006) ("The University argues that the ban is merely a condition of *participation*, not a condition of *payment*.  But in this case, that is a distinction without a difference. . . . These conditions are also "prerequisites" and the *sine qua non* of federal funding for one basic reason:  if the University had not agreed to comply with them, it would not have gotten paid."); *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 786 (4th Cir. 1999) (noting that many courts have found violations of the FCA where defendant has falsely certified compliance with certain conditions as precondition to a government program).

For this same reason, Defendants' preoccupation with whether the Complaint alleges that Defendants submitted false "certifications," *id.* at 5, 7, 13, is misplaced.  As an initial matter, the Complaint does allege false certifications in connection with its FCA claim — the Forms 92900-A.  Even if no such loan-specific certifications were contained in the loan package, however, FCA liability would still attach to the submission of the false statements in the loan packages as to which branch office originated the loan.  *See Longhi*, 575 F.3d at 471.  As the Ninth Circuit explained, "so long as the statement in question is knowingly false when made, it matters not whether it is a certification, assertion, statement, or secret handshake; False Claims liability can attach."  *Hendow*, 461 F.3d at 1172.

## B.   The Complaint Sufficiently Alleges Scienter

To demonstrate that the false statements or fraudulent course of conduct were made "with the requisite level of scienter," the United States must allege that the Defendants had either "(1) actual knowledge of falsity, (2) acted with deliberate ignorance of the truth or falsity of the information provided, or (3) acted with reckless disregard of the truth or falsity of the information provided" to the Government.  *Longhi*, 575 F.3d at 468; *see also* 31 U.S.C. § 3729(b) (2008) (defining terms "knowing" and knowingly"); 31 U.S.C. § 3729(b) (2009) (same).  Although scienter may be pleaded generally under the FCA, the Government must still allege facts that "support an inference of fraud."  *United States ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 385 (5th Cir. 2003) (quoting *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994)).  Such an inference can be drawn by alleging facts

showing a defendant's motive, *Willard*, 336 F.3d at 385, or, where "motive is not apparent," then "by identifying circumstances that indicate conscious behavior on the part of the defendant," *Tuchman*, 14 F.3d at 1068.

In the instant case, the Complaint alleges that the Defendants acted with actual knowledge of the falsity of the statements submitted to HUD/FHA. Specifically, the Complaint alleges that Defendants, as part of a deliberate scheme orchestrated by Hodge himself, sought to deceive HUD/FHA by routinely causing loans originated from shadow branches to be submitted for approval to HUD/FHA under the HUD ID numbers of other, approved branches. Compl. at ¶¶ 46-47, 52-53. Defendants maintained this practice even though Defendants were "well aware that [they were] flouting HUD's requirements" — and, in fact, specifically adopted this practice in order to deceive HUD/FHA into believing that they were complying with HUD/FHA's regulatory requirements, and thereby induce HUD/FHA to insure these loans. *Id.* ¶¶ 39, 43, 53. The Complaint alleges that this fraudulent practice continued despite the fact that concerns were raised by Hodge's employees about the legitimacy of this practice, and despite the fact that HUD/FHA specifically told Allied to cease its operation of shadow branches. *Id.* ¶ 47-53.

The Complaint further supports its allegations of scienter by alleging that Hodge was able to "conceal" his corrupt practices from the Government by "monitor[ing] and intimidat[ing] senior managers and other employees." *Id.* ¶ 108. These tactics included, among other things, "provid[ing] his assistant with full access (including the ability to delete emails) to the email accounts of several key employees, including Allied's general

counsel, senior compliance officers, quality control managers, and others." *Id.* Hodge also required his employees to sign extremely broad confidentiality agreements that, according to Allied, prevented Allied employees from telling anyone outside the company anything about corporate practices other than "what a good company it is." *Id.* ¶ 109. An inference can easily be drawn from these facts that Hodge's strict control of the information communicated by his employees about corporate practices was deliberately designed to conceal Allied Capital's fraudulent and illicit schemes from HUD/FHA.

1.  **The "Government Knowledge" Defense Does Not Apply**

The Defendants cite to *United States ex rel. Becker v. Westinghouse Savannah River Co.* 305 F.3d 284, 289 (4th Cir. 2002), for the proposition that HUD/FHA's purported knowledge of the falsity of the statements made by the Defendants defeats scienter, and therefore requires dismissal of the Complaint. Americus Br. at 18-19. This argument is both legally and factually unsound.

As an initial matter, Defendants cannot demonstrate that the Fifth Circuit even recognizes such a "government knowledge" defense. To the contrary, the Fourth Circuit in *Becker* acknowledged that this defense has been rejected in Fifth Circuit. 305 F.3d at 289. Furthermore, in *United States v. Southland Mgmt. Corp.*, 288 F.3d 665, 686 (5th Cir. 2002), in a decision that was later vacated by an *en banc* panel on other grounds, 326 F.3d 669 (5th Cir. 2003), the Fifth Circuit explained that:

> The text of the Act as it appears today (*i.e.*, subsequent to the 1986 amendments) contains no indication that government knowledge of the falsity of a submission might bear on the defendant's mens rea. Moreover, there is nothing in the legislative or statutory history of the Act suggesting that

> Congress intended to preclude the government from pursuing an action under the civil FCA when the government was aware of the facts and circumstances rendering a claim false at the time of submission. . . .  We find it difficult to justify the proposition that an individual who submits a false claim to the government with knowledge of its falsity should necessarily be excused from liability under the Act merely because the government was also aware that the claim was false when it was submitted.

*Southland*, 288 F.3d at 686.  Accordingly, the viability of this defense in the Fifth Circuit is, at best, suspect.[3]

Even if the Fifth Circuit were to recognize a "government knowledge" defense, the Complaint does not establish a factual predicate for its assertion in this case.  The "government knowledge" defense applies only where "the government knows and approves of the particulars of a claim for payment *before the claim is presented*."  *United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 545 (7th Cir. 1999) (emphasis added). In *Becker*, for example, the Government not only had full knowledge of the relevant facts prior to the submission of any claims, but actually directed the defendants to make the changes to the budgeting codes that were at issue.  305 F.3d at 289.  It was the Government's prior knowledge of the purportedly false statements, and the fact that the defendants had acted at the Government's express instructions, that destroyed the relator's allegations of scienter.  *See also United States ex rel. Longhi v. Lithium Power*

---

[3]  The only other published Fifth Circuit decision Defendants cites in support of such a defense, *United States ex rel. Taylor-Vick v. Smith*, 513 F.3d 228, 232 (5th Cir. 2008), did not even involve a defense of Government knowledge.  Rather, in *Taylor-Vick*, the Fifth Circuit affirmed a grant of summary judgment where a relator, who had the opportunity to take ample discovery, was unable to adduce facts from which an inference of knowledge could be drawn.  *Id.*

*Tech., Inc.*, 513 F. Supp. 2d 866, 875 (S.D. Tex. 2007) ("[T]he falsity of a claim is determined at the time of submission."), *aff'd, Longhi*, 575 F.3d 468.

There is nothing in the Complaint to even suggest that HUD/FHA had prior knowledge that Defendants routinely substituted false branch office ID numbers in the loan packages it submitted to HUD/FHA.  According to the Complaint, HUD/FHA was only aware of a few of Allied Capital's shadow branch operations, and learned of these only after the loan packages had been submitted.  Specifically, the Complaint alleges that in 2000, a HUD/FHA audit revealed that the two branch offices in Arizona had originated loans from thirteen shadow branches, Compl. ¶ 39, and in 2005, HUD/FHA learned that "several" shadow branch offices had been operating using the Fresno office's ID number, *id.* ¶ 42.  The Government's belated discovery of a few sporadic and localized instances of false statements after the fact has no bearing on the Defendants' state of mind at the time of their submission of false statements.  Moreover, nothing in the Complaint suggests that HUD/FHA had any awareness of the falsity of the loan packages being generated in the hundreds of other shadow branch offices operating nationwide.  Nor does anything in the Complaint suggest that HUD/FHA was aware that Allied Capital continued to operate shadow branches even after HUD/FHA expressly prohibited the use of satellite offices for any purpose in 2006.

Although Defendants attempt to cobble together allegations about separate and distinct HUD/FHA audits and investigations in an attempt to suggest that HUD/FHA had greater knowledge about Allied Capital's shadow branch operations than it did, *see* Americus Br. at 4-5, nothing in the Complaint indicates that any of these administrative

actions had anything to do with Defendants' shadow branch operations or the submission of false branch office ID numbers.  Thus, whether HUD/FHA suspended a HUD-approved office operating out of North Carolina because of that office's default history, or conducted audits of Allied Capital's quality control departments, *see* Americus Br. at 4-5, hardly demonstrates that HUD/FHA had prior knowledge of the falsity of the branch office IDs contained in Allied Capital's loan packages.

Defendants' "government knowledge" defense fails for the additional reason that nothing in the Complaint suggests that the Government acquiesced in, let alone approved of, Allied Capital's shadow branch operations.  *Durcholz*, 189 F.3d at 545 (defense available where "the government knows and *approves of* the particulars of a claim" (emphasis added)); *United States ex rel. Tyson v. Amerigroup Illinois, Inc.*, 488 F. Supp. 2d 719, 730 (N.D. Ill. 2007) ("[M]ere acquiescence (rather than approval) by government employees is not sufficient to avoid liability.").  To the contrary, the allegations in the Complaint concerning the Government's response to the limited information it had regarding Allied Capital's shadow branch operations provide further evidence that Defendants acted with the requisite scienter.

For example, in 2002, when HUD/FHA revisited the Arizona branch offices and determined that the practice had continued, rather than accepting potential liability for defaults that resulted from loans generated from these unapproved shadow branches, HUD/FHA demanded indemnification for the loans that had originated from these non-approved offices.  Compl. ¶ 41.  HUD/FHA also reminded Allied Capital at that time that any "office that originates and processes FHA-insured mortgages must be approved by

HUD."  *Id.*  And upon discovering the Fresno shadow offices, HUD/FHA again warned Allied that its practice "violates the certifications made on HUD Form 92900A."  *Id.* ¶ 42.  In other words, far from endorsing Allied's illicit shadow branch practices, HUD/FHA specifically condemned them.  The fact that Defendants continued their practice of submitting falsified loan records to HUD/FHA after being told that Allied Capital's shadow branch operations were prohibited, its loan certifications were false, and that HUD/FHA would not accept financial responsibility for loans generated by unapproved branches, only serves to buttress the Government's allegations of scienter.

Finally, Defendants' "government knowledge" defense fails because, even if an inference can be drawn that HUD/FHA knew that Defendants were lying about the originating branch offices in their loan packages — which it could not — such knowledge is not an automatic bar to suit.  *Southland*, 288 F.3d at 686 (holding that Government knowledge of falsity "does not provide an automatic bar to suit"); *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1156 (2d Cir. 1993) ("[E]xpressly reject[ing] the contention that government knowledge of the falsity of a claim automatically bars an FCA action").  At most, the Government's knowledge of facts underlying a false claim may give rise to an inference that a defendant did not have "knowledge" of the falsity of the claim.  *See United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 951 (10th Cir. 2009) ("It is only an inference.  It does not *automatically* preclude a finding of scienter.") (emphasis in original).  Whether the Government's knowledge of Defendants' false submissions was so extensive as to negate scienter is an issue of fact that cannot form the basis for a motion to dismiss.  *See United States ex rel.*

*Dekort v. Integrated Coast Guard Sys.*, 705 F. Supp. 2d 519, 543-44 (N.D. Tex. 2010)

("Whether the Government's knowledge was so complete as to disprove the Defendants'

false claims were made knowingly is a fact issue, and not a basis for a Rule 12 motion.")

(internal quotations omitted)).

### 2.  *Allison Engine* Did Not Alter the FCA's Scienter Requirements

Despite the fact that both the current and former version of the FCA explicitly

provide that proof of specific intent to defraud the Government is not required to satisfy

the Act's scienter requirements, *see* 31 U.S.C. § 3729(b)(3) (2006); 31 U.S.C. §

3729(b)(1)(B) (2009), Defendants take select and misleading quotations from the

Supreme Court's decision in *Allison Engine Co. v. United States*, 553 U.S. 662 (2008), in

an attempt to suggest that this decision nullified express statutory language and imposed

a specific intent requirement on former section 3729(a)(2).  Americus Br. at 19.

Defendants argue that, unless the Complaint pleads such a specific intent to defraud the

Government with respect to all claims arising prior to June 7, 2008, the effective date of

the FECA amendments that legislatively overruled the *Allison Engine* decision, such

claims must be dismissed.  *Id.* at 19-21.

As an initial matter, the Complaint does allege such specific intent to defraud the

Government, and so this argument is meritless.  *See infra* at Pt.IV.B.  But for purposes of

the FCA, as the Fifth Circuit has held in its post-*Allison Engine* jurisprudence, "the FCA

is plain that 'proof of specific intent to defraud' is not necessary."  *Longhi*, 575 F.3d at

468.  Indeed, the scienter requirements remained unchanged by the *Allison Engine*

decision.  *See Longhi*, 575 F.3d at 468 (applying same test of scienter in case arising

under prior version of statute); *see also United States ex rel. Loughren v. Unum Group*, 613 F.3d 300, 312 n.18 (1st Cir. 2010) ("The FERA amendments did not alter the statute's scienter requirement.").  Accordingly, whether the Government's claims arise under former section 3729(a)(2), or current section 3729(a)(1)(B), the scienter standard is the same.

Indeed, the *Allison Engine* decision did not even involve the FCA's scienter requirements at all.  *See Loughren*, 613 F.3d at 312-13.  Rather, the issue in *Allison Engine* was whether false statements submitted to private entities, as opposed to government agencies, could give rise to FCA liability:

> If a subcontractor or another defendant makes a false statement *to a private entity* and does not intend the Government to rely on that false statement as a condition of payment, the statement is not made with the purpose of inducing payment of a false claim "by the Government." In such a situation, the direct link between the false statement and the Government's decision to pay or approve a false claim is too attenuated to establish liability.

553 U.S. at 671-72 (emphasis added); *see also United States ex rel. Wall v. Circle C Contr., LLC*, 697 F.3d 345, 355 n.3 (6th Cir. 2012) ("[T]he primary concern raised in *Allison* [was] regarding subcontractors' indirect submissions [to the Government].").  In the instant case, the Government alleges that Defendants caused false statements to be submitted to the Government, with the intent of inducing HUD/FHA to insure loans that were actually generated from shadow branches.  Compl. ¶¶ 6, 38-54.  Because the false statements in the instant case were actually submitted to the Government, *Allison Engine*'s holding is not implicated.

Accordingly, "in this litigation, there is no material difference between pre- and post-FERA versions of § 3729(a)(1)." *United States ex rel. Bennett v. Boston Scientific*

*Corp.*, Civil Action No. H-07-2467, 2011 WL 1231577, at *12 n.11  (S.D. Tex. Mar. 31,

2011).  Although the United States asserts that FERA's retroactivity provision is

Constitutional, "it is not necessary to address [retroactivity] because the result is the same

under either the pre-or post-FERA version of the FCA."  *Id.* at *12 n.10.[4]

## C.   The Complaint Sufficiently Alleges Materiality

The Complaint also adequately alleges that the false statements were material.

Under both the prior version (section 3729(a)(2)) and the current version (section

3729(b)(4)), the materiality standard is the same.  A false statement is material if it has a

"natural tendency to influence, or is capable of influencing," the Government's payment

decision.  *Longhi*, 575 F.3d at 469 (applying "natural tendency" test to claims arising

under former section 3729(a)(2)); 31 U.S.C. § 3729(b)(4) (2009) (defining material as

"having a natural tendency to influence, or be capable of influencing, the payment or

receipt of money or property"); *see also Loughren*, 613 F.3d at 307, 309; *United States v.

Bourseau*, 531 F.3d 1159, 1170-71 (9th Cir. 2008); *United States v. Rogan*, 517 F.3d 449,

452 (7th Cir. 2008).

To satisfy the natural tendency test, the Government need only show "that the

false or fraudulent statements either (1) make the government prone to a particular

---

[4]   In deciding that the FERA Amendments did not affect the outcome of the case before
it, the *Bennett* court noted that the main difference between the pre- and post-FERA
versions of 3729(a)(2) is that the prior version of the statute required that claims had to be
paid or approved by the Government, while the amended version of the statute removed
these requirements.  2011 WL 1231577, at *12 n.11.  As in the *Bennett* case, there is no
dispute here that the claims for payment submitted to HUD with respect to defaulted
loans were paid by the Government.  FERA also added a materiality requirement to the
FCA, but that change likewise "does not affect this litigation because the Fifth Circuit
required 'material' false statements before the FERA amendments to § 3729(a)(2)," using
the same materiality test ultimately adopted by FERA.  *Id.*

impression, thereby producing some sort of effect, or (2) have the ability to effect the government's actions, even if this is a result of indirect or intangible actions on the part of the Defendants.  All that is required under the test for materiality, therefore, is that the false or fraudulent statements have the potential to influence the government's decisions."  *Longhi*, 575 F.3d at 470; *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1170 (10th Cir. 2010) (holding that, under natural tendency test, the Government need only show that HUD/FHA "*may* not have paid" (emphasis in original)).[5]  The Government's allegations easily meet this standard.

The Complaint alleges that "[a] fundamental rule of the HUD insurance program is that a lender must be approved by HUD to originate, purchase, hold or sell HUD/FHA-insured mortgages.  For a loan correspondent, such as Allied Capital, HUD requires not only that the lender be approved generally but also that the lender obtain HUD approval for each branch office from which the lender intends to originate HUD-insured loans."  Compl. ¶ 28.  This is no mere technical requirement.  Rather, this rule allows HUD/FHA to exercise its oversight functions with respect to offices originating HUD/FHA loans, *id.* ¶ 53, to ensure, prior to the approval of a branch office, that such office complies with HUD's rules and regulations, *id.* ¶¶ 29-30, to ensure that Allied had the capability to properly supervise and perform quality control of all of its branch offices, *id.* ¶¶ 35, 53,

---

[5] The materiality inquiry is objective; it "focuses on the *potential* effect of the false statement *when it is made* rather than on the false statement's actual effect after it is discovered."  *Longhi*, 575 F.3d at 470 (emphasis added) (quoting *Bourseau*, 531 F.3d at 1171); *cf. United States v. Puente*, 982 F.2d 156, 159 (5th Cir. 1993).  For this reason, actions that government officials take upon learning of a false statement cannot render the statement immaterial.  *See United States ex rel. Anti-Discrimination Ctr. of Metro New York v. Westchester County*, 668 F. Supp. 2d 548, 569-70 (S.D.N.Y. 2009).

and to monitor the default rates on a branch-by-branch basis in order to determine if a particular branch's authorization to originate loans should be suspended, *id.* ¶¶ 31-32. The Complaint alleges that, because of the Defendants' lies, HUD/FHA was unaware that Allied Capital was operating a network of hundreds of shadow branches nationwide, in contravention of HUD's rules and regulations, nor was HUD/FHA aware that it was insuring loans originated from such unapproved branch offices.  *Id.* ¶ 53.  "HUD endorsed these loans for insurance based on false certifications that the loans were originated in compliance with HUD requirements, including, most fundamentally, that the loans originated from HUD-approved branches."  *Id.* ¶ 6.

Moreover, pursuant to HUD Handbook 4000.4, paragraph 1-3, when a loan "is submitted [to HUD] for endorsement, [and] HUD has evidence that there is fraud or misrepresentation on the part of the originating mortgagee, HUD will consider the certifications as fraudulent and will not endorse the mortgage for insurance."  *Id.* ¶ 36.

These allegations are sufficient to establish that Allied Capital's false statements had the potential to influence the Government's decision to insure loans issued by shadow branches that, but for Allied Capital's lies, it otherwise may not have insured. *See, e.g.*, *United States v. Anchor Mortg. Corp.*, No. 06 C 210, 2010 WL 3184210, at *10 (N.D. Ill. Aug. 11, 2010) (finding materiality because "HUD would not have approved the relevant FHA mortgage insurance applications had it known [of the violations]"); *United States v. Dolphin Mortg. Corp.*, No. 06-CV-499, 2009 WL 153190, at *11 (N.D. Ill. Jan. 22, 2009) (citing to HUD Handbook 4000.4 as evidence that false statements in Forms 92900-A are material to HUD's endorsement decisions); *United States ex rel.*

*Fago v. M & T Mortg. Corp.*, 518 F. Supp. 2d 108, 119 (D.D.C. 2007) (finding evidence to support materiality where HUD introduced testimony that "if HUD was certain a certification was false, HUD 'certainly could refuse to endorse [the loan for FHA insurance]'").

Indeed, the Complaint does not merely suggest that Allied Capital's false statements had the potential to influence HUD/FHA's decision to insure the shadow branch loans, but also evidences that HUD/FHA actually would not have insured these loans had it known the truth.  For example, when HUD/FHA discovered during an audit in 2002 that the Arizona offices had continued to issue loans from shadow branches after receiving a prior warning from HUD/FHA about this practice, it refused to assume financial responsibility for defaulted loans generated by unapproved shadow branches and demanded indemnification from Allied Capital.  Compl. ¶ 41.  Similarly, it cannot seriously be suggested that HUD/FHA would have endorsed loans originated from secret branches opened in North Carolina during the period after March 2006 when HUD/FHA had barred Allied Capital from originating any FHA loans in that region.  *Id.* ¶ 45.  Allied Capital nonetheless continued to originate loans illicitly in unapproved branch offices in North Carolina, and was only able to secure FHA insurance for those loans by lying to HUD about where those loans had originated.  *Id.* ¶ 46.

In their motions to dismiss, Defendants nowhere argue that the false statements contained in the loan packages did not have the potential to influence HUD/FHA to insure loans originating from shadow branches that it otherwise may not have insured.  Accordingly, any such argument has been waived.  *See, e.g., Jones v. Cain*, 600 F.3d 527,

541 (5th Cir. 2010); *Cates v. Creamer*, 7:00-CV-0121-O, 2008 WL 2620097, at \*2 (N.D. Tex. June 27, 2008).

Instead, Defendants contend that the Government has not adequately pleaded materiality because it has not established that Allied Capital's compliance with any particular federal statutes, rules or regulations constituted a "prerequisite" for payment. Americus Br. at 18 (citing to *Steury*, 625 F.3d at 268-69).  As the *Steury* decision makes clear, however, the prerequisite to payment requirement is one that applies only to FCA claims that rely upon express or implied certification theories of liability (and, in fact, is not rooted in the materiality prong of the FCA at all, but rather goes to legal falsity). *Steury*, 625 F.3d at 268-69.  As the Government's FCA claim is not based upon express or implied certifications of compliance with federal rules or regulations, but on the submission of objectively false statements of fact, the prerequisite requirement does not apply.

## D.   The Complaint Alleges Payment of Claims

The Government also has alleged facts sufficient to establish that the false statements contained in the loan application packages submitted to HUD/FHA "caused the government to pay out money or forfeit moneys due."  *Longhi*, 575 F.3d at 467. Specifically, the Complaint alleges that, after receiving loan application packages that contained false records and certifications regarding the originating branch office, HUD/FHA proceeded to insure the loans under the FHA program.  Compl. at ¶ 53. When some of the borrowers defaulted on these FHA-insured mortgages, the holder of the loans submitted claims to HUD/FHA for the costs associated with the defaulted

mortgage and the sale of the property.  *Id.* ¶¶ 37, 54.  Upon receiving such a claim, HUD/FHA paid off the balance of the mortgage and other related costs.  *Id.*  HUD/FHA has paid at least $150 million in insurance claims resulting from defaulted loans that originated from Allied Capital's shadow branches.  *Id.* ¶ 54.  Accordingly, because the Government has alleged that it has paid moneys out as a result of Defendants' fraudulent conduct, it has satisfied the fourth prong of the *Longhi* test.

Congress has made clear that the term "false claim" in the FCA should be construed broadly to cover precisely the types of allegations asserted in the instant case. Congress intended the statute to be read so that:

> each and every claim submitted under a contract, loan guarantee, or other agreement which was originally obtained by means of false statements or other corrupt or fraudulent conduct, or in violation of any statute or applicable regulation, constitutes a false claim.

S. Rep. No. 99-345, at 9 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5274.

In accordance with this legislative history, it is well-established that false statements in loan applications submitted to a government agency for the purpose of obtaining a loan guaranty or insurance, including FHA insurance, give rise to liability under the FCA for the claims subsequently paid out on defaulted loans.  *See, e.g.*, *United States v. Eghbal*, 548 F.3d 1281, 1283 (9th Cir. 2008); *United States. v. Van Oosterhout*, 96 F.3d 1491, 1494 (D.C. Cir. 1996); *United States v. First Nat'l Bank of Cicero*, 957 F.2d 1362, 1374 (7th Cir. 1992); *United States v. Miller*, 645 F.2d 473, 476 (5th Cir. 1981) (false statement in application for FHA loans is a false claim); *United States ex rel. Bibby v. Wells Fargo Bank, N.A.*, – F. Supp. 2d –, 2012 WL 5866137, at *5 (N.D. Ga. Nov. 19, 2012) (citing cases); *Anchor Mortg. Corp.*, 2010 WL 3184210, at *5 ("[A]n

application for FHA insurance . . . constitutes a claim within the meaning of the FCA."); *Dolphin Mortg. Corp.*, 2009 WL 153190, at *9 ("The Seventh Circuit (and many other courts) . . . have held that a false statement in a loan guarantee application may constitute a false 'claim' if the loan has defaulted thus creating the obligation to pay.").

In *Eghbal*, for example, the Ninth Circuit held that a scheme to fraudulently induce HUD/FHA to insure mortgages under the FHA program was actionable under the FCA where the mortgagees ultimately defaulted on the loans, causing HUD/FHA to disburse funds. 548 F.3d at 1283-84. The Ninth Circuit reasoned that liability attached to false statements made in the applications to secure FHA insurance because "the false statements were 'relevant to the government's decision to confer [the] benefit'" of FHA insurance. *Id.* (citation omitted). The Ninth Circuit concluded that the "use of fraudulent information to induce the Government to provide a loan guarantee constitutes a false claim under the FCA." *Id.*

Notwithstanding this long line of precedent — which is nowhere addressed in Defendants' briefs — Defendants repeatedly assert that the Complaint should be dismissed because it does not allege that the claims submitted to the FHA with respect defaulted loans contained false statements or were themselves fraudulent. Americus Br. at 5, 9, 17, 18. The Fifth Circuit, along with other Circuit courts to have considered this issue, have rejected Defendants' contention that the FCA encompasses only those fraudulent schemes in which the claim submitted to the Government for payment is itself literally false. *See, e.g.*, *Longhi*, 575 F.3d at 467-68 ("although the Defendants' subsequent claims for payment . . . were not literally false, [because] they derived from

the original fraudulent misrepresentation, they, too, became actionable false claims"
(internal quotation marks omitted)); *see also United States ex rel. Kirk v. Schindler
Elevator Corp.*, 601 F.3d 94, 116 (2d Cir. 2010); *Hendow*, 461 F.3d at 1170; *Harrison*,
176 F.3d at 788. Accordingly, in the mortgage fraud context, the fact that a false
statement was made in a document separate from the actual claim submitted for payment
is of no import. *See Eghbal*, 548 F.3d at 1283-84; *Miller*, 645 F.2d at 476.

The allegations in this case are particularly analogous to the fraudulent scheme the
Fifth Circuit found actionable in the *Longhi* decision. In *Longhi*, the defendants had
submitted grant applications to the Department of Defense ("DOD") that contained false
statements of fact. 575 F.3d at 471. After being awarded the research grants, DOD
entered into a separate contract with the defendants, pursuant to which the defendants
submitted invoices for the work performed. *Id.* at 462. The Fifth Circuit held that the
defendants were liable under the FCA for all funds defendants had received under the
contract, notwithstanding that the defendants had actually performed the work specified
in the contract and there were no false statements contained in the invoices themselves.
*Id.* at 472. The Fifth Circuit concluded that FCA liability attached because the false
statements contained in the research grant applications gave the government the false
impression that the defendants were a more established operation than they in fact were,
and therefore could have induced DOD to award the defendants the research grants in the
first instance. *Id.* at 471-72.[6]

---

[6] The *Longhi* case follows a long line of jurisprudence recognizing that the FCA imposes
liability under a fraud-in-the-inducement theory in "those instances 'when the contract or
extension of [a] government benefit was obtained originally through false statements or

Footnote continued on next page

As described in the Complaint, Defendants fraudulently induced the Government to insure loans originated by the illicit shadow branches, resulting in millions of dollars of losses to the Government.  *See, e.g.*, Compl. ¶¶ 36-54.  It does not matter whether the subsequent insurance claims that flowed from the original false statements were also false.  Under a fraudulent inducement claim, Defendants are liable for all claims paid following the Government's granting of the benefit of FHA insurance regardless of whether those claims are themselves true or false.  *See, e.g., Longhi*, 575 F.3d at 467-68; *Hendow*, 461 F.3d at 1173.

This fraud-in-the-inducement caselaw is also in accord with decisions in which claims have been determined to be false where, as here, a crucial false statement is integral to a causal chain resulting in payment from the Government.  In *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916 (7th Cir. 2005), for example, the Seventh Circuit held that a complaint sufficiently alleged falsity where it alleged that a university falsely certified in an initial "phase one" "certification for eligibility" for federal funding that it would not pay recruiters contingent fees for enrolling students, even though no payments were made until the submission of the "phase two" applications for grants, loans and scholarships, which did not contain any certifications with respect to fees to recruiters.  "If a false statement is integral to a causal chain leading to payment, it

---

*Footnote continued from previous page*
fraudulent conduct.'"  *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008) (quoting *Harrison*, 176 F.3d at 787); *see also United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1326 (D.C. Cir. 2005).  Under a fraudulent inducement theory of liability, the Government need only show that the original statement that induced the Government to confer the benefit was false.  *See Bettis*, 393 F.3d at 1326; *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, No. 95-1231, 2007 WL 915237, at *2 (D.D.C. Mar. 27, 2007) (explaining that the initial FCA violation "taints the submission of each subsequent claim").

is irrelevant how the federal bureaucracy has apportioned the statements among layers of paperwork." *Id*.

Here, as in *Main*, the integral false statements were made at the beginning of the process, in the loan packages submitted to HUD/FHA  to be endorsed for FHA insurance, even though payment was sought from the Government separately, in insurance claims submitted after the loans defaulted.  But liability attaches nonetheless to the "phase one" false statements, as they were a prerequisite to the causal chain leading to the payment of insurance claims for the defaulted loans.

Regardless of the precise theory upon which this case is viewed to rest, one thing is abundantly clear from a review of the caselaw — the Government has sufficiently alleged a cause of action under the FCA.

## II.    THE GOVERNMENT'S FCA CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATONS

The Complaint properly asserts causes of action under the FCA for every claim that has been paid by the Government from May 13, 2001, (*i.e.*, ten years prior to the date this action was initiated by relator Peter Belli) through the present.  *See United States v. Caremark, Inc.*, 634 F.3d 808, 817-18 (5th Cir. 2011) (holding that, under FCA, complaint-in-intervention is deemed to relate back to relator's original complaint); Fed. R. Civ. P. 15(c).  Defendants' argument that all violations of the FCA prior to November 1, 2005 (*i.e.*, six years prior to the date the Government filed its Complaint-in-Intervention), are time-barred, *see* Americus Br. at 7, is based upon a mischaracterization of the relevant statute of limitations, and fails to acknowledge that the running of the

FCA's statute of limitations has been tolled by the Wartime Suspension of Limitations Act, 18 U.S.C. § 3287 (the "Suspension Act").

First, in arguing that the FCA has a six year statute of limitations, Defendants omit half of the relevant statutory language.  The FCA provides in full:

> A civil action under section 3730 may not be brought-
>
> (1) more than 6 years after the date on which the violation of section 3729 is committed, or
>
> (2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed,
>
> whichever occurs last.

31 U.S.C. § 3731(b).  Accordingly, under the tolling provisions of the FCA, "the statute of limitations does not begin to run until the material facts are known by an official within the Department of Justice with the authority to act in the circumstances."  S. Rep. No. 99–345, at 30 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5295; *see also United States v. Tech Refrigeration*, 143 F. Supp. 2d 1006, 1009 (N.D. Ill. 2001) (citing cases); *United States v. Macomb Contracting Corp.*, 763 F. Supp. 272, 274 (M.D. Tenn. 1990) ("The 'official of the United States charged with responsibility' could only have been the appropriate official of the Civil Division of the Department of Justice, which alone has the authority to initiate litigation under the Act.").

Whether the relevant official within the Department of Justice was aware or should have been aware of the material facts underlying this action is a fact intensive analysis that cannot be resolved on the pleadings.  *United States v. BNP Paribas SA*, – F.

Supp. 2d –, 2012 WL 3234233, at **6-7 (S.D. Tex. Aug. 6, 2012); *United States v. Slaey*, Civ. No. 06-4930, 2007 WL 2142361, at *3 (E.D. Pa. July 24, 2007) ("[T]he applicability of the [FCA] tolling provision is a partly fact-driven inquiry that cannot be decided at the pleadings stage."). There is certainly nothing in the Complaint from which it could be inferred that any Department of Justice official knew or should have known that Defendants were falsifying the Branch ID numbers in the loan packages submitted to HUD/FHA, which alone precludes dismissal of any claims that accrued within the extended ten year statute of limitations period. Although the Complaint contains references to certain limited information about Defendants' "shadow" branch operations that was known by HUD/FHA employees holding unknown positions within HUD/FHA, the exact nature of what was known to HUD/FHA, how widely disseminated this information was within HUD/FHA, whether all the "material facts" underlying the FCA action were known to HUD/FHA, and whether this information can be imputed to officials at the Department of Justice are all questions of fact that would need to be resolved before the Court can determine whether the tolling provisions of the FCA apply.

In any event, even if the United States' claims did not fall within the tolling provision of the FCA, all claims that were submitted to the Government subsequent to September 18, 2001, are timely brought by operation of the "Suspension Act.[7] The Suspension Act provides

---

[7] The Suspension Act was amended by the Wartime Enforcement of Fraud Act of 2008 ("WEFA"), effective October 14, 2008. WEFA extended the suspension period from three years to five years, and made clear that the suspension period applies whenever "Congress has enacted a specific authorization for the use of Armed Forces." The WEFA Amendments are applicable here because amendments to statute of limitations periods are given effect if the limitations period on the underlying claim has not run at the time of

Footnote continued on next page

> When the United States is at war or Congress has enacted a specific authorization for the use of the Armed Forces, as described in section 5(b) of the War Powers Resolution (50 U.S.C. § 1544(b)), the running of any statute of limitations applicable to any offense (1) involving fraud or attempted fraud against the United States or any agency thereof in any manner, whether by conspiracy or not, . . . shall be suspended until 5 years after the termination of hostilities as proclaimed by a Presidential proclamation, with notice to Congress, or by a concurrent resolution of Congress. For purposes of applying such definitions in this section, the term "war" includes a specific authorization for the use of the Armed Forces, as described in section 5(b) of the War Powers Resolution (50 U.S.C. § 1544(b)).

18 U.S.C. § 3287.

The Suspension Act applies to civil fraud claims brought pursuant to the FCA. *See, e.g.*, *BNP Paribas SA*, 2012 WL 3234233 at **12-13 (citing cases); *United States v. Kolsky*, 137 F. Supp. 359, 362 (E.D. Pa. 1955).

The Suspension Act was triggered by two specific Congressional authorizations for the use of the Armed Forces:  (1) the Authorized Use of Military Force issued on September 18, 2001, pursuant to which the President ordered United States' armed forces to Afghanistan, Pub. L. 107-40, 115 Stat. 224, Senate Joint Resolution 23, Section 2(a); and (2) the Authorized Use of Military Force Iraq issued on October 11, 2002, pursuant to which the President ordered United States' armed forces to Iraq, the Authorized Use of Military Force Against Iraq Resolution of 2002, Pub. L. 107-243, 116 Stat. 1498.  *See, e.g.*, *United States v. Prosperi,* 573 F. Supp. 2d 436, 442-54 (D. Mass. 2008) (holding,

---

*Footnote continued from previous page*

the enactment.  *See Riddle v. Dyncorp Int'l, Inc.*, 666 F.3d 940, 944 (5th Cir. 2012) ("Our precedent directs us to apply the statute of limitations that is in effect at the time a plaintiff files his complaint."); *FDIC v. Belli*, 981 F.2d 838, 842 (5th Cir. 1993) (statutes of limitations are procedural, and therefore amendments to statutes of limitation apply retroactively unless claim had expired prior to effective date of amendment); *United States v. Anghaie*, 1:09-CR-37-SPM/AK, 2011 WL 720044, at *2 (N.D. Fla. Feb. 21, 2011).

under prior version of statute, that Iraq and Afghanistan conflicts triggered Suspension

Act).  The Fifth Circuit has explicitly held that, as of June 12, 2012, there has been no

"termination of hostilities" under the Suspension Act with respect to the Iraq and

Afghanistan conflicts, and thus the relevant statutes of limitation continue to be tolled.

*United States v. Pfluger*, 685 F.3d 481, 485 (5th Cir. 2012).  Accordingly, the statute of

limitations for FCA claims has been suspended from September 18, 2001, through the

present time.  *BNP Paribas*, 2012 WL 3234233, at **14-15.

## III.   THE COMPLAINT ALLEGES SUFFICIENT FACTS TO DEMONSTRATE HODGE'S PERSONAL LIABILITY FOR FCA VIOLATIONS

The Complaint also alleges sufficient and particularized facts regarding Defendant

Hodge's personal involvement in the shadow branch operations to render him liable

under the FCA.  Although Hodge argues that the Complaint "fails to allege a single false

claim or statement of any kind submitted by Mr. Hodge, why such claim or statement

was false, of how Mr. Hodge knew the claim or statement was false," *see* Defendant Jim

C. Hodge's Memorandum in Support of His Motion to Dismiss ("Hodge Br.") at 3-4, and

that the Complaint "fails to distinguish the actions of the various defendants," *id.* at 11,

the Complaint is replete with precisely such detailed and individualized allegations.

Specifically, the Complaint alleges that Hodge is the founder, President, and Chief

Executive Officer of both Allied Capital and Allied Corporation and is the sole director

of both companies.  Compl. ¶ 20.  In that role, Hodge personally formulated the scheme

to operate hundreds of unauthorized shadow branches nationwide, notwithstanding that

HUD/FHA specifically prohibited this practice, and then directed his employees to

submit loan documentation to HUD/FHA falsely stating that such loans originated from

HUD-approved branches.  *Id.* ¶¶ 6, 47, 52, 53.  It was Hodge's decision to continue this fraudulent practice even after senior managers voiced concerns about these false submissions.  *Id.* ¶¶ 6, 47.  The Complaint alleges that these actions violate both the FCA and FIRREA.  *Id.* ¶¶ 111-25.

In his motion to dismiss, Hodge seems to be operating under the misapprehension that he can avoid liability under the FCA if he did not personally submit a false statement to the Government.  Yet the statute is not so narrowly circumscribed that the orchestrator of a fraudulent scheme can evade liability simply by having others carry out his dirty work on his instructions.  Rather, an individual who "causes [a false record or statement] to be made or used" is equally liable as the person who actually makes the false statement.  31 U.S.C. § 3729(a)(2) (2006); 31 U.S.C. § 3729(a)(1)(A) (2009).  Accordingly, by alleging that Hodge directed his employees to make false statements to HUD/FHA to induce HUD/FHA to endorse the loans for FHA insurance, the Government has sufficiently pleaded FCA claims against Hodge personally.  *See, e.g.*, *U.S. ex rel Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 715 (10th Cir. 2006) (holding that a defendant who actively participates in the knowing submission of false claims, but did not personally submit such claims, is nonetheless liable under the FCA); *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 378 (5th Cir. 2004) ("[A] person need not be the one who actually submitted the claim forms in order to be liable."); *United States v. Mackby*, 261 F.3d 821, 828 (9th Cir. 2001) (holding that physical therapist who instructed his billing service and office manager to substitute a doctor's personal identification number on Medicare claim forms "caused" such false

records to be submitted to the Government within the meaning of the FCA); *Peterson v. Weinberger*, 508 F.2d 45, 53 (5th Cir. 1975) (company owner liable for instructing his employees to include false information on Medicare claim forms); *United States v. President and Fellows of Harvard Coll.*, 323 F. Supp.2d 151, 186-87 (D. Mass. 2004) (individuals who actively participate in submission of false claims are liable under the FCA).

### IV.     THE COMPLAINT STATES A CLAIM UNDER FIRREA

Section 951(a) of FIRREA provides that "[w]hoever violates any provision of law to which this section is made applicable by subsection (c) of this section shall be subject to a civil penalty in an amount assessed by the court in a civil action under this section." 12 U.S.C. § 1833a(a).  Section 951(c) of FIRREA, in turn, identifies the criminal violations as to which FIRREA civil penalties apply, and authorizes the United States to recover civil penalties for violations of, or conspiracies to violate, among other things, 18 U.S.C. §§ 1006 and 1014.

Section 1006 proscribes making false statements in connection with HUD's operations.  Specifically, it makes it crime for any person who is "connected in any capacity with [HUD]" to "make any false entry in any book, report or statement of or to [HUD]" with the "intent to . . . deceive any officer, auditor, examiner, or agent . . . of [a] department or agency of the United States."  18 U.S.C. § 1006.  As the statute makes clear, to plead a cause of action the Complaint must allege that (1) the defendant is a covered person; (2) defendant knowingly made a false entry in a book, report or statement submitted to HUD; and (3) that the person acted unlawfully and intended to

injure, defraud, or deceive HUD. *See United States v Hopkins*, 916 F.2d 207, 215 (5th Cir. 1990). In addition, the Fifth Circuit requires that the false statement be material. *See United States v. Parks*, 68 F.3d 860, 865 (5th Cir. 1995).[8]

Section 1014 prohibits submitting false records or making false statements to the FHA, the component within HUD that administers HUD's mortgage insurance program. Specifically, 18 U.S.C. § 1014 makes it crime for any person to "knowingly mak[e] any false statement or report, or willingly overvalue any land, property or security, for the purpose of influencing in any way the action of [FHA]." *Id.* Thus, to plead a cause of action under this section, the Complaint must allege that (1) Defendants knowingly and willfully made a false statement to one of the listed entities, (2) Defendants knew that the statement was false when they made it; and (3) Defendants made the false statement for the purpose of influencing that entity. *United States v. Sandlin*, 589 F.3d 749, 753 (5th Cir. 2009). The Complaint need not allege that Defendants intended to defraud the FHA, but rather must allege only that they had the lesser intent of influencing the decision of one of the listed entities (here, the FHA). *United States v. Johnson*, 585 F.2d 119, 124 (5th Cir. 1978). Moreover, the false statement need not be material, and the institution

---

[8] Although the Fifth Circuit has held that, in the context of 18 U.S.C. § 1006, in order for a false statement to be punishable it must be material, the Circuit's position is no longer tenable in light of the Supreme Court's decision in *United States v. Wells*, 519 U.S. 482 (1997). In *Wells*, the Court considered whether a misrepresentation under 18 U.S.C. § 1014 had to be material in order to sustain a conviction. The Court held unequivocally that materiality was not an element of the offense, stating "[n]owhere does it further say that a material fact must be the subject of the false statement or so much as mention materiality. . . . Thus, under the first criterion in the interpretive hierarchy, a natural reading of the full text, materiality would not be an element of § 1014." *Id.* at 490. Moreover, the Fifth Circuit has interpreted a similar statute – 18 U.S.C. § 1005 – not to include a materiality requirement. *See United States v. Harvard*, 103 F.3d 412, 417-20 (5th Cir. 1997). In any event, it is plain from the Complaint that the false statements made by the Defendants are material, and Defendants do not claim otherwise.

sought to be influenced need not actually rely on the misrepresentations.  *See, e.g.*, *Sandlin*, 589 F.3d at 754; *United States v. Cleary*, 565 F.2d 43, 46 (2d Cir. 1977); *Johnson*, 585 F.2d at 124 ("The focus . . . is on the defendant's intent rather than on the victim"); *United States v. Davis*, 953 F.2d 1482, 1495 (10th Cir. 1992) (Government not required to prove reliance on false statement to sustain conviction).  Rather, "if a person makes a false statement that has the capacity to influence the bank, 'then the specific intent necessary to violate [Section] 1014 may be inferred and the offense is complete.'" *Sandlin*, 589 F.3d at 754 (citation omitted).

An individual who aids, abets, counsels, commands, induces or procures another individual to violate federal law is liable as a principal for the underlying violation.  18 U.S.C. § 2.  Accordingly, even if an individual does not directly prepare or submit the false statements himself or herself, if that individual directed or caused another to perform the criminal act, he or she is liable under section 1006 or section 1014.  *See Davis*, 953 F.2d at 1495 (holding that defendant could be convicted under 18 U.S.C. § 1006 for causing another person to make false entries in bank minutes; it was sufficient that defendant knowingly "set into motion" or knowingly participated in events which caused false entries to be made); *United States v. McDow*, 27 F.3d 132, 135 (5th.Cir. 1994) ("Under . . . section 1014, it is not required that the defendant actually make the false statement directly to the insured institution to be found guilty . . . ."); *cf. Hopkins*, 916 F.2d at 216 (interpreting 18 U.S.C. § 1001).

**A.   The Complaint Sufficiently Pleads that Defendants Made False Statements to HUD/FHA in Violation of Sections 1006 and 1014 of FIRREA**

Although Defendants repeatedly insist that the Complaint fails to state a claim under sections 1006 and 1014 because the Complaint does not allege that Defendants submitted a false statement or report, *see* Hodge Br. at 7-8; Defendant Jeanne L. Stell's Memorandum in Support of Her Motion to Dismiss ("Stell Br.") at 5-6; Americus Br. at 23, the Complaint clearly pleads that Defendants knowingly submitted four different species of false statements to HUD/FHA with the intent to influence and defraud the HUD/FHA. [9]   And the Complaint further alleges that both Stell and Hodge were not only well aware of the misrepresentations submitted to HUD/FHA (particularly given their positions within Allied Capital and Allied Corporation), but were also instrumental in perpetrating them. [10]

*First*, as set forth in great detail *infra* in Pt.I.A, Allied and Hodge made false statements of fact to HUD/FHA in the loan documentation submitted from the "shadow" branches, falsely stating that the loans had originated from approved branches.

---

[9]   Defendants note that false statements to the FHA did not fall within the scope of section 1014 prior to July 30, 2008, when the statute was amended to include FHA.  *See* Americus Br. at 23; Hodge Br. at 8; Stell Br. at 6.  The Government agrees that 18 U.S.C. § 1014 did not criminalize false statements to FHA until July 30, 2008.  Thus, the Government withdraws any claims under section 1014 concerning conduct prior to that date, including its claims under section 1014 for the submission of the Annual Certifications made in 2006 and 2007.  This does not, however, effect the scope of this case, as each of the Defendants is still liable under 18 U.S.C. § 1006 for such conduct, including the submission of the Annual Certifications.

[10]   Hodge is also liable for the false statements made by Allied Capital, Allied Corporation, and Stell, given his position in the company and his own knowledge of the ongoing fraud.  *See, e.g.*, *Carolene Products Co. v. United States*, 140 F.2d 61, 66 (4th Cir. 1944), *aff'd*, 323 U.S. 18 (1944) (The directing heads of a corporation which is engaged in a unlawful business may be held criminally liable for acts of subordinates done in normal course of business, regardless of whether directing heads personally supervised particular acts done or were personally present at time and place of commission of such acts.).

*Second,* in order to obtain HUD/FHA approval to open new branch offices that were authorized to originate FHA loans, Allied Capital and Allied Corporation both submitted false Branch Certifications attesting untruthfully that the new branch office complied with HUD/FHA regulations and that Allied Capital would pay the operating costs for such new branch office.  *See, e.g.*, Compl. ¶¶ 67, 72-73, 76.  The Complaint alleges that this was a false statement, because Allied Capital and, later, Allied Corporation's policy and practice was that it did not and would not assume financial responsibility for the operating costs of the branch offices.  *Id.* ¶¶ 55-82.  The Complaint alleges that it was Stell who directed another Allied Capital employee to fill out these false Branch Certifications, knowing that they were false.  This practice continued after Allied Corporation acquired Allied Capital's assets in late 2010.  *See id.* ¶¶ 76-82.  Once again Stell was directly involved, emailing improper sublease agreements to each of the branch managers.  *Id.* ¶ 76.

*Third*, the Complaint alleges that Stell, on behalf of Allied Capital, submitted Annual Certifications for the years 2006 and 2007 to HUD/FHA that contained false statements.  In order to maintain its HUD-approved status to originate FHA loans, Allied Capital was required to annually certify, among other things, that none of the employees had been convicted of crime or faced civil penalties, and that the lender had not been refused a license or been sanctioned by any state in which it originates or services HUD/FHA insured loans.   Compl. ¶¶ 33, 93.  In fact, numerous employees had prior convictions, *see id.* ¶¶ 96, 99-101, 103-04, and Allied Capital had been sanctioned or denied a license by multiple states, *see id.* ¶¶ 97-98, 101-02.  Stell, as the senior

46

compliance officer, was aware of these violations yet submitted the false certifications. *See id.* ¶ 107.

According to the Complaint, the 2006 and 2007 Annual Certifications were false for another reason as well.  The Annual Certifications certified that "the above named lender conforms to all HUD/FHA regulations necessary to maintain its HUD/FHA approval." *Id.* ¶ 33.  In order to maintain HUD/FHA approval, an approved lender must maintain a quality control program that, among other things, (1) conducts audits on all early payment defaults; (2) reviews 10% of all closed-loan files; and (3) conducts on-site branch office reviews within 90 days of opening and once per year thereafter.  Compl. ¶¶ 34-35, 83.  Allied Capital's quality control program was practically non-existent, however, and was incapable of meeting these regulatory requirements.  *Id.* ¶¶ 83-84.  Allied Capital conducted on-site branch office audits only sporadically, at best, and by 2009 had discontinued branch audits entirely.  *Id.*  Allied Capital's review of early payment defaults was equally deficient.  *Id.* ¶ 85.  Allied Capital did not even begin conducting reviews of early payment defaults until late 2005 or early 2006.  *Id.*  Between 2004 and 2008, Allied Capital was originating loans out of several hundred branches, yet had a quality control staff of just two in its corporate office to conduct reviews of all early payment defaults.  *Id.*  Stell, as the senior compliance officer, was aware that Allied Capital's quality control program did not meet the regulatory requirements, yet signed the false certifications regardless.  *See id.* ¶ 107.

*Fourth*, the Complaint alleges that Hodge was informed by a quality control manager that quality control reports requested by HUD could not be completed on time,

and instructed that individual "to make the reports appear complete" by falsifying the reports.  Compl. ¶ 91.  The employee followed Hodge's instructions and submitted the falsified reports to HUD.  *Id.*

Defendants suggest that these false statements do not state a claim under section 1014 because the Complaint alleges that these statements were submitted to HUD, rather than the FHA.  *See* Hodge Br. 8-9 & n.4; Stell Br. 6-7 & n.3.  This argument misconstrues the Complaint.  The FHA is not a separate federal agency; it is part of HUD.[11]  Accordingly, it falls to HUD to regulate and enforce the FHA-insurance program.  *See, e.g.*, 12 U.S.C. § 1708, 24 C.F.R. § 25.6, and 24 C.F.R. §§ 202.1-12.  The Complaint makes clear that, with respect to the allegations referencing HUD in the Complaint, HUD is acting "through its Federal Housing Administration ('FHA')."  Compl. ¶ 2; *see also id.* ¶ 26.  This is made evident throughout the Complaint, as all of the allegations concern false statements made with respect to the FHA insurance program.  For example, the Annual Certifications make clear that the loans in question are "HUD-FHA insured" and that the lender is required to and is certifying compliance with "HUD-FHA regulations, handbooks, and policies."  Compl. ¶ 33.  The branch ID's that were fraudulently obtained or unlawfully used to operate shadow branches were issued by the FHA.  *See, e.g.*, HUD Mortgagee Approval Handbook 4060.1, ch. 5-8 ("A mortgagee may request a separate FHA branch ID number for a traditional type branch that will be used for the sole purpose of direct lending").  The losses to the Government

---

[11]  The FHA was established in 1934, *see* National Housing Act, 48 Stat. 1246 (1934), and became a part of HUD in 1965, *see* 42 U.S.C. § 3534(a).

were paid from the FHA insurance fund.  Compl. ¶¶ 5, 54.  Stated simply, the various

false statements at issue in this case were submitted to the FHA.[12]

## B.   The Complaint Properly Pleads That Defendants Acted with the Requisite Scienter in Making False Statements to HUD/FHA

Defendants have not challenged the sufficiency of the Government's pleading of

scienter under section 1014.  *See United States v. Scott*, 701 F.2d 1340, 1348 (11th Cir.

1983) (evidence of intentional falsification supported finding of intent for conviction

under 18 U.S.C. § 1014).  Accordingly, any such challenge has been waived.  *See, e.g.*,

*Jones*, 600 F.3d at 541.  Defendants do contend, however, that the Complaint does not

adequately plead the requisite scienter to state a claim under section 1006.  Although

scienter under section 1006 may be pleaded generally, *see* Fed. R. Civ. P. 9(b), the

Complaint is replete with allegations supporting the claim that Defendants acted with the

requisite intent.

To state a claim under section 1006, the Complaint must allege both that the false

statements were made knowingly and that Defendants acted with the requisite intent to

defraud.  Intent to defraud is defined as "act[ing] . . . with the specific intent to deceive,

ordinarily for the purpose of causing some financial loss to another or bringing about

some financial gain to one's self.  It also means to act knowingly and with specific intent

to deceive such that the natural tendency of the act causes injury to [the institution]."

---

[12]   Defendants' reliance on *United States v. Vanoosterhout*, 898 F. Supp 25 (D.D.C. 1995), is misplaced.  *See* Hodge Br. at 8-9; Stell Br. at 6-7.  There, the court denied leave to charge the defendant with violating 18 U.S.C. § 1014 because the allegedly defrauded entity – the Small Business Administration – was not mentioned by name or among the listed generic types of agencies.  *Vanoosterhout*, 898 F. Supp at 30.  Here, in contrast, the FHA is expressly listed and has, in fact, been defrauded by the Defendants as the Complaint makes clear.

*United States v. Dillman*, 15 F.3d 384, 393 (5th Cir. 1994); *see also United States v.
Brophy*, 22 F.3d 1093 (5th Cir. 1994) (intent to defraud is demonstrated "by showing a
knowing, voluntary act by the defendant, the natural tendency of which may have been to
injure the [institution] even though such may not have been his motive").

   As an initial matter, the Government has pleaded that Hodge directed Allied Capital
employees to falsely record in loan documentation that loans originated from approved
HUD branch offices, knowing that the loans in fact were originated by unauthorized
"shadow" branches, with the specific purpose of inducing HUD/FHA to insure loans that
it otherwise would not have insured.  *See supra* at Pt.I.B.  These allegations show that
Defendants acted with the specific intent to deceive HUD/FHA for their own financial
gain, satisfying the scienter requirements under section 1006.

   The Complaint also details that Defendants Allied Capital, Allied Corporation and
Stell acted with the requisite intent in falsely certifying to HUD/FHA that Allied Capital
and Allied Corporation would pay all branch operating costs in order to obtain
HUD/FHA authorization to originate FHA loans from those branch offices.  The
Complaint alleges that Allied Capital and Stell were well aware that these Branch
Certifications were false.  Indeed, on April 23, 2001, HUD/FHA notified Allied Capital
that its employment agreement with its branch managers violated HUD/FHA
requirements regarding the payment of branch operating costs, and that it intended to
seek civil penalties.  Compl. ¶ 57.

   Yet the Complaint alleges that, even though Allied Capital assuaged HUD/FHA's
concerns by promising to comply in the future with HUD/FHA's rules regarding the

payment of branch operating costs, Allied Capital never had any intent of changing its policies and practices, and in fact did not change its policies. *Id.* ¶¶ 57, 61-62. Instead, Allied Capital merely took additional steps to conceal its violations of HUD/FHA's rules regarding branch operations. For example, immediately after the 2001 HUD audit, Allied Capital's issued strict instructions to its employees regarding what they could tell HUD/FHA auditors about branch operations, so as to conceal the fact that it had not reformed its policies from HUD auditors. *Id.* ¶ 59. Moreover, according to the Complaint, Stell admitted in an email that she refused to sign the false certifications herself because she knew they were false and she wanted to avoid being held personally liable for the knowing misstatements. *Id.* Again, these allegations show that, when Defendants submitted the false Branch Certifications to HUD/FHA, they did so knowing they were false, and with specific intent to deceive HUD/FHA into granting authorization for these branch offices to originate FHA loans. Such allegations satisfy section 1006's scienter requirements.

Defendants nonetheless assert that, because the Government purportedly knew of Defendants' conduct and "allowed Allied Capital to continue its participation in the FHA program," the Government's supposed "knowledge and acquiescence in these alleged practices vitiates any allegation of scienter or intent to defraud." *See* Americus Br. at 22; Hodge Br. at 7; Stell Br. at 5. As explained in detail above, *see supra* Pt.I.B.1, this argument is incorrect, both on the law and the facts.

First, Defendants cite no authority for the proposition that there is such a knowledge defense under section 18 U.S.C. § 1006 or FIRREA. Certainly nothing in the

statutory language suggests that knowledge can vitiate Defendants' otherwise well-plead scienter.  And the Fifth Circuit has been notably hostile to attempts to read a knowledge defense into fraud statutes.  For example, the Fifth Circuit has unequivocally held, based upon its reading of section 1014, that knowledge of falsity by the institution to which a false statement is submitted, or even that institution's complicity in the fraud itself, does not serve as a defense to a claim brought under section 1014.  *See United States v. Johnson*, 585 F.2d 119, 123-25 (5th Cir. 1978).  And as explained *supra* Pt.I.B.1, it is doubtful that the Fifth Circuit would recognize the "government knowledge" defense even under the FCA.  *See Southland*, 288 F.3d at 686.

Second, such a defense, even if applicable, only defeats intent where the government knows and approves particular conduct beforehand.  *See Durcholz*, 189 F.3d at 545; *Becker*, 305 F.3d at 289; *Longhi*, 513 F. Supp. 2d at 875.  Defendants have not pointed to any portion of the Complaint that suggests that the Government was aware that Defendants were going to commit fraud and endorsed it prior to it occurring.  Indeed, there is nothing in the Complaint that suggests that the Government ever became aware, prior to the initiation of this *qui tam* action, of the fact that Defendants falsely certified in their 2006 and 2007 Annual Certifications that Allied Capital had not been subject to state sanctions and had not hired any convicted criminals.  There is similarly nothing in the Complaint that suggests that the Government learned, prior to the initiation of this lawsuit, that Allied Capital had submitted falsified quality control reports at the direction of Hodge in or around late 2008.  Rather, as the Complaint illustrates, Defendants went to great lengths to conceal their fraudulent conduct from HUD/FHA.

When HUD/FHA did discover wrongdoing with respect to the Branch

Certifications, far from condoning Allied Capital's actions, HUD/FHA imposed civil

penalties and extracted Defendants' promise that they would cease their conduct.  Such

actions on the part of HUD/FHA could hardly lead Defendants to believe that their

continued lies and misrepresentations were authorized by HUD/FHA.

Finally, even if Defendants could establish a knowledge defense, it would not be

an automatic bar to suit.  *See Southland*, 288 F.3d at 686; *Kreindler*, 985 F.2d at 1156;

*Burlbaw*, 548 F.3d at 951.  Accordingly, Defendants' argument should be rejected.

## C.   Defendants Fall within the Scope of Parties Covered by Section 1006

Defendants argue unpersuasively that section 1006 does not apply to their conduct

at all, because this section "only applies to individuals in their capacity as officers or

employees of an applicable institution."  Hodge Br. at 5; Stell Br. at 3.  This claim is

easily dispatched, as it is founded on a selective misreading of section 1006.

### 1.   Section 1006 Applies to Parties "Connected" With HUD/FHA

Section 1006 not only penalizes officers, agents and employees of certain

identified institutions, but also "whoever" is "connected *in any capacity* with" HUD.  18

U.S.C. § 1006 (emphasis added).[13]  Defendants conveniently ignore this broad language

---

[13]   Hodge and Stell complain that they cannot be liable under 18 U.S.C. § 1006 because neither Allied Capital nor Allied Corporation were "authorized or acting under the laws of the United States, nor were they insured by the FDIC or the National Credit Union Administration Board.  *See* Hodge Br. at 6-7; Stell Br. at 4-5.  This argument is irrelevant because, as described above, section 1006 does not apply only to those employed by certain mortgage lending institutions, but also to anyone "connected with" HUD.  Hodge and Stell are plainly "connected with" HUD, and thus fall within the scope of parties covered by section 1006 regardless of whether Allied Capital or Allied Corporation was established by state charter or authorized under federal law.

in yet another effort to mislead the Court.  "Section 1006 was enacted not only to ensure that policy makers will not be influenced by their personal interests but also to keep federally insured lenders free from fraud."  *United States v. Rice*, 645 F.2d 691, 693 (9th Cir. 1981) (citing *Beaudine v. United States*, 368 F.2d 417 (5th Cir. 1966)).   Thus, the statute is interpreted "broadly."  *Rice*, 645 F.2d at 693; *United States v. Jones*, 372 F.3d 910, 912 (7th Cir. 2004) (noting that courts, when confronted with the phrase "connected with in any capacity" in various statutes, "have consistently construed the phrase to capture those outside the enumerated offenders"); *accord United States v. Meeks*, 69 F.3d 742, 744 (5th Cir. 1995) (noting with respect to similar statute, 18 U.S.C. § 656, that uses the same phrase, that "[t]he words 'connected in any capacity', as normally used, comprise a broad modifying phrase").[14]

The Complaint adequately pleads that Allied Capital, Allied Corporation, Hodge and Stell are "connected" in some capacity to HUD.  Allied Capital was approved by HUD to be an FHA loan correspondent, while Allied Corporation was a HUD-approved direct endorsement lender.  Compl. ¶¶ 17-18.  Accordingly, as participants in HUD's FHA program, Allied Capital had authority to originate HUD-insured mortgage loans, while Allied Corporation could sponsor loans by underwriting them and endorsing them for FHA insurance.  *Id.*  Indeed, Allied Corporation was, until recently, one of the nation's largest FHA lenders.  *Id.*

---

[14]   In interpreting 18 U.S.C. § 1006, courts regularly reference cases interpreting 18 U.S.C. § 656, and vice versa, since the statutes proscribe the same conduct but are only directed at different entities.  *See,e.g., Meeks*, 69 F.3d at 745 n.5; *Jones*, 372 F.3d at 912.

Hodge was the CEO, President and owner of both of these participants in the FHA insurance program, and Stell was the Executive Vice President of and director of compliance at the companies.  Compl. ¶¶ 20-21.  The purpose of Defendants' conduct was to obtain mortgage insurance coverage and reimbursement from HUD/FHA to which they were not entitled.  Accordingly, each of the Defendants is "connected with" HUD within the meaning of section 1006.  *See, e.g.*, *United States v. Prater*, 805 F.2d 1441, 1446 (11th Cir. 1986) (finding that the president of a bank's subsidiary was "an integral part" of the bank's processes and thus liable under §§ 657 and 1006); *United States v. Chandler*, 66 F.3d 1460, 1468 (8th Cir. 1995) ("Connection with the institution may result from control through stock ownership or through the power to extend credit."); *United States v. Bolstad*, 998 F.2d 597, 598 (8th Cir. 1993) (president of wholly-owned subsidiary who prepared and presented loan documents to the parent corporation was "connected with" for purposes of § 1006); *United States v. Payne*, 750 F.2d 844 (11th Cir. 1985) (loan closing attorney was "connected with" bank); *United States v. Harris*, 729 F.2d 441, 445 (7th Cir. 1984) (Defendants, who were employees of state agency that received 60% of its operating funds from HUD and who were working on project the material for which had been paid for 100% by HUD, were "connected in any capacity with" HUD); *Rice*, 645 F.2d at 692-93 (consultant hired to originate loans, but who was without authority to approve loans, was "connected with" the financial institution).

### 2.  Section 1006 Applies to Corporations

Allied Capital also asserts that it is not liable under Section 1006 because that provision only covers natural persons. [15]  *See* Americus Br. at 22.  This argument misconstrues the statute.

Title 1 of the U.S. Code defines the words "whoever" and "person" to include "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals."  1 U.S.C. § 1.  The Supreme Court has explained that the word "whoever" must be "liberally interpreted," particularly in connection with the Criminal Code, which was enacted in tandem with 1 U.S.C. § 1.  *See United States v. A&P Trucking Co.*, 358 U.S. 121, 123 n.2 (1958).  Likewise, section 1006, which is part of the Criminal Code, is to be interpreted "broadly."  *Rice*, 645 F.2d at 693.  Thus, the statute, by its plain text punishes "whoever" is "connected in any capacity" to HUD. [16] This plainly includes Allied Capital.

### 3.  Allied Capital and Allied Corporation are Liable for Their Employees' Violations of Section 1006 Under Respondeat Superior

Even if Allied Capital and Allied Corporation could not be held liable directly for their conduct under section 1006, both Allied Capital and Allied Corporation are liable

---

[15]  The corporate Defendants do not dispute that they are entities covered by Section 1014.

[16]  Defendants point to the phrase "being an officer, agent or employee of" but intentionally ignore the modifier "connected in any capacity with."  While the former phrase refers to natural persons, the latter phrase, which also modifies whoever, reveals that Congress intended section 1006 to have wider coverage than merely officers, agents or employees.  *See Jones*, 372 F.3d at 912 (noting that courts, when confronted with the phrase "connected with in any capacity" in various statutes, "have consistently construed the phrase to capture those outside the enumerated offenders").

under the doctrine of respondeat superior for the unlawful actions of their employees,

namely Hodge and Stell, in violation of that statute.

It is well-established that a corporation may be liable for the criminal acts of its

employees under the theory of respondeat superior. *See, e.g.*, *United States v. Cincotta*,

689 F.2d 238, 241 (1st Cir. 1982) ("A corporation may be convicted for the criminal acts

of its agents, under a theory of respondeat superior."); *see also United States v. Potter*,

463 F.3d 9, 25 (1st Cir. 2006); *United States v. Automated Med. Laboratories, Inc.*, 770

F.2d 399, 406-07 (4th Cir. 1995).  In order for the corporations to be liable under this

theory, the individual actors who committed the various frauds and misrepresentations

must have been acting within the scope of their employment. *See Potter*, 463 F.3d at 25

("The test is whether the agent is 'performing acts of the kind which he is authorized to

perform,' and those acts are motivated—at least in part—by an intent to benefit the

corporation" (quoting *Cincotta*, 689 F.2d at 241)).  Where such a finding is made, the

corporation may be held liable for the individuals' conduct. *See Pacific Mut. Life Ins.

Co. v. Haslip*, 499 U.S. 1, 15 (1991) (individual was acting as employee of Pacific

Mutual when he committed fraud and liability imputed to the company under respondeat

superior); *see also United States v. Hangar One, Inc.*, 563 F.2d 1155, 1158 (5th Cir.

1977) (holding that a corporation may be vicariously liable under the False Claims Act

for the conduct of employees other than those possessing "substantial authority and broad

responsibility"); *United States v. O'Connell*, 890 F.2d 563, 569 (1st Cir. 1989)

(corporation liable under FCA if employee or agent acted with apparent authority);

*Grand Union Co. v. United States*, 696 F.2d 888, 891 (11th Cir. 1983) (corporation can

be liable under the FCA for the acts of its employees pursuant to the doctrine of respondeat superior).[17]

There can be no question here that Hodge and Stell were acting within the scope of their employment, and thus their conduct may be imputed to Allied Capital and Allied Corporation.[18]  The fraud perpetrated by the corporate defendants was for the purpose of expanding Allied Capital and Allied Corporation's core business and increasing company profits.  Allied Capital held itself out to the public as one of the nation's largest privately held mortgage brokers.  *See* Compl. ¶ 17.  Likewise, Allied Corporation claimed it was one of the nation's largest privately held mortgage bankers.  *See id.* ¶ 18.  Both companies participated in the FHA mortgage insurance program.  *See id.* ¶¶17-18.  Both Hodge and Stell were part of the upper management within the companies, and Hodge in particular controlled all relevant aspects of the company's decisionmaking as he was owner, CEO, President and Director of Allied Capital and Allied Corporation.  *See id.* ¶¶ 20-21.  The misrepresentations and fraud known of and committed by these high-ranking individuals therefore can be imputed to both Allied Capital and Allied Corporation.  *See*

---

[17]  *See also United States ex rel. Shackelford v. Am. Mgmt., Inc.*, 484 F. Supp. 2d 669, 673–76 (E.D. Mich. 2007) ("a principal is vicariously liable whenever its agents act within the scope of their employment or with apparent authority regardless of the employer's knowledge or culpability"); *United States ex rel Bryant v. Williams Building Corp.*, 158 F. Supp. 2d 1001, 1008 (D.S.Da. 2001) (principal is liable under the FCA for the acts of its agents "regardless of principle's knowledge, policies, or efforts to restrain the employee's bad acts"); *United States v. Pierre Bouchet, Inc.*, No. 85 Civ. 8530 (PKL), 1987 WL 11565, at *6 (S.D.N.Y. May 21, 1987) ("It is also clear that a corporation may be held liable for the actions of its employees under the [FCA].").

[18]  The court may consider the respondeat superior claim set forth in this section even though it was not separately plead in the Complaint.  *See, e.g., Laro, Inc. v. Chase Manhattan Bank*, 866 F. Supp. 132, 139 (S.D.N.Y. 1994) (considering plaintiff's respondeat superior claim even though it was "not separately pleaded in the complaint"); *see also Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705, 711 (2d Cir. 1980); *Isik Jewelry v. Mars Media, Inc.*, 418 F. Supp. 2d 112, 129-30 (E.D.N.Y. 2005).

*Continental Baking Co. v. United States*, 281 F.2d 137, 149 (6th Cir. 1960) (where officer or agent of corporation with broad express authority holds a position of some responsibility and performs a criminal act related to the corporation's business and the criminal act is directly related to the performance of the duties which the officer or agent has the broad authority to perform, the corporation is liable for the criminal act and must be deemed to have authorized the criminal act).  Accordingly, both Allied Capital and Allied Corporation are liable for Stell and Hodge's violations of section 1006 under the doctrine of respondeat superior.

## V.  THE COMPLAINT MEETS THE PARTICULARIZED PLEADING STANDARD OF RULE 9(B)

Rule 9(b) provides that, "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  Although the Fifth Circuit often requires "that a fraud complaint include 'the time, place and contents of the false representation[ ], as well as the identity of the person making the misrepresentation and what that person obtained thereby,'" the Fifth Circuit has recognized that "'Rule 9(b)'s ultimate meaning is context-specific' . . . .  Depending on the claim, a plaintiff may sufficiently 'state with particularity the circumstances constituting fraud or mistake' without including all the details of any single court-articulated standard — it depends on the elements of the claim at hand."  *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 188 (5th Cir. 2009) (citations omitted); *see also id.* ("[T]he 'time, place, contents, and identity' standard is not a straitjacket for Rule 9(b).").

The Fifth Circuit, explicitly rejecting the stricter pleading standards that had been adopted in FCA cases by the First, Tenth and Eleventh Circuits, has held that the pleading requirements of Rule 9(b) are relaxed in the FCA context. *Grubbs*, 565 F.3d at 187-89; *see also United States v. Huron Consulting Group, Inc.*, No. 09 Civ. 1800, 2011 WL 253259, at *2 (S.D.N.Y. Jan. 24, 2011) (the "traditional standard of the particularity requirements of Rule 9(b) should be relaxed" in the FCA context). In reaching this conclusion, the Fifth Circuit noted that the "time, place, contents, and identity standard originated in common law fraud and securities fraud cases . . . [so] it [is] no surprise that the elements of those claims match the pleading standard's requirements. . . . Given the elements of reliance and damages [in such claims], pleading common law fraud with particularity demands the specifics of the false representation — without the precise contents of the misrepresentation the plaintiff cannot show he relied on the misrepresentation to his detriment." 565 F.3d at 188-89 (internal citation omitted).

The Fifth Circuit contrasted such common law fraud claims with the False Claims Act, which "lacks the elements of reliance and damages. . . . [T]he contents of the bill are less significant because a complaint need not allege that the Government relied on or was damaged by the false claim. Thus, a claim under the False Claims Act and a claim under common law or securities fraud are not on the same plane in meeting the requirement of 'stat[ing] with particularity' the contents of the fraudulent misrepresentation." *Id.* at 189.

Like the FCA, neither section 1006 nor section 1014 of Title 18 requires proof of reliance or damages as an element of the offense. The Court's analysis in *Grubbs*

therefore indicates that, to the extent that claims for civil penalties pursuant to 12 U.S.C. § 1833a are also subject to Rule 9(b)'s pleading requirements, then the same relaxed pleading standard applies.

Applying that relaxed standard, the Fifth Circuit in *Grubbs* concluded that Rule 9(b) is satisfied if a complaint provides particularized "details of a scheme" to submit fraudulent records to the Government, paired with reliable indicia to support a strong inference that these false records were actually presented to the Government.  565 F.3d at 189.  In *Grubbs*, the relator pleaded that he had been approached by doctors at the hospital in which he was employed to become part of an on-going fraudulent billing scheme, pursuant to which the doctors recorded services in hospital medical records that were not actually performed, ultimately resulting in false claims being presented to the Government.  The relator filed a complaint under the FCA, setting forth his knowledge of the scheme to present fraudulent billing records to the Government.  Even though the complaint could not provide details regarding any of the fraudulent billing records themselves, including the dates, amounts charged, or who prepared or submitted the fraudulent records, the Fifth Circuit concluded that such allegations satisfied Rule 9(b) particularity requirement.  *Id.* at 190-91.

The Government's FCA and FIRREA claims easily meet this pleading standard. Indeed, the Complaint provides more specific details about the implementation of the fraudulent scheme and the content of the misrepresentations than did the relator in *Grubbs.*  The Complaint describes with particularity the decade-long fraudulent schemes that form the basis of the Government's FCA and FIRREA claims, including the content

of the misrepresentations, why the statements at issue are false, the form those

misrepresentations took, and Defendants' motivations for making the false statements to

HUD.  The Complaint also makes clear the role each defendant played in making the

fraudulent misrepresentations.  Accordingly, the Complaint satisfies Rule 9(b)'s pleading

standards.

With respect to the Fifth Count of the Complaint, for example, the Government

has pleaded the "time, place, contents, and identity" of the misrepresentations.

Specifically, the Complaint alleges that the false statements were made by Stell, the Vice

President of Allied, acting on behalf of the company.  Stell made these statements in

Allied Capital's 2006 and 2007 Annual Certifications, which Allied Capital then

submitted to HUD.  Compl. ¶ 107.  The Complaint describes in detail the false statements

contained in the Annual Certifications.  *Id.* ¶¶ 33, 93, 96-104.

Similarly, in support of the Fourth Claim of the Complaint, the Government avers

that false statements were made by corporate defendants Allied Capital and Allied

Corporation in the HUD Form 92001-B certifications submitted by Allied Capital to

HUD/FHA between January 1, 2000, and late 2010 and early 2011, *id.* ¶¶ 7, 55-76, and

Allied Corporation from late 2010 through the present day, *id.* ¶ 76.  The Complaint

details the substance of the false statement in the Branch Certifications, and the role Stell

in particular played in directing another employee to sign the false certifications.  *Id.* ¶¶

56-73.  Such allegations are particularized enough to put the Defendants on notice as to

the basis for the Government's claims against them.

The specificity of these allegations refutes Defendants' claim that the Complaint improperly "lumps all defendants together without properly attributing any of its unspecified fraudulent actions to any specific defendant," Americus Br. at 24.  *See also supra* at Pt.III (outlining allegations addressing Hodge's role in fraud).  Just as the Complaint differentiates between the actions of Hodge and Stell, the Complaint also takes care to distinguish between the actions of Allied Capital and Allied Corporation.  Thus, while the Complaint asserts claims against Allied Corporation as the successor entity to Allied Capital, it also alleges that, after Allied Corporation purchased Allied Capital's assets in 2010, it continued Allied Capital's fraudulent practice of falsely certifying to HUD/FHA that it assumed financial responsibility for branch office operations.  Compl. ¶¶ 7, 55, 76-78.  Accordingly, the Complaint asserts claims against Allied Corporation for its own fraudulent conduct.

In insisting that the allegations are too generalized to put them on notice of the allegations against them, Defendants seem to suggest that the Government can only meet Rule 9(b)'s pleading requirements by itemizing each of the hundreds of Branch Certifications and the thousands of loan packages in which the false statements appear.  This was precisely the interpretation of Rule 9(b) that was rejected by the Fifth Circuit in *Grubbs*, however.  565 F.3d at 187-89.  Indeed, courts have long recognized that when the allegations of a complaint concern a scheme that is "complex and far-reaching, pleading every instance of fraud would be extremely ungainly, if not impossible." *United States ex rel. Franklin v. Parke-Davis, Div. of Warner-Lambert Co.*, 147 F. Supp. 2d 39, 49 (D. Mass. 2001); *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 333 (D.

Conn. 2004) ("[W]here the alleged fraudulent scheme involved numerous transactions that occurred over a long period of time, courts have found it impractical to require the plaintiff to plead the specifics with respect to each and every instance of fraudulent conduct.").  To require the Government to file a tome detailing every loan package submitted from a shadow branch from 2000 through 2010 would be highly impractical and unnecessary, and would result in precisely the type of "ungainly, if not impossible" complaint that courts have attempted to avoid by allowing FCA claimants to plead FCA violations in precisely the manner in which the Government has done here.[19]

To the extent that Defendants suggest that the Complaint is deficient in not identifying the particular Allied employees that actually signed the hundreds of Forms 92001-B submitted to HUD/FHA, or the Allied employees who entered false branch ID numbers in each of the thousands of loan packages at issue in the FCA counts of the Complaint, *see* Defendant Allquest Home Mortgage Corporation's Memorandum in Support of its Motion to Dismiss ("Allquest Br.") at 17, Rule 9(b) again does not require this level of detail.  As an initial matter, the identity of the natural person within the corporate defendant who submitted false statements to the Government is not an essential element of an FCA violation asserted against a corporate defendant.  *United States ex rel.*

---

[19]  Requiring such detail regarding the loan level certifications is also unwarranted where, as here, the facts relating to the fraud are "'peculiarly within the perpetrator's knowledge.'"  *United States ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 330 (5th Cir. 2003) (citation omitted).  In the instant case, although the Government has obtained details of the vast scope of Allied Capital's fraudulent scheme from its investigation, the Government has no ready means to distinguish each of the loan packages originated by Allied Capital's shadow branches from those were originated by HUD-approved branches without being able to take discovery.  This is precisely because Allied Capital submitted all of its shadow branch loan documentation under the identification numbers of approved branches.

*Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 506 (6th Cir. 2007).  Accordingly, Rule 9(b) does not require that the Complaint identify each Allied employee who filled out the forms themselves.  *Id.* at 509 ("[W]here the corporation is the defendant in a FCA action," Rule 9(b) does not require that the Complaint "allege the specific identity of the natural persons within the defendant corporation that submitted the false claims."). Instead, where it is "alleged that the corporation has committed the fraudulent acts, it is the identity of the corporation, not the identity of the natural person, that [must necessarily be] plead with particularity."  *Id.* at 506; *see also Huron Consulting Group*, 2011 WL 253259, at **2-3 & n.3; *United States ex rel. Folliard v. CDW Tech. Serv., Inc.*, 722 F. Supp. 2d 20, 32 (D.D.C. 2010) ("defendants are hardly disadvantaged by relator's failure to identify which of their own employees were responsible for" preparing the types of forms at issue); *United States ex rel. Pogue v. Am. Healthcorp., Inc.*, 977 F. Supp. 1329, 1333 (M.D. Tenn. 1997); *United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 685 F. Supp. 2d 129, 139 (D.D.C. 2010).

Similarly, where the Government charges that an individual "caused" a false statement to be used, the Complaint need not specify the particular individual that actually submitted the statement to the Government.  *See Grubbs*, 565 F.3d at 189 n.31. The identity of the submitting individual is not an element of section 3729(a)(2) of the FCA or FIRREA.  Accordingly, Rule 9(b) is satisfied where, as here, the Government identifies the individual defendants responsible for "causing" false statements to be made and submitted to the Government — Hodge in the case of the loan documentation and the

falsified quality control reports, Stell in the case of the Branch Certifications and the Annual Certifications.

Defendants also take issue with the Complaint's purported failure to identify each of the "claims" for payment that are at issue in this case, a flaw that Defendants categorize as "fatal" to the Government's case. *See, e.g.*, Americus Br. at 24. Rule 9(b) does not require the Government to provide further information about the claims for payment it has received to date.

First, as an initial matter, as the submission of a claim is not an element of either section 1006 or 1014 of FIRREA, this argument on its face only applies to the Government's FCA claims.

Second, Rule 9(b) only requires that the "circumstances constituting fraud" be pleaded with particularity. The "claims" at issue in this case, however, come from third parties who submitted requests for payment to HUD/FHA from the FHA insurance fund following defaults on the underlying mortgages. There is no allegation in this case that there was anything false or fraudulent in the 35,801 claims for payment that the Government has received to date; rather, recovery is based upon the fraudulent misrepresentations that induced the Government to insure these loans in the first instance. *See supra* at Pt.I.A. Specifying which innocent third parties submitted these claims for reimbursement from the FHA insurance fund, the dates HUD/FHA received such claims for payment, or the amounts of such claims for payment would not assist Defendants in understanding the nature of the charges against them. *United States v. Luce*, No. 11 C 5158, 2012 WL 2359357, at **3-5 (N.D. Ill. June 20, 2012) (denying motion to dismiss

an FCA complaint premised upon false statements contained in Forms 92900-A where government had alleged that "some" FHA-insured loans subsequently defaulted, as questions regarding which specific loans had defaulted go "to the amount of damages potentially recoverable by the Government, not to the Government's ability to state a valid claim for violation of the FCA").

It is for this reason that, in an FCA action in which the Complaint asserts that the false statements that give rise to liability were submitted to the Government independent from the later claims for payment, Rule 9(b) does not require that the Complaint plead with specificity the details of such claims.  Such information is neither an element of the FCA action nor does it constitute the circumstances of the fraud.  *Grubbs*, 565 F.3d. at 193 (overturning dismissal of FCA complaint that did not allege any details of claims submitted to the government); *see also United States ex rel. Duxbury v. Ortho Biotech Products, L.P.*, 579 F.3d 13, 29 (1st Cir. 2009); *United States ex rel. Folliard v. CDW Tech. Serv., Inc.*, 722 F. Supp. 2d 20, 32 (D.D.C. 2010); *United States ex rel. Davis v. District of Columbia*, 591 F. Supp. 2d 30, 37 (D.D.C. 2008).  "Th[e] argument [that the Complaint must detail the individual who submitted the claim for payment] conflates the FCA's requirement that a false claim exist with Rule 9(b)'s requirement that the *misrepresentations* underlying the false claim be pled with particularity.  A defendant can make a misrepresentation to the government separately from a claim for payment, even though the misrepresentation relates to the claim." *Folliard*, 722 F. Supp. 2d at 32 (emphasis in original).  To hold otherwise would be run afoul of the Fifth Circuit's admonition in *Grubbs* that Rule 9(b) should not be construed to require pleading more

facts than would be necessary to prove the elements of the cause of action at trial. *Grubbs*, 565 F.3d. at 189-90.

In sum, the Complaint alleges facts with sufficient particularity to put Defendants on notice of the claims against them.

## VI. ALLIED CORPORATION IS LIABLE FOR THE ACTIONS OF ALLIED CAPITAL

In addition to the FIRREA counts brought against Allied Corporation for its own false statements to the FHA starting in late 2010 and early 2011, Compl. ¶¶ 7, 55, 76-78, the Complaint also alleges that Allied Corporation is liable for the actions of Allied Capital as its successor.  The Complaint alleges facts sufficient to establish that there was substantial continuity in the operation of the business before and after the sale of Allied Capital to Allied Corporation, and thus the claims against Allied Corporation should not be dismissed.

### A.   Federal Common Law Controls Whether Allied Corporation is the Legal Successor to Allied Capital

Stated simply, "federal law governs questions involving the rights of the United States arising under nationwide federal programs."  *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726 (1979); *see also Steinbach v. Hubbard*, 51 F.3d 843, 845 (9th Cir. 1995) (stating that successor liability as applied to federal statutes is governed by federal law).  Thus, in actions such as this one involving rights under federal programs and federal statutes, it is well-established that courts apply federal common law to determine successor liability.  *See United States ex rel. Fisher v. Network Software Assocs., Inc.*, 180 F. Supp. 2d 192, 195 (D.D.C. 2002) (court applied federal common law to determine

successor liability in action under the False Claims Act); *U.S. ex rel. Geschrey v. Generations Healthcare, LLC*, No. 10 C 2413, 2012 WL 3581060, at *12 (N.D. Ill. 2012) (same); *see also Chicago Truck Drivers, Helpers, and Warehouse Workers Union (Independent) Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48, 49 (7th Cir. 1995) (applying federal common law of successorship in ERISA case); *EEOC v. G-K-G, Inc.*, 39 F.3d 740, 747-48 (7th Cir. 1994) (applying federal common law doctrine of successor liability to ADEA claim); *Whelco Indust., Ltd. v. United States*, 503 F. Supp. 2d 906, 910 (N.D. Ohio 2007) (applying federal common law successor liability in case involving federal tax liens); *Shevack v. Litton Applied Tech.*, No. 95 Civ. 7740 (JSM), 1998 WL 512959, at *2 (S.D.N.Y. Aug 18, 1998) ("Federal common law governs the issue of successor liability for various federal causes of action."); *R.C.M. Executive Gallery Corp. v. Rols Capital Co.*, 901 F. Supp. 630, 634-35 (S.D.N.Y. 1995); *Vine Street, LLC v. Keeling ex rel. Estate of Keeling*, 460 F. Supp. 2d 728, 740-41 (E.D.Tex. 2006) (applying federal common law of successorship to determine CERCLA liability). Accordingly, federal law governs whether Allied Corporation is a successor to Allied Capital.[20]

---

[20]   Allquest cites the Second Circuit's decision in *State of New York v. Nat'l Serv. Indus., Inc.*, 352 F.3d 682 (2d Cir. 2003), which involved environmental liabilities. *See* Allquest Br. at 11. As the Second Circuit explained in *National Service Industries*, a "substantial continuity" test in the environmental context may expose a good faith purchaser to massive liabilities that it had no reasonable way to discover, given that a seller may have engaged in "illegal dumping of toxic wastes . . . in secret" or that the "dumping that gives rise to liability was done long in the past, at a time when such activities were unregulated and no records were maintained." 352 F.3d at 693-94. Such concerns are not implicated here, and the "substantial continuity" condition remains applicable to FCA cases. Moreover, even in the environmental context, federal common law continues to determine successor liability. *See Vine Street, LLC*, 460 F. Supp. 2d at 740-41; *see also United States v. Gen. Battery Corp.*, 423 F.3d 294, 303-04 (3d Cir. 2005).

Under the federal common law doctrine of successor liability, two conditions must be satisfied: (1) "the successor had notice of the claim before the acquisition"; and (2) there was "substantial continuity in the operation of the business before and after the sale, [which] is satisfied if no major changes are made in that operation." *G-K-G, Inc.*, 39 F.3d at 747-48; *Fisher*, 180 F. Supp. 2d at 195.   These two conditions are related insofar as "[s]ubstantial continuity in ownership and staff between the predecessor corporation and the successor entity 'may well satisfy the notice prong' by suggesting that there was actual knowledge of a claim by the successor corporation or its principals." *Fisher*, 180 F. Supp. 2d at 196 (quoting *Chicago Truck Drivers*), 59 F.3d at 49-50.   This general framework applies in cases, such as this, arising under the False Claims Act.  *See, e.g.*, *U.S. ex rel. Jajdelski v. Kaplan, Inc.*, 834 F. Supp. 2d 1182 (D. Nev. 2011) (applying standard in FCA case); *Geschrey*, 2012 WL 3581060, at *12 (same); *Fisher*, 180 F. Supp. 2d at 195 (same).[21]

## B.   Allied Corporation Is Liable for the Fraudulent Conduct of Allied Capital

The well-pleaded allegations in the Complaint easily show that Allied Corporation is liable for the conduct of Allied Capital.  First, there was substantial continuity in the operation of the business before and after the sale of Allied Capital.  Specifically, Allied

---

[21]   Allquest cites only one FCA case in support of its claim that state law, rather than federal law, should control.  *See* Allquest Br. at 11 (citing *United States ex rel. Pilecki-Simko v. The Chubb Institute*, 06 Civ. 3562, 2010 WL 1076228, at *11 (D.N.J. Mar. 22, 2010)).  That case, however, was wrongly decided.  In *Chubb*, the court held that the relators failed to sufficiently allege violations of the FCA, but proceeded in the alternative to consider the issue of successor liability under New Jersey law.  In doing so, the court erred in relying on two inapplicable appellate court decisions: *Stromberg Metal Works, Inc. v. Press Mechanical, Inc.*, 77 F.3d 928, 933 (7th Cir. 1996), a diversity action, and *In re Cambridge Biotech Corp.*, 186 F.3d 1356, 1376 (Fed. Cir. 1999), which applied state law to a discrete breach of contract issue.

Corporation "continued the business of Allied Capital, operated nearly all of the same branches, and employed nearly all of the same senior managers."  Compl. ¶ 19.  For example, Defendant Hodge is the founder, President, and CEO of both Allied Capital and Allied Corporation, and is also the sole director of both companies.  Compl. ¶ 20; *see also* Tr. at 79.  Similarly, Defendant Stell was the Executive Vice President and Director of Compliance of both Allied Capital and Allied Corporation.  Compl. ¶ 21; *see also* Tr. at 150.  Moreover, Allied Capital and Allied Corporation maintained the same general counsel, chief financial officer, secretary, corporate comptroller, accounting department, information technology department, and quality control department.  Compl. ¶ 19; *see also* Tr. at 54-55, 57-58, 148-54.  In addition, both Allied Capital and Allied Corporation are located in the same building and have the same ownership structure.  Compl. ¶ 19; *see also* Tr. at 155.  Both Allied Capital and Allied Corporation also maintained the same corporate policy "of requiring branch managers to assume financial responsibility for their branches."  Compl. ¶ 7.  In fact, numerous witnesses have confirmed that aside from changing the signage, there was no change in the operation of the Allied Capital branches that Allied Corporation absorbed.  Compl. ¶ 19.

Second, there can be no question that Allied Corporation had notice of the potential claims against Allied Capital before acquiring it.  As set forth *supra* Pt.IV.A, Defendants made numerous false statements to HUD/FHA.  Despite substantial efforts to conceal its scheme through outright lies and deception, Allied Corporation was put on notice of each of these allegations prior to absorbing Allied capital, as the key players in each corporation were the same: Hodge and Stell.

As both Hodge and Stell remain in the exact same roles in Allied Corporation as they had in Allied Capital, this alone is sufficient to conclude that Allied Corporation was on notice of Allied Capital's pre-acquisition violations.  *See Chicago Truck Drivers*, 59 F.3d at 49 (the fact that a particular individual served as "the registered agent" for the old corporation and the "president and secretary" of the new corporation supported an inference of notice); *Fisher*, 180 F. Supp. 2d at 196 ("[s]ubstantial continuity in ownership and staff between the predecessor corporation and the successor entity 'may well satisfy the notice prong' by suggesting that there was actual knowledge of a claim by the successor corporation or its principals").  Defendants nowhere claim that Allied Corporation did not have adequate notice of the potential claims against Allied Capital, nor could they so claim with any credibility.  *See, e.g.*, Tr. at 143.  Indeed, Hodge signed the Asset Sell Agreement between Allied Capital and Allied Corporation on behalf of *both* companies.  Tr. at __.  Accordingly, Allied Corporation is liable for the conduct of Allied Capital.[22]

## C.   The Government Is Not Collaterally Estopped From Arguing Successor Liability

### 1.   Governing Law

The Government is not collaterally estopped from litigating that Allied Corporation is the successor entity to Allied Capital.  The Fifth Circuit requires four conditions to be present in order to collaterally estop a party from litigating an issue:

---

[22]   Moreover, if there is a disputed issue of fact as to whether all of the elements of the Government's successor liability claim have been established, dismissal would be inappropriate.  *See, e.g.*, *Fisher*, 180 F. Supp. 2d at 195 (whether individual's control of predecessor and successor corporations put him on actual notice of potential liability under FCA presented fact questions that could not be resolved on motion to dismiss).

(1) the issue under consideration is identical to that litigated in the prior action; (2) the issue was fully and vigorously litigated in the prior action; (3) the issue was necessary to support the judgment in the prior case; and (4) there is no special circumstance that would make it unfair to apply the doctrine.

*Copeland v. Merrill Lynch & Co.,* 47 F.3d 1415, 1422 (5th Cir. 1995); *see also Duffy & McGovern Accommodation Servs. v. QCI Marine Offshore, Inc.*, 448 F.3d 825, 829 (5th Cir. 2006) ("collateral estoppel applies when a previously litigated issue of law or fact was identical to the present issue, actually litigated, necessary to a final judgment, and reviewed under the same standard as the present issue").  Defendants have failed to establish these factors.

In addition, the court has ruled that certain other "safeguards that must be present before estoppel may be employed."  *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 391 n.3 (5th Cir. 1998) (listing certain safeguards).  One such safeguard is that collateral estoppel will not be invoked unless the facts and the legal standard used to evaluate the facts are the same in both actions.  *See id.*; *see also Copeland*, 47 F.3d at 1422.  Thus, even where both lawsuits arise out of the same nucleus of operative facts, collateral estoppel does not apply unless both suits involve application of the same legal standard.  *See RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1291 (5th Cir. 1995); *Copeland*, 47 F.3d at 1422.  A second safeguard considers whether a new determination of the issue is warranted by differences in the quality or extensiveness of the procedure followed in the two courts.  *See Copeland*, 47 F.3d at 1423.  Lastly, of relevance here, preclusion is inappropriate where the party against whom it is being asserted could not obtain review of the judgment in the other action.  *See Winter*, 149 F.3d at 395 (citing Restatement (Second) of Judgments § 28(1)).  Indeed, the Restatement makes clear that

"the availability of review for the correction of errors has become critical to the application of [the] preclusion doctrine." *Id.*, Cmt. a (cited in *Winter*, 149 F.3d at 395). The application of these safeguards to the instant matters likewise prevents application of the collateral estoppel doctrine as explained below.

## 2.   The Preliminary Injunction Action

Absent from Defendants' briefs, but necessary to a proper resolution of this issue, is any discussion of the prior action they now seek to invoke.  On November 1, 2011, the initial complaint was filed in this action and HUD/FHA suspended Allied Corporation from participating in the FHA loan program (the "HUD suspension").  *See Allied Home Mortg. Corp., et al v. Sec'y of the United States Dep't of Hous. and Urban Dev.*, 11 Civ. 3864 (S.D. Tex.) ("PI Dkt. No. __"), Dkt. No. 1, Ex. 1.  The following day, Allied Corporation instituted a suit against HUD seeking, *inter alia*, a temporary restraining order and a preliminary injunction prohibiting the enforcement of the HUD suspension. *See id.*

The court scheduled a preliminary injunction hearing on November 8, 2012, and ordered that the parties submit briefing by November 7, which they did.  *See* PI Dkt. Nos. 7, 15 and 30.  On November 15, 2011, the Court granted Allied Corporation's motion for a preliminary injunction.  *See Allied Home Mortg. Corp. v. Donovan*, 830 F. Supp. 2d 223 (S.D. Tex. 2011).  In reaching its conclusion, the Court concluded that HUD erred in treating Allied Corporation as the successor to Allied Capital under Texas law.  *Id.* at 232-34.  The Court nowhere discussed whether federal or state law applied to determine

successorship, but assumed (in error and without receiving briefing from the United States on this issue) that state law applied.

On December 2, 2011, the Government moved for reconsideration of the decision granting a preliminary injunction. *See* PI Dkt. No. 42. The Government argued, *inter alia*, that the Court erred in applying Texas law, rather than federal common law, to determine whether Allied Corporation was the successor to Allied Capital. *Id.* at pp.12-14. The Government's reply brief in support of its motion for reconsideration, filed on January 11, 2012, further elaborated on this issue. *See* PI Dkt. No. 47 at pp. 7-9.

On May 30, 2012, the Government filed a motion to dismiss Allied Corporation's complaint because the HUD suspension that was the basis of the preliminary injunction had been withdrawn, and argued, *inter alia*, that Allied Corporation's claim for injunctive relief was moot. *See* PI Dkt. No. 56 at pp.4-8. The district court agreed that Allied Corporation's claim for injunctive relief was moot, and vacated the preliminary injunction. *See Allied Home Mortg. Corp. v. Donovan*, No. 11 Civ. 3864, 2012 WL 3276978, at *8 (S.D. Tex. Aug. 8, 2012) ("The November 15, 2011 preliminary injunction is VACATED AS MOOT"). In addition, the Court denied the Government's motion for reconsideration as moot. *Id.* Thus, the Court never ruled on the choice of law issue presented by the Government's motion to reconsider.

### 3.   Collateral Estoppel Does Not Apply

It is plain that collateral estoppel does not apply. Stated simply, issues litigated in a preliminary injunction action do not form a basis for collateral estoppel. *See Kuzinich v. Santa Clara County*, 689 F.2d 1345, 1350-51 (9th Cir. 1982). Thus, courts regularly

refuse to give preclusive effect to findings made during preliminary injunction hearings.

*See Cent. Fla. Sheet Metal Contractors Ass'n, Inc. v. N.L.R.B.*, 664 F.2d 489, 498 (5th

Cir. 1981); *see also State of Tex. v. Wellington Resources Corp.*, 706 F.2d 533, 537 (5th

Cir. 1983); *In re Allied Pilots Class Action Litig.*, No. CIV.A.3:99–CV–0480P, 2000 WL

1405235, *6 (N.D.Tex. Sept. 26, 2000).

First, the issue of successorship was not "fully and vigorously litigated in the prior

action."  Rather, as the facts show, the matter was barely litigated before the district court

at the preliminary injunction stage – and was done so on an expedited basis in the

absence of any discovery.  Because the parties exchanged briefs on an expedited basis,

disclosed them simultaneously the day before the preliminary injunction hearing took

place, and were given no opportunity to file responsive briefs, the Government was

unaware that successor liability was being challenged until after it had filed its brief, and

thus never addressed the choice of law issue.  *See* PI Dkt. No. 47 at p.7 n.2.  Had the

litigation proceeded in the ordinary course, the Government would have been presented

an opportunity to respond to Allied Corporation's incorrect legal assertion that Texas law

applied.  However, because of the truncated schedule of the proceedings, the Government

was prevented from doing so.  Moreover, although the Government sought to correct the

court's legal error through its motion for reconsideration – and thus attempted to further

litigate this matter – the court vacated the preliminary injunction as moot and did not rule

on the merits of the Government's legal argument.  *Allied Home Mortg. Corp.*, 2012 WL

3276978, at *8.  Thus, because the issue of successorship was not fully and vigorously

litigated, collateral estoppel does not apply.  *See Baros v. Texas Mexican Railway Co.*,

400 F.3d 228 (5th Cir. 2005) (refusing to give preclusive effect to findings made during a preliminary injunction hearing only ten days after the suit was initiated and under a different legal standard).

Second, the legal standards used to evaluate the facts at a preliminary injunction hearing and a judgment on the merits of the instant suit are different, and thus the application of collateral estoppel is unwarranted.  As the court made clear in its preliminary injunction opinion, it concluded *only* that Allied Capital had "made a *prima facie* case of a likelihood of success on the merits of their suspension based on a continuation theory . . . and Texas law."  *Allied Home Mortg. Corp.*, 830 F. Supp. 2d at 234; *Sunbeam Prods., Inc. v. West Bend Co.*, 123 F.3d 246, 254-55 (5th Cir. 1997) (noting different standards that apply to grant of preliminary injunction and final judgment on merits); *accord N. Arapahoe Tribe v. Hodel*, 808 F.2d 741, 753 (10th Cir. 1987) ("The injunction standard of probable success on the merits is not equivalent to actual success on the merits.").  Because the legal standards differ, collateral estoppel does not apply.  *See, e.g.*, *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 290 (5th Cir. 2005) (fact issues in two proceedings are not same, for collateral estoppel purposes, if legal standards governing their resolution are significantly different).

Third, the Government was not (and is not) able to obtain any further review of the initial, but subsequently vacated, decision of the district court concerning the preliminary injunction because the issue, as the district court concluded, had become moot.  *United States Bancorp Mortg. Co. v. Bonner Mall Partnership*, 513 U.S. 18, 21 (1994) (appellate courts may not consider merits of judgment that has become moot).  Indeed, there is no

appellate review available from a vacated decision, as there is necessarily no "case or controversy." *See, e.g.*, *Fuller v. Bd. of Immigration Appeals*, – F.3d –, 2012 WL 4875696, at *1 (2d Cir. 2012); *Gordon v. Colin*, 267 F. App'x 843 (11th Cir. 2008); *accord Baros*, 400 F.3d at 233 (concluding that the preliminary injunction finding was not subject to judicial review because it never went into effect).  Because the United States could not obtain appellate review, the district court's vacated preliminary injunction decision has no preclusive effect in this matter.  *Algonquin Power Income Fund v. Christine Falls of New York, Inc.*, 362 F. App'x 151 (2d Cir. 2010) (where party could not appeal grant of preliminary injunction, collateral estoppel does not apply to bar subsequent litigation of the same issue).[23]

Finally, and relatedly, where a prior decision is vacated, the law treats it as though it never existed.  *See Mitchell v. Joseph*, 117 F.2d 253, 255 (7th Cir. 1941); *Wynne v. Rochelle*, 385 F.2d 789, 796 (5th Cir. 1967).  Indeed, the reason that decisions that have become moot before appellate review is complete are ordinarily vacated is because of the inequity in allowing an unreviewable decision to have any preclusive effects.  *United States v. Munsingwear, Inc.*, 340 U.S. 36, 41 (1950) (where judgment is unreviewable

---

[23]   Allquest argues that because the preliminary injunction decision was immediately appealable to the Fifth Circuit, the Government's decision not to immediately appeal should be held against it in deciding whether collateral estoppel should bar relitigation of this issue.  *See* Allquest Br. at 8.  Moving for reconsideration to permit the district court an opportunity to consider the choice of law issue in the first instance, before appealing to the Circuit, was a perfectly appropriate way to proceed, however.  *See, e.g.*, *Henderson v. Thaler*, 626 F.3d 773, 779 (5th Cir. 2010) (remanding case to district court to allow it to consider, in the first instance, whether facts warrant equitable tolling); *In re Argo Fin., Inc.*, 337 F.3d 516, 525 (5th Cir. 2003) ("Because the district court did not consider the merits of that claim, we find it appropriate to remand this case so that it may do so in the first instance.").

because of mootness, it should be vacated to prevent it from "spawning any legal consequences"). As a vacated decision cannot be binding in subsequent litigation, this is an independent basis upon which to deny the application of collateral estoppel in the instant case. *Bonner Mall*, 513 U.S. at 22-23 ("vacatur [due to mootness] 'clears the path for future relitigation of the issues between the parties and eliminates a judgment, review of which was prevented through happenstance'" (citation omitted)).

## VII.   IF THE COURT DETERMINES THE COMPLAINT IS INADEQUATE, THE GOVERNMENT REQUESTS LEAVE TO AMEND

The Government respectfully requests that, in the event that any of its claims are deemed deficient, the Government be given an opportunity to amend the Complaint to attempt to cure the deficiency. Rule 15(a)(2) provides that a court should "freely give leave [to amend] when justice so requires." This Rule "evinces a bias in favor of granting leave to amend." *Jones v. Robinson Property Group, L.P.*, 427 F.3d 987, 994 (5th Cir. 2005). A motion for leave to amend should not be denied unless the district court has a "substantial reason." *Id.* at 994. Although the Government has twice amended its Complaint, it has not done so in response to any judicial ruling regarding the sufficiency of its pleadings. Accordingly, the Government has not yet had an opportunity to cure any deficiencies found by the Court. Moreover, some of the issues raised in the Complaint, particularly with respect to the FIRREA allegations, are complex and, in some instances, unsettled. The Government should be granted the opportunity to plead additional facts in support of its claims, should the Court deem such additional facts necessary or, if the court determines that the Government cannot proceed against one or more defendant under a particular statutory provision, allow the Government to replead

its claim under a different statute.  Dismissal of these claims with prejudice, without

allowing the Government the opportunity to benefit from the Court's rulings regarding

the pleading requirements, would be "inappropriate given the liberal nature of Rule

15(a)." *United States ex rel. King v. Solvay S.A.,* 823 F. Supp. 2d 472, 545 (S.D. Tex.

2011) (permitting fourth amended complaint, where prior amendments had come prior to

judicial decision on motion to dismiss); *see also Hart v. Bayer Corp.*, 199 F.3d 239, 247

n.6 (5th Cir. 2000) (holding that courts should ordinarily give leave to amend a complaint

dismissed for failure to plead fraud with particularity pursuant to Rule 9(b), unless the

defect is incurable or the plaintiff has been afforded several prior opportunities to plead

with particularity and has failed to do so).

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss the Complaint for

failure to state a claim should be denied.

Respectfully Submitted,

KENNETH MAGIDSON
UNITED STATES ATTORNEY

 _s/_ Jeannette Vargas
Jeannette A. Vargas
James Nicholas Boeving
Special Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2678/2748
Fax: (212) 637-2686
Email: jeannette.vargas@usdoj.gov
Email: james.n.boeving@usdoj.gov