UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
--------------------------------------------------------- x

UNITED STATES OF AMERICA,

                Plaintiff-Intervenor,              12 Civ. 02676 (GCH)

      v.                                   **ECF**

ALLQUEST HOME MORTGAGE
CORPORATION, f/k/a ALLIED HOME
MORTGAGE CORPORATION, AMERICUS
MORTGAGE CORPORATION, f/k/a ALLIED
HOME MORTGAGE CAPITAL
CORPORTATION, JIM C. HODGE, and
JEANNE L. STELL

                Defendants.
--------------------------------------------------------- x

## PLAINTIFF'S APPENDIX

KENNETH MAGIDSON
United States Attorney for the
Southern District of Texas
86 Chambers Street
New York, New York 10007
Telephone: 212.637.2678
Fax: 212.637.2686
E-mail: jeannette.vargas@usdoj.gov

JEANNETTE A. VARGAS
JAMES NICHOLAS BOEVING
Special Assistant United States Attorneys

     – Of Counsel –

# TABLE OF CONTENTS

**Cases**                                                                                                      **Page**

*Allied Home Mortg. Corp. v. Donovan,*
    No. 11 Civ. 3864, 2012 WL 3276978 (S.D. Tex. Aug. 8, 2012).......................PA001

*In re Allied Pilots Class Action Litigation,*
    No. CIV. A. 3:99-CV-0480P, 2000 WL 1405235
    (N.D. Tex. Sept.26, 2000) ........................................................................PA009

*Cates v. Creamer,*
    7:00-CV_0120-0, 2008 WL 2620097 (N.D. Tex. June 27, 2008)....................PA019

*Fuller v. Board of Immigration Appeals,*
    -F.3d-, 2012 WL 4875696 (2d Cir. 2012)................................................PA023

*Shevack v. Litton Applied Tech,*
    No. 95 Civ. 7740(JSM), 1998 WL 512959 (S.D.N.Y. Aug. 18, 1998) ...........PA028

*United States ex rel. Bennett v. Boston Scientific Corp.,*
    Civil Action No. H-07-2467, 2011 WL 1231577
    (S.D. Tex. Mar 31, 2011)........................................................................PA032

*United States ex rel. Bibby v. Wells Fargo Bank, N.A.,*
    -, F. Supp. 2d-, 2010 WL 5886137 (N.D. Ga. Nov. 19, 2012)..........................PA067

*United States ex rel. Geschrey v. Generations Healthcare, LLC,*
    No. 10 C. 2413, 2012 WL 3581060 (N.D. Ill. 2012) ...........................................PA081

*United States ex rel. Miller v. Bill Harbert International Construction, Inc.*
    No.  95-1231, 2007 WL 915237 (D.D.C. Mar. 27, 2007) ...................................PA093

*United States ex rel. Pilecki-Simko v. The Chubb Institute,*
    06 Civ 3562, 2010 WL 1076228, (D.N.J. Mar. 22, 2010) .................................PA096

*United States v. Anchor Mortg. Corp.,*

No. 06 C 210, 2010 WL 3184210 (N.D. Ill. Aug. 11, 2010) ............................ PA114

*United States v. Anghaie,*
1:09-CR-37-SPM/AK, 2011 WL 720044 (N.D. Fla. Feb. 21, 2011) ............... PA125

*United States v. BNP Paribas SA,*
-, F. Supp. 2d-, 2012 WL 3234233 (S.D. Tex. Aug. 6, 2012) ........................... PA128

*United States v. Dolphin Mortg, Corp.,*
No. 06-CV-499, 2009 WL 153190 ......................................................... PA155

*United States v. Huron Consulting Group, Inc.,*
No. 09 Civ. 1800, 2011 WL 253259 (S.D.N.Y. Jan. 24, 2011) ........................ PA171

*United States v. Luce,*
No. 11 C 5158, 2012 WL 2359357 (N.D. Ill. June 20, 2012) ........................... PA175

*United States v. Pierre Bouchet, Inc.,*
No. 85 Civ 8530 (PKL), 1987 WL 11565 (S.D.N.Y. May 21, 1987) .............. PA182

*United States v. Slaey,*
Civ. No. 06-4930, 2007 WL 2142361 (E.D. Pa. July 24, 2007) ....................... PA190



Slip Copy, 2012 WL 3276978 (S.D.Tex.)
**(Cite as: 2012 WL 3276978 (S.D.Tex.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
S.D. Texas,
Houston Division.
ALLIED HOME MORTGAGE CORPORATION,
et al., Plaintiffs,
v.
Shaun DONOVAN, Secretary, United States Dept.
Of Housing and Urban Development, et al., De-
fendants.

Civil Action No. H–11–3864.
Aug. 8, 2012.

Bruce E. Alexander, Scott D. Burke, Weiner Brod-
sky Sidman Kider PC, Washington, DC, A. Kent
Altsuler, Attorney at Law, Houston, TX, for
Plaintiffs.

Jaimie Leeser Nawaday, Pierre G. Armand, New
York, NY, for Defendants.

**MEMORANDUM AND ORDER**

GRAY H. MILLER, District Judge.
    **\*1** Pending before the court is defendants
Shaun Donovan and the United States Department
of Housing and Urban Development's (collectively
"defendants") opposed expedited motion to transfer
venue (Dkt.12), and motion to dismiss for lack of
subject-matter jurisdiction (Dkt.56). After consider-
ing the motions, responses, and the applicable law,
and for the reasons set forth below, the motion to
transfer venue is DENIED, and the motion to dis-
miss for lack of subject-matter jurisdiction is
GRANTED IN PART AND DENIED IN PART.

**I. BACKGROUND**
    James C. Hodge ("Hodge") is the president and
chief executive officer of Allied Home Mortgage
Corporation ("Allied"), a mortgage lender and ori-
ginator of FHA-insured residential mortgage loans.
[FN1] Dkt. 1. More specifically, Allied was classi-

fied as a non-supervised, Title II lender, pursuant to
24 C.F.R. parts 202.5 and 202.7. Dkt. 60, Ex. 4. On
November 1, 2011, the United States intervened in
a *qui tam* fraud action filed in the Southern District
of New York, Case No. 11–cv–05443 (the "SDNY
lawsuit"), in which it filed an expanded complaint-
in-intervention and sued, *inter alia,* Allied Home
Mortgage Capital Corporation and Allied Home
Mortgage Corporation as its successor-in-interest.
Dkt. 12, Ex. 2. Contemporaneously with the SDNY
lawsuit, HUD sent to plaintiffs notices of their sus-
pension ("November notices") and proposed de-
barment pursuant to 12 U.S.C. § 1708(c) and 24
C.F.R. part 25 (Allied), and 2 C.F.R. parts 180 and
2424 (Hodge). Dkt. 1, Ex. 1–2. The November no-
tices indicated that the suspension and debarment
were dependent on the outcome of the SDNY law-
suit. *Id.*

>    FN1. In January 2012, following com-
>    mencement of this action, Allied Home
>    Mortgage Corporation changed its name
>    and registration with the Texas Secretary
>    of State to Allquest Home Mortgage Cor-
>    poration. This order refers to plaintiff as
>    Allied for purposes of clarity and continu-
>    ity.

    HUD's November notice to Allied alleged, un-
der 24 C.F.R. part 25.6, that it (1) originated loans
from branch offices that were not FHA-approved,
(2) submitted loan packages to HUD containing
false information about where the loans originated,
(3) failed to ensure the corporate entity paid the op-
erating expenses of its FHA-approved branch of-
fices, (4) failed to implement a quality control pro-
gram in compliance with HUD's requirements, (5)
submitted false annual recertification materials to
HUD for the years 2006–2011, and (6) employed a
principal, officer, or director when that person was
suspended. Dkt. 1, Ex. 1.

    HUD's November notice to Hodge likewise al-
leged various forms of misconduct. Dkt. 1, Ex. 2.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 3276978 (S.D.Tex.)
**(Cite as: 2012 WL 3276978 (S.D.Tex.))**

Hodge allegedly instructed Allied employees and representatives to violate HUD requirements and caused the submission of false statements to the department. *Id.*

HUD's November notices further explained that because Allied was one of the largest FHA-approved brokers, implementation of an immediate suspension was proper in the name of the public and department interest. Dkt. 1, Ex. 1–2. Despite the suspensions taking immediate effect, the notices did provide a manner in which to contest HUD's findings and to request an informal hearing. *Id.* Plaintiffs chose instead to file this action. Dkt. 1.

**\*2** Plaintiffs seek declaratory and injunctive relief to challenge HUD's suspension of Allied's authority to originate and underwrite FHA-insured loans, and the debarment of Hodge from participating in procurement and non-procurement transactions. Plaintiffs contend that HUD's actions were arbitrary and capricious and effected without due process of law. Dkt. 1. They base these claims on alleged factual errors and procedural defects underlying the suspension and debarment decisions. *Id.* For example, plaintiffs point out that one basis for HUD's suspension of Allied is employing a suspended principal, officer, or director. *Id.* They further point out that the suspensions were issued to both Allied and Hodge on the same day. *Id.* Plaintiffs assert that basing Allied's suspension, in part, on its employment of Hodge while he was suspended violated due process by simultaneously punishing for, and notifying of, an infraction. *Id.*

Plaintiffs further complain that HUD's actions, without opportunity to be heard, have prevented them from originating FHA-insured loans that constitute 70% of Allied's business. *Id.* As a result, plaintiffs' various financial institutions have terminated their warehouse lines of credit, preventing Allied from originating *any* sort of mortgage loan, whether FHA-insured or not. [FN2] Dkt. 1. Fifteen days after the suspension and debarment were noticed, and after an evidentiary hearing, this court [FN3] granted plaintiffs' motion for preliminary injunction, enjoining defendants from enforcing their administrative action pending further review. Dkt. 37.

> FN2. Plaintiffs claim that one line of credit, extended prior to the suspensions in the amount of $50 million, was suspended and has since been restored to $5 million. All other pre-suspension lines of credit have been suspended or terminated. Dkt. 60, Ex. 4.

> FN3. Judge Melinda Harmon heard the motion on an expedited basis and issued the resulting order.

On May 23, 2012, HUD and its Mortgagee Review Board ("MRB") sent three notices to plaintiffs: (1) rescinding Allied's November notice of suspension, (2) notifying Allied that the MRB was considering taking administrative action and seeking monetary penalties, and (3) providing notice of HUD's proposed debarment of Hodge, superseding the original November notice. Dkt. 57, Ex. A–C.

## II. ANALYSIS
### A. Expedited Motion to Transfer Venue

Defendants move the court to transfer this case to the Southern District of New York, arguing that plaintiffs' instant action presents claims and issues that are substantially similar to those raised in the SDNY lawsuit, and this court should adhere to the first-to-file rule and grant their motion to transfer. Dkt. 12. Plaintiffs respond that transferring the action is improper because (1) the claims are not substantially similar, and in fact raise distinct issues, (2) HUD is not a party to the SDNY lawsuit, and (3) neither Allied nor Hodge possess sufficient contacts with that forum to support jurisdiction. Dkt. 16.

### 1. Legal Standard

Defendants move to transfer venue pursuant to the first-to-file rule. The rule is "grounded in the principles of comity and sound judicial administra-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 3276978 (S.D.Tex.)
**(Cite as: 2012 WL 3276978 (S.D.Tex.))**

tion." *Save Power Ltd. v. Syntek Fin. Corp.,* 121 F.3d 947, 950 (5th Cir.1997). It is a discretionary doctrine and may be applied when related cases are pending before two federal courts. *Cadle Co. v. Whataburger of Alice, Inc.,* 174 F.3d 599, 603 (5th Cir.1999). The cases need not be identical, but "the crucial inquiry is one of substantial overlap." *Int'l Fid. Ins. Co. v. Sweet Little Mex. Corp.,* 665 F.3d 671, 678 (5th Cir.2011). "The concern manifestly is to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result." *Save Power,* 121 F.3d at 950.

### 2. Analysis

**\*3** In the SDNY lawsuit, the government alleges fraudulent acts and omissions on the part of plaintiff, reaching back to 2001. Dkt. 1, Ex. 3. The claims in that suit are substantially similar to the claims made by HUD in support of its November and May notices. *Id* . at Ex. 1–3; Dkt. 57, Ex. B–C. That similarity, however, is not dispositive of whether the claims made in the SDNY lawsuit and by HUD are substantially similar to the claims plaintiffs make against HUD in this court.

Defendants direct the court's attention to *Twin City Ins. Co. v. Key Energy Servs., Inc.,* No. H–09–0352, 2009 WL 1544255 (S.D.Tex. June 2, 2009), to support their argument that this case falls squarely within the contours of a transfer pursuant to the first-to-file rule. Dkt. 12. In *Twin City,* a first-to-file scenario arose between Key Energy and its insurer, Twin City, following the parties' unsuccessful arbitration attempt. *Twin City,* 2009 WL 1544255 at *2. There, the parties each filed competing suits in different courts, alleged the same (but counter-positioned) claims, and alleged those claims arose from the same material facts. *Id.* The first-to-file rule was applied to dismiss the second suit and transfer it to the court where the first-filed action was pending. *Id.* at *7. However, *Twin City* is inapposite. Unlike the SDNY lawsuit, where the government alleges fraud, the claims in this case

are alleged to arise from improper administrative action that is continuing to harm plaintiffs. Here, defendants are not a party to the SDNY lawsuit, the claims and relief sought are dissimilar, and the instant allegations are only tangentially related to those alleged in the SDNY lawsuit.

Plaintiffs claim that, despite the preliminary injunction, the suspension and debarment during the fourteen-day period before the injunction issued causes them continuing injury by damaging their reputation. They allege that defendants' arbitrary and capricious actions have prevented them from obtaining or reinstating their warehouse lines of credit and good corporate standing with several states. Dkt. 60.

Without speculating on the merits of plaintiffs' remaining claim, a declaration from this court that the suspensions and debarment were or were not void, *ab initio,* would not "trench upon the authority of [the Southern District of New York,]" nor generate "piecemeal resolution of [the government's fraud claim in the SDNY lawsuit.]" *See Save Power,* 121 F.3d at 950. Therefore, the claims and issues remaining in the instant action are substantially *dissimilar* from the government's *qui tam* action in the Southern District of New York. Accordingly, the court declines to transfer the case to that forum. Defendants' opposed expedited motion to transfer venue is DENIED.

### B. Motion to Dismiss for Lack of Subject Matter Jurisdiction

Defendants move for judgment on the pleadings under FED. R. CIV . P. 12(c), arguing that circumstances have arisen during the pendency of this case that have rendered plaintiffs' claims moot. Dkt. 56. The May notices rescinded HUD's November suspension and debarment action, and defendants urge the court that the May notices enhanced the specificity of the alleged violations and merely provide *notice* of potential administrative action. *Id.* Defendants argue this action cures the procedural defects Judge Harmon found in her preliminary injunction, thus providing the relief that plaintiffs

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 3276978 (S.D.Tex.)
**(Cite as: 2012 WL 3276978 (S.D.Tex.))**

sought in their complaint and rendering the action moot. *Id.* Plaintiffs oppose this motion on two grounds. Dkt. 60. First, plaintiffs argue that defendants' voluntary cessation of alleged illegal conduct, followed by motion practice attempting to moot the controversy, imposes a stringent burden that defendants in this case cannot meet. *Id.* Second, they argue that only their injunctive relief claims are moot. *Id.* The collateral consequences doctrine permits their alleged continuing injury to survive Article III mootness scrutiny; therefore, they contend their declaratory judgment claims remain ripe. *Id.* Because plaintiffs seek both injunctive and declaratory relief, the court assesses the propriety of defendants' motion with respect to each form of relief sought.

### 1. Legal Standard

**\*4** Article III of the Constitution limits this court's jurisdiction to "cases" or "controversies" and encompasses the jurisdictional doctrine of mootness and standing. U.S. Const. art. III, § 2, cl. 1; *In re Scruggs,* 392 F.3d 124, 128 (5th Cir.2004); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 529 U.S. 167, 189 (2000). Article III standing is established by three elements: (1) the plaintiff must have suffered an injury in fact, an invasion of a legally protected interest, that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical, (2) there must be a causal connection that is "fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court[,]" and (3) it must be likely, not merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal citations and quotations omitted). Further, a federal court lacks constitutional authority to determine the merits of a moot case or controversy. *Envtl. Conservation Org. v. City of Dallas,* 529 F.3d 519, 525 (5th Cir.2008). "A controversy becomes moot where, as a result of intervening circumstances, there are no longer adverse parties with sufficient

legal interest to maintain the litigation." *In re Scruggs,* 392 F.3d at 128 (*quoting Chevron U.S.A., Inc. v. Traillor Oil Co.,* 987 F.2d 1138, 1153 (5th Cir.1993)). Mootness has been described as "a time dimension of standing, requiring that the interests originally sufficient to confer standing persist throughout the suit. The distinctive mootness label, however, helps concentrate attention on the peculiar problems of a suit's death, rather than its birth." 13B Charles Alan Wright et al., *Federal Practice and Procedure* § 3533.1 (3d ed.1998).

### 2. Analysis–Injunctive Relief

Plaintiffs argue that a defendant who voluntarily ceases illegal conduct bears the burden of convincing the court that he will not resume his conduct. A defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. *City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982). "[I]f it did, the courts would be compelled to leave '[t]he defendant ... free to return to his old ways.' " *Id.* at 289 n. 10 (*quoting United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953)). To further that principle, the standard for determining whether a case has been mooted by a defendant's voluntary conduct is stringent, and it is only met if "subsequent events [make] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth,* 528 U.S. at 189 (*quoting United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 397, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980)).

HUD notified Allied on May 23, 2012 that the MRB had rescinded the immediate suspension issued in November. Dkt. 57, Ex. A. On the same day, in its notice of violation and notice of intent to seek civil monetary penalties, HUD stated that its MRB was *"considering* taking an administrative action against [Allied]." *Id.* at Ex. B (emphasis added). One week after Allied's notification, HUD notified Hodge that it was *"proposing* [his] debarment ... for five years." *Id.* at Ex. C (emphasis added).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 3276978 (S.D.Tex.)
**(Cite as: 2012 WL 3276978 (S.D.Tex.))**

Additionally, the May notice to Hodge indicated that it "supersede[d] HUD's [November notice]." *Id.* Each of the May notices indicated that plaintiffs were permitted to supply written information and argument prior to the determination of final action. *Id.* at Ex. B–C.

**\*5** To provide Allied with sufficient notice, the MRB's notification of potential administrative action must specifically state the reasons for the action. *See* HUD Mortgagee Review Board, 24 C.F.R. § 25.9(b). The May notice segregates the alleged violations into regulatory sub-parts. Dkt. 57, Ex. B. In its first allegation, the MRB claims that Allied failed to comply with a condition necessary to maintain FHA approval, namely, its failure to maintain an approved quality control program. *Id.* The notice provides the number and dates of allegedly noncompliant quality control reviews and refers to individuals that performed them. *Id.* The allegation further specifies the precise provisions of the HUD handbook that the conduct violates. *Id.* The remaining seven allegations are also indicative of the specificity discussed above, including account numbers of noncompliant loans, addresses of noncompliant branch offices, and names and dates of individuals alleged to falsely certify documents. *Id.* While these allegations are specific and detailed, they are also simple, concise, and direct.

When it proposes an individual debarment action, HUD must meet statutory notice requirements. HUD's notice to Hodge must include, *inter alia,* "the reasons ... in terms sufficient to put [Hodge] on notice of the conduct or transactions upon which the proposed debarment is based." *See* OMB Guidelines to Agencies on Governmentwide Debarment and Suspension, 2 C.F.R. § 180.805(b). Additionally, HUD may "impute the ... improper conduct of [Allied] to [Hodge] if [he] either participated in, had knowledge of, or reason to know of the improper conduct." *See id.* § 180.630(b).

Hodge's proposed debarment is grounded on (1) irregularities in his own acts or omissions as an officer of Allied and (2) acts or omissions of Allied

that are imputed to him pursuant to 2 C.F.R. part 180.630(b). Like the sufficiency analysis of Allied's notice, above, a full recitation of Hodge's notice is unnecessary here. HUD's third allegation is directed at Hodge's individual actions, and claims that Hodge submitted or caused the submission of false certifications to HUD. Dkt. 57, Ex. C. The notice indicates the specific chapters and sections of the HUD handbook alleged to be violated, and provides the dates of the allegations, the titles of the allegedly false documents, and the reasons HUD believed them to be false. *Id.* The remaining allegations pertain to alleged violations, on Allied's part, that HUD is imputing to Hodge. *Id.* Like the notice of violations to Allied, discussed above, these allegations provide a similar level of specificity, including FHA case and loan numbers that violated quality control guidelines, dates of irregularities, addresses of noncompliant branch offices, and specific reasons that HUD has for each allegation. *Id.*

Plaintiffs respond that the May notices demonstrate defendants' propensity to engage in "substantially similar" conduct to that complained of in their original complaint. Dkt. 60. Their support for this is that the allegations raised in the May notices are "flagrantly unsupportable or incorrect," and indicate a lack of good faith on the part of defendants. *Id.* These are merit-based arguments, and the court need not reach the merits of plaintiffs' case in a jurisdictional challenge. *See Envtl. Conservation Org.,* 529 F.3d at 524.

**\*6** The May notices do not deprive plaintiffs of their authority or abilities until further review and opportunity to be heard, and they provide specificity and details of alleged violations sufficient to put plaintiffs on notice of the conduct or violations alleged. The *Friends of the Earth* standard requires that any speculation regarding future wrongful conduct be beyond that necessary to make the court "absolutely clear" it will not recur. *See Friends of the Earth,* 528 U.S. at 189. In this case, defendants have not only cured their defective actions, but there is also no question for the court re-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 3276978 (S.D.Tex.)
**(Cite as: 2012 WL 3276978 (S.D.Tex.))**

garding possible future conduct—HUD has made it "absolutely clear that the allegedly [improper notice procedure and administrative action complained of] could not reasonably be expected to recur" because they have *already* acted properly. *See id.* Accordingly, plaintiffs' request for injunctive relief is MOOT, and defendants' motion to dismiss this claim is GRANTED. Accordingly, the court also VACATES the November 15, 2011 preliminary injunction as MOOT.

### 3. Analysis–Declaratory Relief

Defendants argue that any claims for declaratory relief should be dismissed, along with the injunctive relief claims, because harm to reputation is not a continuing injury sufficiently concrete to avoid mootness. Dkt. 62. They further argue that declaratory relief would be purely advisory as it would not redress plaintiffs' asserted injuries nor prevent future enforcement action. *Id.* In their opposition, plaintiffs argue that merely superseding the November notices does not void them, *ab initio.* Dkt. 60. Further, they argue that the fourteen-day suspension and debarment exists and continues to harm them, and that their continuing harm satisfies the collateral consequences exception to the mootness doctrine. *Id.*

Defendants argue that plaintiffs cannot satisfy the collateral consequences standard, which states that to meet the case-or-controversy requirement, a reputational injury that continues after resolution of the underlying claim must be specific and concrete. *Spencer v. Kemna,* 523 U.S. 1, 14–16, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998) (holding, in the criminal conviction and parole context, that "some concrete and continuing injury other than the now—ended incarceration or parole—some 'collateral consequence' of the conviction-must exist if the suit is to be maintained."); *see also Foretich v. United States,* 351 F.3d 1198, 1212–13 (D.C.Cir.2003) (extending *Spencer* to a civil setting and holding that reputational injury from unexpired and unretracted legislative action is sufficiently concrete so as to prevent mootness and confer

standing); *O'Gilvie v. Corp. for Nat'l Cmty. Serv.,* 802 F.Supp.2d 77, 81–84 (D.D.C.2011) (holding plaintiff lacked standing to assert injury to his reputation resulting from debarment action because the debarment expired before suit was filed, his claims were conclusory, and his claims asserted harmful action from third parties not before the court). Defendants' reply to plaintiffs' opposition contends that the withdrawn suspensions have no legal effect, that plaintiffs' assertions of reputational harm are entirely conclusory, and that they allege no concrete, traceable injury resulting from the suspension and debarment actions. Dkt. 62.

**\*7** Plaintiffs counter that the presence of their prior suspension and debarment has and will continue to harm them by (1) prohibiting them from obtaining and maintaining warehouse lines of credit and affecting other relationships with private financial institutions, (2) affecting their dealings with HUD and state regulators,[FN4] (3) affecting their relationship with past and present employees, and (4) affecting their relationship with private entities with whom they have done or will do business. Because plaintiffs' first and second alleged injuries are sufficiently concrete, it is unnecessary for the court to address their third or fourth points.

> FN4. While plaintiffs' first and second alleged injuries are explicitly stated, they do not provide the court with an explanation of how the relevant regulatory mechanisms will harm them. Ordinarily, if the court considers matters outside the pleadings for a Rule 12(c) motion, Fed.R.Civ.P. 12(d) requires that it treat the motion as one for summary judgment under Rule 56. But as the Fifth Circuit has stated:
>
> > In general, where subject matter jurisdiction is being challenged, the trial court is free to weigh the evidence and resolve factual disputes in order to satisfy itself that it has the power to hear the case. "A court may base its disposition of a motion to dismiss for lack of subject matter

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 3276978 (S.D.Tex.)
**(Cite as: 2012 WL 3276978 (S.D.Tex.))**

jurisdiction on (1) the complaint alone; (2) the complaint supplemented by undisputed facts; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." In short, no presumptive truthfulness attaches to the plaintiff's allegations, and the court can decide disputed issues of material fact in order to determine whether or not it has jurisdiction to hear the case.

*Montez v. Dep't of the Navy,* 392 F.3d 147, 149–50 (5th Cir.2004). This court may consider federal and state statutes and regulations of which it takes judicial notice, and may do so when considering a motion for judgment on the pleadings. 44 U.S.C. § 1507; see also Montez, 392 F.3d at 149–50.

Prior to the suspension and debarment action, plaintiffs maintained warehouse lines of credit with three private financial institutions, Wells Fargo Bank, Customers Bank, and Texas Capital Bank. Dkt. 60, Ex. 4. On November 1 and 2, 2011, these institutions suspended or terminated plaintiffs' warehouse lines of credit, prohibiting them from funding pending loan activity. *Id.* To date, plaintiffs assert that Texas Capital Bank is the only institution to have restored Allied's line of credit, but only to 10% of its previous level. *Id.* Non-supervised Title II lenders, like Allied, are required to maintain warehouse lines of credit "acceptable to the Secretary which is adequate to fund the mortgagee's average 60 day origination operations." 24 C.F.R. § 202.7(b)(3)(ii). While plaintiffs' claimed injury brings third parties into the analysis, the suspension or termination of their warehouse lines of credit is a third party effect that is alleged to be caused by defendants' acts, and HUD's own regulatory mandate would cause further harm because of that effect. Accordingly, while the court "cannot presume either to control or predict" the relevant financial institutions' future business decisions (See *Lujan,*

504 U.S. at 562), if plaintiffs prevail on the merits of their claim, a declaration from this court would likely prevent defendants' actions from harming them, albeit one step removed.

Next, plaintiffs allege the suspension and debarment continue to harm their relationship with HUD and state regulators. Hodge was debarred in November pursuant to federal debarment and suspension regulations, in part by 2 C.F.R. part 180, and those regulations are virtually dispositive of the mootness question. In considering his debarment pursuant to the May notices, the debarring official "may consider," as an aggravating factor, "whether there is a pattern or history of wrongdoing ... similar to that found in the debarment action." *See* 2 C.F.R. § 180.860. The May notice of proposed debarment alleged similar acts and omissions as those alleged in the November notices, albeit with substantially greater specificity. Dkt. 1, Ex. 2; Dkt. 57, Ex. 3. The regulation's use of the word "may" indicates a grant of discretion to the debarring official, but his actual ability and potential to exercise it, and the fact that its mere existence would likely compel plaintiffs to explain and defend against the prior debarment, weigh heavily in favor of denying defendants' motion. Any judgment from this court, that the November debarment was void, *ab initio,* would be instructive to a future debarring official reviewing the May debarment notice, and would prevent him or her from considering the November notice as an aggravating factor.

**\*8** Allied's alleged harm is similarly well founded. Applicants for participation and maintenance of authority in non-supervisory Title II programs must meet an array of standards in addition to the general approval standards established in 24 C.F.R. part 202. The general approval standards require the HUD secretary be notified if plaintiffs are subject to suspension or debarment. *See* 24 C.F.R. § 202.5. The regulation prohibits the approval or maintenance of a lender if it, or an officer, is "subject to unresolved findings as a result of HUD or other governmental ... review." *Id.* § 202.5(j)(3).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 3276978 (S.D.Tex.)
**(Cite as: 2012 WL 3276978 (S.D.Tex.))**

Further, as discussed above, HUD's own mandate that Allied obtain and maintain warehouse lines of credit pursuant to 24 C.F.R. part 202.7(b)(3)(ii) has and will continue to prevent the company from obtaining loan-origination authority.

With respect to state action, the court may take judicial notice of state law without plea or proof. *United States v. Schmitt,* 748 F.2d 249, 255 (5th Cir.1984). The court takes notice of state statutes requiring the state debarment of individuals or entities that have been debarred from federal programs. *See, e.g.,* Md.Code Ann., State Fin. & Proc. § 16–203(c); Mass. Gen. Laws Ann. ch. 29, § 29F(2); 62 Pa. Cons.Stat. Ann. § 531(b)(9); W. Va.Code Ann. § 5A–3–33c to 33d. Further, HUD's general approval standards require authorized loan originators to certify that no states have refused them a business license. 24 C.F.R. § 202.5(m). Unlike the harm posed by plaintiffs' inability to obtain warehouse lines of credit and HUD's aggravating factors, above, the causal chain between defendants' actions and any state action is direct. It is clear to the court that plaintiffs could be subject to state debarment action, and any such action, resulting from defendants' alleged wrongful conduct, would continue to harm plaintiffs in a concrete and particularized manner.

Because the court is satisfied that plaintiffs' allegations of continuing harm as a result of defendants' conduct is concrete and particularized, it holds that defendants' motion to dismiss plaintiffs' declaratory relief claim should be DENIED.

### III. CONCLUSION

After consideration of the motions, the responses, and the applicable law, defendants' opposed expedited motion to transfer venue (Dkt.12) is DENIED. Defendants' motion for judgment on the pleadings (Dkt.56) is GRANTED IN PART and DENIED IN PART. The November 15, 2011 preliminary injunction is VACATED AS MOOT, and the defendant's motion to reconsider (Dkt.42) is also DENIED AS MOOT.

It is so ORDERED.

S.D.Tex.,2012.
Allied Home Mortg. Corp. v. Donovan
Slip Copy, 2012 WL 3276978 (S.D.Tex.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1405235 (N.D.Tex.), 142 Lab.Cas. P 10,822
**(Cite as: 2000 WL 1405235 (N.D.Tex.))**

C

United States District Court, N.D. Texas, Dallas Division.

In re ALLIED PILOTS CLASS ACTION LITIGATION

No. CIV.A.3:99–CV–0480P.
Sept. 26, 2000.

MEMORANDUM OPINION AND ORDER

SOLIS, District Court J.

**\*1** Now before the Court for consideration are:

(1) The Findings and Recommendation of the United States Magistrate Judge filed November 15, 1999;

(2) Plaintiff's Response to Magistrate's Ruling Regarding Defendants' Motion to Dismiss filed December 6, 1999,

(3) APA Defendants' Opposition to Plaintiffs' Objections filed December 16, 1999;

(4) APA Defendants' Objections to the Findings and Recommendation of the United States Magistrate Judge filed December 6, 1999,

(5) Plaintiffs' Response to Allied Pilots Association Defendants' Objections to Magistrate's Recommendation filed January 7, 2000;

(6) APA Defendants' Reply in Further Support of their Objections filed January 25, 2000;

(7) Motion of the Texas AFL–CIO State Council for Leave to File Amicus Brief in Support of Objections of Allied Pilots Association to Magistrate Judge's Findings and Recommendation filed December 6, 1999, and

(8) Motion of Air Line Pilots Association, International for Leave to File Amicus Brief in Support of Objections of Allied Pilots Association to Magistrate Judge's Findings and Recommendation filed December 6, 1999.

After reviewing all of the above materials along with the relevant law, the Court hereby GRANTS the Motions for Leave to File Amicus Briefs,[FN1] SUSTAINS the APA Defendants' objection to the Recommendation of the Magistrate as to preemption of the civil conspiracy claim by the RLA, OVERRULES Defendants' remaining objections, OVERRULES the Plaintiffs' Objections to the Recommendation of the Magistrate, and MODIFIES the Recommendation of the Magistrate Judge as specified herein.

FN1. Pursuant to L.R. 7.2(b), both the AFL–CIO and the Air Line Pilots Association, International demonstrated sufficient interest in the outcome of the litigation to warrant leave to file the amicus briefs.

FACTS

The facts giving rise to this case have been thoroughly discussed in the parties' motions, the Magistrate's Recommendation, and in *American Airlines, Inc. v. Allied Air Pilots Assoc.,* 53 F.Supp.2d 909 (N.D.Tex.1999). Therefore, the Court will give only a brief recitation of the facts.

Allied Pilots Association ("the APA" or "the Defendants") is the exclusive bargaining agent for more than 9,000 pilots of American Airlines, Inc ("American") (*See* Pls' Am. Compl. ¶¶ 2.07, 4.02). In 1998, a dispute arose over terms of the current collective bargaining agreement ("the CBA") between the APA and American.[FN2] *See American Airlines,* 53 F.Supp.2d at 914. The dispute culminated in a staged sick-out by the pilot members of the APA. *Id.* at 915. The sick-out began on February 6, 1999, and continued until February 9, 1999, resulting in the cancellation of more than 1600 American flights due to lack of crew. *Id.* On February 10, 1999, American applied for and received a temporary restraining order, ("the TRO"), from Judge Kendall of the Northern District of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2
Not Reported in F.Supp.2d, 2000 WL 1405235 (N.D.Tex.), 142 Lab.Cas. P 10,822
**(Cite as: 2000 WL 1405235 (N.D.Tex.))**

Texas. The TRO prohibited the union or its officers from "calling, permitting, instigating, authorizing, encouraging, participating in, approving or continuing any interference with American's airline operations, including but not limited to any strike, work stoppage, sick-out, slowdown or other concerted refusals to fly over a minor dispute or otherwise in violation of the RLA, 45 U.S.C. §§ 151–188 (1988)." *See American Airlines,* 53 F.Supp.2d at 918 (quoting language from the TRO).

> FN2. Parties stipulated and agreed, and the court found, that the dispute leading up to the sick-out and the TRO was a "minor dispute" under the RLA. *See* Stipulation filed by the parties on April 28, 1999, *cited with authority, American Airlines,* 53 F.Supp.2d at 938 n. 177, Findings of Fact and Conclusions of Law filed February 13, 1999, at 1, *cited with authority, American Airlines,* 53 F.Supp.2d at 938 n. 178. As discussed *infra,* because this was a minor dispute, the RLA prohibited the APA from engaging in a job action or self-help. *See Consolidated Rail Corp.* ("Conrail") *v. Railway Labor Executives' Assoc,* 491 U.S. 299, 303–04 (1989) (stating that the RLA permits the resort to self-help only when a "major dispute" is at issue).

**\*2** The day after Judge Kendall ordered an end to the APA's staged sick-out, the number of canceled flights actually increased, so that on February 11, 1999, American canceled approximately 1200 flights. FN3 *See American Airlines,* 53 F.Supp.2d at 915. On February 12, 1999, Judge Kendall held a hearing on American's motion to hold the APA in contempt for violating the terms of the TRO. At the conclusion of the hearing, Judge Kendall adjudged the Defendants to be in civil contempt of court and ordered the APA to place $10,000,000 into the Registry of the Court pending resolution of the amount necessary to reimburse American the amount of money lost because of the APA's contumacious acts. *See American Airlines,* 53 F.Supp.2d

at 916. After reviewing additional evidence, the court issued its findings of facts and conclusions of law, which resulted in a civil contempt finding of more than $45,000,000 damages due to American by the APA. *See American Airlines,* 53 F.Supp.2d at 937.

> FN3. The Plaintiffs allege that American canceled over 2,200 scheduled flights between February 10, 1999 and February 17, 1999 "as a direct, intended, and foreseeable result of the Defendants' acts in furtherance of the Sick–Out." (Pls' Am. Compl. ¶ 4.21).

The case currently before this Court is a class action to recover economic damages suffered by passengers as a result of the APA's illegal sick-out. Plaintiffs represent ticketed passengers whose flights were either delayed or canceled as a result of the sick-out. They assert claims under: (1) the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151–188 (1986); (2) the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968 (1984), and (3) state common law theories of civil conspiracy, negligence per se, and tortious interference with contract. Defendants filed a motion to dismiss the action under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The matter was referred to United States Magistrate Judge Kaplan for Findings and Recommendation, which was issued on November 15, 1999. Magistrate Judge Kaplan recommended a dismissal of Plaintiffs' federal claims finding that the RLA does not permit a private cause of action for monetary damages and that Plaintiffs failed to satisfy the elements of a RICO claim. (*See Findings and Recommendation* at 8, 10). He also recommended dismissing Plaintiffs' claim for negligence per se after finding that claim requires an interpretation of the CBA and is therefore preempted by the RLA. (*See Findings and Recommendation* at 12–13).

In addressing the remaining state law claims of tortious interference with contract and civil conspiracy, Magistrate Kaplan divided the Plaintiffs into

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1405235 (N.D.Tex.), 142 Lab.Cas. P 10,822

(Cite as: 2000 WL 1405235 (N.D.Tex.))

two sub-classes: those whose claims rested on acts occurring prior to the issuance of the TRO and those whose claims rested on acts occurring after the issuance of the back to work order. After analyzing the preemption arguments, he then found that the former group's claims should be preempted by the RLA while the latter group's claims should not be preempted. (*See Findings and Recommendation* at 11–12). Finally, Magistrate Kaplan recommended that this Court decline supplemental jurisdiction over the surviving state law claims and dismiss them without prejudice so that Plaintiffs could institute their claims in state court. *Id.* at 18. Both parties filed objections to the Findings and Recommendations.

STANDARD

**\*3** Pursuant to 28 U.S.C. § 636(b), this Court will make a de novo determination of those specified proposed findings and recommendations to which the parties make an objection. However, the Court need not consider frivolous, conclusory or general objections. *See DFW Vending, Inc. v. Jefferson County, Tex.,* 991 F.Supp. 578, 583 (E.D.Tex.1998) (stating that a blanket objection fails the specificity requirement of Fed.R.Civ.P. 72(b) and 28 U.S.C. § 636).

I. Defendants' Objections

Defendants advance four separate arguments in objecting to the Magistrate's finding that some of Plaintiffs' state law claims should not be dismissed with prejudice; (1) that federal labor law preempts and precludes state law remedies for damages resulting from a peaceful labor dispute; (2) that federal labor law preempts all of Plaintiffs' state law claims because their resolution depends upon an interpretation of the CBA; (3) that federal law precludes actions by non-parties for breach of a federal court order; and (4) that the Airline Deregulation Act of 1978 ("ADA"), Pub.L. No. 95–504, 92 Stat. 1705 (codified as amended in scattered sections of 49 U.S.C.), preempts all of the state law claims.[FN4] After reviewing Defendants' Objections, the amicus curiae briefs, and Plaintiffs' Response, the Court

must agree with Defendants except as to the tortious interference with contract claim arising after the TRO was issued.

> FN4. The APA specifically cites 49 U.S.C. § 41713(b)(1) to support the preemption theory, which reads as follows: "[A] State ... may not enact or enforce a law, regulation, or provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart."

A. *The RLA and the Nature of the Sick–Out*

Congress enacted the Railway Labor Act of 1926 in order "to promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes." *Hawaiian Airlines, Inc. v. Norris,* 512 U.S. 246, 252 (1994). In furtherance of that goal, the RLA provides a mechanism of mandatory arbitration for the "prompt and orderly settlement" of disputes. 45 U.S.C. § 151a "Major" disputes concern "rates of pay, rules or working conditions," *id.,* and relate to "the formation of collective [bargaining] agreements or efforts to secure them." *Consolidated Rail Corp. (Conrail) v. Railway Labor Executives' Assoc.,* 491 U.S. 299, 302 (1989). "Minor" disputes "gro[w] out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions," 45 U.S.C. § 151a, and thus involve "controversies over the meaning of an existing collective bargaining agreement in a particular fact situation." *Trainmen v. Chicago R. & I.R. Co.,* 353 U.S. 30, 33 (1957). "The distinguishing feature of [a minor dispute] is that the dispute may be conclusively resolved by interpreting the existing [CBA]" *Conrail,* 491 U.S. at 305. The courts recognized parties could face risks when categorizing disputes as major and minor. Therefore, the Supreme Court established a rule that disputes shall be classified as "minor" if a party's actions can be "arguably justified" by the terms of an existing CBA. *Conrail,* 491 U.S. at 306.

**\*4** During the initial proceedings before Judge

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4
Not Reported in F.Supp.2d, 2000 WL 1405235 (N.D.Tex.), 142 Lab.Cas. P 10,822
**(Cite as: 2000 WL 1405235 (N.D.Tex.))**

Kendall, American and the APA stipulated that the dispute between the parties was a minor dispute under the terms of the RLA. *See American Airlines,* 53 F.Supp.2d at 917. Moreover, in issuing the TRO, Judge Kendall ruled that the dispute was a minor dispute. *See id.* at 917 n. 178. This determination was very important when considering the issuance of the TRO because under the RLA, unions retain no right to strike over a minor dispute. *See Conrail,* 491 U.S. at 305. Because the RLA prohibited the APA from striking over this minor dispute, Judge Kendall found that the sick-out was an illegal job action. *See American Airlines,* 53 F.Supp.2d at 917.

B. *Lingle/Norris Preemption*

The RLA preempts any state law claim where the resolution of that claim depends upon the interpretation of the CBA. *See Hawaiian Airlines v. Norris,* 512 U.S. 246, 262 (1994) (extending preemption of the LMRA as discussed in *Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 405–06 (1988) to the RLA). All disputes, however, do not result in preemption under the RLA. "Purely factual questions" about the conduct of an employer or employee do not require the court to interpret a CBA and are therefore not preempted by the RLA. *See Hawaiian Airlines,* 512 U.S. at 261. Under this analysis, substantive protections provided by the state, independent of the existence of a collective bargaining agreement, are not preempted by the RLA *See Hirras v. National Railroad Passenger Corp.,* 44 F.3d 278, 282 (5th Cir.1995). The Supreme Court provided three examples of these types of claims that the RLA does not preempt (1) a state law prohibiting the termination of an employee for reasons against public policy, such as whistleblowing; (2) a state law requiring cabooses on all trains; and (3) a state law requiring a certain number of employees to handle a certain type of railroad equipment. *See Hawaiian Airlines,* 512 U.S. at 256–57. The Supreme Court similarly provided an example of a state claim which was preempted by the RLA. In that case, the employee sued the employer for wrongful discharge, but the only basis for claiming that he should not have been discharged was his allegation that the action violated the terms of the CBA. *Id.* at 257. Therefore, his claim did not exist independently of the CBA and was preempted by the RLA. *Id.* Even if the resolution of the CBA dispute and the state claim requires the consideration of the same set of facts, the state law claim will not be preempted so long as the claim is derived from a source independent of the collective bargaining agreement. *Hirras,* 44 F.3d at 282.

The APA contends that the RLA preempts Plaintiffs' state law claims for tortious interference with contract and civil conspiracy because the resolution of those claims requires an interpretation of the CBA. The Court addresses each claim in turn.

1. Tortious Interference with Contract

**\*5** In order to make a claim for tortious interference, a plaintiff must prove; (1) the existence of a contract subject to interference; (2) willful and intentional interference with that contract; (3) the intentional interference was a proximate cause of plaintiff's damages; and (4) actual damage or loss occurred. *See Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931, 939 (Tex.1991). As Magistrate Kaplan correctly stated, none of the elements of tortious interference requires the Court to interpret the CBA to resolve the claim. (See Findings and Recommendation at 11). Ascertaining each element demands only a purely factual inquiry. Specifically, the element of "willful and intentional interference" can be established without reference to the CBA.

Plaintiffs need not prove that the interference was illegal or unjustified in order to establish the elements of their claim. Yet conversely, Defendants assert that because they argue that their job action was justified and legal, preemption must result, even if the conflict is later judged to be a "minor dispute." Defendants contend that their proffered affirmative defense of justification demands an interpretation of the CBA to determine if the conflict was a "major dispute" that would justify Defendant's job action.[FN5] This Court will assume *arguendo* that if such interpretation of the CBA were

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5
Not Reported in F.Supp.2d, 2000 WL 1405235 (N.D.Tex.), 142 Lab.Cas. P 10,822
**(Cite as: 2000 WL 1405235 (N.D.Tex.))**

necessary, then Plaintiffs' claim would be preempted.

> FN5. In the Findings and Recommendation, Magistrate Kaplan did not consider whether the Court would need to reference the CBA in resolving the APA's justification defense. (*See Findings and Recommendation* at 11). However, this Court will assume without deciding that "[t]he claim is also preempted if [the defendant] seeks to defend its conduct on the ground that the conduct was justified by the CBA." *Polich v. Burlington N. Inc.,* 942 F.2d 1467, 1470 (9th Cir.1991).

Under Texas law, justification is a defense to a claim for tortious interference with contract. *See Victoria Bank,* 811 S.W.2d at 939. Justification may be shown if Defendants acted so as to protect or further their own legal rights or to protect a colorable legal right that equals or exceeds the rights of Plaintiffs. *See Bennett v. Computer Assoc. Intern., Inc.,* 932 S.W.2d 197, 202 (Tex.App.—Amarillo 1996, writ denied) (citing *Texas Beef Cattle Co. v. Green,* 921 S.W.2d 203, 210 (Tex.1996)). Defendants contend that "their actions were indeed justified because the dispute with American was arguably a 'major' dispute under the RLA involving American's unilateral abrogation or alteration of the existing collective bargaining agreement." (APA Defendants' Objections at 14).

Defendants' argument fails with respect to post-TRO conduct because the issuance of the TRO precluded any justification defense premised upon the CBA. It is irrelevant to inquire whether Judge Kendall correctly interpreted the CBA in finding the conflict to constitute a "minor dispute," whether the TRO was therefore rightly or wrongly issued, or whether or not the sick-out was justified under the CBA. As the Plaintiffs argued, "[a]fter Judge Kendall's Back–To–Work Order, a judicial decree that the APA had no legal right to engage in or solicit the sick out, nothing in the CBA could even arguably justify the Defendants' conduct in maintaining

the sick-out." (Pls' Response to APA's Obj. at 14). Judge Kendall's findings need not be consulted by this Court; once Judge Kendall issued the TRO, his order trumped any possible justification defense based upon the rights conferred by the CBA. Ordinarily, parties should always obey the court's orders, regardless of whether they think the orders are correct. *See Maness v. Meyers,* 419 U.S. 449, 458 (1975). The only appropriate remedy is to appeal the order, and absent a stay, the order must be complied with during appeal. *Id.* The terms of the CBA, a contract between labor and management, offer no legal justification for violating a court order under any interpretation. Since Defendants thus had no possible legal justification under the CBA, there is no need to interpret it.[FN6] Therefore, because the elements of tortious interference with contract as well as the affirmative defense thus involve purely factual inquiries not requiring reference to the CBA, the claim is not preempted by the RLA. *See Hawaiian Airlines,* 512 U.S. at 261.

> FN6. The same logic would nullify a justification defense for civil conspiracy based upon the CBA. The Court does not reach this issue because the civil conspiracy claim is dismissed on other grounds, *infra.*

**\*6** It is important to note that Plaintiffs' claim does not rely upon establishing a violation of the TRO. As the discussion of the civil conspiracy claim makes clear, *infra,* third parties to a TRO may not base claims upon the violation of the TRO. Here, Plaintiffs can establish all of the elements of tortious interference regardless of the existence of the TRO. The TRO merely negates a possible affirmative defense that Defendants might wish to raise to justify their conduct. As Plaintiffs state:

> as part of their common law action for tortious interference with contract, Plaintiffs merely premise their claims on Allied Pilots' conduct which just happens to have already been found contemptuous by Judge Kendall. Plaintiffs properly plead the undeniable fact that such conduct was specifically prohibited by Judge Kendall's

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1405235 (N.D.Tex.), 142 Lab.Cas. P 10,822
**(Cite as: 2000 WL 1405235 (N.D.Tex.))**

Back–To–Work Order. Plaintiffs do not seek liability against the APA Defendants merely because Judge Kendall prohibited their conduct, but rather, Plaintiffs point to Allied Pilots' violation of the Back–To–Work Order as evidence, arguably conclusive, of the lack of justification for Allied Pilots' tortious conduct.

(Pls' Response to APA's Obj. at 14–15). Indeed, as for justification *based upon the CBA,* the existence of the TRO conclusively precludes such a defense.

2. Civil Conspiracy

A civil conspiracy is "a combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Triplex Communications, Inc. v. Riley,* 900 S.W .2d 716, 719 (Tex.1995). Unlike the tortious interference claim, Plaintiffs cannot establish the elements of their civil conspiracy claim without relying upon the TRO or the CBA. Plaintiffs claim therefore fails.

By violating a court order, even one that is later set aside as incorrect, a party risks being held in civil or criminal contempt. *See Maness v. Meyers,* 419 U.S. 449, 458 (1975). Holding the offending party in either civil or criminal contempt is the remedy for the violation of a TRO. *Id.* The TRO may only be enforced by parties to the suit from whom the order emanated. *See Northside Realty Associates, Inc. v. United States,* 605 F.2d 1348, 1356–57 (5th Cir.1979). A non-party to the action may not receive civil contempt damages, nor may an individual institute an independent claim for civil contempt. *See D. Patrick, Inc. v. Ford Motor Co.,* 8 F.3d 455, 459 (7th Cir.1993). Furthermore, a TRO is not a final judgment for the purposes of collateral estoppel or res judicata. *See Texas v. Wellington Resources Corp.,* 706 F.2d 533, 537 (5th Cir.1983) ("Hearings on these nonpermanent injunctions do not serve the same purpose as a hearing on the merits; they only preserve the status quo awaiting resolution of the merits.")

The passengers who have brought suit could not have brought an action to enforce the back-to-work order. Nor can the passengers claim that the TRO conclusively proves that the APA's actions were illegal. Accordingly, Plaintiffs cannot rely upon the issuance of the TRO alone to demonstrate unlawfulness necessary to prove the civil conspiracy claim. Plaintiffs seem to recognize this limitation by arguing that their claims are not prefaced upon the violation of the TRO but that it merely demonstrates the wrongfulness of the APA's conduct. But Plaintiffs demonstrate no basis for claiming the illegality of the conduct other than the violation of the TRO, as any claim based upon the CBA would be preempted by the RLA.[FN7] Since Plaintiffs have failed to satisfy the elements of the civil conspiracy claim, the claim is dismissed.

FN7. Plaintiffs' status as total strangers to the labor/management relationship and the relevant CBA does not require any different outcome. In fact, the NLRA has previously been held to preempt the claims of parties who were similarly situated as third parties to the CBA. *See Rehmar v. Smith,* 555 F.2d 1362, 1366 (5th Cir.1977).

C. *Garmon/Terminal Preemption*

**\*7** With all of the same concerns in mind for a single, federal regulatory scheme for labor law, the Supreme Court developed another form of preemption referred to as *Garmon* preemption.[FN8] *See San Diego Building Trades Council v. Garmon,* 359 U.S. 236 (1959). The *Garmon* Court indicated a concern "with the potential conflict of two law-enforcing authorities, with the disharmonies inherent in two systems, one federal the other state, of inconsistent standards of substantive law and differing remedial schemes." *Garmon,* 359 U.S. at 242. The Supreme Court identified as the common theme of its cases its "regard to the fact that Congress has entrusted administration of the labor policy for the Nation to a centralized administrative agency, armed with its own procedures, and equipped with its specialized knowledge and cumu-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1405235 (N.D.Tex.), 142 Lab.Cas. P 10,822
**(Cite as: 2000 WL 1405235 (N.D.Tex.))**

lative experience." *Id.* at 242. Due to its concern with conflict "in the broadest sense," the judicial system began to focus on the nature of the activities which the states sought to regulate rather than the method of regulation imposed by the states. *Id.* at 243. "When the exercise of state power over a particular area of activity threatened interference with the clearly indicated policy of industrial relations, it has been judicially necessary to preclude the States from acting." *Id.* The Supreme Court went on to state that it does not matter "whether the States have acted through laws of general application rather than laws specifically directed towards the governance of industrial relations. Regardless of the mode adopted, to allow the States to control the conduct which is the subject of national regulation would create potential frustration of national purpose." *Id.* at 244. This does not remove all power from the states to regulate labor activities in some aspects. The Court clearly delineated two areas that would remain within the states' power of control regulation of activity that is a merely peripheral concern of federal labor law and regulations where the activity touches an interest deeply rooted in local feeling and responsibility. *Id.* at 243–244.

> FN8. Although *Garmon* addressed claims preempted by the NLRA, the Court has regularly referred to it for assistance in construing the RLA. *See Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 383 (1969).

While *Garmon* began as a case that focused on the primary jurisdiction of the National Labor Relations Board, *see Jacksonville Terminal,* 394 U.S. at 384 n. 19, it has come to stand for a more sweeping proposition. According to the Fifth Circuit, "[t]he fundamental precept of *Garmon* is that liability under a state cause of action is preempted whenever it poses a serious risk of conflict with national labor policy." *Mobile Mechanical Contractors Ass'n, Inc. v. Carlough,* 664 F.2d 481, 487 (5th Cir.1981). In *Carlough,* the Fifth Circuit preempted the plaintiff's state law claims for damages resulting from an un-

lawful, but peaceful, strike. The Court reasoned, "[t]he basis of the association's state claims—and the activity from which its alleged damages flow—is not the union's demand ... but the strike in support of that demand." *Carlough,* 664 F.2d at 487. In short, the focus has shifted from the labor board's arguable jurisdiction over the subject matter to a preference for a unified area of labor law that is relatively immune from external pressures exerted by the state.

**\*8** In this same trend, the Supreme Court later ruled that states cannot make laws refusing to contract with employers who regularly violate labor laws because such a prohibition would "interfere with Congress' 'integrated scheme of regulation' by adding a remedy to those already prescribed by the NLRA." *Wisconsin Department of Industry v. Gould,* 475 U.S. 282, 287 (1986). According to the Supreme Court, it does not "matter that a supplemental remedy is different in kind from those that may be ordered by the Board, for "judicial concern has necessarily focused on the nature of the activities which the States have sought to regulate, rather than on the method of regulation adopted." *Id.* at 287 (internal quotes omitted). The Fifth Circuit similarly recognized this principle in *Carlough* in stating that "to permit the association to supplement the [NLRB's] remedy with additional state damages runs counter to the teachings of *Garmon* " *Carlough,* 664 F.2d at 488 (finding that an award of damages can interfere with national policy just as preventative regulation can).

1. Pre–TRO Conduct

In the matter at hand, allowing plaintiffs' state law claims premised on pre-TRO conduct to proceed would directly and substantially interfere with federal regulation of the APA's strike. The relationship between management and labor exists in a delicate balance. "The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." *Garmon,* 359 U.S. at 247. Allowing the state law tort claims to proceed under these circumstances, re-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1405235 (N.D.Tex.), 142 Lab.Cas. P 10,822
(Cite as: 2000 WL 1405235 (N.D.Tex.))

gardless of the legality of the strike, would place an incredible advantage in the hands of management. This principle has been regularly noted in cases involving strikes by public employees. In one case, a New York Court of Appeals wrote, "[a private action for damages] would be a powerful deterrent to public employee strikes, but it would also, as the claims for damages in the Burnes Jackson complaint, impose a crushing burden on the unions and each of the employees participating in the strike." *Burns Jackson Miller Simms & Spitzer v. Linder,* 59 N.Y.2d 314, 329 (N.Y.Ct.App.1983).

Other cases have also noted the power associated with awarding damages for illegal strikes by a union. One court expressed reluctance to allow employers and unions "to use the club of damages against each other." *CSX Transportanon Inc. v. Marquar,* 980 F.2d 359, 379 (6th Cir.1992). The potential advantage to management prompted the Fifth Circuit to explicitly refuse an employer's claim for damages against a union for losses incurred as the result of an illegal strike. *See Burlington Northern R.R. Co. v. Brotherhood of Maintenance of Way Employees,* 961 F.2d 86, 89 (5th Cir.1992); *Louisville and Nashville R.R. Co. v. Brown,* 252 F.2d 149, 155 (5th Cir.1958). The Fourth Circuit recently came to the same conclusion and refused an employer's claim for damages resulting from a union's illegal strike over a minor dispute. *See Norfolk Southern Railway v. Brotherhood of Locomotive Engineers,* 164 LRRM 2641 (4th Cir.2000).

**\*9** Regardless of whether the damages are sought by the employer or a third party, the imbalance to the bargaining process would be just as profound. As Magistrate Kaplan recognized, the award of damages for losses incurred in the "collective bargaining process would, in effect, give the employer a weapon with which to keep the unions and their agents "in line." The risk is no less when the party seeking damages is a stranger to the collective bargaining process, such as airline customers affected by an illegal work stoppage. Management

would still be able to use the threat of large damage awards in potential class actions such as this one to keep the unions and their agents 'in line.' ' (Findings and Recommendation at 7) (quoting *National Airlines, Inc. v. Airline Pilots Association International,* 431 F.Supp. 53, 54 (S.D.Fla.1976)).

All of the above cases dealt with claims brought under the RLA. However, that is not dispositive of the issue currently before the Court. Whether the threat of damages comes under the RLA or common law, the result would be the same. The best way to produce more unified results and allow the parties to focus their attention on resolving the labor dispute is to allow the federal courts and federal law sole jurisdiction to implement any remedy.

In looking to the nature of the union's actions, one must acknowledge that the sick-out was the APA's response to the dispute with American. Regardless of the legality of the strike, the union's actions and the ability to strike lie at the heart of labor law. In most cases, strikes by participants of major industrial companies will affect thousands and thousands of people who are not a party to the CBA. Due to the far-reaching consequences of any action taken by these players, such strikes as the APA's cannot be considered peripheral to the concerns of labor law. Moreover, there is no evidence that the strike used any threats or violence or concerned any other matter that is grounded in local control so as to avoid preemption.

2. Post–TRO Conduct

The Court is mindful that the same factors justifying preemption of pre-TRO conduct could arguably justify preemption of post-TRO conduct. Nevertheless, this Court finds that permitting liability to third parties for conduct occurring after issuance of a TRO will not meaningfully disrupt the balance between labor and management.

As discussed above, a TRO must be obeyed until set aside. *Maness v. Meyers,* 419 U.S. 449, 458 (1975). Thus, neither a union nor an employer may

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1405235 (N.D.Tex.), 142 Lab.Cas. P 10,822
**(Cite as: 2000 WL 1405235 (N.D.Tex.))**

have any reasonable expectation or good-faith belief that its conduct in violation of the TRO is legal, let alone legally protected by federal labor policy. Those who violate a court order do so at their peril, and merit no federal license to continue engaging in conduct that violates the rights of third parties even after a judge has forbidden them to do so. Further, there is no ambiguity in a rule refusing to exempt post-TRO conduct from valid state laws not implicating a CBA. The clear bright line is crossed only when a party continues to act contrary to state law after a court has forbidden such conduct by issuing a restraining order or injunction. There can be no confusion that such conduct no longer enjoys special legal protection.

**\*10** The Court notes that the APA did, in fact, pay for the consequences of violating the court order. As a result of the sick-out, Judge Kendall imposed a civil contempt fine of $45,000,000 against the APA. Yet this award does nothing to compensate third parties damaged by illegal conduct. Third parties are not foreclosed by federal labor policy from seeking compensation for damage they suffered when such claims will not disrupt that federal policy. Indeed, national labor policy is not disrupted by permitting post-TRO conduct to be subject to state law; there is no "potential frustration of national purpose." *Cf. Garmon,* 359 U.S. at 242. Parties do not forfeit any rights granted under a CBA or subject to federal management. They merely are not permitted to hide behind the shield of federal preemption doctrine for conduct in violation of state law. All conduct prior to a court order continues to be subject to federal preemption, as does all post-TRO conduct that implicates a CBA. Employers gain no new weapon in their arsenal with which to bludgeon potential strikers, unions will not be more hesitant to strike, for they incur potential liability to third parties only for conduct that takes place after a court order is issued.

Note again that enforcing the issuance of a TRO as the bright line between special legal protection and ordinary subjection to valid laws does not permit claims to be based upon the TRO itself. The TRO is instead a boundary; it marks the point at which the interest of national labor policy no longer outweighs the peculiarly local concerns of the courts enforcing state laws. *Cf. Garmon,* 359 U.S. at 243–244.

#### D. *ADA Preemption*

Defendants argue that Plaintiffs' common law causes of action are preempted by the Airline Deregulation Act of 1978 ("ADA"), Pub.L. No 95–504, 92 Stat. 1705 (codified as amended in various sections of Title 49). This Court adopts the finding and recommendation of the magistrate to find no ADA preemption of Plaintiffs' claims.

#### E. *Liability for Peaceful Labor Strike*

This Court adopts the finding and recommendation of Magistrate Judge Kaplan to reject any defense that no common law claims can arise from a peaceful labor strike as inapplicable to this case.

#### F. *Disposition of Remaining State Law Claim*

This Court adopts the findings and recommendation of the magistrate to dismiss the surviving state law claim without prejudice. The interests of clarity, judicial economy, and the appropriateness of addressing state law claims in state courts all counsel against this Court attempting to disentangle surviving and dismissed claims, surviving and dismissed plaintiffs, and then remanding them to their separate originating state courts. This Court chooses not to exercise its supplemental jurisdiction in this case.

### II. Plaintiffs' Objections

Plaintiffs made three objections to the Findings and Recommendation. The first two object to Magistrate Kaplan's recommendation to dismiss rather than remand Plaintiffs' surviving state law causes of action. Plaintiffs' objections are OVERRULED. The Court's ruling makes clear that the state law claim remaining after this Court's previous rulings is dismissed without prejudice.

**\*11** Plaintiffs' third objection is titled a condi-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1405235 (N.D.Tex.), 142 Lab.Cas. P 10,822
**(Cite as: 2000 WL 1405235 (N.D.Tex.))**

tional objection and argues that in the event the Court sustains the Defendants' objections, Plaintiffs object to the portions of the Findings and Recommendation that dismiss Plaintiffs' claims under the RLA, RICO, and the claims against the individual Defendants. Plaintiffs give no specific reason for their objection and merely incorporate by reference the legal arguments set forth in their briefs and response to Defendants' Motion to Dismiss. This objection is precisely the type of blanket objection that the Court need not consider. *See DFW Vending, Inc. v. Jefferson County, Tex.,* 991 F.Supp. 578, 583 (E.D.Tex.1998). Accordingly, the Court OVERRULES Plaintiffs' Objections to the Findings and Recommendation.

N.D.Tex.,2000.
In re Allied Pilots Class Action Litigation
Not Reported in F.Supp.2d, 2000 WL 1405235 (N.D.Tex.), 142 Lab.Cas. P 10,822

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



FOR EDUCATIONAL USE ONLY
Page 1

Not Reported in F.Supp.2d, 2008 WL 2620097 (N.D.Tex.)
**(Cite as: 2008 WL 2620097 (N.D.Tex.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Texas,
Wichita Falls Division.
Priscilla S. CATES, Individually and as the administrator of the Estate of Bobby Ray Cates, Plaintiff,
v.
Matthew Scott CREAMER, et al., Defendants.

No. 7:00-CV-0121-O ECF.
June 27, 2008.

Steve Briley, Sheri M. Cravens, Banner, Briley & White, Wichita Falls, TX, Charles W. Fillmore, Fillmore Law Firm, Fort Worth, TX, for Plaintiff.

Charles W. Oldham, Oldham & Kennedy, Wichita Falls, TX, Blazena Psurny, Wess H. Tribble, Tribble, Ross & Wagner, Houston, TX, Laura Besvinick, Hogan & Hartson, LLP, Miami, FL, for Defendants.

Hesha Abrams, Abrams Mediation & Negotiation Inc., Dallas, TX, pro se.

### MEMORANDUM OPINION & ORDER
REED O'CONNOR, District Judge.

**\*1** Before the Court is the defendant Hertz Corporation's ("Hertz") Motion to Alter, Amend, or Vacate Judgment ("Motion to Alter"), filed March 10, 2008 (Doc. 151). The plaintiff, Priscilla S. Cates, filed a response on March 31, 2008 (Doc. 152). For the reasons stated herein, Hertz's motion is DENIED.

### I.

This case involves a car accident that took place in Texas. While driving through Texas, the defendant driver Matthew Scott Creamer ("Creamer"), a resident of Florida, momentarily fell asleep at the wheel of a Hertz rental vehicle, which led to an accident severely injuring Bobby Cates

("Cates"), a Texas resident. The vehicle involved in the accident was registered and licensed in Florida and the lease for the vehicle with Hertz was executed in Florida. The rental agreement referenced Florida's financial responsibility and "no fault" personal injury laws but it did not contain a choice of law provision. Hertz is incorporated in Delaware and its principal place of business is in New Jersey.

Cates filed a diversity suit in the Northern District of Texas on June 29, 2000. Cates sued Creamer for negligent operation of a motor vehicle under Texas law, and sought to be compensated for medical expenses and lost wages. Cates also sued Hertz under Florida's dangerous instrumentality doctrine. [FN1] Texas does not recognize the dangerous instrumentality doctrine and has adopted the doctrine of negligent entrustment.[FN2] Hertz moved for summary judgment, contending that Texas law controls the vicarious liability issue. This Court, applying Texas law, granted Hertz's summary judgment motion exonerating Hertz from liability. The first jury found no negligence and returned a verdict for Creamer. This Court subsequently granted a new trial and the second jury found Creamer 70% at fault for the accident and awarded Cates damages. Cates sought on appeal to collect the award from Hertz based on Florida law of vicarious liability. Creamer sought on appeal to reinstate the first jury's verdict.

> FN1. Florida's dangerous instrumentality doctrine holds an owner/lessor of a vehicle vicariously liable when the owner/lessor entrusts the vehicle to a lessee whose negligent operation causes damage to another. *Aurbach v. Gallina,* 753 So.2d 60, 62 (Fla.2000).

> FN2. The elements of negligent entrustment are: "(1) entrustment of a vehicle by the owner; (2) to an unlicensed, incompetent, or reckless driver; (3) that the owner knew or should have known to be unli-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                    Page 2

Not Reported in F.Supp.2d, 2008 WL 2620097 (N.D.Tex.)
**(Cite as: 2008 WL 2620097 (N.D.Tex.))**

censed; (4) that the driver was negligent on the occasion in question and (5) the driver's negligence proximately caused the accident." *Schneider v. Esperanza Transmission Co.,* 744 S.W.2d 595, 596 (Tex.1987).

On November 28, 2005, the United States Court of Appeals for the Fifth Circuit affirmed the judgment against Creamer, but vacated and remanded this Court's grant of summary judgment for Hertz. The Fifth Circuit stated, "[T]he district court erred in applying Texas law to the issue of Hertz's vicarious liability. Because the district court did not conduct a vicarious liability inquiry under Florida law, we remand this case to it for determination, under Florida law, of Hertz's vicarious liability for Cates's judgment against Creamer." *Cates v. Creamer,* 431 F.3d 456, 466 (5th Cir.2005). The Fifth Circuit specifically instructed that "[o]n remand, the district court should focus particularly on whether the Florida law of vicarious liability may be applied to benefit non-Florida residents in a situation such as the case at hand." *Cates,* 431 F.3d at 466. Furthermore, the Fifth Circuit observed, "It seems that the district court will have to make an *Erie* guess to resolve the question, as no Florida precedent exists to resolve the question." *Id.*

**\*2** On February 25, 2008, the Court issued an opinion finding that the Florida supreme court would apply the dangerous instrumentality doctrine to benefit a non-Florida resident injured outside of Florida. *See* February 25, 2008 Opinion at 4-17. Hertz subsequently filed its Motion to Alter seeking relief under Federal Rule of Civil Procedure 59(e). Def.'s Mot. at 1. Plaintiff filed her motion to substitute and suggestion of death regarding Bobby Cates on October 23, 2006. Pl.'s Resp. at 4. Hertz states, "Mr. Cates' death represents an important factual development because the damage model presented at the trial was based on a 10-year or 15-year projected life expectancy, which is plainly no longer applicable. Rather, at this stage of litigation, Mr. Cates' damages are fixed and certain and, given the timing of Mr. Cates' death, no doubt substantially less than the amount projected and awarded at the Creamers' trial." Def.'s Mot. at 3. Therefore, Hertz argues that it is "entitled to a trial on medical damages under an exception to the law of the case doctrine." Def.'s Mot. at 1. The Plaintiff filed a response arguing that Hertz's argument should have been raised previously in response to Plaintiff's motion for judgment and that Bobby Cates' death does not give rise to a basis for relief under Rule 59(e). Pl.'s Resp. at 4-16.

**II.**

"A Rule 59(e) motion 'calls into question the correctness of a judgment.' " *Templet v. Hydro-Chem, Inc.,* 367 F.3d 473, 478 (5th Cir.2004) (quoting *In re Transtexas Gas Corp.,* 303 F.3d 571, 581 (5th Cir.2002)). "Reconsideration of a judgment after its entry is an extraordinary remedy that should be used sparingly." *Templet,* 367 F.3d at 479 (citation omitted). The Fifth Circuit "has held that such a motion is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment." *Templet,* 367 F.3d at 479 (citing *Simon v. United States,* 891 F.2d 1154, 1159 (5th Cir.1990)). "Rather, Rule 59(e) 'serve[s] the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence.' " *Templet,* 367 F.3d at 479 (quoting *Waltman v. Int'l Paper Co.,* 875 F.2d 468, 473 (5th Cir.1989)). "[W]hile a district court has considerable discretion in deciding whether to reopen a case in response to a motion for reconsideration, such discretion is not limitless." *Templet,* 367 F.3d at 479 (citing *Lavespere v. Niagara Machine & Tool Works, Inc.,* 910 F.2d 167, 174 (5th Cir.1990)). The Fifth Circuit "has identified two important judicial imperatives relating to such a motion: 1) the need to bring litigation to an end; and 2) the need to render just decisions on the basis of all the facts." *Id.*

**III.**

As mentioned above, a Rule 59(e) motion is

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                                                      Page 3

Not Reported in F.Supp.2d, 2008 WL 2620097 (N.D.Tex.)
**(Cite as: 2008 WL 2620097 (N.D.Tex.))**

"not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment." *Templet,* 367 F.3d at 479. As Plaintiff points out, Hertz's present argument, presented March 10, 2008, regarding its entitlement to a trial on medical damages was not raised in Hertz's response to Plaintiff's motion for judgment. Pl.'s Resp. at 4-5. Hertz also did not raise the trial on medical damages argument in its motion for Judgment. *See* Doc. 127. In fact in both Hertz's response to Plaintiff's motion for judgment and in Hertz's motion for judgment, Hertz only asked the Court to "deny Cates' Motion to Enter Judgment and enter a new judgment for Hertz" and did not ask the Court for a trial on medical damages. Def.'s Mem. for Judgment at 20; Def.'s Resp. to Pl.'s Mot. for Judgment at 19. As Plaintiff points out, after briefing on the motions for judgment was completed, on August 30, 2007, Hertz raised the trial on medical damages argument for the first time in a reply brief to its brief addressing the Court's December 18, 2006 decision in *Dunn v. Madera.* Pl.'s Resp. at 9; Def.'s Reply at 6. The Court need not address any arguments raised for the first time in a reply. *See United States v. Jackson,* 426 F.3d 301, 304 n. 2 (5th Cir.2005) ("Arguments raised for the first time in a reply brief, even by pro se litigants ... are waived.") (citing *Knighten v. Commissioner,* 702 F.2d 59, 60 n. 1 (5th Cir.1983)). *See also Senior Unsecured Creditors' Comm. of First Republic Bank Corp. v. F.D.I.C.,* 749 F.Supp. 758, 772 (N.D.Tex.1990) (Fitzwater, J.) ("The FDIC raised its third argument for the first time in its reply brief and the court will not consider it in deciding the motion to dismiss.").

**\*3** Furthermore, Bobby Cates' death is not newly discovered evidence. Plaintiff filed her motion to substitute and suggestion of death regarding Bobby Cates on October 23, 2006. *See* Pl.'s Resp. at 4. In addition, there is not a manifest error to correct. Hertz contends that "it would be clear error and manifestly unjust to hold Hertz liable for the judgment entered against the Creamers. Hertz had no opportunity to defend itself in the trial against

the Creamers, having been dismissed from the case prior to those trials." Def.'s Mot. at 5. However, Hertz's liability to Plaintiff is vicarious, based on the negligence of defendant Creamer. Hertz also contends that "the jury in the second Creamer trial based its assessment of Mr. Cates' future medical damages on expert testimony projecting the cost of Mr. Cates' medical treatment assuming that he would live for either another ten (10) or fifteen (15) years. Instead Mr. Cates passed away during the pendency of this action.... Given this change in circumstances, and the critical fact that Mr. Cates' medical damages can now be determined with certainty, it would be unjust to hold Hertz vicariously liable for a damages award that is not supported by the facts of the case ...." *Id.* "To hold that a plaintiff's death following a jury verdict is the sort of 'substantial injustice' requiring the reopening of cases or award of new trials under the Federal Rules of Civil Procedure would be to invite a morass of appeals from defendants in cases where the plaintiffs did not survive an 'acceptable' amount of time following the entry of final judgment." *Davis by Davis v. Jellico Cmty. Hosp., Inc.,* 912 F.2d 129, 135 (2d Cir.1990). "The fact that a plaintiff dies even a second after judgment is entered does not render evidence regarding an expected life span 'false' nor the judgment invalid. The testimony regards an expectancy, not a certainty. Had [Plaintiff] lived well beyond his expected life span, Rules 59 and 60 would not have allowed him to move for a supplemental award of damages." *Id. See also Campbell v. American Foreign S.S. Corp.,* 116 F.2d 926, 928 (2d Cir.1941) ("If it were ground for new trial that facts occurring subsequent to trial have shown that the expert witness made an inaccurate prophecy of the prospective disability of the plaintiff, the litigation would never come to an end.").

**IV.**

In sum, Hertz should have raised its argument regarding a trial on medical damages at an earlier time. Furthermore, the death of Bobby Cates is not newly discovered evidence nor is there a manifest

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                              Page 4
Not Reported in F.Supp.2d, 2008 WL 2620097 (N.D.Tex.)
**(Cite as: 2008 WL 2620097 (N.D.Tex.))**

error to correct. For these reasons, Hertz's Motion
to Alter (Doc. 151) is denied.

So ordered.

N.D.Tex.,2008.
Cates v. Creamer
Not Reported in F.Supp.2d, 2008 WL 2620097
(N.D.Tex.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

--- F.3d ----, 2012 WL 4875696 (C.A.2)
**(Cite as: 2012 WL 4875696 (C.A.2))**

**H**
Only the Westlaw citation is currently available.

United States Court of Appeals,
Second Circuit.
Nadeisha Lotha FULLER, Petitioner,
v.
BOARD OF IMMIGRATION APPEALS, Respondent.

Docket No. 08–3973.
Argued: Feb. 16, 2012.
Decided: Oct. 16, 2012.

**Background:** Citizen and national of Jamaica filed petition for review of Board of Immigration Appeals' (BIA), 2008 WL 3861946, final order of removal. Government moved to dismiss.

**Holding:** The Court of Appeals, Pooler, Circuit Judge, held that alien's petition for review was rendered moot by BIA's vacation of order on reconsideration.

Motion granted.

West Headnotes

**[1] Federal Courts 170B ⟨⟩776**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)1 In General
        170Bk776 k. Trial De Novo. Most Cited Cases
    Court of Appeals reviews its subject matter jurisdiction de novo.

**[2] Aliens, Immigration, and Citizenship 24 ⟨⟩384**

24 Aliens, Immigration, and Citizenship
  24V Denial of Admission and Removal
    24V(G) Judicial Review or Intervention

      24k384 k. In General. Most Cited Cases

**Aliens, Immigration, and Citizenship 24 ⟨⟩392**

24 Aliens, Immigration, and Citizenship
  24V Denial of Admission and Removal
    24V(G) Judicial Review or Intervention
      24k392 k. Decisions Reviewable. Most Cited Cases

    Board of Immigration Appeals' (BIA) disposition of motion to reconsider is new final order; to seek review of that order, petitioner must file new petition for review. 8 U.S.C.A. § 1252(b)(6).

**[3] Federal Courts 170B ⟨⟩723.1**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(I) Dismissal, Withdrawal or Abandonment
      170Bk723 Want of Actual Controversy
        170Bk723.1 k. In General. Most Cited Cases

    Under mootness doctrine, if event occurs while case is pending on appeal that makes it impossible for court to grant any effectual relief whatever to prevailing party, court must dismiss case, rather than issue advisory opinion.

**[4] Aliens, Immigration, and Citizenship 24 ⟨⟩392**

24 Aliens, Immigration, and Citizenship
  24V Denial of Admission and Removal
    24V(G) Judicial Review or Intervention
      24k392 k. Decisions Reviewable. Most Cited Cases

    Alien's petition for review of Board of Immigration Appeals' (BIA) final order of removal was rendered moot by BIA's vacation of order on reconsideration, where grant of reconsideration expressly vacated prior order, and principally addressed itself to two issues that BIA had not addressed in prior order.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 4875696 (C.A.2)
**(Cite as: 2012 WL 4875696 (C.A.2))**

The government moves to dismiss Nadeisha Lotha Fuller's petition for review for lack of jurisdiction because, in a subsequent order, the Board of Immigration Appeals vacated and superseded the order under review. We hold that this petition is moot because we can provide no effective relief from a removal order that has been vacated and replaced by an order that relies on materially different reasoning.Daniel Schwartz, Day Pitney LLP (Victoria Woodin Chavey, on the brief), New York, N.Y., for Petitioner.

Matt A. Crapo, Office of Immigration Litigation, Civil Division, U.S. Department of Justice (Tony West, Assistant Attorney General, Civil Division; Cindy S. Ferrier, Senior Litigation Counsel, on the brief), Washington, D.C., for Respondent.

Before JACOBS, Chief Judge, CALABRESI and POOLER, Circuit Judges.

POOLER, Circuit Judge:

**\*1** Nadeisha Lotha Fuller filed the instant petition for review of a final order of removal and moved the Board of Immigration Appeals ("BIA") to reconsider that order. The BIA subsequently granted Fuller's motion to reconsider, vacated the order of removal that is the subject of this petition for review, and issued a new final order of removal. Fuller did not petition for review of the subsequent order. The government moves to dismiss the petition, arguing that we lack jurisdiction over a vacated order. Fuller responds that we retain jurisdiction because the BIA's subsequent order left the reasoning of the prior order intact and vacated it in name only.

We hold that this petition is moot because we can provide no effective relief from a removal order that has already been vacated. We do not decide, however, whether a petition for review of a vacated order would present a live case or controversy if the order granting reconsideration and vacating the prior order left the reasoning of the prior order sub-

stantially intact. Here, the order granting Fuller's motion to reconsider both vacated and materially altered her prior order of removal. Accordingly, we grant the government's motion to dismiss. Fuller is not without recourse, however; while the vacated order is unreviewable, Fuller may obtain review of the decision on reconsideration if she succeeds in moving the BIA to reissue that decision. *See Luna v. Holder,* 637 F.3d 85, 97, 104 (2d Cir.2011).

## BACKGROUND

Fuller, a citizen and national of Jamaica, was admitted to the United States in 1992. In 2003, an Immigration Judge ("IJ") ordered Fuller removed on the ground that she had been convicted of an aggravated felony. *See* Immigration and Nationality Act ("INA") § 101(a)(43)(F), 8 U.S.C. § 1101(a)(43)(F); INA § 237(a)(2)(A)(iii), 8 U.S.C. § 1227(a)(2)(A)(iii). The BIA dismissed Fuller's appeal, Fuller petitioned for review, and this Court remanded the case to the BIA on the government's motion.

On remand, the IJ again ordered removal. On July 15, 2008, the BIA dismissed Fuller's appeal. *See In re Fuller,* No. A043 093 854 (B.I.A. July 15, 2008) ("2008 Order"). Fuller filed the instant petition for review and also moved the BIA to reconsider its 2008 Order. *See* 8 U.S.C. § 1229a(c)(6) (providing for BIA reconsideration of removal decisions). On the stipulation of the parties, this Court permitted Fuller to withdraw the petition without prejudice to its reinstatement upon the BIA's deciding the motion to reconsider.

In an order dated May 26, 2009, the BIA granted Fuller's motion to reconsider, concluded that the 2008 Order "was issued in error," vacated it, and dismissed anew Fuller's appeal from the IJ's removal order. *In re Fuller,* No. A043 093 854 (B.I.A. May 26, 2009) ("2009 Order"). Fuller's attorney did not learn of the new order until July 29, 2009, however, because the law firm did not properly route the order to Fuller's attorney. By that time, the 30–day deadline to petition for review of the 2009 Order had passed. *See* 8 U.S.C. § 1252(b)(1).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 4875696 (C.A.2)
**(Cite as: 2012 WL 4875696 (C.A.2))**

**\*2** When Fuller moved to reinstate the instant petition for review, the government opposed, arguing that the 2009 Order had divested our jurisdiction over the 2008 Order by vacating it, and that we lacked jurisdiction over the 2009 Order because Fuller had not petitioned for review of that order. This Court reinstated the petition and treated the government's opposition as a motion to dismiss, which is now before us.

### DISCUSSION
#### I.

[1] This Court reviews its subject matter jurisdiction de novo. *Sol v. INS,* 274 F.3d 648, 650 (2d Cir.2001). Courts of appeals have jurisdiction only over petitions for review that are timely filed and that seek review of removal orders that are "final" under the INA. INA § 242(a)(1), (b)(1), 8 U.S.C. § 1252(a)(1), (b)(1); *see Chupina v. Holder,* 570 F.3d 99, 103 (2d Cir.2009); *Malvoisin v. INS,* 268 F.3d 74, 75–76 (2d Cir.2001). The government argues that the 2008 Order is no longer a final order of removal under the INA because it has been vacated. *See* INA § 101(a)(47)(B), 8 U.S.C. § 1101(a)(47)(B) (setting forth the circumstances under which a removal order becomes "final").

We are not persuaded, however, that statutory finality is the relevant jurisdictional inquiry. At the outset, we observe that there is no dispute that the 2008 Order was "final" under the INA at the time Fuller filed the instant petition for review, and the government has not articulated in what way the vacatur affected the finality of the 2008 Order.

[2] A petitioner may concurrently file a petition for review of a final order and move the BIA to reconsider that same order. *See Stone v. INS,* 514 U.S. 386, 393–94, 115 S.Ct. 1537, 131 L.Ed.2d 465 (1995). The BIA's disposition of a motion to reconsider is a new final order; to seek review of that order, the petitioner must file a new petition for review. *Stone,* 514 U.S. at 395; *see also* 8 U.S.C. § 1252(b)(6).

*Filing* a motion to reconsider a final order does not affect the justiciability of a pending petition for review of that order. *See Stone,* 514 U.S. at 394–95. Nor, moreover, does the BIA's *denial* of a motion to reconsider. *Id.* at 395; *Khouzam v. Ashcroft,* 361 F.3d 161, 167 (2d Cir.2004). Neither the Supreme Court nor this court, however, has addressed the effect, if any, of the BIA's *grant* of a motion to reconsider on the finality of the underlying order.

[3][4] Instead of statutory finality, however, we think the proper doctrine to determine the justiciability of a vacated order is that of mootness. The mootness doctrine derives from Article III of the Constitution, which limits federal jurisdiction only to live cases or controversies. U.S. Const. art. III. "[U]nder the mootness doctrine, if an event occurs while a case is pending on appeal that makes it impossible for the court to grant any effectual relief whatever to a prevailing party, we must dismiss the case, rather than issue an advisory opinion." *ABC, Inc. v. Stewart,* 360 F.3d 90, 97 (2d Cir.2004) (internal quotation marks omitted). Here, we cannot grant any effective relief to Fuller because the 2008 Order has already been vacated by the express language of the 2009 Order. *See* 2009 Order at 2 ("[T]he Board's decision dated July 15, 2008, is vacated...."). Therefore, the petition before us is moot, and we lack jurisdiction to review it.

#### II.

**\*3** Fuller argues that we retain jurisdiction over the 2008 Order notwithstanding the fact that it has been vacated because the 2009 Order did not substantively alter the reasoning of the prior order; relying on the express vacatur, she argues, would "[e]levat[e] form over substance." Fuller is correct that the majority of circuits to consider the effect of the grant of a motion to reconsider on the justiciability of the underlying order have concluded that the underlying order remained final and was not moot where the subsequent grant of reconsideration modified the prior order but left the reasoning of the prior order intact. *See Espinal v. Holder,* 636 F.3d 703, 706 (5th Cir.2011) (concluding Court retained jurisdiction where subsequent order "left intact the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 4875696 (C.A.2)

**(Cite as: 2012 WL 4875696 (C.A.2))**

earlier order's general legal analysis" and "[n]o material change occurred"); *Thomas v. Att'y Gen. of U.S.,* 625 F.3d 134, 141 (3d Cir.2010) (court retained jurisdiction where subsequent order "adhered to its earlier legal analysis" and "did not vacate or substantially modify" the prior decision); *Plasencia–Ayala v. Mukasey,* 516 F.3d 738, 746 (9th Cir.2008) (retaining jurisdiction where BIA "expressly affirmed its prior decision" and "its analysis ... was substantially the same as in its previous order"), *overruled on other grounds by Marmolejo–Campos v. Holder,* 558 F.3d 903 (9th Cir.2009) (en banc); *Jaggernauth v. U .S. Att'y Gen.,* 432 F.3d 1346, 1352 (11th Cir.2005) (retaining jurisdiction where "grant of reconsideration actually upheld and affirmed the conclusions of the prior order"). *But see Mu Ju Li v. Mukasey,* 515 F.3d 575, 580 (6th Cir.2008) (departing from case-by-case approach and holding, categorically, that where the BIA grants reconsideration and "renders a new decision addressing the issues presented in the [prior decision], then the new decision effectively vacates the prior decision," and the court no longer has jurisdiction to review it (footnote omitted)).

None of these decisions, however, addressed a grant of reconsideration that expressly vacated the prior order. To the extent these decisions have addressed express vacatur, they suggest that it is sufficient to divest jurisdiction—under a theory either of mootness or of nonfinality—without inquiring whether the subsequent order materially changed the reasoning of the prior order. *See Espinal,* 636 F.3d at 706 ("[T]he [subsequent] Order did not vacate or materially change [the prior] Order. We thus retain appellate jurisdiction."); *Thomas,* 625 F.3d at 141 ("The question for this Court ... is whether the [grant of reconsideration] vacated or materially altered [the prior] decision."); *Plasencia–Ayala,* 516 F.3d at 745 ("Once a petition for review has been filed, federal court jurisdiction is divested only where the BIA subsequently vacates or materially changes the decision under review."); *id.* at 745 n. 3 ("Since the BIA has the power to vacate its de-

cisions expressly, there is little need to adopt a rule that every grant of a motion to reconsider constitutes a *de facto* vacature of its prior decision ."); *see also Jaggernauth,* 432 F.3d at 1351 (reasoning that the subsequent order "explicitly upholds" the prior order, suggesting that the BIA intended "to leave the [prior] order ... intact and unmodified").

**\*4** We need not and do not decide, however, whether express vacatur might not moot the previous order if the subsequent order otherwise left the reasoning of the original order undisturbed. In Fuller's case, the 2009 Order did not simply *state* that the prior order was vacated, but also materially altered the substance of the prior order so as to effectively supersede it.

The 2009 Order addressed and corrected a serious error in the 2008 Order: the 2008 Order was a nearly identical copy of an order the BIA had issued in Fuller's case three years earlier. *Compare In re Fuller,* No. A043 093 854 (B.I.A. May 4, 2005), *with* 2008 Order. Accordingly, the 2008 Order addressed neither the IJ decision that was the subject of Fuller's appeal nor the issues Fuller presented in her BIA appeal brief. *See* 2009 Order at 1 (acknowledging error). In contrast, the 2009 Order not only reviewed, but also adopted and supplemented, the very IJ decision that the BIA had overlooked in 2008. *See* 2009 Order at 1–2. Moreover, the 2009 Order principally addressed itself to two issues that the BIA had not addressed in the 2008 Order. *Compare* 2009 Order at 2, *with* 2008 Order. [FN1] Finally, the 2009 Order relied on authority, *Canada v. Gonzales,* 448 F.3d 560 (2d Cir.2006), that appears nowhere in the 2008 Order. *Compare* 2009 Order at 2, *with* 2008 Order. Considering all of these changes in their totality, we conclude that the 2009 Order materially altered and effectively superseded the 2008 Order.

Accordingly, we hold that we lack jurisdiction to review the 2008 Order because the 2009 Order rendered it moot by vacating it both expressly and substantively.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 4875696 (C.A.2)
**(Cite as: 2012 WL 4875696 (C.A.2))**

### III.

Because Fuller did not petition for review of the 2009 Order and the mandatory deadline to do so has passed, this court lacks jurisdiction to review that order. *See* INA § 242(b)(1), 8 U.S.C. § 1252(b)(1); *Malvoisin,* 268 F.3d at 75–76. Fuller may, however, obtain review of the 2009 Order if she successfully moves the BIA to reopen her proceedings and reissue that order on the ground that ineffective assistance of counsel prevented her from timely petitioning for review. *See Luna v. Holder,* 637 F.3d 85, 97 (2d Cir.2011); 8 U.S.C. § 1229a(c)(7). Although such a motion to reopen would be time-barred in Fuller's case because more than 90 days have passed since the 2009 Order, *see* 8 U.S.C. § 1229a(c)(7)(C)(i), the timeliness requirement is not jurisdictional and may be equitably tolled if Fuller has been diligent. *See Luna,* 637 F.3d at 95–96, 99. We express no view on the merits of such a motion, but we observe that the BIA's reissuance of the 2009 Order would "trigger[ ] a new thirty-day period to obtain judicial review." *Lewis v. Holder,* 625 F.3d 65, 68 (2d Cir.2010). If the BIA denied the motion, Fuller would then have thirty days to petition this Court for review of the denial, and this Court could remand, or even order the BIA to reissue the order, if it concluded the BIA erred in denying the motion. *See Luna,* 637 F.3d at 97, 103.

### CONCLUSION

**\*5** For the reasons stated above, the government's motion is GRANTED, and Fuller's petition for review is DISMISSED for lack of jurisdiction.

Chief Judge DENNIS JACOBS concurs in a separate opinion.

> FN1. The two issues are: (1) whether the IJ had improperly relied on evidence of Fuller's specific criminal conduct to determine whether she was convicted of an aggravated felony, and (2) whether the IJ had erroneously considered the risk of *physical injury* rather than the risk of the *use of physical force* in the commission of

the crime in determining whether the offense came within the definition of a crime of violence under 18 U.S.C. § 16(b).

C.A.2,2012.
Fuller v. Board of Immigration Appeals
--- F.3d ----, 2012 WL 4875696 (C.A.2)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 1998 WL 512959 (S.D.N.Y.)
**(Cite as: 1998 WL 512959 (S.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Hilda N. SHEVACK, Plaintiff,
v.
Litton Applied TECHNOLOGY, Defendant.

No. 95 CIV. 7740(JSM).
Aug. 18, 1998.

Hilda A. Shevack, Brooklyn, for plaintiff.

Francis X. Dee, David J. Reilly, Carpenter, Bennett & Morrissey, Newark, NJ, for defendant.

MEMORANDUM OPINION AND ORDER
MARTIN, District J.

**\*1** Plaintiff Hilda Shevack commenced this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), and the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq. ("ADEA"). Presently before the Court is a motion for summary judgment filed by defendant Litton Systems, Inc., Applied Technology Division ("ATD").

For reasons set forth below, the motion is granted in part and denied in part.

The complaint lists three allegedly discriminatory conducts: (1) the termination of Ms. Shevack's employment; (2) the failure to promote Ms. Shevack; and (3) unequal terms and conditions of employment. The Court will address each in order.

1. The Termination of Ms. Shevack's Employment

The standards set forth in McDonnell–Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), are applicable to both Title VII and ADEA claims of intentional discrimination in the termination of employment. Fisher v. Vassar College, 114 F.3d 1332, 1335 (2d Cir.1997). Under these standards, a plaintiff must first establish a prima facie case by showing (1) that she was within the protected classification, (2) that she was qualified for the position, (3) that she was discharged, and (4) that the discharge occurred under circumstances giving rise to an inference of age or sex discrimination. See Woroski v. Nashua Corp., 31 F.3d 105, 108 (2d Cir.1994).

Ms. Shevack has met the burden of establishing a prima facie case. She alleges that ATD terminated her employment because of her sex and age.[FN1] Specifically, Ms. Shevack alleges that ATD retained another employee in the same work group, Frank Schiavo, a much younger male employee who was far less experienced in the area of logistics than she.[FN2] Given that the plaintiff's burden of establishing a prima facie case is "minimal," Fisher, 114 F.3d at 1335 (citations omitted), Ms. Shevack has met that burden.

> FN1. Ms. Shevack was sixty nine years old, when she was dismissed by ATD.

> FN2. Ms. Shevack was terminated, when ATD closed its Hicksville, New York facility, where she worked. Mr. Schiavo was offered a position in the ATD's San Jose, California facility.

"Once the plaintiff has made out a prima facie case, the employer is required to offer a legitimate, non-discriminatory business rationale for its actions." Woroski, 31 F.3d at 108. "Any legitimate, non-discriminatory reason will rebut the presumption triggered by the prima facie case." Fisher, 114 F.3d at 1335–36.

ATD has met its burden to set forth a legitimate non-discriminatory reason for the termination of Ms. Shevack. First, ATD demonstrated that the dismissal of Ms. Shevack occurred as a part of a legitimate business-motivated plant closure in which about a quarter of 126 exempt employees were dismissed. There is no evidence whatsoever of age or

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

sex bias as to the plant-wide discharge. Second, as to the selection of Ms. Shevack for termination within her workgroup, ATD has provided evidence showing that it was based on expertise in certain software called LEADS. Specifically, ATD selected Mr. Schiavo among four members in Ms. Shevack's workgroup, because Mr. Schiavo possessed superior skill and knowledge in LEADS. Thus, ATD has met its burden of producing an age and sex neutral reason for the discharge.

***2** To defeat a defendant's properly supported motion for summary judgment, a plaintiff must present evidence sufficient to allow a rational fact finder to infer that the employer was actually motivated in whole or in part by age or sex discrimination. *Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 560 (2d Cir.1997). In other words, "a plaintiff must show that there is a material issue of fact as to whether (1) the employer's asserted reason for discharge is false or unworthy of belief *and* (2) more likely than not the employee's age [or sex] was the real reason for the discharge." *Woroski,* 31 F.3d at 108–09 (emphasis in original) (citations omitted).

Ms. Shevack has failed to establish the first factor. Ms. Shevack has not presented any evidence showing that the plant-wide discharge was either age or sex biased. As to the selection of Mr. Schiavo over Ms. Shevack, she does not dispute that: (1) Mr. Schiavo worked exclusively with LEADS prior to her termination, while she spent about ten percent of her time with LEADS; (2) Mr. Schiavo attended all LEADS related outside workshops and performed various functions using LEADS; FN3 (3) LEADS was used in the San Jose facility to complete a major contract; (4) Schiavo's main responsibility after the transfer was to work with LEADS. Thus, there is no material issue as to the reasons why ATD chose Mr. Schiavo, not Ms. Shevack, for a position in its San Jose facility.

FN3. It is undisputed that his duties included: (1) setting up a database using LEADS; (2) inputting data taken from drawings and various documents into that data base; and (3) generating reports based upon information which went into the system. Ms. Shevack's interaction with LEADS was limited to inputting data into the system. In addition, ATD claims that he also created customized "screens" for using LEADS, which Ms. Shevack dis- putes.

Ms. Shevack contends that her claim should not be dismissed because it is clear that her supervisor Barry Zimmerman exercised "blatant discrimination" in selecting Mr. Schiavo as a LEADS expert and then in recommending Mr. Schiavo for the San Jose position. However, Ms. Shevack does not set forth any specific fact in support of these allegations. Her contention is contradicted by Mr. Zimmerman's affidavit, in which he states that he recommended Mr. Schiavo for a temporary position in the San Jose facility, because he believed that Mr. Schiavo's work with LEADS system was necessary to complete the requirements of the major contract. Under these circumstances, mere conclusory allegations made by Ms. Shevack are insufficient to defeat summary judgment. *See Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985).

There is no possibility that any rational fact finder could infer that Ms. Shevack was terminated because of her age or sex. Thus, the motion for summary judgement with respect to the claim based on the termination of Ms. Shevack's employment is granted.

2. Failure to Promote Claim

Ms. Shevack's "failure to promote" claim in her complaint relates to a promotion she sought in 1990, while she was employed by General Instrument (GI), for whom she worked prior to the ATD's acquisition of the GI's Defense Systems Group in August 1991. ATD contends, without citing any case, that it is not liable for any alleged wrongdoings by GI.

Federal common law governs the issue of suc-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp.2d, 1998 WL 512959 (S.D.N.Y.)
**(Cite as: 1998 WL 512959 (S.D.N.Y.))**

cessor liability for various federal causes of action. *R.C.M. Executive Gallery Corp. v. Rols Capital Co.,* 901 F.Supp. 630, 634–35 (S.D.N.Y.1995) (citations omitted); *see also E.E.O.C. v. G–K–G, Inc.,* 39 F.3d 740, 747 (7th Cir.1994) (applying federal common law doctrine of successor liability to ADEA claim). In general, the purchaser of the assets, as distinct from the stock, of a corporation does not acquire the seller's liabilities. *G–K–G, 39 F.3d at 747.* However, courts have allowed the plaintiff to go against the purchaser of the violator's business even if it is a true sale and not a reorganization, provided that two conditions are satisfied: (1) the successor had notice of the claim before the acquisition; (2) there was substantial continuity in the operation of the business before and after the sale. *G–K–G, 39 F.3d at 747–48.*

**\*3** Nothing in the record supports a conclusion that ATD should be held liable for the claim arising from an alleged failure of GI to promote Ms. Shevack. ATD did not have a notice of Ms. Shevack's claim prior to the 1991 acquisition, for her claim did not arise until after she was terminated by ATD in 1993. Therefore, ATD is not liable for any discrimination claim that arose while Ms. Shevack worked for GI.

In her reply to the ATD's motion, she also alleges that ATD also denied a promotion because of her age and sex.

However, Ms. Shevack has failed to make out a prima facie case of discriminatory treatment. It is undisputed that while she remained at the same grade during her employment with ATD, Mr. Schiavo was promoted at least two grades. However, this fact is not useful in establishing a prima facie case of age or sex discrimination. Ms. Shevack does not allege that she was denied a promotion when a similarly situated young male worker was given one. The comparison between Ms. Shevack and Mr. Schivano is irrelevant here, because they were not similarly situated in terms of job titles, grades, qualifications, and responsibilities. Nor were they competing for the same promo-

tion. Thus, Ms. Shevack's contention lacks merits.

The ATD's motion for summary judgement as to the failure to promote ground is granted.

3. Unequal Terms and Conditions of Employment
Ms. Shevack has alleged in her complaint that she was paid less than male workers with inferior qualifications. In addition, Ms. Shevack contends that she did not receive compensation for her overtime hours, while Mr. Schiavo was compensated for his overtime.

"To successfully raise an inference of salary discrimination..., the plaintiff must establish that she was paid a lesser salary than a male for work substantially equal in the degree of skill, effort, and responsibility required, and which was performed under similar working conditions." *Koster v. Chase Manhattan Bank,* 687 F.Supp. 848, 859 (S.D.N.Y.1988); *see also Foster v. Arcata Assocs., Inc.,* 772 F.2d 1453, 1465–66 (9th Cir.1985), *overruled on other grounds by, Kennedy v. Allied Mut. Ins. Co.,* 952 F.2d 262 (9th Cir.1991). Clearly, her first contention lacks merits, for she admits that her claim is based on the comparison of her pay with those of male employees in other companies.

As to her second contention, ATD argues that Ms. Shevack should be precluded from proving it, because she did not mention it in her complaint and because she has never produced records related to her second contention to ATD during discovery although the ATD's request clearly called for such records.

Given Ms. Shevack's pro se status, the Court will not ignore her second contention, which is supported by affidavit and payroll documents. This is not a case where it is clear to the court that a party has invented facts just to prevent a grant of summary judgment. *See, e.g., Reisner v. General Motors Corp.,* 671 F.2d 91, 93 (2d Cir.1982) (disregarding facts presented first time in response to a motion for summary judgment).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 512959 (S.D.N.Y.)
**(Cite as: 1998 WL 512959 (S.D.N.Y.))**

**\*4** Ms. Shevack relies on Applied Technology Division Selected Labor Charges by CSO/TASK reports of Ms. Shevack and Mr. Schiavo, which show charges for Mr. Schiavo's overtime but not for Ms. Shevack's. Ms. Shevack testified in her affidavit that she put in total of approximately 1500 hours of overtime between August 11, 1991 and November 5, 1993 and that she was not aware of the disparate treatment until the reports were produced by ATD during discovery, showing that Mr. Schiavo was paid overtime. Absent further explanation for the apparent difference in the treatment of overtime compensation, the Court will not dismiss her claim based on this issue. *See Cosgrove v. Sears, Roebuck & Co.,* No. 81 Civ. 3482–CSH, 1985 WL 528, \*2 (S.D.N.Y.1985).

ATD has not set forth a legitimate reason for this allegedly discriminatory practice. ATD states that Ms. Shevack, as an exempt employee, was not entitled to overtime compensation. However, ATD does not dispute her allegation that Mr. Schiavo was also an exempt employee. Thus, ATD cannot rely on her exempt status to rebut the presumption of discrimination raised by the prima facie case.

As noted above, an inference of discrimination does not arise when the employees are not in comparable situations. It may be that ATD can offer a sound non-discriminatory reason why Mr. Schiavo was paid overtime but Ms. Shevack was not. To date, ATD has not done so. However, in light of the fact that Ms. Shevack has raised the issue for the first time in her papers submitted in opposition to the ATD's motion for summary judgment, the Court will deny the ATD's motion on the disparate overtime compensation issue without prejudice to ATD's right to submit a new summary judgment motion addressed to this issue.

4. Conclusion
For the foregoing reasons, the ATD's motion for summary judgment is granted, except as to the allegation based on unequal terms and conditions for overtime compensation. As to the overtime compensation issue, ATD may submit an additional

motion without seeking a prior permission from the Court.

    SO ORDERED.

S.D.N.Y.,1998.
Shevack v. Litton Applied Technology
Not Reported in F.Supp.2d, 1998 WL 512959 (S.D.N.Y.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 2011 WL 1231577 (S.D.Tex.), Med & Med GD (CCH) P 303,750
**(Cite as: 2011 WL 1231577 (S.D.Tex.))**

C

Only the Westlaw citation is currently available.

United States District Court,
S.D. Texas,
Houston Division.
UNITED STATES of America, ex rel. Elaine BEN-
NETT, Plaintiffs,
v.
BOSTON SCIENTIFIC CORPORATION and
Guidant Corporation, Defendants.

Civil Action No. H–07–2467.
March 31, 2011.

Mary Michelle Zingaro, Office of U.S. Attorney,
Mitchell R. Kreindler, Kreindler & Associates,
Houston, TX, Michele M. Fox, United States De-
partment of Justice, Lori E. Iwan, Iwan Cray Huber
Horstman & Van Ausdal LLC, Chicago, IL, David
W. Sanford, Sanford Wittels et al., Washington,
DC, for Plaintiffs.

Frederick Robinson, Janet S. Nolan, Fulbright &
Jaworski LLP, Washington, DC, Randall Shirres
Richardson, Fulbright & Jaworski LLP, Houston,
TX, Robert Jeffrey Layne, Fulbright & Jaworski
LLP, Austin, TX, for Defendants.

**MEMORANDUM AND OPINION**

LEE H. ROSENTHAL, District Judge.

**\*1** This case is one of a number raising the
question of when a manufacturer's promotion of a
medical device for an "off-label" use may provide
the basis for a *qui tam* action by a private plaintiff
suing under the False Claims Act.[FN1] The relator,
Elaine Bennett, alleges that Boston Scientific Cor-
poration and Guidant Corporation improperly pro-
moted the FlexView microwave surgical-ablation
system for an off-label use and that these promo-
tional activities caused physicians and hospitals to
submit false claims for reimbursement from Medi-
care or Medicaid. The FDA has approved the de-
fendants' microwave surgical-ablation system for

the general uses of ablating soft tissue and striated,
cardiac, and smooth muscle. The relators allege that
the defendants have improperly promoted the
device for the off-label use of surgical ablation to
treat atrial fibrillation, both in conjunction with oth-
er cardiac surgery and as a stand-alone procedure.

FN1. 31 U.S.C. § 3729 *et seq.*

The defendants have moved to dismiss under
Rule 12(b)(6), applying the standards of Rule 8 and
Rule 9(b) of the Federal Rules of Civil Procedure.
The defendants argue that the allegations of off-
label promotional activities are insufficient to plead
that they caused physicians or hospitals to submit
false reimbursement claims to Medicare or Medi-
caid. (Docket Entry No. 68). Bennett responded,
(Docket Entry No. 75), and the defendants replied,
(Docket Entry No. 77).

Based on the pleadings, the motion, the re-
sponses, and applicable law, this court grants the
defendants' motion to dismiss, for the reasons ex-
plained in detail in this Memorandum and Opinion.
Because there has been only one amendment, and
because Rule 15 embodies a liberal amendment
policy, the relators may amend no later than April
22, 2011, consistent with this Memorandum and
Opinion.

**I. Background**

**A. Procedural History**

Elaine Bennett filed her complaint on Novem-
ber 9, 2006, under seal, to allow the United States
to decide whether it wanted to intervene.[FN2] This
is one of five *qui tam* actions filed by Elaine Ben-
nett against medical-device manufacturers. (Docket
Entry No. 4).[FN3] The United States has not inter-
vened in this suit, but it has filed a "Statement of
Interest in Response to the Defendant's Motion to
Dismiss Plaintiff's First Amended Complaint,
(Docket Entry No. 73). The relator filed an
amended complaint in July 2009, (Docket Entry

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Not Reported in F.Supp.2d, 2011 WL 1231577 (S.D.Tex.), Med & Med GD (CCH) P 303,750
**(Cite as: 2011 WL 1231577 (S.D.Tex.))**

No. 33), and an unredacted version of that complaint in December 2009, (Docket Entry No. 58).

> FN2. A private person may bring an FCA action in the name of the government. 31 U.S.C. § 3730(b). The complaint is served on the government under Federal Rule of Civil Procedure 4(d)(4) and filed *in camera* and under seal for at least sixty days. *Id.* at § 3730(b)(1). The government may elect to intervene and proceed with the action within sixty days after it receives both the complaint and the material evidence and information. *Id.* The relators did not file evidence or information beyond the complaint in this case.

> FN3. The other qui tam actions are discussed in this court's opinion in *United States ex rel. Bennett v. Medtronic, Inc.,* —— F.Supp.2d ——, 2010 WL 3909447 (S.D.Tex. Sept.30, 2010). This opinion uses much of the analysis from this court's previous opinion.

**B. The Parties**

Boston Scientific develops, manufactures, and markets medical devices, including surgical devices. On April 21, 2006, it acquired the codefendant, Guidant Corporation and its Cardiac Rhythm Management and Cardiac Surgery Divisions. Before the acquisition, Guidant had developed the FlexView microwave surgical-ablation system. (Docket Entry No. 58, ¶¶ 17–18).

Boston Scientific employed the relator, Elaine Bennett, for a short period—from June 12 to September 28, 2006—as a sales representative in the Midwest region. Bennett worked in Central Illinois and throughout Missouri. (*Id.,* ¶ 16). In addition to her false claim allegations, Bennett alleges that the defendants retaliated against her for challenging the legality of their marketing practices. (*Id.,* ¶ 128).

**C. The False Claims Act**

**\*2** The False Claims Act prohibits the knowing submission of false or fraudulent claims for payment, or causing the submission of such claims, to the federal government, and prescribes fines and treble damages to penalize offenders. 31 U.S.C. § 3729(a). The FCA establishes liability for "[a]ny person who ... knowingly presents or causes to be presented, a false or fraudulent claim for payment or approval ... [or] knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the government." 31 U.S.C. § 3729(a) (1–2), *amended by* 31 U.S.C. § 3729(a)(1)(A–B).

When a *qui tam* suit is brought by a private relator and the government declines to intervene, the relator is entitled to between 25 and 30% of the recovery, § 3730(d)(2), as well as attorneys' fees. As has often been pointed out, the Act does not create a cause of action against all fraudulent conduct affecting the government. Rather, FCA liability attaches to a "false or fraudulent claim for payment" or to a "false record or statement [made] to get a false or fraudulent claim paid by the government." 31 U.S.C. § 3729(a)(1)-(2), *amended by* 31 U.S.C. § 37299(a) (1)(A–B). "Evidence of an actual false claim is the *'sine qua non* of a False Claims Act violation.' " *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.,* 290 F.3d 1301, 1311 (11th Cir.2002).

In this case, there are no allegations that the defendants themselves submitted false claims. Instead, the complaint alleges that the defendants knowingly caused the submission of fraudulent claims by physicians and hospitals. The fraudulent claims allegedly seek reimbursement for off-label uses of the defendants' devices. The complaint does not identify any specific false claim presented by others to Medicare/Medicaid. Nor does the complaint identify any entity or person who actually submitted such a claim. Instead, the complaint alleges that as a result of the defendants' marketing campaign and illegal kickbacks, the FlexView microwave surgical ablation system has been widely

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1231577 (S.D.Tex.), Med & Med GD (CCH) P 303,750
**(Cite as: 2011 WL 1231577 (S.D.Tex.))**

used for the off-label purpose of treating atrial fibrillation by physicians and hospitals and that this use "caused to be presented to the United States fraudulent claims ... in order to obtain reimbursement for surgical ablation services performed with Defendants' microwave surgical ablation products." (Docket Entry No. 58, ¶ 132).

**D. Off–Label Use of Medical Devices**

The FDA approves products for specific indications, which are stated in the label. When a medical device is approved for one purpose or indication and used outside this approved purpose, that use is deemed "off label." Off-label promotion may involve disseminating information about product uses the FDA did not approve. The FDA generally restricts a manufacturer from marketing for off-label purposes but does not restrict a hospital from purchasing, or a doctor from prescribing or using, a medical device for an off-label purpose. Off-label use of many devices and drugs is an accepted medical practice.[FN4]

> FN4. *See generally,* Ralph F. Hall & Robert J. Berlin, *When You Have a Hammer Everything Looks Like a Nail,* 61 FOOD AND DRUG L.J. 653, 655–56 (2006).

**\*3** Courts recognize that off-label use of a drug or medical device is not the same as a medically unnecessary use of that drug or device. *See Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341, 121 S.Ct. 1012, 1018, 148 L.Ed.2d 854 (2001) (" '[O]ff-label' usage of medical devices ... is an accepted and necessary corollary of the FDA's mission to regulate in this area without directly interfering with the practice of medicine."); *Svidler v. United States Dep't of Health and Human Servs.,* No. C–03–3593 MJJ, 2004 WL 2005781, at \*5 (N.D.Cal. Sept.8, 2004) ("[T]he FDA can restrict a company from marketing off-label uses, but cannot prevent a doctor from prescribing a device for an off-label use for any purpose she deems medically necessary." (citing *Washington Legal Found. v. Friedman,* 13 F.Supp.2d 51 (D.D.C.1998)); *United*

*States ex rel. Polansky v. Pfizer,* No. 04–cv–0704 (ERK), 2009 WL 1456582, at \*6 (E.D.N.Y. May 22, 2009) ("[T]he FDA has acknowledged that 'accepted medical practice often includes drug use that is not reflected in approved drug labeling.' " (citing Food & Drug Admin., Use of Approved Drugs for Unlabeled Indications, 12 FDA Drug Bulletin 4, 5 (1982)); *United States ex rel. Stephens v. Tissue Sci. Labs., Inc.,* Civil Action No. 1:07–CV2357–ODE, LEXIS 2009 DIST. 101601, at \*20 (N.D.Ga. Aug. 13, 2009) (noting that DRG payment may be made for hernia care even if non-covered care—the use of the device at issue—was present).

Medicare reimbursement for off-label uses of medical devices is not addressed within the Medicare Act itself. *See generally Yale—New Haven Hosp. v. Leavitt,* 470 F.3d 71, 73 (2d Cir.2006). Broad wording excludes from Medicare coverage "any expenses incurred for items or services ... which ... are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). The Secretary of the Department of Health and Human Services "is responsible for specifying those services that are covered under the 'reasonable and necessary' standard" and "has wide discretion in selecting the means for doing so." *Yale—New Haven Hosp.,* 470 F.3d at 74 (citing 42 U.S.C. § 1395ff(a); *Heckler v. Ringer,* 466 U.S. 602, 617, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984)). Traditionally, the Secretary has acted through "formal regulations and (informal) instructional manuals and letters." *Id.* Before 1995, the Medicare Hospital Manual, the Medicare Carriers Manual, and the Intermediary Manual stated that payment could not be made for devices not approved by the FDA for commercial distribution because "they were not considered 'reasonable and necessary' under 42 U.S.C. § 1395y(a)(1)." *In re Cardiac Devices Qui Tam Litig.,* 221 F.R.D. 318, 323 (D.Conn.2004) (citing Medicare Hospital Manual § 260.1(B) (effective July 15, 1986); Medicare Carriers Manual § 230.1;

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1231577 (S.D.Tex.), Med & Med GD (CCH) P 303,750
**(Cite as: 2011 WL 1231577 (S.D.Tex.))**

Intermediary Manual § 3151.1)); *see also Yale—New Haven Hosp., 470 F.3d at 74* (discussing the history of the manual provisions). In 1995, the Secretary of the United States Department of Health and Human Services published regulations superseding the manual provisions and allowing Medicare coverage for Category B investigational devices under the "reasonable and necessary" standard. *Yale—New Haven Hosp., 470 F.3d at 71.* As one court has summarized:

**\*4** On September 19, 1995, after completing a formal notice-andcomment rule-making process regarding coverage for investigational devices under the statutory 'reasonable and necessary' standard, the Secretary of HHS published final regulations addressing the coverage of medical devices categorized by the FDA as 'investigational.' The new regulations provided Medicare coverage for those 'nonexperimental/investigational' devices as to which the initial questions about the devices' safety and effectiveness had been resolved. *See 42 C.F.R. § § 405.201(b), 405.203, 405.211(b).* In contrast to the total exclusion from coverage of such devices under the Manual provision, the new regulations classified such devices as either experimental/investigational ('Category A') for which there continued to be no coverage, or non-experimental investigational ('Category B') which are eligible for Medicare coverage. *See 42 C.F.R. §§ 405.201, 405.203(a), 405.205, 405.209, 405.211.*

*In re Cardiac Devices Qui Tam Litig.,* 221 F.R.D. 318, 325 (D.Conn.2004).

The allegations in this case are that a Category B non-experimental/investigational medical device the FDA approved for a general use—ablating soft tissue and striated, cardiac, and smooth muscle in surgical procedures—is being marketed for a specific use that the FDA has not approved—to ablate cardiac tissue to treat atrial fibrillation. Atrial fibrillation is a fast and irregular beating of the heart's atria. The first-line treatments for atrial fibrillation

are nonsurgical and include using drugs. (Docket Entry No. 58, ¶ 46–47). According to the relator, a recognized surgical treatment is an open-heart procedure known as the "maze." In a maze procedure, a cardiothoracic surgeon makes strategic incisions in both atria and uses a "cut and sew" technique to repair the heart. The maze procedure is effective but also dangerous and difficult. (*Id.,* ¶ 48). As a result, the medical community has continued efforts to find less invasive, more effective methods of treatment.

Two newer forms of treatment for atrial fibrillation are catheter ablation and surgical ablation. In catheter ablation, an electrophysiologist—a specialized cardiologist—threads a catheter through the patient's leg and into the heart. The catheter is equipped with a device that delivers microwaves to ablate heart tissue. The relator alleges that catheter ablation is often an outpatient procedure. (*Id.,* ¶¶ 50–52). The relator alleges that a large number of studies and scientific organizations have recently recognized catheter ablation as an effective procedure to treat atrial fibrillation. In 2006, catheter ablation was included within the "Guidelines" for treating atrial fibrillation as a "third-tier treatment option, following drug therapy and cardioversion." ( *Id.,* ¶¶ 52–53).

The relator alleges that surgical ablation is a more recent method. Surgical ablation treats atrial fibrillation by using microwaves to ablate heart tissue and disrupt the normal pathways for electrical impulses. (*Id.,* ¶¶ 54–55). It is typically an inpatient procedure performed by cardiothoracic surgeons. It can be performed as an additional procedure during open-chest surgery for other cardiac conditions or as a stand-alone procedure. As part of other open-chest procedures, a surgeon uses the ablation device to make incisions on tissue similar to the incisions made in a " maze" procedure. In a stand-alone surgical ablation, a surgeon makes incisions on a patient's chest and directs an ablation device through those incisions to the heart. According to the relator, standalone surgical ablation, "unlike traditional

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Not Reported in F.Supp.2d, 2011 WL 1231577 (S.D.Tex.), Med & Med GD (CCH) P 303,750
**(Cite as: 2011 WL 1231577 (S.D.Tex.))**

open heart surgery —does not require opening the thoracic cavity to expose the heart and lungs and does not require putting the patient on a heart-lung bypass machine to stop the heart." (*Id.,* ¶ 59.) It is an inpatient but minimally invasive surgery.

**\*5** As the relator acknowledges, the FlexView system is classified for Medicare reimbursement purposes as a Class II device. (*Id.,* ¶ 73); *see also* 21 C.F.R. § 878.4400 (identifying "electrosurgical cutting and coagulation device and accessories ... intended to remove tissue and control bleeding by use of high-frequency electrical current" as a Class II device). Under Medicare regulations, a device "believed to be in ... Class II" is a Category B—"non-experimental/investigational"—device. 42 C.F.R. § 405.201(b). Class II devices "require special controls, such as performance standards or postmarket surveillance, to provide reasonable assurance of safety and effectiveness." 42 C.F.R. § 405.201(b). Medicare contractors may approve coverage for Category B devices. *Id.* at § 405.211(b). The relator acknowledges that there is no "[n]ational [c]overage [d]etermination" for reimbursement for microwave surgical ablation. "Accordingly, the Medicare Carrier in each state or region determines the conditions for coverage and reimbursement of physician charges for surgical cardiac ablation." (Docket Entry No. 58, ¶ 65). While there is no FDA approval for using the FlexView system to treat atrial fibrillation, there is no identified statutory, regulatory, or other prohibition on reimbursement to physicians or hospitals for using the FlexView system for this purpose. While Medicare and Medicaid typically do not reimburse off-label prescriptions for drugs, *see United States ex rel. Franklin v. Parke—Davis,* 147 F.Supp.2d 39, 44–45 (D.Mass.2001); *United States ex rel. Hess v. Sanofi—Synthelabo Inc.,* No. 4;05CV570MLM, 2006 WL 1064127, at *10 (E.D.Mo. Apr.21, 2006), the relator has not pointed to a similar categorical restriction on reimbursement for Category B medical devices.[FN5] For medical devices, eligibility for reimbursement depends on whether the procedure performed is "medically

necessary" or "reasonable and necessary."

FN5. Under the FDCA, new pharmaceuticals cannot be distributed in interstate commerce unless the drug's sponsor satisfies the FDA that the drug is safe and effective for each of its intended uses. 21 U.S.C. § 355(a), (d). Once a drug is approved for a particular use, the FDA does not prevent doctors from prescribing the drugs for uses that are different than those approved by the FDA. *Parke—Davis,* 147 F.Supp.2d 39, 44 (D.Mass.2001) (citing *Buckman,* 121 S.Ct. at 1018). However, "[w]hether a drug is FDA-approved for a particular use will largely determine whether a prescription for that use of the drug will be reimbursed under the federal Medicaid program." *Id.* One court has summarized the drug-reimbursement criteria, as follows:

Reimbursement under Medicaid is, in most circumstances, available only for "covered outpatient drugs." 42 U.S.C. § 1396b(i)(10). Covered outpatient drugs do not include drugs that are "used for a medical indication which is not a medically accepted indication." *Id.* § 1396r–8(k)(3). A medically accepted indication, in turn, includes a use "which is approved under the Federal Food Drug and Cosmetic Act" or which is included in specified drug compendia. *Id.* § 1396r–8(k)(6). *See also id.* § 1396r–8(g)(1)(B)(i) (identifying compendia to be consulted). Thus, unless a particular off-label use for a drug is included in one of the identified drug compendia, a prescription for the off-label use of that drug is not eligible for reimbursement under Medicaid.

*United States ex rel. Franklin v. Parke—Davis,* 147 F.Supp.2d 39, 44–45 (D.Mass.2001).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1231577 (S.D.Tex.), Med & Med GD (CCH) P 303,750
**(Cite as: 2011 WL 1231577 (S.D.Tex.))**

### E. The Medicare Billing System

The Medicare billing scheme is the context for this FCA suit. Medicare prepays hospitals specific predetermined amounts based on codes for the diagnosis and procedure performed. (Docket Entry No. 58, ¶¶ 25, 28). The complex billing scheme includes a lengthy list of codes that reflect medical and administrative judgments.

The amounts hospitals receive for inpatient procedures depend on the Diagnosis Related Group ("DRG") code assigned to a patient. In addition to basic information about the patient and the diagnosis, the procedure performed on the patient is a factor in determining a patient's DRG. 42 C.F.R. § 412.60(c)(1) (stating that the DRG is based on "essential data extracted from the inpatient bill for that discharge" including "the patient's age, sex, principal diagnosis, ... secondary diagnoses, procedures performed, and discharge status"). Hospitals enter a procedure code when they submit Form HCFA–1450 (UB–92) to obtain reimbursement for items and services provided to a patient. *Cardiac Devices.,* 221 F.R.D. at 328–29; *United States ex rel. Smith v. Yale Univ.,* 415 F.Supp. 58, 91–92 (D.Conn.2006). These codes are based on the International Classification of Diseases, Ninth Revision, Clinical Modification ("ICD–9–CM") system. (Docket Entry No. 58, ¶ 27). In addition to Forms UB–92, hospitals annually submit a Hospital Cost Report, Form HCFA–2552, which summarizes the amounts of interim payments received and the amounts the hospital claims from Medicare. *Cardiac Devices.,* 221 F.R.D. at 328–29.

**\*6** The amounts Medicare pays physicians for services provided in conjunction with a procedure performed at a hospital are based on Current Procedural Terminology ("CPT") codes published by the American Medical Association. Physicians typically provide the CPT code and submit claims for payment on Form CMS–1500. (Docket Entry No. 58, ¶¶ 29–33, 37).

### F. The Medical Device at Issue

The FlexView system includes a microwave generator a surgical-ablation probe "that delivers a continuous flow of microwave energy from the generator to the cardiac tissue" and "is designed to ablate tissue by the induction of cell death in targeted areas." (*Id.,* ¶ 60). The FlexView system can be used either in conjunction with other cardiac surgical procedures or for stand-alone surgical ablation. As noted, the FDA has approved the defendants' FlexView system for use in "the surgical ablation of soft tissue, and striated, cardiac, and smooth muscle." (*Id.,* ¶ 74). The FDA has denied general approval for the FlexView system as a treatment for atrial fibrillation.[FN6] (*Id.,* ¶ 79). The relator alleges, and the defendants accept as true for the purpose of this motion, that because the FDA has approved the FlexView system for general use and has not approved the FlexView system for treating atrial fibrillation, the defendants may not market the FlexView system for use in minimally invasive closed-chest surgical procedures for treating atrial fibrillation. (*Id.,* ¶ 81); *see* 21 C.F.R. § 812.7(a).

> FN6. At the time of the third amended complaint, Boston Scientific was engaged in a study about the FlexView system's efficacy in the treatment of atrial fibrillation. The study is called "RESOLVE–AF" (Randomized Study of Surgical Ablation with Microwave Energy for the Treatment of Atrial Fibrillation). (Docket Entry No. 58, ¶ 77).

### G. The Alleged Improper Promotional Activities

The relator alleges four categories of what she characterizes as actionable conduct by the defendants promoting off-label use of the FlexView system.

• The defendants instructed their sales representatives to train doctors to use the FlexView system to treat atrial fibrillation. Newly hired sales representatives were given a "ten-day 'New Hire Training' that focuses on using the [FlexView system] to treat atrial fibrillation." During the training, the defendants gave their new hires a document outlining "seven basic steps" for using

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

Not Reported in F.Supp.2d, 2011 WL 1231577 (S.D.Tex.), Med & Med GD (CCH) P 303,750
**(Cite as: 2011 WL 1231577 (S.D.Tex.))**

the FlexView system to treat atrial fibrillation. Before the training's conclusion, the defendants required new hires to demonstrate an ability to "teach" physicians how to use the system to treat atrial fibrillation. The defendants required its sales representatives to accompany surgeons into the operating room and instruct them on using the system to treat atrial fibrillation. The defendants also used " 'Ablation Account Managers' who focused entirely on training surgeons to perform microwave surgical ablation to treat atrial fibrillation." (Docket Entry No. 58, ¶¶ 83–87).

• The defendants marketed the FlexView system to hospitals by emphasizing the high reimbursement-to-cost ratio available through using surgical ablation to treat atrial fibrillation in minimally invasive procedures. This is part of the "upcoding" allegations set out below. The defendants' promotional material emphasized the opportunity to obtain a favorable reimbursement-to-cost ratio. The promotional materials stated that there was a seven billion dollar market for reimbursements for the treatment of atrial fibrillation and that hospitals could receive approximately $5,000.00 per treatment by using the FlexView System to treat atrial fibrillation even when the costs to the hospital were far lower. The defendants also trained its sales representatives to "market the spread." The defendants instructed sales representatives to ask hospital executives, "Would you like to learn about a procedure with a large, untreated patient pool and favorable reimbursement"; provided sales representatives with powerpoint presentations emphasizing favorable reimbursements; and instructed sales representatives "to 'go after' hospitals who have a 'CEO and administration that understands the clinical and economic landscape.' " (Docket Entry No. 58, ¶¶ 88–93).

\*7 • The defendants instructed their sales representatives to market the FlexView system by advising hospitals to "upcode" Medicare billings. The allegation is that Medicare could be billed

for using the FlexView system using a DRG and procedure code for open-chest surgery.[FN7] The relator alleges that the defendants told sales representatives to tell hospitals that in closed-chest stand-alone atrial fibrillation procedures, they could bill Medicare using DRG 108 (excision or destruction of other lesion or tissue of heart, open approach), which is a code for "open-chest" procedures. The relator acknowledges that the DRG code associated with procedure code 37.33 is DRG 108. The relator alleges that the ICD–9 procedure code and the DRG codes are incorrect when used for closed-chest procedures. The relator alleges that because there is no procedure code that provides reimbursement for the closed-chest surgical ablation, "a more appropriate code ... would be procedure code 37.99 (other operations on heart and pericardium)," and DRG 110 or 111 (respectively, major cardiovascular procedures with and without complications and comorbidities). (*Id.*, ¶ 122). The relator alleges that the average reimbursement for a hospital under DRG 108 is $30,289 and the average cost to the hospital for patients who require procedures qualifying under that DRG is $31,074. In contrast, the average cost to the hospital of a closed-chest stand-alone surgical ablation is $10,650. The relator alleges that by training sales representatives to tell hospitals that they could bill Medicare for closed-chest stand-alone procedures using DRG and procedure codes for open-chest procedures, the defendants improperly promoted its FlexView system. (*Id.*, ¶¶ 116–24). This category of alleged actionable promotion by the defendants applies only to stand-alone procedures. The relator does not allege that the use of the FlexView in open-chest procedures that also treat other cardiac conditions is improperly billed using the codes for such procedures.

FN7. The relator's upcoding allegations appear to be directed at hospitals. (Docket Entry No. 58, ¶ 116). In describing Medicare billing procedures, the amended com-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1231577 (S.D.Tex.), Med & Med GD (CCH) P 303,750
**(Cite as: 2011 WL 1231577 (S.D.Tex.))**

plaint alleges that hospitals use ICD–9–CM codes for billing, (*Id.,* ¶ 27) and that physicians use CPT codes, (*Id.,* ¶¶ 29–33, 37). The upcoding allegations appear to be focused on the upcoding of the ICD–9–CM code entered by the hospitals. (*Id.,* ¶ 118).

• The relator also alleges that the defendants provided remuneration to physicians and hospitals to encourage them to use the FlexView system, in violation of the antikickback statute, 42 U.S.C. § 1320a–7b(b). The relator alleges that the defendants provided in-kind services to physicians, particularly cardiothoracic surgeons, including referral services, marketing, and direct payments. (Docket Entry No. 58, ¶¶ 99–100). The relator alleges that the defendants sponsored meetings to screen candidates for surgical ablation and referred them to cardiothoracic surgeons who used the FlexView system. (*Id.,* ¶ 103). The relator alleges that the defendants sponsored dinner programs and letter-writing services to present information about FlexView to primary care physicians who could make referrals. (*Id.,* ¶ 102). The relator alleges that the defendants also helped cardiothoracic surgeons advertise surgical ablation to treat atrial fibrillation, including producing marketing brochures that identified physicians who used the FlexView system to treat atrial fibrillation. (*Id.,* ¶ 104). Finally, the relator alleges that the defendants provided direct payments to physicians in the form of grants to physicians who promoted the FlexView system to other physicians. (*Id.,* ¶¶ 105). As to hospitals, the relator alleges that the defendants paid kickbacks in the forms of loans to purchase the FlexView equipment contingent on a minimum number, free products, such as generators to power FlexView components and disposable equipment used to perform surgical ablations, and discounts on other products contingent on a hospital's commitment to purchase a fixed number of ablation products. The relator alleges that the defendants offered these inducements on the condition that a

hospital use the FlexView system for at least eighty percent of surgical ablation procedures. ( *Id.* at ¶¶ 106–15). The relator alleges that the defendants' kickbacks caused false or fraudulent claims for payment to be submitted because certification of compliance with all applicable laws and regulations, including the antikickback statute, is a condition for payment under Medicare.

**\*8** The relator alleges that these promotional efforts "caused physicians and hospitals to perform an increased number of costly inpatient surgical ablation procedures in cases where less costly and less invasive treatments otherwise have been performed." (*Id.,* ¶ 131). The relator alleges that the defendants "knowingly made, used, and caused to be made and used false records and statements in order to obtain reimbursement from the United States for surgical ablation services performed with Defendants' microwave surgical ablation products." (*Id.* at ¶ 133).

The relator also alleges that the defendants violated the FCA's antiretaliation provisions. She alleges that she engaged in "protected conduct [that] put the Defendants on notice of the distinct possibility of a qui tam action" and that the defendants harassed her, threatened her, and ultimately discharged her. (*Id.,* ¶ 139–41). She also alleges that these acts violated Illinois law. (*Id.,* ¶¶ 142–46).

In their motion to dismiss under Rule 12(b)(6), the defendants argue that the relator has not alleged that they made any false claim or caused any false claim to be submitted to Medicare. The defendants emphasize both that the complaint does not link their marketing practices to the submission of specific false claims and that their promotional tactics are not "material" to the government's decisions to pay Medicare claims for surgical ablations. The defendants also argue that the relator did not allege sufficient facts to support a reasonable inference that hospitals or physicians falsely certified compliance with the antikickback statute. Finally, the defendants argue that the relator has not met Federal Rule of Civil Procedure 9(b)'s pleading require-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1231577 (S.D.Tex.), Med & Med GD (CCH) P 303,750
**(Cite as: 2011 WL 1231577 (S.D.Tex.))**

ments for fraud because she fails to identify the "who, what, when, where, and how of the alleged fraud." *See United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 125 F.3d 899, 903 (5th Cir.1997).

As to the FCA retaliation claims, the defendants argue that the relator failed to allege sufficient facts supporting her allegations. Specifically, the defendants argues that the relator has not alleged facts showing that she had engaged in a protected activity, that the defendants were aware she had engaged in a protected activity, or that her discharge was motivated by that protected activity. As to the Illinois retaliation claims, the defendants argue that Illinois law does not govern her allegations. Alternatively, the defendants argue that she has failed to plead sufficient facts supporting her state law claim.

The relator responds that the defendants' promotional efforts caused physicians and hospitals to perform more surgical ablations to treat atrial fibrillation than would otherwise have been performed and, as a result, more that were not medically necessary. *See* Docket Entry No. 75, at 9 ("[C]laims for reimbursement would not have been submitted to the Government *but for* Defendants' off-label promotion of medically unnecessary surgical ablation procedures using their Flex surgical ablation system."). As a result, physicians and hospitals submitted claims for reimbursement for procedures that were not medically necessary and that would not have been submitted but for the off-label promotion. *See* Docket Entry No. 75, at 9; 42 U.S.C. § 1320c–5(a)(3) ("medically necessary"); 42 U.S.C. § 1395y(a)(1)(A) ("reasonable and necessary"). The relator argues that the FlexView system to treat atrial fibrillation is *never* medically necessary because the system is not FDA approved, is experimental, and is not a first-line treatment for this purpose. The relator also argues that by marketing hospitals' ability to upcode stand-alone ablation procedures using the FlexView system, the defendants were the "but for" cause of hospitals and doctors

submitting claims for payment with three false statements: that the code used accurately represented the procedure performed; that the procedure was the most economical, as required by 42 U.S.C. § 1320c–5(a)(1); and that the procedure was "medically necessary," as required by 42 U.S.C. § 1320c–5(a)(3). The relator also argues that the defendants' kickbacks caused physicians and hospitals falsely to certify—either implicitly in claims for payment, or expressly in annual compliance statements—compliance with the antikickback statute. The relator argues that the defendants' promotional efforts were material because their "natural tendency" was to cause the submission of false claims. Finally, the relator responds that she has provided sufficient factual allegations to meet the Rule 9(b) requirements for pleading a scheme to defraud.

**\*9** Each argument and response is analyzed below.

## II. The Legal Standards for a Motion to Dismiss

The defendants moved under Rule 12(b)(6) to dismiss the allegations based on the alleged off-label promotion of the FlexView devices, the allegations of the antikickback statute in connection with the sale of these devices, and the retaliation allegations. Because FCA claims are fraud claims subject to the Rule 9(b) pleading requirements, *see Hopper v. Solvay Pharms.,* 588 F.3d 1318, 1325 (11th Cir.2009); *Thompson,* 125 F.3d at 903; *United States ex rel. Longhi v. Lithium Power Techs., Inc.,* 575 F.3d 458, 468 (5th Cir.2009), the defendants also moved to dismiss for failure to comply with these requirement. The parties also analyzed the application of 31 U.S.C. § 3729(a).

## A. Rule 12(b)(6)

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b) (6). In *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), the Supreme Court confirmed that Rule 12(b)(6) must be read in conjunction with

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1231577 (S.D.Tex.), Med & Med GD (CCH) P 303,750
**(Cite as: 2011 WL 1231577 (S.D.Tex.))**

Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). To withstand a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (citing Twombly, 550 U.S. at 556). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief-including factual allegations that when assumed to be true 'raise a right to relief above the speculative level." Cuvillier v. Taylor, 503 F.3d 397, 401 (5th Cir.2007) (footnote omitted) (quoting Twombly, 550 U.S. at 555); see also S. Scrap Material Co. v. ABC Ins. Co. (In re S. Scrap Material Co.), 541 F.3d 584, 587 (5th Cir.2008) (quoting Twombly, 550 U.S. at 555), cert. denied, 129 S.Ct. 1669 (2009). "Conversely, 'when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should ... be exposed at the point of minimum expenditure of time and money by the parties and the court.' " Cuvillier, 503 F.3d at 401 (quoting Twombly, 550 U.S. at 558).

When a plaintiff's complaint fails to state a claim, the court should generally give the plaintiff at least one chance to amend under Rule 15(a) before dismissing with prejudice. See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 329 (5th Cir.2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal."); see also United States ex rel. Adrian v.

Regents of the Univ. of Cal., 363 F.3d 398, 403 (5th Cir.2004) ("Leave to amend should be freely given, and outright refusal to grant leave to amend without a justification ... is considered an abuse of discretion." (internal citation omitted)). However, a plaintiff should be denied leave to amend a complaint if the court determines that "the proposed change clearly is frivolous or advances a claim or defense that is legally insufficient on its face...." 6 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1487 (2d ed.1990); see also Ayers v. Johnson, 247 F. App'x 534, 535 (5th Cir.2007) (unpublished) (per curiam) (" '[A] district court acts within its discretion when dismissing a motion to amend that is frivolous or futile.' " (quoting Martin's Herend Imports, Inc. v. Diamond & Gem Trading United States of Am. Co., 195 F.3d 765, 771 (5th Cir.1999)).

**B. Rule 9(b)**

**\*10** "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b). "At a minimum, Rule 9(b) requires that a plaintiff set forth the 'who, what, when, where, and how' of the alleged fraud." Thompson, 125 F.3d at 903 (quoting Williams v. WMX Techs., Inc., 112 F.3d 175, 179 (5th Cir.1997)). The pleader must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." Williams, 112 F.3d at 177. " ' Rule 9(b)'s ultimate meaning is context specific, and thus there is no single construction of Rule 9(b) that applies in all contexts.' " United States ex rel. Grubbs v. Kanneganti, 565 F.3d 180, 188 (5th Cir.2009) (quoting Williams, 112 F.3d at 178). In the context of the FCA, the parties dispute whether it is appropriate to relax the Rule 9(b) standard. The relator acknowledges that she has failed to identify a specific false claim but argues that this should not be required because the facts relating to the alleged

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1231577 (S.D.Tex.), Med & Med GD (CCH) P 303,750
**(Cite as: 2011 WL 1231577 (S.D.Tex.))**

fraud are "peculiarly within the perpetrator's knowledge" and the alleged fraud occurred over a multi-year period. (Docket Entry No. 75, at 25–27). The defendants respond that, to the contrary, the relevant information on billing and reimbursements are in the hands of third parties, including physicians, hospitals, and Medicare, and that there is no basis in the case law to relax the Rule 9(b) requirements in such circumstances. (Docket Entry No. 77, at 11–15).

### III. The False Claims Act

In *United States ex rel. Longhi v. Lithium Power Techs., Inc.,* the Fifth Circuit adopted a four-prong test for § 3729(a) claims. 575 F.3d 458 (5th Cir.2009). The Fifth Circuit requires: "(1) a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys." [FN8] *Id.* at 467 (adopting the test stated in *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.,* 525 F.3d 370, 376 (4th Cir.2008)).

> FN8. In *Longhi,* the Fifth Circuit did not state whether this four-prong test applies to the version of the FCA amended by 31 U.S.C. § 3729(a)(1)(B), the "post—FERA version." For post-FERA claims, the fourth prong—that the statement "cause the government to pay out money or forfeit money"—may need alteration. The post-FERA FCA does not require that the government actually pay the false claim. *Compare* 31 U.S.C. § 3729(a)(2), *amended by* 31 U.S.C. § 3729(a)(1)(B) (establishing liability for "any person who ... knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim *paid or approved by the government.")* (emphasis added); *with* 31 U.S.C. § 3729(a)(1)(B) (establishing liability for "any person who ... knowingly makes, uses, or causes to be made or used, a false record or statement material to a

false fraudulent claim"). The application of pre- and post-FERA versions of the FCA is analyzed below, but the elements of a false statement, scienter, and materiality are unaffected. 31 U.S.C. 3729(a)(1)(A–B).

### A. Which Version of the FCA Applies?

A threshold issue is whether the amended or earlier version of 31 U.S.C. § 3729 applies. The Fraud Enforcement Recovery Act of 2009 (FERA) amended sections of the False Claims Act, including two subsections implicated in this action, 31 U.S.C. § 3729(a)(1) and (2).[FN9] Pub.L. No. 111–21, § 386, 123 Stat. 1617 (2009). FERA became law on May 20, 2009. It contained a retroactivity provision stating as follows:

> FN9. The relator also alleged that the defendants violated 31 U.S.C. § 3729(a)(7), *amended by* 31 U.S.C. § 3729(a)(1)(G). Section 3729(a)(7) establishes liability for anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." In their briefing, the relator appears to focus on allegations involving sections (a)(1) and (a) (2) and does not argue that section (a)(7) demands a different analysis. Though this opinion refers explicitly only to (a)(1) and (a)(2), its analysis is applicable to (a)(7) to the extent the relator asserts (a)(7) provides a basis for liability.

The amendments made by this section shall take effect on the date of enactment of this Act and shall apply to conduct on or after the date of enactment, except that (1) subparagraph (B) of section 3729(a)(1) of title 31, United States Code, as added by subsection (a)(1), shall take effect as if enacted on June 7, 2008, and apply to all claims under the False Claims Act (31 U.S.C. 3729 *et*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

Not Reported in F.Supp.2d, 2011 WL 1231577 (S.D.Tex.), Med & Med GD (CCH) P 303,750
**(Cite as: 2011 WL 1231577 (S.D.Tex.))**

seq.) that are pending on or after that date.

**\*11** 123 Stat. 1617 § 4(f). For the § 3729(a)(1) claim, this court must apply the pre-FERA version of § 3729(a)(1) because the relator filed this suit in November 2006, before the "date of [FERA's] enactment." Section 4(f)'s exception—"subparagraph (B) section 3729(a)(1) "—applies to the § 3729(a)(2) claim. Section 4(f) states that the amended version of subsection (a)(2), now found at 31 U.S.C. § 3729(a)(1)(B), applies to all "claims" under the FCA pending on or after June 7, 2008. The pre- and post-FERA versions of the FCA define "claim" similarly. The pre-FERA FCA defines claim as

[A]ny request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, guarantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. § 3729(c), amended by 31 U.S.C. § 3729(b)(2). The post-FERA amendments define "claim" as "any request or demand, whether under a contract or otherwise, for money or property ... [that] is presented to an officer, employee, or agent of the United States% y(4)27" 31 U.S.C. § 3729(b)(2). Neither definition refers to cases or causes of action under the FCA. Instead, both definitions refer to claims "for money or property" from the government. Because "claim" is a defined term in the FCA, the reference to "claims" in FERA § 4(f)(1) must be read in accordance with that definition. See United States ex rel. Gonzales v. Fresenius Med. Care N. Am., No. EP–07–CV–247–PRM, 2010 WL 1645971, at *9 (W.D.Tex. Mar.31, 2010) (reaching the same conclusion). Under this approach, the post-FERA version of § 3729(a)(2), 31 U.S.C. § 3729(a)(1)(B), applies if the false claims alleged by the relator were pending on or after June 7,

2008.

Most of the district courts that have ruled on this issue have reached the same conclusion. See, e.g., United States ex rel. Compton v. Circle B Enters., Inc., No. 7:07–CV–32, 2010 WL 942293, at *2 n. 5 (M.D.Ga. Mar. 11, 2010) ("The revised version of section (a)(1)(B) does not apply to this case because none of Defendants' claims (the ... reimbursement claims) at issue here were pending on or after June 7, 2008."); United States ex rel. Putnam v. E. Idaho Reg'l Med. Ctr., No. CIV. 4:07–192, 2010 WL 910751, at *4 (D.Idaho Mar.10, 2010) ("[B]ecause the claims for Medicaid reimbursement at issue in this case were neither pending on nor filed after June 7, 2008, the pre-FERA version of § 3729(a)(2) governs ...."); Mason v. Medline Indus., Inc., No. 07–C–5615, 2010 WL 653542, at *3 (N.D.Ill. Feb.18, 2010) ("The court interprets § 4(f)(1) to apply to 'claims' as defined in the FCA. Accordingly, FERA's amendment does not apply retroactively to this case."); United States ex rel. Sanders v. Allison Engine Co., Inc., 667 F.Supp.2d 747, 752 (S.D.Ohio 2009) ("[T]he clear indication from Congress is that the revised language at issue here is applicable to 'claims' pending on June 7, 2008, and not to 'cases' pending on June 7, 2008. Since the Defendants in this case had no 'claims' pending on June 7, 2008, the retroactivity clause does not apply to them ...."); United States v. Sci. Applications Int'l Corp., 653 F.Supp.2d 87, 107 (D.D.C.2009) ("[S]ection 4(f)(1) will be interpreted to apply to 'claims' as defined in § 3729, that is, requests or demands for money or property. Thus, FERA has no impact on the present action.").

**\*12** The relator's amended complaint does not appear to involve claims pending on or after June 7, 2008. The amended complaint refers to 31 U.S.C. § 3729(a)(2), not 31 U.S.C. § 3729(a)(1)(B). The relator's allegations of unlawful promotional tactics date back to 2006 when she was employed by Boston Scientific. (Docket Entry No. 58, ¶ 16). The relator's allegations of false or fraudulent claim submission could, however, involve claims submit-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**PA043**

Page 13

Not Reported in F.Supp.2d, 2011 WL 1231577 (S.D.Tex.), Med & Med GD (CCH) P 303,750
**(Cite as: 2011 WL 1231577 (S.D.Tex.))**

ted after June 7, 2008. The defendants have pointed out that the FCA has been amended, (Docket Entry No. 68, at 4 n. 5). The relator has not argued whether the amended FCA or the prior version applies to their claims. The defendants argue that the result is the same under either version and the relator has not addressed this issue. (*Id.*).[FN10] In an abundance of caution, the analysis is conducted under both versions of the FCA because the amended complaint may cover claims pending on or after June 7, 2008.[FN11]

> **FN10.** Some courts have held that FERA's retroactivity clause is unconstitutional. *E.g., United States ex rel. Sanders v. Allison Engine Co., Inc.,* 667 F.Supp.2d 747, 755 (S.D.Ohio 2009) (finding that application of the retroactivity clause violates the Constitution's Ex Post Facto Clause, U.S. CONST. art. 1, § 9, cl. 3). The Fifth Circuit has not ruled on this issue. *See United States ex rel. Longhi v. Lithium Power Techs., Inc.,* 575 F.3d 458, 470 (5th Cir.2009) (declining to rule on whether FERA applies retroactively). Neither party raised this issue and it is not necessary to address because the result is the same under either the pre-or post-FERA version of the FCA.

> **FN11.** As the analysis makes clear, in this litigation, there is no material difference between pre- and post-FERA versions of § 3729(a) (1). FERA removed § 3729(a)(1)'s requirement that the claim be presented "to an officer or employer of the United States Government or a member of the Armed Forces of the United States." *Compare* 31 U.S.C. § 3729(a)(1), *amended by* 31 U.S.C. § 3729(a)(1)(A) (establishing liability for "any person who ... knowingly presents or causes to be presented, *to an officer or employee of the United States government or a member of the Armed Forces of the United States,* a false or

fraudulent claim for payment or approval." (deleted language italicized)); *with* 31 U.S.C. § 3729(a)(1)(A) (establishing liability for "any person who ... knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"). The defendants do not contest that the reimbursement claims were presented to the government. Similarly, the differences between the pre- and post-FERA versions of § 3729(a)(2) do not affect this litigation. FERA removed § 3729(a)(2)'s requirement that the alleged false claim be "paid or approved by the government." *Compare* 31 U.S.C. § 3729(a)(2), *amended by* 31 U.S.C. § 3729(a)(1)(B) (establishing liability for "any person who ... knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the government."); *with* 31 U.S.C. § 3729(a)(1)(B) (establishing liability for "any person who ... knowingly makes, uses, or causes to be made or used, a false record or statement material to a false fraudulent claim"). The defendants do not dispute that the government paid or approved the reimbursement claims. FERA also added a materiality requirement to § 3729(a)(2). *See* 31 U.S.C. § 3729(a)(1)(B) (establishing liability for "any person who ... knowingly makes, uses, or causes to be made or used, a false record or statement *material* to a false fraudulent claim") (emphasis added). This change does not affect this litigation because the Fifth Circuit required "material" false statements before the FERA amendments to § 3729(a)(2). *United States ex rel. Longhi v. Lithium Power Techs., Inc.,* 575 F.3d 458, 470 (5th Cir.2009). And the post-FERA version of § 3729(a)(2) and the Fifth Circuit both use the same test for materiality. 31 U.S.C. § 3729(b) (4) ("[M]aterial means having a natural tendency to influence, or be cap-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 14

Not Reported in F.Supp.2d, 2011 WL 1231577 (S.D.Tex.), Med & Med GD (CCH) P 303,750
**(Cite as: 2011 WL 1231577 (S.D.Tex.))**

able of influencing, the payment or receipt of money or property."); *Longhi,* 575 F.3d at 470 (adopting the "natural tendency test," which only requires "that the false or fraudulent statements have the potential to influence the government's decisions," and noting the test's consistency with FERA).

**B. The Elements of An FCA Claim**

**1. A False or Fraudulent Claim**

The Supreme Court has cautioned that the FCA does not punish every type of fraud committed on the government. *See United States v. McNinch,* 356 U.S. 595, 599, 78 S.Ct. 950, 2 L.Ed.2d 1001 (1958). "The [FCA] attaches liability, not to the underlying fraudulent activity, but to the 'claim for payment.' " *United States ex rel. Hopper v. Anton,* 91 F.3d 1261, 1266–67 (9th Cir.1996) (finding on summary judgment that violation of Individuals with Disabilities Education Act regulations is not also an FCA violation unless compliance certification is a prerequisite to receive federal funds); *see also United States ex rel. Siewick v. Jamieson Sci. And Eng., Inc.,* 214 F.3d 1372, 1376–77 (D.C.Cir.2000) (upholding district court's determination on summary judgment that even if the defendants had violated 18 U.S.C. § 207, "a criminal statute aimed at 'revolving door' abuses by former government employees," there was no fact issue as to an FCA violation because defendants were not required to certify compliance with the statute); *United States ex rel. Willard v. Humana Health Plan of Tex. Inc.,* 336 F.3d 375, 382–83 (5th Cir.2003) (upholding district court's dismissal because the plaintiff only alleged violations of HMO enrollment antidiscrimination laws but did not allege that the United States "conditioned payment ... on any implied certification of compliance with the anti-discriminatory provisions"); *United States ex rel. Roop v. Hypoguard USA, Inc.,* 559 F.3d 818, 824 (8th Cir.2009) (upholding district court's dismissal because the plaintiff alleged violations of the FDA medical-device-reporting regulations by selling defective products but did not allege that certification with these regulations was a prerequisite to payment).

In the specific context of reimbursement claims for using a drug or device in a way that violates the FDA, the courts have held that the "mere fact" of "violating FDA regulations does not translate into liability for causing a false claim to be filed." *United States ex rel. Polansky v. Pfizer,* No. 04–cv–0704, 2009 WL 1456582, at *7 (E.D.N.Y. May 22, 2009); *see also United States ex rel. Rost v. Pfizer, Inc.,* 507 F.3d 729, 732 (1 st Cir.2007), *overruled on other grounds by Allison Engine Co. v. United States ex rel. Sanders,* 553 U.S. 662, 128 S.Ct. 2123, 170 L.Ed.2d 1030 (2008) (noting that the alleged marketing practices, "while illegal, are not a sufficient basis for an FCA action because they do not involve claims for government reimbursement"); *Thompson,* 125 F.3d at 902 ("[C]laims for services rendered in violation of a statute do not necessarily constitute false or fraudulent claims under the FCA.").

**\*13** The courts have held that a claim may be false or fraudulent under the FCA because it includes a certification of compliance with a federal statute, regulation, or contract that is a prerequisite to obtaining the government benefit. *United States ex rel. Graves v. ITT Educ. Servs., Inc.,* 284 F.Supp.2d 487, 497 (S.D.Tex.2003), *aff'd,* 111 F. App'x 296 (5th Cir. Oct.20, 2004). Such "legally false" certification differs from "factually false" certification, which involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided. *See Mikes v. Straus,* 274 F.3d 687 (2d Cir.2001). The Fifth Circuit has held that a claim is "legally false" only when a party affirmatively and explicitly certifies compliance with a statute or regulation and the certification is a condition to receiving the government benefit. *See Thompson,* 125 F.3d at 902. In addition to express certifications of compliance, other circuits have found that FCA liability may exist under an "implied theory" of certi-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 15

Not Reported in F.Supp.2d, 2011 WL 1231577 (S.D.Tex.), Med & Med GD (CCH) P 303,750
**(Cite as: 2011 WL 1231577 (S.D.Tex.))**

fication. *See Willard,* 336 F.3d at 82 (discussing cases). "The theory of implied certification rests on the notion that 'where the government pays funds to a party, and would not have paid those funds had it known of a violation of a law or regulation, the claim submitted for those funds contained an implied certification of compliance with the law or regulation and was fraudulent.' " *United States ex rel. Foster v. Bristol–Myers Squibb Co.,* 587 F.Supp.2d 805, 823 (E.D.Tex.2008) (citing *United States ex rel. Barrett v. Columbia/HCA Healthcare Corp.,* 251 F.Supp.2d 28, 33 (D.D.C.2003)). For example, the Sixth Circuit has found that FCA liability "can attach if the claimant violates its continuing duty to comply with the regulations on which payment is conditioned." *Willard,* 336 F.3d at 82 (quoting *United States ex rel. Augustine v. Century Health Servs., Inc.,* 289 F.3d 409, 415 (6th Cir.2002)). The Fifth Circuit has never adopted implied certification as a theory of FCA liability. *United States ex rel. Marcy v. Rowan Cos., Inc.,* 520 F.3d 384, 389 (5th Cir.2008) (citing *Willard,* 336 F.3d at 381–82); *United States v. Southland Mgmt. Corp.,* 326 F.3d 669, 679 (5th Cir.2003) (en banc) (Jones, J. concurring); *United States ex rel. Steury v. Cardinal Heath, Inc.,* 625 F.3d 262, 268 (5th Cir.2010). Instead, the Fifth Circuit has held that "[t]he violation of the statute or regulation does not create a cause of action under the False Claims Act; liability arises only if the defendant has made a false certification of compliance with the statute or regulation, when payment is conditioned on that certification." *Graves,* 284 F.Supp.2d at 497.

**2. Materiality**

Liability under both the pre- and post-FERA versions of the FCA requires that an actionable false statement be "material." *Longhi,* 575 F.3d at 467 (citing *Thompson,* 125 F.3d at 899); *see also Allison Engine Co., Inc. v. United States ex rel. Sanders,* 553 U.S. 662, 128 S.Ct. 2123, 2126, 170 L.Ed.2d 1030 (2008) (explaining that a § 3729(a) (2) "plaintiff must prove that the defendant intended that the false statement be material to the Government's decision to pay or approve the false

claim"). The Fifth Circuit applies the "natural tendency" test to determine materiality. *Longhi,* 575 F.3d at 470. This test asks whether "the false or fraudulent statements either (1) make the government pay to a particular impression, thereby producing some sort of effect, or (2) have the ability to effect the government's actions, even if this is a result of indirect or intangible actions on the part of the Defendants." *Id.* "All that is required under the test for materiality, therefore, is that the false or fraudulent statements have the potential to influence the government's decisions." *Id.*

**3. Knowingly**

**\*14** An FCA claim must allege that the false statements were "knowingly" made or caused to be made. The FCA defines "knowing or knowingly" to mean "that a person, with respect to information," (i) "has actual knowledge of the information"; (ii) "acts in deliberate ignorance of the truth or falsity of the information"; or (iii) "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1–3). Because an FCA claim alleges a fraudulent or false statement knowingly made or caused to be made, *Longhi,* 575 F.3d at 468, "[c]laims brought under the FCA must comply with Rule 9(b)." *Thompson,* 125 F.3d at 903 (5th Cir.1997); *see also Hopper v. Solvay Pharms.,* 588 F.3d 1318, 1325 (11th Cir.2009). However, "[i]n contrast to common law fraud, the FCA "lacks the element of reliance and damages." *Grubbs,* 565 F.3d at 189. "It is adequate to allege that a false claim was knowingly presented regardless of its exact amount; the contents of the bill are less significant because a complaint need not allege that the Government relied on or was damaged by the false claim." *Id.* "To plead with particularity the circumstances constituting fraud for a FCA section [3729(a)(1)(A) ] claim, a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* at 190. To plead with the requisite particularity a §

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 16

Not Reported in F.Supp.2d, 2011 WL 1231577 (S.D.Tex.), Med & Med GD (CCH) P 303,750
**(Cite as: 2011 WL 1231577 (S.D.Tex.))**

3729(a)(1)(B) claim, the complaint need not "allege details of fraudulent bills actually presented to the government." *Id.* at 192. The relator must, however, allege facts linking a scheme to submit false claims to the submission of false claims. *Solvay Pharms.,* 588 F.3d at 1325.

**4. The Application of the Pleading Standards to FCA Claims**

Although the parties' discussion of Rule 12(b)(6) cites *Twombly* and *Iqbal* as the most recent statements by the Supreme Court under the rule, the arguments do not turn on a claim that the analysis and result in this case are different under those decisions than they would have been earlier. The parties' briefs do not argue whether the facts alleged are sufficient to make the claim of an FCA violation "plausible." Rather, the defendants argue that taking the facts alleged as true, as a matter of law, the FCA does not provide a basis for relief for the promotional activities and remuneration al- leged.

The relator does argue for a relaxed application of Rule 9(b). (Docket Entry No. 75, at 24). The cases are clear that Rule 9(b) applies in FCA cases. *Longhi,* 575 F.3d at 468, *Thompson,* 125 F.3d at 903; *Hopper,* 588 F.3d at 1325. The cases also recognize two exceptions that the relator urges. "It is possible that the pleading requirements of Rule 9(b) may be relaxed in certain circumstances—when, for instance, the facts relating to the fraud are 'peculiarly within the perpetrator's knowledge.' " *United States ex rel. Doe v. Dow Chem. Co.,* 343 F.3d 325, 330 (5th Cir.2003) (quoting *United States ex rel. Russell v. Epic Healthcare Mgmt. Grp.,* 193 F.3d 304, 308 (5th Cir.1999). "Fraud may be pleaded on information and belief under such circumstances." *United States ex rel. Willard v. Humana Health Plan of Texas Inc.,* 336 F.3d 375, 385 (5th Cir.2003). But the Fifth Circuit has held that a plaintiff should not be relieved from complying with the Rule 9(b) requirements "where the documents containing the requisite information are in the possession of, and presumably available from,

other sources." *United States ex rel. Rafizadeh v. Cont'l Common, Inc.,* 553 F.3d 869, 873 n. 6 (5th Cir.2008) (citing *Doe,* 343 F.3d at 330); *see also Polansky,* 2009 WL 1456582, at *8 ("The rationale for reducing the pleading burden when information is in the defendant's possession appears to spring from the fact that an adverse party would not willingly divulge incriminating information. Where the information needed to fill out the complaint is in the hands of third parties, rather than defendants, this rationale for reducing the pleading burden does not apply.").

**\*15** The Eleventh Circuit has held that the pleading standard should not be relaxed for *qui tam* plaintiffs who may have access to information only through discovery in suits where the government refuses to intervene, even though the government would have access to those documents without discovery. *Atkins,* 70 F.3d at 1360 & n. 17. The court reasoned:

> The *qui tam* relator bring the action *on behalf of* the federal government. The relator stands in the government's shoes—in neither a better nor worse position than the government stands when it brings suit. Accordingly, we cannot furnish a *qui tam* relator with an easier burden than the government would bear if it intervened and assumed the prosecution of the case. Permitting a *qui tam* relator to go forward with his complaint, when we would not allow the government to proceed, might encourage the government to evade its burden by merely recruiting a willing relator to file a *qui tam* action.

*United States ex. Rel. Atkins,* 470 F.3d 1350, 1360 (11th Cir.2006).

The relator argues that in *United States ex rel. Grubbs v. Kanneganti,* the Fifth Circuit relaxed the pleading standard for pleading fraud under the FCA. In *Grubbs,* the Fifth Circuit reversed the district court's dismissal of a *qui tam* suit alleging that psychiatrists billed Medicare and Medicaid for services not performed. 565 F.3d 180, 195 (5th

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 17

Not Reported in F.Supp.2d, 2011 WL 1231577 (S.D.Tex.), Med & Med GD (CCH) P 303,750
**(Cite as: 2011 WL 1231577 (S.D.Tex.))**

Cir.2009). The *Grubbs* panel held that a *qui tam* plaintiff does not need to allege "the time, place, and contents of the false representation" in every case. 565 F.3 d at 191. The panel reasoned that requiring this level of detail "is one small step shy of requiring production of actual documentation with the complaint" and held that "to plead fraud with particularity ... a relator's complaint, if it cannot allege details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* at 190. *Grubbs* analyzed the Eleventh Circuit's decision in *Clausen,* which required allegations of the "specific contents of actually submitted claims, such as billing numbers, dates, and amounts." *Id.* at 186. Rejecting this requirement, the *Grubbs* court stated as follows:

> [T]he "time, place, contents, and identity" standard is not a straitjacket for Rule 9(b). Rather, the rule is context specific and flexible and must remain so to achieve the remedial purpose of the False Claim Act. We reach for a workable construction of Rule 9(b) with complaints under the False Claims Act; that is, one that effectuates Rule 9(b) without stymieing legitimate efforts to expose fraud. We hold that to plead with particularity the circumstances constituting fraud for a False Claims Act § 3729(a)(1) claim, a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.

**\*16** *Id.* at 190.

The relator argues that this court should relax the pleading standard because she does not have access to certain information. In the Fifth Circuit, the pleading standard is not relaxed when such information is available from third party entities and individuals. *Rafizadeh,* 553 F.3d at 873 n. 6. The defendants note that it does not have billing or reimbursement information; doctors, hospitals, and government agencies do. There is no basis to relax the Rule 9(b) pleading standard on this ground under the applicable precedents. *See Polansky,* 2009 WL 1456582, at *8 (refusing to relax the pleading standard in off-label *qui tam* against drug manufacturer because the needed information available was not in the hands of the defendants but in the hands of third parties).

The First Circuit has held that "in situations ... where the defendant induced third parties to file false claims ... a more flexible standard applies." *United States ex rel. Westmoreland v. Amgen, Inc.,* 738 F.Supp.2d 267, 275 (D.Mass.2010) (quoting *United States ex rel. Duxbury v. Ortho Biotech. Prods.,* 579 F.3d 13, 29 (1st Cir.2009)). For these claims, "[a] relator can satisfy Rule 9(b) by providing 'factual or statistical evidence to strengthen the inference of fraud beyond possibility without necessarily providing details of each false claim." *Id.* If *Grubbs* states a similar approach, it also emphasizes that district courts must look to whether the plaintiff alleges either at least some false claims with particularity or, if she cannot, alleges both particular details of the scheme to submit false claims and reliable indicia that lead to a strong inference that false claims were actually submitted. *Compare United States ex rel. Carpenter,* 723 F.Supp.2d 395, 408 (D.Mass.2010) (dismissing allegations of an off-label pharmaceutical kickback scheme because the relator could not "offer any particulars as to names, dates, amounts, or the incentives doctors are alleged to have been offered") *with id.* at 407–08 (denying motion to dismiss off-label prescription reimbursement allegations where the relator alleged a detailed description of eight false claims which included: the patient's identity, the patient's drug history to show that the prescription was off-label, the date of the claim, the Medicare of Medicaid program to which the bill was submitted, the location of the submitting pharmacy, the dosage, the dollar amount billed, the initials of the pharmacist who filled the prescription, and the name of the doctor who wrote it). *See also Duxbury,* 579 F.3d at

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 18

Not Reported in F.Supp.2d, 2011 WL 1231577 (S.D.Tex.), Med & Med GD (CCH) P 303,750
**(Cite as: 2011 WL 1231577 (S.D.Tex.))**

29–30 (finding that relator alleging that defendant caused off-label prescriptions alleged fraud with particularity by identifying eight healthcare providers that submitted false claims, the dates of the false claims, and the amounts of the false claims, but noting that the allegations still presented a "close call"); *United States ex rel. Piacentile v. Sanofie Synthelabo, Inc.,* Civ. A. No. 05–2927, 2010 WL 5466043, at *7–9 (D.N.J. Dec. 30, 2010) (noting that courts have not required the relator to "allege the details of particular claims" when the allegations are that the defendant caused false claims to be submitted, but finding the relator's allegations insufficient under this standard because he could not identify one physician who wrote an off-label description because of the defendant's marketing).

**\*17** The relator also urges this court to relax the Rule 9(b) pleading standard because the alleged fraud occurred over an extended period of time and consists of numerous acts." *Bristol—Myers Squibb Co .,* 587 F.Supp.2d at 821 (listing cases). Courts have allowed the plaintiff to "plead the fraudulent scheme with particularity and provide representative examples of specific fraudulent acts conducted pursuant to that scheme." *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.,* 501 F.3d 493, 509–10 (6th Cir.2007); *see also Barrett,* 251 F.Supp.2d at 35 ("While a complaint that covers a multi-year period may not be required by Rule 9(b) to contain a detailed allegation of all facts supporting each and every instance of submission of a false claim, some information on the false claims must be included." (citing *United States ex rel. Lee v. SmithKline Beecham, Inc.,* 245 F .3d 1048, 1051 (9th Cir.2001)). The relator in the present case has not, however, alleged a "representative sample" or even an "instance of submission." *Bledsoe,* 501 F.3d at 509–10; *Barrett,* 251 F.Supp.2d at 35. Nor has the relator alleged that a specific physician or hospital submitted a false claim. *Willard,* 336 F.3d at 385. Instead, the relator relies only on the allegation that the defendants extensively promoted the FlexView system. The relator has identified no basis to relax the Rule 9(b) pleading standard be-

cause the alleged activities extended over years.

Even under a relaxed pleading standard, the relator must still state a factual basis for her assertions. *See United States ex rel. King v. Alcon Labs., Inc.,* 232 F.Supp.2d 568, 572 (N.D.Tex.2005) (finding that even under a relaxed pleading standard, the relators failed to plead fraud with particularity because the relator did not identify a single person involved in the alleged fraud, did not did not identify specific fraudulent claims, and did not identify a single date on which fraudulent activity occurred); *United States ex rel. Lam v. Tenet Healthcare,* 481 F.Supp.2d 673, 688 (W.D.Tex.2006) (finding that even under a relaxed pleading standard, the relators failed to set forth a factual basis for their beliefs because they failed to name one physician who violated the anti-referral statute; did not specifically identify one fraudulent transaction; and failed to specifically allege the fraud's "when" by alleging only that the fraudulent events occurred "at some point in the 1980s, between 1995 and 2002, and in 1999). *Cf. Rost,* 507 F.3d at 732–33 (recognizing that Rule 9(b) may be satisfied where "although some questions remain unanswered, the complaint as a whole is sufficient to pass muster under the FCA," but upholding dismissal because the relator did not identify specific physicians who submitted claims for reimbursement for off-label prescriptions).

**C. The Case Law on Off–Label Marketing as an FDA Claim**

Recently, a number of *qui tam* actions alleging FCA violations caused by off-label marketing by drug companies have been filed in federal courts. [FN12] Both parties discuss three such cases: *United States ex rel. Franklin v. Parke—Davis,* 147 F.Supp.2d 39 (D.Mass.2001); *United States ex rel. Hess v. Sanofi—Synthelabo Inc.,* No. 4;05CV570MLM, 2006 WL 1064127 (E.D.Mo. Apr.21, 2006); *Hopper v. Solvay Pharms. Inc.,* 588 F.3d 1318 (11th Cir.2009). In addition, both parties discuss In re Cardiac Devices Qui Tam Litig., a *qui tam* case alleging FCA violations caused by unlaw-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1231577 (S.D.Tex.), Med & Med GD (CCH) P 303,750
**(Cite as: 2011 WL 1231577 (S.D.Tex.))**

ful use of medical devices by hospitals. 221 F.R.D. 318 (D.Conn.2004).

> FN12. *See* Richard C. Ausness, *There's Danger Here, Cherie!: Liability for the Promotion and Marketing of Drugs and Medical Devices for Off-label Uses,* 73 BROOK. L.REV.. 1253, 1275–96 (2008) (identifying the FCA as a source of liability for off-label promotion and discussing recent cases).

**\*18** In *Franklin v. Parke—Davis,* the relator, a doctor formerly employed by Parke—Davis to promote its drug Neurotonin, alleged that Parke—Davis engaged in a "fraudulent scheme to promote the sale of the drug Neurotonin for 'off-label uses' ... and that this illegal marketing campaign caused the submission of false claims to the Veterans Administration and to the federal government for Medicaid reimbursement." 147 F.Supp.2d at 43. The FDA approved Neurotonin "for use as an adjunctive treatment for epilepsy in doses from 900 to 1800 mg per day." *Id.* at 45. The relator alleged that Parke—Davis promoted Neurotonin for off-label use "as mono-therapy for epilepsy, for control of bipolar disease, and as treatment for attention deficit disorder." *Id.* Parke—Davis's alleged off-label promotional tactics included using medical liaisons such as the relator to make "exaggerated or false claims concerning the safety and efficacy of Parke—Davis drugs for off-label uses"; rewarding physicians who prescribed large quantities of Parke—Davis drugs with kickbacks; and paying physicians to create "sham" studies urging off-label uses that "had no scientific value." *Id.* at 45–46.

The relator also alleged that "when questions arose concerning the availability of reimbursement for prescriptions for off-label uses of Parke—Davis drugs," Parke—Davis made efforts to conceal the fraud. *Id.* at 46. Medical liasons "were instructed to coach doctors on how to conceal the off-label nature of the prescription" and Parke—Davis "shredd[ed] documents, falsif[ied] documents, and

encourag[ed] medical liaisons to conduct their marketing activities without leaving a paper trail." *Id.*

Parke—Davis moved to dismiss. Unlike the medical device case in which there is FDA approval for general use related to the specific purpose being promoted, there was no dispute as to whether "an off-label prescription submitted for reimbursement is a false claim within the meaning of the FCA." *Id.* at 51. The court granted Parke—Davis's motion in part and denied it in part. *Id.* at 44.

The court found that the complaint met Rule 9(b)'s pleading requirements with respect to submissions to Medicaid because it sufficiently alleged fraudulent schemes to "increase the submission of off-label prescriptions for Neuortonin for payment by Medicaid" and "to induce off-label prescriptions for Neurotonin" by physicians. *Id.* at 48. It reasoned that the relator identified the fraud's "who" by naming Parke—Davis employees who instructed medical liaisons on how to fraudulently promote off-label use of Neurotonin, listing the medical liaisons by name, and identifying the physicians contacted; identified the fraud's "what" by alleging that the off-label promotion resulted in the submission of ineligible claims for reimbursement for off-label use of Neurtonin; identified the fraud's "when" by alleging the term of the relator's employment; and the fraud's "how" by alleging a detailed description of the marketing scheme that included "misleading" materials *Id.* The relator also alleged eleven "specific examples of fraudulent statements which medical liaisons ... were trained to give to physicians, and did give to physicians, to induce the purchase of Neurotonin for off-label uses." *Id.* In contrast, the court found that the complaint did not sufficiently allege a fraudulent scheme to cause false submissions to the Veterans Administration because it did not "specify which Parke—Davis personnel engaged in this conduct, where such conduct took place, which VA personnel were involved, or any specific fraudulent statements made to personnel at the [VA]." *Id.* at 50.

**\*19** With respect to the Medicaid allegations,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 20

Not Reported in F.Supp.2d, 2011 WL 1231577 (S.D.Tex.), Med & Med GD (CCH) P 303,750
**(Cite as: 2011 WL 1231577 (S.D.Tex.))**

the court rejected Parke—Davis's causation challenges. Parke—Davis argued that the FCA does not impose liability for violating FDA regulations because such violations do not involve a claim or statement to the government. The court stated:

> It is true that the FCA cannot be used to enforce compliance with every law or regulation ... the FCA can be used to create liability where failure to abide by a rule or regulation amounts to a material misrepresentation made to obtain a government benefit.... Thus, the failure of Congress to provide a cause of action for money damages against a pharmaceutical manufacturer for marketing off-label drugs does not preclude an FCA claim where the manufacturer has knowingly caused a false statement to be made to get a false claim paid or approved by the government in violation of 31 U.S.C. § 3729(a).

*Id.* at 51–52 (internal citations omitted). The court also rejected Parke—Davis's argument that off-label promotion does not always entail a false statement. Parke—Davis argued that off-label promotion may involve only the distribution of one physician's finding of new drug's use to another physician. The court responded that the relator alleged "more than a mere technical violation of the FDA" by alleging that physicians distributed findings they knew to be false. The court also rejected Parke—Davis's argument that physicians' independent determinations that an off-label prescription provided the best treatment for a patient cut off Parke—Davis's liability because it was an intervening cause. The court responded that because the intervening cause was foreseeable to Parke—Davis, the chain of causation did not break. *Id.* at 51–53. Finally, the court rejected Parke—Davis's argument that its false statements were not "material" to the government's decision to pay. The court noted that "[l]iability under the FCA ... is not limited only to false statements or claims made directly by the Defendant to the government," and that the FCA " 'reaches beyond claims which might be legally enforced, to all fraudulent attempts to cause the Gov

ernment to pay out sums of money.' " *Id.* at 53 (citing *United States v. Neifert—White Co.,* 390 U.S. 228, 233, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968)).

However, the *Parke—Davis* court dismissed the relator's kickback allegations. The court rejected the relator's argument that a violation of the antikickback statute is a *per se* violation of the FCA. The court reasoned that though an FCA violation might be based on " 'implied certification' [of compliance with the antikickback statute] by virtue of the defendant's participation in the federal program," the relator had "failed to allege that physicians either expressly certified or, through their participation in a federally funded program, impliedly certified their compliance with the federal antikickback statute as a prerequisite to participating in the federal program." *Id.* The court reasoned that "while Defendant's payment of kickbacks may well be illegal," the relator did not allege that "Parke—Davis caused or induced a doctor and/or pharmacist to file a false or fraudulent certification regarding compliance with the anti-kickback statute." *Id.* at 55.

**\*20** In *Hess,* the relator alleged that Sanofi—Snythelabo's off-label promotion of its drugs Eloxatin —approved for "second line treatment of fourth stage colorectal cancer "—and Elitek —approved for the treatment and prevention of tumor lyses syndrome—caused the submission of false claims for payment for off-label uses. 2006 WL 1064127, at *2. The relator alleged that Sanofi—Synthelabo promoted Eloxatin for treatment in both "first-line" and "adjuvant" [FN13] settings by training sales representatives to use off-label data when promoting Eloxatin to physicians, creating sales goals impossible to meet without off-label usage, and by providing sales representatives with monographs containing information on adjuvant and first-line trials for Eloxatin. *Id.* at *8. The relator further alleged that the data provided to physicians was "immature, unreliable, and misleading." *Id.* With respect to Elitek, the relator alleged that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 21

Not Reported in F.Supp.2d, 2011 WL 1231577 (S.D.Tex.), Med & Med GD (CCH) P 303,750
**(Cite as: 2011 WL 1231577 (S.D.Tex.))**

Sanofi—Synthelabo trained its sales representatives to promote off-label uses and pressured the sales representatives to derive a substantial number of sales from off-label use. *Id.* at *6. Sanofi—Synthelabo moved to dismiss. It argued that the relator did not allege any false representations to physicians or the government, did not allege any improper prescriptions, and did not allege that doctors who prescribed the drugs also sought reimbursement from Medicare. Sanofi—Synthelabo also argued that the relator failed to alleged fraud with the required particularity. *Id.* at *4. Specifically as to Eloxatin, Sanofi—Synthelabo argued that because Medicare does not require a physician to specify the stage of cancer in submitting claims for reimbursement, physicians made no false statements in submitting claims for use of Eloxatin to treat colorectal cancer in first-line and adjuvant settings. *Id.* at *8. The court granted Sanofi—Synthelabo's motion to dismiss, addressing the allegations involving each drug separately.

> FN13. An "adjuvant" use of a drug is a use to "enhance the effectiveness of" other medical treatment. WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 56 (Merriam–Webster 1990).

The court dismissed the allegations related to Elitek under Rule 9(b) because the relator failed to allege the "who, what, when, where, and how of fraud." *Id* at *6. The court noted that the relator did not allege "the time or place of the allegedly false representations regarding Elitek," "the nature or content of claims made which were allegedly fraudulent," or "that doctors to whom Plaintiff promoted off-label use of Elitek actually submitted false claims to the Government for off-label uses of this prescription drug." *Id.* The court deemed the relator's allegations "vague" and "conclusory" and dismissed for "lack of the requisite specificity to withstand a motion to dismiss pursuant to either Rule 12(b)(6) or Rule 9(b)." *Id.*

The court also dismissed the Eloxatim allegations because the relator did not allege a "material"

misrepresentation. In *United States ex rel. Costner v. United States,* the Eighth Circuit adopted a materiality requirement for FCA claims, requiring that the misrepresentation have the natural tendency to influence an agency action, the same test the Fifth Circuit adopted in *Longhi.* 317 F.3d 883, 887–88 (8th Cir.2003). The court accepted Sanofi—Synthelabo's argument that the reimbursement claims did not contain a material false statement because the reimbursement forms did not require that the physician indicate the stage of cancer, only that the patient had cancer. The only statement material to Medicare reimbursement is that the patient had cancer; the government does not inquire further into whether the drug is approved for a particular cancer stage. *Id.* at *7.

**\*21** The court considered other arguments. It agreed with Sanofi—Synthelabo's argument that the relator did not sufficiently plead the FCA's knowledge requirement because the plaintiff did not allege that the "Defendant deliberately lied nor that the data provided by Defendant either to its sales representatives or to doctors was incorrect or false." *Id.* at *9. The court distinguished the alleged promotion tactics in *Parke—Davis* by noting that "none of the actions which Plaintiff alleges on the part of the Defendant ... involve conduct which was designed to present *false* information; rather ... the Defendant sought to disseminate date and information from trials and studies." *Id.* at *10. The court found that the relator did not sufficiently allege false statements to Medicare. The court noted that while typically Medicare reimburses only on-label prescriptions, "such approval is not necessarily a requirement." *Id.* The court also noted that-unlike in *Parke—Davis* —the relevant Medicare administrator chose to apply an exception allowing coverage for off-label prescriptions of Eloxatin and concluded that "because ... the Medicare administrator included off-label uses of Eloxatin for reimbursement purposes, Plaintiff can prove no set of facts to establish that Defendant violated the FCA." *Id.* at *9. Finally, the court, applying *Parke—Davis,* found that the relator did not allege fraud with the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 22

Not Reported in F.Supp.2d, 2011 WL 1231577 (S.D.Tex.), Med & Med GD (CCH) P 303,750
**(Cite as: 2011 WL 1231577 (S.D.Tex.))**

particularity required by Rule 9(b). The court found that the complaint did not identify the fraud's "who" because it did not "identify doctors whom sales representatives allegedly contacted nor ... doctors who allegedly made claims for Medicare reimbursement for off-label uses" or the fraud's "how" because it did not provide "examples of the allegedly false information which Defendant allegedly gave its sales representatives." *Id.*

In *Solvay,* the relators alleged that Solvay Pharmaceuticals's off-label promotion of Marinol caused the submission of false claims for reimbursement to Medicare. 588 F.3d at 1321. The FDA approved Marinol, a synthetic form of THC, a hallucinogenic compound found in marijuana, for use as an appetite stimulant for AIDS patients and for the treatment of nausea and vomiting associated with cancer chemotherapy. *Id.* at 1322. The relators alleged that Solvay promoted Marinol for off-label treatment of appetite loss in cancer patients and of nausea in HIV patients. The alleged off-label promotional activities included "a sophisticated marketing plan" and "kickbacks to physicians and other healthcare providers to induce them to prescribe Marinol for off-label purposes." *Id.* at 1323. The district court referred the case to a magistrate judge, who recommended dismissal. The district court adopted the magistrate judge's recommendation and the relators appealed. *Id.* The issue on appeal was whether the complaint, "which did not include allegations of specific false claims or allege that Solvay intended for its statements to influence the government's decision to pay any claims, satisfies the particularity requirements of Rule 9(b)." *Id.*

**\*22** The Eleventh Circuit upheld the district court's dismissal. In reaching this conclusion, the Eleventh Circuit discussed its decisions in *United States ex rel. Clausen v. Lab Corp. of Am.,* 290 F.3d 1301 (11th Cir.2002); *United States ex rel. Corsello v. Lincare, Inc.,* 428 F.3d 1008 (11th Cir.2005); and *United States ex rel. Atkins v. McInteer,* 470 F.3d 1350 (11th Cir.2006). In *Clausen,* the court upheld the district court's dis-

missal of a complaint alleging the submission of claims for reimbursement for unnecessary laboratory tests even though the complaint "included detailed allegations of a scheme to overcharge, [ ] identified the patients who received tests, specified which tests were improper, and set forth the dates on which the tests were performed" because the complaint "failed to provide any information linking the testing schemes to the submission of false claims." *Solvay,* 588 F.3d at 1325 (citing *Clausen,* 290 F.3d at 1303). Absent an allegation linking the schemes to the submission of false claims, the Eleventh Circuit found that the allegations were conclusory. *Id.* (citing *id.*). In *Corsello,* the court upheld the district court's dismissal of a complaint alleging that medical equipment companies engaged in a "kickback and referral scheme to falsify certificates of medical necessity to submit false claims for Medicare payments" because "it did not allege that a specific fraudulent claim was in fact to submitted to the government." *Id.* (citing *Corsello,* 428 F.3d at 1013–14). In *Atkins,* the court upheld the district court's dismissal of a complaint alleging "an elaborate scheme for defrauding the government by submitting false claims" for payments from Medicare for psychiatric services that were not actually rendered. *Id.* (citing *Atkins,* 470 F.3d at 1354). The complaint cited "particular patients, dates and corresponding medical records for services" not eligible for reimbursement. *Id.* (citing *id.* at 1359). In upholding the dismissal, the *Atkins* court reasoned that the relator "failed to provide the next link in the [FCA] liability chin: showing that the defendant *actually submitted* reimbursement claims for the services he described." *Id.* (quoting *id.*). The *Solvay* court noted that unlike *Clausen, Corsello,* and *Atkins,* the complaint contained "a highly-detailed compelling statistical analysis [that] rendered inescapable the conclusion that a huge number of claims for ineffective uses of Marinol resulted from [Solvay's illegal marketing] campaign." *Id.* at 1326. Nonetheless, the court upheld the dismissal because it did not "allege the existence of a single actual false claim." *Id.* Under these precedents, the *Solvay* court upheld the district court's dismissal because

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1231577 (S.D.Tex.), Med & Med GD (CCH) P 303,750
**(Cite as: 2011 WL 1231577 (S.D.Tex.))**

the relators did not allege "the actual presentment of a false claim." *Id.* at 1324.

The *Solvay* court also found the allegations insufficient under Rule 9(b) because they did not "identify specific persons or entities that participated in any step of the process. Nor [did] it allege dates, times, or amounts of individual false claims." *Id.* And, even assuming that "when a physician writes an off-label prescription with knowledge or intent that the cost of filling that prescription be borne by the federal government," the allegations were still insufficient because the complaint did not "identify a single physician who wrote a prescription with such knowledge; did not "identify a single pharmacist who filled such a prescription"; and did not "identify a single state healthcare program that submitted a claim for reimbursement to the federal government." *Id.* The court summarized: "We cannot conclude that the Complaint satisfies the particularity requirements of Rule 9(b) by offering 'some indicia of reliability ... of an actual false claim for payment being made to the government.' " *Id.* (citing *Clausen,* 290 F.3d at 1311 (emphasis removed)). Finally, the *Solvay* court distinguished the allegations from those found sufficient in *United States ex rel. Walker v. R & F Properties of Lake Co., Inc.,* 433 F.3d 1349 (11th Cir.2005). In *Walker,* the complaint "included allegations of first-hand knowledge that explained why [the relator] believed a specific defendant submitted false or fraudulent claims"; under the facts alleged in *Solvay,* by contrast, "the relators [did] not allege personal knowledge of the billing practices of any person or entity." *Solvay,* 588 F.3d at 1325 (discussing *Walker,* 433 F.3d at 1360).

**\*23** *In re Cardiac Devices* discussed an FCA claim based on off-label use of a medical device. Unlike the present suit, that case involved the pre–1995 Medicare regulations that prohibited reimbursement for devices the FDA did not approve for marketing. 221 F.R.D. at 326–27. A sales representative for cardiovascular-device manufacturers alleged that 132 clinical-trial hospitals from thirty

states submitted Medicare reimbursement claims for services involving "nearly sixty different investigational cardiac devices that had not been approved for marketing by the [FDA]" in direct contravention of the manual instructions.[FN14] *Id.* at 332. After receiving notice of the complaint, the Office of the Inspector General of HHS subpoenaed records from the hospitals and ultimately elected to intervene. *Id.* at 327. The government and the relator moved to sever the action against each hospital and to transfer each to the federal district where the hospital was located. *Id.* at 327. The separate complaints for each hospital generally alleged that the hospitals received cardiac devices the FDA had not approved pursuant to an "Investigation Device Exemption" that restricted their use to "carefully monitored clinical trials ... to gather evidence of the safety and effectiveness of the devices." *Id.* at 329. The complaints alleged that the hospitals had submitted reimbursement claims to Medicare and Medicaid for using the devices in treatment and received "millions of dollars in Medicare and Medicaid reimbursements." *Id.* at 330. The complaints broke "down the number of procedures performed involving each particular cardiac device." *Id.* For example, the complaint for one hospital stated "that it charged Medicare and/or Medicaid for at least thirty-seven procedures involving prosthetic heart valves manufactured by St. Jude that had not received marketing approval from the FDA." *Id.* The complaints also alleged that the defendant hospitals "were on notice ... that Medicare considered medical procedures involving cardiac devices that had not been approved for marketing by the FDA ... to be non-covered and non-reimbursable" and that the hospitals knowingly misrepresented the devices' approval in claims for reimbursement sent to their respective Medicare intermediaries. *Id.*

FN14. A number of the defendant hospitals settled before the court's decision on the motion to dismiss. *Cardiac Devices,* 221 F.R.D. at 326–27.

The defendants filed two motions to dismiss

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 24

Not Reported in F.Supp.2d, 2011 WL 1231577 (S.D.Tex.), Med & Med GD (CCH) P 303,750
**(Cite as: 2011 WL 1231577 (S.D.Tex.))**

the complaints. The first motion argued that the complaints did not allege fraud with sufficient particularity. Specifically, the defendants argued that:

(1) the complaints merely allege a "per se" fraud theory, equating fraud with an alleged violation of the Medicare Hospital Manual and not particular fraudulent misconduct;

(2) the complaints do not identify specific claims submitted to the government and do not allege the "who, what, when, where, and why" of the defendants' allegedly fraudulent misconduct; and

(3) the complaints do not allege facts giving rise to a strong inference of fraudulent intent.

**\*24** *Id.* at 331.

In denying the defendant's motion to dismiss, the court first held that the plaintiffs were entitled to a relaxed pleading standard because the alleged fraud involved a "complex scheme" with numerous transactions and "the specific factual information" was peculiarly within the defendants' control. *Id.* at 333–34. By contrast, no such relaxation is warranted under the Fifth Circuit case law. As discussed, the pleading standard is not relaxed when such information is available from third party entities and individuals. *Rafizadeh,* 553 F.3d at 873 n. 6. The record shows that in the present case, the defendants do not have billing or reimbursement information; doctors, hospitals, and government agencies do.

The court in *In re Cardiac Devices* rejected the defendant's first argument, that violation of the manual provision's "reasonable and necessary" requirement is only a regulatory violation and not fraud *per se.* The court found that a physician's certification that the use of the device was "reasonable and necessary" was an "underlying condition to payment." *Id.* at 335–36. The court also found that the complaints alleged specific false submissions by the hospitals, including the "who, what, where, when, and how" of the alleged fraudulent state-ment.[FN15] The court cited the Eleventh Circuit's decision in *United States ex rel. Clausen v. Lab Corp. of Am.,* which upheld dismissal of an FCA complaint because the relator did not allege "an actual false claim." 290 F.3d at 1311. The *Cardiac Devices* court noted that the complaints "listed the number of claims" for each device and included "patient lists" provided by the defendant hospitals that, when read in conjunction, "identified the submission of specific claims." *Id.* at 337. The court distinguished *Clausen:*

> FN15. The complaints alleged "who" by identifying the specific hospitals; "what" by identifying the specific claims submitted; "where" as the place where the claims were filed; "when" by providing the "dates of the patients' hospitalizations" or the year annual cost reports were filed; and "how" by detailing the Medicare reimbursement scheme. *Clausen,* 209 F.3d at 337.

This is not a situation where only a general scheme of fraud was alleged that might have resulted in the submission of false claims. Here, the fraudulent scheme was the submission of the claims themselves. This stands in sharp contrast to the complaints in Clausen, which "[a]t most, ... raise[d] questions about [the defendant's] internal testing policies. But nowhere in the blur of facts and documents assembled by Clausen regarding six alleged testing schemes can one find any allegation, stated with particularity, of a false claim actually being submitted to the Government." 290 F.3d at 1312.

*Id.* Finally, the court found that the complaints alleged facts giving rise to a strong inference of fraudulent intent. Because the FCA requires only that a defendant act "knowingly," the complaints do not to allege "a specific intent to defraud." *Id.* at 339. Instead, complaints had to allege " 'the knowing presentation of what is known to be false' as opposed negligence or innocent mistake." *Id.* (citing *Mikes v. Straus,* 274 F.3d 687, 703 (2d Cir.2001) (citing *Hagood v. Sonoma*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 25

Not Reported in F.Supp.2d, 2011 WL 1231577 (S.D.Tex.), Med & Med GD (CCH) P 303,750
**(Cite as: 2011 WL 1231577 (S.D.Tex.))**

*County Water Agency,* 81 F.3d 1465, 1478 (9th Cir.1996), *cert. denied,* 519 U.S. 865, 117 S.Ct. 175, 136 L.Ed.2d 116 (1996))).

**\*25** The defendants' second motion to dismiss argued that the complaints failed to state a claim for relief under Federal Rule of Civil Procedure 12(b)(6) because they did not allege that the claims were "false or fraudulent." *Id.* at 342. The court first determined that hospitals' requests for payments on form HCFA–1450 (UB–82 [FN16] and UB–92) "clearly constituted the submission of a 'claim' " under the FCA. *Id.* at 343. The court also found that annual Cost Reports the hospitals submitted were claims because they were accompanied by certifications that the reports were "true, correct, and complete and prepared in accordance with applicable instructions." *Id.* at 344. The court held that the allegations of false claims were sufficient under the Second Circuit's approach in *Mikes v. Straus,* 274 F.3d 687 (2d Cir.2001). The court explained:

> FN16. UB–82 forms were used until 1994, when they were replaced by UB–92 forms. *See Cardiac Devices,* 221 F.R.D. at 345.

The Second Circuit in *Mikes* held that a claim may satisfy the falsity element of the FCA in one of three ways. It may be factually false if it "incorrectly describes the goods or services provided or a request for goods or services never provided," [ 274 F.3d at 697, or it may be legally false because of an express false certification or an implied false certification. *Id.* at 697–98. In *Mikes,* the Second Circuit held an "expressly false claim is ... a claim that falsely certifies compliance with a particular statute, regulation or contractual terms, where compliance is a prerequisite to payment." *Id.* at 698 (emphasis added). Under an implied false certification theory, the act of submitting a claim for reimbursement itself implies compliance with the governing federal rules that are a precondition to payment. *Id.* at 699 (emphasis added). The Court emphasized that "implied false certification is appropriately

applied only when the underlying statute or regulation upon which the plaintiff relies expressly states the provider must comply in order to be paid." *Id.* at 700 (emphasis in original). "Liability under the [FCA] may properly be found therefore when a defendant submits a claim for reimbursement while knowing—as that term is defined by the Act, see 31 U.S.C. § 3729(b) —that payment expressly is precluded because of some noncompliance by the defendant."

*Cardiac Devices,* 221 F.R.D. at 345. The court found that the claims were alleged to be false under the "factually false" and "legally false/ expressly false certification" theories. The claims were alleged to be factually false because the forms instructed hospitals "to enter any remarks not shown elsewhere on the bill but which were necessary for proper payment" and to list "[n]on-covered charges." *Id.* The hospitals' failure to state that the procedures performed were experimental, which were non-covered charges, made the claims factually false. The court also found that the claims were "legally false" because " 42 U.S.C. § 1395y(a)(1)(A) contains an express condition of payment—'no payment may be made [under Medicare] for any expenses incurred for items or services which ... are not reasonable and necessary for the diagnosis or treatment of illness or injury,' " and that it " 'explicitly links each Medicare payment to the requirement that the particular item or service be 'reasonable and necessary.' " *Id.* (quoting *Mikes,* 274 F.3d at 700). The court found that the alleged claims falsely certified compliance and that the certification of compliance was a prerequisite for payment. *Id.* at 346. For the same reasons, the court found that hospitals' certifications on annual Cost Reports that the reports were "true, correct, and complete" falsely certified compliance where compliance was a prerequisite for payment." The court stated:

**\*26** The Medicare regulations imposed on defendants the obligation to provide the intermediaries with all information necessary to determine

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 26

Not Reported in F.Supp.2d, 2011 WL 1231577 (S.D.Tex.), Med & Med GD (CCH) P 303,750
**(Cite as: 2011 WL 1231577 (S.D.Tex.))**

whether payment was due. Critical to this determination would be information concerning whether services were provided for a non-covered item ...

... [I]n submitting their claims, defendants were obligated to seek payment only for those services that were covered. To the extent that they sought payment for services that were not covered, the claims were legally false. The Government has alleged in its complaints that defendants knowingly submitted claims for payment of non-covered services provided in connection with investigational devices that were not reasonable and necessary. These FCA causes of action, as pled, set forth sufficient facts to satisfy the third element, that the claims were false or fraudulent.

*Id.* at 347.

**IV. Analysis**

**A. The Allegations that the Defendants Violated the FCA by Marketing a Medical Device for Off–Label Use**

The relator alleges that the defendants' off-label promotion of the FlexView system for the treatment of atrial fibrillation caused physicians and hospitals to submit claims to the government falsely stating that the use of the FlexView system was "reasonable and necessary" or "medically necessary." *See, e.g., Mikes,* 254 F.3d at 700–01 (finding that HCFA–1500 forms implicitly certify that requests for reimbursement comply with 42 U.S.C. § 1395y(a)(1) (A)'s requirement that the items and services provided were "reasonable and necessary"). The relator's claim is that the use of the FlexView system for treating atrial fibrillation cannot be medically necessary because it is not FDA approved for such use. *See* (Docket Entry No. 75, at 11) ("Defendants' entire surgical ablation marketing scheme is rendered fraudulent by the absence of FDA approval (and indeed the presence of express FDA disapproval) for the *single specific* use being promoted, namely the use of surgical ablation to treat atrial fibrillation.").

Importantly, there is no allegation that the defendants concealed or misstated the limits of the FDA's approval on the use of the FlexView system. The relator alleges only off-label promotion efforts, including direct training to physicians on using the FlexView system to treat atrial fibrillation, instructions to salespersons to promote FlexView off-label, and promotional materials highlighting the economic benefits to hospitals of treating atrial fibrillation with Flexview.[FN17] There is no allegation that the defendants represented that the FlexView system was FDA-approved to treat atrial fibrillation. *Compare Parke—Davis,* 147 F.Supp.2d at 46 (describing Parke—Davis's efforts to conceal the lack of FDA approval).

> FN17. The relator argues that an FDA warning letter sent to St. Jude Medical establishes that the defendants misrepresented the scope of FDA approval. (Docket Entry No. 75, Ex. A). The letter admonishes St. Jude for the off-label promotion of surgical ablation to treat atrial fibrillation. It does not reference Boston Scientific or Guidant. The complaint does not allege that Boston Scientific or Guidant misrepresented the scope of FDA approval to doctors or hospitals. The FDA warning letter does not provide a basis to deny the defendants' motion to dismiss.

Unlike the Medicare coverage at issue in *In re Cardiac Devices,* Medicare may cover medically necessary uses of the FlexView system. Medicare contractors may approve coverage for Category B devices. 42 C.F.R. § 405.211(b). The decision on medical necessity is made by individual physicians exercising independent professional judgment based on the knowledge of their particular patients. The cases recognize that off-label use of a drug or medical device is distinct from a medically unnecessary use of that drug or device. *See Buckman,* 121 S.Ct. at 1018; *Polansky,* 2009 WL 1456582, at *6; *Svidler,* 2004 WL 2005781, at *5; *Stephens,* LEXIS 2009 DIST. 101601, at *20. For medical

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1231577 (S.D.Tex.), Med & Med GD (CCH) P 303,750
**(Cite as: 2011 WL 1231577 (S.D.Tex.))**

devices like the FlexView system, the relator must allege sufficient facts to support an inference that the use of the device is not "medically necessary" or "reasonable and necessary" under Medicare regulations. The relator acknowledges this in her brief. (Docket Entry No. 75, at 10).

**\*27** The relator cites *United States ex rel. Riley v. St. Luke's Episcopal Hosp.,* 355 F.3d 370, 376 n. 6 (5th Cir.2004), in which the court stated that submitting a request for payment "certifies" that "the services shown on the [payment] form were medically indicated and necessary for the health of the patient." *See also* 42 U.S.C. § 13957(1)(A) ("[N]o payment may be made ... for any expenses ... which ... are not reasonable and necessary for the ... treatment of illness or injury...."). The relator also points to 42 U.S.C. § 1320c–5(a)(3)'s statement that:

> It shall be the obligation of any health care practitioner ... who provides health care services for which payment may be made ... to assure, to the extent of his authority that services or items ordered or provided by such practitioner or person to beneficiaries and recipients of this chapter ... will be supported by evidence of medical necessity and quality in such form and fashion and at such time as may reasonably be required by a reviewing peer review organization in the exercise of its duties and responsibilities.

These authorities state that a procedure must be "medically necessary" but do not further define the term. The authorities cited by the relator do not provide a basis to infer that a reimbursement submission for using the FlexView system to treat atrial fibrillation, even as a stand-alone procedure, cannot be medically necessary or reasonable and necessary because it is not specifically approved for that purpose.

The relator argues that the use of the FlexView system for surgical treatment of atrial fibrillation is by definition not medically necessary because it is viewed as experimental within the scientific com-

munity. But Medicare may cover Class II devices even though they "require special controls, such as performance standards or postmarket surveillance, to provide reasonable assurance of safety and effectiveness." 42 C.F.R. § § 405.201(b), 405.211(b). *Cf.* 42 CFR § 405.209 (stating that "payment under Medicare for a non-experimental/investigational (Category B) device is based on, and may not exceed, the amount that would have been paid for a currently used device serving the same medical purpose that has been approved or cleared for marketing by the FDA"). The State's Medicare carrier determines "the conditions for coverage and reimbursement of physician charges for surgical cardiac ablation." (Docket Entry No. 58, ¶ 65). The relator does not allege that *any* state has denied coverage for surgical ablation to treat atrial fibrillation, whether as a stand-alone treatment or in connection with other cardiac procedures. Alleging that the use of the FlexView system to treat atrial fibrillation is "experimental" does not allege a basis for an inference that such use of the system is categorically medically unnecessary.

Nor does the relator allege specific false statements by the defendants that the FlexView system is a first-line treatment for atrial fibrillation. The relator alleges that the defendants promoted FlexView to treat atrial fibrillation even though the FDA had not approved this use and emphasizes that the defendants' salespersons trained physicians to use the FlexView system despite the lack of FDA approval for the specific use of treating atrial fibrillation. These are not statements that the FlexView system is a first-line treatment for atrial fibrillation or that it was FDA approved to treat atrial fibrillation and do not support an inference that the defendants caused physicians and hospitals to submit reimbursement claims for using the FlexView system as a first-line treatment for atrial fibrillation.

**\*28** In addition, the relator has failed to plead with sufficient particularity the alleged false claims. The relator has not identified specific physicians or hospitals who received the promotions. She has not

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 28

Not Reported in F.Supp.2d, 2011 WL 1231577 (S.D.Tex.), Med & Med GD (CCH) P 303,750
(Cite as: 2011 WL 1231577 (S.D.Tex.))

alleged the "who" or "where" of the alleged fraud. *See, e.g., Thompson,* 125 F.3d at 903. Like the allegations involving false submissions to the Veterans Administration the *Parke—Davis* court dismissed, but unlike the allegations involving Medicaid submissions the court did not dismiss, the relator has not identified any specific physicians who received off-label promotion. *Parke—Davis,* 147 F.Supp.2d at 48. Nor has the relator identified any physician to whom the defendants promoted FlexView off-label and who also "actually submitted false claims to the Government for off-label uses" of FlexView. *Hess,* 2006 WL 1064127, at *6; *see also Solvay,* 588 F.3d at 1326 (upholding the district court's dismissal because the relators "did not identify specific persons or entities that participated in any step of the process"); *Polansky,* 2009 WL 1456582 (E.D.N.Y. May 22, 2009) (dismissing *qui tam* involving off-label promotion of Lipitor because the plaintiff did not identify any false claims or physicians who were induced to write a prescription for an off-label use). *Compare Cardiac Devices,* 221 F.R.D. at 337 (denying a motion to dismiss where the complaint identified specific hospitals and specific fraudulent claims). These allegations do not plead fraud with the particularity required by the Fifth Circuit's decision in *Thompson.*

The relator argues that the Eleventh Circuit's decision in *Solvay* is inconsistent with the Fifth Circuit's decision in *Grubbs* because *Solvay* relies on *Clausen* and the Fifth Circuit rejected *Clausen'* s holding that "the minimum indicia of reliability required to satisfy the particularity standard are the specific contents of actually submitted claims." *Grubbs,* 565 F.3d at 186 (citing *Clausen,* 290 F.3d at 1311). But the *Solvay* court did not apply *Clausen'* s rule that the complaint must allege the specific contents of an actually submitted false claim. Instead, *Solvay* upheld the district court's dismissal because the relator did not allege "the existence of a single false claim ... let alone a false or fraudulent claim." 588 F.3d at 1326.

In *Grubbs,* the court recognized that the Elev-

enth Circuit has "moved away from *Clausen'* s most exacting language, accepting less billing detail in a case where particular allegations of a scheme offered indicia of reliability that bills were presented." 565 F.3d at 187 (citing *Walker,* 433 F.3d at 1360). But the relator has not alleged the type of information that the *Grubbs* relator did. The Fifth Circuit explained in *Grubbs:*

The complaint sets out the particular workings of a scheme that was communicated directly to the relator by those perpetrating the fraud. Grubbs describes in detail, including the date, place, and participants, the dinner meeting at which two doctors in his section attempted to bring him into the fold of their on-going fraudulent plot. He alleges his first-hand experience of the scheme unfolding as it related to him, describing how the weekend on-call nursing staff attempted to assist him in recording face-to-face physician visits that had not occurred. Also alleged are specific dates that each doctor falsely claimed to have provided services to patients and often the type of medical service or its Current Procedural Terminology code that would have been used in the bill.

**\*29** *Id.* at 191–92. Under *Grubbs, Thompson,* and other precedents, the relator's complaint does not sufficiently allege that by promoting off-label use, the defendants caused the submission of false claims and are liable under the FCA.

The relator has alleged a number of unlawful promotional tactics. The cases recognize that even if a drug or device manufacturer's marketing or promotion activities violate FDA regulations, that is insufficient to plead that the manufacturer caused physicians or hospitals to submit false claims for reimbursement. *See Rost,* 507 F.3d at 732; *Hess,* 2006 WL 1064127, at *6; *Polansky,* 2009 WL 1456582, at *7. In *Parke—Davis,* the relator identified Parke—Davis's unlawful promotional tactics, including using medical liaisons such as the relator to make "exaggerated or false claims concerning the safety and efficacy of Parke—Davis drugs for off-label uses"; rewarding physicians who pre-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1231577 (S.D.Tex.), Med & Med GD (CCH) P 303,750
**(Cite as: 2011 WL 1231577 (S.D.Tex.))**

scribed large quantities of Parke—Davis drugs with kickbacks; and paying physicians to create "sham" studies urging off-label uses that "had no scientific value." 147 F.Supp.2d at 45–46. The relator also provided eleven "specific examples of fraudulent statements which medical liaisons ... were trained to give physicians, and did give to physicians." *Id.* at 48. The court still dismissed the relator's allegations covering the submission of claims to the Veterans Administration for failure to identify "which Parke—Davis personnel engaged in this conduct, where such conduct took place, which VA personnel were involved, or any specific fraudulent statements made to personnel at the VA." *Id.* at 50. Similarly, in *Rost,* the relator alleged that Pharmacia promoted Genotropin off-label through cash payments for off-label studies, rebates and other kickbacks for off-label prescriptions, and off-label marketing materials. 507 F.3d at 723–24. The relator also alleged statistical data demonstrating a likelihood of high volume off-label prescription-writing. *Id.* at 732. The appellate court nonetheless upheld the dismissal:

> It may well be that doctors who prescribed Genotropin for off-label uses as a result of Pharmacia's illegal marketing of the drug withstood the temptation and did not seek federal reimbursement, and neither did their patients. It may be that physicians prescribed Genotropin for off-label uses only where the patients paid for it themselves or when the patients' private insurers paid for it. Rost did not plead enough to satisfy the concerns behind Rule 9(b).

> *Id.*

In this case, under *Grubbs* and other precedents, the allegations are both insufficient and insufficiently particularized. The claims of an FCA violation by off-label promotion are dismissed, with leave to amend.

**B. The Allegations on Upcoding**
The relator alleges that the defendants instructed hospitals and physicians to "upcode" stand-

alone surgical ablations—minimally invasive, closed-chest procedures—by entering the code associated with open-chest procedures, ICD–9 procedure code 37.33, in reimbursement claims. The relator alleges that physicians and hospitals should have entered procedure code 37.99, which is more appropriate for such minimally invasive procedures. The relator alleges that entering code 37.33 instead of code 37.99 generates a significantly higher Medicare reimbursement and that the defendants' sales representatives "coached hospitals to obtain over-reimbursement of nearly $20,000, or 300% higher than the hospital cost of the procedure each time Defendants' microwave surgical ablation system is used as a stand-alone procedure." (Docket Entry No. 58, ¶ 121). The relator alleges that the defendants' sales presentations highlighted favorable reimbursement rates and identified code 37.33 as the appropriate code for stand-alone surgical ablations, not code 37.99. Because there was an economic incentive to "upcode," because the defendants pointed out the opportunity to do so, and because stand-alone ablation procedures were presumably performed, the relator argues that she has alleged a sufficient basis to support an inference that the defendants caused hospitals to "upcode" and submit false claims to Medicare.

**\*30** Under the applicable case law authority, the relator has not pleaded this scheme to defraud with sufficient particularity to withstand dismissal. The relator has not identified any hospital or physician who did in fact "upcode" improperly in a Medicare reimbursement submission. These allegations fail to allege information about the "who, what, when, where, and how of the alleged fraud." *Thompson,* 125 F.3d at 903. And although the Fifth Circuit qualified the "time, place, and contents" requirement in *Grubbs,* the relator's complaint in this case is still deficient.

The cases involving FCA upcoding allegations against physicians support this result. In *United States ex rel. Bledsoe v. Cmty. Health Sys.,* a district court dismissed a relator's allegations that a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 30

Not Reported in F.Supp.2d, 2011 WL 1231577 (S.D.Tex.), Med & Med GD (CCH) P 303,750
**(Cite as: 2011 WL 1231577 (S.D.Tex.))**

hospital submitted numerous false claims for reimbursement to Medicare and Medicaid. 501 F.3d 493 (6th Cir.2007). The appellate court upheld the dismissal even though the relator identified the CPT codes incorrectly entered in reimbursement submissions because the allegations did "not meet the minimum standard of the 'time, place and content of the alleged misrepresentation on which [the injured party] relied.' " *Id.* at 513 (citing *United States ex rel. Bledsoe v. Cmty. Health Sys.,* 342 F.3d 634, 643 (6th Cir.2003)). While the relator in this case has alleged codes physicians and hospitals should use in submitting claims for reimbursement for minimally invasive, stand-alone surgical ablation procedures, the relator has not identified any physicians or hospitals that put the incorrect code on a Medicare reimbursement claim. These allegations are insufficient under the applicable case law.

In *United States ex rel. Atkins v. McInteer,* 470 F.3d 1350 (11th Cir.2006), the allegations included upcoding. The relator alleged that the defendants submitted claims for, and received, Medicare reimbursement for psychiatric services that were: "(1) not rendered, (2) not medically necessary, (3) the result of improper 'upcoding,' (4) grounded in psychiatric evaluations provided by unqualified staff personnel, (5) based upon 'pre-formed,' predetermined sets of patient evaluations, diagnostic codes, and treatment plans, and (6) provided with substandard levels of care." *Id.* at 1354. The Eleventh Circuit affirmed the district court's dismissal, stating that "the complaint fails rule 9(b) for want of sufficient indicia of reliability to support the assertion that the defendants submitted false claims." *Id.* at 1358–59. Even though the relator cited particular patients, dates, and corresponding medical records for services he contended were not eligible for government reimbursement, his claim failed because he did not allege facts showing that the defendants actually submitted reimbursement claims for the services he described. "Instead, he portrays the scheme and then summarily concludes that the defendants submitted false claims to the government for reimbursement." *Id.* at 1359.[FN18] The relator argues

that she has alleged "a definite narrative of the motive, strategy, and results of the Defendants' ... scheme...." (Docket Entry No. 75, at 25). But in the complaint, the relator has not cited "particular patients, dates, and corresponding medical records" for the alleged upcoding. Nor has the relator alleged that any physician or hospital submitted a false claim for reimbursement. These allegations do not plead fraud with the particularity required by Rule 9(b).

FN18. Similar results were reached in *United States ex rel. Barrett v. Columbia/ HCA Healthcare Corp.,* 251 F.Supp.2d 28, 35 (D.D.C.2003) (dismissing FCA upcoding allegations because the complaint did not sufficiently "link" the upcoding allegations "with the submission of claims to Medicare"); *United States v. Aggarwal,* No. 6:03–cv–117–Orl–31KRS, 2005 WL 6011259, at *6 (M.D.Fla. Feb.10, 2005) (dismissing FCA upcoding allegations against a physician because the United States failed to allege that claims were filed in connection with a specific procedure performed and also failed to allege "the names of the patients in whose name claims were filed, claim numbers, the dates of such claims, to whom the claims were made, and what any of the Defendants received as a result"). *Compare United States ex rel. Harris v. Bernard,* 275 F.Supp.2d 1, 6 (D.D.C.2003) (denying a motion to dismiss because the relator identified the employees who caused the submission of false claims; pleaded that the fraud began in 1993 and continued to the time of lawsuit; pleaded that the fraud occurred in the defendant's offices; pleaded twelve "sample patients" whose claims did not correspond with their treatment; and pleaded that the defendants provided treating physicians with fee tickets allowing physicians to select only high paying codes).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 31

Not Reported in F.Supp.2d, 2011 WL 1231577 (S.D.Tex.), Med & Med GD (CCH) P 303,750
**(Cite as: 2011 WL 1231577 (S.D.Tex.))**

**\*31** One other point is worth noting. Procedure codes and DRGs are part of Medicare's Prospective Payment System (PPS). One court has explained PPS as follows:

Under PPS, hospitals are reimbursed based on a pre-determined rate for each Medicare admission. The rate depends on each patient's particular diagnosis and other clinical information. Each patient is classified into a Diagnosis Related Group (DRG) that determines the amount of payment. The DRG payment amounts were derived based on average costs incurred in treating particular conditions. By paying a flat rate based on the patient diagnosis, the PPS system gives providers a financial incentive to provide cost-efficient care.

*United States ex rel. Digiovanni v. St. Joseph's/Candler Health Sys.,* 2008 WL 395012, at \*6 (S.D.Ga. Feb.8, 2008) (citing 42 C.F.R. § 412.2 (f); Health Care Financing Administration, 65 Fed.Reg. 18434–01 (April 7, 2000); American Hospital Directory, Medicare Prospective Payment System, http:// www.ahd.com/pps.html (last visited Nov. 19, 2007)). The PPS is designed to provide an incentive to hospitals to use lower-cost procedures to treat the diagnosis identified in the PPS code. The allegation that the defendants encouraged hospitals to use the FlexView system in part because of the opportunity to profit by performing a lower-cost procedure to treat the diagnosis does not create a reasonable inference that physicians and hospitals knowingly submitted false claims. There must be an allegation that the defendants and the hospitals and physicians knew that using the DRG code 37.3 3 for stand-alone minimally invasive surgical ablations was always incorrect and that code 37.99 was the only correct code. The complaint fails to state a claim for relief.

**C. The Allegations that the Defendants Paid Kickbacks**

The relator alleges that the defendants provided remuneration in various forms to hospitals and physicians to induce them to purchase and use the FlexView system, in violation of the antikickback statute, 42 U.S.C. § 1320a–7b(b)(1–2). The relator alleges that compliance with the antikickback statute is a prerequisite to seeking reimbursement under Medicare and that a false certification of compliance is a basis for a claim under the FCA. *See Thompson,* 125 F.3d at 902; *Graves,* 284 F.Supp.2d at 497. The Fifth Circuit has held that payment of Medicare claims may be "conditioned upon certification of compliance with laws and regulations including the anti-kickback statute." *Id.; see also United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 20 F.Supp.2d 1017, 1041–42 (S.D.Tex.1998) (finding on remand that allegations that the defendant expressly certified compliance with the antikickback statute in annual cost reports sufficiently states a claim under the FCA because the certifications were a condition of retaining Medicare payments made during the prior year and a condition of continued eligibility for the Medicare program).

**\*32** The antikickback statute provides:

(1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind-

(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2) whoever knowingly and willfully offers or

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 32

Not Reported in F.Supp.2d, 2011 WL 1231577 (S.D.Tex.), Med & Med GD (CCH) P 303,750
**(Cite as: 2011 WL 1231577 (S.D.Tex.))**

pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

  (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

  (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof,

shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a–7b(b)(1–2).

   The facts alleged by the relator are insufficient under the applicable case law to state a claim under the certification theory of FCA liability. The cases demonstrate that the basis of liability is the certification of compliance, not the payment or acceptance of remuneration. *See Siewick,* 214 F.3d at 1376–77 (upholding district court's determination on summary judgment that even if the defendants had violated 18 U.S.C. § 207, "a criminal statute aimed at 'revolving door' abuses by former government employees," there was no fact issue as to an FCA violation because defendants were not required to certify compliance with the statute); *Willard,* 336 F.3d at 382–83 (upholding district court's dismissal because the plaintiff only alleged violations of HMO enrollment antidiscrimination laws but did not allege that the United States "conditioned payment ... on any implied certification of compliance with the anti-discriminatory provisions"); *Roop,* 559 F.3d at 824 (upholding district court's dismissal because the plaintiff alleged only violation of FDA medical-device-reporting regulations by selling defective products but did not allege that certification with

these regulations was a prerequisite to payment).

   The relator alleges that the defendants paid unlawful remuneration to hospitals and physicians for their use of the FlexView system, that physicians and hospitals accepted the remuneration, and that physicians and hospitals made reimbursement claims to Medicare. However, the relator has not alleged that the defendants caused any physicians or hospital to make false certifications of compliance. In *Parke—Davis,* the relator's failure to make this allegation warranted dismissal. *See* 147 F.Supp.2d at 55 (noting that the relator did not allege that "Parke—Davis caused or induced a doctor and/or pharmacist to file a false or fraudulent certification regarding compliance with the anti-kickback statute"). Because the relator has not alleged that the defendants caused any hospital or physician to certify compliance with the antikickback statute, these allegations are dismissed.[FN19]

   FN19. As noted, the Fifth Circuit has not adopted implied certification as a theory of FCA liability. *Marcy,* 520 F.3d at 389 (citing *Willard,* 336 F.3d at 381–82); *Southland Mgmt. Corp. .,* 326 F.3d at 679 (Jones, J. concurring); *Steury,* 625 F.3d at 268. The relator can state a claim that "the defendant has made a false certification of compliance with the statute or regulation, when payment is conditioned on that certification." *Graves,* 284 F.Supp.2d at 497; *Steury,* 625 F.3d at 269. Whether the relator alleges that the defendants expressly or impliedly certified compliance with the antikickback statute is unclear. The relator alleges: "Either pursuant to provider agreements, claims forms, or other manner, hospitals and physicians who participate in a federal health care program generally must certify that they have complied with the applicable federal rules and regulations." (Docket Entry No. 58, ¶ 44). The relator does allege that violation of the antikickback statute can cause exclusion from

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 33

Not Reported in F.Supp.2d, 2011 WL 1231577 (S.D.Tex.), Med & Med GD (CCH) P 303,750
**(Cite as: 2011 WL 1231577 (S.D.Tex.))**

Medicare, but she does not allege any specific certification of compliance. (*Id.* at ¶ 43). *Compare Cardiac Devices,* 221 F.R.D. at 345 (identifying the forms on which the compliance certifications were made, where the forms required certification, and the false statements of certification).

**\*33** Even if the relator sufficiently alleged that the defendants' kickbacks caused false certifications, the relator has not provided reliable indicia that physicians or hospitals actually falsely certified compliance. The relator has not identified the " 'who, what, when, where, and how' " the alleged false certifications. *See Lam,* 481 F.Supp.2d at (citing *Thompson,* 125 F.3d at 903). The relator has not identified a physician or hospital falsely certifying compliance with the antikickback statute in applying for Medicare reimbursement for surgical ablation using the FlexView system; when such a false certification was made; or how such a false certification was made. Instead, the relator has alleged different types of remuneration provided by the defendants and identified certain hospitals and doctors performing stand-alone surgical ablations. These allegations do not provide reliable indicia that there were actual false certifications of compliance. *See id.* at 687 (dismissing allegations of false certifications of compliance with antikickback statute even though the relators named the "who" because the relators did not allege "even one specific illegal referral" or the specific times of the fraud); *Carpenter,* 723 F.Supp.2d at 405 (dismissing allegations of an off-label pharmaceutical kickback scheme because the relator could not "offer any particulars as to names, dates, amounts, or the incentives doctors are alleged to have been offered"); *United States ex rel. Kennedy v. Aventis Pharms.,* 610 F.Supp.2d 938, 945 (2009) (the relators "identified a number of hospitals to which Aventis allegedly gave kickbacks disguised as unrestricted grants to induce their continued use and/or promotion of Lovenox for unapproved indications," but failed to allege "that one or more of the hospitals

falsely certified, in connection with a Medicare claim, that it had complied with the anti-kickback statute; the failure to identify "any certification by a hospital," caused dismissal). The relator fails to identify any hospitals or physicians who certified compliance with the antikickback statute. These allegations are dismissed.

**D. The Retaliation Allegations**
    The relator alleges that the defendants retaliated against her for challenging the legality of their marketing practices by firing her. She asserts that this violated both section 3730(h) of the FCA and Illinois law. Section 3730(h), the FCA's antiretaliation provision, states:

Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

**\*34** The *prima facie* elements of a retaliation claim under the False Claims Act are that: (1) the employee engaged in protected activity under the statute; (2) the employer knew that the employee engaged in protected activity; and (3) the employer discriminated against the employee because she engaged in protected activity. *Graves,* 284 F.Supp.2d 487, 510 (S.D.Tex.2003), *aff'd,* 111 F. App'x 296 (5th Cir.2004)

    Similarly, Illinois law recognizes a tort for "retaliatory discharge." *Zimmerman v. Buchheit of Sparta, Inc.,* 164 Ill.2d 29, 206 Ill.Dec. 625, 645 N.E.2d 877, 880 (Ill.1994). "A plaintiff states a valid claim for retaliatory discharge only if she alleges that she was (1) discharged; (2) in retaliation for her activities; and (3) that the discharge violates a clear mandate of public policy." *Id.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 34

Not Reported in F.Supp.2d, 2011 WL 1231577 (S.D.Tex.), Med & Med GD (CCH) P 303,750
**(Cite as: 2011 WL 1231577 (S.D.Tex.))**

The relator's complaint does not allege suffi-cient factual allegations for either her FCA or Illinois retaliation claims. *Cuvillier,* 503 F.3d at 401. For both claims, the relator alleges only that she "challenged the legality of the Defendants' ... marketing techniques both during her initial training and during a national sales meeting" and that she "was reprimanded, harassed and discharged by Defendants as a direct cause of her acts challenging Defendants' marketing approach as unlawful." (Docket Entry No. 58, ¶¶ 127–28). Courts have held that such threadbare recitations of the elements of an FCA retaliation claim do not meet Rule 12(b)(6)'s pleading standard. *See United States ex rel. Davis v. Prince,* 2010 WL 2679761, at *4 (E.D.Va. July 2, 2010) (dismissing FCA retaliation claim when the plaintiff only alleged that "the de-fendants wrongfully terminated [the relator] for seeking to rectify the abuses occurring in the Jordan offices").[FN20] Nor do threadbare recitations of the elements of an Illinois retaliation claim meet Rule 12(b)(6)'s pleading standard. *See Fleszar v. Am. Med. Ass'n,* 2010 WL 1005030, at *9 (N.D.Ill. Mar.11, 2010) (dismissing complaint because the plaintiff alleged only that she "was discharged ... in retaliation for her reporting perceived violations of state and federal law to ... management and to state and federal agencies"); *United States v. Thorek Hsp. and Med. Ctr.,* 2007 WL 2484333, at *1 (N.D.Ill. Aug.29, 2007) (dismissing as conclusory allegations that the plaintiff refused to assist doc-tors to create claims she believed to be false and that she was fired because of her refusal). The relat-or's allegations do not state a claim for relief under the FCA or Illinois law.

> FN20. Courts have also held that to prevail on an FCA retaliation claim, the plaintiff must do more than "challenge" the defend-ant; she "must have specifically investig-ated or complained about the employer making false claims for federal funds, and the employee must show that the employer knew of the investigation or complaint." *See Bouknight v. Houston Ind. Sch. Dist.,*

2008 WL 110427, at *4 (S.D.Tex. Jan.8, 2008); *United States v. Columbia Health-care Corp.,* 2005 WL 1924187, at * 13 ("In addition, the protected conduct ele-ment requires that a whistleblower must re-port or investigate attempts to defraud the government."); *United States ex rel. Bar-rett v. Columbia/HCA Healthcare Corp.,* 251 F.Supp.2d 28, 38 (D.D.C.2003) (nothing that the FCA retaliation provision requires that "an employee be investigating false or fraudulent claims aimed at extract-ing money from the government." (citing *United States ex rel. Hopper v. Anton,* 91 F.3d 1261, 1269 (9th Cir.1996); *Hammack v. Automated Info. Mgmt., Inc.,* 981 F.Supp. 993, 996 (N.D.Tex.1997)); *Luckey v. Baxter Healthcare Corp.,* 2 F.Supp.2d 1034, 1055 (N.D.Ill.1998) ("[T]he employ-ee must, at least to some degree, couch her concerns or investigation in terms of funds her employer fraudulently obtained from the government.").

The relator argues that an Illinois district court's decision in *Jones v. Park Forest Coop. IV,* No. 09–C–2653, 2010 WL 748147 (N.D.Ill. Feb.26, 2010), establishes that allegations that a plaintiff complained about an activity and was discharged plausibly states a claim for relief for retaliatory dis-charge under Illinois law. In *Jones,* the plaintiff's complaint contained factual allegations. The court, citing the plaintiff's complaint, wrote:

**\*35** On December 12, 2006, Tas completed an al-legedly false disciplinary report of plaintiff. (*Id.* ¶ 18.) On December 15, 2006, plaintiff complained to Tas about being unfairly disciplined when Sandy Isaac, a bookkeeper employed by the de-fendant whose job duties included making the health benefit plan payments to the insurance car-rier, had not been disciplined for her failure to pay the insurance carrier in a timely manner. (*Id.* ¶¶ 13, 22 .) Plaintiff openly demanded reimburse-ment for out-of-pocket medical expenses incurred

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1231577 (S.D.Tex.), Med & Med GD (CCH) P 303,750
**(Cite as: 2011 WL 1231577 (S.D.Tex.))**

as a result of the failure to pay the healthcare insurance premiums. (*Id.* ¶ 61b-c.)

Plaintiff alleges that Isaac, who reported directly to Tas, sought to persuade Tas to terminate plaintiff due to his complaints and his assertion of racial discrimination. (*Id.* ¶¶ 25–26.) After December 15, 2006, plaintiff received false, adverse, work-related performance reports made to justify his subsequent termination. (*Id.* ¶ 23.) In April and May 2007, Tas issued plaintiff official warnings of imminent termination for substandard performance. (*Id.* ¶¶ 44–45.) Shortly thereafter, Tas terminated plaintiff. (*Id.*).

*Id.* at *1. These allegations provide far more detail than the relator's complaint. *Jones* does not provide a basis to deny the defendants' motion to dismiss.

The relator also cites three Illinois appellate court decisions to support her contention that allegations that the plaintiff complained and was discharged state a plausible claim for relief. In both cases, the court applied the "fair notice" pleading standard rejected in *Twombly* and *Iqbal. See Sherman v. Kraft Gen. Foods, Inc.,* 272 Ill.App.3d 833, 209 Ill.Dec. 530, 651 N.E.2d 708, (Ill.Ct.1995) ("Dismissal of a cause of action on the pleadings is only proper where it is clearly apparent that plaintiff can prove no set of facts that would entitle him to recover."); *Paskarnis v. Darien—Woodridge Fire Protection Dist.,* 251 Ill.App.3d 585, 191 Ill.Dec. 138, 623 N.E.2d 383, 586 (Ill.Ct.App.1993) (same); *Russ v. Pension Consultants Co., Inc.,* 182 Ill.App.3d 769, 131 Ill.Dec. 318, 538 N.E.2d 693, 696 (Ill.Ct.App.1989) (same). These cases are inapplicable.

The FCA and Illinois retaliation claims are dismissed.[FN21]

> FN21. The defendants also moved to dismiss the relator's Illinois retaliation claims on the basis that the complaint alleges insufficient contacts with that state to justify

the application of Illinois law. As the defendants acknowledge in their brief, the complaint contains insufficient facts to resolve this issue.

**E. Leave to Amend**

The relator requested leave to amend should this court dismiss their complaint. (Docket Entry no. 75). The relator has only amended once, (Docket Entry No. 58), before the filing of the defendants' motion to dismiss. This court grants the relators leave to amend. *See Great Plains Trust Co.,* 313 F.3d at 329; *Adrian,* 363 F.3d at 403. An amended complaint must be filed by April 15, 2011.

**V. Conclusion**

The defendants' motion to dismiss, (Docket Entry No. 68), is granted, without prejudice. The relator may amend her complaint by April 22, 2011,

S.D.Tex.,2011.
U.S. ex rel. Bennett v. Boston Scientific Corp.
Not Reported in F.Supp.2d, 2011 WL 1231577 (S.D.Tex.), Med & Med GD (CCH) P 303,750

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 5866137 (N.D.Ga.)
**(Cite as: 2012 WL 5866137 (N.D.Ga.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Georgia,
Atlanta Division.
UNITED STATES of America ex rel., Victor E. BIBBY
and Brian J. Donnelly, Relators/Plaintiffs,
v.
WELLS FARGO BANK, N.A., individually and as s/
b/m with Wells Fargo Home Mortgage, Inc., et al., De-
fendants.

Civil Action No. 1:06–CV–0547–AT.

Nov. 19, 2012.

Amy L. Berne, Daniel A. Caldwell, III, Laura Kennedy
Bonander, Office of United States Attorney; James Ed-
ward Butler, Jr., Brandon L. Peak, Leigh M. May, Sam-
antha DiPolito, Butler, Wooten & Fryhofer, LLP; Mar-
lan Bradley Wilbanks, Tyrone M. Bridges, Wilbanks &
Bridges, LLP; Mary Louise Cohen, Timothy P. McCor-
mack, Phillips & Cohen, for Plaintiff.

William Vance Custer, IV, Bryan Cave, LLP; Amy
Pritchard Williams, Robert J. Sherry, K & L Gates;
Charles T. Huddleston, Linda Ann Klein, Baker, Donel-
son, Bearman, Caldwell & Berkowitz, PC; David Lewis
Balser, King & Spaulding, LLP, for Defendants.

### ORDER

AMY TOTENBERG, District Judge.

| TABLE OF CONTENTS | |
| --- | --- |
| Summary | 2 |
| Standard for Motions to Dismiss | 2 |
| Factual Background | 3 |
| Discussion | 8 |
| Applicability of FERA Amendments | 8 |
| Rule 9(b) Pleading Standard | 10 |
| Materiality | 25 |
| Donnelly Bankruptcy | 29 |
| Conclusion | 33 |

### I. SUMMARY

**\*1** This matter is before the Court on Defendant
Wells Fargo Bank, N.A.'s ("Wells Fargo") Motion to
Dismiss [Doc. 168]. Relators allege that Defendant has
engaged in a fraudulent scheme to overcharge veterans
on closing costs during the origination of loans under a
United States Department of Veterans Affairs ("VA")
loan refinancing program. Relators allege that Defend-
ant created false documents and made false demands for
payment under void VA loan guarantees in violation of
the False Claims Act.

For the reasons set forth below, the Court

**GRANTS IN PART** and **DENIES IN PART** Defend-
ant Wells Fargo's Motion to Dismiss Relators' Second
Amended Complaint ("Second Amended Complaint" or
"SAC").

### II. STANDARD FOR MOTIONS TO DISMISS

*A. Standard Under Rule 12(b)(6 )*

Defendant has moved to dismiss Relators' Second
Amended Complaint for "failure to state a claim upon
which relief can be granted." FED.R.CIV.P. 12(b)(6). A
pleading fails to state a claim if it does not contain al-
legations that support recovery under any recognizable

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 5866137 (N.D.Ga.)
**(Cite as: 2012 WL 5866137 (N.D.Ga.))**

legal theory. 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1216 (3d ed.2002); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). In considering a Rule 12(b)(6) motion, the court construes the pleading in the non-movant's favor and accepts the allegations of facts therein as true. *See Duke v. Cleland,* 5 F.3d 1399, 1402 (11th Cir.1993). The pleader need not have provided "detailed factual allegations" to survive dismissal, but the "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). In essence, the pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 570).

### III. FACTUAL BACKGROUND[FN1]

> **FN1.** Consistent with the above-described standard, the Court accepts the facts pled in the Second Amended Complaint as true in evaluating Defendant's Motion to Dismiss.

Relators Victor E. Bibby and Brian J. Donnelly are licensed mortgage brokers. Through their company, U.S. Financial Services, Inc., d/b/a Veteran's Mortgage, they specialize in the brokering and origination of VA loans, including through the VA Interest Rate Reduction Refinancing Loan ("IRRRL") program. (2d Am.Compl.¶ 54.) Since 2001, Relators' company has brokered thousands of VA IRRRL loans across seven states. (*Id.*) As brokers, Relators work directly with veterans to take their applications, gather necessary documents, and connect them with a lender who actually originates the loan. (*Id.* ¶ 52.) The broker acts as an intermediary between lender and borrower, and the lender must approve the loan application and ensure compliance with VA regulations prior to the loan closing. (*Id.* ¶¶ 52, 55.)

Retired and active duty veterans who have a VA mortgage on the home they currently own are eligible to apply for an IRRRL loan. (*Id.* ¶ 30.) The program al-

lows these veterans to refinance their existing mortgages to take advantage of lower interest rates or shorter repayment terms. (*Id.*) Because the VA designed the IRRRL program with the goal of lowering veterans' mortgage payments through refinancing, and because the resulting mortgage loans are guaranteed by the United States government, the VA strictly limits the closing costs a lender may charge on an IRRRL loan. (*Id.* ¶ 31.) In addition to certain enumerated fees which lenders may charge the veteran, such as recording fees, credit report fees, and fees for title examination and title insurance, the VA authorizes a flat charge not to exceed one percent of the loan amount. (*Id.* ¶ 34.) The permissible fees a lender may charge to a veteran for an IRRRL refinance do not include attorney's fees for closing the loan. (*Id.*) Rather, the lender must pay any closing attorney's fees from its own funds or as part of the 1% origination fee it is permitted to assess the veteran. (*Id.* ¶ 36.) Lenders are required to affirmatively certify to the VA that they have complied with the VA rules and regulations for each IRRRL loan. (*Id.* ¶ 37.) This written certification is a condition precedent to the VA's issuance of a loan guaranty. (*Id.*)

**\*2** Through their work brokering IRRRL loans, Relators learned that Defendants were routinely violating the VA rules and regulations and falsely certifying to their compliance with these rules. (*Id.* ¶ 61.) Relators' practice was to inform prospective IRRRL borrowers of the expected attorney's fee charge (along with other anticipated closing costs for the loan) on the "Good Faith Estimate," a form that brokers and lenders provide to a loan applicant early in the application process. (*Id.* ¶ 56.) The lender was then responsible for listing all finalized charges on the HUD form provided to the borrower at the loan closing. (*Id.*) However, Relators observed that the lender was altering the HUD forms in order to avoid showing a charge for attorney's fees, and instead lumping that charge in with title examination or title search fees. (*Id.*) Eventually, the lender began instructing Relators not to show a charge for attorney's fees in the Good Faith Estimate, but instead to add the attorney's fees into the title examination fee. (*Id.* ¶ 57.) When Relators contacted the VA for guidance regarding this issue, the VA referred them to the VA Lender

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 5866137 (N.D.Ga.)
**(Cite as: 2012 WL 5866137 (N.D.Ga.))**

Handbook. (*Id.* ¶ 58.) Relators learned from reviewing the VA Lender Handbook that attorney's fees may not be charged to a veteran and must come out of the lender's 1% flat charge per the VA regulations. (*Id.* ¶ 60.) Although title search and examination charges may be assessed to the veteran, VA regulations prohibit charging more than the reasonable and customary amount for this work. (*Id.* ¶ 61.) Relators allege that Defendant lender has routinely inflated the amounts charged for title examination and title search "for the purpose of hiding that they were charging veterans for unallowable attorneys [sic] fees and other fees." (*Id.*)

Relators provide a specific example loan originated by Defendant to demonstrate how the bank concealed unauthorized attorney's fees by adding them to title search and examination fees and falsely certified to the VA full compliance with program rules, thereby obtaining an unauthorized VA guaranty. (*Id.* ¶¶ 97–110.) Relators aver based on their extensive experience originating IRRRL loans in seven states that the reasonable and customary charge for title search and examination fees ranges from $125 to $200. (*Id.* ¶ 63.) In the example loans pled, Defendant charged veterans padded title search and examination fees of $450, $745, and even $950. (*Id.* ¶¶ 98, 99, 101.)

Based on their experience brokering IRRRL loans with Defendant, Relators allege that Defendant fraudulently submitted multiple false certifications to the VA in connection with each loan containing improper closing costs. Relators allege that when requesting the loan guaranty Defendant submitted VA Form 26–8923, the "Interest Rate Reduction Refinancing Loan Worksheet," to the VA. (*Id.* ¶ 90.) On line 8 of this worksheet, Defendant was required to list the "allowable closing costs" for the loan. (*Id.*) Defendant committed fraud by hiding unallowable attorney's fees within other permissible charges and then expressly certifying that the information provided on the form was "true, accurate and complete." (*Id.*) Defendant falsely certified to the VA that the HUD form for each noncompliant loan signed at the closing was a "true and accurate account of the transaction." (*Id.* ¶ 91.) Defendant also submitted Form 26–1820 to the VA for each IRRRL loan. (*Id.* ¶ 92.) On

this form, Defendant expressly certified that it "[had] not imposed and will not impose any charges or fees against the veteran borrower in excess of those permissible under the schedule as set forth in paragraph (d) of 38 C.F.R. 36.4312." (*Id.*) For loans where Defendant charged veterans for attorney's fees in excess of the 1% flat origination fee allowed, this certification was false. (*Id.* ¶ 93.)

**\*3** Relators allege that the example loan, in addition to other noncompliant IRRRL loans originated by Defendant, went into default and foreclosure, resulting in a claim on the guaranty. The nationwide default rate for IRRRL loans is 18%. (*Id.* ¶ 78.) Of VA loans that go into default, approximately 50% result in foreclosure. (*Id.* ¶ 79.) When an IRRRL loan goes into default, the VA expends funds by virtue of its guaranty obligation regardless of whether the default results in foreclosure. (*Id.* ¶¶ 72–76, 111.) VA regulations require a lender to notify the VA of a borrower's default after the 61st day of nonpayment.[FN2] (*Id.* ¶ 73.) The VA then takes an array of steps to attempt to avoid foreclosure, including reimbursing the servicing lender for costs incurred in protecting the value of the collateral and making incentive payments to the servicing lender when it succeeds in working with the borrower to bring the loan out of default. (*Id.* ¶¶ 73–76.) Relators allege that the average cost to the VA of a default on an IRRRL loan is $15,000, even when the VA is successful in avoiding foreclosure. (*Id.* ¶ 81.) Between 2001–2008, Relators allege that the VA has expended in excess of $2.5 billion in taxpayer funds on payments to various lenders resulting from defaulted IRRRL loans. (*Id.* ¶ 83.) Relators aver that Defendant has benefited from unauthorized VA guarantees on thousands of IRRRL loans that are not qualified for the guaranty by virtue of noncompliance with the limits on allowable closing costs. (*Id.* ¶ 86.)

> FN2. Relators allege that the submission of the Notice of Default, Form 26–6850(a), for a loan tainted by unauthorized closing costs constitutes a false claim. (2d Am.Compl.¶ 95.) For loans where the default is not cured, this form is followed by Form 26–1874, Claim Under

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 5866137 (N.D.Ga.)
**(Cite as: 2012 WL 5866137 (N.D.Ga.))**

Loan Guaranty. (*Id.* ¶ 96; Griffin Decl. Ex. Q, Doc. 166–4 at 434–35.)

## IV. DISCUSSION

Defendant Wells Fargo has moved to dismiss Relators' Second Amended Complaint on two grounds. First, Defendant argues that Relators have failed to plead their claims with sufficient particularity under Federal Rule of Civil Procedure 9(b). Second, Defendant claims that Relators have not identified the particular false claim that was allegedly submitted to the government. The Court addresses each argument in turn after addressing the preliminary matters of the applicable version of the statute appropriate for consideration on the motion to dismiss.

*A. Applicability of FERA Amendments*

Defendant argues that Relators' SAC does not apply to claims pre-dating the Fraud Enforcement and Recovery Act of 2009 ("FERA") because the Eleventh Circuit has held that FERA is not retroactive. In May 2009, Congress enacted FERA, which amended and renumbered sections of the False Claims Act. *See* Pub.L. No. 111–21, 123 Stat. 1617. In relevant part, FERA renumbered 31 U.S.C. §§ 3729(a)(1) and (a)(2) of the FCA as §§ 3729(a)(1)(A) and (a)(1)(B). Defendants contend that by citing §§ 3729(a)(1)(A) and (a)(1)(B) —the post-FERA numeration—Relators' SAC "reflects a conscious decision to plead only under the post-FERA FCA" and, therefore, encompasses only Relators' post-FERA claims. In support of this contention, Defendant contrasts the original complaint's citation to pre-FERA numeration.[FN3]

> FN3. The Court notes that while Relators' SAC cites to the post-FERA numeration, the applicability of FERA's amendments is a question to be determined by the Court. Relators do not forfeit pre-FERA claims simply by referencing post-FERA numeration. Furthermore, Defendant's contention that the SAC reflects "a conscious decision to plead only under the post-FERA FCA" is unconvincing. In addition to renumbering portions of the FCA, FERA also amended the FCA's language. For example, FERA amended 31 U.S.C. § 3729(a)(2) (2003)

by replacing the phrase "knowingly makes ... a false record or statement *to get a false or fraudulent claim paid or approved by the government* " with the phrase "knowing makes ... a false record or statement *material to a false or fraudulent claim.*" Pub.L. No. 111–21, § 4, 123 Stat. 1617, 1621 (emphasis added). When citing this section, Relators' SAC does not adopt either phrase specifically, but rather paraphrases the relevant language. This leaves only the SAC's citation to the post-FERA renumeration to suggest any explicit recognition of the FERA amendments by Relators. That, alone, is insufficient to justify forfeiture of Relators' pre-FERA claims, as Defendant argues.

**\*4** The Eleventh Circuit has ruled that FERA is retroactive to claims for payment submitted to the federal government pending on or after June 7, 2008, regardless of when the litigation was filed. *See* Hopper v. Solvay Pharm., Inc., 588 F.3d 1318 n.3 (11th Cir.2009). Section 4(f)(1) of the Act provides that the amendments "shall take effect as if enacted on June 7, 2008, and apply to all claims ... that are pending on or after that date." Pub.L. No. 111–21, § 4(f)(1), 123 Stat. at 1625. The Eleventh Circuit interpreted the word "claim" to mean "any request or demand ... for money or property," as defined by the amended 31 U.S.C. § 3729(b)(2)(A). This language does not mean that all claims pre-dating June 7, 2008 are rendered void, as Defendant would have the Court hold. Instead, § 4(f)(1) merely dictates whether the FCA's pre-FERA or post-FERA language applies to a pending case. *See* Hopper, 588 F.3d at 1318 n.3 (holding that the post-FERA FCA did not apply retroactively to a case in which no claims were pending on or after June 7, 2008). Because Relators' SAC does not identify a false claim for payment pending as of June 7, 2008, the Court finds that FERA does not apply retroactively to this case.[FN4]

> FN4. The Court's citations to U.S.Code sections will, therefore, refer to the pre-FERA sections of the FCA.

*B.* Rule 9(b) *Pleading Standard*

Defendant argues that the Second Amended Com-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 5866137 (N.D.Ga.)

**(Cite as: 2012 WL 5866137 (N.D.Ga.))**

plaint should be dismissed on the basis of Relators' failure to plead with particularity. The Eleventh Circuit requires False Claims Act violations to be pled with particularity under Rule 9(b). *Id.* at 1324. Therefore, Defendant argues that Relators' Second Amended Complaint must set forth facts as to the who, what, when, where, and how of the fraud. *Id.; United States ex rel. Matheny v. Medco Health Solutions, Inc.,* 671 F.3d 1217, 1222 (11th Cir.2012). In contrast to the particularized standard a complainant must use in alleging the mechanics of the fraud, a complainant may plead the scienter portion of fraud generally. *Id.* at 1224; Fed.R.Civ.P. 9(b) (providing that at the pleading stage, "knowledge, and other conditions of a person's mind may be alleged generally").

1. *Government guaranteed loan cases under the FCA*

Before examining Relators' pleading here, it is helpful to consider the body of case law involving FCA claims arising out of fraudulent applications for federally guaranteed loans. In the Supreme Court's first look at government guaranteed loans under the FCA, *U.S. v. McNinch,* 356 U.S. 595 (1958), the government sought to impose liability on a home improvement company that had caused several lenders to file false applications for loan insurance from the Federal Housing Administration ("FHA"). 356 U.S. at 596–97. No default had yet occurred on the loans in question, and the Court concluded that "a lending institution's application for credit insurance under the FHA program [was] not a 'claim' as that term is used in the False Claims Act." *Id.* at 598. The Court expressly left open the question of "whether a lending institution's demand for reimbursement on a defaulted loan originally procured by a fraudulent application would be a 'claim' covered by the [Act]." *Id.* at 599 n.6.

**\*5** In *United States v. Veneziale,* 268 F.2d 504 (3d Cir.1959), the Third Circuit took up the question reserved by the Supreme Court in *McNinch.* The circuit court held that the United States was entitled to relief under the FCA where the defendant caused a couple to make a fraudulent application for an FHA guaranteed loan that later went into default. 268 F.2d at 506. The fraudulent loan application, which "falsely represented

that the loan was wanted for home improvements" when in fact it was used to purchase real property from the defendant, "became one of the essential documents which induced the [FHA] to guarantee payment of the bank loan." *Id.* at 504. The circuit court reasoned that "the wrong of the defendant was an important, even an essential factor in subjecting the government to an enforceable demand for money." *Id.* at 505. The fact that the guaranty obligated the government to make payment to an innocent third party was no barrier to FCA liability. *Id.* The claim was still "grounded in fraud" in that "a fraudulent misrepresentation induced the government to assume the obligation which it has had to perform." *Id.* at 506. Thus, the defendant's fraud in inducing the government to gauranty the loan ripened into a FCA violation when the loan later went into default and the government was required to honor the guaranty. *Id.*

Other circuit courts have followed suit, finding a viable FCA claim in situations where the defendant fraudulently submitted the paperwork necessary to obtain a government assurance and a subsequent default on the loan resulted in the government's expenditure of funds. *See United States v. Ekelman & Assocs., Inc* . 532 F.2d 545, 550–51 (6th Cir.1976) (where defendants caused veterans to submit false applications for VA and FHA guaranteed mortgages, "no cause of action arose under the [FCA] until the mortgage holder presented a claim to the VA or FHA for payment on the guaranty"); *United States v. Rivera,* 55 F.3d 703, 707 (1st Cir.1995) (a lender's claim on the falsely obtained guaranty "in effect completes the perpetrator's violation of the FCA"); *United States v. Van Oosterhout,* 96 F.3d 1491, 1494 (D.C.Cir.1996) ( "It is generally accepted that the false application for a guaranteed loan by the debtor establishes only an 'inchoate' violation of the Act that does not ripen into a claim actionable under the statute until a later event of legal consequence between the lender and the government.... [A]n actual payment to the lender qualifies as the event that effectuates the 'claim' for the government has 'disbursed funds.' ") (citing *United States v. McNinch,* 356 U.S. 595, 599 (1958)).[FN5]

> FN5. *See also United States v. Klein,* 230 F.Supp. 426, 442 (W.D.Pa.1964) (finding de-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 5866137 (N.D.Ga.)
**(Cite as: 2012 WL 5866137 (N.D.Ga.))**

fendants liable under the FCA for procuring veterans to apply for VA guaranteed loans for properties they never intended to occupy, which subsequently went into foreclosure), *aff'd mem.,* 356 F.2d 983 (3d Cir.1966); *United States v. Inc. Villas of Island Park,* 888 F.Supp. 419, 440 (E.D.N.Y.1995) ("[T]he Village's fraudulent conduct caused false claims to be presented to the government by the innocent mortgagee on behalf of purchasers who were illegally selected in violation of the first-come, first-served requirements [of the Community Development Block Grant program]."), *United States v. Goldberg,* 256 F.Supp. 540, 541 (D.Mass.1966) (the essential act for a FCA violation occurred when the defendant defaulted on the FHA-insured loans, which "caused a claim for payment to be presented to the United States"); *United States v. Ettrick Wood Products, Inc.,* 774 F.Supp. 544, 551 (W.D.Wis.1988) (defendants were liable under FCA for creating false application documents to obtain loans guaranteed by the Farmers Home Administration which subsequently went into default).

The government creates subsidized or guaranteed lending programs with a particular public purpose—e.g., to encourage lending to first-time homebuyers, reduce borrowing costs for veterans, or spur community economic development. While a fraudulent application or certification used to obtain a government-backed loan in contravention of this public purpose does not result in an immediate drain on the federal fisc, it does result in the government taking on an obligation to expend funds if the loan goes into default. Thus, the initial fraudulent conduct in obtaining a government guaranty creates an inchoate FCA violation that becomes choate if and when a loan subsequently goes into default and results in a demand for government payment. *See Rivera,* 55 F.3d at 707.

### 2. Collective pleading

**\*6** As an initial matter, Defendant argues that Relators have run afoul of the Rule 9(b) pleading require-

ments by lumping 14 different lenders together in most of the central factual allegations of the complaint. In *Brooks v. Blue Cross and Blue Shield of Florida, Inc.,* 116 F.3d 1364 (11th Cir.1997), the Eleventh Circuit clarified that in a fraud case involving multiple defendants, to comply with Rule 9(b) "the complaint should inform each defendant of the nature of his alleged participation in the fraud." *Id.* at 1381. The plaintiffs in *Brooks* "lumped together" three insurer defendants and an administrator defendant in their fraud-based claims, alleging that each "directly or indirectly, in combination or conspiracy with each other" engaged in racketeering activities. *Id.* The complaint thus failed to meet the requirements of Rule 9(b) because it was "devoid of specific allegations with respect to the separate Defendants" that would inform each individual defendant of the specific acts that gave rise to its liability. *Id.; see also Ambrosia Coal & Constr. Co. v. Morales,* 482 F.3d 1309, 1317 n.12 (11th Cir.2007) (complaint dismissed on Rule 9(b) grounds for failure to describe the nature of each defendant's participation in the joint fraudulent scheme). Thus, a complaint fails to satisfy the 9(b) pleading standard where it makes vague, collective allegations against defendants with different roles.

Here, Relators are not alleging that Defendant acted in concert with various other lenders in a fraudulent scheme. Rather, Relators allege that each lender individually made false certifications of program compliance to the VA before, during, and after the closings of IRRRL loans. (2d Am.Compl.¶¶ 87–96.) Relators then separately describe one example IRRRL loan in which Defendant charged the veteran borrower for unauthorized attorney's fees and hid them by padding the title fees. (*Id.* ¶¶ 97–107.) In the remaining paragraphs, Relators allege that the example loan and other similar loans extended by each lender went into default, resulting in the submission to the VA of false claims for payment. (*Id.* ¶¶ 108–116.) Similarly, the paragraphs summarizing and restating the elements of the FCA claims against each defendant lender apply equally and identically to Defendant Wells Fargo. (*Id.* at ¶¶ 118–128.)

This is not a situation where the collective pleading of fraud-related allegations against "defendants" results

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 5866137 (N.D.Ga.)
**(Cite as: 2012 WL 5866137 (N.D.Ga.))**

in a lack of clarity as to what conduct is alleged against each individual defendant. The substantive allegations would have been unchanged if Relators had copied the relevant paragraphs 10 times and replaced the word "Defendants" with Wells Fargo. Because the collective pleading approach Relators employed has not created confusion regarding the specific conduct attributable to each defendant, this practice does not require dismissal under Rule 9(b). *See Acciard v. Whitney,* No. 207–CV–476–UA–DNF, 2008 WL 5120898 (M.D.Fla. Dec. 4, 2008) (motion to dismiss denied where allegations were grouped together for defendants with the same role and plaintiffs had *not* "su[ed] several defendants that had different parts in a scheme and asserted every allegation against all defendants generally"). Thus, the Court proceeds to determine whether in other respects the complaint is pled with sufficient particularity under Eleventh Circuit precedent.

*3. Pleading with particularity under Rule 9(b)*

**\*7** Relators here allege that Defendant violated the FCA through the presentment of false claims and use of false documents to induce the government to pay false claims on noncompliant IRRRL loans. So-called "presentment" and "use" claims have different elements. To allege a presentment violation under 31 U.S.C. § 3729(a)(1), a relator must plead: "(1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval, (3) with knowledge that the claim was false." *U.S. ex rel. Stephens v. Tissue Sci. Labs, Inc.,* 664 F.Supp.2d 1310, 1315–16 (N.D.Ga.2009). To assert a False Claims Act violation based on use of a false document under 31 U.S.C. § 3729(a)(2), a relator must allege: "(1) the defendant made a false record or statement for the purpose of getting a false claim paid or approved by the government; and (2) the defendant's false record or statement caused the government to actually pay a false claim, either to the defendant itself, or to a third party." *Hopper v. Solvay Pharm., Inc.,* 588 F.3d 1318, 1327 (11th Cir.2009). Based on the analysis below, the Court finds that Plaintiffs' allegations are sufficient to establish a false document claim under § 3729(a)(2), but not a presentment claim under § 3729(a)(1).

Defendant contends that Relators have not provided particularized factual support for their contention that Defendant presented to the government false claims for payment in violation of the FCA. Thus, Defendant argues, neither Relators' use of false documents nor presentment claims can survive dismissal under the principles of pleading that the Eleventh Circuit set forth in *United States ex rel. Clausen v. Lab. Corp. of Am.,* 290 F.3d 1301, 1308–1312 (11th Cir.2002) and its progeny. *See, e.g., United States ex rel. Atkins v. McInteer,* 470 F.3d 1350 (11th Cir.2006); *Hopper,* 588 F.3d 1318.

In *Clausen,* the Eleventh Circuit held that Rule 9(b)'s particularity requirement applies to both the details of the false claim and the presentment of that claim to the United States for payment. " Rule 9(b)'s directive ... does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government.... [A]s with every other facet of a necessary False Claims Act allegation, if Rule 9(b) is to be adhered to, some indicia of reliability must be given in the complaint to support the allegation of an actual false claim for payment being made to the Government." 290 F.3d at 1311.

The Eleventh Circuit's subsequent cases make clear, however, that a somewhat more flexible, case-by-case approach to *Clausen's* principles may be properly applied where the relator's complaint provides "indicia of reliability" that support the relator's allegations that the defendant submitted actual fraudulent claims to the government. *See generally Cade v. Progressive Community Healthcare, Inc.,* No. 1:09–CV–3522–WSD, 2011 WL 2837648, at \*3–7 (N.D.Ga. July 14, 2011) (Duffey, J.) (collecting and synthesizing Eleventh Circuit qui tam pleading cases). Thus, in *United States ex rel. Walker v. R & F Properties of Lake County, Inc.,* 433 F.3d 1349, 1359–60 (11th Cir.2005), the court found that the relator-nurse practitioner's complaint properly survived dismissal where the plaintiff's allegations were based on her personal employment experience within defendant's medical practice and her conversations with the office

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 5866137 (N.D.Ga.)

**(Cite as: 2012 WL 5866137 (N.D.Ga.))**

administrator regarding the billing procedures at issue. *See also United States ex rel. Matheny,* 2012 WL 555210, at *10 ("As Defendants recognize, we are more tolerant toward complaints that leave out some particularities of the submissions of a false claim if the complaint also alleges personal knowledge or participation in the fraudulent conduct."); *Hill v. Morehouse Medical Associates, Inc.,* No. 02–14429, 2003 WL 22019936, at *3, *5 (11th Cir. Aug. 15, 2003) (observing that " Rule 9(b)'s heightened pleading standard may be applied less stringently ... when specific 'factual information [about the fraud] is peculiarly within the defendant's knowledge or control' " and where plaintiff pled sufficient facts as an employee based on her first hand witnessing of the fraudulent conduct to provide "the indicia of reliability that is necessary in a complaint alleging a fraudulent billing scheme"); *Clausen,* 290 F.3d at 1314 n.25 (recognizing that Rule 9(b) standard may be relaxed in "appropriate circumstances to aid those alleging prolonged multi-act schemes" provided the relator alleges "at least some examples of actual false claims to lay a complete foundation" for the rest of his complaint); *United States ex rel. King v. DSE, Inc.,* No. 8:08–CV–2416–T–23EAJ, 2011 WL 1884012, at *1–3 (M.D.Fla. May 17, 2011) (Merryday, J.) (finding that where relator's allegation of the falsity of the defendant's certification that defendant's manufactured items complied with contract specifications was based upon his own knowledge and involvement in the manufacturing process, complaint afforded the requisite reliability to support the relator's False Claims Act claims).

**\*8** Relators' allegations manifest some indicia of reliability based on Relators' active role as agents in preparing the mortgage paperwork necessary to obtain the guarantees that later culminated in claim submissions. Acting as mortgage brokers for IRRRL loans, Relators worked directly with veterans applying to refinance with Wells Fargo. (2d Am.Compl.¶¶ 54–56.) Relators helped borrowers complete the loan application and submit the required paperwork to these lenders, and the lenders then instructed Relators on how to prepare the loan package. (*Id.*) Relators received instructions from Defendant not to show the attorney's fees charge on the Good Faith Estimate Relators were required to provide

to the borrower, but rather to add the expected attorney's fees to the charge shown for title examination. (*Id.* ¶¶ 56–57.) Although Relators did not attend loan closings, Defendant sent Relators a copy of the Settlement Statement after each loan closing, and these documents confirmed the concealment of unauthorized attorney's fees ultimately charged to the borrowers. (*Id.* ¶ 65.) Relators' allegations therefore manifest personal knowledge that Defendants made false certifications of IRRRL program compliance, lending reliability to this aspect of their claims.

However, these indicia of reliability do not extend to Defendant's presentment of claims on defaulted loans. Relators do not allege that they had any involvement with Defendant's servicing of IRRRL loans or direct knowledge of how Defendant proceeded when IRRRL loans went into default. Rather, Relators' personal knowledge is limited to the fraudulent scheme surrounding the origination of IRRRL loans—the concealment of attorney's fees improperly charged to veterans and related false certifications of program compliance to the VA in order to obtain an unauthorized guaranty. Relators have pled neither indicia or reliability nor detailed facts regarding the who, what, when, and how of Defendant's actual presentment of false claims to the government through submission of the Claim Under Loan Guaranty, Form 26–1874, for each of the fraudulently guaranteed loans.

For the example loan identified in the complaint originated by Wells Fargo, Relators have attached to their response briefs publicly filed documents showing that the loans went into foreclosure and the VA became the owner of the property.[FN6] However, these documents do not show whether, when, or how Defendant actually submitted a claim to the VA. On the contrary, the foreclosure deed for the First Tennessee loan reveals that First Tennessee no longer owned the loan at the time of foreclosure, suggesting that it almost certainly did not make a claim under the loan guaranty. (*See* Claim Under Loan Guaranty Form, Griffin Decl. Ex. Q, Doc. 166–4 at 434–45, requiring the claimant to certify that it is the owner of the loan.)[FN7]

FN6. Resp. Opp. Wells Fargo Mot. Dismiss,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 5866137 (N.D.Ga.)
**(Cite as: 2012 WL 5866137 (N.D.Ga.))**

DiPolito Decl. Ex. 14, Doc. 239–16; Resp. Opp. First Tennessee Mot. Dismiss, DiPolito Decl. Ex. 15, Doc. 255–17; Resp. Opp. CitiMortg. Mot. Dismiss, DiPolito Decl. Ex. 13, 14, Doc. 264–15, 264–16. As explained above, the Court takes judicial notice of these publicly filed real property records.

FN7. It is possible to allege a viable present-ment claim against a defendant who *causes* the submission of a false claim by an innocent third party. *See United States v. Veneziale,* 268 F.2d 504, 505–06 (3d Cir.1959). However, Re-lators did not plead the claim this way. Instead, they pled no factual detail of the actual submis-sion of any false claim.

The failure to plead the specifics of any actual claim Defendant submitted to the government under void guarantees or indicia of reliability, such as person-al knowledge of Defendant's claim submission process, is fatal to Relators' presentment claims. *Hopper,* 588 F.3d at 1326 (dismissing presentment claim as deficient under Rule 9(b), explaining, "[R]elators do not allege personal knowledge of the billing practices of any per-son or entity. The complaint does little more than haz-ard a guess that unknown third parties submitted false claims for Medicaid reimbursement.").

***9** However, the failure to allege presentment of false claims with particularity does not require dismissal of Plaintiffs' claims against Defendants for the use of false documents or making of false statements under the False Claims Act. This clause of the Act imposes liabil-ity on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." FN8 31 U.S.C. § 3729(a)(2) (2008). The Eleventh Circuit has stated that a claim under § 3729(a)(2) "does not demand proof that the defendant presented or caused to be presented a false claim to the government or that the defendant's false record or state-ment was ever submitted to the government." *Hopper,* 588 F.3d at 1327. "Plaintiffs are not required to allege what they are not required to prove." *Id.* Therefore, to state a use of false documents claim under the FCA a

Plaintiff must plead that a defendant "made a false re-cord or statement for the purpose of getting a false claim paid or approved by the government" and that the government did, as a result, pay or approve a claim to the defendant or a third party. *Id.; Allison Engine Co., Inc. v. United States ex rel. Sanders,* 553 U.S. 662, 665 (2008) ("[A] plaintiff asserting a § 3729(a)(2) claim must prove that the defendant intended that the false re-cord or statement be material to the Government's de-cision to pay or approve the false claim.") A § 3729(a)(2) claim therefore does not require a plaintiff to plead the facts as to the specific element of "presentment" of a false claim with particularity. *Hop-per,* 588 F.3d at 1327.

FN8. As explained above, the May 2009 FERA amendments of the statutory language do not apply retroactively to this case. *See Hopper,* 588 F.3d at 1327 n.3.

Here, Relators have made factually specific allega-tions regarding the mechanics of Defendant's routine practice of creating false documents and making false statements to the VA in order to obtain guarantees on loans that were not qualified for a guaranty under VA regulations. (*See* 2d Am. Compl. ¶¶ 56–111.) As dis-cussed above, Relators have explained the personal basis for their knowledge of these practices, providing indicia of reliability. (*Id.* ¶¶ 56–61.) Moreover, Relat-ors have specifically described an example loan in-volving Defendant where Defendant charged unlawful attorney's fees to the veteran, falsely certified compli-ance with the VA regulations on authorized closing costs, obtained the VA guaranty on the basis of that false certification, and subsequently foreclosed (or sold the loan to another bank who foreclosed), requiring the VA to expend funds. (*Id.* ¶¶ 97–111.) Relators have plausibly pled that Defendant intended its false certifi-cations of compliance with all VA regulations to be re-lied upon by the government in extending a loan guar-anty that would be effective in the event of a default. Relators' quasi-insider status, working directly with De-fendant to calculate the up-front closing costs charged and disclosed (or not disclosed) to veteran borrowers, supplies indicia of reliability supporting the key allega-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 5866137 (N.D.Ga.)
**(Cite as: 2012 WL 5866137 (N.D.Ga.))**

tion of a 31 U.S.C. § 3729(a)(2) claim: the fact that Defendant "made a false record or statement for the purpose of getting 'a false or fraudulent claim paid or approved by the Government.' " *Allison Engine,* 553 U.S. at 671 (quoting 31 U.S .C. § 3729(a)(2)). This false certification was designed to induce, and has induced, government payment.

**\*10** Finally, to plead a claim under 31 U.S.C. § 3729(a)(2) in a manner that satisfies Rule 9(b), Relators must allege with particularity "that [Defendant's] false statements ultimately led the government to pay amounts it did not owe." *Hopper,* 588 F.3d at 1330. Thus, although Relators need not plead the facts surrounding presentment with particularity, they must allege that government payment of a false claim occurred. *Id.* Relators have alleged a specific example loan for Defendant where Defendant's false certifications resulted in the government's payment of amounts it did not owe, as each of these loans resulted in foreclosure. (2d Am.Compl.¶¶ 97–116.) The foreclosure deeds Relators have submitted show that the VA became the owner of the property secured by this example loan; thus the VA clearly expended funds under the falsely obtained guarantees. Thus, Relators allege that Defendant's false certifications resulted in the government's expenditure of funds when called upon to honor these specific guarantees. The Defendant's alleged mode of concealment of its charge for attorney's fees indeed appears particularly designed to give the semblance of regulatory compliance that it knew would be a precondition to "getting" the government's approval of VA loans and payment of the guarantee obligation upon default. Further, Relators plead statistical data suggesting that many thousands of additional loans tainted by Defendant's fraud have gone into default and the VA has suffered enormous losses as a result. (2d Am.Compl.¶¶ 78–85.) In the current economic climate, with the default rate for IRRRL loans at 18% and skyrocketing foreclosures leading to a $25 billion national mortgage settlement with five major banks (several of whom are defendant lenders in this case), Plaintiffs' allegations in support of their claims under 31 U.S.C. § 3729(a)(2) are plausible and sufficient.

Under *Hopper,* Relators have therefore properly

pled violations of 31 U.S.C. § 3729(a)(2) against Wells Fargo. 588 F.3d at 1327–29. *See also Matheny,* 671 F.3d at 1230 (relator pled a use of false document claim under the FCA with sufficient particularity to satisfy Rule 9(b) where the relator alleged "personal involvement in not only the process that lead to a false [document], but the creation of the actual [document] that was submitted"); *United States ex rel. Main v. Oakland City Univ.,* 426 F.3d 914, 916 (7th Cir.2005) ("If a false statement is integral to a causal chain leading to payment, it is irrelevant how the federal bureaucracy has apportioned the statements among layers of paperwork."); *United States v. Klein,* 230 F.Supp. 426, 442 (W.D.Pa.1964) ("Here it is clear that the fraudulent statement in the loan application as to the purpose of the borrowing was an essential inducement to the Federal Housing Administration guaranty upon which the government has now had to pay. Thus the wrong of the defendant was an important, even an essential factor in subjecting the government to an enforceable demand for money."), *aff'd mem.,* 356 F.2d 983 (3d Cir.1966).

*C. Materiality*

**\*11** Defendants further argue that Relators have failed to allege a material falsehood as required under the False Claims Act.[FN9] (Def .'s. Br. Supp. Mot. Dismiss, Doc. 232–1, at 24; *see also* First Tennessee Br. Supp. Mot. Dismiss, Doc. 226–1, at 18–21.) Defendant asserts that Relators have not adequately pled that the false certifications alleged were material to the government's decision to honor the VA loan guarantees. (Def.'s Br. Supp. Mot Dismiss, Doc. 232–1, at 24.) Defendant claims that the VA Lender Handbook establishes that the VA does not void loan guarantees based on the charging of unallowable closing costs, but rather requires lenders to refund such unauthorized costs, when discovered, to the borrower.[FN10] (*Id.*)

FN9. Defendant does not address this argument at length in its brief. However, the Court construes Defendant's position as adopting the arguments of other defendant lenders regarding materiality. The Court therefore cites to the briefs of other lenders in this section.

FN10. Defendant's attempt to avoid potential

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 5866137 (N.D.Ga.)

**(Cite as: 2012 WL 5866137 (N.D.Ga.))**

liability by pointing blame on closing attorneys for the alleged unauthorized closing costs is unavailing. First, the IRRRL program regulations make participating lenders responsible for the closing costs assessed to the veteran borrower. 38 C.F.R. § 36.4313(a) ("[N]o loan shall be guaranteed or insured unless the lender certifies to the Secretary that it has not imposed and will not impose any charges or fees against the borrower in excess of those permissible under ... this section."). Moreover, whether Defendant lender were in fact aware of the impermissible attorney's fees concealed within title charges is clearly an issue of fact inappropriate for resolution on a motion to dismiss.

"To be material, a misrepresentation must have the ability to influence the government's decision-making." *Matheny,* 671 F.3d at 1228. In dealings with a government agency, a false statement is material if it "has a natural tendency to influence agency action or is capable of influencing agency action." *United States ex rel. Fago v. M & T Mortg. Corp.,* 518 F.Supp.2d 108, 118 (D.D.C.2007). If a representation is not material, or not capable of influencing an agency's decision to pay out on a claim, then the claim would not be false. "It is only those claims for money or property to which a defendant is not entitled that are 'false' for purposes of the False Claims Act." *United States v. Southland Mgmt. Corp.,* 326 F.3d 669, 674–75 (5th Cir.2003).

The same argument Defendant advances here was rejected by the *Fago* court on a motion for summary judgment. 518 F.Supp.2d at 118–20. There, M & T Mortgage Corporation claimed that the forged documents submitted to the Department of Housing and Urban Development ("HUD") within the required loan file were not material because they were not among the eleven documents listed in Appendix 17 to the Program Handbook that HUD would consider in deciding to insure a loan. *Id.* at 118. The *Fago* court reasoned that Appendix 17 did not give the impression that the list of documents was exclusive and the Handbook as a whole gave HUD the discretion to review additional information if it "has reason to suspect that fraud has occurred."

*Id.* Further, the Court pointed out that Appendix 17 was merely a "checklist" to help lenders submit all required documentation, "not an official agency regulation promulgated pursuant to the Administrative Procedures Act ." *Id.* Moreover, the governing regulations authorized HUD to consider "any information" in determining if a loan application is fraudulent and should be denied. *Id.* Therefore, the court concluded that a genuine issue of fact existed regarding whether the forged documents were "capable of influencing" HUD's decision and denied summary judgment. *Id.* at 119–20.

Defendant here relies on a number of provisions in the VA Lender Handbook describing how the VA handles different kinds of lender misconduct to support its contention that the charging of unauthorized closing costs does not result in the VA voiding a loan guaranty. However, VA regulations adopted pursuant to the Administrative Procedures Act supersede any information in the Lender Handbook. Those regulations provide in relevant part:

**\*12** [A]ny willful and material misrepresentation or fraud by the lender, or by a holder, or the agent of either, in procuring the guaranty or the insurance credit, shall relieve the Secretary of liability, or ... shall constitute a defense against liability on account of the guaranty or insurance of the loan in respect to which the willful misrepresentation, or the fraud, is practiced.

38 C.F.R. § 36.4328(a)(1).

The VA regulations also specifically provide that a lender's certification of compliance with the IRRRL program rules regarding allowable closing costs is a *condition precedent* to the issuance of a VA loan guaranty. *See* 38 C.F.R. § 36.4313(a) ("[N]o loan shall be guaranteed or insured unless the lender certifies to the Secretary that it has not imposed and will not impose any charges or fees against the borrower in excess of those permissible under paragraph (d) or (e) of this section."). Based on this provision of the regulations, Defendant's certifications of compliance with the limitations on closing costs was an essential condition to obtaining the government guaranty.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 5866137 (N.D.Ga.)
**(Cite as: 2012 WL 5866137 (N.D.Ga.))**

Moreover, even if the Court takes judicial notice of the contents of the Lender Handbook, the VA still maintains great discretion in how it responds to a violation of the IRRRL regulations. The Handbook provides, "If VA finds significant deficiencies in a loan submission, VA will contact the lender regarding any corrective measures needed and any impact on VA's guaranty of the loan." (Griffin Decl. Ex. F, Doc. 166–4 at 278.) When the VA determines that a lender has charged unallowable closing costs to a veteran, the Handbook recommends that a reviewing officer obtain further documentation regarding the closing costs, communicate with a lender by letter and telephone, and finally, "[r]eview the situation and actions already completed with the Chief of Loan Processing or higher authority." (*Id.* Ex. G, Doc. 166–4 at 298–99.) Moreover, the VA Servicer Guide states, "To the extent that a holder fails to comply with VA servicing requirements, regulations and/or laws applicable to the servicing and origination of VA home loans, a claim is subject to adjustment by VA." (*Id.* Ex. W, Doc. 166–4 at 617.) Like the HUD Handbook in *Fago,* the VA Handbook and Servicer Guide give the VA ultimate flexibility and discretion in responding to a lender's assessment of unauthorized closing costs.

Therefore, under the VA Handbook and Servicing Guide and, more importantly, the official VA regulations vetted through the administrative rulemaking process, Relators have pled false certifications that could plausibly materially influence the VA's decision to honor a loan guaranty. A factual challenge to the materiality of the certifications is premature on a motion to dismiss.[FN11]

FN11. Moreover, even if Defendant succeeds in establishing that as a factual matter, the false certification of program compliance is not material to the VA's decision to honor a loan guaranty and the VA would simply have required Defendant to refund the unauthorized closing costs at issue, Relators would still be able to show that the false certifications resulted in the government paying a claim that was *false to the extent of the unauthorized closing costs. See*

*United States v. Rivera,* 55 F.3d 703, 707 (1st Cir.1995) ("The claim was 'false or fraudulent' in that the amount claimed was inflated by $686,349, the amount that defendants pocketed as a result of their fraudulent scheme.") (citing *United States v. Veneziale,* 268 F.2d 504, 506 (3d Cir.1959)).

*D. Donnelly Bankruptcy*

*1. Real Party in Interest*

Wells Fargo further moves to dismiss on the basis of Relator Donnelly's Chapter 7 bankruptcy case. Defendant argues that because Donnelly failed to disclose the claims involved in this case to the Bankruptcy Court, they were never abandoned by the bankruptcy Trustee and are still property of the bankruptcy estate. Therefore, Defendant argues, Relator Donnelly lacks standing to pursue these claims. Although Defendant frames this as an issue of standing, "the issue is really about who can litigate the claim, [the debtor] or the Trustee." *Barger v. City of Cartersville,* 348 F.3d 1289, 1292 (11th Cir.2003) (finding that a debtor met the requirements for standing, including (1) having suffered injury in fact (2) traceable to the defendant (3) that is likely to be redressed, and the relevant question was whether the debtor or trustee was the real party in interest under Rule 17(a)).

**\*13** "Generally speaking, a pre-petition cause of action is the property of the Chapter 7 bankruptcy estate, and only the trustee in bankruptcy has standing to pursue it." *Parker v. Wendy's Int'l, Inc.,* 365 F.3d 1268, 1272 (11th Cir.2004) (citing *Barger,* 348 F.3d at 1292). The commencement of a Chapter 7 bankruptcy case creates a bankruptcy estate and vests in the estate title to virtually all of the debtor's assets. 11 U.S.C. § 541(a)(1) (providing that the bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case"). A cause of action belonging to the debtor as of the commencement of the bankruptcy case is property of the estate. *Id .; Parker,* 365 F.3d at 1272. Property of the estate remains in the estate unless it is disclosed and either exempted by the debtor, administered by the trustee, or abandoned by the trust-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 5866137 (N.D.Ga.)
**(Cite as: 2012 WL 5866137 (N.D.Ga.))**

ee. 11 U.S.C. § 554(d); *Parker,* 365 F.3d at 1272. An asset that is never disclosed in a Chapter 7 bankruptcy case remains property of the estate even after the case is closed. 11 U.S.C. § 554(d). Therefore, for a legal claim belonging to the debtor that was not disclosed, the trustee as representative of the estate is the real party in interest entitled to pursue the claim. *Parker,* 365 F.3d at 1272; *Barger,* 348 F.3d at 1292.

At the time Relators filed the instant suit, in 2006, Relator Donnelly had not yet filed his Chapter 7 bankruptcy case. Thus, at that time, Donnelly owned his interest in this suit and was the real party in interest. However, from the moment he filed his bankruptcy case in 2008, the Chapter 7 Trustee became the real party in interest entitled to pursue the claims. *See Barger,* 348 F.3d at 1292. Rule 17(a) states that an action "must be prosecuted in the name of the real party in interest," but the Court may not dismiss an action for failure to comply with this requirement "until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." Fed.R.Civ.P. 17(a). Although Donnelly's Chapter 7 Trustee has not been formally joined or substituted into the action, he has ratified the action by obtaining an Order from the Bankruptcy Court authorizing Donnelly to pursue these claims on behalf of the estate. (*In re Donnelly,* Bankr.N.D. Ga., Case No. 08–23093, Doc. 34, 37.) Moreover, Rule 25(c) states that "[i]n case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom interest is transferred to be substituted in the action or joined with the original party." Fed.R.Civ.P. 25(c). Thus, since the Court has not previously directed the Chapter 7 trustee to be substituted or joined in this action, Donnelly may continue to pursue it until so ordered. *See Barger,* 348 F.3d at 1292–93.

Pursuant to the Bankruptcy Court's Order entered December 1, 2011, Donnelly is pursuing these claims on behalf of the bankruptcy estate. (*In re Donnelly,* Bankr.N.D. Ga., Case No. 08–23093, Doc. 34, 37.) FN12 The Chapter 7 Trustee filed a motion to approve the settlement agreement with JPMorgan Chase on

April 3, 2012, which the Bankruptcy Court approved on April 24, 2012. (*Id.* Docs. 47, 52.) The $3,510,000 to be paid to Relator Donnelly's estate pursuant to the JPMorgan settlement will exceed the amount of any claims and administrative expenses in the bankruptcy case. (*Id.* Doc. 47 at 4; Doc. 1 at 41, reflecting total liabilities of $750,251 .68.) After all claims and administrative expenses of the estate are paid, Donnelly will be entitled to any funds remaining, and the closing of the bankruptcy case will revest the remaining claims with Donnelly. *See* 11 U.S.C. §§ 726(a)(6), 945(b), 554(c). Therefore, as the Trustee has ratified this suit and his interest in the case is soon to be extinguished, the Court does not require that the Trustee be added as a party at this time. The Court further **DENIES** Defendant's motion to dismiss on this ground.

> FN12. The Court takes judicial notice of these public documents filed in Relator Donnelly's bankruptcy case. *See Halmos v. Bomardier Aerospace Corp.,* 404 F. App'x 376, 377 (11th Cir.2010).

*2. Judicial Estoppel*

**\*14** Further and in the alternative, Defendant argues that Donnelly should be barred from pursuing these claims based on the doctrine of judicial estoppel. "Judicial estoppel is an equitable doctrine that precludes a party from 'asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding.' " *Barger,* 348 F.3d at 1293 (citing *Burnes v. Pemco Aeroplex, Inc.,* 291 F.3d 1282, 1284 (11th Cir.2002)). The applicability of judicial estoppel turns on two factors: (1) whether the plaintiff made the inconsistent statement in a prior proceeding under oath, and (2) whether the inconsistencies were "calculated to make a mockery of the judicial system." *Id.* at 1293–94. These factors are not inflexible, and the Court should consider "all of the circumstances of a particular case" in determining whether judicial estoppel should apply. *Id.*

It is uncontested that Relator Donnelly's prior statement to the Bankruptcy Court that he had disclosed all of his assets, when in fact he had omitted the qui tam claim at issue in this suit, was made under oath. The key

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 5866137 (N.D.Ga.)
**(Cite as: 2012 WL 5866137 (N.D.Ga.))**

question, then, is whether Donnelly's conduct reflected an intent to manipulate the judicial system. Donnelly has attested under oath that he did not disclose the qui tam case when his bankruptcy case was originally filed because he understood that the qui tam suit was then under seal and believed that no public disclosure of the suit could be made. (Donnelly Aff. Re. Bankr.¶¶ 3–5.) Once the seal was lifted on October 3, 2011, Donnelly moved to reopen his bankruptcy case on November 2, 2011, and promptly disclosed the qui tam claims on November 15, 2011. (*Id.* ¶¶ 6–8.) On these facts, the Court concludes that Donnelly's behavior did not evince an intent to make a mockery of the judicial system, and the doctrine of judicial estoppel should not be applied to bar his claims.[FN13] *See Ajaka v. Brooksamerica Mortg. Corp.,* 453 F.3d 1339, 1346 (11th Cir.2006). Accordingly, the Court **DENIES** Defendant's motion to dismiss on the ground of judicial estoppel.

> [FN13.] Moreover, judicial estoppel does not bar the chapter 7 Trustee's interest in Donnelly's claims, as the Trustee made no false or inconsistent statement under oath. *Parker,* 365 F.3d 1268, 1273.

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant Wells Fargo's Motion to Dismiss Relators' claims [Doc. 168]. The Court **DISMISSES** Relators' claims against Wells Fargo under 31 U.S.C. § 3729(a)(1) and **DENIES** Wells Fargo's Motion to Dismiss as to Relators' claims under 31 U.S.C. § 3729(a)(2).

The parties are directed to file a consolidated preliminary scheduling and discovery plan on or before December 5, 2012.

IT IS SO ORDERED.

N.D.Ga.,2012.
U.S. ex rel. Bibby v. Wells Fargo Bank, N.A.
--- F.Supp.2d ----, 2012 WL 5866137 (N.D.Ga.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2012 WL 3581060 (N.D.Ill.)
**(Cite as: 2012 WL 3581060 (N.D.Ill.))**

C
Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois,
Eastern Division.
UNITED STATES of America and the State of
Illinois, ex rel Laurie GESCHREY and Laure
Janus, Plaintiffs–Relators,
v.
GENERATIONS HEALTHCARE, LLC, Odyssey
Healthcare, Inc., Narayan Ponakala, Catherine
Ponakala, and John Does, Defendants.

No. 10 C 2413.
Aug. 14, 2012.

David Joel Chizewer, Frederick H. Cohen, Kathryn
B. Walter, Goldberg Kohn Ltd., Chicago, IL, for
Plaintiffs–Relators.

E. Michael Ciesla, Steven Mark Cloh, Ciesla &
Ciesla, P.C., Northbrook, IL, John Louis Litchfield,
Foley & Lardner LLP, Michael Joseph Hayes, Ab-
ram Isaac Moore, K&L Gates LLP, John Louis
Litchfield, Lisa Marie Noller, Foley & Lardner
Chicago, IL, for Defendants.

### MEMORANDUM OPINION & ORDER

JOAN B. GOTTSCHALL, District Judge.
   **\*1** Plaintiffs–Relators Laurie Geschrey and
Laure Janus ("Relators") are former employees of
hospice-care company Generations HealthCare,
LLC ("Generations"), which was purchased by
Odyssey HealthCare, Inc. ("Odyssey") after Relat-
ors' employment was terminated. Relators brought
an action against Generations, Odyssey, and Genera-
tions's founders Catherine and Narayan Ponakala,
alleging fraud against the United States and the
State of Illinois and retaliation against employees,
under the federal False Claims Act ("FCA"), 31
U.S.C. §§ 3729 et seq., the Illinois False Claims
Act, 740 Ill. Comp. Stat. 175/3, and the Illinois
Whistleblower Reward and Protection Act

("IWRPA"), 740 Ill. Comp. Stat. 174/30. The
United States has declined to intervene in the ac-
tion. Now before the court are Generations's and
Odyssey's motions to dismiss the complaint pursu-
ant to Federal Rules of Civil Procedure 12(b)(6)
and 9(b). The court denies Generations's and Odys-
sey's motions as to Counts I–III of the Complaint
and dismisses Count IV without prejudice. The
court also dismisses Relators' claims against Naray-
an Ponakala without prejudice.

### I. BACKGROUND

   Viewing the facts in the light most favorable to
Relators, as the court must on a motion to dismiss,
the background of this case is as follows. Genera-
tions, located in Westchester, Illinois, is a hospice
company that provides palliative care to terminally
ill patients. During the time period at issue, most of
its patients were Medicare and/or Medicaid recipi-
ents; it had very few patients with private insur-
ance. Generations submitted bills to Medicare twice
a month through an electronic billing system.

   Janus was employed by Generations as a be-
reavement and spiritual-care coordinator and chap-
lain from 2002 until August 2008, when she was
terminated for allegedly pretextual reasons after
raising concerns about the company's practices.
Geschrey, a chaplain and Psych–Social Field Su-
pervisor, was terminated in 2007 for allegedly pre-
textual reasons after she refused to go along with
Generations's practices. Both Relators went to work
for Odyssey before it purchased Generations on or
about December 31, 2009, and Janus still works for
Odyssey. Odyssey hired all of Generations's em-
ployees and put Generations's patients onto its own
patient roster.

### A. Medicare and Medicaid Regulations Govern-
ing Hospice–Care Benefits[FN1]

   FN1. Regulations governing patient certi-
   fication for hospice benefits were revised
   several times during the period Relators

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 3581060 (N.D.Ill.)
**(Cite as: 2012 WL 3581060 (N.D.Ill.))**

worked for Generations, and the regulations have since been revised again. The court relies on language common to the different versions of the regulations. For the purposes of this case, Generations need not have conformed to all of the requirements governing the hospice-certification process that are found in the current hospice-care regulations, enacted in 2011. *See* 42 C.F.R. § 418.22 (2011).

The Department of Health and Human Services reimburses hospice providers for services provided to eligible beneficiaries on a *per diem* basis. Patients are eligible for hospice care if they have a terminal diagnosis and a life expectancy of six months or less and if they have elected to forego further curative treatment. According to Medicare regulation 42 C.F.R. § 418.20, in order "to elect hospice care under Medicare, an individual must be—(a) entitled to Part A of Medicare; and (b) certified as being terminally ill in accordance with § 418.22." The latter section provides that "[t]he certification must specify that the individual's prognosis is for a life expectancy of 6 months or less if the terminal illness runs its normal course." § 418.22(b). The certification statements must be obtained from the hospice's medical director or physician and the individual's attending physician if the individual has one. § 418.22(c). The written certifications must be filed in the patient's medical record. § 418.22(d)(2).

**\*2** According to the version of the regulations in effect since 2006, "[a]n individual may elect to receive hospice care during ... (1) An initial 90–day period; (2) A subsequent 90–day period; or (3) An unlimited number of subsequent 60–day periods." § 418.21 (2006).[FN2] "The hospice must obtain written certification of terminal illness for each of the periods listed in § 418.21, even if a single election continues in effect for an unlimited number of periods." § 418.22(a)(1). The written certification is a prerequisite for payment. § 418.22(a).

> **FN2.** The previous version of the regula-

tions divided the periods into two 90–day periods, followed by a 30–day period, followed by a period of unlimited duration. § 418.21(a) (1993).

Hospice-eligible individuals must also file a statement with the hospice-care provider electing hospice care. § 418.24. The statement includes the provisions that "the individual has been given a full understanding of the palliative rather than curative nature of hospice care," and that payment for Medicare services related to the treatment of the terminal condition is waived by hospice election. § 418.24(b)(2), (d)(2). The hospice then files a notice of election with Medicare to begin the *per diem* payments.

Hospice providers must make services, including nursing services, available on a 24–hour basis. The rate of reimbursement by the government varies depending on the type of care provided: (1) routine (non-continuous) home care, (2) continuous home care "consisting predominantly of nursing case on a continuous basis at home ... during brief periods of crisis," (3) short-term "inpatient respite care" in an approved facility, and (4) general inpatient care in a facility "for pain control or acute or chronic symptom management." § 418.302(b), (c). Regarding (2) continuous home care, the regulations explain that "[e]ither homemaker or home health aide (also known as hospice aide) services or both may be covered on a 24–hour continuous basis during periods of crisis but care during these periods must be predominantly nursing care." § 418.204(a). On any day that the patient is not receiving inpatient or continuous care, the hospice is paid the routine home care rate. The *per diem* rate for routine care (approximately $150 in Cook County) is paid regardless of the actual services provided on a given day. § 418.302(e).

The State of Illinois also covers hospice services for Medicaid recipients. To be eligible for reimbursement, the services must comply with the federal Medicare regulations in 42 U.S.C. §§ 418.1–418.405. *See* Handbook for Hospice Agen-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 3581060 (N.D.Ill.)
**(Cite as: 2012 WL 3581060 (N.D.Ill.))**

cies,
www.hfs.illinois.gov/handbooks/chapter200.html
(last visited August 13, 2012). The certification re-
quirements and categories of care are identical to
those set out in the Medicare regulations. *Id.*

### B. Relators' Allegations of Fraudulent Billing

1. *Improper Enrollment and Fraudulent Certifica-
tions*

Relators claim that Generations recruited and
certified patients that it knew were ineligible for
hospice care because they were not terminally ill. It
then fraudulently billed Medicare and/or Medicaid
for the patients' care on a *per diem* basis.[FN3] Relat-
ors claim that patients were recruited from Chicago
housing projects by Generations's sales staff, and
that the staff, who offered housing-project residents
free medical supplies and other perks, often failed
to explain that signing up for hospice made patients
ineligible for curative treatments. The sales staff
obtained signed election forms prior to medical
staff's evaluation of the patients. Relators claim that
they were involved in the decisions to certify pa-
tients for hospice care because they were part of an
"interdisciplinary team" assigned to each patient. A
nurse and members of the interdisciplinary team
would visit the patient, evaluate the patient's condi-
tion, and meet to report their findings. Based on the
interdisciplinary team's findings, a written certifica-
tion of eligibility for hospice care was prepared and
the notice of hospice election was filed on the pa-
tient's behalf. Generations's medical director would
sign off on the written certification without having
seen the patient.

> FN3. Relators repeatedly use "and/or" in
> their allegations, indicating that they are
> not sure which government program was
> billed for a particular patient's care.

**\*3** Relators allege generally that this procedure
for certifying patients was improper because the
medical director was not using his clinical judg-
ment to assess whether the patient was terminally

ill, as required by the hospice-benefit regulations.
Relators further claim that, when patients were re-
certified, nurses did not actually visit the patients
but relied on vital signs taken by nursing assistants.

Relators also provide specific examples of al-
legedly improper certifications. First, they allege
that patient "G.S." was obese but not terminally ill
and remained in Generations's care "for years." She
was discharged before she died. (Compl.¶ 38.) Pa-
tient "A.W.," a Medicare recipient with
Alzheimer's, was certified as terminally ill, despite
the fact that Janus, a social worker, and a nurse who
visited the patient did not believe she was an appro-
priate candidate for hospice because she could talk,
eat, and walk, which Relators allege were criteria
for determining hospice eligibility for an
Alzheimer's patient. (*Id.* ¶ 42.) The staff who vis-
ited A.W. reported their opinions to Ms. Wickman,
a nurse, and Mrs. Ponakala, but A.W. was certified
as hospiceappropriate, and the government was
billed for her care.

Geschrey and a social worker agreed that an-
other unnamed patient was not an appropriate can-
didate for hospice. Although diagnosed with de-
mentia, she could walk, talk, and eat. Nonetheless,
the patient, who spoke Italian, was certified for hos-
pice after Ms. Wickman told Geschrey to write
"speech unintelligible to writer" in her notes, leav-
ing out the fact that the woman's speech was unin-
telligible only to those who did not speak Italian. (
*Id.* ¶ 43.) Generations billed the government for the
woman's care.

2. *Submission of False Documents*

Relators further allege that Generations submit-
ted false documents to Medicare and Medicaid in
support of its claims for reimbursement. Documents
submitted to the government included written certi-
fications, election notices, bills, and patient care
plans. The billing department was run by Ms. Alina
Sanchez, who set up electronic billing systems with
Medicare and Medicaid and submitted documents
to Medicare when Medicare requested patient docu-
mentation.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Slip Copy, 2012 WL 3581060 (N.D.Ill.)
**(Cite as: 2012 WL 3581060 (N.D.Ill.))**

Relators allege generally that Defendants regularly required nurses to change their notes when they did not support bills submitted to Medicare and Medicaid. When Medicare made a request for documents to audit claims, Relators claim that Ms. Wickman and Mrs. Ponakala required nurses to change notes that did not support the billings before giving the documentation to Ms. Sanchez, who then submitted it to Medicare.

Relators further allege that Generations billed the government for patients who were not receiving services. On one occasion, patient "J.C." was out of the state on the date of a nursing assistant's visit, and therefore ineligible for hospice care on that date. The nursing assistant's notes indicated as much. Relators claim that Mrs. Ponakala required the nursing assistant to alter her notes to indicate that J.C. had "refused services" on the date of the visit. Relators allege that Generations submitted bills to Medicare or Medicaid for J.C.'s care. (Compl.¶ 50.)

### 3. *Fraudulent Billing for Services not Provided*

**\*4** Relators also claim that Generations failed to provide patients with needed services that Generations was required to provide. As an example, they cite the case of patient "E.P.," who was kept on the hospice census for approximately five years before she was discharged. After the discharge, E.P.'s daughter called Generations to request hospice services. Relators allege that an inexperienced nurse diagnosed E.P. with a urinary tract infection and did not readmit her into hospice care. E.P. died hours later. (*Id.* at ¶ 52.)

Relators allege that on another occasion, in 2004, Janus was sent to a patient's home to provide "homemaker" services as a chaplain. Generations billed the government for "continuous home care," which under the Medicare regulations must be predominantly nursing care. No nurse was present, however. Janus repeatedly called to request a nurse, saying that the man needed sedation or pain medication. A nurse arrived and left after giving the man medication, although Janus was not qualified to ad-

minister additional medication. Geschrey was sent to the patient's home to relieve Janus, and her time was also billed as "continuous home care," although again no nurse was present. The patient died within an hour of Geschrey's arrival. (*Id.* at ¶ 54.)

### 4. *Retaliation*

Relators claim that they were fired because they raised concerns to Mrs. Ponakala and Ms. Wickman about Generations's fraudulent practices, including the fact that patients were being improperly certified as terminally ill. Geschrey claims that Generations falsely told other employees that Geschrey had falsified time sheets, and that the Ponakalas sent Geschrey a letter warning her not to speak about what had happened. (*Id.* ¶ 55.) Relators attach to the Complaint a letter from Generations's legal counsel demanding that Geschrey cease and desist from any contact with Generations's clients or employees. (*Id.* Ex. C (Letter), ECF No. 1.) Janus claims that she was fired suddenly for "issues with her documentation," despite spotless personnel records and annual reviews. (*Id.* ¶ 55.) Relators allege that a social worker, Lisa Raubolt, was fired the week before Janus was fired, after raising concerns about A.W.'s enrollment in hospice care. Another nurse was fired after refusing to change her notes when requested to do so. (*Id.* ¶ 56.)

### II. LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint's allegations "must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level.' " *EEOC v. Concentra Health Servs., Inc.,* 496 F.3d 773, 776 (7th Cir.2007) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555–56, 569 n. 14, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Legal conclusions or conclusory allegations that simply recite the elements of a claim are not sufficient to withstand Rule 12(b)(6) scrutiny. *Ashcroft v. Iqbal,* 556 U.S. 662, 681, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Additionally, as the FCA "is an anti-fraud statute," FCA claims "are subject to the heightened pleading require-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 3581060 (N.D.Ill.)
**(Cite as: 2012 WL 3581060 (N.D.Ill.))**

ments of [Federal Rule of Civil Procedure] 9(b)."
*United States ex rel. Gross v. AIDS Research Alliance–Chicago,* 415 F.3d 601, 604 (7th Cir.2005).
To satisfy Rule 9(b), a party "alleging fraud or mistake ... must state with particularity the circumstances constituting fraud or mistake." This is often described as requiring a plaintiff to plead "the who, what, when, where and how" of the alleged fraud. *United States ex rel. Garst v. Lockheed–Martin Corp.,* 328 F.3d 374, 376 (7th Cir.2003). For purposes of a motion to dismiss for failure to comply with Rule 9(b), the court takes the allegations in the complaint as true and makes all reasonable inferences in the plaintiffs' favor. *Borsellino v. Goldman Sachs Grp., Inc.,* 477 F.3d 502, 507 (7th Cir.2007).

### III. ANALYSIS

**\*5** Relators' Complaint alleges four counts. Count I alleges a violation of 31 U.S.C. § 3729(a), based on the presentation of false or fraudulent claims to the federal government. Count II claims a violation of 31 U.S.C. § 3730, which bars retaliatory actions against a person based on their actions "in furtherance of" an FCA claim. Count III claims a violation of the Illinois False Claims Act, 740 Ill. Comp. Stat. 175/3(a). Count IV alleges a violation of the IWRPA, 740 Ill. Comp. Stat. 174/30.

### A. Federal and State Fraud Claims (Counts I & III)[FN4]

> FN4. Defendants' arguments for dismissal of the federal and state-law fraud claims are identical. In this section, the court will address the FCA claim, but its reasoning applies equally to the Illinois False Claims Act, as Illinois courts interpreting the state act look to interpretations of the similarly worded federal FCA. *See, e.g., People ex rel. Levenstein v. Salafsky,* 3 Mass.App.Ct. 654, 338 N.E.2d 844, 850–51 (Ill.App.2003).

#### 1. *Rule 9(b)'s Particularity Requirement*
The False Claims Act makes it unlawful to knowingly (1) "present or cause to be presented to

the United States a false or fraudulent claim for payment or approval, 31 U.S.C. § 3729(a)(1) (2006); [or] (2) make or use a false record or statement material to a false or fraudulent claim, § 3729(a)(1)(B)." *United States ex rel. Yannacopoulos v. Gen. Dynamics,* 652 F.3d 818, 822 (7th Cir.2011) (explaining that the 2009 amendment to § 3729(a)(1)(B) including the "material to" language applies to cases pending on or after June 7, 2008). In a case in which false claims are allegedly presented to the government over many years, a relator is required to plead only representative examples of the alleged violations. *United States ex rel. Obert–Hong v. Advocate Health Care,* No. 99 C 5806, 2001 WL 303692, at \*3 (N.D.Ill. Mar.28, 2001); *see also United States v. Quad City Prosthetic, Inc.,* No. 06 C 4015, 2011 WL 3273142, at \*5 (C.D.Ill. Aug. 1, 2011) (motion to dismiss FCA suit denied because plaintiffs provided examples of claims submitted to Medicare and Medicaid, including time, location, persons responsible, and alleged falsity).

Relators allege that Generations committed three types of fraud against the government: improper enrollment and fraudulent certifications, submission of false documents, and improper billing for services not provided. As to the false certification claim, Defendants argue that Relators plead insufficient facts to support that patients were improperly certified for hospice care. They claim that Relators' personal knowledge of the alleged fraud based on their participation in an interdisciplinary team amounts only to their disagreement with the conclusion that the patients were hospice appropriate. They further argue that Relators fail to identify the certifying physicians who ultimately made the certification decision. Therefore, Defendants contend, the Relators have not satisfied the requirements of Rule 9(b) that allegations of fraud be pleaded with particularity.

To the extent that Relators' allegations of fraud rest on the general charge that patients were certified as terminally ill without being seen by a physi-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 3581060 (N.D.Ill.)
**(Cite as: 2012 WL 3581060 (N.D.Ill.))**

cian, they are groundless. The fact that the medical director did not personally see the patients cannot form the basis for a claim of fraud, because this was not required by the hospice-benefit regulations. Section 418.22(b)(3)(iii) requires that the certifying physician "confirm[ ] that he/she composed the narrative based on his/her review of the patient's medical record or, if applicable, his/her examination of the patient ." It does not require a face-toface examination.[FN5] Furthermore, Relators do not allege with particularity that the certifying physician did not use his clinical judgment in certifying patients for hospice, or identify specific certifications not based on a physician's clinical judgment.

> FN5. The revised version of 42 C.F.R. § 418.22(a)(4) requires that "[a]s of January 1, 2011, a hospice physician or hospice nurse practitioner must have a face-to-face encounter with each hospice patient whose total stay across all hospices is anticipated to reach the 3rd benefit period." By implication, no face-to-face encounter was required during the period covered by the Complaint.

**\*6** Turning to Relators' allegations regarding individual patients, the court finds that the alleged fraud involving G.S. is not pled with sufficient particularity to satisfy Rule 9(b). Relators do not allege who was responsible for G.S.'s certification as terminally ill or why Relators believed the certification was fraudulent, rather than merely contrary to Relators' opinion that G.S. was ineligible for hospice. (*See* Compl. ¶ 38.) Nor are Relators' allegations regarding A.W. sufficient to state a claim of fraud. They allege the date when A.W. was enrolled in Generations's care, the names of those responsible for the allegedly fraudulent certification, and state the basis for Relators' belief that A.W. was not terminally ill. (Compl.¶ 42.) But the fact that Relator Janus, a social worker, and a nurse agreed that the patient was not appropriate for hospice because she could walk, eat, and talk does not suffice to allege that the doctor's certification that A.W. was

appropriate for hospice was fraudulent; it merely alleges that Relator Janus and others disagreed with the doctor's assessment. Relators have not alleged facts demonstrating that the certifying physician did not or could not have believed, based on his or her clinical judgment, that the patient was eligible for hospice care.

The court finds that Relators' allegations regarding the unnamed Italian woman, however, do allege a claim of fraud with particularity. According to the Complaint, Ms. Wickman told Relator Geschrey to write down "speech unintelligible to writer" in her notes in order to falsely imply that the Italian woman was non-communicative, rather than merely a non-English-speaker. (Compl.¶ 43.) That misrepresentation was material to the government's payment of claims submitted for the patient. Relators do not claim a mere difference of opinion, but point to an attempt, personally witnessed by Geschrey, to falsify the notes on which the patient's certification of eligibility for hospice benefits was based. Thus, when the patient was certified for hospice eligibility, the physician could not have done so based on his clinical judgment; that judgment was based on false information. The court concludes that Relators have alleged "a false record or statement material to a false or fraudulent claim," as required by § 3729(a)(1)(B).

As to the claim regarding submission of false documents, Defendants argue that Relators do not provide any specific details of the alleged fraud-they claim only generally that nurses were required to change their notes before documentation was submitted to the government. The court finds that Relators have alleged at least one example of false documents material to a claim for payment that were submitted to the government. Relators allege that although patient J.C. was out of the state, a nursing assistant was required by Mrs. Ponakala to alter his notes to indicate that he had refused treatment, thus allowing Generations to bill the government the *per diem* routine-care rate for his care. (Compl.¶ 50.) This allegation states a specific mis-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 3581060 (N.D.Ill.)
**(Cite as: 2012 WL 3581060 (N.D.Ill.))**

representation material to the government's payment of claims submitted for payment for services provided to J.C.

**\*7** Finally, as to the alleged fraudulent billing of services not provided, Defendants argue that Relators allege no factual support for their claim that the government was billed for any services not rendered. In the case of E.P., the court agrees that Relators have not alleged that bills were actually submitted to the government; E.P. was not certified for hospice care at the time Generations allegedly failed to provide services to her. As to Generations's alleged failure to provide nursing care while billing for "continuous care," however, the court finds that Relators have sufficiently alleged an example of billing for services not provided. According to the Complaint, Janus and Geschrey were dispatched to the home of an actively dying man for nine hours to provide nursing services that they were not qualified to perform. Generations allegedly billed the government for these services at the "continuous care" rate, even though no nurse was present during Geschrey's shift, and a nurse made only a brief appearance during Janus's shift. (Compl.¶¶ 53–54.) As continuous care must be "predominantly nursing care," § 418.302, billing for the services at the continuous-care rate constituted a misrepresentation material to the claims submitted for payment. Relators' allegations support the conclusion that claims submitted for reimbursement at that rate were fraudulent because the services provided to the patient did not support such billing.

### 2. Nexus between Allegations and a Claim for Payment

Defendants argue that even if the Relators have alleged the details of a scheme to present fraudulent bills to the government, they have failed to allege with the required particularity that Generations actually *submitted* claims to the government. Defendants are correct that "[t]he False Claims Act does not create liability merely for a health care provider's disregard of Government regulations or im-

proper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe." *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.,* 290 F.3d 1301, 1311 (11th Cir.2002) (citing cases from the First, Fourth, Fifth, and Eighth Circuits). "Without the *presentment* of such a claim, while the practices of an entity that provides services to the Government may be unwise or improper, there is simply no actionable damage to the public fisc as required under the False Claims Act." *Id.* (citing *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 785 (4th Cir.1999)).

Defendants argue that Relators have not specified the actual submission of claims to the government, but have instead alleged in conclusory fashion that Generations billed Medicare and/or Medicaid for patients' care. The court notes that in so arguing, Defendants cite no cases from the Seventh Circuit. In this circuit, a relator does not need to have actually witnessed the "specific request for payment" or to have had access to paperwork submitted to the government. One of the most recent cases from the Seventh Circuit on this issue is *United States ex rel. Lusby v. Rolls–Royce Corp.,* 570 F.3d 849 (7th Cir.2009). In *Lusby,* the Seventh Circuit explained that it is not "essential for a relator to produce the invoices (and accompanying representations) at the outset of the suit. True, it is essential to show a false statement. But much knowledge is inferential." *Id.* at 854. The Seventh Circuit deemed it a plausible inference that a fraudulent claim was submitted to the government where the firm's contract with the government required it to submit a particular form. The Seventh Circuit concluded that if the defendant "submitted [the form], knowing the representations to be false, then it committed fraud." *Id.* The court added that, although it was possible that payments were made without the submission of the fraudulent documentation, the possibility was slim, and "a pleading [need not] exclude all possibility of honesty in order to give the particulars of fraud. It is enough to show, in detail, the nature of the charge, so that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 3581060 (N.D.Ill.)
**(Cite as: 2012 WL 3581060 (N.D.Ill.))**

vague and unsubstantiated accusations of fraud do not lead to costly discovery and public obloquy." *Id.* at 854–55.

**\*8** Despite Relators' lack of specific knowledge about billings submitted to the government, the fact that most of Generations's patients were receiving government benefits and Generations billed Medicare and Medicaid at a *per diem* rate for each covered patient creates a strong inference that bills for the care of patients as to whom fraud has been alleged were submitted to the government. The Complaint alleges that "Generations has mostly Medicare/Medicaid patients because its main service area includes the underserved people on the south side of Chicago. It does have some patients with private insurance, but very few." (Compl. ¶ 7 .) Relators do not specify in each example whether Generations billed Medicaid, Medicare, or both. Even so, the facts as pleaded support the inference that claims based on fraudulent misrepresentations were submitted to one or both of the government programs. Although there is a slim possibility that the alleged fraud might have been committed only in connection with Generations's "very few" patients with private insurance, at the pleading stage, Relators need not exclude all possibility of honesty.

In addition, the court considers Relators' positions at Generations when assessing what information is required of them. The Seventh Circuit has recently noted the importance of balancing detail with flexibility in applying the Rule 9(b) standard, criticizing courts and litigants that cling too tightly to the incantation of "who, what, when, where, and how," rather than understanding that the information required of a plaintiff will differ in each case. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.,* 631 F.3d 436, 441–42 (7th Cir.2011) (citing *Emery v. Am. Gen. Fin., Inc.,* 134 F.3d 1321, 1323 (7th Cir.1998) (allowing greater flexibility when information lies outside of plaintiff's control)). As Relators' duties primarily involved providing spiritual care and supervising other spiritual care or field care employees, they

had no access to billing documents and no way to know which government program was being billed for each patient at the time of each alleged incident of fraud. *See Emery,* 134 F.3d at 1323 (plaintiffs not required to allege facts they could not acquire without discovery); *Lusby,* 570 F.3d at 854 (plaintiffs not required to provide invoices at the pleadings stage); *Pirelli,* 631 F.3d at 444 (noting in dicta that a *"qui tam* relator surely lacked access to reimbursement data from third-party payors that would have allowed him to provide additional circumstances corroborating the existence of fraud").

Finally, contrary to Defendants' argument, Defendants and the court are not "left to ponder who was actually billed, how the billing occurred, who submitted the bills, and what was actually included on any such bills." (Defs.' Reply at 5.) Relators allege that billing was handled by Alina Sanchez, that Medicare billings were submitted every two weeks, that Ms. Sanchez answered to Ms. Wickman and Mrs. Ponakala, and that Ms. Wickman and Mrs. Ponakala instructed staff to provide false documentation to Sanchez in support of billings. (Compl.¶¶ 44, 50.) Relators allege that billing submitted to the government included payment claims for patients not eligible for hospice care, *per diem* billing for absent patients, and continuous-care billing for care not predominantly provided by a nurse. The court finds that Relators' Complaint makes the alleged fraud in the billing process sufficiently clear to allow Defendants to respond to the allegations. Defendants' motion to dismiss Counts I and III is denied.

## B. Federal and State Retaliation Claims (Counts II and IV)

### 1. FCA Retaliation Claim

**\*9** Relators allege that they were fired because they raised concerns to Mrs. Ponakala and Ms. Wickman about Generations's fraudulent practices, including the fact that patients were improperly certified as terminally ill. Relators claim that they were discharged in violation of the FCA's protec-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 3581060 (N.D.Ill.)
(Cite as: 2012 WL 3581060 (N.D.Ill.))

tions against retaliation in employment, pursuant to 31 U.S.C. §§ 3730(h)(1) and (2), which state:

Any employee who is discharged ... because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

31 U.S.C. § 3730(h). To state an FCA retaliatory discharge claim, Relators must allege that (1) their "actions were taken 'in furtherance of an FCA enforcement action and were therefore protected by the statute;'" (2) their employer knew they were engaged in this protected conduct; and (3) their "discharge was motivated, at least in part, by the protected conduct." *Fanslow v. Chi. Mfg. Ctr., Inc.,* 384 F.3d 469, 479 (7th Cir.2004).

Defendants argue that Relators fail to allege that they engaged in protected activity during their employment, as they simply raised concerns privately with Generations. Seventh Circuit case law is not entirely clear as to when such internal complaints can constitute protected conduct. In a 2002 case, the Seventh Circuit held that a plaintiff who expressed concern about billing practices and contacted Medicare for information about billing rules did not engage in protected conduct because his actions did not put his employer on notice of a possible *qui tam* action. *Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.,* 277 F.3d 936, 944 (7th Cir.2002); *see also United States ex rel. Ramseyer v. Century Healthcare Corp.,* 90 F.3d 1514, 1523 (10th Cir.1996) (plaintiff's conduct in advising her superiors of non-compliance with Medicaid program requirements did not suggest to employer that she intended to bring an FCA action.); *c.f. DeCalonne v. G.I. Consultants, Inc.,* 197 F.Supp.2d 1126, 1135 (N.D.Ind.2002) (denying summary judgment for defendant on FCA retaliation claim where plaintiff contacted defendant's legal counsel, raised issues at a board meeting, characterized de-

fendant's conduct as illegal, and sought the advice of an outside attorney). Subsequently, however, the Seventh Circuit has indicated that at least some "type of internal complaints [may be] protected by the FCA." *Fanslow,* 384 F.3d at 482–83. The *Fanslow* court explained that "the relevant inquiry to determine whether an employee's actions are protected under § 3730(h) is whether: '(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government.' " *Id.* at 480.

**\*10** Here, Relators do not specifically allege that they raised their concerns in preparation for or in furtherance of an FCA action. But the Seventh Circuit has explained that an employee "need not have actual knowledge of the FCA for her actions to be considered 'protected activity.' " *Id.* at 479. Relators did raise concerns to their supervisors about improper certification of patients for hospice eligibility, and they explain why they believed the certifications were fraudulent. For the purposes of a motion to dismiss, the court finds that they have sufficiently alleged that they believed in good faith, and that a reasonable employee in similar circumstances would have believed, that Generations was defrauding the government.

The protected conduct must also put the employer "on notice of the distinct possibility of a qui tam action." *Id.* at 483. Regarding the notice requirement, *Fanslow* states that an employee who is not normally engaged in reporting fraudulent activity as part of his job duties is "not required to use any magic words" to put an employer on notice; the employee can meet the notice requirement if his employer is aware of his concerns about the legality of the employer's conduct. *Id.* at 484–85. Here, the court finds that Relators have sufficiently alleged that they made Generations aware of their concerns about the certification process.

Finally, Relators have sufficiently alleged that their "discharge was motivated, at least in part, by the protected conduct." *Id.* at 479. They allege that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 3581060 (N.D.Ill.)
**(Cite as: 2012 WL 3581060 (N.D.Ill.))**

they were terminated "suddenly" after raising concerns, that they had spotless performance evaluations prior to their termination, and that Generations's proffered reasons for their termination were pretextual. They also allege that other employees were terminated for raising similar concerns. Viewing these allegations in the light most favorable to the Relators, they have alleged sufficient circumstantial evidence that their protected conduct was a motivating factor in their discharge. *See id.* at 485–86 (emphasizing plaintiff's positive evaluations and the brief interval between notice of protected activity and termination in denying summary judgment for defendants). Defendants' motion to dismiss Count II is denied.

*2. IWRPA Retaliation Claim*

Relators claim a violation of 740 Ill. Comp. Stat. 174/30. This section of the IWRPA allows an employee to bring a civil action for violations of 740 Ill. Comp. Stat. 174/15 and 20. Section 15 provides that

(a) An employer may not retaliate against an employee who discloses information in a court, an administrative hearing, or before a legislative commission or committee, or in any other proceeding, where the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation.

(b) An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation.

**\*11** 740 Ill. Comp. Stat. 174/15. Section 20 provides that

An employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation, including, but not limited to, violations of the Freedom of Informa-

tion Act.

740 Ill. Comp. Stat. 174/20.

Relators acknowledge that they did not disclose any violation or information in a proceeding or to "a government or law enforcement agency," as required by 174/15. Although Relators do not explain whether they can proceed on a claim pursuant to 174/20, the court notes that Relators have not cited evidence showing that they refused to participate in activities that violated federal regulations. *See Robinson v. Alter Barge Line, Inc.,* 513 F.3d 668, 670 (7th Cir.2008) (plaintiff had no claim under IWRPA after reporting co-workers' drug use because there was "no indication that he refused to use drugs himself"); *Perez v. Bd. of Educ.,* No. 09 C 2095, 2010 WL 3167295, at \*7–8 (N.D.Ill. Aug.10, 2010) (teacher had no IWRPA claim because she did not refuse to follow school policy to avoid violating the law). The court therefore dismisses Relators' IWRPA claim without prejudice. Relators ask in their Response brief for the court's leave to amend their Complaint to add new state-law retaliation claims, and the court will allow them leave to do so.

**C. Defendant Narayan Ponakala**

Defendants argue that Relators have not stated a claim against Narayan Ponakala. According to Defendants, the allegations in the complaint are limited to the facts that Mr. Ponakala founded Generations in 2002, received money from Generations, and bought a house. These allegations have no bearing on the state and federal fraud claims. The court agrees that the Complaint fails to state a claim against Mr. Ponakala, and the claims against him are dismissed without prejudice. Relators ask for leave to amend their complaint to "add significant details" about Mr. Ponakala's involvement in fraudulent billing and retaliation; they are granted leave to do so.

**D. Odyssey's Motion to Dismiss**

Odyssey moves to dismiss the claims against it because Relators' allegations fail to allege fraud

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 3581060 (N.D.Ill.)
**(Cite as: 2012 WL 3581060 (N.D.Ill.))**

with the specificity required by Rule 9(b) and because there is no nexus between the allegations and claims submitted to the government. For these grounds of its motion, Odyssey relies on the arguments made by the other Defendants as to whether Relators' allegations sufficiently allege fraud and claims submitted to the government for payment. The court has addressed these arguments above and need not do so again.

In addition, Odyssey argues that the fraudulent and retaliatory acts alleged by Relators are unrelated to Odyssey and cannot form the basis for a claim against Odyssey. The Complaint contains few allegations that are specific to Odyssey. It alleges that Odyssey purchased Generations on or about December 31, 2009, and incorporated Generations "into its existing structure," hiring all of Generations's employees and putting all of Generations's patients on its own patient census. (Compl.¶ 22.) Generations became Odyssey's new "Southwest Office," scheduled to merge with its existing "South Office." (*Id.*) Relators further allege that Odyssey was aware of Generations's fraudulent practices. In late October or early November 2009, Janus told Odyssey's Regional Vice President for Sales, Gary Johnson, that Generations was "dirty." He later told the Relators in January 2010 that Odyssey knew "it's a mess over there" but that the problems would be taken care of. (*Id.* at ¶ 23.)

**\*12** The court agrees with Odyssey that these allegations do not suggest that Odyssey was itself responsible for the submission of false claims to the government or was involved in Relators' termination. The allegation that Odyssey was "aware" of "dirty" practices does not allege a violation of the FCA or the Illinois False Claims Act. Relators, however, argue that "the sale of Generations to Odyssey is dispositive of Odyssey's liability" (Resp. in Opp. to Odyssey's Mot. to Dismiss 2, ECF. No. 48.) because Odyssey is liable as Generations's successor.

Successor liability is an equitable doctrine that "provides an exception from the general rule that a

purchaser of assets does not acquire a seller's liabilities." Chi. *Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc.,* 59 F.3d 48, 49 (7th Cir.1995); *EEOC v. G–K–G, Inc.,* 39 F.3d 740 (7th Cir.1994). Successor liability applies to FCA cases. *See, e.g., U.S. ex rel. Jajdelski v. Kaplan, Inc.,* 834 F.Supp.2d 1182 (D.Nev.2011). The theory "allows lawsuits against even a genuinely distinct purchaser of a business if (1) the successor had notice of the claim before the acquisition; and (2) there was substantial continuity in the operation of the business before and after the sale." Chi. *Truck Drivers,* 59 F.3d at 49. Thus, to proceed with a claim based on successor liability, Relators must allege that Odyssey had notice of the claims against Generations before its acquisition of Generations on December 31, 2009, and that there was "substantial continuity" in the operation of the business.

The court finds that, viewing the facts in the light most favorable to Relators, Relators have sufficiently alleged that Odyssey had notice of their claims against Generations. Relators' claim was not made public until December 1, 2011, a year after the purchase. Janus, however, worked for Odyssey at the time of its purchase of Generations, and Relators allege that Janus had a conversation with one of Odyssey's officers, Gary Johnson, about problems at Generations. Janus said that she thought Generations was "dirty," although she does not allege that she told Johnson that there was any pending litigation or that Generations was engaged in a specific fraudulent scheme. Shortly after the purchase, Johnson acknowledged to Relators that Odyssey knew there were problems with Generations. These communications in themselves might not suffice to establish notice, but the court also considers the fact that the entire staff of Generations, including its management, was employed by Odyssey. The continuance of staff in management positions further supports the inference that Odyssey or its principals had actual notice of Generations's potential liability. *See U.S. ex rel. Fisher v. Network Software Assocs., Inc.,* 180 F.Supp.2d 192,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 3581060 (N.D.Ill.)
**(Cite as: 2012 WL 3581060 (N.D.Ill.))**

196 (D.D.C.2002) (finding notice where the same person was in control of both the predecessor and successor entities).

**\*13** Relators have also sufficiently alleged continuity of operations to survive a motion to dismiss. All of Generations's employees and patients were incorporated into Odyssey's existing structure after the sale; the new company provided the same services as the old, and its office remained at the same location. *See Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac, 920 F.2d 1323, 1329 (7th Cir.1990)* (continuity of business operations was established where two companies had the same management and work force, used the same location and equipment, manufactured the same products, and serviced the same customers). The court therefore finds that Relators have sufficiently alleged successor liability to survive a motion to dismiss.

### IV. CONCLUSION

The court denies Generations's and Odyssey's motions to dismiss as to Counts IIII of the Complaint and dismisses Count IV without prejudice. The court also dismisses Relators' claims against Narayan Ponakala without prejudice. Relators are granted leave to file an amended complaint within 28 days.

N.D.Ill.,2012.
U.S. ex rel. Geschrey v. Generations Healthcare, LLC
Slip Copy, 2012 WL 3581060 (N.D.Ill.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



FOR EDUCATIONAL USE ONLY                                                                      Page 1

Not Reported in F.Supp.2d, 2007 WL 915237 (D.D.C.)
**(Cite as: 2007 WL 915237 (D.D.C.))**

Only the Westlaw citation is currently available.

United States District Court,
District of Columbia.
UNITED STATES of America, ex rel. Richard F.
MILLER, Plaintiffs,
v.
BILL HARBERT INTERNATIONAL CON-
STRUCTION, INC., et al., Defendants.

Civil Action No. 95-1231 (RCL).
March 27, 2007.

Robert B. Bell, Gregory B. Reece, Howard M. Sha-
piro, Jennifer M. O'Connor, Jonathan Goldman Ce-
darbaum, Matthew B. Baumgartner, Michael J.
Gottlieb, Monya Monique Bunch, Wilmer Cutler
Pickering Hale & Dorr LLP, Kevin Michael Henry,
Sidley Austin, LLP, Keith V. Morgan, U.S. Attor-
ney's Office, Carolyn Gail Mark, Michael F. Hertz,
U.S. Department of Justice, Washington, DC, for
Robert D. Cultice, Wilmer Cutler Pickering Hale &
Dorr LLP, Boston, MA, for Plaintiffs.

June Ann Sauntry, Brian P. Watt, Bryan B. Lavine,
Timothy J. Kozik, Troutman Sanders LLP, Charles
C. Murphy, Jr., Ellen G. Schlossberg, Vaughan &
Murphy, James J. Mills, Burns, Day & Presnell,
P.A., Atlanta, GA, Charles Anthony Zdebski,
Troutman Sanders LLP, Barry Coburn, Trout
Cacheris, PLLC, Charles Samuel Leeper, Jeffrey J.
Lopez, Michael Reilly Miner, Elizabeth Ewert, Mi-
chael J. McManus, Drinker Biddle & Reath LLP,
Alan William Hugh Gourley, Crowell & Moring
LLP, David Schertler, Schertler & Onorato, L.L.P.,
Andrew Lawrence Hurst, Stephen Printiss Murphy,
Reed Smith LLP, Washington, DC, for Defendants.

### MEMORANDUM OPINION & ORDER

ROYCE C. LAMBERTH, United States District
Judge.
   **\*1** This matter is before the Court on defend-
ants Harbert International, Inc. ("HII") and Harbert

Corporation's ("HC") March 1, 2007, Motion in
Limine [561] to exclude all argument that HII or
HC presented or caused to be presented claims for
payment on contracts 20A and 07 after December
9, 1991. To support this argument, defendants as-
sert that the government's own admissions in its
most recent version of the complaint (the Third
Amended Complaint in Intervention) establish in-
disputably that Bill Harbert International Construc-
tion, Inc. ("BHIC")-not HII or HC-was responsible
for claims for payments on those two contracts dur-
ing that time period.

   Specifically, defendants point to the govern-
ment's averment in Complaint in Intervention that
BHIC was the *de facto* joint venture partner of J.A.
Jones Construction Co. on the Harbert-Jones Con-
tract 20A and 07 joint ventures. Additionally, the
defendants state that the government admits that
agents for BHIC, not agents for either HII or HC,
submitted and caused to be submitted claims on
contracts 20A and 07 after December 9, 1991. In
light of the fact that these statements were made in
the government's complaint, these statements con-
stitute judicial admissions that cannot be contra-
dicted at trial. *See* Defs.' Mot. [561] 4 (citing, *inter
alia, Yesudian v. Howard Univ.,* 153 F.3d 731, 748
(D.C.Cir.1998)). Accordingly, defendants argue
that they cannot have been the ones who submitted
or caused to be submitted those claims on the con-
tracts at issue. Therefore, defendants contend that
the plaintiffs should be excluded from introducing
evidence that either HII or HC submitted or caused
to be submitted claims on those contracts after
December 9, 1991.

   The Court disagrees with the defendants for
three reasons. First, notwithstanding the defendants'
contention that the statements at issue are judicial
admissions, which would in essence establish the
averred facts within the statements as "undisputed,"
there is an issue as to whether the government's
statements within the Third Amended Complaint in
Intervention were actually judicial admissions at

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY Page 2

Not Reported in F.Supp.2d, 2007 WL 915237 (D.D.C.)
**(Cite as: 2007 WL 915237 (D.D.C.))**

all. Judicial admissions are "formal concessions ... or stipulations" by the parties intended to act as concessions that the alleged fact at issue is true, thereby eliminating the need to debate the veracity of that fact. *See Keller v. United States,* 58 F.3d 1194, 1198 n. 8 (7th Cir.1995). Accordingly, it is plain to see that judicial admissions, by their very nature, connote a semblance of agreement between the parties as to the existence of that fact. It stands to reason, then, that if there is no such agreement between the parties as to the existence of that fact because it is contradicted or denied, then the fact averred cannot be established as a judicial admission. This is consistent with the D.C. Circuit's view of judicial admissions that "[i]t is of the nature of an admission, plainly, that it be by intention an act of waiver relating to the opponent's proof of the fact, and *not merely a statement of assertion or concession made for some independent purpose.* " *McNamara v. Miller,* 269 F.2d 511, 515 (D.C.Cir.1959) (emphasis added). Here, the statements quoted by defendants were made within the government's Third Amended Complaint in Intervention as assertions of fact. These statements were far from admitted, however, as they were *contradicted and denied* by HII, HC, and BHIC, the party against whom HII and HC would presumably impose liability for the claims at issue. (*See* Defs.' Answers [413, 495, 496].) In light of the controversy between the parties as to the existence of the facts within the statements at issue, the Court finds that the statements at issue were not intended as formal concessions or stipulations by either the government *or* the defendants. Therefore, the statements cannot qualify as judicial admissions that would have a "preclusive effect" to the government arguing against them.

  **\*2** Second, even if the statements qualified as judicial admissions, the defendants' argument still fails because it fails to consider the nature of the claims against them. Plaintiffs have brought claims against the defendants for their participation in a conspiracy to bid-rig multiple USAID contracts. It is hornbook law that a co-conspirator can be found

liable for the future acts of another co-conspirator if the purpose of the future acts was to advance the overall objective of the conspiracy. *See Halberstam v. Welch,* 705 F.2d 472, 487 (D.C.Cir.1983). Therefore, assuming HII, HC, and BHIC were apart of the conspiracy,[FN1] HII and HC could be found liable for those acts done by BHIC in submitting those claims after December 9, 1991 regardless of whether either actually submitted the claims for payment because those claims for payment were made in furtherance of the conspiracy.

> FN1. As defendants' motion is, in essence, a motion to dismiss the government's claims against them, the Court must accept the allegations in the government's Complaint in Intervention as true for the purposes of resolving this motion, as the government is the non-moving party. *See Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Sinclair v. Kleindienst,* 711 F.2d 291, 293 (D.C.Cir.1983).

  Third, defendants' argument overlooks a key tenet of liability under the False Claims Act ("FCA"). Under the FCA, invoices submitted under a contract are false if the contract was fraudulently induced, including contracts in cases of bid rigging. *See, e.g., United States ex rel. Marcus v. Hess,* 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943); *United States v. Krizek,* 111 F.3d 934 (D.C.Cir.1997); *United States ex rel. Alexander v. Dyncorp, Inc.,* 924 F.Supp. 292, 298 (D.D.C.1996) (Harris, J.); *United States ex rel. Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 787-88 (4th Cir.1999) (collecting cases). In other words, the very existence of a fraudulent contract taints the submission of each subsequent claim for payments thereunder. Therefore, it is of no moment in this case that either HII or HC was not the actual entity who submitted the claims for payment on the two contracts after December 9, 1991 because, if the government's allegations are taken as true, both HII and HC engaged in acts that caused the contracts to be fraudulent in the first place. If true, de-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY
Page 3

Not Reported in F.Supp.2d, 2007 WL 915237 (D.D.C.)
**(Cite as: 2007 WL 915237 (D.D.C.))**

fendants' actions and involvement in making contracts 20A and 07 fraudulent creates a taint on the submission of all claims for payment on these contracts, whether submitted by BHIC, HII, HC, or any other defendant charged in this case. Defendants' alleged actions establish, at the very least, that they "caused to be presented" fraudulent claims on contracts 20A and 07, as defendants' acts were the proximate and "but for" cause of BHIC's submission of allegedly fraudulent claims for payments on those two contracts.[FN2]

> FN2. Certainly, but for the defendants' conspiring to bid-rig the contracts, the submission of fraudulent claims for payment on those contracts would not have occurred. Additionally, the submission of fraudulent claims for payments is a reasonably foreseeable consequence of conspiring to establish the fraudulent contract upon which the claims for payment were sought. *Cf. Palsgraf v. Long Island R. Co.,* 248 N.Y. 339, 162 N.E. 99 (N.Y.1928).

Accordingly, for the reasons stated in this Memorandum Opinion & Order, the government cannot be precluded from arguing and attempting to establish the defendants' involvement in the submission of the claims for payment on contracts 20A and 07 made after December 9, 1991. Therefore, defendant's Motion [561] is DENIED.

SO ORDERED.

D.D.C.,2007.
U.S. ex rel. Miller v. Bill Harbert Intern. Const., Inc.
Not Reported in F.Supp.2d, 2007 WL 915237 (D.D.C.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2010 WL 1076228 (D.N.J.)
**(Cite as: 2010 WL 1076228 (D.N.J.))**

▷

Only the Westlaw citation is currently available.NOT FOR PUBLICATION

United States District Court,
D. New Jersey.
UNITED STATES of America, ex rel. Mary Beth Pilecki–Simko and Tom Giunta, Relators,
v.
The CHUBB INSTITUTE, the Chubb Corporation, Chubb America Service Corporation, and High–Tech Institute, Inc., Defendants.

Civil Action No. 06–3562.
March 22, 2010.

Michael S. Green, Esq., Green & Pagano, LLP, East Brunswick, NJ, Gary S. Graifman, Esq., Kantrowitz, Goldhamer & Graifman, Montvale, NJ, for Plaintiffs/Relators.

Eric A. Savage, Esq., Littler Mendelson, PC, Newark, NJ, for Defendants The Chubb Institute & High–Tech Institute, Inc.

Michael R. McDonald, Esq., Gibbons, PC, Newark, NJ, for Defendant The Chubb Corporation.

### *MEMORANDUM OPINION*

BROWN, Chief Judge.

**\*1** This matter is a *qui tam* action [FN1] brought pursuant to the False Claims Act, 31 U.S.C. § 3729 et seq., by Relators Mary Beth Pilecki–Simko and Tom Giunta against their former employer, The Chubb Institute (TCI). Relators allege that TCI knowingly caused false claims to be filed by making a number of misrepresentations to the Department of Education, its accrediting agencies, and students that wrongfully enabled them to secure student financial aid in the form of loans and grants from the federal government. Relators also seek to impose liability for this conduct on TCI's former corporate parents, High–Tech Institute (HTI) and

The Chubb Corporation, on the basis of their alleged control of TCI's actions.

FN1. "*Qui tam* actions have a long history and were used in England before the foundation of this country." *United States ex rel. Atkinson v. Pa. Shipbuilding Co.,* 473 F.3d 506, 509 (3d Cir.2007). The term "*qui tam*" derives from "the Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur,* which means 'who pursues this action on our Lord the King's behalf as well as his own.' " *Vt. Agency of Natural Res. v. United States ex rel. Stevens,* 529 U.S. 765, 769 n. 1, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000) (citation omitted). "Under modern practice, *qui tam* actions are brought by private plaintiffs on behalf of the Government in exchange for some portion of any resulting damages award." *United States ex rel. Rodriguez v. Our Lady of Lourdes Med. Ctr.,* 552 F.3d 297, 299 n. 1 (3d Cir.2009) (citing *Vt. Agency of Natural Res.,* 529 U.S. at 773–74).

Presently before the Court are two motions (Doc. Nos.38, 39) to dismiss Relators' Second Amended Complaint filed by Defendants The Chubb Corporation, TCI, and HTI.[FN2] Both motions seek dismissal pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) on the grounds that Relators have failed to plead fraud with the requisite particularity and failed to state a claim upon which relief can be granted. HTI and The Chubb Corporation also challenge the sufficiency of the allegations supporting Relators' veil-piercing and successor liability claims against them. For the following reasons, the Court will grant The Chubb Corporation's motion, and the Court will grant the motion filed by TCI and HTI.

FN2. This matter was reassigned to the undersigned by Order of August 10, 2009.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1076228 (D.N.J.)
**(Cite as: 2010 WL 1076228 (D.N.J.))**

## I. PROCEDURAL HISTORY

The present motions challenge the sufficiency of Relators' Second Amended Complaint (SAC). Defendants had previously filed motions challenging the sufficiency of Relators' First Amended Complaint,[FN3] but this Court denied those motions without prejudice on August 24, 2009, because Relators sought leave to amend their pleadings a second time. Defendants and the Court consented to Relators' request,[FN4] and Relators filed a six-count SAC on September 21, 2009.

> FN3. The Court notes that the docket in this case reflects that Relators' did not properly file the First Amended Complaint on the Court's CM/ECF system. In lieu of this filing, The Chubb Corporation has provided a copy of the First Amended Complaint (McDonald Decl., Ex. B), which Relators do not dispute.

> FN4. Defendants' stipulation of consent is reflected by Magistrate Judge Esther Salas' Consent Order of September 22, 2009.

Defendants renewed their motions to dismiss on October 16, 2009, and the Government reinstated the Statement of Interest it filed with regard to Defendants' earlier motions to dismiss. (Doc. No. 43 .)[FN5] These motions are now ripe for the Court's consideration.

> FN5. The Government had previously declined to intervene in this case on August 19, 2008. (Doc. No. 5.)

## II. THE SECOND AMENDED COMPLAINT

For purposes of these motions, this Court must accept as true the factual allegations contained in the SAC and draw all reasonable inferences in favor of Relators. *See, e.g., Ashcroft v. Iqbal,* ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). According to the SAC, as of the time of the Complaint, TCI [FN6] was a technical career training institute that had been a part of the HTI family of technical career training schools

since HTI purchased the Institute in 2004. Prior to that time, TCI had been a subsidiary of insurance company The Chubb Corporation. Relators worked as career services and admissions counselors, respectively, for the North Brunswick Campus of TCI for different periods between 1995 and 2005. (SAC ¶¶ 5–7.)

> FN6. The Court notes that the SAC purports to use "Chubb Institute" and/or "Chubb" to refer to TCI, The Chubb Corporation, and Chubb America Service Corporation (SAC ¶ 6); yet, the SAC consistently differentiates between TCI and its alleged parent corporations bearing the "Chubb" name. Furthermore, in their opposition papers, Relators do not contend that The Chubb Corporation or Chubb America Service Corporation directly violated the False Claims Act. Thus, rather than reading every allegation about "Chubb" as a group allegation against all three Chubb Defendants, which would be inconsistent with Relators' representations to the Court, the Court construes the SAC's "Chubb" and "Chubb Institute" allegations to refer to TCI unless the SAC specifies that allegation concerns The Chubb Corporation or Chubb America Service Corporation.

According to Relators, TCI participates in the federal student financial aid program authorized by Title IV of the Higher Education Act, which provides financial assistance in the form of direct loans and federally insured private loans to eligible students that attend qualifying higher education institutions. In order to qualify for federal subsidies, the institution must enter into a Program Participation Agreement (PPA) with the Department of Education, which requires continuing adherence to a number of statutory and regulatory conditions. (*See id.* ¶¶ 9–23.) This process has been referred to by courts as the "phase I application." Students at qualifying higher education institutions then submit

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1076228 (D.N.J.)
**(Cite as: 2010 WL 1076228 (D.N.J.))**

individual applications for financial aid, which courts have referred to as "phase II applications."

**\*2** The Court understands Relators to contend that TCI violated the False Claims Act by knowingly violating Title IV requirements it had agreed to in the phase I application (the PPA) and knowingly providing false statements to maintain Title IV eligibility, but nevertheless continuing to submit students' phase II applications for financial aid as if it had complied with the regulations. (*See id.* ¶¶ 24, 51–86.) Courts have referred to this theory of False Claims Act liability—wherein a party "submit[s] claims for payment to the federal Government while at the same time violating, without disclosing, applicable rules" governing eligibility for the government program—as the implied false certification [FN7] theory of liability. *See, e.g., United States ex rel. Rodriguez v. Our Lady of Lourdes Med. Ctr.,* 552 F.3d 297, 303 (3d Cir.2009). In other words, by submitting or causing to be submitted the claim for funds, the entity implicitly falsely certifies that it has complied with governing regulations.

> FN7. Implied false certification, which refers to a submission for payment without disclosing the knowing failure to comply with applicable regulations, thus differs from an express false certification, which occurs when a participating institution falsely certifies, usually on the claim for payment itself, that it is currently in compliance with the applicable regulations.

With regard to specific violations of Title IV regulations, Relators allege that TCI knowingly made the following misrepresentations to the Department of Education, its accreditation agencies, and students between 2001 and 2006 in order to satisfy various phase I obligations: (1) false reports of the employment placement rates of TCI graduates (SAC ¶¶ 24(i)(a)—(g) and (ii), 52–59); (2) false assurances that TCI students were making satisfactory academic progress in their program of study (*id.* ¶¶ 24(iii), 68–72); (3) permitting English-deficient

applicants and applicants who failed admissions tests to enroll despite their failure to meet TCI admissions standards (*id.* ¶¶ 24(iv), 60–67); (4) allowing students ineligible for financial assistance under Title IV to apply for Title IV funds (SAC ¶¶ 24(v), 80–85); and (5) false assurances of compliance with Title IV's ban (hereinafter "incentive compensation ban") on the payment of bonuses to recruiters on the basis of the number of students they admit (*id.* ¶¶ 24(vi), 73–79). Further, Relators allege that TCI employees used "pixie dust" to increase applicants' admission test scores and thereby increase enrollment, that TCI rated admissions personnel with scorecards to award bonuses based on enrollment numbers, and that TCI administrators made "professional judgment[s]" that admissions personnel should submit to the Government the financial aid forms for ineligible students. (*Id.* at ¶¶ 61, 74–75, 82.)

In support of these allegations, Relators submit numerous exhibits that they contend demonstrate the willfully false statements TCI submitted to its accreditation agencies concerning the job-placement rates of its students. (SAC Exs. A–E.) Relator Pilecki–Simko also submitted a sworn affidavit identifying 13 students from TCI's North Brunswick campus that she claims "are examples of the allegations made in the complaint and disclosure statement." (SAC Ex. F, Pt. 23 ¶ 3.) These purported "examples" included one graduate discovered to be an illegal alien, two graduates who were not proficient in the English language, two students who gave poor interviews and could not be placed, two students that received assurances from admissions representatives regarding employment and salary opportunities, and six students whose employment TCI ostensibly misrepresented. (*See id.*) [FN8]

> FN8. Relator Giunta also submitted a two-paragraph affidavit, consisting solely of vague assertions that he was "fully familiar with this proceeding," and that "[t]he allegations in the complaint and disclosure

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1076228 (D.N.J.)
**(Cite as: 2010 WL 1076228 (D.N.J.))**

statement ... as to the Admission Process and misrepresentations as regards admissions and financial aid are to my knowledge accurate." (SAC Ex. F, Pt. 24.) Relator Pilecki–Simko's affidavit contained similar generic assertions. (*See* SAC Ex. F, Pt. 23 ¶¶ 1–2.)

**\*3** With regard to TCI's parent corporations, Relators assert that HTI directly participated in TCI's misrepresentations to its accrediting agency about the employment placement rates of TCI graduates. (*See id.* ¶ 24(i)(a), (b).) Relators further allege that HTI and The Chubb Corporation both (i) knew of TCI's misconduct, and (ii) controlled TCI to the point that TCI was their alter ego. (*See id.* ¶¶ 99–119.)

As presently constituted, the SAC presents three counts of False Claims Act violations arising under the following subsections [FN9] of 31 U.S.C. § 3729:(a)(1) (knowingly causing a false claim for payment to be presented to an employee of the United States Government), (a)(2) (knowingly using a false statement to get a false claim paid by the Government), and (a)(3) (conspiracy to defraud the Government by getting a false claim paid). With regard to TCI's former parent corporations, the SAC alleges one count of piercing the corporate veil against both HTI and The Chubb Corporation, as well as one count of successor liability against HTI.

> FN9. Unless otherwise noted, the Court refers to portions of 31 U.S.C. § 3729 when it refers to "subsections."

III. DISCUSSION

A motion to dismiss under Federal Rule of Civil Procedure 12(b) (6) may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds that plaintiff has failed to set forth fair notice of what the claim is and the grounds upon which it rests. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citations omitted).

A complaint will survive a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570).

The plausibility standard requires that "the plaintiff plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" and demands "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 556). Although a court must accept as true all factual allegations in a complaint, that tenet is "inapplicable to legal conclusions," and "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 555); *see also Phillips v. County of Allegheny,* 515 F.3d 224, 231 (3d Cir.2008). In evaluating a motion to dismiss, a court may consider only the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the complainant's claims are based upon those documents. *Pension Benefit Guar. Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1196 (3d Cir.1993).

Here, Relators allege that TCI violated the False Claims Act by knowingly violating Title IV requirements it had agreed to in its phase I application (the PPA) and knowingly providing false statements to maintain Title IV eligibility, but nevertheless continuing to submit students' phase II applications for financial aid as if it had complied with the applicable regulations. Alternatively, Relators allege that TCI conspired with its corporate parents to defraud the Government by performing these alleged acts. Relators further allege that TCI's parent corporations controlled TCI's operations to the point that liability should attach to them for TCI's transgressions. Presently, Defendants challenge both the legal basis and the sufficiency of the fraud allegations for Relators' False Claims Act claims, as

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Not Reported in F.Supp.2d, 2010 WL 1076228 (D.N.J.)
**(Cite as: 2010 WL 1076228 (D.N.J.))**

well as the pleadings for Relators' veil-piercing and successor liability claims. Although the weight of authority appears to support Relators' implied false certification theory of a False Claims Act violation in the context of a university's phase I application for Title IV funds, the Court finds that the allegations contained in the SAC fall well short of Rule 9(b)'s heightened pleading requirement for allegations of fraud. The Court further finds Relators' conclusory allegations about TCI's parent corporations insufficient to support veil-piercing and successor liability claims.

*A. False Claims Act*
**\*4** At the time that Relators commenced this lawsuit, the False Claims Act provisions relied on by Relators made it unlawful for any entity to do the following acts:

(1) knowingly present[ing], or caus[ing] to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2) knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

(3) conspir[ing] to defraud the Government by getting a false or fraudulent claim allowed or paid....

31 U.S.C.A. § 3729(a)(1)-(3) (West 2003 & Supp.2008).[FN10] For purposes of these subsections, the Act defined the scienter requirement "knowingly" to refer to a person who "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information," but notes that "no proof of specific intent to defraud is required." 31 U.S.C.A. § 3729(b)(1)-(3) (West 2003 & Supp.2008).

FN10. Last year, Congress substantively

revised and reorganized the above portion of § 3729(a) into a new § 3729(a)(1), which prohibited the following acts:

(A) knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspir[ing] to commit a violation of subparagraph (A), (B), ...

Fraud Enforcement Recovery Act (FERA), No. 111–21, § 4(a)(1), 123 Stat. 1617, 1621 (2009) (codified at 31 U.S.C. § 3729(a)(1)). Congress provided that, with the exception of new § 3729(a)(1)(B), these revisions to § 3729(a)(1) would only "apply to conduct on or after the date of enactment [May 20, 2009]." FERA § 4(f)(1). Thus, it is clear that FERA's revisions to the False Claims Act would not supplant the preexisting subsections (a)(1) and (a)(3) of § 3729 in this case. Yet Congress made new § 3729(a) (1)(B) retroactive to "all claims under the False Claims Act ... that are pending on or after [June 7, 2008]." FERA § 4(f) (1).

Defendants submit that the statutory provision applicable at the time of the filing of the lawsuit should apply, and Relators do not suggest otherwise. This Court is persuaded by Judge Rose's statutory interpretation in *United States ex rel. Sanders v. Allison Engine Co.,* 667 F.Supp.2d 747, 2009 WL 3626773 at *3–4 (S.D.Ohio 2009) (citing § 3729's definition of "claim," 31 U.S.C. § 3729(b) (2)(A), another FERA retroactivity provision premised on "cases

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1076228 (D.N.J.)
**(Cite as: 2010 WL 1076228 (D.N.J.))**

pending on the date of enactment," FERA § 4(f)(2), and the legislative history of FERA), that the "claims pending" trigger to FERA's retroactivity clause refers to *claims* for payment and not *cases* presenting False Claims Act claims. *See also United States v. Aguillon,* 628 F.Supp.2d 542, 550–51 (D.Del.2009) (declining to give FERA's revisions retroactive effect). Relators have not alleged that Defendants directly or indirectly made false claims for payment that were pending on or after June 7, 2008. Thus, the Court will not apply FERA's § 3729 provisions retroactively to the legal claims involved in this case.

Subsections (a)(1) and (a)(2) share many common elements. As the Third Circuit explained in *United States ex rel. Schmidt v. Zimmer, Inc.,* a prima facie case of a violation under subsection (a)(1) requires a showing that "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent," but "[i]n order to prove a claim under [subsection] (a)(2), a plaintiff must also show that the defendant made or used (or caused someone else to make or use) a false record in order to cause the false claim to be actually paid or approved." 386 F.3d 235, 242 (3d Cir.2004) (citations omitted). The Supreme Court clarified in *Allison Engine Co. v. United States ex rel. Sanders* that while a subsection (a)(2) violation does not require subsection (a)(1)'s presentment requirement, an (a)(2) violation requires a showing "that the defendant made a false record or statement for the purpose of getting 'a false or fraudulent claim paid or approved by the Government.' " 553 U.S. 662, 128 S.Ct. 2123, 2139, 170 L.Ed.2d 1030 (2008). Meanwhile, a conspiracy in violation of subsection (a)(3) does not require a showing "that the conspirators intended the false record or statement to be presented directly to the Government, but it must be established that they agreed that the false record or

statement would have a material effect on the Government's decision to pay the false or fraudulent claim." *Id.* at 2130.

Before the Court addresses Relators' pleadings, the Court will examine the viability of Relators' false certification theory of False Claims Act liability and the applicability of Federal Rule of Civil Procedure 9(b).

*1. Implied False Certification Theory of Liability*

**\*5** With regard to Relators' false certification theory of False Claims Act liability, it bears mentioning that the Third Circuit has twice declined to adopt this doctrine, but in each instance, it left the door open for this theory of liability in future cases. *See Rodriguez,* 552 F.3d at 303–04 & n. 6 (explaining, on review of a 12(b)(6) dismissal, that the Circuit has not adopted the false certification theory and declining to address the issue, but nevertheless holding that the relators "failed to assert the elements necessary to succeed under that theory"), *abrogated on other grounds by United States ex rel. Eisenstein v. City of N.Y.,* —— U.S. ——, 129 S.Ct. 2230, 173 L.Ed.2d 1255 (2009); *United States ex rel. Quinn v. Omnicare, Inc.,* 382 F.3d 432, 441–43 (3d Cir.2004) (finding, on appeal of an order of summary judgment, that relators' evidence failed to establish a false certification claim under the standards articulated by other courts).

The "archetypal *qui tam* False Claims action" involves "a private company overcharg[ing] under a government contract, [where] the claim for payment is itself literally false or fraudulent." *United States ex rel. Hendow v. Univ. of Phoenix,* 461 F.3d 1166, 1170 (9th Cir.2006). Yet the Supreme Court has recognized that Congress "intended [the False Claims Act] to reach all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert–White Co.,* 390 U.S. 228, 232, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968) (citation omitted). Congress reinforced this broad mandate when it passed the 1986 amendments to the False Claims Act, instructing courts that "each and every claim submitted under a con-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1076228 (D.N.J.)
**(Cite as: 2010 WL 1076228 (D.N.J.))**

tract, loan guarantee, or other agreement which was originally obtained by means of false statements or other corrupt or fraudulent conduct, or in violation of any statute or applicable regulation, constitutes a false claim." S.Rep. No. 99–345, at 9, *reprinted in* 1986 U.S.C.C.A.N. at 5274. Consequently, the overwhelming majority of courts have extended False Claims Act liability to a party's knowingly false certification of compliance with applicable regulations when such regulations are a condition of payment. *See, e.g., United States ex rel. Mikes v. Straus,* 274 F.3d 687, 697 (2d Cir.2001); *United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.,* 214 F.3d 1372, 1376 (D.C.Cir.2000); *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 786–87, 793 (4th Cir.1999); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 125 F.3d 899, 902 (5th Cir.1997); *United States ex rel. Hopper v. Anton,* 91 F.3d 1261, 1266–67 (9th Cir.1996).

While the extent of the broader implied false certification theory (i.e., where the claim for payment does not include an express certification of compliance) is less clear, both the Seventh and Ninth Circuits have endorsed False Claims Act liability under false certification and/or promissory fraud theory in the context of educational institutions' phase I applications for Title IV eligibility and subsequent receipt of financial aid. *Hendow,* 461 F.3d at 1171–77; *United States ex rel. Main v. Oakland City Univ.,* 426 F.3d 914, 916–17 (7th Cir.2005).[FN11] Although these decisions are not binding on this Court, the Court finds their analyses helpful in gauging the extent of false certification liability under the False Claims Act. The purported false certification in both cases, which also appears in the matter *sub judice,* consisted of the educational institution's false certification on its PPA that it would comply with Title IV's incentive compensation ban. *Hendow,* 461 F.3d at 1175; *Main,* 426 F.3d at 916. Placing the purported fraud in terms of the statutory language, the *Main* court explained:

> FN11. Although the *Main* court's decision

relies on principles of promissory fraud, this Court agrees with the *Hendow* court's observation that promissory fraud and false certification are two sides of the same coin. *See Hendow,* 461 F.3d at 1174 (explaining that promissory fraud "in substance, is not so different from the false certification theory, and even requires the same elements"). The difference between the two, so far as the Court can discern, is when the institution manifested the scienter to defraud the Government: when it signed the PPA (promissory fraud), or when it purposely caused claims to be filed, knowing that it was violating the PPA (false certification). *Compare Main,* 426 F.3d at 917 *with Hendow,* 461 F.3d at 1171–72.

**\*6** [t]he University "uses" its phase-one application (and the resulting certification of eligibility) when it makes (or "causes" a student to make) a phase-two application for payment.... The phase-two application is itself false because it represents that the student is enrolled in an eligible institution, which isn't true.... If a false statement is integral to a causal chain leading to payment, it is irrelevant how the federal bureaucracy has apportioned the statements among layers of paperwork. *Main,* 426 F.3d at 916.

Defendants ask this Court to employ the Second Circuit's narrow application of the doctrine, which requires that the applicable regulations be an express condition of payment. *See Mikes,* 274 F.3d at 699–700. Ostensibly, Defendants worry that broad application of the false certification theory would turn the False Claims Act "into 'a blunt instrument to enforce compliance with all ... regulations.'" *See Rodriguez,* 552 F.3d at 304 (quoting *Mikes,* 274 F.3d at 699). With regard to the Second Circuit's express-condition requirement, the Court notes that the Third Circuit, while stopping short of adopting the false certification theory, has suggested a lower threshold would apply, one requiring

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

Not Reported in F.Supp.2d, 2010 WL 1076228 (D.N.J.)
**(Cite as: 2010 WL 1076228 (D.N.J.))**

only "that the alleged violations would be relevant to 'the [G]overnment's disbursement decisions.' " *Id.* (addressing *dicta* in the Circuit's prior opinion in *Quinn* that the false certification theory should not be limited to regulations that are express conditions of payment). However, even if the express-condition-of-payment rule applied, the Court does not see how the narrower rule would benefit TCI in this case; federal statutory and regulatory law, as well as the PPA itself, expressly condition Title IV participation, and necessarily the receipt of federal funds, on compliance with a number of regulations, including the incentive compensation ban. *E.g.,* 20 U.S.C. § 1094(a)(20); 34 C.F.R. § 668.14(a)(1), (b)(22)(i); *Hendow,* 461 F.3d at 1176 (rejecting the university's argument that PPA-incorporated regulations were "merely ... condition[s] of *participation,* [but] not [ ] condition[s] of *payment"* ). The PPA requirements are " 'prerequisites,' and 'the *sine qua non'* of federal funding, for one basic reason: if the [institution] had not agreed to comply with them, it would not have gotten paid." *Hendow,* 461 F.3d at 1176. As for Defendants' larger concern about a broad application of the false certification theory, this Court finds solace in the Seventh Circuit's differentiation between breach of contract and promissory fraud in *Main* :

> The University protests that this approach would treat any violation of federal regulations in a funding program as actionable fraud, but that's wrong. A university that accepts federal funds that are contingent on following a regulation, which it then violates, has broken a contract. But fraud requires more than breach of promise: fraud entails making a false representation, such as a statement that the speaker will do something it plans not to do. Tripping up on a regulatory complexity does not entail a knowingly false representation.

**\*7** 426 F.3d at 917 (citation omitted).

*2. Federal Rule of Civil Procedure 9(b)*

At the motion to dismiss stage, Relators need not satisfy the above burdens with specific proofs.

Yet, because the False Claims Act is a fraud statute, Relators' pleadings must satisfy the heightened pleading requirements of Federal Rule 9(b). *See United States ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc.,* 149 F.3d 227, 234 (3d Cir.1998) (noting that Rule 9(b) "provides sufficient deterrence against overly broad allegations" under the False Claims Act); *see also United States ex rel. Clausen v. Lab. Corp. of Am., Inc.,* 290 F.3d 1301, 1309–10 (11th Cir.2002) (concluding that it was "well settled" and "self-evident" that the False Claims Act was "a fraud statute" triggering application of Rule 9(b)'s heightened pleading requirements). Accordingly, Relators must plead "with particularity the circumstances constituting fraud," but "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b).

The Third Circuit has held that " Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of ... fraud with all of the essential factual background that would accompany 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where and how' of the events at issue." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.,* 311 F.3d 198, 217 (3d Cir.2002) (citations omitted). " Fed.R.Civ.P. 9(b) requires plaintiffs to plead the circumstances of the alleged fraud with particularity to ensure that defendants are placed on notice of the 'precise misconduct with which they are charged, and to safeguard defendants against spurious charges' of fraud." *Craftmatic Sec. Litig. v. Kraftsow,* 890 F.2d 628, 645 (3d Cir.1989) (quoting *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984).

Although Rule 9(b) permits a plaintiff to generally allege a defendant's mental state, the Third Circuit has read the Rule to still require plaintiffs to "allege facts that show the court their basis for inferring that the defendants acted with 'scienter.' " *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1418 (3d Cir.1997). Although *Burlington Coat Factory* dealt with securities fraud, the Court

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1076228 (D.N.J.)
**(Cite as: 2010 WL 1076228 (D.N.J.))**

sees no reason to limit its ruling to that context, especially in light of the Circuit's concern that the False Claims Act not become a "blunt instrument" of regulatory enforcement. *See Rodriguez,* 552 F.3d at 304; *cf. Quinn,* 382 F.3d at 440 (explaining that False Claims Act relators "cannot 'merely ... describe a private scheme in detail but then ... allege simply and without any stated reason for his belief that claims requesting illegal payments must have submitted, were likely submitted or should have been submitted to the Government.") (quoting *United States ex rel. Clausen v. Lab. Corp. of Am.,* 290 F.3d 1301, 1311 (11th Cir.2002)).[FN12]

> FN12. The Court notes that the Seventh Circuit has endorsed a similar pleading requirement—that the plaintiff "must be able to point to specific, objective manifestations of fraudulent intent"—in the analogous context of promissory fraud claims. *Bower v. Jones,* 978 F.2d 1004, 1012 (7th Cir.1992) (quoting *Hollymatic Corp. v. Holly Sys., Inc.,* 620 F.Supp. 1366, 1369 (N.D.Ill.1985)).

*3. Application*

**\*8** While the Court agrees that the weight of authority supports Relators' implied false certification theory of liability in the Title IV context under the False Claims Act, the Court finds that Relators' allegations lack sufficient particularity to satisfy Rule 9(b).

Although Relators present five species of misrepresentation that they contend demonstrate TCI's knowing false certification of compliance with PPA requirements, Relators do not allege any facts identifying either a particular false claim submitted to a Government agent, per § 3729(a)(1), or a false statement used to get a false claim paid in violation of § 3729(a)(2). To recap, Relators allege that TCI made the following misrepresentations to its accreditation agency, the Department of Education, and/or its students, in violation of PPA regulations: (a) false reports of TCI graduates' employment placement rates; (b) false assurances that TCI stu-

dents were making satisfactory academic progress in their program of study; (c) permitting English-deficient applicants and applicants who failed admissions tests to enroll despite their failure to meet TCI admissions standards; (d) allowing students ineligible for financial assistance under Title IV to apply for Title IV funds; and (e) false assurances of compliance with Title IV's incentive compensation ban. Relators also allege (f) that TCI and its parent corporations conspired to commit the above violations. The Court considers each subset of allegations in turn.

*a. Misrepresentations Regarding Employment Placement*

With regard to the alleged false reports of employment placement rates, Relators attached numerous documents to the SAC that they contend TCI submitted to its accreditation agency between 2003 and 2005. (*See* SAC ¶ 24(i) Exs. A ("Completion and Placement Charts"), B ("Letter of Assurance" and "[TCI] Jersey City Campus Interim Report, July 2004"), C ("2003 ACCSCT Annual Report for [TCI] North Brunswick Campus"), D ("2005 Annual Institutional Report for the Year [2004–2005]"), and E ("Probation Officer Response").) Relators claim that these documents contained willfully false statements "with the purpose of falsely obtaining accreditation" and Title IV eligibility. *See generally* SAC ¶ 24(i). Yet Relators' pleadings do not provide a plausible basis for making this conclusion, and the purported false statements are not apparent on the face of the documents. Among the voluminous statistics presented by these documents, Relators' pleadings do not identify which statements regarding the placement rates were false (or conversely what the actual placement rates were), to what degree they were inflated or diminished, and upon whose instructions they were falsified. In other words, Relators only provide the *what,* but omit the *who, when,* and *how.*[FN13]

> FN13. The "examples" contained in Relator Pilecki–Simko's Affidavit do not fill in these gaps. Although Relator indicates that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 10

Not Reported in F.Supp.2d, 2010 WL 1076228 (D.N.J.)
**(Cite as: 2010 WL 1076228 (D.N.J.))**

as many as six graduates' employment placements were incorrectly entered into TCI's student-placement database, it is unclear who made these entries (i.e., did the Relators make these entries?), why these entries were made, and how they were used. The SAC does not allege that this data was in any way improperly used by TCI to procure federal funds, and the SAC fails to allege circumstantial facts permitting the inference that these entries were knowingly entered into the database with the purpose of obtaining federal funds not otherwise due.

Also missing from Relators' conclusory allegations is the *why;* Relators do not allege circumstantial facts indicating that TCI knowingly committed acts in violation of § 3729. *See* 31 U.S .C. § 3729(b) (defining "knowing" to require, at a minimum, "reckless disregard of the truth or falsity of the information"); *Allison Engine,* 128 S.Ct. at 2128 (explaining that "a person must have the purpose of getting a false or fraudulent claim 'paid or approved by the Government' in order to be liable under § 3729(a) (2)"). Conspicuously absent from the SAC is any indication, other than Relators' *ipse dixit,* that TCI had notice that its submissions contained erroneous data, let alone that they intended to use erroneous data for the purpose of defrauding the Government. *Cf. Hendow,* 461 F.3d at 1175 (noting that relators had alleged specific instances of improper bonuses, in addition to allegations that the university adopted policies of violating the incentive compensation ban, that it repeatedly changed these policies to avoid detection, and that its staff "openly bragged about perpetrating fraud"). The SAC does not provide a plausible basis for inferring that TCI acted with scienter with regard to providing false employment placement reports. *See Burlington Coat Factory,* 114 F.3d at 1418.

*b. False Certifications of Satisfactory Progress*

**\*9** Turning next to Relators' allegations that TCI gave false assurances of students' satisfactory

progress in their program of study, the SAC again provides the *what,* but omits the *who, where, when, why,* and *how.* Relators aver that failing students received passing grades so that they would be eligible for Title IV financial aid, that teachers gave openbook exams with the answers included in the exam, and that "teachers were pressured by management to change the grade curving of classes such that more students would pass ... [and consequently Chubb] would be allowed under federal and state guidelines to receive more of the tuition monies paid by students." (SAC ¶¶ 69–71.) [FN14] Relators provide no examples of this alleged misconduct (i.e., specific student grades changed, specific teacher pressured to change grading practices), and again they fail to aver circumstantial facts enabling the inference that TCI acted with scienter with regard to providing false progress reports. *See Burlington Coat Factory,* 114 F.3d at 1418.

> FN14. It is unclear from the SAC whether this alleged misconduct violated Title IV requirements, accreditation requirements, or TCI's own guidelines.

*c. Admitting Sub–Standard Students Contrary to TCI Guidelines*

Relators' allegations that TCI knowingly admitted unqualified students who failed TCI's Entrance Assessment Test or lacked English proficiency also lack particularity. Relators provide no examples of admissions counselors being instructed to apply "pixie dust" to the admissions exams, nor do they provide examples of students benefitting from this practice. (*See generally* SAC ¶¶ 60–63 .) Although Relator's Affidavit identifies two students whom she claims were not proficient in the English language, the SAC does not explain how their admission violated TCI's PPA requirements. Further, the SAC again fails to aver circumstantial facts enabling the inference that TCI acted with scienter with regard to admitting allegedly unqualified students. *See Burlington Coat Factory,* 114 F.3d at 1418.

*d. Permitting Ineligible Students to Apply for Title*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1076228 (D.N.J.)
**(Cite as: 2010 WL 1076228 (D.N.J.))**

*IV Financial Aid*

With regard to Relators' allegations that TCI permitted ineligible students (including illegal aliens) to apply for Title IV financial aid, Relators plead no specific facts to support this allegation. Although Relator's Affidavit identifies one TCI graduate who was discovered to be an illegal alien by her employer, neither the SAC nor the Affidavit allege that TCI knew of this fact at the time it admitted this student, or that the mere admission of this student violated TCI's PPA requirements. Moreover, the SAC fails to allege circumstantial facts enabling the inference that TCI acted with scienter in assisting ineligible students apply for Title IV financial aid. *See Burlington Coat Factory,* 114 F.3d at 1418.

*e. False Certification of Compliance with Incentive Compensation Plan*

With regard to Relators' claim that TCI adopted compensation policies that rewarded higher enrollments in violation of Title IV's incentive compensation ban, Relators attached examples of TCI's compensation plan to the SAC. Defendants argue that the compensation plans are protected by regulatory safeharbor because the compensation plan was not based solely on enrollment practices covered by the ban. As a matter of law, the Court agrees with Defendants.

**\*10** While the incentive compensation ban prohibits Title IV-participating institutions from "provid[ing] any commission, bonus, or other incentive payment based directly or indirectly upon success in securing enrollments or financial aid to any person or entity engaged in any student recruiting or admission activities," 20 U.S.C. § 1094(a)(20), 31 C.F.R. § 668.14(b)(22)(i), federal regulation permits:

The payment of fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid.

31 C.F.R. § 668.14(b)(22)(ii)(A). Although the language of the safeharbor provision appears at odds with the incentive compensation ban, it stands to reason that an institution adhering to a federal regulation defining the contours of permissible compensation under the incentive compensation ban cannot have the requisite scienter to violate the ban. *See, e.g., United States ex rel. Bott v. Silicon Valley Colleges,* 262 F. App'x 810, 812 (9th Cir.2008); *United States ex rel. Lee v. Corinthian Colleges,* No. 07–1984, 2009 WL 4730890, at \*4 (C.D.Cal. Dec.4, 2009). Relators do not allege that TCI based its compensation practices solely on means prohibited by the Title IV ban, and the examples provided with the SAC demonstrate that TCI's compensation scale complied with the regulatory safeharbor. (*See* SAC, Ex. F, Pts. 25 (basing performance evaluation not only on enrollment starts, but student retention, success at recruiting activities, and administrative tasks), 26–27 (basing compensation not only on enrollment starts, but student retention, success at recruiting activities, administrative records-keeping, and professional- ism).)

The SAC does not allege with particularity examples of other prohibited compensation practices not covered by the safeharbor, and the SAC further fails to allege circumstantial facts enabling the inference that TCI acted with scienter by falsely certifying compliance with Title IV's incentive compensation ban. *See Burlington Coat Factory,* 114 F.3d at 1418.

*f. Conspiracy to Commit the Above Violations*

Lastly, the Court considers Relators' claim that TCI conspired with its corporate parents to commit the above violations. Defendants argue, and the Court agrees, that the law deems a parent corporation and its subsidiaries "legally incapable of forming a conspiracy with one another." *Fogie v. THORN Ams., Inc.,* 190 F.3d 889 (8th Cir.1999) (applying parent-subsidiary conspiracy rule, pronounced by the Supreme Court in the context of the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

Not Reported in F.Supp.2d, 2010 WL 1076228 (D.N.J.)
**(Cite as: 2010 WL 1076228 (D.N.J.))**

Sherman Act, *see Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 777, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984),* to claims arising under RICO). However, even if the law permitted a conspiracy claim to lie solely against a parent corporation and its subsidiary, Relators have not plead a plausible conspiracy claim against TCI and its parent corporations. Other than conclusory assertions that HTI provided false statements for TCI's placement records and participated in the submission of false placement records to TCI's accreditation agency, the SAC does not provide particularized allegations that TCI had an agreement with any of its corporate parents that it would use a false record or statement that "would have a material effect on the Government's decision to pay the false or fraudulent claim." *See Allison Engine,* 128 S.Ct. at 2130. Further, as explained *supra,* Relators have not identified with particularity any intentional falsehoods in the attached placement statements.

\* \* \*

**\*11** To summarize, Relators' primary allegations of fraudulent misconduct against TCI lack sufficient particularity to satisfy Federal Rule of Civil Procedure 9(b). Perhaps in recognition of these deficiencies, Relators ask this Court to ease Rule 9(b) 's pleading requirements, arguing that Defendants retain control over key information supporting their claims. Relators correctly note that courts will "relax" the particularity requirements of Rule 9(b) "when factual information is peculiarly within the defendant's knowledge or control," *Craftmatic Sec. Litig.,* 890 F.2d at 645 (collecting cases), but "even under a non-restrictive application of the rule, claimants must allege that the necessary information lies within defendants' control, and their allegations must be accompanied by a statement of the facts upon which the allegations are based," *id.* (collecting cases). However, Relators' argument is undermined by the fact that they have had access for the past two years to voluminous records concerning TCI's employment placement statistics (including the records submitted as Exhibits to the SAC) courtesy of the Government's 2007 subpoena.

Relators do not explain how the additional discovery they seek will enable them to cure the above pleading deficiencies. Because Defendants have not stated plausible False Claims Act claim against TCI, the Court will dismiss all such claims (SAC, Counts I–III) pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).

*B. Piercing the Corporate Veil & Successor Liability*

Because Relators have not sufficiently alleged that TCI violated the False Claims Act, and because Relators do not aver that The Chubb Corporation, Chubb America Service Corporation, and/or HTI themselves violated the False Claims Act, no claims remain for the imposition of liability upon TCI's corporate parents.[FN15] However, *assuming arguendo* that Relators sufficiently alleged False Claims Act violations committed by TCI, the allegations contained in Relators' SAC fail to state veil-piercing and successor liability claims against The Chubb Corpration and HTI.

> **FN15.** Although Defendant Chubb America Service Corporation does not join the current motions, the SAC only seeks to impose liability against this Defendant on the basis of its veil-piercing claim, a derivative claim. (*See* SAC Count IV, ¶ 100–04.) In the absence of a properly pled claim against TCI, Relators may not impose liability on a purported corporate parent such as Chubb America Service Corporation. Accordingly, this Count will be dismissed as against both The Chubb Corporation and Chubb America Service Corporation.

*1. Veil–Piercing*

Because veil-piercing is a state-law claim, the Court must apply the alter ego framework of the state(s) in which The Chubb Corporation and HTI are incorporated. *See, e.g., In re Cambridge Biotech Corp.,* 186 F.3d 1356, 1376 n. 11 (Fed.Cir.1999); *Stromberg Metal Works, Inc. v. Press Mech., Inc.,* 77 F.3d 928, 933 (7th Cir.1996). The SAC alleges that The Chubb Corporation was incorporated in

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 13

Not Reported in F.Supp.2d, 2010 WL 1076228 (D.N.J.)
**(Cite as: 2010 WL 1076228 (D.N.J.))**

New Jersey, and the parties appear to agree that New Jersey law governs Relators' veil-piercing claim against it. With regard to HTI, however, the SAC only avers that HTI has a principal place of business in Arizona, leading this Court to believe that Arizona law may govern this veil-piercing claim. However, the Court need not definitively decide which jurisdiction controls this claim, because the Court agrees with Defendants that Arizona law does not materially differ from New Jersey law as it applies to Relators' pleadings.

**\*12** As in other jurisdictions, it is well-established in New Jersey "that a corporation is a separate entity from its shareholders, and that a primary reason for incorporation is the insulation of shareholders from the liabilities of the corporate enterprise." *State, Dep't of Envtl. Prot. v. Ventron Corp.,* 94 N.J. 473, 500, 468 A.2d 150 (1983) (citations omitted). This limited-liability principle—known as the corporate veil—applies to corporate shareholders as well. *Id.* In the parent-subsidiary context, New Jersey law permits courts to "pierce the corporate veil" where the subsidiary is shown to be the alter ego, or "mere instrumentality," of the parent corporation. *Id.* at 500–01, 468 A.2d 150. Alter ego liability attaches where "the parent [corporation] so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent." *Id.* at 501, 468 A.2d 150 (citation omitted); *accord Gatecliff v. Great Republic Life Ins. Co.,* 170 Ariz. 34, 821 P.2d 725, 729 (Ariz.1991) (applying Arizona law). Yet, "[e]ven in the presence of corporate dominance, liability generally is imposed only when the parent has abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or otherwise to circumvent the law." *Ventron,* 94 N.J. at 501, 468 A.2d 150 (citations omitted); *see also Craig v. Lake Asbestos of Quebec, Ltd.,* 843 F.2d 145, 150 (3d Cir.1988) ("It is patently clear since *Ventron* that in New Jersey even the exercise of significant control by the parent over the subsidiary will not suffice to pierce the corporate veil.").

"In order to state a claim for piercing the corporate veil under New Jersey law, a plaintiff must show that: (1) one corporation is organized and operated as to make it a mere instrumentality of another corporation, and (2) the dominant corporation is using the subservient corporation to perpetrate fraud, to accomplish injustice, or to circumvent the law." *Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.,* 296 F.3d 164, 171 (3d Cir.2002) (citation omitted); *cf. Gatecliff,* 821 P.2d at 728 (recognizing that veil-piercing in Arizona requires a showing of "(1) unity of control and (2) that observance of the corporate form would sanction a fraud or promote injustice.") (citations omitted). Relevant considerations to the veil-piercing analysis include

gross undercapitalization ... failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant stockholder, non-functioning of other officers or directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders.

*Foodtown,* 296 F.3d at 172 (citations and internal quotation marks omitted) (applying New Jersey law); *cf. Deutsche Credit Corp. v. Case Power & Equip. Co.,* 179 Ariz. 155, 876 P.2d 1190, 1195–96 (Ariz.Ct.App.1994) (identifying similar relevant factors under Arizona law). Without more, neither stock ownership (majority or complete) nor overlapping boards of directors suffice to establish an alter ego relationship. *E.g., Ramirez v. STi Pre-paid LLC,* 644 F.Supp.2d 496, 507 (D.N.J.2009) (applying New Jersey law); *Horizon Res. Bethany Ltd. v. Cutco Indus.,* 180 Ariz. 72, 881 P.2d 1177, 1180 (Ariz.Ct.App.1994) (applying Arizona law); *see also United States v. Bestfoods,* 524 U.S. 51, 69, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998); *Pearson v. Component Tech. Corp.,* 247 F.3d 471, 484–85 (3d Cir.2001).

*a. The Chubb Corporation*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 14

Not Reported in F.Supp.2d, 2010 WL 1076228 (D.N.J.)
(Cite as: 2010 WL 1076228 (D.N.J.))

**\*13** With regard to The Chubb Corporation, Relators allege that The Chubb Corporation founded TCI in 1970 to train employees for its computer center,[FN16] and that TCI was a subsidiary of The Chubb Corporation until The Chubb Corporation sold TCI to co-Defendant HTI in 2004. (SAC ¶¶ 6–7, 26.) Under its veil-piercing claim in Count IV, Relators further aver that The Chubb Corporation and Chubb Services Corporation both (i) "exclusively controlled" and "managed" TCI; (ii) that they received reports from TCI; (iii) that they "directly benefitted" from the federal funds obtained by TCI; (iv) that they used TCI as an alter ego; (v) that they "were aware of and had complete control of the fraud committed by [TCI];" and (vi) that they "created this corporate structure to avoid [their] duties to consumers and to shelter [their] wrongdoings from judicial or administrative oversight." (*id.* ¶¶ 100–105.) These boilerplate allegations, which presume the legal conclusion that TCI was The Chubb Corporation's alter ego, do not speak to the factors identified by the Third Circuit for determining whether a subsidiary is the mere instrumentality of the parent. Relators do not allege that TCI was grossly undercapitalized, failed to observe corporate formalities, had non-functioning directors, or that it commingled funds with either of its parent corporations. Instead, Relators contend that The Chubb Corporation should be liable because it was the "sole owner and beneficiary" of TCI's alleged false claims. (Relators' J. Opp'n Br. at 23.) Yet courts in New Jersey have consistently rejected imposing alter ego liability solely on this basis. *E.g., Ramirez,* 644 F.Supp.2d at 508 (finding allegations that a parent corporation owned a controlling interest in its subsidiary and shared upper management with its subsidiary insufficient to state a valid veil-piercing claim); *Premier Pork L .L. C. v. Westin, Inc.,* No. 07–1661, 2008 WL 724352, at *7 (D.N.J. Mar.17, 2008) (same).

> **FN16.** Relators base this allegation on a statement that purportedly appeared on TCI's website on or about the time this case was filed. (*See* SAC ¶ 26 (averring

that TCI's website contained the following statement: "In 1970, one of the largest insurance organizations in the world needed qualified people to run its multimillion dollar computer center. Not able to find skilled employees, it created its own training center. This proved so successful that [other companies] soon asked [TCI] to provide them with computer professionals. And so [TCI] was born").)

Relators attempt to minimize these deficiencies in their opposition brief and in the declaration of counsel, which present the following new allegations not contained in the SAC: (i) that another corporation, Chubb Computer Services, Inc., owned all of TCI's stock in 2004; (ii) that *this* entity sold the shares to HTI in the 2004 sale of TCI; and (iii) that this entity had a common treasurer and secretary with The Chubb Corporation. (Relators' J. Opp'n Br. at 7 (citing Green Decl., Exs. E, F).) Relators' attempt to bolster their pleadings midstream is improper. *See Burlington Coat Factory.,* 114 F.3d at 1426 ("As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings."). However, accepting these allegations for the sake of argument, the Court does not understand how they advance Relators' position. Not only do these allegations add nothing to the claim that The Chubb Corporation dominated TCI, but they contradict the SAC's claim that The Chubb Corporation sold TCI to HTI in 2004. If anything, the new allegations suggest that The Chubb Corporation had a close working relationship with Chubb Computer Services, Inc., but the SAC does not allege that The Chubb Corporation had an alter ego relationship with this company.[FN17]

> **FN17.** In fact, it does not appear that the SAC even identifies this entity, lest this Court is to presume that Chubb Computer Services, Inc., is the same corporation as co-Defendant Chubb America Service Corporation.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 15

Not Reported in F.Supp.2d, 2010 WL 1076228 (D.N.J.)
**(Cite as: 2010 WL 1076228 (D.N.J.))**

**\*14** The SAC also falls short under the second prong of the Third Circuit's veil-piercing analysis, because Relators fail to plead The Chubb Corporation's role in TCI's alleged fraud with sufficient particularity. "When a cause of action seeks to pierce the corporate veil on the basis of fraud, it is subject to Fed.R.Civ.P. 9(b)." *Foodtown,* 296 F.3d at 172 n. 10 (citing *Coyer v. Hemmer,* 901 F.Supp. 872, 883–84 (D.N.J.1995)). As noted above, the SAC fails to allege with sufficient particularity that TCI used false statements to fraudulently procure federal monies. The SAC provides no additional perspective on The Chubb Corporation's purported role in this scheme. Construing the SAC in the light most favorable to Relators and accepting the additional facts asserted in Relators' brief, the SAC is bereft of allegations permitting an inference that The Chubb Corporation used TCI as a mere instrumentality to perpetrate fraud.

*b. HTI*

Turning to HTI, Relators advance *verbatim* the same veil-piercing allegations that they made about The Chubb Corporation that the Court considered above. (SAC ¶¶ 107–12.) Relators also allege that Defendants submitted documents, letters, and reports to its accreditation agency at various dates between 2003 and 2005 that "contain[ed] willfully false statements made by [TCI] and The High Tech Institute" (*id.* ¶ 24(i)(a)), and that TCI and HTI "submitted these documents with the purpose of falsely obtaining accreditation and falsely entitling them to Title IV/HEA funding from the Department of Education" (*id.* ¶ 24(i)(b)). Although the SAC does not appear to speak to the matter, Relators contend in their brief that HTI's chief executive officer also acted as an officer of TCI and submitted documents on their behalf to unspecified recipients. (Relators' J. Opp'n Br. at 30; *see also id* . at 7 (suggesting additional overlapping officers).) Finally, Relators allege that statements appeared on TCI's and/or HTI's website [FN18] proclaiming that HTI "added The Chubb Institute's eight locations to its list of 17 HTI campuses throughout the United States," and referring to TCI and/or TCI affiliates

as "branch [ ] schools" and "part of the HTI family of schools." (SAC ¶ 27; Relators' J. Opp'n Br. at 24.)

> FN18. The Court notes that not all of these statements appear in the SAC, and the SAC indicates that one of the statements appeared on The Chubb Institute's website rather than HTI's website. (*See* SAC ¶ 27.) Further, although Relators attached printouts of portions of Defendants' respective websites, the Court has been unable to locate where each of these statements were made, and the websites referenced in the SAC appear to have changed since the time this lawsuit was filed. For purposes of addressing Relators' argument, the Court will accept the alleged website statements as described in Relators' brief.

By themselves, the duplicated boilerplate allegations and the shared-corporate-officers allegations fail to state a claim with respect to HTI for the same reason that these allegations failed to state a claim against The Chubb Corporation. *See Horizon,* 881 P.2d at 1180 (recognizing that, under Arizona law, "[A] mere showing that one corporation is owned by another or that the two share interlocking officers or directors is insufficient to support a finding of alter ego."); *accord Ramirez,* 644 F.Supp.2d at 507 (applying New Jersey law). The question remains whether Relators' additional allegations that HTI welcomed TCI into its "family of schools" and participated in the submission of false statements to TCI's accreditation agency sufficiently plead the unity of control and/or mere instrumentality status to state a claim for veil-piercing. The Court finds that they do not.

**\*15** With regard to the alleged website statements that TCI joined the HTI family of schools, these statements do not permit the inference that TCI ceased operating as a distinct corporate entity. The alleged statements do not suggest that TCI was grossly undercapitalized, failed to observe corporate formalities, had non-functioning directors, or

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1076228 (D.N.J.)
**(Cite as: 2010 WL 1076228 (D.N.J.))**

that it commingled funds with either of its parent corporations. Meanwhile, Relators' contention that HTI participated in the submission of false documents fails to state a plausible veil-piercing claim against HTI because the documents provided with the SAC do not support this contention.

As noted above, Relators included Exhibits A (2003 Placement Charts) and B (2004 Letter of Assurance and Interim Report) with the SAC to demonstrate Defendants' submission of false statements to their accreditation agencies. The SAC avers that HTI either provided false statements and/or participated in the submission of these documents to the accreditation agency, but these documents do not bear any indicia of HTI approval or participation, and Relators do not explain which, if any, of the statements contained therein were attributable to HTI. Moreover, because these allegations purport to speak for HTI's role in the fraudulent activity, they must comport with the heightened pleading requirements of *Rule 9(b)*. *See, e.g., Foodtown,* 296 F.3d at 172 n. 10. As the Court explained with regard to Relators' claims against TCI, *see supra* Part III.A, Relators do not identify a single knowingly false statement among the voluminous statistics contained in these exhibits. Thus, presuming that HTI submitted some of these documents to accreditation agencies and/or that HTI made some of the statements contained therein, Relators have not plead with particularity that HTI participated in the commission of fraud.

*2. Successor Liability*

Relators rely on the same veil-piercing allegations above (including the boilerplate allegations made against The Chubb Corporation and HTI) to present a claim for successor liability against HTI. ( *See* SAC ¶¶ 114–19.) However, the same allegations fair no better under New Jersey's law for successor liability.

The general rule in New Jersey is that "where one company sells or otherwise transfers all its assets to another company the latter is not liable for the debts and liabilities of the transferor." *Ramirez v. Amsted Indus., Inc.,* 86 N.J. 332, 340, 431 A.2d 811 (1981) (citations omitted). Nevertheless, New Jersey law recognizes the following exceptions warranting the imposition of successor liability: "where (1) the purchasing corporation expressly or impliedly agreed to assume such debts and liabilities; (2) the transaction amounts to a consolidation or merger of the seller and purchaser; (3) the purchasing corporation is merely a continuation of the selling corporation, or (4) the transaction is entered into fraudulently in order to escape responsibility for such debts and liabilities." *Id.* at 340–41, 431 A.2d 811 (collecting cases); *see also Colman v. Fisher–Price, Inc.,* 954 F.Supp. 835, 838 (D.N.J.1996). Relators contend that their allegations state a plausible claim under the merger and mere continuation theories.

**\*16** The following considerations guide a court's determination of whether the sale of a corporation constitutes a *de facto* merger or mere continuation: "(a) continuity of management, personnel, physical location, assets, and general business operations; (b) a cessation of ordinary business and dissolution of the predecessor as soon as practically and legally possible; (c) assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor; and (d) continuity of ownership/shareholders." *Portfolio Fin. Servicing Co. ex rel. Jacom Computer Servs., Inc.,* 334 F.Supp.2d 620, 625–26 (D.N.J.2004); *see also Luxliner P.L. Export, Co. v. RDI/Luxliner, Inc.,* 13 F.3d 69, 73 (3d Cir.1993). All of the factors need not be present to demonstrate a *de facto* merger or mere continuation, and "[t]he crucial inquiry is whether there was an 'intent on the part of the contracting parties to effectuate a merger or consolidation rather than a sale of assets.' " *Luxliner,* 13 F.3d at 73 (quoting *McKee v. Harris–Seybold Co.,* 109 N.J.Super. 555, 567, 264 A.2d 98 (App.Div.1970)).

Here, Relators contend that HTI absorbed TCI by incorporating TCI's campuses into the "HTI family of schools." (Relators' J. Opp'n Br. at 27.)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 17

Not Reported in F.Supp.2d, 2010 WL 1076228 (D.N.J.)
**(Cite as: 2010 WL 1076228 (D.N.J.))**

Relators further argue that HTI's assumption of TCI's liabilities "is clear on its face—the obligations for accreditation and revenue requirements, obligations to vendors, teachers and administrators have all undeniably passed to the new entity going forward." (*id.*)[FN19] Unfortunately, these conclusory assertions are not supported by the pleadings.

> FN19. The Court understands Relators to argue that the purchase of stock necessarily entails an assumption of the corporation's debts and obligations. This argument flies in the face of the corporate veil doctrine, which presumes, with limited exceptions, "that a corporation is a separate entity from its shareholders, and that a primary reason for incorporation is the insulation of shareholders from the liabilities of the corporate enterprise." *Ventron,* 94 N.J. at 500, 468 A.2d 150.

The SAC avers that HTI is the successor corporation to TCI (SAC ¶ 119), but Relators concede that HTI purchased TCI from Chubb Computer Services, Inc. (Relators' J. Opp'n Br. at 27).[FN20] Relators also appear to concede that HTI did not purchase TCI's assets. (Relators' J. Opp'n Br. at 27 (explaining that the 2004 sale of TCI "was a stock purchase, not an asset purchase").) With regard to the purportedly merged entity, the SAC does not allege that TCI has ever ceased operations as a distinct corporate entity, and Relators concede that TCI continued to operate at the "same campus locations" under the same "Chubb brand" after the stock sale, "albeit within the HTI 'family' of schools." (Relators' J. Opp'n Br. at 26, 27.) Furthermore, the SAC neither alleges that HTI's purchase of TCI maintained continuity in shareholders (i.e., that HTI exchanged shares for TCI's assets), nor that HTI expressly or implicitly agreed to assume TCI's debts and obligations. In the absence of such allegations, Relators cannot plausibly claim that HTI and Chubb Computer Services, Inc. intended to merge TCI into HTI when the latter sold its shares of TCI stock.

FN20. As previously noted, the SAC does not identify Chubb Computer Services, Inc., and Relators do not suggest that this entity merged with HTI.

**III. LEAVE TO AMEND**

The Court notes that Relators have already amended the original Complaint twice. It also appears that, courtesy of a Government subpoena served in 2007, they have had access to a considerable amount of records providing TCI's employment placement statistics for the years 2003–2005, which included student and employer contact information, as well as all TCI submissions to accreditation agencies. (*See* SAC Exs. A–E; TCI & HTI Reply Br. at 1.) Despite having had access to this information for more than two years, Relators still have not pled plausible causes of action for a False Claims Act violation, piercing the corporate veil, or successor liability. Further, Relators do not seek leave to amend the SAC to cure their pleading deficiencies.

**\*17** Federal Rule of Civil Procedure 15(a) provides that "leave [to amend] shall be freely given when justice so requires," and the Third Circuit has recommended granting leave to amend unless amendment would be futile, prejudicial to a party, or dilatory, *see In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1434 (3d Cir.1997). It may well be that further amendment would be futile; however, the Court will give Relators an opportunity to explain otherwise. For the time being, the Court will dismiss the claims presented in the Second Amended Complaint without prejudice, and the Court will give Relators 30 days from the receipt of the accompanying Order to show cause as to why they should be granted leave to amend the Complaint for a third time. Pursuant to the Government's continuing authority under 31 U.S.C. § 3730, the Court will require Relators to provide the Government a copy of any such reasons within the time allotted to show cause.

**IV. CONCLUSION**

For the aforementioned reasons, the Court will

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 18

Not Reported in F.Supp.2d, 2010 WL 1076228 (D.N.J.)
**(Cite as: 2010 WL 1076228 (D.N.J.))**

grant The Chubb Corporation's motion (Doc. No. 38) to dismiss, as well as the motion (Doc. No. 39) to dismiss filed by TCI and HTI. Relators' Second Amended Complaint will be dismissed in its entirety without prejudice. An appropriate form of order accompanies this Memorandum Opinion. Relators will have thirty (30) days from the filing of the accompanying Order to show cause for why they should be granted leave to amend the Second Amended Complaint.

D.N.J.,2010.
U.S. v. Chubb Institute
Not Reported in F.Supp.2d, 2010 WL 1076228 (D.N.J.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



FOR EDUCATIONAL USE ONLY                                                                        Page 1
Not Reported in F.Supp.2d, 2010 WL 3184210 (N.D.Ill.)
**(Cite as: 2010 WL 3184210 (N.D.Ill.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois,
Eastern Division.
UNITED STATES of America, Plaintiff,
v.
ANCHOR MORTGAGE CORP. and John Munson, Defendants.

No. 06 C 210.
Aug. 11, 2010.

West KeySummary**United States 393** ⟜**120.1**

393 United States
    393VIII Claims Against United States
        393k120 Making or Presentation of False Claims
and Other Offenses Relating to Claims
            393k120.1 k. In General. Most Cited Cases
    Mortgage company knowingly provided false gift
affidavits under the False Claims Act in connection with
applications it submitted to obtain Federal Housing Administration
(FHA) insured loans for its customers.
Home builder referred clients to mortgage company to
obtain FHA insured loans. Mortgage company informed
home builder that Housing and Urban Development
(HUD) and FHA rules did not permit parties involved in
a home sale, builders, to provide the buyer with any part
of the down payment. Mortgage company learned that
home builder was providing money to the applicants for
their down payment and then the applicants stated that
they had received down payment funds from a relative.
31 U.S.C.A. § 3729.

Eric S. Pruitt, AUSA, United States Attorney's Office,
Chicago, IL, for Plaintiff.

James B. Zaczek, Law Offices of James B. Zaczek,
Peter W. Andjelkovich, Bradley J. Wartman, Peter Andjelkovich
& Associates, Chicago, IL, for Defendant.

***MEMORANDUM OPINION AND ORDER***

MATTHEW F. KENNELLY, District Judge.
    **\*1** The United States has sued Anchor Mortgage
Corporation and John Munson, its former president, under
the False Claims Act (FCA), 31 U.S.C. § 3729. The
government alleges that Anchor violated the FCA by
knowingly providing false information to the Department
of Housing and Urban Development (HUD) in
connection with applications for home mortgage loans
to be insured by the Federal Housing Administration
(FHA). The government also alleges that Anchor and
Munson violated the FCA by paying an unrelated real
estate company fees for referring borrowers to Anchor
and falsely certifying in applications for FHA-insured
loans that no such fees had been paid.[FN1]

    FN1. The government's complaint in this case
    also includes two common law fraud claims,
    but the government dropped them at the time of
    trial.

    The Court previously denied the government's motion
for summary judgment. *See United States v. Anchor
Mortgage Corp.,* No. 06 C 210, 2010 WL 1882018
(N.D.Ill. May 10, 2010). The same decision describes
the procedural history of the case. *Id.* at \*1–3.

    The Court conducted a two-day bench trial on July
9 and July 23, 2010. This constitutes the Court's findings
of fact and conclusions of law pursuant to Federal
Rule of Civil Procedure 52(a).

**Facts**
    HUD is a federal agency that, through the FHA,
provides mortgage insurance to qualified private
lenders. HUD/FHA-approved lenders make mortgage
loans that are FHA-insured to qualified buyers who are
unable to make a large down payment. Some HUD-approved
lenders participate in HUD/FHA's direct endorsement
program, which allows them to close and underwrite
HUD/FHA insured loans before final acceptance
by HUD/FHA. Other lenders submit loan applications
to HUD/FHA for approval.

    John Munson began his career in the mortgage in-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                          Page 2

Not Reported in F.Supp.2d, 2010 WL 3184210 (N.D.Ill.)
**(Cite as: 2010 WL 3184210 (N.D.Ill.))**

dustry in 1989 as a loan officer and branch manager of a company called American Frontiers. In 1992, he started his own mortgage brokerage firm, Anchor, which obtained mortgage loans for customers. Anchor's business expanded to seven offices and approximately seventy-five employees. In the mid–1990's, Anchor became a mortgage bank, meaning that it funded its own mortgage loans. In the ensuing years, Anchor opened more offices and had as many as 150 employees. Anchor's business took a nosedive after this lawsuit was filed, and the company is now defunct.

Anchor submitted applications for FHA-insured loans to HUD for approval. It also participated in HUD/FHA's direct endorsement program. When it acted as a direct endorser, Anchor was required to follow HUD regulations and other laws that govern mortgage lending. Anchor derived its income from processing fees, origination fees, and yield spread premiums that it earned when making or brokering loans, and also by pooling mortgages and selling them to the FHA or secondary market lenders.

After Munson started Anchor, Alfredo Busano, another loan officer who had worked at American Frontiers, came to work for Anchor. Busano became an Anchor loan officer, and from 1994 through 2001, he managed the company's office in Elgin, Illinois. As manager, Busano performed administrative duties and hired and recruited new loan officers, and he also continued working as a loan officer. Anchor paid him a monthly base salary, which was then netted against commissions he made from loans he and others at the Elgin office had originated. From time to time, Busano submitted expense reports to the company's accountant, Jeffrey Stack, for reimbursement. For instance, as office manager, Busano would receive reimbursements for office supplies. In his work as a loan officer, Busano had to pay up front the fee for appraising the home to be purchased but was reimbursed if the loan closed.

**A. Customers referred to Anchor by Gordon Nelson**

**\*2** Busano first met Gordon Nelson, a home builder, when Busano and his wife were looking to purchase a new home. At the time, Nelson did business through a company called Lifetime Homes. Later he also did busi-

ness through companies called Century Homes and Builders Funding, Inc.

After Busano went to work for Anchor, he contacted Nelson to seek customer referrals. At first, the customers that Nelson referred to Anchor were prospective buyers of newly constructed homes. Eventually, Nelson started purchasing and reselling foreclosed homes and would refer prospective buyers of those homes to Anchor as well.

In 1996, in connection with his sale of foreclosed homes in a development called Candlewood Lakes, Nelson asked Busano about the options available to borrowers who lacked sufficient funds for the down payment required for FHA-insured loans. Busano understood at the time that HUD/FHA rules did not permit parties involved in a home sale—such as realtors, builders, or sellers—to provide the buyer with any part of the down payment. Busano told Nelson that FHA rules provided only three options. A buyer could do repair work on the home and get a "sweat equity" credit that would apply toward the down payment. A seller could contribute toward the buyer's down payment through a non-profit agency, but this would involve additional costs and more documentation. Busano also told Nelson that FHA guidelines allowed a buyer to receive a gift from a relative that could be used toward the down payment. Nelson requested a copy of HUD/FHA's gift guidelines, and Busano sent them to Nelson's office.

On a number of occasions after this conversation, between 1996 and 1999, buyers purchasing Nelson's foreclosed homes in Candlewood Lakes contacted Anchor Mortgage to obtain financing. Busano testified credibly that buyers told him that they had gotten money for their down payment from Nelson. Busano also testified credibly that he learned from others who worked for Nelson that he had provided down payment funds to buyers of Candlewood Lakes homes. In addition, Nelson and his employees would frequently call Anchor to ask for the exact amount needed for the three percent down payment required under FHA rules, which confirmed Busano's belief that Nelson was providing buyers with down payment funds.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                      Page 3

Not Reported in F.Supp.2d, 2010 WL 3184210 (N.D.Ill.)
**(Cite as: 2010 WL 3184210 (N.D.Ill.))**

A number of the loan files that Anchor submitted to HUD to obtain approval for FHA insurance included a gift letter, on a HUD-approved form, stating that down payment funds had come from a relative of the buyer. Busano testified credibly that in connection with loans to buyers referred by Nelson or his company, he knew these statements were false. Busano also testified credibly that he knew gifts by Nelson to home buyers for their down payments were prohibited by FHA rules.

Bob and Lisa Kaplan were also home buyers whom Nelson referred to Busano to obtain a loan. In 1998, Nelson and the Kaplans called Busano, asking to pre-qualify their loan for FHA approval. Based on the information they provided to him, Busano said the Kaplans would qualify. Busano met with the Kaplans later the same day to complete their loan application. When Busano reviewed the Kaplans' income tax returns at his office, he realized that the return listed Bob Kaplan's gross income from self-employment, not his net income. Busano explained to the Kaplans that FHA approval would depend on his net income. Based on Busano's review of the tax returns, he told the Kaplans that he believed their net income would be insufficient to qualify for an FHA-insured loan. The Kaplans were upset by this, and they called their accountant from Busano's office. Busano heard Bob Kaplan inform his accountant that they had not qualified for a loan, and he heard Kaplan discuss with the accountant the possibility of amending his tax return. Two or three weeks later, the Kaplans returned to Busano with amended tax returns. Based on the new tax returns, the Kaplans qualified for an FHA-insured loan, and Busano submitted their paperwork to HUD.

**\*3** Busano pled guilty to a charge of mail fraud in connection with his work at Anchor. Nelson also entered a guilty plea to a mail fraud charge. Nelson died prior to trial. The Court admitted into evidence, with some redactions, his plea agreement and the transcript of his guilty plea colloquy before Judge Ruben Castillo.

In the plea agreement, Nelson admitted that between 1996 and 1999, he provided down payments to over twenty home buyers whom he referred to Busano at Anchor and instructed the buyers to conceal the source of the down payments via false gift affidavits. Nelson admitted that he would get information from Busano about the amount each buyer would need to qualify for an FHA-insured mortgage. Nelson also admitted that he was aware that Busano was concealing from HUD the source of the down payments and the falsity of the affidavits. Nelson also admitted that he knew HUD rules did not permit someone like him to be the source of a buyer's down payment for an FHA-insured mortgage. Nelson's plea agreement identified thirteen specific properties on which FHA-insured loans made from 1997 through 1999 based on false gift affidavits or other information he knew was false. They include the Candlewood Lakes properties at issue in this case. About half of the home buyers defaulted. When Nelson appeared before Judge Castillo, he affirmed under oath the veracity of his statements in the plea agreement.

**B. Mortgage business referred to Anchor by Casa Linda**

Casa Linda Realty, a real estate company, referred home buyers to Anchor to obtain loans. In 1997 or 1998, Monica Holderby, an Anchor loan officer, discussed with Busano the possibility of paying Casa Linda for referrals. Busano told her that he would have to talk to Munson.[FN2] Munson and Busano then had a discussion about paying Casa Linda referral fees. At the time, both Busano and Munson knew that the law prohibited payment of a referral fee to an entity like Casa Linda in connection with an FHA-insured mortgage. Both men understood that it was legally permissible to pay such fees as part of a "controlled business arrangement" (CBA), a joint venture of sorts, so long as the arrangement was disclosed to borrowers and certain other conditions were met. Munson said he would look into the possibility of setting up a CBA with Casa Linda.

> FN2. Holderby's employment was later terminated. After that, Busano approached Casa Linda about keeping its business, and the subject of paying referral fees again came up.

Shortly after this conversation, Munson contacted Anchor's attorney, Kenneth Michaels, to discuss setting up a CBA with Casa Linda. Michaels drafted a pro-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                                  Page 4

Not Reported in F.Supp.2d, 2010 WL 3184210 (N.D.Ill.)
**(Cite as: 2010 WL 3184210 (N.D.Ill.))**

posed agreement. Munson testified credibly that he signed the draft agreement and sent it to Busano so that he could have it executed by Casa Linda. Andy Quiroz, a part owner and the managing broker of Casa Linda, testified credibly that at some point he saw a document that he understood as reflecting that Anchor had found a legal way to pay referral fees to Casa Linda. Quiroz did not know, however, whether the document had ever been finalized, though he testified that he did not think Anchor would "engage in something illegal unless they had found a right way to do it [sic]." July 9, 2010 Tr. 93.

**\*4** The evidence reflects that sometime in 1998, Anchor began paying Casa Linda referral fees for borrowers it referred to Anchor. The evidence shows that there was no arrangement in place at the time that would have made the payments permissible under HUD/FHA rules. No fully executed version of the draft CBA exists. In addition, the draft CBA contemplated the formation of a new entity, but there is no record that this entity was established. Munson's testimony that he believed a CBA had been set up is uncorroborated and otherwise lacking in credibility.

The referral fees for Casa Linda were paid via Anchor checks, signed by Munson, payable to Busano or Casa Linda. If the check was made payable to Busano, he would cash the check and pay Casa Linda in currency. The total amount of payments Anchor made to Casa Linda is unclear.

The documentary evidence admitted at trial reflects three payments that the Court finds constituted referral fees that Anchor paid to Casa Linda. These are reflected in Government Exhibits 27, 28, and 29. Exhibits 27 and 28 are checks to Busano dated July 20 and August 20, 1998 that included referral fees for several Casa Linda borrowers. Busano cashed the checks and made payments to Casa Linda. Exhibit 29 is a check to Casa Linda for dated February 12, 1999 for transactions that apparently took place in January 1999. The checks were prepared by Anchor's controller, who gave them to Munson for signature. The materials Munson received along with each check for signature included a spreadsheet referencing Casa Linda Realty that listed the bor-

rowers, loan type (HUD/FHA), loan amount, and the "net commission." The spreadsheets clearly referenced Casa Linda as a "loan originator" that was receiving a "commission" at a specified rate (three-eighths of one percent).

The government also offered evidence concerning three FHA-insured loans originated by Anchor for buyers referred by Casa Linda Realty. Government Exhibit 14 concerns a \$127,000 loan to Ramon Santiago and Carmen Velez in or about July 2008 for property at 1013 E. Lilac in Palatine, Illinois. Anchor made the loan as a direct endorser. The pertinent form included a certification that, among other things, the lender had paid no kickbacks, fee or consideration of any type to anyone in connection with the transaction except as permitted by HUD rules. Though the copy of the form admitted in evidence was not executed by Anchor, the loan could not have been approved absent Anchor's signature. It is reasonable to infer, and the Court does infer, that Anchor executed the form, including the certification. The spreadsheet that accompanied the previously-described August 20, 2008 check to Busano for "Casa Linda reimbursement" listed a commission payment related to a loan to "Santiago" for \$127,000. *See* Govt. Ex. 27. The Court finds that this was a referral fee for the Santiago loan.

Government Exhibit 15 includes documentation concerning a loan in the amount of \$126,150 to Ruben Islas and Tolentino Martiniano for property at 6860 Hickory in Hanover Park, IL. The loan was direct-endorsed by Anchor and was made in or about late May 1998. The documentation offered by the government includes a signed certification by Anchor that no kickback, fee, or consideration had been paid to anyone in connection with the transaction except as permitted by HUD rules. The documentation regarding the previously-described July 20, 1998 check to Busano reflects that the check stub includes a line item of \$473.06 for "Ruben Islas." The accompanying spreadsheet lists a borrower named "Ruben Ligarte" on a loan for \$126,150 with a net commission of \$473.06. The next line item on the spreadsheet lists a borrower named "Cecil Islas" on a loan for \$93,700 with a commission

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                    Page 5

Not Reported in F.Supp.2d, 2010 WL 3184210 (N.D.Ill.)
**(Cite as: 2010 WL 3184210 (N.D.Ill.))**

of $351.38. Though the records are somewhat jumbled, the Court finds that the check included a referral fee to Casa Linda for the Islas loan.

**\*5** Government Exhibit 16 includes documents regarding a loan in the amount of $114,550 to Miguel Prado and Maria Guzman for property at 7018 Lowell Drive in Carpentersville, Illinois. Anchor direct-endorsed the loan, which was made in or about January 1999. The documentation includes a signed certification by Anchor that no fees had been paid to anyone in connection with the transaction. The spreadsheet accompanying the previously-described February 12, 1999 check to Casa Linda Realty for "January fees" includes a line item for "Miguel Padro [sic]" concerning a loan of $112,050 with a commission of $420.19. Again, though the amounts do not correspond exactly, the Court finds that this check included a referral fee for the Prado loan.

### Discussion[FN3]

> FN3. This section of the decision includes additional findings of fact beyond those made in the section entitled "Facts."

Under the False Claims Act, any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" is liable to the government for a civil penalty plus three times the damages the government sustains as a result. 31 U.S.C. § 3729(a)(1) (A & B). The government is required to prove a defendant's liability by a preponderance of the evidence. *Id.* § 3731(d).

The term "claim" as used in the FCA means a request or demand for money or property presented to the government or a government contractor. *Id.* § 3729(b)(2). When the government insures a mortgage loan via the FHA, it does not pay out money at that point; indeed, it does not pay out money unless and until a demand is made on the FHA insurance. But an application for FHA insurance nonetheless constitutes a claim within the meaning of the FCA. *See Allison Engine Co. v. United States ex rel. Sanders,* 553 U.S. 662,

128 S.Ct. 2123, 2130–31, 170 L.Ed.2d 1030 (2008) (FCA imposes liability for a false statement that has a material effect on the government's eventual decision to pay a claim); *United States v. Eghbal,* 548 F.3d 1281, 1283–84 (9th Cir.2008) (fraudulent information used to induce government to provide a loan guarantee is a false claim).

The term "knowingly," as used in section 3729(a), denotes actual knowledge, deliberate ignorance or reckless disregard of the truth or falsity of the relevant information. *Id.* § 3729(b)(1). The FCA requires "no proof of specific intent to defraud." *Id* .

### A. Vicarious liability and imputation of knowledge

The government contends that Anchor is liable on a theory of respondeat superior. A principal is vicariously liable for its agent's conduct if that agent "is an employee who commits a tort while acting within the scope of employment." Restatement (Third) of Agency § 7.03(2)(a) (2006); *see also, United States v. Dolphin Mortgage Corp.,* No. 06 C 499, 2009 WL 153190, at *12 (N.D.Ill. Jan.22, 2009). Both Busano and Munson were Anchor's agents at the relevant time.

"One fundamental rule of agency law is that corporations 'know' what their employees know—at least, what employees know about subjects that are within the scope of their duties." *Prime Eagle Group Ltd. v. Steel Dynamics, Inc.,* No. 09–1663, 2010 WL 2899097, at *2 (7th Cir. July 27, 2010). Thus, knowledge that Busano and Munson had about matters within the scope of their responsibilities is imputed to Anchor. *See Grand Union Co. v. United States,* 696 F.2d 888, 891 (5th Cir.1983) ("We have held in cases brought under the False Claims Act that the knowledge of an employee is imputed to the corporation when the employee acts for the benefit of the corporation and within the scope of his employment."). That is the case regarding the matters at issue here—both the false borrower information and referral fee aspects of the government's FCA claim.

**\*6** The Court rejects Anchor's contention that Busano's acts and knowledge are not attributable to Anchor because, in committing fraud, he acted against the company's interests. Busano may have been advancing

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                    Page 6

Not Reported in F.Supp.2d, 2010 WL 3184210 (N.D.Ill.)
**(Cite as: 2010 WL 3184210 (N.D.Ill.))**

his own interest in obtaining commissions. But his acts involved authority delegated to him by Anchor—generating, okaying, and submitting loan applications—and he quite clearly was also acting for the benefit of Anchor, which profited from the transactions via the fees and other income it earned when loans were approved. *See generally* Restatement (Third) of Agency § 7.07 (2006).

**B. False gift affidavits**

The government contends that Anchor, through Busano, knowingly provided false gift affidavits in connection with applications it submitted to obtain FHA-insured loans for its customers. The government cites eleven loans, represented in the evidence via Government Exhibits 1–11, as having been approved for FHA insurance based on false gift affidavits.

The portions of Nelson's admissions in plea agreement that the Court admitted in evidence, along with Busano's credible testimony, establish that Anchor engaged in a practice of knowingly submitting to HUD loan applications relating to properties in Poplar Grove, Illinois that contained material false statements concerning the source of the borrowers' down payments. Specifically, Anchor knowingly submitted applications that included gift affidavits that it knew falsely stated the applicant or applicants had received money for the down payment from relatives. In fact, they had received this money from Nelson and/or his companies. Busano knew these gift affidavits were false at the time he caused them to be submitted to HUD/FHA.

These false statements were material to HUD's decision to grant FHA insurance. HUD/FHA rules required the borrower's down payment to be in a particular amount—typically three percent of the loan total—in order for the loan to be eligible for FHA insurance. To the extent Anchor submitted such loan applications to HUD/FHA for approval, it presented or caused the presentment of materially false or fraudulent claims and caused material false statements to be made in connection with false or fraudulent claims. To the extent Anchor approved the loans itself as a direct endorser, it falsely represented to HUD/FHA that the loans met the requirements for FHA insurance.

As the Court has indicated, the government's allegations regarding false gift affidavits concern specific loan applications. In his guilty plea, Nelson stated that each of these applications included false gift affidavits. The loan files the government offered in evidence, however, include gift affidavits for only seven of the eleven loans. Specifically, the loan files for the following seven properties include gift affidavits: 45 King Henry, 115 Chanticleer, 202 Carthage, 213 Constitution, 310 Constitution, 508 Pembroke, and 615 Constitution. The loan files for the following four properties do not include gift affidavits: 133 Lamplighter, 149 Lamplighter, 209 Pembroke, and 400 Pembroke. Though some of the latter files include loan applications that make reference to a portion of the down payment coming from a gift (or from the borrower's own funds), there is no documentary evidence that actually occurred and, more particularly, no corroboration that a false document was actually submitted or a false representation was actually made to obtain an FHA-insured loan.

**\*7** With one exception, discussed below, Busano was not asked at trial about the circumstances of the particular loans claimed to involve false gift affidavits. Although Nelson stated in his plea agreement that all eleven of the loans included false gift affidavits, his statement, though sworn, was not subject to cross examination. In addition, Nelson's statements were made as part of a plea deal that is fairly described as favorable to him.

Nelson's sworn statements concerning his involvement in providing down payment funds and submitting false gift affidavits are corroborated by Busano's credible testimony at trial in the present case. By contrast, Nelson's statements about particular loan applications are corroborated only to the extent there is documentation or other testimony confirming that particular loans were part of the scheme and course of conduct he described. The Court acknowledges that corroboration is not a legal requirement. Given the circumstances, however, the Court does not find Nelson's statements about particular loans sufficient to sustain the government's claims regarding those loans, absent some corroboration.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                    Page 7

Not Reported in F.Supp.2d, 2010 WL 3184210 (N.D.Ill.)
**(Cite as: 2010 WL 3184210 (N.D.Ill.))**

For these reasons, the Court concludes that the government has sustained its burden of proof regarding the seven loans for which there is documentary evidence of the submission of a gift affidavit: the loans for the properties at 45 King Henry, 115 Chanticleer, 202 Carthage, 213 Constitution, 310 Constitution, 508 Pembroke, and 615 Constitution. The Court likewise concludes that the government has sustained its burden of proof regarding the loan for the property at 209 Pembroke, despite the absence of documentary evidence of a gift affidavit. Busano credibly testified that he saw Nelson give Ella Harris, the purchaser of the 209 Pembroke property, cash for her down payment. Harris's loan application falsely states that the source of her down payment was "sellers [sic] contribution [and] savings." Govt. Ex. 6. The Court can reasonably infer from this, and does infer, that a material false statement was made or submitted to HUD/FHA to obtain FHA insurance on Harris's loan. As for the other three properties, however (133 Lamplighter, 149 Lamplighter, and 400 Pembroke), the government has failed to prove by a preponderance of the evidence that a false gift affidavit or other false statement was made or provided to obtain FHA insurance.[FN4]

> **FN4.** The government's contention that the seller and buyer acknowledged via their signature of the HUD–1 settlement statement that the down payment was legitimate is insufficient to prove the submission of a false statement to HUD/FHA.

**C. Kaplan tax returns**

The government also contends that Anchor knowingly submitted false documents to HUD in connection with the Kaplan loan application, which concerned the property at 207 Gable Drive SW in Poplar Grove. Specifically, the government contends that by submitting the Kaplans' amended tax returns or information from them in connection with their loan application, Anchor (via Busano) acted with deliberate ignorance or reckless disregard of the truth or falsity of that information.

There is no denying that the circumstances of the Kaplans' loan application are suspicious. The government offered no evidence, however, that the amended tax returns were actually false. For all the Court can say, and for all Busano knew, the original returns were incorrect, and the amended returns were accurate. Absent some evidence—missing here—that the amended tax returns included a false statement, the government cannot sustain its burden of proof regarding this transaction.

**\*8** The missing evidence is not supplied by the statement in Nelson's plea agreement that he caused false information to be submitted in connection with the 207 Gable Drive transactions. Nelson's plea agreement says only that "other false statements" were submitted in connection with that transaction; it says nothing about the tax returns. In any event, any knowledge Nelson may have had regarding the falsity of statements concerning this transaction cannot be imputed to Anchor, because Nelson was not Anchor's agent.

For these reasons, the Court concludes that the government has failed to sustain its burden of proof with regard to the 207 Gable Drive transaction.

**D. Casa Linda Realty referral fees**

As a direct endorser, Anchor was responsible for ensuring that FHA mortgage insurance applications complied with HUD regulations, guidelines and forms. *See* Govt. Ex. 23, Single Family Direct Endorsement Program, § 4000.4, ¶ 3–16 ("The underwriter is responsible for the quality of decisions made by the mortgagee under the program. For endorsement purposes, the department relies upon certifications by the mortgagee and the mortgagee's underwriter that the mortgage loan complies with HUD regulations and underwriting instructions."). In addition, in submitting direct-endorsed loans to HUD for approval, Anchor certified that it had paid no kickbacks, fees, or other consideration to any party in connection with the transaction except as permitted by HUD regulations. *See, e.g.,* Govt. Ex. 14 (lender's certificate). In the same document, Anchor also made "all certifications required for this mortgage as set forth in HUD Handbook 4004.4," *id.,* which includes the requirement that the loan comply with HUD rules.

The government's FCA claim regarding the three

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                                Page 8

Not Reported in F.Supp.2d, 2010 WL 3184210 (N.D.Ill.)
**(Cite as: 2010 WL 3184210 (N.D.Ill.))**

Casa Linda loans is premised on defendants' allegedly false representation that the loans complied with HUD regulations and that no improper fees had been paid to any party in connection with the transactions. Under HUD regulations, "[n]o person shall give and no person shall accept any fee, kickback or other thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or part of a settlement service involving a federally related mortgage loan shall be referred to any person." 24 C.F.R. § 3500.14(b). The HUD handbook concerning FHA insured loans also provides that "[a] mortgagee is not permitted to pay any fee, compensation, or thing of value: ... that is a kickback ... [or][t]o any party for referring the loan (a 'finder's fee')," among other things. *See* Govt. Ex. 22, § 4000.2, ¶ 5–5. The handbook also states that any payment "[t]hat is prohibited by the Real Estate Settlement Procedures Act (RESPA)" is barred. *Id.* RESPA prohibits "any fee, kickback, or thing of value pursuant to any agreement ... that business incident to ... a real estate settlement service involving a federally related mortgage loan shall be referred to any person." 12 U.S.C. § 2607(a).

**\*9** RESPA and HUD regulations provided at the relevant time that certain specific types of payments were permitted, as exceptions to the general rules quoted above. *See* 12 U.S.C. § 2607(c); 24 C.F .R. § 3500.14(g). Only a few of these exceptions conceivably might apply. Defendants have suggested that Anchor was paying Casa Linda for services performed. *See* 12 U.S.C. § 2607(c)(1)(C) & (2); 24 C.F.R. § 3500.14 (g)(1) (iii-iv). The Court rejects this contention. Busano and Quiroz both testified credibly that the payments were compensation for referrals, not for services rendered. And the spreadsheets that Anchor personnel prepared described the payments as "commissions" to Casa Linda as a "loan originator."

RESPA also permits "payments pursuant to cooperative brokerage and referral arrangement or agreements between real estate agents and brokers." 12 U.S.C. § 2607(c)(3); 24 C.F.R. § 3500.14(g)(1) (v). This exception, however, applies only to fee divisions among real estate brokers, not to "any fee arrangements between

real estate brokers and mortgage brokers," which is the situation here. 24 C.F.R. § 3500.14(g)(1)(v).

The only other potentially applicable exception concerns payments pursuant to what RESPA and HUD regulations call "affiliated business arrangements," which the Court understands to be the type of understanding the parties have referred to as a "controlled business arrangement" or CBA.[FN5] *See* 12 U.S.C. § 2607(c) (4); 24 C.F.R. § 3500.15. RESPA defines an affiliated business arrangement as an arrangement in which a person in a position to refer business in connection with the making or settlement of federally related loan, or an associate of such a person, "has either an affiliate relationship with or a direct or beneficial ownership interest of more than 1 percent in a provider of settlement services." 12 U.S.C. § 2602(a)(7). (The term "settlement services" includes, among other things, real estate brokerage services, origination of federally related mortgage loans, and loan processing. *See id.* § 2607(a)(3).)

> FN5. RESPA was amended in 1996 to incorporate this change in terminology.

Both RESPA and HUD regulations, however, tightly control how affiliated business arrangements must work in order for RESPA's exception to apply. First, RESPA contains detailed disclosure requirements. *See* 12 U.S.C. § 2607(c)(4)(A–C). Second, HUD regulations set additional, detailed conditions for compliance. Among other things, the only thing of value that may be received from the arrangement (apart from payments provided under other RESPA exceptions that do not apply here) "is a return on an ownership interest or franchise relationship." 24 C.F.R. § 3500.15(b)(3). That gibes with the testimony at trial that Munson and Casa Linda contemplated setting up a separate joint entity, to which any referral fees presumably would be paid. Anchor and Casa Linda, as the owners of that entity, could then obtain, consistent with HUD regulations, a return on their ownership interest.

**\*10** That, however, is not what happened. First, the evidence shows that the contemplated separate entity was never formed. Second, the payments were nothing

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3184210 (N.D.Ill.)
**(Cite as: 2010 WL 3184210 (N.D.Ill.))**

like a "return on an ownership interest"; rather, they were commissions that were paid based on a set percentage of the amount of the home buyer's loan.

To summarize, Anchor made payments to Casa Linda, as shown by the credible testimony of Busano and Quiroz and the three checks and supporting spreadsheets that were admitted in evidence. The same evidence shows these payments were referral fees, not some other sort of payment. In particular, Anchor paid Casa Linda referral fees in connection with the three Casa Linda-related loans at issue in this case.

Munson authorized paying referral fees to Casa Linda. Busano so testified, and that testimony was credible. It stands to reason that no middle manager like Busano would have okayed paying such fees without Munson's authorization. This is particularly so in light of the fact that Busano had previously discussed with Munson the idea of paying referral fees to Casa Linda as a means of keeping this significant source of business.

The referral fees that Anchor paid to Casa Linda were improper and impermissible under RESPA and HUD rules. Anchor (via Munson) may have taken steps toward the establishment of an affiliated business arrangement that, if put in place and carried out properly, conceivably might have made the payments proper. But the evidence shows they neither finalized that arrangement nor carried it out in the way the law required. Despite this, Munson authorized and Anchor paid Casa Linda fees for referring customers.

The government has proven that Anchor falsely certified to HUD that it had paid no improper referral fees. Anchor made both an express certification to this effect via the form that accompanied the direct-endorsed loans and an implied certification via the form's catch-all language stating that it was making all the certifications required by section 4000.4 of the HUD Handbook.

Defendants contend that the false certifications were immaterial and did not cause HUD's alleged loss on these loans. The Court agrees with the government, however, that it has established both materiality and causation in connection with the Casa Linda referral fees. The evidence shows that HUD would not have approved the relevant FHA mortgage insurance applications had it known improper referral fees were being paid. *See, e.g., United States v. Rogan,* 517 F.3d 449, 542–53 (7th Cir.2008); *Dolphin Mortgage,* 2009 WL 153190, at *10–12; *see also* Govt. Ex. 23, § 4000.4, ¶ 1–3 ("If at the time the case is submitted for endorsement HUD has evidence that there is fraud or misrepresentation on the part of the originating mortgagee, HUD will consider the certifications as fraudulent and will not endorse the mortgage for insurance.").

The government has also proven that Anchor knowingly made the false certifications. Busano testified credibly that he knew that Anchor could pay Casa Linda referral fees only if a CBA [FN6] was established. He also testified credibly that he did not know whether a CBA was ever actually put into place. And, as the Court has found, no CBA was ever concluded. Yet at some point, Busano began making referral fee payments to Casa Linda, after Munson had authorized him to do so, to obtain and keep Casa Linda's business. Busano made these payments in what was at least reckless disregard of their illegality. In addition, with at least the same level of intent, Busano caused Anchor to make the previously-referenced false certifications to HUD. Busano's knowledge and intent are attributable to Anchor for purposes of FCA liability.

FN6. The Court uses this term to include what RESPA and HUD rules refer to as an affiliated business arrangement.

**\*11** The government also contends that Munson is personally liable with regard to the Casa Linda-related false claims. Munson knew, or at least recklessly disregarded, that no CBA had been concluded with Casa Linda. Thus Munson's liability under the FCA largely turns on whether he knew at the relevant time that referral fees were being paid to Casa Linda.

Munson signed each of the three checks that the Court has found represented illegal referral fees to Casa Linda. The first and second checks were payable to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                    Page 10

Not Reported in F.Supp.2d, 2010 WL 3184210 (N.D.Ill.)
**(Cite as: 2010 WL 3184210 (N.D.Ill.))**

Busano; the third was payable directly to Casa Linda.

The Court cannot say that the first two checks in and of themselves provided Munson with information sufficient for a finding that he knew, deliberately ignored, or recklessly disregarded the purpose of those payments. The spreadsheets that accompanied each of those checks when Munson signed them, however, clearly showed that "commissions"—referral fees—were being paid to Casa Linda as "loan originator." Munson testified that he did not review the spreadsheets and that the checks were presented to him along with numerous other checks for signature. That may mean that Munson did not have actual knowledge that the checks represented referral fees. The Court finds, however, that Munson deliberately ignored or recklessly disregarded the truth—in short, he put his head in the sand. As the person responsible for setting the terms of Anchor's arrangement with Casa Linda, Munson knew that no CBA had been concluded and that payments to Casa Linda for referrals were improper. Munson also quite clearly knew that Anchor was making loans to customers referred by Casa Linda. It is equally clear that documents (the spreadsheets) were placed before him showing that improper payments were being made to Casa Linda.

In sum, the government has shown by a preponderance of the evidence that Munson had the requisite knowledge regarding the payments. Because Munson knew Anchor was submitting direct-endorsed loans to HUD relating to the Casa Linda properties, he likewise had the requisite knowledge that false statements and certifications were being made to obtain HUD's approval for FHA insurance. Because Busano credibly testified that Munson had authorized him to pay the referral fees even though they were legally improper, the evidence also establishes that Munson caused the false certifications to be made.

The evidence is even stronger regarding the third payment, as to which the face of Anchor's check showed that money was being paid to Casa Linda. The Court rejects defendants' argument that Munson and Anchor lacked knowledge because no one in his right mind would make an improper payment via a check. It is not at all unusual for laws to be knowingly violated in a way that makes later detection simple. The FCA does not require proof of deviousness or that the claimant tried to avoid detection.

**D. Damages**
The FCA provides that any person who violates the act is subject to a civil penalty of between $5,500 and $11,000 per false claim, "plus [three] times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a) (1); 28 C.F.R. § 85.3(a)(9). The government's damages are trebled "before any deduction is made for payments previously received from any source in mitigation of those damages." *United States v. Bornstein,* 423 U.S. 303, 316, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976).

**\*12** The government requests, and the Court will award, the minimum civil penalty per claim of $5,500. The Court has found Anchor liable with regard to eleven claims and thus imposes civil penalties on Anchor in the amount of $60,500. The Court imposes on Munson civil penalties of $16,500, representing the three false Casa Linda claims.

The government's actual damages are calculated based on the losses it suffered in connection with the following loan applications: 45 King Henry; 115 Chanticleer; 202 Carthage; 209 Carthage; 213 Constitution; 310 Constitution; 508 Pembroke; 615 Constitution; 1013 Lilac; 6860 Hickory; and 7018 Lowell. The following table represents the government's total losses for these properties. The table also includes the price at which the government sold each property.

| Property Address and FHA No. | Total Loss | Sale Price |
|---|---|---|
| 45 King Henry Dr., Poplar Grove, IL | $131,643.05 | ($68,200.00) |

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                                                  Page 11

Not Reported in F.Supp.2d, 2010 WL 3184210 (N.D.Ill.)
**(Cite as: 2010 WL 3184210 (N.D.Ill.))**

| | | |
|---|---|---|
| 115 Chanticleer, Poplar Grove, IL | $151,983.17 | ($109,200.00) |
| 202 Carthage Ct., Poplar Grove, IL | $40,370.31 | N/A |
| 209 Pembroke, Poplar Grove, IL | $155,416.49 | ($85,000.00) |
| 213 Constitution, Poplar Grove, IL | $133,022.70 | ($69,400.00) |
| 310 Constitution, Poplar Grove, IL | $135,118.15 | ($70,305.00) |
| 508 Pembroke, Poplar Grove, IL | $135,679.07 | ($72,000.00) |
| 615 Constitution, Poplar Grove, IL | $129,204.65 | ($67,115.00) |
| 1013 E. Lilac, Palatine, IL | $10,624.14 | N/A |
| 6860 Hickory, Hanover Park, IL | $23,051.84 | N/A |
| 7018 Lowell Dr., Carpentersville, IL | $36,298.88 | N/A |

**Totals**                    $1,082,412.45                    ($541,220.00)

The government's total loss relating to all of these properties amounts to $1,082,412.15. Trebling these losses is mandatory under the FCA, and the trebling occurs before taking into account amounts the government later recovered. *See Bornstein,* 423 U.S. at 316; *see also* 31 U.S.C. § 3729(1). Three times the government's total loss is $3,247,237.35. Deduction of $541,220.00 for the amount later recovered by the government results in a total damage award against Anchor of $2,706,017.35. When civil penalties are added, the total is $2,766,517.35.

The government's damages arising from the three properties on which the Court has found Munson individually liable—the last three properties on the list above—total $69,974.86. Three times this amount is $209,924.58. When civil penalties are added, the total is $226,424.58.

The evidence shows that Munson contacted HUD and the FBI to report that Casa Linda had falsified loan documents. Defendants appear to argue that this entitles them to a reduction of damages. *See* 31 U.S.C. § 3729(a)(2). The Court disagrees. Though Munson quite clearly reported some wrongdoing, he did not report the violations involved in this case. Defendants cite no authority for the proposition that the FCA's reduced damages provision applies if a person reports one violation but the FCA suit is based on a separate violation that may have been uncovered following the party's self-reporting.[FN7]

FN7. To the extent defendants are arguing that Munson's reporting of a separate violation reflects a lack of the intent required for liability under the FCA, the Court rejects the contention.

**Conclusion**

**\*13** The Court directs the Clerk to enter judgment in favor of the plaintiff and against both defendants on Count 1 of the complaint, and in favor of both defendants and against the plaintiff on Counts 2 and 3. The court awards the plaintiff damages and penalties in the amount of $2,766,517.35 against defendant Anchor Mortgage Corp. and in the amount of $226,424.58 against defendant John Munson. The liability of the defendants is joint and several.

N.D.Ill.,2010.
U.S. v. Anchor Mortg. Corp.
Not Reported in F.Supp.2d, 2010 WL 3184210 (N.D.Ill.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



FOR EDUCATIONAL USE ONLY                                                    Page 1

Not Reported in F.Supp.2d, 2011 WL 720044 (N.D.Fla.)
**(Cite as: 2011 WL 720044 (N.D.Fla.))**

H

Only the Westlaw citation is currently available.

United States District Court, N.D. Florida,
Gainesville Division.
UNITED STATE of America,
v.
Samim ANGHAIE, et al., Defendants.

No. 1:09–CR–37–SPM/AK.
Feb. 21, 2011.

Stephen M. Kunz, Tallahassee, FL, for United State
of America.

Lloyd L. Vipperman, Jr., Lloyd Vipperman PA,
Gainesville, FL, for Defendants.

***ORDER***

STEPHAN P. MICKLE, Chief Judge.

**\*1** THIS CAUSE comes before the Court on
Defendants' Joint Motion for Judgment of Acquittal
(docs.111, 112) and the Government's Response in
Opposition (doc. 113). Notably, Defendants argue
that they are entitled to Judgment of Acquittal on
Counts 23–33, 35, 42, 44, 45, 52–58, and 60 of the
Superseding Indictment, as the prosecution thereof
is foreclosed by the statute of limitations for the
wire fraud and money laundering offenses.

18 U.S.C. § 3282(a) provides that "[e]xcept as
otherwise expressly provided by law, no person
shall be prosecuted, tried, or punished for any of-
fense, not capital, unless the indictment is found or
the information is instituted within five years next
after such offense shall be been committed." This
general federal statute of limitations applies to both
wire fraud and money laundering offenses. *See
United States v. Evans,* 473 F.3d 1115 (11th
Cir.2006); *United States v. Torres,* 318 F.3d 1058
(11th Cir.2003).* The purpose of statutes of limita-
tions is to protect individuals from the unfairness of
prosecution after significant periods of time have
elapsed since the alleged commission of offenses,

as probative evidence may have become lost or des-
troyed and memories may have faded. Additionally,
"[s]uch a time limit may also have the salutary ef-
fect of encouraging law enforcement officials
promptly to investigate suspected criminal activ-
ity." *Toussie v. United States,* 397 U.S. 112, 115,
90 S.Ct. 858, 25 L.Ed.2d 156 (1970). Accordingly,
"criminal limitations statutes are to be liberally in-
terpreted in favor of repose [.]" *Id.* (internal cita-
tions omitted).

In this case, Defendants raised the statute of
limitations issue at the close of the Government's
case in chief at trial. The Court determines that De-
fendants did not waive the statute of limitations is-
sue by raising it during, but not prior to, trial.
"[T]he statute of limitations is a matter of defense
that must be asserted at trial by the defendant."
*United States v. Najjar,* 283 F.3d 1306, 1308 (11th
Cir.2002). Although the dates of the wire transmis-
sions and financial transactions which formed the
bases of the substantive wire fraud and money laun-
dering offenses were provided in both the initial in-
dictment, dated October 29, 2009, and superseding
indictment, dated December 20, 2010, and therefore
the Defendants could have raised the issue prior to
trial, the Court accepts the Defendants' explanation
that they needed to consider the evidence presented
by the Government at trial on the relevant counts
prior to making the statute of limitations objection.
Indeed, part of the Government's oral response at
trial to the Defendants' statute of limitations argu-
ment was that the facts of the case, particularly the
continued diverting of funds in subsequent financial
transactions, makes the calculation of the limita-
tions period according to the date of each transmis-
sion and transaction improper in this case.
However, as each wire transmission or financial
transaction constitutes a separate offense, the limit-
ations period began to run from the date of each
transmission or transaction. *See United States v.
Tadros,* 310 F.3d 999, 1006 (7th Cir.2002) ("For
purposes of mail fraud and wire fraud, the five-year

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                                                Page 2

Not Reported in F.Supp.2d, 2011 WL 720044 (N.D.Fla.)
**(Cite as: 2011 WL 720044 (N.D.Fla.))**

statute of limitations begins to run from the date of mailing of the fraudulent information."); *United States v. De La Mata,* 266 F.3d 1275, 1287 (11th Cir.2001) (holding that statute of limitations for bank fraud begins to run from the date of each execution of scheme to defraud, as "a defendant may be charged in separate counts for each 'execution' of the scheme to defraud."); *see also United States v. Gilbert,* 136 F.3d 1451, 1453 (11th Cir.1998) ("Offenses should not be considered continuing unless 'the explicit language of the ... statute compels such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing [offense].' ") (quoting *Toussie,* 397 U.S. at 114–15).

**\*2** Moreover, there has been no sandbagging, as the Government has suffered no prejudice by the Defendants raising the statute of limitations issue in a Motion for Judgment of Acquittal at trial, as opposed to prior to trial. Here, regardless of whether the argument was first presented before or during trial, as to each of the offenses for which the limitations period had lapsed, there is nothing that the Government could have done, had it been on notice of the issue, to correct the defect and proceed with the prosecution on the pertinent counts. Therefore, given the liberal treatment which should be afforded to statutes of limitations, the Court finds that the Defendants did not waive the issue by not raising it prior to trial.

The Government contends that the limitations period has been tolled by the Wartime Suspension of Limitations Act ("WSLA"), 18 U.S.C. § 3287. Prior to October 14, 2008, the WSLA provided that:

When the United States is at war the running of any statute of limitations applicable to any offense (1) involving fraud or attempted fraud against the United States or any agency thereof in any manner, whether by conspiracy or not, or (2) committed in connection with the acquisition, care, handling, custody, control or disposition of any real or personal property of the United States,

or (3) committed in connection with the negotiation, procurement, award, performance, payment for, interim financing, cancellation, or other termination or settlement, of any contract, subcontract, or purchase order which is connected with or related to the prosecution of the war, or with any disposition of termination inventory by any war contractor or Government agency, shall be suspended until three years after the termination of hostilities as proclaimed by the President or by a concurrent resolution of Congress.

18 U.S.C. § 3287 (2000). On October 14, 2008, the Act was amended to expand its operation to times "[w]hen the United States is at war or Congress has enacted a specific authorization for the use of the Armed Forces, as described in section 5(b) of the War Powers Resolution (50 U.S.C. 1544(b)) [.]" 18 U.S.C.A. § 3287 (West 2010). The amendment lengthened the suspension period to "5 years after the termination of hostilities as proclaimed by a Presidential proclamation, with notice to Congress, or by a concurrent resolution of Congress." *Id.*

Upon careful consideration of this issue, the Court is in agreement with and adopts the reasoning of District Judge Sammartino in *United States v. Western Titanium, Inc.,* 2010 WL 2650224 (S.D.Cal.2010), which concluded that the United States was not "at war" prior to the amendment of the WSLA, as there had been no Congressional declaration of war. *See also United States v. Shelton,* 816 F.Supp. 1132 (W.D.Tex.1993). Therefore, as to the counts for which the limitations period had expired prior to the effective date of the WSLA amendment, there is no suspension of the limitations period pursuant to the WSLA. However, as to the counts for which the limitations period would have lapsed after the WSLA amendment, the limitations period has been suspended pursuant to the WSLA, as there has been an authorization of military force, though no formal declaration of war.

**\*3** Lastly, as to the other grounds relied on by the Defendants in support of their Motion for Judg-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                      Page 3

Not Reported in F.Supp.2d, 2011 WL 720044 (N.D.Fla.)
**(Cite as: 2011 WL 720044 (N.D.Fla.))**

ment of Acquittal, specifically, that the indictment failed to state a claim for the money laundering offenses and that there has been insufficient evidence of concealment and specific intent to defraud or mislead, the Court determines that the indictment sufficiently sets forth the claims and that the evidence is not insufficient to sustain a conviction. Therefore, the Motion for Judgment of Acquittal must be denied on these bases.

Accordingly, it is hereby ORDERED AND ADJUDGED as follows:

1. Judgment of Acquittal is entered as to Counts 23, 24, 25, 26, 27, 28, 29, 30, 31, 42, 52, 53, 54, 55, and 56.

2. Defendants' Joint Motion for Judgment of Acquittal is otherwise denied.

**DONE AND ORDERED.**

N.D.Fla.,2011.
U.S. v. Anghaie
Not Reported in F.Supp.2d, 2011 WL 720044 (N.D.Fla.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**PA127**



FOR EDUCATIONAL USE ONLY                                         Page 1

--- F.Supp.2d ----, 2012 WL 3234233 (S.D.Tex.)
**(Cite as: 2012 WL 3234233 (S.D.Tex.))**

Only the Westlaw citation is currently available.

United States District Court,
S.D. Texas,
Houston Division.
UNITED STATES of America, Plaintiff,
v.
BNP PARIBAS SA; BNP Paribas North America;
BNP Paribas Houston Agency; and Jovenal Mir-
anda Cruz, Defendants.

Civil Action No. H–11–3718.
Aug. 6, 2012.

**Background:** United States brought action against
affiliated lenders and one lender's vice-president
under the False Claims Act (FCA), and for unjust
enrichment and payment by mistake based on alleg-
ations that they engaged in a scheme to defraud the
United States in connection with commodity pay-
ment guarantees provided by Department of Agri-
culture (USDA) under its Supplier Credit Guarantee
Program (SCGP). Defendants filed motion to dis-
miss.

**Holdings:** The District Court, Sim Lake, J., held that:
(1) United States was not judicially estopped from
pursuing FCA claims;
(2) complaint's allegations did not affirmatively
demonstrate that the government's False Claims Act
(FCA) claims were barred by the statute of limita-
tions;
(3) Wartime Suspension of Limitations Act
(WSLA) applied to the FCA's statute of limitations;
and
(4) FCA claims failed to satisfy particularity re-
quirement for claims that sounded in fraud.

Motions granted in part and denied in part.

West Headnotes

**[1] Estoppel 156 ⚖68(2)**

156 Estoppel
    156III Equitable Estoppel
        156III(B) Grounds of Estoppel
            156k68 Claim or Position in Judicial Pro-
ceedings
                156k68(2) k. Claim Inconsistent with
Previous Claim or Position in General. Most Cited
Cases

    Judicial estoppel prevents a party from assert-
ing a claim in a legal proceeding that is inconsistent
with a claim taken by that party in a previous pro-
ceeding.

**[2] Estoppel 156 ⚖68(2)**

156 Estoppel
    156III Equitable Estoppel
        156III(B) Grounds of Estoppel
            156k68 Claim or Position in Judicial Pro-
ceedings
                156k68(2) k. Claim Inconsistent with
Previous Claim or Position in General. Most Cited
Cases

    "Judicial estoppel" is an equitable doctrine in-
voked by the court at its discretion' to protect the
integrity of the judicial process by preventing
parties from playing fast and loose with the courts
to suit the exigencies of self interest; doctrine of ju-
dicial estoppel does not apply unless (1) the posi-
tion of the party to be estopped is plainly inconsist-
ent with its previous position, (2) the court accepted
the previous position, and (3) the party did not act
inadvertently.

**[3] Estoppel 156 ⚖68(2)**

156 Estoppel
    156III Equitable Estoppel
        156III(B) Grounds of Estoppel
            156k68 Claim or Position in Judicial Pro-
ceedings
                156k68(2) k. Claim Inconsistent with
Previous Claim or Position in General. Most Cited
Cases

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                          Page 2

--- F.Supp.2d ----, 2012 WL 3234233 (S.D.Tex.)
**(Cite as: 2012 WL 3234233 (S.D.Tex.))**

United States was not judicially estopped from pursuing False Claims Act (FCA) claims against lender and lender's vice-president based on allegations that they engaged in a scheme to defraud the United States in connection with commodity payment guarantees provided by Department of Agriculture (USDA) under its Supplier Credit Guarantee Program (SCGP); fact that government alleged in criminal prosecution that false information was provided by vice-president to lender as part of conspiracy to defraud the United States was not necessarily inconsistent with the United States' allegations that lender was liable for the knowing submission of false and fraudulent claims to the United States. 31 U.S.C.A. § 3729 et seq.

**[4] Limitation of Actions 241 ☜58(1)**

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(A) Accrual of Right of Action or Defense
            241k58 Liabilities Created by Statute
                241k58(1) k. In General. Most Cited Cases
Limitations period for False Claims Act (FCA) claims is computed from the date on which the violation of FCA is committed, and that the violation is the submission, not the payment, of a false claim. 31 U.S.C.A. § 3731(b).

**[5] Limitation of Actions 241 ☜199(1)**

241 Limitation of Actions
    241V Pleading, Evidence, Trial, and Review
        241k199 Questions for Jury
            241k199(1) k. In General. Most Cited
Cases
Complaint's allegations did not affirmatively demonstrate that the government's False Claims Act (FCA) claims were barred by the statute of limitations and did raise some basis for tolling; question of whether action was filed more than 3 years after the date when facts material to the right of action were known or reasonably should have been known by the official of the United States charged with re-

sponsibility to act in the circumstances was a question of fact for jury. 31 U.S.C.A. § 3731(b)(2).

**[6] Limitation of Actions 241 ☜113**

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(G) Pendency of Legal Proceedings, Injunction, Stay, or War
            241k113 k. War. Most Cited Cases
Wartime Suspension of Limitations Act (WSLA) applies to the False Claims Act's (FCA) statute of limitations. 18 U.S.C.A. § 3287; 31 U.S.C.A. § 3731(b)(2).

**[7] Criminal Law 110 ☜151.1**

110 Criminal Law
    110X Limitation of Prosecutions
        110k151 Exceptions and Suspension
            110k151.1 k. In General. Most Cited Cases

**Limitation of Actions 241 ☜113**

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(G) Pendency of Legal Proceedings, Injunction, Stay, or War
            241k113 k. War. Most Cited Cases
Wartime Suspension of Limitations Act (WSLA) suspends the False Claims Act's (FCA) statute of limitations in civil cases, as well as in criminal cases. 18 U.S.C.A. § 3287; 31 U.S.C.A. § 3731(b)(2).

**[8] Limitation of Actions 241 ☜113**

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(G) Pendency of Legal Proceedings, Injunction, Stay, or War
            241k113 k. War. Most Cited Cases
For purposes of Wartime Suspension of Limitations Act (WSLA), United States was "at war" in 2005 when the acts underlying False Claims Act (FCA) claims based on alleged scheme to defraud

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                    Page 3

--- F.Supp.2d ----, 2012 WL 3234233 (S.D.Tex.)
**(Cite as: 2012 WL 3234233 (S.D.Tex.))**

the United States in connection with commodity payment guarantees occurred; authorizations for use of military force issued by Congress with respect to the conflicts in Iraq and Afghanistan (AUMF and AUMFIA) were sufficient to deem the United States "at war" for WSLA purposes. 18 U.S.C.A. § 3287; 31 U.S.C.A. § 3731(b)(2).

**[9] Limitation of Actions 241 ☞6(9)**

241 Limitation of Actions
    241I Statutes of Limitation
        241I(A) Nature, Validity, and Construction in General
            241k6 Retroactive Operation
                241k6(9) k. Revival of Causes of Action by Amendment or Repeal of Statute. Most Cited Cases

**Limitation of Actions 241 ☞113**

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(G) Pendency of Legal Proceedings, Injunction, Stay, or War
            241k113 k. War. Most Cited Cases
Wartime Suspension of Limitations Act's (WSLA) 2008 amendments, which recognized specific authorization for the use of Armed Force as described in War Powers Resolution was sufficient to trigger the WSLA, and applied to False Claims Act (FCA) claims based on alleged scheme to defraud the United States in connection with commodity payment guarantees, which occurred in 2005, since the prior limitations period had not expired. 18 U.S.C.A. § 3287; 31 U.S.C.A. § 3731(b)(2); 50 U.S.C.A. § 1544(b).

**[10] United States 393 ☞120.1**

393 United States
    393VIII Claims Against United States
        393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims
            393k120.1 k. In General. Most Cited Cases

False Claims Act (FCA) prohibits three distinct, but overlapping practices, namely: (1) the knowing presentment of a false claim to the government, (2) the knowing use of a false record or statement to get a false claim paid, and (3) conspiracy to get a false claim paid. 31 U.S.C.A. § 3729(b) .

**[11] United States 393 ☞120.1**

393 United States
    393VIII Claims Against United States
        393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims
            393k120.1 k. In General. Most Cited Cases
For False Claims Act (FCA) purposes, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required. 31 U.S.C.A. § 3729(b).

**[12] United States 393 ☞122**

393 United States
    393VIII Claims Against United States
        393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims
            393k122 k. Penalties and Actions Therefor. Most Cited Cases
United States' False Claims Act (FCA) complaint against lender and its vice president, which were based on allegations that they engaged in a scheme to defraud the United States in connection with commodity payment guarantees provided by Department of Agriculture (USDA) under its Supplier Credit Guarantee Program (SCGP), sufficiently alleged the knowing submission of false claims; complaint alleged that lender and its co-conspirators engaged in a course of false or fraudulent conduct by making false statements to obtain guarantees from the United States for transactions that they knew they were not eligible for guaran-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY Page 4

--- F.Supp.2d ----, 2012 WL 3234233 (S.D.Tex.)
**(Cite as: 2012 WL 3234233 (S.D.Tex.))**

tees, that when those transactions created losses, lender under the guarantees that it knew were false or fraudulent and thereby caused the USDA to pay it money that it knew it was not entitled to receive, and that when vice-president committed the acts underlying the FCA claims he was acting within the scope of his employment and for the benefit of lender, which, through vice-president, knowingly violated the FCA. 31 U.S.C.A. § 3729(b).

**[13] Federal Civil Procedure 170A ☞636**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
     170AVII(A) Pleadings in General
      170Ak633 Certainty, Definiteness and Particularity
        170Ak636 k. Fraud, Mistake and Condition of Mind. Most Cited Cases

United States' False Claims Act (FCA) claims against affiliated lenders and one lender's vice-president, which were based on allegations that they engaged in a scheme to defraud the United States in connection with commodity payment guarantees provided by Department of Agriculture (USDA) under its Supplier Credit Guarantee Program (SCGP), failed to satisfy particularity requirement for claims that sounded in fraud; United States alleged that vice-president was employed by one lender, but had not alleged that he was employed by either of the other two entities named as defendants, and therefore complaint did not adequately allege facts capable of holding either of those two entities vicariously liable for vice-president's actions, and complaint did not recite all of the terms and conditions of the relevant agreements in the case, and failed to distinguish which of the three entity defendants engaged in the acts alleged. 31 U.S.C.A. § 3729(b); Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[14] United States 393 ☞88**

393 United States
   393VI Fiscal Matters

393k88 k. Recovery of Payments. Most Cited Cases

United States has power, independent of any statute, to recover monies its agents have wrongfully, erroneously, or illegally paid out pursuant to the federal common law doctrines of unjust enrichment and/or payment by mistake.

**[15] Agriculture 23 ☞3.5(1)**

23 Agriculture
   23k3 Public Aid
     23k3.5 Credit, Loans, and Price Supports
      23k3.5(1) k. In General. Most Cited Cases

United States, which alleged that defendants engaged in a scheme to defraud the United States in connection with commodity payment guarantees provided by Department of Agriculture (USDA) under its Supplier Credit Guarantee Program (SCGP), pleaded facts capable of establishing that the payment guarantee contracts were void because they were tainted by fraud, bribes, and/or kickbacks. 7 C.F.R. §§ 1493.430(c), 1493.510(e), 1493.520(d,e).

***MEMORANDUM OPINION AND ORDER***

SIM LAKE, District Judge.

**\*1** Plaintiff, the United States of America, brings this action against defendants, BNP Paribas SA, BNP Paribas North America, BNP Paribas Houston Agency (collectively "BNPP defendants"), and Jovenal Miranda Cruz, under the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.,* and for unjust enrichment and payment by mistake. Pending before the court are the Motion to Dismiss the Complaint by Defendants BNP Paribas, BNP Paribas North America, and BNP Paribas Houston Agency (Docket Entry No. 22), and Defendant Jovenal Miranda Cruz's Motion to Adopt in Part Motion to Dismiss Complaint by BNPP (Docket Entry No. 25). For the reasons set forth below, the motion to dismiss filed by defendant Cruz will be denied, and the motion to dismiss filed by the BNPP defendants will be granted in part and denied in part, and the United States will be ordered to file

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                              Page 5

--- F.Supp.2d ----, 2012 WL 3234233 (S.D.Tex.)
**(Cite as: 2012 WL 3234233 (S.D.Tex.))**

an amended complaint within thirty (30) days.

## I. *Background*

From 1998 through 2005, a number of individuals and companies schemed and conspired to exploit the Supplier Credit Guarantee Program ("SCGP") pursuant to which the Commodity Credit Corporation ("CCC"), a federally chartered corporation within the United States Department of Agriculture ("USDA"), issues guarantees to United States commodity exporters. The SCGP allows United States commodity exporters to access financing before payments are due from foreign importers. Under this program exporters assign to a financial institution both the importer's promissory note and the exporter's right to payment, and the CCC guarantees payment to a financial institution. Eligibility requirements barred exporters from participating in the SCGP if they were directly or indirectly owned or controlled by the foreign importer, or by a person or entity that owned or controlled the importer.

The scheme at issue involved exporters and importers that were owned and/or controlled by Fernando Pablo Villarreal Cantu (Villarreal), a citizen of Mexico. Villarreal's ownership and/or control of both the exporters and the importers meant that the exporters were not eligible to receive SCGP guarantees from the CCC. As part of the scheme, the criminal co-conspirators bribed defendant Jovenal Miranda Cruz (Cruz) who at the relevant time served as a Vice–President and Manager of Trade Finance for BNPP in Houston. Largely through Cruz, BNPP entered into a series of Master Purchase and Sale Agreements ("MPSAs") with several United States Exporters ("Exporters") pursuant to which BNPP agreed to provide financing to the Exporters in exchange for receipt of payment obligations from a series of corresponding Mexican Importers ("Importers") and SCGP guarantees for those payment obligations. The MPSAs detailed the income BNPP would earn for each transaction. Using false documents the Exporters, acting with the assistance and knowledge of Villarreal, the Import-

ers, and Cruz, applied for and received SCGP guarantees. Upon receipt of a CCC guarantee, the Exporters assigned the guarantee and the Importers' payment obligation to BNPP. In exchange, BNPP provided the Exporters a line of credit up to the amount of the guarantee minus the amount BNPP charged for the service.

**\*2** Beginning in April of 2005 the Mexican Importers failed to make over $78 million in payments due to BNP. BNPP promptly filed claims on the CCC guarantees to recover its losses. BNPP filed its last claim on September 15, 2005. The CCC and the USDA referred the defaults to the United States Attorney's Office in Houston ("USAO"). A subsequent investigation resulted in the indictment of several individuals, including Cruz. The indictments charged Cruz and his co-conspirators with various acts, including "knowingly mak[ing] a false statement for the purpose of influencing the action of BNP Paribas ... in connection with advance or draw requests for funds on lines of credit." [FN1] On January 12, 2012, Cruz pleaded guilty to conspiracy to commit bank fraud and other charges.

On October 18, 2011, the United States filed this action against BNPP based on allegations that BNPP and Cruz knew the Exporters were not eligible for the SCGP guarantees, yet concealed that information from the CCC and the USDA. The United States also alleges that Cruz acted within the scope of his employment and for the benefit of his employer in acquiring and maintaining this business for BNPP. (Compl.¶¶ 15, 41–44.)

## II. *Standards of Review*

Defendants move the court to dismiss the plaintiff's claims pursuant to Federal Rules of Civil Procedure 12(b)(6) for failure to state a claim for which relief may be granted and 9(b) for failure to plead fraud with particularity. "A dismissal for failure to plead fraud with particularity under Rule 9(b) is treated as a dismissal for failure to state a claim under Rule 12(b)(6)." *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 125 F.3d 899, 901 (5th Cir.1997).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                    Page 6

--- F.Supp.2d ----, 2012 WL 3234233 (S.D.Tex.)
**(Cite as: 2012 WL 3234233 (S.D.Tex.))**

### A. Federal Rule of Civil Procedure 12(b)(6)

A motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim for which relief may be granted tests the formal sufficiency of the pleadings and is "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim." *Ramming v. United States,* 281 F.3d 158, 161 (5th Cir.2001), *cert. denied sub nom Cloud v. United States,* 536 U.S. 960, 122 S.Ct. 2665, 153 L.Ed.2d 839 (2002). The court must accept the factual allegations of the complaint as true, view them in a light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor. *Id.*

When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.

*Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 997, 152 L.Ed.2d 1 (2002). To avoid dismissal a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). Plausibility requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* The plausibility standard is not akin to a "probability requirement," but asks for more than a sheer possibility a defendant acted unlawfully. *Id.* "Dismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief." *Torch Liquidating Trust ex rel. Bridge Associates L.L.C. v. Stockstill,* 561 F.3d 377, 384 (5th Cir.2009). When considering a motion to dismiss courts generally are limited to the complaint

and its proper attachments. *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 338 (5th Cir.2008). However, courts may rely upon "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id.*

### B. Federal Rule of Civil Procedure 9(b)

**\*3** Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). "[A complaint filed under the False Claims Act must meet the heightened pleading standard of Rule 9(b)." *United States ex rel. Grubbs v. Kanneganti,* 565 F.3d 180, 185 (5th Cir.2009). Pleading fraud with particularity in this circuit requires "[a]t a minimum ... the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Benchmark Electronics, Inc. v. J.M. Huber Corp.,* 343 F.3d 719, 724 (5th Cir.2003). The Fifth Circuit has explained that

[i]n cases of fraud, Rule 9(b) has long played [a] screening function, standing as a gatekeeper to discovery, a tool to weed out meritless fraud claims sooner than later. We apply Rule 9(b) to fraud complaints with "bite" and "without apology," but also aware that Rule 9(b) supplements but does not supplant Rule 8(a)'s notice pleading. Rule 9(b) does not "reflect a subscription to fact pleading" and requires only "simple, concise, and direct" allegations of the "circumstances constituting fraud," which after *Twombly* must make relief plausible, not merely conceivable, when taken as true.

*Grubbs,* 565 F.3d at 185–86 (citing *Twombly,* 127 S.Ct. at 1955). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b).

### III. *Analysis*

The United States asserts both statutory claims for violation of the FCA, 31 U.S.C. § 3729, *et seq.,* and common law claims for unjust enrichment and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY Page 7

--- F.Supp.2d ----, 2012 WL 3234233 (S.D.Tex.)
**(Cite as: 2012 WL 3234233 (S.D.Tex.))**

payment by mistake against each of the four defendants. These claims are all based on allegations that "from 1998 through 2006 (the 'Relevant Time Period'), BNP and its former Vice President, Jerry M. Cruz, engaged in a scheme to defraud the United States in connection with commodity payment guarantees provided by the U.S. Department of Agriculture ('USDA') under its Supplier Credit Guarantee Program ('SCGP')." [FN2] The BNPP defendants argue that the complaint should be dismissed because the United States is judicially estopped from bringing its claims, and because the asserted claims are time barred and/or legally flawed. [FN3] Cruz adopts BNPP's argument that the United States' claims are time-barred. [FN4]

**A. United States' Claims Are Not Judicially Estopped**

Asserting that

[t]he government has prosecuted six individuals in this district for bank fraud based upon their effort to defraud BNPP and other institutions [, and that t]hroughout those proceedings, the government has repeatedly explained to the district court that BNPP was a *victim* of Cruz and his co-conspirators' scheme, [FN5]

the BNPP defendants argue that "[a]fter repeatedly and deliberately taking the position that BNPP is the victim of the fraud, the government should be judicially estopped from now asserting the opposite—that BNPP is liable as the perpetrator." [FN6] In support of this argument the BNPP defendants have summarized and quoted documents in *United States v. Cantu, et al.,* 4:10–cr–00179 (S.D.Tex.), e.g., the indictment, a press release issued by the USAO, Plea Agreements entered by Cruz, Javier Heriberto Hinojosa, and .... Villalon, and the motions in limini.

**\*4** The United States argues that its FCA and common law claims are not judicially estopped because

[e]stoppel rarely applies against the United States

... and BNPP does not cite any case judicially estopping the government based on positions taken in a criminal proceeding. Even if it could, BNPP also failed to identify a single inconsistency between the United States' position in the criminal proceedings and those stated in the Complaint. BNPP merely posits that it is inconsistent to refer to the Bank as the "victim" of a criminal fraud and then pursue the Bank for civil FCA liability. [FN7]

The United States explains that
BNPP is not a "victim," and the United States did not suggest otherwise in the criminal proceedings. The facts surrounding BNPP's role in the criminal enterprise are entirely consistent with the facts alleged by the United States in the Complaint. The mere fact that some Bank employees were lied to as part of the conspiracy to defraud the USDA is not inconsistent with the fact that BNPP, nevertheless, participated in the scheme to defraud and is liable for the knowing submission of false and fraudulent claims to the United States. [FN8]

[1][2] "[J]udicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." *Reed v. City of Arlington,* 650 F.3d 571, 573–74 (5th Cir.2011). Judicial estoppel "is 'an equitable doctrine invoked by the court at its discretion' to 'protect the integrity of the judicial process,' " *id.* at 574, by preventing parties from "playing fast and loose with (the courts) to suit the exigencies of self interest." *Brandon v. Interfirst Corp.,* 858 F.2d 266, 268 (5th Cir.1988). The Fifth Circuit has recognized that the doctrine of judicial estoppel does not apply unless (1) the position of the party to be estopped is plainly inconsistent with its previous position, (2) the court accepted the previous position, and (3) the party did not act inadvertently. *Reed,* 650 F.3d at 574.

[3] The BNPP defendants have not attempted to show that the United States' position in this case

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                    Page 8

--- F.Supp.2d ----, 2012 WL 3234233 (S.D.Tex.)
**(Cite as: 2012 WL 3234233 (S.D.Tex.))**

is clearly inconsistent with a position taken by the United States in a related criminal proceeding, or that the court in a related criminal proceeding accepted the United States' clearly inconsistent position. Instead, citing the criminal prosecutions of Cruz and his co-conspirators, the BNPP defendants argue that "the government has repeatedly explained to the district court that BNPP was a *victim* of Cruz and his co-conspirators' scheme." [FN9] However, the BNPP defendants have not cited a single document in which the United States refers to BNPP as a "victim." Instead, the BNPP defendants have cited documents showing that Cruz and his co-conspirators knowingly provided false information to BNPP. But the fact that false information was provided to BNPP as part of the conspiracy to defraud the United States is not necessarily inconsistent with the United States' allegations that BNPP is liable for the knowing submission of false and fraudulent claims to the United States. *See United States v. Hemmingson,* 157 F.3d 347, 356 (5th Cir.1998) (rejecting defendant's contention that the government assumed "inconsistent litigating positions" by prosecuting a company as a defendant in one action seeking to hold the company vicariously liable for an officer's bad acts, and portraying the same company as a victim in the criminal prosecution of the company officer). *See also United States v. Crop Growers Corp.,* 954 F.Supp. 335, 343 (D.D.C.1997) (recognizing that a corporation "can be both a victim and a participant in crimes arising out of the same facts" and that "a basic principal of corporate law [is] that, in a shareholder derivative suit, a corporation plays the role of both plaintiff and defendant"). The court therefore concludes that the United States is not judicially estopped from pursuing this action.

**B. United States' Claims Are Not Affirmatively Time Barred**

**\*5** Defendants argue that the United States' Complaint should be dismissed because the United States' FCA claims and common law claims are all time-barred. "[A] complaint may be subject to dismissal if its allegations affirmatively demonstrate

that the plaintiff's claims are barred by the statute of limitations and fail to raise some basis for tolling." *Frame v. City of Arlington,* 657 F.3d 215, 240 (5th Cir.2011), *cert. denied,* —— U.S. ——, 132 S.Ct. 1561, 182 L.Ed.2d 168 (2012) (citing *Jones v. Bock,* 549 U.S. 199, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007)). *See also Jones v. Alcoa, Inc.,* 339 F.3d 359, 366 (5th Cir.2003) ("A statute of limitations may support dismissal under Rule 12(b)(6) where it is evident from the plaintiff's pleadings that the action is barred and the pleadings fail to raise some basis for tolling ...").

1. *FCA Claims Are Not Time Barred*

The following language from the FCA provides a six-year statute of limitations and a three-year tolling period, and bars the United States from filing FCA claims over ten years old:

A civil action ... may not be brought—

(1) more than 6 years after the date on which the violation of [the statute] is committed, or

(2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed.

31 U.S.C. § 3731(b).

Defendants argue that the United States' FCA claims are time barred because

Plaintiff's own allegations show that the FCA's six-year statute of limitations has expired. As the Fifth Circuit has held, the FCA limitations period commences when a claim is submitted. BNPP submitted all of its claims by September 15, 2005. Compl. ¶ 48 (listing "Date Claim Received" for each claim). Thus, the FCA's six-year statute of limitations expired on September 15, 2011—more than one month before Plaintiff filed its Complaint on October 18, 2011. For this reas-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                                    Page 9

--- F.Supp.2d ----, 2012 WL 3234233 (S.D.Tex.)
**(Cite as: 2012 WL 3234233 (S.D.Tex.))**

on, all of Plaintiff's FCA claims must be dismissed as untimely. [FN10]

Defendants argue that "[t]he FCA's three-year tolling provision does not save Plaintiff's FCA claims because long ago 'facts material to the right of action [were] known or reasonably should have been known,' " [FN11] and because "the Wartime Suspension of Limitations Act [ ("WSLA") ] [d]oes [n]ot [s]ave Plaintiff's FCA [c]laims." [FN12] The United States responds that the BNPP defendants' contention that its claims are time barred

fails for three reasons: (1) by operation of the Wartime Suspension of Limitations Act ... [WSLA], 18 U.S.C. § 3287, the statute of limitations on all of the United States' FCA claims are suspended; (2) the FCA's three-year tolling provision prevents dismissal of the action; and (3) many of the claims in question fall squarely within the FCA's six-year limitation period. [FN13]

Although the court concludes that the United States' FCA claims do not fall squarely within the FCA's six-year limitation period, the court also concludes that these claims are not subject to dismissal because whether they are subject to the FCA's three-year tolling provision is a question of fact that cannot be resolved on the pleadings alone, and because the WSLA acts to suspend the FCA's statute of limitations.

(a) The United States' Claims Do Not Fall Squarely Within the FCA's Limitation Period
**\*6** [4] Asserting that "[f]alse claims paid after October 18, 2005 fall within the FCA's six-year statute of limitations," [FN14] the United States argues that "many of the claims in question fall squarely within the FCA's six-year limitation period." [FN15] The United States' contention that the limitations period for FCA claims is computed from the date the claim is paid is precluded by the Fifth Circuit's holding in *Smith v. United States,* 287 F.2d 299 (5th Cir.1961), that the limitations period for FCA claims is computed from "the date on which the violation of [the FCA] is committed," and that the "violation" is the submission—not the pay-

ment—of a false claim. *Id.* at 303–04 ("The six-year period is to be computed from the time of 'the commission of the act,' 31 U.S.C.A. § 235. The 'act' in question is the filing of the false claim."). *See also Graham County Soil & Water Conservation District v. United States ex rel. Wilson,* 545 U.S. 409, 125 S.Ct. 2444, 2449, 162 L.Ed.2d 390 (2005) (time limit for FCA claims begins to run on the date the defendant submitted a false claim for payment.

(b) The United States' Complaint Raises Questions of Fact Regarding Applicability of the FCA's Three–Year Tolling Provision
Asserting that "[t]he FCA's six-year limitation period may be tolled for three years from the date when 'facts material to the right [of] action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances,' " [FN16] the United States argues that its complaint should not be dismissed because "[d]etermining whether the statute was tolled is a fact intensive analysis that cannot be decided on the pleadings ... A full record must be developed in discovery and, only then can this issue be determined on summary judgment or at trial." [FN17] Defendants contend that this argument lacks merit because

[t]he government was on notice of potential civil claims when BNPP in 2005 submitted 238 claims totaling almost $80 million based upon virtually simultaneous defaults by four Importers. Compl. ¶ 48. In fact, the government concedes that in response it immediately commenced a grand jury investigation of the circumstances surrounding the defaults by "August 11, 2005"—weeks before BNPP even finished submitting its claims in September 2005. Compl. ¶ 52. *See* Ex. 23 & 24 (issuing subpoenas in 2005 and 2006 to BNPP).

No matter how these circumstances are analyzed, the government is not entitled to tolling. Either the government knew through its criminal investigation of BNPP's alleged role in the underlying conduct or the Civil Division failed to act

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3234233 (S.D.Tex.)
**(Cite as: 2012 WL 3234233 (S.D.Tex.))**

diligently by launching an investigation based on BNPP's substantial claims. Indeed, the Department of Justice is required to timely investigate civil claims with coordination between criminal and civil officials. *See* 31 U.S.C. § 3730(a) (requiring Attorney General to "diligently investigate a violation under section 3729 " and "bring a civil action under this section" where appropriate); U.S. Attorneys' Manual, § 9–42.010(C) (Ex. 25) ("Cases pursued criminally must also be analyzed for civil potential. This analysis should be conducted at the *earliest possible stage."* (emphasis added)). The Civil Division made no timely effort to investigate its potential civil claims and now trots out a litany of excuses for sleeping on its obligations. Its lack of diligence is no basis for tolling.[FN18]

**\*7** In support of their argument that the United States is not able to rely on the FCA's three-year tolling provision, defendants cite a number of cases in which courts have denied plaintiffs the benefit of tolling, e.g., *United States v. Incorporated Village of Island Park,* 791 F.Supp. 354, 364 (E.D.N.Y.1992) (concluding that DOJ should have known of alleged fraud when government released cabinet-level audit report alleging wrongdoing because "it cannot be but that the Department of Justice 'should have ... known' through the exercise of 'due diligence' about these matters at the time that they were well known throughout the rest of the United States government"); *United States, ex rel. Kreindler & Kreindler v. United Techs. Corp.,* 777 F.Supp. 195, 205 (N.D.N.Y.1991) (dismissing FCA claims where "facts material to relator's cause of action were known ... by the senior officials in charge of the ... project"); *United States ex rel. Purcell v. MWI Corp.,* 520 F.Supp.2d 158, 170 (D.D.C.2007) ("courts apply a 'discovery-due diligence' standard" that "begins to run when the government official charged with bringing the civil action 'discovers, or by reasonable diligence could have discovered, the basis of the lawsuit' "); *United States ex rel. Miller v. Bill Harbert International Construction,* 505 F.Supp.2d 1, 14 (D.D.C.2007)

(concluding that Civil Division attorneys did not exercise due diligence in pursuing FCA claims where they "made no attempts to investigate the bid-rigging allegations under their own efforts"). Because none of these cases involved a Rule 12(b)(6) motion to dismiss but, instead, involved either a motion for summary judgment following discovery, or a motion for judgment as a matter of law following an evidentiary hearing, they do not support the defendants' contention that the claims asserted in this action are subject to dismissal as time barred on the pleadings.

[5] The allegations contained in the United States' Complaint make clear that the question of whether this action was filed "more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances," 31 U.S.C. § 3731(b)(2), is a question of fact that cannot be answered based solely on the pleadings before discovery has begun. The Complaint alleges that the

USDA referred the commodity guarantee scheme to the United States Attorney's Office for the Southern District of Texas (USAO), Criminal Division, in or about June or July 2005, for investigation. An investigation of the scheme by the USAO, Criminal Division, did not commence before August 11, 2005. On March 24, 2010, Cruz, Villarreal, See, Gonzalez, Hinojosa and Villalon were indicted on charges pertaining to the scheme. On information and belief, the official of the United States charged with responsibility to act in the circumstances did not know nor should have known the facts material to the right of action any earlier than October 19, 2005, and the United States believes it is probable that the date is later.[FN19]

**\*8** This excerpt from the Complaint alleges that as of October 19, 2005, the United States official charged with responsibility to act neither knew nor should have known of the material facts. Accord-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                    Page 11

--- F.Supp.2d ----, 2012 WL 3234233 (S.D.Tex.)
**(Cite as: 2012 WL 3234233 (S.D.Tex.))**

ingly, the court concludes that the United States' Complaint is not subject to dismissal under Rule 12(b)(6) because the Complaint's allegations do not affirmatively demonstrate that the plaintiff's claims are barred by the statute of limitations and do raise some basis for tolling. *See Frame,* 657 F.3d at 240.

(c) WSLA Suspends the FCA's Statute of Limitations

The United States argues that the FCA claims were timely filed because the WSLA, as amended by the Wartime Enforcement of Fraud Act of 2008 ("WEFA"), 18 U.S.C. § 3287, suspends the FCA's statute of limitations for the United States' FCA claims. Defendants argue that the WSLA does not apply to the United States' FCA claims.

**(1) Applicable Law**

Congress initially enacted the WSLA for World War I, 42 Stat. 220, and repealed it in 1927. In 1942 Congress re-enacted the WSLA temporarily for World War II to extend the time prosecutors had to bring charges relating to criminal fraud offenses against the United States, 56 Stat. 747. "Both statutes were similar and extended the statute of limitations as to any 'offenses involving the defrauding or attempts to defraud the United States ... and now indictable under any existing statutes.' " *Duqan & McNamara, Inc. v. United States,* 130 Ct.Cl. 603, 127 F.Supp. 801, 802 (Ct.Cl.1955). In 1944 the WSLA was amended to reach violations of the Contract Settlement Act of 1944. "In so doing the phrase 'now indictable under existing statutes' was deleted." *Id.* (citing 58 Stat. 649, 667, 41 U.S.C. § 101, et seq.). In 1948 the WSLA was codified "as permanent legislation to be applicable whenever the country is at war." *Id.*

In 2005 when the claims at issue in this action were submitted for payment, WSLA provided, in relevant part,

[w]hen the United States is at war ... the running of any statute of limitations applicable to any offense (1) involving fraud or attempted fraud against the United States or any agency thereof

..., shall be suspended until five years after the termination of hostilities as proclaimed by the President or by a concurrent resolution of Congress.

18 U.S.C. § 3287. The Fifth Circuit has explained that

[t]he WSLA has three components: (1) a triggering clause ("When the United States is at war the running of [the applicable statute of limitations] shall be suspended."), (2) a suspension period ("three years"), and (3) a termination clause ("suspended until ... after the termination of hostilities as proclaimed by the President or by a concurrent resolution of Congress.").

*United States v. Pfluger,* 685 F.3d 481, 2012 WL 2345027, *2 (5th Cir. June 21, 2012). In *United States v. Smith,* 342 U.S. 225, 72 S.Ct. 260, 261, 96 L.Ed. 252 (1952), the Supreme Court held that the WSLA applied only to offenses committed after the triggering of the suspension of limitations but before the termination of hostilities. The Supreme Court explained that "under our construction the ... period prescribed by the [WSLA] starts to run at the date of termination of hostilities ... No reasons of policy are suggested for straining the language of the Act to suspend the running of the statute beyond the emergency which made the suspension seem advisable." *Id.* at 262.

**\*9** Effective October 14, 2008, Congress amended the WSLA through the WEFA, Pub.L. No. 110–417 § 855, to expand its operation to times "[w]hen the United States is at war or *Congress has enacted a specific authorization for the use of the Armed Forces, as described in section 5(b) of the War Powers Resolution (50 U.S.C. 1544(b))."* 18 U.S.C. § 3287 (2011) (change in italics). The amendment also extended the suspension period until "5 years after the termination of hostilities as proclaimed by the Presidential proclamation, with notice to Congress, or by a concurrent resolution of Congress." *Id.*

The United States contends that the amended

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                                Page 12

--- F.Supp.2d ----, 2012 WL 3234233 (S.D.Tex.)
**(Cite as: 2012 WL 3234233 (S.D.Tex.))**

WSLA applies to BNPP's conduct. [FN20] Courts are in conflict as to whether the post-amendment WSLA should apply to offenses that occurred before passage of the 2008 amendments. *Compare United States v. Anghaie,* No. 1:09–CR–37, 2011 WL 720044, at *2 (N.D.Fla. Feb.21, 2011) (applying post-amendment WSLA to counts for which the limitations period would have expired after the amendment) with *United States v. Pearson,* No. 2:09cr43, 2010 WL 3120038, at *1 (S.D.Miss. Aug.4, 2010) (applying pre-amendment WSLA to offenses that occurred prior to the amendment). Courts are similarly in conflict as to whether the pre-amendment WSLA requires a formal declaration of war or whether the authorized use of military force suffices. *Compare United States v. Shelton,* 816 F.Supp. 1132, 1135 (W.D.Tex.1993) (pre-amendment WSLA requires congressional declaration of war), with *Pearson,* 2010 WL 3120038, at *1–2 (citing *United States v. Prosperi,* 573 F.Supp.2d 436, 455–56 (D.Mass.2008) (in support of conclusion that the United States was "at war" for purposes of the pre-amended WSLA during the Afghanistan and Iraq conflicts that began in 2001 and 2002)).

**(2) Application of the Law to the Facts**
Defendants argue that the WSLA does not save the United States' FCA claims because "the WSLA does not apply in civil FCA cases" [FN21] and because even if the WSLA does apply to civil FCA cases, the United States was not "at war" in 2005 when the acts underlying the FCA claims alleged in this case occurred. [FN22]

(i) *Application of WSLA to Civil FCA Cases*
Defendants argue that the WSLA does not apply to civil FCA cases because the FCA's six-year statute of limitations and attendant three-year tolling period provide the exclusive limitations period applicable to FCA claims. [FN23] Defendants also argue that because the "WSLA, by its own terms, only tolls the period applicable to an 'offense' involving fraud," [FN24] WSLA's application is limited to criminal cases. [FN25]

(A) WSLA Suspends FCA's Statute of Limitations
[6] The FCA was first enacted in 1863, 12 Stat. 696. The FCA made certain acts to defraud the government punishable by fine and imprisonment, and provided that any person who committed any of the prohibited acts should forfeit and pay to the United states the sum of $2,000 for each act and, in addition, double the amount of the damages. The prohibited acts included the making of a claim against the United States knowing such claim to be false, fictitious, or fraudulent. The different portions of the FCA have since been distributed throughout the United States Code. The portion imposing criminal penalties is now 18 U.S.C. §§ 287 and 1001, and the portion imposing civil penalties is now 31 U.S.C. § 3729, which provides "for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410), plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(1).

*10 In *United States v. Grainger,* 346 U.S. 235, 73 S.Ct. 1069, 1071, 97 L.Ed. 1575 (1953), the Supreme Court held that the WSLA applied to the statute of limitations relating to proceedings under that portion of the FCA that imposed criminal penalties. Since the criminal portion of the FCA and the civil portion involved here both prohibit knowingly making a false, fictitious, or fraudulent claim against the United States and since the Supreme Court has held that such an act constitutes an "offense" within the scope of the WSLA when the United States proceeds against the wrongdoer by criminal prosecution, making such a claim would also appear to fall within the scope of the WSLA when the United States avails itself of the civil remedies afforded to it under 31 U.S.C. § 3729. Nevertheless, defendants argue that the WSLA applies only to criminal charges and not to civil claims.

Defendants argue that

the WSLA does not apply in civil FCA cases because the FCA's six-year statute of limitations

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                                                  Page 13

--- F.Supp.2d ----, 2012 WL 3234233 (S.D.Tex.)
**(Cite as: 2012 WL 3234233 (S.D.Tex.))**

and attendant three-year tolling period in § 3731(b) (discussed above) are the exclusive statutes of limitations applicable in civil FCA cases. In fact, the FCA itself makes this clear, stating definitively that a "civil action ... *may not be brought*" unless that statute is satisfied. That restrictive language is so strong that the Fifth Circuit has characterized it as an "absolute limitations period" and for that reason has rejected any form of tolling that Congress omitted from the FCA.[FN26]

In support of this argument defendants cite *United States ex rel. Erskine v. Baker,* No. 99–50034, 2000 WL 554644 (5th Cir. April 13, 2000) (per curiam), and *United States v. Borin,* 209 F.2d 145 (5th Cir.), *cert. denied,* 348 U.S. 821, 75 S.Ct. 33, 99 L.Ed. 647 (1954). In *Erskine,* 2000 WL 554644, at * 1–*2, the Fifth Circuit rejected the plaintiffs' argument that relators could take advantage of the equitable tolling provision in 31 U.S.C. § 3731(b)(2). Reasoning that the language and the legislative history of § 3731(b)(2) made clear that relators cannot benefit from equitable tolling unless they are "in direct identity with the United States," the Fifth Circuit concluded that the relators could not benefit from "a tolling provision passed exclusively for the government's benefit." *Id.* at *1. In reaching this conclusion, the Fifth Circuit cited *Borin,* 209 F.2d at 148–49, for its "finding that a much earlier version of the statute of limitations, which stated only that [e]very [Fair Claims Act] suit shall be commenced within six years from the commission of the act, and not afterward," did not allow for equitable tolling." *Id.* *2. Defendants' reliance on *Erskine* and *Borin* is misplaced because, as the United States argues, those cases involved the judicially created doctrine of equitable tolling; they did not involve a tolling statute like the WSLA. Because the WSLA expressly applies to "any *statute of limitations* applicable to any offense," 18 U.S.C. § 3287 (emphasis added), the court concludes that the WSLA applies to the FCA's statute of limitations.

**(B) WSLA Applies in Civil Cases**
**\*11** [7] Alternatively, the defendants argue that the WSLA suspends the FCA's statute of limitations in criminal cases and has no application in civil cases. In support of this argument defendants assert that the "WSLA, by its own terms, only tolls the period applicable to an 'offense' involving fraud,"[FN27] and that historically "an offense ... did not include a civil cause of action given the 'ordinary, contemporary, common meaning' of the statutory language at the time of its enaction in 1948."[FN28] In support of this argument defendants assert that

[h]ad Congress intended to apply the WSLA to civil actions it certainly knew how to do so. Just before Congress enacted the WSLA's "offense" language, it enacted in 1942 (and amended in 1945) the War–Time Tolling Statute using markedly different language: that statute tolled the running of statutes of limitations applicable to "violations of the antitrust laws of the United States, now indictable *or subject to civil proceedings.*" Congress, however, did not use that language in the WSLA and restricted the WSLA to criminal cases.[FN29]

As additional support for this argument defendants cite *United States v. Weaver,* 107 F.Supp. 963, 966 (N.D.Ala.1952), *rev'd on other grounds,* 207 F.2d 795 (5th Cir.1953), for its statement that "the history of the [WSLA] ... as reviewed in *United States v. Smith,* 342 U.S. 225, 72 S.Ct. 260, 96 L.Ed. 252, is persuasive to the conclusion that the Congress intended only to toll the running of existing statutes of limitations as a bar to criminal prosecutions."[FN30] The *Weaver* court based its conclusion that the WSLA applies only to criminal actions on the Supreme Court's decision in *Smith,* 342 U.S. 225, 72 S.Ct. 260, 96 L.Ed. 252. At issue in *Smith* was whether the WSLA applies to offenses committed after the date of the proclamation of termination of hostilities. *Id.* at 261. Because the question of whether the WSLA extended to civil claims was not at issue in *Smith,* neither *Smith* nor *Weaver* provides guidance on this issue.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                    Page 14

--- F.Supp.2d ----, 2012 WL 3234233 (S.D.Tex.)
**(Cite as: 2012 WL 3234233 (S.D.Tex.))**

With the exception of *Weaver,* 107 F.Supp. at 963, all other courts to have faced the issue of whether the WSLA applies to civil actions have concluded the WSLA applies to such actions. Moreover, all of these courts have reached this conclusion either by analyzing WSLA's legislative history, analyzing the meaning of the word "offense," and/or by citing opinions that have analyzed WSLA's legislative history and/or the meaning of "offense." *See, e.g., Dugan & McNamara,* 127 F.Supp. at 803–04 (analyzing both the meaning of "offense" and WSLA's legislative history before concluding that amendments to WSLA enacted in 1944 made WSLA applicable to civil FCA actions); *United States v. Kolsky,* 137 F.Supp. 359, 362 (E.D.Pa.1955) (same). In *Dugan & McNamara,* 127 F.Supp. at 804, the court concluded that the term "offense" as used in the 1942 version of the WSLA referred only to criminal offenses, but that the 1944 amendments deleting the words "now indictable" made the WSLA applicable to all actions involving fraud against the United States regardless of whether the government sought criminal or civil penalties. In reaching this conclusion the court reasoned that

**\*12** the term "offense" in statutory construction is not without difficulty. Standing by itself we understand the term to have reference to a breach of law established for the protection of the public, usually, but not necessarily, involving criminal proceedings, as distinguished from an action to redress infringement of mere private rights for which a penalty is imposed or punishment inflicted by judicial proceeding ... Here, however, we do not have the term standing apart. The 1942 statute with the phrase "now indictable" spoke clearly of only criminal offenses. The 1944 enactment deleted that phrase ... This deletion leads us to the conclusion that the [WSLA] then became applicable to all actions involving fraud against the United States whether the Government should seek redress by criminal or civil means.

*Id.* In *Kolsky,* 137 F.Supp. at 361, the court

similarly concluded that the WSLA applied to civil claims as well as to criminal charges. The court explained:

It is agreed that the prior wartime suspension acts applied only to criminal action. 42 Stat. 220; 56 Stat. 747. However, we think, the inclusion of civil actions was intended by the present Act. In the prior statutes Congress had used appropriate language to show that it had intended to make said statutes applicable to criminal offenses only. For example, it used the words, "now indictable". If it wished the applicability of the present Act to be limited again to criminal offenses only it could have used similar words. Congress did not, however, and it is our opinion that by failing to do so it thereby intended the Act to apply to civil offenses as well as criminal offenses.

We think it is of no benefit to the defendant, Kolsky, that the present [WSLA] uses the word "offense"; for, said word is not synonymous with the word "crime". If it had been the intent of Congress to make said Act applicable to criminal actions only, instead of using the word "offense" it could have used such words as "crime", "criminal offense", etc.

*Id.*

Although defendants correctly argue that some courts have reached their conclusions that the WSLA applies to civil claims without analyzing the meaning of "offense," all the cases that the defendants cite in support of this argument relied on *Dugan & McNamara,* 127 F.Supp. at 801, and/or *Kolsky,* 137 F.Supp. at 359, in support of their conclusions. *See, e.g., United States v. Temple,* 147 F.Supp. 118, 120–21 (N.D.Ill.1956) (citing *Dugan & McNamara,* 127 F.Supp. at 801, in support of conclusion that 1944 version of WSLA applied to civil FCA claims); *United States ex rel McCans v. Armour & Co.,* 146 F.Supp. 546, 551 (D.D.C.1956) (citing both *Dugan & McNamara,* 127 F.Supp. at 801, and *Kolsky,* 137 F.Supp. at 359, in support of its conclusion that the WSLA as amended in 1944 applied "to civil actions in addition to criminal pro-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                                    Page 15

--- F.Supp.2d ----, 2012 WL 3234233 (S.D.Tex.)
**(Cite as: 2012 WL 3234233 (S.D.Tex.))**

ceedings"); *United States v. Salvatore,* 140 F.Supp. 470, 473 (E.D.Pa.1956) (citing *Kolsky,* 137 F.Supp. at 359, in support of its conclusion that the 1944 version of WSLA applied to civil FCA claims). Defendants' attempt to counter the United States' position by citing directly to the WSLA's legislative history is not persuasive because the legislative history on which defendants rely pertains to the 1942 and earlier versions of the WSLA, i.e., versions of the WSLA that all agree applied only to criminal actions.[FN31] *See Dugan & McNamara,* 127 F.Supp. at 804 (acknowledging that prior to the 1944 amendments the WSLA applied only to criminal actions).

*13 Because defendants have failed to cite any persuasive authority in support of their contention that the WSLA applies only to criminal and not to civil actions, and because the court finds persuasive the analysis of the WSLA's legislative history, the analysis of the meaning of the word "offense," and the conclusion that the amendments to the WSLA made in 1944 extended the WSLA's application to civil actions made in *Dugan & McNamara,* 127 F.Supp. at 801, and in *Kolsky,* 137 F.Supp. at 359, the court concludes that defendants have failed to carry their burden of showing that the FCA claims asserted in this action should be dismissed as time barred because the WSLA applies only to criminal charges and does not apply to civil claims.

(ii) *United States Was "At War" in 2005*
     Defendants argue that

    even if the WSLA had application to civil FCA cases, it would not toll claims related to BNPP's 2005 submission of claims. All of the courts that recently have analyzed the WSLA in criminal cases have either concluded that U.S. was never "at war" in Iraq and Afghanistan or that those conflicts had ended by 2003. Many of those courts have held that WSLA has no application to those conflicts because the term "at war" in the WSLA "requires a finding that it encompasses only those wars that have been formally declared by Congress." Indeed, Congress recently

amended the WSLA because "at war" only covered declared wars.

    But even those courts that have disagreed and found the U.S. "at war" in Iraq and Afghanistan would still not apply the WSLA here. The WSLA only applies to offenses committed during the period of war. *See United States v. Smith,* 342 U.S. 225, 227, 72 S.Ct. 260, 261, 96 L.Ed. 252 (1952) ("the Suspension Act is inapplicable to crimes committed after the date of termination of hostilities"). Both courts that have held that the United States was "at war" in Iraq and Afghanistan have concluded that those "wars" ended by May 1, 2003.[FN32]

    Defendants' contention that "[a]ll of the courts that recently have analyzed the WSLA in criminal cases have either concluded that the U.S. was never 'at war' in Iraq and Afghanistan or that those conflicts had ended by 2003" is not accurate. For the reasons explained below, the court concludes that the United States was "at war" in 2005 when the acts underlying the claims asserted in this action occurred.

(A) Beginning of "At War" Status

    [8] Citing *Shelton,* 816 F.Supp. at 1135, and two unpublished district court cases from other jurisdictions, *United States v. Western Titanium, Inc.,* No. 08–cr–4229–JLS, 2010 WL 2650224 (S.D.Cal. July 1, 2010), and *Anghaie,* 2011 WL 720044, defendants argue that the "WSLA has no application to [the conflicts in Iraq and Afghanistan] because the term 'at war' in the WSLA 'requires a finding that it encompasses only those wars that have been formally declared by Congress.' "[FN33] Defendants explain that in 2008 "Congress. amended the WSLA because 'at war' only covered declared wars,"[FN34] and that because "the amendments were passed following the events in 2005 that gave rise to this case ... the amended statute is not applicable here."[FN35] Citing *Prosperi,* 573 F.Supp.2d at 436, the United States argues that the Authorizations for Use of Military Force issued by Congress with respect to the conflicts in Iraq and Afghanistan

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                                    Page 16

--- F.Supp.2d ----, 2012 WL 3234233 (S.D.Tex.)
**(Cite as: 2012 WL 3234233 (S.D.Tex.))**

are sufficient to deem the United States "at war" for WSLA purposes.[FN36]

**\*14** The courts in *Shelton,* 816 F.Supp. at 1132, and *Prosperi,* 573 F.Supp.2d at 436, addressed the question of what constitutes "at war" for purposes of the WSLA before the 2008 amendments and reached opposite conclusions. In *Shelton* 816 F.Supp. at 1135, the court held that the United States was not "at war" during the 1991 conflict in Iraq because WSLA requires a formal declaration of war that was never issued for that conflict. In *Prosperi* the court held that the Authorization for Use of Military Force ("AUMF") issued by Congress on September 18, 2001, granting the President the power to use all "necessary and appropriate force" against "those nations, organizations or persons" responsible for 9/11 attacks, Pub.L. No. 107–40, 115 Stat. 224, and the Authorization for the Use of Military Force Against Iraq ("AUMFAI") on October 11, 2002, Pub.L. No. 107–243, 116 Stat. 1498, authorizing the use of military force, if necessary, to "remove from power the current Iraqi regime and promote the emergence of a democratic government to replace that regime," to defend the United States "against the continuing threat posed by Iraq," and to "enforce all relevant United Nations Security Council resolutions regarding Iraq," both provided a sufficient basis on which to conclude that the United States was "at war" as of the dates on which those authorizations were issued. *Prosperi,* 573 F.Supp.2d at 450–54. In support of this conclusion the court observed that "[e]ach authorization specifically states that it is 'intended to constitute specific statutory authorization within the meaning of section 5(b) of the War Powers Resolution[, 50 U.S.C. § 1544(b) ]." *Id.* at 450 (citing AUMF at 224, and AUMFAI at 1501). The court also considered several factors including: (1) the extent of congressional authorization, (2) whether the conflict was deemed "war" under accepted definitions of the term and international law, (3) the size, scope, and cost of the conflict, and (4) the diversion of government resources that might have been expended on investigating frauds

against the government. *Prosperi,* 573 F.Supp.2d at 450–454. Based on the thorough analysis of these factors conducted in *Prosperi,* the court concludes that the AUMF issued by Congress on September 18, 2001, and the AUMFAI issued by Congress on October 11, 2002, provide a sufficient basis on which to conclude that the United States was "at war" as of those dates.

Defendants' contention that the wars initiated by the AUMF and the AUMFIA ended before 2005 when the claims at issue in this action were submitted for payment fails in light of the Fifth Circuit's recent decision to the contrary in *United States v. Pfluger,* 685 F.3d 481, 2012 WL 2345027 (5th Cir. June 21, 2012). Because the defendant in *Pfluger* did not dispute that either the AUMF or the AUMFAI was sufficient to place the United States "at war," the court in that case was required to determine only "(1) what conditions serve to mark the termination of hostilities and (2) whether such conditions were in place prior to May 2004, when the last of [the defendant's] criminal conduct occurred." *Id.* at \*2. The Fifth Circuit rejected the conclusion reached in *Prosperi,* 573 F.Supp.2d at 454–55, that the war in Afghanistan ended on December 22, 2001, with the formal recognition of Hamid Karzai's government, and that the war in Iraq ended on May 1, 2003, when President George W. Bush proclaimed that major combat operations in Iraq had ended, concluding, instead, that "neither Congress nor the president met the formal requirements for terminating the WSLA's suspension of limitations as of May 2004 (nor yet to this date)." *Id.* at \*3 (citing *Hamdi v. Rumsfeld,* 542 U.S. 507, 124 S.Ct. 2633, 2642, 159 L.Ed.2d 578 (2004), for its statement that "[a]ctive combat operations against Taliban fighters apparently are ongoing in Afghanistan"). Based on the Fifth Circuit's finding in *Pfluger* that the wars initiated by the AUMF and the AUMFIA have not yet ended, the court concludes that the United States was "at war" for purposes of the WSLA in 2005 when the acts alleged in this action occurred.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3234233 (S.D.Tex.)
**(Cite as: 2012 WL 3234233 (S.D.Tex.))**

(iii) WSLA's 2008 Amendments Apply to the United States' FCA Claims

**\*15** [9] Alternatively, the court concludes that the 2008 amendments to the WSLA, which recognized specific authorization for the use of Armed Force as described in § 5(b) of the War Powers Resolution, 50 U.S.C. § 1544(b), as sufficient to trigger the WSLA, apply to the FCA claims asserted in this action." *See Riddle v. Dyncorp International, Inc.,* 666 F.3d 940, 944 (5th Cir.2012) ("Our precedent directs us to apply the statute of limitations that is in effect at the time a plaintiff files his complaint."). In *Riddle* the Fifth Circuit explained that the question of whether to apply a newly-enacted statute of limitations turns on whether the claims at issue expired before the effective date of the newly-enacted statute of limitations. *Id.* Although defendants argue that the 2008 amendments do not apply to the claims asserted in this action because the underlying acts at issue occurred in 2005, three years prior to the 2008 amendments, those claims had not expired on the effective date of the amendments, i.e., October 14, 2008. Because the acts underlying the United States' claims against defendants occurred in 2005, the FCA's six-year statute of limitations had not expired when in 2008 the WSLA was amended by WEFA. Accordingly, the court concludes that the WSLA's 2008 amendments apply to the FCA claims asserted in this action. *Id. See also FDIC v. Belli,* 981 F.2d 838, 842 (5th Cir.1993) (recognizing that although amendments to a statute of limitations will not revive expired claims, they are applicable to claims that are unexpired at the time of their enactment); *Stogner v. California,* 539 U.S. 607, 123 S.Ct. 2446, 2453, 156 L.Ed.2d 544 (2003) (recognizing that "extension of existing limitations periods is not *ex post facto,* 'provided,' 'so long as,' 'because,' or 'if the prior limitations periods have not expired").

2. *United States' Common Law Claims Are Not Time Barred*

Citing the statute of limitations for common law claims, 28 U.S.C. § 2415, defendants argue that the United States' claims for unjust enrichment and payment by mistake are time barred regardless of whether they are subject to the six-year period for claims "founded upon any contract" referenced in § 2415(a), or the three-year limitations period for claims "founded upon a tort" referenced in § 2415(b).FN37 Defendants argue that "Plaintiff's claims are time-barred because they—like the FCA claims—accrued on submission of the claims ... As a result, Plaintiff suffered its alleged legal injury as of the claim date and its common law causes of action began to accrue at that time," FN38 i.e., September of 2005—more than six years before the United States filed this action on October 18, 2005. Citing 28 U.S.C. § 2416(c), the United States argues in response that "[t]he limitations period for all actions under Section 2415 excludes the period during which 'facts material to the right of action are not known and reasonably could not be known by an official of the United States charged with the responsibility to act in the circumstances.' " FN39 The United States argues that § 2416(c) "extends, rather than tolls, the statute of limitations," FN40 that it is the defendants' burden to prove that the statute of limitations period has run, and that the defendants have failed to shoulder that burden.FN41

**\*16** Section 2416 provides in relevant part:

For the purpose of computing the limitations periods established in section 2415, there shall be excluded all periods during which—

...

(c) facts material to the right of action are not known and reasonably could not be known by an official of the United States charged with the responsibility to act in the circumstances.

28 U.S.C. § 2416(c). The United States' Complaint alleges that the

USDA referred the commodity guarantee scheme to the United States Attorney's Office for the Southern District of Texas (USAO), Criminal Division, in or about June or July 2005, for invest-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                    Page 18

--- F.Supp.2d ----, 2012 WL 3234233 (S.D.Tex.)
**(Cite as: 2012 WL 3234233 (S.D.Tex.))**

igation. An investigation of the scheme by the USAO, Criminal Division, did not commence before August 11, 2005. On March 24, 2010, Cruz, Villarreal, See, Gonzalez, Hinojosa and Villalon were indicted on charges pertaining to the scheme. On information and belief, the official of the United States charged with responsibility to act in the circumstances did not know nor should have known the facts material to the right of action any earlier than October 19, 2005, and the United States believes it is probable that the date is later.[FN42]

The facts alleged in this excerpt from the United States' Complaint do not affirmatively establish that by October 19, 2005, facts material to the right of action were known or reasonably could have been known by a United States official responsible to act in the circumstances. Instead, the United States affirmatively alleges that the official charged with responsibility to act in the circumstances neither knew nor should have known facts material to the right of action as of October 19, 2005, six years before the date on which the United States filed this action. Accordingly, the court concludes that the question of when facts material to the right of action were known or reasonably could have been known is a question of fact, and that the United States' Complaint is not subject to dismissal because the complaint's "allegations affirmatively demonstrate that the plaintiff's claims are barred by the statute of limitations and fail to raise some basis for tolling." *Frame,* 657 F.3d at 240.

**C. Sufficiency of the United States' Claims**

The BNPP defendants argue that the United States' Complaint should be dismissed because the FCA and common law claims asserted therein are legally flawed.

1. *United States' FCA Claims Sufficiently Allege the Knowing Submission of False Claims But Do Not Satisfy the Requirements of Rule 9(b)*

The United States' Complaint asserts three FCA claims against all the defendants: (1) Count One alleges that "Defendants BNP and Cruz viol-

ated the False Claims Act, 31 U.S.C. § 3729(a)(1), by knowingly presenting or causing to be presented to the United States Government, false or fraudulent claims for payment on the CCC commodity payment guarantees assigned to BNP by any of the U.S. Exporters"; [FN43] (2) Count Two alleges that "Defendants BNP and Cruz violated the provisions of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B) (2009) by knowingly making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, which the United States paid"; [FN44] and (3) Count Three alleges that "Defendants BNP and Cruz have violated the provisions of the False Claims Act, 31 U.S.C. § 3729(a)(3) by knowingly conspiring to defraud the government by getting a false or fraudulent claim allowed or paid, and which the United States paid." [FN45] The BNPP defendants argue that the United States' FCA claims

**\*17** fail as a matter of law because the Complaint (a) does not allege vicarious liability for the actions of a co-conspirator of the Exporters (Cruz) who received bribes, (b) does not allege any false claims filed by BNPP, and (c) does not plead fraud with particularity.[FN46]

(a) Applicable Law

[10][11] The FCA prohibits three distinct, but overlapping practices, all of which are alleged in the United States' Complaint: (1) the knowing presentment of a false claim to the Government,[FN47] (2) the knowing use of a false record or statement to get a false claim paid,[FN48] and (3) conspiracy to get a false claim paid.[FN49] "The FCA applies to anyone who 'knowingly assist[s] in causing' the government to pay claims grounded in fraud, 'without regard to whether that person ha[s] direct contractual relations with the government.' " *United States ex rel. Riley v. St. Luke's Episcopal Hospital,* 355 F.3d 370, 378 (5th Cir.2004). For FCA purposes

the terms "knowing" and "knowingly" mean that a person, with respect to information—

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3234233 (S.D.Tex.)
**(Cite as: 2012 WL 3234233 (S.D.Tex.))**

(1) has actual knowledge of the information;

(2) acts in deliberate ignorance of the truth or falsity of the information; or

(3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729(b) (2003).FN50 The requisite intent is thus the knowing presentation of what is known to be false; "which means that a lie is actionable but not an error." *Riley,* 355 F.3d at 376. In *United States v. Southland Management Corp.,* 326 F.3d 669, 682 (5th Cir.2003) (en banc) (Judge Jones concurring), the Fifth Circuit explained that

the FCA is not an appropriate vehicle for policing technical compliance with administrative regulations. The FCA is a fraud prevention statute; violations of [agency] regulations are not fraud unless the violator knowingly lies to the government about them. *United States ex rel. Lamers v. City of Green Bay,* 168 F.3d 1013, 1019 (7th Cir.1999). Innocently made faulty calculations or flawed reasoning cannot give rise to liability. *United States ex rel. Wang v. FMC Corp.,* 975 F.2d 1412, 1420–21 (9th Cir.1992). Further, where disputed legal issues arise from vague provisions or regulations, a contractor's decision to take advantage of a position cannot result in his filing a "knowingly" false claim. *See United States ex rel. Siewick v. Jamieson Science & Engineering, Inc.,* 214 F.3d 1372, 1378 (D.C.Cir.2000); *Hagood v. Sonoma County Water Agency,* 81 F.3d 1465, 1478–79 (9th Cir.1996).

The statute's definition of "knowingly" excludes liability for innocent mistakes or negligence. *Id.* at 681.

(b) Application of the Law to the Facts

**(1) The United States' Complaint Contains Enough Facts to Allege that BNPP Filed False Claims**

[12] The BNPP defendants argue that the FCA claims "fail because BNPP's claims were not false." FN51 The BNPP defendants explain that

**\*18** [t]he core problem for Plaintiff is that those claims were real and legitimate: Plaintiff actually issued the guarantees, BNPP actually paid over $78 million dollars for the receivables and importers' promissory notes, and those notes were not repaid. None of the claims submitted by BNPP was a factually false claim, which "involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." FN52

The BNPP defendants' argument fails because in *United States ex rel. Longhi v. Lithium Power Technologies, Inc.,* 575 F.3d 458 (5th Cir.2009), *cert. denied,* —— U.S. ——, 130 S.Ct. 2092, 176 L.Ed.2d 722 (2010), the Fifth Circuit reaffirmed that long-standing principle that, "[i]n certain cases, FCA liability may be imposed 'when the contract under which payment is made was procured by fraud.' " *Id.* at 467–68 (quoting *United States ex rel. Willard v. Humana Health Plan of Texas, Inc.,* 336 F.3d 375, 384 (5th Cir.2003)). The Fifth Circuit explained that "[t]his type of FCA claim is characterized as fraudulent inducement. Under a fraudulent inducement theory, although the Defendants' 'subsequent claims for payment made under the contract were not literally false, [because] they derived from the original fraudulent misrepresentation, they, too, became actionable false claims." *Id.* at 468 (quoting *United States ex rel. Laird v. Lockheed Martin Engineering & Science Services Co.,* 491 F.3d 254, 259 (5th Cir.), *cert. denied,* 552 U.S. 1023, 128 S.Ct. 629, 169 L.Ed.2d 395 (2007). The United States' Complaint alleges that BNPP and its co-conspirators engaged in a course of false or fraudulent conduct by making false statements to obtain guarantees from the United States for transactions that they knew they were not eligible for guarantees. The United States alleges that when these transactions created losses, BNPP made claims under the guarantees that BNPP knew were

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                        Page 20

--- F.Supp.2d ----, 2012 WL 3234233 (S.D.Tex.)
**(Cite as: 2012 WL 3234233 (S.D.Tex.))**

false or fraudulent and thereby caused the USDA to pay BNPP money that BNPP knew it was not entitled to receive.[FN53] Accordingly, the court is not persuaded by the BNPP defendants' contention that the claims underlying this action were not false.

**(2) The United States' Complaint Contains Enough Facts to Allege that the BNPP Defendants, Through Cruz, Knowingly Violated the FCA**

The BNPP defendants argue that the FCA claims fail because the United States "does not allege that any of BNPP's purportedly false statements were made 'knowingly.' " [FN54] Asserting that "[t]he Complaint contains no allegations that BNPP acted 'knowingly,' " [FN55] the BNPP defendants argue that

[a]mong the glaring omissions from the Complaint are any allegations that (1) any BNPP employee other than Cruz knew or approved of his corrupt misconduct, or (2) Cruz acted with the intent of for the purpose of benefitting his employer, BNPP, by his corrupt misconduct in taking bribes and deceiving BNPP. [FN56]

Citing *United States v. Ridalea State Bank*, 357 F.2d 495, 500 (5th Cir.1966), the BNPP defendants argue that "[t]he Fifth Circuit has prohibited vicarious liability in circumstances materially identical to those here." [FN57]

**\*19** In *Ridalea* a bank officer perpetrated a fraudulent scheme that involved approval of applications for loans insured by the Federal Housing Authority ("FHA") while employed at two different banks. The officer knew that material representations in the borrowers' applications were false, and he personally received some of the proceeds of the loans as kickbacks from the borrowers. When the borrowers defaulted the banks sought to recover from the FHA, which paid some of the claims. The bank officer was indicted and pleaded guilty of making fraudulent loans. The United States subsequently sought to hold the two banks liable for the officer's fraudulent acts under the FCA.

*Ridglea,* 357 F.2d at 496–97. The facts developed at trial established that "none of the employees in either bank except [the officer who had approved the loans] had actual knowledge of the falsity of the documents which accompanied the claims." *Id.* at 498. "The Government's case rest[ed] on imputing to the banks [the officer's] knowledge of the falsity of the documents, on the theory that he was acting as the agent of the banks at the time he approved the loans." *Id.* "The district court, sitting without a jury ... gave judgment for both defendant banks on all of the counts which went to trial, primarily on the grounds that [the bank officer's] fraud could not properly be imputed to the banks." *Id.* at 497. The Fifth Circuit affirmed the district court's judgment, explaining that the bank officer's

purpose was most certainly not to benefit his employer banks. He must have known that the loans he approved would be defaulted, so that the banks would not make any money on interest on the loans. And, as the trial court found, [the bank officer's] approval of fraudulent applications for FHA-insured loans endangered the bank's ability to continue to handle FHA business and jeopardized the reputation of the banks and their financial integrity. [The bank officer's] purpose, in fact, was to line his own pockets and those of his accomplices with the proceeds of the loans and to get money to make payments on loans previously approved by him on the basis of fraudulent applications, so that these earlier wrongdoings would remain concealed.

*Id.* at 498.

The BNPP defendants argue that like the bank officer in *Ridglea*, Cruz must have known that approval for disbursement of funds under guarantees that he knew had been obtained by the Exporters through false statements would jeopardized BNPP's reputation and financial integrity, and endanger BNPP's ability to continue to handle the SCGP and/ or other USDA-related business. Moreover, the BNPP defendants argue that far from benefitting BNPP, Cruz's actions led to a substantial loss, a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                                                  Page 21

--- F.Supp.2d ----, 2012 WL 3234233 (S.D.Tex.)
**(Cite as: 2012 WL 3234233 (S.D.Tex.))**

lengthy criminal investigation, and the institution of this civil action seeking $237 million ($79 million trebled). The BNPP defendants argue that "[i]n such circumstances, Cruz's knowledge cannot be imputed to BNPP as a matter of law.[FN58]

**\*20** The BNPP defendants' reliance on *Ridglea* is misplaced for at least two reasons. First, *Ridglea* is distinguishable from this case because the facts on which both the district and circuit courts based their conclusions that the bank officer had not acted within the scope of his employment for the benefit of his employers were established during a trial and not, as here, merely alleged in a complaint challenged by a motion to dismiss prior to discovery. Second, the United States has alleged that unlike the bank officer in *Ridglea,* Cruz was acting within the scope of his employment and for the benefit of BNPP when he committed the acts at issue. The United States' Complaint alleges that

[a]s part of his responsibilities at BNP, Cruz was expected to develop new clients and business volume under the USDA Programs, such as SCGP, as well as increase business with existing clients, all for the benefit of BNP. As BNP's Manager of Trade Finance, Cruz negotiated with the U.S. Exporters for assignment of the SCGP guarantees and the promissory notes of the U.S. Importers, and was instrumental in establishing lines of credit for the U.S. Exporters through BNP's approval process. By financing these transactions, BNP earned fees in exchange for providing a line of credit to U.S. Exporters that were fully secured by the United States. In acquiring and maintaining this business for BNP, Cruz acted within the scope of his employment and for the benefit of his employer, BNP.[FN59]

If true, these facts alleged in the United States' Complaint are capable of proving that when Cruz committed the acts underlying the United States' FCA claims he was acting within the scope of his employment and for the benefit of BNPP. These facts are thus capable of establishing that the BNPP defendants, through Cruz, knowingly violated the

FCA.   *See   Ridglea,   357   F.2d   at   498–500* (acknowledging that guilty intent of an agent acting for the benefit of his employer will be imputed to the employer when the latter is sought to be held liable under a statute requiring knowledge or guilty intent).

**(3) The United States' Complaint Fails to Plead Fraud with Particularity**

[13] The BNPP defendants argue that the United States' Complaint fails to plead fraud with particularity as required by Rule 9(b), because "Plaintiff fails to 'set forth the who, what, when, where, and how of the alleged fraud.' "[FN60] The BNPP defendants assert that

*First,* Plaintiff does not attempt to distinguish between the alleged conduct of the three defendants (BNP Paribas, BNPP NA, and BNPP Houston), but rather groups them into one entity, using "BNP" throughout the Complaint. *Second,* Plaintiff alleges that Cruz was an employee of BNP Houston (Compl.¶ 15) but fails to provide any basis to impute his actions to BNP Paribas or BNPP NA. *Third,* Plaintiff does not identify with specificity who it believes made false statements to the government, what these statements were, or where, and to whom they were made. *See* Compl. ¶¶ 34, 42. *Fourth,* Plaintiff provides no details related to the nature of the agreements, when they were formed, or the parties to them.[FN61]

**\*21** In response to the BNPP defendants' assertion that the Complaint does not attempt to distinguish between the alleged conduct of the three BNPP defendants, the United States argues that it has alleged that

each of the three BNPP defendants participated equally in the fraud because the MPSAs with the Exporters, the guarantee assignments, and the actual claims submitted to the USDA were executed interchangeably among the three defendants such that their differences, if any, cannot be discerned at this time.[FN62]

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY Page 22

--- F.Supp.2d ----, 2012 WL 3234233 (S.D.Tex.)
**(Cite as: 2012 WL 3234233 (S.D.Tex.))**

The United States has not cited the paragraphs of the Complaint in which these allegations are made, and the court has not found them. The United States' Complaint contains a Table that lists the date each of the guarantees was approved by the CCC, the date the CCC received BNP's claims on each guarantee, the date the CCC paid BNP on each guarantee, and the amount paid on each guarantee; but the Table does not identify which of the BNPP defendants accepted the assignment of each guarantee, submitted the claim on each guarantee, and/or received payment on each guarantee. Accordingly, the court is not persuaded that the Complaint adequately distinguishes between the allegedly fraudulent conduct of the three BNPP defendants. *See United States ex rel. Russell v. Epic Healthcare Management Group,* 193 F.3d 304, 308 (5th Cir.1999) ( "The conduct to which liability attaches in a False Claims Act suit consists in part of false statements or claims for payment presented to the government ... Because such statements or claims are among the circumstances constituting fraud in a False Claims Act suit, these must be pled with particularity under Rule 9(b).")*, abrogated on other grounds by United States es rel. Eisenstein v. City of New York, New York,* 556 U.S. 928, 129 S.Ct. 2230, 2233 n. 1, 173 L.Ed.2d 1255 (2009). *See also United States ex rel. Hebert v. Dizney,* 295 Fed.Appx. 717, 722 (5th Cir.2008) (recognizing the need for plaintiffs in FCA cases with multiple corporate defendants to plead with particularity the identity of corporate actors making the misrepresentations).

In response to the BNPP defendants' assertion that the United States alleges that Cruz was an employee of BNP Houston (Compl.¶ 15), but fails to provide any basis to impute Cruz's actions to BNP Paribas or BNPP NA, the United States argues that "Cruz's actions and knowledge are attributable to BNPP because at all times he was acting with actual and apparent authority from BNPP, on its behalf and for its benefit." [FN63] Because the United States has alleged that Cruz was employed by BNP Houston, but has not alleged that Cruz was

employed by either of the other two BNPP entities named as defendants in this action, i.e., BNPP and BNPP North America, the court is not persuaded that the Complaint adequately alleges facts capable of holding either of these two entities vicariously liable for Cruz's actions. *See Grubbs,* 565 F.3d at 192 (discussing the need for plaintiffs in FCA cases to plead with particularity the basis on which corporate defendants are alleged to be held vicariously liable).

**\*22** In response to the BNPP defendants' assertion that the United States has failed to identify with particularity to whom it believes made false statements to the government, what these statements were, or when, where, and to whom they were made, the United States cites the Complaint at ¶ 34 as evidence of allegations that "identif[y] precisely who was responsible for the false statements of eligibility being submitted to the USDA," [FN64] and ¶ 48 as evidence of allegations that "Cruz, BNPP and their co-conspirators submitted the false claims to the USDA and the exact dates on which those claims were received." [FN65] Because neither the allegations made in ¶ 34 nor those made in ¶ 48 of the Complaint distinguish which of the defendants are responsible for false statements of eligibility, or which of the defendants obtained and/or submitted guarantees to the USDA for payment, the court is not persuaded that the facts alleged in either of these two paragraphs adequately distinguish between the allegedly fraudulent conduct of the named defendants.

In response to the BNPP defendants' assertion that the United States fails to provide details related to the nature of the agreements the defendants allegedly made, when these agreements were made, or which parties made them, the United States acknowledges that the Complaint does not recite all of the terms and conditions of the relevant agreements at issue in this case, but asserts that "each of the agreements is identified: the MPSAs between BNPP and the Exporters (Compl.¶¶ 27–34); the guarantees between BNPP and the USDA and the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                         Page 23

--- F.Supp.2d ----, 2012 WL 3234233 (S.D.Tex.)
**(Cite as: 2012 WL 3234233 (S.D.Tex.))**

claims made thereon (Compl.¶ 48). Surely, the BNPP defendants are on notice of the facts alleged against them." [FN66] Because—like the allegations regarding the guarantees and the submission of the guarantees for payment made in ¶ 48 of the Complaint—the allegations made in ¶¶ 27–34 of the Complaint fail to distinguish which of the three BNPP defendants engaged in the acts alleged, the court is not persuaded that the allegations made in these paragraphs are pleaded with the particularity required by Rule 9(b). *See Grubbs, 565 F.3d at 192.* Accordingly, the court concludes that the United States' Complaint fails to satisfy Rule 9(b)'s particularity requirement for claims that sound in fraud.

2. *United States' Common Law Claims Are Not Legally Flawed*

The BNPP defendants argue that the United States' common law claims for unjust enrichment and payment by mistake are "foreclosed by the existence of a valid, express contract." [FN67] Asserting that "[t]he SCGP regulations explain that the guarantees assigned to BNPP are contracts," [FN68] the BNPP defendants argue that "[t]he existence of these payment guarantee contracts ... forecloses [the United States' resort to alternative equitable theories of relief." [FN69] The BNPP defendants explain that

> [w]ith respect to unjust enrichment, no "quasi-contract will be found where an express contract exists." *Coghlan v. Wellcraft Marine Corp.,* 240 F.3d 449, 454 (5th Cir.2001). Likewise, a claim for so-called payment by mistake is precluded where the payment is made pursuant to a contract because it is no mistake at all. *See, e.g., United States v. First Choice Armor & Equipment, Inc.,* 2011 WL 3799544, at *7 (D.D.C. Aug.29, 2011) (Ex. 22) ("Allegations in a complaint that an express contract existed between the parties ... preclude a plaintiff from proceeding on alternative theories of FCA liability and unjust enrichment or payment by mistake.").[FN70]

**\*23** Alternatively, the BNPP defendants argue

that the United States' common law claims "fail as a matter of law because equity dictates that Plaintiff must bear the loss of alleged fraudulent scheme because BNPP is an innocent third party." [FN71]

[14][15] These arguments fail because the United States has a longstanding power, independent of any statute, to recover monies its agents have wrongfully, erroneously, or illegally paid out pursuant to the federal common law doctrines of unjust enrichment and/or payment by mistake. *See United States v. Wurts,* 303 U.S. 414, 58 S.Ct. 637, 638, 82 L.Ed. 932 (1938); *LTV Education System, Inc. v. Bell,* 862 F.2d 1168, 1175 (5th Cir.1989). Moreover, since parties may plead alternative and inconsistent theories of recovery, a motion to dismiss is not the appropriate vehicle for determining whether the guarantees preclude claims for unjust enrichment and/or payment by mistake. In *United States v. Applied Pharmacy Consultants, Inc.,* 182 F.3d 603 (8th Cir.1999), the Eighth Circuit affirmed a judgment for the United States on unjust enrichment claims despite the presence of a claimed contract. The court explained that

> the rules of common law, especially rules which concern forms of pleading, should never be taken beyond the reason which gave them birth. The reason for the rule that someone with an express contract is not allowed to proceed on an unjust-enrichment theory, is that such a person has no need of such a proceeding, and, moreover, that such a person should not be allowed by means of such a proceeding to recover anything more or different from what the contract provides for. Here, that reason does not apply, and therefore the rule should not apply.

> *Id.* at 608. Alternatively, the defendants' arguments fail because the United States has pleaded facts capable of establishing that the payment guarantee contracts, which the BNPP defendants argue foreclose the United States' common law claims, are void because they were tainted by fraud, bribes, and/or kickbacks. *See United States v. Mississippi Valley Generating Co.,* 364 U.S. 520, 81 S.Ct. 294,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                    Page 24

--- F.Supp.2d ----, 2012 WL 3234233 (S.D.Tex.)
**(Cite as: 2012 WL 3234233 (S.D.Tex.))**

5 L.Ed.2d 268 (1961) (finding that government contracts tainted by fraud or wrong-doing are unenforceable); *United States v. Acme Process Equipment Co.,* 385 U.S. 138, 87 S.Ct. 350, 355–56, 17 L.Ed.2d 249 (1966) (the government may rescind a contract tainted by kickbacks). The regulations that govern the SCGP provide that recipients and assignees of SCGP guarantees are subject to cancellation in the event of fraud or bad faith in the course of application or certification as alleged here. *See* 7 C.F.R. §§ 1493.430(c), 1493.510(e), 1493.520(d), and 1493.520(e).

### IV. *Conclusions and Order*

For the reasons explained above, the Motion to Dismiss the Complaint by Defendants BNP Paribas, BNP Paribas North America, Inc., and BNP Paribas Houston Agency (Docket Entry No. 22) is **GRANTED in PART and DENIED in PART.** Defendant Jovenal Miranda Cruz's Motion to Adopt in Part Motion to Dismiss Complaint by BNPP (Docket Entry No. 25) is **DENIED.** The United States shall file an amended complaint within thirty (30) days stating with particularity facts showing how and why each of the three BNPP entities may be held liable for the claims asserted in this action.

**\*24** As the length of this Memorandum Opinion and Order indicates, the court has expended considerable time reading these papers and performing a significant amount of independent research to be as fully informed as possible when addressing the parties' arguments. When appropriate the court will consider motions for summary judgment, but additional motions to dismiss pursuant to Rule 12(b) (6) will not be considered.

FN1. Criminal Indictment filed in Criminal Action No. H–10–179, Exhibit 2 to BNP's Motion to Dismiss, Docket Entry No. 22, p. 34.

FN2. United States' Complaint, Docket Entry No. 1, pp. 1–2 ¶ 2.

FN3. Motion to Dismiss the Complaint by

Defendants BNP Paribas, BNP Paribas North America, Inc., and BNP Paribas Houston Agency ("BNPP's Motion to Dismiss"), Docket Entry No. 22.

FN4. Defendant Jovenal Miranda Cruz's Motion to Adopt in Part Motion to Dismiss Complaint by BNPP ("Cruz's Motion to Dismiss"), Docket Entry No. 25.

FN5. Memorandum of Points and Authorities in Support of BNPP's Motion to Dismiss, Docket Entry No. 22–1, p. 9.

FN6. *Id.*

FN7. 0pposition to Motion to Dismiss the Complaint by Defendants BNP Paribas, BNP Paribas North America, Inc. and BNP Paribas Houston Agency ("United States' Opposition to BNPP's Motion to Dismiss"), Docket Entry No. 32, p. 4.

FN8. *Id.* at 4–5.

FN9. Memorandum of Points and Authorities in Support of BNPP's Motion to Dismiss, Docket Entry No. 22–1, p. 9.

FN10. Memorandum of Points and Authorities in Support of BNPP's Motion to Dismiss, Docket Entry No. 22–1, p. 10. *See also* Cruz's Motion to Dismiss, Docket Entry No. 25, p. 1 (adopting the BNPP defendants' arguments that the United States' claims are time-barred).

FN11. Memorandum of Points and Authorities in Support of BNPP's Motion to Dismiss, Docket Entry No. 22–1, p. 10.

FN12. *Id.* at 11.

FN13. United States' Opposition to BNPP's Motion to Dismiss, Docket Entry No. 32, p. 6.

FN14. *Id.* at 14.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                    Page 25

--- F.Supp.2d ----, 2012 WL 3234233 (S.D.Tex.)
**(Cite as: 2012 WL 3234233 (S.D.Tex.))**

FN15. *Id.* at 6.

FN16. *Id.* at 12.

FN17. *Id.*

FN18. Reply Memorandum of Points and Authorities in Support of Motion to Dismiss the Complaint by Defendants BNP Paribas, BNP Paribas North America, Inc., and BNP Paribas Houston Agency ("BNPP's Reply"), Docket Entry No. 37, pp. 3–4.

FN19. United States' Complaint, Docket Entry No. 1, p. 20 ¶ 52.

FN20. United Stats' Opposition to BNPP's Motion to Dismiss, Docket Entry No. 32, pp. 6–7.

FN21. Memorandum of Points and Authorities in Support of BNPP's Motion to Dismiss, Docket Entry No. 22–1, p. 11.

FN22. *Id.* at 14–15.

FN23. *Id.* at 11–12.

FN24. *Id.* at 12.

FN25. *Id.* at 12–13.

FN26. *Id.* at 11.

FN27. *Id.* at 12.

FN28. *Id.*

FN29. *Id.* at 13.

FN30. *Id.*

FN31. *See* BNPP's Reply, Docket Entry No. 37, pp. 5–10, and Exhibits 29–30 and 32–35.

FN32. Memorandum of Points and Authorities in Support of BNPP's Motion to Dis-

miss, Docket Entry No. 22–1, pp. 14–15.

FN33. *Id.* at 14.

FN34. *Id.* (citing Pub.L. No. 110–329, Div. C, Title VIII, § 8117, 122 Stat. 3574, 3647 (Sept. 30, 2008) (extending tolling to congressionally authorized uses of military force), and S.Rep. No. 110–431, at 4 (2008) ("[T]he ongoing military operations in Iraq and Afghanistan are likely exempt from [the pre-amendment version of the WSLA] because they were undertaken when Congress authorized the use of military force, rather than by a formal declaration of war.")).

FN35. *Id.* at 14–15 n. 8. *See also* Notice of Supplemental Authority by Defendants BNP Paribas, BNP Paribas North America, Inc., and BNP Paribas Houston Agency, Docket Entry No. 45, pp. 1–2.

FN36. United States' Opposition to BNPP's Motion to Dismiss, Docket Entry No. 32, pp. 10–11.

FN37. Memorandum of Points and Authorities in Support of BNPP's Motion to Dismiss, Docket Entry No. 22–1, p. 15.

FN38. *Id.* at 16.

FN39. United States' Opposition to BNPP's Motion to Dismiss, Docket Entry No. 32, p. 15.

FN40. *Id.*

FN41. *Id.*

FN42. United States' Complaint, Docket Entry No. 1, p. 20 ¶ 52.

FN43. *Id.* at 21 ¶ 54.

FN44. *Id.* at 21 ¶ 58.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY  Page 26

--- F.Supp.2d ----, 2012 WL 3234233 (S.D.Tex.)
**(Cite as: 2012 WL 3234233 (S.D.Tex.))**

FN45. *Id.* at 22 ¶ 62.

FN46. Memorandum of Points and Authorities in Support of BNPP's Motion to Dismiss, Docket Entry No. 22–1, p. 17.

FN47. *See* 31 U.S.C. § 3729(a)(1) (2003), which makes liable whoever "knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States, a false or fraudulent claim for payment or approval." In 2009 Congress passed the Fraud Enforcement and Recovery Act ("FERA"), Pub.L. No. 111–21, 123 Stat. 1617 (2009), which, *inter alia,* amended and renumbered §§ 3729(a)(1–3) as §§ 3729(a)(1)(A)-(c). The 2009 amendments to the False Claims Act generally apply to conduct occurring on or after May 20, 2009, but the changes to § 3729(a)(1)(B) apply retroactively to all claims "pending on or after June 7, 2008." *See U.S. ex rel. Steury v. Cardinal Health, Inc.,* 625 F.3d 262, 267 n. 1 (5th Cir.2010).

FN48. *See* 31 U.S.C. § 3729(a)(1)(B) (2009) which makes liable whoever "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

FN49. *See* 31 U.S.C. § 3729(a)(3) (2003) which makes liable whoever "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid."

FN50. The 2009 amendments reordered this section but did not effect any substantive change. *See* 31 U.S.C. § 3729(b) (2009).

FN51. Memorandum of Points and Authorities in Support of BNPP's Motion to Dismiss, Docket Entry No. 22–1, p. 21.

FN52. *Id.* at 21 (quoting *United States ex rel. Bennett v. Boston Scientific Corp.,* No. H–07–2467, 2011 WL 1231577, at *13 (S.D.Tex. March 31, 2011).

FN53. United States' Complaint, Docket Entry No. 1, ¶¶ 27–50.

FN54. Memorandum of Points and Authorities in Support of BNPP's Motion to Dismiss, Docket Entry No. 22–1, p. 17.

FN55. *Id.* at 18.

FN56. *Id.*

FN57. *Id.* at 19.

FN58. *Id.* at 20–21.

FN59. United States' Complaint, Docket Entry No. 1, p. 12 ¶ 44.

FN60. Memorandum of Points and Authorities in Support of BNPP's Motion to Dismiss, Docket Entry No. 22–1, p. 23 (citing *United States ex rel. Doe v. Dow Chemical Co.,* 343 F.3d 325, 328 (5th Cir.2003)).

FN61. *Id.*

FN62. United States' Opposition to BNPP's Motion to Dismiss, Docket Entry No. 32, p. 24.

FN63. *Id.*

FN64. *Id.* at 25.

FN65. *Id.*

FN66. *Id.*

FN67. Memorandum of Points and Authorities in Support of BNPP's Motion to Dismiss, Docket Entry No. 22–1, p. 23.

FN68. *Id.* at 24.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                    Page 27

--- F.Supp.2d ----, 2012 WL 3234233 (S.D.Tex.)
**(Cite as: 2012 WL 3234233 (S.D.Tex.))**


FN69. *Id.*

FN70. *Id.* at 23–24.

FN71. *Id.* at 25. *See also* BNPP's Reply, Docket Entry No. 37, p. 15.


S.D.Tex.,2012.
U.S. v. BNP Paribas SA
--- F.Supp.2d ----, 2012 WL 3234233 (S.D.Tex.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



FOR EDUCATIONAL USE ONLY                                        Page 1

Not Reported in F.Supp.2d, 2009 WL 153190 (N.D.Ill.)
**(Cite as: 2009 WL 153190 (N.D.Ill.))**

▷

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois,
Eastern Division.
UNITED STATES of America, Plaintiff,
v.
DOLPHIN MORTGAGE CORP., Defendant.

No. 06–CV–499.
Jan. 22, 2009.

West KeySummary**United States 393** 120.1

393 United States
   393VIII Claims Against United States
      393k120 Making or Presentation of False
Claims and Other Offenses Relating to Claims
         393k120.1 k. In General. Most Cited Cases
   Lender's employee violated False Claims Act
(FCA) pursuant to her apparent authority, and
therefore lender was liable to United States Depart-
ment of Housing and Urban Development (HUD).
It was clear that lender provided employee with ac-
cess to computers that enabled her to print out
forms with lender's name pre-printed that were ne-
cessary to receive HUD loans. When lender re-
ceived origination fees resulting from transactions
on which employee singed off, lender was put on
notice that someone from the company indicated to
HUD that the loans were legitimate. 31 U.S.C.A. §
3279.

AUSA, Eric S. Pruitt, United States Attorney'S Of-
fice, Chicago, IL, Brian Reese Young, David J.
Leviss, United States Department of Justice, Wash-
ington, DC, for Plaintiff.

**MEMORANDUM OPINION AND ORDER**
ROBERT M. DOW, JR., District Judge.
   **\*1** Plaintiff United States of America
("Plaintiff") filed suit against Defendant Dolphin

Mortgage Corporation ("Dolphin" or "Defendant"),
alleging that Dolphin committed fraud upon the
United States Department of Housing and Urban
Development ("HUD") and in so doing, violated
the False Claims Act ("FCA"), as amended 31
U.S.C. § 3279, *et seq.* Before the Court are
Plaintiff's Motion for Summary Judgment [77], De-
fendant's Response [86], and Plaintiff's Reply [94].
For the reasons set forth below, Plaintiff's Motion
for Summary Judgment is granted in part and
denied in part.

**I. Estoppel**
   As a threshold matter, Plaintiff argues that Dol-
phin should be estopped from denying certain ad-
missions made in two plea agreements arising out
of the same operative facts at issue in this case.
Collateral estoppel is permissible under the FCA. In
fact, the FCA includes a specific provision preclud-
ing certain parties from contesting civil liability if
there has been a criminal conviction or plea under
the same operative facts. The preliminary issue be-
fore the Court is the scope of that statutory preclu-
sion and its relation to general collateral estoppel
principles.

   The FCA provides that "[n]otwithstanding any
other provision of law, the Federal Rules of Crimin-
al Procedure, or the Federal Rules of Evidence, a fi-
nal judgment rendered in favor of the United States
in any criminal proceeding charging fraud or false
statements, whether upon a verdict after trial or
upon a plea of guilty or *nolo contendere,* shall estop
the defendant from denying the essential elements
of the offense in any action which involves the
same transaction as in the criminal proceeding and
which is brought under subsection (a) or (b) of sec-
tion 3730." 31 U.S.C. § 3731(d). Dolphin has
neither been convicted nor pleaded guilty to any
criminal charges related to the facts at issue in this
case. Yet Plaintiff contends that Dolphin is es-
topped from denying the guilty pleas (and the ad-
missions contained therein) of certain individuals
on account of their relationships to Dolphin.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                    Page 2

Not Reported in F.Supp.2d, 2009 WL 153190 (N.D.Ill.)
**(Cite as: 2009 WL 153190 (N.D.Ill.))**

Tamira Smyth ("Tamira") [FN1] and Nicole Williams ("Williams") each pleaded guilty to one count of mail fraud in violation of 18 U.S.C. § 1341. Tamira had some form of employment relationship with Dolphin, although the parties dispute the extent and precise scope of that relationship. Williams' relationship with Dolphin is even less clear. Plaintiff describes Williams as "Mrs. Smyth's loan processor and co-conspirator" as well as someone who "signed a number of fraudulent loan origination documents bearing Dolphin's name." In Williams' plea agreement she is described as Tamira's "personal assistant."

> FN1. Tamira used several aliases while engaging in the mail fraud to which she pleaded guilty. For simplicity, and except as otherwise noted, she will be referred to solely as Tamira for purposes of this motion.

There can be no dispute that the mail fraud charges to which the two pleaded guilty are "criminal proceedings charging fraud or false statements" within the meaning of Section 3731(d). It also is clear—and Defendant makes no argument to the contrary—that the facts giving rise to the criminal pleas involved "the same transaction" as the one before this Court. The remaining issues are: (i) whether Dolphin can be considered a "defendant" under the statute; and, if so, (ii) what the essential elements of the mail fraud offense are.

**\*2** In this instance, the Court need not proceed beyond the first question. On its face, the statute is somewhat ambiguous as to the scope of "defendant." One possible reading is that "defendant" is limited to the actual defendant who was convicted or pleaded guilty in the underlying criminal trial. Under that reading, Tamira's and Williams' pleas only could be used against them, individually, in a later civil suit. The other possible reading is that the estopped "defendant" is the defendant in the subsequent civil suit—regardless of whether he or she (or it) was the defendant in the criminal trial. Under that broader construction, Dol-

phin conceivably could be precluded from denying the essential elements of mail fraud.

In support of its argument, Plaintiff relies on *United States v. Anchor Mortgage Corp.,* 503 F.Supp.2d 959 (N.D.Ill.2007), in which the court broadly construed the term "defendant." In so doing, the court reasoned that if Section 3731(d) did not extend estoppel principles beyond the criminal defendant in the underlying case, it would add nothing to general collateral estoppel rules. *Id.* at 959. This Court respectfully disagrees and adopts a different view.

To begin with, although the language of Section 3731 is not crystal clear, this Court believes that the better structural and textual reading of that language indicates that the estopped "defendant" is the party against whom the "final judgment rendered in favor of the United States" in the criminal proceeding. The use of the word "estop" further supports that reading. "Estop" means "to bar or prevent by estoppel," and "estoppel," in turn, is "the barring of a person, in a legal proceeding, from making allegations or denials which are contrary to either a previous statement or act *by that person* or a previous adjudication." WEBSTER'S NEW WORLD COLLEGE DICTIONARY 487 (4th ed.2007) (emphasis added).

Moreover, even if the term were susceptible to two plausible readings, the legislative history of Section 3731(d) indicates that the purpose of adding subsection (d) was not to expand general collateral estoppel rules to cover other defendants, but rather to permit *nolo contendere* pleas in criminal fraud cases to have preclusive effect in later civil litigation. See Senate Report 99–345, at 13676 (1986) ("Section 3 of the bill amends section 3731 of title 31 by adding a new subsection (d) providing that a nolo contendere plea in a criminal fraud case shall have estoppel effect in a subsequent civil action. Without this amendment, the well-settled rule that a nolo plea would have no collateral estoppel effect in related civil proceedings would apply.") The Senate Report specifically stated that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 153190 (N.D.Ill.)
**(Cite as: 2009 WL 153190 (N.D.Ill.))**

"given the high priority which should be afforded to the effective prosecution of procurement fraud cases, an exception [to the general rule making nolo pleas inadmissible] should be made for False Claims Act cases. Moreover, even when the criminal prosecutor wants to pursue his case fully and gain a guilty verdict, the court could still accept a nolo plea over the Government's objection, thus requiring the Civil Division to relitigate the issue. The Committee believes that this would be an unacceptable result; individuals who cheat the Government should not be able to hide behind a nolo plea."

**\*3** *Id.* The House Report similarly remarked that "[a]nother new provision to the False Claims Act incorporated in H.R. 4827 provides that a nolo contendere plea in a criminal prosecution would estop a defendant from denying liability in a civil suit involving the same transaction. The Committee determined that it was unfair to the Government to allow defendants who are cheating the Government by making false claims to enter a plea of nolo contendere in a criminal case and then force the Government to litigate the same issue for civil purposes." House Report 99–660, at 26 (1986).

Based on the foregoing discussion of the statutory text and legislative history, the Court concludes that the term "defendant" in Section 3731(d) is limited to the defendant in the underlying criminal trial. Because Dolphin itself was not convicted of any fraudulent activity, it is not a "defendant" for purposes of 3731(d) and therefore is not estopped under Section 3731(d) from denying the essential elements of the plea agreements.

**II. Background**

HUD, through the Federal Housing Administration ("FHA"), is authorized pursuant to Section 203(b) of the National Housing Act, as amended 12 U.S.C. § 1709(b), to insure lenders against loss on mortgage loans made to buyers of single family housing. Pl. SOF ¶ 1. Under the program's direct endorsement provisions, the lender makes a determination that the property and the borrower are eli-

gible for mortgage insurance according to HUD's requirements. *Id.* Thereafter, the lender causes the loan to be closed and submits the prescribed paperwork to HUD for insurance endorsement. *Id.* Once the mortgage loan is insured, if the homeowner defaults on the loan and the lender forecloses, the lender may submit a claim under which HUD will pay the balance of the loan, related interest and other costs, and assume ownership and possession of the property. *Id.* at ¶ 2. HUD then incurs additional expenses for the management, maintenance, rehabilitation, and marketing of the property until it is resold. *Id.*

There are several steps in the creation of a HUD-insured mortgage loan. It begins with a loan originator/loan officer who has the borrower fill out and sign a loan application, sign a credit authorization, sign a borrower's authorization form, submit verification, and determine the type of loan product the borrower wants. Def. SOF ¶ 10. The loan originator/loan officer then presents the documents to the loan processor. *Id.* The loan processor reviews all of the documents obtained by the loan originator, including mortgage, rent, and bank information, and orders the verification of that information. *Id.* at ¶ 11. The loan processor also obtains all documentation and obtains pre-approval from a lender along with all federal and state signed disclosures. *Id.* The processor then submits the package to the underwriter. *Id.* Underwriting is a process through which loan documentation is examined and verified to permit the lender to determine whether it wishes to undertake the risk. *Id.* at ¶ 9. In the underwriting process, the lender reviews credit scores, debt-to-income ratios, verification of employment, deposits, bank statements, and other documents. *Id.* The underwriting was not performed by Dolphin. *Id.* at ¶ 21.

**\*4** Dolphin was approved by HUD to be a "loan correspondent mortgagee," permitting it to originate HUD-insured mortgage loans for sale or transfer to another qualifying mortgagee, known as a "sponsor mortgagee." Pl. SOF ¶ 3. Dolphin was

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 153190 (N.D.Ill.)
**(Cite as: 2009 WL 153190 (N.D.Ill.))**

the "loan correspondent mortgagee" for the seven loans at issue in this case. *Id.*

In the fall of 1996, Dolphin interviewed a woman whom they knew as Tamira Russo to work as a loan originator/loan officer on an independent contractor basis. Def. SOF ¶ 1; Pl. SOF ¶ 4. During the interview, Dolphin learned that Tamira previously had worked as a loan originator at another mortgage brokerage. Def. SOF ¶ 3. Tamira provided a drivers' license to Dolphin. *Id.* at ¶ 2. Dolphin did not register Tamira as a loan originator or run a background check on her, nor were they required to do so at the time. Def. SOF ¶ 2; Pl. SOF. ¶ 5. However, as of the time that she applied for the job with Dolphin, Tamira had been arrested eight times for various offenses, including issuance of bad checks, fraud and deceptive practices. Pl. SOF ¶ 6.

Dolphin entered into an independent contractor agreement with Tamira, pursuant to which she was authorized by Dolphin to originate mortgage loans, including HUD insured loans. Def. SOF ¶ 4; Pl. SOF ¶ 8. At the initial interview, Dolphin advised Tamira that, as a matter of company policy, she was authorized to originate, but not to process, HUD loans. Def. SOF ¶ 8. Dolphin trained loan officers in the origination of loans through an internal training course. *Id.* at ¶ 23. Dolphin did not train its loan officers on HUD handbook provisions, but the Illinois Association of Mortgage Brokers offered a training course on the HUD handbook. *Id.* Dolphin loan officers attended that course. *Id.* It was Dolphin corporate policy that only loan originators could originate HUD loans and that any loan processing took place at the corporate office and by processors. *Id.* at ¶ 5.

For the performance of her duties, Dolphin provided Tamira with the ability to obtain business cards. Def. SOF ¶ 6. She also was allowed access to computer software permitting her to manipulate and enter electronic data into documents that HUD requires lenders to submit as a precondition to mortgage insurance. Pl. SOF ¶ 12. Dolphin provided Tamira with copies of the documents necessary to

originate a HUD-insured loan, some of which had "Dolphin Mortgage" preprinted on the form. *Id.* at ¶ 13–14. She also was able to print blank copies of those documents from Dolphin's computer system. *Id.* at ¶ 13. Several of the documents for HUD-insured loans to which Tamira had access, including verifications of employment, verifications of deposit, Addenda to the Uniform Residential Loan Application and verifications of rent, had the name "Dolphin Mortgage" preprinted on them. *Id.* at ¶ 14. As a condition of participation in HUD insured loans, Dolphin was required to file with HUD a list of persons authorized to sign the Addendum to the Uniform Residential Loan Application and Lender Certification ("AURLALC"). Def. SOF ¶ 28. Tamira's name was not on the list of authorized signatories. *Id.*

**\*5** Generally, after a loan closed, the title company sent Dolphin its loan origination fees in the form of a check. Pl. SOF ¶ 15. Dolphin then would deposit the check in its bank account and pay the loan officer a commission from the fees. *Id.* Dolphin claims that it has no record of receiving its portion of the loan origination fees from the loans at issue in this case. Def. Resp. SOF ¶ 15. However, Plaintiff has attached HUD–1 settlement statements for the loans at issue stating that Dolphin received origination and broker fees. Pl. SOF ¶ 60. Tamira stated she received her share of the origination fees for the seven loans at issue. *Id.*

While a loan officer at Dolphin, Tamira originated the seven loans at issue in this case. Pl. SOF ¶ 18. Tamira pleaded guilty to one count of mail fraud, 18 U.S.C. § 1341, in connection with her role in the "flipping" scheme. *Id.* at ¶ 16. Nicole Williams also pleaded guilty to one count of violating 18 U.S.C. § 1341. *Id.* at ¶ 17.

The transactions giving rise to this lawsuit were accomplished through back-to-back closings of property in reverse order—that is, the second transaction in the chain of title closed first. Pl. SOF ¶ 19. For the loans in question, a "first purchaser" agreed to acquire property he did not own yet

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                         Page 5

Not Reported in F.Supp.2d, 2009 WL 153190 (N.D.Ill.)
**(Cite as: 2009 WL 153190 (N.D.Ill.))**

through a cash transaction. *Id.* Tamira or another individual then would recruit a "second purchaser" who, through Tamira's assistance, applied for and received a HUD-insured home mortgage loan. *Id.* The sales contract would reflect that the "second purchaser" was buying the property from the "first purchaser" although the "first purchaser" did not own the property at that point. *Id.* The "second purchaser" "purchased" the property from the "first purchaser" at an inflated price despite the fact that the "first purchaser" did not actually own the property. *Id.* Another individual then would provide the "first purchaser" with funds from the HUD-insured home mortgage loan and the "first purchaser" would use those funds immediately to purchase the property in a cash transaction. *Id.* The individuals involved split the proceeds between the inflated price at which the "second purchaser" purported to have purchased the property from the "first purchaser" and the price that the "first purchaser" actually paid to acquire the property. *Id.*

While working for Dolphin as a loan officer, Tamira completed and submitted loan applications on behalf of "second purchasers" and falsified or knowingly accepted falsified financial information pertaining to the borrowers to make them appear eligible for HUD-insured loans. Pl. SOF ¶ 20. Tamira knew that the false information eventually would be submitted to HUD. *Id.* Tamira recruited individuals to serve as "second purchasers" and caused payments to be issued to them after the closings were successfully completed. *Id.* at ¶ 22. Tamira caused money to be deposited into the bank accounts of "second purchasers" to make it appear as though they had enough money to make their cash down payments. *Id.* at ¶ 23. She also procured false identification on behalf of herself and others involved in the actions at issue in this case. *Id.* at ¶ 24.

**\*6** While at Dolphin, Tamira originated loans with computer software provided by Dolphin. *Id.* at ¶ 21. The software allowed her to manipulate loan origination paperwork and type information elec

tronically on the loan application. *Id.* Tamira originated all seven of the loans at issue. Pl. SOF ¶ 18.

In regard to 179 North Leamington, Chicago, Illinois Tamira knowingly (i) "included, or caused to be included" false information in the Residential Mortgage Credit Report, "which made the borrower appear to be more credit-worthy than she actually was"; (ii) "created or caused to be created" a gift letter that falsely represented that the borrower's sister gave her $6,000 to put toward the cash down payment; (iii) "caused funds to be deposited" in the borrower's bank account and then "caused a false bank statement to be submitted" with the loan origination materials with the purpose of making the borrower appear credit-worthy; (iv) "caused" a Verification of Deposit to be submitted with the loan origination materials that made the borrower appear more credit-worthy; (v) made false statements on the Addendum to the Uniform Residential Loan Application, which she signed under the "Officer of Lender" signature block; and (vi) made false statements on the Lender's Certificate, which she signed under the "Lender's Officer" signature block. *Id.* at ¶¶ 25–30.

As to 7418 Kingston Avenue in Chicago, Illinois, Tamira knowingly (i) included false information in the Pre–Closing Verbal Audit Re–Verification; (ii) falsely represented that she did a face-to-face interview with the borrower; [FN2] (iii) included false information on the Request for Verification of Employment, which made the borrower appear more credit-worthy than he actually was; (iv) "caused" a false W–2 to be submitted which made the borrower appear more credit worthy; (v) made false statements on the Addendum to the Uniform Residential Loan Application, which she signed under the "Officer of Lender" signature block; and (vi) made false statements on the Lender's Certificate, which she signed under the "Lender's Officer" signature block. Pl. SOF ¶¶ 31–36.

  FN2. The "face to face borrower requirement" may not have been applicable to the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                                          Page 6

Not Reported in F.Supp.2d, 2009 WL 153190 (N.D.Ill.)
**(Cite as: 2009 WL 153190 (N.D.Ill.))**

purchaser of the property. See Pl.Ex. 36 to MSJ, ML 95–36 (08/02/95).

To receive HUD insurance for the property at 3518 West Lexington in Chicago, Illinois, Tamira knowingly "caused" to be included in the loan file (i) a forged Verification of Employment, which made the borrower appear more credit-worthy than he actually was, (ii) a forged W–2, which also made the borrower appear more credit worthy than he actually was, and (iii) a false certification on the Uniform Residential Loan Application that she had done a face-to-face interview with the borrower. FN3 Pl. SOF ¶¶ 37–39.

> FN3. Again, this requirement may not have applied to this property and this borrower.

In regard to the 3845 West Gladys property in Chicago, Illinois, Tamira knowingly (i) "caused" to be submitted with the loan application a monthly statement from American Family Credit Union, a forged W–2, and a false Request for Verification of Employment, all of which contained false information designed to make the borrower look more credit-worthy than he actually was; (ii) made false statements on the Lender's Certificate, which she signed under the "Lender's Officer" signature block; and (iii) made false statements on the Addendum to the Uniform Residential Loan Application, which she signed under the "Officer of Lender" signature block. Pl. SOF ¶¶ 40–44.

**\*7** Tamira's activities in regard to 4429 West Adams Street in Chicago, Illinois are unclear. The testimony that she provided at a criminal trial contradict the declaration that she provided in this case. At the criminal trial of one of her co-conspirators, Tamira testified that she was not aware of any untoward behavior until the closing of the loan. In her declaration, she now states that she originated the loan knowing that the purported seller did not yet own the property and also made false statements and included forged documents. Affidavits that contradict previous deposition are entitled to no weight in summary judgment proceedings unless

the affiant gives a plausible reason for the discrepancy. See *Beckel v. Wal–Mart Associates, Inc.,* 301 F.3d 621, 623 (7th Cir.2002). There is no reason to depart from that rule when the prior testimony was provided at a criminal trial. If anything, such a proceeding provides greater indicia of reliability. Plaintiff has not provided a reason for the discrepancy, and therefore the Court gives no weight to Tamira's statements that she was engaged in fraudulent activity before the closing in regard to 4429 West Adams.

As to the property at 821 North Menard Avenue in Chicago, Illinois, Tamira knowingly (i) included in the loan package a forged Verification of Deposit, which made the borrower appear more credit-worthy, (ii) made false statements on the Lender's Certificate, which she signed under the "Lender's Officer" signature block; (iii) made false statements in the Addendum to the Uniform Residential Loan Application, which she signed under the "Officer of Lender" signature block; and (iv) "caused" a forged W–2 and Tax Statement to be included with the loan application. Pl. SOF ¶¶ 50–53.

The final property at issue was located at 3939 West Monroe. At that address, Tamira knowingly (i) "caused" to be submitted with the loan application a false Verification of Employment and a forged W–2, both of which made the borrower appear more credit-worthy than he actually was, to be submitted with the loan application; (ii) also "caused" to be submitted with the loan application a false Verification of Deposit, which made it appear as if the borrower had sufficient funds to make the mortgage payments; (iii) made false statements on the Addendum to the Uniform Residential Loan Application, which she signed under the "officer of Lender" signature block; and (iv) made false statements on the Lender's Certificate, which she signed under the "Lender's Officer" signature block. Pl. SOF ¶¶ 54–58.

For six of the loans at issue, Tamira signed and caused to be submitted to HUD an Addendum to the URLA and a Lender's Certificate in which she

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                                Page 7

Not Reported in F.Supp.2d, 2009 WL 153190 (N.D.Ill.)
**(Cite as: 2009 WL 153190 (N.D.Ill.))**

represented herself as an officer of Dolphin. Pl. SOF ¶ 59. Each of these documents had "Dolphin Mortgage" preprinted in an area that identifies the name of the lender. *Id.* With respect to the property at 3518 Lexington, the corresponding documents were executed by an unidentified individual on behalf of Dolphin. *Id.*

**\*8** HUD endorsed each of the seven loans at issue. Pl. SOF ¶ 62. HUD would not have been permitted to endorse the loans for insurance had it been aware that any of the documentation accompanying the loan file, which pertained to the borrower's financial qualifications for a HUD-insured loan, were false and fraudulent.[FN4] *Id.* at ¶ 66. According to the HUD handbook that was in force at the time that the loans at issue were originated, "all employees who sign applications for mortgage insurance on behalf of the mortgagee must be corporate officers, or be authorized to bind the mortgagee in matters involving the origination and servicing of insured mortgages." *Id.* at ¶ 67. In addition, HUD's Mortgagee Letter 95–36, while permitting outsourcing or "contracting out" of certain clerical loan origination functions, admonishes lenders that "the * * * customary loan officer functions may not be contracted out." *Id.*

> FN4. The Court previously granted, in part, Defendant's motion to strike the First Declaration of Charles Martinez. Pl. SOF ¶ 66 is predicated on that declaration. However, in that same ruling, the Court reserved the right to consider and draw its own conclusions with respect to HUD regulations, handbooks, or other materials that may be relevant to the issues. See Docket Entry 120, September 30, 2008. Additionally, the Court denied Dolphin's motion to strike a Second Declaration of Charles Martinez, which provides the factual support for ¶ 66. The Court permitted Dolphin a chance to file a sur-reply and respond to the declaration and underlying HUD document. Despite repeated extensions of time,

Dolphin failed to take advantage of that opportunity.

Each of the seven loans went into default. *Id.* at ¶ 68. Following default and foreclosure, the mortgage holder submitted claims to HUD for insurance benefits on each of the seven loans at issue. *Id.* at ¶ 69. HUD paid the mortgage insurance claims presented on each of the seven loans. *Id.* at ¶ 70. For the seven loans at issue, HUD expended a total of $981,022.61—a figure consisting of HUD's claim payment ($917,924.97), taxes ($10,930.60), maintenance ($20,931.81), and sales expenses ($31,235.23). *Id.* at ¶ 71. HUD recovered a total of $294,700 by taking possession of and selling six of the seven properties for which the United States seeks damages. *Id.* at ¶ 72. HUD has received restitution payments of $3,120 from twenty individuals for their participation in the scheme. *Id.* at ¶ 73. On December 14, 2005, the United States executed a settlement agreement with Attorney's Title Guaranty Fund, Inc. ("ATGF"), resolving claims involving eleven properties, including the seven at issue here. *Id* . at ¶ 74. ATGF paid the United States $1,100,000 under the terms of that settlement. *Id.*

**III. Standard of Revie**

Summary judgment will be granted when the pleadings, the discovery and disclosure materials on file, and any affidavits or declarations, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c). A fact is "material" if it might affect the outcome of the action under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party seeking summary judgment bears the initial burden of demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party makes its initial showing, however, the nonmoving party must demonstrate "specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324. Accordingly, the nonmov-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 153190 (N.D.Ill.)
**(Cite as: 2009 WL 153190 (N.D.Ill.))**

ing party must provide evidence that would permit a reasonable jury to find in his or her favor. *Liberty Lobby,* 477 U.S. at 255–56. "If the evidence is merely colorable, or is not significantly probative, summary judgment will be granted." *Id.* at 249–50 (citations omitted). In reviewing the evidence, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

**IV. Analysis**

**\*9** This case arises out of Dolphin's alleged failure to "turn square corners when [it] deal[s] with the government." [FN5] See *Rock Island, A. & L.R. Co. v. United States,* 254 U.S. 141, 143, 41 S.Ct. 55, 65 L.Ed. 188 (1920) (Holmes, J.). Plaintiff argues that Tamira violated the FCA—the primary vehicle used by the Government for recouping losses suffered through fraud [FN6] —as a result of the actions set forth in detail above and that Dolphin is liable for those actions under the theory of *respondeat superior.*

> FN5. For purposes of the FCA, the FHA is part of the Government of the United States. See *United States v. McNinch,* 356 U.S. 595, 598, 78 S.Ct. 950, 2 L.Ed.2d 1001 (1958).

> FN6. See Senate Judiciary Committee, S.Rep. No. 99–345, at 9 (1986).

**A. Tamira's Liability**

The FCA imposes liability on one who "knowingly presents, or causes to be presented" to the United States a "false or fraudulent claim for payment or approval" (31 U.S.C. § 3729(a) (1)), or who knowingly uses a "false record or statement to get a false or fraudulent claim paid or approved by the Government." (31 U.S.C. § 3729(a)(2)). Plaintiff asserts three ways in which it believes Tamira violated the FCA: (i) she was involved in the "flipping" scheme described above; (ii) she

caused financial documentation which she knew to be false or forged to be submitted with the loan applications for all seven loans; and (iii) she made false statements on the Addenda to the URLA and the Lender's Certifications.

The Court disregards the first asserted basis for liability, because it is not a violation of the FCA, but rather a term that encompasses specific actions that might violate the Act.[FN7] Dolphin appears to concede that Tamira violated the explicit elements of the FCA through the other two actions and instead argues that material questions of fact exist as to whether Plaintiff has satisfied the judicially created requirement of materiality. Despite the absence of argument from Dolphin, the Court briefly will analyze the explicit elements of an FCA violation to ensure that no question of material fact exists.

> FN7. Dolphin also argues that "flipping" was not specifically against HUD regulations at the time period in question. Although the regulation that Dolphin cites does not support that proposition, the Court does not rest its opinion on the overall scheme.

Technically, Plaintiff had no "claims" for FCA purposes until money was distributed from the public fisc. That did not occur until the lenders foreclosed on the seven properties and the government fulfilled its insurance obligations. At one time it was unclear whether a lending institution's demand for reimbursement on a loan that was procured through a fraudulent application was a "claim" under the FCA. See *United States v. McNinch,* 356 U.S. 595, 599 n. 6, 78 S.Ct. 950, 2 L.Ed.2d 1001 (1958). The Seventh Circuit (and many other courts) since have held that a false statement in a loan guarantee application may constitute a false "claim" if the loan has defaulted thus creating the obligation to pay. See, e.g., *United States v. First Nat'l Bank of Cicero,* 957 F.2d 1362, 1373–74 (7th Cir.1992). The FCA "requires a causal rather than a temporal connection between fraud and payment. If a false statement is integral to a causal chain lead-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                Page 9

Not Reported in F.Supp.2d, 2009 WL 153190 (N.D.Ill.)
**(Cite as: 2009 WL 153190 (N.D.Ill.))**

ing to payment, it is irrelevant how that federal bureaucracy has apportioned the statements among layers of paperwork." *United States ex rel. Main v. Oakland City Univ.,* 426 F.3d 914, 916 (7th Cir.2005) (internal citation omitted). The seven loans at issue have defaulted, giving rise to the government's obligation to pay. The seven loans thus constitute "claims" for purposes of the FCA.

**\*10** As to all but one of the loans at issue, there is no dispute that Tamira knowingly submitted false information and/or made false statements on the Addendum to the Uniform Residential Loan Applications ("AURLA") and Lender's Certificate ("LC"), which she also signed as an alleged officer of Dolphin. "[W]hat constitutes the offense is not intent to deceive but knowing presentation of a claim that is either fraudulent or simply false. The requisite intent is the knowing presentation of what is known to be false." *Hindo v. Univ. of Health Servs./The Chicago Med. Sch.,* 65 F.3d 608, 613 (7th Cir.1995) (quoting *United States ex rel. Hagood v. Sonoma County Water Agency,* 929 F.2d 1416, 1420 (9th Cir.1991)). Tamira has admitted to these actions for each of the seven properties and Dolphin has failed to provide any evidence to the contrary except as to the property at 4429 W. Adams.

With respect to that property, Dolphin has pointed to evidence that creates a question of material fact. In particular, Dolphin has cited testimony that Tamira gave in a criminal trial, in which she stated that she was unaware of any untoward behavior until the closing of the loan. Plaintiff makes a cursory argument that failure to report is an FCA violation., but provides no support for its contention. In the alternative, Plaintiff argues that Tamira is liable under 31 U.S.C. § 3729(a)(3), the FCA's conspiracy provision. That is the only reference in Plaintiff's briefs to the conspiracy provision, and without a more developed record and support for the argument, the Court cannot accept that as a potential basis for liability, either. "[P]erfunctory and undeveloped arguments, and ar-

guments that are unsupported by pertinent authority, are waived * * * *." *United States v. Lanzotti,* 205 F.3d 951, 957 (7th Cir.2000). The Court does not have a duty to research and construct legal arguments available to a party. See *Head Start Family Educ. Program, Inc. v. Coop. Educ. Serv. Agency 11,* 46 F.3d 629, 635 (7th Cir.1995). Moreover, a litigant who fails to support a request with pertinent authority forfeits that request. *LINC Fin. Corp. v. Onwuteaka,* 129 F.3d 917, 922 (7th Cir.1997). There are, however, no disputes of material fact as to the six remaining properties in regard to the explicit elements of the FCA.[FN8]

> **FN8.** The Court must reject Dolphin's overarching argument that a fact question foreclosing summary judgment exists as a result of Tamira's lack of credibility. The Seventh Circuit explicitly has stated that "the district court cannot weigh credibility issues at the summary judgment stage." *AutoZone, Inc. v. Strick,* 543 F.3d 923, 934 (7th Cir.2008) (quoting *AHP Subsidiary Holding Co. v. Stuart Hale Co.,* 1 F.3d 611 (7th Cir.1993). The cases cited by Dolphin in fact note that "the opposing party may not merely recite the incantation 'credibility,'" and have a trial on the hope that a jury may disbelieve factually uncontested proof. See *Corrugated Paper Prods., Inc. v. Longview Fibre Co.,* 868 F.2d 908 (7th Cir.1989) (citations omitted). But where Dolphin has pointed to specific evidence contradicting the affidavit, the Court has denied summary judgment.

While conceding that false claims were submitted, Dolphin argues that questions of material fact exist as to whether the false information, and false statements on the AURLA and LC, were "material" to HUD's decision to insure the loans that eventually defaulted. Beyond showing that the claims are false or fraudulent, Plaintiff must show: "(1) that the alleged false statement or claim was essential to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                        Page 10

Not Reported in F.Supp.2d, 2009 WL 153190 (N.D.Ill.)
**(Cite as: 2009 WL 153190 (N.D.Ill.))**

the government's funding decision; (2) that the government specifically relied on the falsity; or (3) that the falsity caused the government to pay out sums it otherwise would not have paid." John T. Boese, *Civil False Claims and Qui Tam Actions* § 2.04 (3d ed.2008); see also *United States ex rel. Harrison v. Westinghouse Savannah River Co.,* 352 F.3d 908 (4th Cir.2003). Courts have imposed this additional factor in FCA cases to prevent *de minimis* or insignificant falsities from leading to liability. See Boese, *Civil False Claims and Qui Tam Actions* § 2.04 ("In light of the obvious fact that no regulated party could ever comply with the tens of thousands of applicable laws, regulations, and guide-lines, courts needed to develop a legal mechanism for differentiating those violations that went to the heart of the claim for federal money from those violations that were inconsequential to the funding decision"). The Seventh Circuit follows that approach. See, *e.g., United States v. Rogan,* 517 F.3d 449, 452 (7th Cir.2008); *United States ex rel. Gross v. AIDS Research Alliance–Chicago,* 415 F.3d 601, 604 (7th Cir.2005); *Luckey v. Baxter Healthcare Corp.,* 183 F.3d 730, 732 (7th Cir.1999); see also *United States ex rel. Hendow v. Univ. of Phoenix,* 461 F.3d 1166 (9th Cir.2006).

**\*11** Dolphin argues that to satisfy this requirement, Plaintiff must prove that the fraudulent documents and false statements boosting the borrower's credit-worthiness were the determining factor in HUD approving the loan. In other words, if the borrower had applied without any "help" from Tamira, HUD may still have approved the loan. The Court rejects this position for two reasons: (i) the Seventh Circuit uses a less strict standard to analyze materiality and (ii) a HUD regulation precludes endorsement of fraudulently originated loans.

Under Seventh Circuit case law, a "statement is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decision making body to which it is addressed.' " *Rogan,* 517 F.3d 449 (citations omitted); *Luckey,* 183 F.3d at 732 (citing *Neder v. United States,* 527

U.S. 1, 16, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)). *Rogan* contains language suggesting that the materiality requirement has been satisfied:

> Suppose someone who applies for a loan represents that he has a net worth of $2 million, when his actual net worth is -$2 million. A loan officer might fail to see the minus sign (had one been included), but the lie would be material anyway, because net worth strongly influences lending decisions.

*Rogan,* 517 F.3d at 452.

For six of the seven loans under consideration, Tamira has admitted that she included or caused to be included false information that would improve the financial status of the "second purchasers." In particular, she forged verifications of deposit or employment, forged W–2s, created false gift letters, and caused false bank statements to be submitted with the loan applications. Tamira has admitted that these actions were taken to improve the credit-worthiness of the borrower. It is common sense that information on net worth and employment would have a natural tendency to influence HUD (or any other lender or guarantor) when determining whether to endorse the loans at issue. See *Rogan,* 517 F.3d at 452.

*Rogan* also supports a wholly independent basis for concluding that Plaintiff has established materiality. In holding that defendants violated a statute in connection with the submission of claims to the government, the court stated that "[t]estimony from a claims-processing officer along the lines of 'I follow the law' is not required." *Rogan,* 517 F.3d at 452. Here, the HUD handbook, in effect at the time of the transactions in question stated that "[i]f, at the time the case is submitted for endorsement, HUD has evidence that there is fraud or misrepresentation on the part of the originating mortgagee, HUD will consider the certifications as fraudulent and will not endorse the mortgage for insurance." 400.4 REV–1 CHG–2; see also 24 C.F.R. § 203.255(c). That the false statements, including

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                           Page 11

Not Reported in F.Supp.2d, 2009 WL 153190 (N.D.Ill.)
**(Cite as: 2009 WL 153190 (N.D.Ill.))**

those made on the AURLA and LC, were not discovered at the time is irrelevant. Had HUD known, it would not have endorsed the loan. As in *Rogan,* HUD need not provide testimony from someone at HUD saying that UHUD would not have approved if it had known the applications contained false statements and certifications. "The United States is entitled to guard the public fisc against schemes designed to take advantage of overworked, harried, or inattentive disbursing officers ." *Rogan,* 517 F.3d at 452.

**\*12** In short, a materiality requirement has been judicially imposed to prevent liability based on false statements unrelated to the claim. But here, the relationship between a false statement as to the ability of an applicant to pay and the decision to insure that borrower is self evident. See *Rogan,* 517 F.3d at 452. There are no questions of material fact on the element of materiality.[FN9]

> FN9. *Rogan* also includes a brief discussion on the related concept of reliance, which neither party discussed. In particular, the Seventh Circuit stated that "[r]eliance is an element of a civil action under the False Claims Act but is easy to show: the truth would have revealed that reimbursement is illegal." *Rogan,* 517 F.3d at 452–453. Here, the government has no difficulty in meeting the "easy to show" standard. If, when the loans were presented to HUD, an acknowledgement had been made that the loan applications contained false information and certification regarding the borrowers' financial situation, HUD's regulations establish that it would not have endorsed the loan.

Before proceeding to the questions of respondeat superior and damages, a brief detour into the question of "causation" is necessary. In FCA cases, there is a distinction between penalties and damages. A defendant is liable for civil penalties if the elements discussed above are met. However, in order to recover treble damages, the government also must establish causation. See *United States v. First Nat'l Bank of Cicero,* 957 F.2d 1362, 1374 (7th Cir.1992); see also 31 U.S.C. § 3729(a) (a person is liable for "3 times the amount of damages which the Government sustains *because of* the act of that person * * * ") (emphasis added). Under the test set forth by the Seventh Circuit, "[i]f the government would not have made a financial commitment absent the claimant's false statement, and the government is nevertheless required to pay a mortgage insurance claim or a loan guaranty, the government has suffered damage 'because of' the false statement, as required by the Act." *First Nat'l Bank of Cicero,* 957 F.2d at 1374. The court thus established a "but for" test of causation in FCA cases in this Circuit. *Id.*

Dolphin cites the "but for" test, but appears to confuse it with the element of materiality discussed above. Dolphin's confusion is understandable because causation is directly related to materiality. At the very least, if they are considered separate elements (one for liability and one for treble damages), then satisfaction of materiality almost always would satisfy the causation requirement—and certainly would do so in this instance. Dolphin views the causation issue as requiring Plaintiff to show that the loans would not have been insured "but for" Dolphin's actions. Such a position merely rehashes the materiality question resolved in Plaintiff's favor above. In some jurisdictions, causation presents a more formidable hurdle, because courts require the subject matter of the false statements to be the source of the government's loss. See, *e.g., United States v. Hibbs,* 568 F.2d 347 (3d Cir.1977). However, the court of appeals in this Circuit expressly has rejected such an "unduly restrictive causation requirement." *First Nat'l Bank of Cicero,* 957 F.2d at 1374. Because this Court has held that the false statements were material to the government's decision to insure the properties, and the government was required to (and did) pay the mortgage insurance claims, the causation requirement has been satisfied.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY
                                                                                        Page 12
Not Reported in F.Supp.2d, 2009 WL 153190 (N.D.Ill.)
**(Cite as: 2009 WL 153190 (N.D.Ill.))**

**B. *Respondeat Superior***

Having held that Tamira herself would be liable under the FCA, the question shifts to Dolphin's responsibility for her actions. Plaintiff argues that Dolphin is vicariously liable because it employed Tamira as a loan officer and she violated the FCA pursuant to the authority that Dolphin granted her. There are two ways in which a principal may be held vicariously liable for its agent's conduct: (i) the agent is an employee who commits a tort while within the scope of employment (actual authority); or (ii) the agent commits the tort when acting with apparent authority in dealing with a third party on or purportedly on behalf of the principal. Restatement (Third) Agency § 7.03(2).[FN10] Courts routinely have applied these concepts in the FCA context. See *United States ex rel. McCarthy v. Straub Clinic and Hosp., Inc.,* 140 F.Supp.2d 1062 (D.Haw.2001) (collecting cases).

> FN10. "In developing the federal law of agency, courts have relied on the Restatement of Agency as a valuable source for those general agency principles. *Moriarty v. Glueckert Funeral Home, Ltd.,* 155 F.3d 859, 865 n. 15 (7th Cir.1998).

**\*13** Tamira took many different actions that violated the FCA. Some of those actions clearly were taken within the scope of her employment and subject Dolphin to liability under the actual authority theory of liability. Other actions exceeded the explicit instructions that she was given, but still subject Dolphin under actual authority. Alternatively, even if her actions were so far beyond the scope of her employment, Dolphin would still be liable under the theory of apparent authority. Although the Court will discuss both actual and apparent authority, only one basis is necessary to find Dolphin liable for Tamira's actions under *respondeat superi- or.*

**1. Actual Authority**

The central issue in examining whether an employee had actual authority is the scope of the employee's employment. The Court thus turns to the

role that Dolphin assigned to Tamira. There is no substantive dispute that Dolphin hired Tamira as a "loan originator" or "loan officer."[FN11] The disagreement lies in what duties that job encompassed and whether Tamira was acting within the scope of those duties when she violated the FCA. "An employee acts within the scope of employment when performing work assigned by the employer or engaging in a course of conduct subject to the employer's control." Restatement (Third) of Agency, § 7.07(2).

> FN11. The parties refer to Tamira's official title, without any apparent distinction, as both a "loan officer" and "loan originator." For simplification and clarity, only "loan originator" will be used for the remainder of the opinion.

Dolphin hired Tamira as a "loan originator" and advised her that her duties were limited to origination and that she could not process HUD loans. According to Dolphin's Rule 30(b)(6) witness, loan origination can include gathering pay stubs, W–2s, and bank statements and submitting verification. The originator presents these and other documents to the loan processor. Processing includes reviewing of all documents obtained by the loan originator, ordering verifications of information received (e.g., mortgage, rent and banking information), obtaining all documentation, and obtaining a pre-approval from a lender along with all federal and state signed disclosures. The processor then submits the package of documents to the underwriter.

Comparing those job descriptions with the actions that led to the FCA violations, it is clear that at least some of Tamira's actions were undertaken as an originator. Specifically, she acted as a "loan originator" when she included false information and forged documents to make the borrowers appear more creditworthy. Those actions alone would make Dolphin liable for all of the properties at issue (except 4429 West Adams), and may make irrelevant the fact that signing the AURLA and LC also appear to be beyond the scope of a loan origin-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                              Page 13

Not Reported in F.Supp.2d, 2009 WL 153190 (N.D.Ill.)
**(Cite as: 2009 WL 153190 (N.D.Ill.))**

ator.

Additionally, before the principal may be held vicariously liable, the agent must act with "intent to benefit the employer." *United States v. One Parcel of Land Located at 7326 Highway 45 North, Three Lakes, Oneida County, Wis.,* 965 F.2d 311 (7th Cir.1992). That standard may be satisfied, however, by acts that benefit both the principal and the agent. See, *e.g., Ackerman v. Northwestern Mut. Life Ins. Co.,* 172 F.3d 467, (7th Cir.1999); *Zero v. United States,* 459 U.S. 991, 103 S.Ct. 347, 74 L.Ed.2d 387 (1982) (acting within the scope of agency defined as acting as authorized and motivated at least in part by an intent to benefit the corporation). Here, there is uncontroverted evidence that Dolphin did in fact benefit from the loans through loan origination fees evidenced in the HUD–1 settlement statements and from Tamira's testimony as well. Dolphin's argument that it has no evidence of receiving such fees is unavailing in light of the concrete evidence marshaled by Plaintiff.

**\*14** Dolphin benefitted from actions within the scope of Tamira's employment, and therefore is liable for the damages to the government resulting from those actions. To the extent that some of Tamira's actions took place when she was acting outside the scope of her employment, the Court discusses below liability under the theory of apparent authority.

**2. Apparent Authority**

Although some of Tamira's actions arguably were outside the scope of her employment as an loan originator, Dolphin nonetheless is liable for the damages caused by those actions because it imbued Tamira with apparent authority on which HUD relied. Under an apparent agency analysis, the Court focuses on what third parties believed the scope of Tamira's authority to be based on Dolphin's actions. A principal may be liable for an agent's wrongdoing even though the agent is acting wholly for himself "[i]f the agent, acting with apparent authority, commits a fraud against a third party who reasonably believed that he was entering

into a bona fide transaction with the agent's principal." *Hartman v. Prudential Ins. Co.,* 9 F.3d 1207, 1211 (7th Cir.1993) (citing *Gleason v. Seaboard Air Line Ry. Co.,* 278 U.S. 349, 49 S.Ct. 161, 73 L.Ed. 415 (1929)).

"An agent acts with apparent authority with regard to a third party when the third party reasonably believes that the agent * * * has authority to act on behalf of the principal and that belief is traceable to manifestations made by the principal." Restatement (Third) of Agency, § 7.08 cmt. b.; see also *Moriarty v. Glueckert Funeral Home, Ltd.,* 155 F.3d 859 (7th Cir.1998) ( "apparent authority is created by the same method as that which creates actual authority, except that the manifestation of the principal is to the third person rather than to the agent"). Plaintiff argues that HUD naturally would assume that Tamira had authority to engage in the actions giving rise to liability on behalf of Dolphin because: (i) the AURLA and LC identify Dolphin as the lender; (ii) Tamira signed documents under "Signature & Title of Officer or Lender"; (iii) Williams signed fraudulent loan origination docs identifying Dolphin as lender under the signature block reserved for "signature of lender"; (iv) the HUD handbook states that all employees who sign applications on behalf of the mortgagee must be officers or authorized to bind that mortgagee; (v) Dolphin provided Tamira with copies of loan origination docs with Dolphin's name; (vi) Dolphin also provided Tamira with the ability to get business cards; (vii) Dolphin accepted loan origination fees; (viii) Dolphin provided Tamira with access to Dolphin's computer programs which allowed her to enter information and print out forms; (ix) Dolphin performed no background check and armed her with the tools to commit fraud.

The Court rejects some of these asserted bases for liability. For example, providing Tamira with the opportunity to get business cards does not create the appearance that Tamira had authority to process loans or certify documents. If anything, the business cards alone might have been read to limit

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                   Page 14

Not Reported in F.Supp.2d, 2009 WL 153190 (N.D.Ill.)
**(Cite as: 2009 WL 153190 (N.D.Ill.))**

the scope of Tamira's authority to loan origination. Also, Dolphin's failure to run a background check is not an action by the principal (Dolphin) "which, reasonably interpreted, caused[ed] the third person to believe that the principal consents to have the act done on his behalf by the agent." *Trs. of Chicago Painters and Decorators Pension, Health and Welfare and Deferred Savings Plan Trust Funds v. LaCosta, Inc.,* 397 F.3d 558, 563 (7th Cir.2005).

**\*15** Nevertheless, there are sufficient uncontested facts for the Court to find that Tamira was acting with apparent authority in violating the FCA and that Dolphin therefore can be held responsible under the *respondeat superior* doctrine. Although Dolphin disputes the name of the exact computer program, it is clear that Dolphin provided Tamira with access to computers that enabled her to print out forms with Dolphin's name pre-printed that were necessary to receive the HUD loans. Tamira was able to enter data directly into those forms. In short,

[W]hen it is the principal itself which clothes the agent with the authority to conduct such activities, and by such actions places the agent in such a position that others will rely on that apparent authority, such principal must bear the loss occasioned by its failure to more discreetly dispense authority.

*United States v. Fox Lake State Bank,* 240 F.Supp. 720 (D.C.Ill.1965), *rev'd in part on other grounds,* 366 F.2d 962 (7th Cir.1966).

Tamira also signed documents (AURLA and LC) as if she were authorized to do so on Dolphin's behalf. Defendant argues that HUD was on notice that Tamira was not permitted to sign these documents because her name was not on the original list provided to HUD. However, Plaintiff has shown that Tamira did not become associated with Dolphin until after the list was provided and that the applicable regulations did not require the list to be updated. Rather, the regulations place the onus on mortgagee: "All employees who sign applications

for mortgage insurance on behalf of the mortgagee *must be corporate officers, or be authorized to bind the mortgagee* in matters involving the origination and servicing of insured mortgages." HUD Handbook 4060.1 Rev–1 ¶ 2–15 (emphasis added).

HUD thus assumes that those signing the AURLA and LC documents are permitted to do so, thus binding the mortgagee. Dolphin was the party best able to ensure that Tamira only signed documents that were within the scope of her authority. Furthermore, when Dolphin received origination fees resulting from transactions on which Tamira signed off, Dolphin was on notice that someone from the company indicated to HUD that the loans were legitimate. At bottom, Dolphin's attempt to disavow Tamira's representations on the AURLA and LC documents cannot be accepted in light of the Seventh Circuit's pronouncement that the False Claims Act was designed to protect against taking advantage of the "overworked, harried, or inattentive" government officers ( *Rogan,* 517 F.3d at 452) —which, in a sense, reaffirms the settled principle that those who deal with the government must "turn square corners." *Rock Island, A. & L.R. Co. v. United States,* 254 U.S. 141, 143, 41 S.Ct. 55, 65 L.Ed. 188 (1920).

In sum, applying the undisputed facts of this case to the authorities cited above, Dolphin is liable for Tamira's actions under both actual and apparent authority.

**C. Damages**

Plaintiff seeks both civil penalties and treble damages for the seven loans that the government was required to purchase from the lenders. Because the Court has found Dolphin liable for only six of those transactions, it will assess the extent of damages as to those six. Plaintiff seeks civil penalties of between $5,500 and $11,000 per violation. Although the statute limits the penalties to between $5,000 and $10,000 (see 31 U.S.C. § 3729(a)), Plaintiff points the Court to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                     Page 15

Not Reported in F.Supp.2d, 2009 WL 153190 (N.D.Ill.)
**(Cite as: 2009 WL 153190 (N.D.Ill.))**

28 U.S.C. § 2461, which adjusted the amount to between $5,500 and $11,000, 31 U.S.C. § 3729(a); see also 64 Fed.Reg. 47099, 47103 (1999). However, the increased penalties may be assessed only on "violations occurring on or after September 29, 1999." All of the violations occurred before that date; thus, the original penalty range will be applied.

**\*16** Dolphin contends that the recovery sought by Plaintiff violates the Eighth Amendment because the fines would be excessive.[FN12] As an initial matter, "[i]t is far from clear that the Excessive Fines Clause applies to civil actions under the False Claims Act." United States v. Rogan, 517 F.3d 449, 453 (7th Cir.2008). Rogan noted that while treble damages often are grouped with punitive damages—which are not "fines" under the Eighth Amendment—the Supreme Court has noted that penalties paid to the sovereign can be "fines" under the Eighth Amendment. Rogan, 517 F .3d at 453–54 (citing Browning–Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 265, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989)). The Supreme Court has held that the FCA has a penal component. See Vermont Agency of Natural Res. v. United States ex rel. Stevens, 529 U.S. 765, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000); Cook County v. United States ex rel. Chandler, 538 U.S. 119, 123 S.Ct. 1239, 155 L.Ed.2d 247 (2003). However, "penal' does not mean 'excessive,' for judgments about the appropriate punishment for an offense belong in the first instance to the legislature." Rogan, 517 F.3d at 454 (quoting United States v. Bajakajian, 524 U.S. 321, 336, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998)).

> FN12. The Eighth Amendment states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted."

Despite the unsettled nature of this issue, the Court concludes that even if the Eighth Amendment applied to this action, the amount sought by Plaintiff would not violate the Excessive Fines

Clause.[FN13] The Eighth Amendment is violated if the fine is "grossly disproportional to the gravity of a defendant's offense." Bajakajian, 524 U.S. at 334. The parties agree that Plaintiff's actual damages were approximately $980,000. After trebling this amount and subtracting amounts recovered by Plaintiff through sales of the property, a settlement, and restitution, Plaintiff requests $1,545,247.83 in treble damages. Even if the Court imposed the maximum civil penalty of $11,000 for the six violations, the recovery would amount to less than twice the amount of Plaintiff's out of pocket losses. The Supreme Court has found single digit ratios acceptable as not "grossly excessive" in the Fifth Amendment context. See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). The Seventh Circuit saw no reason that such a ratio would not apply equally in the Eighth Amendment context, and in fact stated that "[i]f there is to be a difference, one would think that a fine expressly authorized by statute could be higher than a penalty selected ad hoc by a jury." Rogan, 517 F.3d at 454.

> FN13. Dolphin also argues that a genuine issue of material fact exists as to whether the recovery sought violates the Eighth Amendment. The Court agrees with Plaintiff that excessiveness is a question of law for the Court. See Towers v. City of Chicago, 979 F.Supp. 708, 721 (N.D.Ill.1997) ("Whether a fine is excessive is a question for this Court to determine.") aff 'd 173 F.3d 619, 1999 (7th Cir.1999); see also United States v. Real Property Located at 24124 Lemay Street, West Hills, California, 857 F.Supp. 1373 (C.D.Cal.1994) (collecting cases)

In sum, the Court concludes that the amount sought is not grossly excessive because (i) the resulting multiplier is less than two times actual damages, (ii) "heavier punitive awards have been thought to be justifiable" to ensure that crime does not pay where, as here, the fraud was difficult to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY                                              Page 16

Not Reported in F.Supp.2d, 2009 WL 153190 (N.D.Ill.)
**(Cite as: 2009 WL 153190 (N.D.Ill.))**

detect (see *Exxon Shipping Co. v. Baker,* —— U.S.
——, ——, 128 S.Ct. 2605, 2622, 171 L.Ed.2d 570
(2008); *Rogan,* 517 F.3d at 454), and (iii) and
Plaintiff has failed to cite a single case in which re-
covery from a corporate defendant within the Con-
gressionally-approved boundaries has been held to
violate the Eighth Amendment.

**\*17** Finally, the Court requests clarification of
the amount to be recovered in light of the Court's
holding that Plaintiff cannot establish at the sum-
mary judgment stage that Dolphin is liable for the
property at 4429 Adams. Plaintiff has asked for
treble damages of $1,545,247.83 based on six of the
seven properties at issue.[FN14] The Court will not
include 4429 Adams in the damage calculation, but
without an itemization of the damages alleged to
have been caused by that false claim, the Court can-
not accurately determine the proper amount of dam-
ages. The Court therefore requests Plaintiff to sub-
mit a supplemental damage request omitting dam-
ages and costs related to 4429 Adams within 21
days of the date of his opinion.

> FN14. Plaintiff has not included 821 North
> Menard in its treble damage request.

**V. Conclusion**

Plaintiff's motion for summary judgment [77]
is granted in part and denied in part. The Court re-
quests that within 21 days of the date of this opin-
ion Plaintiff file a supplemental brief with respect
to the proper calculation of damages omitting any
damages for 4429 W. Adams. The Court also re-
quests that Plaintiff address in its supplemental
brief how it wishes to proceed as to that remaining
property.

N.D.Ill.,2009.
U.S. v. Dolphin Mortg. Corp.
Not Reported in F.Supp.2d, 2009 WL 153190
(N.D.Ill.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 1

Not Reported in F.Supp.2d, 2011 WL 253259 (S.D.N.Y.)
**(Cite as: 2011 WL 253259 (S.D.N.Y.))**

H

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
UNITED STATES of America, the State of New
York, ex. rel. Associates Against Outlier Fraud,
Plaintiffs,
v.
HURON CONSULTING GROUP, INC. and Em-
pire Health Choice Assurance, Inc d/b/a Empire
Medicare Services, Defendants.

No. 09 Civ. 1800(JSR).
Jan. 24, 2011.

*MEMORANDUM*

JED S. RAKOFF, District Judge.

**\*1** This *qui tam* action alleges violation of the
False Claims Act ("FCA"), 31 U.S.C. § 3729, and
the analogous New York False Claims Act, N.Y.
State Fin. Law § 187 *et seq.,* in connection with the
submission of Medicare and/or Medicaid reim-
bursement forms seeking outlier reimbursement.
FN1 The plaintiff relator ("Associates Against Out-
lier Fraud") filed its First Amended Complaint on
December 9, 2010, and defendants Huron Consult-
ing Group, Inc. ("Huron") and Empire Health
Choice Assurance, Inc. ("Empire") filed motions to
dismiss on February 2, 2010. On August 25, 2010,
the Court issued a Memorandum Order dismissing
with prejudice the state law claim against Empire
and dismissing without prejudice the remaining
claims in the First Amended Complaint. *See*
08/25/10 Memorandum Order at 6–7. On October
6, 2010, the relator filed its Second Amended Com-
plaint and reasserted all of the claims the Court pre-
viously dismissed without prejudice except for the
conspiracy charge. *Id.* at 6. The defendants filed
new motions to dismiss on October 19, 2010, and,
following a full round of briefing, the Court heard
oral argument on November 19, 2010. After careful
consideration, the Court issued an Order on Decem-
ber 30, 2010 denying defendants' motions to dis-

miss. This Memorandum explains the reasons for
that decision.

FN1. On January 6, 2010, the United
States served notice of its decision to de-
cline intervention in this action.

Plaintiff's basic allegations are detailed in the
Court's Memorandum Order of August 25, 2010,
with which full familiarity is presumed. *See*
08/25/10 Memorandum Order at 1–3. The question
now before the Court is whether the Second
Amended Complaint has cured the deficiencies the
Court identified in the relator's earlier pleading.

The first flaw in the First Amended Complaint
was its failure to adequately allege the basis of the
relator's first-hand knowledge. *Id.* at 4. *See Rock-
well Int'l Corp. v. United States ex rel. Stone,* 549
U.S. 457, 463 (2007) (explaining that the False
Claims Act requires that the person bringing the ac-
tion must be an "original source" of the informa-
tion, which is defined as "an individual who has
direct and independent knowledge of the informa-
tion on which the allegations are based and has vol-
untarily provided the information to the Govern-
ment before filing an action under this section
which is based on the information.") (quoting 31
U.S.C. § 3730(e)(4)(B)). The Court finds that the
Second Amended Complaint has cured this defi-
ciency. The relator claims it has direct and inde-
pendent knowledge of the alleged fraud through
Steven Landgraber, who obtained his information
through his employment with the St. Vincent Group
and the personal relationships he developed with
his colleagues. *See, e.g.,* Second Amended Com-
plaint ¶¶ 26, 31–35, 48–61, 87–90, 100. The
Second Amended Complaint further alleges that all
the information ascribed to Landgraber "comes dir-
ectly from his eyewitness accounts of what he per-
sonally observed or did," *id.* at 31; specifies how
Landgraber learned of the alleged fraud (*i.e.,*
through his work on St. Vincent's internal revenue
models and spreadsheets), *id.* at 48; and provides

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 253259 (S.D.N.Y.)
(Cite as: 2011 WL 253259 (S.D.N.Y.))

the names of the employees who informed him of the fraud (such as Frank Wegner and Tamra Aloi), *id.* at 35. Without multiplying examples, the Court finds that these allegations are sufficient to defeat defendants' motions to dismiss on this ground.

**\*2** The second deficiency of the First Amended Complaint was its failure to plead the fraud claims with the particularity required by Federal Rule of Civil Procedure 9(b). *See* 08/25/10 Memorandum Order at 5. Rule 9(b) requires that the FCA claimant must, for each defendant, "(1) specify the statements that he contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994) (citations omitted).[FN2] In this case, the relator has, among other allegations, included a chart with a sample of 421 Medicare outlier cases in the Brooklyn–Queens region for the years at issue in the Second Amended Complaint. *See* Second Amended Complaint at pages 25–26. This chart includes the date of each patient's admission, the length of each patient's stay, billing codes, account balances, cost-to-charge ratios, etc.

> FN2. *See also United States ex rel. Karvelas v. Melrose–Wakefield Hosp.,* 360 F.3d 220, 232–33 (1st Cir.2004) ("As applied to the FCA, Rule 9(b)'s requirement that averments of fraud be stated with particularity—specifying the 'time, place, and content' of the alleged false or fraudulent representations—means that a relator must provide details that identify particular false claims for payment that were submitted to the government. In a case such as this, details concerning the dates of the claims, the content of the forms or bills submitted, their identification numbers, the amount of money charged to the government, the particular goods or services for which the government was billed, the individuals involved in the billing, and the length of time

between the alleged fraudulent practices and the submission of claims based on those practices are the types of information that may help a relator to state his or her claims with particularity.") (footnote omitted).

Although the Court found a similar chart that was part of the First Amended Complaint insufficient to satisfy Rule 9(b), plaintiff has now called the Court's attention to the case of *United States ex rel. Grubbs v. Kanneganti,* 565 F.3d 180, 189 (5th Cir.2009). In *Kanneganti,* the Fifth Circuit noted that the FCA is a remedial statute that lacks the elements of reliance and damages; consequently, it determined that "a claim under the False Claims Act and a claim under common law or securities fraud are not on the same plane in meeting the requirement of 'stat[ing] with particularity' the contents of the fraudulent misrepresentation." 565 F.3d at 189. The Fifth Circuit therefore determined that "[i]f at trial a *qui tam* plaintiff proves the existence of a billing scheme and offers particular and reliable indicia that false bills were actually submitted as a result of the scheme—such as dates that services were fraudulently provided or recorded, by whom, and evidence of the department's standard billing procedure—a reasonable jury could infer that more likely than not the defendant presented a false bill to the government, this despite no evidence of the particular contents of the misrepresentation." *Id.; see also Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir.1990) (requirements of Rule 9(b) may be relaxed when a plaintiff is not in a position to know specific facts until after discovery and the opposing party has particular knowledge of the facts). In this case, the relator argues that it has presented evidence of a billing scheme, and contends that timing of the claims would have been closely related to the date of the discharge patient's discharge; that the statements were made in the billing departments of the hospitals; and that the false statements were authored by Huron Corporation[FN3] and low-level company employees at the direction of upper management.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp.2d, 2011 WL 253259 (S.D.N.Y.)
(Cite as: 2011 WL 253259 (S.D.N.Y.))

FN3. Citing *United States ex rel. Bledsoe v. Cmty. Health Sys.,* 501 F.3d 493, 506 (6th Cir.2007) ("Where, as here, the relator has alleged that the corporation has committed the fraudulent acts, it is the identity of the corporation, not the identity of the natural person, that the relator must necessarily plead with particularity.")

More importantly, the Second Amended Complaint now fleshes out more fully why the traditional standard of the particularity requirements of Rule 9(b) should be relaxed in this context. As there alleged, the Medicare Prospective Payment System ("PPS") generally pays hospitals a fixed amount based on the average cost of treatment for a particular illness, but also provides additional payments for cost outliers "to protect hospitals from large financial losses due to extremely costly cases which the ... average cost estimate[ ] cannot fairly accommodate." *Boca Raton Cmty. Hosp., Inc. v. Tenet Healthcare Corp.,* 238 F.R.D. 679, 682 (S.D.Fla.2006), *aff'd* 582 F.3d 1227 (11th Cir.2009). *See* Second Amended Complaint ¶ 63. A hospital is eligible for outlier payments when the product of its charges (i.e., what the hospital bills its patients) and the hospital specific CCR (the cost divided by the charge ["cost-to-charge ratio"] ), together with certain other costs, exceed a fixed threshold that CMS [the Centers for Medicare & Medicaid Services] determines each year. *Id.* at ¶¶ 67–69.

**\*3** Before 2003, Medicare fiscal intermediaries determined outlier payments using CCRs based on a hospital's most recently settled cost report, which could be up to five years old. *Id.* at 67. Thus, hospitals could fairly easily manipulate their outlier payments with charge increases that exceeded costs, because applying the outdated CCR could mask the fact that costs had not increased alongside charges. To prevent this practice of "turbocharging," CMS determined that after October 1, 2003, fiscal intermediaries would be required to process claims with CCRs based on either the latest settled cost report or the latest tentative

settled cost report, whichever is more recent. *See* 42 C.F.R. § 412.84(i)(2).

The relator alleges, however, that when defendant Huron assumed control of St. Vincent's in 2005, charges increased by nearly 75% from 2003. Second Amended Complaint ¶ 71. It claims that an incorrect CCR was applied to these charges, and that as a result outlier payments more than tripled. According to the relator, "[f]or St. Vincent's Manhattan campus alone, Medicare's outlier payments, which in years 2002 through 2004 had been $3.96 million, $5.30 million and $5.39 million [respectively], soared to $19.79 million and $19.37 million in years 2005 and 2006. If the increase in Charges for the Manhattan Hospital had been actual, the one place that would have been manifested was in net income of St. Vincent's, but those increases were non-existent. Furthermore, costs had not increased anywhere close to the magnitude of the arbitrary increases in Charges." FN4 *Id.* ¶ 72. Additionally, the relator contends that the outlier payments dropped backed down to an average of $3 million in 2007 and 2008 after Huron was ousted from St. Vincent's. *Id.* at ¶ 98.

FN4. *See also* Second Amended Complaint ¶ 75 ("The increase in Charges was neutralized or offset by increases in Contractual Allowances, of $718 million and $670 million, for 2005 and 2006, respectively, a total of $1.4 billion. During those same periods, Charges also increased by approximately $1.4 billion. The Relator contends that this nearly perfect offset is proof of a scheme, whereby Charges were increased not for a legitimate reason—an increase in revenue—but merely as the initial step in an outlier scheme. During 2004, as a preliminary step to initiating an outlier scheme, Speltz and Weis of S & W increased charges by $159 million compared to 2003, while offsetting this increase by raising Contractual Allowances by $175 million. For the period of 2004 through

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 253259 (S.D.N.Y.)
**(Cite as: 2011 WL 253259 (S.D.N.Y.))**

2007, using 2003 as the base year, Charges increased by $2.36 billion, whereas Contractual Allowances went up by $2.21 billion, a 94% match...."); SAC ¶ 76 ("In the period 2005 and 2006, while the Manhattan campus' Costs went up by approximately $143 million, when compared to Costs in 2003 and 2004 which averaged $530 million, Charges increased seven times as much, to more than $1 billion....").

During oral argument, defendants argued that the huge increase in outlier payments can be explained by the use of outdated CCRs. *See* transcript at 32–36. This argument is not sufficient to render the allegation of fraud implausible, however, because Huron itself has alleged that fiscal intermediaries are now required to use updated CCRs pursuant to the 2003 reforms. The defendants' seeming failure to offer a convincing explanation for the seeming anomaly in outlier payments bolsters the relator's claims.

Accordingly, while the Court expresses no opinion on the underlying merit as to either defendant, the Court finds that the relator has offered sufficient detail and sufficient circumstantial evidence to at least defeat defendants' motion to dismiss. The Court therefore affirms its Order of December 30, 2010.

S.D.N.Y.,2011.
U.S. v. Huron Consulting Group, Inc.
Not Reported in F.Supp.2d, 2011 WL 253259 (S.D.N.Y.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2012 WL 2359357 (N.D.Ill.)
**(Cite as: 2012 WL 2359357 (N.D.Ill.))**

**C**
Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois,
Eastern Division.
UNITED STATES of America, Plaintiff,
v.
Robert S. LUCE, Defendant.

No. 11 C 5158.
June 20, 2012.

AUSA, Kurt N. Lindland, United States Attorney's Office, Chicago, IL, for Plaintiff.

Kenneth L. Cunniff, Kenneth L. Cunniff Ltd., Brandt Randall Madsen, Smithamundsen, LLC, Michael Samuel Shapiro, Scandaglia & Ryan, Chicago, IL, for Defendant.

**MEMORANDUM OPINION AND ORDER**
JOHN J. THARP, JR., District Judge.
   **\*1** Plaintiff United States of America filed suit against Defendant Robert S. Luce, alleging that Luce made numerous false statements to the United States Department of Housing and Urban Development ("HUD") and the Federal Housing Administration ("FHA") in connection with the origination of FHA-insured loans in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.,* and the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), 12 U.S.C. § 1833a. The Government's complaint seeks treble damages and civil penalties under the FCA (Counts I & II), and civil penalties under FIRREA (Count III). Luce moves to dismiss the complaint, arguing that the statements at issue "did not apply" to him. Luce also moves to dismiss claims premised on loans that are not in default and claims premised on statements made before Congress included false statements to the FHA as a basis for liability under FIRREA. For the reasons set forth below, Defendant's Motion to Dismiss is denied.

**BACKGROUND**[FN1]

   FN1. The Court accepts the Government's factual allegations as true for the purposes of Defendants' Rule 12(b)(6) motion. *See Virnich v. Vorwad,* 664 F.3d 206, 212 (7th Cir.2011).

   HUD, through the FHA, is authorized pursuant to Section 203(b) of the National Housing Act, 12 U.S.C. § 1709, to insure lenders against losses on mortgage loans to homebuyers. In order to be eligible for insurance, loans must be made and held by an approved mortgagee. 12 U.S.C. § 1709(b)(1)[FN2]. Under HUD's mortgage insurance program, if a homeowner fails to make payments on the mortgage loan and the mortgage holder forecloses on the property, HUD will pay the mortgage holder the balance of the loan and assume ownership and possession of the property. Cmplt. ¶ 2.

   FN2. Unless otherwise stated, the Court references the versions of the statutes and regulations applicable during the time period relevant to this dispute.

   Luce founded MDR Mortgage Corp. ("MDR"), an approved HUD/FHA loan correspondent,[FN3] in 1993 and served as president and secretary of the company between approximately December 15, 1993 and October 22, 2008. *Id.* ¶¶ 8–9, 18. On April 7, 2005, Luce was indicted in this Court in *United States v. Robert Luce,* Case No. 05–CR–340–5, for wire fraud, mail fraud, making false statements, and obstruction of justice. *Id.* ¶ 10. On July 17, 2008, Luce entered into a plea agreement in which he agreed to plead guilty to obstruction of justice. *Id.* ¶ 11.

   FN3. A loan correspondent is an entity that has as its principal activity the origination of mortgages for sale to other mortgagees. 24 C.F.R. § 202.8(a)(2). It may originate mortgages and submit applications for

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2359357 (N.D.Ill.)
**(Cite as: 2012 WL 2359357 (N.D.Ill.))**

mortgage insurance, but may not hold, purchase, or service insured mortgages. *Id.*

Because MDR was a loan correspondent approved by HUD, it had the authority to originate HUD-insured mortgage loans for sale or transfer to other qualifying mortgagees. Cmplt. ¶¶ 8, 18. Per the complaint, for each loan that MDR originated, it was required to submit, and did submit, forms entitled HUD/VA Addendum to Uniform Residential Loan Application ("Form 92900–A") at the time the loan was submitted for endorsement. *Id.* ¶¶ 19, 24. MDR identified itself as the lender on Form 92900–A. *Id.* ¶ 24. Form 92900–A requires the lender to make certain certifications. It states, in pertinent part:

"The undersigned lender makes the following certifications ... to induce the Department of Housing and Urban Development—Federal Housing Commissioner to issue a firm commitment for mortgage insurance ... under the National Housing Act.... To the best of my knowledge and belief, I and my firm and its principals: ... (3) are not presently indicted for or otherwise criminally or civilly charged by a governmental entity (Federal, State or local) with commission of any of the offenses enumerated in paragraph G(2) of this certification...."

**\*2** One of the offenses enumerated in paragraph G(2) is "making false statements," a crime for which Luce was indicted in 2005. Cmplt. ¶ 10.

In addition, MDR was required to provide, and per the complaint did provide, an annual certification to HUD on a Title II Yearly Verification Report ("V-form") pursuant to 24 C.F.R. §§ 202.3(b) and 202.5(m). Cmplt. ¶ 20. The V-form stated, in pertinent part:

I certify that none of the principals, owners, officers, directors and/or employees of the above named mortgagee are currently involved in a proceeding and/or investigation that could result, or has resulted in a criminal conviction, debarment,

limited denial of participation, suspension, or civil money penalty by a federal, state, or local government.

For the years 2006, 2007, and 2008 Luce certified the V-form for MDR to submit to HUD. *Id.* ¶ 25.

Between Luce's indictment on April 7, 2005, and October 22, 2008, the government alleges that MDR originated at least 2,539 FHA-insured loans. *Id.* ¶ 26. For each of those loans, Luce submitted or caused to be submitted certifications incorrectly stating that MDR and its principals were not indicted or criminally charged with the offense of "making false statements." ¶ ¶ 24–26. A number of these insured loans have gone into default, requiring HUD to pay insurance claims. *Id.* ¶ 27.

**LEGAL STANDARD**

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7,* 570 F.3d 811, 820 (7th Cir.2009). In evaluating the sufficiency of the complaint, the Court must "construe all of the plaintiff's factual allegations as true, and must draw all reasonable inferences in the plaintiff's favor." *Virnich,* 664 F.3d at 212. "However, legal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to this presumption." *Id.* Under Rule 8(a)(2), a plaintiff's complaint must contain a short and plain statement sufficient to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Under the federal notice pleading standards, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* Put differently, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2359357 (N.D.Ill.)
**(Cite as: 2012 WL 2359357 (N.D.Ill.))**

173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570).

## DISCUSSION

Luce moves to dismiss the complaint on three grounds. First, Luce argues that the FCA claims fail in their entirety because Form 92900–A and the V-form "do not apply" to MDR or to himself because MDR was not a "mortgagee" or "lender." Second, Luce argues that the FCA claims fail with respect to each loan that has not defaulted because those loans have not resulted in a claim for an insurance payment to the Government. Third, Luce argues for the dismissal of the portion of Count III, the FIRREA claim, that depends on the Government establishing that Luce violated 18 U.S.C. § 1014 prior to July 30, 2008 because that statute did not cover statements made to HUD before that date.

**1. The False Statements "Apply" to Luce and MDR.**

**\*3** The allegedly false statements on which the Government's claims are based are representations on Form 92900–A and the V-form that neither the "lender" nor the "mortgagee," respectively, were under indictment. Luce argues that these representations do not apply to MDR or to himself because MDR was not a "lender" or "mortgagee" under the statutory or commonly understood definitions of those terms. MDR was merely a "loan correspondent," Luce argues, and so the representations that no indictment was pending or threatened against the "lender" or the "mortgagee" were not representations about MDR and/or Luce and therefore do not provide a basis for liability under the FCA.

Luce's argument is flawed in several respects. First, it ignores the allegations that Luce caused MDR to submit the forms at issue and that the forms identified MDR—not some other company—as the "lender" and "mortgagee," respectively. Cmplt. ¶¶ 24–25; MTD Resp. at 5, n. 4. The certification required by Form 92900–A expressly identifies the submitting party as the "lender" ("the undersigned lender makes the following certifications") and Form–V's certification applies to the

company identified at the top of the form ("the above named mortgagee") as the "mortgagee" to which the certification applies. Fairly read, the complaint alleges that "the undersigned lender" and the "above-named mortgagee" identified on the forms at issue is MDR and, for the purposes of this motion to dismiss, the Court must accept these allegations as true. *Virnich,* 664 F.3d at 212.

In this light, Luce's contention that a "loan correspondent" like MDR is not *actually* a "mortgagee" or "lender" required to provide certifications to the FHA is beside the point. The complaint alleges that MDR represented itself, via the submission of Forms 92900–A and Forms–V, to be a "mortgagee" and "lender" and that it was not under indictment or facing possible indictment. If MDR is a "lender" and/or "mortgagee," as the Government maintains, then (accepting the Government's allegations as true) it falsely stated that none of its principals had been indicted for making false statements or were involved in a proceeding that could result in a criminal conviction. And if MDR is not a "lender" and/or "mortgagee," as Luce contends, then (again accepting the Government's allegations as true) its submissions were no less false—indeed, they were more so since both aspects of the representation (identity as mortgagee or lender, and absence of indictment) would have been false if Luce's interpretation of the terms is correct. Either way, MDR is alleged to have made false statements in connection with the origination of FHA-insured loans.

In any event, Luce's contention that a loan correspondent like MDR cannot be understood to be a "mortgagee" or "lender" obliged to provide the certifications required by Form 92900–A and Form–V is unpersuasive. Under the statutory and regulatory scheme that governs FHA loans, a "loan correspondent" like MDR is also defined to be a "lender" and a "mortgagee." The regulations promulgated under the National Housing Act, 12 U.S.C. § 1702 *et seq.,* define both terms to include a "loan correspondent." *See* 24 C.F.R. § 202.2 and § 202.8. Con-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2359357 (N.D.Ill.)
**(Cite as: 2012 WL 2359357 (N.D.Ill.))**

sistent with these definitions, 24 C.F.R. §§ 202.3(a)(1)(iii) and 202.5(m) required loan correspondents like MDR to submit to HUD a yearly verification form—the V-form, which requires a certification by the "lender"—for recertification.

**\*4** Luce ignores the regulatory definitions and points instead to several statutory provisions to support his argument that the terms "lender" and "mortgagee" on the certification forms do not apply to loan correspondents. Neither of the statutory provisions he cites, however, is inconsistent with or in any way undermines the validity of the regulatory definitions in effect during the period in which Luce was allegedly submitting false certifications to the FHA. Luce first notes that the definition of "mortgagee" included in § 1708(c)(7) is *consistent* with the Government's interpretation of the term, as it expressly includes loan correspondents under the definition of "mortgagee," but argues that it was not until after MDR stopped originating mortgages that a provision was added to § 1708 expressly requiring HUD approval of such "mortgagees." FN4 That does not, of course, mean that HUD did not require loan correspondents to be approved before that date, however, and indeed it did. *See* HUD Mortgage Letter 2008–17 (available at http://portal.hud.gov/hudportal/documents/huddoc?id=DOC_36036.doc); HUD Handbook 4060.1 REV–2, FHA Title II Mortgagee Approval Handbook (Aug. 14, 2006).

> FN4. Luce argued that § 1708 was amended in 2011 to require HUD approval of loan correspondent mortgagees took effect in 2011, but in actuality the amendment took effect in May 2009. 12 U.S.C. § 1708(d)(1).

Luce also submits that 12 U.S.C. § 1707(b) "limits" the definition of "mortgagee" to an entity that actually lends money because it states that the term "includes the original lender under a mortgage, and his successors and assigns approved by the Secretary." By its terms, however, nothing in §

1707(b) "limits" the definition of the term "mortgagee" to entities that actually lend money and in any event the definition it provides applies only to the term "as used in § 1709." That section sets forth requirements necessary for mortgagees to be insured and requires that any mortgagee that holds a mortgage be approved by HUD. Section 1707(b) plainly does not reach, much less nullify, regulations that impose other requirements on other classes of "mortgagees," like loan correspondents, which are authorized to originate, but not to hold, mortgages. *See* 24 C.F.R. § 202.8(a) ("loan correspondent lender" and "loan correspondent mortgagee" eligible to originate but not to hold loans and mortgages).FN5

> FN5. Although he does not expressly invoke it, Luce's argument regarding § 1707 amounts to a variation on the interpretive cannon that *expressio unius est exclusio alterius.* As the Supreme Court has repeatedly cautioned, however, the canon has force "only when the items expressed are members of an 'associated group or series,' justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence." *Barnhart v. Peabody Coal Co.,* 537 U.S. 149, 168, 123 S.Ct. 748, 154 L.Ed.2d 653 (2003) (citing cases). In this context, where an extensive regulatory scheme defining and governing other classes of "mortgagees" has been contemporaneously promulgated to give effect to statutory directives, there is simply no basis to infer that Congress intended to negate by implication definitions set forth in those regulations—particularly where the definition Congress provided was expressly limited in application.

Luce also advocates adoption of narrower dictionary definitions of the terms "mortgagee" and "lender" in lieu of reliance on the regulatory definitions. The regulations define the terms to include "loan correspondents," however, and the forms in

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2359357 (N.D.Ill.)
**(Cite as: 2012 WL 2359357 (N.D.Ill.))**

question are required by those regulations. As such, the terms must be understood to encompass the regulatory context from which they are derived. *See, e.g., Bloate v. United States,* —— U.S. ——, —— n. 9, 130 S.Ct. 1345, 1352 n. 9, 176 L.Ed.2d 54 (2010) (rejecting dictionary definition of terms that "does not account for the governing statutory context"). The question here is whether the use of the terms "mortgagee" and "lender" on form 92900–A and on the V-form, which are required in connection with HUD's mortgage insurance programs, include loan correspondents like MDR. Because a variety of statutory and regulatory provisions include "loan correspondents" within those terms, the argument that HUD meant to exclude loan correspondents from the meaning of those terms when it promulgated those forms is unpersuasive and Luce's motion to deny the claims on this basis is denied.

**2. The Government Properly Seeks to Recover Only for "Claims" Under the FCA.**
**\*5** Luce also moves to dismiss Counts I and II, the FCA claims, with respect to each loan that has not resulted in the Government actually making an insurance payment.

Luce's argument goes to the amount of damages potentially recoverable by the Government, not to the Government's ability to state a valid claim for violation of the FCA. The Government properly alleges that Luce made false statements relating to numerous mortgages, and it alleges that a subset of those mortgages eventually defaulted, requiring HUD to pay out on mortgage insurance claims. If true, Luce's assertion that the remainder of the mortgages did not default, and therefore that no "claim" has been made on those loans, may reduce the amount of damages the Government could potentially recover under Counts I and II.[FN6] But Counts I and II do not stand or fall on whether *every* allegedly false certification Luce (or MDR, at his behest) submitted can be tied to a loan that defaulted. The government has alleged that some loans defaulted, and that is sufficient to state an

FCA claim. The question of which, if any, loans defaulted is a question of fact to be proved at trial; it would be inappropriate to dismiss the FCA claims now solely because Luce may later prove facts showing that the Government cannot recover damages with respect to some fraction of the loans identified in the complaint.[FN7] *See, e.g., Homeyer v. Stanley Tulchin Assocs., Inc.,* 91 F.3d 959, 962 (7th Cir.1996) ( "a fact-based inquiry and determination is not generally appropriate to dismiss territory"); *Smith v. Aon Corp.,* No. 04 C 6875, 2006 WL 1006052, at \*8 (N.D.Ill. Apr.12, 2006) ("The court, however, will not engage in fact-based analysis of the amount of damages at the motion to dismiss stage.").

> **FN6.** The Government acknowledges that it can recover damages only for the "false claim[s] Luce submitted or caused to be submitted." MTD Resp. at 8. The Complaint clearly seeks treble damages and civil penalties only for "the false or fraudulent claims paid by the United States." Cmplt. at ¶¶ 36–43.

> **FN7.** At some point, however, the Court will likely impose a cut-off date by which the Government will be required to identify specifically which loans it alleges to be in default, in order to close out discovery and to allow the defendant to focus on a finite and static body of evidence.

However, Luce is correct to note that, under the FCA, a "claim" is defined as "any request or demand, whether under a contract or otherwise, for money or property which is made to a[n agency] if the United States Government provides any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2) (A). If there is no "claim" for the United States to pay or reimburse, then there is no basis for liability under the FCA. *See, e.g., U.S. ex rel. Gross v. AIDS Research Alliance–Chicago,* 415 F.3d 601, 604 (7th Cir.2005) ("As the statute itself puts it, liability attaches only when a false statement is used to get a false or

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2359357 (N.D.Ill.)
(Cite as: 2012 WL 2359357 (N.D.Ill.))

fraudulent claim paid or approved by the Government.") (internal quotation omitted); *United States v. Dolphin Mortg. Corp.,* No. 06 C 499, 2009 WL 153190, *9 (N.D.Ill. Jan.22, 2009) (FCA claims based on false submissions by mortgage loan correspondent do not arise until default occurs and a demand for payment on the FHA guarantee is made). Accordingly, the Government's contention that Luce will be subject to statutory penalties under the FCA for each of the 2,539 loans for which Luce allegedly submitted false certifications is not correct—unless the Government can establish that each of those loans defaulted and resulted in a claim on the FHA loan guarantee.

**\*6** Luce's assertion that "MDR never filed a claim for FHA insurance or for insurance proceeds" and "the FHA never paid any money to MDR or Mr. Luce," is irrelevant. The FCA imposes liability on anyone who "knowingly presents, *or causes to be presented,* ... a false or fraudulent claim." 31 U.S.C. 3729(a)(1) (emphasis added). Even if Luce and MDR did not directly file claims for FHA insurance or insurance proceeds, the Complaint sufficiently alleges that they caused such claims to be filed. The Seventh Circuit has held that when "a false statement is integral to a causal chain leading to [government] payment," it does not matter whether that statement was preliminary to the eventual "claim." *United States ex rel Main v. Oakland City Univ.,* 426 F.3d 914, 916 (2005). When a party makes a false statement and knowingly causes another entity to use that statement later to make a claim for governmental payment, the false statement violates the FCA. *Id; see also Allison Engine Co., Inc. v. United States ex rel. Sanders,* 553 U.S. 662, 671, 128 S.Ct. 2123, 170 L.Ed.2d 1030 (2008) (for example, "a subcontractor violates § 3729(a)(2) if the subcontractor submits a false statement to the prime contractor intending for the statement to be used by the prime contractor to get the Government to pay its claim").

Therefore, the second portion of Luce's Motion to Dismiss is denied.

**3. The Government's FIRREA Claim is Sufficiently Pled.**

Finally, Luce moves to dismiss the portions of Count III that rely on 18 U.S.C. § 1014 because that statute did not cover false statements made to the FHA prior to statutory revisions that became effective on July 30, 2008.

In Count III, the Government seeks to recover civil penalties under FIRREA, 12 U.S.C. § 1833a, which sets forth maximum penalties for violations of other sections of FIRREA. Section 1833a damages apply "to a violation of, or a conspiracy to violate," certain statutes, including 18 U.S.C. § 1006 and 18 U.S.C. § 1014. 12 U.S.C. § 1833a(c). The Government claims that Luce violated both 18 U.S.C. § 1006 and § 1014, and that the violation of each section independently makes penalties available under 12 U.S.C. § 1833a.

Luce correctly recognizes—and the Government does not dispute—that prior to July 30, 2008, 18 U.S.C. § 1014 did not prohibit false statements to the FHA. This is not sufficient to warrant dismissal of any portion of Count III, however, because the Government asserts a second, independent, ground for liability for each false statement: 18 U.S.C. § 1006. Count III does not allege that certain false statements violated § 1006, while others violated § 1014. Rather, it alleges that each of Luce's alleged false statements violates *both* sections. Because Luce does not challenge the application of 18 U.S.C. § 1006 to each of his allegedly false statements, no portion of Count III can be dismissed. Therefore, this portion of Luce's Motion to Dismiss is also denied.

\* \* \*

For all of these reasons, the Court denies Defendant Luce's Motion to Dismiss the Government's Complaint.

N.D.Ill.,2012.
U.S. v. Luce
Slip Copy, 2012 WL 2359357 (N.D.Ill.)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2359357 (N.D.Ill.)
**(Cite as: 2012 WL 2359357 (N.D.Ill.))**

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1987 WL 11565 (S.D.N.Y.)
**(Cite as: 1987 WL 11565 (S.D.N.Y.))**

C
Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
UNITED STATES OF AMERICA, Plaintiff,
v.
PIERRE BOUCHET, INC., GERALDINE SO-
LOMON, RHODA HERTZBERG, MYRON SO-
LOMON and SID HERTZBERG, Defendants.

No. 85 CIV. 8530 (PKL).
May 21, 1987.

RUDOLPH W. GIULIANI, United States Attorney
for Southern District of New York, for plaintiff;
Amy Rothstein, Assistant United States Attorney,
of counsel.

RICHARD KRANIS, P.C., New York, City, FOR
DEFENDANTS.

OPINION AND ORDER

LEISURE, District Judge:

**\*1** Plaintiff United States of America has
brought this action against Pierre Bouchet, Inc.
('Bouchet'), and four individuals who are both
principals of Bouchet and guarantors of a disaster
loan made to Bouchet by the Small Business Ad-
ministration ('SBA'). The Government contends
that Bouchet has defaulted on the disaster loan, and
that consequently, certain sums are due and owing
by Bouchet and the guarantors. The Government
also seeks to recover for a check mistakenly issued
by the SBA to Bouchet, claiming (1) wrongful ap-
propriation under the common law, (2) wrongful
misapplication of the proceeds of a loan under 15
U.S.C. § 636(b), and (3) violations of the False
Claims Act, 31 U.S.C. §§ 3729–31. The instant ac-
tion is now before the Court upon the Government's
motion for summary judgment. For the reasons set
forth below, the Government's motion is granted.

FACTUAL BACKROUND

The following facts are developed from the
loan and guaranty instruments, copies of the checks
allegedly negotiated by Bouchet, copies of the de-
mand letters sent to each of the defendants by the
SBA, and the affidavits and the Statement under
Rule 3(g) of the Civil Rules of this Court submitted
by the Government, as specifically indicated by ref-
erences below.[FN1]

The SBA, on May 2, 1984, entered into a
'disaster' loan agreement (the 'Loan') with defend-
ant Bouchet. On that same day, Bouchet executed a
promissory note (the 'Note'), in the amount of
$54,300, to secure the Loan. The Loan and the Note
were signed by Geraldine Solomon, as President of
Bouchet, and Rhoda Hertzberg, as Secretary of
Bouchet. Also on May 2, 1984, four guaranty in-
struments were executed (the 'Guaranties'), one by
each of the individual defendants, Geraldine So-
lomon, Rhoda Hertzberg, Myron Solomon and Sid-
ney Hertzberg (the 'Guarantors'). In these instru-
ments, the Guarantors assumed liability for the
terms and conditions of the Loan and the Note.

On or about May 22, 1984, the SBA, pursuant
to the terms of the Loan, issued a check in the
amount of $54,300 to Bouchet. Bouchet, claiming
that it did not receive the check, requested that the
SBA send a replacement check. Consequently, the
SBA issued a duplicate check on or about July 11,
1984. This check was negotiated by Bouchet on Ju-
ly 16, 1984.

The SBA, however, due to an administrative
error or mistake, issued a second duplicate check to
Bouchet on July 12, 1984. This check was negoti-
ated on July 23, 1984. Upon learning of its mistake,
the SBA made several requests of Bouchet for re-
turn of the $54,300 received by Bouchet as a result
of negotiating the second duplicate check. Requests
were also made of the Guarantors to refund the ad-
ditional $54,300 received by Bouchet. Defendants
have not yet repaid the SBA for the second duplic-
ate check.[FN2]

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1987 WL 11565 (S.D.N.Y.)

**(Cite as: 1987 WL 11565 (S.D.N.Y.))**

With respect to the original disaster loan, Bouchet is required to pay the SBA in quarterly installments of $1,816. Bouchet has failed to make these payments on time as required by the Note. See Puleo Aff. ¶¶15–17. In addition, as of August 28, 1986, Bouchet has completely failed to make its required payments which were due on May 2, 1986 and August 2, 1986. Id.

**\*2** Pursuant to the terms of the Note, the SBA opted to accelerate; therefore, the entire indebtedness became immediately due and payable. Subsequent to the acceleration of the debt, the SBA has twice sent demand letters to Bouchet and each of the Guarantors for the total amount due under the Loan. Id. at ¶18.

LEGAL DISCUSSION

A. The Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered if the pleadings and affidavits 'show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' Fed. R. Civ. P. 56(c); see, e.g. Falls Riverway Realty, Inc. v. City of Niagra Falls, 754 F.2d 49, 57 (2d Cir. 1985); R.G. Group Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir. 1984). 'In considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party.' Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986) (citing Anderson v. Liberty Lobby Inc., 106 S. Ct. 2505, 2509–11 (1986); Eastway Constr. Corp. v. City of New York, 762 F.2d 243, 249 (2d Cir. 1985)).

In order to render summary judgment, a 'court must also determine that any unresolved issues are not material to the outcome of the litigation.' Knight, supra, 804 F.2d at 11. '[T]he mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment.'

Quarles v. General Motors Corp., 758 F.2d 839, 840 (2d Cir. 1985) (per curiam). Moreover, as the Supreme Court has noted, '[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which were designed 'to secure the just, speedy and inexpensive determination of every action.'' Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2555 (1986) (quoting Fed. R. Civ. P. 1) (citations omitted).

B. Default on the Loan

A guaranty is 'an obligation to answer for the debt of another' and it 'binds the guarantor to a relationship under which he may become . . . indebted in the future—if, and when, the debtor defaults.' Michaels v. Chemical Bank, 110 Misc. 2d 74, 76, 441 N.Y.S. 2d 638, 640 (1981) (citations omitted). An absolute guaranty, like the one which the four Guarantors have signed, 'is an unconditional undertaking on the part of the guarantor that the person primarily obligated will make payment or will perform, and such a guarantor is liable immediately upon default of the principle without notice.' Ammerman v. Miller, 488 F.2d 1285, 1293 (D.C. Cir. 1973). Moreover, the standard form SBA guaranty which the Guarantors have signed contains the standard 'waiver of defenses' language uniformly upheld by the courts. See United States v. Mallet, 782 F.2d 302, 303 (1st Cir. 1986).

**\*3** Where the terms of the guaranties are unambiguous, as in the instant action, then the guarantors are required to respond on their guaranty of an SBA loan. See McNatt v. United States, 400 F.2d 846, 847 (5th Cir. 1968); United States v. Outriggers, Inc., 549 F.2d 337, 339 (5th Cir. 1977) (finding that virtually identical SBA guaranty unconditionally bound the defendant guarantors upon the principal debtor's default); United States v. Basil's Family Supermarket, Inc., 259 F. Supp. 139, 141–42 (S.D.N.Y. 1966).

The Note requires timely quarterly payments of $1,816. The documents submitted by the Government reveal that there have been several defaults by

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1987 WL 11565 (S.D.N.Y.)

**(Cite as: 1987 WL 11565 (S.D.N.Y.))**

Bouchet. Upon default, the Note unambiguously allows the SBA to demand from the Guarantors, as well as Bouchet, the entire sum owing. The Government sent two sets of demand letters to Bouchet and the Guarantors requesting payment of the entire outstanding amount. These demands have gone unheeded.

Based on the foregoing, the Court concludes that the Government has satisfied its burden under Rule 56(c), with respect to Bouchet's default on the Loan and the consequent liability of all the defendants. Defendants' response to the Government, however, does not satisfy Rule 56(e) or this Court.

In opposition to the Government's motion, defendants have merely submitted two, almost identical, affidavits containing only fanciful and conclusory assertions and denials.[FN3] For example, with regard to the default of the Loan, Sidney Hertzberg asserts in a conclusory fashion that 'we, the defendants, are not in default of any loan. We have been paying as agreed upon, the loan which was individually signed for as guarantors, and we the defendants are not in default of this loan, or any other loan.' Affidavit of Sidney Hertzberg, sworn to on October 20, 1986 ('Hertzberg Aff.') at 1.[FN4] Such a statement is clearly insufficient to defeat the Government's motion for summary judgment. Defendants offer only a conclusory denial of default without providing any supporting facts or 'concrete particulars' which would show that a trial is necessary. See SEC v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir. 1978); R.G. Group, supra, 751 F.2d at 77. Defendants could have submitted easily to this Court copies of cancelled checks to show that Bouchet had in fact made timely payments on the Loan or provided an affidavit from a witness with personal knowledge stating specifically when such payments were made, how, and by whom.[FN5]

Defendants have offered no evidence with respect to Bouchet's default on the Loan. Therefore, the Court hereby grants the Government's motion for summary judgment with respect to default of

the Loan. Defendants are liable to the Government in the amount of $47,738.32—$47,257.58 in principal and $481.74 in interest—plus whatever interest has accrued since August 15, 1986 until the date that this judgment is entered and whatever interest accrues from the date this judgment is entered until execution of this judgment.

C. The Second Replacement Check

1. The Common Law

**\*4** The Government alleges that Bouchet is liable for the $54,300 plus interest as a result of Bouchet's negotiation of the second replacement check, which the SBA sent to Bouchet by mistake. The Government argues that Bouchet was under an obligation to return the money it received by mistake and that Bouchet unjustly obtained this money by negotiating the second replacement check. The question is whether Bouchet is liable for a payment which the SBA sent to it by mistake.

It is clear that the United States can recover payments made by its agents by mistake. See, e.g., Brooklyn & Richmond Ferry Co. v. United States, 167 F.2d 330, 334 (2d Cir. 1948); Mt. Vernon Co-operative Bank v. Gleason, 367 F.2d 289, 291 (1st Cir. 1966); DiSilvestro v. United States, 405 F.2d 150, 155 (2d Cir. 1968), cert. denied, 396 U.S. 964 (1969); United States v. Estate of Cole, 620 F. Supp. 126, 128–29 (W.D. Mich. 1985).

The Court finds that the Government has met its initial burden under Rule 56(c) with regard to the check sent by mistake. In support of its motion, the Government has submitted the loan officer's affidavit, see Puleo Aff., copies of both checks negotiated by Bouchet, and copies of the demand letters sent to Bouchet and the Guarantors with regard to this second check, which together show that Bouchet negotiated the second check and has not returned the money. In any event, defendants concede that Bouchet negotiated this check; see Hertzberg Aff. at 1; yet, they assert merely that Bouchet should have its day in Court to explain

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1987 WL 11565 (S.D.N.Y.)

**(Cite as: 1987 WL 11565 (S.D.N.Y.))**

what happened to this check. Id. at 1–2. Such an assertion is inadequate as a basis for denying a summary judgment motion. As the Second Circuit stated in Donnelly v. Guion, 467 F.2d 290, 293 (2d Cir. 1972), '[a] party opposing a motion for summary judgment simply cannot make a secret of his evidence until the trial, for in doing so he risks the possibility that there will be no trial. A summary judgment motion is intended to 'smoke out' the facts so that the judge can decide if anything remains to be tried.' See also Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.), cert. denied, 106 S. Ct. 91 (1985) ('To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations . . ., absent any concrete particulars, would necessitate a trial in all . . . cases.'). The Government is therefore entitled to recover the full amount of the second check, plus whatever interest is due, from Bouchet.[FN6]

2. Wrongful Misapplication of the Proceeds under a Loan pursuant to 15 U.S.C. § 636(b)

The Government also asserts that it is entitled to an additional $81,450, an amount equal to one and a half times the principal amount of the second replacement check, under 15 U.S.C. § 636(b), The end of the last paragraph of § 636(b) provides that '[w]hoever wrongfully misapplies the proceeds of a [SBA disaster] loan obtained under this subsection shall be civilly liable to the Administrator in an amount equal to one-and-one-half times the original principal amount of the loan.'

**\*5** This provision of 15 U.S.C. § 636(b) clearly applies to situations in which a borrower uses money received from a § 636(b) disaster loan for purposes other than those allowed under the statute and specified by the SBA and the borrowers in the loan documents. Cf. United States v. Davis, 809 F.2d 1509 (11th Cir. 1987) (finding that defendant had knowingly misapplied loan proceeds under 42 U.S.C. § 5157 by using the money he received from a SBA disaster relief loan for unauthorized purposes, specifically where the borrower was authorized to use the loan to pay certain creditors and in

stead used it to buy a house and land.)

The Court has not found any legal precedent, nor has any been cited by the Government, for expanding the clear scope of § 636(b) to include the case at bar. The Government's motion for summary judgment based on its claim made under 15 U.S.C. § 636(b) is therefore denied.

c. The False Claims Act

The Government also seeks recovery relating to the second replacement check under the False Claims Act, 31 U.S.C. § 3729–31.[FN7] The False Claims Act provides that one who 'knowingly presents, or causes to be presented, to an officer or employee of the Government . . . a false or fraudulent claim for payment or approval' shall be liable to the Government for two times the amount of damages sustained by the Government due to that person's act, plus a civil penalty of $2,000, plus the costs of the civil action.' 31 U.S.C. § 3729.

The presentation of a Government check by a party who is not entitled to it constitutes a presentation of a false claim within the meaning of the False Claims Act. United States v. Branker, 395 F.2d 881, 889 (2d Cir. 1968), cert. denied, 393 U.S. 1029 (1969); Scolnick v. United States, 331 F.2d 598, 599 (1st Cir. 1964); United States v. McLeod, 721 F.2d 282, 284 (9th Cir. 1983); United States v. Silver, 384 F. Supp. 617, 620 (E.D.N.Y. 1974), aff'd, 515 F.2d 505 (2d Cir. 1975); United States v. Fowler, 282 F. Supp. 1, 2 (E.D.N.Y. 1968).

The Supreme Court has stated that Congress' objective in passing the False Claims Act was 'broadly to protect the funds and property of the Government from fraudulent claims, regardless of the particular form, or function, of the government instrumentality upon which such claims were made.' Rainwater v. United States, 356 U.S. 590, 592 (1958) (citation omitted). Under the Act 'any actions which have the purpose and effect of causing the Government to immediately pay out money are clearly 'claims' within the purpose of the Act.' Silver, supra, 384 F. Supp. at 620.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1987 WL 11565 (S.D.N.Y.)
**(Cite as: 1987 WL 11565 (S.D.N.Y.))**

The Second Circuit has held that the presentation for payment of a check by a depositor who was not entitled to it constitutes a false claim within the meaning of the False Claims Act. Branker, supra, 395 F.2d at 889; see also Silver, supra, 384 F. Supp. at 620; Fowler, supra, 282 F. Supp. at 2. In Branker, the Second Circuit explicitly approved the First Circuit's holding in Scolnick, 331 F.2d 598, to the effect 'that the indorsement and deposit for collection of a government check to which the depositor was not entitled constituted a false claim within the meaning of the civil false claims statute . . ..' Branker, supra, 395 F.2d at 889 (citations omitted). FN8

**\*6** It is also clear that a corporation may be held liable for the actions of its employees under the False Claims Act. Knowledge of an employee may be imputed to the corporation 'when the employee acts for the benefit of the corporation and within the scope of his employment.' Grand Union Co. v. United States, 696 F.2d 888, 891 (11th Cir. 1983) (citations omitted). See also United States v. Hangar One, Inc., 563 F.2d 1155 (5th Cir. 1977). FN9 Whether or not it is true, as defendants' attorney has stated in his affidavit, that Bouchet's bookeeper deposited the second check, Bouchet would still be liable if the bookeeper knew that Bouchet was not entitled to the payment, since the deposit of such a sum of money certainly benefitted Bouchet and was within the scope of a bookeeper's duty to his employer.

As previously noted, there is no doubt that Bouchet negotiated the second replacement check; the Government has adequately demonstrated that Bouchet negotiated this check and the defendants concede this fact. Bouchet's liability then turns upon whether there is a genuine issue of triable fact as to whether Bouchet, through its agent and/or employee 'knowingly' presented a 'false or fraudulent' claim. For if Bouchet's agents had the requisite state of mind, then under the principles set forth above, Bouchet would be liable under the Act for knowingly negotiating a Government check to which it knew it was not entitled.

Courts have differed in their determination of what is meant by knowingly presenting a false or fraudulent claim. See generally United States v. Hughes, 585 F.2d 284, 286–88 (7th Cir. 1978); Annotation, 26 ALR Fed. 307, Specific Intent to Defraud Government as Necessary to Impose Liability Under Provisions of the False Claims Act. Some courts claim that an intent to defraud is required under the statute and its predecessor, former 31 U.S.C. § 231. See, e.g., United States v. Mead, 426 F.2d 118, 121 (9th Cir. 1970); Davis, supra, 809 F.2d 1509, 1512 (11th Cir. 1986); Hangar One, supra, 406 F. Supp. 60, 70 (D. Ala. 1975), rev'd on other grounds, 563 F.2d 1155 (5th Cir. 1977); Miller v. United States, 550 F.2d 17 (Ct. Cl. 1977). Other courts assert that knowledge of the falsity of the claim is sufficient. See, e.g., Hughes, supra, 585 F.2d at 287–88; United States v. Cooperative Grain and Supply Co., 476 F.2d 47 (8th Cir. 1973); United States v. DiBona, 614 F. Supp. 40, 44 (E.D. Pa. 1984); United States ex rel. Fahner v. Alaska, 591 F. Supp. 794 (N.D. Ill. 1984); United States v. Eagle Beef Cloth Co., 235 F. Supp. 491 (E.D.N.Y. 1964).

Recent cases in this Circuit have taken the view that an intent to defraud is not necessary for the Government to recover under the False Claims Act. See United States v. Foster Wheeler Corp., 316 F. Supp. 963, 967 (S.D.N.Y. 1970), mod. on other grounds, 447 F.2d 100 (2d Cir. 1971) (the United States in a False Claims suit brought under former 31 U.S.C. § 231 'does not have to prove an intent to defraud by those submitting the false claims and vouchers but rather need only prove, as a matter of law, that 'the claimant made a claim upon or against the United States, knowing it to be false.'') (quoting Fleming v. United States, 336 U.S. 475, 479–80 (10th Cir. 1964), cert. denied, 380 U.S. 907 (1965)); Eagle Beef Cloth Co., supra, 235 F. Supp. at 492 (in granting government's motion for summary judgment, court found that the government did not need to establish fraud or deceit, '[l]iability

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1987 WL 11565 (S.D.N.Y.)
**(Cite as: 1987 WL 11565 (S.D.N.Y.))**

follows if the claim be false or if it be fictitious or if it be fraudulent.'); Silver, supra, 384 F. Supp. at 620 (because the defendant knew he was not authorized to demand or receive money on the checks, even though each was originally a valid claim, his claims come within the Act.) In Blusal Meats, Inc. v. United States, 638 F. Supp. 824, 827 (S.D.N.Y. 1986), the Government's False Claims Act allegations were found adequate where the Government alleged only that 'the defendant knew the claim was false or fraudulent.'[FN10] Therefore, the law in this Circuit is that a defendant may be held liable under the Act if he knew the claim he presented was false, i.e., that he was not entitled to it.

*7 The Government asks the Court to infer that Bouchet and its employees knew the claim for the second check to be false. The Government argues that '[k]nowledge of the replacement check's duplication must be inferred from the fact that both checks, in identical amounts, were negotiated within the space of one week. Receipt and negotiation of a Government check in the amount of $54,300 could not have gone unnoticed by a corporation whose finances required that it borrow this much as a disaster loan.' Plaintiff's Memorandum of Law at 8.

The defendants have not even attempted to deny that Bouchet knew that it was not entitled to the check when it was negotiated. Defendants assert only that although the check was deposited in Bouchet's account, Bouchet and all the defendants 'should have their day in Court to explain what happened to this second check.' Hertzberg Aff. at 1–2. Such a statement, as the Court has already noted, does not satisfy the requirements of Fed. R. Civ. P. 56(e), nor does it demonstrate to this Court the need for a trial on this issue. It is, in short, clearly inadequate to defeat the Government's sufficiently supported motion for summary judgment.[FN11]

Of course, the Court is aware that summary judgment is usually inappropriate where an individual's state of mind is an element. Patrick v. Le-

Fevre, 745 F.2d 153, 159 (2d Cir. 1984). However, the Second Circuit has upheld the granting of summary judgment in such cases where the party opposing summary judgment offers only conclusory allegations and asserts no concrete particulars. See Meiri, supra, 759 F.2d at 998; see also United States v. Kates, 419 F. Supp. 846, 855 (E.D. Pa. 1976) (a defendant in a False Claims Act suit 'had an obligation under Rule 56(e) to specify by affidavit or otherwise those facts which were in dispute. [Where the defendant fails to do so] he is not entitled to a jury trial on that issue.') (citations omitted); Eagle Beef Cloth Co., supra, 235 F. Supp. at 492. As the Second Circuit stated in Meiri, '[t]he summary judgment rule would be rendered sterile, however, if the mere incantation of intent or state of mind would operate as a talisman to defeat a[n] otherwise valid motion.' 759 F.2d at 998. Accord Research Automation, supra, 585 F.2d at 33 (granting summary judgment where party opposing the motion totally fails to contradict the claims brought against them.) Accordingly, the Government's motion for summary judgment for its claim under the False Claims Act is granted. Defendants are liable to the Government for twice the amount of the loan plus $2,000, as well as the costs of bringing this action.

### CONCLUSION

For the aforementioned reasons, the Government's motion for summary judgment is granted. Bouchet and the four individual Guarantors are liable to the Government for Bouchet's default on the Loan. In addition, Bouchet is liable for its negotiation of the second replacement check under both the common law and the False Claims Act, 31 U.S.C. § 3729. The Government is not, however, entitled to recover with respect to this second check under 15 U.S.C. § 636(b) for wrongful misapplication of the proceeds of the SBA loan. The parties are hereby directed to submit papers to the Court with respect to calculating the total final judgment to be entered with the Clerk of the Court.

*8 SO ORDERED.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1987 WL 11565 (S.D.N.Y.)
(Cite as: 1987 WL 11565 (S.D.N.Y.))

FN1 Defendants did not, as required by Civil Rule 3(g), submit a statement of material facts as to which they contend that there exists a genuine issue to be tried. Rule 3(g) states that 'the parties opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried.' The Rule further provides that 'the material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.' Defendants, by failing to submit the required statement, have not even attempted to controvert the material facts which the Government alleges. Consequently, all material facts which the Government has set forth are deemed to be admitted by this Court. See San Filippo v. U.S. Trust Co. of New York, Inc., 737 F.2d 246, 248 (2d Cir. 1984), cert. denied, 470 U.S. 1035 (1985); Wyler v. United States, 725 F.2d 156, 158 (2d Cir. 1983); Gattling v. Atlantic Richfield Co., 577 F.2d 185, 187–88 (2d Cir.), cert. denied, 439 U.S. 861 (1978). This defect is not cured by the defendants' submission of the affidavit of their attorney and the affidavit of Sidney Hertzberg, since these affidavits merely state vague and conclusory allegations. See Woods v. State, 469 F. Supp. 1127, 1129 n.2 (S.D.N.Y.), aff'd without opinion, 614 F.2d 1293 (2d Cir. 1979); Martin v. N.Y. State Dept. of Mental Hygiene, 588 F.2d 371, 372 (2d Cir. 1978) (per curiam).

FN2 Defendant Sidney Hertzberg, did offer, on behalf of Bouchet, to pay 10% of the $54,300 to be followed by quarterly payments of $3,000. Affidavit of Frank Puleo, sworn to on August 28, 1986 ('Puleo Aff.') at ¶3.

FN3 The Court also notes that defendants have failed to submit a memorandum of law in opposition to the motion for summary judgment as required by Civil Rule 3(b) of this Court. Rule 3(b) provides that failure to submit such a memorandum may be deemed sufficient cause for granting the summary judgment motion by default.

FN4 The accompanying affirmation of defendants' attorney contains a virtually identical assertion. See Affirmation of Richard Kranis, Esq., sworn to on October 20, 1986, at 1.

FN5 The law in this Circuit is clear:

[T]he mere possibility that a factual dispute may exist, without more, is not sufficient to overcome a convincing presentation by the moving party. [Citation omitted]. The litigant opposing summary judgment, therefore, may not rest upon mere conclusory allegations or denials as a vehicle for obtaining a trial. [Citation omitted]. Rather he must bring to the district court's attention some affirmative indication that his version of relevant facts is not fanciful.

United States v. Potamkin Cadillac Co., 689 F.2d 379, 381 (2d Cir. 1982) (quoting Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir. 1980)); see also Anderson, supra, 106 S. Ct. at 2511 ('[i]f . . . evidence is merely colorable . . . or not significantly probative . . . summary judgment may be granted').

FN6 The Government further alleges that Bouchet and the Guarantors are liable for the second replacement check on the theory that the Loan and the Guaranties render them all liable for any expenses incurred by the SBA in conjunction with the Loan's administration. However, the Gov-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1987 WL 11565 (S.D.N.Y.)
**(Cite as: 1987 WL 11565 (S.D.N.Y.))**

ernment has offered no legal support for the proposition that negotiation by a borrower—either negligently or willfully—of a check sent to it by mistake may fairly be considered an expense incurred in conjunction with a loan's administration for which a borrower and its guarantors would be liable. This Court, therefore declines to reach this issue, especially since the Court has already found Bouchet liable for this payment under an alternative theory.

FN7 The Court notes that the United States is not deprived of its common law remedies, discussed previously, by also seeking recovery under the False Claims Act. See, e.g., United States v. Silliman, 167 F.2d 607, 611 (3d Cir.), cert. denied, 335 U.S. 825 (1948) (False Claims Act does not deprive United States of common law tort remedies); United States v. Borin, 209 F.2d 145, 148 (5th Cir.), cert. denied, 348 U.S. 821 (1954) (False Claims Act did not deprive United States of common law fraud remedies and was an additional remedy). Therefore, the fact that this Court has already ordered that the Government can recover the full amount of the second replacement check under the common law does not prevent the Government from also seeking relief under the False Claims Act.

FN8 In Scolnick, the defendant was found liable under the False Claims Act for depositing United States Government checks which were issued to his company by mistake where the district court had found that the defendant could not have honestly believed his company was entitled to these payments. Scolnick, supra, 219 F. Supp. 408, 411 (D. Mass. 1963), aff'd, 331 F.2d 598 (1st Cir. 1964). On appeal the First Circuit stated that the district court was not obligated 'to accept the defendant's protestations of innocence.' 331 F.2d at 599.

See also McLeod, supra, 721 F.2d at 282 (holding that defendant's endorsement and deposit of government checks which he knew were issued to him by mistake constituted false claims against the United States).

FN9 Moreover, corporate liability under the Act 'may arise from the conduct of employees other than those with 'substantial authority and broad responsibility.' 563 F.2d at 1158.

FN10 However, earlier Second Circuit cases seem to take the opposite view. See United States ex rel Brensilber v. Bausch & Lomb Optical Co., 131 F.2d 545 (2d Cir. 1942), aff'd, 320 U.S. 711, reh. denied, 320 U.S. 814 (1943); United States ex rel Weinstein v. Bressler, 160 F.2d 403 (2d Cir. 1947). The controversy among the Circuits over this issue was recognized by the Court in United States v. Rapoport, 514 F. Supp. 519, 523 n.8 (S.D.N.Y. 1981).

FN11 The Court notes that defendants did not ever bother to offer a sworn affidavit of the employee who negotiated the second replacement check to the effect that neither the employee, nor they, knew that Bouchet was not entitled to the check when it was negotiated. Such a sworn statement, based on personal knowledge, would have probably sufficed to create a genuine issue of material fact with respect to this material element of the Government's claim.

S.D.N.Y., 1987.
U.S. v. Pierre Bouchet, Inc.
Not Reported in F.Supp., 1987 WL 11565 (S.D.N.Y.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2142361 (E.D.Pa.)
**(Cite as: 2007 WL 2142361 (E.D.Pa.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
UNITED STATES, Plaintiff,
v.
Mary Louise Denese SLAEY, et al., Defendants.

Civil No. 06-4930.
July 24, 2007.

Susan R. Becker, Virginia A. Gibson, U.S. Attorney's Office, Philadelphia, PA, for Plaintiff.

Jack L. Gruenstein, Kathleen M. Nagle, Vaira & Riley, PC, Philadelphia, PA, for Defendants.

### *MEMORANDUM OPINION AND ORDER*
RUFE, J.

**\*1** This matter comes before the Court on Defendants' Pre-Answer Motion to Dismiss the Complaint. After reviewing the Complaint, the parties' briefs, and the applicable law, the Court will **DENY** the Motion, for the reasons set forth below.

### BACKGROUND

This is an action in which the United States seeks to recover money that it paid to Systems Integration and Management, Inc. ("SIM"), a Virginia-based software company, between late 1999 and late 2001. The United States, through the General Services Administration ("GSA"), awarded SIM a series of government contracts, under which the United States paid SIM roughly $6.5 million to perform certain services. The United States now alleges that SIM and its Chief Executive Officer, Mary Louise Denese Slaey, defrauded the government, receiving much of this money through bribery and overbilling. The United States has filed this action under the False Claims Act ("FCA"), seeking repayment of the amounts that SIM and Slaey allegedly falsely claimed and received.

This civil suit is not the first action taken by the government in this case-the United States also filed criminal charges against Slaey and two of her co-conspirators, Donald Nicholson and Leo Medley. Nicholson, a former GSA official who helped SIM collect on its false claims, pled guilty in this Court on March 6, 2006, to one count of conspiracy to defraud the government, and to one count of bribery.[FN1] He was sentenced to, *inter alia,* 15 months' imprisonment. Medley, formerly a SIM Vice President of Operations who participated with Nicholson in the scheme to use SIM invoices to steal government funds, pled guilty in this Court on March 3, 2006, to one count of conspiracy to defraud the government, one count of bribery, and one count of making false claims.[FN2] He was sentenced to, *inter alia,* 5 months' imprisonment.

> FN1. Nicholson pled guilty to two counts of an eight-count indictment filed in case number 05-CR-704, before U.S. District Judge Harvey Bartle: Count 1, a violation of 18 U.S.C. § 286; and Count 8, a violation of 18 U.S.C. § 201(b)(2)(A).

> FN2. Medley pled guilty to three counts of a four-count indictment filed in case number 06-CR-43, before U.S. District Judge Michael M. Baylson: Count 1, a violation of 18 U.S.C. § 286; Count 2, a violation of 18 U.S.C. § 287; and Count 3, a violation of 18 U.S.C. § 201(b)(1)(B).

As for Slaey, the United States filed criminal charges against her on December 13, 2005, for one count of conspiracy to defraud the government, one count of making false claims, and five counts of bribery. On August 21, 2006, the Court, acting on the Government's motion, dismissed without prejudice the fraud and bribery counts, and dismissed with prejudice the count of making false claims. The fraud and bribery charges against Slaey were then transferred to the U.S. Attorney for the Eastern District of Virginia based on venue considerations.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Not Reported in F.Supp.2d, 2007 WL 2142361 (E.D.Pa.)

**(Cite as: 2007 WL 2142361 (E.D.Pa.))**

On November 7, 2006, the United States filed the civil complaint in this case against Slaey and SIM. When the U.S. Attorney's Office in Virginia then declined to prosecute the criminal case against Slaey, the government served Slaey and SIM with the instant Complaint on March 1, 2007. The Complaint describes the pattern of fraudulent misconduct in which Slaey, Nicholson, and Medley engaged, and seeks money damages based on violations of the FCA. The Complaint also seeks relief under state-law theories of misrepresentation, breach of contract, unjust enrichment, and payment by mistake. Defendants now ask the Court to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6), arguing that the claims are barred under the applicable statutes of limitations. Defendants also argue that the allegations of fraud are not made out with sufficient particularity, and that venue does not lie in this Court for three of the alleged false claims.

**DISCUSSION**

**A. Statute of Limitations**

*2 Defendants argue that the claims are time-barred under the applicable statutes of limitations, and that therefore the Complaint does not state a claim upon which relief can be granted. Although under Federal Rule of Civil Procedure 12(b)(6), the failure to state a claim is a proper basis for a pre-answer motion to dismiss, in general, "a limitations defense must be raised in the answer, since Rule 12(b) does not permit it to be raised by motion." FN3 However, under a limited exception to this general rule, the Third Circuit has held that a statute of limitations may serve as the basis for a Rule 12(b)(6) motion to dismiss, "where the complaint facially shows noncompliance with the limitations period." FN4 Accordingly, the Court has reviewed the Complaint to determine whether the claims-by the terms of the Complaint itself-are time-barred.

> FN3. Robinson v. Johnson, 313 F.3d 128, 135 (3d Cir.2002).

> FN4. Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1385 n. 1 (3d Cir.1994).

1. Claims under the FCA

31 U.S.C. § 3731(b) is the statute of limitations for the FCA. Under § 3731(b)(1), an FCA claim may not be brought "more than 6 years after the date on which the violation ... is committed." Therefore, under this rule, because the United States filed the Complaint in this case on November 7, 2006, any violations that Slaey or SIM committed before November 7, 2000 would be time-barred.

The next question is: what constitutes a violation of the FCA, such that the limitations clock begins to run? The Second Circuit has held that the clock under § 3731(b)(1) "begins to run on the date the claim is made, or, if the claim is paid, on the date of payment." FN5 In the absence of any Supreme Court or Third Circuit decision on this point, the Court will follow this sensible rule.

> FN5. United States ex rel. Kreindler & Kreindler v. United Technologies Corp., 985 F.2d 1148, 1157 (2d Cir.1993) (internal quotation omitted).

Applying this rule, the Court notes that only five of the 28 false claims are alleged to have been either presented to or paid by GSA within this six-year period: (1) three invoices under Task Order K00MS003 S00, each in the amount of $89,000, paid by GSA to SIM on November 28, 2000 and November 30, 2000; FN6 (2) invoice number 2000-1212, in the amount of $98,466.21, which SIM submitted to GSA on December 15, 2000; FN7 and (3) invoice number 2001-0326, in the amount of $52,361.52, paid by GSA to SIM on May 16, 2001. FN8

> FN6. Compl. ¶ 82.

> FN7. Id. ¶ 64.

> FN8. Id. ¶ 49.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2142361 (E.D.Pa.)
(Cite as: 2007 WL 2142361 (E.D.Pa.))

Of the remaining 23 false claims alleged in the Complaint, 14 of them are alleged to have been either presented to or paid by GSA before November 7, 2000, and are thus time-barred under § 3731(b) (1).[FN9] The other nine false claims do not have precise dates attached to them. The allegations listed as "False Claims # 17-20," describe four invoices for a project for which GSA paid SIM $524,211.50, but do not describe when GSA paid SIM.[FN10] As for "False Claims # 24-28," the Complaint states that they comprise "five separate payments of $170,000 between October 2000 and October 2001."[FN11] Because November 7, 2000, is the date when the § 3731(b)(1) limitations clock began running, it is not clear which of these claims is time-barred under that provision and which is not.

FN9. They are: (1) invoice # 99-0910, in the amount of $156,105.60, paid by GSA to SIM on November 4, 1999, see Compl. ¶ 33; (2) invoice 99-0918, in the amount of $118,408.65, and invoice 99-1001, in the amount of $224,280.47, both paid by GSA to SIM on December 21, 1999, see id. ¶ 36; (3) invoice number 99-1201, in the amount of $31,901.94, paid by GSA to SIM on February 4, 2000, see id. ¶ 46; (4) invoice number 99-1209, in the amount of $90,040.39, and invoice number 2000-0104, in the amount of $30,080.40, both paid by GSA to SIM on February 28, 2000, see id. ¶¶ 52, 53; (5) invoice number 2000-0208, in the amount of $22,753.36, paid by GSA to SIM on March 16, 2000, see id. ¶ 47; (6) invoice number 2000-0211, in the amount of $57,874.41, paid by GSA to SIM on March 24, 2000, see id. ¶ 44; (7) invoice number 2000-0203, in the amount of $29,995.69, paid by GSA to SIM on April 18, 2000, see id. ¶ 54; (8) invoice number 2000-0212, in the amount of $15,000.00, paid by GSA to SIM on April 28, 2000, see id. ¶ 41; (9) invoice number 2000-0435, in the amount of $49,749.79, paid by GSA to SIM on May 4, 2000, see id. ¶ 57; (10) invoice number 2000-0802, in the amount of $195,000.00, submitted by SIM to GSA on August 1, 2000, see id. ¶ 60; (11) invoice number 2000-0919, in the amount of $65,000.00, submitted by SIM to GSA on September 25, 2000, id.; and (12) invoice number 2000-0713, in the amount of $90,034.34, paid by GSA to SIM on October 25, 2000, see id. ¶ 48.

FN10. Id. ¶ 78.

FN11. Id. ¶ 87.

*3 The FCA, however, also includes a tolling provision under 31 U.S.C. § 3731(b)(2), which provides that even if FCA violations occurred more than six years before the filing of the complaint, they are not time-barred as long as the complaint is filed within "3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances."[FN12] Applying this rule, the FCA claims would be time-barred only if the appropriate governmental official knew of (or should have known of) facts material to those claims before November 7, 2003. The government argues that under this tolling provision, the FCA claims are not time-barred, or at a minimum, that the Court cannot decide the issue yet based on the allegations in the Complaint alone.

FN12. 31 U.S.C. § 3731(b)(2).

Defendants counter by pointing out that because GSA's Office of the Inspector General ("OIG") began investigating SIM for possible fraud in August of 2001-long before November 7, 2003-GSA had "constructive knowledge of the claims" at that time, and thus the claims are time-barred.[FN13] GSA responds by pointing out that although it began interviewing GSA and SIM personnel in 2001 about irregularities with SIM's GSA

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2142361 (E.D.Pa.)
**(Cite as: 2007 WL 2142361 (E.D.Pa.))**

contracts, this represents merely a starting point of the investigation. Therefore, the government argues that it would be improper to attribute to GSA knowledge of facts material to the fraud at the outset of the investigation. The Government points out that it spent the greater part of 2003 cajoling SIM into complying with a GSA/OIG subpoena that ordered SIM to produce its business records. Accordingly, the government contends that it was not until November 12, 2003, when Slaey gave written assurances that SIM had produced copies of all documents responsive to the subpoena, that knowledge of the facts surrounding the fraud can properly be attributed to the government.

> FN13. *See* Defs.' Mem. of Law [Doc. # 12], at 5.

The Court concludes that the applicability of the tolling provision is a partly fact-driven inquiry that cannot be decided at the pleadings stage. In order for the Court to determine the effect of § 3731(b)(2), it must first resolve at least three as-of-yet unanswered questions: First, who is the governmental official charged with responsibility to act (i.e. file a civil action) in this case? Second, which facts are "facts material to the right of action"? And third, when did the relevant governmental official know of-or when should he have known of-these material facts? Thus, whether the running of limitations is tolled is a question for the Court to resolve through a motion for summary judgment, only after the parties have developed a factual record. Of course, if that record reveals disputed factual issues material to the analysis under § 3731(b)(2), then the jury must decide whether the limitations period is tolled.

Hence, the Court will not dismiss the FCA claims in Counts I, II, and III of the Complaint based on a limitations defense.

2. Claims under State Law

**\*4** The United States has also brought state-law claims against SIM and Slaey for breach of contract, misrepresentation, unjust enrichment, and

payment by mistake. Defendants argue, and the Government does not dispute, that the limitations periods for these claims are set by 28 U.S.C. § 2415 . Under 28 U.S.C. § 2415(a), "every action for money damages brought by the United States ... which is founded upon any contract express or implied in law or fact, shall be barred unless the complaint is filed within six years after the right of action accrues." Similarly, under 28 U.S.C. § 2415(b), "every action for money damages brought by the United States ... which is founded upon a tort shall be barred unless the complaint is filed within three years after the right of action first accrues." Neither party, however, has briefed the issues of what constitutes accrual of any of these causes of action, nor have they described when they believe that these various rights of action accrued. The Defendants merely state in a conclusory fashion that the state-law claims are time-barred as a matter of law,FN14 while the government does not even address the question of limitations for the state-law claims. Hence, without guidance on how and when these causes of action accrued, and viewing the summary-judgment or trial stage as the more appropriate point at which the Court can determine the effect of a limitations defense, the Court will not dismiss the state-law claims at this time.

> FN14. *Id.* at 6.

**B. Pleading with Particularity**

Defendants also argue that the United States has not pleaded the allegations of fraudulent misconduct with sufficient particularity. While it is true that Federal Rule of Civil Procedure 9(b) commands that all allegations of fraud "shall be stated with particularity," it is clear that the government has done so in this case.

The purpose of Rule 9(b) is to "place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." FN15 The heightened pleading standard not only "gives defendants notice of the claims against them, [and] provides an increased

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2142361 (E.D.Pa.)

**(Cite as: 2007 WL 2142361 (E.D.Pa.))**

measure of protection for their reputations," but also "reduces the number of frivolous suits brought solely to extract settlements." FN16

>    FN15. *Seville Indus. Machinery Corp. v. Southmost Machinery Corp.,* 742 F.2d 786, 791 (3d Cir.1984).

>    FN16. *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1418 (3d Cir.1997).

Applying this rule, there can be no doubt that the Complaint puts Defendants on notice of the precise misconduct with which they are charged. The Complaint first describes the scheme that Nicholson, Medley, and Slaey used to defraud GSA. FN17 It then lists, one by one, each of the 28 alleged fraudulent transactions, describing the type of services that GSA contracted for, the invoice number, and amount paid (or charged) for each. While Defendants correctly point out that the Complaint does not provide dates for False Claims 17-20, there is no requirement that the government allege the date for each claim. Even without a particular date, as long as the government "provide[s] an alternative means of injecting precision and some measure of substantiation into the fraud allegations," FN18 then the particularity requirement of Rule 9(b) is satisfied. The description of False Claims 17-20 includes the nature of the work performed, the hours and amount billed, and the invoice numbers . FN19 The Court considers this description specific enough to satisfy the purposes of Rule 9(b).

>    FN17. Compl. ¶¶ 17-29.

>    FN18. *Lum v. Bank of Am.,* 361 F.3d 217, 224 (3d Cir.2004).

>    FN19. Compl. ¶¶ 68-78.

**\*5** Additionally, Slaey, Nicholson, and Medley were all indicted by a federal grand jury for acts connected to this same pattern of conduct. Nicholson and Medley pleaded guilty to at least some of the charges in those indictments, and are now serving prison sentences imposed under those guilty pleas. This further weakens Defendants' claim that somehow the allegations in the Complaint in this civil case are not particular enough to put them on notice of the precise conduct at issue, or that there is a danger that spurious allegations of misconduct might harm their reputations.

**C. Venue**

Finally, Defendants ask the Court to dismiss all claims arising out of alleged False Claims 21-23, for improper venue. Under 28 U.S .C. § 1391(b), a civil action based on federal-question jurisdiction may be brought only in

>    (1) a judicial district where any defendant resides, if all defendants reside in the same state, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

The Defendants point out that except for False Claims 21-23, all of the other false claims alleged in the Complaint "were authorized for payment through the [GSA] Finance Service Center in Philadelphia, PA." FN20 False Claims 21-23, on the other hand, were administered by the GSA's Kansas City office, FN21 and have no connection to Philadelphia or the Eastern District of Pennsylvania.

>    FN20. *Id.* ¶ 4.

>    FN21. *Id.* ¶ 81.

28 U.S.C. § 1391(b)(2), however, requires only that a substantial part of the events that give rise to a claim occur in the judicial district. Here, it is alleged that the GSA in Philadelphia authorized payment for 25 of the 28 alleged false claims. Thus, a substantial part of the events that give rise to the three FCA claims, as well as the four state-law claims, occurred here in the Eastern District of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2142361 (E.D.Pa.)
**(Cite as: 2007 WL 2142361 (E.D.Pa.))**

Pennsylvania. Hence, venue is proper in this Court.

**CONCLUSION**

For the foregoing reasons, the Court will deny Defendants' Motion in its entirety.

An appropriate Order follows.

### ORDER

**AND NOW,** this 23rd day of July 2007, upon consideration of Defendants' Motion to Dismiss [Doc. # 12], and the United States' Opposition thereto [Doc. # 13], it is hereby

**ORDERED,** that the Motion is **DENIED.**

E.D.Pa.,2007.
U.S. v. Slaey
Not Reported in F.Supp.2d, 2007 WL 2142361 (E.D.Pa.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.