UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| *Plaintiff,* | § | |
| VS. | § | CIVIL ACTION NO. 4:12-cv-02676 |
| | § | |
| AMERICUS MORTGAGE | § | |
| CORPORATION, *et al.,* | § | |
| | § | |
| *Defendants.* | § | |

## MEMORANDUM AND ORDER

Pending before the Court are the Motions to Dismiss filed by Jim C. Hodge [Dkt 52] and Jeanne L. Stell [Dkt. 54].[1]  The United States of America has sued two residential mortgage lending companies and executive officers of those companies, alleging civil fraud in violation of the False Claims Act ("FCA") 31 U.S.C. § 3729 and the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1833a.   The Government alleges that Defendants Americus Mortgage Corporation ("Allied Capital"), Allquest Home Mortgage Corporation ("Allied Corp"),[2] Jim C. Hodge, and Jeanne L. Stell made numerous false statements in loan applications and other documents to procure home mortgage insurance on loans from the United States Department of Housing and Urban Development ("HUD").   The Government asserts that

---

[1] Each of the Defendants has filed a motion to dismiss the Government's Complaint.  The Court has analyzed these in separate opinions, but adopts each of the opinions into the other because many of the facts and arguments overlap.

[2] Defendant Americus Mortgage Corporation was formerly known and is identified in the Second Amended Complaint by its former name, Allied Home Mortgage Capital Corporation. Defendant Allquest Home Mortgage Corporation is identified in the Second Amended Complaint by its former name, Allied Home Mortgage Corporation.

this alleged fraud resulted in HUD paying over $150 million in insurance proceeds to Defendants for loans that defaulted.

The case has been transferred to this Court by consent of the parties pursuant to 28 U.S.C. § 636(c).  After considering the pleadings, the arguments of the parties, and applicable legal authorities, the Court **DENIES** the Motions to Dismiss.

## I.   BACKGROUND[3]

### A. *The FHA Mortgage Insurance Program*

HUD insures lenders against losses on mortgage loans they make to homebuyers. HUD administers this mortgage insurance program through the Federal Housing Administration ("FHA").  Under this program, if a homeowner fails to make payments on a mortgage loan and the lender forecloses on the property, HUD pays the lender the balance of the loan and assumes ownership and possession of the property.  In addition, HUD incurs the expenses of managing and marketing the foreclosed property until it is resold.[4]

A fundamental requirement of the HUD insurance program is that a loan correspondent, *i.e.*, a lender who originates mortgage loans and later sells them to other lenders,[5] must be approved by HUD to originate, purchase, hold, or sell HUD-insured mortgages.  HUD requires that the loan correspondent be generally approved by HUD,

---

[3] The Court's factual background recites the facts as alleged in the Second Amended Complaint, the Government's live pleading in this case.  In reviewing a motion to dismiss made under Federal Rule of Civil Procedure 12(b)(6), "[t]he complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true."  *Beanal v. Freeport-McMoran, Inc.*  197 F.3d 161, 164 (5th Cir. 1999); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554–55, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).
[4] Dkt. 48, Second Amended Complaint.
[5] *See* 24 C.F.R. § 202.8(a)(2).

and further insists that the loan correspondent obtain specific approval from HUD for each branch office from which the correspondent intends to originate HUD-insured loans.[6]

To obtain HUD approval to originate a loan from a specific branch office, the loan correspondent must submit HUD Form 92001-B—a form containing basic information about the branch, a general certification that the branch "meets all HUD/FHA requirements," and a specific certification that the lender "will pay all operating costs of the branch office . . . ."[7] Further, loan correspondents must submit Annual Certifications containing four representations:

> I certify that none of the principles, owners, officers, directors, and/or employees of the above-named lender is currently involved in a proceeding and/or investigation that could result, or has resulted in a criminal conviction, debarment, limited denial of participation, suspension, or civil money penalty by a federal, state, or local government.
>
> I certify that the above named lender has not been refused a license and has not been sanctioned by any state(s) in which it originates and/or services HUD-FHA insured loans.
>
> I know, or am in the position to know, whether the operations of the above named lender conform to HUD-FHA regulations, handbooks, and policies. I certify that to the best of my knowledge, the above named lender conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the above lender is fully responsible for all actions of its employees including those of its HUD-FHA approved branch offices.[8]

After submitting the certifications, the loan correspondent receives an identification number ("HUD ID") that permits the branch to originate HUD-insured

---

[6] Dkt. 48, Second Amended Complaint
[7] *Id.* at ¶ 29.
[8] *Id.* at ¶ 33.

loans. As a means of monitoring lender default rates, HUD requires lenders to enter the specific HUD ID for the originating branch in every loan file submitted to HUD. HUD also requires loan correspondents to implement a quality control program. As part of this program, the lender must "(1) conduct an on-site audit of all branch offices within ninety days of opening and annually thereafter; (2) review 10% of all closed loan files to ensure they were underwritten in accordance with HUD guidelines; and (3) review all early payment defaults (i.e., those that default within the first six months)."[9]

### B. Claims against Hodge and Stell

Defendant Jim Hodge is the President and Chief Executive Officer of both Allied Capital[10] and Allied Corp.[11] Defendant Jeanne Stell is the Executive Vice President and Director of Compliance for both companies, and she has served as the Director of Compliance for both since 2001.

In Claims I and II of the Second Amended Complaint, the Government asserts causes of action against Defendants Allied Capital, Allied Corp, and Hodge under former Section 3729(a)(2) and Section 3729(a)(1)(B) (as amended) of the FCA. The FCA is the Government's "primary litigation tool" for recovering losses resulting from fraud. *United States ex rel. Marcy v. Rowan Cos.,* 520 F.3d 384, 388 (5th Cir. 2008). The FCA

---

[9] *Id.* at ¶ 34, 35.

[10] Allied Capital was an approved FHA loan correspondent from September 26, 1991 to December 31, 2010. It had the authority to originate HUD-insured mortgage loans for sale or transfer to other qualifying lenders. On January 23, 2012, Allied Capital changed its name with the Secretary of State of Texas to "Americus Mortgage Corporation."

[11] Allied Corporation is the successor to Allied Capital. In 2010 and 2011, Allied Capital sold its assets to Allied Corporation and terminated nearly all of its branches, only to then reopen them as branches of Allied Corporation. On January 10, 2012, Allied Corporation changed its name with the Secretary of State of Texas to "Allquest Home Mortgage Corporation."

4

imposes civil penalties and treble damages on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B) (2009).[12]

In Claims III-VI, the Government asserts causes of action under Section 1006 and Section 1014 of FIRREA.[13]   Section 1006 makes it a crime for any person who is "connected in any capacity with [HUD]" to "mak[e] any false entry in any book, report or statement of or to [HUD]" with the "intent to . . . deceive any officer, auditor, examiner or agent . . of [a] department or agency of the United States. . ." 18 U.S.C. § 1006.  To plead a cause of action under Section 1006, the Government must allege that (1) the Defendant is a "covered person;" (2) who knowingly made a false entry in a book, report or statement submitted to HUD; and (3) who acted unlawfully and intended to injure, defraud, or deceive HUD. *See United States v. Hopkins,* 916 F.2d 207, 215 (5th Cir. 1990); *United States v. Parks*, 68 F.3d 860, 865 (5th Cir. 1995).

Section 1014 prohibits the submission of false records or making of false statements to the FHA.  18 U.S.C. § 1014.  Specifically, it makes it a crime for any

---

[12] The terms "knowing" and "knowingly" as used in the FCA means that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." *Id.* § 3729(b)(1)(A)(i)-(iii).   Proof of "specific intent to defraud" is not required. *Id.* § 3729(b)(1)(B). The term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* § 3729(b)(4); *see also United States ex rel. Longhi v. United States,* 575 F.3d 458, 470 (5th Cir. 2009). The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property . . . that . . . is presented to an officer, employee, or agent of the United States . . . ." *Id.* § 3729(b)(2).

[13] Section 951(a) of FIRREA provides that "[w]hoever violates any provision of law to which this section is made applicable by subsection (c) of this section shall be subject to a civil penalty in an amount assessed by the court in a civil action under this section." 12 U.S.C. § 1833a(a). Section 951(c) of FIRREA identifies the criminal violations to which FIRREA civil penalties apply, including Sections 1006 and 1014. *Id.* §1833a(c).

person to "knowingly mak[e] any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of the [FHA]. . ." *Id.* To plead a cause of action under this section, the Complaint must allege that (1) Defendants knowingly and willfully made a false statement to one of the listed entities; (2) Defendants knew that the statement was false when they made it; and (3) Defendants made the false statement for the purpose of influencing that entity. *United States v. Sandlin*, 589 F.3d 749, 753 (5th Cir. 2009). The Complaint need not allege that Defendants intended to defraud the FHA, but rather must allege only that they intended to influence the decision of the FHA. *Id.* at 754. If a person makes a false statement that that has the capacity to influence the lender, then the specific intent necessary to violate Section 1014 may be inferred through circumstantial evidence, and the offense is complete. *Id.* at 754-55; *see also United States v. Jena,* 478 Fed. App'x. 99, 102 (5th Cir. 2012) (noting that in a fraud case, "intent will almost always have to be established by circumstantial evidence.").

## II.    Factual Allegations against the Hodge and Stell[14]

The Government alleges that, under the direction of Hodge and with the assistance of Stell, Allied Capital willfully violated the requirements that provide protection to HUD's insurance fund and knowingly deceived HUD to further its fraudulent schemes.[15] The Government contends that Allied Capital made fraudulent representations to HUD/FHA in four separate types of documents: (1) loan application packages to secure

---

[14] For the purpose of the Defendants' Rule 12(b)(6) Motion to Dismiss, the Court accepts the Government's factual allegations as true.

[15] *Id.* at ¶ 6.

6

approval for FHA insurance; (2) Branch Certifications to obtain approval to originate FHA loans from a new branch office; (3) Annual Certifications for continued participation in the FHA program; and (4) quality control reports.

### A. Loan Application Packages

For over ten years, Allied Capital originated loans out of hundreds of branches that it never disclosed to HUD. The Government refers to these branches as "shadow branches" because they operated without HUD's knowledge or approval, and were therefore not authorized to originate HUD-insured loans.[16] In some jurisdictions, the number of shadow branches exceeded the number of HUD-approved branches.[17] For example, Allied Capital was authorized to operate 8 branches in North Carolina, but Allied Capital actually operated over 70 offices in that state without HUD approval. These shadow branches often operated in regions where HUD had previously suspended Allied Capital's authorization to originate loans because of the region's high mortgage default rate. The Government estimates that these shadow branches are responsible for $150 million in insurance claims paid by HUD.

Although HUD prohibited the origination of loans from unapproved offices, the Complaint alleges that Allied Capital was nonetheless able to secure FHA insurance for these loans by falsifying the records submitted to HUD.[18] At the instruction of Allied Capital CEO Hodge, Allied Capital employees routinely entered the HUD ID numbers of an approved branch into the loan documentation for loans originating from the shadow

---

[16] *Id.* ¶ 37-39.
[17] *Id.* ¶¶ 48, 51.
[18] *Id.* ¶¶ 6, 38, 52.

branches. These loans were then submitted to HUD for approval and falsely stated that the loans originated from an approved branch office.[19]   HUD relied on these false statements and endorsed the loans.[20]

### B. False Statements in Branch Certification Forms

The Government also claims that Allied Capital lied to obtain HUD approval for its authorized branches.[21]   Each time Allied sought approval for a new branch office, it was required to submit HUD Form 92001-B to certify the branch complied with HUD requirements.   The form specified, among other things, that Allied Capital would pay all operating costs for the branch office.   However, the Government alleges that Allied Capital and its successor Allied Corp treated branches as independent franchises.   For the past ten years, Allied Capital and Allied Corporation maintained a corporate policy of requiring branch managers to assume financial responsibility for their branches.   Allied Capital demanded that branch officers enter directly into leasing agreements for office space, required that branch managers indemnify Allied Capital from "liability of every kind," and made branch  managers responsible for payroll, insurance, legal judgments, and other office expenses.[22]   Allied was aware that this policy was in violation of HUD regulations and policy—in 2001 it issued an "Examination/Audit Procedure guide"

---

[19] *Id.* ¶¶ 6, 38, 47, 52.
[20] *Id.* ¶¶ 6, 47, 52, 53.
[21] *Id.* ¶¶ 7, 55.
[22] *Id.* ¶¶ 7, 56, 63-76.

instructing branch managers to tell HUD auditors they were "not a franchise."[23] The

guide directed managers to:

> Select ONE PERSON, and one person ONLY in your office to interface
> and converse with the examiner/auditor. . .No one else in the office should
> have any conversation with the examiner/auditor prior to, during or after
> the examination/audit. The only corporate personnel who should converse
> with the examiner/auditor. . . .should be Jeanne Stell or Jim Hodge. . . .
> You, and any employee working in your branch, are w-2 employees of
> Allied. Frequently, examiners/auditors view us as a franchise. WE ARE
> NOT A FRANCHISE. Along those same lines, Allied pays all the bills
> incurred by the branch. **Both of these statements are true and that is the
> only way those questions are to be answered, *no deviations!*[24]**

This directive failed to comply with the HUD Handbook and certification form, which

requires that a lender "fully cooperate with any investigations brought by HUD [and]

make all officers and employees available for interviews."[25]

    The Complaint alleges that it was Stell who directed Allied Capital employees to

make these false certifications.[26]  In 2009,  after a HUD audit report found that Allied

Capital's leasing arrangements with its branches violated HUD regulations, Stell sent an

email regarding Branch Certifications, stating,

> I had [another senior manager] as sign the 'add a branch' form for years for
> HUD as I knew this [HUD audit] would eventually happen.  It required you
> to swear the branches meet and will continue to meet HUD's regulations.
> Jim [Hodge] has to be the biggest target personally for his disregard for the
> regulations.  Serves him right never listening and thinking he didn't have to
> play by the rules.[27]

---

[23] *Id.* at ¶ 59.
[24] *Id.* (emphasis in original).
[25] *Id.* at ¶ 60.
[26] *Id.* at ¶73.
[27] *Id.* at ¶ 72, 73.

## C. Annual Certifications for 2006 and 2007

To maintain HUD-approved status, Allied Capital was required to submit Annual Certifications to HUD and to implement a quality control program.  HUD required that this quality control program include (1) conducting an on-site audit of all branch offices within 90 days of opening and annually thereafter; (2) reviewing 10% of all closed loan files to ensure they were underwritten in accordance with HUD guidelines, and (3) reviewing all early payment defaults (*i.e.*, those defaults within the first six months).[28] Stell, in her role as Chief Compliance Officer, signed the Annual Certification on behalf of Allied Capital in both 2006 and 2007.  These documents certified that Allied Capital was not currently subject to state sanctions, did not employ felons, and maintained the requisite quality control program.  The Government alleges that each of the certification statements were false.

The Complaint states that Allied Branches were sanctioned by the Rhode Island Department of Business Regulation, the South Carolina Department of Consumer Affairs, the State of Washington Department of Financial Institutions, the New York State Banking Department, and the Arizona Department of Financial Institutions, none of which were ever addressed on the certification form.[29]  It also cites several instances in which Allied Capital hired convicted felons.

The Annual Certification also falsely certified that "the above named lender conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval,"

---

[28] *Id.* ¶ 35.  Review of early payments defaults is important because the defaults are indicative of mortgage fraud. *Id.*
[29] *Id.* at ¶ 97-106.

including the requisite quality control program.[30]  Instead, Allied Capital's quality control program was virtually non-existent.  Although Allied Capital operated between 400 and 650 branches between 2003 and early 2009, it maintained only a few branch auditors.  These designated auditors rarely conducted on-site branch office audits and discontinued branch audits by 2009.  Allied Capital also rarely reviewed early payment defaults.  The Complaint alleges that between 2004 and 2008, Allied Capital had only a few quality control staff to review all early payment defaults.  An additional 2-5 quality control department members worked in St. Croix, in the U.S. Virgin Islands.  However, when the quality control manager visited the staff in St. Croix, the workers apparently did not know "what HUD was" or "what a mortgage was."[31]

### D.  Falsified Quality Control Reports

The Complaint also alleges that Hodge instructed a member of Allied Capital's quality control department to prepare fraudulent quality control reports and submit them to HUD.[32]  In October 2008, HUD ordered Allied Capital to provide up-to-date quality control reports.[33]  The Government alleges that Hodge, lacking adequate or qualified quality control staff, instructed staff to instead fabricate the reports.  In an effort to make the reports appear complete, they indicated that verifications of income, employment, and

---

[30] *Id.* ¶¶ 33-35, 83,84.
[31] *Id.* ¶ 85.
[32] *Id.* ¶ 91.
[33] *Id.* ¶89.

11

deposit in the loan files under review had been conducted, when in fact no such work had been done.[34]

### III. Dismissal Under Rule 12(b)(6) and Rule 9(b)

#### A. *The Rule 12(b)(6) Standard*

The Government's live Complaint is the Second Amended Complaint. [Dkt. 48]. Defendants Hodge and Stell have moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6). Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) is "viewed with disfavor and is rarely granted." *United States ex rel. Tucker v. Christus Health*, No. 09-11819, 2012 U.S. Dist. LEXIS 151906, 8-9 (S.D. Tex. Oct. 23, 2012) (Atlas, J.) (*qui tam* case citing *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).

The Supreme Court has confirmed that Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2); *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). To withstand a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face"—legal conclusions alone are insufficient. *Twombly,* 550 U.S. at 570. The "pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *United States ex*

---

[34] *Id.* ¶91.

*rel. King v. Univ. of Texas Health Science Center-Houston*, 907 F. Supp. 2d 846, 849 (S.D. Tex. 2012) (Rosenthal, J.) (*qui tam* case quoting *Iqbal*, 556 U.S. at 678).   The complaint must be liberally construed in favor of the plaintiff, and when there are well-pleaded factual allegations, courts should presume they are true, even if doubtful—only then may the court determine whether they "plausibly give rise to entitlement to relief." *United States ex rel. Tucker*, 2012 U.S. Dist. LEXIS 151906 at 8-9.

### B. *The Rule 9(b) Standard*

Complaints filed under the False Claims Act must also meet the pleading standard of Federal Rule of Civil Procedure Rule 9(b), which provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." *United States ex rel. Grubbs v. Kanneganti,* 565 F.3d 180, 185 (5th Cir. Tex. 2009) (citing Fed. R. Civ. P. 9(b)).  Rule 9(b) requires "that a plaintiff set forth the 'who, what, when, where, and how' of the alleged fraud." *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 266 (5th Cir. 2010).   "Because the linchpin of an FCA claim is a false claim, the time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what that person obtained thereby must be stated in a complaint alleging violation of the FCA in order to satisfy Rule 9(b)." *United States ex rel. Rafizadeh v. Continental Common, Inc.*, 553 F.3d 869, 873 (5th Cir. 2008) (internal quotations and citation omitted).

For FCA claims, Rule 9(b) must be applied in a "context-specific and flexible" manner.  *United States ex rel. Grubbs*, 565 F.3d at 190.  "It is adequate to allege that a false claim was knowingly presented regardless of its exact amount; the contents of the

bill are less significant because a complaint need not allege that the Government relied on or was damaged by the false claim." *Id.* at 189.  The complaint may "survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* at 190.

## IV.  Defendant Jim Hodge's Motion to Dismiss[35]

Hodge moves to dismiss the Complaint on four grounds.  First, Hodge argues that the Government fails to allege any activity by Hodge that violates the FCA or FIRREA. Second, Hodge claims that the Government's FIRREA claims have no basis in law. Third, Hodge argues the "knowledge defense," claiming that the Government acquiesced to the fraudulent practices.   Finally, he asserts the Government cannot meet the particularity requirement of Rule 9(b).

### A. The Government does allege violations of the FCA

Hodge argues that he should not be subject to FCA liability because he did not "personally" submit any claims or reports to the Government for payment.  He contends that personal submission is required under the FCA, and the Complaint fails because it does not "distinguish the actions of the various defendants.[36]

Hodge is simply incorrect.  The FCA applies to anyone who "knowingly assist[s] in causing the government to pay claims grounded in fraud." *Gonzalez v. Fresenius Med. Care N. Am.*, 689 F.3d 470, 477 (5th Cir. 2012).  "[A] person need not be the one who actually submitted the claim forms in order to be liable." *United States ex rel. Riley v. St.*

---

[35] Dkt. 52
[36] Dkt. 52 at 11.

*Luke's Episcopal Hosp.*, 355 F.3d 370, 378 (5th Cir. 2004) (citations omitted).  Liability can attach to any defendant who cooperates, assists, or leads a fraudulent scheme.  *See Gonzalez*, 689 F.3d at 477.  The Court finds that the Government adequately states claims for relief under the FCA.

### B. The Complaint properly alleges claims under FIRREA

Second, Hodge argues that the Government's FIRREA claims have no basis in law.  He argues that Section 1006 of FIRREA does not prohibit false statements to HUD because HUD is not a covered institution.  This is also an erroneous argument.  As explained above, Section 1006 penalizes false statements made by "whoever" is "connected in any capacity with" HUD. 18 U.S.C. § 1006.

He also argues that he is not liable under FIRREA because the Government does not allege that he personally made false statements.  However, under FIRREA, any individual who aids, abets, counsels, commands, induces or procures another individual to violate federal law is liable as a principle for the underlying action.  A person need merely "set into motion" the events which caused the false entries to be made.  *Davis, 953* F.2d at 1495; *United States v. McDow*, 27 F.3d 132, 135 (5th Cir. 1994) (explaining that under Section 1014, the defendant need not actually make the false statement directly to the institution to be found guilty).

The Complaint clearly alleges that Hodge is the founder, President, and Chief Executive Officer of both Allied Capital and Allied Corp. The Complaint alleges that, in his role as the Director for both companies, Hodge was heavily involved in the scheme to operate the shadow branches and conceal them from HUD by false statements.  It was

Hodge's decision to continue these practices, and all of Allied Capital's business decisions were "mainly Jim's [Hodge's] decision."[37]

### C. The Government did not concede to the fraudulent scheme

Next, Hodge claims the Government "concedes it knew of the alleged behavior and allowed Allied Capital to maintain participation in the FHA insurance program," and this "acquiescence in these alleged practices vitiates any allegation of scienter or intent to defraud."[38] First, the Fifth Circuit has not recognized a "governmental knowledge" defense to such statues prohibiting fraud. *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 682 (5th Cir. 2003) ("[N]o case has squarely interpreted this qualification, nor need we do so."). Second, the Complaint alleges that the Government was not aware of the fraudulent scheme prior to the initiation of the *qui tam*, nor was it aware that Allied Capital had been subject to state sanctions or hired convicted felons. In short, there is nothing in the Complaint to suggest that the Government endorsed the fraud or was complicit in the scheme. *See c.f. United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 288-89 (4th Cir. 2002) (finding no FCA claim because the Government and contractor worked together).

### D. The Government's Complaint is Sufficiently Particular

Finally, Hodge asserts that the Government failed to plead its claims with the required particularity under Federal Rule of Procedure 9(b). The Court finds that the Government has satisfied the requirements of Rule 9(b). The Government identifies

---

[37] Dkt. 48, Second Amended Complaint, ¶ 6, 47, 52, 53.
[38] Dkt. 53 at 7.

16

Hodge by name and explains his role in both companies and in the fraudulent scheme as a whole—including as examples email excerpts indicating that Hodge maintained control in the corporations and was aware of the fraudulent practices. The Government outlines the fraudulent scheme, identifies the time periods, identifies the geographic regions containing the alleged shadow branches, and identifies the falsified certification submitted to HUD at Hodge's direction.

Rule 9(b) "ought not to be read to insist that a plaintiff plead the level of detail required to prevail at trial."[39] *Grubbs* 565 F.3d 180, 189 (5th Cir. 2009). As explained by the Fifth Circuit, a fraudulent presentment claim requires "proof only of the claim's falsity, not its exact contents." *Id.* Here, the Government has adequately pled specific facts to support its fraud claims against Hodge.

## V.     Defendant Jeanne Stell's Motion to Dismiss

Stell moves to dismiss the Complaint on two grounds, raising substantially identical points to those argued by Hodge. First, Stell argues that the Government's FIRREA claims have no basis in law. As explained above, Section 1006 not only penalizes officers, agents, and employees of certain identified institutions, but also "whoever" is "connected in any capacity with" HUD. 18 U.S.C. § 1006. Stell was an officer and agent of Allied Capital, and her roles bring her under the umbrella of FIRREA.

---

[39] When considering an FCA complaint under Rule 9(b), the Complaint must only meet the standard "required for a ticket to the federal discovery apparatus." *Grubbs*, 565 F.3d at 190. In this case, the Government has earned not just a ticket to the "federal discovery apparatus," but a FASTPASS. *See* https://disneyworld.disney.go.com/guest-services/fast-pass/.

Second, Stell argues that the Government failed to plead its claims against her with the necessary particularity.  The Complaint clearly establishes that Stell was an officer and agent of Allied Capital and that Stell directed Allied Capital employees to submit false Branch Certifications to HUD. The Complaint includes emails from Stell detailing these activities.  Stell was also identified in the Complaint as the Chief Compliance Officer, and she signed the Annual Certifications on behalf of Allied Capital in 2006 and 2007, certifying full compliance with the HUD regulations.  These allegations are sufficient to plead that Stell knowingly made or caused to be made false annual certifications to HUD/FHA, in violation of Sections 1006 and 1014.

## CONCLUSION

Based on the foregoing, the Court concludes that the Government has adequately pled claims under both the FCA and FIRREA.  Accordingly, it is **ORDERED** that both Hodge's and Stell's Motions to Dismiss are **DENIED**.

SIGNED at Houston, Texas on September ___9___ , 2013.

George C. Hanks, Jr.
United States Magistrate Judge