UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| *Plaintiff,* | § | |
| VS. | § | CIVIL ACTION NO. 4:12-cv-02676 |
| | § | |
| AMERICUS MORTGAGE | § | |
| CORPORATION, *et al.,* | § | |
| | § | |
| *Defendants.* | § | |

## MEMORANDUM AND ORDER

Pending before the Court is the Motion to Dismiss filed by Defendants Americus Mortgage Corporation [Dkt. 58], and the responsive briefing. [Dkt. 59, 69, and 77].[1] The United States of America has sued two residential mortgage lending companies and two executive officers of those companies, alleging civil fraud in violation of the False Claims Act ("FCA") 31 U.S.C. § 3729 and the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1833a. The Government alleges that Defendants Americus Mortgage Corporation ("Allied Capital"), Allquest Home Mortgage Corporation ("Allied Corp"),[2] Jim C. Hodge, and Jeanne L. Stell made numerous false statements in loan applications and other documents in a scheme to procure home mortgage insurance from the United States Department of Housing and

---

[1] Each of the Defendants has filed a motion to dismiss the Government's Complaint. The Court has analyzed these in separate opinions, but adopts each of the opinions into the other because many of the facts and arguments overlap.

[2] Defendant Americus Mortgage Corporation was formerly known and is identified in the Second Amended Complaint by its former name, Allied Home Mortgage Capital Corporation. Defendant Allquest Home Mortgage Corporation is identified in the Second Amended Complaint by its former name, Allied Home Mortgage Corporation.

Urban Development ("HUD") on loans they issued.  The Government asserts that this alleged fraud resulted in HUD paying out over $150 million in insurance proceeds to cover loans that defaulted.

The case has been transferred to this Court by consent of the parties pursuant to 28 U.S.C. § 636(c).  After considering the pleadings, the arguments of the parties, and applicable legal authorities, the Court **DENIES** the Motion to Dismiss.

## I.    BACKGROUND AND FACTUAL ALLEGATIONS[3]

### A. *The FHA Mortgage Insurance Program*

HUD insures lenders against losses on mortgage loans they make to homebuyers. HUD administers this mortgage insurance program through the Federal Housing Administration ("FHA").  Under this program, if a homeowner fails to make payments on a mortgage loan and the lender forecloses on the property, HUD pays the lender the balance of the loan and assumes ownership and possession of the property.  In addition, HUD incurs the expenses of managing and marketing the foreclosed property until it is resold.[4]

A fundamental requirement of the HUD insurance program is that a loan correspondent, *i.e.*, a lender who originates mortgage loans and later sells them to other

---

[3] The Court's factual background recites the facts as alleged in the Second Amended Complaint, the Government's live pleading in this case.  In reviewing a motion to dismiss made under Federal Rule of Civil Procedure 12(b)(6), "[t]he complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true."  *Beanal v. Freeport-McMoran, Inc.*  197 F.3d 161, 164 (5th Cir. 1999); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554–55, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).
[4] Dkt. 48, Second Amended Complaint.

lenders,[5] must be approved by HUD to originate, purchase, hold, or sell HUD-insured mortgages.  HUD requires that the loan correspondent be generally approved by HUD, and further insists that the loan correspondent obtain specific approval from HUD for each branch office from which the correspondent intends to originate HUD-insured loans.[6]

To obtain HUD approval to originate a loan from a specific branch office, the loan correspondent must submit HUD Form 92001-B—a form containing basic information about the branch, a general certification that the branch "meets all HUD/FHA requirements," and a specific certification that the lender "will pay all operating costs of the branch office . . . ."[7] Further, loan correspondents must submit Annual Certifications containing four representations:

> I certify that none of the principles, owners, officers, directors, and/or employees of the above-named lender is currently involved in a proceeding and/or investigation that could result, or has resulted in a criminal conviction, debarment, limited denial of participation, suspension, or civil money penalty by a federal, state, or local government.
>
> I certify that the above named lender has not been refused a license and has not been sanctioned by any state(s) in which it originates and/or services HUD-FHA insured loans.
>
> I know, or am in the position to know, whether the operations of the above named lender conform to HUD-FHA regulations, handbooks, and policies. I certify that to the best of my knowledge, the above named lender conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the above lender is fully responsible for all actions of its employees including those of its HUD-FHA approved branch offices.[8]

---

[5] *See* 24 C.F.R. § 202.8(a)(2).
[6] Dkt. 48, Second Amended Complaint.
[7] *Id.* at ¶ 29.
[8] *Id.* at ¶ 33.

After submitting the certifications, the loan correspondent receives an identification number ("HUD ID") that permits the branch to originate HUD-insured loans. As a means of monitoring lender default rates, HUD requires lenders to enter the specific HUD ID for the originating branch in every loan file submitted to HUD. HUD also requires loan correspondents to implement a quality control program. As part of this program, the lender must "(1) conduct an on-site audit of all branch offices within ninety days of opening and annually thereafter; (2) review 10% of all closed loan files to ensure they were underwritten in accordance with HUD guidelines; and (3) review all early payment defaults (i.e., those that default within the first six months)."[9]

### B. Allied Capital and Allied Corp

Allied Capital was an approved FHA loan correspondent from September 26, 1991 to December 31, 2010. It had the authority to originate HUD-insured mortgage loans for sale or transfer to other qualifying lenders. On January 23, 2012, Allied Capital changed its name with the Secretary of State of Texas to "Americus Mortgage Corporation."

Allied Corp is the successor to Allied Capital. In 2010 and 2011, Allied Capital sold its assets to Allied Corp and terminated nearly all of its branches, only to then reopen them as branches of Allied Corp. On January 10, 2012, Allied Corp changed its name with the Secretary of State of Texas to "Allquest Home Mortgage Corporation."

Defendant Jim Hodge is the President and Chief Executive Officer of both Allied Capital and Allied Corp. Defendant Jeanne Stell is the Executive Vice President and

---

[9] *Id.* at ¶ 34, 35.

Director of Compliance for both companies, and she has served as the Director of Compliance for both since 2001.

## II. Causes of Action Against the Defendants

In Claims I and II of the Second Amended Complaint, the Government asserts causes of action against Defendants Allied Capital, Allied Corp and Hodge under former Section 3729(a)(2) and Section 3729(a)(1)(B) (as amended) of the FCA. The FCA is the Government's "primary litigation tool" for recovering losses resulting from fraud. *United States ex rel. Marcy v. Rowan Cos.*, 520 F.3d 384, 388 (5th Cir. 2008). The FCA imposes civil penalties and treble damages on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B) (2009).[10] To plead a claim under the FCA, the Government must allege that Defendants either made, used, or caused to be made or used, (1) a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that is presented to the Government to pay out money or forfeit moneys due. *United States ex rel. Longhi v. United States,* 575 F.3d 458, 467 (5th Cir. 2009).

---

[10] The terms "knowing" and "knowingly" as used in the FCA means that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." *Id.* § 3729(b)(1)(A)(i)-(iii). Proof of "specific intent to defraud" is not required. *Id.* § 3729(b)(1)(B). The term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* § 3729(b)(4); *see also United States ex rel. Longhi v. United States,* 575 F.3d 458, 470 (5th Cir. 2009). The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property . . . that . . . is presented to an officer, employee, or agent of the United States . . . ." *Id.* § 3729(b)(2).

In Claims III-VI, the Government asserts causes of action under Section 1006 and Section 1014 of FIRREA.[11]   Section 1006 makes it a crime for any person who is "connected in any capacity with [HUD]" to "mak[e] any false entry in any book, report or statement of or to [HUD]" with the "intent to . . . deceive any officer, auditor, examiner or agent . . of [a] department or agency of the United States. . ." 18 U.S.C. § 1006.  To plead a cause of action under Section 1006, the Government must allege that (1) the Defendant is a "covered person;" (2) who knowingly made a false entry in a book, report or statement submitted to HUD; and (3) who acted unlawfully and intended to injure, defraud, or deceive HUD.  *See United States v. Hopkins,* 916 F.2d 207, 215 (5th Cir. 1990); *United States v. Parks*, 68 F.3d 860, 865 (5th Cir. 1995).

Section 1014 prohibits the submission of false records or making of false statements to the FHA.  18 U.S.C. § 1014.  Specifically, it makes it a crime for any person to "knowingly mak[e] any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of the [FHA]. . ." *Id.*  To plead a cause of action under this section, the Complaint must allege that (1) Defendants knowingly and willfully made a false statement to one of the listed entities; (2) Defendants knew that the statement was false when they made it; and (3) Defendants made the false statement for the purpose of influencing that entity.  *United States v. Sandlin*, 589 F.3d 749, 753 (5th Cir. 2009).  The Complaint need not allege that

---

[11] Section 951(a) of FIRREA provides that "[w]hoever violates any provision of law to which this section is made applicable by subsection (c) of this section shall be subject to a civil penalty in an amount assessed by the court in a civil action under this section." 12 U.S.C. § 1833a(a). Section 951(c) of FIRREA identifies the criminal violations to which FIRREA civil penalties apply, including Sections 1006 and 1014. *Id.* §1833a(c).

Defendants intended to defraud the FHA, but rather must allege only that they intended to influence the decision of the FHA. *Id.* at 754. If a person makes a false statement that that has the capacity to influence the lender, then the specific intent necessary to violate Section 1014 may be inferred through circumstantial evidence, and the offense is complete. *Id.* at 754-55; *see also United States v. Jena,* 478 Fed. App'x. 99, 102 (5th Cir. 2012) (noting that in a fraud case, "intent will almost always have to be established by circumstantial evidence.").

### III.   Factual Allegations against the Defendants[12]

Between January 1, 2001 and December 31, 2010—when HUD discontinued the loan correspondent program—Allied Capital originated 112,324 home loans.    Of those loans, 35,801 (approximately 32%) defaulted, costing over $834 million in insurance claims paid by HUD.[13]  The Second Amended Complaint, the live pleading, encompasses every claim that has been paid by the Government on these loans from May 13, 2001 through the present.

The Government alleges that Allied Capital willfully violated the requirements that provide protection to HUD's insurance fund and knowingly deceived HUD to further its fraudulent schemes.[14]  The Government contends that Allied Capital made fraudulent representations to HUD/FHA in four separate types of document: (1) loan application packages to secure approval for FHA insurance; (2) Branch Certifications to obtain

---

[12] For the purpose of the Defendants' Rule 12(b)(6) Motion to Dismiss, the Court accepts the Government's factual allegations as true.
[13] Dkt. 48, Second Amended Complaint.
[14] *Id.* at ¶ 6.

approval to originate FHA loans from a new branch office; (3) Annual Certifications for continued participation in the FHA program; and (4) quality control reports.

### A. Loan Application Packages

For over ten years, Allied Capital originated loans out of hundreds of branches that it never disclosed to HUD.  The Government refers to these branches as "shadow branches" because they operated without HUD's knowledge or approval, and were therefore not authorized to originate HUD-insured loans.[15]  In some jurisdictions, the number of shadow branches exceeded the number of HUD-approved branches.[16]  For example, Allied Capital was authorized to operate 8 branches in North Carolina, but Allied Capital actually operated over 70 offices without HUD approval.  These shadow branches often operated in regions where HUD had previously suspended Allied Capital's authorization to originate loans because of the region's high mortgage default rate.  The Government estimates that these shadow branches are responsible for $150 million in insurance claims paid by HUD.

Although HUD prohibited the origination of loans from unapproved offices, the Complaint alleges that Allied Capital was nonetheless able to secure FHA insurance for these loans by falsifying the records submitted to HUD.[17]  At the instruction of Allied Capital CEO Hodge, Allied Capital employees routinely entered the HUD ID numbers of an approved branch into the loan documentation for loans originating from the shadow branches.  These loans were then submitted to HUD for approval and falsely stated that

---

[15] *Id.* ¶ 37-39.
[16] *Id.* ¶¶ 48, 51.
[17] *Id.* ¶¶ 6, 38, 52.

8

the loans originated from an approved branch office.[18]   HUD relied on these false statements and endorsed the loans. [19]

## B. False Statements in Branch Certification Forms

The Government also claims that Allied Capital lied to obtain HUD approval for its authorized branches.[20]  Each time Allied sought approval for a new branch office, it was required to submit HUD Form 92001-B to certify the branch complied with HUD requirements.  The form specified, among other things, that Allied Capital would pay all operating costs for the branch office.  However, the Government alleges that Allied Capital and its successor Allied Corp treated branches as independent franchises.  For the past ten years, Allied Capital and Allied Corp maintained a corporate policy of requiring branch managers to assume financial responsibility for their branches.  Allied Capital demanded that branch officers enter directly into leasing agreements for office space, required that branch managers indemnify Allied Capital from "liability of every kind," and made branch  managers responsible for payroll, insurance, legal judgments, and other office expenses.[21]  Allied was aware that this policy was in violation of HUD policy—in 2001 it issued an "Examination/Audit Procedure guide" instructing branch managers to tell HUD auditors they were "not a franchise."[22] The guide directed managers to:

> Select ONE PERSON, and one person ONLY in your office to interface and converse with the examiner/auditor. . .No one else in the office should have any conversation with the examiner/auditor prior to, during or after

---

[18] *Id.* ¶¶ 6, 38, 47, 52.
[19] *Id.* ¶¶ 6, 47, 52, 53.
[20] *Id.* ¶¶ 7, 55.
[21] *Id.* ¶¶ 7, 56, 63-76.
[22] *Id.* at ¶ 59.

> the examination/audit.  The only corporate personnel who should converse
> with the examiner/auditor. . . .should be Jeanne Stell or Jim Hodge. . . .
> You, and any employee working in your branch, are w-2 employees of
> Allied.  Frequently, examiners/auditors view us as a franchise.  WE ARE
> NOT A FRANCHISE.  Along those same lines, Allied pays all the bills
> incurred by the branch.  **Both of these statements are true and that is the
> only way those questions are to be answered,** *no deviations![23]*

This directive failed to comply with the HUD Handbook and certification form, which

requires that a lender "fully cooperate with any investigations brought by HUD [and]

make all officers and employees available for interviews."[24]

The Complaint alleges that it was Stell who directed Allied Capital employees to

make these false certifications.[25]  In 2009,  after a HUD audit report found that Allied

Capital's leasing arrangements with its branches violated HUD regulations, Stell sent an

email regarding Branch Certifications, stating,

> I had [another senior manager] as sign the 'add a branch' form for years for
> HUD as I knew this [HUD audit] would eventually happen.  It required you
> to swear the branches meet and will continue to meet HUD's regulations.
> Jim [Hodge] has to be the biggest target personally for his disregard for the
> regulations.  Serves him right never listening and thinking he didn't have to
> play by the rules.[26]

### C. Annual Certifications for 2006 and 2007

To maintain HUD-approved status, Allied Capital was required to submit Annual

Certifications to HUD and to implement a quality control program.  HUD required that

this quality control program include (1) conducting an on-site audit of all branch offices

within 90 days of opening and annually thereafter; (2) reviewing 10% of all closed loan

---

[23] *Id.* (emphasis in original).
[24] *Id.* at ¶ 60.
[25] *Id.* at ¶73.
[26] *Id.* at ¶ 72, 73.

files to ensure they were underwritten in accordance with HUD guidelines; and (3) reviewing all early payment defaults (i.e., those defaults within the first six months).[27] Stell, in her role as Chief Compliance Officer, signed the Annual Certification on behalf of Allied Capital in both 2006 and 2007.  These documents certified that Allied Capital was not currently subject to state sanctions, did not employ felons, and maintained the requisite quality control program.  The Government alleges that each of the certification statements were false.

The Complaint states that Allied Branches were sanctioned by the Rhode Island Department of Business Regulation, the South Carolina Department of Consumer Affairs, the State of Washington Department of Financial Institutions, the New York State Banking Department, and the Arizona Department of Financial Institutions, none of which were ever addressed on the certification form.[28]  It also cites several instances in which Allied Capital hired convicted felons.

The Annual Certification also falsely certified that "the above named lender conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval," including the requisite quality control program.[29]  Instead, Allied Capital's quality control program was virtually non-existent.  Although Allied Capital operated between 400 and 650 branches between 2003 and early 2009, it maintained only a few branch auditors. These designated auditors rarely conducted on-site branch office audits and discontinued

---

[27] *Id.* ¶ 35.  Review of early payments defaults is important because the defaults are indicative of mortgage fraud.  *Id.*
[28] *Id.* at ¶ 97-106.
[29] *Id.* ¶¶ 33-35, 83,84.

branch audits by 2009.  Allied Capital also rarely reviewed early payment defaults.  The Complaint alleges that between 2004 and 2008, Allied Capital had only a few quality control staff to review all early payment defaults.  An additional 2-5 quality control department members worked in St. Croix, in the U.S. Virgin Islands.  However, when the quality control manager visited the staff in St. Croix, the workers apparently did not know "what HUD was" or "what a mortgage was."[30]

### D. Falsified Quality Control Reports

The Complaint also alleges that Hodge instructed a member of Allied Capital's quality control department to prepare fraudulent quality control reports and submit them to HUD.[31]  In October 2008, HUD ordered Allied Capital to provide up-to-date quality control reports.[32]  The Government alleges that Hodge, lacking adequate or qualified quality control staff, instructed staff to instead fabricate the reports.  In an effort to make the reports appear complete, they indicated that verifications of income, employment, and deposit in the loan files under review had been conducted, when in fact no such work had been done.[33]

### IV.  Dismissal Under Rule 12(b)(6) and Rule 9(b)

#### A. *The Rule 12(b)(6) Standard*

---

[30] *Id.* ¶ 85.
[31] *Id.* ¶ 91.
[32] *Id.* ¶89.
[33] *Id.* ¶91.

The Government's live Complaint is the Second Amended Complaint. [Dkt. 48]. Defendant Americus has moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6).  Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6).  A motion to dismiss under Rule 12(b)(6) is "viewed with disfavor and is rarely granted." *United States ex rel. Tucker v. Christus Health*, No. 09-11819, 2012 U.S. Dist. LEXIS 151906, 8-9 (S.D. Tex. Oct. 23, 2012) (Atlas, J.) (*qui tam* case citing *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009).

The Supreme Court has confirmed that Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).  To withstand a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face"—legal conclusions alone are insufficient. *Twombly*, 550 U.S. at 570.  The "pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *United States ex rel. King v. Univ. of Texas Health Science Center-Houston*, 907 F. Supp. 2d 846, 849 (S.D. Tex. 2012) (Rosenthal, J.) (*qui tam* case quoting *Iqbal*, 556 U.S. at 678).  The complaint must be liberally construed in favor of the plaintiff, and when there are well-pleaded factual allegations, courts should presume they are true, even if doubtful—only

then may the court determine whether they "plausibly give rise to entitlement to relief." *United States ex rel. Tucker*, 2012 U.S. Dist. LEXIS 151906 at 8-9.

### B. The Rule 9(b) Standard

Complaints filed under the False Claims Act must also meet the heightened pleading standard of Federal Rule of Civil Procedure Rule 9(b), which provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." *United States ex rel. Grubbs v. Kanneganti,* 565 F.3d 180, 185 (5th Cir. Tex. 2009) (citing FED. R. CIV. P. 9(b)). Rule 9(b) requires "that a plaintiff set forth the 'who, what, when, where, and how' of the alleged fraud." *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 266 (5th Cir. 2010). "Because the linchpin of an FCA claim is a false claim, the time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what that person obtained thereby must be stated in a complaint alleging violation of the FCA in order to satisfy Rule 9(b)." *United States ex rel. Rafizadeh v. Continental Common, Inc.*, 553 F.3d 869, 873 (5th Cir. 2008) (internal quotations and citation omitted).

For FCA claims, Rule 9(b) must be applied in a "context-specific and flexible" manner. *United States ex rel. Grubbs*, 565 F.3d at 190. "It is adequate to allege that a false claim was knowingly presented regardless of its exact amount; the contents of the bill are less significant because a complaint need not allege that the Government relied on or was damaged by the false claim." *Id.* at 189. The complaint may "survive by alleging

particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* at 190.

## V.  Analysis

Americus Mortgage moves to dismiss the Government's Second Amended Complaint on three grounds.  First, Americus Mortgage argues that the Complaint fails to state a valid claim under the FCA.   Second, Americus Mortgage argues that the Government fails to adequately plead FIRREA violations.   Finally, Americus argues that the Government has failed to plead any of its claims with the requisite particularity.  The Court will address each of these arguments in turn.

### A.  The Government's claims under the FCA.

As stated above, to plead a claim under either former section 3729(a)(2) or current section 3729(a)(1)(B) of the FCA, the Government must allege that Allied Capital either made, used, or caused to made or used, (1) a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or forfeit moneys due (*i.e.,* that involved a claim). *Longhi*, 575 F.3d at 467.

Americus argues that the Government's allegations are conclusory and cannot satisfy these elements. Americus argues that "a careful reading of the Complaint reveals that it fails to identify a single certification that was false, let alone why the certification was false, who made the false statement, whether was made to receive a payment from

the government, or whether any specific payment was made to any identifiable party."[34]
Rather, Americas contends that the "allegations suggest that violations of regulatory
participation requirements create FCA liability for all subsequent and unspecified
payments from the FHA insurance fund.".[35]   It also argues that the Complaint "notably
fails to allege scienter or materiality."[36]   The Court disagrees and finds that the
Government's Complaint sufficiently alleges each of these elements.

### 1.   The Complaint successfully alleges false statements and a fraudulent course of conduct.

First, the Complaint establishes that Americus (as Allied Capital) made, or caused
to be made, false statements of fact, while engaging in a fraudulent course of conduct.
The Complaint alleges that Allied Capital created false records, statements, and
certifications in each of the loan application packages originating from the shadow
branches.  For example, the Complaints states that Allied Capital was required to enter in
every loan file submitted to HUD/FHA the specific HUD ID number for the branch
office.  For those loan files originating from shadow branches, Allied Capital used the
HUD ID number from an approved branch; therefore, by falsely stating, or causing others
to falsely state, that a loan originated from a particular approved branch office, *when it
had not*, Allied Capital caused false statements of fact to be submitted to HUD.

The Complaint also describes how each of the loan packages contained a loan-
specific certification (HUD Form 92900-A), in which the lender certifies that the

---

[34] Dkt. 58 at 7.
[35] *Id.*
[36] *Id.* at 8.

information in the application is "true to the best of the lender's knowledge and belief."[37] According to the Complaint, this statement was false—Allied Capital was aware the loan packages falsely represented that the loans originated from legitimate branch offices.

The Complaint also successfully asserts that the defendants engaged in a "course of fraudulent conduct" within the meaning of *Longhi*. Americus argues unsuccessfully that "in order to state a claim for FCA violations, the statement allegedly creating liability must certify compliance with a statute or regulation that is a condition of payment."[38] This is a misreading of the standard in *Longhi*; while a certification falsely indicating compliance with a statute or regulation can form the basis of an FCA claim, the court in *Longhi* found the defendant liable under the FCA for including factually false statements in grant applications to the Department of Defense. *Longhi*, 575 F.3d at 471-72. Here, the course of fraudulent conduct including the submission of numerous loan documents to HUD/FHA for endorsement that contained falsified information. Americus's argument that the Government rests entirely on expressly or impliedly certified compliance with regulatory compliance is not supported by a reading of the Complaint.[39] The Complaint makes specific references to the false statements and certifications made in the individual loan files submitted to the HUD/FHA. Even if these loan-specific certifications had not been outlined in the Complaint, this first element would still be satisfied by the submission of the false statements in the loan packages regarding which branch

---

[37] Complaint, ¶ 36.
[38] Dkt. 58 at 10.
[39] Although strongly stated, the Government's contention that "defendants attempt to obfuscate the Government's simple and straightforward theory of liability by casting the Government's FCA theory as something that it is not" is not inaccurate.

originated the loan.  *See United States ex rel. Hendow v. Univ. of Phoenix,* 461 F.3d 1166, 1172 (9th Cir. 2006) (famously stating the oft-cited "as the statement in question is knowingly false when made, it matters not whether it is a certification, assertion, statement, or secret handshake").

### 2.    The Complaint Sufficiently Alleges Scienter

To plead that false statements or fraudulent course of conduct were made with the requisite level of scienter, the Government must allege that the defendants had either "(1) actual knowledge of falsity, (2) acted with deliberate ignorance of the truth or falsity of the information provided, or (3) acted with reckless disregard of the truth or falsity of the information provided" to the Government.  *Longhi,* 575 F.3d at 468.  Even though scienter may be plead generally, the Government must still allege facts supporting an "inference of fraud."  *United States ex rel. Willard v. Humana Health Plan of Texas Inc.,* 336 F.3d 375, 385 (5th Cir. 2003).  The inference may be drawn by alleging facts showing a defendant's motive or "by identifying circumstances that indicate conscious behavior on the part of the defendant. . ." *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1068 (5th Cir. 2003).

Here, the Complaint clearly establishes that the Defendants engaged in a scheme designed to deceive HUD through the use of shadow branches, false certifications, and routinely causing loans originated from shadow branches to be submitted under another HUD ID number.  The Complaint adequately frames this scheme as an intentional effort by Hodge to perpetrate fraud.  The Complaint supports its allegations of scienter by explaining the Hodge concealed corrupt practices by "monitor[ing] and intimidate[ing]

18

senior managers and other employees.[40]  It describes how he carefully controlled account access and the flow of information.  These allegations support an inference that the strict control of information was deliberately designed to conceal Allied Capital's fraudulent scheme from HUD.  *See e.g., Willard*, 336 F.3d at 385.

Americus argues that the Government failed to plead facts supporting scienter because "HUD was on notice of, and conducting an investigation into, the very conduct alleged by the Government here to violate the FCA.[41]   However, the Fifth Circuit has stated that the "inaptly-named government knowledge defense" is "not a statutory defense to FCA liability."  *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 682 (5th Cir. 2003) ("[N]o case has squarely interpreted this qualification, nor need we do so.").   Further, there is nothing in the Complaint to suggest that HUD had prior knowledge of the use duplicative use of HUD ID numbers.  In 2005, HUD did become aware of a limited number of shadow branches using the Fresno office's ID number.  However, the Complaint indicates that this was believed to be a localized incident, and states that there was no knowledge of the hundreds of other shadow branches using duplicative numbers across the country.  There is no evidence that the Government approved of this process, nor is there evidence that the Government was aware that Allied Capital continued to operate shadow branches after HUD prohibited satellite offices in 2006.

---

[40] Complaint, ¶ 108.
[41] Dkt. 58 at 18.

Americus also argues the *Allison Engine Co. v. United States* altered the FCA's scienter requirement, making it necessary show an intent to defraud the government. *See Allison Engine Co. v. United States*, 553 U.S. 662 (2008). Americus asserts that, unless the Complaint pleads a specific intent to defraud the Government with respect to all claims arising prior to June 7, 2008 (the effective date of the FECA amendments that overruled the *Allison Engine* decision), the claims should be dismissed.

The Fifth Circuit has directly addressed this argument, stating "proof of specific intent to defraud is not necessary." *Longhi*, 575 F.3d at 468. Second, the *Allison Engine* decision is not on point. That case centered on whether false statements submitted to private entities (as opposed to government agencies) could give rise to liability under the FCA. *See* 553 U.S. at 671-72 ("If a subcontractor or another defendant makes a false statement to a private entity and does not intend the Government to rely on that false statement as a condition of payment, the statement is not made with the purpose of inducing payment of a false claim 'by the Government.'"); *see also United States ex rel. Wall v. Circle C Constr., LLC*, 697 F.3d 345, 355 n.3 (6th Cir. 2012) (noting that the primary concern in *Allison* was the subcontractors' indirect submissions to the Government). Here, the Government alleges that Allied Capital directly submitted false statements HUD with the intent of inducing it to insure loans from shadow branches.

### 3.    The Complaint sufficiently alleges the Government forfeited money

A false statement is material under the FCA if it has a "natural tendency to influence, or be capable of influencing," the Government's payment decision. *Longhi*,

575 F.3d at 469 (applying "natural tendency" test to claims arising under former section 3729(a)(2)). The current version, 3729(b)(4) defines material as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." To satisfy the "natural tendency test," the Government need only show that "the false or fraudulent statements either (1) make the government prone to a particular impression, thereby producing some sort of effect, or (2) have the ability to effect the government's actions, even if this is a result of indirect or intangible actions on the part of the Defendants. *Longhi*, 575 F.3d at 470 (noting that all that is required under the test for materiality, therefore, is that the false or fraudulent statements have the potential to influence the government's decisions.

Here, the Complaint pleads facts satisfying the "natural tendency test" by alleging that HUD was unaware that Allied Capital violated a fundamental HUD rule by operating a network of hundreds of unapproved and unaudited shadow branches. "HUD endorsed these loans for insurance based on false certifications that the loans were originated incompliance with HUD requirements, including, most fundamentally, that the loans originated from HUD-approved branches."[42]

### 4.    The Complaint Sufficiently Alleges Materiality

Finally, the Government sufficiently alleged that the statements at issue caused the Government to pay out money. Americus contends that the Government's entire factual recitation in its complaint is incorrect. However, the Court is bound to review a 12(b)(6)

---

[42] Complaint, ¶ 6.

motion under the assumption that all plead facts are true. *United States ex rel. Tucker*, 2012 U.S. Dist. LEXIS 151906 at 8-9. The Complaint alleges that HUD would not have insured the loans at issue without the statements Americus made regarding its compliance. Whether these statements are true or false is a question of fact the Court will not reach in addressing a 12(b)(6) motion.

### 5.     The Claims prior to 2005 are not time-barred.

Finally, Americus argues that any claims for violations before November 1, 2005 should be dismissed as time-barred. While "a complaint may be subject to dismissal if its allegations affirmatively demonstrate that the plaintiff's claims are barred by the statute of limitations and fail to raise some basis for tolling," that is not what has occurred in this case. *Frame v. City of Arlington*, 657 F.3d 215, 240 (5th Cir. 2011).

The FCA provides a six-year statute of limitations and a three-year tolling period. The Second Amended Complaint asserts FCA causes of action for any insurance claim paid, up to ten years prior to the date this action was filed by the relator. Americus Mortgage argues that any violation alleged to have occurred prior to November 1, 2005— six years prior to the date the Government filed its Complaint-in-Intervention—are barred by the FCA's six year statute of limitation.    However, this argument fails to account for the tolling period. The FCA allows a tolling period of up to three years "after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States".[43]  Therefore, the Government's Complaint is

---

[43] 31 U.S.C. §3731(b). The "date on which the violation. . .is committed" refers date that the claim was submitted to the government for payment. *Graham County Soil & Water*

subject to dismissal only if it fails to assert causes of action within 6 years or fails to allege claims brought within three years after the date upon which the appropriate government official knew (or should have known) of facts material to the fraudulent claims. *See Frame*, 657 F.3d 215, 240 (5th Cir. 2011).

Courts in this District have held that the determination of whether the relevant official was aware (or should have been aware) of the alleged fraud is a fact-intensive analysis that cannot be resolved on the pleadings. *Id.* ("Because the statute of limitations is an affirmative defense and not a pleading requirement, it is an issue that must be resolved through discovery and summary judgment or trial."); *see also United States v. BNP Paribas SA,* 884 F. Supp. 2d 589, 598 (S.D. Tex 2012) (Lake, J.) (finding whether tolling section of 3731(b) applied was "question of fact" and therefore complaint was not subject to dismissal under Rule 12(b)(6)). Similarly, the Court declines to dismiss the Government's Complaint on these grounds.

### B.     The Complaint states a valid claim under FIRREA.

Next, Americus argues that the Government's FIRREA should be dismissed because it is not an entity subject to FIRREA. Section 1006 of FIRREA states that the Act applies to "whoever" is "connected in any capacity with" HUD, not just the officers, agents, and employees of certain identified institutions. Title 1 of the U.S. Code does not restrict "whoever" to natural persons, but also includes "corporations, companies,

---

*Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 415, 125 S.Ct. 2444, 2449, 162 L.Ed.2d 390 (2005) (time limit for FCA claims begins to run on the date the defendant submitted a false claim for payment).

associations, firms, partnerships, [and] societies." 1 U.S.C. § 1.  The Supreme Court has also clarified that the word "whoever," first enacted as part of the revised Criminal Code, is intended to be liberally interpreted. *United States v. A&P Trucking Co.*, 358 U.S. 121, 123 n.2 (1958).  The plain text of Section 1006 applies to "whoever" is connected to HUD, and this clearly includes Allied Capital.

Likewise, Section 1014 prohibits submitting false records or making false statements to the FHA, the component within HUD that administers HUD's mortgage insurance program.  Section 1014 makes it a crime for any person to "knowingly mak[e] any false statement or report, or willingly overvalues any land, property or security, for the purpose of influencing in any way the action of [the FHA]."  18 U.S.C. § 1014. Furthermore, an individual who aids, abets, counsels, commands, induces, or procures another individual to violate federal law is liable as a principal for the underlying violation.  18 U.S.C. § 2.  A person need not directly prepare or submit the false statements if he or she directed or caused another to perform the act. *See United States v. Davis*, 953 F.2d 1482, 1495 (10th Cir. 1992) (holding that a defendant could be convicted under Section 1006 for causing another person to make false entries in bank minutes). The Complaint establishes that Allied submitted knowingly submitted false statements to influence HUD and alleges a claim under FIRREA.

## C.   The Government's Complaint meets the particularized pleadings standard

Americus generally argues that the Government has failed to meet the pleading standard required by Rule 9(b).[44]  It claims the Government's allegations are "conclusory invective," and "lump[ed] all defendants together without properly attributing any of its unspecified fraudulent actions to any specific defendant."[45]

Federal Rule of Civil Procedure 9(b) provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge and other conditions of a person's mind may be alleged generally."  FED. R. CIV. P. 9(b).  When reviewing a motion to dismiss a complaint asserting claims for violations of the FCA, and comparing it to Rule 9(b)'s pleading standard, the courts apply a more lenient standard than in other instances.  *See United States ex rel. Wall v. Vista Hospice Care, Inc.*, 778 F. Supp. 2d 709, 715 (N.D. Tex. 2011) (noting the "standard for stating a claim for relief with particularity is lower in the FCA context than it is in the securities or common law fraud contexts").  For complaints asserting claims under the FCA, the "time, place, contents, and identity standard is not a straitjacket for Rule 9(b)," and the Government is not required to plead facts with exacting detail.  *Id.* Rather, in such cases, Rule 9(b) is both "context specific and flexible."  *Id.*  The Complaint may survive by alleging the "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that such claims were actually submitted." *See id.; United States ex rel. Willard* 336 F.3d at 385

---

[44] Dkt. 58 at 24.
[45] *Id.*

(holding that in order to adequately plead scienter, "a plaintiff must set forth specific facts that support an inference of fraud.").

A review of the Complaint shows that, to the extent possible without discovery, the Government has adequately alleged a fraudulent scheme by the Defendants to deceive HUD through the use of shadow branches and induce it to insure loans that it otherwise would not have insured, and that HUD had to pay out on those loans.[46]  The Complaint further supports an inference of fraud by outlining the level of control Hodge maintained at Allied Capital—he required the signing of broad confidentiality agreements and "persistently monitored" senior managers and employees, and actions taken by Stell.  At the present stage, this is sufficient to infer that the individual defendants were aware of Allied Capital's activities as a company and that these activities were fraudulent.

## CONCLUSION

Based on the foregoing, the Court concludes that the Government has adequately pled claims under both the FCA and FIRREA.  Accordingly, it is **ORDERED** that Americus's Motion to Dismiss be **DENIED**.

SIGNED at Houston, Texas on September ___9___ , 2013.

GEORGE C. HANKS, JR.
**UNITED STATES MAGISTRATE JUDGE**

---

[46] Dkt. 48, Second Amended Complaint, ¶ 46-47, 52, 53.