UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | CIVIL ACTION NO. 4:12-cv-02676 |
| VS. | § | |
| | § | |
| AMERICUS MORTGAGE | § | |
| CORPORATION, *et al.*, | § | |

*Defendants.*

## MEMORANDUM AND ORDER

The United States of America has brought this action against two residential mortgage lending companies and two executive officers of those companies, alleging civil fraud in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729, and the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1833a, and seeking indemnification under federal common law. The Government alleges that Defendants Americus Mortgage Corporation ("Allied Capital"), Allquest Home Mortgage Corporation ("Allied Corp"),[1] Jim C. Hodge, and Jeanne L. Stell made numerous false statements in loan applications and other documents in a scheme to procure home mortgage insurance from the United States Department of Housing and Urban Development ("HUD") on loans they issued. The Government contends that this alleged fraud resulted in HUD paying out more than $260 million in

---

[1]     Defendant Americus Mortgage Corporation was formerly known as and is identified in the Third Amended Complaint by its former name, Allied Home Mortgage Capital Corporation. Defendant Allquest Home Mortgage Corporation is identified in the Third Amended Complaint by its former name, Allied Home Mortgage Corporation.

insurance proceeds to cover loans that have defaulted, and that HUD will be faced with more defaults in the future. Dkt. 100, ¶ 1.

The case has been transferred to this Court by consent of the parties, pursuant to 28 U.S.C. § 636(c). Pending before the Court is the Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) filed by Allied Corp, Dkt. 109, and the responsive briefing. Dkt. 110, 119, 124, 126, and 128. After considering the pleadings, the arguments of the parties, and applicable legal authorities, Defendant's Motion to Dismiss is **GRANTED in part** and **DENIED in part**.

## I.  Background[2]

### A. The FHA Mortgage Insurance Program

HUD insures lenders against losses on mortgage loans made to homebuyers. HUD administers this mortgage insurance program through the Federal Housing Administration ("FHA"). Under this program, if a homeowner fails to make payments on an insured mortgage loan and the lender forecloses on the property, HUD pays the lender the balance of the loan and assumes ownership and possession of the property. Additionally, HUD incurs the expense of managing and marketing the foreclosed property until it is resold.[3]

---

[2]  The Court's factual background recites the facts as alleged in the Third Amended Complaint, the Government's live pleading. In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "[t]he complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true." *Beanal v. Freeport-McMoran, Inc.*, 197 F.3d 161, 164 (5th Cir. 1999); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554–55, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

[3]  Dkt. 100, Third Amended Complaint.

A fundamental requirement of the HUD insurance program is that a loan correspondent, *i.e.*, a lender who originates mortgage loans and later sells them to other lenders,[4] must be approved by HUD to originate, purchase, hold, or sell HUD-insured mortgages. HUD further insists that the loan correspondent obtain specific approval from HUD for each branch office from which the correspondent intends to originate HUD-insured loans.[5]

To obtain HUD approval to originate loans from a specific branch office, the loan correspondent must submit HUD Form 92001-B—a form containing basic information about the branch, a general certification that the branch "meets all HUD/FHA requirements," and a specific certification that the lender "will pay all operating costs of the branch office . . . ."[6] Further, loan correspondents must submit annual certifications containing four representations:

> I certify that none of the principals, owners, officers, directors, and/or employees of the above-named lender is currently involved in a proceeding and/or investigation that could result, or has resulted in a criminal conviction, debarment, limited denial of participation, suspension, or civil money penalty by a federal, state, or local government.
>
> I certify that the above named lender has not been refused a license and has not been sanctioned by any state(s) in which it originates and/or services HUD-FHA insured loans.
>
> I know, or am in the position to know, whether the operations of the above named lender conform to HUD-FHA regulations, handbooks, and policies.
>
> I certify that to the best of my knowledge, the above named lender conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA

---

[4]   *See* 24 C.F.R. § 202.8(a)(2).
[5]   Dkt. 100 at ¶ 35.
[6]   *Id.* at ¶ 36.

approval, and that the above lender is fully responsible for all actions of its employees including those of its HUD-FHA approved branch offices.[7]

After submitting the certifications, the loan correspondent receives an identification number ("HUD ID") that permits the branch to originate HUD-insured loans. As a means of monitoring lender default rates, HUD requires lenders to enter the specific HUD ID for the originating branch in every loan file submitted to HUD. HUD also requires loan correspondents to implement a quality-control program. As part of this program, the lender must "(1) conduct an on-site audit of all branch offices within ninety days of opening and annually thereafter; (2) review 10% of all closed loan files to ensure they were underwritten in accordance with HUD guidelines; and (3) review all early payment defaults (i.e., those that default within the first six months)."[8]

## B. Allied Capital and Allied Corp

Allied Capital was an approved FHA loan correspondent from September 26, 1991 to December 31, 2010. In this capacity, it had the authority to originate HUD-insured mortgage loans for sale or transfer to other qualifying lenders. On January 23, 2012, Allied Capital changed its name with the Secretary of State of Texas to "Americus Mortgage Corporation."[9]

In 2010 and 2011, Allied Capital sold its assets to Allied Corp and terminated nearly all of its branches, only to then reopen them as branches of Allied Corp. On

---

[7]   *Id.* at ¶ 40.
[8]   *Id.* at ¶ 42.
[9]   *Id.* at ¶ 20.

January 10, 2012, Allied Corp changed its name with the Secretary of State of Texas to "Allied Corp Home Mortgage Corporation."

Defendant Jim Hodge is the founder, President, and Chief Executive Officer of both Allied Capital and Allied Corp.[10]

Defendant Jeanne Stell is the Executive Vice President and Director of Compliance for both companies. She has held a senior management position since approximately 2001, with the exception of a temporary absence between November 2007 and early 2010.[11]

## II.    Causes of Action Against Defendants

### A. False Claims Act

In Claims 2 and Claim 20 of the Third Amended Complaint, the Government asserts causes of action against Allied Corp under former § 3729(a)(2) and § 3729(a)(1)(B) (as amended) of the FCA. In Claim 21, the Government asserts causes of action against Allied Corp under 31 U.S.C. § 3729(a)(1) (2006) and § 3729(a)(1)(A) of the FCA. The FCA is the Government's "primary litigation tool" for recovering losses resulting from fraud. *United States ex rel. Marcy v. Rowan Cos.*, 520 F.3d 384, 388 (5th Cir. 2008). The FCA imposes civil penalties and treble damages on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B) (2009).[12]

---

[10]    *Id.* at ¶ 23.
[11]    *Id.* at ¶ 24.
[12]    The terms "knowing" and "knowingly" as used in the FCA means that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the

**B. Claim for "Indemnification"**

In Claim 5, the Government asserts an "indemnification" claim against Allied Corp, seeking "indemnification" for insurance claims that it might be required to pay out as a result of Defendants' alleged false or fraudulent records, statements, or certifications. The Government's Complaint does not allege the source of, or elements of proof of, such a cause of action.[13] The existence of such a cause of action under these facts appears to be a question of first impression.

**C. Financial Institutions Reform, Recovery, and Enforcement Act**

In Claims 8, 11, 14, and 18, the Government asserts causes of action under § 1006 and § 1014 of FIRREA against Allied Corp.[14]

Section 1006 makes it a crime for any person who is "connected in any capacity with [HUD]" to "mak[e] any false entry in any book, report or statement of or to [HUD]"

---

information; or (iii) acts in reckless disregard of the truth or falsity of the information." *Id.* § 3729(b)(1)(A)(i)–(iii). Proof of "specific intent to defraud" is not required. *Id.* § 3729(b)(1)(B). The term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* § 3729(b)(4); *see also United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 470 (5th Cir. 2009). The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property . . . that . . . is presented to an officer, employee, or agent of the United States . . . ." *Id.* § 3729(b)(2).

[13]   As courts have observed, "there is no clear nomenclature among state and federal courts for the different types of indemnity, nor do courts seem to agree on what elements constitute even identically-named types of indemnity." *Collier v. Land & Sea Rest. Co.*, 972 F. Supp. 2d 870 n.1 (W.D. Va. 2013).

[14]   Section 951(a) of FIRREA provides that "[w]hoever violates any provision of law to which this section is made applicable by subsection (c) of this section shall be subject to a civil penalty in an amount assessed by the court in a civil action under this section." 12 U.S.C. § 1833a(a). Section 951(c) of FIRREA identifies the criminal violations to which FIRREA civil penalties apply, including Sections 1006 and 1014. *Id.* §1833a(c).

with the "intent to . . . deceive any officer, auditor, examiner or agent . . . of [a] department or agency of the United States . . ." 18 U.S.C. § 1006.

Section 1014 prohibits the submission of false records or making of false statements to the FHA. 18 U.S.C. § 1014. Specifically, it makes it a crime for any person to "knowingly mak[e] any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of the [FHA] . . ." *Id.*

## III. Factual Allegations against Defendants

Between January 1, 2001 and December 31, 2010, Allied Capital and Allied Corp, originated 112,324 home loans. Of those loans, 35,801 (approximately 32%) defaulted, costing over $834 million in insurance claims to be paid by HUD.[15]

The Government alleges that Allied Capital willfully violated the regulations that provide protection to HUD's insurance fund and knowingly deceived HUD to further its fraudulent schemes. The Government contends that Allied Capital made fraudulent representations to HUD-FHA in four separate types of documents: (1) loan application packages to secure FHA insurance on individual loans; (2) branch certifications to obtain approval to originate FHA loans from a new branch office; (3) annual certifications required for lender participation in the FHA program; and (4) quality-control reports.

### A. Loan Application Packages

For over ten years, Allied Capital originated loans out of hundreds of branches that it never disclosed to HUD. The Government refers to these branches as "shadow

---

[15]     Dkt. 100 at ¶ 5.

branches," because they operated without HUD's knowledge or approval, and were therefore not authorized to originate HUD-insured loans.[16] In some jurisdictions, the number of shadow branches exceeded the number of HUD-approved branches.[17] For example, Allied Capital was authorized to operate 8 branches in North Carolina, but Allied Capital actually operated over 70 offices in North Carolina without HUD approval. These shadow branches often operated in regions where HUD had previously suspended Allied Capital's authorization to originate loans because of the region's high mortgage default rate. The Government estimates that these shadow branches are responsible for $150 million in insurance claims paid by HUD.

Although HUD prohibited the origination of loans from unapproved offices, the Government alleges that Allied Capital was nonetheless able to secure FHA insurance for these loans by falsifying the records it submitted to HUD.[18] At the instruction of Hodge, Allied Capital's CEO, Allied Capital employees routinely entered the HUD ID numbers of an approved branch into the loan documentation for loans originating from the shadow branches. These loans were then submitted to HUD for approval, even though they falsely stated that the loans originated from an approved branch office.[19] HUD relied on these false statements and endorsed the loans.[20] The Government alleges that Allied Corp continued these practices when it acquired nearly all Allied Capital's assets in 2010.[21]

---

[16]     *Id.* ¶ 51.
[17]     *Id.* ¶¶ 52, 61, 64.
[18]     *Id.* ¶¶ 7, 63–68.
[19]     *Id.* ¶¶ 7, 51, 60, 65.
[20]     *Id.* ¶¶ 7, 60, 65, 68.
[21]     *Id.* ¶¶ 66–68.

## B. False Statements in Branch Certification Forms

The Government also alleges that Allied Capital, and later Allied Corp, lied to obtain HUD approval for its authorized branches.[22] Each time Allied Capital sought approval for a new branch office, it was required to submit HUD Form 92001-B to certify the branch complied with HUD requirements. The form specified, among other things, that Allied Capital would pay all operating costs for the branch office. However, the Government alleges that Allied Capital and Allied Corp treated branches as independent franchises, maintaining a corporate policy of requiring branch managers to assume financial responsibility for their branches. Allied Capital required that branch managers indemnify it from "liability of every kind" and made branch managers responsible for payroll, insurance, legal judgments, and other office expenses.[23] Responsibility for lease agreements, in particular, was borne by branch managers. After Allied Corp acquired Allied Capital's assets, it also adopted its branching practices. On behalf of Allied Corp, Stell sent sublease agreements to almost every branch manager, requiring the managers to become the responsible parties on the lease. When Allied Corp shut down in November 2011, it was branch managers—not Hodge and Allied Corp—who were held liable for the continuing lease obligations by landlords.[24]

The Government alleges this violated HUD policy and that Allied Corp was aware it was in violation of HUD policy—in 2001 it issued an "Examination/Audit Procedure

---

[22]    *Id.* ¶¶ 8, 70, 92–98.
[23]    *Id.* ¶¶ 8, 71, 78, 90.
[24]    *Id.* ¶¶ 89, 92–98.

Guide," instructing branch managers to tell HUD auditors they were "not a franchise."[25]

The Guide directed branch managers to:

> Select ONE PERSON, and one person ONLY in your office to interface and converse with the examiner/auditor . . . . No one else in the office should have any conversation with the examiner/auditor prior to, during or after the examination/audit. The only corporate personnel who should converse with the examiner/auditor . . . should be Jeanne Stell or Jim Hodge . . . .
>
> You, and any employee working in your branch, are W-2 employees of Allied. Frequently, examiners/auditors view us as a franchise. WE ARE NOT A FRANCHISE. Along those same lines, Allied pays all the bills incurred by the branch. **Both of these statements are true and that is the only way those questions are to be answered,** *no deviations!*[26]

The Government alleges that this directive failed to comply with the HUD Handbook and certification form, which requires that a lender "fully cooperate with any investigations brought by HUD [and] make all officers and employees available for interviews."[27]

The Government further alleges that it was Stell who directed Allied employees to make these false certifications.[28] In 2009, after a HUD audit report found that Allied Capital's branch leasing arrangements violated HUD regulations, Stell sent an email stating:

> I had [another senior manager] sign the 'add a branch' form for years for HUD as I knew this [HUD audit] would eventually happen. It required you to swear the branches meet and will continue to meet HUD's regulations. Jim [Hodge] has to be the biggest target personally for his disregard for the regulations. Serves him right never listening and thinking he didn't have to play by the rules.[29]

---

[25] *Id.* at ¶ 74.
[26] *Id.* (emphasis in original).
[27] *Id.* at ¶ 75.
[28] *Id.* at ¶ 88.
[29] *Id.* at ¶ 87–88.

## C. False Annual Certifications

The Government also alleges the Defendants submitted false annual certifications. To maintain HUD-approved and Direct Endorsement Lender ("DEL") status, Allied Capital and Allied Corp were required to submit annual certifications to HUD and to implement a quality-control program. HUD required this quality-control program include: (1) conducting an on-site audit of all branch offices within 90 days of opening and annually thereafter; (2) reviewing 10% of all closed loan files to ensure they were underwritten in accordance with HUD guidelines; and (3) reviewing all early payment defaults (*i.e.*, those defaults within the first six months).[30] In her role as Chief Compliance Officer, Stell signed the annual certification on behalf of Allied Capital in 2004, 2006, and 2007. Hodge signed the annual certification in 2008.[31] These documents certified that Allied Capital was not currently subject to state sanctions, did not employ felons, and maintained the requisite quality-control program. The Government alleges that each of these certification statements were false.

The Government alleges that Allied Capital branches were sanctioned by the Rhode Island Department of Business Regulation, the South Carolina Department of Consumer Affairs, the State of Washington Department of Financial Institutions, the New York State Banking Department, and the Arizona Department of Financial Institutions—none of which were ever disclosed on the annual certification forms signed by Stell and

---

[30]   *Id.* ¶ 42. Review of early payments defaults is important because the defaults are indicative of mortgage fraud. *Id.*

[31]   *Id.* at ¶¶ 128–129.

Hodge.[32] The Government also cites several instances in which Allied Capital and Allied Corp concealed prior sanctions and convictions of employees that should have been reported to HUD.[33]

The annual certifications also falsely certified that "the above named lender conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval," including the requisite quality-control program.[34] Instead, Allied Capital's quality-control program was virtually non-existent: it had few quality-control staff and almost never performed reviews. Although Allied Capital operated between 400 and 650 branches from 2003 to early 2009, it employed only a few branch auditors. These auditors rarely conducted on-site branch office audits and wholly discontinued branch audits by 2009. Allied Capital also rarely reviewed its early payment defaults. In addition to a small handful of auditors to review these early payment defaults, an additional 2–5 quality-control department members worked in St. Croix, in the U.S. Virgin Islands. However, this staff in St. Croix reportedly did not even know "what HUD was" or "what a mortgage was."[35]

Similarly, the Complaint alleges that Allied Corp also failed to implement a quality-control program. Instead of hiring or training quality-control professionals, Allied Corp directed its underwriting coordinators to conduct reviews. However, these employees had no quality-control experience or training. In separate instances in 2009,

---

[32] *Id.* at ¶¶ 118–127.
[33] *Id.* at ¶¶ 117–132.
[34] *Id.* ¶¶ 40, 42, 100–101.
[35] *Id.* ¶ 103.

Hodge and Stell directed these Allied Corp employees to skip re-verification requirements in the quality-control review process, including obtaining credit reports and re-verifying employment, income, deposits, and alternate credit sources. Further, Allied Corp's quality-control reviews were not performed within the required 90-day period after loans were closed.[36] Finally, the Complaint alleges that Allied Corp failed to supervise the actions of its loan correspondent, Allied Capital, when it allowed Allied Capital employees to disregard a number of compliance requirements. Nevertheless, in 2003, 2006, 2007, 2008, and 2010, Hodge permitted the submission of annual certifications verifying Allied Corp's full compliance, and Stell personally submitted the annual certification in 2003.[37]

### D. Falsified Quality-control Reports

The Government next alleges that Hodge and Stell instructed a member of Allied Capital's and Allied Corp's quality-control department to prepare fraudulent quality-control reports and submit them to HUD.[38] In October 2008, HUD ordered Allied Capital to provide up-to-date quality-control reports.[39] The Government alleges that Hodge, lacking adequate or qualified quality-control staff, instructed staff to instead fabricate the reports. In an effort to make the reports appear complete, employees indicated that verifications of income, employment, and deposit in the loan files under review had been

---

[36] *Id.* ¶¶ 107–112. *See also* 24 C.F.R. § 202.5(b).
[37] *Id.* ¶¶ 133–134.
[38] *Id.* ¶ 108.
[39] *Id.* ¶ 106.

conducted, when in fact no such work had been done.[40]  The Government also alleges
that, beginning in 2008, Allied Corp submitted Quality Assurance Division reports to
HUD despite a non-compliant and incomplete review process.[41]

## IV.  Dismissal Under Rule 12(b)(6) and Rule 9(b)

### A. The Rule 12(b)(6) Standard

Rule 12(b)(6) allows dismissal of a claim if a plaintiff fails "to state a claim upon
which relief can be granted." FED. R. CIV. P. 12(b)(6).  A motion to dismiss under Rule
12(b)(6) is "viewed with disfavor and is rarely granted." *United States ex rel. Tucker v.
Christus Health*, No. 09-11819, 2012 U.S. Dist. LEXIS 151906, 8–9 (S.D. Tex. Oct. 23,
2012) (Atlas, J.) (*qui tam* case citing *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d
141, 147 (5th Cir. 2009)).

Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short
and plain statement of the claim showing that the pleader is entitled to relief." FED. R.
CIV. P. 8(a)(2); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L.
Ed. 2d 929 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868
(2009).  To withstand a Rule 12(b)(6) motion, a complaint must contain "enough facts to
state a claim to relief that is plausible on its face"—legal conclusions alone are
insufficient. *Twombly*, 550 U.S. at 570.  The "pleading standard Rule 8 announces does
not require 'detailed factual allegations,' but it demands more than an unadorned, the-
defendant-unlawfully-harmed-me accusation." *United States ex rel. King v. Univ. of*

---

[40]     *Id.* ¶ 108.
[41]     *Id.* at ¶¶ 110–112.

*Texas Health Science Center-Houston*, 907 F. Supp. 2d 846, 849 (S.D. Tex. 2012) (Rosenthal, J.) (*qui tam* case quoting *Iqbal*, 556 U.S. at 678). The complaint must be liberally construed in favor of the plaintiff, and when there are well-pleaded factual allegations, courts should presume they are true, even if doubtful—only then may the court determine whether they "plausibly give rise to entitlement to relief." *United States ex rel. Tucker*, 2012 U.S. Dist. LEXIS 151906 at 8–9.

### B. The Rule 9(b) Standard

Complaints filed under the False Claims Act must also meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009) (citing FED. R. CIV. P. 9(b)). Rule 9(b) requires "that a plaintiff set forth the 'who, what, when, where, and how' of the alleged fraud." *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 266 (5th Cir. 2010). "Because the linchpin of an FCA claim is a false claim, the time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what that person obtained thereby must be stated in a complaint alleging violation of the FCA in order to satisfy Rule 9(b)." *United States ex rel. Rafizadeh v. Continental Common, Inc.*, 553 F.3d 869, 873 (5th Cir. 2008) (internal quotations and citation omitted).

For FCA claims, Rule 9(b) must be applied in a "context-specific and flexible" manner. *United States ex rel. Grubbs*, 565 F.3d at 190. "It is adequate to allege that a false claim was knowingly presented regardless of its exact amount; the contents of the

bill are less significant because a complaint need not allege that the Government relied on or was damaged by the false claim." *Id.* at 189. The complaint may "survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* at 190.

## V.   Analysis

Defendant Allied Corp now moves to dismiss the Government's Third Amended Complaint, arguing that the Government has failed to plead facts sufficient to establish causes of action for violations of the FCA, for common law "indemnity," or for violations of FIRREA. Allied Corp also argues that the Government has failed to plead its fraud claims with the particularity mandated by Rule 9(b). The Court will address these arguments presented in turn.

### A. False Claims Act

In Claims 2, 20, and 21, the Government brings claims against Allied Corp for FCA violations stemming from its use of shadow branches and from its reckless underwriting scheme. The FCA imposes civil penalties and treble damages on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B) (2009). The False Claims Act is a broad remedial statute which "reaches beyond 'claims' which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968). Thus, courts should "refuse[] to accept a rigid, restrictive reading" of the Act. *Id.* at 233. To

establish a claim under either former § 3729(a)(2) or current § 3729(a)(1)(B) of the FCA, the Government must allege that Allied Corp either made, used, or caused to made or used, (1) ". . . a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or forfeit moneys due (*i.e.,* that involved a claim)." *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 467 (5th Cir. 2009). The Court finds that the Government has pled sufficient facts to establish each of its claims under the FCA.

### 1. False Statements or Fraudulent Course of Conduct

First, to state a claim under the FCA, the Government must plead sufficient facts to establish "a false statement or fraudulent course of conduct." *Longhi*, 575 F.3d at 467. The Court finds that the Government's factual allegations against Allied Corp give rise to FCA liability under two distinct theories: false certification and fraudulent inducement.

Under the "false certification" theory, a claim gives rise to FCA liability when it includes a certification of compliance with a federal statute, regulation, or contract that is a prerequisite to obtaining a government benefit. *United States ex rel. Bennett v. Boston Scientific Corp.,* 2011 WL 1231577 (S.D. Tex. Mar. 31, 2011); *United States ex rel. Graves v. ITT Educ. Servs., Inc.,* 284 F.Supp.2d 487, 497 (S.D. Tex. 2003), *aff'd,* 111 F. App'x 296 (5th Cir. Oct. 20, 2004). There are two kinds of false certifications that give rise to liability: factually false claims and legally false claims. A "factually false" certification is one "which involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." *Mikes v. Straus,*

274 F.3d 687, 697 (2d Cir. 2001). On the other hand, a "legally false" certification gives rise to liability "only when a party affirmatively and explicitly certifies compliance with a statute or regulation and the certification is a condition to receiving the government benefit." *Bennett*, 2011 WL 1231577 at *13. *See also U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997) ("[W]here the government has conditioned payment of a claim upon a claimant's certification of compliance with, for example, a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or regulation.").

Under the "fraudulent inducement" theory, FCA liability is imposed when the Government was obligated to pay based on terms of an agreement that was "procured by fraud." *Longhi*, 575 F.3d at 468. The ultimate claim for payment need not be fraudulent, so long as the defendant's fraudulent conduct initially induced the Government to take on the obligation. *Id.* ("[A]lthough the Defendants' subsequent claims for payment made under the contract were not literally false, because they derived from the original fraudulent misrepresentation, they, too, become actionable false claims.").[42]

Here, the Government has alleged sufficient facts to establish false statements or a fraudulent course of conduct under either theory. The live Complaint alleges that,

---

[42]    Put differently, under the fraudulent inducement theory, the fraud "did not spend itself with the execution of the contract. The initial fraudulent action and every step thereafter taken, pressed ever to the ultimate goal—payment of government money to persons who had caused it to be defrauded." *United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 623 (S.D.N.Y. 2013) (quoting *United States ex rel. Marcus v. Hess,* 317 U.S. 537 (1943)) (internal quotations omitted).

through its shadow branch and reckless underwriting schemes, Allied Corp caused HUD to insure loans that were actually ineligible for FHA insurance. The Complaint explains HUD's requirements for providing FHA insurance, then alleges that Allied Corp flouted the requirements and submitted false certifications stating that the mortgages had been originated by HUD-approved branches and had undergone quality-control procedures. To support the Government's allegations, the Complaint specifically identifies instances in which Allied Corp "falsely certified, on a loan-by-loan basis, that it had complied with HUD rules and requirements, and that the mortgages it endorsed were eligible for FHA insurance under HUD rules."[43] The Government further alleges the false submissions were made knowingly, in order to satisfy HUD's prerequisites for FHA insurance.[44] Accordingly, these allegations are sufficient to state a claim under the "legally false" certification theory.

Alternatively, Allied Corp's shadow branch and reckless underwriting schemes can be characterized as "fraudulent inducement." The Government alleges that Allied Corp fraudulently induced the Government to provide FHA insurance at the time of origination by submitting false statements to the Government that its mortgages were eligible for FHA insurance, when they were not. These false statements caused the Government provide FHA insurance and, consequently, obligated the Government to pay insurance claims on defaulted mortgages. The Government will incur these losses, set into motion by Allied Corp's initial fraud, even if the claims for payment are not

---

[43]     Dkt. 100 at ¶¶ 135, 138–173.
[44]     Dkt. 100 at ¶¶ 51–52, 61, 68, 115, 135, 137.

themselves false—*i.e.* if the mortgages have legitimately defaulted and left the holder of the mortgage uncompensated. Accordingly, the Government's allegations against Allied Corp are also sufficient to give rise to FCA liability under a "fraudulent inducement" theory.

Allied Corp argues the Complaint's allegations cannot establish any claim for fraud under the FCA because it "did not receive government funds when it applied for the insurance nor . . . when default occur[red]" because "payment does not occur upon application for the insurance."[45] In support of this argument, Allied Corp contends that its allegedly false certifications were "conditions of participation" in the FHA insurance scheme and not conditions of "payment" of insurance proceeds.[46] Accordingly, Allied Corp contends that the Government should not seek recourse under the FCA, but instead through HUD's "extensive array of administrative remedies through which it enforces compliance with its regulations."[47] The Court finds these arguments unpersuasive. In short, the Government need not allege fraudulent conduct at each step of the process of paying on FHA insurance claims when it has alleged fraud at the mortgage origination stage. *See generally Longhi*, 575 F.3d at 467–68. In other words, but for Allied Corp's false statements, the Government would not have insured the mortgages and, as a result, ultimately would not have incurred losses from paying out the FHA insurance claims on these mortgages. *See generally Wells Fargo Bank, N.A.*, 972 F. Supp. 2d at 624–25 (holding it sufficient that the Government alleged Defendant "originated loans that did

---

[45]     Dkt. 110 at 11.
[46]     *Id.* at 12.
[47]     *Id.* at 14.

not meet the requirements upon which FHA insurance—and thus FHA insurance payments—are conditioned, but nevertheless submitted certifications to HUD stating that they did").

## 2. Scienter

To plead the requisite level of scienter under the FCA, the Government must allege facts establishing that Allied Corp had either "(1) actual knowledge of falsity, (2) acted with deliberate ignorance of the truth or falsity of the information provided, or (3) acted with reckless disregard of the truth or falsity of the information provided" to the Government. *Longhi*, 575 F.3d at 468. Even though scienter may be plead generally, the Government must still allege facts supporting an "inference of fraud." *United States ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 385 (5th Cir. 2003). The inference may be drawn by alleging facts showing a defendant's motive or "by identifying circumstances that indicate conscious behavior on the part of the defendant . . ." *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068 (5th Cir. 2003).

Here, the Government has pled facts sufficient to establish Allied Corp's scienter. The Complaint alleges that Allied Corp submitted false loan-level and annual certifications "knowingly or . . . with deliberate ignorance and/or with reckless disregard for the truth."[48] The Government further alleges that Allied Corp's motive behind "knowingly and deliberately flouting HUD's quality control requirements" was "to maximize its own profit at the expense of the ensuring the quality of the loans being

---

[48]    Dkt. 100 at ¶¶ 258, 263.

insured by the HUD/FHA program."[49]  In support of these allegations, the Government

provides details of Allied Corp's fraudulent scheme, including instances where

employees were directed to disregard quality-control measures and to "make it appear" as

if Allied Corp had complied with HUD's requirements.[50]

Allied Corp contends that the Government's allegations cannot establish the

requisite scienter because HUD had actual knowledge of Allied Corp's alleged

violations.[51]  The Court finds this argument unpersuasive.  It has long been established

that the "inaptly-named government knowledge defense" is "not a statutory defense to

FCA liability."  *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 682 (5th Cir.

2003).  Further, there are no allegations in the Complaint suggesting that HUD had prior

knowledge of Allied Corp's use of duplicative HUD ID numbers.  In 2005, the Complaint

alleges HUD did become aware of a limited number of shadow branches using the Fresno

office's ID number.[52]  However, the Complaint alleges that HUD believed this to be a

localized incident and further states that HUD had no knowledge of the hundreds of other

shadow branches using duplicative numbers across the country.[53]  The allegations do not

suggest that the Government approved of this process or that the Government was aware

that Allied Capital continued to operate shadow branches after HUD specifically

prohibited satellite offices in 2006.

---

[49]     *Id.* at ¶ 110.

[50]     *Id.* at ¶¶ 110–112, 135–137.

[51]     *Id.* at 17–18.

[52]     *Id.* at ¶ 55.

[53]     Dkt. 100 at ¶¶ 59, 68.

Next, Allied Corp argues *Allison Engine Co. v. United States* altered the FCA's scienter requirement, making it necessary show an intent to defraud the government. *See Allison Engine Co. v. United States*, 553 U.S. 662 (2008). Allied Corp contends that, unless the Complaint pleads a specific intent to defraud the Government with respect to all claims arising prior to June 7, 2008 (the effective date of the FECA amendments that overruled the *Allison Engine* decision), the claims should be dismissed. The Court also finds this argument unpersuasive.

In *Longhi*, decided after *Allison Engine Co.*, the Fifth Circuit directly addressed this argument and stated that, to establish scienter under the FCA, "proof of specific intent to defraud is not necessary." *Longhi*, 575 F.3d at 468. Further, *Allison Engine Co.* is inapposite in this case—that opinion addresses whether false statements submitted to private entities (as opposed to government agencies) could give rise to liability under the FCA. *See* 553 U.S. at 671–72 ("If a subcontractor or another defendant makes a false statement to a private entity and does not intend the Government to rely on that false statement as a condition of payment, the statement is not made with the purpose of inducing payment of a false claim 'by the Government.'"); *see also United States ex rel. Wall v. Circle C Constr., LLC*, 697 F.3d 345, 355 n.3 (6th Cir. 2012) (noting that the primary concern in *Allison Engine Co.* was the subcontractors' indirect submissions to the Government). Here, the Government alleges that Allied Corp directly submitted false

statements HUD with the intent of inducing it to insure loans originated by shadow branches.[54]

### 3. Materiality

To plead that the false statements or fraudulent conduct were "material," the Government must allege facts establishing that the statements or conduct had a "natural tendency to influence, or [are] capable of influencing, the decision of the decisionmaking body to which it was addressed." *Longhi*, 575 F.3d at 468 (citing *Neder v. United States*, 527 U.S. 1, 16 (1999)). The Fifth Circuit has adopted a relaxed interpretation of the natural tendency test. "All that is required under the test for materiality . . . is that the false or fraudulent statements have the potential to influence the government's decisions." *Id.* at 470. Here, the Government has sufficient pled facts establishing materiality.

The Complaint alleges that Allied Corp submitted loan-level and annual certifications containing false statements. These certifications were requisite to the mortgages receiving FHA insurance and to Allied Corp maintaining its HUD-approved mortgagee and DEL. The Government alleges that, "absent th[ese] certifications, FHA would not have insured the loans, and HUD would not have paid claims on them."[55] Likewise, "[a]bsent a truthful loan level certification, a Direct Endorsement Lender is not

---

[54] As a sub-argument, Allied Corp asserts that it cannot be held liable for fraud because the Complaint only alleges wrongful conduct by Allied Capital and does not specify any wrongful conduct committed by Allied Corp individually. Dkt. 110 at 24. The Court disagrees. Contrary to Allied Corp's arguments, the Government has not brought this action against Allied Corp for "merely knowing of fraud that was committed by other parties." Rather, the Government has sued Allied Corp for being an active participant in that fraud and for its supervisory role over Allied Capital as a DEL. Dkt. 100 at ¶ 43.

[55] Dkt. 119 at 29. Dkt. 100 at ¶ 50.

entitled to endorse a particular loan for FHA insurance."[56]  Thus, the Government has alleged that Allied Corp's false statements not only had the potential to—but actually did—influence HUD's decision to insure these mortgages and allow Allied Corp to maintain its status as an approved lender.

Allied Corp next argues that the Complaint "has failed to specify any claim for payment" and "has not alleged any facts showing that any false statement was submitted in connection with a request for payment."[57]  The Court finds these arguments unpersuasive. Neither of these arguments is consistent with the facts alleged in the Complaint, which must be taken as true.

### 4. Causation

Finally, to state a claim under the FCA, the Government must allege facts establishing that Allied Corp's false statements "caused the government to pay out money or to forfeit moneys due." *Longhi*, 575 F.3d at 467.  Further, in the context of FHA insurance, "the United States must demonstrate that the events which caused the defaults were related to the false statements in the applications." *United States v. Miller*, 645 F.2d 473, 475 (5th Cir. 1981). The Court finds that the Government has sufficiently pled such facts.

The Government alleges Allied Corp's actions resulted in "hundreds of millions of dollars in losses to the United States."[58]  Specifically, the Complaint alleges a non-exhaustive list of violations that led to such losses, including "a failure to ensure that the

---

[56]    Dkt. 100 at ¶ 50.
[57]    Dkt. 110 at 17.
[58]    Dkt. 100 at ¶ 1.

borrower of the property was eligible for an FHA-insured loan, a failure to ensure that the borrower is creditworthy, the approval of loans with unacceptable debt-to-income ratios, a failure to verify or document a borrower's employment or income . . . submission of information into the automated underwriting system that lacked integrity . . . and refinancing loans where the borrower was not current on the loan being refinanced."[59] To further illustrate these violations and how they led to the Government's losses, the Government provides six examples of mortgages that were recklessly underwritten by Allied Corp and ultimately resulted in an FHA insurance claim. In each example, the Government identifies the inconsistencies or omissions that Allied Corp's quality-control mechanisms failed to resolve, the HUD regulations violated by such failures, and the amount of the resulting insurance claim the Government paid out.[60] The Government pleads that Allied Corp's false certifications "bore upon the likelihood that the borrower would make mortgage payments."[61] The Court agrees.

The regulations that the Government alleges Allied Corp violated are the very regulations meant to ensure a borrower would not pose a serious risk of default.[62] By failing to conduct the required due diligence but nonetheless certifying loans as eligible for FHA insurance, Allied Corp submitted "false statements regarding the ability of purchasers to afford housing," which "could very well be the major factor for subsequent defaults." *Miller*, 645 F.2d at 476 (citing *United States v. Hibbs*, 568 F.2d 347, 352 (3d

---

[59] *Id.* at ¶¶ 135–137.
[60] *Id.* at ¶¶ 138–175.
[61] *Id.*
[62] *Id.* at ¶ 137.

Cir. 1977) ("[T]he false representation . . . had some relevance to the credit worthiness of the borrower as well as the value of the security, and thus causal connection with the default which later occurred."). *See also Wells Fargo*, 972 F. Supp. 2d at 626. Accordingly, the Court finds that the Government has successfully pled a causal relationship between Allied Corp's false statements, the subsequent mortgage defaults, and the Government's ultimate losses.

Allied Corp also argues that the Government has not sufficiently pled causation under the FCA because "the Complaint has failed to allege any facts showing a presentment of any claim for payment."[63] The facts alleged in the Complaint, which must be taken as true, do not support this argument. The Government alleged that "Allied Corp[] has originated or sponsored approximately 18,000 loans. Of these, approximately 1,850 have gone into claim status. The Government estimates that HUD has paid in excess of $230 million in FHA insurance claims [on these loans]."[64] Accordingly, the Court finds that the Government has sufficiently pled claims for violations of the FCA against Allied Corp.

## B. Financial Institutions Reform, Recovery, and Enforcement Act

In Claims 8, 11, 14, and 18, the Government sets forth causes of action against Allied Corp for, among other things, violations of § 1006 the FIRREA. To plead a cause of action under § 1006, the Government must allege sufficient facts establishing that (1) the Defendant is a "covered person"; (2) who knowingly made a false entry in a book,

---

[63]     Dkt. 110 at 16.
[64]     Dkt. 100 at ¶ 175.

report or statement submitted to HUD; and (3) who acted unlawfully and intended to injure, defraud, or deceive HUD. *See United States v. Hopkins,* 916 F.2d 207, 215 (5th Cir. 1990); *United States v. Parks,* 68 F.3d 860, 865 (5th Cir. 1995).

Allied Corp argues the Government's claims should be dismissed because Allied is not an entity "covered" under § 1006 of FIRREA. The Court disagrees. The Court finds that, under the facts alleged, Allied Corp is clearly an entity subject to § 1006 of FIRREA. This section states that the Act applies to "whoever" is "connected in any capacity with" HUD, not just the officers, agents, and employees of certain identified institutions. Title 1 of the U.S. Code does not restrict "whoever" to natural persons, but also includes "corporations, companies, associations, firms, partnerships, [and] societies." 1 U.S.C. § 1. The Supreme Court has also clarified that the word "whoever," first enacted as part of the revised Criminal Code, is intended to be liberally interpreted. *United States v. A&P Trucking Co.,* 358 U.S. 121, 123 n.2 (1958). Accordingly, the Court finds that the Government has sufficiently pled a cause of action under FIRREA against Allied Corp.

### C. Claim for "Indemnification"

In Claim 5, the Government seeks "indemnification."[65] Specifically, the Government pleads that Allied Corp, "for the purpose of fraudulently obtaining HUD mortgage insurance," made false statements and caused shadow branches to originate some loans "that [are] currently in default, but for which no insurance claim has been submitted to HUD." As a result, the Government alleges it "will pay future insurance

---

[65]    Dkt. 100, ¶¶ 189, 193, 197.

claims, and incur future losses," and it pleads that it is "entitled to indemnification of [these] losses."[66]

However, the Government's Complaint does not set out the law that entitles it to such relief. During briefing and oral argument, the Government explained that it believes that it has a right to such "indemnification" under the federal common law.[67] As courts have observed, "[t]here is, of course, "no federal general common law." *Erie R. Co.* v. *Tompkins*, 304 U.S. 64, 78 (1938). Nevertheless, federal courts have recognized their authority, in some limited areas, to formulate what has become known as "federal common law." *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981). The United States Supreme Court has repeatedly held, however, that these areas are "few and restricted," and fall into essentially two categories: those in which a federal rule of decision is "*necessary to protect uniquely federal interests* and those in which Congress has given the courts the power to develop substantive law." *Id.* (emphasis added and internal quotations and citations omitted). The authority to create a federal rule of decision "necessary to protect uniquely federal interests" includes the authority to formulate substantive rules of decision when "the rights and obligations of the United States" are at issue. *Id.* at 641.

Here, the Government argues the Court should recognize a federal common law claim for indemnity, contending this case is one where "the rights and obligations of the United States" are at issue. *Id.* at 641. The Government has not provided any binding

---

[66]     *Id.* at ¶¶ 192–195.
[67]     Dkt. 119, 129.

authority on what the elements or scope of such a right might be. Further, absent a clearly stated need, courts should not fashion new remedies under federal common law where carefully considered legislative schemes such as the FCA already exist. As courts have noted, statutes such as the FCA consist of "a comprehensive legislative scheme including an integrated system of procedures for enforcement." *Nw. Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO*, 451 U.S. 77, 97 (1981); *see also* 31 U.S.C. § 3729 *et seq*. When Congress has enacted such a scheme, there is a strong presumption against the courts' ability to supplement the statutorily provided remedies. *Id; see also Walker v. Cadle Co.*, 51 F.3d 562, 567 (5th Cir. 1995) (denying the right to contribution because the court refused "to fashion a new remedy that might disturb [a] carefully considered legislative scheme" and refused "to formulat[e] remedies to enforce the provisions" of a Congressional act).

The Court finds that, under the facts as alleged in the Complaint, recognition of a federal common law "indemnification" claim—whatever its scope or elements may be—is not necessary to protect any right, obligation or interest of the Government. For example, the Government has not shown that it will not be able to either (1) recover on all claims it has actually paid as of the date of trial, or (2) recover claims it pays after the trial of this case, based on a favorable judgment in this case. Here, the Government seeks an amorphous right to "indemnification" for insurance claims it has not yet had presented to it. Contrary to the Government's arguments, merely expediting the administration of the Government's future collection efforts and effecting a purely hypothetical saving of future judicial resources are insufficient reasons to take the extraordinary step of creating

a right of "indemnification" out of whole cloth. Accordingly, the Government's claim for "indemnification" is **DISMISSED without prejudice**.[68]

### D. The Government's Complaint satisfies Rule 9(b)

Finally, Allied Corp moves for dismissal on the grounds that the Government has failed to meet the pleading standard required by Rule 9(b) for both its FCA claims and its FIRREA claims.[69] Allied Corp argues that the Government's allegations are "conclusory" and state "no facts" regarding who presented the claims for FHA insurance or on how Defendants' actions caused the HUD to make claim payments.[70] The Court disagrees.

Federal Rule of Civil Procedure 9(b) provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b). Rule 9(b) "ought not to be read to insist that a plaintiff plead the level of detail required to prevail at trial." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 189 (5th Cir. 2009). A fraudulent presentment claim requires "proof only of the claim's falsity, not its exact contents." *Id.*

The Court finds that the Complaint's allegations of fraud under the FCA and FIRREA satisfy the requirements of Rule 9(b). The Complaint contains detailed allegations of Allied Corp's fraudulent practices to deceive HUD in violation of the FCA

---

[68] In this opinion, the Court does not reach the issue of whether the Government may later seek an equitable remedy to enforce a judgment, or whether the Government may bring additional lawsuits against Defendants to recover any future damages.

[69] Dkt. 110 at 5, 21–23.

[70] *Id.* at 5.

and § 1006[71] and § 1014[72] of FIRREA. It alleges facts which, if true, show that Allied Corp perpetuated the use of shadow branches, committed various due diligence abuses in its underwriting, and falsely certified its compliance to maintain its DEL status. The Complaint also identifies specific practices through which Allied Corp was able to induce HUD to insure loans that it otherwise would not have insured.

Further, the Government identifies over 1,800 loans originated or sponsored by Allied Corp that have gone into claim status, and provided the details of the deficiencies in six of them.[73] Contrary to Allied Corp's arguments, the Government does not need to provide facts on the specific underwriters who approved loan applications, nor does it need to allege specific facts on each of the over 1,800 loans.[74] It would be "impractical, if not impossible" for the Government to plead every allegedly false detail of each of these defaulted loans. *Wells Fargo*, F.3d at 616. To attempt to do so would be "a formula for paralysis," which would impede the Government from going forward on its claim in this case. *United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008) (rejecting a

---

[71]   *See supra* pages 17 and 28 for the elements of claims brought under the FCA and FIRREA § 1006.

[72]   To plead a cause of action under § 1014, the Complaint must allege that (1) Defendants knowingly and willfully made a false statement to one of the listed entities; (2) Defendants knew that the statement was false when they made it; and (3) Defendants made the false statement for the purpose of influencing that entity. *United States v. Sandlin*, 589 F.3d 749, 753 (5th Cir. 2009). The Complaint need not allege that Defendants intended to defraud the FHA, but rather must allege only that they intended to influence the decision of the FHA. *Id.* at 754. If a person makes a false statement that that has the capacity to influence the lender, then the specific intent necessary to violate § 1014 may be inferred through circumstantial evidence, and the offense is complete. *Id.* at 754–55. *See also United States v. Jena*, 478 Fed. App'x. 99, 102 (5th Cir. 2012) (noting that in a fraud case, "intent will almost always have to be established by circumstantial evidence.").

[73]   Dkt. 100 at ¶¶ 135–173, 175.

[74]   Dkt. 110 at 6–7.

FCA defendant's argument that the Court must address each of the 1,812 claims). "[W]here a relator pleads a complex and far-reaching fraudulent scheme with particularity, and provides examples of specific false claims submitted to the government pursuant to that scheme, a relator may proceed to discovery on the entire fraudulent scheme." *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 510 (6th Cir. 2007); *see also United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 618 (S.D.N.Y. 2013) ("[G]iven the breadth and length of the schemes alleged in the [ ] Complaint, the Government need not plead the details of every false or fraudulent claim . . ."). Here, the Government sufficiently pled such a complex and far-reaching scheme with illustrative examples. Accordingly, the Court finds that the Government has adequately pled its claims under FED. R. CIV. P. 9(b).

## CONCLUSION

Based on the foregoing, it is **ORDERED** that Defendants Allied Corp's Motion to Dismiss be **GRANTED in part** and **DENIED in part**. Defendant's Motion to Dismiss is **GRANTED** with respect to the Government's Claim 5, and this claim is **DISMISSED without prejudice**. The Motion to Dismiss is **DENIED** with respect to all other claims.

SIGNED at Houston, Texas on August 29, 2014.

*George C. Hanks Jr*

**GEORGE C. HANKS, JR.**
**UNITED STATES MAGISTRATE JUDGE**