UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:12-cv-02676 |
| | § | |
| AMERICUS MORTGAGE | § | |
| CORPORATION, *et al.,* | § | |

*Defendants.*

## MEMORANDUM AND ORDER

The United States of America has brought this action against two residential mortgage lending companies and two executive officers of those companies, alleging civil fraud in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729,  and the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1833a, and seeking indemnification under federal common law. The Government alleges that Defendants Americus Mortgage Corporation ("Allied Capital"), Allquest Home Mortgage Corporation ("Allied Corp"),[1] Jim C. Hodge, and Jeanne L. Stell made numerous false statements in loan applications and other documents in a scheme to procure home mortgage insurance from the United States Department of Housing and Urban Development ("HUD") on loans they issued.  The Government contends that this alleged fraud resulted in HUD paying out more than $260 million in

---

[1]     Defendant Americus Mortgage Corporation was formerly known as and is identified in the Third Amended Complaint by its former name, Allied Home Mortgage Capital Corporation. Defendant Allquest Home Mortgage Corporation is identified in the Third Amended Complaint by its former name, Allied Home Mortgage Corporation.

insurance proceeds to cover loans that have defaulted, and that HUD will be faced with more defaults in the future. Dkt. 100, ¶ 1.

The case has been transferred to this Court by consent of the parties, pursuant to 28 U.S.C. § 636(c). Now pending before the Court is the Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) filed by Defendants Americus Mortgage Corporation, Jim C. Hodge, and Jeanne L. Stell, Dkt. 107, and the responsive briefing. Dkt. 108, 111, 119, 123, 124, 126, and 128. After considering the pleadings, the arguments of the parties, and applicable legal authorities, Defendants' Motion to Dismiss is **GRANTED in part** and **DENIED in part**.

## I.     Background[2]

### A. The FHA Mortgage Insurance Program

HUD insures lenders against losses on mortgage loans made to homebuyers. HUD administers this mortgage insurance program through the Federal Housing Administration ("FHA"). Under this program, if a homeowner fails to make payments on an insured mortgage loan and the lender forecloses on the property, HUD pays the lender the balance of the loan and assumes ownership and possession of the property.

---

[2]     The Court's factual background recites the facts as alleged in the Third Amended Complaint, the Government's live pleading in this case. In reviewing a motion to dismiss made under Federal Rule of Civil Procedure 12(b)(6), "[t]he complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true." *Beanal v. Freeport-McMoran, Inc.*, 197 F.3d 161, 164 (5th Cir. 1999); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554–55, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

Additionally, HUD incurs the expense of managing and marketing the foreclosed property until it is resold.[3]

A fundamental requirement of the HUD insurance program is that a loan correspondent, *i.e.*, a lender who originates mortgage loans and later sells them to other lenders,[4] must be approved by HUD to originate, purchase, hold, or sell HUD-insured mortgages. HUD further insists that the loan correspondent obtain specific approval from HUD for each branch office from which the correspondent intends to originate HUD-insured loans.[5]

To obtain HUD approval to originate loans from a specific branch office, the loan correspondent must submit HUD Form 92001-B—a form containing basic information about the branch, a general certification that the branch "meets all HUD/FHA requirements," and a specific certification that the lender "will pay all operating costs of the branch office . . . ."[6] Further, loan correspondents must submit annual certifications containing four representations:

> I certify that none of the principals, owners, officers, directors, and/or employees of the above-named lender is currently involved in a proceeding and/or investigation that could result, or has resulted in a criminal conviction, debarment, limited denial of participation, suspension, or civil money penalty by a federal, state, or local government.
>
> I certify that the above named lender has not been refused a license and has not been sanctioned by any state(s) in which it originates and/or services HUD-FHA insured loans.

---

[3]    Dkt. 100, Third Amended Complaint.
[4]    *See* 24 C.F.R. § 202.8(a)(2).
[5]    Dkt. 100 at ¶ 35.
[6]    *Id.* at ¶ 36.

> I know, or am in the position to know, whether the operations of the above named lender conform to HUD-FHA regulations, handbooks, and policies.
>
> I certify that to the best of my knowledge, the above named lender conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the above lender is fully responsible for all actions of its employees including those of its HUD-FHA approved branch offices.[7]

After submitting the certifications, the loan correspondent receives an identification number ("HUD ID") that permits the branch to originate HUD-insured loans. As a means of monitoring lender default rates, HUD requires lenders to enter the specific HUD ID for the originating branch in every loan file submitted to HUD. HUD also requires loan correspondents to implement a quality-control program. As part of this program, the lender must "(1) conduct an on-site audit of all branch offices within ninety days of opening and annually thereafter; (2) review 10% of all closed loan files to ensure they were underwritten in accordance with HUD guidelines; and (3) review all early payment defaults (i.e., those that default within the first six months)."[8]

### B. Allied Capital and Allied Corp

Allied Capital was an approved FHA loan correspondent from September 26, 1991 to December 31, 2010. In this capacity, it had the authority to originate HUD-insured mortgage loans for sale or transfer to other qualifying lenders. On January 23, 2012, Allied Capital changed its name with the Secretary of State of Texas to "Americus Mortgage Corporation."[9]

---

[7]     *Id.* at ¶ 40.
[8]     *Id.* at ¶ 42.
[9]     *Id.* at ¶ 20.

In 2010 and 2011, Allied Capital sold its assets to Allied Corp and terminated nearly all of its branches, only to then reopen them as branches of Allied Corp.  On January 10, 2012, Allied Corp changed its name with the Secretary of State of Texas to "Allied Corp Home Mortgage Corporation."

Defendant Jim Hodge is the founder, President, and Chief Executive Officer of both Allied Capital and Allied Corp.[10]

Defendant Jeanne Stell is the Executive Vice President and Director of Compliance for both companies. She has held a senior management position since approximately 2001, with the exception of a temporary absence between November 2007 and early 2010.[11]

## II.     Causes of Action Against Defendants

### A. False Claims Act

In Claims 1 and 3 of the Third Amended Complaint, the Government asserts causes of action against Allied Capital and Hodge under former § 3729(a)(2) and § 3729(a)(1)(B) (as amended) of the FCA.  The FCA is the Government's "primary litigation tool" for recovering losses resulting from fraud.  *United States ex rel. Marcy v. Rowan Cos.*, 520 F.3d 384, 388 (5th Cir. 2008).  The FCA imposes civil penalties and treble damages on any person who "knowingly makes, uses, or causes to be made or used,

---

[10]     *Id.* at ¶ 23.
[11]     *Id.* at ¶ 24.

a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B) (2009).[12]

## B. Claim for "Indemnification"

In Claim 4 and 6, the Government asserts an "indemnification" claim against Allied Capital and Hodge, seeking "indemnification" for insurance claims that it might be required to pay out as a result of Defendants' alleged false or fraudulent records, statements, or certifications. The Government's Complaint does not allege the source of, or elements of proof of, such a cause of action.[13] The existence of such a cause of action under these facts appears to be a question of first impression.

## C. Financial Institutions Reform, Recovery, and Enforcement Act

In Claims 7, 9–10, 12–13, 15–17, and 19, the Government asserts causes of action against Hodge, Stell, and Allied Capital for violations of § 1006 and § 1014 of FIRREA.[14] Section 1006 makes it a crime for any person who is "connected in any

---

[12]     The terms "knowing" and "knowingly" as used in the FCA means that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." *Id.* § 3729(b)(1)(A)(i)–(iii).     Proof of "specific intent to defraud" is not required. *Id.* § 3729(b)(1)(B). The term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* § 3729(b)(4); *see also United States ex rel. Longhi v. Lithium Power Techs., Inc.,* 575 F.3d 458, 470 (5th Cir. 2009). The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property . . . that . . . is presented to an officer, employee, or agent of the United States . . . ." *Id.* § 3729(b)(2).

[13]     As courts have observed, "there is no clear nomenclature among state and federal courts for the different types of indemnity, nor do courts seem to agree on what elements constitute even identically-named types of indemnity." *Collier v. Land & Sea Rest. Co.,* 972 F. Supp. 2d 870 n.1 (W.D. Va. 2013).

[14]     Section 951(a) of FIRREA provides that "[w]hoever violates any provision of law to which this section is made applicable by subsection (c) of this section shall be subject to a civil penalty in an amount assessed by the court in a civil action under this section." 12 U.S.C. §

capacity with [HUD]" to "mak[e] any false entry in any book, report or statement of or to [HUD]" with the "intent to . . . deceive any officer, auditor, examiner or agent . . . of [a] department or agency of the United States . . ." 18 U.S.C. § 1006. Section 1014 prohibits the submission of false records or making of false statements to the FHA. 18 U.S.C. § 1014. Specifically, it makes it a crime for any person to "knowingly mak[e] any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of the [FHA] . . ." *Id.*

## III.   Factual Allegations against Defendants

Between January 1, 2001 and December 31, 2010, Allied Capital and Allied Corp originated 112,324 home loans. Of those loans, 35,801 (approximately 32%) defaulted, costing over $834 million in insurance claims to be paid by HUD.[15]

The Government alleges that Allied Capital willfully violated the regulations that provide protection to HUD's insurance fund and knowingly deceived HUD to further its fraudulent schemes. The Government contends that Allied Capital made fraudulent representations to HUD-FHA in four separate types of documents: (1) loan application packages to secure FHA insurance on individual loans; (2) branch certifications to obtain approval to originate FHA loans from a new branch office; (3) annual certifications required for lender participation in the FHA program; and (4) quality-control reports.

---

1833a(a). Section 951(c) of FIRREA identifies the criminal violations to which FIRREA civil penalties apply, including Sections 1006 and 1014. *Id.* §1833a(c).

[15]     Dkt. 100 at ¶ 5.

### A. Loan Application Packages

For over ten years, Allied Capital originated loans out of hundreds of branches that it never disclosed to HUD.  The Government refers to these branches as "shadow branches," because they operated without HUD's knowledge or approval, and were therefore not authorized to originate HUD-insured loans.[16]  In some jurisdictions, the number of shadow branches exceeded the number of HUD-approved branches.[17]  For example, Allied Capital was authorized to operate 8 branches in North Carolina, but Allied Capital actually operated over 70 offices in North Carolina without HUD approval.  These shadow branches often operated in regions where HUD had previously suspended Allied Capital's authorization to originate loans because of the region's high mortgage default rate.  The Government estimates that these shadow branches are responsible for $150 million in insurance claims paid by HUD.

Although HUD prohibited the origination of loans from unapproved offices, the Government alleges that Allied Capital was nonetheless able to secure FHA insurance for these loans by falsifying the records it submitted to HUD.[18]  At the instruction of Hodge, Allied Capital's CEO, Allied Capital employees routinely entered the HUD ID numbers of an approved branch into the loan documentation for loans originating from the shadow branches.  These loans were then submitted to HUD for approval, even though they falsely stated that the loans originated from an approved branch office.[19]  HUD relied on

---

[16]    *Id.* ¶ 51.
[17]    *Id.* ¶¶ 52, 61, 64.
[18]    *Id.* ¶¶ 7, 63–68.
[19]    *Id.* ¶¶ 7, 51, 60, 65.

these false statements and endorsed the loans.[20]   The Government alleges that Allied

Corp continued these practices when it acquired nearly all Allied Capital's assets in

2010.[21]

### B. False Statements in Branch Certification Forms

The Government also alleges that Allied Capital, and later Allied Corp, lied to

obtain HUD approval for its authorized branches.[22]   Each time Allied Capital sought

approval for a new branch office, it was required to submit HUD Form 92001-B to certify

the branch complied with HUD requirements.   The form specified, among other things,

that Allied Capital would pay all operating costs for the branch office.   However, the

Government alleges that Allied Capital and Allied Corp treated branches as independent

franchises, maintaining a corporate policy of requiring branch managers to assume

financial responsibility for their branches.   Allied Capital required that branch managers

indemnify it from "liability of every kind" and made branch managers responsible for

payroll, insurance, legal judgments, and other office expenses.[23] Responsibility for lease

agreements, in particular, was borne by branch managers.   After Allied Corp acquired

Allied Capital's assets, it also adopted its branching practices.   On behalf of Allied Corp,

Stell sent sublease agreements to almost every branch manager, requiring the managers to

become the responsible parties on the lease.   When Allied Corp shut down in November

---

[20]     *Id.* ¶¶ 7, 60, 65, 68.
[21]     *Id.* ¶¶ 66–68.
[22]     *Id.* ¶¶ 8, 70, 92–98.
[23]     *Id.* ¶¶ 8, 71, 78, 90.

2011, it was branch managers—not Hodge and Allied Corp—who were held liable for the continuing lease obligations by landlords.[24]

The Government alleges this violated HUD policy and that Allied Corp was aware it was in violation of HUD policy—in 2001 it issued an "Examination/Audit Procedure Guide," instructing branch managers to tell HUD auditors they were "not a franchise."[25] The Guide directed branch managers to:

> Select ONE PERSON, and one person ONLY in your office to interface and converse with the examiner/auditor . . . . No one else in the office should have any conversation with the examiner/auditor prior to, during or after the examination/audit.  The only corporate personnel who should converse with the examiner/auditor . . . should be Jeanne Stell or Jim Hodge . . . .
>
> You, and any employee working in your branch, are W-2 employees of Allied.  Frequently, examiners/auditors view us as a franchise.  WE ARE NOT A FRANCHISE.  Along those same lines, Allied pays all the bills incurred by the branch. **Both of these statements are true and that is the only way those questions are to be answered,** *no deviations!*[26]

The Government alleges that this directive failed to comply with the HUD Handbook and certification form, which requires that a lender "fully cooperate with any investigations brought by HUD [and] make all officers and employees available for interviews."[27]

The Government further alleges that it was Stell who directed Allied employees to make these false certifications.[28]  In 2009, after a HUD audit report found that Allied Capital's branch leasing arrangements violated HUD regulations, Stell sent an email stating:

---

[24]    *Id.* ¶¶ 89, 92–98.
[25]    *Id.* at ¶ 74.
[26]    *Id.* (emphasis in original).
[27]    *Id.* at ¶ 75.
[28]    *Id.* at ¶ 88.

I had [another senior manager] sign the 'add a branch' form for years for HUD as I knew this [HUD audit] would eventually happen.  It required you to swear the branches meet and will continue to meet HUD's regulations. Jim [Hodge] has to be the biggest target personally for his disregard for the regulations.  Serves him right never listening and thinking he didn't have to play by the rules.[29]

## C. False Annual Certifications

The Government also alleges the Defendants submitted false annual certifications. To maintain HUD-approved and Direct Endorsement Lender ("DEL") status, Allied Capital and Allied Corp were required to submit annual certifications to HUD and to implement a quality-control program.  HUD required this quality-control program include: (1) conducting an on-site audit of all branch offices within 90 days of opening and annually thereafter; (2) reviewing 10% of all closed loan files to ensure they were underwritten in accordance with HUD guidelines; and (3) reviewing all early payment defaults (*i.e.*, those defaults within the first six months).[30]  In her role as Chief Compliance Officer, Stell signed the annual certification on behalf of Allied Capital in 2004, 2006, and 2007. Hodge signed the annual certification in 2008.[31]  These documents certified that Allied Capital was not currently subject to state sanctions, did not employ felons, and maintained the requisite quality-control program. The Government alleges that each of these certification statements were false.

The Government alleges that Allied Capital branches were sanctioned by the Rhode Island Department of Business Regulation, the South Carolina Department of

---

[29]   *Id.* at ¶ 87–88.
[30]   *Id.* ¶ 42. Review of early payments defaults is important because the defaults are indicative of mortgage fraud. *Id.*
[31]   *Id.* at ¶¶ 128–129.

Consumer Affairs, the State of Washington Department of Financial Institutions, the New York State Banking Department, and the Arizona Department of Financial Institutions— none of which were ever disclosed on the annual certification forms signed by Stell and Hodge.[32]  The Government also cites several instances in which Allied Capital and Allied Corp concealed prior sanctions and convictions of employees that should have been reported to HUD.[33]

The annual certifications also falsely certified that "the above named lender conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval," including the requisite quality-control program.[34]  Instead, Allied Capital's quality-control program was virtually non-existent: it had few quality-control staff and almost never performed reviews.  Although Allied Capital operated between 400 and 650 branches from 2003 to early 2009, it employed only a few branch auditors.  These auditors rarely conducted on-site branch office audits and wholly discontinued branch audits by 2009.  Allied Capital also rarely reviewed its early payment defaults.  In addition to a small handful of auditors to review these early payment defaults, 2–5 quality-control department members worked in St. Croix, in the U.S. Virgin Islands. However, this staff in St. Croix reportedly did not even know "what HUD was" or "what a mortgage was."[35]

---

[32]    *Id.* at ¶¶ 118–127.
[33]    *Id.* at ¶¶ 117–132.
[34]    *Id.* ¶¶ 40, 42, 100–101.
[35]    *Id.* ¶ 103.

Similarly, the Complaint alleges that Allied Corp also failed to implement a quality-control program.   Instead of hiring or training quality-control professionals, Allied Corp directed its underwriting coordinators to conduct reviews.   However, these employees had no quality-control experience or training.   In separate instances in 2009, Hodge and Stell directed these Allied Corp employees to skip re-verification requirements in the quality-control review process, including obtaining credit reports and re-verifying employment, income, deposits, and alternate credit sources.   Further, Allied Corp's quality-control reviews were not performed within the required 90-day period after loans were closed.[36]   Finally, the Complaint alleges that Allied Corp failed to supervise the actions of its loan correspondent, Allied Capital, when it allowed Allied Capital employees to disregard a number of compliance requirements.   Nevertheless, in 2003, 2006, 2007, 2008, and 2010, Hodge permitted the submission of annual certifications verifying Allied Corp's full compliance, and Stell personally submitted the annual certification in 2003.[37]

### D.  Falsified Quality Control Reports

The Government next alleges that Hodge and Stell instructed a member of Allied Capital's and Allied Corp's quality-control department to prepare fraudulent quality-control reports and submit them to HUD.[38] In October 2008, HUD ordered Allied Capital to provide up-to-date quality-control reports.[39] The Government alleges that Hodge,

---

[36]   *Id.* ¶¶ 107–112. *See also* 24 C.F.R. § 202.5(b).
[37]   *Id.* ¶¶ 133–134.
[38]   *Id.* ¶ 108.
[39]   *Id.* ¶ 106.

lacking adequate or qualified quality-control staff, instructed staff to instead fabricate the reports.  In an effort to make the reports appear complete, employees indicated that verifications of income, employment, and deposit in the loan files under review had been conducted, when in fact no such work had been done.[40]  The Government also alleges that, beginning in 2008, Allied Corp submitted Quality Assurance Division reports to HUD despite a non-compliant and incomplete review process.[41]

## IV.    Dismissal Under Rule 12(b)(6) and Rule 9(b)

### A. *The Rule 12(b)(6) Standard*

Rule 12(b)(6) allows dismissal of a claim if a plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6).  A motion to dismiss under Rule 12(b)(6) is "viewed with disfavor and is rarely granted." *United States ex rel. Tucker v. Christus Health*, No. 09-11819, 2012 U.S. Dist. LEXIS 151906, 8–9 (S.D. Tex. Oct. 23, 2012) (Atlas, J.) (*qui tam* case citing *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).

Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).  To withstand a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face"—legal conclusions alone are

---

[40]      *Id.* ¶ 108.
[41]      *Id.* at ¶¶ 110–112.

insufficient. *Twombly,* 550 U.S. at 570. The "pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *United States ex rel. King v. Univ. of Texas Health Science Center-Houston*, 907 F. Supp. 2d 846, 849 (S.D. Tex. 2012) (Rosenthal, J.) (*qui tam* case quoting *Iqbal*, 556 U.S. at 678). The complaint must be liberally construed in favor of the plaintiff, and when there are well-pleaded factual allegations, courts should presume they are true, even if doubtful—only then may the court determine whether they "plausibly give rise to entitlement to relief." *United States ex rel. Tucker*, 2012 U.S. Dist. LEXIS 151906 at 8–9.

### B. The Rule 9(b) Standard

Complaints filed under the False Claims Act must also meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." *United States ex rel. Grubbs v. Kanneganti,* 565 F.3d 180, 185 (5th Cir. 2009) (citing FED. R. CIV. P. 9(b)). Rule 9(b) requires "that a plaintiff set forth the 'who, what, when, where, and how' of the alleged fraud." *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 266 (5th Cir. 2010). "Because the linchpin of an FCA claim is a false claim, the time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what that person obtained thereby must be stated in a complaint alleging violation of the FCA in order to satisfy Rule 9(b)." *United States ex rel. Rafizadeh v. Continental Common, Inc.*, 553 F.3d 869, 873 (5th Cir. 2008) (internal quotations and citation omitted).

For FCA claims, Rule 9(b) must be applied in a "context-specific and flexible" manner. *United States ex rel. Grubbs*, 565 F.3d at 190. "It is adequate to allege that a false claim was knowingly presented regardless of its exact amount; the contents of the bill are less significant because a complaint need not allege that the Government relied on or was damaged by the false claim." *Id.* at 189. The complaint may "survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* at 190.

## IV.   Analysis

Defendants Allied Capital, Hodge, and Stell now move to dismiss the Government's Third Amended Complaint. Defendants first argue that the Government fails to state a valid claim for "indemnification." Defendants next urge four grounds on which the Government's FIRREA claims should be dismissed. The Court will address these in turn.

### A. Claim for "Indemnification"

In Claims 4 and 6, the Government seeks "indemnification."[42] Specifically, the Government pleads that Hodge and Allied Capital, "for the purpose of fraudulently obtaining HUD mortgage insurance," made false statements and caused shadow branches to originate some loans "that [are] currently in default, but for which no insurance claim has been submitted to HUD." As a result, the Government alleges it "will pay future

---

[42]     Dkt. 100, ¶¶ 189, 193, 197.

insurance claims, and incur future losses," and it pleads that it is "entitled to indemnification of [these] losses."[43]

However, the Government's Complaint does not set out the law that entitles it to such relief. During briefing and oral argument, the Government explained that it believes that it has a right to such "indemnification" under the federal common law.[44] As courts have observed, "[t]here is, of course, "no federal general common law." *Erie R. Co.* v. *Tompkins*, 304 U.S. 64, 78 (1938). Nevertheless, federal courts have recognized their authority, in some limited areas, to formulate what has become known as "federal common law." *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981). The United States Supreme Court has repeatedly held, however, that these areas are "few and restricted," and fall into essentially two categories: those in which a federal rule of decision is *"necessary to protect uniquely federal interests* and those in which Congress has given the courts the power to develop substantive law." *Id.* (emphasis added and internal quotations and citations omitted).   The authority to create a federal rule of decision "necessary to protect uniquely federal interests" includes the authority to formulate substantive rules of decision when "the rights and obligations of the United States" are at issue. *Id.* at 641.

Here, the Government argues the Court should recognize a federal common law claim for indemnity, contending this case is one where "the rights and obligations of the United States" are at issue. *Id.* at 641. The Government has not provided any binding

---

43  *Id.* at ¶¶ 188–191, 196–199 .
44  Dkt. 119, 129.

authority on what the elements or scope of such a right might be.   Further, absent a clearly stated need, courts should not fashion new remedies under federal common law where carefully considered legislative schemes such as the FCA already exist. As courts have noted, statutes such as the FCA consist of "a comprehensive legislative scheme including an integrated system of procedures for enforcement." *Nw. Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO*, 451 U.S. 77, 97 (1981); *see also* 31 U.S.C. § 3729 *et seq*. When Congress has enacted such a scheme, there is a strong presumption against the courts' ability to supplement the statutorily provided remedies. *Id.; see also Walker v. Cadle Co.*, 51 F.3d 562, 567 (5th Cir. 1995) (denying the right to contribution because the court refused "to fashion a new remedy that might disturb [a] carefully considered legislative scheme" and refused "to formulat[e] remedies to enforce the provisions" of a Congressional act).

The Court finds that, under the facts as alleged in the Complaint, recognition of a federal common law "indemnity" claim—whatever its scope or elements may be—is not necessary to protect any right, obligation or interest of the Government. For example, the Government has not shown that it will not be able to either (1) recover on all claims it has actually paid as of the date of trial, or (2) recover claims it pays after the trial of this case, based on a favorable judgment in this case. Here, the Government seeks an amorphous right to "indemnification" for insurance claims it has not yet had presented to it. Contrary to the Government's arguments, in this case, merely expediting the administration of the Government's future collection efforts and effecting a purely hypothetical saving of future judicial resources are insufficient reasons to take the

extraordinary step of creating a right of "indemnification" out of whole cloth. Accordingly, the Government's claims for "indemnification" (Claims 4 and 6) are **DISMISSED without prejudice**.[45]

### B. FIRREA Claims

Defendants also seek dismissal the Government's claims for violations of § 1014 and § 1006 of FIRREA. Defendants argue that these claims should be dismissed because (1) the Government exceeded its authorization from this Court to amend its Complaint by bringing wholly new claims against Defendants; (2) the Government has brought claims for violations of § 1014 based on conduct that occurred prior to the date the statute was enacted; (3) the Defendants are not covered "persons" or entities under § 1006 of FIRREA; (4) Hodge cannot be held liable under § 1014 because he did not personally submit any false claims; (5) HUD acquiesced to the fraud "vitiat[ing] scienter or intent to defraud"[46]; and (6) the Government has failed to meet its burden to plead with particularity under Rule 9(b). The Court will address each of these arguments in turn.

### 1. Leave to Amend

Federal Rule of Civil Procedure 15(a)(2) states, "The Court should freely give leave when justice so requires." Consistent with this Rule, the Court previously dismissed the Second Amended Complaint and did not place any restrictions on the Government's

---

[45] In this opinion, the Court does not reach the issue of whether the Government may later seek an equitable remedy to enforce a judgment, or whether the Government may bring additional lawsuits against Defendants to recover any future damages.

[46] Dkt. 108 at 11.

leave to amend.[47] Defendants were allowed time to respond, and the additional claims—which are grounded in the same underlying facts as the claims in the Second Amended Complaint—do not constitute unfair surprise to Defendants. *See Lyon v. Kohler Co.*, CIVA H-04-3533, 2006 WL 6549494 (S.D. Tex. May 25, 2006) (granting leave to amend under Rule 15(a) in the absence of unfair surprise and bad faith). Accordingly, the Government did not abuse its leave to amend by alleging additional claims against Defendants. The Defendants' Motion is **DENIED** on this point.

### 2. Liability under § 1014 of FIRREA

Next, Defendants argue that the Government's § 1014 claims are not "legally viable" and should be dismissed because these claims are based on statements made prior to the statute's effective date of July 30, 2008.[48] On February 19, 2014, the Court held a hearing on the pending motions to dismiss. At the hearing, the Government stipulated that it is only seeking to hold Defendants liable under § 1014 for representations made on or after July 30, 2008.[49]

### 3. Remaining Arguments

Defendants' remaining arguments are identical to those they previously asserted with respect to the Second Amended Complaint. These arguments were each addressed in

---

[47]   Dkt. 95.

[48]   Dkt. 108 at 13–14.

[49]   Dkt. 129 at 49. ("Your Honor, we will happily stipulate that § 1014 applies when it was enacted, 2008 going forward. We've stipulated that in our papers. There's no reason for this Court to waste time on a Motion to Dismiss. We're stipulating it on the record. [Section] 1014 covers the period we all agree that it covers.").

detail in the Court's previous orders.[50] Defendants have not established any basis for the Court to reconsider its previous rulings regarding these arguments. *See* FED. R. CIV. P. 59(e); *In re Benjamin Moore & Co.*, 318 F.3d 626, 629 (5th Cir. 2002).

The Court has already found that Allied Capital, Hodge, and Stell can be held liable for violations of § 1006 as entities or individuals "connected in any capacity with" HUD.[51] The Court has also held that the Complaint sufficiently alleges that Hodge is personally liable under FIRREA for setting in motion the events that caused false entries to be made.[52] Further, the Court has ruled that the "government knowledge defense" does not vitiate Hodge and Stell's scienter.[53] Finally, the Court has held that the Government's allegations—now even more elaborately pled in the Third Amended Complaint—satisfied Rule 9(b)'s particularity requirement.[54] Accordingly, Defendants' Motion to Dismiss based on these grounds is **DENIED**. *See* Dkt. 93, 94, 95.

---

[50]     Dkt. 93, 94, 95.
[51]     Dkt. 93 at 15, 17.; Dkt. 94 at 23–24.
[52]     Dkt. 93 at 15–16.
[53]     Dkt. 93 at 16.
[54]     Dkt. 93 at 16–18; Dkt. 94 at 24–26.

## CONCLUSION

Based on the foregoing, it is **ORDERED** that Defendants Allied Capital, Hodge, and Stell's Motion to Dismiss be **GRANTED in part** and **DENIED in part**.  Defendants' Motion to Dismiss is **GRANTED** with respect to the Government's Claims 4 and 6, and these claims are **DISMISSED without prejudice**.  The Motion to Dismiss is **DENIED** with respect to all other claims.

SIGNED at Houston, Texas on August 29, 2014.

**GEORGE C. HANKS, JR.**
**UNITED STATES MAGISTRATE JUDGE**