**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
(HOUSTON DIVISION)**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:12-cv-02676 |
| | ) | |
| AMERICUS MORTGAGE CORPORATION, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**ALLIED DEFENDANTS' MEMORANDUM IN SUPPORT OF
<u>MOTION FOR JUDGMENT AS A MATTER OF LAW</u>**

# TABLE OF CONTENTS

**PAGE**

ARGUMENT ..................................................................................................... 1

I.      STANDARD ............................................................................................ 1

II.     THE ALLIED DEFENDANTS ARE ENTITLED TO JUDGMENT ON
ALL OF THE FCA COUNTS ................................................................... 2

      A.     The Government Failed to Establish Essential Elements of an
FCA Case ........……………………………………………………3

             1.     The Requisite Scienter Is "Gross Negligence Plus" .............. 3

             2.     The Government's "Eligible for Insurance" Theory of
Liability Is Based on an Illegal and Irrelevant Standard ......... 5

                    a.     The Government Ignored Part One of the
Standard ................................................................. 6

                    b.     HUD Failed to Follow Its Own Regulation ................ 6

                    c.     There Is No Proof of Recklessness ............................. 8

      B.     The Branch Number in Box 13 of Form 92900-A and the
Claim-Level Certifications of "Eligibility" Were Not Material as a
Matter of Law .................................................................................... 10

      C.     The Government Failed to Connect the Required Scienter with
a False Statement .............................................................................. 16

III.    THERE CAN BE NO FCA DAMAGES UNDER EITHER A "RECKLESS
UNDERWRITING" OR "FALSE BRANCH CERTIFICATIONS"
THEORY BECAUSE THE GOVERNMENT FAILED TO PROVE THAT
THE ALLEGED MISCONDUCT WAS THE PROXIMATE CAUSE OF
ANY LOAN DEFAULT ............................................................................ 17

      1.     There is No Evidence That Any Loans Defaulted as a Result of
"Reckless Underwriting".................................................................. 18

      2.     There is No Basis for Permitting the Government to Extrapolate
Reckless Underwriting Damages .................................................... 20

3.    While the Government Did Not Attempt to Prove Causation, its
Experts Demonstrated that the Government Cannot Prove
Causation ........................................................................................... 23

IV.    THE ALLIED DEFENDANTS ARE ENTITLED TO JUDMENT ON THE
FIRREA CLAIMS CONCERNING QUALITY CONTROL .................... 24

A.    Section 1006 ..................................................................................... 25

B.    Section 1014 ..................................................................................... 25

C.    There Is a Failure of Proof on the FIRREA Claims......................... 26

CONCLUSION .................................................................................................... 28

Defendants, Americus Mortgage Corporation, f/k/a Allied Home Mortgage Capital Corporation ("Allied Capital"), AllQuest Home Mortgage Corporation, f/k/a Allied Home Mortgage Corporation ("Allied Corporation"), and Jim Hodge (the "Allied Defendants"), move for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a). The Government failed to prove essential elements of its case.

## **ARGUMENT**

The Court should enter judgment in favor of the Allied Defendants on all Counts in the Third Amended Complaint ("TAC") because:

(1) the Government failed to prove materiality and the requisite *scienter* to establish liability under the False Claims Act ("FCA") under either a reckless underwriting or unregistered branch theory of liability;

(2) even if evidence to support materiality and the requisite *scienter* existed, the Government failed to prove that any alleged damages were proximately caused by any alleged underwriting deficiency or by a false branch certification; and

(3) the annual certifications made to HUD by Allied to stay in the Direct Endorsement Lender program concerning compliance with all of the program's requirements were not material to HUD.

## I.    STANDARD

Fed. R. Civ. P. 50(a) provides:

(a) Judgment as a Matter of Law.

(1) *In General.* If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:

(A) resolve the issue against the party; and

> (B) grant a motion for judgment as a matter of law against the
> party on a claim or defense that, under the controlling law,
> can be maintained or defeated only with a favorable finding
> on that issue.
>
> (2) *Motion.* A motion for judgment as a matter of law may be
> made at any time before the case is submitted to the jury. The
> motion must specify the judgment sought and the law and
> facts that entitle the movant to the judgment.

"The district court properly grants a motion for judgment as a matter of law only if the facts and inferences point so strongly in favor of one party that reasonable minds could not disagree." *Piotrowski v. City of Houston*, 237 F.3d 567, 576 n.9 (5th Cir. 2001). "The court considers all the evidence, not merely that which supports the nonmovant's case, but in the light and with all reasonable inferences most favorable to the party opposed to the motion." *Utraflo Corp. v. Pelican Tank Parts, Inc.*, No. H-09-0782, 2015 WL 300488, at *1 (S.D. Tex. Jan. 22, 2015) (quotation marks and citation omitted). "In deciding such a motion, the court may not make credibility determinations or weigh the evidence." *Id.* (quotation marks and citation omitted).

## II.   THE ALLIED DEFENDANTS ARE ENTITLED TO JUDGMENT ON ALL OF THE FCA COUNTS

The FCA counts are based on the theories that the Allied Defendants were engaged in "reckless underwriting" and made "false certifications" concerning the diligence performed when underwriting a loan or that the Allied Defendants made false statements concerning which Allied branch "originated" certain loans. The Allied Defendants are entitled to judgment as a matter of law on the FCA counts because:

(1)   the Government failed to establish essential elements (such as materiality and the requisite *scienter*) of an FCA claim under either theory; and

2

(2)     binding Fifth Circuit precedent requires proof of proximate causation to obtain damages and there is no evidence that either "reckless underwriting" or a "false branch certification" was the proximate cause of any insured loan default.

## A.     The Government Failed to Establish Essential Elements of an FCA Case

A violation of the FCA is established only if the Government can prove each of the following elements:

(1)     that a defendant either (a) presented or caused to be presented a false or fraudulent claim for payment or (b) made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim;

(2)     the defendant did so knowingly; and

(3)     the falsehood was "material" to the Government's payment decision.

31 U.S.C. § 3729; *United States ex. Rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 467 (5th Cir. 2009).

## 1.     The Requisite Scienter Is "Gross Negligence Plus"

The FCA contains a scienter requirement.  To be actionable, a false claim for payment must be "knowingly" false.  31 U.S.C. §§ 3729(a)(1)(A) & (a)(1)(B).  The FCA defines "knowingly" (with respect to information) to mean actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of the information.  31 U.S.C. § 3729(b)(1).  A specific intent to defraud is not required.

Innocent mistakes, negligent actions, and flawed reasoning are <u>not</u> actionable. *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 681-82 (5th Cir. 2003).  "The circuits have . . . rejected the proposition that claimants 'knowingly' presented false

3

claims where there were instances of 'mere' contractual or regulatory non-compliance."

*Id.*

> The FCA is also not an appropriate vehicle for policing technical compliance with administrative regulations. The FCA is a fraud prevention statute; violations of [agency] regulations are not fraud unless the violator knowingly lies to the government about them. Innocently made faulty calculations or flawed reasoning cannot give rise to liability. Further, where disputed legal issues arise from vague provisions or regulations, a contractor's decision to take advantage of a position cannot result in his filing a "knowingly" false claim.

*Id.* at 682 (citations and quotations omitted). "It is a long-established rule of [the Fifth] Circuit that to show a violation of the FCA, the evidence must demonstrate 'guilty knowledge of purpose on the part of [the defendant] to cheat the Government.'" *United States ex rel. Taylor-Vick v. Smith*, 513 F.3d 228, 231 (5th Cir. 2008) (citation omitted).

With regard to the reckless underwriting theory, there is not even an allegation, much less evidence, that any of the Allied Defendants did anything intentionally to cheat the Government when underwriting FHA-insured loans. What distinguishes this case from virtually every other reported case involving FHA-insured loans is that this is not a case involving fraud in the origination of loans. There are no allegations that Allied was in any way involved in the submission of loans containing representations that Allied knew were false.

Recognizing this requirement, the Government asserts that the Allied Defendants were reckless in their underwriting practices. In the absence of proof of intentional misconduct, the courts have interpreted § 3729 to require a showing of "gross negligence-

4

plus." *United States v. Krizek*, 111 F.3d 934, 942-43 (D.C. Cir. 1997) ("While the Act was not intended to apply to mere negligence, it is intended to apply in situations that could be considered gross negligence where the submitted claims to the Government are prepared in such a sloppy or unsupervised fashion that resulted in overcharges to the Government.") (citation omitted); *United States ex rel. Longhi v. Lithium Power Techs,, Inc.*, 513 F. Supp. 2d 866, 876 (S.D. Tex. 2007) (following *Krizek* and applying the "gross negligence plus" standard). The D.C. Circuit has called the gross negligence plus standard "an extreme form of ordinary negligence." *Krizek*, 111 F.3d at 942.

There is a continuum of underwriting conduct that can range from innocent immaterial mistakes, ordinary negligence concerning a material matter, gross negligence, recklessness (or gross negligence plus), to intentional misconduct. *See United States v. Bourseau*, 531 F.3d 1159, 1167 (9th Cir. 2008) ("The requisite intent is the knowing presentation of what is known to be false, as opposed to innocent mistake or mere negligence. Bad math is no fraud, proof of mistakes is not evidence that one is a cheat") (quotation marks and citations omitted). The Government has the burden to prove recklessness/extreme negligence. This necessarily means that the Government must draw a line and distinguish between innocent immaterial mistakes, ordinary negligence, and reckless misconduct. This the Government has not done.

### 2. The Government's "Eligible for Insurance" Theory of Liability Is Based on an Illegal and Irrelevant Standard

HUD's regulations unambiguously specify what it takes for a loan to be "eligible" for FHA insurance. The regulation governing the "Direct Endorsement Process" is set

forth at 24 C.F.R. § 203.5.  Section 203.5(c) is entitled "Underwriter due diligence" and

provides:

> A Direct Endorsement mortgagee shall exercise the same
> level of care which it would exercise in obtaining and
> verifying information in a loan in which the mortgagee would
> be entirely dependent on the property as security to protect its
> investment. . . .  The Secretary <u>shall publish</u> guidelines for
> Direct Endorsement underwriting procedures <u>in **a** handbook</u>,
> which is deemed to be the minimum standard of due diligence
> in underwriting mortgages.

(Emphasis added.)

### a.    The Government Ignored Part One of the Standard

The first part of the underwriter due diligence standard requires Direct

Endorsement lenders to underwrite unto the FHA as they would underwrite unto

themselves.  The Government's underwriting expert, Mr. Payne, <u>admitted that he made</u>

<u>no effort to analyze whether the Allied Defendants' underwriting practices varied in any</u>

<u>way depending upon whether they were underwriting an FHA-insured loan or a loan on</u>

<u>which the Allied Defendants would retain the risk of default</u>.  Trial Tr. (Payne, Nov. 3) at

209-10 ("It wasn't part of my assignment, no").  There was no evidence on this topic

from any other witness.  Thus, the Government completely ignored the first part of the

relevant standard.  For this reason alone, the Government cannot prove recklessness as a

matter of law because it ignored half of the "eligibility" standard.

### b.    HUD Failed to Follow Its Own Regulation

Section 203.5(c), using mandatory "shall" language, requires that HUD "publish

guidelines for Direct Endorsement underwriting procedures <u>in **a** handbook</u>, which is

deemed to be the minimum standard of due diligence in underwriting mortgages."

(Emphasis added.)  The evidence shows that no such handbook exists.  Rather, it is the

Government's contention that the relevant standards are found in a potpourri of

guidebooks, over 900 mortgagee letters, and in other sources.

### Clarifying Policy—The New FHA Handbook

One initiative undertaken by FHA has been the reconciliation of more than 900 mortgagee letters and other policy guidance into a single, authoritative document that will serve as the definitive guide on all aspects of FHA's Single Family programs. In October 2013, FHA posted the first section, Application through Endorsement, of the new Handbook for feedback. Throughout 2014, FHA will publish several other sections of the handbook, including Doing Business with FHA, Oversight and Compliance, guidance for Appraisers, Condominium policies, and Servicing.

http://portal.hud.gov/hudportal/documents/huddoc?id=BlueprintAcess5_9_2014.pdf

(Blueprint for Access at 4) (last accessed November 12, 2016).  Thus, HUD, by its own

admission, is still endeavoring to create this single, mandatory handbook.

Because HUD has failed to follow its own regulation, and provide the definitive

guidance in the single, authoritative document required by its own regulation, there is no

official standard as to what makes a loan "eligible" for HUD insurance.  Ms. Shaffer

admitted as much.  Lacking the required definitive standard, Mr. Payne cobbled together

his own "Frankenstandard" of eligibility, which he admits was created from at least

eleven different sources, two of which are not even from HUD, and his own training and

experience.  Trial Tr.  (Nov. 3 Payne) at 108, 205-08.  A finding of "ineligibility" under a

wrong and legally irrelevant standard proves nothing.  Moreover, in a case where HUD is

7

accusing the Allied Defendants of breaking HUD rules, it is ironic that the Government did not follow HUD's <u>binding</u> regulation for crafting an ineligibility standard.

### c.      There Is No Proof of Recklessness

Recklessness in the FCA context has been defined as "gross negligence plus." *United States ex rel. Longhi v. Lithium Power Technologies, Inc.*, 513 F. Supp. 2d 866, 876 (S.D. Tex. 2007).  Recklessness can only be judged as a major deviation from either a definitive statutory or regulatory standard, or as a major deviation from an applicable industry standard of care.  W. Page Keeton *et al.*, *Prosser and Keeton on the Law of Torts* § 34 (5th ed. 1984) (recklessness usually "can be proved only by the conduct and the circumstances," and "an objective standard must of necessity in practice be applied"); *Black's Law Dictionary* (10th ed. 2014) ("Reckless conduct is . . . a gross deviation from what a reasonable person would do").

Here, no definitive statutory or regulatory standard of negligence exists. Eligibility is not a synonym for negligence.  There is a complete failure of proof on what constitutes negligence because the Government did not present evidence as to the mortgage industry standard of care, or even the average industry error rate in meeting the "eligibility" standard.  There was no evidence as to whether and to what extent the Allied Defendants' underwriting practices and errors deviated from the undefined standard of care.  Mr. Payne's "Frankenstandard" for eligibility proves nothing and is recognized nowhere as a relevant standard.

- In underwriting the allegedly "ineligible" loans, were the Allied Defendants in any way negligent?  We do not know because the Government introduced no evidence of an industry standard of care.

- Has any entity in the DEL program ever been perfect when undergoing an "eligibility" review of its underwriting decisions?  If not, what is the average (or mean) eligibility error rate in the FHA-insured underwriting industry?  We do not know because no evidence on this topic was ever adduced.

- How much, if any, did the Allied Defendants deviate from the mean industry error rate?  We know neither the industry error rate nor the amount of deviation.

Without answers to these basic questions, the jury has no basis for determining whether the Allied Defendants were even negligent, much less whether what happened here amounts to "gross negligence plus."  In assessing both violations and damages, the Government could only recover the difference between simple negligence and gross negligence, but the Government provided the jury with no basis to make that assessment.

We do know, however, that neither the Government's expert nor HUD could identify any "egregious" underwriting deficiencies, nor could they identify any pattern of deficiencies or practices that led to the deficiencies.  The evidence showed that any problems were evenly distributed into approximately 10 different categories.  The Government knew this long before its experts submitted their reports.[1]  Set forth below is a portion of an email string between HUD officials discussing the results of Post-Endorsement Technical Reviews ("PETRs") of Allied:

> **From:** Burke, Jennifer S
> **Sent:** Friday, July 02, 2010 1:18 PM
> **To:** Beachy, Joyce E
> **Subject:** RE: Allied Home Mortgage Corporation and Allied Home
> Mortgage Capital Corporation (PETRs)

---

[1]     Ms. Shaffer's testimony about Ms. Freeman's audit of 157 loans, out of which she found 51 loans with deficiencies, which resulted in a settlement with HUD involving just 9 loans, does not prove recklessness.  It is an isolated snippet in three months of conduct in a case involving 11 years.  Moreover, 9 bad loans out of 157 is a far cry from Mr. Payne's 53% ineligibility opinion.

> Results of HUD's post-technical reviews of loans underwritten by AHMC demonstrate <u>no patterns of consistent or egregious deficiencies</u>.  Neighborhood Watch data does reveal that some of AHMC's underwriters have relatively high default and claim compare ratios, but these underwriters do not appear among those AHMC underwriters with high levels of post-technical review deficiencies.

Allied Defs. Exh. 746 at 2.

### B.   The Branch Number in Box 13 of Form 92900-A and the Claim-Level Certifications of "Eligibility" Were Not Material as a Matter of Law

The Supreme Court's recent decision in *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016), dictates a ruling that the claim-level (or "loan-level") certifications concerning "eligibility" for HUD insurance and the "Lender ID No." in Box 13 off HUD form 92900-A were not material as a matter of law.  How the Government labels such certifications is no longer the question.  In *Escobar*, the Supreme Court rejected the contention that the labels that the Government attaches to certifications are dispositive.  "What matters is not the label the Government attaches to a requirement, but whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision."  *Id.* at 1996.

The Court then clarified "how that rigorous materiality requirement should be enforced."  *Id.*  "Whether a provision is labeled a condition of payment is relevant to but not dispositive of the materiality inquiry."  *Id.* at 2001.  "The materiality standard is demanding."  *Id.* at 2003.  The FCA "is not 'an all-purpose antifraud statute.'"  *Id.* (citation omitted).  Nor is it "a vehicle for punishing garden-variety breaches of contract or regulatory violations."  *Id.*

> [A] misrepresentation cannot be deemed material merely because the Government designates compliance with a

10

particular statutory, regulatory, or contractual requirement as
a condition of payment.  Nor is it sufficient for a finding of
materiality that the Government would have the option to
decline to pay if it knew of the defendant's noncompliance.

\* \* \*

[I]f the Government pays a particular claim in full despite its
actual knowledge that certain requirements were violated, that
is very strong evidence that those requirements are not
material.  Or, if the Government regularly pays a particular
type of claim in full despite actual knowledge that certain
requirements were violated, and has signaled no change in
position, that is strong evidence that the requirements are not
material.

*Id.* at 2003-04.

It has long been the law that a falsity made in connection with continued

participation in Government programs, such as the DEL program, are not falsities made

in connection with the submission of claims for payment.  Thus, certifications made to

remain eligible for program participation are not material to false claims.  *Urquilla-Diaz

v. Kaplan Univ.*, 780 F.3d 1039, 1045 (11th Cir. 2015); *United States ex rel. Spicer v.

Westbrook*, 751 F.3d 354, 365-66 (5th Cir. 2014); *United States ex rel. Wilkins v. United

Health Group, Inc.*, 659 F.3d 295, 309 (3d Cir. 2011).  Ms. Shaffer's testimony was rife

with testimony about how extensively HUD regulates DE lenders at the program level.

Bad actors are removed from the DE program by HUD's Mortgage Review Board.

"Conditions of participation . . . are enforced through administrative mechanisms,

and the ultimate sanction is removal from the government program," while "[c]onditions

of payment are those which, if the government knew they were not being followed, might

cause it to actually refuse payment."  *United States ex rel. Conner v. Salina Reg'l Health*

11

*Ctr., Inc.*, 543 F.3d 1211, 1220 (10th Cir. 2008).  The statement of the law set forth in *Conner* remains accurate save for one small modification.  After *Escobar*, false statements that the Government contends are "conditions of payment" are now also subject to a "rigorous" materiality requirement.

The Government has at its disposal a wide array of statutory and regulatory remedies to address DEL program-level misconduct, such as substandard underwriting. *See, e.g.*, 12 U.S.C. § 1715z-21 (indemnity for poorly underwritten loans); 24 C.F.R. § 202.5 (standards to be approved for DEL program participation); 24 C.F.R. § 203.255(e) (to monitor a lender's compliance with program requirements, HUD may review all documents required for a mortgagee's insurance endorsement under the DEL program).

The rule in the Fifth Circuit is that when, as here, federal regulations provide "a range of remedies in the event of non-compliance," that means that payment is not conditioned on compliance with the regulations, regardless of what the certification states.  *Spicer*, 751 F.3d at 366; *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 270 (5th Cir. 2010).  That rule should be fatal to the Government's contentions that the vague and omnibus certifications of compliance with "program-level" requirements made at the "loan-level" in this case are actionable.

The Fifth Circuit's "range of remedies" doctrine is perfectly consistent with *Escobar's* rigorous materiality requirement.  Both are designed to thwart the kind of "Government gotcha game" the Government is playing here.  In this case, the Allied Defendants were heavily regulated, monitored, and audited to be allowed to remain in the DEL program for approximately 20 years.  Still, HUD required claim-level certifications

on Form 92900-A that the Allied Defendants were in compliance with program regulations concerning the underwriting of FHA-insured loans.  HUD did that so that the Department of Justice can later attempt to drag "program-level" conduct up to the "claim for payment" level, years after the fact, to attach FCA liability.

The evidence shows, via the testimony of Mr. Bice and Ms. Shaffer, that the only attention that HUD paid at the claim level was to hire outside contractors to ensure that the Government "gotcha boxes" were checked:

> Before insuring, HUD employs a contractor that has a check list to review information submitted by the lender in conjunction with this check list for completeness and thoroughness of the file.

Bice Testimony, p. 71:9-13.  There is no evidence that anyone actually employed by HUD reviews the certifications or that HUD employees ever even see them prior to endorsing a loan for FHA insurance.

The Fifth Circuit did not permit such Governmental gamesmanship under the "range of remedies" doctrine.  *Escobar* now makes it even harder.  How HUD labels the certification does not control when the reality is that HUD makes no decisions and conducts no substantive review prior to insuring a loan.  The Government's own documents acknowledge this fact, as this excerpt from a 2006 Audit Report entitled "Significant Weaknesses in HUD's Oversight of Single Family Mortgage Insurance Claims are Costly" makes clear:

The statutory requirements for HUD's single family insurance program will not allow HUD to reduce or reject claims for lender non-performance except for fraud or misrepresentation on the part of the lender holding the mortgage[6]. This in effect prohibits HUD from rejecting claims for non-performance of underwriting requirements because most insured loans are sold after loan insurance endorsement. However, this does not prohibit HUD from reviewing claims to ensure lenders comply with program requirements. The claim can be paid and HUD can then review the loan for compliance with program requirements (additional information on HUD's program requirements is presented in Appendix E). HUD's program provides for actions that can be taken when lenders do not meet the program requirements. Those actions include referral to the Mortgagee Review Board. The Mortgagee Review Board is authorized by Section 202(c) of the National Housing Act to take administrative action when lenders do not comply with HUD's requirements.

http://archives.hud.gov/offices/oig/reports/internal/ig600001.pdf at 6.

This statement confirms that any pre-endorsement review conducted by HUD is not material as a matter of law. Problematic underwriting is purely a program-level concern and not material at the claim or "loan level."

For the same reasons, the "Lender ID" number in Box 13 of the 92900-A form is immaterial. No one at HUD reviews it for accuracy, as Ms. Shaffer admitted. The only review is whether the box is filled in. If there is a problem with a loan, it is addressed at the program level with a demand for indemnification. Such a misrepresentation is not material to the decision to endorse the loan, which is the only relevant consideration when the issue is whether a violation of the FCA has been proved.[2]

---

[2] The Allied Defendants anticipate that the Government may file its own Rule 50 motion based on certain admissions made by various Allied witnesses. An admission that a statement was false is not sufficient. To be actionable under either the FCA or FIRREA, the false statement must be made with the requisite *scienter*. There have been no admissions on *scienter* and that remains a question for the jury. The materiality of the false statements will also be a jury question.

The FHA was created in 1934.  For the first 73 years of the FHA's existence, the
Government did not track or regulate who "originated" (whatever that may mean and Ms.
Shaffer struggled with multiple definitions of the terms) an FHA loan.  In 2007, HUD
began requiring branches originating FHA loans to register with HUD.  However, in
2010, HUD abandoned that effort, as the following excerpt from the Federal Register
makes clear:

> *HUD Response:* HUD appreciates and
> carefully considered the issues raised by
> commenters, but HUD maintains its
> position that the elimination of FHA
> approval of loan correspondents is
> prudent for FHA and efficient for both
> FHA and mortgage lenders. Limiting
> approval to mortgagees reflects the
> recognition that the mortgagee, by
> underwriting, servicing, or owning a
> loan, is the most critical lending party
> to a mortgage transaction. It is the
> mortgagee that determines whether a
> borrower qualifies for the mortgage for
> which the borrower applied, and,
> therefore, determines the risk of lending
> money to the borrower. This is the most
> critical determination of the mortgage
> process. Accordingly, it is appropriate
> that FHA's approval process and
> oversight be focused on mortgagees, the
> parties to the loan transaction that pose
> the greatest risk to HUD.

75 Fed. Reg. No. 73 at 20723 (Apr. 20, 2010).

By this point in 2010, it was HUD's stated policy that, while it makes sense to
regulate underwriters, there is no reason to continue to monitor branch offices as
"originators."  It is highly ironic that HUD sued Allied <u>18 months after it abandoned this
regulation</u> for the reasons stated above.  In the face of these official agency admissions,

15

the Government cannot seriously argue materiality with respect to the monitoring of loan
originators.

**C.    The Government Failed to Connect the Required Scienter with a False
       Statement**

In *United States ex rel. Wall v. Vista Hospice Care*, 2016 WL 3449833 (N.D. Tex.
June 20, 2016), the court observed that to establish liability under the FCA, the
Government must connect the alleged scienter (in this case recklessness) with the
underwriting of an ineligible loan.  *Id.* at *19.  "Relator seemingly suggests she is only
required to prove Defendants operated with reckless disregard as to falsity, and not that
the certifications or claims were actually false or fraudulent."  *Id.*  "This view reflects a
misunderstanding of the FCA's falsity element, confusing the FCA's *scienter*
requirement . . . with the necessity to prove that the claims were *false*.  *Id.* (emphasis in
original).  Because in *Wall* there was no evidence that the certifying physicians were not
exercising their best clinical judgments, or that they did not believe the patients were
terminally ill when they certified them as eligible for hospice care, the FCA claim
suffered from a failure of proof.

That should be the same result here.  Numerous Allied underwriters and
underwriter managers have testified.  <u>Not one</u> suggested that they falsely certified that a
loan was properly underwritten; all purported to exercise the highest standards of care;
and every one of them scoffed at the notion that half the loans they underwrote were
"ineligible."  Most importantly, the Government has not connected any loan found to be
"ineligible" by Mr. Payne to reckless scienter.  Just because Mr. Payne found a loan to be

16

ineligible, it does not follow that the underwriter who certified the loan was acting

recklessly when he or she underwrote the loan or signed the certification or that he or she

was not exercising their best judgment when doing so.  Without such a connection, there

is no basis for FCA liability.  None.

**III.  THERE CAN BE NO FCA DAMAGES UNDER EITHER A "RECKLESS UNDERWRITING" OR "FALSE BRANCH CERTIFICATIONS" THEORY BECAUSE THE GOVERNMENT FAILED TO PROVE THAT THE ALLEGED MISCONDUCT WAS THE PROXIMATE CAUSE OF ANY LOAN DEFAULT**

Proof of causation is a statutory requirement.  An FCA defendant is liable for "3

times the amount of damages which the Government sustains because of the act of that

person."  31 U.S.C. § 3729(a)(1) (emphasis added).  All courts have focused upon that

"because of" language and all have required that the Government or a *qui tam* relator

prove causation to be awarded any damages under the FCA.

The applicable Fifth Circuit causation standard in exactly this kind of case is

unambiguous.  **"In the context of a federal housing case, the United States must show**

**that the false statements in the [loan] application were the cause of subsequent**

**defaults"** to recover damages under the FCA.  *United States v. Miller*, 645 F.2d 473, 476

(5th Cir. Unit A May 1981) (emphasis added); *see also United States ex rel. Longhi v.*

*United States*, 575 F.3d 458, 473 (5th Cir. 2009) ("Before the government may recover

17

treble damages, it must 'demonstrate the element of causation between the false statements and the loss'") (quoting *Miller*, 645 F.2d at 475-76).[3]

### 1. There Is No Evidence That Any Loans Defaulted as a Result of "Reckless Underwriting"

The Government has presented no evidence that <u>any</u> loan default was proximately caused by "reckless underwriting."  Its experts all admitted that they were <u>not even tasked with establishing causation</u>.  The Government has the burden of proof on causation, and it has utterly failed to meet that burden for even a single loan.  Just because poor underwriting *could* be a cause of a loan default does not mean that it actually was.  At this stage of litigation, after all of the Government's evidence is in, the Government must have either presented evidence of causation or its FCA damages claims should be dismissed.

The teachings of *United States v. Hibbs*, 568 F.2d 347 (3d Cir. 1977) are dispositive.  In *Hibbs*, the defendant real estate broker falsely certified on behalf of applicants for FHA mortgage guarantees that plumbing, electrical, and heating systems met federally prescribed standards.  *Id.* at 349.  The Government argued, as it did in this case, that had the defendant not furnished the false certifications, the FHA would not

---

[3]      *See also United States v. Hibbs*, 568 F.2d 347, 349-51 (3d Cir. 1977) ("a broad 'but for' test is not in compliance with the statute"); *United States v. United Techs. Corp.*, 782 F.3d 718, 728 (6th Cir. 2015); *United States ex rel. Sikkenga v. Regence BlueCross BlueShield of Utah*, 472 F.3d 702, 715 n.17 (10th Cir. 2006) (adopting restrictive proximate cause standard to "narrow, rather than enlarge, the field of actions for which FCA liability may be imposed"); *United States ex rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196, 199 (D.C. Cir. 1995); *United States ex rel. Fago v. M&T Mortgage Corp.*, 518 F. Supp. 2d 108, 120-21 (D.D.C. 2007) (characterizing *Miller* causation standard as a "restrictive" proximate causation standard and applying the restrictive standard in a FHA insurance case).  The Allied Defendants discussed these authorities extensively in their briefing on their *Daubert* motion with respect to reckless underwriting.  Those arguments are incorporated by reference herein.

have insured the mortgages and, therefore, would not have made payment when the mortgages defaulted. *Id.* at 351.

The *Hibbs* court rejected the Government's argument for a "but for" causation standard and refused to hold the defendant liable for <u>any</u> damages because the court found the Government's loss was due to the "unexpected diminution of property values" and other factors, not to the defendant's false certifications. *Id.*[4] Thus, the Third Circuit required that the subject matter of a party's false statement be the proximate (*i.e.*, the direct) cause of the Government's subsequent loss. *Id.* In *Miller*, the Fifth Circuit embraced *Hibbs*. *Miller*, 645 F.2d at 475 ("This court finds no error in the decisions in *Hibbs* and *Aerodex*.").

Similarly, in *United States ex rel. Fago v. M & T Mortgage Corp.*, 518 F. Supp. 2d 108 (D.D.C. 2007), the plaintiff was unable to produce any evidence showing that the borrower defaulted on the loans because the defendant forged signatures on various loan documents. *Id.* at 122. The court held that the plaintiff failed to show that the specific misrepresentations made by the defendant were "the direct and proximate cause of [the government's] losses and not merely the 'but for' cause of those losses," and therefore granted the defendant summary judgment as to the plaintiff's claims for damages under the FCA. *Id.* "[I]f the subject matter of the alleged misrepresentation is unrelated to the ultimate reason for the borrower's default . . . plaintiff cannot recover . . . ." *Id.*

---

[4]     One mortgagor lost his job; another suffered a severe diminution in income; a third mortgagor was depending on income from relatives who were renting, but then moved out. *Id.* at 349 n.2. Then, an injunction concerning the use of lead paint rendered the homes nearly worthless. *Id.* at 350. It was not surprising that the borrowers defaulted on low-down-payment loans under such circumstances. There was no link between the cause of the defaults and the alleged fraud.

The Government's entire case on causation, like it was in *Hibbs* and in *Fago*, is based on a "but for" causation theory, which is a theory that has <u>never</u> found favor in the Fifth Circuit.  Because the Government based its case on a causation standard that is not applicable in the Fifth Circuit, it failed to put on any evidence causally connecting any underwriting deficiencies with an insured loan default.  For this reason alone, the Allied Defendants are entitled to judgment as a matter of law on the issue of FCA damages.

This argument is equally relevant to FCA damages under a false statement concerning the originating branch theory.  There is zero evidence that the use of an incorrect branch number on a form, <u>which the borrower never sees and is completely irrelevant to the creditworthiness of the borrower</u>, was the proximate cause of any insured loan default.

**2.**    **There Is No Basis for Permitting the Government to Extrapolate Reckless Underwriting Damages**

Substantial evidence was adduced at trial that mortgage loan underwriting is an inherently subjective activity that involves balancing a wide variety of factors and making discretionary exceptions.  However, Mr. Payne, in his eligibility analysis, attempted to analyze a set of loans underwritten by dozens of different underwriters over eleven years.  This means he was analyzing, as a group, subjective determinations made by different people, at different times, in different locations, during different market conditions, based on the unique facts and circumstances of each case.  That raises the issue of whether this is an appropriate case for statistical sampling.  It is not.

Statistical sampling is inappropriate here for the same reasons that it was inappropriate in *United States ex rel. Wall v. Vista Hospice Care*, 2016 WL 3449833 (N.D. Tex. June 20, 2016).  In *Wall*, the relator attempted to use experts to establish both liability and damages by extrapolating from a statistical sample.  *Wall*, 2016 WL 3449833 at *5.  Under Medicare regulations a patient is "eligible" for hospice if they have a life expectancy of six months or less.  The issue in *Wall* was whether it was appropriate to bill Medicare for hospice patients with life expectancies allegedly greater than six months.  The expert in *Wall* was hired to second guess life expectancy determinations made by physicians working for the defendants.  *Id.* at *11-12.  The defendants moved to strike that testimony.

The court (Judge Lynn) granted the motion to strike.  The court recognized that each and every life expectancy determination was "fact dependent" and "wholly unrelated to each and every other claim."  *Id.* at *12.  The court stated that determining eligibility for hospice care for each of the patients required a thorough review of the charts and medical records for each patient.  *Id.*  Therefore, the case was not suited for statistical sampling.  *Id.* at *12-13.

"The Supreme Court and the Fifth Circuit have made clear that sampling and extrapolations cannot always be used to prove liability, and courts are required to engage in a particularized analysis of whether the extrapolation from a particular data set can reliably prove the elements of the specific claim."  *Id.* at *13.  The court deemed it wholly inappropriate to extrapolate from how one physician assessed a patient's eligibility to make conclusions about other physicians.  *Id.*

21

The sample of loans used by Mr. Payne included loans underwritten by dozens of different people, at different times, and in different locations.  All were dealing with a unique set of facts.[5]  If sampling was not appropriate in *Wall* it is equally inappropriate here.

_____

[5]  The Cleveland Federal Reserve has described how underwriting standards and market conditions changed violently during the relevant time period:

> Before the subprime mortgage boom, FHA loans were an important source of credit for first-time home buyers and borrowers with less than prime credit ratings.  In 2001, for example, 21.6 percent of all new mortgage loans were backed by the FHA.  But in 2003, subprime loans began to take off, and FHA lending began to decline.  By 2005, subprime loans represented 16.3 percent of the mortgage market and FHA loans were down to 3.5 percent.

> While the FHA was still offering favorable mortgage terms for qualified borrowers, subprime lenders were offering a much easier and faster application process, at times with no down payment requirement.  When lending standards tightened after the subprime market crashed in the middle of 2007, three types of potential borrowers could no longer obtain a mortgage loan: borrowers who would have gotten a subprime loan had the subprime market continued to exist, borrowers with subprime mortgages who needed to refinance into loans with better terms, and borrowers who could not afford large down payments but were otherwise creditworthy.

> To assist some of these underserved people, the FHA began to increase its lending at the end of 2007, regaining market share which eventually peaked at 43.8 percent of mortgage market originations in November of 2009.  During this timeframe, FHA-supported mortgage originations increased more than 500 percent.  After the recession, FHA-supported lending steadily declined to around 11 percent of all purchase mortgage originations, where it remains.

See https://www.clevelandfed.org/newsroom-and-events/publications/economic-trends/2015-economic-trends/et-20150414-fha-lending-rebounds-in-wake-of-subprime-crisis.aspx (last accessed Nov. 11, 2016).

3.     **While the Government Did Not Attempt to Prove Causation, its Experts Demonstrated that the Government Cannot Prove Causation**

The Government's underwriting expert determined that 53.7% of the claim loans and 48.9% off the non-claim loans were "ineligible" for insurance as a result of underwriting defects.  However, given the sample size used by its statistical expert, Dr. Ensor, the expected margin of error is plus or minus 10% for her non-claim sample and 5.1% for her claim sample.  Ensor Rep. at 9, 13 and 15 (Gov. Exh. 461).  The default rates here are approximately 5% apart, which means they are well within both of the margins of error.  Rates within the margin of error are statistically identical.  *McNamara v. Bre-X Minerals, Ltd.*, 197 F. Supp. 2d 622, 655 (E.D. Tex. 2001) (two measurements 5% apart were "statistically identical" given the sample size).

There is no argument that underwriting is driving the defaults when there is no correlation between underwriting defects and the tendency of a loan to default.  When there is no correlation between two variables, the only reasonable conclusion is that some other factor or factors caused the defaults.  *See United States v. Valencia*, 600 F.3d 389, 425 (5th Cir. 2010) (observing how even a strong correlation cannot usually infer causation if other variables are not considered or controlled for).

In its opposition to the Allied Defendants' *Daubert* motion concerning "reckless underwriting," the Government cited academic literature showing that the Financial Crisis was the major precipitating factor of insured loan defaults and that "lax" (not "reckless") underwriting was responsible for only about 1/3 of the defaults.  Dkt. No. 318 at 15-16 n.5 (citing Ashish Das & Roger M. Stein, *Underwriting Versus Economy:  A*

23

*New Approach to Decomposing Mortgage Losses*, 5 J. of Credit Risk 19, 40 (2009) ("it would appear that about 33% (relative) of abnormal late-vintage subprime losses can be attributed either directly or indirectly to the reported quality of underwriting at the time of loan origination")).  Thus, even though the Government knows that the Financial Crisis was responsible for the major portion of its losses (the headnote of the Das article states that "the economic downturn is the dominant driver of projected subprime losses"), it failed to control for that variable.

The Government also failed to control for the impact of down payment assistance programs, such as the Nehemiah Program, on insured loan default rates.  Trial Tr. (Nov. 3 Payne) 217-20.  The evidence shows that loans facilitated with down payment assistance defaulted at more than twice the rate of unassisted loans.  Allied Exh. 774 at page iii ("the default rate increased to 19.39 percent compared to a 9.7% default rate for FHA loans without Nehemiah Assistance.").  Allied's compliance training materials suggested that the default rate of loans facilitated by down payment assistance was as much as <u>four times higher than average</u>.  Allied Exh. 265 (13th slide).  Failing to control for these variables completely undermines the reliability of the samples used, especially since the evidence shows that over 37% of the loans in the Ensor sample closed at the height of the Financial Crisis.

## IV.   THE ALLEID DEFENDANTS ARE ENTITLED TO JUDGMENT ON THE FIRREA CLAIMS CONCERNING QUALITY CONTROL

The Government's claims against the Allied Defendants in Counts 13, 14, 15, 17, 18 and 19 are brought under 12 U.S.C. § 1833a.  Section 1833a provides for the award of

civil penalties if the Government can prove that the Allied Defendants specified in each of the above-listed counts violated either 18 U.S.C. § 1006 or 18 U.S.C. § 1014 by making false annual certifications that the Allied Defendants' quality control program complied with HUD's requirements.

### A.    Section 1006

To establish a violation of 18 U.S.C. § 1006, the Government must prove each of the following elements:

(1)    the defendant named in the count was connected with HUD;

(2)    the defendant made, or caused to be made, a false entry concerning a material fact in a statement to HUD;

(3)    the defendant knew that the entry or statement was false; and

(4)    the defendant acted with intent to deceive or to defraud HUD.

Any false statement must be material.  *United States v. Pettigrew*, 77 F.3d 1500, 1510-11 (5th Cir. 1996).  The statute of limitations for a violation of § 1006 is five years. *United States v. Loe*, 248 F.3d 449, 474 (5th Cir. 2007).  Thus, only conduct that occurred after November, 2006, is actionable under § 1006.

### B.    Section 1014

To establish a violation of 18 U.S.C. § 1014, the Government must prove each of the following elements:

(1)    the applicable defendant made a false statement to the FHA on or after July 30, 2008;

(2)    the defendants knew that the statement was false when made; and

(3)     the defendant made the false statement with the purpose influencing an FHA action.

**C.     There Is a Failure of Proof on the FIRREA Claims**

The evidence shows that the Allied Defendants, throughout the relevant time period, had an extensive quality control program and that they never misled HUD about either the nature or the extent of their quality control efforts.  The evidence further shows that HUD was intimately familiar with the Allied Defendants' quality control efforts through repeated audits and recommendations for improvement.  Trial Tr. (Nov. 7) 308-09; (Nov. 8) 41-46 (Stell).  Despite citing the Allied Defendants for quality control deficiencies in these audits, despite Allied working assiduously to correct them (especially in 2009 after the hiring of Diane Rivera and Mr. Hodge was first made aware of the extent of the deficiencies), and despite being allowed to remain in the DEL program year after year, the Government now contends that certifications of compliance filed by the Allied Defendants were false and that Allied acted with the intent to deceive the Government when it made those certifications.

The Government has created an illegal and unconscionable "Mission Impossible" for Direct Endorsement program lenders.  Allied was in the DE program for 20 years.  No large lender could operate in that complex, confusing, and sometimes contradictory regulatory environment, during rapidly changing industry conditions, without running afoul of HUD's Byzantine requirements at some point.  Even though HUD repeatedly audits DE program lenders, and repeatedly cites them for major and minor violations of program requirements, it also insists that all program participants sign annual

26

verifications of compliance, which is a standard of perfection that it knows no program

participant could ever meet.  Even though HUD knows all of this, it repeatedly allowed

Allied to remain in the program for years.  HUD does this so – if the political winds later

change and the Government needs scapegoats for economic problems caused by

Government programs designed to distort the market to achieve Governmental objectives

– it can initiate a back-end enforcement action years after the fact and play the

Government "gotcha" game.

   The evidence shows that the annual certifications of compliance with all of HUD's

regulations were plainly not material to HUD's decision to allow the Allied Defendants

to remain in the program.  HUD knew exactly what was going on at all relevant times.

Moreover, the constitutional principles of due process and fundamental fairness provided

by the Fifth and Fourteenth Amendments, as well as judicially created doctrines such as

estoppel and waiver, prevent what the evidence shows is going on here.  The Supreme

Court's recent decision in *Escobar* makes this abundantly clear:

> [I]f the Government required contractors to aver their
> compliance with the entire U.S. Code and Code of Federal
> Regulations, then under this view, failing to mention
> noncompliance with any of those requirements would always
> be material.  The False Claims Act does not adopt such an
> extraordinarily expansive view of liability.

136 S. Ct. at 2004.  Because materiality is an element of the § 1006 portion of the

FIRREA claims, this reasoning applies with equal vigor to the FIRREA counts.  Because

it is plain that HUD does not and cannot possibly rely on such broad certifications, the §

1014 claims fail.  The Supreme Court no longer countenances the expansive

Governmental "gotcha" game theory of liability asserted here.

## **<u>CONCLUSION</u>**

For the reasons set forth above, this Rule 50 Motion should be granted.

Dated:  November 15, 2016                        Respectfully submitted,

                                                  ODOM & DAVIS

                                                  /s/ Wendell A. Odom, Jr.
                                                  Wendell A. Odom, Jr.
                                                  State Bar Number:  15208500
                                                  Federal ID Number:  0947
                                                  440 Louisiana Street, Suite 200
                                                  Houston, Texas 77002
                                                  Tel. (713) 223-5575
                                                  Fax (713) 224-2815
                                                  wendell@wendellodom.com
                                                  **ATTORNEY-IN-CHARGE**


Of Counsel
LECLAIRRYAN, A PROFESSIONAL CORPORATION
Laurin H. Mills
Virginia Bar Number: 79848
S.D. Tex. Bar Number: 20464
David Warrington (*pro hac vice*)
123 West Loop South, Suite 1000
Houston, Texas 77027
Tel. (703) 647-5903
Fax (713) 647-5953
laurin.mills@leclairryan.com
david.warrington@leclairryan.com

HOOVER KERNELL LLP
Terry D. Kernell
State Bar Number:  11339020
Federal ID Number:  15074
Diana L. Hoover

28

State Bar Number:  00787333
Federal ID Number:  17079
Megan C. Moore
State Bar Number:  24054322
Federal ID Number:  963966
Kelcy L. Palmer
State Bar Number:  24088099
Federal ID Number:  2524981
500 Dallas Street, Suite 1360
Houston, Texas 77002
Tel:  (713) 655-7700
Fax:  (713) 655-7701
Email:  tkernell@hooverkernell.com
          dhoover@hooverkernell.com
          mmoore@hooverkernell.com
          kpalmer@hooverkernell.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of November, 2016, a copy of the foregoing

document with the Clerk of Court using the CM/ECF system, which will then send

notification of such filing to all counsel of record as follows:

Jeannette A. Vargas
Jean-David Barnea
Joseph N. Cordaro
Jaimie L. Nawaday
James N. Boeving
Stephen Cha-Kim
Caleb Hayes-Deats
US Attorney's Office
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
jeannette.vargas@usdoj.gov
jean-david.barnea@usdoj.gov
joseph.cordaro@usdoj.gov
jaimie.nawaday@usdoj.gov
james.n.boeving@usdoj.gov
stephen.cha-kim@usdoj.gov
caleb.hayes-deats@usdoj.gov

**ATTORNEYS FOR PLAINTIFF UNITED STATES OF AMERICA**

/s/ Wendell A. Odom, Jr.