UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:12-CV-2676 |
| | § | |
| AMERICUS MORTGAGE | § | |
| CORPORATION, *et al.*, | § | |
| | § | |
| Defendants. | | |

## MEMORANDUM OPINION AND ORDER

Before the Court are the Allied Defendants'[1] Motion for Judgment as a Matter of Law (Dkt. 390); and [Renewed] Motion for Judgment as a Matter of Law (Dkt. 508); as well as associated memoranda, appendices, and responsive pleadings.

Allied's original motion for judgment as a matter of law has been superseded by its post-trial renewed motion. Allied's original motion (Dkt. 350) is therefore **DENIED as moot**. Based on the motions, response, reply, and various supplemental briefings; the applicable law; and the arguments of counsel, the Allied Defendant's renewed motion for judgment as a matter of law (Dkt. 508) is **DENIED**. The reasons for the ruling are explained below.

---

[1] The "Allied Defendants" (or "Allied") include Americus Mortgage Corporation (formerly known as Allied Home Mortgage Capital Corporation) ("Allied Capital"), Allquest Home Mortgage Corporation (formerly known as Allied Home Mortgage Corporation) ("Allied Corporation"), and Jim C. Hodge ("Hodge").

## ANALYSIS

A motion for judgment as a matter of law challenges "the legal sufficiency of the evidence supporting a jury's verdict." *Ford v. Cimarron Ins. Co.*, 230 F.3d 828, 830 (5th Cir. 2000) (quoting *Jones v. Kerrville State Hosp.*, 142 F.3d 263, 265 (5th Cir. 1998)). A movant may file a renewed motion for judgment ("RJMOL") as a matter of law if its original motion was not ruled upon during a jury trial. FED. R. CIV. P. § 50(b). "The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment." FED. R. CIV. P. § 50(a)(2).

A court should only grant a JMOL if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party" on the raised issue. FED. R. CIV. P. § 50(a)(1). "It goes without saying that the evidence must be viewed in the light most favorable to the nonmovant." *Montano v. Orange County, Texas*, 842 F.3d 865, 873-74 (5th Cir. 2016). It is not within the province of the trial court to weigh the evidence or the credibility of the witnesses. *Id.* at 874. These matters are reserved solely for the jury. *Id.* On the other hand, a jury's factual findings must be supported by "substantial evidence." *American Home Assurance Co. v. United Space All., LLC*, 378 F.3d 482, 487 (5th Cir. 2004). A trial court should grant judgment "only if the evidence points so strongly and so overwhelmingly in favor of the []moving party that no reasonable juror could return a contrary verdict." *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011) (internal quotation marks and citation omitted).

Allied argues that the United States failed to: 1) establish the required elements of an FCA claim; 2) prove that Allied proximately caused the defaults; and 3) failed to

prove its FIRREA claims. As the moving party, Allied faces a rigorous task in establishing that the jury's verdict should be overturned.

## I. Whether the United States Established Essential Elements of an FCA Claim

Under the FCA,

> [A]ny person who **(A)** knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] **(B)** knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . **(G)** is liable to the United States Government for a civil penalty of not less than [$5,500] and not more than [$11,000][2], plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a). Under Fifth Circuit precedent, the United States was thus required to prove the following elements: 1) a false statement or false conduct; 2) made with the requisite scienter; 3) that was material; and 4) that caused the loss to the government. *United States ex rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009) (quoting *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008)). Allied does not dispute that false statements were made. Rather, it argues that the United States failed to introduce evidence of scienter (here, "recklessness") or materiality.

### A. Recklessness

The United States introduced evidence that Allied was aware of HUD regulations prohibiting unregistered branches from originating loans, Dkt. 457, p. 112; that Allied continued originating loans from unregistered branches after learning of the HUD rule,

---

[2] This amount has been adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990. PL 101-410 (S 535). Oct. 5, 1990, 104 Stat 890; 28 C.F.R. § 85.3(a)(9).

*id.* at 113-14; that Allied nevertheless certified on each loan that it complied with all HUD requirements, Dkt. 516, p. 358; that some unregistered branches provided the FHA identification numbers of its registered branches to skirt the HUD prohibition, Dkt. 458, pp. 109-111; and that Allied forged its branch managers' signatures, Dkt. 472, pp. 25, 65. Here, the jury received substantial evidence that warranted its finding that Allied's false statements were the result of its reckless disregard for the truth. Based on this same evidence, Allied's related argument that the United States failed to connect the false statements with the required scienter is also without merit.

## B. Materiality

A recent decision by the Supreme Court of the United States clarified the FCA's materiality requirement. The FCA provides the following definition of materiality: "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). Justice Thomas's unanimous opinion in *Escobar* recently clarified "how the [FCA's] rigorous materiality requirement should be enforced." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, —— U.S. ——, 136 S.Ct. 1989, 1996, 195 L.Ed.2d 348 (2016).

Under *Escobar*, "evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement" constitutes proof of materiality. *Id.* at 2003. Conversely, *Escobar* notes two situations creating "very strong evidence that those requirements are not material": (1) "if the Government pays a

particular claim in full despite its actual knowledge that certain requirements were violated"; and (2) "if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position ...." *Id.* at 2003-04.

The United States produced evidence showing the importance that HUD officials placed upon Allied's false certifications in deciding whether to pay. Dkts 401, 458, 469. For example, the government introduced a HUD addendum to the Uniform Residential Loan Application ("92900-A"). Plaintiff's Ex. 196. Through the testimony of fourteen-year HUD employee Scott Bice, the Government examined the 92900-A, discussing the importance of the various required entries. Dkt. 469. Under Blocks 13 and 15, the originating branch was required to enter its HUD-approved lender ID and address. *Id.* According to Bice, this information is necessary for HUD to track, inter alia, the branch office's claim-to-default ratio. *Id.* HUD does not allow non-registered branches to originate loans for insurance. *Id.* HUD will not approve an application without this information. *Id.* Under Lender Certification, Part B, the lender was required to certify that "[t]he information contained in [this Application] was obtained directly from the borrower by an employee of the undersigned lender or its duly authorized agent and is true to the best of the lender's knowledge and belief." *Id.*

The trial transcripts are replete with detailed analyses of various HUD-requirements, the importance of those requirements, and why these requirements were necessary for HUD to make an informed decision. *See, e.g.*, Dkt. 469, pp. 115-16, 122-

23, 131-35, 181. The Court finds that the United States presented sufficient evidence of materiality.

## II. Whether the United States Proved Proximate Causation

Allied argues that the United States failed to prove that Allied's malfeasance proximately caused any loss. According to Allied: 1) there was no evidence showing that the defaults occurred because of the FCA violations; 2) there was no basis for the United States' determination of damages through extrapolation; 3) the margin of error for the Allied eligibility rates for its claim and non-claim loans are statistically identical; and 4) the United States failed to control for known variables in its statistical analysis.

### A. Proximate Causation

Under Fifth Circuit law, the United States must show that a defendant's false statement or fraudulent course of conduct "caused the government to pay out money or to forfeit money due (i.e., that involved a claim)." *Longhi*, 575 F.3d, at 467 (citation omitted); *see also United States v. Miller*, 645 F.2d 473, 476 (5th Cir. 1981) ("The language of the [FCA] clearly requires that before the United States may recover ... damages, it must demonstrate the element of causation between the false statements and the loss."). In a federal housing case, the United States must show that the false statements in the application caused the subsequent default. *Miller*, 645 F.2d at 475.

However, "the Fifth Circuit has not delineated a specific causation standard applicable to FCA claims." *United States v. Abbott Labs*, No. 3:06-CV-1769-M, 2016 WL 80000, at *6 (N.D. Tex. Jan. 7, 2016). Here, the Court and the parties agreed that the United States must demonstrate that Allied proximately caused the loss incurred.

Proximate causation carries a more stringent standard of proof than does actual (i.e., "but for") causation. However, it is not so stringent as to require elimination of all alternative possible causes. *See Paroline v. United States*, —— U.S. ——, 134 S.Ct. 1710, 1719–20, 188 L. Ed. 2d 714 (2014) ("Every event has many causes, however ... and only some of them are proximate, as the law uses that term. So to say that one event was a proximate cause of another means that it was not just any cause, but one with a sufficient connection to the result."); *United States v. Spicer*, 57 F.3d 1152, 1159 (D.C. Cir. 1995) ("It is undoubtedly true that in each case other factors also 'caused' the buyer's default, but that is of no moment, for as long as Spicer's misrepresentations were a material and proximate cause, they need not have been the sole factor causing HUD's losses.").

Here, the United States introduced evidence that Allied originated loans from unregistered branches; that HUD required branch registration because of the increased risks of noncompliance; and that loans from these unregistered branches resulted in high default rates. The United States further introduced evidence that Allied underwriters issued false statements regarding borrowers' creditworthiness; that these false statements increased the risk of default; and that loans underwritten by Allied did in fact default at a high rate. This evidence formed a sufficient basis upon which the jury inferred that Allied's malfeasance proximately caused these defaults.

## B. Extrapolation

In determining the number of ineligible loans and their associated damages, the United States' experts engaged in statistical sampling. The United States presented expert testimony from Dr. Katherine Ensor (a statistician), Mr. Richard Payne (an expert

underwriter), and Mr. Gordon Klein (a financial and management accounting professor). Dr. Ensor drew random stratified samples from the over-17,000 loans that Allied submitted between 2001 and 2011. Payne then re-underwrote the loans from these samples to determine the number of properly underwritten loans in the sample. Klein then extrapolated Payne's findings to determine the total number of falsely underwritten loans. According to Allied, the United States should have been required to show that Allied Corporation proximately caused each individual default.

The use of extrapolation in trials has been widely adopted by the Fifth Circuit as well as other circuits in cases involving a large amount of data. *See, e.g., In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1020 (5th Cir. 1997) ("The applicability of inferential statistics have long been recognized by the courts."); *United States v. Lahey Clinic Hospital, Inc.*, 399 F.3d 1, 18 n.19 (1st Cir. 2005) ("[S]ampling of similar claims and extrapolation from the sample is a recognized method of proof."); *Ratansen v. Cal. Dept. of Health Servs.*, 11 F.3d 1467, 1471 (9th Cir. 1993); *Chaves County Home Health Serv. Inc. v. Sullivan*, 931 F.2d 914, 919 (D.C. Cir. 1991). The jury heard exhaustive testimony from the United States' experts discussing the methodology of extrapolation. The jury ultimately decided that Allied Corporation's false underwriting FCA violations caused 1,192 claims to be submitted. Dkt. 435, p. 6. The jury further found that "the total dollar amount of damages that the FHA sustained as a result of Allied Corporation's violation(s) of the False Claims Act" was $85,612,643.00. *Id.* at 7. The Court finds that the experts' testimony provided a substantial basis for jury's verdict.

### C. Eligibility Rates

The United States' experts testified that the default rate was 53.7% of claim loans and 48.9% of non-claim loans. Allied argues that—given the margin of error—these rates are statistically identical, and there is therefore no evidence to show a causal connection between its underwriting defects and the default rate. Allied provides no testimony of its own to buttress this argument. In contrast, Dr. Ensor refuted Allied's methodology under cross-examination. According to Dr. Ensor, Allied's "thinking of the margin of errors in that fashion is incorrect." Dkt. 472, p. 132. She elaborated that she "won't buy into that correctness because that's not a statistically valid way to look—to think about this information." *Id.* This unrefuted testimony provided a sufficient basis for the jury to find that Allied's false underwriting caused loans to default.

### D. Known Variables

Allied argues here and in its other post-trial motions that the United States failed to account for other variables—namely the global financial crisis that began in 2007—other than recklessness that may have led to the default claims. It is undoubtedly true that the crisis could have led to an increased number of defaults. However, the United States did not have the burden to address every possible alternative cause of the default claims. *See Paroline*, 134 S.Ct., at 1719–20; *Spicer*, 57 F.3d at 1159.

In any event, the evidence provided the jury with a sufficient basis with which to consider the effects of the financial crisis. For example, Dr. Ensor's samples were stratified into two-year periods based on the year in which the loan closed. Further, Allied's counsel discussed the financial crisis as well as HUD's down-payment assistance

program—another known variable, according to Allied—with Dr. Ensor during her cross-examination. The jury was thus able to consider these potential alternative causes before reaching its verdict.

### III. Whether the United States Proved its FIRREA Claims

Allied argues that the annual certifications were not material; that there is no factual basis for finding FIRREA liability against Allied Capital or Hodge; and that Allied's quality control statements "were limited to a short period in early 2009, quickly corrected, and have no connection with Allied Capital or Jim Hodge." Dkt. 509, p. 29.

**A. Materiality**

Allied notes the testimony of Joy Hadley, HUD's Director of Lender Activities and Program Compliance, who was asked whether the certifications ever "s[aw] the light of day[.]" Dkt. 473, p. 161. Hadley replied, "Absent some real reason, I mean once they were signed and, you know, received, signed and the—and the lender recertified, I can't imagine why they would need to ever see the light of day." *Id.* According to Allied, this testimony proves that HUD did not rely upon the certifications, and therefore they were not material.

The government introduced contradictory evidence from former Quality Assurance Division Director Julie Shaffer. Shaffer testified that HUD required annual certifications to ensure that branches were in compliance. Dkt. 499, p. 50. She testified about the difference between minor violations—which did not require HUD reporting—and more serious violations—which did. She confirmed that the allegations against Allied constituted these more serious types of violations, which required self-reporting to

HUD. Dkt. 499, pp. 166-67. While the parties produced contradictory evidence on FIRREA materiality for the jury to consider, the Court finds that the United States provided a sufficient evidentiary basis for the jury to find that Allied's FIRREA violations were material.

**B. Factual Basis**

The jury unanimously found Allied Capital, Allied Corporation, and Jim Hodge violated the FIRREA concerning both false annual certifications and quality control documents. The Allied Defendants argue that there was no evidentiary basis to find either Allied Capital or Hodge liable under either theory. As to the false annual certifications, the United States introduced nine separate annual certifications as evidence (GX 72; 537-40; 543; 548-49; 604). Dkt. 468, p. 24. The United States attributed four of the annual certifications jointly to Allied Capital and Hodge, and the remaining five jointly to Allied Corporation and Hodge. Dkt. 468, p. 20.

In addition to the annual certifications, the United States introduced testimony from Jeanne Hammond-Stell, who had worked for various Allied entities since 1998 and rose to the position of Executive Vice President and Director of Compliance. She testified that the Allied Defendants were aware of their non-compliance with HUD requirements prior to signing the annual certifications. She personally signed and submitted four of the nine annual certifications. She signed half of these certifications while working with Allied Capital, and the other half with Allied Corporation. Her testimony demonstrates the degree of control Hodge wielded in causing the submission of false annual HUD certifications:

> Q Who told you to sign those certifications?
> A Well, it was part of my job duties to ensure that these were submitted to HUD.
> Q And who informed you that this was part of your job duties?
> A Jim Hodge
> Q Did Mr. Hodge tell you why it was your responsibility to sign these certifications to HUD?
> A Well, he wanted to make sure that they were submitted to HUD so that the company could remain open.
> Q Was Allied in compliance with HUD's quality control rules when you signed each of these certifications?
> A No.
> Q Were these certifications true and correct when you signed them?
> A No.
> Q Did—to your knowledge, did Mr. Hodge know that these certifications were not true when you signed these and submitted them to HUD?
> A He knew that the company did not follow the—the required rules.
> Q For quality control?
> A Yes.
> Q So why did you sign these?
> ....
> A I should have had the backbone not to do it, but I—I didn't. I knew that if I refused, I would lose my job, and I needed my job.

Dkt. 457, pp. 240-43. In addition, there is ancillary evidence of chronic noncompliance by the Defendants. Such obvious noncompliance—in the form of false reports and uncompleted audits and reverifications—further renders the annual certifications as false. Further, Allied concedes that Hodge personally signed one annual certification. Dkt. 492, p. 15.[3] The Court therefore finds that the United States provided a sufficient evidentiary basis for the jury to find that all three Allied Defendants violated the FIRREA with respect to false annual certifications.

As to the false quality control documents, the United States introduced a 2009 email from compliance specialist and assistant vice president Cynthia Ann Coolger to

---

[3] Hodge signed the fiscal year 2008 annual certification (GX 604) for Allied Capital. *Id.*

HUD employee Odell Freeman in 2009. Attached to the email was Allied's January 2009 Management Summary. The Summary contained eighteen false TENA reports—the basis for the false quality control document violations. Coogler sent the email to Freeman as an Allied Capital employee. Dkt. 510-38. The United States examined Allied employee Renita Mathis on the stand. Mathis recounted a telephone conversation in which Hodge told her to skip the required reverification step. Dkt. 453, p. 217.

As a whole, the evidence provides a sufficient basis for the jury to find that both Allied Capital and Hodge violated FIRREA as to false quality control documents. In summary, the United States provided a substantial basis for the jury's verdict against all three Allied Defendants for FIRREA violations involving both false annual certifications and false quality control documents.

## CONCLUSION

The Allied Defendants' original motion for judgment as a matter of law (Dkt. 390) was superseded by the instant post-trial motion. Accordingly, the original motion for judgement is hereby **DENIED as moot**.

Further, the Allied Defendants have failed to meet their burden to show that the United States failed to provide a sufficient evidentiary basis for any of the jury's findings. Accordingly, Allied's renewed motion for judgment as a matter of law (Dkt. 508) is hereby **DENIED**.

SIGNED at Galveston, Texas, this 14th day of September, 2017.

George C. Hanks, Jr.
United States District Judge