UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:12-CV-2676 |
| | § | |
| AMERICUS MORTGAGE | § | |
| CORPORATION, *et al.*, | § | |
| | § | |
| Defendant. | | |

## MEMORANDUM OPINION AND ORDER

This case arises from the operation of mortgage lending businesses by Allied.[1] At the conclusion of a five-week trial, the jury found Allied liable for multiple violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, and the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1833a. *See* Dkt. 435. The Court subsequently denied Allied's renewed motion for judgment as a matter of law (Dkt. 539) and motion for new trial (Dkt. 540).

Now pending before the Court is The United States of America's Post-Trial Motion for Treble Damages and Entry of the Judgment (Dkt. 479); and associated responsive pleadings.[2] Based on the motion, responses, replies, and various supplemental

---

[1] "Allied" includes Americus Mortgage Corporation (formerly known as Allied Home Mortgage Capital Corporation) ("Allied Capital"), Allquest Home Mortgage Corporation (formerly known as Allied Home Mortgage Corporation) ("Allied Corporation"), and Jim C. Hodge ("Hodge").

[2] Responsive pleadings include The United States of America's Post-Trial Memorandum of Law in Support of Treble Damages and Civil Penalties (Dkt. 468); Allied Defendants' Opposition to Government's Position Concerning Treble Damages and Civil Penalties (Dkt. 492); The United States of America's Post-Trial Reply Memorandum of Law in Further Support of Treble Damages and Civil Penalties (Dkt. 500); the Corrected Declaration of Joseph N. Cordaro in Support of the United States' Post-Trial Memorandum of Law (Dkt. 516); and the

briefings; the applicable law; and the arguments of counsel, the Court finds Allied liable for treble damages and civil penalties under the FCA, as well as for civil penalties under FIRREA. For the reasons set forth in detail below, the Court enters judgment in favor of the United States of America ("United States").

## ANALYSIS

### I. Treble Damages and Civil Penalties for FCA Violations

A defendant who violates the FCA is liable to the United States for civil penalties of "not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1). The jury found that Allied Capital and Jim Hodge submitted or caused to be submitted 103 insurance claims, in violation of 31 U.S.C. § 3729(a)(1)(B), and that the Federal Housing Administration (FHA) thereby sustained damages of $7,370,132 because Allied Capital and Jim Hodge falsely represented that their branches were registered by HUD. The jury further found that Allied Corporation submitted or caused to be submitted 1,192 insurance claims in violation of 31 U.S.C. § 3729(a)(1)(A) and (B), and that the FHA thereby sustained damages of $256,837,929 because Allied Corporation recklessly underwrote loan applications. Pursuant to the FCA, the United States now asks the Court to award treble damages as well as civil penalties against Allied.

---

United States of America's Post-Trial Reply Memorandum of Law in Further Support of Treble Damages and Civil Penalties (Dkt. 517).

## A. FCA Treble Damages

Treble damages are mandatory under the FCA. *See* 31 U.S.C. § 3729(a)(1)(G). However, Allied argues that there are no damages to treble because the United States failed to prove that the FCA violations were the proximate cause of the losses that it suffered. Allied also argues that the United States improperly seeks to treble "gross"—rather than "net"—damages. Dkt. 492, p. 1.

### *i. Causation*

First, Allied argues that the United States cannot recover treble damages because it failed to prove that Allied's FCA violations proximately caused the damages it suffered. According to Allied, the United States relied solely upon a "but for" theory of actual causation throughout the case, and "*made no attempt* to prove that any loan loss was proximately caused by either 'reckless underwriting' or because a loan was 'originated' from a branch office not registered with HUD." Dkt. 492, p. 5 (emphasis added). In support of the argument, Allied asserts that the United States' experts' conceded that "they were not instructed to analyze or otherwise determine or opine upon causation." The Court finds that this argument is without merit.

Allied's arguments ignore both the definition of proximate cause that was submitted to the jury and the evidence that was presented at trial. To recover damages, the United States must show that a defendant's false statement or fraudulent course of conduct "caused the government to pay out money or to forfeit money due (i.e., that involved a claim)." *United States ex rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009) (quoting *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d

370, 376 (4th Cir. 2008)); *see also United States v. Miller*, 645 F.2d 473, 476 (5th Cir. 1981). While the Fifth Circuit has not articulated a specific causation standard applicable to FCA claims, the parties agree that the proximate cause standard applies to the claims asserted by the United States in this case. Dkt. 492, p. 5; Dkt. 537. *See e.g., United States v. Abbott Labs*, No. 3:06-CV-1769-M, 2016 WL 80000, at *6 (N.D. Tex. Jan. 7, 2016).

Proximate causation carries a more stringent standard of proof than does actual (i.e., "but for") causation. However, it is not so stringent as to require elimination of all alternative possible causes. *See United States v. Spicer*, 57 F.3d 1152, 1159 (D.C. Cir. 1995) ("It is undoubtedly true that in each case other factors also 'caused' the buyer's default, but that is of no moment, for as long as Spicer's misrepresentations were a material and proximate cause, they need not have been the sole factor causing HUD's losses."). "Proximate cause is often explicated in terms of foreseeability." *Paroline v. United States*, —— U.S. ——, 134 S.Ct. 1710, 1719-20, 188 L.Ed.2d 714 (2014). Thus, as courts have held, "Defendants' conduct may be found to have caused [the FCA violation] if the conduct was (1) a substantial factor in inducing providers to submit claims ... and (2) if the submission of claims ... was reasonably foreseeable or anticipated as a natural consequence of Defendants' conduct." *Abbott Labs*, 2016 WL 80000 at *6.

Here, the Court gave the following jury instructions requiring the United States to establish proximate causation to recover damages in this action:

> In order for the United States to recover damages in a lawsuit under the False Claims Act, the allegedly false or fraudulent claim must have caused the United States to have suffered damages it otherwise would not have suffered. The United States has the burden to prove the damages it suffered. This means that the United States must show by a preponderance of the evidence that Allied's conduct was a *substantial factor* causing the United States to suffer damages, and that the amount of damages suffered by the United States was a *foreseeable consequence* of the allegedly false statements, false claims, or fraudulent course of conduct.

Dkt. 482, pp. 6-7, 18 (emphasis added).[3] Even a cursory review of the trial record reflects that the United States presented significant and credible evidence from multiple sources from which the jury could conclude that Allied's conduct of recklessly underwriting and originating loans from unregistered branch offices was a substantial factor in the submission of claims. *See, e.g.*, Dkt. 401, pp. 21-23 (transcript, testimony of HUD representative Julie Shaffer). There was also significant and credible evidence presented through exhibits and both fact and expert witness testimony that the damages suffered by the United States were the foreseeable consequence of Allied's misconduct. Accordingly, the Court finds that the jury properly found damages upon which it can base an award of treble damages.

### ii. Gross v. Net Damages

Next, Allied argues that the United States is seeking to improperly treble "gross"—rather than "net"—damages. Allied argues that only net damages—the difference between the amount the United States paid on the claims and any payment back to the United States as a result of those claims—should be trebled under the FCA. The Court disagrees. It is well established in this circuit that the damages awarded by the

---

[3] Allied concedes that the jury charge was a correct statement of the law. Dkt. 492, p. 5.

jury are to be tripled *before* any subtractions to the award are made for compensatory payments previously received by the Government from any source. *See Longhi*, 575 F.3d, at 473 (specifically rejecting the argument that, when calculating damages under the FCA, the trial court must first subtract value of benefit that defendants conferred on Government from amount Government paid to defendants and then treble this "actual-damages" figure).[4] Accordingly, the Court finds that the jury's FCA damages award must be trebled as follows:

- **Allied Capital and Jim Hodge** violated 31 U.S.C. § 3729(a)(1)(B), causing the government to sustain damages in the amount of $7,370,132. Pursuant to 31 U.S.C. § 3729(a)(1)(G), Allied Capital and Hodge are therefore jointly and severally liable to the United States for **$22,110,396**.

- **Allied Corporation** violated 31 U.S.C. § 3729(a)(1)(A) and (B), causing the government to sustain damages in the amount of $85,612,643. Pursuant to 31 U.S.C. § 3729(a)(1)(G), Allied Corporation is therefore liable to the United States for **$256,837,929**.

**B. FCA Civil Penalty**

In addition to the mandatory trebling of damages, the Court may at its discretion assess civil penalties of between $5,000 and $11,000 per FCA violation. 31 U.S.C. § 3729(a)(1)(G). In enacting the FCA, Congress "afforded the federal trial courts considerable discretion in calculating damages and ascertaining the amount of the civil penalty component, within the statutory range." *U.S. ex rel. Rigsby v. State Farm Fire & Cas. Co.*, No. 1:06CV433-HSO-RHW, 2014 WL 691500, at *6 (S.D. Miss. Feb. 21,

---

[4] The Court declines to follow Allied's suggestion to disregard this clear precedent in favor of contrary precedent from other jurisdictions. *See, e.g., United States v. Anchor Mortgage Corp.*, 711 F.3d 745, 750 (7th Cir. 2013).

2014). Under the FCA, "[e]ach individual false claim or statement triggers the statute's civil penalty." *United States ex rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196, 199 (D.C. Cir. 1995). FCA civil penalties exist—at least partly—to combat and deter fraud. *Hudson v. United States*, 522 U.S. 93, 102 (1997).

The FCA provides no specific formula or list of factors to consider when determining a civil penalty. Accordingly, in determining an appropriate civil penalty, courts consider the "totality of the circumstances" which necessarily encompasses the various considerations employed by other courts and recommended by the parties. *See, e.g., United States v. Saavedra*, 661 F. App'x 37, 46 (2d Cir. 2016) (unpublished) (considering defendant's willingness to accept responsibility); *United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 389 (4th Cir. 2015) (considering whether violations were isolated or recurrent); *U.S. ex rel. Miller v. Bill Herbert Intern. Const., Inc.*, 501 F. Supp. 2d 51, 56 (D.D.C. 2007) (including seriousness of misconduct, scienter, amount of damages suffered in totality of circumstances approach).

After carefully considering the trial record, the Court finds that penalties toward the high end of the spectrum are warranted in this case. The evidence presented at trial showed that this conduct resulted in a large number of claims submitted and considerable resulting damage to the United States. *See Drakeford*, 792 F.3d, at 389 ("[W]hile the penalty is certainly severe, it is meant to reflect the sheer breadth of the fraud ... perpetrated upon the federal government."). Rather than making an isolated or occasional mistake, Allied engaged in a prolonged, consistent enterprise of defrauding the United States.

### i. 103 'Unregistered Branches' Violations

The jury found that Allied Capital and Jim Hodge violated the False Claims Act by knowingly representing to HUD that certain FHA-insured loans were originated from HUD-approved Allied Capital branches, and were therefore eligible for FHA insurance, when in fact they were not. Dkt. 435, p. 2. These violations caused the submission of 103 claims, resulting in $7,370,132 in damages to the FHA.

The damages suffered by the United States arose from the loan origination and processing operations of the Allied Capital and Jim Hodge. In 2007, the United States Department of Housing and Urban Development ("HUD") began enforcing a rule that only Federal Housing Administration ("FHA")-registered branches could originate FHA-insured loans. Evidence shows that Allied Capital and Hodge engaged in a campaign of subterfuge and noncompliance with this rule. Specifically, Allied Capital and Hodge developed corporate policies whereby its unregistered North Carolina branches would continue to originate and process loans. These branches did so by using false registration numbers—namely, those assigned to Allied Capital's registered branches. At trial, several managers even testified that their signatures had been forged.

HUD became aware of the Allied's North Carolina branches' disproportionately high loan default rates. A 2011 HUD audit identified eight loans that had originated from unregistered branches. When given the opportunity to explain, Allied Capital—in a letter signed by Hodge—insisted that their corporate policy required strict adherence to HUD regulations and that these eight loans originating from unregistered branches were

aberrations. Notably, Hodge's letter failed to notify HUD of its other loans that originated from unregistered branches.

The fact that Allied Capital and Hodge's actions resulted in over seven million dollars of damages speaks for itself regarding the harm to the public that was caused by the violations. Further, Allied Capital and Hodges' failure to address the unregistered-branch loans that were not discovered by the HUD audit demonstrates both an increased level of scienter as well as a patent unwillingness to accept responsibility for their actions. Accordingly, the Court orders that the assessment of a civil penalty against Allied Capital and Hodge, jointly and severally, in the amount of $10,000 for each of the 103 violations, for a total civil penalty of **$1,030,000**.[5]

*ii. 1,192 'False Underwriting' Violations*

The jury found that Allied Corporation also violated the FCA by knowingly representing to HUD that certain FHA-insured loans had been underwritten with due diligence and were eligible for FHA insurance when they were not. Dkt. 435, pp. 4-6. These violations caused the submission of 1,192 claims resulting in $85,612,643 in damages to the FHA.

Allied Corporation argues for a civil penalty for these violations on the low end of the spectrum because "[m]ost of the FCA finding of liability against Allied Corporation

---

[5] Allied argues that the civil penalty should be decreased for Mr. Hodge because there is relatively little evidence of his wrongdoing in violating the FCA. The Court disagrees. The jury found both Hodge and Allied Capital liable for an equal number of violations and amount of damages and there was significant evidence presented at trial that Hodge was well aware of—and participated in—these violations. Specifically, the evidence taken as a whole reflects that the violations were all part of a scheme overseen by Hodge to defraud the United States.

is based on a 'reckless underwriting' theory," and "recklessness" is at the low end of the *mens rea* spectrum. *See* Dkt. 492, p. 9. The Court disagrees.

Assuming *arguendo* that the recklessness mental state favors a lenient civil penalty, the degree of scienter is but one factor that the Court may consider in its analysis.[6] Additionally, the Court may consider the systematic and consistent nature of Allied Corporation's culpable actions and the decade-long span of the 1,192 violations. *See, e.g.*, Dkt. 297-2, p. 108 (expert report of Dr. Ensor in which "[t]he population of loans considered for the stratified samples ranged in closing dates from the year 2001 through the year 2011"). Here, the evidence at trial reflected that Allied Corporation's approach to underwriting FHA loans under the direct endorsement lender program was custom-designed to flout the very program that relied upon Allied Corporation's diligence and compliance. There was evidence that Allied Corporation's underwriters were subjected to unrealistic quotas, bullying, and even threats of removal for attempting to comply with regulations. Just as insidiously, there was evidence that Allied Corporation's quality control department was designed to rubber-stamp—rather than

---

[6] Furthermore, the jury could have based its finding under the FCA on more than merely "reckless conduct." The jury was instructed that:

> Under the False Claims Act, the term "knowingly" means that a person, with respect to information, (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth; or (iii) acts in reckless disregard of the truth or falsity of the information. It is not necessary for the United States to prove that Allied acted with the specific intent to defraud anyone. However, mere errors or negligent mismanagement alone are not enough to create liability under the False Claims Act.

Dkt. 434; *see U.S., ex rel. Johnson v. Kaner Med. Grp., P.A.*, 641 F. App'x 391, 394 (5th Cir. 2016).

check—the underwriters' loans. Allied Corporation's actions resulted in a large number of claims and significant harm to both the United States and its citizens.

Next, Allied argues that a low civil penalty is appropriate because there is a possibility that the jury found Allied liable for loans that were underwritten based on "honest mistakes ... and simple negligence." Dkt. 492, p. 15. The Court disagrees. This argument completely ignores the instructions given to the jury—specifically the instructions regarding mere errors or negligence. *See supra* note 6.

Considering the totality of the circumstances surrounding Allied's conduct, the Court imposes a civil penalty upon Allied Corporation in the amount of $10,000 for each of the 1,192 violations, for a total civil penalty of **$11,920,000**.

In summary, the Court finds Allied liable for the following damages and civil penalties under the FCA:

| Defendant(s) | Statute | Damages sustained by FHA | Treble damages awarded | Claims submitted | Civil penalty per claim awarded | Total civil penalty awarded | Total |
|---|---|---|---|---|---|---|---|
| Allied Capital, Jim Hodge | 3729(a)(1)(B) | $7,370,132 | $22,110,396 | 103 | $10,000 | $1,030,000 | **$23,140,396** |
| Allied Corporation | 3729(a)(1)(A) and (B) | $85,612,643 | $256,837,929 | 1,192 | $10,000 | $11,920,000 | **$268,757,929** |

## II. FIRREA Civil Penalty

Allied violated FIRREA by submitting or causing the submission of nine separate false annual certifications to HUD concerning Allied's compliance with HUD's quality

control requirements.[7] Dkt. 435, pp. 8-9. The United States requests that the Court impose a total civil penalty of $9,900,000 against Allied collectively for these violations.[8] Dkt. 468, p. 21. Allied violated FIRREA by submitting or causing the submission of false quality control documents to HUD. Dkt. 435, pp. 8-11. The United States requests that the Court impose a civil penalty of $1,100,000 each against Jim Hodge, Allied Capital, and Allied Corporation. Dkt. 468, p. 25.

FIRREA requires the Court to assess a civil penalty for Allied's violations. While the assessment of a penalty is mandatory, the amount of the penalty is discretionary with the Court. 12 U.S.C. § 1833a(a). The general maximum penalty is $1,100,000 per violation.[9] FIRREA also provides a special penalty for continuing violations, which is capped at $5,500,000.

As a preliminary matter, Allied argues an award of a FIRREA civil penalty in addition to an FCA civil penalty would violate the Eighth Amendment of the United States Constitution. Specifically, Allied argues—without providing any case law

---

[7] Allied makes a sub-argument that the United States failed to produce evidence of Allied Corporation's false annual certifications for fiscal years 2006 and 2007. Allied's argument is not supported by the record. See, e.g., Dkt. 467-4, pp. 239-259 (email from Lorie Hiatt of Allied Corporation with attached incomplete FY07 reverifications); Dkt. 467-6, pp. 264-272 (email from Lorie Hiatt of Allied Corporation with attached incomplete FY06 reverifications); Dkt. 467-32, p. 486 (FY07 Allied Corporation Title II Annual Verification Report); Dkt. 467-33, p. 488 (FY06 Allied Corporation Title II Annual Verification Report).

[8] These penalties include: 1) $4,400,000 for Allied Capital and Jim Hodge, jointly and severally; and 2) $5,500,000 for Allied Corporation and Jim Hodge, jointly and severally.

[9] See 28 C.F.R. § 85.3(a)(6).

support—that it is being subjected to multiple punishments under different statutes for the same conduct. The Court disagrees.

The evidence establishes that Allied independently and without overlap violated both the FCA and FIRREA. The FCA violations at issue are directed toward the combined 1,295 insurance claims that Allied caused to be submitted. Allied caused these claims by either falsely stating that the loans originated from HUD-registered branches or by underwriting ineligible loans. The FIRREA penalties, in contrast, are directed toward the submission of false annual certifications over the course of nine years. These annual certifications, if submitted in good faith, were to serve as a separate and independent quality check on the branches, whose actions led to the FCA violations. Unlike the FCA violations, which often physically originated at the employee level, the annual certifications resulting in FIRREA violations were signed directly by either a president or vice president. Accordingly, the Court finds that an award of civil penalties under the FCA and FIRREA in this case would not be unconstitutional.[10]

## A. Annual False Certification Violations

FIRREA provides no factors for courts to consider when determining an appropriate civil penalty and there is a dearth of case law regarding the assessment of FIRREA civil penalties. The parties have presented only two federal district court cases that have considered this subject. *See United States v. Luce*, No. 11 C 05158, 2016 WL

---

[10] As a further sub-argument, Allied also argues that no FIRREA civil penalty can be based on the FY09 annual certification because this exhibit was never sent to the jury during deliberations. The Court finds this argument unpersuasive. Although the FY09 annual certification was not submitted to the jury, there was testimonial evidence presented to the jury regarding its contents.

6892857 (N.D. Ill. Nov. 23, 2016); *United States v. Menendez*, No. CV 11-06313 MMM (JCGx), 2013 WL 828926 (C.D. Cal. Mar. 6, 2013).

Courts ruling on statutes that mandate discretionary penalties but that do not provide factors for consideration have traditionally turned to the factors used to analyze other statutes requiring discretionary civil penalties. Both *Luce* and *Menendez* adopted this approach. This Court does so as well, considering the following factors when determining an appropriate civil penalty:

> (1) the good or bad faith of the defendant and the degree of his scienter; (2) the injury to the public, and whether the defendant's conduct created substantial loss or the risk of substantial loss to other persons; (3) the egregiousness of the violation; (4) the isolated or repeated nature of the violation; and (5) the defendant's financial condition and ability to pay.

*Menendez*, 2013 WL 828926, at *5 (citing *Fed. Election Comm'n v. Furgatch*, 869 F.2d 1256, 1258 (9th Cir. 1989)). Accordingly, the Court will consider these factors in the context of the "totality of the circumstances" surrounding the Allied's conduct. *See Saavedra*, 661 Fed. App'x 37, at 46.

At trial there was clear evidence of Allied's bad faith and knowledge regarding the filing of false annual certifications. They were aware of their non-compliance with HUD requirements prior to signing the annual certifications. Jeanne Hammond-Stell, who had worked for Allied since 1998, rose to the position of Executive Vice President and Director of Compliance. She personally signed and submitted four of the nine annual certifications. Her testimony demonstrates the degree of scienter involved in submitting the false annual HUD certifications:

> **Q** Who told you to sign those certifications?

> A Well, it was part of my job duties to ensure that these were submitted to HUD.
> Q And who informed you that this was part of your job duties?
> A Jim Hodge
> Q Did Mr. Hodge tell you why it was your responsibility to sign these certifications to HUD?
> A Well, he wanted to make sure that they were submitted to HUD so that the company could remain open.
> Q Was Allied in compliance with HUD's quality control rules when you signed each of these certifications?
> A No.
> Q Were these certifications true and correct when you signed them?
> A No.
> Q Did—to your knowledge, did Mr. Hodge know that these certifications were not true when you signed these and submitted them to HUD?
> A He knew that the company did not follow the—the required rules.
> Q For quality control?
> A Yes.
> Q So why did you sign these?
> ....
> A I should have had the backbone not to do it, but I—I didn't. I knew that if I refused, I would lose my job, and I needed my job.

Dkt. 457, pp. 240-43. Further, there is ancillary evidence of chronic noncompliance. Such obvious noncompliance—in the form of false reports and uncompleted audits and reverifications—further renders the annual certifications as false. The evidence leaves little doubt that such noncompliance was at the behest of Allied's upper management. *See* Dkt. 453, p. 209 ("It is noted that no reverifications or appraisals have been ordered since March, 2008 up [through] the present per instructions from management."). In short, the scienter and egregiousness factors weigh heavily against Allied.

The risk of significant loss and injury to the public from the filing of false annual certifications was clearly apparent to Allied. HUD required annual certifications to provide an extra level of quality control after the underwriting phase. As with the FCA

civil penalty analysis, Allied's false annual certifications were instrumental in injuring the public to a degree that cannot be overstated. This injury arrived in the form of multiple defaults and foreclosures for Allied's borrowers as well as elevated mortgage insurance premiums for the general public due to such foreclosures. The Court notes that these injuries span nearly a decade. Finally, the Court finds that Allied's purported financial situations weighs slightly in favor of a less than maximum allowable FIRREA civil penalty.

The circumstances in *Luce* and *Menendez* are distinguishable from the facts of this case. Unlike in *Luce*, the United States has not urged—nor has the Court determined—that Allied is unable to pay a civil penalty. *See Luce*, 2016 WL 6892857, at *5. Unlike in *Menendez*, Allied's violations were neither isolated nor relatively benign. 2013 WL 828926, at *2. Here, unlike in *Menendez*, there is no easy determination of the amount that Allied profited from their violations. Further, their actions were reckless, egregious, and widely injurious. *Id.* Accordingly the Court declines to impose in this case penalties similar to the amounts imposed by the courts in *Luce* and *Menendez*.

Having considered the above factors, the Court assesses Jim Hodge, Allied Capital, and Allied Corporation with separate FIRREA civil penalties of **$1,100,000** each with respect to the false annual certification violations.

**B. False Quality Control Violations**

These violations occurred in connection with an email sent from compliance specialist and assistant vice president Cynthia Ann Coolger to HUD employee Odell Freeman in 2009. Attached to the email was the January 2009 Management Summary.

The Summary explained that Allied's quality control staff was utilizing "software for individual file audits, the tracking of review credit reports, review appraisals, and re-verifications" called TENA. Dkt. 516-3, p. 3. The Summary contained eighteen false TENA reports.

Utilizing the *Menendez* factors above, the Court finds that, once again, Allied's actions reflect a high level of scienter and egregiousness. The eighteen false reports further show that Allied's actions were not isolated. Allied's false quality control documents also caused injury upon their clients and the general public, as discussed above. Having considered the above factors, the Court assesses Jim Hodge, Allied Capital, and Allied Corporation with separate FIRREA civil penalties of **$1,100,000** each with respect to the false quality control documents.

## CONCLUSION

It is hereby **ORDERED** that the United States' Motion is **GRANTED**. The Court directs entry of Judgment in favor of the United States: (i) awarding FCA treble damages of $22,110,396 and penalties of $1,030,000, for a combined amount of $23,140,396, against Allied Capital and Hodge, jointly and severally; (ii) awarding FCA treble damages of $256,837,929 and penalties of $11,920,000, for a combined amount of $268,757,929, against Allied Corporation; and (iii) imposing FIRREA penalties of $2,200,000 each against Allied Capital, Allied Corporation, and Jim Hodge.

SIGNED at Galveston, Texas, this 14th day of September, 2017.

*George C. Hanks*
George C. Hanks, Jr.
United States District Judge